## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COOPER-STANDARD HOLDINGS INC., *et al.*,[1] | ) | Case No. 09-_____ (____) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

**MOTION PURSUANT TO SECTIONS 361, 362, 363, 364, 507 AND 105 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) INCUR POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) PROVIDE CERTAIN PROTECTIONS TO THE PREPETITION SECURED LENDERS AND (II) SCHEDULING A FINAL HEARING**

Cooper-Standard Holdings Inc. ("Holdings") and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this motion (the "Motion"), for entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A and final order (the "Final Order"), pursuant to sections 361, 362, 363, 364, 507 and 105 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing the Debtors to (a) incur postpetition financing, (b) use cash collateral, and (c) provide adequate protection to the prepetition secured lenders and (ii) scheduling a final hearing date. In support of this Motion, the Debtors rely on the Declaration of Allen J.

---

[1]     The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Cooper-Standard Holdings Inc. (5088); Cooper-Standard Automotive Inc. (9970); Cooper-Standard Automotive FHS Inc. (2953); Cooper-Standard Automotive Fluid Systems Mexico Holding LLC (0442); Cooper-Standard Automotive OH, LLC (2845); StanTech, Inc. (4014); Westborn Service Center, Inc. (7448); North American Rubber, Incorporated (9926); Sterling Investments Company (1393); Cooper-Standard Automotive NC L.L.C. (2839); CS Automotive LLC (4267) ("U.S. Finco"); CSA Services Inc. (9510); NISCO Holding Company (1697).

Campbell in Support of Chapter 11 Petitions and First Day Pleadings (the "Campbell Declaration") and the Declaration of Eric Mendelsohn in Support of this Motion (the "Mendelsohn Declaration"). In further support of this Motion, the Debtors represent as follows:

## JURISDICTION

2.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) in that this is a matter concerning the administration of the Debtors' estates. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 361, 363(b), 364, 507 and 105 of the Bankruptcy Code.

## RELIEF REQUESTED

3.     By this Motion, the Debtors seek entry of the Interim Order and Final Order, which:

> (a)     authorize Cooper-Standard Automotive Inc. (the "U.S. Borrower") to incur obligations under the superpriority senior secured postpetition credit facility (the "DIP Facility") up to an aggregate principal amount of $200,000,000 (consisting of a $175,000,000 superpriority delayed draw term loan facility (the "Initial DIP Facility" and the commitments thereunder being the "Initial DIP Commitment") and a $25,000,000 standby uncommitted single draw term loan facility (the "Incremental DIP Facility" and the commitments thereunder being the "Incremental DIP Commitment," if applicable), in each case, pursuant to the terms and conditions of the superpriority senior secured postpetition debtor-in-possession credit agreement, dated as of August 3, 2009 (the "DIP Credit Agreement");

> (b)     authorize (i) Holdings, each wholly-owned domestic subsidiary of Holdings other than U.S. Finco (collectively, the "U.S. Guarantors" and, together with the U.S. Borrower, the "U.S. Credit Parties") to guaranty the obligations of the U.S. Borrower under the DIP Facility and (ii) the U.S. Guarantors and U.S. Finco to guaranty the obligations of (a) Cooper-Standard Automotive Canada Limited, an indirect

subsidiary of Holdings organized under the laws of Ontario, Canada (the "Canadian Borrower") as borrower under the DIP Facility and (b) the additional foreign subsidiary of the U.S. Borrower that becomes an additional borrower under the DIP Facility, if any (the "Additional Foreign Borrower" and, together with the U.S. Borrower and the Canadian Borrower, the "Borrowers");

(c)     authorize the Debtors to execute the DIP Credit Agreement and related ancillary documents (the "DIP Loan Documents") and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(d)     authorize the Debtors to continue using their cash collateral (the "Cash Collateral") in which the Prepetition Secured Lenders (as defined below) have an interest;

(e)     authorize the Debtors to provide adequate protection to the Prepetition Secured Lenders for the priority of their prepetition liens and any diminution in the value (such diminution being a "Diminution of Value") of their Cash Collateral arising from the Debtors' use thereof;

(f)     grant to the administrative agent for the DIP Facility (the "DIP Agent"), on behalf of the several lenders from time to time thereunder (the "DIP Lenders") and certain other secured creditors[2] (together with the DIP Lenders, the "Secured Parties") for all obligations under the DIP Loan Documents, (i) a joint and several superpriority administrative expense claim status pursuant to section 364(c)(1), (ii) a first priority lien on all unencumbered assets of the Debtors pursuant to section 364(c)(2), (iii) a junior lien on all encumbered assets of the Debtors pursuant to section 364(c)(3), and (iv) a first priority priming lien on all assets of the Debtors pursuant to section 364(d) (with clauses (i), (ii), (iii), and (iv) above subject to the Carve-Out) and limited in the case of property and assets of a Credit Party that is not a U.S. Credit Party to liens securing the obligations of the Borrowers other than the U.S. Borrower, except as otherwise agreed pursuant to the DIP Loan Documents; and with the liens granted pursuant to clauses (ii), (iii) and (iv) excluding certain capital stock of Permitted Joint Ventures)[3];

---

[2]     The DIP Agent is also a representative for secured creditors that are parties to the Debtors' Postpetition Swap Agreements and Cash Management Arrangements (each defined below).

[3]     With respect to liens on the voting capital stock of the foreign subsidiaries of the U.S. Credit Parties (other that those subsidiaries organized in Mexico, Brazil, or the Netherlands), such liens securing the obligations of the U.S. Borrower shall be limited to pledges that would not result in deemed dividends to the U.S. Borrower or such other Debtors pursuant to section 956 of the Internal Revenue Code, except as otherwise agreed pursuant to the DIP Loan Documents. For the avoidance of doubt, 100% of the voting capital stock of the wholly-owned subsidiaries organized in Mexico, Brazil, and the Netherlands will secure the obligations of the U.S. Borrower.

3

(g)    authorize the Debtors to borrow, pending a final hearing, the aggregate principal amount not to exceed $35,000,000, pursuant to the terms and conditions set forth in the DIP Credit Agreement;[4]

(h)    authorize the U.S. Borrower to use the proceeds of the DIP Facility as provided in the DIP Loan Documents (i) to pay costs, fees and expenses related to the execution and delivery of the DIP Credit Agreement and the consummation of the transactions contemplated under the DIP Loan Documents as well as all scheduled payments of interest and principal thereunder, (ii) to provide working capital and funding for other general corporate purposes related to the U.S. Borrower and its subsidiaries, including the Debtors and its foreign subsidiaries and (iii) to pay administration costs of these Cases and the claims or amounts approved by this Court. In addition, the Canadian Borrower will use the proceeds of the DIP Facility (i) to provide working capital and funding for other general corporate purposes related to the Canadian Borrower, its Canadian and foreign subsidiaries and the U.S. Borrower and (ii) to pay the costs, expenses and disbursements related to the relief it has sought under the Companies' Creditors Arrangement Act (the "CCAA") in the Ontario Superior Court of Justice (the "Canadian Court") in Toronto, Ontario, Canada (the "Canadian Case"), as well as the claims, amounts and other charges approved by the Canadian Court. Furthermore, if applicable, the Additional Foreign Borrower will use the proceeds under the DIP Facility to provide working capital and funding for other general corporate purposes related to certain of Holdings' foreign subsidiaries, as specified in an Additional Foreign Borrower Designation Agreement.

(i)    vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order and Final Order;

(j)    waive any applicable stay (including under Bankruptcy Rule 6004) and provide for immediate effectiveness of the Interim Order and the Final Order; and

(k)    schedule a final hearing (the "Final Hearing") to allow for entry of the Final Order within thirty (30) days of the entry of the Interim Order (the date on which the Final Order is entered being the "Final Order Entry Date").

---

[4]    Subject to approval of the Canadian Court, an additional amount of no more than $15,000,000 may be borrowed by the Canadian Borrower during the interim period.

RLF1-3420855-1

4.     In accordance with Bankruptcy Rule 4001(b) and (c), set forth below is a brief

summary of the material provisions of the DIP Credit Agreement and the Interim Order[6]:

(a)     <u>Borrowers</u> (Preamble, Sections 1 & 2.1): The U.S. Borrower, the Canadian Borrower and, subject to the execution of the "Additional Foreign Borrower Designation Agreement" between the U.S. Borrower, the Additional Foreign Borrower and the DIP Agent (at the direction of the Required Lenders), the Additional Foreign Borrower.

(b)     <u>Guarantors</u> (Sections 1, 6.13, 14, & 15): All obligations of the Borrowers under the DIP Facility and under the DIP Loan Documents will be unconditionally guaranteed jointly and severally on a first priority secured basis by (i) the U.S. Guarantors, (ii) wholly-owned Subsidiaries of Holdings incorporated or organized under the laws of Mexico (the "<u>Mexican Credit Parties</u>"),[7] (iii) wholly-owned Subsidiaries of Holdings incorporated or organized under the laws of Brazil (the "<u>Brazilian Credit Parties</u>"), and (iv) wholly-owned Subsidiaries of Holdings incorporated or organized under the laws of the Netherlands (the "<u>Dutch Credit Parties</u>"). In addition, the obligations of the Canadian Borrower are guaranteed by U.S. Finco (the "<u>Canadian Guarantor</u>" and together with the Canadian Borrower, the "<u>Canadian Credit Parties</u>"). Furthermore, if and when applicable, the obligations of the Additional Foreign Borrower will be guaranteed by the U.S. Guarantors, U.S. Finco, the Canadian Borrower (subject to approval of the Canadian Court), and foreign Subsidiaries of Holdings designated in the Additional Borrower Designation Agreement (the "<u>Additional Foreign Guarantor</u>" and, together with the Additional Foreign Borrower, the U.S. Credit Parties, the Canadian Credit Parties, the Mexican Credit Parties, the Brazilian Credit Parties and the Dutch Credit Parties, the "<u>Credit Parties</u>").

In addition, pursuant to the DIP Credit Agreement, Holdings will guarantee the obligations of the U.S. Borrower and its Subsidiaries under Postpetition Swap Agreements and the Postpetition Cash Management Arrangements.[8] The Mexican Credit Parties, the

---

[5]     Capitalized terms used in this Concise Statement but not otherwise defined shall have the meanings ascribed to them in the DIP Credit Agreement.

[6]     To assist the Court, attached hereto as <u>Exhibit B</u> is an organizational chart highlighting the borrowers and guarantors under the DIP Facility.

[7]     Cooper-Standard Automotive Sealing de Mexico S.A. de C.V. is not a Mexican Credit Party.

[8]     The term "Cash Management Arrangements" is defined as "any agreement or arrangement providing for treasury, depository and/or cash management services or any automated clearing house transfer services

RLF1-3420855-1

Brazilian Credit Parties and the Dutch Credit Parties will also guarantee the obligations of the U.S. Borrower and its Subsidiaries under Postpetition Swap Agreements and the Postpetition Cash Management Arrangements. The U.S. Borrower will guarantee the obligations of the U.S. Borrower's Subsidiaries under the Postpetition Cash Management Arrangements.

(c)     Additional Parties under DIP Loan Documents (Section 1.0): (i) DIP Agent and Documentation Agent - Deutsche Bank Trust Company Americas ("DB Americas"); (ii) Co-Syndication Agents – Banc of America Securities LLC, ("BofA Securities"), UBS Securities LLC ("UBS Securities") and General Electric Capital Corporation; (iii) Joint Lead Arrangers and Book Runners – Deutsche Bank Securities Inc. and General Electric Capital Corporation; (iv) Co-Arrangers – BofA Securities and UBS Securities.

(d)     Amount and Type of Facility (Section 2.01): The DIP Facility will consist of the Initial DIP Facility in an aggregate principal amount of $175,000,000 and an Incremental DIP Facility in an aggregate principal amount of $25,000,000. The Initial DIP Facility will consist of a Tranche A Term Loan drawn by the U.S. Borrower, a Tranche B Term Loan drawn by the Canadian Borrower, and, if applicable, a Tranche C Term Loan drawn by the Additional Foreign Borrower (collectively, with the loans under the Incremental DIP Facility, the "Loans"). In the event an Additional Foreign Borrower is designated, the amount of the Tranche C Term Loan will be specified in the Additional Foreign Borrower Designation Agreement and will reduce, on an aggregate basis, dollar-for-dollar the commitments under the Tranche A Term Loan or the Tranche B Term Loan (as indicated in the Additional Foreign Borrower Agreement).

In addition, each Borrower, in consultation and coordination with the DIP Agent, and with the consent of the Required Lenders, has the right to request at one time after the Initial Borrowing Date (as defined below), that the DIP Lenders (in their sole discretion) make Loans under the Incremental DIP Facility to such Borrower, which will constitute (if made) a new Tranche Term Loan unless certain requirements set forth in Section 2.15 of the DIP Credit Agreement related to maturity and pricing are met, in which case the Incremental Term Loans will constitute an increase of an existing Tranche.

(e)     Interim Availability (Section 2.01(a), (b)): On the date that is on or after the Interim Order Entry Date (the "Initial Borrowing Date") and until the Final Order Entry Date, availability to the U.S. Borrower

---

(including customary overdrafts lines), to the extent the payment obligations of the U.S. Borrower and its Subsidiaries under all such agreements or arrangements do not exceed $5,500,000 in the aggregate."

under the Tranche A Term Loan and to the Canadian Borrower under the Tranche B Term Loan will be $35,000,000 and $15,000,000, respectively, or such other amount as may be approved by order of the Bankruptcy Court and the Canadian Court, respectively.

(f)     <u>Full Availability</u> (Section 2.01(a), (b)):  The remaining undrawn borrowings under Tranche Term Loans A, B and C (if applicable) will be drawn on the Final Order Entry Date.  The borrowings under the Incremental DIP Facility will be available after the Initial Borrowing Date.

(g)     <u>Use of Proceeds</u> (Section 9.11(a), Interim Order ¶ H): As stated above, the proceeds of the DIP Facility will be used for working capital requirements and general corporate purposes of each of the Borrowers and their respective subsidiaries.  Proceeds may also be used to pay fees and expenses incurred in connection with, among other things, the execution of the DIP Loan Documents, the commencement and administration of the Cases and the Canadian Case and the claims or amounts approved by the Bankruptcy Court or the Canadian Court, as the case may be, including the fees, costs, expenses and disbursements of professionals retained by the Debtors or any statutory committees and other related charges all as allowed by the Bankruptcy Court and Canadian Court.

(h)     <u>Priority and Security</u> (Section 6 and Interim Order ¶ 6):  All obligations of the Debtors to the Secured Parties and the DIP Agent under the DIP Loan Documents, including all loans made under the DIP Facility, shall, subject to the Carve-Out (as discussed below), at all times (i) pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases, which claims in respect of the DIP Facility shall be superior to all other claims (until entry of the Final Order, excluding the proceeds of the claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>")); (ii) pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all unencumbered assets of the Credit Parties (now or hereafter acquired and all proceeds thereof); (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, have a junior lien on all encumbered assets of the Credit Parties (now or hereafter acquired and all proceeds thereof); and (iv) pursuant to section 364(d) of the Bankruptcy Code, have a first priority priming lien on all assets of the Credit Parties (now or hereafter acquired and all proceeds thereof) that were subject to a lien as of the Petition Date.[9]

---

[9]     With respect to liens on the voting capital stock of the Foreign Subsidiaries of the U.S. Credit Parties (other that those Subsidiaries organized in Mexico, Brazil, or the Netherlands), such liens securing the obligations of the U.S. Borrower shall be limited to pledges that would not result in deemed dividends to the U.S.

(i)    <u>Cash Collateral</u> (Interim Order ¶ 7): The Prepetition Secured Lenders have an interest in the Cash Collateral pursuant to the Prepetition Credit Agreement. The Debtors are authorized to use Cash Collateral until the earlier to occur of (the "<u>Cash Collateral Termination Date</u>"): (a) thirty (30) days after the Interim Order Entry Date, unless the Final Order shall have been entered by the Court on or before such date in accordance with the DIP Loan Agreement, (b) such earlier date on which the Loans shall become due and payable in accordance with the terms of the Interim Order and/or the DIP Loan Documents, and (c) the date on which all commitments have been terminated under the Interim Order and/or the DIP Loan Documents as a result of the occurrence of an Event of Default (as defined below).

(j)    <u>Protection for Prepetition Secured Lenders</u> (Interim Order ¶ 10): The Prepetition Secured Parties will receive (i) solely to the extent of any Diminution of Value, a security interest in and liens on all Collateral of the Debtors, subject and subordinate only to (x) after the Carve-Out Effective Date, the Carve-Out, (y) the Permitted Liens and (z) the liens securing the DIP Facility; (ii) solely to the extent of any Diminution of Value, a superpriority administrative expense claim junior only to the claims under section 364(c)(2) of the Bankruptcy Code held by the DIP Agent and subject to the Carve-Out; (iii) a consent fee (the "<u>Consent Fee</u>"), in an amount equal to .25% of the outstanding principal amount of all loans and the undrawn revolving loan commitments under the Prepetition Credit Facilities, for those Prepetition Secured Lenders that are DIP Lenders, and 1.25% for those Prepetition Secured Lenders that are not DIP Lenders, in each case granted to those Prepetition Secured Lenders who executed the fifth amendment to the Prepetition Credit Agreement, dated as of July 14, 2009 (the "<u>Fifth Amendment</u>"), in which the Prepetition Secured Lenders consented to the priming of their liens granted under the Prepetition Credit Agreement; (iv) the payment of all professional fees and expenses payable to any agent under the Prepetition Secured Facilities, subject to review by the U.S. Trustee; (v) reasonable access for the purposes of monitoring the business of the Credit Parties and the value of the collateral under the Prepetition Secured Facilities; and (vi) financial reporting substantially in compliance with the Prepetition Secured Facilities.

(k)    <u>Maturity Date</u> (Section 1.0): The maturity date of the DIP Facility will be the earliest of: (i) the date that is nine (9) months after the Interim

---

Borrower or such other Debtors pursuant to section 956 of the Internal Revenue Code, except as otherwise agreed pursuant to the DIP Loan Documents. For the avoidance of doubt, 100% of the voting capital stock of the wholly-owned subsidiaries organized in Mexico, Brazil, and the Netherlands will secure the obligations of the U.S. Borrower.

8

Order Entry Date, (ii) the first date on which a plan of reorganization or plan of liquidation under chapter 11 of the Bankruptcy Code is confirmed by the Court and a CCAA plan is approved by the requisite creditors of the Canadian Borrower and the Canadian Court, (iii) the date that is thirty (30) days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date and (iv) the acceleration of DIP Loans occurring under Section 11 (as described below) of the DIP Credit Agreement (the date of any such occurrence, the "Maturity Date"); provided that, if no Default (as defined in the DIP Credit Agreement) or Event of Default (as defined below) shall have occurred and be continuing as of the then-current Maturity Date or would result therefrom, the Maturity Date may be extended at the option of the Borrowers and with the prior consent of the Required Lenders, by up to two consecutive three-month periods; provided further that, the Borrowers shall pay a fee to the DIP Agent for the account of the DIP Lenders equal to 1.0% of the sum of the then outstanding DIP Loans plus the unused commitments under the DIP Facility in effect immediately prior to giving effect to any and each such extension.

(l)     Interest Rates and Interest Period (Sections 1, 2.08 & 2.15): Interest under the DIP Facility will accrue in accordance with the following: (i) for Base Rate Loans, interest will accrue at 9.0% per annum plus the Base Rate (which Base Rate will have a 4.0% per annum floor); (ii) for Eurodollar Loans, interest will accrue at 10.0% per annum plus the Eurodollar Rate (which Eurodollar Rate will have a 3.0% per annum floor); (iii) for the Incremental Term Loans, interest will be as specified in the Incremental Term Loan Commitment Agreement, and if such interest rate, as determined by the DIP Agent pursuant to Section 2.15 of the DIP Credit Agreement, exceeds the interest rate then applicable to the Tranche A Loan and Tranche B Loan, the applicable margin for the Tranche A Loan and Tranche B Loan shall be increased by such excess amount; and (iv) Default Interest will accrue at 2.0% per annum.

(m)     Carve-out (Interim Order ¶ 4): The Debtors' obligations to the Secured Creditors and the liens and superpriority claims granted as provided above shall be subject in each case only to a carve-out (the "Carve-Out") which shall be comprised of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a) and (ii) subject to the terms of the Interim Order, all allowed fees and expenses accrued on or before the first business day (the "Carve-Out Effective Date") following the delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below) by the professionals retained under sections 327, 328, 363, and/or 1102 of the Bankruptcy Code by

9

the Debtors and any Committee, whether approved by the Bankruptcy Court before or after the Carve-Out Effective Date; and (iii) on and after the Carve-Out Effective Date following the delivery a Carve-Out Trigger Notice an amount not exceeding $4,000,000 in the aggregate, which amount may be used (subject to the terms of the Interim Order) to pay any allowed fees or expenses incurred by the professionals retained under sections 327, 328, 363, and/or 1102 of the Bankruptcy Code by the Debtors and any statutory committees appointed in the Cases pursuant to section 1102 of the Bankruptcy Code (the "Committees"), on or after the Carve-Out Effective Date, provided that (x) the above dollar limitation on fees and expenses will neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid on or prior to the Carve-Out Effective Date in respect of which the Carve-Out is invoked or by any fees, expenses, indemnities or other amounts paid to any agent or lender (or any of their respective attorneys or agents under the Prepetition Facility, the DIP Facility or otherwise), and (y) nothing in the Interim Order will be construed to impair the ability of any entity to object to the fees, expenses, reimbursement or compensation described above.

(n)     Budget (Section 19.7(c)):  Commencing on the Effective Date, and every fourth week thereafter, a 13-week rolling cash flow forecast detailing cash receipts and cash disbursements on a weekly basis broken down for (i) the U.S. Credit Parties and (ii) the Canadian Credit Parties for the next 13 weeks; and commencing with the first 13-Week Budget due after September 1, 2009 (excluding U.S. Finco), broken down by (x) the U.S. Credit Parties, (y) the Canadian Credit Parties (excluding U.S. Finco), and (z) all other Subsidiaries, and by week and aggregated by country, including anticipated uses of the DIP Facility (a "13-Week Budget"), in each case in substance satisfactory to the Required Lenders in their sole discretion.[10]

(o)     Conditions Precedent to all Loans (Section 6):  The conditions precedent to borrowing under the DIP Facility are customary and include, among other things, the following: (i) the delivery of proper borrowing notices, officer's certificates, counsel opinions and company documents to the DIP Agent; (ii) no Material Adverse Effect shall have occurred; (iii) no litigation is occurring or has commenced other than listed litigation; (iv) all necessary governmental and third party approvals have been provided to the DIP Agent; (v) all necessary guarantees and security agreements shall have been executed and delivered on the Initial Borrowing Date; (vi) all required documents including insurance certificates, shareholders agreements, and management agreements shall have been delivered to the DIP Agent

---

[10]     The initial 13-Week Budget is attached hereto as Exhibit C.

on or prior to the Initial Borrowing Date; (vii) all fees, costs, and expenses and all other compensation due to the Agents and the DIP Lenders shall have been paid to the extent due; (viii) the Court shall have entered the Interim Order no later than five (5) business days after the commencement of the Cases approving and authorizing the DIP Facility and the Canadian Court shall have entered the Initial Order; and (ix) the Bankruptcy Court shall have entered the Final Order no later than thirty (30) days following the Interim Order Entry Date.

(p)     Covenants (Sections 9, 10): The DIP Credit Agreement contains affirmative, negative and financial reporting covenants customary for facilities of this nature, including, without limitation: (i) obligations to furnish the DIP Agent periodic balance sheets and statements of income; (ii) obligations to provide notice of material events; (iii) obligations relating to preserving and renewing licenses, paying liabilities related to taxes, maintaining the condition of properties and maintaining insurance; (iv) obligations to use commercially reasonable efforts to have the Loans rated by Moody's Inc. and Standard & Poor's; (v) limitations on the ability to incur and make payments on indebtedness; (vi) limitations on the ability to make intercompany loans and conduct transactions with affiliates; (vii) limitations on the ability to incur liens; (viii) limitations on the ability to make investments or sell assets; (ix) limitations on the ability to enter into sale leaseback transactions or Postpetition Swap Agreements; (x) minimum capital expenditure requirements; (xi) minimum consolidated EBITDA requirements; and (xii) minimum liquidity requirements.

(q)     Milestones (Section 11.01(t)): The DIP Credit Agreement contains certain chapter 11 milestones that include the following: (i) a motion seeking approval of a disclosure statement (the "Disclosure Statement") for a chapter 11 plan of reorganization proposing to pay all obligations under the DIP Facility in full in cash on the effective date of the plan (the "Plan") must be filed before the 70th day before the Maturity Date; (ii) a motion seeking approval for the circulation to the requisite creditors of the Canadian Borrower of a plan of compromise or arrangement that proposes to pay all obligations under the DIP Facility in full in cash on the effective date of the plan (the "CCAA Plan") must be filed before the 60th day before the Maturity Date; (iii) an order approving the Disclosure Statement must be entered before the 45th day before the maturity date; (iv) the Plan must be confirmed before the 10th day before the Maturity Date and the CCAA Plan must be approved by the requisite creditors of the Canadian Borrower before the 15th day before the Maturity Date and by the Canadian Court before the 5th day before the Maturity Date;

11

and (v) the Plan and the CCAA Plan must be consummated and become effective and fully implemented before the Maturity Date.

(r) Events of Default (Section 11): The DIP Credit Agreement contains certain events of default. By way of example, and as more fully set forth in Section 11 of the DIP Credit Agreement, the following constitute "Events of Default": (i) the failure of any Borrower to pay any principal, interest or fees of any Loan or Note whether on the due date or the date fixed for prepayment (subject to a grace period, in certain respects); (ii) representations and warranties made or deemed to by made on behalf of Holdings or any Borrower shall have been incorrect in any material respect; (iii) the Credit Parties shall have failed to observe or perform certain covenants, conditions or agreements in the DIP Loan Documents, subject to a 30 day cure period in certain respects; (iv) failure to make payments when due in respect of Material Indebtedness; (v) the occurrence of an involuntary or voluntary foreign or domestic insolvency proceeding with respect to the Credit Parties or any of their Subsidiaries (other than an Immaterial Subsidiary), subject to a sixty (60) day cure period in the case of an involuntary proceeding; (vi) any Credit Party or any of its Subsidiaries (other than a Debtor) is unable to pay its debts generally as they come due; (vii) one or more judgments exceeding $10,000,000 rendered against Holdings, a Borrower or any of its Subsidiaries, which shall be remained undischarged for a period of thirty (30) consecutive days; (viii) an ERISA Event occurs or a Credit Party or governmental authority shall have taken steps to terminate certain Canadian or foreign pension plans, resulting in liability of Holdings and its Subsidiaries exceeding $10,000,000; (ix) subject to certain exceptions, any Lien created by the DIP Loan Documents shall cease to be, or asserted by any Credit Party not to be, a valid and perfected Lien on any material portion of the Collateral; (x) any Guaranty shall cease to be in full force and effect; (xi) a Change of Control; (xii) the Final Order Entry Date shall not have occurred by the date that is thirty (30) days after the Interim Order Entry Date; (xiii) any proceeding before a court, tribunal or governmental authority or agency in any jurisdiction seeking to adversely affect the interests of the DIP Lenders and DIP Agent under certain circumstances; (xiv) the Court or Canadian Court shall enter an order granting relief from the automatic stay permitting foreclosure or any other actions having a Material Adverse Effect on the assets of the Debtors or the Canadian Borrower subject to certain limits and circumstances; (xv) failure to meet the milestones set forth above; and (xvi) the Debtors cease to have the exclusive right to file a plan of reorganization.

(s) Fees (Section 4.01): (i) Administrative Agent Fee - Amount and payment dates agreed to in writing by Borrowers and the DIP Agent; (ii)

12

Upfront Fee – 2.5% multiplied by the Initial DIP Commitment (and the Incremental DIP Commitment, if applicable); (iii) Exit Fee – 2.5% multiplied by Initial DIP Commitment terminated or Loans repaid or prepaid (and the Incremental DIP Commitment, if applicable); (iv) Extension Fee – 1.0% multiplied by the sum of the aggregate outstanding principal amount of the Loans plus the aggregate outstanding principal amount of the Initial DIP Commitment (and the Incremental DIP Commitment, if applicable); (v) other Agent fees- Agreed to in writing by the Borrowers and such Agent.

(t) <u>Waiver of Rights</u> (Interim Order ¶ E, 19): The Debtors waive certain rights and causes of action and grant certain releases, including their rights under section 506(c) of the Bankruptcy Code, pending entry of the Final Order. The Creditors Committee will have sixty (60) days from its formation to investigate these waivers and releases against the Prepetition Agent and the Prepetition Secured Lenders.

(u) <u>Avoidance Actions</u> (Interim Order ¶ 6(b), 10(a)): Upon entry of the Final Order, the DIP Lenders and the Prepetition Secured Lenders shall have liens on claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 552 of the Bankruptcy Code (the "<u>Avoidance Actions</u>").

(v) <u>Waiver or Modification of the Automatic Stay</u> (Interim Order ¶ 15): Subject to five (5) business days prior notice, the automatic stay will be vacated to permit the exercise of remedies by the DIP Agent or the DIP Lenders.

(w) <u>Indemnification</u> (Section 13.01(b)): Holdings and the Borrowers jointly and severally agree, whether or not the transactions contemplated in the DIP Credit Agreement are consummated, to pay all out-of-pocket costs and expenses of each Agent, Collateral Agent and each of the DIP Lenders (including their consultants) in connection with enforcement of the DIP Loan Documents and their rights thereunder, any refinancing or restructuring of the credit arrangements provided under the DIP Credit Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceeding, and the commencement, defense or intervention in any court proceeding or filing of a petition, complaint, answer, motion or other pleading relating in any way to, among other things, the Obligations, any Credit Party, any of the U.S. Borrower's Subsidiaries, and the DIP Loan Documents.

RLF1-3420855-1

## LOCAL RULE 4001-2 DISCLOSURES

5.      Pursuant to Local Rule 4001-2, a debtor in possession seeking authority to use

cash collateral or obtain financing must disclose the presence and location of certain

provisions contained in the documentation evidencing the cash collateral usage or

financing. The debtor in possession must also justify the inclusion of such provisions. Set

forth below are the disclosures required in accordance with Local Rule 4001-2:

(a)     Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing. **The DIP Loan Documents do not provide for the granting of cross-collateralization protection to any Prepetition Secured Lenders.**

(b)     Local Rule 4001-2(a)(i)(B) requires disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters. **Paragraphs E(vii) and 19 of the proposed Interim Order provide that subject to entry of the Final Order, the Prepetition Lenders will receive broad releases from causes of action asserting the invalidity of their prepetition liens. In addition, paragraph 17 provides that the Investigation Fund is limited to $25,000 and gives the Committee up to sixty (60) days to investigate from the date of the formation of the Committee.**

(c)     Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code. **Paragraph ¶ 30 of the Interim Order provides that the Debtors shall waive their rights under section 506(c) of the Bankruptcy Code with respect to the DIP Obligations and the Superpriority Claims and Postpetition Liens.**

(d)     Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. **Paragraph 10(a) of the Interim Order grants the Prepetition Secured Lenders liens, solely**

14

in respect of Diminution in Value of their existing liens, on Avoidance Actions subject to the entry of the Final Order.

(e) Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). **The Prepetition Credit Facilities will not be rolled into the DIP Facility and the proceeds of the DIP Facility will not be used to pay all or part of the Prepetition Credit Facility**.

(f) Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. **The DIP Loan Documents do not provide for disparate treatment for the professionals retained by the Committee from those professionals retained by the Debtors.**

(g) Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienor. **Paragraph 6 of the Interim Order and Section 6 of the DIP Credit Agreement provide that the DIP Lenders will be receiving priming liens on all of the Debtors' assets. The Prepetition Secured Lenders, however, have consented to such priming liens subject to their receipt of the adequate protection listed above. In addition, as explained in more detail below, the Debtors conducted an extensive search for postpetition financing and have determined in good-faith and through arms-length negotiations that the DIP Facility represents the best and most viable means of maintaining the Debtors' operations and preserving and enhancing the Debtors' going concern value.**

## BACKGROUND

6. On August 3, 2009 (the "Filing Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration and consolidation of the Debtors' chapter 11 cases (the "Cases") for procedural purposes only. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their properties as debtors in possession. No trustee or examiner has been appointed in the Cases.

15

7.     As described more fully in the Campbell Declaration, Holdings and its affiliated

Debtors and non-debtor subsidiaries (collectively, the "Company") are a leading global

manufacturer of fluid handling, body sealing, noise vibration, and harshness control ("NVH")

components, systems, subsystems, and modules, which are designed primarily for use in

passenger vehicles and light trucks for global original equipment manufacturers ("OEMs") and

replacement markets. Holdings conducts substantially all of its activities through its

subsidiaries, which design and manufacture the Company's products in each major region of the

world. The Company operates in sixty-eight manufacturing locations and ten design,

engineering, and administrative locations in eighteen countries around the world.

8.     The Company operates in two divisions, North America and International

(covering Europe, South America and Asia). The Company's customers are OEMs, including

Ford Motors Company, General Motors Corp., Chrysler LLC, Audi, BMW, Fiat, Honda,

Mercedes Benz, Porsche, PSA Peugeot Citroën, Renault/Nissan, Toyota, and Volkswagen and

other Tier I and Tier II automotive suppliers. In 2008, the Company's products were found in

twenty-two of the twenty-five top-selling models in North America and in twenty-four of the

twenty-five top-selling models in Europe.

9.     Holdings' indirect subsidiary, Cooper-Standard Automotive Canada Limited

("CSA Canada"), will be seeking relief under the Companies' Creditors Arrangement Act (the

"CCAA") in the Ontario Superior Court of Justice in Toronto, Ontario, Canada. CSA Canada

operates five manufacturing facilities in Canada. None of the Company's foreign subsidiaries

are debtors in these cases and none have commenced insolvency proceedings in other

jurisdictions, except CSA Canada.

## PREPETITION CAPITAL STRUCTURE

10.     As of the Filing Date, the Company had approximately $1.170 billion of outstanding indebtedness on a consolidated basis, of which: approximately $84.3 million consisted of draws on a senior secured revolving credit facility; approximately $522.82 million consisted of five senior secured term loan facilities; approximately $513.4 million consisted of unsecured senior and senior subordinated bond debt; and approximately $49.9 million consisted of debt on account of other credit facilities, capital leases for affiliates, swaps, and other miscellaneous obligations. The following summarizes the Company's primary long-term debt obligations in order of priority.

## I.    Senior Secured Credit Facilities

11.     On December 23, 2004, Holdings, the U.S. Borrower and the Canadian Borrower entered into a senior secured credit agreement (as amended, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement") with various lending institutions (the "Prepetition Secured Lenders"), Deutsche Bank Trust Company Americas, as administrative agent (the "Administrative Agent"), Lehman Commercial Paper Inc., as syndication agent, and Goldman Sachs Credit Partners, L.P., UBS Securities LLC and The Bank of Nova Scotia, as co-documentation agents (with subsequent amendments thereto, and with related agreements, the "Prepetition Credit Facilities"). The proceeds of the Prepetition Credit Agreement were used, among other things, to finance of the acquisition of the automotive segment of Cooper Tire & Rubber Company (the "2004 Acquisition") through CSA Acquisition Corp, which was then merged into the Company, and for general working capital needs. As of the Filing Date, the total outstanding under the Prepetition Credit Facilities, including swap obligations, was approximately $627.0 million.

RLF1-3420855-1

12.     The Prepetition Credit Facilities consist of a revolving credit facility (the "Revolving Credit Facility") and multiple term loan facilities. The Revolving Credit Facility is a multi-currency facility revolver that could be drawn by the U.S. Borrower, the Canadian Borrower and CSA International Holdings BV, a subsidiary of the U.S. Borrower later incorporated under the laws of the Netherlands and added as a borrower.[11] As of the Filing date, approximately $84.3 million was outstanding under the Revolving Credit Facility, with approximately $23.2 million drawn by the Canadian Borrower and the remainder drawn by the U.S. Borrower.

13.     In addition to the Revolving Credit Facility, the Prepetition Credit Facilities contain five term loan facilities. Two of the term loan facilities – Term Loan A and Term Loan B – were funded through the Canadian Borrower in connection with the 2004 Acquisition and were scheduled to mature in 2010 and 2011. As of the Filing Date, approximately $19.9 million[12] and $66.0 million remained outstanding of Term Loan A and Term Loan B, respectively. Furthermore, in connection with the 2004 Acquisition, a third term loan – Term Loan C – was funded through the U.S. Borrower and was scheduled to mature in 2011. As of the Filing Date, approximately $165.0 million of the Term Loan C remained outstanding. The remaining two term loans – Term Loan D and Term Loan E – were funded through the U.S. Borrower in connection the acquisition of the FHS and the MAPS businesses in 2006 and 2007. Both of these term loans were scheduled to mature in 2011. As of the Filing Date,

---

[11]    The Revolving Credit Facility consists of a multi-currency facility revolver to the Canadian Borrower, a dollar facility revolver to the U.S. Borrower, and a dual-borrower, dual-currency facility revolver that could be drawn by either the U.S. Borrower or CSA International Holdings BV.

[12]    Term Loan A was funded as a Canadian dollar term loan. This amount reflects the conversion of the outstanding principal amount under Term Loan A into U.S. dollars.

18

approximately $183.4 million and $88.6 million[13] of Term Loan D and Term Loan E remained outstanding.

14.     The Prepetition Credit Facilities are unconditionally guaranteed on a senior secured basis by Holdings and substantially all of its Debtor subsidiaries, and its Canadian subsidiaries in the case of Term Loans A and B and Canadian dollar borrowings under the Revolving Credit Facilities.

## II.     Senior Notes and Senior Subordinated Notes

15.     In connection with the 2004 Acquisition, the CSA also issued $200.0 million 7% Senior Notes due 2012 (the "Senior Notes") and $350.0 million 8 3/8% Senior Subordinated Notes (the "Senior Subordinated Notes"). The Senior Notes and Senior Subordinated Notes are guaranteed by Holdings and all U.S. subsidiaries. As of the Filing Date, the principal outstanding amount of Senior Notes, including accrued and unpaid interest, was approximately $208.9 million. In addition, as of the Filing Date, the principal outstanding amount of the Senior Subordinated Notes, including accrued and unpaid interest, was approximately $329.9 million.

16.     The indebtedness evidenced by the Senior Notes is unsecured senior indebtedness of CSA. The indebtedness evidenced by the Senior Subordinated Notes is unsecured senior subordinated indebtedness of CSA.

## NEED FOR THE DIP FACILITY

17.     In order for the Debtors to continue manufacturing their products in an efficient and effective manner and operate as a going concern during the duration of these Cases, the Debtors must have ample liquidity to meet the needs, demands and obligations of and to their

---

[13]     Term Loan E was funded as a Euro dollar term loan.

19

customers, suppliers, employees and taxing authorities. Because of the Debtors' current financial condition, the Debtors do not have adequate liquidity to fund either their ordinary course business expenditures or the expenses necessary to administer the Cases. In addition to simply paying expenses as they become due, the availability of financing has certain intangible benefits that are critical to the Debtors' restructuring efforts. First, the Debtors' reorganization hinges on the ongoing cooperation of suppliers, vendors and employees to ensure a restructuring in an orderly and reasonable manner which seeks to preserve and enhance the value of the Debtors' businesses for the benefit of all parties in interest. These parties need to be assured that not only will the Debtors' businesses continue, but that the Debtors will have access to the necessary funds during the coming months. Additionally, the DIP Facility is essential to ensure timely payment of employees' wages, salaries and other employee-related obligations to maintain employee morale and not risk the loss of personnel critical to the Debtors' operations and reorganization. Without the DIP Facility, the Debtors may be required to cease their operations and the Debtors, their estates and their creditors would be irreparably harmed. Accordingly, the Debtors have an urgent and immediate need for the DIP financing contemplated herein.

18.     Moreover, the DIP Facility provides the Company with financing for its global operations. The Debtors operate a global enterprise through their foreign subsidiaries, and a significant portion of their value is derived from Canada and overseas operations.[14] In addition to the funds borrowed directly by the U.S. Borrower, the DIP Facility provides funds directly to the Canadian Borrower and allows for an Additional Foreign Borrower so that funds may be borrowed directly overseas. The DIP Facility also permits, subject to certain exceptions, the

---

[14]     Approximately 52% of the Company's sales in 2008 were generated outside of North America.

20

Credit Parties to make intercompany loans in accordance with the Company's manual cash pooling arrangement (which is described more fully in the Debtors' motion for approval to, among other things, maintain their centralized cash management system, which was filed concurrently herewith), which is essential for the Debtors' overseas operations to function and meet their obligations as they arise in the ordinary course. As such, the DIP Facility is imperative to meet the needs of the Debtors both domestically and abroad.

19.     As described more fully below and in the Mendelsohn Declaration, the Debtors have been unable to obtain any viable form of equity, unsecured or secured financing to fund the Cases other than the financing proposal by the DIP Lenders. As such, the Debtors believe that the DIP Facility provides the best and only viable alternative for the Debtors and their estates. In that regard, the only available option for the Debtors to obtain the liquidity necessary to sustain their operations and avoid a liquidation is to incur financing through the DIP Facility.

20.     After a series of good faith, arms-length negotiations, the DIP Lenders agreed to provide the Initial DIP Commitment (and the Incremental DIP Commitment, if applicable) on the terms and conditions set forth in the DIP Credit Agreement. The DIP Lenders consist of lenders that are Prepetition Secured Lenders, and the Prepetition Secured Lenders have consented to the priming of their prepetition liens by the DIP Facility. The Debtors believe that not only will the DIP Facility enable the Debtors to meet their daily postpetition obligations but, absent such financing, their prospects for a successful reorganization will be irreparably harmed. In sum, the Debtors believe that the commitments under the DIP Facility to be provided by the DIP Lenders are essential to the Debtors' restructuring efforts and are in the best interests of the Debtors, their creditors and their estates. Additionally, the Debtors believe that the DIP Facility provides the greatest liquidity to the Debtors on the most favorable terms available.

21

## APPLICABLE AUTHORITY

21.     Section 361 of the Bankruptcy Code provides, in pertinent part, as follows:

When adequate protection is required under section 362, 363, or
364 of this title of an interest of an entity in property, such
adequate protection may be provided by –

(1) requiring the trustee to make a cash payment or periodic cash
payments to such entity, to the extent that the stay under section
362 of this title, use, sale, or lease under section 363 of this title, or
any grant of a lien under section 364 of this title results in a
decrease in the value of such entity's interest in such property; . . .

(2) providing to such entity an additional or replacement lien to the
extent that such stay, use, sale, lease, or grant results in a decrease
in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to
compensation allowable under section 502(b)(1) of this title as an
administrative expense, as will result in the realization by such
entity of the indubitable equivalent of such entity's interest in such
property.

11 U.S.C.§ 361.

22.     Section 363 of the Bankruptcy Code provides, in pertinent part, as follows:

(a) In this section "cash collateral" means cash, negotiable
instruments, documents of title, securities, deposit accounts, or
other cash equivalents whenever acquired in which the estate and
an entity other than the estate have an interest and includes the
proceeds, products, offspring, rents, or profits of property and the
fees, charges, accounts or other payments for the use of occupancy
of rooms and other public facilities in hotels, motels, or other
lodging properties subject to a security interest as provided in
section 522(b) of this title, whether existing before or after the
commencement of a case under this title.

                    *                    *                    *

(c)(1) If the business of the debtor is authorized to be operated
under section . . . 1108 . . . of this title and unless the court orders
otherwise the trustee may enter into transactions, including the sale
or lease of property of the estate, in the ordinary course of
business, without notice or a hearing and may use property of the

22

estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

(A) each entity that has an interest in such cash collateral consents or

(B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

(3) Any hearing under paragraph (2)(B) of this section may be a preliminary hearing . . . but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on a request for authorization under paragraph (2)(B) of this subsection.

\*　　　　\*　　　　\*

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363.

23. Section 364 of the Bankruptcy Code provides, in pertinent part, as follows:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt –

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

RLF1-3420855-1

(d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if -

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C.§ 364.

24.     Section 507 of the Bankruptcy Code provides, in pertinent part, as follows:

(b) If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. §507.

25.     Rule 4001 of the Bankruptcy Code provides, in pertinent part, as follows:

(b) Use of Cash Collateral.

(1) Motion; Service.

(A) A motion for authorization to use cash collateral shall be made in accordance with Rule 9014 and shall be accompanied by a proposed form of order.

(C) The motion shall be served on any entity which has an interest in the cash collateral, on any committee elected pursuant to § 705 or appointed pursuant to § 1102 of the Code or its authorized agent, or, if the case is a . . . chapter 11 reorganization case and no committee of unsecured creditors has been appointed pursuant to § 1102, on the creditors included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct.

(2) Hearing.  The court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 15 days after

24

service of the motion. If the motion so requests, the court may conduct a preliminary hearing before such 15 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

*     *     *

(c) Obtaining Credit.

(1) Motion; Service.

(A) A motion for authority to obtain credit shall be made in accordance with Rule 9014 and shall be accompanied by a copy of the credit agreement and a proposed form of order.

(C) The motion will be served on any committee elected pursuant to § 705 or appointed pursuant to § 1102 of the Code or its authorized agent, or if the case is a . . . chapter 11 reorganization case and no committee of unsecured creditors has been appointed pursuant to § 1102, on the creditors included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct.

(2) Hearing. The court may commence a final hearing on a motion for the authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001.

26.    Section 105(a) of the Bankruptcy Code provides, in relevant part, as follows:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

11 U.S.C. § 105(a).

## BASIS FOR RELIEF

27.     Without the funding provided under the DIP Facility and the immediate access to the Cash Collateral, the repercussions to the Debtors' business will be catastrophic and likely irreparable, severely damaging their ability to function as a viable going concern. The Debtors need access to funds to, among other things, continue uninterrupted access to their supply chain and maintain inventory under their just-in-time supply method, fund employee compensation and benefits, and otherwise fulfill their obligations and pay their debts in the ordinary course of business.

28.     In addition, the implementation of the DIP Facility is critical to sustaining the Company's foreign operations, which are part of the Company's integrated business and are necessary for the Debtors to meet the needs of their customers. The Company's foreign operations provide significant value to the Debtors and their estates. These operations are exceedingly complex and consist of a highly integrated web of businesses that lean on the U.S. operations for financial and technical support. Without the funding structure provided by the DIP Facility – which allows the U.S. Borrower and the Canadian Borrower to fund their foreign subsidiaries and affiliates through intercompany loans and cash contributions and allows for an Additional Foreign Borrower – the Company's foreign subsidiaries and affiliates will be unable to meet their obligations in the ordinary course of business and will lose significant value during these Cases, and the Debtors' ability to meet the needs of their customers will be severely impeded. Indeed, the access to financing for the Company's foreign subsidiaries and affiliates is limited due to the financial condition of the Debtors. As such, the DIP Facility is necessary for the Company to sustain its foreign operations and preserve its international presence and reputation, which are vital to the Debtors' successful reorganization.

26

29.     In sum, if the Motion is not approved, the Debtors' only alternative would be to liquidate, as they would be unable to sustain their operations and preserve the value of their estates during the pendency of the Cases. In that regard, the relief sought in this Motion should be granted both on an interim basis and by a final order of the Court.

## THE DEBTORS ARE AUTHORIZED TO INCUR POSTPETITION SECURED FINANCING AND GRANT ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS

30.     As described above, as security for all borrowing under the DIP Facility, the Debtors propose to grant the DIP Lenders a superpriority administrative claim and a first priority lien on and security interest in substantially all of the Debtors' assets, subject to the Carve-Out, Permitted Liens and, until entry of the Final Order, Avoidance Actions.[15] As explained below, because the Debtors were unable to obtain viable financing on any better terms other than those proposed by the DIP Lenders, and because the Debtors require the funding to be provided by the DIP Facility, such relief is authorized pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code.

31.     Section 364(c) of the Bankruptcy Code provides for a debtor in possession to obtain credit or incur debt if, after notice and a hearing, the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) . . . as an administrative expense." 11 U.S.C. § 364(c). The debtor carries the burden of showing that it has made a reasonable effort to obtain unsecured credit as an ordinary administrative expense claim before it can access other available sources of credit using the remaining provisions of section 364(c).

---

[15]     With respect to liens on the voting capital stock of the Foreign Subsidiaries of the U.S. Credit Parties (other than those Subsidiaries organized in Mexico, Brazil, or the Netherlands), such liens securing the obligations of the U.S. Borrower shall be limited to pledges that would not result in deemed dividends to the U.S. Borrower or such other Debtors pursuant to section 956 of the Internal Revenue Code, except as otherwise agreed pursuant to the DIP Loan Documents.

27

See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("A court . . . may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)."); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating debtor carries the burden in showing financing justified under section 364(c)).  If the debtor meets this burden, the debtor may obtain financing that will (i) have priority over all other administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) be secured by a lien on unencumbered property of the estate, or (iii) be secured by a junior lien on encumbered property of the estate. See 11 U.S.C. § 364(c).

32.    In determining whether a debtor has carried its burden in showing that it is entitled to credit or financing pursuant to the provisions section 364(c), courts have considered the following factors:

(a)    the debtor, using reasonable efforts, is unable to obtain unsecured credit under section 364(b) in the form of an administrative expense claim;

(b)    the credit transaction or financing is necessary to preserve the estate assets; and

(c)    the terms are fair, reasonable and adequate given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, Inc., 115 B.R. at 37-39; In re Crouse Group, Inc., 71 B.R. at 549 ("[W]e believe that the Debtors must nevertheless sustain the burden of establishing the following before we could approve the Stipulations in issue: (1) They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) The credit transaction is necessary to preserve the

28

assets of the estate; and (3) The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.").

33.     Furthermore, if a debtor in possession is unable to obtain financing under section 364(c) of the Bankruptcy Code, the debtor may still seek to obtain financing under section 364(d).  Section 364(d) provides that the court, after notice and a hearing, may authorize a debtor to obtain credit or incur debt secured by a "senior or equal lien" on the debtor's assets, but only if (i) the debtor is unable to obtain such credit otherwise, and (ii) the lienholder subject to the "senior or equal" lien is adequately protection.  See 11 U.S.C. § 364(d).

(i)     <em>Alternative Financing Is Not Otherwise Available</em>

34.     In the period preceding the Filing Date, the Debtors sought in good faith to obtain unsecured credit on reasonable terms in an effort to sustain their operations and possibly avoid a chapter 11 filing.  During this time, however, the Debtors had to contend with (i) an automotive industry in great distress, as recently demonstrated by the bankruptcy proceedings of some of the Debtors' largest customers – Chrysler LLC and General Motors Corporation – and several of their competitors and (ii) a global economy suffering from the worst recession in recent history.  These factors contributed to the significant erosion in the Debtors' value as a going concern and crippled the Debtors' ability to manage their prepetition debt.  In this context, the credit markets and the Debtors' suppliers and vendors essentially foreclosed any and all opportunities for the Debtors to access not only unsecured credit, but credit secured by a junior lien on the Debtors' assets.

35.     As such, and as discussed in the Mendelsohn Declaration, the Debtors have been unable to procure the necessary funding in the form of unsecured credit.  Moreover,

29

the Debtors have been unable to obtain any viable source of secured financing other than that proposed by the DIP Lenders pursuant to the DIP Facility. Substantially all of the Debtors' assets are encumbered by the Prepetition Secured Facilities, and it became apparent to the Debtors that they would be unable to provide the Prepetition Secured Lenders with reasonable adequate protection for their first priority liens in the event they received financing from a source other than the DIP Lenders. In that regard, given the difficulty of winning of nonconsensual priming fight, it is very difficult to attract third-party debtor in possession lenders. While the Debtors did seek proposals for secured financing from other third parties, no proposals materialized into an offer that could compete with the DIP Facility. As such, this Court is authorized to permit the Debtors to obtain postpetition financing with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

36. The Debtors believe in their sound business judgment that the terms and conditions set forth the proposed DIP Loan Documents represented the best and most viable form of financing for the Debtors to sustain their operations during these Cases.

(ii) *The DIP Facility Is Necessary to Preserve the Estates*

37. As discussed above, the DIP Facility is necessary to preserve the value of the Debtors' estates. The DIP Facility will allow the Debtors to conduct their operations, pay their obligations to their employees, and administer the Cases. Moreover, the availability of credit under the DIP Facility should give the Debtors' vendors and suppliers the necessary confidence to continue their ongoing relationships with the Debtors both domestically and, with respect to the Debtors' foreign subsidiaries, worldwide. The stability provided by the DIP Facility will also be viewed favorably by the employees and

30

thereby help promote the Debtors' successful reorganization. On the other hand, without the benefit of the DIP Facility, the Debtors will suffer irreparable harm and will be forced to liquidate. Under those circumstances, stakeholders will receive significantly less than what they will receive if the Debtors are allowed to continue their reorganization efforts in chapter 11 with the support of the DIP Facility.

      (iii)    *The Terms of the DIP Credit Agreement Are Fair, Reasonable and Adequate Under the Circumstances*

38.     The Debtors believe that the DIP Credit Agreement is fair, reasonable and adequate given the circumstances of the Debtors and the DIP Lenders. As more fully described hererin and in the Campbell Declaration and Mendelsohn Declaration, the dire state of the automotive industry and the global economy as a whole has limited the Debtors' options with respect to obtaining postpetition financing. The Debtors, through Lazard, conducted a search for postpetition financing and determined in good-faith and through arms-length negotiations that entry into the DIP Facility represents the most viable means of maintaining the Debtors' operations and preserving and enhancing the Debtors' going concern value.

      (iv)    *The Proposed Adequate Protection Should Be Authorized*

39.     The Prepetition Secured Lenders have consented to the priming of their liens and to the use of their Prepetition Collateral (including Cash Collateral) subject to receiving adequate protection that consists of the following: (i) solely to the extent of any Diminution of Value, a security interest in and liens on all Collateral of the Debtors, subject and subordinate only to (x) after the Carve-Out Effective Date, the Carve-Out, (y) the Permitted Liens and (z) the liens securing the DIP Facility; (ii) solely to the extent of any Diminution of Value, a superpriority administrative expense claim junior only to the claims under

31

section 364(c)(2) of the Bankruptcy Code held by the DIP Agent on account of the DIP Obligations and subject to the Carve-Out; (iii) payment of the Consent Fee pursuant to the terms of the Fifth Amendment; (iv) the payment of all professional fees and expenses payable to the administrative agent under the Prepetition Secured Facilities, subject to objection by the United States Trustee; (v) reasonable access for the purposes of monitoring the business of the Obligors and the value of the collateral under the Prepetition Secured Facilities; and (vi) financial reporting substantially in compliance with the Prepetition Secured Facilities.

40.     Section 361 of the Bankruptcy Code authorizes a debtor to pay adequate protection by granting replacement liens, making periodic cash payments, or granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." See 11 U.S.C. § 361. According to the legislative history of section 361 of the Bankruptcy Code, a finding of adequate protection is "left to case-by-case interpretation and development. It is expected that the courts will apply the concept [of adequate protection] in light of the facts of each case and general equitable principles." H.R. Rep. No. 595, 95th Cong., 1st Sess. 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295; see also MBank Dallas v. O'Connor (In re O' Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987) ("[T]he courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis.").

41.     The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See Resolution Trust Corp. v. Swedeland Dev. Group., Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994); see also In re Pursuit Athletic

32

Footwear, Inc., 193 B.R. 713, 716 (Bankr. D. Del. 1996) (examining possible diminution in value of secured creditors' collateral in determining whether to allow the granting of adequate protection). This standard applies equally to proposed priming financing under section 364(d)(1) of the Bankruptcy Code. See In re Swedeland, 16 F.3d at 564 (sating that the adequate protection proposal should provide the prepetition secured creditor with the same level of protection it would have had if there had not been postpetition financing); In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); In re Beker Ind. Corp., 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986)(stating that priming lien is a detriment to existing interests in collateral and stating issue is not the need for adequate protection but rather the amount of such adequate protection).

42.     The proposed adequate protection components compensate the Prepetition Secured Lenders for the diminution in value of the Debtors' assets securing their liens and are wholly appropriate and justified given the significant value the Debtors stand to lose in the event they are denied access to the funding provided under the DIP Facility.

43.     Given the need for the DIP Facility, lack of alternative available financing, the reasonableness of the terms of the DIP Credit Agreement under the circumstances, and the appropriateness of the Prepetition Secured Lenders' adequate protection package, this Court should approve the DIP Facility and grant the relief requested in this Motion.

## THE DEBTORS MUST BE ALLOWED TO USE CASH COLLATERAL

44.     As previously noted, in order to address their working capital needs and fund other costs and expenses associated with their reorganization efforts, the Debtors require the use of the Prepetition Secured Lenders' Cash Collateral. The use of Cash Collateral will provide the Debtors with the additional necessary capital with which to operate their

businesses, pay their employees, maximize value and successfully reorganize under chapter 11.

45.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent or (ii) the court approves the use of cash collateral after notice and a hearing. See 11 U.S.C. § 363(c). Here, the Prepetition Secured Lenders have consented to the Debtors' use of Cash Collateral subject to the Prepetition Secured Lenders receiving adequate protection. Therefore, this Court should approve the Debtors' use of the Cash Collateral and the adequate protection granted to the Prepetition Secured Lenders.

## INTERIM ORDER AND FINAL HEARING

46.     The urgent need to preserve the Debtors' businesses, and avoid immediate and irreparable harm to the estates, makes it imperative that the Debtors be authorized to obtain authority to borrow funds pursuant to the terms and conditions of the DIP Credit Agreement as of the Filing Date, pending the Final Hearing. As noted above, the Debtors are seeking to borrow $35,000,000 (the "Interim Amount") after the Interim Order Entry Date and an additional $125,000,000 on the Final Order Entry Date in order to continue their operations and administer these Cases. The Debtors will then have an additional $25,000,000 to borrow if committed to by DIP Lenders (in their sole discretion), upon request by the Borrowers.

47.     Without the ability to access the Interim Amount, the Debtors would be unable to meet their postpetition obligations and would be unable to fund their working capital needs until the Final Order Entry Date, thus causing irreparable harm to the value of the Debtors' estates and to the value of the reorganized Debtors. Accordingly, the Debtors

34

respectfully request that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding upon the DIP Lenders.

## WAIVER OF BANKRUPTCY RULE 6004

48.     The Debtors seek a waiver of any stay of the effectiveness of the orders approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors submit that ample cause exists to justify a waiver of the ten (10) day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## NOTICE

49.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee; (b) counsel to the DIP Agent; (c) counsel to the Prepetition Administrative Agent under the Debtors' Prepetition Credit Agreement; (d) counsel to the ad hoc group of holders of the Debtors' senior notes; (e) counsel to the ad hoc group of holders of the Debtors' senior subordinated notes, and (f) the 30 largest unsecured creditors and any statutory committee of unsecured creditors (or, if retained, its counsel) when one is appointed. Because of the nature of the relief requested, the Debtors respectfully submit that no other or further notice of the relief requested in this Motion need be given.

## NOTICE WITH RESPECT TO FINAL HEARING

50.     No trustee, examiner or statutory committee has been appointed in the Debtors' Cases. Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing by serving a copy of this Motion,

together with the Interim Order, by hand or overnight mail or courier service (or for those set up to receive electronic transmissions, by electronic transmission), upon, (a) the Office of the United States Trustee for the District of Delaware, (b) counsel to the DIP agent under the DIP Facility; (c) counsel to the Prepetition Administrative Agent under the Debtors' Prepetition Credit Agreement; (d) counsel to the ad hoc group of holders of the Debtors' senior notes; (e) counsel to the ad hoc group of holders of the Debtors' senior subordinated notes, (f) any and all secured creditors of the Debtors who have liens on the Debtors' assets, (g) the thirty (30) largest unsecured creditors and the statutory committee of unsecured creditors (and, if retained, its counsel) when one is appointed, and (h) all parties that have filed notices of appearance and requests for notices in the Cases. The Debtors respectfully request that such notice is sufficient and request that this Court find that no further notice of the Final Hearing and Final Order is required.

## NO PRIOR REQUEST

51. No prior motion for the relief requested herein has been made to this or any other court.

RLF1-3420855-1

WHEREFORE, based upon the foregoing, the Debtors request entry of the Interim Order and the Final Order under sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2, (i) authorizing the Debtors to (a) incur postpetition financing in the form of the DIP Facility, (b) use Cash Collateral, and (c) provide adequate protection to the Prepetition Secured Lenders and (ii) scheduling the Final Hearing Date.

Dated: August 3, 2009
      Wilmington, Delaware

Respectfully submitted,

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (Bar. No. 2981)
Michael J. Merchant (Bar No. 3854)
Chun I. Jang (Bar No. 4790)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-   and –

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
Gary L. Kaplan, Esq.
Richard J. Slivinski, Esq.
Peter B. Siroka, Esq.
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

*Proposed Counsel for the Debtors and
Debtors in Possession*

RLF1-3420855-1