# EXHIBIT A

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| COOPER-STANDARD HOLDINGS INC., *et al.*[1], | ) ) ) | Case No. 09-_____ (___) (Jointly Administered) |
| Debtors. | ) ) | |
| | ) | Related Doc. No. (___) |

**INTERIM ORDER (I) AUTHORIZING U.S. DEBTORS (A) TO OBTAIN
POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
AND 364, (B) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363,
(II) GRANTING CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES
PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND
(III) SCHEDULING FINAL HEARING PURSUANT TO
BANKRUPTCY RULES 4001(b) AND (c)**

Upon consideration of the motion (the "Motion")[2], dated August 3, 2009, of Cooper-

Standard Holdings Inc. ("Holdings"), and the other above-captioned debtors and debtors-in-

possession (collectively, the "U.S. Debtors") in the above-captioned cases (the "Chapter 11

Cases") pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local

Rules for the Bankruptcy Court for the District of Delaware, seeking, among other things:

(i)     The Court's authorization for the U.S. Borrower (as defined below) to obtain

postpetition financing (the "Financing"), and the U.S. Borrower and U.S. Guarantors (as defined

below) to guaranty the obligations of all Obligors (as defined below) in connection with the

---

[1]     The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Cooper-Standard Holdings Inc. (5088); Cooper-Standard Automotive Inc. (9970); Cooper-Standard Automotive FHS Inc. (2953); Cooper-Standard Automotive Fluid Systems Mexico  Holding LLC (0442); Cooper-Standard Automotive, OH LLC (2845); StanTech, Inc. (4014); Westborn Service Center, Inc. (7448); North American Rubber, Incorporated (9926); Sterling Investments Company (1393); Cooper-Standard Automotive NC LLC (2839); CS Automotive LLC (4267) ("U.S. Finco"); CSA Services Inc. (9510); NISCO Holding Company (1697).

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Loan Agreement as applicable.

Financing, consisting of a superpriority priming delayed draw term loan facility (the "DIP Facility") in an aggregate principal amount of up to $200,000,000 and other financial accommodations, allocated as follows:

    (a) **DIP Term Loans**. A superpriority priming delayed draw term loan facility in the principal amount of $175,000,000 (the "DIP Term Loan Commitments" and the term loans made thereunder, the "DIP Term Loans") to be secured by liens on all of the property, assets or interests in property or assets of each U.S. Debtor, each U.S. Debtor's "estate" (as defined in the Bankruptcy Code), and the Canadian Borrower[3] and on certain of the property and assets of each other Obligor (as defined below), in each case of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each subsidiary of such U.S. Debtor or other Obligor[4] (excluding the capital stock, if any, of any Permitted Joint Ventures), all of the capital stock of all other entities

---

[3]    Neither the Canadian Borrower nor U.S. Finco will guaranty, and the liens on their respective property will not secure, the obligations of the U.S. Borrower, however the Canadian Borrower (subject to the approval of the Canadian Court) and U.S. Finco will guaranty, and the liens on their respective property will secure, the obligations of the Canadian Borrower and any Additional Foreign Borrower.

[4]    With respect to liens on the voting capital stock of foreign subsidiaries of the U.S. Debtor or other Obligor (other than subsidiaries organized in Mexico, Brazil, or the Netherlands), such liens securing the obligations of the U.S. Borrower shall be limited to pledges that would not result in deemed dividends to the U.S. Debtor or such other Debtors pursuant to section 956 of the Internal Revenue Code, except as otherwise agreed pursuant to the DIP Documents, as that term is defined herein. For the avoidance of doubt, 100% of the voting capital stock of the wholly-owned direct or indirect subsidiaries of Holdings organized in Mexico, Brazil, and the Netherlands shall secure the obligations of the U.S. Borrower.

2

that are not subsidiaries directly owned by such U.S. Debtor or other Obligor (other than capital stock of Permitted Joint Ventures), money, investment property, deposit accounts, all commercial tort claims and other causes of action (including any and all actions arising under the Bankruptcy Code), Cash Collateral (as that term is defined below), and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above (collectively, with respect to all such entities, the "Collateral") and entered into between, on the one hand, Holdings, Cooper-Standard Automotive Inc., an Ohio corporation (the "U.S. Borrower"), as debtor and debtor-in-possession under the Bankruptcy Code, and Cooper-Standard Automotive Canada Limited, a corporation organized under the laws of Ontario ("Cooper Canada" or "Canadian Borrower"), as a petitioner under a proceeding (the "Canadian Case") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA"), and any Additional Foreign Borrower (as defined in the DIP Loan Agreement) and, on the other hand, Deutsche Bank Trust Company Americas ("DB"), as administrative agent (the "DIP Administrative Agent") and documentation agent (the "Documentation Agent"), Banc of America Securities LLC, General Electric Capital Corporation, and UBS Securities LLC, as joint syndication agents (collectively the "Syndication Agent"), and Deutsche Bank Securities Inc. and General Electric Capital Corporation, as joint lead arrangers and joint book-running lead managers and Banc of America Securities LLC and UBS Securities LLC as co-arrangers (collectively, the "Arrangers," and together with the DIP Administrative Agent, the Documentation Agent, the Syndication Agent and any successors in such capacities, the "DIP Agents") and

3

certain financial institutions that are party to the DIP Loan Agreement (as defined below) from time to time with respect to the DIP Facility (each a "<u>DIP Lender</u>," and collectively, the "<u>DIP Lenders</u>") with all obligations under the DIP Documents (as defined below) to be guaranteed (the "<u>Guarantee</u>") (i) with respect to obligations of the U.S. Borrower, the Canadian Borrower, and any Additional Foreign Borrower (collectively the "<u>Borrowers</u>"), unconditionally and jointly and severally by Holdings and each U.S. direct or indirect subsidiary of Holdings (other than U.S. Finco) as debtor and debtor-in-possession under the Bankruptcy Code (together with Holdings, the "<u>U.S. Guarantors</u>")[5] as well as all direct or indirect wholly-owned subsidiaries of Holdings organized under the laws of Mexico, Brazil, and the Netherlands (the "<u>Global Guarantors</u>"), (ii) with respect to all obligations of the Canadian Borrower under the DIP Facility, unconditionally and jointly and severally (to the extent provided in the DIP Obligations), by U.S. Finco and certain non-U.S. direct or indirect subsidiaries of Holdings as specified in the DIP Documents (the "<u>Canadian Guarantors</u>"), and (iii) with respect to all obligations of the Additional Foreign Borrower, unconditionally and jointly and severally (to the extent provided in the DIP Obligations), by U.S. Finco and certain non-U.S. direct or indirect subsidiaries of Holdings as specified in the DIP Documents (the "<u>AFB Guarantors</u>," and together with the Global Guarantors and the Canadian Guarantors, the "<u>Non-U.S. Guarantors</u>," and the Non-U.S. Guarantors together with the U.S. Guarantors, the "<u>Guarantors</u>," and the Guarantors together with the Borrowers, the "<u>Obligors</u>").

(b) **<u>Incremental New Money Loans</u>**. A standby uncommitted single draw term loan facility (the "<u>Incremental DIP Facility</u>," which shall be considered part of the DIP

---

[5] Each U.S. Guarantors and U.S. Finco are U.S. Debtors in the Chapter 11 Cases.

Facility for all purposes hereof), in one or more series, in an aggregate amount not exceeding $25,000,000 (the incremental term loans thereunder, the "Incremental DIP Loans" which shall be considered DIP Loans for all purposes hereof; and the lenders from time to time thereunder, "Incremental DIP Lenders," who shall be considered DIP Lenders for all purposes hereof). Following a request by the Borrowers, the Incremental DIP Facility may be made available by any of the DIP Lenders, in their sole discretion, with the consent of the Requisite DIP Lenders in accordance with section 2.01(d) of the DIP Loan Agreement (as defined below) subject to approval by the Court;

(ii)     The Court's authorization for the U.S. Debtors to execute and deliver (and cause their non-U.S. Debtor subsidiaries to execute and deliver to the extent necessary) additional final documentation consistent with the terms of (or as may be required by) the Debtor-In-Possession Financing Agreement (as the same may be amended or modified, the "DIP Loan Agreement" [6]) attached as Exhibit A to this interim order (the "Interim Order"), the Guaranties (the "Guaranties") attached as Exhibit B to this Interim Order and all additional documentation (the "DIP Loan Documents" and together with the DIP Loan Agreement and the Guaranties, the "DIP Documents"), and to perform such other and further acts as may be required in connection with the DIP Documents;

(iii)     The Court's authorization for the use of proceeds of the Financing extended to the U.S. Borrower as expressly provided in the DIP Documents (A) to pay costs, fees and expenses of the DIP Agents, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders as provided for in the Interim Order and the DIP Documents, as well as all scheduled payments of interest and principal thereunder, (B) to provide working capital and for other general corporate purposes of the U.S. Debtors and, by way of the Intercompany Notes of the Non-U.S. Guarantors

---

[6] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Loan Agreement.

5

and of the other subsidiaries of Holdings, and (C) to pay administration costs of these Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court <u>provided that</u> payments of (A) above shall be made from the proceeds of the DIP Facility irrespective of the then-applicable 13-Week Budget;

(iv)     The Court granting to the DIP Lenders and the DIP Administrative Agent in respect of the DIP Loans, for the benefit of the DIP Agents, the DIP Lenders and any other parties referred to in the collateral documents (collectively, the "<u>DIP Secured Parties</u>") with respect to the respective DIP Obligations (as defined below), in accordance with the relative priorities as set forth more fully below, and subject to, after the Carve-Out Effective Date (as defined below), the Carve-Out (as defined below)[7]:

> (a) pursuant to Bankruptcy Code section 364(c)(1), joint and several superpriority administrative expense claim status in the Chapter 11 Cases, which claims in respect of the DIP Facility shall be superior to any and all other claims;

> (b) pursuant to Bankruptcy Code section 364(c)(2), a first priority lien on all unencumbered assets of the U.S. Debtors and their estates (now or hereafter acquired and all proceeds thereof);

> (c) pursuant to Bankruptcy Code section 364(c)(3), a junior lien on all encumbered assets (except as set forth in Subparagraph (d) below) of the

---

[7]     With respect to liens on the voting capital stock of foreign subsidiaries of the U.S. Debtors (other than those subsidiaries organized in Mexico, Brazil, or the Netherlands), such liens securing the obligations of the U.S. Borrower shall be limited to pledges that would not result in deemed dividends to the U.S. Debtor or such other Debtors pursuant to section 956 of the Internal Revenue Code, except as otherwise agreed pursuant to the DIP Documents, as defined herein. For the avoidance of doubt, 100% of the voting capital stock of the wholly-owned direct or indirect subsidiaries of Holdings organized in Mexico, Brazil, and the Netherlands shall secure the obligations of the U.S. Borrower.

6

U.S. Debtors and their estates (now or hereafter acquired and all proceeds thereof); and

(d) pursuant to Bankruptcy Code section 364(d), a first priority priming lien on all assets of the U.S. Debtors and their estates (now or hereafter acquired and all proceeds thereof) that were subject to the liens of the Prepetition Primed Obligations (as defined below) as of the Filing Date (as defined below);

(v)　The Court granting protection to the secured parties whose liens and security interests are being primed by the Financing as set forth below (such parties, the "Lender Protection Parties");

(vi)　The Court's authorization for the U.S. Debtors to use any Cash Collateral in which Lender Protection Parties may have an interest and the granting of certain protections to the Lender Protection Parties with respect to, inter alia, use of their Cash Collateral in accordance with the 13-Week Budget and the use (and any Diminution in Value (as defined below)) of their collateral;

(vii)　The Court vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(viii)　The Court waive any applicable stay (including under Bankruptcy Rule 6004) and provide for immediate effectiveness of this Interim Order;

(ix)　Pursuant to Bankruptcy Rule 4001, the Court order that an interim hearing on the Motion be held before this Court to consider entry of this Interim Order, authorizing that during the period commencing on the date (the "Interim Order Entry Date") of this Court's entry of this

7

Interim Order and ending on the earlier of (a) the date this Court enters the Final Order and (b) the occurrence of the DIP Loan Maturity Date (as defined in the DIP Loan Agreement) (such period, the "Interim Period"), a portion of the DIP Commitments shall be borrowed by the U.S. Borrower (the "Initial Availability"), subject to (i) delivery by the U.S. Debtors of the 13-Week Budget, (ii) entry by the Canadian Court of an initial order approving the Canadian Borrower's entry into the DIP Loan Agreement (the "Initial Canadian Order"), and (iii) compliance with the terms, conditions and covenants contained in the definitive documents relating to the DIP Facility, including, without limitation, the credit agreements, guarantees, security agreements, pledge agreements, and all other DIP Documents, in an amount equal to the lesser of $35,000,000[8] or such other amount as may be approved by order of this Court, to be made available during the Interim Period in accordance with the 13-Week Budget; and

    (x)    The Court schedule a final hearing (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and DIP Documents filed with this Court.

    The interim hearing on the Motion having been held on August __, 2009 (the "Interim Hearing"); and based upon all of the pleadings filed with the Court, the evidence presented at the Interim Hearing and the entire record herein; and the Court having heard and resolved or overruled all objections to the interim relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the U.S. Debtors, their estates, and creditors; and the U.S. Debtors having provided notice of the Motion as set forth in the Motion and it appearing that no further

---

[8]    An additional amount not to exceed $15,000,000 will be made available to the Canadian Borrower during the Interim Period, subject to approval by the Canadian Court.

8

or other notice of the Motion need be given; and after due deliberation and consideration, and sufficient cause appearing therefor:

**BASED ON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:** [9]

A.     Filing Date. On August 3, 2009 (the "Filing Date"), the U.S. Debtors commenced their Chapter 11 Cases by filing voluntary petitions for relief under the Bankruptcy Code. The U.S. Debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of these Chapter 11 Cases.

B.     Jurisdiction; Venue. The Court has jurisdiction over these cases, the parties, and the U.S. Debtors' property pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Bankruptcy Rules.

C.     Committee Formation. No official committee of unsecured creditors has yet been appointed in any of these Chapter 11 Cases.

D.     Prepetition Loan Documents. The U.S. Debtors and the Canadian Borrower are Borrowers or Guarantors under that certain Credit Agreement, dated as of December 23, 2004 (as amended, restated, supplemented or otherwise modified from time to time, including by that certain First Amendment and Consent to Credit Agreement, dated February 1, 2006, that certain Second Amendment to Credit Agreement, dated July 26, 2007, that certain Third Amendment and Waiver to Credit Agreement, dated December 18, 2008, that certain Fourth Amendment to Credit Agreement, dated May 15, 2009, and the Fifth Amendment

---

[9]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

9

and Consent to Credit Agreement (the "<u>Fifth Amendment</u>") dated as of July 14, 2009, the "<u>Prepetition Facility</u>" and, together with the Credit Documents (as defined therein), the "<u>Prepetition Loan Documents</u>"), the lenders from time-to-time party thereto (the "<u>Prepetition Lenders</u>") and DB as administrative agent (the "<u>Prepetition Agent</u>") for the Prepetition Lenders, and the other agents party thereto. Pursuant to the Prepetition Loan Documents, the Prepetition Lenders provided the U.S. Debtors and other Obligors with loans and letters of credit in the aggregate principal amount of approximately $503.4 million, CND$50.0 million and €63.1 million. For purposes of this Interim Order, the term "<u>Prepetition Indebtedness</u>" shall mean all amounts owed, as of the Filing Date, to the Prepetition Agent and the Prepetition Lenders under the Prepetition Loan Documents, including, without limitation, all Obligations (as defined in the Prepetition Facility) of any Credit Party (as defined in the Prepetition Facility) thereunder.

    E.  <u>Stipulations</u>. In requesting the Financing under the DIP Documents, the Obligors permanently, immediately, and irrevocably acknowledge, represent, stipulate, and agree that:

    (i)  in entering into the DIP Documents, and as consideration therefor, the Obligors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments are terminated in accordance with the terms of the DIP Documents, the Obligors will not (except as expressly permitted by this Interim Order, the DIP Documents, or the Prepetition Loan Documents) in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens, security interests, or claims provided under this Interim Order or Prepetition Facility to the DIP Administrative Agent or the Prepetition Agent by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364 of the Bankruptcy Code, or otherwise;

    (ii)  as of the Filing Date, (A) the aggregate principal amount of the Prepetition Indebtedness is not less than $503.4 million, CND$50.0 million and €63.1 million plus all

10

accrued and unpaid interest, plus all fees, costs, and expenses incurred in connection therewith, and all other Obligations under the Prepetition Facility, (B) all of the Prepetition Indebtedness is unconditionally owing by the Obligors to the Prepetition Agent and the Prepetition Lenders, and (C) all claims in respect of the Prepetition Indebtedness are not and shall not be subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, recoupment, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity and the Prepetition Loan Documents constitute the legal, valid, and binding obligations of the U.S. Debtors, their respective estates, and the other Obligors and are enforceable against each such U.S. Debtor, estate, and Obligor in accordance with the terms of the Prepetition Loan Documents;

(iii)     the liens securing the Prepetition Facility (the "Existing Liens") (A) constitute valid, binding, enforceable, and perfected first priority liens on the collateral as described in the Prepetition Loan Documents (the "Prepetition Collateral") that, prior to the entry of this Interim Order, were subject only to the Permitted Liens (as defined in the Prepetition Loan Documents) and (B) are not, and shall not be, subject to avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity;

(iv)     the DIP Agents, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders are not control persons or insiders of the Obligors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Documents and/or the Prepetition Loan Documents;

11

(v)     as of the date hereof, there exist no claims or causes of action against any of the Prepetition Agent, the Prepetition Lenders, the DIP Agents, or the DIP Lenders with respect to, in connection with, related to, or arising from the Prepetition Facility or the Financing that may be asserted by the Obligors or any other person or entity;

(vi)     as of the date hereof, there were no other liens on or security interests in the Collateral except for the Existing Liens and, to the extent such liens are determined to be valid, perfected, binding, and enforceable, the Permitted Liens; and

(vii)     the Obligors forever and irrevocably release, discharge, and acquit the former, current, or future DIP Agents, DIP Lenders, Prepetition Agents, and Prepetition Lenders, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Financing, the DIP Documents, the Prepetition Loan Documents, the Prepetition Primed Obligations, or the transactions contemplated hereunder or thereunder including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action with respect to

12

the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agents, the Prepetition Lenders, the DIP Agents, and/or the DIP Lenders.

F. Cash Collateral. For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in which the Prepetition Agent under the Prepetition Facility has, for the benefit of itself and its lenders, a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Filing Date, arising pursuant to this Interim Order, or otherwise. The U.S. Debtors require the use of Cash Collateral to operate their businesses. Without the use of Cash Collateral, the U.S. Debtors will not be able to meet their cash requirements for working capital needs and fund the working capital needs of the other Obligors and result in an immediate shutdown of the U.S. Debtors' and other Obligors' businesses. The DIP Agents, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders do not consent to the use of Cash Collateral except on the terms and for the purposes specified herein.

G. Lender Protection. The Lender Protection Obligations (as defined below) are sufficient to protect the interests of the Lender Protection Parties in the collateral securing the Prepetition Primed Obligations (as defined below) and no further adequate protection is presently required under sections 363, 364, or any other provision of the Bankruptcy Code.

H. Purpose and Necessity of Financing. The Obligors require the financing described in the Motion and as expressly provided in the DIP Documents (i) to pay costs, fees and expenses of the DIP Agents, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders as provided for in the Interim Order and the DIP Documents, as well as all scheduled payments of interest and principal thereunder, (ii) to provide working capital and for other general corporate purposes of the U.S. Debtors, the Canadian Borrower, and the Non-U.S. Guarantors and other subsidiaries of Holdings, (iii) to pay administration costs of these Chapter

13

11 Cases and claims or amounts approved by the Bankruptcy Court, and (iv) to pay administration costs of the Canadian Case and claims or amounts approved by the Canadian Court, provided that payments of (i) above shall be made from the proceeds of the DIP Facility irrespective of the then-applicable 13-Week Budget. Amounts advanced by a Borrower for general corporate purposes of any subsidiary of Holdings shall be advanced by way of the Intercompany Notes (as defined in the DIP Documents), which shall be pledged as collateral security on a first priority basis to secure the DIP Facility. If the U.S. Debtors do not obtain authorization to borrow under the DIP Loan Agreement and the DIP Loans are not approved, the Obligors will suffer immediate and irreparable harm. The U.S. Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Documents. A loan facility in the amount provided by the DIP Documents is not available to the U.S. Debtors without granting the DIP Administrative Agent, for the benefit of the DIP Lenders, superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Documents. After considering all alternatives, the Obligors have concluded, in the exercise of their prudent business judgment, that the loan facility provided under the DIP Documents represents the best and only working capital financing available to them at this time. The DIP Facility is the only loan available to the Obligors and the U.S. Debtors have been unsuccessful in their attempts to find any alternative financing. Additionally, the terms of the Financing and the use of Cash Collateral are fair and reasonable and reflect the U.S. Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

I. Good Cause. The ability of the U.S. Debtors to obtain sufficient working capital and liquidity under the DIP Documents, and use of Cash Collateral, is vital to the U.S.

Debtors, their estates and creditors and the other Obligors. The liquidity to be provided under the DIP Documents and through the use of the Cash Collateral will enable the Obligors to continue to operate their businesses in the ordinary course and preserve the value of their businesses. The U.S. Debtors' estates will be immediately and irreparably harmed if this Interim Order is not entered. Good cause has, therefore, been shown for the relief sought in the Motion.

J. Good Faith. The Financing and the DIP Documents have been negotiated in good faith and at arm's length among the Obligors, the DIP Agents and the DIP Lenders, and all of the obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, all loans made to and guarantees issued by the U.S. Debtors and the other Obligors pursuant to the DIP Documents, and any other obligations under the DIP Documents, including, without limitation, credit extended in respect of overdrafts and related liabilities and other depositary, treasury, hedging, swap , and cash management services and other clearing services provided by any Lender, Agent or their respective affiliates (all of the foregoing collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the Postpetition Liens (as defined below), the Superpriority Claims (as defined below), and the Lender Protection Obligations shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits, and privileges of this Interim Order regardless of whether this Interim Order is subsequently reversed, vacated, modified, or otherwise is no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.

K. Consideration. All of the Obligors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the DIP Loans, the use

of Cash Collateral, and all other financial accommodations provided under the DIP Documents and this Interim Order.

      L.    Consent. Prior to the Filing Date, on July 13, 2009, the U.S. Borrower requested that the Prepetition Agent solicit those Prepetition Lenders who had agreed to receive non-public information to approve the Fifth Amendment. Subsequently, also on July 13, 2009, the U.S. Borrower posted a notice on the Prepetition Agent's "public side" intralinks website to all Prepetition Lenders strongly encouraging them to agree to receive non-public information to be able to review the Fifth Amendment. The Fifth Amendment, among other things, provided a consent to the priming of the Prepetition Loans by the DIP Obligations in exchange for a consent fee paid to such Prepetition Lenders. Under the Prepetition Loan Documents, holders of more than 50% of the outstanding amount of Prepetition Loans may consent on behalf of all Prepetition Lenders to the priming of the Prepetition Facility. Each Prepetition Lender has been provided the opportunity to review the DIP Loan Agreement, a detailed term sheet with respect to the Financing (which term sheet, among other things, specified the form and substance of the Lender Protections (as defined below) to be provided by this Interim Order), and, through the procedures detailed above, each Prepetition Lender was solicited and given the opportunity to consent thereto by executing the Fifth Amendment. After due deliberation and consideration, Prepetition Lenders holding in the aggregate more than 85% of the Prepetition Indebtedness, and constituting 151 of the 182 Prepetition Lenders executed the Fifth Amendment and therefore have explicitly consented to the entry of this Interim Order, the execution and consummation of the DIP Loan Agreement, and all of the transactions contemplated herein and therein (including without limitation the priming effected by this Interim Order and the DIP Documents) and on that basis, among others, this Court has requisite authority to enter this Interim Order under applicable law, and such consent is sufficient under applicable law. Additionally, as no Prepetition Lender has objected to the DIP Financing or entry of this Interim Order, all

16

Prepetition Lenders are hereby deemed to have consented to the entry of this Interim Order, the execution and consummation of the DIP Loan Agreement, and all of the transactions contemplated herein and therein (including without limitation the priming effected by this Interim Order and the DIP Documents).

M.    <u>Immediate Entry of Interim Order</u>.  The U.S. Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The permission granted herein to enter into the DIP Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Obligors.  This Court concludes that entry of this Interim Order is in the best interests of the U.S. Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued flow of supplies and services to the Obligors necessary to sustain the operation of the Obligors' existing businesses and further enhance the Obligors' prospects for a successful restructuring.  Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED:**

1.    <u>Disposition</u>.  The Motion is granted on an interim basis and on the terms set forth herein.  Any objections to the Motion that have not previously been withdrawn, waived, settled, or resolved and all reservations of rights included therein are hereby denied and overruled on their merits with prejudice.

2.    <u>Effectiveness</u>.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Filing Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

17

3.     Authorization of the Financing and DIP Loan Agreement.

(a)     The U.S. Debtors are hereby authorized to execute and enter into the DIP Documents, and the DIP Documents are hereby approved and incorporated herein by reference in their entirety. The DIP Documents, and this Interim Order shall govern the financial and credit accommodations to be provided to the U.S. Debtors by the DIP Lenders.

(b)     The U.S. Borrower is hereby authorized to borrow money pursuant to the DIP Documents, and the U.S. Borrower and the U.S. Guarantors are hereby authorized to unconditionally guaranty (on a joint and several basis) such borrowings and the Borrowers' other obligations under the DIP Documents, up to an aggregate principal amount of $175,000,000, (provided, however that during the Interim Period no more than $35,000,000 may be borrowed by the U.S. Borrower[10]), plus interest, costs, fees and other expenses and amounts provided for in the DIP Loan Agreement, in accordance with the terms of this Interim Order and the DIP Loan Agreement, which shall be used solely as expressly provided in the DIP Documents (i) to pay costs, fees and expenses of the DIP Agents, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders as provided for in the Interim Order and the DIP Documents, as well as the scheduled payments of principal and interest thereunder, (ii) to provide working capital and for other general corporate purposes of the U.S. Debtors, the Canadian Borrower, and, subject to the terms of this Interim Order and the DIP Documents, the other subsidiaries of Holdings, (iii) to pay administration costs of these Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court, and (iv) to pay administration costs of the

18

Canadian Case and claims or amounts approved by the Canadian Court, <u>provided that</u> payments of (i) shall be made from the proceeds of the DIP Facility irrespective of the then-applicable 13-Week Budget. U.S. Finco is hereby authorized to unconditionally guaranty all obligations under the DIP Documents of the Canadian Borrower and any Additional Foreign Borrower.

(c)    In furtherance of the foregoing and without further approval of this Court, each U.S. Debtor, other Obligor (other than the Canadian Borrower), and the Prepetition Agent is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be required or necessary for the U.S. Debtors' performance of their obligations under the Financing, including, without limitation:

(i) the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Loan Agreement, any guarantees, any security and pledge agreements, and any mortgages contemplated thereby,

(ii) the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the U.S. Debtors, the DIP Administrative Agent and the Requisite DIP Lenders may agree;

---

[10]    During the Interim Period, the U.S. Borrower and the U.S. Guarantors shall also guaranty all obligations of the Canadian Borrower and any Additional Foreign Borrower.

19

(iii) the non-refundable payment of the fees referred to in the DIP Documents and the Fifth Amendment (and in the separate letter agreements executed in connection with the Financing) and costs and expenses as may be due in accordance with the DIP Documents, and

(iv) the performance of all other acts required under or in connection with the DIP Documents, including, without limitation, all acts required to designate an Additional Foreign Borrower under the DIP Documents and bind such Additional Foreign Borrower to such DIP Documents.

(d) The DIP Documents constitute valid, binding and non-avoidable obligations of the Obligors enforceable against each person or entity party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted case of any U.S. Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any case. No obligation, payment, transfer, or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

RLF1-3420851-1

4. <u>Carve-Out</u>.

(a)     The U.S. Debtors' obligations to the DIP Lenders and the liens and superpriority claims granted herein shall be subject and subordinate only to, after a Carve-Out Effective Date, payment of the Carve-Out. For the purposes of this Order "<u>Carve-Out</u>" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a); (ii) subject to the terms of this Interim Order and the 13-Week Budget, all allowed fees and expenses of the professionals retained under sections 327, 328, 363, and/or 1102 of the Bankruptcy Code or otherwise by the U.S. Debtors and any statutory committees appointed in the Chapter 11 Cases (each, a "<u>Committee</u>") accrued on or before the first business day (the "<u>Carve-Out Effective Date</u>") following the delivery by the DIP Administrative Agent of a Carve-Out Trigger Notice (as defined below), whether approved by the Bankruptcy Court before or after the Carve-Out Effective Date; and (iii) on and after the Carve-Out Effective Date an amount not exceeding $4,000,000 in the aggregate, which amount may be used (subject to the terms of this Interim Order and the 13-Week Budget) to pay any allowed fees or expenses incurred by the professionals retained under sections 327, 328, 363, and/or 1102 of the Bankruptcy Code (or otherwise) by the U.S. Debtors and Committee, on or after the Carve-Out Effective Date, *provided* that (x) the dollar limitation in this clause (iii) on fees and expenses shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid on or prior to the Carve-Out Effective Date in respect of which the Carve-Out is invoked or by any fees, expenses, indemnities or other amounts paid to any agent or lender (or any of their respective attorneys or agents under the Prepetition Facility, the DIP Facility or otherwise), and (y) nothing herein shall be construed to impair the ability of any entity to object to the fees, expenses, reimbursement or compensation

21

described above. "Carve-Out Trigger Notice" means a written notice delivered by the DIP Administrative Agent to the U.S. Borrower and its counsel, the U.S. Trustee, and lead counsel to any Committees, which notice may be delivered following the occurrence and during the occurrence of an Event of Default, expressly stating that it is a Carve-Out Trigger Notice hereunder.

5. <u>Superpriority Claims</u>. The DIP Administrative Agent, for the benefit of the DIP Lenders, is hereby granted an allowed superpriority administrative expense claim (the "<u>Superpriority Claim</u>") pursuant to section 364(c)(1) of the Bankruptcy Code for all DIP Obligations, having priority over any and all other claims against the U.S. Debtors and their estates, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the U.S. Debtors and their estates and all proceeds thereof. The Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to, after the Carve-Out Effective Date, the Carve-Out. Except as expressly set forth herein, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

6. <u>Postpetition Liens</u>.

(a) To secure the DIP Obligations, the DIP Administrative Agent is hereby granted, for the benefit of the DIP Lenders:

22

i.     a first priority, perfected security interest in, and lien, under section 364(c)(2) of the Bankruptcy Code upon all of the Collateral of each U.S. Debtor and of each U.S. Debtor's estate that, on or as of the Filing Date is not subject to valid, perfected, and non-avoidable liens; provided however, that any such lien shall not extend to any leasehold where the terms of the lease would prohibit the imposition of such lien, but provided further that such lien shall extend to the proceeds of any such leasehold;

ii.     a junior lien, under section 364(c)(3) of the Bankruptcy Code upon all of the Collateral of each U.S. Debtor and of each U.S. Debtor's estate that is, as of the Filing Date, subject to valid, perfected, and non-avoidable liens in favor of third parties except as set forth in Subparagraph (iii) below;

iii.     a first priority, perfected priming security interest in and lien under section 364(d)(1) of the Bankruptcy Code upon all Collateral that also constitutes Prepetition Collateral, in all cases senior to the (A) Existing Liens and (B) all other liens and obligations secured by the Prepetition Collateral on a *pari passu* or junior basis to the Existing Liens (collectively the "Prepetition Primed Obligations").

(b)     The liens created as described in clauses (i), (ii), and (iii) above (the "Postpetition Liens") shall cover all property and assets of the U.S. Debtors and their estates (now or hereafter acquired and all proceeds thereof), including property or assets that do not secure the Prepetition Primed Obligations,[11] except (i) the capital stock of any Permitted Joint Ventures; (ii) until entry of the Final Order, claims and causes of action under Sections 502(d),

---

[11]     With respect to liens on the voting capital stock of foreign subsidiaries of the U.S. Debtors (other than those subsidiaries organized in Mexico, Brazil, or the Netherlands), such liens securing the obligations of the U.S. Borrower shall be limited to pledges that would not result in deemed dividends to the U.S. Debtor or such other Debtors pursuant to section 956 of the Internal Revenue Code, except as otherwise agreed pursuant to the DIP Documents, as defined herein. For the avoidance of doubt, 100% of the voting capital stock of the subsidiaries organized in Mexico, Brazil, and the Netherlands shall secure the obligations of the U.S. Borrower.

23

544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions"); and

(iii) as otherwise agreed to by the Requisite DIP Lenders.

(c)     The Postpetition Liens shall be effective immediately upon the entry of this Interim Order and subject only to, after the Carve-Out Effective Date, payment of the Carve-Out.

(d)     Except as provided in this Interim Order, the Postpetition Liens shall not at any time be (i) made subject or subordinated to, or made *pari passu* with any other lien, security interest or claim existing as of the Filing Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, or (ii) subject to any lien or security interest that is avoided and preserved for the benefit of the U.S. Debtors' estates under section 551 of the Bankruptcy Code.

(e)     The Postpetition Liens shall be and hereby are fully perfected liens and security interests, effective and perfected upon the date of this Interim Order without the necessity of execution by the U.S. Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements or other agreements, such that no additional steps need be taken by the DIP Agents or the DIP Lenders to perfect such interests. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the U.S. Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting the DIP Administrative Agent, for the benefit of the DIP Lenders, a priority security interest in such fee, leasehold or other interest or other collateral or

24

the proceeds of any assignment, sale or other transfer thereof, by any of the U.S. Debtors in favor of the DIP Administrative Agent, for the benefit of the DIP Lenders, in accordance with the terms of the DIP Loan Agreement and the other DIP Documents.

(f)     The Postpetition Liens, Superpriority Claim, and other rights, benefits, and remedies granted under this Interim Order to the DIP Administrative Agent, for the benefit of the DIP Lenders, shall continue in these Chapter 11 Cases, in any superseding case or cases under the Bankruptcy Code (including without limitation any case for any Obligor under chapter 7 of the Bankruptcy Code) (a "Superseding Case"), and following any dismissal of the Chapter 11 Cases, and such liens and claims shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lenders' commitments have been terminated in accordance with the DIP Documents.

7.     Authorization to Use Cash Collateral.  Subject to the terms of this Interim Order and the 13-Week Budget, the U.S. Debtors are authorized to use Cash Collateral in which the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, respectively, may have an interest, in accordance with the terms, conditions, and limitations set forth in this Interim Order and/or the DIP Documents.  Any dispute in connection with the use of Cash Collateral shall be heard by the Court.  Notwithstanding anything in this Interim Order to the contrary, the U.S. Debtors' authority to use Cash Collateral shall not begin until such time as all conditions precedent to initial borrowing under the DIP Facility have been satisfied and shall automatically terminate without any further action by this Court or the DIP Administrative Agent, and the Obligors shall be immediately prohibited from using such Cash Collateral upon the earliest to occur of (the "Cash Collateral Termination Date"): (a) thirty (30) days after the date of entry of

25

this Interim Order, unless the Final Order shall have been entered by the Court on or before such date in accordance with the DIP Loan Agreement, (b) such earlier date on which the DIP Loans shall become due and payable in accordance with the terms of this Interim Order and/or the DIP Documents, and (c) the date on which all commitments have been terminated under this Interim Order and/or the DIP Documents as a result of the occurrence of an Event of Default.

(a) <u>Fees</u>. All fees paid and payable, and costs and/or expenses reimbursed or reimbursable by the U.S. Debtors to the DIP Agents and the DIP Lenders are hereby approved. The U.S. Debtors are hereby authorized and directed to promptly pay all such fees, costs, and expenses on demand, without the necessity of any further application with the Court for approval or payment of such fees, costs or expenses. Notwithstanding anything to the contrary herein, the fees, costs and expenses (other than those of professionals retained by the DIP Agents and DIP Lenders) of the DIP Agents and the DIP Lenders, whether incurred prior to or after the Filing Date shall be deemed fully earned, non-refundable, irrevocable, and non-avoidable as of the date of this Interim Order; <u>provided that</u> with respect to fees and expenses of professionals of the DIP Agents and the DIP Lenders, such professionals shall submit copies of their invoices to the Debtors and the United States Trustee and, provided that no objection is raised to such fees or expenses within ten (10) days of the provision of such invoice, the U.S. Debtors shall promptly pay such fees and expenses which shall, upon payment be deemed fully earned, non-refundable, irrevocable, and non-avoidable. All unpaid fees, costs, and expenses shall be included and constitute part of the principal amount of the DIP Obligations and be secured by the Postpetition Liens.

26

8. Authority to Execute and Deliver Necessary Documents.

(a) All of the liens described herein with respect to the assets of the U.S. Debtors shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

(b) Each of the U.S. Debtors is hereby further authorized and directed to (i) perform all of its obligations under the DIP Documents, and such other agreements as may be required by the DIP Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Documents and this Interim Order.

(c) The U.S. Debtors shall cause the Obligors (other than the Canadian Borrower) to execute all documents and take all actions required to effectuate DIP Documents, including, without limitation, executing all instruments which may be requested by any of the DIP Agents and all documents required to designate an Additional Foreign Borrower under the DIP Documents and bind such Additional Foreign Borrower to such DIP Documents

(d) All obligations under the DIP Documents shall constitute valid and binding obligations of each of the Obligors enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order. No obligation, payment, transfer, or grant of a security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or

27

otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

9.  Amendments, Consents, Waivers, and Modifications.

    (a)    The U.S. Debtors, with the express written consent of the DIP Administrative Agent (at the direction of the Requisite DIP Lenders) may enter into any amendments, consents, waivers, or modifications to the DIP Documents without the need for further notice and hearing or any order of this Court, provided that such amendments, consents, waivers, or modifications do not (i) shorten maturity, (ii) increase commitments or the rate of interest payable under the DIP Documents, or (iii) change any Event of Default, add any covenants or amend the covenants in the DIP Documents, in each case as applicable to the Obligors, in any such case to be materially more restrictive; provided, however, that a copy of any such amendment, consent, waiver or other modification shall be served by the U.S. Debtors on the U.S. Trustee and the Creditors' Committee (as that term is defined below). No consent shall be implied by any other action, inaction, or acquiescence of the DIP Agents or any DIP Lender.

    (b)    The U.S. Debtors, with the express written consent of the Prepetition Agent (at the direction of the Requisite Prepetition Lenders) may enter into any amendments or modifications to the Prepetition Loan Documents without the need for further notice and hearing or any order of this Court, provided that such amendments or modifications do not

28

increase any claims against any obligor under the Prepetition Loan Documents or increase any obligations of any obligor under the Prepetition Loan Documents.

10. <u>Protections for Prepetition Lenders</u>. The Prepetition Agent, the Prepetition Lenders and each other Secured Creditor (as defined in the Prepetition Loan Documents) (collectively with the Prepetition Agent and the Prepetition Lenders, the "<u>Prepetition Secured Parties</u>") are hereby granted the following protections (collectively, the "<u>Prepetition Lender Protection</u>"), pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, with respect to their pre-petition security interests in the Prepetition Collateral for the consent of such Prepetition Secured Parties to the priming effectuated by the DIP Facility, consent to the use of their Prepetition Collateral (including Cash Collateral), consent to the transactions contemplated by the DIP Facility, and as adequate protection for the diminution in the value (each such diminution, a "<u>Diminution in Value</u>") of the Existing Liens, whether or not such Diminution in Value results from the sale, lease or use by the U.S. Debtors of the Prepetition Collateral (including, without limitation, Cash Collateral), the priming of the Existing Liens or the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise ((a) through (c) below shall be referred to collectively as the "<u>Lender Protection Obligations</u>"):

(a) <u>Lender Protection Liens</u>. The Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, shall be granted, for the reasons set forth above in this Paragraph 10, solely to the extent of any Diminution in Value, for the benefit of the Prepetition Secured Parties, effective and perfected as of the date of this Interim Order and without the necessity of the execution of mortgages, security agreements, pledge

29

agreements, financing statements or other agreements, valid, perfected, postpetition security interests in and liens on all of the Collateral of the U.S. Debtors and their estates (together, the "Lender Protection Liens"), subject and subordinate only to (x) after the Carve-Out Effective Date, the Carve-Out; (y) the Permitted Liens; and (z) the Postpetition Liens securing the DIP Facilities, provided that the Lender Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order. The Lender Protection Liens shall not at any time be (i) made subject or subordinated to, or made pari passu with any other lien, security interest or claim existing as of the Filing Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise or (ii) subject to paragraph 21 hereof, subject to any lien or security interest that is avoided and preserved for the benefit of the U.S. Debtors' estates under section 551 of the Bankruptcy Code.

(b)     Administrative Expense Claim. The Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, shall be granted, for the reasons set forth above in this Paragraph 10, solely to the extent of any Diminution in Value, subject, after the Carve-Out Effective Date, to the payment of the Carve-Out, a superpriority administrative expense claim immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Administrative Agent on account of the DIP Obligations, provided that no entity shall receive or retain any payments, property, or other amounts in respect of superpriority claims relating to such Prepetition Primed Obligations unless and until the obligations under the DIP Facility have indefeasibly been paid in cash in full.

30

(c)     As further compensation for the consensual use of the Prepetition Collateral (including Cash Collateral) by the U.S. Debtors for the reasons set forth above in this Paragraph 10, and in accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Prepetition Agent or the respective professional identified below shall receive from the U.S. Debtors:

    i.     <u>Fees and Expenses</u>.  Current cash payments payable under the Prepetition Facility shall be made to the Prepetition Agent under the Prepetition Facility (for the benefit of the Prepetition Lenders thereunder) for of all fees and expenses payable to any agent under the Prepetition Facility, including, but not limited to, the fees and disbursements of  professionals, including, without limitation (i) Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, in connection with the Prepetition Agent in its role as Administrative Agent and its administration of the Prepetition Loan Documents, (ii) each local counsel of the Prepetition Agent in connection with the Prepetition Agent in its role as Administrative Agent and its administration of the Prepetition Loan Documents, (iii) Capstone Advisory Group LLC ("<u>Capstone</u>"), in connection with the Prepetition Agent in its role as Administrative Agent and its administration of the Prepetition Loan Documents and (iv) Houlihan Lokey Howard & Zukin Capital, Inc. ("<u>Houlihan</u>"), in connection with the Prepetition Agent in its role as Administrative Agent and its administration of the Prepetition Loan Documents, in each case promptly upon receipt of invoices <u>provided that</u> with respect to fees and expenses of professionals, such professionals shall submit copies of their invoices to the Debtors and the United States Trustee and, provided that no objection is raised to such fees or expenses within ten (10) days of the provision of such invoice, the U.S. Debtors shall promptly pay such fees and expenses which shall, upon payment be deemed fully earned, non-refundable, irrevocable, and non-avoidable.;

    ii.    <u>Monitoring of Pre-Petition Collateral</u>.  Capstone shall be given reasonable access for purposes of monitoring the business of the Obligors and the value of the collateral under the Prepetition Facility; and

    iii.   <u>Financial Reporting</u>.  The U.S. Debtors shall continue to provide the Prepetition Agent, Capstone, and Houlihan with financial and other reporting substantially in compliance with the Prepetition Facility and any reporting described herein or in the DIP Documents.

31

(d)     Reservation of Rights.  Notwithstanding any other provision hereof to the contrary, the grant of Lender Protection Obligations to the Prepetition Secured Parties pursuant hereto is without prejudice to the right of the Prepetition Secured Parties to seek different or additional adequate protection, including without limitation the current payment of post-petition interest (at the applicable default rate) and to seek payments under section 506(b) of the Bankruptcy Code.  Except as expressly provided herein, nothing contained in this Interim Order (including without limitation, the authorization to use any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Prepetition Secured Parties.  The consent of the Prepetition Secured Parties to the priming of the Existing Liens by the DIP Liens (a) is limited solely to the DIP Financing and does not extend to any other post-petition financing the Obligors may subsequently propose to enter into and (b) does not constitute, and shall not be construed as constituting, an acknowledgement or stipulation by the Prepetition Agent or the Prepetition Secured Parties that, absent such consent, their respective interests in the Prepetition Collateral would be adequately protected pursuant to this Interim Order.  Nothing in this Interim Order shall constitute an admission that the Prepetition Secured Parties are not entitled to payment under section 506(b) of the Bankruptcy Code.

11.     Perfection of Postpetition Liens and Lender Protection Liens.

(a)     The DIP Administrative Agent and the Prepetition Agent are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, in each case without the

32

necessity to pay any mortgage recording fee or similar fee or tax. Whether or not the DIP Administrative Agent on behalf of the DIP Lenders or the Prepetition Agent on behalf of the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge dispute or subordination, at the time and on the date of entry of this Interim Order. The U.S. Debtors shall, if requested, execute and deliver to the DIP Administrative Agent and the Prepetition Agent all such agreements, financing statements, instruments and other documents as the DIP Administrative Agent and the Prepetition Agent may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the Postpetition Liens and the Lender Protection Liens. All such documents will be deemed to have been recorded and filed as of the Filing Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Administrative Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording.

12.     Application of Proceeds. The U.S. Debtors are hereby directed to remit (as and when required by the DIP Documents and this Interim Order) to the DIP Administrative Agent one-hundred percent (100%) of all collections on, and proceeds of, the Collateral (including without limitation the Prepetition Collateral), including, but not limited to, all accounts

33

receivable collections, proceeds of sales of inventory, fixed assets, and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Filing Date come into the possession or control of the U.S. Debtors, or to which the U.S. Debtors shall become entitled at any time, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Agents or the DIP Lenders to retain and apply all collections, remittances, and proceeds of the Collateral in accordance with the DIP Documents, without further order of this Court.

13. <u>Access to Collateral</u>. Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agents or the DIP Lenders contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, upon five (5) business days' written notice to the landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Documents or a default by any of the U.S. Debtors of any of their obligations under this Interim Order has occurred and is continuing, the DIP Agents or the DIP Lenders (i) may, only subject to any separate agreement by and between the applicable landlord or licensor, and the DIP Administrative Agent or the DIP Lenders (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of any of the U.S. Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and (ii) shall be entitled to all of the U.S. Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of the U.S. Debtors, which are owned by or subject to a lien of any third party and which are used by the

34

U.S. Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder, provided, however, that the DIP Administrative Agent or the DIP Lenders shall pay only rent and additional rent, fees, royalties or other obligations of the U.S. Debtors that first arise after the DIP Administrative Agent's or the DIP Lenders' written notice referenced above and that are payable during the period of such occupancy or use by the DIP Administrative Agent or the DIP Lenders, as the case may be, calculated on a *per diem* basis. Nothing herein shall require the U.S. Debtors, the DIP Administrative Agent or the DIP Lenders to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Administrative Agent and the DIP Lenders in this paragraph.

14.     Cash Management Systems. The U.S. Debtors are authorized to maintain their cash management system in a manner consistent with the DIP Documents, and the order of this Court approving the maintenance of the U.S. Debtors' cash management system, provided, however, that such order is on terms and conditions (i) acceptable to the DIP Administrative Agent, and (ii) to the extent that it is not inconsistent with the terms specified herein, consistent with the DIP Documents.

15.     Automatic Stay Modified. The automatic stay provisions of section 362 of the Bankruptcy Code hereby are, to the extent applicable, vacated, and modified to the extent necessary without the need for any further order of this Court:

(a)     whether or not a default, Default, an Event of Default under the DIP Documents, or a default by any of the U.S. Debtors of any of their obligations under this Interim Order has occurred, to require all cash, checks, or other collections or proceeds from Collateral received by any of the U.S. Debtors to be deposited in accordance with

35

the requirements of the DIP Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Agents and the DIP Lenders, under the DIP Documents in accordance with any requirements of the DIP Documents without further order of this Court; and

(b)     following a default, Default or an Event of Default under the DIP Documents, or a default by any of the U.S. Debtors of any of their obligations under this Interim Order, the DIP Agents and the DIP Lenders are authorized to exercise any and all of their rights and remedies in accordance with the terms of the DIP Documents, and to take all actions required or permitted by the DIP Documents without necessity of further Court orders; provided that the DIP Administrative Agent shall give five (5) business days notice to the U.S. Debtors, the U.S. Trustee, and any Committee of such action; provided further however, that this Interim Order shall not prejudice the rights of any party-in-interest to oppose the exercise of the DIP Agents' or the DIP Lenders' remedies; provided further, that the only issue that may be raised by any entity in opposition thereto shall be whether a default, Default or Event of Default has in fact occurred and is continuing, and all entities hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or delay the exercise or benefit of, the rights and remedies of DIP Agents or the DIP Lenders under the DIP Documents or this Interim Order.

16.     Subsequent Reversal or Modification.  This Interim Order is entered pursuant to, inter alia, section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lenders all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that

action will not affect (i) the validity of any obligation, indebtedness or liability incurred

hereunder by any of the Obligors to the DIP Agents, the DIP Lenders, the Prepetition Agent, and

the Prepetition Lenders prior to the date of receipt by the DIP Administrative Agent and the DIP

Lenders of written notice of the effective date of such action or (ii) the validity and enforceability

of any lien, claim, or priority authorized or created under this Interim Order or pursuant to the

DIP Documents. Notwithstanding any such reversal, stay, modification, or vacatur, any

postpetition indebtedness, obligation or liability incurred by any of the Obligors to the DIP

Agent, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders prior to written

notice to the DIP Agents and the DIP Lenders of the effective date of such action, shall be

governed in all respects by the original provisions of this Interim Order (and, with respect to the

Canadian Borrower, any order of the Canadian Court), and the DIP Agents, the DIP Lenders, the

Prepetition Agent, and the Prepetition Lenders shall be entitled to all the rights, remedies,

privileges, and benefits granted herein and in the DIP Documents with respect to all such

indebtedness, obligations or liability.

     17.    <u>Restriction on Use of Lenders' Funds</u>. Notwithstanding anything herein to the

contrary, no Collateral, proceeds thereof, Cash Collateral, Prepetition Collateral, proceeds

thereof, proceeds of the Financing, or any portion of the Carve-Out may be used by any of the

U.S. Debtors, their estates, any other Obligor, any Committee, any trustee or examiner appointed

in these Chapter 11 Cases or any chapter 7 trustee, or any other person, party or entity to, in any

jurisdiction anywhere in the world (other than the appointment of the Monitor (as defined in the

DIP Documents), directly or indirectly (a) request authorization to obtain postpetition financing

(whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of

the Bankruptcy Code, or otherwise, other than (i) from the DIP Lenders or (ii) if such financing

37

is sufficient to indefeasibly pay all DIP Obligations in full in cash and such financing is immediately so used; (b) assert, join, commence, support, investigate, or prosecute any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the Releasees, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any action arising under the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity and extent of the DIP Obligations, the Superpriority Claims, the Lender Protection, or the Prepetition Indebtedness, or the validity, extent, perfection, and priority of the Postpetition Liens, the Existing Liens or the Lender Protection Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counter claims or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against or with respect to the Postpetition Liens, the Superpriority Claims, the Prepetition Liens or the Lender Protection Liens in whole or in part; (v) appeal or otherwise challenge this Interim Order, the Final Order, the Initial Canadian Order, the DIP Documents, or any of the transactions contemplated herein or therein; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Agents, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders in respect of their liens and security interests in the Collateral or the Prepetition Collateral or any of their rights, powers, or benefits hereunder or in the Prepetition Loan Documents or the DIP Documents anywhere in the world; and/or (c) pay any claim of a pre-petition creditor except in accordance with the DIP Documents and the 13-Week Budgets; provided however, that the Official

38

Committee of Unsecured Creditors (the "Creditors' Committee") may use (in accordance with the DIP Documents and the 13-Week Budget) up to $25,000 (the "Investigation Fund") to investigate the Liens and claims of and claims against the Prepetition Agent and Prepetition Lenders under the Prepetition Facility but may not use the Investigation Fund to initiate, assert, join, commence, support, or prosecute any actions or discovery with respect thereto. Any claim incurred in connection with any activities described in subparagraph (b) of this paragraph 17 shall not constitute an allowed administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

18.     [Reserved]

19.     Claims Stipulation Investigation Period Reservation of Rights. Except as expressly set forth below in the immediately following sentence, the stipulations set forth in Paragraph E hereof (together the "Claims Stipulation") and all of the terms and conditions hereof shall be immediately and irrevocably binding on all persons and entities. Notwithstanding anything herein or in the DIP Documents to the contrary, until the day that is 60 days from the date of the formation of the Creditors' Committee (as such date may be extended by the Requisite DIP Lenders or by the Court for cause shown, the "Investigation Termination Date"), the Creditors' Committee shall be entitled to investigate the accuracy of the Claims Stipulation (but solely with respect to the U.S. Debtors and their estates) against the Prepetition Agents and the Prepetition Secured Lenders;[12] provided, however, that nothing contained in this paragraph shall alter the restrictions contained in Paragraph 17 hereof. Any assertion of claims or causes of action of the U.S. Debtors or their estates against any of the Prepetition Agents and/or the

---

[12] Nothing herein shall be interpreted as conferring on any person or entity standing to pursue any claim, cause of action or take any action on behalf of the U.S. Debtors or their respective estates or any of the other Obligors.

Prepetition Secured Lenders must be made by commencing an adversary proceeding on or before the Investigation Termination Date, and each Claim Stipulation shall remain binding and in full force and effect until a final order has been entered invalidating such Claim Stipulation, and following the entry of such a final order, such Claim Stipulation shall be invalidated only to the extent provided for in such final order. If no such action is filed on or before the Investigation Termination Date, all persons and entities shall be forever barred from bringing or taking such action and the Claims Stipulations shall be permanently and irrevocably binding upon all persons and entities. Any Claim Stipulation that is not expressly challenged in an adversary proceeding before the Investigation Termination Date shall remain in full force and effect and shall permanently and irrevocably bind all entities and persons, despite the filing of any other adversary proceeding in accordance with this paragraph.

20. <u>Collateral Rights</u>. In the event that any person or entity that holds a lien or security interest in Collateral of the U.S. Debtors or their estates or Prepetition Collateral that is junior and/or subordinate to the Postpetition Liens in such Collateral of the U.S. Debtors or their estates or Prepetition Collateral receives or is paid the proceeds of such Collateral of the U.S. Debtors or their estates or Prepetition Collateral, or receives any other payment with respect thereto from any other source, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Documents and the Prepetition Indebtedness under the Prepetition Loan Documents, and termination of the commitments in accordance with the DIP Documents and the Prepetition Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such Collateral of the U.S. Debtors or their estates in trust for the DIP Lenders, and shall immediately turnover such

40

proceeds to the DIP Administrative Agent for application in accordance with the DIP Documents and this Interim Order.

21. <u>Prohibition on Additional Liens</u>. Except as provided in the DIP Documents and/or this Interim Order, the U.S. Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases until such time as the DIP Obligations have been indefeasibly paid in full, granting liens on the Collateral or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, pari passu with or junior to the liens granted to the DIP Administrative Agent, for the benefit of the DIP Lenders, the Lender Protection Liens, or the Existing Liens, except in accordance with the DIP Documents, the Prepetition Loan Documents, and this Interim Order.

22. <u>No Waiver</u>. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Agents, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders may have to bring or be heard on any matter brought before this Court.

23. <u>Sale/Conversion/Dismissal/Plan</u>.

(a) No order providing for either the sale of the ownership of the stock of the U.S. Debtors or the sale of all or substantially all of the assets of the U.S. Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, the proceeds of such sale shall be used to satisfy, in cash the DIP Obligations in accordance with the DIP Documents; and (ii) such sale is expressly permitted under the DIP Documents.

(b) No motion shall be filed by any Obligor seeking dismissal or conversion of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code, or seeking appointment of a chapter 11 trustee or an examiner with expanded powers unless and

41

until (x) the DIP Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Documents are terminated in accordance therewith or (y) the DIP Administrative Agent expressly consents in writing. If an order dismissing or converting any of these cases under sections 305 or 1112 of the Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered, and unless otherwise agreed to by the DIP Administrative Agent with the consent of the Requisite DIP Lenders, such order shall provide that (i) the Postpetition Liens, Superpriority Claim, and the Lender Protection Obligations granted hereunder and in the DIP Documents shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order until all DIP Obligations and Prepetition Indebtedness are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Documents and the Prepetition Loan Documents are terminated in accordance with the DIP Documents and the Prepetition Loan Documents, (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the Postpetition Liens, the Lender Protection Liens, the Superpriority Claim, and the Lender Protection Claim, and (iii) all postpetition indebtedness, obligation or liability incurred by any of the U.S. Debtors to the DIP Agents, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders prior to the date of such order, including without limitation, the DIP Obligations, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agents, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Documents with respect to all such indebtedness, obligations or liability.

42

24.     _Priority of Terms_.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Documents, the terms and provisions of this Interim Order shall govern.

25.     _No Third Party Beneficiary_.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

26.     _Rights Under Section 363(k)_.  The full amount of the DIP Obligations may be used to "credit bid" for the assets and property of the U.S. Debtors as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of the DIP Loan Agreement without the need for further Court order authorizing the same.

27.     _Headings_.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

28.     _Final Hearing Date._  The Final Hearing to consider the entry of the Final Order approving the relief sought in the Motion shall be held on August __ , 2009 at _____ before the Honorable _____, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801.

29.     _No Consent_.  No action, inaction or acquiescence by the DIP Agents, the DIP Lenders, the Prepetition Agents or the Prepetition Secured Lenders, including funding the U.S. Debtors' ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Agents, the DIP Lenders, the

43

Prepetition Agents or the Prepetition Secured Lenders to a charge against the Collateral pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code. The DIP Agents, the DIP Lenders, the Prepetition Agents and the Prepetition Secured Lenders shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

30. <u>Waiver</u>. Effective upon entry of this Interim Order, no person or entity shall be entitled, directly or indirectly, to (a) except as expressly provided by paragraph 4 of this Interim Order, charge or recover from the Carve-Out or the Collateral, whether by operation of (i) with respect to the DIP Obligations and the liens and claims granted in paragraphs 5 and 6 of this Interim Order, section 506(c) of Bankruptcy Code; (ii)with respect to the Prepetition Primed Obligations, the Existing Liens on the Prepetition Collateral, or the liens or claims granted under paragraph 10 of this Interim Order, section 506(c) of the Bankruptcy Code (but solely with respect to this paragraph 30(a)(ii), upon entry of a Final Order); or (c) sections 105 or 552(b) of the Bankruptcy Code or otherwise or (ii) direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of Collateral or Property after an Event of Default under the DIP Documents, or termination or breach under the DIP Documents or this Interim Order.

31. <u>Adequate Notice</u>. The notice given by the U.S. Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2), and the Local Bankruptcy Rules, and was adequate and sufficient. Under the circumstances, no further notice of the request for the relief granted at the Interim Hearing is required. The U.S. Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to the Notice Parties, any known entity effected by the terms of the Final Order, and any other entity requesting notice

44

after the entry of this Interim Order. Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be <u>actually received</u> no later than seven (7) days prior to the Final Hearing by the following: (i) counsel to the U.S. Debtors, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York, 10004, Attn: Gary L. Kaplan, Richard J. Slivinski and Peter B. Siroka, and Richards, Layton & Finger P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899, Attn: Mark D. Collins and Michael J. Merchant; and (ii) counsel to the DIP Administrative Agent, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Abhilash M. Raval, Tyson Lomazow, and Brian Kinney and Morris, Nichols, Arsht & Tunnell LLP, Chase Manhattan Centre, 18th Floor, 1201 North Market Street, Wilmington, Delaware 19899, Attn: Robert Dehney and Gregory Werkheiser.

32. Binding Effect; Successors and Assigns. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties-in-interest in these Chapter 11 Cases, including, without limitation, the Obligors, the DIP Agents, the DIP Lenders, the Prepetition Agent, the Lender Protection Parties, any Committee or examiner appointed in these Chapter 11 Cases, and the U.S. Debtors, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the U.S. Debtors or with respect to the property of the estates of the U.S. Debtors) whether in these Chapter 11 Cases, in any Successor Cases, or upon any dismissal of any such chapter 11 or chapter 7 case and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agent, the Lender Protection Parties, and the U.S. Debtors and their respective successors and assigns, *provided*, *however*, that the consent of the DIP Agents, the DIP Lenders, the Prepetition

45

Agent, and the Prepetition Lenders to permit the use of Cash Collateral and the agreement of the DIP Agents and the DIP Lenders to extend financing shall terminate upon the appointment of any chapter 7 or 11 trustee, examiner with expanded powers, or similar responsible person appointed for the estates of the U.S. Debtors. In determining to make any loan (whether under the DIP Loan Agreement, a promissory note, or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agents, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders and the Lender Protection Parties shall not (i) be deemed to be in control of the operations of the Obligors, (ii) owe any fiduciary duty to the Obligors, their respective creditors, shareholders, or estates. Each stipulation, admission and agreement contained in this Interim Order shall also be binding upon all other parties in interest, including, any Committee, under all circumstances and for all purposes.

33. <u>Retention of Jurisdiction</u>. This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: Wilmington, Delaware
      August \_\_, 2009

_____
**UNITED STATES BANKRUPTCY JUDGE**

46

# EXHIBIT A

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

COOPER-STANDARD HOLDINGS INC.,

COOPER-STANDARD AUTOMOTIVE INC.,

COOPER-STANDARD AUTOMOTIVE CANADA LIMITED,

VARIOUS LENDING INSTITUTIONS,

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent,

BANC OF AMERICA SECURITIES LLC,
GENERAL ELECTRIC CAPITAL CORPORATION
and
UBS SECURITIES LLC,
as Co-Syndication Agents,

and

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Documentation Agent

Dated as of August 3, 2009

_____

DEUTSCHE BANK SECURITIES INC.,
and
GENERAL ELECTRIC CAPITAL CORPORATION,
as Joint Lead Arrangers and Book Runners

BANC OF AMERICA SECURITIES LLC
and
UBS SECURITIES LLC
as Co-Arrangers

# TABLE OF CONTENTS

Page

SECTION 1. Definitions..................................................................................................2

SECTION 2. Amount and Terms of Credit ..................................................................40

    2.01 Commitments.................................................................................................40
    2.02 Minimum Borrowing Amounts, etc. ............................................................43
    2.03 Notice of Borrowing ....................................................................................43
    2.04 Disbursement of Funds ................................................................................43
    2.05 Notes ............................................................................................................44
    2.06 Conversions and Continuations ...................................................................46
    2.07 Pro Rata Borrowings ...................................................................................46
    2.08 Interest..........................................................................................................46
    2.09 Interest Periods.............................................................................................48
    2.10 Increased Costs; Illegality; etc. ...................................................................48
    2.11 Compensation ..............................................................................................51
    2.12 Change of Lending Office.............................................................................51
    2.13 Replacement of Lenders ..............................................................................51
    2.14 [Intentionally Omitted] ................................................................................52
    2.15 Incremental Term Loan Commitments ........................................................52

SECTION 3. [Intentionally Omitted]............................................................................55

SECTION 4. Fees; Commitments..................................................................................55

    4.01 Fees ..............................................................................................................55
    4.02 Voluntary Termination of Commitments......................................................56
    4.03 Mandatory Reduction of Commitments........................................................56

SECTION 5. Prepayments; Repayments; Taxes ..........................................................57

    5.01 Voluntary Prepayments................................................................................57
    5.02 Mandatory Repayments ...............................................................................57
    5.03 Method and Place of Payment ......................................................................59
    5.04 Net Payments ...............................................................................................60

SECTION 6. Conditions Precedent to Credit Events on the Initial Borrowing Date and the Final
        Borrowing Date....................................................................................62

    6.01 Effective Date; Delivery of Notes.................................................................62
    6.02 Officer's Certificate .....................................................................................63
    6.03 Opinions of Counsel ....................................................................................63
    6.04 Company Documents; Proceedings; Capital Structure..................................63
    6.05 Adverse Change, etc ....................................................................................63
    6.06 Litigation......................................................................................................64
    6.07 Approvals......................................................................................................64
    6.08 [Intentionally Omitted] ................................................................................64
    6.09 [Intentionally Omitted] ................................................................................64

6.10 [Intentionally Omitted] ...................................................................................... 64
6.11 Outstanding Indebtedness and Preferred Stock ............................................. 64
6.12 Consent Letter ................................................................................................. 64
6.13 Subsidiaries Guaranties; Intercompany Subordination Agreement ............... 64
6.14 Pledge Agreements ......................................................................................... 65
6.15 Security Agreements ....................................................................................... 66
6.16 Mortgages; Title Insurance; etc. .................................................................... 69
6.17 Shareholders' Agreements; Management Agreements; Collective Bargaining
      Agreements; Financial Advisors Engagement Agreements, Existing Indebtedness
      Agreements; and Tax Allocation Agreements ............................................... 69
6.18 Insurance Certificates ..................................................................................... 70
6.19 Payment of Fees .............................................................................................. 70
6.20 Patriot Act ....................................................................................................... 71
6.21 Interim Order/Bankruptcy Matters ................................................................. 71
6.22 Financial Statements, 13-Week Budgets and Reports .................................... 72
6.23 Amendment of the Prepetition Facility and Prepetition Security Documents ............. 72
6.24 Lien Searches .................................................................................................. 72
6.25 Final Order ...................................................................................................... 72
6.26 Other Conditions ............................................................................................. 73

SECTION 7. Conditions Precedent to All Credit Events ..................................................... 73

7.01 No Default; Representations and Warranties .................................................. 73
7.02 Notice of Borrowing; etc. ............................................................................... 74
7.03 Incremental Term Loans ................................................................................. 74
7.04 [Intentionally Omitted] ................................................................................... 74
7.05 [Intentionally Omitted] ................................................................................... 74
7.06 Commitments ................................................................................................... 74
7.07 Interim Order, Initial Order and Final Order ................................................. 74
7.08 Payment ........................................................................................................... 74

SECTION 8. Representations and Warranties ..................................................................... 74

8.01 Company Status ............................................................................................... 75
8.02 Authorization; Enforceability ......................................................................... 75
8.03 Governmental Approvals; No Conflicts .......................................................... 75
8.04 Financial Condition; No Material Adverse Change ........................................ 76
8.05 Properties ......................................................................................................... 76
8.06 Litigation and Environmental Matters ............................................................ 77
8.07 Compliance with Laws and Agreements ......................................................... 77
8.08 Investment Company Status ............................................................................ 77
8.09 Taxes ................................................................................................................ 77
8.10 ERISA; Canadian Welfare and Pension Plans ................................................ 77
8.11 Disclosure ........................................................................................................ 78
8.12 Subsidiaries and Joint Ventures ...................................................................... 79
8.13 Insurance .......................................................................................................... 79
8.14 Labor Matters ................................................................................................... 79
8.15 [Intentionally Omitted] ................................................................................... 79
8.16 Senior Indebtedness; Designated Senior Indebtedness ................................... 79
8.17 Collateral Matters ............................................................................................ 80
8.18 Scheduled Existing Indebtedness .................................................................... 80
8.19 Cases ................................................................................................................ 81

8.20 Orders..................................................................................................................81
8.21 Material Contracts....................................................................................................81
8.22 Forward Looking Projections ...................................................................................81

SECTION 9. Affirmative Covenants ......................................................................................81

9.01 Financial Statements and Other Information ............................................................81
9.02 Notices of Material Events..........................................................................................82
9.03 Information Regarding Collateral ...............................................................................83
9.04 Existence; Conduct of Business..................................................................................84
9.05 Payment of Taxes........................................................................................................84
9.06 Maintenance of Properties ..........................................................................................84
9.07 Insurance.....................................................................................................................84
9.08 Casualty and Condemnation ......................................................................................85
9.09 Books and Records; Inspection and Audit Rights ......................................................85
9.10 Compliance with Laws ...............................................................................................85
9.11 Use of Proceeds..........................................................................................................85
9.12 Additional Subsidiaries ..............................................................................................86
9.13 Further Assurances......................................................................................................86
9.14 End of Fiscal Years; Fiscal Quarters..........................................................................87
9.15 [Intentionally Omitted] ..............................................................................................87
9.16 [Intentionally Omitted] ..............................................................................................87
9.17 Financial Statements and Additional Bankruptcy-related Reporting..........................87
9.18 Financial Advisors ......................................................................................................89
9.19 Ratings .......................................................................................................................89
9.20 Environmental Assessment .........................................................................................89
9.21 Post-Closing Actions ..................................................................................................89
9.22 Lender Conference Calls.............................................................................................90

SECTION 10. Negative Covenants ........................................................................................90

10.01 Indebtedness; Certain Equity Securities ..................................................................90
10.02 Liens...........................................................................................................................93
10.03 Fundamental Changes.................................................................................................95
10.04 Investments, Loans, Advances, Guarantees and Acquisitions...................................96
10.05 Asset Sales ................................................................................................................99
10.06 Sale and Leaseback Transactions.............................................................................101
10.07 Post Petition Swap Agreements...............................................................................101
10.08 Restricted Payments; Certain Payments of Indebtedness ........................................101
10.09 Transactions with Affiliates .....................................................................................102
10.10 Restrictive Agreements ............................................................................................103
10.11 Amendment of Material Documents .........................................................................103
10.12 New Subsidiaries ......................................................................................................104
10.13 13-Week Budget .......................................................................................................104
10.14 Maximum Capital Expenditures................................................................................104
10.15 Limitation on Issuance of Equity Interests. ............................................................104
10.16 Minimum EBITDA....................................................................................................104
10.17 Minimum Liquidity...................................................................................................105
10.18 Chapter 11 Claims.....................................................................................................105
10.19 No Right of Subrogation. ..........................................................................................105
10.20 Modification of Engagement Letters. ........................................................................105
10.21 Hazardous Materials. ................................................................................................105

SECTION 11. Events of Default and Remedies ............................................................................. 106

SECTION 12. The Agents ............................................................................................................ 111

    12.01 Appointment ............................................................................................................... 111
    12.02 Nature of Duties ......................................................................................................... 112
    12.03 Certain Rights of the Agents ...................................................................................... 113
    12.04 Reliance by Agents ..................................................................................................... 113
    12.05 Notice of Default, etc. ................................................................................................ 113
    12.06 Nonreliance on Agents and Other Lenders ................................................................ 113
    12.07 Indemnification ........................................................................................................... 114
    12.08 Agents in their Individual Capacities .......................................................................... 114
    12.09 Holders ....................................................................................................................... 114
    12.10 Resignation of the Agents .......................................................................................... 115
    12.11 Collateral Matters ....................................................................................................... 115
    12.12 Delivery of Information ............................................................................................... 117
    12.13 Special Appointment of Collateral Agent (German Security Documents) .............. 117
    12.14 Special Appointment of Collateral Agent (French Security Documents) ................ 118
    12.15 Special Appointment of Collateral Agent (Dutch Security Documents) ................. 119

SECTION 13. Miscellaneous ...................................................................................................... 120

    13.01 Payment of Expenses, etc. .......................................................................................... 120
    13.02 Right of Setoff ............................................................................................................. 122
    13.03 Notices ........................................................................................................................ 123
    13.04 Benefit of Agreement .................................................................................................. 124
    13.05 No Waiver; Remedies Cumulative ............................................................................. 126
    13.06 Payments Pro Rata ...................................................................................................... 126
    13.07 Calculations; Computations ........................................................................................ 126
    13.08 Governing Law; Submission to Jurisdiction; Venue ................................................. 128
    13.09 Counterparts ................................................................................................................ 129
    13.10 Effectiveness ............................................................................................................... 129
    13.11 Headings Descriptive .................................................................................................. 130
    13.12 Amendment or Waiver; etc. ........................................................................................ 130
    13.13 Survival ....................................................................................................................... 131
    13.14 Domicile of Loans and Commitments ........................................................................ 131
    13.15 Confidentiality ............................................................................................................ 132
    13.16 Waiver of Jury Trial .................................................................................................... 132
    13.17 Register ........................................................................................................................ 132
    13.18 English Language ........................................................................................................ 133
    13.19 Special Provisions Regarding Pledges of Equity Interests in Persons Not
           Organized in Qualified Jurisdictions ...................................................................... 133
    13.20 Powers of Attorney; etc. ............................................................................................. 134
    13.21 Waiver of Sovereign Immunity .................................................................................. 134
    13.22 Determinations of Satisfaction by the Lenders ......................................................... 135
    13.23 Judgment Currency. .................................................................................................... 135
    13.24 Limitation on Additional Amounts, etc ..................................................................... 135
    13.25 USA PATRIOT Act .................................................................................................... 136
    13.26 Abstract Acknowledgment of Indebtedness and Joint Creditorship; Release of
           German Pledge Agreement ..................................................................................... 136

SECTION 14. Holdings Guaranty ................................................................................ 138

    14.01 The Guaranty ........................................................................................... 138
    14.02 Bankruptcy .............................................................................................. 139
    14.03 Nature of Liability .................................................................................. 139
    14.04 Independent Obligation ........................................................................... 139
    14.05 Authorization ........................................................................................... 140
    14.06 Reliance .................................................................................................... 141
    14.07 Subordination .......................................................................................... 141
    14.08 Waiver ...................................................................................................... 141
    14.09 Payments .................................................................................................. 143
    14.10 Maximum Liability .................................................................................. 143

SECTION 15. U.S. Borrower's Guaranty ................................................................... 143

    15.01 The U.S. Borrower's Guaranty ............................................................... 143
    15.02 Bankruptcy .............................................................................................. 144
    15.03 Nature of Liability .................................................................................. 144
    15.04 Independent Obligation ........................................................................... 144
    15.05 Authorization ........................................................................................... 144
    15.06 Reliance .................................................................................................... 145
    15.07 Subordination .......................................................................................... 145
    15.08 Waiver ...................................................................................................... 146
    15.09 Payments .................................................................................................. 148
    15.10 Maximum Liability .................................................................................. 148

| | |
|---|---|
| SCHEDULE 1 | List of Lenders and Commitments |
| SCHEDULE 1-A | List of Permitted Joint Ventures |
| SCHEDULE 2.12(a) | Lender Addresses |
| SCHEDULE 6.05 | Existing Material Adverse Effects |
| SCHEDULE 6.06 | Litigation |
| SCHEDULE 6.14 | Certificate Collateral |
| SCHEDULE 6.14(h) | Local Law Pledge Agreements |
| SCHEDULE 8.03 | Conflicts with Material Agreements |
| SCHEDULE 8.05(c) | Real Properties |
| SCHEDULE 8.12 | Subsidiaries |
| SCHEDULE 8.13 | Insurance |
| SCHEDULE 8.18 | Scheduled Existing Indebtedness |
| SCHEDULE 9.21 | Post-Closing Matters |
| SCHEDULE 10.02(a) | Existing Liens |
| SCHEDULE 10.04(c) | Existing Investments |
| SCHEDULE 10.05(b) | Sales, Transfers and Other Dispositions of Assets |
| SCHEDULE 10.09 | Existing Transactions with Affiliates |
| SCHEDULE 10.10 | Existing Restrictions |

| | | |
|---|---|---|
| EXHIBIT A-1 | - | Form of Notice of Borrowing |
| EXHIBIT A-2 | - | Form of Notice of Conversion/Continuation |
| EXHIBIT B-1 | - | Form of Tranche A Term Note |
| EXHIBIT B-2 | - | Form of Tranche B Term Note |
| EXHIBIT B-3 | - | Form of Tranche C Term Note |
| EXHIBIT B-4 | - | Form of Incremental Term Note |
| EXHIBIT C | - | [Intentionally Omitted] |
| EXHIBIT D | - | Form of Section 5.04(b)(ii) Certificate |
| EXHIBIT E-1 | - | [Intentionally Omitted] |
| EXHIBIT E-2 | - | [Intentionally Omitted] |
| EXHIBIT F | - | Form of Officers' Certificate |
| EXHIBIT G-1 | - | [Intentionally Omitted] |
| EXHIBIT G-2 | - | [Intentionally Omitted] |
| EXHIBIT H-1 | - | [Intentionally Omitted] |
| EXHIBIT H-2 | - | [Intentionally Omitted] |
| EXHIBIT H-3 | - | [Intentionally Omitted] |
| EXHIBIT H-4 | - | [Intentionally Omitted] |
| EXHIBIT H-5 | - | [Intentionally Omitted] |
| EXHIBIT I-1 | - | [Intentionally Omitted] |
| EXHIBIT I-2 | - | [Intentionally Omitted] |
| EXHIBIT I-3 | - | [Intentionally Omitted] |
| EXHIBIT I-4 | - | [Intentionally Omitted] |
| EXHIBIT I-5 | - | [Intentionally Omitted] |
| EXHIBIT J | - | [Intentionally Omitted] |
| EXHIBIT K | - | Form of Assignment and Assumption Agreement |
| EXHIBIT L | - | Form of Intercompany Note |
| EXHIBIT M | - | Form of Consent Letter |
| EXHIBIT N | - | [Intentionally Omitted] |
| EXHIBIT O | - | Form of Incremental Term Loan Commitment Agreement |
| EXHIBIT P | - | [Intentionally Omitted] |
| EXHIBIT Q | - | Form of Additional Foreign Borrower Designation Agreement |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of August 3, 2009, among COOPER-STANDARD HOLDINGS INC., a Delaware corporation ("Holdings"), COOPER-STANDARD AUTOMOTIVE INC., an Ohio corporation (the "U.S. Borrower"), COOPER-STANDARD AUTOMOTIVE CANADA LIMITED, a corporation organized under the laws of Ontario (the "Canadian Borrower" or the "Canadian Debtor"), an additional borrower that is a Foreign Subsidiary of the U.S. Borrower if it and the Administrative Agent as directed by the Required Lenders execute and deliver an Additional Foreign Borrower Designation Agreement on or prior to the Final Borrowing Date designating such Foreign Subsidiary as the Additional Foreign Borrower hereunder, the Lenders from time to time party hereto, DEUTSCHE BANK TRUST COMPANY AMERICAS, as the administrative agent (in such capacity, the "Administrative Agent"), BANC OF AMERICA SECURITIES LLC, GENERAL ELECTRIC CAPITAL CORPORATION and UBS SECURITIES LLC, as co-syndication agents (in such capacity, each a "Co-Syndication Agent" and, collectively, the "Co-Syndication Agents"), DEUTSCHE BANK TRUST COMPANY AMERICAS, as documentation agent (in such capacity, the "Documentation Agent"), DEUTSCHE BANK SECURITIES INC. and GENERAL ELECTRIC CAPITAL CORPORATION, as joint lead arrangers and book runners (in such capacity, each a "Joint Lead Arranger" and, collectively, the "Joint Lead Arrangers") and BANC OF AMERICA SECURITIES LLC and UBS SECURITIES LLC, as co-arranger (in such capacity, each a "Co-Arranger" and, collectively, the "Co-Arrangers").

## PRELIMINARY STATEMENTS:

On or about August 3, 2009 (the "Petition Date"), (i) Holdings, the U.S. Borrower, U.S. Finco and each U.S. Subsidiary of the U.S. Borrower (collectively, the "U.S. Debtors") shall file voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating their respective cases under Chapter 11 of the Bankruptcy Code (the cases of Holdings, the U.S. Borrower and the U.S. Subsidiaries of the U.S. Borrower, each a "U.S. Case" and collectively, the "U.S. Cases") and shall continue in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code and (ii) the Canadian Borrower shall commence proceedings (the "Canadian Case"; together with the U.S. Cases, the "Cases") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA").

The Borrowers (as defined below) have requested that the Lenders provide them with (i) a delayed draw term loan facility in an aggregate principal amount not to exceed U.S.$175,000,000 (the "Initial Facility") and (ii) the ability to incur a single draw incremental term loan facility, which is uncommitted on the date hereof, in an aggregate principal amount not to exceed U.S.$25,000,000 (the "Incremental Facility"; together with the Initial Facility, the "DIP Facility"). The Lenders are willing to make loans to the Borrowers on the terms and subject to the conditions set forth herein.

On or about the Petition Date: (1) the Bankruptcy Court will enter the Interim Order (as defined below) approving on an interim basis the DIP Facility (and the Bankruptcy Court subsequently shall enter the Final Order), and providing *inter alia*, that (i) in the U.S. Cases the obligations under the DIP Facility shall constitute allowed senior administrative expense claims against the U.S. Debtors with priority over any and all administrative expenses, adequate protection

claims, dimunition claims and all other claims against the U.S. Debtors, now existing or hereafter arising, of any kind whatsoever, and (ii) the obligations of the U.S. Debtors under the DIP Facility shall be secured by fully perfected security interests in and Liens upon all pre-and post-petition assets of the U.S. Debtors and certain other non-Debtor Subsidiaries of Holdings, whether existing on the Interim Order Entry Date or thereafter acquired, including any cash and any investments of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Interim Order Entry Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interest in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all of the foregoing and, in the U.S. Cases, subject only to and effective upon entry of the Final Order (and the limitations set forth therein), the Avoidance Actions and (2) the Canadian Court will grant the Initial Order (as defined below), approving the DIP Facility to the Canadian Borrower and providing, *inter alia*, that the obligations of the Canadian Debtor shall be secured by a first-ranking court ordered DIP Lenders' Charge over all the property, assets and undertaking of the Canadian Debtor ranking subordinate only to the Administration Charge (as defined below). The respective priorities of the DIP Facility and other parties claiming Liens on all or any part of the Collateral shall be as set forth in the Interim Order and the Initial Order.

All of the claims and the Liens granted in the Orders and in the Security Documents to the Collateral Agent and the Lenders in respect of the DIP Facility shall be subject only to the Carve-Out (in the case of the claims against and Liens on Collateral of the U.S. Debtors) and the Administration Charge (in the case of the claims against and Liens on Collateral of the Canadian Debtor).

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. <u>Definitions</u>. As used herein, the following terms shall have the meanings herein specified unless the context otherwise requires. Defined terms in this Agreement shall include in the singular number the plural and in the plural the singular:

"<u>13-Week Budget</u>" shall have the meaning provided in Section 9.17(c).

"<u>A&M</u>" shall have the meaning provided in Section 9.18(b).

"<u>A&M Engagement Letter</u>" shall have the meaning provided in Section 6.17.

"<u>Additional Collateral</u>" shall mean all property (whether real or personal) in which security interests are granted (or have been purported to be granted) (and continue to be in effect at the time of determination) pursuant to Sections 9.12 and 9.13.

"<u>Additional Foreign Borrower</u>" shall mean the Foreign Subsidiary of Holdings designated as a Borrower in the Additional Foreign Borrower Designation Agreement.

"<u>Additional Foreign Borrower Credit Parties</u>" shall mean the Additional Foreign Borrower and the Subsidiary Guarantors designated as such in the Additional Foreign Borrower Designation Agreement.

"Additional Foreign Borrower Designation Agreement" shall mean the Additional Foreign Borrower Designation Agreement executed by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent at the direction of the Required Lenders substantially in the form of Exhibit Q (appropriately completed), designating (a) the Additional Foreign Borrower, (b) the amount of the Total Tranche C Term Loan Commitment, which shall not be greater than U.S.$50,000,000, and the portion thereof, if any, that shall reduce the Total Tranche A Term Loan Commitment pursuant to Section 4.03(c) and the portion thereof, if any, that shall reduce the Total Tranche B Term Loan Commitment pursuant to Section 4.03(c) (it being understood that the amount of the Total Tranche C Term Loan Commitment shall reduce the aggregate of the Total Tranche A Term Loan Commitment and the Total Tranche B Term Loan Commitment on a dollar-for-dollar basis and the Total Tranche A Term Loan Commitment shall not be so reduced to an amount less than U.S.$100,000,000), (c) the amount of each Lender's Tranche C Term Loan Commitment (which amount shall equal such Lender's pro rata portion (determined as the percentage that the aggregate of such Lender's Tranche A Term Loan Commitment and Tranche B Term Loan Commitment bears to the aggregate Total Tranche A Term Loan Commitment and Total Tranche B Term Loan Commitment immediately prior to the effectiveness of such Additional Foreign Borrower Designation Agreement) of the Total Tranche C Term Loan Commitment), (d) the collateral that will secure the Obligations of the Additional Foreign Borrower and the related Security Documents that will grant a Lien on such collateral and (e) the Foreign Subsidiaries of Holdings that will guarantee and secure the Obligations of the Additional Foreign Borrower and thereby become Additional Foreign Borrower Credit Parties and Subsidiary Guarantors and containing such other provisions, including without limitation implementing amendments to this Agreement and the other Credit Documents as may be contained therein; provided that no such Foreign Subsidiary shall be required to make such a guarantee if doing so would (1) violate applicable law (including corporate benefit, financial assistance, fraudulent preference, thin capitalization rules, and similar laws or regulations), result in a breach or default under an existing contract identified on a schedule attached to the Additional Foreign Borrower Designation Agreement or would reasonably be expected to result in a material incremental tax liability or personal liability of any director or officer of such Foreign Subsidiary or (2) result in costs (administrative or otherwise) that in the determination of the Administrative Agent are materially disproportionate to the benefit obtained thereby, all of which including (a) through (e) above and the foregoing provisos shall be satisfactory in form and substance to the Required Lenders in their sole discretion. For the avoidance of doubt, if the Additional Foreign Borrower is organized under the laws of Germany, the Subsidiaries of such Additional Foreign Borrower that will be required to guarantee and secure the Obligations of the Additional Foreign Borrower shall only be Subsidiaries organized under the laws of Germany.

"Additional Foreign Borrower Incremental Term Loans" shall mean Incremental Term Loans incurred by the Foreign Borrower.

"Additional Security Documents" shall have the meaning provided in Section 9.13.

"Administration Charge" shall mean a charge granted over all of the assets, property and undertaking of the Canadian Borrower by the Canadian Court pursuant to the Initial Order in an aggregate amount not in excess of Cdn.$450,000 ranking in priority over all other encumbrances and other charges granted by the Canadian Court.

"<u>Administrative Agent</u>" shall mean Deutsche Bank Trust Company Americas and shall include any successor to the Administrative Agent appointed pursuant to Section 12.10.

"<u>Affiliate</u>" means, with respect to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Neither any Agent nor any Lender shall be deemed to be an Affiliate of Holdings or any of its Subsidiaries solely by virtue of being a party to this Agreement.

"<u>Agent</u>" shall mean the Administrative Agent, the Collateral Agent, the Co-Syndication Agents, the Joint Lead Arrangers and the Documentation Agent and shall include any successor to any such Person appointed pursuant to Section 12.10.

"<u>Agreement</u>" shall mean this Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended, renewed, refinanced or replaced from time to time.

"<u>Applicable Increased Term Loan Rate</u>" shall mean, at any time, with respect to any newly-created Tranche of Incremental Term Loans, the rate per annum (expressed as a percentage) determined by the Administrative Agent (and notified to the Lenders) as the rate per annum required to equalize the interest rates applicable to each then existing Tranche of Term Loans and such Tranche of Incremental Term Loans. Each determination of the "Applicable Increased Term Loan Rate" shall be made by the Administrative Agent taking into account the relevant factors outlined in subclause (II) of the proviso to clause (vi) of Section 2.15(a) and shall be conclusive and binding on all Lenders absent manifest error.

"<u>Applicable Margin</u>" shall mean initially a percentage per annum equal to (i) in the case of Tranche A Term Loans, Tranche B Term Loans and Tranche C Term Loans maintained as (A) Base Rate Loans, 9.00% and (B) Eurodollar Loans, 10.00% (or, on and after the date of the most recent incurrence of any Tranche of Incremental Term Loans bearing interest at the Applicable Increased Term Loan Rate, the Applicable Increased Term Loan Rate for such Tranche of Incremental Term Loans); and (ii) in the case of any Type of Incremental Term Loan of a given Tranche, that percentage per annum set forth in, or calculated in accordance with, Section 2.15 and the relevant Incremental Term Loan Commitment Agreement (or in the case of Incremental Term Loans of a given Tranche, on and after the date of the most recent incurrence of any Tranche of Incremental Term Loans bearing interest at the Applicable Increased Term Loan Rate, the Applicable Increased Term Loan Rate for such Tranche of Incremental Term Loans).

"<u>Asset Sale</u>" shall mean any sale, transfer or other disposition by Holdings or any of its Subsidiaries to any Person (other than the U.S. Borrower or any Wholly-Owned Subsidiary of the U.S. Borrower to the extent that the aggregate fair market values of the assets subject to such sales, transfers or other dispositions not in the ordinary course of business do not exceed the limitations set forth in Section 10.04(e) (determined for this purpose as though the fair market value of an asset sold from one Person to another were an intercompany loan made by such Person to such other Person)) of any asset or property (including, without limitation, any capital stock or other securities of, or other Equity Interests in, another Person) of Holdings or such Subsidiary other than the dispositions described in clauses (a) through (g) inclusive, clause (j) and clause (l) of Section 10.05).

"<u>Assignment and Assumption Agreement</u>" shall mean the Assignment and Assumption Agreement substantially in the form of <u>Exhibit K</u> (appropriately completed).

"Authorized Officer" shall mean, with respect to (i) delivering Notices of Borrowing, Notices of Conversion/Continuation and similar notices, any person or persons that has or have been authorized by the board of directors of the relevant Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards on file with the Administrative Agent; (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, principal accounting officer, any treasurer, any controller or (except in the case of financial matters) the general counsel of Holdings or the U.S. Borrower; and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of Holdings or the U.S. Borrower.

"Auto Supplier Support Program" shall mean the Auto Supplier Support Program established by the United States Department of the Treasury pursuant to the authority granted to it by and under the Emergency Economic Stabilization Act of 2008 (Pub. L. 110-343, enacted October 1, 2008), as in effect on the Effective Date and including any modifications thereto, so long as such modifications are not adverse to the interests of the U.S. Borrower, any of its Subsidiaries or the Lenders in any material respect.

"Auto Supplier Support Program Credit Agreement" shall mean each of (i) the Credit Agreement, dated as of April 3, 2009, by and between GM Supplier Receivables, LLC, a Delaware limited liability company, and the United States Department of the Treasury, (ii) the Credit Agreement, dated as of April 7, 2009, by and between Chrysler Receivables SPV LLC, a Delaware limited liability company, and the United States Department of the Treasury and (iii) any other credit agreement or other agreement pursuant to which the United States Department of the Treasury (or other United States governmental agency designated by it pursuant to the Auto Supplier Support Program) shall provide extensions of credit to a Program SPV pursuant to the Auto Supplier Support Program substantially in the form of the Credit Agreement described in preceding clauses (i) and (ii), in each case as in effect on the Effective Date (or, in the case of an agreement referred to in clause (iii), the date of execution and delivery thereof) and including any amendment, modification or waiver of the terms thereof, so long as the same is not adverse to the interests of the U.S. Borrower, any of its Subsidiaries or the Lenders in any material respect.

"Auto Supplier Support Transactions" shall mean each Permitted Credit Protection Transaction and each Permitted Quick Pay Sale.

"Avoidance Actions" shall mean the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" shall have the meaning provided in the Preliminary Statements.

"Base Rate" at any time shall mean the highest of (i) the rate which is 1/2 of 1% in excess of the Federal Funds Rate at such time, (ii) the Prime Lending Rate at such time and (iii) 4.00% per annum.

"Base Rate Loan" shall mean each Loan which is designated or deemed designated as a Base Rate Loan by the respective Borrower at the time of the incurrence thereof or conversion thereto.

"Borrowing" shall mean the borrowing of one Type of Loan pursuant to a single Tranche by the Borrower under such Tranche from all the Lenders having Commitments with respect to such Tranche on a given date (or resulting from a continuation or conversion on such date), having in the case of Eurodollar Loans the same Interest Period; provided (x) that Base Rate Loans incurred pursuant to Section 2.10(b) shall be considered part of the related Borrowing of Eurodollar Loans and (y) any Incremental Term Loans incurred pursuant to Section 2.01(d) shall be considered part of the related Borrowing of the then outstanding Tranche of Term Loans (if any) to which such Incremental Term Loans are added pursuant to, and in accordance with the requirements of, Section 2.15(c).

"Borrowers" shall mean the U.S. Borrower, the Canadian Borrower and the Additional Foreign Borrower.

"Brazilian Collateral Agent" shall mean the "collateral agent" as set forth in the Brazilian Security Agreements.

"Brazilian Credit Party" shall mean each Brazilian Subsidiary.

"Brazilian Pledge Agreement" shall have the meaning provided in Section 6.14(c).

"Brazilian Security Agreement" shall have the meaning provided in Section 6.15(c).

"Brazilian Subsidiary" shall mean each Subsidiary of Holdings incorporated or organized in the Federative Republic of Brazil or any province or territory thereof.

"Business Day" shall mean (i) any day except Saturday, Sunday and any day which shall be in New York City a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on or with respect to, Eurodollar Loans, any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in U.S. dollar deposits in the London interbank market and which shall not be a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close in London or New York City.

"Canadian Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"Canadian Borrower Incremental Term Loans" shall mean Incremental Term Loans incurred by the Canadian Borrower.

"Canadian Case" shall have the meaning provided in the Preliminary Statements.

"Canadian Court" shall have the meaning provided in the Preliminary Statements.

"Canadian Credit Party" shall mean the Canadian Borrower and each Canadian Subsidiary Guarantor.

"Canadian Debtor" shall have the meaning provided in the first paragraph of this Agreement.

"Canadian Dollar Equivalent" shall mean, at any time for the determination thereof, the amount of Canadian Dollars which could be purchased with the amount of U.S. Dollars involved in such computation at the spot rate of exchange therefor as quoted by the Administrative Agent as of 11:00 A.M. (New York time) on the date two Business Days prior to the date of any determination thereof for purchase on such date (or, in the case of any determination pursuant to Section 13.23, on the date of determination).

"Canadian Dollars" and "Cdn.$" shall mean freely transferable lawful money of Canada.

"Canadian Pension Plan" shall mean any "registered pension plan" that is subject to the funding requirements of the *Pension Benefits Act* (Ontario) or applicable pension benefits legislation in any other Canadian jurisdiction and is applicable to employees of any Subsidiary of Holdings resident in Canada or any province or territory thereof.

"Canadian Pledge Agreement" shall have the meaning provided in Section 6.14(b).

"Canadian Security Agreement" shall have the meaning provided in Section 6.15(b).

"Canadian Subsidiaries Guaranty" shall have the meaning provided in Section 6.13(b).

"Canadian Subsidiary" shall mean (i) each Subsidiary of Holdings incorporated or organized in Canada or any province or territory thereof and (ii) U.S. Finco.

"Canadian Subsidiary Guarantor" shall mean (i) each Wholly-Owned Subsidiary of Holdings that is a Canadian Subsidiary as of the Initial Borrowing Date (other than the Canadian Borrower) and (ii) each other Wholly-Owned Subsidiary of Holdings that is a Canadian Subsidiary and is created, established or acquired after the Initial Borrowing Date which executes and delivers a Canadian Subsidiaries Guaranty, unless and until such time as the respective Canadian Subsidiary is released from all of its obligations under its Canadian Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Canadian Welfare Plan" shall mean any medical, health, hospitalization, insurance, retirement or other employee benefit or welfare plan or arrangement (but excluding any Canadian Pension Plan) applicable to employees of a Subsidiary of the U.S. Borrower resident in Canada or any province or territory thereof.

"Capital Expenditures" means, for any period, (a) the additions to property, plant and equipment and other capital expenditures of the U.S. Borrower and its Subsidiaries that are (or would be) set forth in a consolidated statement of cash flows of the U.S. Borrower for such period prepared in accordance with U.S. GAAP and (b) Capital Lease Obligations incurred by the U.S. Borrower and its Subsidiaries during such period, provided that Capital Expenditures shall not include (i) the purchase price of equipment to the extent the consideration therefor consists of used or surplus equipment traded in at the time of such purchase, (ii) interest capitalized during such period, (iii) expenditures that are accounted for as capital expenditures of the U.S. Borrower and its Subsidiaries

and that actually are paid for by a third party (excluding Holdings or any Subsidiary thereof) and for which neither Holdings nor any Subsidiary thereof has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period) and (iv) the book value of any asset owned by the U.S. Borrower or any of its Subsidiaries prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of the U.S. Borrower or such Subsidiary reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period, provided that (A) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (B) such book value shall have been included in Capital Expenditures when such asset was originally acquired if such asset was originally acquired on or after January 1, 2009.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under U.S. GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with U.S. GAAP.

"Carve-Out" shall have the meaning provided in the Orders.

"Cases" shall have the meaning provided in the Preliminary Statements.

"CCAA" shall have the meaning provided in the Preliminary Statements.

"CCAA Plan" shall have the meaning provided in Section 11(x).

"Change in Control" means occupation of a majority of the seats (other than vacant seats) on the board of directors of Holdings by Persons who were neither (i) nominated by the board of directors of Holdings, (ii) appointed by directors so nominated or (iii) nominated or appointed by the Permitted Holders (other than in connection with a transaction which results in Permitted Holders ceasing to own Equity Interests in Holdings).

"Co-Arranger" shall have the meaning provided in the first paragraph of this Agreement and shall include any successor to a Co-Arranger appointed pursuant to Section 12.10.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean all property (whether real or personal, movable or immovable) with respect to which any security interests have been granted (or purported to be granted) pursuant to the Orders or any Security Document (including any Additional Security Document), including, without limitation, all Pledge Agreement Collateral, all Mortgaged Properties and all cash and Permitted Investments delivered as collateral pursuant to Sections 5.02 or 11 or any Credit Document and all Additional Collateral, if any.

"Collateral Agent" shall mean DBTCA, acting as collateral agent for the Secured Creditors.

"Collective Bargaining Agreements" shall have the meaning provided in Section 6.17.

"Commitment" shall mean any of the commitments of any Lender, _i.e._, whether a Tranche A Term Loan Commitment, Tranche B Term Loan Commitment, Tranche C Term Loan Commitment or Incremental Term Loan Commitment.

"Company" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period plus (in the case of charges, losses and expenses) or minus (in the case of income and gains), without duplication and to the extent deducted in determining such Consolidated Net Income for such period, the sum of (i) consolidated interest expense of the U.S. Borrower and its Subsidiaries for such period (including, to the extent not otherwise included in consolidated interest expense for such period, commissions, discounts, yield and other fees and charges incurred during such period in connection with Permitted Securitizations and Auto Supplier Support Transactions that are payable to any person other than a U.S. Credit Party, and any other amounts for such period comparable to or in the nature of interest under any Permitted Securitization and any Auto Supplier Support Transaction, including losses on the sale of assets relating to any receivables securitization transaction accounted for as a "true sale"), (ii) consolidated income tax expense of the U.S. Borrower and its Subsidiaries for such period (including any income tax expense of Holdings for such period to the extent the U.S. Borrower has made payment to or for the account of Holdings in respect thereof), (iii) all amounts attributable to depreciation and amortization expense of the U.S. Borrower and its Subsidiaries for such period and (iv) any non-cash charges, losses or expenses of the U.S. Borrower and its Subsidiaries for such period (including any unrealized foreign exchange losses, but excluding any non-cash charge, loss or expense in respect of an item that was included in Consolidated Net Income in a prior period) and any non-cash charge, loss or expense that relates to the write-down or write-off of inventory or assets, (v) any expenses incurred in such period by the U.S. Borrower or any of its Subsidiaries related to the early termination of any Swap Agreements as a result of any Default or Event of Default under any Indebtedness existing prior to the Effective Date (including, without limitation, as a result of the Cases) to the extent not paid in cash, (vi) any cash Restructuring Charges in an amount not to exceed U.S.$15,000,000 for the period from the Effective Date through December 31, 2009 and U.S.$15,000,000 for each subsequent Fiscal Year, (vii) any professional fees and other costs and expenses incurred in such period connection with the Cases, (viii) any non-cash income or non-cash gains (including any unrealized foreign exchange gains) and (ix) any realized foreign exchange gains or losses related to conversion of Loans made hereunder into local currencies.

"Consolidated Liquidity" shall mean, on any date, (a) the fair market value on such date of unrestricted cash and cash equivalents held in securities accounts of the U.S. Borrower and its Subsidiaries, (b) the amount of unrestricted available funds held on such date in bank deposit accounts of the U.S. Borrower and its Subsidiaries and (c) the proportionate amount of cash owned by any Existing Joint Venture (determined on the basis of the proportionate ownership interest of the U.S. Borrower and its Subsidiaries in such Existing Joint Venture), to the extent that such amount is immediately and unconditionally available to the U.S. Borrower and its Subsidiaries on such date, in each case subject to no Liens other than (i) Liens in favor of the Secured Creditors pursuant to the

Security Documents, (ii) Liens in favor of the Secured Creditors (as such term is defined in the Prepetition Facility) pursuant to the Prepetition Security Documents and (iii) Liens permitted by Section 10.02(a)(xvii).

"Consolidated Net Income" shall mean, for any period, the net income or loss of the U.S. Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with U.S. GAAP (adjusted to reflect any charge, tax or expense incurred or accrued by Holdings during such period as though such charge, tax or expense had been incurred by the U.S. Borrower, to the extent that the U.S. Borrower has made or is permitted under the Credit Documents to make any payment to or for the account of Holdings in respect thereof), provided that (a) there shall be excluded from Consolidated Net Income (i) the income of any Subsidiary of the U.S. Borrower to the extent that the declaration or payment of dividends or other distributions by such Subsidiary of that income is not at the time permitted by a Requirement of Law (other than as a result of the Cases) or any agreement or instrument applicable to such Subsidiary, except to the extent of the amount of cash dividends or other cash distributions actually paid to the U.S. Borrower or any of its Subsidiaries during such period (unless the income of the Subsidiary receiving such dividend or distribution would be excluded from Consolidated Net Income pursuant to this proviso) and (ii) the income or loss of any Person accrued prior to the date it becomes a Subsidiary of the U.S. Borrower or is merged into or consolidated with the U.S. Borrower or any of its Subsidiaries or the date that such Person's assets are acquired by the U.S. Borrower or any of its Subsidiaries and (b) there shall be included in Consolidated Net Income the income of any Permitted Joint Venture to the extent of the amount of cash dividends or other cash distributions actually paid by such Permitted Joint Venture to the U.S. Borrower or any of its Subsidiaries during such period (unless the income of the Subsidiary receiving such dividend or distribution would be excluded from Consolidated Net Income pursuant to clause (a) above).

"Consummation Date" shall mean the first date on which both (i) a Plan of Reorganization or a plan of liquidation under Chapter 11 of the Bankruptcy Code that is confirmed pursuant to an order of the Bankruptcy Court and (ii) a CCAA Plan that is approved by the requisite creditors of the Canadian Borrower and the Canadian Court, in the case of any U.S. Debtor or the Canadian Debtor, as the case may be, shall have become effective in accordance with its terms.

"Control" means the possession, directly or indirectly, of the power to (i) direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise or (ii) vote 10% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of a Person. "Controlling" and "Controlled" have meanings correlative thereto.

"Co-Syndication Agent" shall have the meaning provided in the first paragraph of this Agreement and shall include any successor to each of the Co-Syndication Agents appointed pursuant to Section 12.10.

"Credit Agreement Party" shall mean Holdings and each Borrower.

"Credit Documents" shall mean this Agreement, the Notes, each Subsidiaries Guaranty, the Intercompany Subordination Agreement, each Security Document, each Incremental Term Loan Commitment Agreement, the Additional Foreign Borrower Designation Agreement, any German Abstract Acknowledgment and any other guarantees or security documents executed and delivered for the benefit of the Lenders in accordance with the requirements of this Agreement and

any other guaranties, pledge agreements or security documents executed and delivered in accordance with the requirements of Sections 9.12 and 9.13.

"Credit Event" shall mean the making of a Loan.

"Credit Party" shall mean each U.S. Credit Party, each Canadian Credit Party, each Mexican Credit Party, each Brazilian Credit Party, each Dutch Credit Party and, following the execution and delivery of an Additional Foreign Borrower Designation Agreement, each Additional Foreign Borrower Credit Party.

"DBSI" shall mean Deutsche Bank Securities Inc., in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"DBTCA" shall mean Deutsche Bank Trust Company Americas, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"Debtors" shall mean, collectively, the U.S. Debtors and the Canadian Debtor.

"Debtor Relief Laws" shall mean the Bankruptcy Code (other than under the U.S. Case), the Companies' Creditors Arrangement Act of Canada (other than under the Canadian Case), the Bankruptcy and Insolvency Act of Canada, the Dutch Bankruptcy Act (*Faillissementswet*), the German Insolvency Law, the Spanish Insolvency Code, the Mexican Bankruptcy Law (*Ley de Concursos Mercantiles*) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, compromise, *faillissement* (*voorlopige*), *surseance van betaling*, *onderbewindstelling*, *ontbinding*, *concurso mercantil* or similar debtor relief laws (including corporate laws) of the United States, Canada, The Netherlands, Germany, Spain, Brazil, the Czech Republic, Japan, the Republic of Korea, the United Kingdom, India, Poland, Mexico, Australia, Barbados, China, Belgium, Italy or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (including administration, administrative receivership, voluntary arrangement and schemes of arrangement).

"Default" shall mean any event, act or condition, which with notice or lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"DIP Facility" shall have the meaning provided in the Preliminary Statements.

"DIP Lenders' Charge" shall have the meaning provided in the Initial Order.

"Directors' Charge" shall mean a directors' and officers' charge granted over the property, assets and undertaking of the Canadian Borrower by the Canadian Court pursuant to the Initial Order in an aggregate amount not in excess of the amount set forth in the Initial Order.

"Disclosure Statement" shall have the meaning provided in Section 11(x).

"Documentation Agent" shall have the meaning provided in the first paragraph of this Agreement and shall include any successor to the Documentation Agent appointed pursuant to Section 12.10.

"Domestic Subsidiary" shall mean, as to any Person, any Subsidiary of such Person incorporated or organized in the United States or any State or territory thereof or the District of Columbia (other than U.S. Finco).

"Dutch BV" shall mean Cooper-Standard Automotive Holdings BV, a company incorporated under the laws of The Netherlands.

"Dutch Credit Party" shall mean each Dutch Subsidiary.

"Dutch Security Agreements" shall have the meaning provided in Section 6.15(e).

"Dutch Subsidiary" shall mean each Subsidiary of Holdings incorporated or organized in The Netherlands or any province or territory thereof.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Effective Date" shall have the meaning provided in Section 13.10.

"Eligible Transferee" shall mean and include a commercial bank, a mutual fund, an insurance company, a financial institution, a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act), any fund that regularly invests in bank loans or any other "accredited investor" (as defined in Regulation D), but in any event excluding any individual and Holdings and its Subsidiaries and Affiliates. For the avoidance of doubt, neither Holdings, nor any of its Subsidiaries, nor any of their respective Affiliates (including any Permitted Holder that owns 5% or more of the Equity Interests of Holdings) shall be an Eligible Transferee.

"Environmental Laws" shall mean all applicable federal, provincial, state, local and foreign laws (including common law), treaties, regulations, rules, directives, orders, injunctions, decrees, notices or legally binding agreements, in each case issued, promulgated or entered into by any Governmental Authority relating to protection of the environment, natural resources, human health and safety (as relating to Hazardous Materials, the environment or occupational health and safety), or the presence of, Release of, or exposure to, Hazardous Materials.

"Environmental Liability" shall mean liabilities, obligations, damages, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and medical monitoring, investigation or remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or noncompliance with any Environmental Law, (b) the presence, generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated)

equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the U.S. Borrower or Subsidiaries of the U.S. Borrower, is treated as a single employer under Section 414(b) or (c) of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than reportable events with respect to which the 30-day notice period has been waived), (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by Holdings, the U.S. Borrower or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, (e) the receipt by Holdings, the U.S. Borrower or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the incurrence by Holdings, the U.S. Borrower or any of their respective ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan or (g) the receipt by Holdings, the U.S. Borrower or any of their respective ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from Holdings, the U.S. Borrower or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar Loans" shall mean each Loan designated as such by the respective Borrower or Borrowers at the time of the incurrence thereof.

"Eurodollar Rate" shall mean, for any Interest Period, the higher of (a) (i) the rate (rounded upwards to the nearest 1/16 of 1%) appearing on the page identified as 'Reuters Libor 01' of the Reuters Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interests rates applicable to U.S. dollar deposits in the London interbank market) for U.S. Dollar deposits of amounts in immediately available funds comparable to the principal amount of the applicable Eurodollar Loan for which the Eurodollar Rate is being determined with maturities comparable to the Interest Period for which such Eurodollar Rate will apply, as of approximately 10:00 A.M. (New York time) on the Interest Determination Date divided by (ii) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D) and (b) 3.0% per annum. The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive and binding on the Borrowers absent manifest error.

"Event of Default" shall have the meaning provided in Section 11.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder.

"Existing Indebtedness Agreements" shall have the meaning provided in Section 6.17.

"Existing Joint Ventures" means joint ventures in respect of which each Borrower or any of their respective Subsidiaries holds any Equity Interests on the Initial Borrowing Date, as set forth on Schedule 8.12.

"Exit Fee" shall have the meaning provided in Section 4.01(c).

"Federal Funds Rate" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent.

"Fees" shall mean all amounts payable pursuant to, or referred to in, Section 4.01.

"FEMA" shall mean the Federal Emergency Management Agency.

"Final Order" shall have the meaning provided in Section 6.25.

"Final Borrowing Date" shall mean the date of the Borrowing of Term Loans under Section 2.01 on the Final Order Entry Date.

"Final Order Entry Date" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Advisors Engagement Agreements" shall have the meaning provided in Section 6.17.

"First Day Orders" means all orders entered by the Bankruptcy Court on the Petition Date or within five Business Days of the Petition Date or based on motions filed on the Petition Date or within five Business Days of the Petition Date, in form and substance satisfactory to the Required Lenders.

"Fiscal Quarter" shall mean, for any Fiscal Year, each of (i) the three month period commencing on January 1 of such Fiscal Year and ending on March 31 of such Fiscal Year, (ii) the three month period commencing on April 1 of such Fiscal Year and ending on June 30 of such Fiscal Year, (iii) the three month period commencing on July 1 of such Fiscal Year and ending on September 30 of such Fiscal Year and (iv) the three month period commencing on October 1 of such Fiscal Year and ending on December 31 of such Fiscal Year, as the case may be. For purposes of this Agreement, a reference to the 1st Fiscal Quarter of any Fiscal Year shall be a reference to the period

referred to in clause (i) above; a reference to the 2nd Fiscal Quarter of any Fiscal Year shall be a reference to the period referred to in clause (ii) above; a reference to the 3rd Fiscal Quarter of any Fiscal Year shall be a reference to the period referred to in clause (iii) above; and a reference to the 4th Fiscal Quarter of any Fiscal Year shall be a reference to the period referred to in clause (iv) above.

"Fiscal Year" shall mean the fiscal year of the U.S. Borrower and its Subsidiaries ending on December 31 of each calendar year. For purposes of this Agreement, any particular Fiscal Year shall be designated by reference to the calendar year in which the majority of such Fiscal Year falls.

"Foreign Pension Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States of America by Holdings or any one or more of its Subsidiaries primarily for the benefit of employees of Holdings or any of its Subsidiaries residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code, but excluding any Canadian Pension Plan.

"Foreign Pledge Agreements" shall mean and include the Canadian Pledge Agreement, the Brazilian Pledge Agreement, the German Pledge Agreements, the Mexican Amendment to the Equity Interest Pledge Agreement, the Mexican Floating Lien Pledge Agreement and the Local Law Pledge Agreements.

"Foreign Security Document" shall mean each Security Document other than a U.S. Security Document.

"Foreign Subsidiary" shall mean, as to any Person, any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"German Abstract Acknowledgement" means each of (i) that certain German law Abstract Acknowledgment of Indebtedness *(Abstraktes Schuldanerkenntnis)* delivered pursuant to Section 6.14(d) between the Canadian Borrower and the Collateral Agent, (ii) if applicable, that certain German law Abstract Acknowledgment of Indebtedness *(Abstraktes Schuldanerkenntnis)* dated on or about the date of Additional Foreign Borrower Designation Agreement between the Additional Foreign Borrower and the Collateral Agent and (iii) if applicable, any other German law Abstract Acknowledgment of Indebtedness *(Abstraktes Schuldanerkenntnis)* between any Subsidiary of Holdings organized under the laws of Germany and the Collateral Agent.

"German Pledge Agreements" shall have the meaning provided in Section 6.14(d).

"German Pledge Intercreditor Agreement" shall mean that certain German Pledge Intercreditor Agreement delivered pursuant to Section 6.14(d) between Holdings, the Borrowers, the Collateral Agent and the "Collateral Agent" (as defined in the Prepetition Facility).

"Global Subsidiaries Guarantor" shall mean each U.S. Subsidiary Guarantor, Mexican Subsidiary, Brazilian Subsidiary and Dutch Subsidiary which executes and delivers a Global Subsidiaries Guaranty, unless and until such time as the respective Subsidiary is released

from all of its obligations under its Global Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Global Subsidiaries Guaranty" shall have the meaning provided in Section 6.13(a) and shall include any counterpart thereof and any other substantially identical guaranty executed and delivered by any Domestic Subsidiary, Mexican Subsidiary, Brazilian Subsidiary and Dutch Subsidiary of the U.S. Borrower pursuant to Sections 9.12 or 9.13.

"Governmental Authority" shall mean the government of the United States of America, Canada, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof (including pursuant to any synthetic lease financing), (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party or applicant in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (b) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guarantee (without giving effect to any rights of indemnification, contribution or subrogation), unless such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be such guaranteeing Person's maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guaranteed Creditors" shall mean and include each of the Agents, the Collateral Agent, the Lenders and each Person (other than any Credit Party or any of its Subsidiaries) party to any Post Petition Swap Agreement or Post Petition Cash Management Arrangement to the extent that such Person constitutes a Secured Creditor under any of the Security Documents.

"Guarantors" shall mean and include Holdings, the U.S. Borrower and each Subsidiary Guarantor.

"Guaranty" and "Guaranties" shall mean and include the Holdings Guaranty, the U.S. Borrower's Guaranty and each Subsidiaries Guaranty.

"Hazardous Materials" shall mean (i) all petroleum products or byproducts and all other petroleum hydrocarbons, coal ash, radon gas, asbestos or asbestos-containing materials, urea

formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (ii) all chemicals, materials, substances or wastes that are prohibited, limited or regulated by or pursuant to any Environmental Law.

"Holdings" shall have the meaning provided in the first paragraph of this Agreement.

"Holdings Guaranteed Obligations" shall mean (i) the principal and interest on each Note issued to each Lender, and all Loans made, under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities (including, without limitation, indemnities, fees and interest thereon) of the Borrowers (or any of them) to each Lender, each Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document and the due performance and compliance by each Borrower with all the terms, conditions and agreements contained in this Agreement and each other Credit Document to which it is a party and (ii) all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities of the U.S. Borrower or any of its Subsidiaries owing under any Post Petition Swap Agreement or Post Petition Cash Management Arrangements entered into by the U.S. Borrower or any of its Subsidiaries with any Guaranteed Creditor so long as such Guaranteed Creditor participates in such Post Petition Swap Agreement, and their subsequent assigns, if any, whether now in existence or hereafter arising, and the due performance and compliance with all terms, conditions and agreements contained therein.

"Holdings Guaranteed Party" shall mean each Borrower and each Subsidiary of Holdings party to any Post Petition Swap Agreement or any Post Petition Cash Management Arrangements with any Secured Creditor.

"Holdings Guaranty" shall mean the guaranty of Holdings pursuant to Section 14.

"Immaterial Subsidiary" means, as of the date of determination, each of Holdings' Subsidiaries that as of such time is not a Credit Party and has consolidated assets with a book value of US$1,000,000 or less and which has consolidated revenues of US$1,000,000 for the most recently ended period of four consecutive fiscal quarters.

"Incremental Facility" shall have the meaning provided in the Preliminary Statements.

"Incremental Term Loan" shall have the meaning provided in Section 2.01(d).

"Incremental Term Loan Borrower" shall mean (x) the U.S. Borrower, with respect to U.S. Borrower Incremental Term Loans, (y) the Canadian Borrower, with respect to Canadian Borrower Incremental Term Loans and (z) the Additional Foreign Borrower, with respect to Additional Foreign Borrower Incremental Term Loans.

"Incremental Term Loan Borrowing Date" shall mean the date on which Incremental Term Loans are incurred pursuant to Section 2.01(d), which date shall be the date of the effectiveness of the respective Incremental Term Loan Commitment Agreement pursuant to which such Incremental Term Loans are to be made.

"Incremental Term Loan Commitment" shall mean, for each Lender, the commitment to make Incremental Term Loans provided by such Lender pursuant to Section 2.15 on the Incremental Term Loan Borrowing Date, in such amount as agreed to by such Lender in the respective Incremental Term Loan Commitment Agreement delivered pursuant to Section 2.15, as the same may be terminated pursuant to Sections 4.03 and/or 11.

"Incremental Term Loan Commitment Agreement" shall mean the Incremental Term Loan Commitment Agreement in the form of Exhibit O (appropriately completed) executed in accordance with Section 2.15.

"Incremental Term Loan Commitment Requirements" shall mean, with respect to any provision of the Incremental Term Loan Commitment on the Incremental Term Loan Borrowing Date, the satisfaction of each of the following conditions: (v) no Default or Event of Default then exists or would result therefrom; (w) the delivery by the relevant Credit Parties of such technical amendments, modifications and/or supplements to the respective Security Documents as are reasonably requested by the Administrative Agent to ensure that the additional Obligations to be incurred pursuant to the Incremental Term Loan Commitments are secured by, and entitled to the benefits of, the relevant Security Documents; (x) the delivery by the U.S. Borrower to the Administrative Agent of an officer's certificate executed by an Authorized Officer of the U.S. Borrower certifying as to compliance with preceding clause (v); (y) the satisfaction of all other conditions precedent that may be set forth in the respective Incremental Term Loan Commitment Agreement and (z) the completion by the Credit Parties of such other actions as the Administrative Agent may reasonably request in connection with the provision of the Incremental Term Loan Commitment (including, without limitation, delivery of officers' certificates, resolutions, evidence of good standing and reasonably satisfactory opinions of counsel).

"Incremental Term Loan Lender" shall have the meaning provided in Section 2.15(b).

"Incremental Term Loan Maturity Date" shall mean the final maturity date set forth for Incremental Term Loans in the Incremental Term Loan Commitment Agreement relating thereto.

"Incremental Term Loan Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Incremental Term Note" shall have the meaning provided in Section 2.05(a).

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all obligations of others secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Guarantees by such Person of the obligations of others (to the extent such obligations would constitute "Indebtedness" pursuant to the other clauses of this definition), (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party or appli-

cant in respect of letters of credit and letters of guaranty, (j) the amount of any Permitted Securitizations of such Person and (h) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Initial Borrowing Date" shall mean the date of the Borrowing of Term Loans under Sections 2.01(a) and (b) on or after the Interim Order Entry Date.

"Initial Equity Investors" shall mean Cypress Merchant Banking Partners II L.P., Cypress Merchant Banking II C.V., 55th Street Partners II L.P., Cypress Side-by-Side LLC, GS Capital Partners 2000, L.P., GS Capital Partners 2000 Offshore, L.P., GS Capital Partners 2000 GmbH & Co. KG, GS Capital Partners 2000 Employee Fund, L.P. and Goldman Sachs Direct Investment Fund 2000, L.P.

"Initial Facility" shall have the meaning provided in the Preliminary Statements.

"Initial Order" shall mean the initial order granted by the Canadian Court on the Petition Date upon an application made by the Canadian Borrower pursuant to the CCAA, in form and substance satisfactory to the sole discretion of the Required Lenders, as such order may be amended, restated, supplemented or modified from time to time with the consent of the Required Lenders in their sole discretion and in form and substance satisfactory to the sole discretion of the Required Lenders.

"Intercompany Debt" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by Holdings or any Subsidiary of Holdings to Holdings or any other Subsidiary of Holdings.

"Intercompany Note" shall mean a promissory note evidencing intercompany loans made pursuant to Section 10.04(e), in each case duly executed and delivered substantially in the form of Exhibit L, with blanks completed in conformity herewith (or such other form as may be approved by the Administrative Agent or the Required Lenders).

"Intercompany Scheduled Existing Indebtedness" shall have the meaning provided in Section 8.18.

"Intercompany Subordination Agreement" shall have the meaning provided in Section 6.26(b).

"Interest Determination Date" shall mean, with respect to any Eurodollar Loan, the second Business Day prior to the commencement of any Interest Period relating to such Eurodollar Loan.

"Interest Period" shall mean, with respect to any Eurodollar Loan, the interest period applicable thereto, as determined pursuant to Section 2.09.

"Interim Order" shall mean the interim order, in form and substance acceptable to the Required Lenders in their sole discretion, (I) authorizing Debtors (A) to obtain post-petition

financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3)(1) and 364(e) and (B) to utilize cash collateral pursuant to 11 U.S.C. § 363, (II) granting adequate protection to prepetition secured parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (III) scheduling a final hearing pursuant to Bankruptcy Rules 4001(b) and (c) entered by the Bankruptcy Court on or about the date hereof).

"Interim Order Entry Date" shall mean later of the date of the Bankruptcy Court's entry of the Interim Order and the Canadian Court's entry of the Initial Order.

"Investment" shall have the meaning provided in the preamble to Section 10.04.

"Joint Lead Arrangers" shall mean DBSI and General Electric Capital Corporation, each in their capacities as Joint Lead Arrangers and Book Runners.

"Judgment Currency" shall have the meaning provided in Section 13.23(a).

"Judgment Currency Conversion Date" shall have the meaning provided in Section 13.23(a).

"Lazard" shall have the meaning provided in Section 9.18.

"Lazard Engagement Letter" shall have the meaning provided in Section 6.17.

"Leasehold" of any Person shall mean all of the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lender" shall mean and include each financial institution with a Commitment listed on Schedule 1 (as amended from time to time), as well as any Person that becomes a "Lender" hereunder pursuant to Sections 2.13, 2.15 and/or 13.04(b). Unless the context otherwise requires, each reference in this Agreement to a Lender includes each lending office (including any Affiliate of the respective Lender) of the respective Lender designated from time to time pursuant to Section 2.12. For the avoidance of doubt, neither Holdings, nor any of its Subsidiaries, nor any of their respective Affiliates (including any Permitted Holder that owns 5% or more of the Equity Interests of Holdings) shall become a Lender.

"Lender Advisors" shall mean Capstone Advisory Group LLC and Houlihan Lokey Howard & Zukin Capital, Inc. as financial advisors to the Lenders, and other consultants for the Lenders.

"Lender Default" shall mean, as to any Lender, (i) the wrongful refusal (which has not been retracted) of such Lender to make available its portion of any Borrowing, (ii) such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, (iii) such Lender having notified the Administrative Agent and/or any Credit Agreement Party (x) that it does not intend to comply with its obligations under Sections 2.01 in circumstances where such non-compliance would constitute a breach of such Lender's obligations thereunder or (y) of the events described in preceding clause (ii), (iv) any Affiliate of such Lender that has Control of such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, (v) any previously cured "Lender Default" of such Lender under this Agreement, unless such Lender Default has ceased to exist for a period of at least 90 consecutive days, or (vi) any

default by such Lender with respect to its obligations under any other credit facility to which it is a party and which the Administrative Agent believes in good faith has occurred and is continuing.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien (statutory or other), security trust, deemed trust, charge, preference, priority or other security agreement of any kind or nature whatsoever (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC, PPSA or any similar recording or notice statute, and any lease having substantially the same economic effect as the foregoing).

"Loan" shall mean each Tranche A Term Loan, each Tranche B Term Loan, each Tranche C Term Loan and each Incremental Term Loan.

"Local Law Pledge Agreement" shall have the meaning provided in Section 6.14(f).

"Majority Lenders" of any Tranche shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if all outstanding Obligations of the other Tranches under this Agreement were repaid in full and all Commitments with respect thereto were terminated.

"Management Agreements" shall have the meaning provided in Section 6.17.

"Margin Regulations" shall mean, collectively, Regulation T, Regulation U and Regulation X.

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean any event, development or circumstance that has had, or could reasonably be expected to have, a material adverse effect on (i) the business, assets, liabilities, condition (financial or otherwise) or results of operations or prospects of Holdings, the Borrowers and their respective Subsidiaries, taken as a whole, (ii) the ability of any Credit Party to perform any of its material obligations under any Credit Document or (iii) the validity or enforceability of any of the Credit Documents or the rights and remedies of the Agents and the Lenders hereunder or thereunder.

"Material Contract" shall mean any contract the loss of which, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" shall mean Indebtedness (other than the Loans), or obligations in respect of one or more Post Petition Swap Agreements (if any), of any one or more of Holdings, the Borrowers and the Subsidiaries of the U.S. Borrower in an aggregate principal amount exceeding U.S.$10,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the U.S. Borrower or any Subsidiary of the U.S. Borrower in respect of any Post Petition Swap Agreements (if any) at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the U.S. Borrower or such Subsidiary would be required to pay if such Post Petition Swap Agreement were terminated at such time.

"Material Subsidiary" means, as of the date of determination, each of Holdings' Subsidiaries that as of such time is not an Immaterial Subsidiary.

"Maturity Date" shall mean the date that is the earliest of (a) the date that is 270 days after the Interim Order Entry Date, (b) the Consummation Date, (c) the date that is 30 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date and (d) the date of the acceleration of the Loans under Section 11; provided that, so long as no Default or Event of Default shall have occurred and be continuing as of the then-current Maturity Date or would result therefrom, the Maturity Date may be extended by 90 days on up to two separate occasions at the option of the Borrowers and with the prior consent of the Required Lenders, in each case so long as the Borrowers shall pay a fee on the date of such extension to the Administrative Agent for the account of the Lenders equal to 1.00% of the sum of the then outstanding Loans plus the unused Commitments in effect immediately prior to giving effect to any and each such extension.

"Mediofactor Facility" shall mean, collectively, (1) the factoring agreement dated July 6, 2005 by and between Metzeler Automotive Profile Systems Italy SPA and Intesa Mediofactoring in regards to the accounts receivable of debtor Pinifarina SPA C.F., and (2) the factoring agreement dated July 6, 2005 by and between Metzeler Automotive Profile Systems Italy SPA and Intesa Mediofactoring in regards to the accounts receivable of debtors Case New Holland Italia SPA, Fornitek - SRL, Industria Manifatturiera Articoli Tecnici, Italcab SRL, Plastal SPA, Rieter Automotive Fimit SPA, SV Gomma SRL, Siac SPA and Siccom Societa a Responsabilita' Limitata.

"Mexican Amendment to the Equity Interest Pledge Agreement" shall mean the Amendment to the Equity Interests Pledge Agreement delivered pursuant to Section 6.15(d), among Cooper-Standard Automotive Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, CSA Services Inc., Cooper-Standard Automotive de México, S.A. de C.V., Cooper-Standard Automotive FHS Inc. and Cooper-Standard Automotive Fluid Systems de México, S. de R.L. de C.V., as pledgors, DBTCA, as collateral agent for the Prepetition Lenders, as pledgee and the Collateral Agent, as pledgee, pursuant to which, among other things, the parties thereto shall amend the Mexican Equity Interest Pledge Agreement, to incorporate the Collateral Agent as pledgee and the Holdings Guaranteed Obligations as part of the obligations guaranteed by the first priority Lien and security interest granted by the pledgors, over their respective Mexican Pledged Equity Interests, in favor of DBTCA, as collateral agent for the Prepetition Lenders and the Collateral Agent, acting in the name and for the benefit of the Secured Creditors, as pledgees, in form and substance satisfactory to the Required Lenders.

"Mexican Collateral" shall mean the Mexican Real Estate Properties, the Mexican Pledged Equity Interests, and all other Mexican Property that, in accordance with the Mexican Security Agreements, from time to time is subject to any Lien in favor of the Mexican Collateral Agent or the Collateral Agent, as the case may be.

"Mexican Equity Interests Pledge Agreement" shall mean the Amended and Restated Pledge Agreement dated February 15, 2005 (as amended and restated on February 15, 2008), among Cooper-Standard Automotive Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, CSA Services Inc., Cooper-Standard Automotive de México, S.A. de C.V., Cooper-Standard Automotive FHS Inc., and Cooper-Standard Automotive Fluid Systems de México, S. de R.L. de C.V., as pledgors, Deutsche Bank Trust Company Americas, as collateral agent for the Prepetition Lenders, as pledgee, pursuant to which the pledgors created a first priority pledge and security interest over the Mexican Pledged Equity Interests in favor of DBTCA as collateral agent for the Prepetition Lenders, as pledgee, to guaranty the payment obligations derived from the Prepetition Facility.

"Mexican Credit Party" shall mean each Mexican Subsidiary.

"Mexican Floating Lien Pledge Agreement" shall mean each Mexican Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*) delivered pursuant to Section 6.15(d)(iii), among each respective Mexican Credit Party, as pledgors and the Collateral Agent, as pledgee, acting in the name and for the benefit of the Collateral Agent, pursuant to which each respective Mexican Credit Party created a first priority pledge and security interest over their respective Mexican Property, in form and substance satisfactory to the Required Lenders.

"Mexican Pledged Equity Interests" shall mean Equity Interests representing the capital stock of the Mexican Credit Parties pledged pursuant to the Mexican Security Agreements.

"Mexican Property" shall mean with respect to any Mexican Subsidiary, any property, rights or revenues, or interest therein (other than the Mexican Real Estate Properties), owned by such Mexican Subsidiary.

"Mexican Real Estate Properties" shall mean with respect to any Mexican Credit Party, any real estate property located in Mexico owned by such Mexican Credit Party.

"Mexican Security Agreements" shall mean and include the Mexican Floating Lien Pledge Agreement, the Mexican Security Trust Agreement and the Mexican Equity Interests Pledge Agreement (as amended by the Mexican Amendment to the Equity Interests Pledge Agreement), and each pledge or other security agreement entered into pursuant to the terms of this Agreement and governed by the laws of Mexico.

"Mexican Security Trust Agreement" shall mean the Irrevocable Transfer of Title and Security Trust Agreement (*Contrato de Fideicomiso Irrevocable Translativo de Dominio y de Garantía*) delivered pursuant to Section 6.15(d)(ii), among each of the Mexican Credit Parties that own Mexican Real Estate Property, as settlors, the Collateral Agent, as first place beneficiary, and the Mexican Security Trustee, in such capacity, pursuant to which each of the applicable Mexican Credit Parties shall create a first priority Lien and security interest over the Mexican Real Estate Properties, in form and substance satisfactory to the Required Lenders.

"Mexican Security Trustee" shall mean a Mexican financial institution acting as security trustee for purposes of the Mexican Security Trust Agreement.

"Mexican Subsidiary" shall mean each Subsidiary of Holdings incorporated or organized in Mexico.

"Minimum Borrowing Amount" shall mean U.S.$5,000,000.

"Monitor" means the monitor appointed pursuant to the Initial Order, being RSM Richter Inc.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgage" shall mean each mortgage, debenture (together with a debenture delivery agreement), deed of trust or deed to secure debt required to be delivered with respect to any Real Property pursuant to the terms of this Agreement, together with any assignment of leases and rents to

be executed in connection therewith (as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof).

"Mortgage Policy" shall mean each mortgage title insurance policy (and all endorse- ments thereto) for each Mortgaged Property required to be delivered pursuant to this Agreement.

"Mortgaged Property" shall mean each Real Property owned by Holdings or any of its Subsidiaries and required to be mortgaged pursuant to this Agreement.

"Multiemployer Plan" shall mean a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is established or maintained in the United States of America.

"Net Proceeds" shall mean, with respect to any event, (a) the cash proceeds received in respect of such event including, without limitation (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty event, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event and (ii) the amount of all taxes paid (or reasonably estimated to be payable) that are directly attributable to such event (as determined reasonably and in good faith by an Authorized Officer) or would result therefrom.

"Non-Defaulting Lender" shall mean each Lender other than a Defaulting Lender.

"Non-U.S. Borrower" means any Borrower that is not a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code).

"Note" shall mean each Tranche A Term Note, each Tranche B Term Note, each Tranche C Term Note and each Incremental Term Note.

"Notice of Borrowing" shall have the meaning provided in Section 2.03(a).

"Notice of Notice of Conversion/Continuation" shall have the meaning provided in Section 2.06.

"Notice Office" shall mean the office of the Administrative Agent located at 60 Wall Street, MS NYC60-4305, New York, NY 10005-2858, or such other office as the Administrative Agent may designate in writing to Holdings and the Lenders from time to time.

"Obligation Currency" shall have the meaning provided in Section 13.23(a).

"Obligations" shall mean all (a) advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party and its Subsidiaries arising under any Credit Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding and (b) obligations of any Borrower or any Credit Party arising under any Post Petition Swap

Agreement or any Post Petition Cash Management Arrangement. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and of their Subsidiaries to the extent they have obligations under the Credit Documents) include (i) the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party or Subsidiary under any Credit Document and (ii) the obligation of any Credit Party or Subsidiary to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Credit Party or such Subsidiary to the extent originally payable by that Credit Party or Subsidiary.

"Operating Forecast" shall have the meaning provided in Section 9.17(a) and be in form and substance reasonably satisfactory to the Required Lenders.

"Orders" shall mean, collectively, the Interim Order, the Initial Order, the Final Order and any Other CCAA Order.

"Other Auto Supplier Support Program Requirements" shall mean, as to any sale of Receivables and Related Assets by the U.S. Borrower or any of its Subsidiaries to a Program SPV pursuant to an Auto Supplier Support Transaction, (i) the applicable Program SPV shall be party to an Auto Supplier Support Program Credit Agreement (which shall be in full force and effect), (ii) no "Default" or "Event of Default" under, and as defined, in the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party shall have occurred and be continuing, (iii) the Receivables and Related Assets so sold shall constitute "Eligible Receivables" (as defined in the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party), (iv) the sale of such Receivables and Related Assets shall be made in accordance with the relevant Supplier Purchase Agreement (as defined in the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party) and (v) the U.S. Borrower or its relevant Subsidiary shall not be an "Ineligible Supplier" (as defined in the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party).

"Other CCAA Order" shall mean each order, that is in form and substance acceptable to the Required Lenders in their sole discretion, issued by the Canadian Court in the Canadian Case other than the Initial Order that could not reasonably be expected to have an adverse effect on the Lenders, as each such Order may be amended restated, supplemented or modified from time to time with the consent of the Required Lenders in their sole discretion.

"Payment Office" shall mean the office of the Administrative Agent located at 60 Wall Street, MS NYC60-4305, New York, NY 10005-2858, or such other office as the Administrative Agent may designate in writing to Holdings and the Lenders from time to time.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 5002 of ERISA, or any successor thereto.

"Permitted Credit Protection Transaction" shall mean any transaction or series of transactions entered into by the U.S. Borrower or any of its Subsidiaries in connection with the Auto Supplier Support Program pursuant to which it sells Receivables payable by any Qualifying OEM and all Related Assets to a Program SPV established by such Qualifying OEM in exchange for a "payment right" from such Program SPV in an amount equal to the face amount of the Receivables so sold less any discount; provided that (1) the discount shall not exceed 2.0% of the face amount of the