Receivables so sold, (2) no other commissions, fees or charges shall be payable by the U.S. Borrower or any of its Subsidiaries in connection with any such transaction, (3) such "payment right" shall be due and payable by the SPV Subsidiary to the U.S. Borrower or its applicable Subsidiary on the same date the payment on the related Receivable so sold is due from the Qualifying OEM (or, if earlier, two business days prior to the maturity date of the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party) and (4) at the time of such sale, the Other Auto Supplier Support Program Requirements are satisfied.

"Permitted Encumbrances" shall mean:

(a)     Liens imposed by law for taxes, rates, assessments or other governmental charges or levies the payment of which is not yet due, or for which installments have been paid based on reasonable estimates pending final assessments, or if due, the validity of which is being contested in accordance with Section 9.05 and for which reserves have been taken in accordance with and to the extent required by U.S. GAAP;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers' and other like Liens imposed by law (including Liens of customs and revenue authorities to secure customs duties in connection with the importation of goods), arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in accordance with Section 9.05;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Section 11;

(f)     easements, zoning restrictions, rights-of-way, licenses, permits, reservations, covenants, servitudes, and rights in the nature of easements (including, without limiting the generality of the foregoing, licenses, easements, rights-of-way and rights in the nature of easements for sidewalks, public ways, sewers, drains, gas, steam and water mains or electric light and power, or telephone and telegraph conduits, poles, wires and cables) and land use and building restrictions, by-laws, regulations and ordinances of federal, provincial, regional, state, municipal and other Governmental Authorities, minor defects or irregularities of title and other similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the U.S. Borrower or any Subsidiary of the U.S. Borrower;

(g)     landlords' and lessors' and other like Liens in respect of rent not in default or being reasonably contested and the rights of any tenant, occupant or licensee under any lease, occupancy agreement or license which do not materially impair the use of the real property subject thereto for the purpose for which it is used by that Person;

(h)   reservations, limitations, provisos and conditions expressed in any original grant from the Crown or other grant of real or immovable property, or interests therein; and

(i)   the right reserved to or vested in any Governmental Authority by the terms of any lease, license, franchise, grant or permit acquired by that Person or by any statutory provision to terminate any such lease, license, franchise, grant or permit, or to require annual or other payments as a condition to the continuance thereof.

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Holder" shall mean (i) any Initial Equity Investor and any Affiliate of any Initial Equity Investor that is neither an operating company nor a company controlled by an operating company and (ii) any general partner of any of the foregoing.

"Permitted Investments" shall mean:

(a)   direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)   investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)   investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than U.S.$500,000,000;

(d)   repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)   money market funds that comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above.

"Permitted Joint Venture" shall mean any joint venture listed on Schedule 1-A (a) in which the U.S. Borrower or any Subsidiary of the U.S. Borrower, together with any other Subsidiary of the U.S. Borrower, holds Equity Interests that represents 50% or less of the ordinary voting power and aggregate equity value represented by the issued and outstanding Equity Interests in such joint venture and (b) that is engaged in a business permitted under Section 10.03(b), including the Existing Joint Ventures.

"Permitted Liens" shall have the meaning provided in Section 10.02.

"Permitted Quick Pay Sale" shall mean any transaction or series of transactions entered into by the U.S. Borrower or any of its Subsidiaries in connection with the Auto Supplier Support Program pursuant to which it sells Receivables payable by any Qualifying OEM and all Related Assets to a Program SPV established by such Qualifying OEM in exchange for cash consideration (payable not later than four business days following such sale) in an amount equal to the face amount of the Receivables so sold less any discount; provided that (i) the discount shall not exceed 3% of the face amount of the Receivables so sold, (ii) no other commissions, fees or charges shall be payable by the U.S. Borrower or any of its Subsidiaries in connection with any such transaction, (iii) the sum of the face amount of the Receivables offered for sale but for which payment has not yet been received (and intended to qualify as "Permitted Quick Pay Sales" pursuant to this definition) shall not exceed U.S.$50,000,000 in the aggregate outstanding at any given time and (iv) at the time of such sale, the Other Auto Supplier Support Program Requirements are satisfied.

"Permitted Securitization" shall mean any transaction or series of transactions that may be entered into by any Foreign Subsidiary (other than the Canadian Credit Parties) of the U.S. Borrower pursuant to which it may sell, convey, contribute to capital or otherwise transfer (which sale, conveyance, contribution to capital or transfer may include or be supported by the grant of a security interest) Receivables or interests therein and all collateral securing such Receivables, all contracts and contract rights, purchase orders, security interests, financing statements or other documentation in respect of such Receivables, any guarantees, indemnities, warranties or other obligations in respect of such Receivables, any other assets that are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving receivables similar to such Receivables and any collections or proceeds of any of the foregoing (collectively, the "Related Assets") (i) to a trust, partnership, corporation or other Person (other than the U.S. Borrower or any Subsidiary of the U.S. Borrower, other than a SPE Subsidiary), which transfer is funded in whole or in part, directly or indirectly, by the incurrence or issuance by the transferee or any successor transferee of Indebtedness, fractional undivided interests or other securities that are to receive payments from, or that represent interests in, the cash flow derived from such Receivables and Related Assets or interests in such Receivables and Related Assets, or (ii) directly to one or more investors or other purchasers (other than the U.S. Borrower or any Subsidiary of the U.S. Borrower), it being understood that a Permitted Securitization may involve (A) one or more sequential transfers or pledges of the same Receivables and Related Assets, or interests therein (such as a sale, conveyance or other transfer to an SPE Subsidiary followed by a pledge of the transferred Receivables and Related Assets to secure Indebtedness incurred by the SPE Subsidiary), and all such transfers, pledges and Indebtedness incurrences shall be part of and constitute a single Permitted Securitization, and (B) periodic transfers or pledges of Receivables and/or revolving transactions in which new Receivables and Related Assets, or interests therein, are transferred or pledged upon collection of previously transferred or pledged Receivables and Related Assets, or interests therein, provided that (x) any such transactions shall provide for recourse to such Foreign Subsidiary of the U.S. Borrower (other than any SPE Subsidiary) or the U.S. Borrower (as applicable) only in respect of the cash flows in respect of such Receivables and Related Assets and to the extent of other customary securitization undertakings in the jurisdiction relevant to such transactions and (y) the aggregate amount of all such transactions constituting "Permitted Securitizations" shall not exceed U.S.$75,000,000 at any time outstanding. The "amount" or "principal amount" of any Permitted Securitization shall be deemed at any time to be (1) the aggregate principal, or stated amount, of the Indebtedness, fractional undivided interests (which stated amount may be described as a "net investment" or similar term reflecting the amount invested in such undivided interest) or other securities incurred or issued pursuant to such Permitted

Securitization, in each case outstanding at such time, or (2) in the case of any Permitted Securitization in respect of which no such Indebtedness, fractional undivided interests or securities are incurred or issued, the cash purchase price paid by the buyer in connection with its purchase of Receivables less the amount of collections received by the U.S. Borrower or any Subsidiary of the U.S. Borrower in respect of such Receivables and paid to such buyer, excluding any amounts applied to purchase fees or discount or in the nature of interest. Each Lender authorizes each of the Administrative Agent and Collateral Agent to enter into an intercreditor agreement in respect of each Permitted Securitization from time to time in effect and to take all actions it deems appropriate or necessary in connection with any such intercreditor agreement. Notwithstanding the foregoing, in no event shall any Auto Supplier Support Transaction constitute (or qualify as) a "Permitted Securitization".

"Person" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any government or political sub-division or any agency, department or instrumentality thereof.

"Petition Date" shall have the meaning specified in the Preliminary Statements.

"Plan" shall mean any employee pension benefit plan established or maintained in the United States of America subject to the provisions of Title IV or Section 302 of ERISA or Section 412 of the Code, and in respect of which Holdings or a Subsidiary of Holdings or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization" shall have the meaning provided in Section 11(x).

"Plan Termination Event" shall have the meaning provided in Section 11(l).

"Pledge Agreement Collateral" shall mean all U.S. Pledge Agreement Collateral and all other Equity Interests or other property similar to that pledged (or purported to have been pledged) pursuant to the U.S. Pledge Agreement which is pledged (or purported to be pledged) pursuant to one or more Canadian Pledge Agreements, Local Law Pledge Agreements, other Foreign Security Documents or Additional Security Documents.

"Pledge Agreements" shall mean the U.S. Pledge Agreement and each Foreign Pledge Agreement.

"Post Petition Cash Management Arrangements" shall mean any agreement or arrangement entered into after the Petition Date with Bank of America, N.A. (or its Affiliates) or other Secured Creditors providing for treasury, depository and/or cash management services (including corporate credit card services) or any automated clearing house transfer services (including customary overdraft lines), to the extent the payment obligations of the U.S. Borrower and its Subsidiaries under all such agreements or arrangements do not exceed (i) in the case of such agreements or arrangements entered into with Bank of American, N.A. (or its Affiliates), U.S.$5,500,000 in the aggregate at any time outstanding or (ii) in the case of all other agreements or arrangements entered into with other Secured Creditors, U.S.$2,500,000 in the aggregate at any time outstanding.

"Post Petition Swap Agreement" shall mean any Swap Agreement entered into after the Petition Date with a Lender.

"PPSA" shall mean the Personal Property Security Act (Ontario) and the regulations thereunder and any other personal property security legislation and applicable regulations of any other province or territory of Canada where a Canadian Credit Party has, from time to time, tangible personal property, in each case, as may be amended from time to time and includes any successor legislation.

"Preferred Equity" as applied to the Equity Interests of any Person, shall mean Equity Interests of such Person (other than common stock of such Person) of any class or classes (however designed) that ranks prior, as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of such Person, to Equity Interests of any other class of such Person.

"Prepetition Agent" shall mean Deutsche Bank Trust Company Americas, as administrative agent and collateral agent under the Prepetition Facility.

"Prepetition Facility" shall mean that certain Credit Agreement, dated as of December 23, 2004 (as amended, restated, supplemented or otherwise modified from time to time, including by that certain First Amendment and Consent to Credit Agreement, dated February 1, 2006, that certain Second Amendment to Credit Agreement, dated July 26, 2007, that certain Third Amendment and Waiver to Credit Agreement, dated December 18, 2008, that certain Fourth Amendment to Credit Agreement, dated May 15, 2009 and that certain Fifth Amendment to the Credit Agreement, dated July 14, 2009), among Holdings, Cooper-Standard Automotive Inc., Cooper-Standard Automotive Canada Limited, Cooper-Standard Automotive International Holdings B.V. (f/k/a Steffens Beheer BV), the "Lenders" (as defined therein) from time to time party thereto, the Prepetition Agent, as administrative agent for the "Lenders" and the other agents party thereto.

"Prepetition Facility Amendment" shall mean that certain Fifth Amendment and Consent to Credit Agreement dated as of July 14, 2009, between Holdings, Cooper-Standard Automotive Inc., Cooper-Standard Automotive Canada Limited, Cooper-Standard Automotive International Holdings B.V. (f/k/a Steffens Beheer BV), the lenders party thereto and the Prepetition Agent.

"Prepetition Lenders" shall mean the "Lenders" (as defined therein) under the Prepetition Facility.

"Prepetition Loan Documents" shall mean the Prepetition Facility and the "Credit Documents" as defined in the Prepetition Facility.

"Prepetition Obligations" shall mean the "Obligations" as defined in the Prepetition Facility.

"Prepetition Security Documents" shall mean the "Security Documents" as defined in the Prepetition Facility.

"Prime Lending Rate" shall mean the rate which DBTCA (or another bank of recognized standing reasonably selected by the Administrative Agent) announces from time to time

as its prime lending rate to commercial borrowers in the United States (in the case of Base Rate Loans to the U.S. Borrower) or Canada (in the case of Base Rate Loans to the Canadian Borrower), as the case may be, the Prime Lending Rate to change when and as such prime lending rate changes. The Prime Lending Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. DBTCA may make commercial loans or other loans at rates of interest at, above or below the Prime Lending Rate.

"Priority Payables" means, with respect to any Person, any amount payable by such Person solely to the extent that it is secured by a Lien which ranks or is capable of ranking prior to or pari passu with the Liens created by the Security Documents, including amounts which are owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, tax payable pursuant to Part IX of the Excise Tax Act (Canada) (net of GST input credits), income tax, workers compensation, government royalties, pension fund obligations, Canada Pension Plan obligations and overdue taxes.

"Program SPV" shall mean (i) GM Supplier Receivables, LLC, a Delaware limited liability company, (ii) Chrysler Receivables SPV LLC, a Delaware limited liability company and (iii) any other special purpose, bankruptcy remote, vehicle established by a Qualifying OEM in connection with an Auto Supplier Support Program.

"Qualified Preferred Stock" shall mean Preferred Equity of Holdings that (a) is issued at an aggregate purchase price no less than its aggregate liquidation preference, (b) does not require any payment of dividends (other than in additional shares of such preferred stock) prior to the date that is one year after the Maturity Date, (c) is not mandatorily redeemable pursuant to a sinking fund obligation or otherwise prior to the date that is one year after the Maturity Date, (d) contains no maintenance covenants, other covenants materially adverse to the Lenders or remedies (other than voting rights and increases in pay-in-kind dividends) and (e) is convertible only into common equity of Holdings or securities that would constitute Qualified Preferred Stock.

"Qualifying OEM" shall mean any original equipment manufacturer taking part in the Auto Supplier Support Program, including, without limitation, General Motors Corporation, a Delaware corporation, and Chrysler, LLC, a Delaware limited liability company.

"Quarterly Payment Date" shall mean the last Business Day of each March, June, September and December.

"Real Property" of any Person shall mean all of the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Receivables" shall mean accounts receivable (including all rights to payment created by or arising from the sales of goods, leases of goods or the rendition of services, no matter how evidenced (including in the form of chattel paper) and whether or not earned by performance).

"Recovery Event" shall mean the receipt by Holdings or any of its Subsidiaries of any insurance or condemnation proceeds payable (i) by reason of theft, physical destruction or damage or any other similar event with respect to any properties or assets of Holdings or any of its Subsidiaries, (ii) by reason of any condemnation, taking, seizing or similar event with respect to any properties or assets of Holdings or any of its Subsidiaries and (iii) under any policy of insurance required to be maintained under Section 9.07.

"Register" shall have the meaning provided in Section 13.17.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from to time in effect and any successor to all or any portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or any portion thereof.

"Reinvestment Deferred Amount" shall mean, with respect to any Reinvestment Event, the aggregate Net Proceeds received by Holdings or any of its Subsidiaries in connection therewith that are not applied to prepay the Loans pursuant to Section 5.02(c) or (e) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event" shall mean any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice" shall mean a written notice executed by an Authorized Officer stating that no Event of Default has occurred and is continuing and that the U.S. Borrower (directly or indirectly through a Wholly-Owned Subsidiary) intends and expects to use all or a specified portion of the Net Proceeds of an Asset Sale or Recovery Event in the business of the U.S. Borrower and its Subsidiaries (it being understood that any portion of such Net Proceeds not used as aforesaid shall be subject to the mandatory prepayment requirements of Sections 5.02(c) and (e)).

"Reinvestment Prepayment Amount" shall mean, with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the business of the U.S. Borrower and its Subsidiaries.

"Reinvestment Prepayment Date" shall mean, with respect to any Reinvestment Event, the earlier of (a) the date occurring 180 days after such Reinvestment Event and (b) the date on which the U.S. Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the business of the U.S. Borrower and its Subsidiaries with all or any portion of the relevant Reinvestment Deferred Amount.

"Related Assets" shall have the meaning provided in the definition of Permitted Securitization.

"Release" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Remaining Present Value" shall mean, as of any date with respect to any lease, the present value as of such date of the scheduled future lease payments with respect to such lease, deter-

mined with a discount rate equal to a market rate of interest for such lease reasonably determined at the time such lease was entered into.

"Replaced Lender" shall have the meaning provided in Section 2.13.

"Replacement Lender" shall have the meaning provided in Section 2.13.

"Required Appraisal" shall have the meaning provided in Section 9.13(d).

"Required Lenders" shall mean Non-Defaulting Lenders, the sum of whose outstanding principal of Loans (or, if prior to the occurrence of the Credit Events on the Initial Borrowing Date, whose Tranche A Term Loan Commitments and Tranche B Term Loan Commitments) as of any date of determination represent greater than 50% of the sum of all outstanding principal of Loans (or if prior to the occurrence of the Credit Events on the Initial Borrowing Date, the sum of all Tranche A Term Loan Commitments and Tranche B Term Loan Commitments) of Non-Defaulting Lenders at such time.

"Requirement of Law" shall mean, with respect to any Person, (i) the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person and (ii) any statute, law, treaty, rule, regulation, order, decree, writ, injunction or determination of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted" shall mean, when referring to cash or Permitted Investments of the U.S. Borrower or any of its Subsidiaries, that such cash or Permitted Investments (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the U.S. Borrower or of any such Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder), (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors or (iii) are not otherwise generally available for use by the U.S. Borrower or such Subsidiary.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, any Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings, any Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in Holdings, any Borrower or any Subsidiary.

"Restructuring Charges" shall mean charges in respect of restructurings, plant closings, headcount reductions or other similar actions, including severance charges in respect of employee terminations.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw Hill, Inc.

"Sale and Leaseback Transaction" shall have the meaning provided in Section 10.06.

"Scheduled Existing Indebtedness" shall mean Third Party Scheduled Existing Indebtedness and Intercompany Scheduled Existing Indebtedness.

"Scheduled Repayment" shall mean any Tranche A Term Loan Scheduled Repayment, Tranche B Term Loan Scheduled Repayment, Tranche C Term Loan Scheduled Repayment and/or Incremental Term Loan Scheduled Repayment, as applicable.

"SEC" shall mean the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Section 5.04(b)(ii) Certificate" shall have the meaning provided in Section 5.04(b)(ii).

"Secured Creditor" shall mean each applicable "Secured Creditor", as defined in any applicable Security Document.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreements" shall mean the U.S. Security Agreement, the Canadian Security Agreement, the Brazilian Security Agreement, the Dutch Security Agreements and the Mexican Security Trust Agreement.

"Security Document" shall mean and include each of the Security Agreements, the Pledge Agreements, each Mortgage and, after the execution and delivery thereof, each Additional Security Document and all other mortgages, pledge agreements, security agreements and other security documents entered into from time to time pursuant to Sections 9.12 and/or 9.13 and/or as required by the Additional Foreign Borrower Designation Agreement, in each case as the same may be modified, supplemented or amended from time to time in accordance with the terms hereof and thereof.

"Shareholders' Agreements" shall have the meaning provided in Section 6.17.

"SPE Subsidiary" shall mean any Wholly-Owned Subsidiary formed solely for the purpose of, and that engages only in, one or more Permitted Securitizations.

"Sponsor" shall mean, collectively, The Cypress Group L.L.C. and GS Capital Partners 2000, L.P.

"Subsidiaries Guaranty" shall mean and include the Global Subsidiaries Guaranty, the Canadian Subsidiaries Guaranty and any other guaranty executed and delivered by any Subsidiary of the U.S. Borrower pursuant to Sections 9.12 and/or 9.13 and/or as required by the Additional Foreign Borrower Designation Agreement.

"Subsidiary" of any Person shall mean and include (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through one or more Subsidiaries of such Person and (ii) any partnership, association, limited liability company,

joint venture or other entity (other than a corporation) in which such Person directly or indirectly through one or more Subsidiaries of such Person, has more than a 50% Equity Interest at the time.

"Subsidiary Guarantor" shall mean each Subsidiary of Holdings that executes and delivers any Subsidiaries Guaranty, unless and until such time as the respective Subsidiary is released from all of its obligations under any relevant Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Supermajority Lenders" of any Tranche shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if (x) all outstanding Obligations of the other Tranches under this Agreement were repaid in full and all Commitments with respect thereto were terminated and (y) the percentage "50%" contained therein were changed to "66-2/3%."

"Superpriority Claim" shall mean a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the U.S. Borrower or any of its Subsidiaries shall be a Swap Agreement.

"Tax Allocation Agreements" shall have the meaning provided in Section 6.17.

"Tax Distribution" shall mean, in the event that Holdings and the U.S. Borrower become pass-through or disregarded entities for U.S. federal income tax purposes, a distribution to Holdings to the extent the proceeds of such distribution are distributed to the holders of Equity Interests of Holdings in any taxable year to enable such holders to pay their Tax liability on their respective shares of cumulative taxable income attributable to Holdings for such year.

"Taxes" shall have the meaning provided in Section 5.04(a).

"Term Loans" shall mean and include Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans and each Incremental Term Loan.

"Third Party Scheduled Existing Indebtedness" shall have the meaning provided in Section 8.18.

"Total Commitment" shall mean, at any time, the sum of the Total Tranche A Term Loan Commitment, the Total Tranche B Term Loan Commitment, the Total Tranche C Term Loan Commitment and the Total Incremental Term Loan Commitment.

"Total Incremental Term Loan Commitment" shall mean, at any time, the sum of the Incremental Term Loan Commitments of each of the Lenders with such a Commitment at such time.

"Total Tranche A Term Loan Commitment" shall mean, at any time, the sum of the Tranche A Term Loan Commitments of each of the Lenders with such a Commitment at such time. The initial amount of the Total Tranche A Term Loan Commitment shall be U.S.$125,000,000.

"Total Tranche B Term Loan Commitment" shall mean, at any time, the sum of the Tranche B Term Loan Commitments of each of the Lenders with such a Commitment at such time. The initial amount of the Total Tranche B Term Loan Commitment shall be U.S.$50,000,000.

"Total Tranche C Term Loan Commitment" shall mean, at any time, the sum of the Tranche C Term Loan Commitments of each of the Lenders with such a Commitment at such time.

"Tranche" shall mean the respective facilities and commitments utilized in making Loans hereunder (i.e., whether Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans or Incremental Term Loans made pursuant to one or more tranches designated pursuant to the respective Incremental Term Loan Commitment Agreements in accordance with the relevant requirements specified in Section 2.15); provided that in the circumstances contemplated by Section 2.15(c), Incremental Term Loans may be made part of a then existing Tranche of Term Loans.

"Tranche A Term Loan" shall have the meaning provided in Section 2.01(a).

"Tranche A Term Loan Commitment" shall mean, with respect to each Lender, the amount set forth opposite such Lender's name in Schedule 1 directly below the column entitled "Tranche A Term Loan Commitment", as the same may be (i) reduced pursuant to Section 4.03(c) or (ii) terminated pursuant to Sections 4.03 and/or 11.

"Tranche A Term Loan Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Tranche A Term Note" shall have the meaning provided in Section 2.05(a).

"Tranche A TL Lender" shall mean any Lender with a Tranche A Term Loan Commitment or outstanding Tranche A Term Loans.

"Tranche B Term Loan" shall mean have the meaning provided in Section 2.01(b).

"Tranche B Term Loan Commitment" shall mean, with respect to each Lender, the amount set forth opposite such Lender's name in Schedule 1 directly below the column entitled "Tranche B Term Loan Commitment", as the same may be (i) reduced pursuant to Section 4.03(c) or (ii) terminated pursuant to Sections 4.03 and/or 11.

"Tranche B Term Loan Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Tranche B Term Note" shall have the meaning provided in Section 2.05(a).

"Tranche B TL Lender" shall mean any Lender with a Tranche B Term Loan Commitment or outstanding Tranche B Term Loans.

"Tranche C Term Loan" shall mean have the meaning provided in Section 2.01(c).

"Tranche C Term Loan Commitment" shall mean, with respect to each Lender, (i) prior to the delivery of an executed Additional Foreign Borrower Designation Agreement, zero and (ii) after the execution and delivery an Additional Foreign Borrower Designation Agreement, the amount set forth opposite such Lender's name in Schedule 1 to the Additional Foreign Borrower Designation Agreement directly below the column entitled "Tranche C Term Loan Commitment" (which amount shall equal such Lender's pro rata portion (determined as the percentage that the aggregate of such Lender's Tranche A Term Loan Commitment and Tranche B Term Loan Commitment bears to the aggregate Total Tranche A Term Loan Commitment and Total Tranche B Term Loan Commitment immediately prior to the effectiveness of such Additional Foreign Borrower Designation Agreement) of the Total Tranche C Term Loan Commitment as set forth on said Schedule I), in each case as the same may be terminated pursuant to Sections 4.03 and/or 11.

"Tranche C Term Loan Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Tranche C Term Note" shall have the meaning provided in Section 2.05(a).

"Tranche C TL Lender" shall mean any Lender with a Tranche C Term Loan Commitment or outstanding Tranche C Term Loans.

"Transaction" shall mean, collectively, (i) the entering into of the Credit Documents and the incurrence of Loans, (ii) the commencement of the Cases, (iii) the entering into of the Prepetition Facility Amendment, (iv) all intercompany loans, equity contributions, repayments of intercompany loans, dividends, distributions and other intercompany Investments related to the foregoing and (v) the payment of all fees and expenses in connection with the foregoing.

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a Eurodollar Loan.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the relevant jurisdiction.

"Unrestricted" shall mean, when referring to cash or Permitted Investments of the U.S. Borrower or any of its Subsidiaries, that such cash or Permitted Investments are not Restricted.

"Unscheduled Third Party Indebtedness" shall have the meaning provided in Section 6.11.

"U.S." or "United States" shall mean the United States of America.

"U.S. Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"U.S. Borrower Guaranteed Obligations" shall mean (i) the principal and interest on each Tranche B Term Note, each Tranche C Term Note, each Incremental Term Note issued by the Canadian Borrower to each Lender, each Incremental Term Note issued by the Additional Foreign Borrower to each Lender, each Tranche B Term Loan, each Tranche C Term Loan, each Incremental Term Loan made to the Canadian Borrower and each Incremental Term Loan made to the Additional Foreign Borrower, under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would

become due) and liabilities (including, without limitation, indemnities, fees and interest thereon) of the Canadian Borrower and the Additional Foreign Borrower to each Lender, each Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement or any other Credit Document and the due performance and compliance by the Canadian Borrower and the Additional Foreign Borrower with all the terms, conditions and agreements contained in the Credit Documents to which it is a party and (ii) all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities of each Subsidiary of the U.S. Borrower owing under each Post Petition Swap Agreement or Post Petition Cash Management Arrangement entered into by each Subsidiary of the U.S. Borrower with any Guaranteed Creditor so long as such Guaranteed Creditor participates in such Post Petition Swap Agreement or Post Petition Cash Management Arrangement, and their subsequent assigns, if any, whether now in existence or hereafter arising, and the due performance and compliance with all terms, conditions and agreements contained therein.

"U.S. Borrower Guaranteed Party" shall mean (i) the Canadian Borrower, (ii) the Additional Foreign Borrower and (iii) each Subsidiary of the U.S. Borrower party to any Post Petition Swap Agreement or any Post Petition Cash Management Arrangement with any Secured Creditor.

"U.S. Borrower's Guaranty" shall mean the guaranty of the U.S. Borrower pursuant to Section 15.

"U.S. Borrower Incremental Term Loans" shall mean Incremental Term Loans incurred by the U.S. Borrower.

"U.S. Cases" shall have the meaning provided in the Preliminary Statements.

"U.S. Credit Party" shall mean Holdings, the U.S. Borrower and each U.S. Subsidiary Guarantor.

"U.S. Debtors" shall have the meaning provided in the Preliminary Statements.

"U.S. Dollar Equivalent" of an amount denominated in a currency other than U.S. Dollars shall mean, at any time for the determination thereof, the amount of U.S. Dollars which could be purchased with the amount of such currency involved in such computation at the spot exchange rate therefor as quoted by the Administrative Agent as of 11:00 A.M. (New York time) on the date two Business Days prior to the date of any determination thereof for purchase on such date (or, in the case of any determination pursuant to Section 13.23, at the date of determination). Notwithstanding anything to the contrary contained in this definition, at any time that a Default or an Event of Default then exists, the Administrative Agent may revalue the U.S. Dollar Equivalent of any amounts outstanding under the Credit Documents in a currency other than U.S. Dollars in its sole discretion.

"U.S. Dollars", "Dollars" and the sign "U.S. $" shall each mean freely transferable lawful money of the United States of America.

"U.S. Finco" shall mean CS Automotive LLC, a limited liability company organized under the laws of the State of Delaware.

"U.S. GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time; provided that determinations made pursuant to this Agreement in accordance with U.S. GAAP are subject (to the extent provided therein) to Section 13.07(a).

"U.S. Pledge Agreement" shall have the meaning provided in Section 6.14(a).

"U.S. Pledge Agreement Collateral" shall mean all of the "Collateral" as defined in the U.S. Pledge Agreement.

"U.S. Security Agreement" shall have the meaning provided in Section 6.15(a).

"U.S. Security Documents" shall mean and include the U.S. Security Agreement, the U.S. Pledge Agreement, each Mortgage covering a Mortgaged Property located in the United States or any State or territory thereof and each other Security Document covering assets of a U.S. Credit Party situated in the United States or any State or territory thereof.

"U.S. Subsidiary Guarantor" shall mean (i) each Wholly-Owned Domestic Subsidiary of Holdings as of the Initial Borrowing Date (other than the U.S. Borrower) and (ii) each other Wholly-Owned Domestic Subsidiary of Holdings created, established or acquired after the Initial Borrowing Date which executes and delivers a Global Subsidiaries Guaranty, unless and until such time as the respective Domestic Subsidiary is released from all of its obligations under its Global Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing (i) the then outstanding principal amount of such Indebtedness into (ii) the product obtained by multiplying (x) the amount of each then remaining installment or other required scheduled payments of principal, including payment at final maturity, in respect thereof, by (y) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person that is a Domestic Subsidiary of such Person.

"Wholly-Owned Foreign Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock (other than director's qualifying shares and/or other nominal amounts of shares required by applicable law to be held by Persons other than such Person) is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% Equity Interest at such time.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in ERISA.

"Written" (whether lower or upper case) or "in writing" shall mean any form of written communication or a communication by means of telex, facsimile device, telegraph or cable.

SECTION 2.  Amount and Terms of Credit.

2.01  Commitments.

(a)     Tranche A Term Loans.  Subject to and upon the terms and conditions set forth herein, each Lender with a Tranche A Term Loan Commitment severally agrees to make a term loan (each, a "Tranche A Term Loan" and, collectively, the "Tranche A Term Loans") to the U.S. Borrower, which Tranche A Term Loans:

(i)     shall be incurred by the U.S. Borrower pursuant to a single drawing on the Initial Borrowing Date in an aggregate principal amount equal to the lesser of U.S.$35,000,000 and such other amount as may be approved in the Interim Order and a single drawing on the Final Borrowing Date in an aggregate principal amount not exceeding the amount of the Total Tranche A Term Loan Commitment on such date (determined after giving effect to any reduction thereof on such date pursuant to Section 4.03(c) but before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) minus the aggregate principal amount of Tranche A Term Loans borrowed on the Initial Borrowing Date, in each case for the purposes described in Section 9.11(a); provided that, if on or prior to the Final Borrowing Date (x) an Additional Foreign Borrower Designation Agreement is not executed and delivered by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent as directed by the Required Lenders or (y) all conditions set forth therein not shall have been satisfied as determined by the Required Lenders in their sole discretion, in no event shall the aggregate principal amount of Tranche A Term Loans made on the Final Borrowing Date plus the aggregate principal amount of Tranche B Term Loans made on the Final Borrowing Date exceed U.S.$75,000,000, unless otherwise agreed by the Required Lenders;

(ii)     shall be denominated in U.S. Dollars;

(iii)     except as hereafter provided, shall, at the option of the U.S. Borrower, be incurred and maintained as Base Rate Loans or Eurodollar Loans, provided that, except as otherwise specifically provided in Section 2.10(b), all Tranche A Term Loans made as part of the same Borrowing shall at all times consist of Tranche A Term Loans of the same Type; and

(iv)     shall be made by each Lender in an aggregate principal amount not in excess of (x) in the case of the Borrowing on the Initial Borrowing Date, the Tranche A Term Loan Commitment of such Lender on the Initial Borrowing Date (determined before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) and (y) in the case of the Borrowing on the Final Borrowing Date, the Tranche A Term Loan Commitment of such Lender on the Final Borrowing Date (determined after giving effect to any reduction thereof on such date pursuant to Section 4.03(c) but before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)).

Once repaid, Tranche A Term Loans incurred hereunder may not be reborrowed.

(b)　Tranche B Term Loans.  Subject to and upon the terms and conditions set forth herein, each Lender with a Tranche B Term Loan Commitment severally agrees to make a term loan (each, a "Tranche B Term Loan" and, collectively, the "Tranche B Term Loans") to the Canadian Borrower, which Tranche B Term Loans:

(i)　shall be incurred by the Canadian Borrower pursuant to a single drawing on the Initial Borrowing Date in an aggregate principal amount equal to the lesser of U.S. $15,000,000 and such other amount as may be approved in the Initial Order and a single drawing on the Final Borrowing Date in an aggregate principal amount not exceeding the amount of the Total Tranche B Term Loan Commitment on such date (determined after giving effect to any reduction thereof on such date pursuant to Section 4.03(c) but before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) minus the aggregate principal amount of Tranche B Term Loans borrowed on the Initial Borrowing Date, in each case for the purposes described in Section 9.11(a); provided that, if on or prior to the Final Borrowing Date an Additional Foreign Borrower Designation Agreement is not executed and delivered by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent as directed by the Required Lenders or (y) all conditions set forth therein not shall have been satisfied as determined by the Required Lenders in their sole discretion, in no event shall the aggregate principal amount of Tranche A Term Loans made on the Final Borrowing Date plus the aggregate principal amount of Tranche B Term Loans made on the Final Borrowing Date exceed U.S.$75,000,000, unless otherwise agreed by the Required Lenders;

(ii)　shall be denominated in U.S. Dollars;

(iii)　except as hereafter provided, shall, at the option of the Canadian Borrower, be incurred and maintained as Base Rate Loans or Eurodollar Loans, provided that, except as otherwise specifically provided in Section 2.10(b), all Tranche B Term Loans made as part of the same Borrowing shall at all times consist of Tranche B Term Loans of the same Type; and

(iv)　shall be made by each Lender in an aggregate principal amount not in excess of (x) in the case of the Borrowing on the Initial Borrowing Date, the Tranche B Term Loan Commitment of such Lender on the Initial Borrowing Date (determined before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) and (y) in the case of the Borrowing on the Final Borrowing Date, the Tranche B Term Loan Commitment of such Lender on the Final Borrowing Date (determined after giving effect to any reduction thereof on such date pursuant to Section 4.03(c) but before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)).

Once repaid, Tranche B Term Loans incurred hereunder may not be reborrowed.

(c)　Tranche C Term Loans.  Subject to and upon the terms and conditions set forth herein, if on or prior to the Final Borrowing Date an Additional Foreign Borrower Designation Agreement is executed and delivered by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent as directed by the Required Lenders and all conditions set forth therein shall have been satisfied as determined by the Required Lenders in their sole discretion, each Lender with a Tranche C Term Loan Commitment severally agrees to make a term loan (each, a "Tranche C Term

Loan" and, collectively, the "Tranche C Term Loans") to the Additional Foreign Borrower, which Tranche C Term Loans:

       (i)      shall be incurred by the Additional Foreign Borrower pursuant to a single drawing on the Final Borrowing Date in an aggregate principal amount equal to the amount of the Total Tranche C Term Loan Commitment on such date (determined before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) for the purposes described in Section 9.11(a);

       (ii)     shall be denominated in U.S. Dollars;

       (iii)    except as hereafter provided, shall, at the option of the Additional Foreign Borrower, be incurred and maintained as Base Rate Loans or Eurodollar Loans, _provided_ that, except as otherwise specifically provided in Section 2.10(b), all Tranche C Term Loans made as part of the same Borrowing shall at all times consist of Tranche C Term Loans of the same Type; and

       (iv)    shall be made by each Lender in an aggregate principal amount not in excess of, the Tranche C Term Loan Commitment of such Lender on the Final Borrowing Date (determined before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)).

Once repaid, Tranche C Term Loans incurred hereunder may not be reborrowed.

       (d)    _Incremental Term Loans_.  Subject to and upon the terms and conditions set forth herein, (i) each Lender with an Incremental Term Loan Commitment for a given Tranche of Incremental Term Loans severally agrees, to make a term loan (each, an "Incremental Term Loan" and, collectively, the "Incremental Term Loans") to the Incremental Term Loan Borrower for such Tranche, which Incremental Term Loans:

       (i)      shall be incurred pursuant to a single drawing for such Tranche on the applicable Incremental Term Loan Borrowing Date for the purposes described in Section 9.11(a);

       (ii)     shall be denominated in U.S. Dollars;

       (iii)    shall, except as hereinafter provided, at the option of the Incremental Term Loan Borrower for such Tranche, be incurred and maintained as one Borrowing of Base Rate Loans or Eurodollar Loans, _provided_ that except as otherwise specifically provided in Section 2.10(b), all such Incremental Term Loans of a given Tranche made as part of the same Borrowing shall at all times consist of Incremental Term Loans of the same Type; and

       (iv)    shall not exceed for any such Incremental Term Loan Lender at any time of any incurrence thereof, the Incremental Term Loan Commitment of such Incremental Term Loan Lender for such Tranche on the respective Incremental Term Loan Borrowing Date (before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)).

Once repaid, Incremental Term Loans may not be reborrowed.

2.02 Minimum Borrowing Amounts, etc. The aggregate principal amount of each Borrowing of Loans shall not be less than the Minimum Borrowing Amount applicable to Borrowings of the respective Type and Tranche of Loans to be made or maintained pursuant to the respective Borrowing. More than one Borrowing may be incurred on any day, but at no time shall there be outstanding more than ten (10) Borrowings of Eurodollar Loans.

2.03 Notice of Borrowing. (a) Whenever a Borrower desires to make a Borrowing of Loans hereunder, an Authorized Officer of such Borrower shall give the Administrative Agent at its Notice Office at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) of each Base Rate Loan and at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of each Eurodollar Loan, provided that any such notice shall be deemed to have been given on a certain day only if given before 12:00 Noon (New York time) on such day. Each such written notice or written confirmation of telephonic notice (each, a "Notice of Borrowing"), except as otherwise expressly provided in Section 2.10, shall be irrevocable and shall be given by or on behalf of the respective Borrower in the form of Exhibit A-1, appropriately completed to specify: (i) the aggregate principal amount of the Loans to be made pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), (iii) whether the respective Borrowing shall consist of Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans or Incremental Term Loans, (iv) in the case of Incremental Term Loans, the Borrower thereof, and (v) whether the Loans being made pursuant to such Borrowing are to be initially maintained as Base Rate Loans or Eurodollar Loans and, if Eurodollar Loans, the Interest Period to be initially applicable thereto, which shall be three months. The Administrative Agent shall promptly give each Lender which is required to make Loans of the Tranche specified in the respective Notice of Borrowing notice of such proposed Borrowing, of such Lender's proportionate share thereof (determined in accordance with Section 2.07) and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

(b) Without in any way limiting the obligation of each Borrower to confirm in writing any telephonic notice permitted to be given hereunder, the Administrative Agent may, prior to receipt of written confirmation, act without liability upon the basis of any such telephonic notice reasonably believed by the Administrative Agent in good faith to be from an Authorized Officer of such Borrower. In each such case, the Administrative Agent's record of the terms of such telephonic notice shall be conclusive evidence of the contents of such notice, absent manifest error.

2.04 Disbursement of Funds. Not later than 12:00 Noon (New York time) on the date specified in each Notice of Borrowing, each Lender with a Commitment under the respective Tranche will make available its pro rata portion (determined in accordance with Section 2.07) of each such Borrowing requested to be made on such date. All such amounts shall be made available in U.S. Dollars and in immediately available funds at the Payment Office of the Administrative Agent, and the Administrative Agent will make available to the respective Borrower at the Payment Office or such other location as may be reasonably satisfactory to the Administrative Agent and specified in the relevant Notice of Borrowing the aggregate of the amounts so made available by the Lenders prior to 1:00 P.M. (New York time) on such day to the extent of funds actually received by the Administrative Agent prior to such time on such day. Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may, in reliance upon such assumption, make available to the relevant Borrower a corresponding amount. If such

corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the relevant Borrower to pay immediately such corresponding amount to the Administrative Agent and such Borrower shall immediately pay such corresponding amount to the Administrative Agent. The Administrative Agent shall also be entitled to recover on demand from such Lender or the relevant Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the respective Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate and (ii) if recovered from the respective Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.08. Nothing in this Section 2.04 shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the relevant Borrower may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

2.05 <u>Notes</u>. (a) Subject to the provisions of Section 2.05(g), the Borrowers' obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced (i) if Tranche A Term Loans, by a promissory note duly executed and delivered by the U.S. Borrower substantially in the form of <u>Exhibit B-1</u> with blanks appropriately completed in conformity herewith (each, a "<u>Tranche A Term Note</u>" and, collectively, the "<u>Tranche A Term Notes</u>"), (ii) if Tranche B Term Loans, by a promissory note duly executed and delivered by the Canadian Borrower substantially in the form of <u>Exhibit B-2</u> with blanks appropriately completed in conformity herewith (each, a "<u>Tranche B Term Note</u>" and, collectively, the "<u>Tranche B Term Notes</u>"), (iii) if Tranche C Term Loans, by a promissory note duly executed and delivered by the Additional Foreign Borrower substantially in the form of <u>Exhibit B-3</u> with blanks appropriately completed in conformity herewith (each, a "<u>Tranche C Term Note</u>" and, collectively, the "<u>Tranche C Term Notes</u>") and (iv) if Incremental Term Loans, by a promissory note duly executed and delivered by the Incremental Term Loan Borrower for such Tranche substantially in the form of <u>Exhibit B-4</u>, with blanks appropriately completed in conformity herewith (each, an "<u>Incremental Term Note</u>" and, collectively, the "<u>Incremental Term Notes</u>").

(b) The Tranche A Term Note issued to each Lender with a Tranche A Term Loan Commitment or outstanding Tranche A Term Loans shall (i) be executed by the U.S. Borrower, (ii) be payable to such Lender (or an affiliate designated by such Lender) or its registered assigns and be dated the Initial Borrowing Date (or, in the case of any Tranche A Term Note issued after the Initial Borrowing Date, the date of issuance thereof), (iii) be in a stated principal amount (expressed in U.S. Dollars) equal to the Tranche A Term Loan Commitment of such Lender on the Initial Borrowing Date before giving effect to any reductions thereto on such date (or, in the case of any Tranche A Term Note issued after the Initial Borrowing Date, in a stated principal amount (expressed in U.S. Dollars) equal to the sum of the outstanding principal amount of the Tranche A Term Loan of such Lender and the Tranche A Term Loan Commitment of such Lender on the date of the issuance thereof) and be payable in the outstanding principal amount of Tranche A Term Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary repayment as provided in Section 5.01 and mandatory repayment as provided in Section 5.02 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(c)     The Tranche B Term Note issued to each Lender with a Tranche B Term Loan Commitment or outstanding Tranche B Term Loans shall (i) be executed by the Canadian Borrower, (ii) be payable to such Lender (or an affiliate designated by such Lender) or its registered assigns and be dated the Initial Borrowing Date (or, in the case of any Tranche B Term Note issued after the Initial Borrowing Date, the date of issuance thereof), (iii) be in a stated principal amount (expressed in U.S. Dollars) equal to the Tranche B Term Loan Commitment of such Lender on the Initial Borrowing Date before giving effect to any reductions thereto on such date (or, in the case of any Tranche B Term Note issued after the Initial Borrowing Date, in a stated principal amount (expressed in U.S. Dollars) equal to the sum of the outstanding principal amount of the Tranche B Term Loan of such Lender and the Tranche B Term Loan Commitment of such Lender on the date of the issuance thereof) and be payable in the outstanding principal amount of Tranche B Term Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary repayment as provided in Section 5.01 and mandatory repayment as provided in Section 5.02 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(d)     The Tranche C Term Note issued to each Lender with a Tranche C Term Loan Commitment or outstanding Tranche C Term Loans shall (i) be executed by the Additional Foreign Borrower, (ii) be payable to such Lender (or an affiliate designated by such Lender) or its registered assigns and be dated the Final Borrowing Date (or, in the case of any Tranche C Term Note issued after the Final Borrowing Date, the date of issuance thereof), (iii) be in a stated principal amount (expressed in U.S. Dollars) equal to the Tranche C Term Loan Commitment of such Lender on the Final Borrowing Date before giving effect to any reductions thereto on such date and be payable in the outstanding principal amount of Tranche C Term Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary repayment as provided in Section 5.01 and mandatory repayment as provided in Section 5.02 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(e)     The Incremental Term Note issued to each Lender with an Incremental Term Loan Commitment or outstanding Incremental Term Loans under a given Tranche shall (i) be executed by the Incremental Term Loan Borrower for such Tranche, (ii) be payable to such Lender (or an affiliate designated by such Lender) or its registered assigns and be dated the date of issuance thereof, (iii) be in a stated principal amount (expressed in U.S. Dollars) equal to the Incremental Term Loan Commitment of such Lender on the Incremental Term Loan Borrowing Date (prior to the incurrence of any Incremental Term Loans pursuant thereto on such date) (or, if issued thereafter, be in a stated principal amount (expressed in U.S. Dollars) equal to the outstanding principal amount of the Incremental Term Loans of such Lender on the date of issuance thereof) and be payable (in U.S. Dollars) in the principal amount of the Incremental Term Loans evidenced thereby from time to time, (iv) mature on the Incremental Term Loan Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of Base Rate Loans or Eurodollar Loans, as applicable, evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 5.01 and mandatory repayment as provided in Section 5.02 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(f)     Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and will prior to any transfer of any of its Notes endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby.  Failure to

make any such notation or any error in any such notation or endorsement shall not affect each Borrower's obligations in respect of any Loans.

(g)     Notwithstanding anything to the contrary contained above or elsewhere in this Agreement, Notes shall only be delivered to Lenders that at any time specifically request the delivery of such Notes. No failure of any Lender to request or obtain a Note evidencing its Loans to each Borrower shall affect or in any manner impair the obligations of the respective Borrower to pay the Loans (and all related Obligations) which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents. Any Lender that does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (f). At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the relevant Borrower shall promptly execute and deliver to the respective Lender the requested Note or Notes in the appropriate amount or amounts to evidence such Loans.

2.06  Conversions and Continuations.  Each Borrower shall have the option to convert, on any Business Day occurring after the Initial Borrowing Date, all or a portion equal to at least the applicable Minimum Borrowing Amount (and, if greater, in an integral multiple of U.S.$500,000) of the outstanding principal amount of Loans made pursuant to one or more Borrowings of one or more Types under a single Tranche into a Borrowing or Borrowings of another Type under such Tranche, provided that (i) except as otherwise provided in Section 2.10(b) or unless the respective Borrower pays all amounts owing pursuant to Section 2.11 concurrently with any such conversion, Eurodollar Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Eurodollar Loans being converted, (ii) no such partial conversion of Eurodollar Loans shall reduce the outstanding principal amount of such Eurodollar Loans made pursuant to a single Borrowing to less than the applicable Minimum Borrowing Amount applicable thereto, and (iii) Base Rate Loans may not be converted into Eurodollar Loans if an Event of Default is in existence on the date of conversion and the Administrative Agent (on behalf of the Required Lenders) has given notice to the U.S. Borrower that no such conversion shall be permitted while such Event of Default is continuing. Each such conversion shall be effected by a Borrower by giving the Administrative Agent at its Notice Office prior to 12:00 Noon (New York time) at least three Business Days' prior notice (each, a "Notice of Conversion/Continuation") in the form of Exhibit A-2, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were made and, if to be converted into Eurodollar Loans, the Interest Period to be initially applicable thereto, which shall be three months. The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07  Pro Rata Borrowings.  All Borrowings of Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans and Incremental Term Loans under this Agreement shall be incurred from the Lenders pro rata on the basis of such Lenders' Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, Tranche C Term Loan Commitments and Incremental Term Loan Commitments, as the case may be. It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08  Interest.  (a) The U.S. Borrower hereby agrees to pay (in the case of Tranche A Term Loans and U.S. Borrower Incremental Term Loans, in each case maintained as Base Rate Loans), the Canadian Borrower hereby agrees to pay (in the case of Tranche B Term Loans and

Canadian Borrower Incremental Term Loans, in each case maintained as Base Rate Loans) and the Additional Foreign Borrower hereby agrees to pay (in the case of Tranche C Term Loans and Additional Foreign Borrower Incremental Term Loans, in each case maintained as Base Rate Loans), interest in respect of the unpaid principal amount of each Base Rate Loan made to it from the date the proceeds thereof are made available to it until the earlier of (i) the maturity (whether by acceleration or otherwise) of such Base Rate Loan and (ii) the conversion of such Base Rate Loan to a Eurodollar Loan pursuant to Section 2.06, at a rate per annum which shall be equal to the sum of the Base Rate in effect from time to time during the period such Base Rate Loan is outstanding plus the relevant Applicable Margin as in effect from time to time.

(b)     The U.S. Borrower hereby agrees to pay (in the case of Tranche A Term Loans and U.S. Borrower Incremental Term Loans maintained as Eurodollar Loans), the Canadian Borrower hereby agrees to pay (in the case of Tranche B Term Loans and Canadian Borrower Incremental Term Loans, in each case maintained as Eurodollar Loans) and the Additional Foreign Borrower hereby agrees to pay (in the case of Tranche C Term Loans and Additional Foreign Borrower Incremental Term Loans, in each case maintained as Eurodollar Loans), interest in respect of the unpaid principal amount of each Eurodollar Loan made to it from the date the proceeds thereof are made available to it until the earlier of (i) the maturity (whether by acceleration or otherwise) of such Eurodollar Loan and (ii) the conversion of such Eurodollar Loan to a Base Rate Loan pursuant to Section 2.06, 2.09 or 2.10, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the Eurodollar Rate for such Interest Period plus the relevant Applicable Margin as in effect from time to time.

(c)     [Intentionally Omitted].

(d)     To the fullest extent permitted by applicable law, overdue principal and, to the extent permitted by law, overdue interest in respect of each Loan and any other overdue amount payable hereunder shall, in each case, bear interest at a rate per annum (1) in the case of overdue principal of, and interest or other overdue amounts owing with respect to, Eurodollar Loans, equal to 2.00% per annum in excess of the Applicable Margin for Eurodollar Loans as in effect from time to time plus the Eurodollar Rate for such successive periods not exceeding one month as the Administrative Agent may determine from time to time in respect of amounts comparable to the amount not paid, and (2) in all other cases, equal to the greater of (x) 2.00% per annum in excess of the rate otherwise applicable to Base Rate Loans from time to time and (y) the rate which is 2.00% in excess of the rate then borne by such Loans, in each case with such interest to be payable on demand.

(e)     Accrued (and theretofore unpaid) interest shall be calculated daily and payable (i) in respect of each Base Rate Loan, quarterly in arrears on each Quarterly Payment Date, (ii) in respect of each Eurodollar Loan, on (x) the date of any conversion into a Base Rate Loan pursuant to Section 2.06, 2.09 or 2.10(b), as applicable (on the amount converted) ,and (y) the last day of each Interest Period applicable thereto and (iii) in respect of each Loan, on (x) the date of any prepayment or repayment thereof (on the amount prepaid or repaid), (y) at maturity (whether by acceleration or otherwise) and (z) after such maturity, on demand.

(f)     All computations of interest hereunder shall be made in accordance with Section 13.07(b) and (c).

(g)     Upon each Interest Determination Date, the Administrative Agent shall determine the relevant Eurodollar Rate for the respective Interest Period or Interest Periods and shall

promptly notify the respective Borrower and the respective Lenders thereof. Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.09 <u>Interest Periods</u>. At the time a Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or the continuation as or conversion into, any Eurodollar Loans (in the case of the initial Interest Period applicable thereto) or on the third Business Day prior to the expiration of an Interest Period applicable to such Eurodollar Loans (in the case of any subsequent Interest Period), the interest period (each, an "<u>Interest Period</u>") shall be a three-month period; <u>provided</u> that:

    (i)    all Eurodollar Loans comprising the same Borrowing shall at all times have the same Interest Period;

    (ii)    the initial Interest Period for any Eurodollar Loan shall commence on the date of Borrowing of such Eurodollar Loan (or the date of any conversion thereto from a Borrowing of Base Rate Loans) and each Interest Period occurring thereafter in respect of such Eurodollar Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

    (iii)    if any Interest Period relating to a Eurodollar Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

    (iv)    if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; <u>provided</u>, <u>however</u>, that if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

    (v)    no Interest Period in respect of any Borrowing under a given Tranche of Loans shall be selected which extends beyond the respective Maturity Date for such Tranche of Loans;

    (vi)    no Interest Period may be elected at any time an Event of Default is then in existence if the Administrative Agent (on the behalf of the Required Lenders) has given notice to the U.S. Borrower that no Interest Period may be elected while such Event of Default is continuing; and

    (vii)    no Interest Period in respect of any Borrowing of any Tranche of Term Loans shall be elected which extends beyond any date upon which a Scheduled Repayment for the respective Tranche of Term Loans will be required to be made under Section 5.02(b), if, after giving effect to the election of such Interest Period, the aggregate principal amount under such Tranche of Term Loans which have Interest Periods which will expire after such date will be in excess of the aggregate principal amount under such Tranche of Term Loans then outstanding less the aggregate amount of such required Scheduled Repayment.

2.10 <u>Increased Costs; Illegality; etc.</u> (a) In the event that any Lender shall have determined in good faith (which determination shall, absent manifest error, be final and conclusive

and binding upon all parties hereto but, with respect to clauses (i) and (iv) below, may be made only by the Administrative Agent):

(i)      on any Interest Determination Date that, by reason of any changes arising after the Effective Date affecting the applicable interbank market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of the Eurodollar Rate; or

(ii)      at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Eurodollar Loans because of (x) any change since the Effective Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, for example, but not limited to (A) a change in the basis of taxation of payments to a Lender of the principal of or interest on the Loans or any other amounts payable hereunder (except for changes in the rate of tax on, or determined by reference to, the net income or net profits of such Lender imposed by the jurisdiction in which its principal office or applicable lending office is located), or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate and/or (y) other circumstances affecting such Lender, the applicable interbank market or the position of such Lender in such market (whether or not such Lender was a Lender at the time of such occurrence); or

(iii)      at any time after the Effective Date, that the making or continuance of any Eurodollar Loan has been made unlawful by any law or governmental rule, regulation or order (or would conflict with any governmental rule, regulation, guideline, request or order not having the force of law but with which such Lender customarily complies even though the failure to comply therewith would not be unlawful), or impracticable as a result of a contingency occurring after the Effective Date which materially and adversely affects the applicable interbank market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (by telephone confirmed in writing) to the affected Borrower, and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (w) in the case of clause (i) above, in the event Eurodollar Loans are so affected, Eurodollar Loans shall no longer be available until such time as the Administrative Agent notifies Holdings, any affected Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by each Borrower with respect to Eurodollar Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by such Borrower, (x) in the case of clause (ii) above, the respective Borrower or Borrowers agrees, subject to the provisions of Section 13.24 (to the extent applicable), to pay to such Lender, upon written demand therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (with the written notice as to the additional amounts owed to such Lender, submitted to the respective Borrower or Borrowers by such Lender in accordance with the foregoing

to be, absent manifest error, final and conclusive and binding on all the parties hereto, although the failure to give any such notice shall not release or diminish any of the respective Borrower's or Borrowers' obligations to pay additional amounts pursuant to this Section 2.10(a) upon the subsequent receipt of such notice), and (y) in the case of clause (iii) above, the respective Borrower or Borrowers shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law.

(b)     At any time that any Eurodollar Loan is affected by the circumstances described in Section 2.10(a)(ii) or (iii), the affected Borrower may (and in the case of a Eurodollar Loan affected by the circumstances described in Section 2.10(a)(iii) shall) either (x) if the affected Eurodollar Loan is then being made initially (or pursuant to a conversion), cancel the respective Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that such Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected Eurodollar Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, in the case of a Eurodollar Loan, require the affected Lender to convert such Eurodollar Loan into a Base Rate Loan (which conversion, in the case of the circumstance described in Section 2.10(a)(iii), shall occur no later than the last day of the Interest Period then applicable to such Eurodollar Loan or such earlier day as shall be required by applicable law); provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

(c)     If any Lender shall have determined after the Effective Date that the adoption or effectiveness after the Effective Date of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change after the Effective Date in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on such Lender's or such other corporation's capital or assets as a consequence of such Lender's Commitment or Commitments hereunder or its obligations hereunder to each Borrower to a level below that which such Lender or such other corporation could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration such Lender's or such other corporation's policies with respect to capital adequacy), then from time to time, upon written demand by such Lender (with a copy to the Administrative Agent), accompanied by the notice referred to in the next succeeding sentence of this clause (c), such Borrower agrees, subject to the provisions of Section 13.24 (to the extent applicable), to pay to such Lender such additional amount or amounts as will compensate such Lender or such other corporation for such reduction in the rate of return to such Lender or such other corporation. Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the relevant Borrower (a copy of which shall be sent by such Lender to the Administrative Agent), which notice shall set forth such Lender's basis for asserting its rights under this Section 2.10(c) and the calculation, in reasonable detail, of such additional amounts claimed hereunder, although (subject to the provisions of Section 13.24 (to the extent applicable)) the failure to give any such notice shall not release or diminish such Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon the subsequent receipt of such notice. A Lender's good faith determination of compensation owing under this Section 2.10(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto.

2.11 Compensation. Each Borrower severally agrees, subject to the provisions of Section 13.24 (to the extent applicable), to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Loans but excluding any loss of anticipated profit) which such Lender may sustain: (i) if for any reason (other than a default by such Lender or any Agent) a Borrowing of, or a conversion from or into, Eurodollar Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by such Borrower or deemed withdrawn pursuant to Section 2.10(a)); (ii) if any repayment (including any repayment made pursuant to Sections 5.01 or 5.02 or as a result of an acceleration of the Loans pursuant to Section 11 or as a result of the replacement of a Lender pursuant to Sections 2.13 or 5.01) or conversion or realignment of any of its Eurodollar Loans occurs on a date which is not the last day of an Interest Period applicable thereto; (iii) if any prepayment of any Eurodollar Loans is not made on any date specified in a notice of prepayment given by the respective Borrower or Borrowers; or (iv) as a consequence of (x) any other default by such Borrower to repay its Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to Section 2.10(b). Each Lender's calculation of the amount of compensation owing pursuant to this Section 2.11 shall be made in good faith. A Lender's basis for requesting compensation pursuant to this Section 2.11 and a Lender's calculation of the amount thereof, shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.12 Change of Lending Office. (a) Each Lender may at any time or from time to time designate, by written notice to the Administrative Agent to the extent not already reflected on Schedule 2.12(a), one or more lending offices (which, for this purpose, may include Affiliates of the respective Lender) for the various Loans made by such Lender; provided that, for designations made after the Effective Date, to the extent such designation shall result in increased costs under Sections 2.10 or 5.04 in excess of those which would be charged in the absence of the designation of a different lending office (including a different Affiliate of the respective Lender), then the Borrowers shall not be obligated to pay such excess increased costs (although if such designation results in increased costs, the Borrowers shall be obligated to pay the costs which would have applied in the absence of such designation and any subsequent increased costs of the type described above resulting from changes after the date of the respective designation). Except as provided in the immediately preceding sentence, each lending office and Affiliate of any Lender designated as provided above shall, for all purposes of this Agreement, be treated in the same manner as the respective Lender (and shall be entitled to all indemnities and similar provisions in respect of its acting as such hereunder).

(b) Each Lender agrees that upon the occurrence of any event giving rise to the operation of Sections 2.10(a)(ii) or (iii), Section 2.10(c) or Section 5.04 with respect to such Lender, it will, if requested by the applicable Borrower by notice to such Lender, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of each Borrower or the rights of any Lender provided in Sections 2.10 and 5.04.

2.13 Replacement of Lenders. (x) If any Lender becomes a Defaulting Lender or (y) upon the occurrence of any event giving rise to the operation of Sections 2.10(a)(ii) or (iii),

Section 2.10(c) or Section 5.04 with respect to any Lender which results in such Lender charging to each Borrower increased costs materially in excess of the average costs being charged by the other Lenders in respect of such contingency, the U.S. Borrower shall have the right, in accordance with the requirements of Section 13.04(b), to replace such Lender (the "Replaced Lender") with one or more Eligible Transferees (collectively, the "Replacement Lender"), none of whom shall constitute a Defaulting Lender at the time of such replacement and each of whom shall be reasonably acceptable to the Administrative Agent; provided that:

>　　　(i)　　　at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire all of the Commitments and all then outstanding Loans of the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum (in the relevant currency or currencies) of (A) an amount equal to the principal of, and all accrued interest on, all then outstanding Loans of the respective Replaced Lender and (B) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to Section 4.01; and

>　　　(ii)　　　all obligations of the Borrowers owing to the Replaced Lender (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid but including all amounts, if any, owing under Section 2.11 shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (i) and (ii) above, the recordation of the assignment on the Register by the Administrative Agent pursuant to Section 13.17 and, if so requested by the Replacement Lender (when applicable), delivery to the Replacement Lender of the appropriate Note or Notes executed by the respective Borrower, the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 5.04, 13.01 and 13.06), which shall survive as to such Replaced Lender. In connection with any replacement of Lenders pursuant to, and as contemplated by, this Section 2.13, each Borrower hereby irrevocably authorizes Holdings to take all necessary action, in the name of such Borrower as described above in this Section 2.13 in order to effect the replacement of the respective Lender or Lenders in accordance with the preceding provisions of this Section 2.13.

>　　　2.14　　[Intentionally Omitted].

>　　　2.15　　Incremental Term Loan Commitments. (a) So long as no Default or Event of Default is then in existence, each Borrower shall have the right, in consultation and coordination with the Administrative Agent as to all of the matters set forth below in this Section 2.15, and with the consent of the Required Lenders, to request at one time after the Initial Borrowing Date, that one or more Lenders (and/or one or more other Persons which are Eligible Transferees and which will become Lenders) provide Incremental Term Loan Commitments to such Borrower and, subject to the terms and conditions contained in this Agreement and in the Incremental Term Loan Commitment Agreement, make Incremental Term Loans pursuant thereto; it being understood and agreed, however, that (i) no Lender shall be obligated to provide an Incremental Term Loan Commitment as

a result of any such request by such Borrower, and until such time, if any, as such Lender has agreed in its sole discretion to provide an Incremental Term Loan Commitment and executed and delivered to the Administrative Agent an Incremental Term Loan Commitment Agreement as provided in clause (b) of this Section 2.15, such Lender shall not be obligated to fund any Incremental Term Loans, (ii) each Tranche of Incremental Term Loan Commitments shall be made available to a single Borrower and shall be denominated in U.S. Dollars, (iii) the amount of Incremental Term Loan Commitments made available pursuant to a given Incremental Term Loan Commitment Agreement shall be in a minimum aggregate amount for all Lenders which provide an Incremental Term Loan Commitment thereunder (including Eligible Transferees who will become Lenders) of U.S.$10,000,000, (iv) the aggregate amount of all Incremental Term Loan Commitments provided pursuant to this Section 2.15 on and after the Effective Date shall not exceed U.S.$25,000,000, (v) each Incremental Term Loan Commitment Agreement shall specifically designate, with the approval of the Administrative Agent, the Tranche of the Incremental Term Loan Commitments being provided thereunder (which Tranche shall be a new Tranche (i.e., not the same as any existing Tranche of Incremental Term Loans, Incremental Term Loan Commitments or other Term Loans), unless the requirements of Section 2.15(c) are satisfied), (vi) if to be incurred as a new Tranche of Incremental Term Loans, such Incremental Term Loans shall have the same terms as each other Tranche of Term Loans as in effect immediately prior to the effectiveness of the applicable Incremental Term Loan Agreement, except as to purpose and mandatory repayment application provisions (which are governed by Section 5.02); provided, however, that (I) the maturity and amortization of such Tranche of Incremental Term Loans may differ, so long as such Tranche of Incremental Term Loans shall have (a) an Incremental Term Loan Maturity Date of no earlier than the Maturity Date and (b) a Weighted Average Life to Maturity of no less than the Weighted Average Life to Maturity as then in effect for the Tranche A Term Loans and (II) the "interest rate" for such Tranche of Incremental Term Loans as of the Incremental Term Loan Borrowing Date therefor (which, for such purposes only, shall be determined by the Administrative Agent and deemed to include all upfront or similar fees or original issue discount (amortized over the life of such Incremental Term Loans) payable to all Lenders providing such Incremental Term Loans, but exclusive of any arrangement, structuring or other fees payable in connection therewith that are not shared with all Lenders providing such Tranche of Incremental Term Loans) may exceed the "interest rate" then applicable to the Tranche A Term Loans, Tranche B Term Loans and the Tranche C Term Loans, in the case of a new Tranche of Incremental Term Loans (as such "interest rate" shall have been determined by the Administrative Agent on the same basis provided in the immediately preceding parenthetical) if the Applicable Margin for the Tranche A Term Loans, Tranche B Term Loans and the Tranche C Term Loans is increased to the Applicable Increased Term Loan Rate for such Tranche of Incremental Term Loans, (vii) all Incremental Term Loans (and all interest, fees and other amounts payable thereon) incurred by a given Incremental Term Loan Borrower shall be Obligations of such Incremental Term Loan Borrower under this Agreement and the other applicable Credit Documents and shall be secured by the relevant Security Agreements, and guaranteed under each relevant Guaranty, on a pari passu basis with all other Loans secured by each such Security Agreement and guaranteed under each such Guaranty and (viii) each Lender (including any Eligible Transferee who will become a Lender) agreeing to provide an Incremental Term Loan Commitment pursuant to an Incremental Term Loan Commitment Agreement shall, subject to the satisfaction of the relevant conditions set forth in this Agreement, make Incremental Term Loans under the Tranche specified in such Incremental Term Loan Commitment Agreement as provided in Section 2.01(d) and such Loans shall thereafter be deemed to be Incremental Term Loans under such Tranche for all purposes of this Agreement and the other applicable Credit Documents.

(b)    At the time of the provision of Incremental Term Loan Commitments pursuant to this Section 2.15, the respective Incremental Term Loan Borrower, the Administrative Agent and each such Lender or other Eligible Transferee which agrees to provide an Incremental Term Loan Commitment (each, an "Incremental Term Loan Lender") shall execute and deliver to the Administrative Agent an Incremental Term Loan Commitment Agreement substantially in the form of Exhibit O (appropriately completed), with the effectiveness of the Incremental Term Loan Commitment provided therein to occur on the date on which (w) a fully executed copy of the respective Incremental Term Loan Commitment Agreement shall have been delivered to the Administrative Agent, (x) all fees required to be paid in connection therewith at the time of such effectiveness shall have been paid (including, without limitation, any agreed upon up-front or arrangement fees owing to the Administrative Agent), (y) all Incremental Term Loan Commitment Requirements are satisfied, and (z) all other conditions set forth in this Section 2.15 shall have been satisfied.    The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Incremental Term Loan Commitment Agreement, and at such time, (i) Schedule 1 shall be deemed modified to reflect the revised Incremental Term Loan Commitments of the affected Lenders and (ii) to the extent requested by any Incremental Term Loan Lender, Incremental Term Notes will be issued at the respective Incremental Term Loan Borrower's expense, to such Incremental Term Loan Lender, to be in conformity with the requirements of Section 2.05 (with appropriate modification) to the extent needed to reflect the new Incremental Term Loans made by such Incremental Term Loan Lender.

(c)    Notwithstanding anything to the contrary contained above in this Section 2.15, the Incremental Term Loan Commitments provided by an Incremental Term Loan Lender or Incremental Term Loan Lenders, as the case may be, pursuant to each Incremental Term Loan Commitment Agreement shall constitute a new Tranche, which shall be separate and distinct from the existing Tranches pursuant to this Agreement (with a designation which may be made in letters (i.e., A, B, C, etc.), numbers (1, 2, 3, etc.) or a combination thereof (i.e., A-1, A-2, B-1, B-2, C-1, C-2, etc.), provided that, with the consent of the Administrative Agent, the parties to a given Incremental Term Loan Commitment Agreement may specify therein that the respective Incremental Term Loans made pursuant thereto shall constitute part of, and be added to, an existing Tranche of Term Loans, in any case so long as the following requirements are satisfied:

(i)    the Incremental Term Loans to be made pursuant to such Incremental Term Loan Commitment Agreement shall have the same Borrower, the same Maturity Date, the same Applicable Margins and the same currency denomination as the Tranche of Term Loans to which the new Incremental Term Loans are being added;

(ii)    the new Incremental Term Loans shall have the same Scheduled Repayment dates as then remain with respect to the Tranche to which such new Incremental Term Loans are being added with the amount of each Scheduled Repayment applicable to such new Incremental Term Loans to be the same on a proportionate basis as is theretofore applicable to the Tranche to which such new Incremental Term Loans are being added, thereby increasing the amount of each then remaining Scheduled Repayment of the respective Tranche proportionately; and

(iii)    on the date of the making of such new Incremental Term Loans, and notwithstanding anything to the contrary set forth in Section 2.09, such new Incremental Term Loans shall be added to (and form part of) each Borrowing of outstanding Term Loans of the respective Tranche on a pro rata basis (based on the relative sizes of the various outstanding Borrowings), so that each Lender under the respective holding Tranche of Term Loans

participates in each outstanding Borrowing of Term Loans of the respective Tranche (after giving effect to the incurrence of such new Incremental Term Loans pursuant to Section 2.01(d)) on a pro rata basis.

To the extent the provisions of preceding clause (iii) require that Lenders making new Incremental Term Loans add such Incremental Term Loans to the then outstanding Borrowings of Eurodollar Loans of such Tranche, it is acknowledged that the effect thereof may result in such new Incremental Term Loans having short Interest Periods (i.e., an Interest Period that began during an Interest Period, then applicable to outstanding Eurodollar Loans of such Tranche and which will end on the last day of such Interest Period). In connection therewith, it is hereby agreed that, to the extent the Incremental Term Loans are to be so added to the then outstanding Borrowings of Term Loans of such Tranche which are maintained as Eurodollar Loans, the Lenders that have made such Incremental Term Loans shall be entitled to receive from the U.S. Borrower such amounts, as reasonably determined by the respective Lenders, to compensate them for funding the new Incremental Term Loans of the respective Tranche during an existing Interest Period (rather than at the beginning of the respective Interest Period based upon rates then applicable thereto). All determinations by any Lender pursuant to the immediately preceding sentence shall, absent manifest error, be final and conclusive and binding on all parties hereto.

SECTION 3. [Intentionally Omitted].

SECTION 4. Fees; Commitments.

4.01 Fees. Each Borrower agrees to pay to the Administrative Agent and the Lenders, as applicable, the following fees:

(a)    an agency fee, payable to the Administrative Agent for its own account in such amounts and at such times as have been agreed to in writing by the Borrowers and the Administrative Agent;

(b)    an upfront fee, payable to the Administrative Agent for the account of each Lender on the Interim Order Entry Date in an amount equal to 2.50% multiplied by the aggregate amount of the Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, Tranche C Term Loan Commitments and, if applicable, Incremental Term Loan Commitments, in each case of such Lender as of the Interim Order Entry Date; and

(c)    an exit fee, payable to the Administrative Agent for the account of each Lender on the date of termination of the undrawn Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, Tranche C Term Loan Commitments and, if applicable, Incremental Term Loan Commitments, in each case of such Lender (other than pursuant to Section 4.03(b) by reason of a Borrowing) or upon each repayment or prepayment of the Loans, in an amount equal to 2.50% multiplied by (i) the amount of such Commitments so terminated and (ii) the amount of principal of such Loans repaid or prepaid (an "Exit Fee");

(d)    an extension fee, payable by the Borrowers to the Administrative Agent for the account of each Lender on the date of each extension of the Maturity Date as described in the definition of "Maturity Date", in an amount equal to 1.00% multiplied by the sum of the aggregate outstanding principal amount of the Loans of such Lender plus the aggregate amount of the Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, Tranche C Term Loan

Commitments and, if applicable, Incremental Term Loan Commitments, in each case of such Lender immediately after to giving effect to any and each such extension; and

(e) such other fees, to each Agent, for its own account, as have been agreed to in writing by the Borrowers and such Agent.

All computations of Fees shall be made in accordance with Section 13.07(b) and (c) and all fees shall be payable in U.S. Dollars and shall be non-refundable under all circumstances.

4.02 <u>Voluntary Termination of Commitments</u>. Upon at least three (3) Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrowers shall have the right, at any time or from time to time, without premium or penalty (other than Exit Fees on the amount of the Total Commitment), to terminate the Total Commitment in whole but not in part.

4.03 <u>Mandatory Reduction of Commitments</u>.

(a) The Total Commitment (other than the Total Incremental Term Loan Commitment under a given Tranche) and the Tranche A Term Loan Commitment and Tranche B Term Loan Commitments shall terminate at 5:00 P.M. (New York time) on (i) August 14, 2009 unless the Initial Borrowing Date has occurred on or before such time or (ii) the Final Borrowing Date.

(b) In addition, upon each Borrowing of Loans of any Tranche under Section 2.01 hereof, the aggregate Commitments of such Tranche shall be reduced by the principal amount of Loans of such Tranche included in such Borrowing.

(c) Upon the execution and delivery of the Additional Foreign Borrower Designation Agreement, (i) the Total Tranche A Term Loan Commitment shall be reduced on a dollar-for-dollar basis by the amount of the Total Tranche C Term Loan Commitment specified therein to reduce the Total Tranche A Term Loan Commitment and (ii) the Total Tranche B Term Loan Commitment shall be reduced on a dollar-for-dollar basis by the amount of the Total Tranche C Term Loan Commitment specified therein to reduce the Total Tranche B Term Loan Commitment.

(d) Each reduction to the Total Tranche A Term Loan Commitment, the Total Tranche B Term Loan Commitment, the Total Tranche C Term Loan Commitment and the Total Incremental Term Loan Commitment under a given Tranche pursuant to this Section 4.03 as provided above shall be applied proportionately to reduce the Tranche A Term Loan Commitment, the Tranche B Term Loan Commitment, the Tranche C Term Loan Commitment and the Incremental Term Loan Commitment under such Tranche, as the case may be, of each Lender with such a Commitment.

(e) Each termination or reduction of the Total Tranche A Term Loan Commitment, the Total Tranche B Term Loan Commitment, the Total Tranche C Term Loan Commitment and the Total Incremental Term Loan Commitment under a given Tranche and the Total Commitment shall be permanent.

SECTION 5. Prepayments; Repayments; Taxes.

5.01 Voluntary Prepayments. Each Borrower shall have the right to prepay the Loans made to such Borrower, with the payment of Exit Fees but without premium or penalty except as otherwise provided in this Agreement, in whole but not in part, at any time and from time to time on the following terms and conditions:

(i)     an Authorized Officer of such Borrower shall give the Administrative Agent at its Notice Office written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay the Loans, whether such Loans are Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans, U.S. Borrower Incremental Term Loans, Canadian Borrower Incremental Term Loans or Additional Foreign Borrower Incremental Term Loans, the amount of the Loans to be prepaid and the Types of Loans to be repaid, which notice shall be given by an Authorized Officer of such Borrower (x) prior to 1:00 P.M. (New York time) at least one Business Day prior to the date of such prepayment in the case of Loans maintained as Base Rate Loans and (y) prior to 10:00 A.M. (New York time) at least three Business Days prior to the date of such prepayment in the case of Eurodollar Loans, and such written notice shall be promptly transmitted by the Administrative Agent to each of the Lenders;

(ii)     at the time of any prepayment of Eurodollar Loans pursuant to this Section 5.01 on any date other than the last day of the Interest Period applicable thereto, such Borrower shall pay the amounts required pursuant to Section 2.11; and

(iii)     each prepayment in respect of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans made pursuant to such Borrowing.

5.02 Mandatory Repayments. (a) [Intentionally Omitted].

(b) (i) In addition to any other mandatory repayments pursuant to this Section 5.02, on each date set forth below, the U.S. Borrower shall be required to repay that principal amount of Tranche A Term Loans, to the extent then outstanding, (A) in an amount equal to 0.25% of the original principal amount of the Tranche A Term Loans on the last day of each Fiscal Quarter (each such repayment, as the same may be reduced as provided in Section 5.02(g) and as the same may be increased as provided in clause (ii) of Section 2.15(c), a "Tranche A Term Loan Scheduled Repayment") and (B) in an amount equal to the balance of the outstanding Tranche A Term Loans payable on the Maturity Date.

(ii)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, on each date set forth below, the Canadian Borrower shall be required to repay that principal amount of Tranche B Term Loans, to the extent then outstanding, (A) in an amount equal to 0.25% of the original principal amount of the Tranche B Term Loans on the last day of each Fiscal Quarter (each such repayment, as the same may be reduced as provided in Section 5.02(g) and as the same may be increased as provided in clause (ii) of Section 2.15(c), a "Tranche B Term Loan Scheduled Repayment") and (B) in an amount equal to the balance of the outstanding Tranche B Term Loans payable on the Maturity Date.

(iii)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, on each date set forth below, the Additional Foreign Borrower shall be required to repay that principal amount of Tranche C Term Loans, to the extent then outstanding,

(A) in an amount equal to 0.25% of the original principal amount of the Tranche C Term Loans on the last day of each Fiscal Quarter (each such repayment, as the same may be reduced as provided in Section 5.02(g) and as the same may be increased as provided in clause (ii) of Section 2.15(c), a "Tranche C Term Loan Scheduled Repayment") and (B) in an amount equal to the balance of the outstanding Tranche C Term Loans payable on the Maturity Date.

(iv)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, each Incremental Term Loan Borrower shall be required to make, with respect to each Tranche of Incremental Term Loans of such Incremental Term Loan Borrower, to the extent then outstanding, scheduled amortization payments of such Tranche of Incremental Term Loans on the dates and in the principal amounts set forth in the respective Incremental Term Loan Commitment Agreement (each such repayment, as the same may be reduced as provided in Sections 4.02, 5.01 and 5.02(g), an "Incremental Term Loan Scheduled Repayment"); provided that, if any Incremental Term Loans are incurred which will be added to (and form part of) an existing Tranche of Incremental Term Loans as contemplated by Section 2.15(c), the amount of the then remaining Incremental Term Loan Scheduled Repayments of the respective Tranche shall be proportionally increased (with the aggregate amount of increases to the then remaining Incremental Term Loan Scheduled Repayments to equal the aggregate principal amount of such new Incremental Term Loans then being incurred) in accordance with the requirements of clause (ii) of Section 2.15(c).

(c)     In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Effective Date upon which Holdings or any of its Subsidiaries receives Net Proceeds from any Asset Sale, unless a Reinvestment Notice shall have been timely delivered in respect thereof, an amount equal to 100% of the Net Proceeds from such Asset Sale shall be applied as a mandatory prepayment in accordance with the requirements of Sections 5.02(g) and (h); provided that, notwithstanding the foregoing, (i) the aggregate Net Proceeds of Asset Sales that may be excluded from the foregoing prepayment requirement under this Section 5.02(c) pursuant to Reinvestment Notices, together with the aggregate Net Proceeds of Recovery Events that may be excluded from the prepayment requirement under Section 5.02(e) pursuant to Reinvestment Notices, shall not exceed U.S.$25,000,000 and (ii) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Loans as set forth in Sections 5.02(g) and (h).

(d)     In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Effective Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any incurrence of Indebtedness (other than Indebtedness permitted pursuant to Section 10.01(a)) or from any issuance of Equity Interests, an amount equal to 100% of the Net Proceeds from such incurrence or issuance shall be applied as a mandatory prepayment in accordance with the requirements of Sections 5.02(g) and (h).

(e)     In addition to any other mandatory repayments pursuant to this Section 5.02, within five Business Days following each date on or after the Effective Date upon which Holdings or any of its Subsidiaries receives any proceeds from any Recovery Event, unless a Reinvestment Notice shall have been timely delivered in respect thereof, an amount equal to 100% of the Net Proceeds of such Recovery Event shall be applied as a mandatory prepayment in accordance with the requirements of Sections 5.02(g) and (h); provided that, notwithstanding the foregoing, (i) the aggregate Net Proceeds of Recovery Events that may be excluded from the foregoing prepayment requirement under this Section 5.02(e) pursuant to Reinvestment Notices, together with the aggregate Net Proceeds of Asset Sales that may be excluded from the prepayment requirement under Section

5.02(c) pursuant to Reinvestment Notices, shall not exceed U.S.$25,000,000 and (ii) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Loans as set forth in Sections 5.02(g) and (h).

(f)    [Intentionally Omitted].

(g)    (I)    Each amount required to be applied pursuant to Sections 5.02(c), (d) and (e) in accordance with this Section 5.02(g) shall be applied to repay the outstanding principal amount of Term Loans.

(II)    Each amount required to be applied to repay outstanding Term Loans pursuant to this Section 5.02(g) shall be applied pro rata to each Tranche of Term Loans (based upon the then outstanding principal amounts of the respective Tranches of Term Loans).

(III)    All repayments of outstanding Term Loans required by Sections 5.02(c), (d) and (e) shall be applied to reduce the then remaining Scheduled Repayments of the respective Tranche of Term Loans on a pro rata basis (based upon the then remaining principal amounts of the Scheduled Repayments of such Tranche of Term Loans after giving effect to all prior reductions thereto).

(h)    With respect to each repayment of Loans required by this Section 5.02, the respective Borrower may (subject to the requirements of preceding clause (g)) designate the Types of Loans of the respective Tranche which are to be repaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings of the respective Tranche pursuant to which made, provided that: (i) in the case of repayments of Eurodollar Loans, repayments of such Loans pursuant to this Section 5.02 on any day other than the last day of an Interest Period applicable thereto shall be accompanied by payment by the respective Borrower of all amounts owing in connection therewith pursuant to Section 2.11; (ii) if any repayment of Eurodollar Loans made pursuant to a single Borrowing shall reduce the outstanding Eurodollar Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable to the respective Eurodollar Loans, such Borrowing shall be converted at the end of the then current Interest Period into a Borrowing of Base Rate Loans; and (iii) each repayment of any Tranche of Loans made pursuant to a Borrowing shall be applied pro rata among such Tranche of Loans.  In the absence of a designation by the respective Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

(i)    Notwithstanding anything to the contrary contained elsewhere in this Agreement, all then outstanding Loans shall be repaid in full on the respective Maturity Date for such Loans.

5.03    Method and Place of Payment.    Except as otherwise specifically provided herein, all payments under this Agreement or any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 12:00 Noon (New York time) on the date when due and shall be made in U.S. Dollars in immediately available funds at the Payment Office of the Administrative Agent in respect of any obligation of the Borrowers under this Agreement.  The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 12:00 Noon (New York time)

like funds relating to the payment of principal, interest or Fees ratably to the Lenders entitled thereto. Any payments under this Agreement which are made later than 1:00 P.M. (New York time) shall be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

5.04 <u>Net Payments</u>. (a) All payments made by any Credit Party under any Credit Document (including, in the case of Holdings or the U.S. Borrower, in its capacity as a guarantor pursuant to Section 14 or 15, as the case may be) or under any Note will be made without setoff, counterclaim or other defense. Except as provided in Section 5.04(b), all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding (i) any tax imposed on or measured by the net income, capital, or net profits of a Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein and (ii) any U.S. withholding tax that is imposed on amounts payable to such Lender with respect to any such payments of the U.S. Borrower at the time such Lender becomes party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the U.S. Borrower with respect to such withholding taxes pursuant to this paragraph 5.04(a)) and all interest, penalties or similar liabilities with respect thereto (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "<u>Taxes</u>"). If any Taxes are so levied or imposed, the respective Borrower (or other Credit Party making the payment) shall, subject to the limitations with respect to the application of this Section 5.04 set forth in the first sentence of Section 2.12(a) and in the penultimate sentence of Section 13.04(b), pay the full amount of such Taxes to the appropriate Governmental Authority, and shall pay such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note. The respective Borrower (or Credit Party) will furnish to the Administrative Agent within 45 days after the date of the payment of any Taxes due pursuant to applicable law certified copies of tax receipts or, to the extent such tax receipts are not customarily provided by the relevant Governmental Authority, other evidence of payment of such Tax reasonably acceptable to the Lender, evidencing such payment by such Borrower (or the respective other Credit Party). The Credit Agreement Parties jointly and severally agree (and each Subsidiary Guarantor pursuant to its respective Subsidiary Guaranty, and the incorporation by reference therein of the provisions of this Section 5.04, shall agree) to indemnify and hold harmless each Lender, and reimburse such Lender upon its written request, for the amount of any Taxes levied or imposed on and paid by such Lender.

(b)    Each Lender that is a Lender to the U.S. Borrower and that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) agrees to deliver to the U.S. Borrower and the Administrative Agent on or prior to the Effective Date, or in the case of a Lender that is a Lender to the U.S. Borrower and that is an assignee or transferee of an interest under this Agreement pursuant to Sections 2.13 or 13.04 (unless the respective Lender was already a Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or successor forms) certifying to such Lender's entitlement as of such date to a complete

exemption from United States withholding tax with respect to payments to be made under this Agreement and under any Note, or (ii) if the Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit D appropriately completed (any such certificate, a "Section 5.04(b)(ii) Certificate") and (y) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (with respect to the portfolio interest exemption) (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement and under any Note. In addition, each Lender that is a Lender to the U.S. Borrower agrees that from time to time after the Effective Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, it will deliver to the U.S. Borrower and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to the benefits of any income tax treaty), or Form W-8BEN (with respect to the portfolio interest exemption) and a Section 5.04(b)(ii) Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement and any Note, or it shall immediately notify the U.S. Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Lender shall not be required to deliver any such Form or Certificate pursuant to this Section 5.04(b); provided, however, in the event that the Lender cannot deliver any Form or Certificate which certifies to such Lender's complete exemption from United States withholding tax as of such date, the U.S. Borrower shall not be obligated pursuant to Section 5.04(a) to gross-up payments to be made to such Lender in respect of United States withholding taxes except to the extent that the Lender's inability to provide the Form or Certificate is directly as a result of changes, after the date the Lender became a party to this Agreement, in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such United States withholding taxes. Notwithstanding anything to the contrary contained in Section 5.04(a), but subject to Section 13.04(b) and the immediately succeeding sentence, (x) the U.S. Borrower shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or similar taxes imposed by the United States (or any political subdivision or taxing authority thereof or therein) from interest, fees or other amounts payable by the U.S. Borrower hereunder for the account of any Lender that is a Lender to the U.S. Borrower and which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes to the extent that such Lender has not provided to the U.S. Borrower U.S. Internal Revenue Service Forms that establish a complete exemption from such deduction or withholding and (y) the U.S. Borrower shall not be obligated pursuant to Section 5.04(a) hereof to gross-up payments to be made to a Lender in respect of income or similar taxes imposed by the United States (including, without limitation, United States withholding taxes) if (I) such Lender has not provided to the U.S. Borrower the Internal Revenue Service Forms required to be provided to the U.S. Borrower pursuant to this Section 5.04(b) or (II) in the case of a payment, other than interest, to a Lender described in clause (ii) above, to the extent that such forms do not establish a complete exemption from withholding of such taxes. Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this Section 5.04 and except as set forth in Section 13.04(b), the Borrower agrees to pay additional amounts and to indemnify each Lender in the manner set forth in Section 5.04(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any amounts deducted or withheld by it as described in the immediately preceding sentence as a result of any changes after the Effective Date (or, if later, after the date such Lender became party to this Agreement) in any

applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of income or similar taxes.

(c)     If any Borrower pays any additional amount under this Section 5.04 to a Lender and such Lender determines in its sole good faith discretion that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), such Lender shall pay to such Borrower an amount that the Lender shall, in its sole good faith discretion, determine is equal to the net benefit, after tax, which was obtained by the Lender in such year as a consequence of such Tax Benefit; provided, however, that (i) any Lender may determine, in its sole good faith discretion consistent with the policies of such Lender, whether to seek a Tax Benefit; (ii) any Taxes that are imposed on a Lender as a result of a disallowance or reduction (including through the expiration of any tax credit carryover or carryback of such Lender that otherwise would not have expired) of any Tax Benefit with respect to which such Lender has made a payment to such Borrower pursuant to this Section 5.04(c) shall be treated as a Tax for which such Borrower is obligated to indemnify such Lender pursuant to this Section 5.04 without any exclusions or defenses; (iii) nothing in this Section 5.04(c) shall require the Lender to disclose any confidential information to such Borrower (including, without limitation, its tax returns); and (iv) no Lender shall be required to pay any amounts pursuant to this Section 5.04(c) at any time which a Default or Event of Default exists.

(d)     Each Lender agrees to use reasonable efforts (consistent with legal and regulatory restrictions and subject to overall policy considerations of such Lender) to file any certificate or document or to furnish to the Non-U.S. Borrower any information, in each case, as reasonably requested by the Non-U.S. Borrower that may be necessary to establish any available exemption from, or reduction in the amount of, any Taxes; provided, however, that nothing in this Section 5.04(c) shall require a Lender to disclose any confidential information (including, without limitation, its tax returns or its calculations).


SECTION 6.  Conditions Precedent to Credit Events on the Initial Borrowing Date and the Final Borrowing Date.

Initial Borrowing Date

A.  All obligations of each Lender to make each Loan hereunder on the Initial Borrowing Date is subject to the satisfaction of the Required Lenders in their sole discretion of the following applicable conditions precedent (subject to Section 9.21), and such other conditions as set forth herein, in each case on or prior to 5:00 p.m. (New York time) on August 14, 2009 and, if such conditions are not satisfied by such time, all obligations of each Lender under the DIP Facility (including the Total Commitment) shall terminate at such time unless extended prior to such time by the Required Lenders in their sole discretion:

6.01  Effective Date; Delivery of Notes.  On or prior to the Initial Borrowing Date, (i) the Effective Date shall have occurred and (ii) there shall have been delivered to the Administrative Agent for the account of each Lender which has requested the same the appropriate Tranche A Term Note and Tranche B Term Note, in each case executed by the relevant Borrower and in the amount, maturity and as otherwise provided herein.

6.02 Officer's Certificate. On the Initial Borrowing Date, the Administrative Agent shall have received a certificate from the U.S. Borrower, dated such date and signed by the chairman, a vice-chairman, the president or any vice-president of the U.S. Borrower, and attested to by the secretary, any assistant secretary or other senior officer of such the U.S. Borrower, certifying that all of the applicable conditions set forth in Sections 6.05 and 6.07 and Section 7.01 (other than such conditions that are expressly subject to the satisfaction of the Agents and/or the Required Lenders), have been satisfied on such date.

6.03 Opinions of Counsel. On the Initial Borrowing Date, the Administrative Agent shall have received (i) from Davies Ward Phillips & Vineberg LLP, special Canadian counsel to the Canadian Credit Parties, an opinion addressed to each Agent, the Collateral Agent and each of the Lenders and dated the Initial Borrowing Date in form and substance satisfactory to the Required Lenders and (ii) from foreign counsel to the Credit Parties and/or the Agents in The Netherlands, Germany, France, Brazil and Mexico, in each case reasonably satisfactory to the Agents, opinions which shall (x) be addressed to each Agent, the Collateral Agent and each of the Lenders and be dated the Initial Borrowing Date, (y) cover various matters regarding the execution, delivery and performance of the Global Subsidiaries Guaranty, the Local Law Pledge Agreements, the Brazilian Security Agreements, the Mexican Security Agreements and the Dutch Security Agreements and the perfection and, to the extent required by the Administrative Agent, priority of security interests granted by Credit Parties in respect of entities organized in such jurisdiction, and/or such other matters incident to the transactions contemplated herein as the Agents may reasonably request and (z) be in form, scope and substance reasonably satisfactory to the Agents.

6.04 Company Documents; Proceedings; Capital Structure. (a) On the Initial Borrowing Date, the Administrative Agent shall have received from each Credit Party a certificate, dated the Initial Borrowing Date, signed by the chairman, a vice-chairman, the president or any vice-president of such Credit Party, and attested to by the secretary, any assistant secretary or other senior officer of such Credit Party, in the form of Exhibit F (or, in respect of each Credit Party other than the U.S. Borrower, with such modification thereto as may be acceptable to the Administrative Agent in its sole discretion) with appropriate insertions, together with copies of the certificate of incorporation, by-laws or equivalent organizational documents of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and all of the foregoing (including each such certificate of incorporation, by-laws or other organizational document) shall be reasonably satisfactory to the Agents.

(b) On the Initial Borrowing Date, all Company and legal proceedings and all instruments and agreements in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be satisfactory in form and substance in the sole discretion of Required Lenders, and the Administrative Agent shall have received all information and copies of all certificates, documents and papers, including good standing certificates, bring-down certificates and any other records of Company proceedings and governmental approvals, if any, which the Required Lenders may have reasonably requested in connection therewith, such documents and papers, where appropriate, to be certified by proper Company or governmental authorities.

6.05 Adverse Change, etc. Except as set forth on Schedule 6.05 hereto, since July 14, 2009, no Material Adverse Effect (other than by virtue of the commencement of the Cases) shall have occurred.

6.06 Litigation. Except as set forth on Schedule 6.06, on the Initial Borrowing Date, there shall be no actions, suits, proceedings or investigations pending or threatened (a) with respect to the Transaction or any documentation executed in connection therewith (including any Credit Document) or the transactions contemplated hereby and thereby or (b) which any Agent or the Required Lenders shall determine has had, or could reasonably be expected to have, a Material Adverse Effect.

6.07 Approvals. On or prior to the Initial Borrowing Date, (i) all necessary governmental (domestic and foreign), regulatory and third party approvals and/or consents required in connection with any Existing Indebtedness, the transactions contemplated by the Credit Documents and otherwise referred to herein or therein shall have been obtained and remain in full force and effect and evidence thereof shall have been provided to the Administrative Agent, and (ii) all applicable waiting periods shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the making of the Loans and the transactions contemplated by the Credit Documents or otherwise referred to herein or therein. Additionally, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the consummation of the Transaction or the making of the Loans or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein.

6.08 [Intentionally Omitted].

6.09 [Intentionally Omitted].

6.10 [Intentionally Omitted].

6.11 Outstanding Indebtedness and Preferred Stock. On the Initial Borrowing Date and after giving effect to the consummation of the Transaction, Holdings and its Subsidiaries shall have no outstanding Preferred Equity or Indebtedness, except for (i) Indebtedness pursuant to or in respect of the Credit Documents, (ii) Intercompany Scheduled Existing Indebtedness, and (iii) such other existing indebtedness of Holdings and its Subsidiaries, if any, as shall be permitted by the Agents and Required Lenders to remain outstanding (all of which shall be listed as Third Party Scheduled Existing Indebtedness on Part A of Schedule 8.18; provided that such Indebtedness not in excess of U.S.$10,000,000 in the aggregate ("Unscheduled Third Party Indebtedness") shall not be required to be listed as Third Party Scheduled Existing Indebtedness on Part A of Schedule 8.18).

6.12 Consent Letter. On the Initial Borrowing Date, the Administrative Agent shall have received a letter from Corporation Service Company, presently located at 80 State Street, Albany, New York, 12207, substantially in the form of Exhibit M (appropriately completed), indicating its consent to its appointment by the Canadian Borrower as its agent to receive service of process as specified in Section 13.08.

6.13 Subsidiaries Guaranties; Intercompany Subordination Agreement. (a) On the Initial Borrowing Date, each Global Subsidiaries Guarantor shall have duly authorized, executed and delivered the Global Subsidiaries Guaranty in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Global Subsidiaries Guaranty"), guaranteeing all of the obligations of each of the Borrowers as more fully provided therein, and the Global Subsidiaries Guaranty shall be in full force and effect.

(b)　　On the Initial Borrowing Date, each Canadian Subsidiary Guarantor shall have duly authorized, executed and delivered the Canadian Subsidiaries Guaranty in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Canadian Subsidiaries Guaranty"), guaranteeing all of the obligations of the Canadian Borrower as more fully provided therein, and the Canadian Subsidiaries Guaranty shall be in full force and effect.

6.14 Pledge Agreements. (a) On the Initial Borrowing Date, each U.S. Credit Party shall have duly authorized, executed and delivered the U.S. Pledge Agreement in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "U.S. Pledge Agreement") and shall (except to the extent delivered to and in the possession of the Prepetition Agent) have delivered to the Collateral Agent, as Pledgee thereunder, all of the certificated U.S. Pledge Agreement Collateral, if any, referred to therein and then owned by such U.S. Credit Party (other than the certificated U.S. Pledge Agreement Collateral set forth on Part A of Schedule 6.14 which shall be delivered on such date as indicated on Part A of Schedule 6.14), (x) endorsed in blank in the case of promissory notes constituting U.S. Pledge Agreement Collateral and (y) together with executed and undated transfer powers in the case of certificated Equity Interests constituting U.S. Pledge Agreement Collateral, and the U.S. Pledge Agreement shall be in full force and effect.

(b)　　On the Initial Borrowing Date, each Canadian Credit Party shall (i) have duly authorized, executed and delivered the Canadian Pledge Agreement in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Canadian Pledge Agreement") and (ii) shall (except to the extent delivered to and in the possession of the Prepetition Agent) have delivered to the Collateral Agent, as Pledgee thereunder, all of the certificated Collateral, if any, referred to therein and then owned by such Canadian Credit Party (other than the certificated Collateral set forth on Part B of Schedule 6.14 which shall be delivered on such date as indicated on Part B of Schedule 6.14), (x) endorsed in blank in the case of promissory notes constituting Collateral therein and (y) together with executed and undated transfer powers in the case of certificated Equity Interests constituting Collateral therein, and the Canadian Pledge Agreement shall be in full force and effect.

(c)　　On the Initial Borrowing Date, each Brazilian Credit Party shall have duly authorized, executed and delivered the Brazilian Pledge Agreements in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Brazilian Pledge Agreements") together with evidence of the filing for registration of the Brazilian Pledge Agreements with the competent registries in Brazil or other actions as may be necessary or, in the reasonable opinion of the Brazilian Collateral Agent, advisable to perfect the security interests purported to be created by the Brazilian Pledge Agreements and intended to be created by the Brazilian Pledge Agreements, and the Brazilian Pledge Agreements shall be in full force and effect.

(d)　　On the Initial Borrowing Date, the Canadian Borrower shall have duly authorized, executed and delivered the German Law Pledge Agreement (as defined in Section 13.26) and the Abstract Acknowledgement of Indebtedness (as defined in Section 13.26) and Holdings and the Borrowers shall have duly authorized, executed and delivered the German Pledge Intercreditor Agreement, in each case in form and substance satisfactory to the Required Lenders (collectively, as each is amended, modified, restated and/or supplemented from time to time, the "German Pledge Agreements") together with evidence of the filing for registration of the German Pledge Agreements

with the competent registries in Germany or other actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests purported to be created by the German Pledge Agreements and intended to be created by the German Pledge Agreements, and the German Pledge Agreements shall be in full force and effect.

(e)     [Intentionally Omitted].

(f)     On the Initial Borrowing Date, with respect to any Credit Party which is pledging promissory notes or Equity Interests in one or more Persons organized under the laws of a different jurisdiction from the jurisdiction of organization of the respective Credit Party, if the Agents determine (based on advice of local counsel) that it would be in the interests of the Lenders that the respective Credit Party authorize, execute and deliver one or more additional pledge agreements governed by the laws of the jurisdiction or jurisdictions in which the Person or Persons whose promissory notes or Equity Interests are being pledged is (or are) organized, then the respective Credit Party shall (i) so authorize, execute and deliver one or more such additional pledge agreements (each, as amended, modified, restated and/or supplemented from time to time, a "Local Law Pledge Agreement" and, collectively, the "Local Law Pledge Agreements") and (ii) take such actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable under local law (as advised by local counsel) to create, maintain, effect, perfect, preserve, maintain and protect the security interests granted (or purported to be granted) by each such Local Law Pledge Agreement. Each Local Law Pledge Agreement shall (i) be prepared by local counsel reasonably satisfactory to the Agents, (ii) be in form and substance reasonably satisfactory to the Agents and (iii) be in full force and effect on the Initial Borrowing Date, it being understood and agreed, however, in the case of any Local Law Pledge Agreement entered into by Holdings or any of its Domestic Subsidiaries, the respective Credit Party shall not be required to pledge more than 65% of the total combined voting power of all classes of Equity Interests entitled to vote of any Foreign Subsidiary that is a corporation (or treated as such for U.S. federal tax purposes), other than any such Foreign Subsidiary organized under the laws of Mexico, Brazil or The Netherlands, in support of its obligations (x) as a Borrower under the Credit Agreement (in the case of the U.S. Borrower) or (y) under its Guaranty in respect of the Obligations of the U.S. Borrower (in the case of the other U.S. Credit Parties) (although 100% of the non-voting Equity Interests, if any, of each such Foreign Subsidiary shall be required to be pledged in support of such obligations). Schedule 6.14(h) sets forth a list of all Local Law Pledge Agreements to be executed and delivered on the Initial Borrowing Date.

6.15 Security Agreements. (a) On the Initial Borrowing Date, each U.S. Credit Party shall have duly authorized, executed and delivered the Security Agreement in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "U.S. Security Agreement") covering all of such U.S. Credit Party's present and future Collateral referred to therein, together with:

(i)     proper financing statements (Form UCC-1 or the equivalent) fully executed (where required) for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests purported to be created by the U.S. Security Agreement; and

(ii)     evidence of the completion of all other recordings and filings of, or with respect to, the U.S. Security Agreement or other actions as may be necessary or, in the

reasonable opinion of the Collateral Agent, advisable to perfect the security interests intended to be created by the U.S. Security Agreement;

and the U.S. Security Agreement and such other documents shall be in full force and effect.

(b) On the Initial Borrowing Date, each Canadian Credit Party shall have duly authorized, executed and delivered a Canadian Security Agreement in form and substance satisfactory to the Required Lenders (as amended, amended and restated, modified and/or supplemented from time to time, the "Canadian Security Agreement") covering all of such Canadian Credit Party's present and future Collateral referred to therein, together with:

(i) proper financing statements (PPSA Form 1-C or such other financing statements or similar notices as shall be required by local law), registered under the PPSA in Ontario and each other jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests purported to be created by the Canadian Security Agreement;

(ii) PPSA inquiry response certificates certified by the Ontario Registrar of Personal Property or any other equivalent certificate or search report in any other province or territory, listing all effective financing statements that name Holdings or any of its Subsidiaries, or a division or other operating unit of any such Person, as debtor and that are filed in the jurisdictions referred to in said clause (i), together with evidence of the discharge (by a PPSA Form 2-C or such other termination statements as shall be required by local law) of all Liens other than Permitted Liens and acknowledgments and confirmations from secured creditors of such Canadian Credit Party as reasonably requested by the Collateral Agent; and

(iii) evidence of the completion of all other recordings and filings of, or with respect to, the Canadian Security Agreement as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests intended to be created by the Canadian Security Agreement;

and the Canadian Security Agreement shall be in full force and effect.

(c) On the Initial Borrowing Date, each Brazilian Credit Party and the Brazilian Collateral Agent shall have duly authorized, executed and delivered the Brazilian Security Agreements in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Brazilian Security Agreements") covering all of such Brazilian Credit Party's present and future Collateral referred to therein, together with evidence of the filing for registration of the Brazilian Security Agreements with the competent registries in Brazil or other actions as may be necessary or, in the reasonable opinion of the Brazilian Collateral Agent, advisable to perfect the security interests purported to be created by the Brazilian Security Agreements and intended to be created by the Brazilian Security Agreements;

and the Brazilian Security Agreements and such other documents shall be in full force and effect.

(d) On the Initial Borrowing Date, each Mexican Credit Party and the other parties thereto, as applicable shall have duly authorized, executed and delivered the Mexican Security

Agreements covering all present and future Mexican Collateral referred to therein, in the following terms:

      (i)    *Mexican Amendment to the Equity Interests Pledge Agreement.* No later than on the Initial Borrowing Date, certain pledgors shall:

      (y)    execute and deliver the Mexican Amendment to the Equity Interests Pledge Agreement, in order to incorporate the Holdings Guaranteed Obligations as obligations covered by the first-priority pledge (*prenda en primer lugar*) created on all of the Mexican Pledged Equity Interests of the Mexican Credit Parties held or beneficially owned by certain pledgors thereunder in favor of the Collateral Agent, in form and substance satisfactory to the Required Lenders;

      (z)    deliver evidence of the completion of all other recordings (including the registry of a notation regarding the Mexican Amendment to the Equity Interests Pledge Agreement in the stock registry books of the Mexican Credit Parties) or other actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interest over the Mexican Pledged Equity Interests intended to be created by the Mexican Amendment to the Equity Interest Pledge Agreement;

      (ii)    *Mexican Security Trust Agreement.* No later than on the Initial Borrowing Date, each of the Mexican Credit Parties that own a Mexican Real Estate Property, shall:

      (y)    execute and deliver the Mexican Security Trust Agreement, by which a perfected first-priority Lien in favor of the Collateral Agent is created over their Mexican Real Estate Properties, in form and substance satisfactory to the Required Lenders; and

      (z)    deliver documents evidencing that registration filings of the Mexican Security Trust Agreement with the "Public Registry of Property" of the jurisdiction in which each Mexican Real Estate Property is located are in the process of being made by a notary public.

      (iii)    *Mexican Floating Lien Pledge Agreement.* No later than on the Initial Borrowing Date, each of the Mexican Credit Parties shall:

      (y)    execute and deliver a Mexican Floating Lien Pledge Agreements, by which a perfected first-priority Lien in favor of the Mexican Collateral Agent is created over their Mexican Property owned by each of the Mexican Credit Parties, respectively, in form and substance satisfactory to the Required Lenders; and

      (z)    deliver documents evidencing that registration filings of each Mexican Floating Lien Pledge Agreement with the applicable "Public Registry of Commerce" are in the process of being made by a notary public.

      (iv)    *Mexican Counsel Opinion.* No later than on the Initial Borrowing Date, certain Mexican counsel shall deliver to the Collateral Agent an opinion of such Mexican counsel under the Mexican Security Agreements, reasonably satisfactory to the Collateral

Agent, with respect to the security interests created pursuant to the Mexican Security Agreements, in form and substance satisfactory to the Required Lenders.

(e)     On the Initial Borrowing Date, each Dutch Credit Party and the Collateral Agent shall have duly authorized, executed and delivered the Dutch Security Agreements in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Dutch Security Agreements") covering all of such Dutch Credit Party's present and future Collateral referred to therein, together with evidence of the filing for registration of the Dutch Security Agreements with the competent registries in The Netherlands or other actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests purported to be created by the Dutch Security Agreements and intended to be created by the Dutch Security Agreements.

6.16 Mortgages; Title Insurance; etc.   On the Initial Borrowing Date, the Collateral Agent shall have received:

(a)     fully executed counterparts of Mortgages in form and substance reasonably satisfactory to the Collateral Agent (with such changes thereto as shall be advisable under the law of the jurisdiction in which such Mortgage is being recorded), which Mortgages shall cover such of the Real Property owned by Holdings or any of its Subsidiaries (after giving effect to the Transaction) as are designated on Part A of Schedule 8.05(c) as a Mortgaged Property, together with evidence that counterparts of the Mortgages have been delivered to the title insurance company insuring the lien of such Mortgage for recording in all places to the extent necessary, unless otherwise agreed by the Required Lenders, or, in the reasonable opinion of the Collateral Agent, advisable to effectively create a valid and enforceable first priority mortgage lien on each Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, subject to Permitted Encumbrances of the type described in clauses (a), (b) and (f) of the definition thereof and other matters of title shown on the title report prepared by, or provided to, the applicable title company and reasonably acceptable to the Administrative Agent; and

(b)     UCC-1 Fixture Filings (or the equivalent under applicable laws) covering each Mortgaged Property.

6.17 Shareholders' Agreements; Management Agreements; Collective Bargaining Agreements; Financial Advisors Engagement Agreements, Existing Indebtedness Agreements; and Tax Allocation Agreements.   On or prior to the Initial Borrowing Date, there shall have been made available to the Administrative Agent by the U.S Borrower true and correct copies of the following documents, certified as such by the U.S. Borrower, to the extent not previously delivered under the Prepetition Facility to the Prepetition Agent:

(i)     all written agreements (including, without limitation, shareholders' agreements, subscription agreements and registration rights agreements) entered into by Holdings or any of its Subsidiaries governing the terms and relative rights of its capital stock or other Equity Interests and any agreements entered into by shareholders relating to any such entity with respect to its capital stock or other Equity Interests (collectively, the "Shareholders' Agreements");

(ii)    all written agreements (excluding employment agreements) entered into by Holdings or any of its Subsidiaries with respect to the management of Holdings or any of its Subsidiaries after giving effect to the Transaction (including consulting agreements and other management advisory agreements) (collectively, the "Management Agreements");

(iii)    the collective bargaining agreements (A) between Cooper-Standard Automotive Group (Bowling Green, Ohio) and the United Steelworkers of America, AFL-CIO (Local No. 1152 of Bowling Green, Ohio), dated as of February 12, 2001, (B) between Cooper-Standard Automotive (Gaylord, Michigan) and the United Autoworkers (Local No. 388 of Gaylord, Michigan), dated as of March 18, 2008, (C) between Cooper-Standard Automotive (Auburn, Indiana) and the United Steelworkers of America, AFL-CIO-CLC (Local No. 634 of Auburn, Indiana), dated as of November 8, 1999 and (D) between Cooper-Standard Automotive Group (Bowling Green, Ohio) and United Steelworkers of America, AFL-CIO-CLC (Local No. 1042 of Bowling Green, Ohio), dated as of July 23, 1999 (collectively, the "Collective Bargaining Agreements");

(iv)    the engagement letters (A) between Holdings and A&M, dated as of May 19, 2009 (together with all side letters in connection therewith, the "A&M Engagement Letter") and (B) between Holdings, its controlled Subsidiaries and Lazard, dated as of June 1, 2009 (together with all side letters in connection therewith, the "Lazard Engagement Letter"; together with the A&M Engagement Letter, "Financial Advisors Engagement Agreements") and all fees payable in connection with the Financial Advisors Engagement Agreements;

(v)    all agreements evidencing or relating to any Scheduled Existing Indebtedness of Holdings or any of its Subsidiaries (collectively, the "Existing Indebtedness Agreements"); and

(vi)    any tax sharing or tax allocation agreements entered into by Holdings or any of its Subsidiaries (collectively, the "Tax Allocation Agreements");

all of which Shareholders' Agreements, Management Agreements, Collective Bargaining Agreements, Financial Advisors Engagement Agreements (including the fees payable in connection therewith), Existing Indebtedness Agreements and Tax Allocation Agreements shall be in form and substance satisfactory to the Agents and shall be in full force and effect on the Initial Borrowing Date.

6.18  Insurance Certificates.  On or before the Initial Borrowing Date, the Administrative Agent shall have received evidence of insurance complying with the requirements of Section 9.07 for the business and properties of Holdings and its Subsidiaries, in scope, form and substance reasonably satisfactory to the Agents and naming the Collateral Agent as an additional insured and/or loss payee, and stating that such insurance shall not be canceled without at least 30 days' (or 10 days', in the case of any cancellation arising from any non-payment of insurance premium) prior written notice by the insurer to the Collateral Agent.

6.19  Payment of Fees.  On the Initial Borrowing Date, all costs, fees and expenses, and all other compensation due to the Agents and the Lenders (including, without limitation, legal fees and expenses) shall have been paid to the extent then due.

6.20 Patriot Act. The Administrative Agent shall have received all documentation and other information mutually agreed to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "PATRIOT Act"), including the information described in Section 13.25.

6.21 Interim Order/Bankruptcy Matters.

(i)    (a) The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory in the sole discretion of the Required Lenders, on such prior notice as may be satisfactory to the Required Lenders in their sole discretion, the Interim Order no later than five (5) Business Days after the date of commencement of the Cases, approving and authorizing the DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance satisfactory to the Required Lenders and their counsel in their sole discretion and (b) the Canadian Court shall have entered, upon application in form and substance satisfactory in the sole discretion of the Required Lenders, on such prior notice as may be satisfactory to the Required Lenders in their sole discretion, the Initial Order as to the transactions contemplated hereby, which Initial Order shall be in form and substance satisfactory to the sole discretion of the Required Lenders and their counsel in their sole discretion.

(ii)    The Interim Order, the Initial Order and the Credit Documents shall be in full force and effect and shall not (in whole in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge anywhere in the world.

(iii)    The Credit Parties shall be in compliance in all respects with the Interim Order and the Initial Order.

(iv)    (w) The U.S. Cases shall have been commenced in the Bankruptcy Court for the District of Delaware, (x) the Canadian Case shall have been commenced in the Canadian Court, (y) a First Day Order approving the cash management system of the Debtors, in form, scope and substance acceptable to the Required Lenders, shall have been entered by the Bankruptcy Court, be in full force and effect, and shall not, in whole or in part, have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or being challenged in whole or in part in any jurisdiction in any part of the world and the Debtors shall be in compliance with such First Day Order (except for such modifications as may be acceptable to the Administrative Agent and the Required Lenders); and (z) the amount of claims incurred prior to the Petition Date that are permitted to be paid under each First Day Order shall be acceptable to the Required Lenders in their sole discretion; provided that consent by the Required Lenders to the entry of any First Day Order shall authorize the Debtors making payments as specified in such First Day Orders.

(v)    The Administrative Agent shall have received on or prior to the Effective Date each engagement letter (or amended engagement letter) for each of the Credit Parties' professionals that have been or that will be retained under section 327(a), 327(e), 328 or 363 of the Bankruptcy Code, other than the Financial Advisors Engagement Agreements, and each has been executed in form and substance acceptable to the Required Lenders, and each has been dated the Effective Date unless otherwise indicated or agreed to by the Required

Lenders, and all fees in connection therewith shall be acceptable to the Required Lenders, in form and substance satisfactory to the Required Lenders.

6.22 <u>Financial Statements, 13-Week Budgets and Reports</u>. The Lenders shall have received the 13-Week Budget, which 13-Week Budget shall be in form and substance satisfactory to the Required Lenders in their sole discretion, including a forecast of sources and uses of cash as described in Section 9.17(c) by the Debtors and the non-Debtor Guarantors on a weekly basis for the succeeding 13 calendar weeks.

6.23 <u>Amendment of the Prepetition Facility and Prepetition Security Documents</u>. The Prepetition Facility Amendment, executed by the requisite Prepetition Lenders, Holdings, the U.S. Borrower, the Canadian Borrower and the Prepetition Administrative Agent, and amendments to the Prepetition Security Documents shall have been delivered to the Administrative Agent.

6.24 <u>Lien Searches</u>. The Administrative Agent shall have received the results of a recent lien search (if applicable) in each of the jurisdictions where any Credit Party is organized and, in the case of the Canadian Borrower, has tangible personal or real property, and such search shall reveal no liens on any of the assets of the Credit Parties except for liens permitted by Section 10.02 or discharged on or prior to the Effective Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

The occurrence of the Initial Borrowing Date and the acceptance of the benefits or proceeds of each Credit Event shall constitute a representation and warranty by each Credit Agreement Party to each Agent and each of the Lenders that all the conditions specified in Section 6 (A) on the Initial Borrowing Date and applicable to such Credit Event (other than such conditions that are expressly subject to the satisfaction of the Agents and/or the Required Lenders, and subject to Section 9.21) exist as of that time. All of the Notes, certificates, legal opinions and other documents and papers referred to in Sections 6 (A), unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Lenders (as evidenced by their execution and delivery of this Agreement).

<u>Final Borrowing Date</u>.

B. The obligation of each Lender to make each Loan hereunder, in each case on the Final Borrowing Date, is subject, at the time of the making of such Loans:

6.25 <u>Final Order</u>.

(i) Not later than 30 days following the Interim Order Entry Date, a final order shall have been entered by the Bankruptcy Court (the "<u>Final Order</u>") in form and substance satisfactory to the Required Lenders in their sole discretion on a motion by the U.S. Debtors that is in form and substance satisfactory to the Required Lenders, which Final Order shall have been entered on such prior notice to such parties as may be satisfactory to the Required Lenders in their sole discretion, approving and authorizing on a final basis the matters provided for herein.

(ii)    The Final Order, the Interim Order, the Initial Order and the Credit Documents shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge anywhere in the world.

(iii)    No order shall have been entered by the Canadian Court in the Canadian Case that has an adverse impact on the Credit Documents, the Initial Order or the priority of the DIP Lenders' Charge or the transactions contemplated thereby.

(iv)    The Credit Parties shall be in compliance with the Final Order.

(v)    The Lenders shall have received the required periodic updates of the 13-Week Budget and weekly variance reports, each in form and substance satisfactory to the Required Lenders, and Credit Parties shall be in compliance with the updated 13-Week Budget.

6.26  Other Conditions.  (a) The Lenders shall have received the periodic updates of the 13-Week Budget and weekly variance reports, as required hereunder, each in form and substance satisfactory to the Required Lenders, and Credit Parties shall be in compliance with the updated 13-Week Budget.

(b) Each Credit Party and each other Subsidiary of Holdings which is an obligee or obligor with respect to any Intercompany Debt shall have duly authorized, executed and delivered the amended Intercompany Subordination Agreement in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Intercompany Subordination Agreement"), and the Intercompany Subordination Agreement shall be in full force and effect

The occurrence of the Final Borrowing Date and the acceptance of the benefits or proceeds of each Credit Event shall constitute a representation and warranty by each Credit Agreement Party to each Agent and each of the Lenders that all the conditions specified in Section 6 (B) on the Finial Borrowing Date and applicable to such Credit Event (other than such conditions that are expressly subject to the satisfaction of the Agents and/or the Required Lenders, and subject to Section 9.21) exist as of that time.  All of the Notes, certificates, legal opinions and other documents and papers referred to in Sections 6 (B), unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Lenders (as evidenced by their execution and delivery of this Agreement).

SECTION 7.  Conditions Precedent to All Credit Events.  The obligation of each Lender to make Loans (including Loans made on the Initial Borrowing Date, the Final Borrowing Date and on each Incremental Term Loan Borrowing Date), is subject, at the time of each such Credit Event (except as hereinafter indicated), to the satisfaction of the following conditions:

7.01  No Default; Representations and Warranties.  At the time of each such Credit Event and immediately after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein or in any other Credit Document shall be true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) with the same effect as though such

representations and warranties had been made on the date of such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) only as of such specified date).

7.02 <u>Notice of Borrowing; etc.</u> Prior to the making of each Loan, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.03(a).

7.03 <u>Incremental Term Loans.</u> Prior to the incurrence of any Incremental Term Loans on the Incremental Term Loan Borrowing Date, Holdings shall have satisfied (or caused to be satisfied) all of the applicable conditions set forth in Section 2.15.

7.04 [Intentionally Omitted].

7.05 [Intentionally Omitted].

7.06 <u>Commitments.</u> As a result of any Borrowing, usage of the Commitments shall not exceed (i) the aggregate amount authorized by the Interim Order, the Initial Order or the Final Order, as the case may be and (ii) if so reflected in the 13-Week Budget, the maximum amount of borrowings contemplated to be outstanding as reflected in the 13-Week Budget and as otherwise agreed by the parties.

7.07 <u>Interim Order, Initial Order and Final Order.</u> The Interim Order, the Initial Order and the Final Order, as the case may be, and all Credit Documents shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge in any jurisdiction worldwide.

7.08 <u>Payment.</u> All costs, fees, expenses (including, without limitation, legal fees) and other compensation contemplated by the Credit Documents (and any such amounts owing pursuant to the Prepetition Facility) to be payable to the Agents or Lenders shall have been paid to the extent due.

The occurrence of the Initial Borrowing Date and the Final Borrowing Date and the acceptance of the benefits or proceeds of each Credit Event shall constitute a representation and warranty by each Credit Agreement Party to each Agent and each of the Lenders that all the conditions specified in Section 7 exist as of that time. All of the Notes, certificates, legal opinions and other documents and papers referred to in Section 7, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Lenders (as evidenced by their execution and delivery of this Agreement).

SECTION 8. <u>Representations and Warranties.</u> In order to induce the Lenders to enter into this Agreement, to make the Loans as provided for herein, each Credit Agreement Party makes the following representations, warranties and agreements with the Lenders, in each case after giving effect to the Transaction, all of which shall survive the execution and delivery of this Agreement, the making of the Loans (with the occurrence of the Initial Borrowing Date and each Credit Event on or after the Initial Borrowing Date being deemed to constitute a representation and

warranty that the matters specified in this Section 8 are true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) on and as of the Initial Borrowing Date and on and as of the date of each such Credit Event, unless stated to relate to a specific earlier date in which case such representations and warranties shall be true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) as of such earlier date):

8.01 <u>Company Status</u>. Each Credit Agreement Party and each of its Subsidiaries (i) is a duly organized and validly existing Company in good standing (or its equivalent) under the laws of the jurisdiction of its organization, (ii) subject, in the case of the U.S. Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order, has all requisite Company power and authority to own its assets, to carry on its business as now conducted and as proposed to be conducted and, subject, in the case of the Canadian Borrower, to the entry by the Canadian Court of the Initial Order, to execute, deliver and perform its obligations under each Credit Document to which it is a party and (iii) subject, in the case of the Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

8.02 <u>Authorization; Enforceability</u>. Subject, in the case of the Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and the entry by the Canadian Court of the Initial Order, as applicable, each component of the Transaction to be entered into by each Credit Agreement Party and its Subsidiaries has been duly authorized by all necessary Company action and, if required, stockholder action. Subject, in the case of the Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order, this Agreement has been duly executed and delivered by each Credit Agreement Party and constitutes, and each other Credit Document to which any Credit Party is to be a party, when executed and delivered by such Credit Party, will constitute, a legal, valid and binding obligation of such Credit Agreement Party or such Credit Party, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

8.03 <u>Governmental Approvals; No Conflicts</u>. The Transaction (a) subject, in the case of the Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and the entry by the Canadian Court of the Initial Order, as applicable, does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Credit Documents, (b) subject, in the case of the Canadian Borrower, to the entry by the Canadian Court of the Initial Order, will not violate any Requirement of Law applicable to any Credit Agreement Party or any of its Subsidiaries, as applicable, (c) subject, in the case of the Canadian Borrower, to the entry by the Canadian Court of the Initial Order, other than as set forth on Schedule 8.03 or as a result of the commencement of the U.S. Cases, will not violate or result in a default under any indenture or other material agreement or instrument binding upon any Credit Agreement Party or any of its Subsidiaries or any of their respective assets, or give rise to a right thereunder to require any payment to be made by any Credit Agreement Party or any of its Subsidiaries or give rise to a right of, or result in, termination, cancellation or acceleration of any material obligation thereunder, and (d) will not result in the creation or imposition of any Lien on any asset of any Credit Agreement Party or any of its Subsidiaries, except Liens created under the Credit Documents or pursuant to the Orders.

8.04 Financial Condition; No Material Adverse Change. (a) The U.S. Borrower has heretofore furnished to the Agents and to the Lenders (i) its consolidated balance sheet as of December 31, 2008, (ii) its consolidated statements of income, stockholders' equity and cash flows for the Fiscal Years ended December 31, 2007, and December 31, 2008, in the case of clauses (i) and (ii), reported on by Ernst & Young LLP, independent public accountants, and (iii) its consolidated balance sheet and combined statements of income, stockholders' equity and cash flows as of and for the three months ended March 31, 2009 (and the comparable period for the prior Fiscal Year), as reviewed by Ernst & Young, LLP, independent public accountants, in accordance with Statement on Auditing Standards No. 100. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the U.S. Borrower and its Subsidiaries as of such dates and for such periods in accordance with U.S. GAAP consistently applied, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)     Except as disclosed in the financial statements referred to in clause (a) above or the notes thereto, after giving effect to the Transaction, none of Holdings, the U.S. Borrower or any of their respective Subsidiaries has, as of the Initial Borrowing Date, any material direct or contingent liabilities, unusual long term commitments or material unrealized losses.

(c)     There has not been any event, development or circumstance that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect since July 14, 2009; provided that the filing of the Cases shall not in and of itself be deemed a Material Adverse Effect for purposes of this Section 8.04(c).

(d)     The Credit Parties have disclosed to the Agents and the Lenders all material assumptions with respect to the 13-Week Budget.

8.05 Properties. (a)   Each Credit Agreement Party and each of its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business (including each Mortgaged Property), except for Permitted Encumbrances with respect to each Mortgaged Property and with respect to each Real Property which is not a Mortgaged Property, Permitted Liens and minor defects in title that do not interfere with its ability to conduct its business as currently conducted and as proposed to be conducted or to utilize such properties for their intended purposes.

(b)     Each Credit Agreement Party and each of its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and, to the knowledge of each Credit Agreement Party or any of its respective Subsidiaries, the use thereof by each Credit Agreement Party and each of its Subsidiaries does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c)     Schedule 8.05(c) sets forth the address of each Real Property that is owned or leased by Holdings or any of its Subsidiaries as of the Initial Borrowing Date.

(d)     As of the Initial Borrowing Date, neither Credit Agreement Party nor any of its Subsidiaries has received notice of, or has knowledge of, any pending or contemplated condemn-ation proceeding affecting any Mortgaged Property or any sale or disposition thereof in lieu of condemnation. Neither any Mortgaged Property nor any interest therein is subject to any right of

first refusal, option or other contractual right to purchase such Mortgaged Property or interest therein, except as permitted by Sections 10.02 and 10.05.

8.06 <u>Litigation and Environmental Matters</u>.  (a) Except for the commencement of the Cases and as set forth on Schedule 6.06, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Credit Agreement Party or any of its Subsidiaries, threatened against or affecting any Credit Agreement Party or any of its Subsidiaries (x) that could reasonably be expected, individually or in the aggregate, to (i) result in a Material Adverse Effect or (ii) adversely affect in any material respect the ability of the Credit Parties to consummate the Transaction or (y) with respect to any Credit Document.

(b)     Except as set forth on Schedule 6.05, and with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither any Credit Agreement Party nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

8.07 <u>Compliance with Laws and Agreements</u>.  Each Credit Agreement Party and each of its Subsidiaries is in compliance with all material Requirements of Law applicable to it or its property and all material indentures, agreements and other instruments binding upon it or its property.  No Default or Event of Default has occurred and is continuing.

8.08 <u>Investment Company Status</u>.  Neither any Credit Agreement Party nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

8.09 <u>Taxes</u>.  Each Credit Agreement Party and each of its Subsidiaries has timely filed or caused to be filed all federal, state and provincial income tax returns and all other material tax returns and reports, domestic and foreign, required to be filed by it and has paid or caused to be paid all material taxes required to have been paid by it, except any taxes that are being contested in good faith by appropriate proceedings and for which such Credit Agreement Party or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with U.S. GAAP.

8.10 <u>ERISA; Canadian Welfare and Pension Plans</u>.  (a)  No ERISA Event (other than the filing of the Cases) has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that, when combined with the amount of the total unfunded liability (whether on a going concern or wind-up basis of each Canadian Pension Plan) using the actuarial methods and assumptions employed in the most recent actuarial reports prepared in respect of each such Canadian Pension Plan that had a deficiency on that basis, could reasonably be expected to result in a Material Adverse Effect.

(b)　Except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.10(b) could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (x) each Canadian Welfare Plan has been maintained and is in compliance with the terms thereof and all applicable Requirements of Law including, without limitation, all requirements relating to employee participation, funding, investment of funds, benefits and transactions with the Credit Parties and persons related to them and (y) with respect to Canadian Pension Plans: (i) no steps have been taken to terminate any Canadian Pension Plan (wholly or in part) which could result in any Credit Party being required to make any additional contribution to the Canadian Pension Plan; (ii) no contribution failure has occurred with respect to any Canadian Pension Plan sufficient to give rise to a Lien under any applicable pension benefits laws of any jurisdiction; (iii) no condition exists and no event or transaction has occurred with respect to any Canadian Pension Plan which is reasonably likely to result in any Credit Party incurring any material liability, fine or penalty; (iv) no Credit Party has a material contingent liability with respect to any post-retirement benefit under a Canadian Welfare Plan; (v) each Canadian Pension Plan is in compliance in all material respects with all applicable pension benefits laws and laws in respect to Taxes; (vi) all contributions (including, employee contributions made by authorized payroll deductions or other withholdings) required to be made in respect of each Canadian Pension Plan as determined in the most recently completed and filed actuarial valuation report have been made in accordance with all Requirements of Law and the terms of each Canadian Pension Plan; (vii) all required special payments, if any, have been made in accordance with Requirements of Law and the most recent actuarial report filed therefor; and (viii) no event has occurred and no conditions exist with respect to any Canadian Pension Plan that has resulted or could reasonably be expected to result in any Canadian Pension Plan (A) having its registration revoked or refused or (B) being subject to an involuntary winding-up (either in whole or in part) by any relevant pension benefits regulatory authority and no Taxes or penalties under any applicable pension benefits laws or laws in respect to Taxes are owing or eligible.

(c)　Except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.10(c) could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (w) each Foreign Pension Plan has been maintained and administered in a timely manner in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing (including, without limitation, maintaining registered status) with applicable regulatory or other Governmental Authorities, (x) all contributions required to be made with respect to a Foreign Pension Plan have been timely made, (y) none of the Credit Parties nor any of their respective Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan, and (z) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Credit Party's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

8.11 <u>Disclosure</u>.　None of the reports, financial statements, certificates or other information furnished by or on behalf of any Credit Party to any Agent or any Lender in connection with the negotiation of this Agreement or any other Credit Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, <u>provided</u> that, with respect to projected financial information, each Credit Agreement Party represents only that such

information was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Initial Borrowing Date, as of the Initial Borrowing Date.

8.12 <u>Subsidiaries and Joint Ventures</u>. (a) Holdings does not have any Subsidiaries other than the U.S. Borrower and the Subsidiaries of the U.S. Borrower listed on Schedule 8.12. Schedule 8.12 sets forth the name of, and the ownership interest of Holdings in, (a) each Subsidiary, including the U.S. Borrower (and identifies each Subsidiary that is a Credit Party), and (b) each joint venture in which Holdings, the U.S. Borrower or any of their respective Subsidiaries holds an Equity Interest, in each case as of the Initial Borrowing Date.

(b) As of the Initial Borrowing Date (and after giving effect to the Transaction), there does not exist any Subsidiary of Holdings that (x) is organized under the laws of the United States, or a State thereof, other than the U.S. Credit Parties and (y) that is organized under the laws of Canada, or a province or territory thereof, other than the Canadian Credit Parties.

(c) (i) Holdings shall at all times own directly 100% of the capital stock or other Equity Interests of the U.S. Borrower and (ii) the U.S. Borrower shall at all times own directly 100% of the capital stock or other Equity Interests of the Canadian Borrower.

8.13 <u>Insurance</u>. Schedule 8.13 sets forth a description of all insurance maintained by or on behalf of each Credit Agreement Party and each of its Subsidiaries as of the Initial Borrowing Date. As of the Initial Borrowing Date, all premiums due and payable in respect of such insurance have been paid. Each Credit Agreement Party reasonably believes that the insurance maintained by or on behalf of each Credit Agreement Party and each of its Subsidiaries is adequate.

8.14 <u>Labor Matters</u>. As of the Initial Borrowing Date, there are no strikes, lockouts or slowdowns against any Credit Agreement Party or any of its Subsidiaries pending or, to the knowledge of any Credit Agreement Party, threatened. The hours worked by and payments made to employees of the Credit Agreement Parties and their respective Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, provincial, local or foreign law dealing with such matters. All payments due from any Credit Agreement Party or any of its Subsidiaries, or for which any claim may be made against any Credit Agreement Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Credit Agreement Party or such Subsidiary. The consummation of the Transaction will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Credit Agreement Party or any of its Subsidiaries is bound.

8.15 [<u>Intentionally Omitted</u>].

8.16 <u>Senior Indebtedness; Designated Senior Indebtedness</u>. The subordination provisions contained in the indenture and the documents governing the U.S. Borrower's 8.375% Senior Subordinated Notes due 2014 (and any notes issued in exchange therefor pursuant to such indenture) are enforceable against the U.S. Borrower and the U.S. Subsidiary Guarantors party thereto and the holders thereof, and all Obligations of the U.S. Borrower and all Guaranteed Obligations (as defined in the Global Subsidiaries Guaranty) of the U.S. Subsidiary Guarantors are within the definitions of "Senior Indebtedness" and "Designated Senior Indebtedness" included in such subordination provisions.

8.17 Collateral Matters. (a) The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Secured Creditors legal, valid, enforceable and fully perfected security interests in and Liens on the Collateral of the U.S. Debtors.

(b)     Each Mortgage (other than a Mortgage granted by a Debtor, as to which clause (a) or (c) of this Section 8.17 is applicable), upon execution and delivery by the parties thereto, will create in favor of the Collateral Agent, for the benefit of the Secured Creditors, a legal, valid and enforceable Lien on all the applicable mortgagor's right, title and interest in and to the Mortgaged Properties subject thereto and the proceeds thereof, and when the Mortgages have been filed in the jurisdictions specified in Schedule 8.05(c), the Mortgages will constitute a fully perfected Lien on all right, title and interest of the mortgagors in the Mortgaged Properties and the proceeds thereof, prior and superior in right to any other Person (but subject to Liens or other encumbrances for which exceptions are taken in the policies of title insurance delivered in respect of the Mortgaged Properties and subject to Permitted Liens).

(c)     Upon the issuance of the Initial Order, the DIP Lenders' Charge is effective to create in favor of the Secured Creditors' legal, valid, and fully perfected security interests in and Liens on the Collateral of the Canadian Borrower.

(d)     Each Security Document, other than the U.S. Security Agreement, the U.S. Pledge Agreement, the Mortgages, the Canadian Security Agreement and the Canadian Pledge Agreement, when executed and delivered, will be effective under applicable law to create in favor of the Collateral Agent, for the benefit of the Secured Creditors, a valid and enforceable security interest or hypothec, as the case may be, in the Collateral subject thereto (and defined therein), and will, upon the taking of any required action under applicable law to perfect each Lien, constitute a fully perfected Lien on and security interest or hypothec, as the case may be in all right, title and interest of the Credit Parties in the Collateral subject thereto, prior and superior to the rights of any other Person except for Permitted Liens and Permitted Encumbrances.

(e)     All "Collateral" under and as defined in the Prepetition Facility required to be delivered under the Prepetition Loan Documents has been delivered to the Prepetition Agent as "Pledgee" thereunder,

8.18 Scheduled Existing Indebtedness. Schedule 8.18 sets forth a true and complete list of all Indebtedness of Holdings and its Subsidiaries as of the Initial Borrowing Date which is to remain outstanding after giving effect to the Transaction and the incurrence of Loans on such date (exclusive of Indebtedness pursuant to this Agreement and the other Credit Documents and Unscheduled Third Party Indebtedness), in each case showing the aggregate principal amount thereof (and the aggregate amount of any undrawn commitments with respect thereto) and the name of the respective borrower and any other entity which directly or indirectly guarantees such debt. Part A of Schedule 8.18 lists all Indebtedness as described in the immediately preceding sentence which is owed to Persons other than Holdings or any of its Subsidiaries (after giving effect to the Transaction) (with all such Indebtedness being herein called "Third Party Scheduled Existing Indebtedness") and Part B of Schedule 8.18 lists all Indebtedness as described in the immediately preceding sentence which is owed to Holdings and its Subsidiaries (after giving effect to the Transaction) (with all of such Indebtedness being herein called "Intercompany Scheduled Existing Indebtedness").

8.19 <u>Cases</u>. The Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and of the hearing for the approval of the Final Order has been given as identified in the Certificate of Service filed with the Bankruptcy Court.

8.20 <u>Orders</u>. The Interim Order or, after it has been entered, Final Order (as applicable), the Initial Order and the transactions contemplated by this Agreement and the other Loan Documents are in full force and effect, and have not, in whole or in part, been reversed, modified, amended, stayed (for more than five (5) days), vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction in any part of the world and the Debtors are in compliance with the Interim Order, the Initial Order, the Final Order and each Other CCAA Order, as applicable.

8.21 <u>Material Contracts</u>. No default has occurred and is continuing under any Material Contract that is not otherwise stayed by the Interim Order, the Final Order or the Initial Order, as applicable.

8.22 <u>Forward Looking Projections</u>. All forward looking projections included in each 13-Week Budget have been completed in good faith and based on assumptions which were reasonable when made.

SECTION 9. <u>Affirmative Covenants</u>. Each Credit Agreement Party hereby covenants and agrees that as of the Effective Date and thereafter for so long as this Agreement is in effect and until the Total Commitment has been terminated, and the Loans and Notes, together with interest, Fees and all other Obligations (other than any indemnities described in Section 13.13 which are not then due and payable) incurred hereunder, are paid in full:

9.01 <u>Financial Statements and Other Information</u>. The U.S. Borrower will furnish to the Administrative Agent (for distribution to each Lender):

(a) within 90 days (or such shorter period as the SEC shall specify for the filing of annual reports on Form 10-K) after the end of each Fiscal Year, its audited consolidated balance sheet and consolidated statements of income, stockholders' equity and cash flows as of the end of and for such Fiscal Year, and the related notes thereto, setting forth in each case in comparative form the figures for the previous Fiscal Year, all reported on by independent public accountants of recognized national standing (without any exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the U.S. Borrower and its Subsidiaries on a consolidated basis in accordance with U.S. GAAP consistently applied;

(b) within 45 days (or such shorter period as the SEC shall specify for the filing of quarterly reports on Form 10-Q) after the end of each of the first three Fiscal Quarters of each Fiscal Year, its consolidated balance sheet and consolidated statements of income, stockholders' equity and cash flows as of the end of and for such Fiscal Quarter and the then-elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by an Authorized Officer as presenting fairly in all material respects the financial condition and results of operations of the U.S. Borrower and its Subsidiaries on a consolidated basis in accordance with U.S. GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)　concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of an Authorized Officer (i) certifying as to whether a Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations (A) demonstrating compliance with Sections 10.14, 10.16 and 10.17 and (B) detailed information regarding the utilization of the baskets described in Sections 10.01 (a)(vi), 10.01 (a)(vii), 10.01 (a)(xv), 10.01 (a)(xviii), 10.01(a)(xix), 10.01 (a)(xx), 10.02(a)(xiii), 10.04(e), 10.04(j), 10.04(q), 10.04(r), 10.05(b), 10.05(i), 10.05(j), 10.05(k), 10.06, 10.08(a), 10.09 and 10.14(a) of this Agreement, in each case as of the last day of the Fiscal Quarter or Fiscal Year, as the case may be, then last ended;

(d)　concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default or Event of Default and, if such knowledge has been obtained, describing such Default or Event of Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(e)　promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Credit Agreement Party or any of its Subsidiaries with the SEC or with any national securities exchange, as applicable;

(f)　promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Credit Agreement Party or any of its Subsidiaries or any Plan, or compliance with the terms of any Credit Document, as the Administrative Agent or any Lender may reasonably request;

9.02 <u>Notices of Material Events</u>. The Credit Agreement Parties will furnish to the Administrative Agent (for distribution to each Lender), prompt written notice of the following:

(a)　the occurrence of any Default or Event of Default;

(b)　the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Credit Agreement Party or any of its Affiliates that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)　the occurrence of any ERISA Event or Plan Termination Event or any fact or circumstance that gives rise to a reasonable expectation that any ERISA Event or Plan Termination Event will occur that, in either case, alone or together with any other ERISA Events or Plan Termination Events that have occurred, could reasonably be expected to result in liability of the Credit Agreement Parties and their respective Subsidiaries in an aggregate amount exceeding U.S.$5,000,000;

(d)　the filing of any annual actuarial valuation report (and any subsequent report containing material changes) in respect of a Canadian Pension Plan with any Governmental Authority, together with a copy of such report forthwith after such filing; and

(e) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 9.02 shall be accompanied by a statement of a Authorized Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

9.03 <u>Information Regarding Collateral</u>. (a) The U.S. Borrower will furnish to the Collateral Agent prompt written notice of any change (i) in any Credit Party's corporate name, (ii) in the jurisdiction of incorporation or organization of any Credit Party, (iii) in any U.S. Credit Party's organizational identification number or (iv) in the case of any Canadian Credit Party, in the chief executive office or principal place of business of such Person, or in any jurisdiction (country, state or province) where such Canadian Credit Party stores or maintains tangible personal property or acquires Real Property (owned or leased). For greater certainty, no Canadian Credit Party may change its jurisdiction of incorporation and become an unlimited liability company in such jurisdiction. Each Credit Agreement Party agrees not to effect or permit any change referred to in the preceding sentence unless any new documentation is executed by any Credit Party (including, without limitation, a movable hypothec under any applicable laws of Canada or province or territory thereof) and all filings have been made under the UCC, the PPSA, The Register of Personal and Movable Real Rights or otherwise that are required, in each case, in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral. The U.S. Borrower also agrees promptly to notify the Collateral Agent if any material portion of the Collateral is damaged, destroyed or otherwise the subject of a Recovery Event.

(b) At the time of delivery of the annual financial statements pursuant to Section 9.01(a), the U.S. Borrower shall deliver to the Collateral Agent a certificate of an Authorized Officer certifying that there have been no changes to Annexes A through H of the U.S. Security Agreement, Annexes A through H of the Canadian Security Agreement, Annexes A through G of the U.S. Pledge Agreement, Annexes A through G of the Canadian Pledge Agreement and the annexes or schedules to each other Security Document, in each case since the Initial Borrowing Date or, if later, since the date of the most recent certificate delivered pursuant to this Section 9.03(b), or if there have been any such changes, a list in reasonable detail of such changes (but, in each case, only to the extent that such changes are required to be reported to the Collateral Agent pursuant to the terms of such Security Documents) and whether the relevant Credit Parties have otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes, <u>provided</u> that the U.S. Borrower shall also deliver the certificate required by this Section 9.03(b) with respect to Annexes A, C, D and F of the U.S. Security Agreement on a quarterly basis at the time of delivery of financial statements pursuant to Sections 9.01(b); <u>provided further</u> that each Credit Agreement Party will, and will cause each of its Subsidiaries to, at the expense of such Borrower to (a) notify the Collateral Agent of any acquisition of assets (i) not previously listed on Annexes A through H of the U.S. Security Agreement, Annexes A through H of the Canadian Security Agreement, Annexes A through G of the U.S. Pledge Agreement, Annexes A through G of the Canadian Pledge Agreement and the annexes or schedules to each other Security Document and (ii) not previously subject to a pledge under the Security Documents, and (b) at the request of the Collateral Agent, take such further steps (or authorize the Collateral Agent to take such further steps) relating to such acquired assets as the Collateral Agent may reasonably require to satisfy perfection and priority of the Liens created or intended to be created by the Security Documents with respect to such acquired assets.

9.04 Existence; Conduct of Business. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, permits, approvals, authorizations, licenses, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 10.03, and provided further, that the foregoing shall not prohibit any Credit Agreement Party or any of its Subsidiaries from causing or permitting the expiration, cancellation, abandonment, impairment or invalidation of any rights, qualifications, permits, approvals, authorizations, licenses, franchises, patents, copyrights, domain names, trademarks or tradenames, or from failing to maintain or renew, abandoning, impairing or permitting to expire or be cancelled any applications or registrations for any of such item, if, in such Credit Agreement Party's or such Subsidiary's, as applicable, reasonable business judgment, such item is no longer material to the conduct of its business.

9.05 Payment of Taxes. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, pay its liabilities for taxes (other than the tax liabilities arising prior to the Petition Date), before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and such Credit Agreement Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with U.S. GAAP, (b) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

9.06 Maintenance of Properties. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

9.07 Insurance. (a) Each Credit Agreement Party will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies, (a) insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required to be maintained pursuant to the Security Documents. The U.S. Borrower will furnish to the Administrative Agent, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

(b) Each Credit Agreement Party will, and will cause each of its Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by such Credit Agreement Parties and/or such Subsidiaries) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance policies shall not be canceled without at least 30 days' (or 10 days', in the case of any cancellation arising from any non-payment of insurance premium) prior written notice thereof by the respective insurer to the Collateral Agent, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors, and (iv) shall be deposited with the Collateral Agent.

(c) If any Credit Agreement Party or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 9.07, or if any Credit Agreement Party or any of its

Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Credit Agreement Parties jointly and severally agree to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

9.08 <u>Casualty and Condemnation</u>. The U.S. Borrower (a) will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the net proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Security Documents.

9.09 <u>Books and Records; Inspection and Audit Rights</u>. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, keep proper books of record and account in accordance with U.S. GAAP, consistently applied, and in accordance with the internal controls of Holdings and each of its Subsidiaries. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties during normal business hours, to examine and make extracts from its books and records, including Phase I or Phase II environment assessment reports, and to discuss its affairs, finances and condition with its officers, employees and independent accountants, all at such reasonable times and as often as reasonably requested (subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract), <u>provided</u> that an officer of the Borrowers may attend any such discussions with such employees or accountants. Without limiting the foregoing, if an Event of Default is continuing or if the Administrative Agent at any time has a reasonable basis to believe that there exist violations of Environmental Laws by any Credit Agreement Party or that there exist any Environmental Liability, in each case, that would have, in the aggregate, a Material Adverse Effect, then each Credit Agreement Party will, and will cause each of its Subsidiaries to, promptly upon receipt of request from the Administrative Agent, allow a reputable environmental consulting firm reasonably acceptable to the Administrative Agent, and its representatives, access to such real property for the purpose of conducting such environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case as the Administrative Agent may from time to time reasonably request. Such audits, assessments and reports, shall be in form and substance reasonably acceptable to the Required Lenders.

9.10 <u>Compliance with Laws</u>. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, comply with all Requirements of Law, including Environmental Laws, applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

9.11 <u>Use of Proceeds</u>. (a) Each Credit Agreement Party will, and will cause each of its Subsidiaries to, use the proceeds of the Loans solely (x) for working capital requirements and general corporate purposes (including to pay administration costs of any U.S. Cases and the Canadian Cases and claims or amounts approved by the Bankruptcy Court or the Canadian Court) of the Credit Parties and their Subsidiaries and (y) to pay fees and expenses incurred in connection with the Transaction.

(b)   No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of the Margin Regulations.

9.12 <u>Additional Subsidiaries</u>.   If any additional SPE Subsidiary of Holdings is formed or acquired after the Initial Borrowing Date, the U.S. Borrower will, promptly after such Subsidiary is formed or acquired, notify the Collateral Agent and the Lenders (through the Administrative Agent) thereof and, upon the consummation of the Permitted Securitization to which such SPE Subsidiary relates, cause the Equity Interests of such new Subsidiary to be pledged pursuant to, and to the extent required by, the relevant Security Document and the certificates, if any, representing such Equity Interests, together with appropriate transfer powers duly executed in blank, to be delivered to the Collateral Agent.

9.13 <u>Further Assurances</u>.  (a) Each Credit Agreement Party will, and will cause each other Credit Party to, grant to the Collateral Agent security interests and mortgages in such assets and Real Property of such Credit Agreement Party and such Credit Party which are of the type required to be pledged, assigned or hypothecated pursuant to the original Security Documents and as are not covered by such original Security Documents, in each case to the extent requested from time to time by the Administrative Agent or the Required Lenders (collectively, the "<u>Additional Security Documents</u>"). All such security interests and mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Collateral Agent and shall constitute valid and enforceable perfected security interests, hypothecations and mortgages superior to and prior to the rights of all third Persons and enforceable as against third parties and subject to no other Liens except for Permitted Liens or, in the case of Real Property, the Permitted Encumbrances described in clauses (a), (b) and (f) of the definition thereof and other matters of title shown on the title report prepared by the applicable title company and acceptable to the Administrative Agent. The Additional Security Documents or instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full. Notwithstanding the foregoing, (i) this Section 9.13(a) shall not apply to (and Holdings and its Subsidiaries shall not be required to grant a mortgage in) any Real Property the fair market value of which (as determined in good faith by senior management of Holdings) is less than U.S.$5,000,000 and (ii) the foregoing requirements shall not require the creation or perfection of pledges of or security interests in particular assets of the Credit Parties if and for so long as, the Administrative Agent, in consultation with Holdings, reasonably determines that the cost of creating or perfecting such pledges or security interests in such assets (taking into account any adverse tax consequences to Holdings and its Affiliates (including the imposition of withholding or other material taxes on Lenders)) shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

(b)   Each Credit Agreement Party will, and will cause each of its Subsidiaries to, at the expense of such Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents as the Collateral Agent may reasonably require (including any of the foregoing required for each Credit Agreement Party to comply with Section 6.16 of the Credit Agreement). Furthermore, each Credit Agreement Party shall cause to be

delivered to the Collateral Agent such opinions of counsel, title insurance and other related documents as may be reasonably requested by the Collateral Agent to assure itself that this Section 9.13 has been complied with. Each Credit Agreement Party also agrees to provide to the Collateral Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(c)     Each Credit Agreement Party agrees that each action required above by this Section 9.13 shall be completed as soon as possible, but in no event later than 30 days after such action is either requested to be taken by the Administrative Agent, the Collateral Agent or the Required Lenders or required to be taken by the Credit Agreement Parties and their respective Subsidiaries pursuant to the terms of this Section 9.13 (or such later date as shall be determined by the Administrative Agent in its sole discretion in any given case); provided that in no event will any Borrower or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts, to obtain consents from third parties with respect to its compliance with this Section 9.13.

(d)     In the event that the Administrative Agent or the Required Lenders at any time after the Initial Borrowing Date determine in their sole discretion (whether as a result of a position taken by an applicable bank regulatory agency or official, or otherwise) that real estate appraisals satisfying the requirements set forth in 12 C.F.R., Part 34-Subpart C, or any successor or similar statute, rule, regulation, guideline or order in any jurisdiction (any such appraisal a "Required Appraisal") are or were required to be obtained, in connection with any Mortgaged Property or Mortgaged Properties, then, within 90 days after receiving written notice thereof from the Administrative Agent, the relevant Credit Agreement Party shall cause such Required Appraisal to be delivered, at the expense of such Credit Agreement Party, to the Administrative Agent, which Required Appraisal, and the respective appraiser, shall be satisfactory to the Administrative Agent.

9.14     End of Fiscal Years; Fiscal Quarters.  If Holdings and the U.S. Borrower change their and their Subsidiaries' Fiscal Year or Fiscal Quarter end dates, Holdings and the U.S. Borrower shall give immediate written notice of such change to the Administrative Agent and, in such an event, the Credit Agreement Parties and the Administrative Agent shall, and are hereby authorized by the Lenders to, make any modifications or adjustments to this Agreement (including the financial covenants contained in Sections 10.14, 10.16 and 10.17) that are necessary to reflect any such change; it being understood that each of the Credit Agreement Parties and the Administrative Agent agree to negotiate in good faith to implement such necessary modifications or adjustments.

9.15     [Intentionally Omitted].

9.16     [Intentionally Omitted].

9.17     Financial Statements and Additional Bankruptcy-related Reporting.  The U.S. Borrower shall furnish to the Administrative Agent (with sufficient copies for each of the Lenders, which the Administrative Agent shall provide to the Lenders) each of the following:

(a)     *Operating Forecast.*  (A) Within 30 days of the Interim Order Entry Date, a projected operating budget on a monthly basis through the end of the current fiscal year of Holdings, in form and substance acceptable to the Required Lenders (the "Operating Forecast"), to include income statements by country, cash flow statement on a consolidated basis, and a balance sheet on a

consolidated basis; (B) within 120 days of the Interim Order Entry Date, an Operating Forecast, in the format set forth in 9.17(a)(A), through the end of the subsequent fiscal year of Holdings, on a monthly basis, in form and substance acceptable to the Required Lenders; and (C) updated Operating Forecasts as become available from time to time.

(b)     *Operating Reports.* As it becomes available and within ten (10) days of the Interim Order Date, a copy of the most recent operating report known as of the date hereof as "Corporate Monthly Operations Report", including statistics for each operating plant of Holdings and its Subsidiaries and reported on a monthly basis, in form and substance acceptable to the Required Lenders.

(c)     *13-Week Budgets.* Commencing on the Effective Date, and every fourth week thereafter, a 13-week rolling cash flow forecast detailing cash receipts and cash disbursements on a weekly basis broken down for (i) the U.S. Credit Parties and (ii) the Canadian Credit Parties for the next 13 weeks; and commencing with the first 13-Week Budget due after September 1, 2009 (excluding U.S. Finco), broken down by (A) the U.S. Credit Parties, (B) the Canadian Credit Parties (excluding U.S. Finco), and (C) all other Subsidiaries, and by week and aggregated by country, including anticipated uses of the DIP Facility (a "13-Week Budget"), in each case in form substantially similar to the 13-Week Budget delivered pursuant to Section 6.22 and substance satisfactory to the Required Lenders in their sole discretion.

(d)     *Weekly DIP Budget Performance Report.* Commencing on the first Thursday after the Effective Date, and every Thursday thereafter (or if Thursday is not a business day, on the next succeeding business day), a comparison of the actual cash flows for the most recently completed week (ending on the previous Sunday) to the most recent 13-Week Budget for such week for each line item in the applicable 13-Week Budget, including an explanation for all material variances from the applicable 13-Week Budget, and any other information requested by the Administrative Agent to determine compliance with the financial covenants contained in Sections 10.17 and 10.18, the form of which shall be satisfactory to the Administrative Agent in its sole discretion, in each case certified by the Chief Financial Officer of the U.S. Borrower.

(e) *Monthly Reports.* Monthly reports with respect to asset sales and facility closures.

(f) *Sales Flash Reports.* By Thursday of each week, a "flash" sales report which includes actual and forecasted sales for the current and subsequent month.

(g) *Interim Order, Initial Order, Final Order and Other Canadian Court Orders.* As soon as practicable in advance of filing with the Bankruptcy Court or the Canadian Court the Interim Order, the Initial Order, the Final Order and copies of any other proposed orders of the Canadian Court in the Canadian Case, as applicable, all other proposed orders and pleadings related to the DIP Facility (which must be, in each case, in form and substance satisfactory to the sole discretion of Required Lenders), any pleading relating to a Chapter 11 plan or a CCAA plan of compromise or arrangement, and/or any disclosure statement or other summary documents related to or copies of such Chapter 11 plan or CCAA plan.

(h) *Additional Requirements.* Additional reporting requirements reasonably requested by the Administrative Agent, including, without limitation, with respect to litigation, contingent liabilities, and ERISA, Canadian Pension Plans and environmental events.

(i) *Environmental.* (i) Any unpermitted Releases, (ii) receipt of any notice of violation of or potential liability or similar notice under, or the existence of any condition that could reasonably be expected to result in violations of or liabilities under, any Environmental Law or (iii) the commencement of, or any material and adverse change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or liability under any Environmental Law, that, for each of clauses (i), (ii) and (iii) above, in the aggregate for each such clause, could reasonably be expected to in an result in an Material Adverse Effect.

(j) *Access to Information.* Information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with senior management and other company advisors and the Required Lenders and Lender Advisors, and the Lender Advisors shall be provided with access to all information any of them shall reasonably request.

9.18 <u>Financial Advisors</u>. Upon terms and conditions satisfactory to the Required Lenders, the U.S. Borrower will (a) continue to retain Lazard Frères & Co. LLC ("<u>Lazard</u>") and/or other financial consultants and advisors acceptable to the Required Lenders; <u>provided</u> that in the event that Lazard's engagement has been terminated, the U.S. Borrower shall use commercially reasonable efforts to have approved by the Bankruptcy Court within 30 days a replacement advisor satisfactory to the Required Lenders and (b) continue to retain Alvarez & Marsal ("<u>A&M</u>") as restructuring advisors and/or other financial consultants and advisors acceptable to the Required Lenders; <u>provided</u> that in the event that A&M's engagement has been terminated, the U.S. Borrower shall use commercially reasonable efforts to have approved by the Bankruptcy Court within 30 days a replacement restructuring advisor satisfactory to the Required Lenders.

9.19 <u>Ratings</u>. The Credit Agreement Parties will, and will cause each of its Subsidiaries to, use commercially reasonable efforts to have the Loans rated by Moody's and S&P within 90 days after the Initial Borrowing Date.

9.20 <u>Environmental Assessment</u>. Within 30 days of the Interim Order Entry Date, the Credit Agreement Parties shall engage a reputable international third-party consultant, reasonably acceptable to Administrative Agent, to review the environmental, health and safety management systems and compliance programs of Holdings and its Subsidiaries, conduct an assessment of the compliance with environmental laws and cleanup liabilities of Holdings and its Subsidiaries in all applicable jurisdictions, and provide recommendations on any improvements and corrections as may be necessary or appropriate to maintain compliance with good management practices and environmental laws. Within 90 days of the Interim Order, the Credit Agreement Parties shall provide written satisfactory confirmation to the Administrative Agent describing any findings from such assessment and that such findings have been properly resolved.

9.21 <u>Post-Closing Actions</u>. Notwithstanding anything to the contrary contained in this Agreement or the other Credit Documents, each Credit Agreement Party shall, and shall cause each of its Subsidiaries to, consummate each of the actions set forth in Schedule 9.21, within the applicable specified time periods set forth therein. All conditions precedent and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above, rather than as elsewhere provided in the Credit Documents), <u>provided</u> that (x) to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Initial Borrowing Date, the respective representation and warranty shall be

required to be true and correct in all material respects at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 9.21 and (y) all representations and warranties relating to the Security Documents shall be required to be true immediately after the actions required to be taken by Section 9.21 have been taken (or were required to be taken). The occurrence of each Credit Event shall constitute a representation, warranty and covenant by the Credit Agreement Parties to each of the Lenders that the actions required pursuant to this Section 9.21 will be, or have been, taken within the relevant time periods referred to in this Section 9.21 and that, at such time, all representations and warranties contained in this Agreement and the other Credit Documents shall then be true and correct in all material respects without any modification pursuant to this Section 9.21, and the parties hereto acknowledge and agree that the failure to take any of the actions required above, within the relevant time periods required above, shall give rise to an immediate Event of Default pursuant to this Agreement.

9.22 <u>Lender Conference Calls</u>.  On a regular basis (but in any event no less frequently than quarterly if and to the extent requested by the Administrative Agent) at such times as the Borrowers and the Administrative Agent shall agree, host a conference call with the Administrative Agent and the Lenders to discuss the performance of the business, strategic alternatives and other issues as the Administrative Agent may reasonably request.

SECTION 10. <u>Negative Covenants</u>. Each Credit Agreement Party hereby covenants and agrees that as of the Effective Date and thereafter for so long as this Agreement is in effect and until the Total Commitment has terminated, no Notes are outstanding and the Loans, together with interest, Fees and all other Obligations (other than any indemnities described in Section 13.13 which are not then due and payable) incurred hereunder, are paid in full:

10.01 <u>Indebtedness; Certain Equity Securities</u>. (a)  No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), create, incur, assume or permit to exist any Indebtedness, except:

    (i)    Indebtedness created under the Credit Documents;

    (ii)    [Intentionally Omitted];

    (iii)    [Intentionally Omitted];

    (iv)    Third Party Scheduled Existing Indebtedness existing on the Effective Date and set forth in Part C of Schedule 8.18 (for purposes of this clause (iv), treating unutilized amounts of overdraft facilities and lines of credit specifically identified on said Part C as outstanding Indebtedness of a like principal amount, even though same remain undrawn on such date) and extensions, renewals and replacements of any such Indebtedness, <u>provided</u> that such extending, renewal or replacement Indebtedness (A) shall not add guarantors, obligors or security from that which applied to the Indebtedness being extended, renewed or replaced, (B) shall not be in a principal amount that exceeds the principal amount of the Indebtedness being extended, renewed or replaced (plus accrued interest and premium thereon), (C) shall not have an earlier maturity date or a decreased Weighted Average Life to Maturity than the Indebtedness being extended, renewed or replaced and (D) shall be subordinated to the Obligations on the same terms (or, from the perspective of the Lenders, better terms), if any, as the Indebtedness being extended, renewed or replaced;

(v) intercompany Indebtedness by and among the Borrowers and their Subsidiaries permitted pursuant to subclauses (v), (w), (x) and (y) of Section 10.04(e);

(vi) Guarantees (v) by any U.S. Credit Party (other than Holdings) of Indebtedness incurred after the date hereof of any other U.S. Credit Party, (w) by any Canadian Credit Party of Indebtedness incurred after the date hereof of any other Credit Party (other than an Additional Foreign Borrower Credit Party), (x)(I) by any U.S. Credit Party (other than Holdings) of Indebtedness incurred after the date hereof of any Foreign Subsidiary of the U.S. Borrower and (II) by any Canadian Credit Party of Indebtedness incurred after the date hereof of any Foreign Subsidiary of the U.S. Borrower that is not a Canadian Credit Party, (y) by any Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party or an Additional Foreign Borrower Credit Party) of Indebtedness incurred after the date hereof of the U.S. Borrower or any Subsidiary of the U.S. Borrower and (z) the U.S. Credit Parties (other than Holdings) and the Canadian Credit Parties of Indebtedness incurred after the date hereof of any Foreign Subsidiary of the U.S. Borrower which is not organized under the laws of a European country, provided that, in each case, (1) the Indebtedness so Guaranteed is permitted by this Section 10.01 (other than Section 10.01(a)(iv)), (2) Guarantees permitted under this clause (vi) shall be subordinated to the Obligations of the U.S. Borrower or the applicable Subsidiary, as the case may be, on the same terms as the Indebtedness so Guaranteed is subordinated to the Obligations, (3) the aggregate outstanding principal amount of all Indebtedness of Subsidiaries guaranteed pursuant to subclause (x) of this clause (vi), when added to the aggregate principal amount of all intercompany loans made pursuant to (and in reliance on) Section 10.04(e)(x) and the aggregate amount of cash equity contributions made pursuant to (and in reliance on) Section 10.04(d)(x), shall not exceed U.S.\$60,000,000 at any time and shall not exceed U.S.\$50,000,000 at the end of any calendar month (provided that if the Mediofactor Facility shall be cancelled and not replaced in whole or in part the two immediately preceding dollar limits shall each be increased by U.S.\$20,000,000) (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (4) the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to subclause (z) of this clause (vi), when added to the aggregate principal amount of all intercompany loans made pursuant to (and in reliance on) Section 10.04(e)(z)(ii) and the aggregate amount of cash equity contributions made pursuant to (and in reliance on) Section 10.04(d)(z), shall not exceed U.S.\$10,000,000 at any time (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)) and (5) no Guarantees may be made or incurred pursuant to subclause (x) of this clause (vi) at any time any Default or any Event of Default is in existence (or would be in existence after giving effect thereto);

(vii) Indebtedness of the U.S. Borrower or any of its Subsidiaries incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed by the U.S. Borrower or any of its Subsidiaries in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any

such Indebtedness that do not increase the outstanding principal amount thereof (plus accrued interest and premium in respect thereof), <u>provided</u> that (A) such Indebtedness is incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement and (B) the aggregate principal amount of Indebtedness permitted by this clause (vii) shall not exceed, together with the Remaining Present Value of all leases permitted under Section 10.06, U.S.$15,000,000 at any time outstanding;

(viii)   Indebtedness by and among Dutch BV and one or more Foreign Subsidiaries of the U.S. Borrower organized under the laws of a European country pursuant to a manual cash pooling arrangement; <u>provided</u> that (a) the Additional Foreign Borrower may borrow but shall not lend pursuant to such manual cash pooling arrangement, (b) Dutch BV shall act as an intermediary for such Foreign Subsidiaries participating in the pool, (c) the pool shall have at all times an aggregate cash position of at least U.S.$0 and (d) at any time, the positive excess of (1) the aggregate amount owing in respect of the pool by Dutch BV to Credit Parties participating in the pool over (2) the aggregate amount owing in respect of the pool to Dutch BV by Credit Parties participating in the pool shall not exceed the applicable amount specified in clause (II) of the proviso in Section 10.04(e);

(ix)   Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(x)   (A) Indebtedness of the U.S. Borrower or any of its Subsidiaries in respect of performance bonds, bid bonds, appeal bonds, surety bonds, completion guarantees and similar obligations, in each case provided in the ordinary course of business and (B) any refinancings, renewals and replacements of any such Indebtedness pursuant to the preceding clause (A) that do not increase the outstanding principal amount thereof (plus accrued interest and premium in respect thereof);

(xi)   Indebtedness of any Credit Party pursuant to Swap Agreements or Post Petition Swap Agreements permitted by Section 10.07;

(xii)   Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, <u>provided</u> that such Indebtedness is extinguished within five Business Days of its incurrence;

(xiii)   reimbursement obligations in respect of letters of credit issued for the account of the U.S. Borrower or any of its Subsidiaries, in an aggregate amount not in excess of U.S.$35,000,000 at any time outstanding;

(xiv)   Permitted Securitizations;

(xv)   Indebtedness of any Foreign Subsidiary (other than a Canadian Credit Party) incurred to finance working capital needs of such Foreign Subsidiary, <u>provided</u> that the aggregate principal amount of Indebtedness permitted by this clause (xv), shall not exceed U.S.$20,000,000 at any time outstanding;

(xvi) [Intentionally Omitted];

(xvii) Indebtedness arising from agreements of the U.S. Borrower or a Subsidiary of the U.S. Borrower providing for indemnification in connection with the disposition of any business, any assets or any Subsidiary of the U.S. Borrower, other than Guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition; and

(xviii) other Indebtedness of the U.S. Borrower or any Credit Party (other than Holdings), provided that the aggregate principal amount of Indebtedness permitted by this clause (xviii) shall not exceed U.S.$10,000,000 at any time outstanding.

(b) The U.S. Borrower will not, and will not permit any of its Subsidiaries to, issue any Preferred Equity.

(c) Holdings will not issue any Preferred Equity other than Qualified Preferred Stock.

10.02 Liens. (a) No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to) create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except (Liens described below are herein referred to as "Permitted Liens")

(i) (A) Liens created under the Credit Documents, the DIP Lenders' Charge, the Administration Charge, the Directors' Charge (to the extent subordinated in full to the DIP Lenders' Charge), and any other Liens created under the Interim Order, the Initial Order, the Final Order or any Other CCAA Order (in each case to the extent subordinated in full to the DIP Lenders' Charge) and (B) Liens granted in favor of the Canadian Borrower in respect of any intercompany loans made by the Canadian Borrower, to the extent (i) such loans are otherwise permitted hereunder and (ii) such liens are required in connection with the administration of the Canadian Case;

(ii) Permitted Encumbrances;

(iii) any Lien on any property or asset of the U.S. Borrower or any of its Subsidiaries existing on the Initial Borrowing Date and either (x) set forth in Schedule 10.02(a) or (y) securing obligations in an aggregate amount less than U.S.$2,500,000, provided that (A) such Lien shall not apply to any other property or asset of the U.S. Borrower or any of its Subsidiaries and (B) such Lien shall secure only those obligations which it secures on the Initial Borrowing Date and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof (plus accrued interest and premium in respect thereof);

(iv) Liens created under the Prepetition Loan Documents (except to the extent such Liens are released by the Orders or the DIP Loan Documents or by the transactions contemplated hereby or thereby);

(v)     Liens on fixed or capital assets acquired, constructed or improved by the U.S. Borrower or any of its Subsidiaries, provided that (A) such Liens secure Indebtedness permitted by clause (vii) of Section 10.01(a), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of the U.S. Borrower or any of its Subsidiaries;

(vi)     Liens of a collecting bank arising in the ordinary course of business under Section 5-208 of the UCC covering only the items being collected upon;

(vii)     Liens that are statutory, common law or contractual rights of set-off relating to deposit accounts in favor of banks and other depositary institutions arising in the ordinary course of business;

(viii)     Liens arising out of sale and leaseback transactions permitted by Section 10.06;

(ix)     Liens granted by a Subsidiary of the U.S. Borrower that is not a Credit Party in favor of the U.S. Borrower or another Credit Party in respect of Indebtedness owed by such Subsidiary;

(x)     Liens representing any interest or title of a licensor, lessor or sub-licensor under any lease or license entered into by the U.S. Borrower or any of its Subsidiaries in the ordinary course of business;

(xi)     sales or other transfers of Receivables pursuant to, and Liens existing or deemed to exist in connection with, Permitted Securitizations permitted by Section 10.01(a)(xiv);

(xii)     Liens on property of a Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party or an Additional Foreign Borrower Credit Party) or any of its Foreign Subsidiaries (other than a Canadian Credit Party or an Additional Foreign Borrower Credit Party) securing Indebtedness permitted by Section 10.01(a)(xv);

(xiii)     Liens with respect to property or assets of the U.S. Borrower or any of its Subsidiaries not constituting Collateral with an aggregate fair value (valued at the time of creation thereof) of not more than U.S.$5,000,000 at any time;

(xiv)     Liens (a) securing obligations in respect of trade-related letters of credit or trade-related bankers acceptances issued in the ordinary course of business of the U.S. Borrower and its Subsidiaries, in each case covering the goods (or the documents of title in respect of such goods) financed by such letters of credit or trade-related bankers acceptances and the proceeds and products thereof and (b) on up to U.S.$35,000,000 of cash (which may be proceeds of the Loans) to secure obligations in respect of letters of credit issued by one or more Lenders for the account of the U.S. Borrower or any of its Subsidiaries;

(xv)     Liens on securities held by the U.S. Borrower or any of its Subsidiaries representing an interest in a joint venture to which the U.S. Borrower or such Subsidiary is a