party (provided that such joint venture is not a Subsidiary of the U.S. Borrower) to the extent that (A) such Liens constitute purchase options, calls or similar rights of a counterparty to such joint venture and (B) such Liens are granted pursuant to the terms of the partnership agreement, joint venture agreement or other similar document or documents pursuant to which such joint venture was created or otherwise governing the rights and obligations of the parties to such joint venture;

(xvi)   sales of Receivables and Related Assets pursuant to, and Liens existing or deemed to exist in connection with, Auto Supplier Support Transactions; and

(xvii)   undetermined or inchoate Liens and charges arising or potentially arising under statutory provisions which have not at the time been filed or registered in accordance with applicable law or of which written notice has not been given in accordance with applicable law, or which if filed or registered, relates to obligations not yet due or delinquent.

10.03   Fundamental Changes. (a) No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, or liquidate or dissolve, except that (i) any Domestic Subsidiary of the U.S. Borrower may be merged, consolidated or liquidated with or into the U.S. Borrower (so long as the surviving Person of such merger, consolidation or liquidation is a corporation, limited liability company or limited partnership organized or existing under the laws of the United States of America, any State thereof or the District of Columbia and, if such surviving Person is not the U.S. Borrower, such Person expressly assumes, in writing, all the obligations of the U.S. Borrower under the Credit Documents pursuant to an assumption agreement in form and substance reasonably satisfactory to the Administrative Agent) or any U.S. Subsidiary Guarantor (so long as the surviving Person of such merger, consolidation or liquidation is a Wholly-Owned Domestic Subsidiary of the U.S. Borrower, is a corporation, limited liability company or limited partnership and is or becomes a U.S. Subsidiary Guarantor concurrently with such merger, consolidation or liquidation), (ii) any Canadian Subsidiary of the U.S. Borrower (other than the Canadian Borrower and any unlimited liability company) may be merged, consolidated, amalgamated or liquidated with or into the Canadian Borrower (so long as the Canadian Borrower is the surviving corporation of such merger, consolidation, amalgamation or liquidation and is not an unlimited liability company) or any Canadian Subsidiary Guarantor (so long as the surviving Person of such merger, consolidation, amalgamation or liquidation is a Wholly-Owned Subsidiary of the U.S. Borrower organized or existing under the laws of Canada or any province thereof, is not an unlimited liability company and is or becomes a Canadian Subsidiary Guarantor concurrently with such merger, consolidation or liquidation), (iii) any Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party or an Additional Foreign Borrower Credit Party) may be merged, consolidated or liquidated with or into any Credit Party (so long as such Credit Party is the surviving corporation of such merger, consolidation or liquidation), (iv) any Foreign Subsidiary of the U.S. Borrower that is not a Credit Party may be merged, consolidated or liquidated with or into any other Foreign Subsidiary of the U.S. Borrower that is not a Credit Party and (v) any asset sale permitted by Section 10.05(k) may be effected through the merger of a Subsidiary with a third party; provided that any such merger, consolidation, amalgamation or liquidation shall only be permitted pursuant to this clause (a), so long as (I) no Default and no Event of Default then exists or would exist immediately after giving effect thereto, (II) except in the case of sub-clause (v) above, any security interests granted to the Collateral Agent for the benefit of the Secured Creditors in the assets (and Equity Interests) of any such Person subject to any such transaction shall remain in full force and effect and

perfected and enforceable (to at least the same extent as in effect immediately prior to such merger, consolidation, amalgamation or liquidation) and (III) the surviving Person from the merger (the "Surviving Entity") assumes all obligations under the Credit Documents of the Person or Persons being merged into the Surviving Entity.

(b)    No Credit Agreement Party will, nor will permit any of its Subsidiaries to, engage to any material extent in any business other than (i) businesses of the type conducted by the U.S. Borrower and its Subsidiaries on the Initial Borrowing Date and businesses reasonably related or incidental thereto and (ii) in the case of SPE Subsidiaries of the U.S. Borrower, Permitted Securitizations.

(c)    Notwithstanding anything to the contrary contained in Section 10.03(b), (i) Holdings will not engage in any business or activity other than the ownership of all the outstanding Equity Interests of the U.S. Borrower and activities incidental thereto and (ii) Holdings will not own or acquire any assets (other than Equity Interests of the U.S. Borrower and the cash proceeds of any Restricted Payments permitted by Section 10.08) or incur any liabilities (other than liabilities under the Credit Documents, Third-Party Scheduled Existing Indebtedness in the form of guaranties identified on Part C of Schedule 8.18 and liabilities reasonably incurred in connection with its maintenance of its existence).

(d)    Notwithstanding anything to the contrary contained in Section 10.03(b), (i) U.S. Finco will not engage in any business or activity other than the holding of an intercompany loan to CSA Holding (Deutschland) GmbH and activities incidental thereto and (ii) U.S. Finco will not own or acquire any assets (other than the intercompany obligation owing to it by CSA Holding (Deutschland) GmbH described in preceding clause (i) and cash proceeds from any payments made in respect thereof) or incur any liabilities (other than liabilities under the Credit Documents to which it is a party and liabilities reasonably incurred in connection with its maintenance of its existence).

10.04    Investments, Loans, Advances, Guarantees and Acquisitions.    No Credit Agreement Party will, nor will permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), purchase, hold or acquire any Equity Interests in or evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit  (each of the foregoing, an "Investment"), except:

(a)  [Intentionally Omitted];

(b)  Permitted Investments;

(c)  Investments existing on the Effective Date and set forth on Schedule 10.04(c);

(d)  (v) any U.S. Credit Party may make cash common equity contributions to any of its direct Wholly-Owned Subsidiaries that is a U.S. Credit Party, (w) any Canadian Credit Party may make cash common equity contributions to any of its direct Wholly-Owned Subsidiaries that is a Canadian Credit Party, (x)(I) any U.S. Credit Party may make cash common equity contributions to any of its direct Foreign Subsidiaries and (II) any Canadian Credit Party may make cash common equity contributions to any of its direct Foreign Subsidiaries that is not a Canadian Credit Party, (y)

any Foreign Subsidiary (other than a Canadian Credit Party) may make cash common equity contributions to any of its direct Foreign Subsidiaries and (z) the U.S. Credit Parties (other than Holdings) and the Canadian Credit Parties may make cash common equity contributions to any Foreign Subsidiary of the U.S. Borrower which is not organized under the laws of a European country; provided that (I) the aggregate amount of the cash common equity contributions made pursuant to subclause (x) of this clause (d), when added to the aggregate outstanding principal amount of all intercompany loans made pursuant to (and in reliance on) subclause (x) of clause (e) below and the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to Section 10.01(a)(vi)(x), shall not exceed U.S.$60,000,000 at any time and shall not exceed U.S.$50,000,000 at the end of any calendar month (provided that if the Mediofactor Facility shall be cancelled and not replaced in whole or in part the two immediately preceding dollar limits shall each be increased by U.S.$20,000,000) (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (II) the aggregate amount of the cash common equity contributions made pursuant to subclause (z) of this clause (d), when added to the aggregate outstanding principal amount of all intercompany loans made pursuant to (and in reliance on) subclause (z)(ii) of clause (e) below and the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to Section 10.01(a)(vi)(z), shall not exceed U.S.$10,000,000 at any time (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (III) no contributions may be made after the Effective Date pursuant to subclause (x) of this clause (d) at any time any Default or any Event of Default is in existence (or would be in existence after giving effect thereto), (IV) any Equity Interests held by a Credit Party shall be pledged to the Collateral Agent for the benefit of the Secured Creditors as, and to the extent required by, the relevant Pledge Agreement and (V) any cash common equity contribution made by a Canadian Credit Party is subject to approval of the Canadian Court;

(e) (v) U.S. Credit Parties (other than Holdings) may make intercompany loans to each other, (w) Canadian Credit Parties may make intercompany loans to any other Credit Party (other than Dutch BV), (x)(I) U.S. Credit Parties (other than Holdings) may make intercompany loans to any Foreign Subsidiary of the U.S. Borrower and (II) Canadian Credit Parties and the Additional Foreign Borrower Credit Parties (other than Dutch BV) may make intercompany loans to any Foreign Subsidiary of the U.S. Borrower that is not a Canadian Credit Party, (y) any Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party and Dutch BV) may make intercompany loans to any Credit Party and any Foreign Subsidiary of the U.S. Borrower that is not a Credit Party may make intercompany loans to any other Foreign Subsidiary of the U.S. Borrower that is not a Credit Party and (z) (i) Dutch BV may make intercompany loans to any U.S Credit Party, any Canadian Credit Party, any Additional Foreign Borrower Credit Party and any Foreign Subsidiary of the U.S. Borrower permitted pursuant to Section 10.01(a)(viii) and (ii) the U.S. Credit Parties (other than Holdings) and the Canadian Credit Parties may make intercompany loans to any Foreign Subsidiary of the U.S. Borrower which is not organized under the laws of a European country; provided that (I) any such intercompany loan made by a Credit Party pursuant to this clause (e) shall be evidenced by an Intercompany Note pledged in favor of the Collateral Agent for the benefit of the relevant Secured Creditors pursuant to the relevant Pledge Agreement, (II) the aggregate outstanding principal amount of all such intercompany loans made pursuant to subclause (x) of this clause (e) above, when added to the aggregate amount of cash equity contributions made pursuant to (and in

reliance on) Section 10.04(d)(x) above and the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to Section 10.01(a)(vi)(x), shall not exceed U.S.$60,000,000 at any time and shall not exceed U.S.$50,000,000 at the end of any calendar month (provided that if the Mediofactor Facility shall be cancelled and not replaced in whole or in part the two immediately preceding dollar limits shall each be increased by U.S.$20,000,000) (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (III) the aggregate outstanding principal amount of all such intercompany loans made pursuant to subclause (z)(ii) of this clause (e) above, when added to the aggregate amount of cash equity contributions made pursuant to (and in reliance on) Section 10.04(d)(z) above and the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to Section 10.01(a)(vi)(z), shall not exceed U.S.$10,000,000 at any time (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (IV) no intercompany loans may be made pursuant to subclause (x) of this clause (e) at any time any Default or any Event of Default is in existence (or would be in existence after giving effect thereto), (V) each intercompany loan made pursuant to this clause (e) shall be subject to subordination as, and to the extent required by, the Intercompany Subordination Agreement, (VI) any intercompany loans made pursuant to this clause (e) shall cease to be permitted hereunder if the obligor or obligee thereunder ceases to constitute a Credit Party or a Subsidiary of the U.S. Borrower, as applicable, as contemplated above and (VII) any intercompany loan made by a Canadian Credit Party is subject to approval of the Canadian Court;

(f) Guarantees constituting Indebtedness expressly permitted by Section 10.01(a);

(g) receivables or other trade payables owing to the U.S. Borrower or any of its Subsidiaries if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms, provided that such trade terms may include such concessionary trade terms as the U.S. Borrower or any such Subsidiary deems reasonable under the circumstances;

(h) Investments consisting of Equity Interests, obligations, securities or other property received in settlement of delinquent accounts of and disputes with customers and suppliers in the ordinary course of business and owing to the U.S. Borrower or any of its Subsidiaries or in satisfaction of judgments;

(i) Investments by the U.S. Borrower or any of its Subsidiaries in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(j) loans or advances by the U.S. Borrower or any of its Subsidiaries to employees made in the ordinary course of business (including travel, entertainment and relocation expenses) of the U.S. Borrower or any of its Subsidiaries not exceeding U.S.$1,000,000 in the aggregate at any time outstanding (determined without regard to any write-downs or write-offs of such loans or advances);

(k) Investments in the form of Swap Agreements permitted by Section 10.07;

(l) [Intentionally Omitted];

(m) Investments received in connection with the dispositions of assets permitted by Section 10.05;

(n) Investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances";

(o) Investments and Guarantees arising or made under Permitted Securitizations permitted by Section 10.01(a)(xiv);

(p) [Intentionally Omitted];

(q) other Investments by the U.S. Borrower or any of its Subsidiaries in an aggregate amount, as valued at cost at the time each such Investment is made (including all commitments for future investments), not exceeding U.S.$10,000,000 in the aggregate for all such Investments made from and after the Initial Borrowing Date plus an amount equal to any returns of capital actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such investment valued at cost at the time such investment was made);

(r) [Intentionally Omitted];

(s) [Intentionally Omitted]; and

(t) any Investment which may be deemed to exist as a result of the consummation of any Auto Supplier Support Transaction.

10.05 Asset Sales. No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the U.S. Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary (other than to the U.S. Borrower or any of its Subsidiaries in compliance with Section 10.04), except (and subject to the Initial Order):

(a) sales, transfers and dispositions of (i) inventory in the ordinary course of business and (ii) surplus, obsolete or worn out equipment or property in the ordinary course of business;

(b) sales, transfers and dispositions of assets (v) among the U.S. Credit Parties (other than Holdings), (w) by any Canadian Credit Party to any other Credit Party (other than Holdings), (x) by any Credit Party to any Foreign Subsidiary of the U.S. Borrower, (y) by any Subsidiary of the U.S. Borrower to any Credit Party (other than Holdings) and (z) by any Foreign Subsidiary of the U.S. Borrower that is not a Credit Party to (1) any Credit Party (other than Holdings) or (2) any other Foreign Subsidiary of the U.S. Borrower; provided that (I) no Default and no Event of Default then exists or would exist immediately after giving effect to the respective transfer, (II) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the relevant Security Documents in the assets so transferred shall remain in full

force and effect and perfected and enforceable (to at least the same extent as in effect immediately prior to such transfer) and (III) the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon subclause (x) of this clause (b) either (X) does not exceed U.S.$500,000 in any Fiscal Year or (Y) if such assets consist of surplus, obsolete or worn out equipment listed on Schedule 10.05(b), does not exceed U.S.$2,500,000;

(c) sales, transfers and dispositions of accounts receivable in connection with the compromise, settlement or collection thereof;

(d) sales, transfers and dispositions of property to the extent such property constitutes an investment permitted by clause (b), (h), (m) or (n) of Section 10.04;

(e) sale and leaseback transactions permitted by Section 10.06;

(f) dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the U.S. Borrower or any of its Subsidiaries;

(g) sales, transfers and other dispositions of Receivables and Related Assets (as defined in the definition of "Permitted Securitization") pursuant to Permitted Securitizations permitted by Section 10.01(a)(xiv);

(h) licensing and cross-licensing arrangements entered into in the ordinary course of business involving any technology or other intellectual property of the U.S. Borrower or any of its Subsidiaries;

(i) sales, transfers and other dispositions of assets listed on Part A or B of Schedule 10.05(b); provided that any Equity Interests received by the U.S. Borrower or any of its Subsidiaries in exchange for the assets listed on Part A of such Schedule 10.05(b) are pledged to the Collateral Agent to secure the Obligations to the extent such pledge would not (1) violate applicable law (including corporate benefit, financial assistance, fraudulent preference, thin capitalization rules, and similar laws or regulations), result in a breach or default under an existing contract identified on Part C of Schedule 10.05(b) or would reasonably be expected to result in a material incremental tax liability or personal liability of any director or officer of the pledgor of such Equity Interests or (2) result in costs (administrative or otherwise) that in the determination of the Administrative Agent are materially disproportionate to the benefit obtained thereby, all of which shall be satisfactory in form and substance to the Required Lenders in their sole discretion;

(j) sales, transfers and other dispositions of assets for proceeds not constituting cash or Permitted Investments, provided that the aggregate fair market value of all assets, sold, transferred or otherwise disposed of in reliance upon this paragraph (j) shall not exceed U.S.$2,000,000 during the term of this Agreement;

(k) sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary of the U.S. Borrower unless all Equity Interests in such Subsidiary are sold) that are not permitted by any other clause of this Section 10.05, provided that the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon this clause (k) shall not exceed U.S.$10,000,000 during any Fiscal Year; and

(l)　sales of Receivables and Related Assets pursuant to Auto Supplier Support Transactions,

provided that (i) all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clauses (b) and (f) above) shall be made for fair value, (ii) all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b), (f), (h) (to the extent relating to cross-licensing), (i), (j) and (l) (to the extent relating to Permitted Credit Protection Transactions) above) shall be made for at least 75% cash consideration (which cash consideration (1) for purposes of clause (a)(i) above, shall be deemed to include accounts receivable and (2) for purposes of clause (a)(ii) above, shall be deemed to include additions to property, plant and equipment received in connection with a trade in of surplus, obsolete or worn out equipment) and provided further, that for purposes of the preceding proviso, the assumption by the transferee of liabilities associated with the assets subject to any sale, transfer or other disposition (other than any liabilities that are subordinated to the Obligations or have stated maturity that is outside the Maturity Date) shall not be deemed to be consideration paid in respect of such assets.

10.06 Sale and Leaseback Transactions. No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction"), provided that (and subject to the Initial Order), a Sale and Leaseback Transaction shall be permitted so long as at the time the lease in connection therewith is entered into, and after giving effect to the entering into of such lease, the Remaining Present Value of such lease (together with Indebtedness outstanding pursuant to clause (vii) of Section 10.01(a) and the Remaining Present Value of outstanding leases previously entered into under this Section 10.06) does not exceed U.S.$10,000,000.

10.07 Post Petition Swap Agreements. No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), enter into any Post Petition Swap Agreement, except (a) Post Petition Swap Agreements entered into to hedge or mitigate risks to which the U.S. Borrower or any of its Subsidiaries has actual exposure (other than those in respect of Equity Interests of the U.S. Borrower or any of its Subsidiaries) and (b) Post Petition Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of U.S. Borrower or any of its Subsidiaries.

10.08 Restricted Payments; Certain Payments of Indebtedness.

(a) No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) each of Holdings and the U.S. Borrower may declare and pay dividends with respect to its common stock payable solely in additional shares of its common stock, and Holdings may declare and pay dividends with respect to its preferred stock payable solely in additional shares of such preferred stock or in shares of its common stock, (ii) Subsidiaries of the U.S. Borrower may declare and pay dividends ratably with respect to their capital

stock, membership or partnership interests or other similar Equity Interests, (iii) the U.S. Borrower may make Restricted Payments to Holdings to permit Holdings to make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of Holdings and its Subsidiaries that have been approved by the board of directors of Holdings in an amount during any Fiscal Year equal to the sum of (A) U.S.$1,000,000 and (B) amounts received by Holdings as a result of the sale of Equity Interests in Holdings to employees, officer, directors or consultants of Holdings, the U.S. Borrower or any Subsidiary of the U.S. Borrower since the beginning of the relevant Fiscal Year, which amounts, if not used in any Fiscal Year, may be carried forward to any subsequent Fiscal Year, (iv) the U.S. Borrower may pay dividends to Holdings, at such times and in such amounts (A) not exceeding U.S.$2,500,000 during any Fiscal Year, as shall be necessary to permit Holdings to discharge its corporate overhead (including franchise taxes and directors fees) and other permitted liabilities and to make payments permitted by Section 10.09 and (B) as shall be necessary to pay any taxes that are due and payable by Holdings as part of a consolidated, combined, unitary or similar group that includes the U.S. Borrower or any of its Subsidiaries, to the extent that such taxes relate to the operations of the U.S. Borrower and its Subsidiaries and so long as any refunds received by Holdings attributable to the U.S. Borrower or any of its Subsidiaries shall be promptly returned by Holdings to the U.S. Borrower and (v) without duplication as to amounts distributable with respect to taxes under clause (iv) above, in the event that Holdings and the U.S. Borrower become pass-through or disregarded entities for U.S. federal income tax purposes, the U.S. Borrower may make Tax Distributions to Holdings to the extent that the aggregate amount of Tax Distributions made pursuant to this clause (v) in respect of any taxable year does not exceed the aggregate amount of U.S. federal, state and local income taxes that would have otherwise been payable by the U.S. Borrower for such taxable year had it remained a corporation for U.S. federal income tax purposes for such taxable year, in each case as may be approved by the Bankruptcy Court and the Canadian Court.

(b)     No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Scheduled Existing Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness, except, in each case as may be approved by the Bankruptcy Court and the Canadian Court.

10.09 <u>Transactions with Affiliates</u>. No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (subject to the Initial Order) (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Credit Agreement Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among (x) the U.S. Borrower and the other Credit Parties not involving any other Affiliate, (y) the Canadian Borrower and the other Canadian Credit Parties not involving any other Affiliate or (z) the Credit Parties not involving any other Affiliate, so long as the aggregate transaction value (as determined in good faith by the U.S. Borrower) for all such transactions described in this clause (z) does not exceed U.S.$1,000,000, (c) any investment or Guarantee permitted by Sections 10.04(d), 10.04(e), 10.04(f), 10.04(j) or 10.04(o), (d) any Indebtedness permitted under Section 10.01(a)(v), Section 10.01(a)(vi) or Section 10.01(a)(viii), (e)

any Restricted Payment permitted by Section 10.08, (f) any contribution to the capital of Holdings by any Permitted Holder or any purchase of Equity Interests of Holdings by any Permitted Holder, (g) the payment of reasonable fees to directors of Holdings or any of its Subsidiaries who are not employees of Holdings or any of its Subsidiaries, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers, employees and consultants of Holdings or any of its Subsidiaries in the ordinary course of business, (h) any transactions permitted by Section 10.05(g), and (i) transactions in existence on the Effective Date or pursuant to agreements in existence on the Effective Date and, in each case, set forth on Schedule 10.09 or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect.

10.10 <u>Restrictive Agreements</u>. No Credit Agreement Party will, nor will permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Credit Agreement Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets or (b) the ability of any Subsidiary of the U.S. Borrower to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the U.S. Borrower or any other Subsidiary of the U.S. Borrower or to Guarantee Indebtedness of the U.S. Borrower or any other Subsidiary of the U.S. Borrower, <u>provided</u> that (i) the foregoing shall not apply to restrictions and conditions imposed by (A) applicable laws (B) any Credit Document, and (C) any instrument or agreement governing any Indebtedness incurred by a Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party) pursuant to Section 10.01(a)(xv), but only to the extent such restrictions or conditions are imposed only on such Foreign Subsidiary and its Foreign Subsidiaries, (ii) the foregoing shall not apply to restrictions and conditions existing on the Effective Date and identified on Schedule 10.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements and other documents (including organizational documents) governing any Permitted Joint Venture, (iv) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary of the U.S. Borrower or the sale of assets pending such sale, <u>provided</u> such restrictions and conditions apply only to the Subsidiary or assets that are to be sold and such sale is permitted hereunder, (v) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to Permitted Securitizations or Auto Supplier Support Transactions permitted by this Agreement if such restrictions or conditions apply only to the Receivables and the Related Assets that are the subject of the Permitted Securitization or Auto Supplier Support Transaction, as the case may be, and neither clause (a) nor clause (b) of the foregoing shall apply to restrictions or conditions imposed on any SPE Subsidiary in connection with any Permitted Securitization, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement (other than in respect of an Auto Supplier Support Transaction) if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (vii) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof.

10.11 <u>Amendment of Material Documents</u>. No Credit Agreement Party will, nor will it permit any of its respective Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), amend, modify or waive any of its rights under (a) any Existing Indebtedness Agreement, (b) any Tax Allocation Agreement, (c) any Management Agreement, or (d) its certificate of incorporation, by-laws or other organizational documents, in each case to the extent

such amendment, modification or waiver would be materially adverse to the Lenders; provided that in no event shall any amendment or modification to the foregoing (i) increase the applicable interest rate, (ii) shorten the maturity date from that theretofore in effect, (iii) modify or change any subordination provisions contained therein or (iv) make any covenant more restrictive in any material respect than previously existed thereunder.

10.12 New Subsidiaries. No Credit Agreement Party will, nor will it permit any of its respective Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), form or acquire any new Subsidiary, other than an SPE Subsidiary.

10.13 13-Week Budget. Each of the Credit Parties will, and will cause each of its Subsidiaries to, comply with the most recently delivered 13-Week Budget. Operating cash disbursements shall be tested every four weeks on a combined basis, for the U.S. Credit Parties and the Canadian Credit Parties, as compared to the most recent 13-Week Budget with a permitted variance for the four-week period of 15%. For purposes of the covenant described in the preceding sentence, the disbursement of funds collected on behalf of one Subsidiary on behalf of another Subsidiary, shall be excluded from operating cash disbursements.

10.14 Maximum Capital Expenditures. The U.S. Borrower will not, nor will it permit any of its Subsidiaries to, incur or make any Capital Expenditures for the three month period ending on the last day of September 2009, the six month period ending on the last day of December 2009 or the nine month period ending on the last day of March 2010, respectively, set forth below in excess of the maximum amount set forth below opposite such period:

| PERIOD | CAPITAL EXPENDITURES |
|---|---|
| Three month period ending September 30, 2009 | U.S.$30,000,000 |
| Six month period ending December 31, 2009 | U.S.$52,500,000 |
| Nine month period ending March 30, 2010 | U.S.$77,500,000 |

10.15 Limitation on Issuance of Equity Interests. Neither the U.S. Borrower nor the Canadian Borrower will issue any capital stock or other Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock or other Equity Interests, except (i) for transfers and replacements of then outstanding shares of capital stock or other Equity Interests and (ii) for stock splits, stock dividends and additional issuances which do not decrease the percentage ownership of Holdings (in the case of the U.S. Borrower) or the U.S. Borrower (in the case of the Canadian Borrower) in any class of the capital stock or other Equity Interests of such Borrower.

10.16 Minimum EBITDA. The U.S. Borrower will not permit Consolidated EBITDA for the three month period ending on the last day of September 2009, the six month period ending on the last day of December 2009 or the nine month period ending on the last day of March 2010, respectively, to be less than the minimum amount set forth below opposite such period:

| Period | Minimum Consolidated EBITDA |
|---|---|
| Three month period ending September 30, 2009 | U.S.$35,000,000 |
| Six month period ending December 31, 2009 | U.S.$77,500,000 |
| Nine month period ending March 30, 2010 | U.S.$102,500,000 |

10.17 <u>Minimum Liquidity</u>. Holdings shall maintain Consolidated Liquidity, (i) in the case of the calendar months August 2009 and September 2009, as determined at all times, commencing on the Final Borrowing Date, for and reported on a monthly basis for the preceding monthly period, of at least U.S.$100,000,000 and (ii) in the case of any calendar month after September 2009, as determined as of the last day of such calendar month and reported on a monthly basis for the preceding calendar month, of at least U.S.$100,000,000.

10.18 <u>Chapter 11 Claims</u>. Unless the Required Lenders consent (which consent may be given or withheld in their sole discretion) and except as expressly provided in the Orders, the Debtors shall not, and shall not permit any of their Subsidiaries to, agree to, incur, create, assume, suffer to exist or permit or apply to the Bankruptcy Court or the Canadian Court for authority to do so (including any extension, grant or application in respect of the Prepetition Obligations) (a) any administrative expense, unsecured claim, or other Superpriority Claim or Lien (including any administrative expense, unsecured claim, or other super-priority claim or lien in respect of the Prepetition Obligations) which is *pari passu* with or senior to the claims of the Secured Creditors against the Credit Parties hereunder, or apply to the Bankruptcy Court or the Canadian Court for authority to do so, except for the Carve-Out and the Administration Charge or (b) the extension of any existing adequate protection or the grant of further adequate protection.

10.19 <u>No Right of Subrogation</u>. No Credit Party will, nor will it permit any of its Subsidiaries to, assert any right of subrogation or contribution against any other Credit Party or any of their Subsidiaries as long as any Obligation or any Commitment remains outstanding.

10.20 <u>Modification of Engagement Letters</u>. No Credit Party will, nor will it permit any of its Subsidiaries to, (i) materially modify any terms (including any economic terms) of the A&M Engagement Letter or the Lazard Engagement Letter or (ii) enter into any other engagement letter with any other financial, restructuring or similar advisor in connection with the Transaction without the terms and conditions of such engagement letter being satisfactory to the Required Lenders in their sole discretion.

10.21 <u>Hazardous Materials</u>. No Credit Party shall cause or suffer to exist any Release of any Hazardous Materials at, to or from any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party that would violate any Environmental Laws, form the basis for any Environmental Liability or otherwise adversely affect the value or marketability of any real property (whether or not owned by any Credit Party), other than such violations, Environmental Liability and effects that would not, in the aggregate, have a Material Adverse Effect.

SECTION 11.  <u>Events of Default and Remedies</u>.  If any of the following specified events (any such event, an "<u>Event of Default</u>") shall occur:

(a)     any  Borrower shall fail to pay any principal of any Loan or Note, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     any Borrower shall fail to pay any interest on any Loan or Note or any Fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Agreement or any other Credit Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)     any representation or warranty made or deemed made by or on behalf of any Credit Agreement Party or any of its Subsidiaries in or in connection with any Credit Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Credit Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty), in either case when made or deemed made, except to the extent such representation or warranty relates expressly to an earlier date (in which case such representation or warranty shall prove to have been incorrect in any material respect (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) as of such earlier date);

(d)     any Credit Agreement Party shall fail to observe or perform any covenant, condition or agreement contained in Sections 9.02(a), 9.03(a), 9.04 (with respect to the existence of any Credit Agreement Party) or 9.11 or in Section 10;

(e)     any Credit Agreement Party or any other Credit Party shall fail to observe or perform any covenant, condition or agreement contained in any Credit Document (other than those specified in clause (a), (b) or (d) of this Section 11), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to Holdings or the U.S. Borrower (which notice will be given at the request of any Lender);

(f)     any Credit Agreement Party or any of its Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness (which, in the case of any Debtor, was incurred after the Petition Date or where payment thereof by a Debtor or enforcement, acceleration or termination thereof by the holder(s) of such Material Indebtedness was not otherwise subject to a stay of proceedings in any of the Cases), when and as the same shall become due and payable (after giving effect to any applicable grace period with respect thereto, <u>provided</u> that, during the applicable grace period, no additional consideration is paid or additional rights are granted in respect of such Material Indebtedness);

(g)     any event or condition occurs that results in any Material Indebtedness (which, in the case of any Debtor, was incurred after the Petition Date or where payment thereof by a Debtor or enforcement, acceleration or termination thereof by the holder(s) of such Material Indebtedness was not otherwise subject to a stay of proceedings in either of the

Cases) becoming due or, in the case of a Permitted Securitization (other than the Mediofactor Facility), terminating (except voluntary terminations) prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of such Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due or, in the case of a Permitted Securitization (other than the Mediofactor Facility), to be terminated, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets (to the extent not prohibited under this Agreement) securing such Indebtedness;

(h)   (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking liquidation, reorganization or other relief in respect of any Credit Party or any of its Subsidiaries (other than an Immaterial Subsidiary) or its debts, or of a substantial part of its assets, under any Federal, state or foreign Debtor Relief Law now or hereafter in effect (including the Bankruptcy Code) or (ii) a proceeding shall be commenced or a petition filed seeking the appointment of a receiver, interim receiver, receiver and manager, trustee, sequestrator, conservator, liquidator, provisional liquidator, rehabilitator, examiner with expanded powers under the Bankruptcy Code, responsible officer, or any similar party or officer under any Debtor Relief Law (other than the appointment of the Monitor with respect to the Canadian Case) for any Credit Party, any of their Subsidiaries (other than Immaterial Subsidiaries), or a substantial part of any such entity's assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)   any Credit Party or any of their respective Immaterial Subsidiaries shall (i) other than the Cases, voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign Debtor Relief Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 11, (iii) apply for or consent to the appointment of a receiver, interim receiver, receiver and manager, trustee, sequestrator, conservator, liquidator, provisional liquidator, rehabilitator, examiner with expanded powers under the Bankruptcy Code, responsible officer, or any similar party or officer under any Debtor Relief Law (other than the appointment of the Monitor with respect to the Canadian Case), (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any formal action for the purpose of effecting any of the foregoing;

(j)   any Credit Party or any of its Subsidiaries (other than a Debtor) shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)   one or more judgments for the payment of money in an aggregate amount in excess of U.S.$10,000,000 shall be rendered against any Credit Agreement Party or any of its Subsidiaries (but in the case of the Debtors, only as to post-Petition Date activities or where enforcement thereof was not subject to a stay of proceedings in any of the Cases) or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally

taken by a judgment creditor to attach or levy upon any assets of any Credit Agreement Party or any of its Subsidiaries to enforce any such judgment;

(l)       (x) an ERISA Event (other than the filing of the Cases) shall have occurred and/or (y) a Credit Party or a Governmental Authority shall have taken steps to terminate a Canadian Pension Plan and/or a Foreign Pension Plan ("Plan Termination Events") or any fact or circumstance gives rise to a reasonable expectation that any Plan Termination Event could occur that, when taken together with all other ERISA Events and/or Plan Termination Events that have occurred, could reasonably be expected to result in liability of, and/or required contribution by, Holdings and its Subsidiaries in an aggregate amount exceeding U.S.$10,000,000 for all periods;

(m)      The failure to make payment of any Priority Payables in excess of an amount equal to Cdn.$100,000 as and when due;

(n)      any Lien purported to be created under any Security Document or the DIP Lenders' Charge shall cease to be, or shall be asserted by any Credit Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Document or the DIP Lenders' Charge, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Credit Documents or (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments (if any) delivered to it under the Security Documents or to file all continuation statements;

(o)      any Credit Document shall not be, or for any reason be asserted by any Credit Party not to be, a legal, valid and binding obligation of any party thereto;

(p)      any Guaranty shall cease to be in full force and effect (other than in accordance with the terms thereof) or shall be asserted by any Credit Party not to be in effect or not to be legal, valid and binding obligations;

(q)      a Change in Control shall occur;

(r)      The Final Order Entry Date shall not have occurred by the date that is 30 days after the Interim Order Entry Date;

(s)      Any proceeding before a court, tribunal, or Governmental Authority or agency in any jurisdiction seeking to (i) amend in a manner adverse to the DIP Lenders, vacate, reverse, nullify, or otherwise challenge any provision of the Interim Order, the Initial Order, or any Other CCAA Order (whether in whole or in part), or any of the transactions required to effectuate the DIP Facility (or any document related to such transactions), (ii) amend in a manner adverse to the DIP Lenders, release, subordinate, nullify, or otherwise challenge any material lien, charge or similar security securing the DIP Facility (iii) prohibit the Administrative Agent, the Prepetition Administrative Agent, the Lenders, or the Prepetition Lenders from acting in accordance with this Agreement or the Interim Order or the Initial Order, (iv) apply or require the Administrative Agent or Prepetition Administrative Agent to apply the proceeds of any material collateral securing the Obligations or the Prepetition Obligations except in the manner and in the order set forth in this Agreement and the Interim Order or the Initial Order, (v) foreclose or otherwise act against any material

collateral securing the Obligations wherever located in the world or (vi) reduce the percentage ownership of any Credit Party or Material Subsidiary of Holdings in any entity, and in each case such pleading, complaint, summons, opening or other filing or similar document or act is not denied or otherwise adjudicated in favor of the applicable Credit Party or other Subsidiary of Holdings to the satisfaction of the Required Lenders in their sole discretion shall be (A) commenced by any Credit Party or any of their Subsidiaries; or (B) commenced by any other party and not dismissed, stayed, withdrawn, enjoined, held in abeyance via abstention or otherwise resolved to the satisfaction of the Required Lenders in their sole discretion within (i) in the case of any proceeding before the Bankruptcy Court or Canadian Court, ten (10) days after such proceeding is commenced or (ii) in the case of any proceeding before any Government Authority (other than the Bankruptcy Court or the Canadian Court), thirty (30) days after such proceeding is commenced;

(t)     The Bankruptcy Court or the Canadian Court, as applicable, shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code and under the Initial Order to any party in interest, including without limitation any holder or holders of any security interest:

(i)     to permit foreclosure, the granting of a deed in lieu of foreclosure, or any similar action or other act of enforcement on any assets of the U.S. Debtors or the Canadian Debtor, as applicable, having an aggregate book value in excess of U.S.$500,000; or

(ii)     to permit any other action or actions that would, either singly or in the aggregate, have a Material Adverse Effect on the U.S. Debtors or the Canadian Debtor, as applicable, or their estates or the value of the Collateral in the aggregate or the interests of any Lenders in the Collateral in the aggregate;

(u)     the Interim Order, the Initial Order, or the Credit Documents (in whole or in part) shall cease to be in full force and in effect, shall have been reversed, modified, amended, stayed for more than ten days, vacated, appealed or subject to a stay pending appeal;

(v)     Any of the Credit Parties or any of their Affiliates shall fail to comply with the Interim Order, the Final Order, the Initial Order or, to the extent non-compliance would be adverse to the Lenders, any Other CCAA Order in any respect;

(w)     There shall be filed a motion, pleading or proceeding by any of the Credit Parties or their Affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to any motion, pleading or proceeding brought by another party which results in such an impairment;

(x)     A motion seeking approval of a disclosure statement (the "Disclosure Statement") for a Chapter 11 plan of reorganization for each of the U.S. Debtors that proposes to pay all Obligations in full in cash on the effective date of such plan, (the "Plan of Reorganization") shall not have been filed with the Bankruptcy Court before the 70th day before the Maturity Date or a motion seeking approval for the circulation to the requisite creditors of the Canadian Debtor of a plan of compromise or arrangement of the Canadian

Debtor that proposes to pay all Obligations in full in cash on the effective date of such plan, (the "CCAA Plan"), shall not have been filed with the Canadian Court before the 60th day before the Maturity Date;

(y)     An order approving the Disclosure Statement and permitting solicitation of the Plan of Reorganization shall not have been entered by the Bankruptcy Court before the 45th day before the Maturity Date;

(z)     The Plan of Reorganization shall not have been confirmed by the Bankruptcy Court before the 10th day before the Maturity Date or the CCAA Plan shall not have been approved by the requisite creditors of the Canadian Debtor before the 15th day before the Maturity Date and by the Canadian Court before the 5th day before the Maturity Date;

(aa)    The Plan of Reorganization and a CCAA Plan shall not have been consummated and become effective and fully implemented before the Maturity Date;

(bb)    (i) Any of the Cases shall be dismissed or converted to a Chapter 7 Case or a Chapter 11 plan of liquidation shall have been filed for any of the U.S. Cases or the Canadian Case shall be terminated or proceedings thereunder shall be stayed, or the Canadian Case shall be converted into proceeding under the Bankruptcy & Insolvency Act (Canada); (ii) a trustee, receiver, interim receiver or receiver and manager shall be appointed in any of the Cases or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)); or (iii) the Bankruptcy Court shall abstain from asserting jurisdiction over any of the U.S. Debtors or the Canadian Court shall abstain from asserting jurisdiction over the Canadian Debtor;

(cc)    An application shall be made by any U.S. Debtor, any Guarantor or any Subsidiary of Holdings seeking an order by the Bankruptcy Court, or an order shall be entered by the Bankruptcy Court, approving a Disclosure Statement in any of the U.S. Cases with respect to a plan not  that does not propose to pay all Obligations in full in cash on the effective date of such plan or an application shall have been made by the Canadian Debtor or any other Person seeking an order of the Canadian Court, or an order of the Canadian Court shall be entered, approving a CCAA plan of compromise or arrangement in respect of the Canadian Cases with respect to a plan that does not propose to pay all Obligations in full in cash on the effective date of such plan;

(dd)    Any of the U.S. Debtors shall cease to have the exclusive right pursuant to Section 1121 of the Bankruptcy Code to file a plan of reorganization;

(ee)    The occurrence of a "default" or "event of default" under any other agreement where a creditor is granted status as an "unaffected creditor" in the Canadian Case; or

(ff)    Any order shall be issued by the Canadian Court in the Canadian Case that is adverse to the Lenders in any material respect.

(A) During the continuance of any Event of Default pursuant to this Section 11, the Administrative Agent (i) may, and at the request of the Required Lenders shall, by advance written

notice to the Borrowers that is also filed with the Bankruptcy Court and with the Canadian Court and the Monitor in accordance with the Initial Order declare that all or any portion of the Commitments be terminated, whereupon the obligation of each Lender to make any Term Loan shall immediately terminate and (ii) may, and at the request of the Required Lenders shall, by advance written notice to the Borrowers that is also filed with the Bankruptcy Court and with the Canadian Court and the Monitor in accordance with the Initial Order, declare the Loans, all interest thereon and all other amounts and Obligations payable under this Agreement to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts and Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers. In addition, subject solely to any requirement of the giving of notice, if any, by the terms of the Interim Order or the Final Order or the Initial Order, as the case may be, the automatic stay provided in section 362 of the Bankruptcy Code and under the Initial Order in respect of the DIP Lenders' Charge and the Credit Documents as the case may be, shall be deemed automatically vacated without further action or order of the Bankruptcy Court or the Canadian Court, as the case may be, the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents, including, without limitation, all rights and remedies with respect to the Collateral and the Guarantors. In addition to the remedies set forth above, the Administrative Agent may, and at the request of the Required Lenders shall, direct the Administrative Agent to exercise any remedies provided for by the Security Documents in accordance with the terms thereof or any other remedies provided by applicable law or in equity.

(B) At any time after termination of the Commitments or acceleration of the maturity of the Loans, (a) if the Borrowers shall pay all arrears of interest and all payments on account of principal of the Loans and other Obligations that shall have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein) and all Events of Default and Defaults (other than non-payment of principal of and accrued interest on the Loans due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to Section 13.12, then upon the written consent of the Required Lenders and written notice to the Borrowers, the termination of the Commitments or the acceleration and their consequences may be rescinded and annulled and (b) in the case of such remedies exercised under Section 11(A)(i), upon the written consent of the Required Lenders and written notice to the Borrowers, the termination of the Commitments or the acceleration and their consequences applicable to the Lenders may be rescinded and annulled; provided, however, that such action shall not affect any subsequent Event of Default or Default or impair any right or remedy consequent thereon. The provisions of the preceding sentence are intended merely to bind the Lenders to a decision that may be made at the election of the Required Lenders, and such provisions are not intended to benefit the Borrowers and do not give the Borrowers the right to require the Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

SECTION 12. The Agents.

12.01 Appointment. (a) Each Lender hereby irrevocably designates and appoints DBTCA as Administrative Agent for such Lender (as used hereinafter for purposes of this Section 12, the term "Administrative Agent" shall mean DBTCA in its capacities as Administrative Agent and as Collateral Agent hereunder and pursuant to the Security Documents and the term "Agent" shall include the term "Administrative Agent" as so defined), (b) Banc of America Securities LLC, General Electric Capital Corporation and UBS Securities LLC as Co-Syndication Agents for such Lender, (c) Banc of America Securities LLC and UBS Securities LLC as Co-Arrangers for such

Lender, and (d) DBTCA as Documentation Agent for such Lender, each to act as specified herein and in the other Credit Documents, and each such Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent, each Co-Syndication Agent, each Co-Arranger and the Documentation Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder or thereunder as are specifically delegated to or required of the Administrative Agent, such Co-Syndication Agent, each Co-Arranger or the Documentation Agent, as the case may be, by the terms hereof or thereof, together with such other powers as are reasonably incidental thereto. Each of the Agents may perform any of their respective duties under this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein by or through its respective officers, directors, agents, employees or affiliates (it being understood and agreed, for avoidance of doubt and without limiting the generality of the foregoing, that the Administrative Agent and/or Collateral Agent may perform any of its duties under the Security Documents by or through one or more of its affiliates).

(b)     The provisions of this Section 12 are solely for the benefit of the Administrative Agent, the Co-Syndication Agents, the Co-Arrangers, the Documentation Agent and the Lenders, and neither Holdings nor any of its Subsidiaries shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, each of the Administrative Agent, the Co-Syndication Agents, the Co-Arrangers and the Documentation Agent shall act solely as agent for the Lenders, and none of the Administrative Agent, the Co-Syndication Agents, the Co-Arrangers or the Documentation Agent assumes (and shall not be deemed to have assumed) any obligation or relationship of agency or trust with or for Holdings or any of its Subsidiaries.

12.02 <u>Nature of Duties</u>.   (a) No Agent shall have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents. Neither any Agent nor any of its officers, directors, agents, employees, representatives or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The duties of the Agents shall be mechanical and administrative in nature; no Agent shall have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

(b)     Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, each of the Joint Lead Arrangers is named as such for recognition purposes only, and in their respective capacities as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Joint Lead Arrangers shall be entitled to all indemnification and reimbursement rights in favor of "Agents" as, and to the extent, provided for under Sections 12.07 and 13.01. Without limitation of the foregoing, none of the Joint Lead Arrangers shall, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship in respect of any Lender or any other Person.

12.03  Certain Rights of the Agents.  The Agents shall have the right to request instructions from the Required Lenders at any time.  If any Agent shall request instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders; and such Agent shall not incur liability to any Lender by reason of so refraining.  Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against any Agent or any of its employees, directors, officers, agents, representatives or affiliates as a result of such Agent or such other person acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

12.04  Reliance by Agents.  Each Agent shall be entitled to rely, and shall be fully protected (and shall have no liability to any Person) in relying, upon any note, writing, resolution, notice, statement, certificate, telex, facsimile, teletype or telecopier message, cablegram, radiogram, order, telephone message or other document or conversation that such Agent believed, in the absence of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision), to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent (which may be counsel for the Credit Parties) and, with respect to other matters, upon advice of independent public accountants or other experts, consultants or specialists selected by it.

12.05  Notice of Default, etc.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has actually received written notice from a Lender or a Credit Agreement Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give prompt notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders (as determined by the Administrative Agent in its sole discretion).

12.06  Nonreliance on Agents and Other Lenders.  Independently and without reliance upon any Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings and its Subsidiaries and, except as expressly provided in this Agreement, no Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.  No Agent or their respective affiliates nor any of their respective officers, directors, agents or employees shall be responsible to any Lender or the holder of any Note for, or be required or have any duty to ascertain, inquire or verify the accuracy of, (i) any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith, (ii) the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any other Credit

Document, (iii) the financial condition of Holdings and any of its Subsidiaries, (iv) the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, (v) the satisfaction of any of the conditions precedent set forth in Sections 6 or 7, or (vi) the existence or possible existence of any Default or Event of Default.

12.07 <u>Indemnification</u>. (a) To the extent any Agent (or any affiliate thereof) is not reimbursed and indemnified by the Credit Agreement Parties, the Lenders will reimburse and indemnify such Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders), for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Agent (or any affiliate thereof) in performing its respective duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document, <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, claims, judgments, suits, costs, expenses or disbursements resulting from such Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(b)     Any Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Credit Document (except actions expressly required to be taken by it hereunder or under the Credit Documents) unless it shall first be indemnified to its satisfaction by the Lenders <u>pro rata</u> against any and all liability, cost and expense that it may incur by reason of taking or continuing to take any such action.

(c)     The agreements in this Section 12.07 shall survive the payment of all Obligations.

12.08 <u>Agents in their Individual Capacities</u>. With respect to its obligation to make Loans under this Agreement, each Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender", "Required Lenders", "Supermajority Lenders", "Majority Lenders", "holders of Notes" or any similar terms shall, unless the context clearly indicates otherwise, include each Agent in its individual capacity. Each Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to, any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.09 <u>Holders</u>. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person or entity who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

12.10 <u>Resignation of the Agents</u>.  (a) The Administrative Agent may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents (including, without limitation, its functions and duties as Collateral Agent) at any time by giving 15 Business Days' prior written notice to the Lenders.  Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)      Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder and/or under the other Credit Documents who shall be a commercial bank or trust company acceptable to Holdings, which acceptance shall not be unreasonably withheld or delayed (<u>provided</u> that Holdings' approval shall not be required if an Event of Default then exists).

(c)      If a successor Administrative Agent shall not have been so appointed within such 15 Business Day period, the Administrative Agent, with the consent of Holdings (which consent shall not be unreasonably withheld or delayed, <u>provided</u> that Holdings' consent shall not be required if an Event of Default then exists), shall then appoint a successor Administrative Agent who shall serve as Administrative Agent hereunder and/or under the other Credit Documents until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)      If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 20th Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(e)      Each Co-Syndication Agent may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents at any time by giving five Business Days' prior written notice to the Lenders.  Such resignation shall take effect at the end of such five Business Day period.

(f)      Each Co-Arranger may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents at any time by giving five Business Days' prior written notice to the Lenders.  Such resignation shall take effect at the end of such five Business Day period.

(g)      The Documentation Agent may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents at any time by giving five Business Days' prior written notice to the Lenders.  Such resignation shall take effect at the end of such five Business Day period.

(h)      Upon a resignation of any Agent pursuant to this Section 12.10, such Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 12 shall continue in effect for the benefit of such Agent for all of its actions and inactions while serving as such Agent.

12.11 <u>Collateral Matters</u>.  (a) Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured

Creditors. Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b) The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than the Credit Parties) upon the sale or other disposition thereof in compliance with Sections 10.05 or 10.06, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 13.12) or (iv) as otherwise may be expressly provided in the relevant Security Documents. The Lenders hereby authorize (i) the Collateral Agent to release (or subordinate) any Lien granted to or held by the Collateral Agent upon any Collateral consisting of Receivables or Related Assets sold pursuant to any Auto Supplier Support Transaction and (ii) the Administrative Agent and the Collateral Agent to consent to any Auto Supplier Support Transaction and enter into any related documentation required in connection with the Credit Parties' participation in the Auto Supplier Support Program. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release (or subordinate) particular types or items of Collateral pursuant to this Section 12.11.

(c) The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Agreement Party or any of its Subsidiaries or is cared for, protected or insured or that the Liens granted to or held by the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 12.11 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(d) The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to appoint a collateral agent, security trustee, trustee or Person serving in a similar capacity, including an Affiliate of the Collateral Agent, in such foreign jurisdiction and authorize such collateral agent, security trustee, trustee or Person serving in a similar capacity to enter into any Foreign Security Documents governed by the laws of such jurisdiction for the benefit of the Lenders and the other Secured Creditors. Each such collateral agent, security trustee, trustee or Person serving in a similar capacity shall be entitled to all of the benefits afforded the Collateral Agent

hereunder (including, but not limited to the benefits under Section 12.07 and Section 13.01) and the powers of the Collateral Agent under the Section 12, as if such collateral agent, security trustee, trustee or Person serving in a similar capacity were the Collateral Agent hereunder.

(e)    The Lenders hereby authorize the Collateral Agent and each such collateral agent, security trustee, trustee or Person serving in a similar capacity referred to in the Section 12.11(d) to enter into any intercreditor arrangements to reflect the relative Lien priority of, or right to receive proceeds from Collateral securing, the DIP Facility relative to the Prepetition Facility and such other matters as may be incidental thereto.

12.12  Delivery of Information.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Agreement Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

12.13  Special Appointment of Collateral Agent (German Security Documents).  (a) Without prejudice to the generality of Section 12.11:

(i)    Each Lender hereby appoints, on the terms hereof, and each Hedging Creditor (as defined in the U.S. Security Agreement) by their acceptance of the benefits of the German Security (as defined below) and by notice in writing to the Collateral Agent to that effect hereby appoints, on the terms hereof, the Collateral Agent as trustee (*Treuhaender*), agent and administrator for the purpose of holding on trust (*Treuhand*) accepting, administering and enforcing the German Security for and on behalf of the Lenders and the other Secured Creditors.

(ii)    The Collateral Agent accepts its appointment as a trustee (*Treuhaender*), agent and administrator of the German Security on the terms and subject to the conditions set out in this Agreement.

(iii)    The Secured Creditors agree that, in relation to the German Security, no Secured Creditor shall exercise any independent power to enforce any German Security or take any other action in relation to the enforcement of the German Security, or make or receive any declarations in relation thereto; and

(b)    The Collateral Agent shall:

(i)    hold and administer any German Security which is security assigned or otherwise transferred (*Sicherungsübereignung/Sicherungsabtretung*) under German law under a non-accessory security right (*nicht akzessorische Sicherheit*) to it as a trustee (*Treuhaender*) for the benefit of the Secured Creditors; and

(ii)    administer any German Security which is pledged under German law (*Verpfaendung*) or otherwise transferred in accordance with German law to any of the Secured Creditors under an accessory security right (*akzessorische Sicherheit*),

where "German Security" means the assets the subject of a security document which is governed by German Law. Each Secured Creditor hereby authorizes the Collateral Agent to accept, as its representative (*Stellvertreter*), any German Security created in favor of such Secured Creditor.

(c)    Furthermore, each Secured Creditor hereby authorizes (*bevollmaechtigt*) the Collateral Agent (with the right of sub-delegation) to enter into any documents evidencing German Security and to make and accept all declarations and take all actions as it considers necessary or useful in connection with any German Security on behalf of such Secured Creditor. The Collateral Agent shall further be entitled to rescind, amend and/or execute new and different documents securing the German Security. The Collateral Agent is released from the restrictions arising under Clause 181 of the German Civil Code (*Buergerliches Gesetzbuch*) (restrictions on self-dealing).

12.14  Special Appointment of Collateral Agent (French Security Documents).  (a) Each of Secured Creditors (as such defined below) as "*mandants*" under French law:

(i)    hereby irrevocably appoints the Collateral Agent to act as its agent ("*mandataire*" under French law) under and in connection with the French Security Documents (as such term is defined below); and

(ii)    irrevocably authorizes the Collateral Agent to execute for and on its behalf the French Security Documents (as such term is defined below) and to perform the duties and to exercise the rights, powers and discretions that are specifically delegated to it under or in connection with the French Security Documents (as such term is defined below), together with any other rights, powers and discretions which are incidental thereto and to give a good discharge for any moneys payable under the French Security Documents (as such term is defined below).

For purposes of this Section 12.14, "French Security Documents" means those Security Documents stated to be governed by the laws of France and reference to "Secured Creditors" shall be construed as a reference to such Secured Creditors as defined in the French Security Documents.

(b)    The Collateral Agent will act solely for itself and as agent for the other Secured Creditors in carrying out its functions as agent under the French Security Documents.

(c)    The relationship between the Secured Creditors (other than the Collateral Agent) on the one hand and the Collateral Agent on the other is that of principal ("*mandant*" under French law) and agent ("*mandataire*" under French law) only. The Collateral Agent shall not have, nor be deemed to have, assumed any obligations to, or trust or fiduciary relationship with, any party to this Agreement other than those for which specific provision is made by the French Security Documents and, to the extent permissible under French law, the other provisions of this Agreement, which shall be deemed to be incorporated in this Section 12.14, where reference is made to any French Security Documents.

(d)    Notwithstanding Section 13.08 (*Governing Law; Submission to Jurisdiction; Venue*) of this Agreement, the provision of this Section 12.14 and the other provisions of this

Agreement which are deemed to be incorporated in this Section 12.14 as stated in paragraph (c) above, shall be governed by, and construed in accordance with, French law and any dispute arising out of this Section 12.14 shall be submitted to the Commercial Court of Paris (*Tribunal de Commerce de Paris*).

(e)     The Secured Creditors, the Collateral Agent and the other parties hereto which are also party to any French Security Document irrevocably acknowledge that the existence and extent of the Collateral Agent's authority resulting from this Section 12.14 and the effects of the Collateral Agent's exercise of this authority shall be governed by French law.

12.15  Special Appointment of Collateral Agent (Dutch Security Documents).

(a)     Each Credit Agreement Party irrevocably and unconditionally undertakes (and to the extent necessary undertakes in advance (*bij voorbaat*)) to pay to the Collateral Agent amounts equal to any amounts owing from time to time by that Credit Agreement Party to any Secured Creditor under any Credit Document as and when those amounts are due.

(b)     Each Credit Agreement Party, the Collateral Agent and the other Secured Creditors acknowledge that the obligations of each Credit Agreement Party under Section 12.15(a) are several and are separate and independent (*eigen zelfstandige verplichtingen*) from, and shall not in any way limit or affect, the corresponding obligations of that Credit Agreement Party to any Secured Creditor under any Credit Document (its "Corresponding Debt") nor shall the amounts for which each Credit Agreement Party is liable under Section 12.15(a) (its "Parallel Debt") be limited or affected in any way by its Corresponding Debt provided that:

(i)     the Parallel Debt of each Credit Agreement Party shall be decreased to the extent that its Corresponding Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and

(ii)     the Corresponding Debt of each Credit Agreement Party shall be decreased to the extent that its Parallel Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and

(iii)     the amount of the Parallel Debt of each Credit Agreement Party shall at all times be equal to the amount of its Corresponding Debt.

(c)     For the purpose of this Section 12.15, the Collateral Agent acts in its own name and on behalf of itself and not as agent, representative or trustee of any other Secured Creditor, and its claims in respect of each Parallel Debt shall not be held on trust.

(d)     The security granted under the Security Documents to the Collateral Agent to secure each Parallel Debt is granted to the Collateral Agent in its capacity as sole creditor of each Parallel Debt.

(e)     All monies received or recovered by the Collateral Agent pursuant to this Section 12.15, and all amounts received or recovered by the Collateral Agent from or by the enforcement of any security granted to secure each Parallel Debt, shall be applied in accordance with Section 7.14 of the U.S. Security Agreement.

(f)　Without limiting or affecting the Collateral Agent's rights against the Credit Agreement Parties (whether under this Section 12.15 or under any other provision of the Credit Documents), each Credit Agreement Party acknowledges that:

(i)　nothing in this Section 12.15 shall impose any obligation on the Collateral Agent to advance any sum to any Credit Agreement Party or otherwise under any Credit Document, except in its capacity as Lender; and

(ii)　for the purpose of any vote taken under any Credit Document, the Collateral Agent shall not be regarded as having any participation or commitment other than those which it has in its capacity as a Lender.

(g)　For the avoidance of doubt (i) the Parallel Debt of each Credit Agreement Party will become due and payable (*opeisbaar*) at the same time its Corresponding Debt becomes due and payable and (ii) without prejudice to Section 12.15, a Credit Agreement Party may not repay or prepay its Parallel Debt unless directed to do so by the Collateral Agent or the Collateral is enforced by the Collateral Agent.

SECTION 13. Miscellaneous.

13.01 Payment of Expenses, etc.　(a) The Credit Agreement Parties jointly and severally agree, whether or not the transactions herein contemplated are consummated, to:

(i)　pay all documented (pursuant to summary form invoices which may be redacted for privileged information) fees, out-of-pocket audit, legal, appraisal, valuation, filing, document duplication and reproduction and investigation expenses and for all other documented costs and expenses of every type and nature of each Agent (including internal costs of such Agent incurred on a *per diem* basis, the fees and disbursements of Milbank, Tweed, Hadley & McCloy LLP and local and foreign counsel and consultants, the fees, expenses and disbursements of the Lender Advisors, auditors, accountants, appraisers, printers, insurance and environmental advisors, and other consultants and agents) in connection with (A) the negotiation, preparation, execution and delivery of this Agreement, other Credit Documents, the documents and instruments referred to herein and therein or any proposal letter or commitment letter issued in connection therewith; (B) the Administrative Agent's periodic audits of the Borrowers or any of their Subsidiaries, as the case may be; (C) the funding of all loans; (D) the creation, perfection or protection of the Liens under any applicable Credit Document (including any reasonable fees, disbursements and expenses for local counsel in various jurisdictions), (E) the ongoing administration of this Agreement, including consultation with attorneys in connection therewith and with respect to each Agent's and each Lender's rights and responsibilities hereunder and under the other Credit Documents; (F) any amendment, waiver, consent, assignment, restatement or supplement relating to this Agreement, other Credit Documents and the documents and instruments referred to herein and therein; and (G) syndication efforts with respect to this Agreement;

(ii)　pay all out-of-pocket costs and expenses of each Agent, the Collateral Agent and each of the Lenders (including, without limitation, the fees and disbursements of counsel (including costs of in-house counsel and costs of settlement) and consultants for each Agent, the Collateral Agent and each of the Lenders) in connection with (A) the enforcement of this Agreement, other Credit Documents and the documents and instruments referred to herein or therein or the

enforcement of Obligations or any security therefore; (B) the exercise or enforcement of any right or remedy available by reason of a Default or Event of Default; (C) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceeding; (D) the commencement, defense or intervention in any court proceeding or filing a petition, complaint, answer, motion or other pleading relating in any way to the Obligations, any Credit Party, any of the U.S. Borrower's Subsidiaries, this Agreement or any other Credit Document and the documents and instruments referred to therein or the Cases; (E) the response to, and preparation for, any subpoena or request for document production with which any Agent or Lender is served or deposition or other proceedings in which such Agent or Lender is called to testify, in each case, relating in any way to the Obligations, any Credit Party, any of the Borrowers' Subsidiaries, this Agreement or any other Credit Documents and the documents and instruments referred to herein or therein; (F) the protection of the rights of each Agent, the Collateral Agent and each of the Lenders under this Agreement, other Credit Documents and the documents and instruments referred to herein or therein; or (G) taking any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) described in clauses (A) through (F) above (including the Cases).

(iii)    pay all documented (pursuant to summary form invoices which may be redacted for privileged information) fees, out-of-pocket costs and expenses of each Agent, the Collateral Agent (including, without limitation, the fees and disbursements of Milbank, Tweed, Hadley & McCloy LLP and local and foreign counsel and consultants), the Lenders, and the Prepetition Lenders in connection with (A) the Prepetition Facility and other Prepetition Loan Documents and the documents and instruments referred to therein; (B) any amendment, waiver, consent, assignment, restatement or supplement relating to the Prepetition Facility, other Prepetition Documents and the documents and instruments referred to therein; (C) the creation, perfection or protection of the Liens under any applicable Prepetition Loan Document (including any reasonable fees, disbursements and expenses for local counsel in various jurisdictions); (D) the commencement, defense or intervention in any court proceeding or filing a petition, complaint, answer, motion or other pleading relating in any way to the Prepetition Loan Documents; and (E) the response to, and preparation for, any subpoena or request for document production with which any Agent is served or deposition or other proceedings in which such Agent is called to testify, in each case, relating in any way to the Prepetition Loan Documents;

(iv)    pay all documented (pursuant to summary form invoices which may be redacted for privileged information) fees and expenses of the Lender Advisors;

(b)    The Credit Agreement Parties jointly and severally agree, whether or not the transactions herein contemplated are consummated, to pay and hold each of the Agents, the Collateral Agent and each of the Lenders harmless from and against any and all present and future stamp, documentary, transfer, sales and use, goods and services, harmonized sales, value added, excise and other similar taxes with respect to the foregoing matters, the performance of any obligation under this Agreement or any other Credit Document or any payment thereunder, and save each of the Agents, the Collateral Agent and each of the Lenders harmless from and against any and all liabilities (including, without limitation, penalties and interest) with respect to or resulting from any delay or omission to pay such taxes; and

(c)    The Credit Agreement Parties jointly and severally agree, whether or not the transactions herein contemplated are consummated, to indemnify each Agent, the Collateral Agent, each Lender and each of its respective affiliates and its and their respective officers, directors,

employees, representatives, trustees, advisors and agents from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not any Agent, the Collateral Agent, or any Lender is a party thereto and whether or not any such investigation, litigation or other proceeding is brought by or on behalf of any Agent, the Collateral Agent, any Lender, any Credit Party or any third Person or otherwise) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the Transaction or the consummation of any other transactions contemplated by any Document or the exercise or enforcement of any of their rights or remedies provided herein or in any other Credit Documents, or (b) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased or operated by any Credit Agreement Party or any of its Subsidiaries, the Release, generation, storage, transportation, handling or disposal of Hazardous Materials at any location, whether or not owned, leased or operated by any Credit Agreement Party or any of its Subsidiaries, the non-compliance of any Real Property with foreign, federal, state and local laws, regulations, and ordinances (including applicable permits thereunder) applicable to any Real Property, or any Environmental Liability in connection with or relating to any Credit Agreement Party, any of its Subsidiaries or any of their operations or activities or any Real Property at any time owned, leased or operated by any Credit Agreement Party or any of its Subsidiaries, in each case, including, without limitation, the fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding (but excluding any such liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including attorneys' and consultants' fees and disbursements) to the extent incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)). To the extent that the undertaking to indemnify, pay or hold harmless any Agent, the Collateral Agent, any Lender or any other indemnified person set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Credit Agreement Parties hereby agree to make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

13.02 <u>Right of Setoff</u>. (a) In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, each Agent, each Lender and the Collateral Agent is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Agreement Party or any of its Subsidiaries or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by such Agent, such Lender or the Collateral Agent (including, without limitation, by branches and agencies of such Agent, such Lender or the Collateral Agent wherever located) to or for the credit or the account of any Credit Agreement Party or any of its Subsidiaries against and on account of the Obligations and liabilities of such Credit Agreement Party or such Subsidiary, as the case may be, to such Agent, such Lender or the Collateral Agent under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 13.06(b) and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not such Agent, such Lender or the Collateral Agent shall have made any demand hereunder and although

said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured. Each Borrower agrees that any Lender purchasing participations as required by Section 13.06(b), may, to the fullest extent permitted by law, exercise all rights (including without limitation the right of setoff) with respect to such participations as fully as if such Lender is a direct creditor of such Borrower with respect to such participations in the amount thereof.

(b) **NOTWITHSTANDING THE FOREGOING SUBSECTION (a), AT ANY TIME THAT THE LOANS OR ANY OTHER OBLIGATION SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO LENDER OR THE ADMINIS-TRATIVE AGENT SHALL EXERCISE A RIGHT OF SETOFF, LIEN OR COUNTER-CLAIM OR TAKE ANY COURT OR ADMINISTRATIVE ACTION OR INSTITUTE ANY PROCEEDING TO ENFORCE ANY PROVISION OF THIS AGREEMENT OR ANY NOTE UNLESS IT IS TAKEN WITH THE CONSENT OF THE REQUIRED LENDERS OR APPROVED IN WRITING BY THE ADMINISTRATIVE AGENT, IF SUCH SETOFF OR ACTION OR PROCEEDING WOULD OR MIGHT (PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d AND 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR SECTION 2924 OF THE CALIFORNIA CIVIL CODE, IF APPLICABLE, OR OTHERWISE) AFFECT OR IMPAIR THE VALIDITY, PRIORITY OR ENFORCEABILITY OF THE LIENS GRANTED TO THE COLLATERAL AGENT PURSUANT TO THE SECURITY DOCUMENTS OR THE ENFORCEABILITY OF THE NOTES AND OTHER OBLIGATIONS HEREUNDER, AND ANY ATTEMPTED EXER-CISE BY ANY LENDER OR THE ADMINISTRATIVE AGENT OF ANY SUCH RIGHT WITHOUT OBTAINING SUCH CONSENT OF THE REQUIRED LENDERS OR THE ADMINISTRATIVE AGENT SHALL BE NULL AND VOID. THIS SUBSECTION (b) SHALL BE SOLELY FOR THE BENEFIT OF EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREUNDER.**

13.03 Notices. (a) Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telecopier or facsimile communication) and mailed, telecopied or delivered: if to any Credit Agreement Party, at the address specified opposite its signature below; if to any Lender, at its address specified on Schedule 2.12(a); and if to the Administrative Agent, at its Notice Office; or, as to any Credit Agreement Party or any of the Agents, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to Holdings and the Administrative Agent. All such notices and communications shall be mailed, telecopied or faxed, or sent by overnight courier, and shall be effective when deposited in the mails, delivered overnight courier, or sent by facsimile, or telecopier, as the case may be, except that notices and communications to the Administrative Agent and/or any Credit Agreement Party shall not be effective until received by the Administrative Agent or the applicable Credit Agreement Party, as the case may be.

(b) Without in any way limiting the obligation of Holdings and its Subsidiaries to confirm in writing any telephonic notice permitted to be given hereunder, any Agent may prior to receipt of written confirmation act without liability upon the basis of such telephonic notice, believed by such Agent in good faith to be from an Authorized Officer. In each such case, each Credit Agreement Party hereby waives the right to dispute such Agent's record of the terms of such telephonic notice.

13.04  <u>Benefit of Agreement</u>.  (a)  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; <u>provided, however</u>, no Credit Agreement Party may assign or transfer any of its rights, obligations or interest hereunder or under any other Credit Document without the prior written consent of each of the Lenders and, <u>provided further</u>, that, although any Lender may (without the consent of any Credit Party) transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments or Loans hereunder except as provided in Section 13.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, <u>provided further</u>, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment or of a manda-tory repayment of Loans shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof and that any amendment or modification to the financial definitions in this Agreement or to Section 13.07 shall not constitute a reduction in any rate of interest or Fees for purposes of this clause (i), notwith-standing the fact that such amendment or modification actually results in such a reduction), (ii) consent to the assignment or transfer by any Credit Agreement Party of any of its rights and obligations under this Agreement, or (iii) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) supporting the Obligations in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrowers hereunder shall be determined as if such Lender had not sold such participation.

(b)  Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may:

(x) assign all or a portion of its Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to (i) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company, (ii) one or more Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(ii)), or (iii) in the case of any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is managed by the same investment advisor of a Lender or by an Affiliate of such investment advisor; or

(y) assign all, or if less than all, a portion equal to at least U.S.$1,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to one or more Eligible Transferees (treating (I) any fund that invests in loans and (II) any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor, as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement;

provided that (i) each assignment of Tranche A Loans, Tranche B Loans, Tranche C Loans, Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, or Tranche C Term Loan Commitments (and the Obligations associated with all such Loans and Commitments) may only be made as part of an assignment by such assigning Lender of a pro rata portion of all such Loans and Commitments then held by it, (ii) at the time of such assignment Schedule 1 shall be deemed modified to reflect the Commitments and/or outstanding Loans, as the case may be, of such new Lender and of the existing Lenders, (iii) new Notes will be issued, at the respective Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, as the case may be, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Loans, as the case may be, of the affected Tranche, (iv) except in the case of assignments by the Agents in connection with their syndication of this Agreement, the consent of the Administrative Agent and, so long as no Default or Event of Default then exists and is continuing, the U.S. Borrower shall be required in connection with any such assignment pursuant to clause (y) of this Section 13.04(b) (which consent shall not be unreasonably withheld or delayed), (v) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of U.S.$3,500 (other than with respect to such assignments from an assigning Lender to its Affiliate) and (vi) such transfer or assignment will not be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.17. To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and/or outstanding Term Loans, as the case may be. At the time of each assignment pursuant to this Section 13.04(b) to a Person which is not already a Lender hereunder and which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for Federal income tax purposes, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the U.S. Borrower and the Administrative Agent the appropriate Internal Revenue Service Forms (and, if applicable, a Section 5.04(b)(ii) Certificate) described in Section 5.04(b)(ii) to the extent such forms would provide a complete exemption from or reduction in United States withholding tax. To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 2.13 or this Section 13.04(b) would, at the time of such assignment, result in increased costs under Sections 2.10, 2.11 or 5.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank or other foreign Governmental Authority in support of borrowings made by such Lender from such Federal Reserve Bank or other foreign Governmental Authority and, with prior notification to the Administrative Agent (but without the

consent of the Administrative Agent or any Credit Agreement Party), any Lender which is a fund may pledge all or any portion of its Loans or Notes to its trustee or to a collateral agent or to another creditor providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of, or any other representative of a holder of, such obligations, or such other creditor, as the case may be. No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

13.05 <u>No Waiver; Remedies Cumulative</u>. No failure or delay on the part of any Agent, the Collateral Agent, or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between any Credit Party and any Agent, the Collateral Agent, or any Lender shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any Agent, the Collateral Agent or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

13.06 <u>Payments Pro Rata</u>. (a) Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of any Credit Party in respect of any Obligations of such Credit Party, it shall, except as otherwise provided in this Agreement, distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its <u>pro rata</u> share of any such payment) <u>pro rata</u> based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b) Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise) which is applicable to the payment of the principal of, or interest on, the Loans of any Tranche or other Fees, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the principal of, or interest on, the Loans of such Tranche or other Fees then owed and due to such Lender bears to the total of such Obligations then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all of the Lenders in such amount; <u>provided</u> that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c) Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 13.06(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

13.07 <u>Calculations; Computations</u>. (a) The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with U.S. GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto), <u>provided</u> that (i) if

the U.S. Borrower notifies the Administrative Agent that the U.S. Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in U.S. GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the U.S. Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in U.S. GAAP or in the application thereof, then such provision shall be interpreted on the basis of U.S. GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith and (iii) for purposes of determining compliance with any incurrence or expenditure tests set forth in Sections 9 and/or 10, any amounts so incurred or expended (to the extent incurred or expended in a currency other than U.S. Dollars) shall be converted into U.S. Dollars on the basis of the exchange rates (as shown on Reuters ECB page 37 or, if same does not provide such exchange rates, on such other basis as is reasonably satisfactory to the Administrative Agent) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate U.S. Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the aggregate amount outstanding at any time and it is expressed in terms of U.S. Dollars, all outstanding amounts originally incurred or spent in currencies other than U.S. Dollars shall be converted into U.S. Dollars on the basis of the exchange rates (as shown on Reuters ECB page 37 or, if same does not provide such exchange rates, on such other basis as is reasonably satisfactory to the Administrative Agent) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time).

(b)     All computations of interest (other than interest based on the Base Rate at times when the Base Rate is based on the Prime Lending Rate), and other Fees hereunder shall be made on the basis of a year of 360 days for the actual number of days occurring in the period for which such interest or Fees are payable. All computations of interest based on the Prime Lending Rate and clause (x) of the definition of Base Rate shall be based on a year of 365 days.

(c)     For purposes of the *Interest Act* (Canada), (i) whenever any interest or fee under this Agreement is calculated using a rate based on a year of 360 days or 365 days, as the case may be, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate based on a year of 360 days or 365 days, as the case may be, (y) multiplied by the actual number of days in the calendar year in which such annual rate is to be ascertained, and (z) divided by 360 or 365, as the case may be; (ii) the principle of deemed reinvestment or interest does not apply to any interest calculation under this Agreement; and (iii) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

(d)     If any provision of this Agreement or of any of the other Credit Documents would obligate any Credit Party to make any payment of interest with respect to the Obligations or other amount payable to any Lender in an amount or calculated at a rate which would result in a receipt by that Lender of "interest" with respect to the Obligations at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)) then, notwithstanding such provision, such amount or rates shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not so result in a receipt by that Lender of interest with respect to the Obligations at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (i) first, by reducing the amount or rates of interest required to be paid to the affected Lender under Section 2.08; and (ii) thereafter, by reducing any charges, fees, commissions, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute "interest" with respect to the Obligations for purposes of Section 347 of the Criminal Code (Canada).

Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received an amount in excess of the maximum permitted by that section of the Criminal Code (Canada), then the Canadian Borrower shall be entitled, by notice in writing to the affected Lender, to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to Canadian Borrower. Any amount or rate of interest on the Obligations referred to in this Section 13.07(d) shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that the applicable Loan or Loans remain outstanding on the assumption that any charges, fees, commissions, expenses, premiums and other amounts that fall within the meaning of "interest" (as defined in the Criminal Code (Canada)) shall, if they relate to a specific period of time, be pro-rated over that period of time and otherwise be pro-rated over the period from the Initial Borrowing Date to the applicable Maturity Date and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent shall be conclusive for the purposes of such determination.

13.08 <u>Governing Law; Submission to Jurisdiction; Venue</u>. (a) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE SECURITY DOCUMENTS AND EXCEPT TO THE EXTENT NEW YORK LAW IS SUPERSEDED BY THE BANKRUPTCY CODE, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(b)     (i)     Prior to the closing or dismissal of the U.S. Cases, the U.S. Credit Parties shall submit to the exclusive jurisdiction of the Bankruptcy Court over any legal action or proceeding with respect to this Agreement or any other Credit Document. Following the closing or dismissal of a U.S. Case of any U.S. Credit Party, such U.S. Credit Party shall submit to the exclusive jurisdiction of the courts of the State of New York or of the United States for the Southern District of New York, in each case located within the City of New York.

(ii)     Prior to the termination or dismissal of the Canadian Case, the Canadian Borrower shall submit to the non-exclusive jurisdiction of the Canadian Court over any legal action or proceeding with respect to this Agreement or any other Credit Document. Following the termination or dismissal of the Canadian Case, the Canadian Borrower shall submit to the non-exclusive jurisdiction of the courts of the State of New York or of the United States for the Southern District of New York, in each case located within the City of New York.

(iii)     If (A) a Credit Agreement Party is neither the U.S. Credit Parties nor the Canadian Borrower or (B) the Bankruptcy Court, in case of the U.S. Credit Parties, or the Canadian Court, in case of the Canadian Borrower, does not have or does not exercise jurisdiction over such Credit Agreement Party, as the case may be, then a legal action or proceeding may be brought in the courts of the State of New York or of the United States for the Southern District of New York, in each case located within the City of New York.

(iv)     By execution and delivery of this Agreement, each Credit Agreement Party hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

(c)     The Canadian Borrower hereby irrevocably designates, appoints and empowers Corporation Service Company, with offices on the date hereof at 80 State Street, Albany, NY 12207, as its designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents which may be served in any such action or proceeding. If for any reason such designee, appointee and agent shall cease to be available to act as such, the Canadian Borrower agrees to designate a new designee, appointee and agent in New York City on the terms and for the purposes of this provision reasonably satisfactory to the Administrative Agent under this Agreement.

(d)     Each Credit Agreement Party hereby further irrevocably waives any claim that any such courts lack jurisdiction over such Credit Agreement Party, and agrees not to plead or claim, in any legal action or proceeding with respect to this Agreement or any other Credit Document brought in any of the aforesaid courts, that any such court lacks jurisdiction over such Credit Agreement Party. Each Credit Agreement Party further irrevocably consents to the service of process in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Credit Agreement Party, as the case may be, at its address for notices pursuant to Section 13.03, such service to become effective 30 days after such mailing. Each Credit Agreement Party hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other Credit Document that service of process was in any way invalid or ineffective.

(e)     Nothing herein shall affect the right of any Agent, the Collateral Agent, any Lender or the holder of any Note to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against any Credit Agreement Party in any other jurisdiction.

(f)     SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND THE CANADIAN COURT AS PROVIDED IN CLAUSES (b)(i) AND (ii) ABOVE, EACH CREDIT AGREEMENT PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (b) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(g)     EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT.

13.09 <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with each Credit Agreement Party and the Administrative Agent.

13.10 <u>Effectiveness</u>.  This Agreement shall become effective on the date (the "<u>Effective Date</u>") on which each Credit Agreement Party, each Agent, the Collateral Agent and each

of the Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same (including by way of facsimile transmission) to the Administrative Agent at the Notice Office or at the office of the Administrative Agents' counsel or, in the case of the Lenders, shall have given to the Administrative Agent or the Administrative Agents' counsel telephonic (confirmed in writing), written or telex notice (actually received) at such applicable office that the same has been signed and mailed to it. The Administrative Agent will give Holdings and each Lender prompt written notice of the occurrence of the Effective Date.

13.11 <u>Headings Descriptive</u>. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.12 <u>Amendment or Waiver; etc.</u> (a) Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the U.S. Borrower may be released from, any Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), <u>provided</u> that no such change, waiver, discharge or termination shall, without the consent of each Lender (other than a Defaulting Lender) (with Obligations being directly affected thereby in the case of the following clause (i)), (i) extend the final scheduled maturity of any Loan or Note (other than by amending clause (c) of the definition of "Maturity Date") or extend the duration of any Interest Period beyond six months, or reduce the rate or extend the time of payment of interest (other than as a result of any waiver of the applicability of any post-default increase in interest rates) or Fees thereon, or reduce the principal amount thereof (except to the extent paid in cash), (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under any Security Document or alter the relative priority of the Liens, (iii) amend, modify or waive any provision of this Section 13.12 (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Tranche A Term Loans, Tranche B Term Loans and Tranche C Term Loans on the Effective Date), (iv) reduce the percentage specified in the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Term Loans are included on the Effective Date), (v) consent to the assignment or transfer by any Credit Agreement Party of any of its rights and obligations under this Agreement, or (vi) release the Holdings Guaranty, the U.S. Borrower's Guaranty or any Subsidiaries Guaranty; <u>provided further</u>, that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase in the Commitment of such Lender), (2) without the consent of each Agent affected thereby, amend, modify or waive any provision of Section 12 as same applies to such Agent or any other provision as same relates to the rights or obligations of such Agent, (3) without the consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (4) except in cases where additional extensions of term loans are being afforded substantially the same treatment afforded to the Term Loans pursuant to this Agreement as originally in effect,

without the consent of the Majority Lenders of each Tranche which is being allocated a lesser prepayment, repayment or commitment reduction as a result of the actions described below, alter the required application of any prepayments or repayments (or commitment reduction), as between the various Tranches, pursuant to Sections 5.01 or 5.02 (excluding Section 5.02(b)) (although the Required Lenders may waive, in whole or in part, any such prepayment, repayment or commitment reduction, so long as the application, as amongst the various Tranches, of any such prepayment, repayment or commitment reduction which is still required to be made is not altered), (5) without the consent of the Majority Lenders of the respective Tranche affected thereby, amend the definition of Majority Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Majority Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Effective Date), or (6) without the consent of the Supermajority Lenders of the respective Tranche, reduce the amount of or extend the date of, any Tranche A Term Loan Scheduled Repayment, Tranche B Term Loan Scheduled Repayment, Tranche C Term Loan Scheduled Repayment or Incremental Term Loan Scheduled Repayment (except that, if additional Loans are made pursuant to a given Tranche, the Scheduled Repayments of such Tranche may be increased on a proportionate basis without the consent otherwise required by this clause (6)), or amend the definition of Supermajority Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Supermajority Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Effective Date). Notwithstanding anything to the contrary contained above in this Section 13.12(a), the Administrative Agent and/or the Collateral Agent shall be permitted to enter into such amendments and/or modifications to the Foreign Security Documents which may be required in the discretion of the Administrative Agent and/or the Collateral Agent which are of a technical nature and/or are, in the judgment of the Collateral Agent, required by applicable law, in the interests of the Secured Creditors or necessary or, in the reasonable opinion of the Collateral Agent, advisable to preserve, maintain, perfect and/or protect the security interests purported to the granted by the respective Foreign Security Documents.

(b)     Notwithstanding anything to the contrary contained in clause (a) above of this Section 13.12, the respective Borrower, the Administrative Agent and each Incremental Term Loan Lender may, in accordance with the provisions of Section 2.15, enter into an Incremental Term Loan Commitment Agreement, provided that after the execution and delivery by the respective Borrower, the Administrative Agent and each such Incremental Term Loan Lender of such Incremental Term Loan Commitment Agreement, such Incremental Term Loan Commitment Agreement may thereafter only be modified in accordance with the requirements of clause (a) above of this Section 13.12.

13.13  Survival.  All indemnities set forth herein including, without limitation, in Sections 2.10, 2.11, 5.04, 12.07, 13.01 and 13.17, shall survive the execution and delivery of this Agreement and the making and repayment of the Loans and the other Obligations.

13.14  Domicile of Loans and Commitments.  Each Lender may transfer and carry its Loans and/or Commitments at, to or for the account of any branch office, subsidiary or affiliate of such Lender.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.14 would, at the time of such transfer, result in increased costs under Sections 2.10, 2.11 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

13.15 <u>Confidentiality</u>. (a) Subject to the provisions of clause (b) of this Section 13.15, each of the Lenders agrees that it will use its reasonable efforts not to disclose without the prior consent of any Credit Agreement Party (other than to its affiliates and its and their respective directors, employees, auditors, counsel or other professional advisors, to affiliates or to another Lender if the Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information) any information with respect to Holdings or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement; <u>provided</u> that any Lender may disclose any such information (a) as has become generally available to the public other than by virtue of a breach of this Section 13.15(a) by the respective Lender, (b) as may be required or appropriate (x) in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors or (y) in connection with any request or requirement of any such regulatory body, (c) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (d) to comply with any law, order, regulation or ruling applicable to such Lender, (e) to the Administrative Agent, the Collateral Agent or any other Agent, (f) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 13.15 and (g) to any creditor or any prospective transferee or participant in connection with any contemplated transfer or participation of any of the Obligations or any interest therein by such Lender; <u>provided</u> that such creditor or prospective transferee or participant agrees to be bound by the confidentiality provisions contained in this Section 13.15 to the same extent as such Lender.

(b)     Each Credit Agreement Party hereby acknowledges and agrees that each Lender may share with any of its affiliates or its investment advisors, and such affiliates and investment advisors may share with such Lender, any information related to Holdings or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of such entities), <u>provided</u> that such Persons shall be subject to the provisions of this Section 13.15 to the same extent as such Lender and shall only use such information in connection with matters relating to this Agreement.

13.16 <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.17 <u>Register</u>. Each of the Borrowers hereby designates the Administrative Agent, and the Administrative Agent agrees, to serve as such Borrower's agent, solely for purposes of this Section 13.17, to maintain a register at one of its offices in New York, New York (the "<u>Register</u>") on which it will record the Commitments from time to time of each of the Lenders, the Loans made by each of the Lenders and each repayment in respect of the principal amount of the Loans of each Lender. Failure to make any such recordation, or any error in such recordation shall not affect each Borrower's obligations in respect of such Loans. With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and/or Loans. Prior to such recordation, all amounts owing to the transferor with respect to such

Commitments and/or Loans shall remain owing to the transferor. The registration of an assignment or transfer of all or part of any Commitments and/or Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04(b). Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and the registration of assignment or transfer of all or part of a Commitment and/or Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender any Note evidencing such Commitment and/or Loan and such Note shall be marked "cancelled", and one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or, if requested thereby, the new Lender. The registration of any provision of Incremental Term Loan Commitments pursuant to Section 2.15 shall be recorded by the Administrative Agent on the Register only upon the acceptance of the Administrative Agent of a properly executed and delivered Incremental Term Loan Commitment Agreement. Coincident with the delivery of such Incremental Term Loan Commitment Agreement for acceptance and registration of the provision of an Incremental Term Loan Commitment, or as soon thereafter as practicable, to the extent requested by such Incremental Term Loan Lenders and Incremental Term Notes shall be issued, at the respective Borrower's expense, to such Incremental Term Loan Lenders, to be in conformity with Section 2.05 (with appropriate modification) to the extent needed to reflect the Incremental Term Loan Commitments and outstanding Incremental Term Loans made by such Incremental Term Loan Lender. Each Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature that may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 13.17 in respect of the Loans and Commitments made to such Borrower.

13.18  English Language. This Agreement and all other Credit Documents shall be in the English language, except as required by applicable local law (in which event certified English translations thereof shall, upon the request of the Administrative Agent, be provided by Holdings to the Administrative Agent). All documents, certificates, reports or notices to be delivered or communications to be given or made by any party hereto pursuant to the terms of this Agreement or any other Credit Document shall be in the English language or, if originally written in another language, shall, upon request of the Administrative Agent, be accompanied by an accurate English translation upon which the other parties hereto shall have the right to rely for all purposes of this Agreement and the other Credit Documents.

13.19  Special Provisions Regarding Pledges of Equity Interests in Persons Not Organized in Qualified Jurisdictions. The parties hereto acknowledge and agree that the provisions of the various Security Documents executed and delivered by the Credit Parties require that, among other things, all Equity Interests in, various Persons owned by the respective Credit Party be pledged, and delivered for pledge, pursuant to the Security Documents. The parties hereto further acknowledge and agree that each Credit Party shall be required to take all actions under the laws of the jurisdiction in which such Credit Party is organized to create and perfect all security interests granted pursuant to the various Security Documents and to take all actions under the laws of the United States, Canada, Germany, France, Brazil, Mexico and The Netherlands to perfect the security interests in the Equity Interests of any Person organized under the laws of said jurisdictions (to the extent said Equity Interests are owned by any Credit Party). Except as provided in the immediately preceding sentence, to the extent any Security Document requires or provides for the pledge of Equity Interests in any Person organized under the laws of a jurisdiction other than those specified in the immediately preceding sentence, it is acknowledged that, as of the Initial Borrowing Date, no actions have been required to be taken to perfect, under local law of the jurisdiction of the Person

who issued the respective promissory notes or whose Equity Interests are pledged, under the Security Documents. The Credit Agreement Parties hereby agree that, following any reasonable request by the Administrative Agent or Required Lenders to do so, each Credit Agreement Party shall, and shall cause its Subsidiaries to, take such actions (including, without limitation, the execution of Additional Security Documents, the making of any filings and the delivery of appropriate legal opinions) under the local law of any jurisdiction with respect to which such actions have not already been taken as are determined by the Administrative Agent or Required Lenders to be necessary or, in the reasonable opinion of the Administrative Agent, advisable in order to fully perfect, preserve or protect the security interests granted pursuant to the various Security Documents under the laws of such jurisdictions. If requested to do so pursuant to this Section 13.19, all such actions shall be taken in accordance with the provisions of this Section 13.19 and Sections 9.12 and 9.13 and within the time periods set forth therein. All conditions and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing and so that same are not violated by reason of the failure to take actions under local law (but only with respect to Equity Interests in Persons organized under laws of jurisdictions other than the United States, Canada, Germany, France, Brazil, Mexico or The Netherlands) not required to be taken in accordance with the provisions of this Section 13.19, provided that to the extent any representation or warranty would not be true because the foregoing actions were not taken, the respective representation of warranties shall be required to be true and correct in all material respects at such time as the respective action is required to be taken in accordance with the foregoing provisions of this Section 13.19 or pursuant to Sections 9.12 and 9.13.

13.20 <u>Powers of Attorney; etc.</u> Each of Holdings and the U.S. Borrower is hereby authorized by, and on behalf of, the Canadian Borrower to give Notices of Borrowing, Notices of Conversion/Continuation and other notices and directions in connection with the extensions of credit and repayments thereof to be made pursuant to this Agreement to the Canadian Borrower (including without limitation notices as to the application of proceeds of such extensions of credit). The Canadian Borrower hereby grants to each of Holdings and the U.S. Borrower an irrevocable power-of attorney, in the Canadian Borrower's name, to take the actions contemplated above in this Section 13.20 and in the last sentence of Section 2.13 hereof. Furthermore, the Canadian Borrower agrees that the Agents and the Lenders may at any time rely upon any notices, instructions or other information furnished by Holdings or the U.S. Borrower.

13.21 <u>Waiver of Sovereign Immunity.</u> Each of the Credit Agreement Parties, in respect of itself, its Subsidiaries, its process agents, and its properties and revenues, hereby irrevocably agrees that, to the extent that such Credit Agreement Party, its Subsidiaries or any of its properties has or may hereafter acquire any right of immunity, whether characterized as sovereign immunity or otherwise, from any legal proceedings, whether in the United States, Canada or elsewhere, to enforce or collect upon the Loans or any Credit Document or any other liability or obligation of such Credit Agreement Party or any of its Subsidiaries related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, such Credit Agreement Party, for itself and on behalf of its Subsidiaries, hereby expressly waives, to the fullest extent permissible under applicable law, any such immunity, and agrees not to assert any such right or claim in any such proceeding, whether in the United States, Canada or elsewhere. Without limiting the generality of the foregoing, each Credit Agreement Party further agrees that the waivers set forth in

this Section 13.21 shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for purposes of such Act.

13.22 <u>Determinations of Satisfaction by the Lenders</u>. Where a document or matter is required by this Agreement to be satisfactory to the Lenders (or a subset thereof) (whether reasonably, or in its or their sole discretion, or otherwise), such document or matter shall be deemed to be so satisfactory in the absence of notice from any Lender to the U.S. Borrower and the Administrative Agent that such document or matter is not satisfactory.

13.23 <u>Judgment Currency</u>.

(a) The Credit Parties' obligations hereunder and under the other Credit Documents to make payments in U.S. Dollars (the "<u>Obligation Currency</u>") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by the Administrative Agent, the Collateral Agent or the respective Lender of the full amount of the Obligation Currency expressed to be payable to the Administrative Agent, the Collateral Agent or such Lender under this Agreement or the other Credit Documents. If for the purpose of obtaining or enforcing judgment against any Credit Party in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "<u>Judgment Currency</u>") an amount due in the Obligation Currency, the conversion shall be made, at the Canadian Dollar Equivalent or the U.S. Dollar Equivalent thereof, as the case may be, and, in the case of other currencies, the rate of exchange (as quoted by the Administrative Agent or if the Administrative Agent does not quote a rate of exchange on such currency, by a known dealer in such currency designated by the Administrative Agent) determined, in each case, as of the day on which the judgment is given (such day being hereinafter referred to as the "<u>Judgment Currency Conversion Date</u>")

(b) If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due by any Borrower, such Borrower covenants and agrees to pay, or cause to be paid, such additional amounts, if any (but in any event not a lesser amount), as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate or exchange prevailing on the Judgment Currency Conversion Date.

(c) For purposes of determining the U.S. Dollar Equivalent or the Canadian Dollar Equivalent or any other rate of exchange for this Section, such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency. If the amount of the Judgment Currency so purchased exceeds the sum originally due to the Lenders in the Judgment Currency, the Lenders shall, except during the occurrence and continuation of an Event of Default under paragraph (a), (b), (h), (i) or (j) of Section 11 (in which case such excess shall be applied by such Lender to any outstanding Obligations owed to such Lender by any Credit Party), remit such excess to the relevant Borrower.

13.24 <u>Limitation on Additional Amounts, etc</u>. Notwithstanding anything to the contrary contained in Section 2.10 or 2.11 of this Agreement, unless a Lender gives notice to the

respective Borrower that it is obligated to pay an amount under such Section within six months after the date the Lender incurs the respective increased costs, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital, then such Lender shall only be entitled to be compensated for such amount by the respective Borrower pursuant to said Section 2.10 or 2.11, as the case may be, to the extent of the costs, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital that are incurred or suffered on or after the date which occurs six months prior to such Lender giving notice to the respective Borrower that it is obligated to pay the respective amounts pursuant to said Section 2.10 or 2.11, as the case may be (provided further that, if any Requirement of Law giving rise, directly or indirectly, to such obligation to pay under Section 2.10 or 2.11, as the case may be, is retroactive, then the six month period referred to above shall be extended to include the period of retroactive effect thereof). This Section 13.24 shall have no applicability to any Section of this Agreement other than said Sections 2.10 or 2.11.

13.25  <u>USA PATRIOT Act</u>.  Each Lender subject to the Act hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Patriot Act</u>"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of each of the Borrowers and other information that will allow such Lender to identify each of the Borrowers in accordance with the Patriot Act.

13.26  <u>Abstract Acknowledgment of Indebtedness and Joint Creditorship; Release of German Pledge Agreement</u>.

(a)  In connection with the Local Law Pledge Agreement pursuant to which the Canadian Borrower has pledged all of its Equity Interests in its wholly-owned Subsidiary CSA Holding (Deutschland) GmbH to the Collateral Agent (the "<u>German Law Pledge Agreement</u>"), the Canadian Borrower has granted an abstract acknowledgement of indebtedness (*abstraktes Schuldanerkenntnis*) to the Collateral Agent in a separate agreement governed by German law to pay to the Collateral Agent amounts equal to, and in the currency of, any amounts owed by the Canadian Borrower to a Secured Creditor (as defined in the Canadian Pledge Agreement) under any Credit Document, Post Petition Swap Agreement or Post Petition Cash Management Arrangement as and when such amounts falls due for payment under the relevant Credit Document, Post Petition Swap Agreement or Post Petition Cash Management Arrangement or would have fallen due but for any discharge resulting from failure of another Secured Creditor to take appropriate steps, in insolvency proceedings affecting the Canadian Borrower or any other Credit Party, to preserve its entitlement to be paid that amount (the "<u>Abstract Acknowledgement of Indebtedness</u>"). For purposes of the Abstract Acknowledgement of Indebtedness only, the Collateral Agent shall be the joint creditor (together with the relevant Secured Creditor) of all obligations of the Canadian Borrower towards each of the Secured Creditors under the Credit Documents, the Post Petition Swap Agreements and the Post Petition Cash Management Arrangements.

(b)  Any amount due and payable by the Canadian Borrower to the Collateral Agent under the Abstract Acknowledgement of Indebtedness shall be decreased to the extent that the other Secured Creditors have received (and are able to retain) payment in full of the corresponding amount under the other provisions of the Credit Documents, the Post Petition Swap Agreements or the Post Petition Cash Management Arrangements and any amount due and payable by the Canadian Borrower to the other Secured Creditors under those provisions shall be decreased to the extent that the Collateral Agent has received (and is able to retain) payment in full in cash of the corresponding

amount under the Abstract Acknowledgement of Indebtedness, provided that the Canadian Borrower may not consider its obligations towards a Secured Creditor to be so discharged by virtue of any set-off, counterclaim or similar defence that it may invoke vis-à-vis the Collateral Agent. For purposes of the Abstract Acknowledgement of Indebtedness and German Law Pledge Agreement only, for the avoidance of doubt and notwithstanding any provision in the Abstract Acknowledgement of Indebtedness, irrevocable and unconditional payment in full in cash of all of the Credit Document Obligations (as defined in the Canadian Pledge Agreement) shall satisfy in full all obligations owed by the Canadian Borrower under the Abstract Acknowledgement of Indebtedness.

(c) Subject to paragraph (b) above, the rights of the Secured Creditors (other than the Collateral Agent) to receive payment of amounts payable by the Canadian Borrower under the Credit Documents, the Post Petition Swap Agreements and the Post Petition Cash Management Arrangements are several and are separate and independent from, and without prejudice to, the rights of the Collateral Agent to receive payment under the Abstract Acknowledgement of Indebtedness.

(d) On the German Pledge Termination Date (as defined below), the German Law Pledge Agreement shall terminate and the security interests granted thereby shall be released automatically (provided that all indemnities set forth therein shall survive any such termination) and the Collateral Agent, at the request and expense of the Canadian Borrower, will execute and deliver to the Canadian Borrower a proper instrument or instruments (including local law termination statements) acknowledging the satisfaction and termination of the German Law Pledge Agreement (including, without limitation, local law termination statements and instruments of satisfaction, discharge and/or reconveyance), and will assign, transfer and deliver to the Canadian Borrower (without recourse and without any representation or warranty) such of the Equity Interests in CSA Holding (Deutschland) GmbH as may be in the possession of the Collateral Agent or any of its sub-agents thereunder and as has not theretofore been sold or otherwise applied or released pursuant to the German Law Pledge Agreement, together with any moneys at the time held by the Collateral Agent or any of its sub-agents hereunder. As used in this Agreement, "German Pledge Termination Date" shall mean the date upon which the Commitments under the Credit Agreement have been terminated, no or Note is outstanding (and all Loans have been paid in full), and all other Credit Document Obligations (as defined in the Canadian Pledge Agreement) (other than indemnities described in the German Law Pledge Agreement and described in Section 13.01 hereof, and any other indemnities set forth in any other Security Documents, in each case which are not then due and payable) then due and payable have been paid in full.

(e) In the event that any Equity Interests in CSA Holding (Deutschland) GmbH are sold or otherwise disposed of (to a Person other than a Credit Party) at any time prior to the time at which all Credit Document Obligations (as defined in the Canadian Pledge Agreement) have been paid in full and all Commitments, in connection with a sale or disposition permitted by Section 10.05 hereof or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by Section 13.12 hereof), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Credit Agreement to the extent required to be so applied, such Equity Interests shall be automatically released from the security interest granted under the German Law Pledge Agreement and the Collateral Agent, at the request and expense of the Canadian Borrower, will execute and deliver such documentation (including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to the Canadian Borrower (without recourse and without any representation or warranty) such Equity Interests as are then being (or has been) so sold or released and as may be in the possession of the Collateral Agent

(or, in the case of Equity Interests held by any sub-agent designated pursuant to the German Law Pledge Agreement, such sub-agent) and has not theretofore been released pursuant to this Agreement.

(f) At any time that the Canadian Borrower desires that the Collateral Agent execute and deliver any release documentation as provided in the foregoing in this Section 13.26, the Canadian Borrower shall deliver to the Collateral Agent (and the relevant sub-agent, if any, designated pursuant to the German Law Pledge Agreement) a certificate signed by an authorized officer of the Canadian Borrower stating that the release of the respective Collateral is permitted pursuant to this Section 13.26. The Collateral Agent shall have no liability whatsoever to any other Secured Creditor (as defined in the Canadian Pledge Agreement) as the result of any release of Collateral by it in accordance with (or which the Collateral Agent believes to be in accordance with) this Section 13.26.

(g) If at any time all of the Equity Interests of the Canadian Borrower owned by the U.S. Borrower or any of its Subsidiaries are sold (to a Person other than a Credit Party) in a transaction permitted pursuant to the Credit Agreement (and which does not violate the terms of any other Secured Debt Agreement (as defined in the Canadian Pledge Agreement) then in effect), then, at the request and expense of the U.S. Borrower, the Canadian Borrower shall be released as a pledgor under the German Law Pledge Agreement pursuant to this Section 13.26 automatically without any further action hereunder (it being understood that the sale of all of the Equity Interests in any Person that owns, directly or indirectly, all of the Equity Interests in the Canadian Borrower shall be deemed to be a sale of all of the Equity Interests in the Canadian Borrower for purposes of this Section), and the Collateral Agent is authorized and directed to execute and deliver such instruments of release as are reasonably satisfactory to it. At any time that the U.S. Borrower desires that the Canadian Borrower be released from the German Law Pledge Agreement as provided in this Section 13.26, the U.S. Borrower shall deliver to the Collateral Agent a certificate signed by a principal executive officer of the U.S. Borrower stating that the release of the Canadian Borrower is permitted pursuant to this Section 13.26. The Collateral Agent shall have no liability whatsoever to any other Secured Creditor as a result of the release of the Canadian Borrower by it in accordance with, or which it believes to be in accordance with, this Section 13.26.

SECTION 14. Holdings Guaranty.

14.01 The Guaranty. In order to induce the each of the Agents, the Collateral Agent and the Lenders to enter into this Agreement and to extend credit hereunder, and to induce the other Guaranteed Creditors to enter into Post Petition Swap Agreements, and in recognition of the direct benefits to be received by Holdings from the proceeds of the Loans and the entering into of such Post Petition Swap Agreements, Holdings hereby agrees with the primary, absolute and unconditional, as follows: Holdings hereby unconditionally and irrevocably guarantees, as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Holdings Guaranteed Obligations to the Guaranteed Creditors. If any or all of the Holdings Guaranteed Obligations to the Guaranteed Creditors becomes due and payable hereunder, Holdings unconditionally and irrevocably promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, together with any and all expenses which may be incurred by the Guaranteed Creditors in collecting any of the Holdings Guaranteed Obligations. This Holdings Guaranty is a guaranty of payment and not of collection. This Holdings Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. If claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on

account of any of the Holdings Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrowers and any other Holdings Guaranteed Party), then and in such event Holdings agrees that any such judgment, decree, order, settlement or compromise shall be binding upon Holdings, notwithstanding any revocation of this Holdings Guaranty or any other instrument evidencing any liability of each Borrower or any other Holdings Guaranteed Party, and Holdings shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

14.02 <u>Bankruptcy</u>.    Additionally, Holdings unconditionally and irrevocably guarantees the payment of any and all of the Holdings Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by each Borrower or any other Holdings Guaranteed Party upon the occurrence of any of the events specified in clause (h), (i) or (j) of Section 11, and irrevocably and unconditionally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand.

14.03 <u>Nature of Liability</u>.   The liability of Holdings hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Holdings Guaranteed Obligations whether executed by Holdings, any other guarantor or by any other party, and the liability of Holdings hereunder is not affected or impaired by (a) any direction as to application of payment by each Borrower, any other Holdings Guaranteed Party or any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Holdings Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by each Borrower or any other Holdings Guaranteed Party, or (e) any payment made to the Guaranteed Creditors on the Holdings Guaranteed Obligations which any such Guaranteed Creditor repays to each Borrower or any other Holdings Guaranteed Party pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and Holdings waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction of the type described in Section 14.05, or (g) the lack of validity or enforceability of any Credit Document or any other instrument relating thereto.

14.04 <u>Independent Obligation</u>.   No invalidity, irregularity or unenforceability of all or any part of the Holdings Guaranteed Obligations or of any security therefor shall affect, impair or be a defense to this Holdings Guaranty, and this Holdings Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the Holdings Guaranteed Obligations.   The obligations of Holdings hereunder are independent of the obligations of each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party and a separate action or actions may be brought and prosecuted against Holdings whether or not action is brought against each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party and whether or not each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party be joined in any such action or actions. Holdings waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by a Borrower or any other Holdings Guaranteed Party or other circumstance that operates to toll any

statute of limitations as to such Borrower or such other Holdings Guaranteed Party shall operate to toll the statute of limitations as to Holdings.

14.05 <u>Authorization</u>. Holdings authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)     change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Holdings Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Holdings Guaranty made shall apply to the Holdings Guaranteed Obligations as so changed, extended, renewed, increased or altered;

(b)     take and hold security for the payment of the Holdings Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Holdings Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)     exercise or refrain from exercising any rights against each Borrower, any other Holdings Guaranteed Party or others or otherwise act or refrain from acting;

(d)     release or substitute any one or more endorsers, guarantors, each Borrower, any other Holdings Guaranteed Party or other obligors;

(e)     settle or compromise any of the Holdings Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of each Borrower or any other Holdings Guaranteed Party to their respective creditors other than the Guaranteed Creditors;

(f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of each Borrower or any other Holdings Guaranteed Party to the Guaranteed Creditors regardless of what liability or liabilities of such Borrower or such other Holdings Guaranteed Party remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any Post Petition Swap Agreement or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document, any Post Petition Swap Agreement or any of such other instruments or agreements; and/or

(h)     take any other action that would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of Holdings from its liabilities under this Holdings Guaranty.

14.06 <u>Reliance</u>. It is not necessary for the Guaranteed Creditors to inquire into the capacity or powers of each Borrower or any other Holdings Guaranteed Party or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Holdings Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

14.07 <u>Subordination</u>. Any of the indebtedness of each Borrower or any other Holdings Guaranteed Party now or hereafter owing to Holdings is hereby subordinated to the Holdings Guaranteed Obligations of such Borrower or such other Holdings Guaranteed Party owing to the Guaranteed Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of such Borrower or such other Holdings Guaranteed Party to Holdings shall be collected, enforced and received by Holdings for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the Holdings Guaranteed Obligations of such Borrower or such Holdings Guaranteed Party to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of Holdings under the other provisions of this Holdings Guaranty. Prior to the transfer by Holdings of any note or negotiable instrument evidencing any of the indebtedness of each Borrower or any other Holdings Guaranteed Party to Holdings, Holdings shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.

14.08 <u>Waiver</u>. (a) Holdings waives any right (except as shall be required by applicable statute and cannot be waived) to require any Guaranteed Creditor to (i) proceed against each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party, (ii) proceed against or exhaust any security held from each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever. Holdings waives any defense based on or arising out of any defense of each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party, other than payment in full in cash of the Holdings Guaranteed Obligations, based on or arising out of the disability of each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party, or the unenforceability of the Holdings Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of each Borrower or any other Holdings Guaranteed Party other than payment in full in cash of the Holdings Guaranteed Obligations. The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against each Borrower, any other Holdings Guaranteed Party or any other party, or any security, without affecting or impairing in any way the liability of Holdings hereunder except to the extent the Holdings Guaranteed Obligations have been paid in full in cash. Holdings waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Holdings against each Borrower, any other Holdings Guaranteed Party or any other party or any security.

(b) Holdings waives all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Holdings Guaranty, and notices of the existence, creation or incurring of new or additional Holdings Guaranteed Obligations. Holdings assumes all responsibility for being and keeping itself informed of each Borrower's and each other Holdings Guaranteed

Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Holdings Guaranteed Obligations and the nature, scope and extent of the risks which Holdings assumes and incurs hereunder, and agrees that the Guaranteed Creditors shall have no duty to advise Holdings of information known to them regarding such circumstances or risks.

(c)     Until such time as the Holdings Guaranteed Obligations have been paid in full in cash, Holdings hereby waives all rights of subrogation which it may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code, or otherwise) to the claims of the Guaranteed Creditors against each Borrower, any other Holdings Guaranteed Party or any other guarantor of the Holdings Guaranteed Obligations and all contractual, statutory or common law rights of reimbursement, contribution or indemnity from each Borrower, any other Holdings Guaranteed Party or any other guarantor which it may at any time otherwise have as a result of this Holdings Guaranty.

(d)     Holdings hereby acknowledges and affirms that it understands that to the extent the Holdings Guaranteed Obligations are secured by Real Property located in California, Holdings shall be liable for the full amount of the liability hereunder notwithstanding the foreclosure on such Real Property by trustee sale or any other reason impairing Holdings' or any Guaranteed Creditor's right to proceed against each Borrower, any other Holdings Guaranteed Party or any other guarantor of the Holdings Guaranteed Obligations.   In accordance with Section 2856 of the California Code of Civil Procedure, Holdings hereby waives until such time as the Holdings Guaranteed Obligations have been paid in full in cash:

(i)     all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to Holdings by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Code of Civil Procedure;

(ii)     all rights and defenses that Holdings may have because the Holdings Guaranteed Obligations are secured by Real Property located in California, meaning, among other things, that:  (A) the Guaranteed Creditors may collect from Holdings without first foreclosing on any real or personal property collateral pledged by each Borrower or any other Credit Party, and (B) if the Guaranteed Creditors foreclose on any Real Property collateral pledged by each Borrower or any other Credit Party, (1) the amount of the Holdings Guaranteed Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) the Guaranteed Creditors may collect from Holdings even if the Guaranteed Creditors, by foreclosing on the Real Property collateral, have destroyed any right Holdings may have to collect from each Borrower or any other Holdings Guaranteed Party, it being understood that this is an unconditional and irrevocable waiver of any rights and defenses Holdings may have because the Holdings Guaranteed Obligations are secured by Real Property (including, without limitation, any rights or defenses based upon Sections 580a, 580d or 726 of the California Code of Civil Procedure); and

(iii)     all rights and defenses arising out of an election of remedies by the Guaranteed Creditors, even though that election of remedies, such as a nonjudicial fore-closure with respect to security for the Holdings Guaranteed Obligations, has destroyed Holdings' rights of subrogation and reimbursement against each Borrower or any other Holdings Guaranteed Party by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(e) Holdings warrants and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law of public policy, such waivers shall be effective only to the maximum extent permitted by law.

14.09 Payments. All payments made by Holdings pursuant to this Section 14 shall be made in U.S. Dollars. All payments made by Holdings pursuant to this Section 14 will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Sections 5.03 and 5.04.

14.10 Maximum Liability. It is the desire and intent of Holdings and the Guaranteed Creditors that this Holdings Guaranty shall be enforced against Holdings to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If, however, and to the extent that, the obligations of Holdings under this Holdings Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of Holdings' obligations under this Holdings Guaranty shall be deemed to be reduced and Holdings shall pay the maximum amount of the Holdings Guaranteed Obligations which would be permissible under applicable law.

SECTION 15. U.S. Borrower's Guaranty.

15.01 The U.S. Borrower's Guaranty. In order to induce the each of the Agents, the Collateral Agent, and the Lenders to enter into this Agreement and to extend credit hereunder, and to induce the other Guaranteed Creditors to enter into Post Petition Swap Agreements, and in recognition of the direct benefits to be received by the U.S. Borrower from the proceeds of the Loans and the entering into of such Post Petition Swap Agreements, the U.S. Borrower hereby agrees with the Guaranteed Creditors as follows: the U.S. Borrower hereby unconditionally and irrevocably guarantees, as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the U.S. Borrower Guaranteed Obligations to the Guaranteed Creditors. If any or all of the U.S. Borrower Guaranteed Obligations to the Guaranteed Creditors becomes due and payable hereunder, the U.S. Borrower unconditionally and irrevocably promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, together with any and all expenses which may be incurred by the Guaranteed Creditors in collecting any of the U.S. Borrower Guaranteed Obligations. This U.S. Borrower's Guaranty is a guaranty of payment and not of collection. This U.S. Borrower's Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. If claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the U.S. Borrower Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Canadian Borrower or any other U.S. Borrower Guaranteed Party), then and in such event the U.S. Borrower agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the U.S. Borrower, notwithstanding any revocation of this U.S. Borrower's Guaranty or any other instrument evidencing any liability of the Canadian Borrower or any U.S. Borrower Guaranteed Party, and the U.S. Borrower shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

15.02 <u>Bankruptcy</u>.    Additionally, the U.S. Borrower unconditionally and irrevocably, guarantees the payment of any and all of the U.S. Borrower Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by the Canadian Borrower or any other U.S. Borrower Guaranteed Party upon the occurrence of any of the events specified in clause (h), (i) or (j) of Section 11, and irrevocably and unconditionally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand.

15.03 <u>Nature of Liability</u>.  The liability of the U.S. Borrower hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the U.S. Borrower Guaranteed Obligations whether executed by the U.S. Borrower, any other guarantor or any other party, and the liability of the U.S. Borrower Guarantors hereunder is not affected or impaired by (a) any direction as to application of payment by the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the U.S. Borrower Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Canadian Borrower or any other U.S. Borrower Guaranteed Party or (e) any payment made to the Guaranteed Creditors on the U.S. Borrower Guaranteed Obligations which any such Guaranteed Creditor repays to the Canadian Borrower or any other U.S. Borrower Guaranteed Party pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and the U.S. Borrower waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction of the type described in Section 15.05, or (g) the lack of validity or enforceability of any Credit Document or any other instrument relating thereto.

15.04 <u>Independent Obligation</u>.  No invalidity, irregularity or unenforceability of all or any part of the U.S. Borrower Guaranteed Obligations or of any security therefor shall affect, impair or be a defense to this U.S. Borrower's Guaranty, and this U.S. Borrower's Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the U.S. Borrower Guaranteed Obligations. The obligations of the U.S. Borrower hereunder are independent of the obligations of the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party, and a separate action or actions may be brought and prosecuted against the U.S. Borrower whether or not action is brought against the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party and whether or not the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party be joined in any such action or actions. The U.S. Borrower waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Canadian Borrower or any other U.S. Borrower Guaranteed Party or other circumstance that operates to toll any statute of limitations as to the Canadian Borrower or such other U.S. Borrower Guaranteed Party shall operate to toll the statute of limitations as to the U.S. Borrower.

15.05 <u>Authorization</u>.  The U.S. Borrower authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)     change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the U.S. Borrower Guaranteed

Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this U.S. Borrower's Guaranty made shall apply to the U.S. Borrower Guaranteed Obligations as so changed, extended, renewed, increased or altered;

(b)     take and hold security for the payment of the U.S. Borrower Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the U.S. Borrower Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)     exercise or refrain from exercising any rights against the Canadian Borrower, any other U.S. Borrower Guaranteed Party or others or otherwise act or refrain from acting;

(d)     release or substitute any one or more endorsers, guarantors, the Canadian Borrower, any other U.S. Borrower Guaranteed Party or other obligors;

(e)     settle or compromise any of the U.S. Borrower Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Canadian Borrower or any other U.S. Borrower Guaranteed Party to their respective creditors other than the Guaranteed Creditors;

(f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Canadian Borrower or any other U.S. Borrower Guaranteed Party to the Guaranteed Creditors regardless of what liability or liabilities of the Canadian Borrower or such other U.S. Borrower Guaranteed Party remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any Post Petition Swap Agreement or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document or any Post Petition Swap Agreement or any of such other instruments or agreements; and/or

(h)     take any other action that would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of the U.S. Borrower from its liabilities under this U.S. Borrower's Guaranty.

15.06 <u>Reliance</u>.  It is not necessary for the Guaranteed Creditors to inquire into the capacity or powers of the Canadian Borrower or any other U.S. Borrower Guaranteed Party or the officers, directors, partners or agents acting or purporting to act on its or their behalf, and any U.S. Borrower Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

15.07 <u>Subordination</u>.  Any of the indebtedness of the Canadian Borrower or any other U.S. Borrower Guaranteed Party now or hereafter owing to the U.S. Borrower is hereby subordinated to the U.S. Borrower Guaranteed Obligations of the Canadian Borrower or such other U.S. Borrower Guaranteed Party owing to the Guaranteed Creditors; and if the Administrative Agent

so requests at a time when an Event of Default exists, all such indebtedness of the Canadian Borrower or such other U.S. Borrower Guaranteed Party to the U.S. Borrower shall be collected, enforced and received by the U.S. Borrower for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the U.S. Borrower Guaranteed Obligations of the Canadian Borrower or such other U.S. Borrower Guaranteed Party to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of the U.S. Borrower under the other provisions of this U.S. Borrower's Guaranty. Prior to the transfer by the U.S. Borrower of any note or negotiable instrument evidencing any of the indebtedness of the Canadian Borrower or any other U.S. Borrower Guaranteed Party to the U.S. Borrower, the U.S. Borrower shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.

15.08 <u>Waiver</u>. (a) The U.S. Borrower waives any right (except as shall be required by applicable statute and cannot be waived) to require any Guaranteed Creditor to (i) proceed against the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever. The U.S. Borrower waives any defense based on or arising out of any defense of the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party, other than payment in full in cash of the U.S. Borrower Guaranteed Obligations, based on or arising out of the disability of the Canadian Borrower, any other Guaranteed Party, any other guarantor or any other party, or the unenforceability of the U.S. Borrower Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Canadian Borrower or any other U.S. Borrower Guaranteed Party other than payment in full in cash of the U.S. Borrower Guaranteed Obligations. The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other party, or any security, without affecting or impairing in any way the liability of the U.S. Borrower hereunder except to the extent the U.S. Borrower Guaranteed Obligations have been paid in full in cash. The U.S. Borrower waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the U.S. Borrower against the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other party or any security.

(b)     The U.S. Borrower waives all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this U.S. Borrower's Guaranty, and notices of the existence, creation or incurring of new or additional U.S. Borrower Guaranteed Obligations. The U.S. Borrower assumes all responsibility for being and keeping itself informed of the Canadian Borrower's and each other U.S. Borrower Guaranteed Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the U.S. Borrower Guaranteed Obligations and the nature, scope and extent of the risks which the U.S. Borrower assumes and incurs hereunder, and agrees that the Guaranteed Creditors shall have no duty to advise the U.S. Borrower of information known to them regarding such circumstances or risks.

(c)     Until such time as the U.S. Borrower Guaranteed Obligations have been paid in full in cash, the U.S. Borrower hereby waives all rights of subrogation which it may at any time otherwise have as a result of this U.S. Borrower's Guaranty (whether contractual, under Section 509 of the Bankruptcy Code, or otherwise) to the claims of the Guaranteed Creditors against the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other guarantor of the U.S. Borrower Guaranteed Obligations and all contractual, statutory or common law rights of reimbursement, contribution or indemnity from the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other guarantor which it may at any time otherwise have as a result of this U.S. Borrower's Guaranty.

(d)     The U.S. Borrower hereby acknowledges and affirms that it understands that to the extent the U.S. Borrower Guaranteed Obligations are secured by Real Property located in California, the U.S. Borrower shall be liable for the full amount of the liability hereunder notwithstanding the foreclosure on such Real Property by trustee sale or any other reason impairing the U.S. Borrower's or any Guaranteed Creditor's right to proceed against any U.S. Borrower Guaranteed Party or any other guarantor of the U.S. Borrower Guaranteed Obligations. In accordance with Section 2856 of the California Code of Civil Procedure, the U.S. Borrower hereby waives until such time as the U.S. Borrower Guaranteed Obligations have been paid in full in cash:

(i)     all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the U.S. Borrower by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Code of Civil Procedure;

(ii)     all rights and defenses that the U.S. Borrower may have because the U.S. Borrower Guaranteed Obligations are secured by Real Property located in California, meaning, among other things, that: (A) the Guaranteed Creditors may collect from the U.S. Borrower without first foreclosing on any real or personal property collateral pledged by any Credit Party, and (B) if the Guaranteed Creditors foreclose on any Real Property collateral pledged by any Credit Party, (1) the amount of the U.S. Borrower Guaranteed Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) the Guaranteed Creditors may collect from the U.S. Borrower even if the Guaranteed Creditors, by foreclosing on the Real Property collateral, have destroyed any right the U.S. Borrower may have to collect from any U.S. Borrower Guaranteed Party, it being understood that this is an unconditional and irrevocable waiver of any rights and defenses the U.S. Borrower may have because the U.S. Borrower Guaranteed Obligations are secured by Real Property (including, without limitation, any rights or defenses based upon Sections 580a, 580d or 726 of the California Code of Civil Procedure); and

(iii)     all rights and defenses arising out of an election of remedies by the Guaranteed Creditors, even though that election of remedies, such as a non-judicial foreclosure with respect to security for the U.S. Borrower Guaranteed Obligations, has destroyed the U.S. Borrower's rights of subrogation and reimbursement against any U.S. Borrower Guaranteed Party by the operation of Section 680d of the California Code of Civil Procedure or otherwise.

(e)     The U.S. Borrower warrants and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such

waivers are determined to be contrary to any applicable law of public policy, such waivers shall be effective only to the maximum extent permitted by law.

15.09 <u>Payments</u>. All payments made by the U.S. Borrower pursuant to this Section 15 shall be made in U.S. Dollars. All payments made by the U.S. Borrower pursuant to this Section 15 will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Sections 5.03 and 5.04.

15.10 <u>Maximum Liability</u>. It is the desire and intent of the U.S Borrower and the Guaranteed Creditors that this U.S. Borrower's Guaranty shall be enforced against the U.S Borrower to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If, however, and to the extent that, the obligations of the U.S Borrower under this U.S. Borrower's Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of the U.S Borrower's obligations under this U.S. Borrower's Guaranty shall be deemed to be reduced and the U.S. Borrower shall pay the maximum amount of the U.S Borrower Guaranteed Obligations which would be permissible under applicable law.

\* \* \* \*

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

Address:

39550 Orchard Hill Place Drive
Novi, MI 48375
Telephone No.: (248) 596-5900
Facsimile No.: (248) 596-6535
Attention: Allen J. Campbell

COOPER-STANDARD HOLDINGS INC.

By _~Allen J. Campbell~_
Title: _Vice President and Chief Financial Officer_

39550 Orchard Hill Place Drive
Novi, MI 48375
Telephone No.: (248) 596-5900
Facsimile No.: (248) 596-6535
Attention: Allen J. Campbell

COOPER-STANDARD AUTOMOTIVE INC.

By _Allen J. Campbell_
Title: _Vice President and Chief Financial Officer_

703 Douro Street
Stratford, Ontario
N5A 3T1
Telephone No.: 1-519-271-3360
Facsimile No.: 1-519-271-8805
Attention: Allen J. Campbell

COOPER-STANDARD AUTOMOTIVE CANADA LIMITED

By _Allen J. Campbell_
Title: _Vice President_

DEUTSCHE BANK TRUST COMPANY
AMERICAS,
Individually, as Administrative Agent and as
Documentation Agent

By_____
Valerie Shapiro

Title: Vice President

By_____
Omayra Laucella

Title: Vice President

DEUTSCHE BANK SECURITIES INC.,
as Joint Lead Arranger

By_____

　　Title:

By_____
　　Title:

DEUTSCHE BANK TRUST COMPANY
AMERICAS,
Individually, as Administrative Agent and as
Documentation Agent


By_____
    Title:


By_____
    Title:


DEUTSCHE BANK SECURITIES INC.,
as Joint Lead Arranger

By *Edwin E. Roland*
    Title: *Managing Director*


By_____
    Title:


[Signature Page to Debtor-in-Possession Credit Agreement]

DEUTSCHE BANK TRUST COMPANY
AMERICAS,
Individually, as Administrative Agent and as
Documentation Agent

By_____
    Title:

By_____
    Title:

DEUTSCHE BANK SECURITIES INC.,
as Joint Lead Arranger
By_____
    Title:    **David J. Crescenzi**
              **Managing Director**

By_____
    Title:

[Signature Page to Debtor-in-Possession Credit Agreement]

GMAC Commercial Finance LLC,
as Lender

By _____

Name: W. Wakefield Smith
Title:   Director

Approved
Law Dept.
By: _MPC_
Date: _7-24-09_

CONTINENTAL CASUALTY COMPANY,
as Lender

By _____
Title
     Marilou R. McGirr
**Vice President and Assistant Treasurer**

[Signature Page to Debtor-in-Possession Credit Agreement]

COA Caerus CLO Ltd., as Lender

By FS COA Management LLC, as Portfolio
Manager

By_____
Name: John Fraser

Title: Manager

Credit Opportunity Associates, LLC., as Lender

By FS COA Management LLC, as Manager

By _____
    Name: John Fraser

    Title: Manager

The Foothill Group, Inc.
as Lender

By _____
Scott P. Quigley
Title: Vice President

[Signature Page to Debtor-in-Possession Credit Agreement]

TCW Shared Opportunities Fund V
TCW Shared Opportunities Fund IV
TCW Shared Opportunities Fund IVB,
as Lender

By _____
Title:     Richard H. Stevenson
        Senior Vice President

By _____
Title:
        Jason A. Breaux
        Senior Vice President

LIBERTY MUTUAL INSURANCE
COMPANY,
as Lender

By

Name: Sheila Finnerty

Title: Vice President

[Signature Page to Debtor-in-Possession Credit Agreement]

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,
as Lender

By

Name: Sheila Finnerty

Title: Vice President

[Signature Page to Debtor-in-Possession Credit Agreement]

EMPLOYERS INSURANCE COMPANY OF
WAUSAU,
as Lender

By

Name: Sheila Finnerty

Title: Vice President

[Signature Page to Debtor-in-Possession Credit Agreement]

Morgan Stanley Senior Funding, Inc,
as Lender

By_____
Title: Vice President

Bank of America, N.A.
as Lender

By_____
Title: Kevin M. Behan, SVP

By_____
Title:

[Signature Page to Debtor-in-Possession Credit Agreement]