**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| COOPER-STANDARD HOLDINGS INC., *et al.*,[1] | Case No. 09-_____ (___) |
|  | (Joint Administration Requested) |
| Debtors. |  |

**DECLARATION OF ALLEN J. CAMPBELL**
**IN SUPPORT OF CHAPTER 11**
**PETITIONS AND FIRST DAY MOTIONS**

Allen J. Campbell states under penalty of perjury:

1.     I am the Vice President and Chief Financial Officer of Cooper-Standard Holdings

Inc. ("Holdings"), President of three and Vice President of twelve of the other debtors and

debtors in possession (the "Affiliated Debtors" and, collectively with Holdings, the "Debtors") in

the above-captioned chapter 11 cases. I am familiar with the Debtors' day-to-day operations,

business and financial affairs, and books and records. I am also authorized to submit this

declaration (the "Declaration").

2.     I submit this Declaration in support of the Debtors' need for voluntary relief under

the Bankruptcy Code and the relief requested by the Debtors in the various motions and

applications filed with this Court contemporaneously with this Declaration (collectively, the

---

[1]     The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification
number are as follows: Cooper-Standard Holdings Inc. (5088); Cooper-Standard Automotive Inc. (9970);
Cooper-Standard Automotive FHS Inc. (2953); Cooper-Standard Automotive Fluid Systems Mexico
Holding LLC (0442); Cooper-Standard Automotive OH, LLC (2845); StanTech, Inc. (4014); Westborn
Service Center, Inc. (7448); North American Rubber, Incorporated (9926); Sterling Investments Company
(1393); Cooper-Standard Automotive NC LLC (2839); CS Automotive LLC (4267); CSA Services Inc.
(9510); NISCO Holding Company (1697).

"First Day Motions"). This Declaration (a) describes the Debtors' businesses, (b) describes the Debtors' prepetition indebtedness, (c) describes the events leading up to the Debtors' filing their petitions for relief under chapter 11 of the Bankruptcy Code, and (d) sets forth the relevant facts in support of each of the First Day Motions.

3.      All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others within the Debtors' organizations, and upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## PART I
## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

**I.      Description of the Debtors' Businesses**

4.      Holdings is a Delaware corporation with its primary place of business in Novi, Michigan. Holdings is the ultimate parent company of each of the Debtors. A corporate organizational chart is attached to this declaration as Exhibit A. The Debtors and their foreign non-debtor affiliates and subsidiaries (collectively, the "Company") are a leading global manufacturer of fluid handling, body sealing, and noise, vibration and harshness control ("NVH") components, systems, subsystems, and modules, primarily for use in passenger vehicles and light trucks for global original equipment manufacturers ("OEMs") and replacement markets. Holdings conducts substantially all of its activities through its subsidiaries, which design and manufacture the Company's products in each major region of the world. The Company operates in sixty-eight manufacturing locations and ten design, engineering, and administrative locations around the world, including the United States, Mexico, Canada, Australia, China, Czech Republic, Japan, Germany, Korea, Spain, the United Kingdom, Belarus, Poland, France, India,

2

Netherlands, Italy, Belgium, Barbados, and Brazil. The Company operates in two divisions, North America and International (covering Europe, South America and Asia).

5.      The Company's main customers are OEMs, including Ford Motor Company ("Ford"), General Motors Company ("GM"), Chrysler Group LLC ("Chrysler"), Audi, Volkswagen, BMW, Fiat, Honda, Mercedes Benz, Porsche, PSA Peugeot Citroën, Renault/Nissan, Toyota and other Tier I and Tier II automotive suppliers (collectively, the "OEMs"). In 2008, the Company's products were found in twenty-two of the twenty-five top-selling models in North America and in twenty-four of the twenty-five top-selling models in Europe.

6.      As of the Filing Date, the Company employs approximately 16,000 employees worldwide. The Debtors employ approximately 2,600 active employees of which approximately 850 are salaried employees and approximately 1,750 are hourly employees. As of June 30, 2008, unions represented approximately 60% of the Company's employees, with approximately 30% of the Debtors' employees represented by unions. The Company has not experienced any major work stoppages in the past ten years.

## II.   Products

7.      Through the North American and International divisions, the Company supplies a diverse range of products on a global basis to a broad group of customers. The Company's principal product lines are described more fully below.

### A.    Body & Chassis Products

8.      The Company is a leading global supplier of body sealing and chassis products. Body Sealing products consist of components that protect vehicle interiors from weather, dust, and noise intrusion. Chassis products, also referred to as Noise Vibration and Harshness

3

products or NVH, isolate and reduce noise and vibration to improve ride and handling. Both

body and chassis products lead to a better driving experience for all occupants. For the year

ended December 31, 2008, the Company generated approximately 61% of total revenue before

corporate eliminations from the sale of body and chassis products.

(i)     Body Sealing

9.      The Company is a leading global supplier of body sealing products to the

automotive industry with approximately 21% of global market share. The Company is known

throughout the industry to be a leader in providing innovative design and manufacturing

solutions for complex automotive designs.

10.     The Company's sealing products include: (i) door seals that fit the door structure

and body cabin of the vehicle to seal rain, dust, and noise from the occupants of vehicles; (ii)

body seals that provide further noise and aesthetic coverage of weld flanges on the vehicle body;

(iii) hood seals that protect engine components against water and dust penetration while also

reducing engine and road noise in the vehicle's interior during high-speed travel; (iv) belt line

seals that protect against water, dust and noise for driver and passenger door moveable glass; (v)

lower door seals that protect in the "rocker" area against water and dust penetration and reduce

loud road noise entering the cabin and maintain quietness during high-speed driving; (vi) a glass

run channel assembly that enables the movable door glass and door to form one surface,

improving glass movement and sealing the vehicle's interior from the exterior environment; (vii)

trunk lid and lift gate seals located on the body flanges in the truck or lift gate compartment that

offer protection against water and dust penetration; (viii) a roof seal that combines

compressibility with superior design for use on soft top weather sealing applications; (ix) sunroof

seals that are required to create a narrow sealing space and minimize resistance for the sunroof;

4

and (x) obstacle detection sensors that will reverse windows and doors upon sensing the capacitance of an animate object.

(ii)    Chassis

11.    The Company is one of the leading suppliers of chassis products in North America with approximately 14% of North American market share. The Company is known in North America for utilizing its advanced development and testing of NVH products and subsystems to provide innovative solutions.

12.    The Company's chassis products include components manufactured with various types of rubber: natural rubber, butyl or EPDM in combination with stamped steel, aluminum or cast iron sub-components. Additionally, the Company supplies brackets that are manufactured from stamped steel, aluminum, or cast iron as individual final products. The typical production process for a rubber and metal product involves mixing of rubber compounds, metal preparation (cleaning and primer application), injection molding of the rubber and metals, final assembly, and testing as required based on specific products.

13.    The Company's chassis products include: (i) body/cradle mounts that enable isolation of the interior cabin from the vehicle body, reducing noise, vibration, and harshness; (ii) engine mounts that secure and isolate vehicle powertrain noise, vibration, and harshness from the uni-body or frame; (iii) transmission mounts that enable mounting of transmission to vehicle body and reducing vibration and harshness from the powertrain; (iv) torque link that controls the fore and aft movement of transverse mounted engines within their compartment while isolating engine noise and vibration from the body; (v) strut mounts that isolate vibration from the suspension and dampen vibration from the suspension into the interior cabin; (vi) spring seats/ bumpers that work in conjunction with NVH systems to prevent offensive noise generation; (vii)

5

suspension bushing that allows flexibility in suspension components and eliminates NVH from entering into the interior cabin; (viii) mass damper that is developed to counteract a specific resonance at a specific frequency to eliminate vibration; and (ix) hydromounts/hydrobushings comprising of an engine mount or suspension bushing filled with fluid (a hydromount provides spring rate and damping performance that varies according to frequency and displacement, while a conventional (non hydro) mounts provide fixed response).

(iii)    Fluid Handling Products

14.    The Company is one of the leading global integrators of fluid subsystems and components that control, sense, and deliver fluids. The Company believes that it is the second largest global provider of fluid handling system products manufactured in its industry. The Company offers an extensive product portfolio and is positioned to serve its diverse customer base around the world.

15.    The Company's fluid handling products are principally found in four major vehicle systems: thermal management; fuel and brake; emissions management; and power management. The thermal management products direct, control and transport oil, coolant, water, and other fluids throughout the vehicle. The fuel and brake products direct, control, and transport fuel, brake fluid, and vapors throughout the vehicle. The emissions management products direct, control, and transmit emission vapors and fluids throughout the vehicle. Lastly, the power management products direct, control, and transmit power management fluids throughout the vehicle.

16.    The Company provides thermal management solutions that enhance hybrid powertrain cooling systems and offer bio-fuel compatible materials for alternative fuel vehicles. The Company's products support improved fuel economy initiatives with lightweight, high

6

performance plastic and aluminum materials that reduce weight and offer an improved value equation. The Company specializes in complete fuel system integration encompassing products from the fuel rail to the fuel tank lines. The Company's low permeation fuel lines meet and exceed LEV II (low emission vehicle) and PZEV (partial zero emission vehicle) emission standards. The Company supports reduced emissions through the control of flow and temperature of exhaust gas.

**B.    Patents and Trademarks**

17.    The Company holds over 600 patents in key product technologies, such as Daylight Opening Modules, Engineered Stretched Plastics, Low Fuel Permeation Nylon Tubing, Quick Connect Fluid Couplings, as well as core process methods, such as molding, joining, and coating.

18.    The Company has license and technology sharing agreements with Nishikawa Rubber Company for sales, marketing, and engineering services on certain body sealing products the Company sells. Under those agreements, each party pays for services provided by the other and royalties on certain products for which the other party provides design or development services. The Company also owns or has licensed several trademarks that are registered in many countries, enabling it to protect and market its products worldwide. During 2006, the Company purchased the right to use its current name from Cooper Tire.

**C.    Research and Development**

19.    The Company operates ten design, engineering, and administration facilities throughout the world and employs 620 research and development personnel, some of whom reside at customer facilities. The Company utilizes Design for Six Sigma and other methodologies that emphasize manufacturability and quality. The Company has been pursuing

7

innovations that assist in resource conservation with particular attention to developing materials that are lighter weight and made of materials that can be recycled and the Company's development teams work closely with its customers to design and deliver thermal management solutions for cooling electric motors and batteries for new hybrids.

**D.    Joint Ventures and Strategic Alliances**

20.    The Company has used joint ventures to supplement its entry into new geographic markets such as China, Korea and India and to acquire new customers. The Company also has a joint venture in North America, which has proven valuable in establishing new relationships with North American Japanese manufacturers. The Company guarantees certain obligations of certain of its joint ventures.

**PART II**
**PREPETITION CAPITAL STRUCTURE**

**I.    Corporate History and Capital Structure**

21.    CSA Acquisition Corp. was formed and capitalized in 2004 as a Delaware corporation owned by affiliates of each of The Cypress Group L.L.C., a New York-based private equity firm, and GS Capital Partners 2000, L.P., a subsidiary of Goldman Sachs (collectively, with their affiliates the "Sponsors") via the sale of 3,180,000 shares of common stock to the Sponsors (with each Sponsor obtaining 49.1% of the outstanding shares of common stock). CSA Acquisition Corp. then entered into a stock purchase agreement with Cooper Tire & Rubber Company and its subsidiary Cooper Tyre & Rubber Company UK Limited ("Cooper Tire") on September 16, 2004. The parties entered into an amendment of the stock purchase agreement on December 3, 2004, which provided for the acquisition by CSA Acquisition Corp. of all of the outstanding shares of capital stock of certain subsidiaries of Cooper Tire comprising Cooper Tire's automotive division for a purchase price of $1.165 billion in cash (the "2004

8

Acquisition"). In connection with the 2004 Acquisition, CSA Acquisition Corp. changed its name to Cooper-Standard Automotive Holdings Inc. (previously defined as "Holdings"). Also in connection with the 2004 Acquisition, on December 23, 2004, Holdings, Cooper-Standard Automotive Inc. ("CSA"), and Cooper-Standard Automotive Canada Limited ("CSA Canada") entered into a credit agreement which consisted of revolving credit facilities in a total principal amount of up to $125.0 million, a term loan facility of $51.3 million, a term loan facility of $115.0 million and a term loan facility of $185.0 million. The term loans were used to fund the 2004 Acquisition.

22.     On February 6, 2006, the Company acquired fluid handling businesses in North America, Europe and China from ITT Industries, Inc. ("FHS") for approximately $202 million. FHS, based in Auburn Hills, Michigan, was a leading manufacturer of steel and plastic tubing for fuel and brake lines and quick-connects, and operated fifteen facilities in seven countries. The acquisition of the fluid handling businesses was funded pursuant to an amendment to the credit agreement, which established an additional term loan facility, with a notional amount of $215 million. The additional term loan facility was structured in two tranches, with $190 million borrowed in US dollars and €20.725 million borrowed in Euros, to take into consideration the value of the European assets acquired in the transaction.

23.     On August 31, 2007, the Company completed the acquisition of nine Metzeler Automotive Profile Systems sealing systems operations in Germany, Italy, Poland, Belarus, Belgium (collectively, "MAPS"), and a joint venture interest in China from Automotive Sealing

Systems S.A. The MAPS businesses were acquired for approximately $144 million.[2] The acquisition of the MAPS businesses was funded in part by borrowings under the credit agreement. The Company borrowed €44.0 million and combined this borrowing with EUR amounts outstanding under the FHS term loan facility to create a new term loan facility. In addition, the Company borrowed $10.0 million under the revolving credit facility and €15.0 million under the dual-currency sub limit of the revolving credit facility, borrowed directly by Cooper-Standard Automotive International Holdings BV, an indirectly owned Dutch subsidiary of Holdings. The Company also received an aggregate of $30.0 million in equity contributions from its Sponsors, affiliates of GS Capital Partners 2000, L.P., which contributed a total of $15.0 million, and affiliates of The Cypress Group L.L.C., which also contributed a total of $15.0 million. The remainder of the funding necessary for the acquisition came from available cash on hand.

24.     As of the Filing Date, the Company had approximately $1.170 billion of outstanding indebtedness on a consolidated basis, of which $84.3 million consisted of draws on a senior secured revolving credit facility; $522.8 million consisted of five senior secured term loan facilities; $513.4 million consisted of unsecured senior and senior subordinated bond debt; and $49.9 consisted of debt on account of other credit facilities, capital leases for affiliates, swaps, and other miscellaneous obligations. The remainder of this section summarizes the Company's primary long-term debt obligations in order of priority.

---

[2]     Pursuant to subscription agreements entered into as of August 27, 2007, the Company issued a total of 250,000 additional shares of common stock to its Sponsors, which was invested by the Sponsors in connection with the financing of the Company's acquisition of MAPS.

10

**II.    Senior Secured Credit Facilities**

25.    As described above, on December 23, 2004, in connection with the 2004

Acquisition, Holdings, CSA and CSA Canada entered into the 2004 Credit Agreement with

various lending institutions, Deutsche Bank Trust Company Americas, as administrative agent,

Lehman Commercial Paper Inc., as syndication agent, and Goldman Sachs Credit Partners, L.P.,

UBS Securities LLC and The Bank of Nova Scotia, as co-documentation agents (with subsequent

amendments thereto, and with related agreements, the "Senior Credit Facilities"). The Senior

Credit Facilities consist of (i) a $125 million revolving credit facility (the "Revolving Credit

Facility") with available letters of credit of $45.0 million[3] and (ii) term loan facilities consisting

of a Term Loan A facility of the Canadian dollar equivalent of $51.3 million with a maturity of

2010 and a Term Loan B facility of $115.0 million with a maturity of December 2011, both of

which were funded through CSA Canada, and a Term Loan C facility of $185.0 million with a

maturity of December 2011. The term loans were used to fund the 2004 Acquisition. In

addition, as part of the Senior Credit Facility, the Company entered into a Term Loan D of $215

million with a maturity of 2011 (structured into a U.S. tranche of $190 million and a European

tranche of €20.7 million) and later a Term Loan E of €64.7 million (which incorporates the

European tranche of Term Loan D) with a maturity of 2011, which were used to fund the

acquisition of FHS and the MAPS businesses.[4] The Senior Credit Facilities are unconditionally

guaranteed on a senior secured basis by Holdings and substantially all of its domestic

---

[3]    The Revolving Credit Facility consists of a multi-currency facility revolver to CSA Canada, a dollar facility
revolver to CSA, and a dual-borrower, dual currency facility revolver that can be drawn by either CSA or
CSA International Holdings BV, a subsidiary of CSA incorporated under the laws of the Netherlands

[4]    Term Loans C, D and E were funded through CSA.

subsidiaries, and its Canadian subsidiaries in the case of Term Loans A and B and Canadian dollar borrowings under the Revolving Credit Facilities.

26.     As of the Filing Date, the total amount outstanding under the Senior Credit Facilities including swap obligations was $627 million.

**A.     Senior Notes and Senior Subordinated Notes**

27.     In connection with the 2004 Acquisition, CSA also issued $200.0 million 7% Senior Notes due 2012 (the "Senior Notes") and $350.0 million 8 3/8% Senior Subordinated Notes (the "Senior Subordinated Notes"). The Senior Notes and Senior Subordinated Notes are guaranteed by Holdings and all U.S. subsidiaries. As of the Filing Date, the principal outstanding amount of the Senior Notes, including accrued and unpaid interest, was $208.8 million. In addition, as of the Filing Date, the principal outstanding amount of the Senior Subordinated Notes, including accrued and unpaid interest, was $329.9 million.

28.     The indebtedness evidenced by the Senior Notes is unsecured senior indebtedness of CSA. The indebtedness evidenced by the Senior Subordinated Notes is unsecured senior subordinated indebtedness of CSA.

**B.     Capital Stock**

29.     Holdings has 3,482,612 shares of authorized outstanding common stock. Holdings' principal shareholders are affiliates of the Sponsors. Each of the Sponsors, including their respective affiliates, currently owns approximately 49.3% of the equity of Holdings. The remaining shares are owned by current and former officers and directors.

**C.**     **Off Balance Sheet Arrangements**

(i)     Factoring Arrangements

30.     As part of its working capital management, certain of the foreign non-debtor subsidiaries sell certain receivables through third party financial institutions without recourse. At June 30, 2008, the Company had $41.5 million of receivables outstanding under receivables transfer agreements entered into by various foreign locations.

## PART III
## EVENTS LEADING UP TO BANKRUPTCY

**I.**     **Initial Prepetition Restructuring Efforts**

31.     Since the 2004 Acquisition, the Company has implemented an aggressive restructuring strategy to reduce costs and eliminate non-strategic or duplicative facilities across the Company. Many manufacturing facilities across the United States, Canada, Europe, Asia, and Australia were closed, consolidated, or sold. The Company also reduced its European and U.S. workforce and froze contributions to certain of its global and U.S. pension plans. In October 2008, the Company commenced the initial phase of a global reorganization in North America and Europe, announcing in March 2009 the implementation of a comprehensive plan involving the discontinuation of its global product line operating divisions, formerly called the Body & Chassis Systems division and the Fluid Systems division, and the establishment of a new operating structure organized on the basis of geographic regions. As a result, the Company now operates in two divisions, North America and International. This new operating structure allows the Company to maintain its full portfolio of global products and provide unified customer contact points, while better managing its operating costs and resources in severe industry conditions.

## II.     The Global Financial Crisis

32.     The current and unprecedented global economic crisis has had a crushing effect on the automotive industry and ultimately the Company's business. Cars and light trucks are a major purchase for consumers and the purchase of these items is highly dependent upon the health of the overall economy. Similarly, the purchase of new commercial vehicles is highly dependent upon macro-economic factors such as Gross Domestic Product growth, disposable income, and interest rates. Due to the global financial crisis, which has resulted in the massive deterioration of consumer net worth and a shortage of financing for consumers and businesses, potential purchasers are holding onto their vehicles longer and foregoing the purchase of new vehicles. Consequently, there has been a severe global downturn in both the light vehicle and heavy vehicle market.

33.     U.S. automotive sales have declined significantly in 2008 and 2009. In 2004, North American Vehicle Production was at 15.8 million units. In 2007, there were 16.2 million vehicles produced, in 2008, there were 12.6 million vehicles produced and in 2009, only 8 million vehicles. The OEMs, including the Detroit 3, have suffered greatly as a result. The impact of the crisis on the OEMs has rippled through the automotive industry with no clear end in sight. In North America, Chrysler filed for bankruptcy protection in April 2009, followed by GM in June, and both have implemented extended shutdowns. Estimated vehicle production volumes are drastically lower than prior years and product mix is changing. GM's 2009 second-quarter preliminary actual production is down 53% (to 394,000 units from 834,000) compared with a year ago. Ford's second quarter production is down 43% for cars (to 135,000 units from 237,000) and 35% (to 290,000 from 448,000) for trucks. Chrysler shut down production entirely during its bankruptcy proceedings. In Europe, the market is fragmented with significant

14

overcapacity and estimated production volumes are declining. Since the majority of the Company's customers are OEMs and their suppliers, the Debtors have likewise experienced a significant fall off in sales, resulting in a decline in operating income and EBITDA. For the quarter ending March 31, 2009, the Company generated only $401.7 million in sales, compared with $756.0 million for the same period in 2008.

34.     Furthermore, the cost of raw materials that the Company uses in manufacturing many of its products increased significantly from 2006 to 2008, with some of these increases continuing in 2009. The principal raw materials the Company purchases include fabricated metal-based components, synthetic rubber, carbon black and natural rubber. The Company also purchases raw steel and steel related components. The increase in the price of these items has materially increased the Company's operating costs and adversely affected its profit margins because it is generally difficult to pass these increased costs on to the Company's customers. While these increases fell off in the second half of 2008, continued volatility in the global market has presented risk in forecasting costs.

35.     As a result of the deterioration of the financial condition of the Company's customers and other ancillary effects of the global financial crisis, the Company's business has been negatively impacted. For the three months ended March 31, 2009, the Company's sales were approximately $401.7 million compared with approximately $756.0 million for the same period in 2008. The decrease in sales by over $354 million, or approximately 46.9%, was primarily due to lower sales volume in North America and Europe. For the three months ended March 31, 2009, EBITDA was $15 million (approximately 3.7% of sales) compared to $85.5 million (approximately 11.3% of sales) for the same period in 2008. The Company incurred a net loss of approximately $55 million for the period ended March 31, 2009 compared with net

15

income of approximately $15.7 million for the same period in 2008. Furthermore, for fiscal year 2008, the Company's adjusted EBITDA was approximately $217.9 million (approximately 8.4% of sales) compared with $285.7 million (approximately 11.4% of sales) for fiscal year 2007. As a result of the global meltdown, the Company's EBITDA for fiscal year 2009 is projected to be significantly lower than fiscal year 2008 results.

### III.    The Company's High Degree of Leverage

36.    As a result of the severe downturn in the automotive industry and the accompanying decrease in production volumes, the Company is overleveraged, with outstanding indebtedness of approximately $1.170 billion as of the Filing Date. A substantial portion of the Company's cash flows from operations must be dedicated to the payment of principal and interest on the Company's indebtedness. The Company engaged in discussion regarding possible alternatives to the bankruptcy filing, including refinancing a portion of its indebtedness with its key creditors. However, it was unable to complete those negotiations prior to seeking bankruptcy protection.

### IV.    Recent Restructuring Efforts

37.    In addition to reorganizing its operating structure, the Company has implemented temporary layoffs, wage reductions, and modifications to employee benefit programs. Furthermore, salaried headcount has been reduced by over 1,300 workers in the past 12 months.

38.    Prior to the filing of the Debtors' chapter 11 cases, the Company undertook a concentrated effort to reduce its leverage to keep its position as one of the world's top suppliers as the global automotive industry undergoes a massive overhaul. To assist with this effort, the Company hired Lazard to advise it on restructuring its debt. The Company first commenced negotiations with its Sponsors in an effort to obtain liquidity and avoid the need for chapter 11

protection. With the realization that a restructuring of the Company's indebtedness was necessary, the Company and its advisors commenced discussions with the Company's lenders under the Senior Credit Facilities (the "Senior Lenders"), while continuing to pursue alternatives with the Sponsors. In connection with those efforts, and as a result of the utilization of the grace period in connection with the Company's decision to not make an interest payment on its Senior Notes and Senior Subordinated Notes (as discussed further below), the Company also reached out to and commenced discussions with an ad hoc group of Senior Noteholders and an ad hoc group of the Senior Subordinated Noteholders. While these restructuring efforts were ongoing, the Company was also in discussions with its existing lenders and other possible financing sources regarding potential postpetition debtor in possession financing.

## V.    Missed Interest Payment, Covenant Defaults, Forbearance Agreements

39.    As noted above, on June 15, 2009, the Company announced that it would utilize a 30-day grace period in connection with interest payments scheduled for June 15, 2009 on its Senior Notes and Senior Subordinated Notes to allow the Company to continue discussions with its stakeholders to increase liquidity and improve its capital structure. The 30-day grace period expired on July 15, 2009.

40.    On July 14, 2009, the Debtors secured a limited waiver agreement (the "Waiver") with their lenders under the Senior Credit Facilities (the "Senior Lenders") and secured forbearance agreements (the "Forbearance Agreements") with the majority of its Senior Noteholders and majority of its Senior Subordinated Noteholders. Pursuant to the Waiver the Senior Lenders agreed to waive certain events of default, including the Debtors' non-payment of the June 15, 2009 interest payments within the applicable 30-day grace period.

41.    Pursuant to its terms, the Waiver would have expired on July 28, 2009 absent

notice from the Senior Lenders that the Waiver would continue through August 14, 2009. On

July 27, 2009, the Senior Lenders amended and restated the Waiver, extending the waiver period

until August 14, 2009. Under the Forbearance Agreements, the Senior Noteholders and Senior

Subordinated Noteholders agreed that they would not exercise their rights and remedies under the

indentures governing the notes in connection with the nonpayment of the June 15, 2009 interest

payments until the earlier of (i) August 14, 2009 or (ii) the expiration of the Waiver.

42.    During this period the Debtors engaged in negotiations with the Senior Lenders to

arrange for postpetition debtor in possession financing ("DIP Financing"). As described more

fully in the "DIP Motion" (defined below) – which is being filed concurrently with this Motion –

the Debtors agreed to enter into the superpriority senior secured postpetition credit facility

(the "DIP Facility"). The proposed lenders under the DIP Facility have agreed to provide DIP

Financing up to an aggregate principal amount of $200,000,000, consisting of a

$175,000,000 superpriority delayed draw term loan facility and a $25,000,000 standby

uncommitted single draw term loan facility. Further detail with respect to the terms as

conditions of the DIP Facility can be found in the DIP Motion.

43.    In addition, during this period, the Debtors engaged in negotiations with the

Senior Lenders regarding a consensual restructuring of the Company's indebtedness. While the

Debtors have made substantial progress in its negotiations with the Senior Lenders, the Debtors

have not yet reached agreement on the terms of the Chapter 11 plan.

## VI.    Tax Refund Received by CSA Canada

44.    As discussed above, until the 2004 Acquisition, the Debtors and CSA Canada

were owned by Cooper Tire. Under the terms of the purchase agreement, to the extent that

18

Cooper Standard (or any of its affiliates or subsidiaries) were to receive any tax refunds for periods of time prior to the 2004 Acquisition, Cooper Tire would have a claim against Holdings for the amounts refunded, plus interest received (net of taxes), subject to certain offsets that have not yet been finally negotiated and determined. In that regard, on July 27, 2009, CSA Canada received a tax refund of approximately CAD $80 million from the Canada Revenue Agency, which is the federal portion of a refund owing as a result of certain transfer pricing issues for the years 2000-2007. CSA Canada has not yet received the Statement of Interest from the Canada Revenue Agency that sets forth the allocation of the CAD $80 million refund. In addition, CSA Canada has not yet received any portion of the refund expected from the Ontario provincial government. On July 31, 2009, Cooper Tire demanded payment of at least $38 million from Holdings for the period prior to 2004 and has threatened litigation, but has not yet commenced any litigation seeking payment.

## VII.    The Commencement of the Chapter 11 Cases

45.    While the Debtors are continuing to negotiate with their constituents over the restructuring of the Debtors' balance sheets, given the near term expiration of the Waiver and Forbearance Agreements, the risk of potential litigation over nonpayment of amounts that may be owed to Cooper Tire, and the benefits to the Debtors of being able to access the DIP Financing, the Debtors determined that it is in the best interests of the Company and its stakeholders to file these Chapter 11 Cases at this time so as to complete negotiations of, and implement, a balance sheet restructuring.

## PART IV
## FIRST DAY MOTIONS AND APPLICATIONS

46.    The First Day Motions seek relief aimed at, among other things, maintaining the going concern of the enterprise, effectuating a debtor in possession financing arrangement,

19

maintaining customer loyalty and supplier confidence, and retaining the employees critically needed to operate the business of the Debtors as a going concern, and maintaining employee morale.

47.     The near term success of the Company depends on its ability to continue to timely produce and deliver products to its customers. Thus, it is imperative that the Company makes a quick and smooth transition into chapter 11 to avoid disruption in the supply chain to the automotive industry. OEMs and Tier I and Tier II suppliers count on the Company to enable their own manufacturing process and function. A disruption in the Company's business would ripple through the entire industry. The relief sought in the First Day Motions is aimed at allowing a smooth process that will avoid such consequences.

48.     I have reviewed each of the First Day Motions (including the exhibits thereto), and I believe that the relief sought in each (a) is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption or loss of business, (b) constitutes a critical element in achieving a successful conclusion to the Debtors' Cases, and (c) is in the best interests of the Debtors, their estates, creditors and parties in interest. A summary of each of the motions for which the Debtors seek relief on the first day of these Cases is briefly described below:

> **A.      Motion Pursuant To Bankruptcy Rule 1015(b) and Local Bankruptcy Rule 1015-1 for an Order Directing Joint Administration of Related Chapter 11 Cases**

49.     As described above, the Debtors in these cases are Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., Cooper-Standard Automotive FHS Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, Cooper-Standard Automotive, OH LLC, StanTech, Inc., Westborn Service Center, Inc., North American Rubber, Incorporated,

Sterling Investments Company, Cooper-Standard Automotive NC LLC, CS Automotive LLC,

CSA Services Inc., and NISCO Holding Company.

50.     I believe the joint administration of the chapter 11 cases will benefit the Debtors

and their creditors as it will promote and ensure the efficiency of these cases.  Moreover, as joint

administration will be for procedural purposes only, no creditor will be harmed by the joint

administration of these cases.

> **B.     Motion For An Order, Pursuant to Sections 363(B), 507(A) and 105(A) of the Bankruptcy Code (A) Authorizing Debtors to (I) Pay Prepetition Employee Wages, Salaries and Other Compensation; (II) Contribute to Prepetition Employee Benefit Plans and Continue Such Programs in the Ordinary Course; and (III) Make Deductions from Employees' Paychecks For, Among Other Things, Certain Employee Benefit Plans and Payroll Taxes; and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor All Checks and Electronic Payment Requests Made By Debtors Relating to the Foregoing  (the "Employee Benefits Motion")**

51.     As of the Filing Date, the Debtors employ approximately 2,602 active employees

(the "Employees").  In the ordinary course of business, the Employees were owed or had accrued

sums for wages and salaries, and reimbursement of business expenses.  In addition, the

Employees were entitled to employee benefit claims (including, without limitation, claims and

other obligations arising under the Debtors' self-insured health plans, third-party insured health

plans, life insurance, disability insurance, tuition reimbursement, 401(k) plans, the car program,

retiree benefits, and union benefits) (collectively, the "Employee Obligations").  The Debtors

estimate that, as of the Filing Date, the aggregate amount of Employee Obligations owed is

approximately $5.4 million.

52.     I believe that it is essential to the continued operation of the Debtors' business and

their successful rehabilitation that the Debtors retain the Employees and maintain their morale.

21

The uncertainty surrounding the chapter 11 process will likely cause Employees great concern, and the successful reorganization of the Debtors' business will require significant efforts from their many valued Employees. If the Debtors do not pay employee compensation and benefits, employee morale would be severely harmed, Employees would suffer significant hardship, and the Debtors' reorganization would be jeopardized.

53.    To ensure that the Debtors continue to retain the services of their employees, which are necessary to continue as a growing concern and successfully reorganize, it is imperative that the Debtors be authorized (i) to pay prepetition employee wages, salaries and other compensation up to the Employee Compensation Cap; as defined in the Employee Benefits Motion (ii) contribute to prepetition employee benefit plans and continue such programs in the ordinary course; and (iii) make deductions from employees' paychecks for, among other things, certain employee benefit plans and payroll taxes.

54.    In addition, and in order to ensure that there will not be any unnecessary disruption in the lives of the Employees, the Debtors request that the Debtors' banks be directed to honor prepetition payroll checks, provided that sufficient funds exist in such accounts or the Debtors arrange for sufficient funds to be deposited.

C.    **Motion Pursuant to Sections 345, 363(B), 364, 503(B), and 105(A) of the Bankruptcy Code and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure For An Order (A) Authorizing Debtors to (I) Continue Using A Centralized Cash Management System (Including the Cash Pool) and Bank Accounts, (II) Use Existing Business Forms, Stationery and Checks, and (III) Continue Intercompany Transfers and Provide Administrative Priority Status to Postpetition Intercompany Claims and (B) Waiving the Interest and Deposit Requirements of 345(B) (the "Cash Management Motion")**

22

55.   The Debtors' businesses and financial affairs are complex, requiring the collection, disbursement, and movement of funds through various bank accounts. In the normal course of business, the Debtors' funds are managed utilizing an integrated, centralized cash management system (the "Cash Management System"). By utilizing the Cash Management System, the Debtors are able to monitor the Company's cash position and maintain centralized control over the administration of their various bank accounts used in the ordinary course of business. The Debtors have a comprehensive set of internal controls governing the receipt and disbursement of funds throughout the Cash Management System.

56.   I believe it is imperative that the Debtors maintain their Cash Management System, which is central to the Debtors' ability to meet their postpetition obligations and obtain the goods and services necessary for the continued operation of the Debtors' businesses. The Debtors' cash management system provides the Debtors with substantial benefits, including the ability to control receipts and disbursements, invest idle cash, ensure maximum availability of funds, and reduce the costs and administrative expenses inherent in moving funds between entities and tracking such funds. I believe that it is essential that the Debtors' cash management practices not be interrupted by the implementation of new cash management procedures so as to ensure that the Debtors will be able to meet their obligations in the ordinary course of business during the pendency of these cases.

57.   Furthermore, the value of the Debtors is integrally tied to the success and value of the Company's foreign subsidiaries. Due to the global nature of the Debtors' business, the poor performance or failure of any of the Debtors' foreign subsidiaries would have an extremely detrimental effect on the value of the Debtors. As contemplated by the DIP Facility, the Debtors' Cash Management System enables the Debtors to transfer funds to, from, and between the

23

Company's foreign subsidiaries as needed to sustain the Company's foreign operations. I believe that preserving the ability of the Debtors to maintain their Cash Management System and transfer funds throughout the Company is essential to maintaining the value of the Debtors' estates, which is in the best interests of all stakeholders.

58.    In addition, I understand that upon the filing of a petition for relief under chapter 11 of the Bankruptcy Code, debtors in possession are normally required to close all of their bank accounts, and to open new "debtor in possession" bank accounts. As discussed in greater detail within the relevant motion, the Debtors bank accounts are the basis of their complex Cash Management System. Closing all of the Debtors bank accounts and opening new accounts could substantially disrupt and delay the Debtors in the timely collection of their receivables and payment of their postpetition obligations and interfere with the conduct of their businesses. In addition, in the ordinary course of their businesses, the Debtors use a number of preprinted business forms and stationery. I believe that it would be extremely costly and disruptive to cease using all existing forms and to purchase and begin using new business forms and stationery.

59.    Finally, from time to time, to the extent that there are excess amounts in the Debtors central account, the Debtors invest such amounts in short term, overnight investment vehicles (the "Short Term Investments") with Comerica Bank and Bank of America. These investment accounts are held by CSA. Both funds invest in U.S. government securities, CDs and other securities issued by domestic and foreign banks, and other high quality, short-term investments. The Short Term Investments allow the Debtors to achieve a reasonable net return on their money to help fund their operations and maximize their liquidity. Therefore, to continue making Short Term Investments, the Debtors intend to seek a waiver of any restrictions on their ability to make the Short Term Investments.

24

    **D.**    **Motion of the Debtors Pursuant to Sections 507(A) (8), 541(D) and 105(A) of the Bankruptcy Code For An Order (I) Authorizing the Payment of Prepetition Sales, Use, Property and Other Taxes and Government Charges and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing**

60.    In the ordinary course of business, the Debtors collect and incur taxes, including sales, use, franchise, income, property, and other taxes in operating their businesses. By way of example, the Debtors collect and remit sales taxes ("Sales Taxes") in connection with the sale of automotive products to their customers. The Debtors also pay franchise taxes ("Franchise Taxes") to the taxing authorities (collectively, the "Taxing Authorities") in certain localities in order for the Debtors to operate in the applicable taxing jurisdictions. Similarly, many municipal, county, and state governments require the Debtors to obtain a business license and to pay corresponding business license fees and de minimus registration fees (collectively, the "Business License Fees") to the Taxing Authorities in order for the Debtors to operate in the applicable taxing jurisdictions. The Debtors also pay property taxes levied against the Debtors' real and personal property (collectively, the "Property Taxes" and, with Sales Taxes, Franchise Taxes and Business Taxes, the "Taxes and Fees").

61.    It is my understanding that certain of the Taxes and Fees may be "trust fund" taxes that are held in trust for the relevant Taxing Authorities and, therefore, pursuant to section 541(d) of the Bankruptcy Code, are not property of the Debtors' estates. In addition, in those states that have laws providing that certain of the Taxes and Fees constitute "trust fund" taxes, I have been advised that officers and directors of the Debtors might be held personally liable under state and local laws to the extent that Taxes and Fees are not paid on time. Should any accrued Taxes and Fees of the Debtors remain unpaid as of the Filing Date in such jurisdictions, the

25

Debtors' officers and directors may be subject to lawsuits during the pendency of these Cases,

even if the failure to pay was not a result of any nonfeasance or malfeasance on their part. Such

personal liability, or even the threat of potential personal liability, would prove extremely

disruptive for the Debtors, and the named officers and directors whose attention would be

diverted away from the Debtors' reorganization. In addition, there is a risk that some, if not all,

of the Taxing Authorities will cause the Debtors to be audited if the Taxes are not paid. Such

audits will needlessly divert the Debtors' attention away from the reorganization process.

Accordingly, the Debtors are seeking authority to pay such Taxes to the relevant Taxing

Authorities in the ordinary course of business, as such payments become due.

> **E.**    **Motion Pursuant to Sections 366 and 105(A) of the Bankruptcy Code
> For Interim and Final Order (A) Prohibiting Utilities from Altering,
> Refusing Or Discontinuing Service to, or Discriminating Against, the
> Debtors, (B) Determining that Utilities Are Adequately Assured of
> Payment, and (C) Establishing Procedures for Determining Requests
> for Additional Adequate Assurance (the "Utilities Motion")**

62.    In the normal course of their businesses, the Debtors use electricity, gas, heat

water, telephone, internet, telecommunication, and other utility services provided by the Debtors'

utility companies (the "Utility Companies"). The Debtors estimate that their average monthly

obligations to the Utility Companies on account of services rendered total approximately $1.8

million.

63.    Uninterrupted utility services are essential to the Debtors' ongoing manufacturing

and other operations and that, therefore, the temporary or permanent discontinuation of utility

services at any of the Debtors' facilities could cause irreparable harm to the Debtors' businesses

and jeopardize the Debtors' reorganization efforts. In addition, uninterrupted telephone, internet,

and related service are essential services used by the Debtors for communications with

26

customers, vendors and other contract counterparties. Moreover, the Debtors' employees are entitled to uninterrupted utility services such as water and waste management to ensure a sanitary work environment.

64.     To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to deposit $1 million, which is equal to approximately the Debtors' estimated aggregate cost of two weeks of Utility Services, into a newly created, segregated, interest-bearing account, within twenty (20) business days of the Petition Date (the "Adequate Assurance Deposit"). The Adequate Assurance Deposit will be maintained with a minimum balance equal to the Debtors' estimated two week cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with a Utility Company. The Debtors will have sufficient liquidity and working capital through the DIP Facility (as defined below), to enable the Debtors to satisfy all their postpetition obligations to the Utility Companies. In order to ensure that the Debtors' business operations will not be disrupted during their restructuring, the Debtors are requesting that the Court enter an order. (a) prohibiting utility companies from altering, refusing or discontinuing services to, or discriminating against, the Debtors, (b) deeming the Utility Companies adequately assured of payment, and (c) establishing procedures for determining requests for additional adequate assurance, all as more fully set forth in the Utilities Motion.

      **F.**      **Motion Pursuant to Sections 361, 362, 363, 364, 507 and 105 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2 For Entry of Interim and Final Orders (I) Authorizing the Debtors to (a) Incur Postpetition Financing, (b) Use Cash Collateral, and (c) Provide Adequate Protection to the Prepetition Secured Lenders and (II) Scheduling a Final Hearing (the "DIP Motion")**

65.    In order for the Debtors to continue manufacturing their products in an efficient and effective manner and operate as a going concern during the duration of these Cases, the Debtors must have ample liquidity to meet the needs, demands and obligations of and to their customers, suppliers, employees and taxing authorities. Because of the Debtors' current financial condition, the Debtors do not have adequate liquidity to fund either their ordinary course business expenditures or the expenses necessary to administer the Cases.

66.    Prior to the Filing Date, in light of the Debtors' liquidity issues, over the past several months the Debtors have considered numerous options to obtain incremental liquidity. In order to consider all of their alternatives, the Debtors engaged in a process designed to seek out financing that would be in the best interests of the Debtors and all of their creditors. After evaluating the alternatives, the Debtors concluded that the debtor in possession financing obtained was the most viable alternative and provided the Debtors with the best opportunity to successfully reorganize.

67.    The proposed lenders under the DIP Facility have agreed to provide DIP Financing up to an aggregate principal amount of $200,000,000, consisting of a $175,000,000 superpriority delayed draw term loan facility and a $25,000,000 standby uncommitted single draw term loan facility. The Debtors believe that absent such financing, their prospects for a successful reorganization would be irreparably harmed.

68.    The funds to be provided by the DIP Facility are necessary to ensure that the Company has sufficient liquidity during the chapter 11 cases to operate its business in the ordinary course. While the Debtors' have approximately $15 million in cash on hand, based upon the Company's near term cash forecasts, that cash is insufficient to operate during the chapter 11 cases. Beyond simply paying expenses as they become due, the availability of

28

financing has certain intangible benefits that are critical to the Debtors' restructuring efforts. First, the Debtors' reorganization hinges on the ongoing cooperation of suppliers, vendors and employees. These parties need to be assured that not only will the Debtors' businesses continue, but that the Debtors will have access to the necessary funds during the coming months and the pendency of these cases.

69.    Additionally, the DIP Facility is essential to ensure timely payment of employees' wages, salaries and other employee-related obligations to maintain employee morale and not risk the loss of personnel critical to the Debtors' operations and reorganization. Without the DIP Facility, the Debtors may be required to cease their operations and the Debtors, their estates and their creditors would be irreparably harmed. Accordingly, the Debtors have an urgent and immediate need for the DIP financing contemplated herein.

70.    Moreover, the DIP Facility provides the Company with financing for its global operations. In addition to the funds borrowed directly by the U.S. Borrower, the DIP Facility provides funds directly to the Canadian Borrower and allows for an Additional Foreign Borrower so that funds may be borrowed directly overseas. The DIP Facility also permits, subject to certain exceptions, the parties to the governing credit agreement to make intercompany loans in accordance with the Cash Management System, which is essential for the Debtors' overseas operations to function and meet their obligations as they arise in the ordinary course. As such, the DIP Facility is imperative to meet the needs of the Debtors both domestically and abroad.

71.    In light of the foregoing, I believe that the financing provided by the DIP Facility is essential to the Debtors' restructuring efforts and, therefore, in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

72.    Additionally, I believe the proposed adequate protection components under

the DIP Credit Agreement compensate the Secured Lenders for the diminution in value of

the Debtors' assets securing their liens and are appropriate and justified given the significant

value the Debtors stand to lose in the event they are denied access to the funding provided

under the DIP Facility.

> **G.    Motion Pursuant to Sections 363, 364, 503(B)(9) and 105(A) of the Bankruptcy Code For Entry of Interim and Final Orders (I) Confirming the Grant of Administrative Expense Status to Obligations Arising from Prepetition Delivery of Goods Received Within 20 Days of the Commencement Date of These Chapter 11 Cases and Authorizing But Not Directing the Debtors to Pay Such Obligations in Their Discretion in the Ordinary Course of Business, (II) Authorizing the Debtors to Pay Additional Prepetition Obligations to Certain Essential Suppliers and (III) Authorizing Banks to Receive, Process, Honor and Pay Checks or Electronic Transfers Used by the Debtors to Pay the Foregoing (the "Essential Suppliers Motion")**

73.    The preservation and maximization of the going concern value of the Debtors'

business, including the preservation of key business relationships, are among the Debtors'

primary goals as the Debtors transition into chapter 11.  Providing seamless service to their

customers, including the Debtors' OEM customers, which account for a substantial portion of

the Debtors' global sales, is key to meeting those goals.  In that regard, I believe it is essential

that the Debtors continue the uninterrupted manufacturing of parts for their customers to

preserve and enhance the Debtors' enterprise value.

74.    Like many of the OEMs and other Tier I suppliers in the automotive industry,

the Debtors' manufacturing facilities use the "just-in-time" supply method for processing

their products, meaning the Debtors do not maintain a significant inventory of goods.  If

shipments are delayed or untimely, the Debtors will lack the requisite components and

materials to manufacture their parts, which would inevitably slow or stop the Debtors' operations. Such a disruption would cause immediate and significant harm because the Debtors would incur considerable costs as a result of the facilities being idled by the failure to receive parts, compounded by the inability to generate revenue from their idled facilities.

75. Moreover, since many of the Debtors' customers also use the just-in-time supply method, they do not maintain a significant inventory of the Debtors' products and instead rely upon frequent and timely shipments of such products to keep operating. Even the smallest disruption in the shipment of goods and supplies to the OEMs has the potential to cause work stoppages and slowdowns at the highest level of production – the cost of which would reverberate back down through the Tier I and Tier II suppliers, including the Debtors.

76. I believe the Debtors must continue to receive an uninterrupted supply of essential products to avoid disruption of the supply chain. Any failure to maintain a continuing relationship with certain essential and foreign suppliers (the "Essential and Foreign Suppliers") or to meet the demands of their customers at this crucial time would irreparably harm the Debtors. Indeed, the impact to the Debtors' value as a going concern would be catastrophic. Therefore, given the negative impact that failing to pay the Essential and Foreign Suppliers will have, I believe that it is essential that the Debtors receive interim and final authority to pay the claims of the Essential and Foreign Suppliers, only to the extent necessary and only on such terms and conditions as are appropriate, as more fully set forth in the Essential Suppliers Motion. Additionally, to prevent disruption of the Debtors business, the Debtors intend to seek authority to pay, on a conditional basis, claims of vendors that have contractual obligations to the Debtors but that nevertheless refuse to honor such obligations on a postpetition basis and to request approval of procedures for determining the appropriateness of such payments.

**H.**    **Motion Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code for an Order Authorizing the Debtors to Pay the Prepetition Claims of Shippers, Warehousemen, Customs Brokers, and Tooling Vendors and For Related Relief**

77.    In order to maintain their supply chains, the Debtors must continue to ship, store, and manage the transport of supplies and goods. The Debtors accomplish these critical steps by relying heavily on certain parties such as common carriers, warehouse facilities, customs brokers, and tooling manufacturers (the "Lienholders"). During the course of the transport of supplies and goods, I am advised that these parties may obtain liens and interests in property owned by the Debtors (collectively the "Lienholders' Claims"), including in some cases, a right to possession of that property.

78.    I believe that many, if not all, of the providers that the Debtors seek authority to pay provide goods or services that are critical to the continued operation of the Debtors' production and distribution chains. Failure to pay the Lienholders' Claims may result in the assertion of liens by the identified providers against any goods in their possession as of the Filing Date. Moreover, unless their prepetition claims are satisfied, these providers may refuse to release goods in their possession, which would disrupt the Debtors' ability to manufacture goods and deliver their products to their customers.

79.    Additionally, counsel has advised me pursuant to section 506 of the Bankruptcy Code, fully secured creditors are entitled to receive (i) payment in full of their prepetition claims and (ii) the postpetition interest accruing on such claims up to the value of the collateral. Consequently, payment of the Lienholders' Claims now will, in most cases, (i) give the Lienholders no more than they otherwise would be entitled to receive on account of their claims in the chapter 11 process; and (ii) save the Debtors the cost of interest that otherwise may accrue on the Lienholders' Claims.

80.     As discussed above, the supply chains of the Debtors and their customers are extremely sensitive, and the disruption in the Debtors operations caused by a delay or non-delivery of goods and services could have disastrous effects on the Debtors business operations and successful rehabilitation.  Therefore, the Debtors believe that it is necessary and appropriate to pay the prepetition Lienholders' claims to preserve and maximize the value of the Debtors' estate.

I.      **Motion of Debtors For Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Rule 6003 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to Continue to Honor Obligations on Account of the Debtors' Warranties, Clearinghouse Functions, and Participation in Purchasing Programs and (II) Authorizing and Directing Banks and Other Financial Institutions to Honor All Checks and Electronic Payment Requests Made by Debtors Relating to the Foregoing**

81.     During the ordinary course of business, the Debtors offer a number of customer programs ("Customer Programs") that have proven to be a successful business strategy in the past, and are responsible for generating valuable goodwill, repeat business, and net revenue increases.  By way of example, the Debtors issues warranties for the various products they produce and obligations that arise under their OEM customers' warranty programs and under the OEM warranty sharing programs and warranty reduction programs.  The Debtors also function as an intermediary buyer or clearinghouse for several of their customers, which results in advanced payments being to the Debtors in which they do not have an equitable interest.  Furthermore, the Debtors participate in various purchasing programs in which various OEMs facilitate the purchasing of parts and raw materials in order to allow the Debtors to take advantage of the OEMs' aggregate purchasing power.

82.     I believe that continuing the Customer Programs throughout the Cases is essential
to maintaining the value of the Debtors' estates as they attempt to restructure their businesses.
The success of the Debtors' reorganization under Chapter 11 depends upon the continued loyalty
and patronage of customers.  An interruption of the Customer Programs, even for a brief period
of time, could irreparably damage the Debtors' reputation as makers of reliable products and
could severely damage the Debtors' relationships with customers, possibly beyond repair, and as
a result, such customers may seek to purchase and distribute products from other manufacturers.
The effect of this damage could be a disastrous reduction in the Debtors' client base that would
preclude any reorganization.  Although the Debtors believe that the continuation of the Customer
Programs is within the ordinary course of their business activities, out of an abundance of
caution, the Debtors intend to request authority to continue their Customer Programs.

J.     **Application for Entry of Order Authorizing Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Notice, Claims and Solicitation Agent Nunc Pro Tunc to the Petition Date**

83.     The Debtors are seeking to retain Kurtzman Carson Consultants LLC ("KCC") to
act as claims, notice and balloting agent for the Clerk of the Bankruptcy Court.  The thousands of
creditors and other parties in interest involved in the Debtors' Cases may impose heavy
administrative and other burdens on the Court and the Office of the Clerk of the Court (the
"Clerk's Office").  To relieve the Debtors and the Clerk's Office of these burdens, the Debtors
propose to engage KCC as their notice and balloting agent in these Cases.

84.     I am informed that KCC is a bankruptcy administrator that specializes in
providing comprehensive chapter 11 administrative services including noticing, claims
processing, balloting and other related services critical to the effective administration of
chapter 11 cases.  I am informed that KCC's compensation levels are reasonable, and the Debtors

34

propose to pay KCC its fees and expenses upon receipt of monthly invoices, without further application to the Court.

## PART V
## CONCLUSION

85.    In order to minimize any loss of value to the Debtors' businesses, the Debtors' immediate objective is to engage in business as usual following the commencement of these Cases, with as little interruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of creditors and the Debtors' estates, will be substantially enhanced.

86.    Pursuant to 28 U.S.C. § 1746, I declare, under the penalty of perjury, that the above statements are true and correct.

August 3, 2009

By: _____

Allen J. Campbell
Vice President and Chief Financial Officer

# EXHIBIT A