# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COOPER-STANDARD HOLDINGS INC., et *al.*,[1] | ) | Case No. 09-12743 (PJW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | |

---

## FIRST AMENDED DISCLOSURE STATEMENT
## FOR DEBTORS' SECOND AMENDED JOINT
## CHAPTER 11 PLAN OF REORGANIZATION

---

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn.:  Mark D. Collins, Esq.
       Michael J. Merchant, Esq.
       Chun I. Jang, Esq.
       Drew G. Sloan, Esq.
Tel:  (302) 651-7700
Fax:  (302) 651-7701

Dated: March 26, 2010

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
Attn.:  Gary L. Kaplan, Esq.
       Richard J. Slivinski, Esq.
       Peter B. Siroka, Esq.
Tel:  (212) 859-8000
Fax:  (212) 859-4000

---

[1] The Debtors are the following entities: Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., Cooper-Standard Automotive FHS Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, Cooper-Standard Automotive OH, LLC, Stan Tech, Inc., Westborn Service Center, Inc., North American Rubber, Incorporated, Sterling Investments Company, Cooper-Standard Automotive NC L.L.C., CS Automotive LLC, CSA Services Inc., and NISCO Holding Company. The corporate address of the Debtors is: 39550 Orchard Hill Place Drive, Novi, Michigan 48375.

# TABLE OF CONTENTS

**PAGE**

ARTICLE I. INTRODUCTION AND SUMMARY ....................................................................4

    1.01    The Solicitation .......................................................................................4

    1.02    Recommendations ...................................................................................6

    1.03    Summary of Key Provisions of the Plan .........................................................7

    1.04    Separate Sub-Plan for Each Debtor...............................................................10

    1.05    Summary of the Rights Offering and Holdback.................................................10

    1.06    Summary of Classifications and Treatment of Claims and Equity Interests.................12

    1.07    Conditions of Confirmation and Consummation of Plan.......................................17

ARTICLE II. DEFINITIONS..............................................................................................19

ARTICLE III. BACKGROUND ..........................................................................................36

    3.01    Debtors' Business....................................................................................36

    3.02    Prepetition Financing ...............................................................................41

    3.03    Events Preceding Commencement of the Chapter 11 Cases.....................................42

    3.04    Pending Ordinary Course Litigation ..............................................................45

ARTICLE IV. DESCRIPTION OF CHAPTER 11 CASES .........................................................46

    4.01    First Day Motions....................................................................................46

    4.02    Retention of Professionals..........................................................................48

    4.03    Appointment of Creditors' Committee ............................................................49

    4.04    The DIP Financing Facility ........................................................................50

    4.05    The Refinanced DIP Financing Facility..........................................................51

    4.06    The Cooper Tire Adversary Proceeding...........................................................52

    4.07    Schedules of Assets and Liabilities & Statements of Financial Affairs.......................53

    4.08    Bankruptcy Rule 2015.3(a) Reports of Financial Information ..................................53

    4.09    Bar Dates ..............................................................................................54

4.10   Exclusivity..................................................................................54

4.11   Unexpired Non-Residential Real Property Leases.......................................54

4.12   Removal of Claims and Actions..........................................................55

4.13   Development of the Business Plan.......................................................55

4.14   Negotiations Relating to Development of the Plan......................................56

ARTICLE V. SUMMARY OF THE PLAN ...............................................................58

5.01   General ....................................................................................58

5.02   Voting on the Plan........................................................................58

5.03   Classification and Treatment of Claims and Equity Interests Under the Plan ..............59

ARTICLE VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................70

6.01   Assumption and Rejection of Executory Contracts and Unexpired Leases.................70

6.02   Cure of Defaults ..........................................................................71

6.03   Bar Date for Rejection Damages.........................................................71

6.04   Employee Benefit Plans and Agreements ...............................................71

ARTICLE VII. IMPLEMENTATION OF THE PLAN.................................................73

7.01   No Substantive Consolidation............................................................73

7.02   Vesting of Property .......................................................................74

7.03   Preservation of Causes of Action ........................................................74

7.04   Implementation............................................................................75

7.05   Rights Offering and Holdback ...........................................................75

7.06   New Credit Facilities......................................................................77

7.07   Corporate Action ..........................................................................77

7.08   Issuance of New Common Stock .........................................................77

7.09   Issuance of New Preferred Stock ........................................................78

7.10   Issuance of New Capital Warrants .......................................................81

7.11    Registration Rights Agreement; Shelf Registration ...................................................... 81

7.12    Cancellation of Existing Securities and Agreements ..................................................... 83

7.13    Reorganized Debtors' Certificates of Incorporation; Certificate of Designations ........ 83

7.14    Directors of the Reorganized Debtors .......................................................................... 84

7.15    Management Agreements ............................................................................................... 85

7.16    Pension Plans .................................................................................................................. 86

7.17    Termination of DIP Financing Agreement ................................................................... 86

7.18    Director Nomination Agreement ................................................................................... 87

ARTICLE VIII. DISTRIBUTIONS UNDER THE PLAN .......................................................... 87

8.01    Timing of Distributions Under the Plan ....................................................................... 87

8.02    Distributions on Account of the Prepetition Credit Facility Claim .............................. 87

8.03    Distributions on Account of the Senior Notes .............................................................. 87

8.04    Distributions on Account of the Senior Subordinated Notes ........................................ 88

8.05    Allocation of Consideration ........................................................................................... 89

8.06    Cash Payments ................................................................................................................ 89

8.07    Payment of Statutory Fees ............................................................................................. 90

8.08    No Interest ...................................................................................................................... 90

8.09    Setoffs ............................................................................................................................. 90

8.10    Special Provision Regarding Unimpaired Claims ......................................................... 90

8.11    Fractional Securities ....................................................................................................... 90

8.12    Compliance with Tax Requirements .............................................................................. 91

8.13    Persons Deemed Holders of Registered Securities; the Distribution Record Date ....... 91

8.14    Surrender of Existing Securities .................................................................................... 91

8.15    Undeliverable or Unclaimed Distributions ................................................................... 92

8.16    Distributions on Account of General Unsecured Claims .............................................. 92

8.17   Exemption From Certain Transfer Taxes ........................................................ 92

ARTICLE IX. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ................................ 93

9.01   Objections to Claims; Disputed Claims ...................................................... 93

9.02   Estimation of Claims ................................................................................... 93

9.03   Payments and Distributions with Respect to Disputed Claims .................... 94

9.04   Timing of Payments and Distributions with Respect to Disputed Claims ................... 94

9.05   Prosecution of Objections ........................................................................... 94

ARTICLE X. DISCHARGE, INJUNCTIONS, RELEASES AND SETTLEMENT OF
          CLAIMS .......................................................................................... 94

10.01   Discharge of all Claims and Old Equity Interests and Releases ................... 95

10.02   Exculpation ................................................................................................. 97

10.03   Injunction .................................................................................................... 98

10.04   Guarantees and Claims of Subordination .................................................... 98

10.05   Survival of Indemnification Obligations ..................................................... 99

ARTICLE XI. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE .................... 99

11.01   Conditions to Entry of the Confirmation Order ........................................... 99

11.02   Conditions to Effective Date ....................................................................... 99

11.03   Waiver of Conditions ................................................................................ 101

11.04   Effect of Failure of Conditions ................................................................. 101

ARTICLE XII. MISCELLANEOUS PROVISIONS OF THE PLAN ................................... 102

12.01   Retention of Jurisdiction ........................................................................... 102

12.02   Binding Effect .......................................................................................... 103

12.03   Authorization of Corporate Action ........................................................... 103

12.04   Modification of the Plan ........................................................................... 103

12.05   Withdrawal of the Plan ............................................................................. 104

12.06   Non-Voting Stock ..................................................................................... 104

12.07   Dissolution of the Committee ....................................................................... 104

12.08   Record Date for Voting Purposes................................................................... 104

12.09   Section 1125(e) of the Bankruptcy Code ..................................................... 105

12.10   Post-Confirmation Obligations ..................................................................... 105

12.11   Severability of Plan Provisions ..................................................................... 105

12.12   Successors and Assigns................................................................................... 105

ARTICLE XIII. CERTAIN RISK FACTORS ........................................................... 106

13.01   Certain Bankruptcy Law Considerations. .................................................... 106

13.02   Risks Related to the Debtors' Business......................................................... 113

13.03   Factors Affecting the Value of the Securities .............................................. 120

ARTICLE XIV. APPLICATION OF SECURITIES ACT ......................................... 123

14.01   Issuance and Resale of New Securities Under the Plan .............................. 123

14.02   New Common Stock, New Preferred Stock, New Capital Warrants .......... 125

14.03   Rights Offering: Rights Offering Shares, Holdback Shares and Backstop Warrants . 125

ARTICLE XV. FINANCIAL PROJECTIONS, VALUATION AND ASSUMPTIONS USED 125

15.01   Valuation of the Debtors ................................................................................ 126

15.02   Financial Projections...................................................................................... 131

ARTICLE XVI. CERTAIN UNITED STATES FEDERAL INCOME TAX
            CONSEQUENCES......................................................................... 133

1.01   United States Federal Income Tax Consequences to the Debtors................ 135

16.02   United States Federal Income Tax Consequences of the Plan to U.S. Holders of Senior
         Subordinated Note Claims .......................................................................... 138

16.03   Information Reporting and Backup Withholding.......................................... 145

ARTICLE XVII. ACCEPTANCE AND CONFIRMATION OF THE PLAN ........... 146

17.01   Solicitation of Acceptance ............................................................................ 146

17.02   Confirmation Hearing .................................................................................... 146

17.03  Requirements for Confirmation of the Plan ........................................................... 147

17.04  Confirmation of the Plan under Section 1129(b) ..................................................... 147

17.05  No Unfair Discrimination ........................................................................................ 148

17.06  Fair and Equitable Test .......................................................................................... 148

17.07  Best Interests Test .................................................................................................. 149

17.08  Feasibility .................................................................... ............................................ 151

ARTICLE XVIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN .................................................................................................... 152

18.01  Continuation of the Chapter 11 Cases ................................................................... 152

18.02  Liquidation Under Chapter 7 of the Bankruptcy Code ........................................... 152

18.03  Alternative Plan ...................................................................................................... 153

ARTICLE XIX. THE BANKRUPTCY PLAN—VOTING INSTRUCTIONS AND
PROCEDURES ............................................................................................. 153

19.01  General .................................................................................................................... 153

19.02  Voting Deadline ...................................................................................................... 154

19.03  Holders of Claims Entitled to Vote ......................................................................... 154

19.04  Vote Required for Acceptance by a Class ................................................................ 155

19.05  Voting Procedures ................................................................................................... 155

ARTICLE XX. CONCLUSION AND RECOMMENDATION ................................................. 157


APPENDIX A       —       FINANCIAL PROJECTIONS

APPENDIX B       —       LIQUIDATION ANALYSIS

APPENDIX C       —       SECOND AMENDED PLAN OF REORGANIZATION

APPENDIX D       —       COOPER-STANDARD HOLDINGS INC. FORM 10-K FOR
THE FISCAL YEAR ENDED DECEMBER 31, 2008

APPENDIX E       —       COOPER-STANDARD HOLDINGS INC. FORM 10-Q FOR
THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2009

APPENDIX F          &ndash;       COOPER-STANDARD HOLDINGS INC. FORM 10-Q FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2009

APPENDIX G          &ndash;       COOPER-STANDARD HOLDINGS INC. FORM 10-Q FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2009

APPENDIX H          &ndash;       DEBTORS' MONTHLY OPERATING REPORT FOR THE MONTHLY PERIOD JANUARY 1, 2010 THROUGH JANUARY 31, 2010

Cooper-Standard Holdings Inc. and its subsidiaries, Cooper-Standard Automotive Inc., Cooper-Standard Automotive FHS Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, Cooper-Standard Automotive OH, LLC, StanTech, Inc., Westborn Service Center, Inc., North American Rubber, Incorporated, Sterling Investments Company, Cooper-Standard Automotive NC LLC, CS Automotive LLC, CSA Services Inc., and NISCO Holding Company, the above-captioned Debtors and Debtors In Possession, hereby propose and file this disclosure statement for the Debtors' Second Amended Joint Chapter 11 Plan, dated March 26, 2010, which is comprised of thirteen (13) sub-plans, one for each Debtor:

**THE PLAN IS THE RESULT OF EXTENSIVE NEGOTIATIONS AMONG THE DEBTORS, THE CREDITORS' COMMITTEE AND THE BACKSTOP PARTIES. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' CREDITORS. THE DEBTORS AND THE CREDITORS' COMMITTEE STRONGLY URGE ALL HOLDERS OF SENIOR SUBORDINATED NOTEHOLDER CLAIMS TO VOTE TO ACCEPT THE PLAN.**

**THIS DISCLOSURE STATEMENT IS DESIGNED TO SOLICIT YOUR ACCEPTANCE OF THE ATTACHED PLAN AND CONTAINS INFORMATION RELEVANT TO YOUR DECISION. PLEASE READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE OTHER MATERIALS COMPLETELY AND CAREFULLY. THE PLAN IS ATTACHED AS APPENDIX C TO THIS DISCLOSURE STATEMENT. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER APPENDICES ANNEXED HERETO, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT. THE TERMS OF THE PLAN WILL GOVERN IN CASE OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT. FURTHERMORE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE, OR (B) THE DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.**

**THE CLASS OF CLAIMS IMPAIRED (AS DEFINED IN THE BANKRUPTCY CODE) UNDER EACH SUB-PLAN AND ENTITLED TO VOTE ON THE PLAN IS CLASS 6 (SENIOR SUBORDINATED NOTE CLAIMS). CLASS 1 (PRIORITY CLAIMS), CLASS 2 (MISCELLANEOUS SECURED CLAIMS), CLASS 3 (INTERCOMPANY CLAIMS), CLASS 4 (PREPETITION CREDIT FACILITY CLAIMS), CLASS 5 (SENIOR NOTE CLAIMS), CLASS 7 (SUBSIDIARY DEBTOR GENERAL UNSECURED CLAIMS) AND CLASS 8 (SUBSIDIARY DEBTOR EQUITY INTERESTS) ARE UNIMPAIRED, AND HOLDERS OF CLAIMS OR INTERESTS IN SUCH CLASSES ARE CONCLUSIVELY PRESUMED TO HAVE ACCEPTED THE PLAN PURSUANT TO SECTION 1126(f) OF THE BANKRUPTCY CODE. CLASS 9 (HOLDINGS GENERAL UNSECURED CLAIMS) AND CLASS 10 (OLD HOLDINGS**

EQUITY INTERESTS) ARE IMPAIRED AND THE HOLDERS OF HOLDINGS GENERAL UNSECURED CLAIMS AND OLD HOLDINGS EQUITY INTERESTS IN SUCH CLASSES WILL NOT RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN ON ACCOUNT OF THEIR CLAIMS OR OLD HOLDINGS EQUITY INTERESTS, AS THE CASE MAY BE, AND, THEREFORE, ARE DEEMED TO HAVE REJECTED THE PLAN PURSUANT TO SECTION 1126(g) OF THE BANKRUPTCY CODE.

HOLDERS OF SENIOR SUBORDINATED NOTE CLAIMS (CLASS 6) ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, INCLUDING THOSE UNDER "CERTAIN RISK FACTORS," PRIOR TO SUBMITTING BALLOTS VOTING ON THE PLAN. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH HOLDER OF SENIOR SUBORDINATED NOTE CLAIMS (CLASS 6) MUST RELY ON ITS OWN EXAMINATION OF THE DEBTORS AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. IN ADDITION, CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CONDITIONS PRECEDENT THAT COULD LEAD TO DELAYS IN CONSUMMATION OF THE PLAN. THERE CAN BE NO ASSURANCE THAT EACH OF THESE CONDITIONS WILL BE SATISFIED OR WAIVED (AS PROVIDED IN THE PLAN) OR THAT THE PLAN WILL BE CONSUMMATED. EVEN AFTER THE EFFECTIVE DATE, DISTRIBUTIONS UNDER THE PLAN MAY BE SUBJECT TO SUBSTANTIAL DELAYS FOR HOLDERS OF CLAIMS THAT ARE DISPUTED.

CLASS 6 (SENIOR SUBORDINATED NOTE CLAIMS) WILL HAVE ACCEPTED THE PLAN IF THE HOLDERS OF CLAIMS IN SUCH CLASS (OTHER THAN ANY HOLDER DESIGNATED UNDER SUBSECTION 1126(e) OF THE BANKRUPTCY CODE) WHO CAST VOTES TO ACCEPT THE PLAN HOLD AT LEAST TWO-THIRDS IN DOLLAR AMOUNT AND MORE THAN ONE-HALF IN NUMBER OF THE ALLOWED CLAIMS THAT ARE HELD BY HOLDERS OF CLAIMS ACTUALLY VOTING IN SUCH CLASS. THE BACKSTOP PARTIES (WHICH HOLD A SUBSTANTIAL MAJORITY IN DOLLAR AMOUNT OF SUCH CLAIMS) SUPPORT THE PLAN AND HAVE AGREED TO VOTE IN FAVOR OF THE PLAN.

THE DEBTORS WILL REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE PLAN UNDER BANKRUPTCY CODE SECTION 1129(b). SECTION 1129(b) PERMITS CONFIRMATION OF THE PLAN DESPITE REJECTION BY ONE OR MORE CLASSES IF THE BANKRUPTCY COURT FINDS THAT THE PLAN "DOES NOT DISCRIMINATE UNFAIRLY" AND IS "FAIR AND EQUITABLE" AS TO THE CLASS OR CLASSES THAT DO NOT ACCEPT THE PLAN. BECAUSE CLASS 9 (HOLDINGS GENERAL UNSECURED CLAIMS) AND CLASS 10 (OLD HOLDINGS EQUITY INTERESTS) ARE DEEMED TO HAVE REJECTED THE PLAN, THE DEBTORS WILL REQUEST THAT THE BANKRUPTCY COURT FIND THAT THE PLAN IS FAIR AND EQUITABLE AND DOES NOT DISCRIMINATE UNFAIRLY AS TO CLASS 9 (HOLDINGS GENERAL UNSECURED CLAIMS) AND CLASS 10 (OLD

HOLDINGS EQUITY INTERESTS). FOR A MORE DETAILED DESCRIPTION OF THE REQUIREMENTS FOR ACCEPTANCE OF THE PLAN AND OF THE CRITERIA FOR CONFIRMATION, SEE ARTICLE XVII HEREIN, ENTITLED "ACCEPTANCE AND CONFIRMATION OF THE PLAN."

NO PARTY IS AUTHORIZED BY THE DEBTORS TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTORS, THEIR FUTURE BUSINESS OPERATIONS, OR THE VALUE OF THEIR PROPERTIES HAS BEEN AUTHORIZED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAWS. ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT AND THE PLAN DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON OR WILL PASS UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN OR THEREIN.

IF THE REQUISITE ACCEPTANCES OF THE PLAN ARE RECEIVED, THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE WHO DO NOT OR ARE NOT ENTITLED TO SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) WILL BE BOUND BY THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

EACH HOLDER OF A CLAIM AGAINST OR AN EQUITY INTEREST IN THE DEBTORS SHOULD CONSULT WITH SUCH PARTY'S LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTERS CONCERNING THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY DISTRIBUTION OF PROPERTY PURSUANT TO THE PLAN WILL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF OR THAT THERE HAS

BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN OR IN THE AFFAIRS OF THE DEBTORS SINCE THE DATE HEREOF.

THIS SOLICITATION AND DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE COMPANY AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING THOSE SUMMARIZED HEREIN.

ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN WHICH, THEREFORE, ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE DEBTORS AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTORS, THEIR ADVISORS, OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF, OR AGAINST, THE PLAN. NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY. NO STATEMENT OF FACT SHALL BE ADMISSIBLE IN ANY PROCEEDING, INCLUDING ANY PROCEEDING WITH RESPECT TO ANY LEGAL EFFECT OF THE CHAPTER 11 CASES.

## ARTICLE I.
## INTRODUCTION AND SUMMARY

This Disclosure Statement is being furnished by the Debtors, pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the Plan (as it may be altered, amended, modified or supplemented) from Holders of Senior Subordinated Note Claims (Class 6). All capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in Article II herein, entitled "Definitions", except as otherwise indicated. The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements appearing elsewhere in this Disclosure Statement.

### 1.01    The Solicitation

On the Filing Date, each of the Debtors filed separate petitions under chapter 11 of the Bankruptcy Code. The Debtors' Canadian subsidiary, CSA Canada, commenced a proceeding under Canada's CCAA on August 4, 2009, in the Ontario Superior Court of Justice

(Commercial List) in Toronto, Ontario, Canada. The Debtors' remaining direct and indirect subsidiaries did not seek chapter 11 protection under the Bankruptcy Code, and each of these non-filing entities is continuing normal business operations. On the date hereof, the Debtors filed their Plan and this related Disclosure Statement with the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

On March 26, 2010, the Bankruptcy Court determined that this Disclosure Statement contains "adequate information" in accordance with section 1125 of the Bankruptcy Code. Pursuant to section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . ." 11 U.S.C. § 1125(a)(1).

**The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for May 12, 2010 at 9:30 a.m. (prevailing Eastern Time) before the Honorable Peter J. Walsh, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware. The hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing. Any objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties listed below to ensure RECEIPT by them on or before 4:00 p.m. (prevailing Eastern Time), May 5, 2010.**

**Counsel to the Debtors:**

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Chun I. Jang, Esq.
Tel.: (302) 651-7700
Fax: (302) 651-7701

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
Attn: Gary L. Kaplan, Esq.
Richard J. Slivinski, Esq.
Peter B. Siroka, Esq.
Tel.: (212) 859-8000
Fax: (212) 859-4000

**The United States Trustee:**

Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, Delaware 19801
Attn:  Joseph McMahon, Esq.
Fax:    (302) 573-6497

**Counsel to the Creditors' Committee:**

YOUNG, CONWAY, STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-1347
Attn.: M. Blake Cleary, Esq.
Erin Edwards, Esq.
Jaime N. Luton, Esq.
Tel.:  (302) 571-6600
Fax:   (302) 571-1253

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Attn.:  Robert T. Schmidt, Esq.
Kenneth H. Eckstein, Esq.
Stephen D. Zide, Esq.
Tel.:   (212) 715-9100
Fax:    (212) 715-8000

**Counsel to the Backstop Parties:**

Bayard, P.A.
222 Delaware Avenue, Suite 900
Wilmington, Delaware  19899
Attn.:  Charlene D. Davis, Esq.
Tel.:   (302) 655-5000
Fax:    (302) 658-6395

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn.: Timothy Graulich, Esq.
Brian M. Resnick, Esq.
Tel.:   (212) 450-4000
Fax:    (212) 701-5800

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899
Attn.:  Curtis A. Hehn, Esq.
Tel.:   (302) 652-4100
Fax:   (302) 652-4400

Akin, Gump, Strauss, Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn.:  Daniel Golden, Esq.
Arik Preis, Esq.
Tel. : (212) 872-1000
Fax : (212) 872-1002

1.02   **Recommendations**

THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND
THAT EACH ENTITY ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE
PLAN.  IN ADDITION, THE BACKSTOP PARTIES SUPPORT THE PLAN AND HAVE

**AGREED, SUBJECT TO APPROVAL OF THIS DISCLOSURE STATEMENT, TO VOTE IN FAVOR OF THE PLAN.** The Debtors and the Creditors' Committee believe that:

        (a)      The Plan provides the best available result for the Holders of Claims;

        (b)      With respect to each Impaired Class of Claims, the distributions under the Plan, if any, are not less than the amounts that would be received if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and

        (c)      Acceptance of the Plan is in the best interests of Holders of Claims.

### 1.03    <u>Summary of Key Provisions of the Plan</u>

Prior to commencing these Chapter 11 Cases and since the filing of the Debtors' petition for relief under the Bankruptcy Code, the Debtors have sought a consensual restructuring of their balance sheets so as to be able to emerge from chapter 11 with an appropriate capital structure that would enable the Debtors to remain competitive. Although the value of the Debtors significantly exceeds the amount of the Prepetition Credit Facility Claims under the Prepetition Credit Facility, the Debtors could not reinstate or refinance that debt because the Debtors would be significantly over leveraged. Accordingly, the Debtors' initial efforts focused on negotiating a stand-alone chapter 11 plan with the Creditors' Committee and the Prepetition Credit Facility Lenders that would provide the Prepetition Credit Facility Lenders with a recovery consisting of debt and equity in a reorganized Holdings, with the remaining equity being distributed to the Senior Noteholders and the Senior Subordinated Noteholders (collectively, the "Noteholders"). However, as negotiations continued, it became apparent that the Prepetition Credit Facility Lenders, the Creditors' Committee and certain of Senior Noteholders and Senior Subordinated Noteholders held vastly different views of the value of the reorganized Debtors and that the Prepetition Credit Facility Lenders would not accept equity at a value that would be acceptable to the Noteholders or the Creditors' Committee. The Debtors also recognized the potential obstacles they would face if they had to try to force the Prepetition Credit Facility Lenders to accept equity in satisfaction of their Prepetition Credit Facility Claims. In order to resolve these divergent viewpoints and avoid contested and lengthy chapter 11 cases, the Debtors engaged with the Creditors' Committee and certain of the Debtors' Noteholders to develop a chapter 11 plan that would pay the claims of the Prepetition Credit Facility Lenders in full, in Cash, while providing the best possible distribution to the Debtors' other creditors and achieving the Debtors' stated goals. As a result, on February 1, 2010, the Debtors filed their Joint Chapter 11 Plan of Reorganization (the "Original Plan") providing for the unimpairment of the Prepetition Credit Facility Claims using (i) the proceeds from a $245 million equity rights offering offered to the Debtors' Noteholders and backstopped by certain of the Debtors' Noteholders (the "First Backstop Parties") pursuant to that certain Commitment Agreement, dated as of February 1, 2010 (the "Original Commitment Agreement"), and (ii) the Debtors' exit financing. In addition, under the Original Plan, the Senior Noteholders and Senior Subordinated Noteholders were to receive equity in the Reorganized Debtors as well as rights to purchase additional New Common Stock.

Shortly after filing the Original Plan, certain of the Debtors' Noteholders (the "Second Backstop Parties") approached the Debtors with an alternative proposal to backstop a

rights offering that contained certain advantages when compared to the recovery provided for in the Original Plan. Accordingly, the Debtors adjourned the hearing on the approval of the Original Commitment Agreement to engage in negotiations with the Second Backstop Parties regarding the alternative proposal and reengage with the First Backstop Parties to improve the terms of the Original Commitment Agreement.

While the Debtors made significant progress negotiating a commitment agreement with the Second Backstop Parties, the Debtors had significant concerns about going forward with such alternative proposal for various reasons including, without limitation, uncertainty about receiving sufficient votes to confirm any plan of reorganization based on such alternative.

After extensive, arms-length negotiations between the Debtors, the Creditors' Committee, the First Backstop Parties and the Second Backstop Parties, all parties agreed upon the terms of a revised restructuring proposal incorporated in the new Equity Commitment Agreement. The Equity Commitment Agreement and the Plan provide for a $355 million backstopped equity rights offering that would pay the Prepetition Facility Claims and the Senior Note Claims in full, in cash, and improve the recovery to the Senior Subordinated Noteholders. Thus, the Debtors have now filed the Plan, which has the support of Holders holding more than half of the outstanding principal amount of Senior Note Claims and Holders holding a substantial majority of the outstanding principal amount of the Senior Subordinated Note Claims.

Pursuant to the terms of the Plan:

- Each Allowed Administrative Expense will be paid in full, in cash;

- Each Allowed Priority Tax Claim will receive Cash payments in an amount equal to the amount of such Allowed Priority Tax Claim on the Effective Date or such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtors or the Reorganized Debtors, as the case may be;

- Holders of Allowed Prepetition Credit Facility Claims will be paid in full, in Cash, on the Effective Date;

- Holders of Allowed Senior Note Claims will be paid in full, in Cash, on the Effective Date; provided, however, that the Supporting Senior Noteholders have each agreed to forgo their right to receive payment in full, in Cash, and in lieu thereof, have agreed to accept, in full satisfaction of the Allowed Supporting Senior Note Claims, its Pro Rata share of 4,563,095 shares of the New Common Stock;

- Allowed Priority Claims, Allowed Miscellaneous Secured Claims, Intercompany Claims, Subsidiary Debtor General Unsecured Claims and Subsidiary Debtor Equity Interests will be Unimpaired;

- Holders of Allowed Senior Subordinated Note Claims will receive a distribution of, in the aggregate, (i) 1,742,222 shares, or approximately

8

8%, of the New Common Stock (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants) and (ii) warrants to acquire an additional 725,926, or approximately 3% of the New Common Stock pursuant to the New Capital Warrant Agreement. In addition, pursuant to the Rights Offering, Eligible Noteholders will be entitled to receive their pro rata share of Senior Subordinated Noteholder Rights to purchase, in the aggregate, 8,623,491 shares, or approximately 39.6%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants), at the New Common Stock Subscription Price. Non-Eligible Noteholders will receive a distribution of a number of shares of New Common Stock determined after the deadline for receipt of all Investor Certificates in a manner previously agreed upon by the Debtors and the Backstop Parties with a value equal to the value of the Senior Subordinated Noteholder Rights such Holder would have received if it was an Accredited Investor, a QIB or a Non-U.S. Person and which number of shares will be filed as a Plan Supplement;

.   Holders of Holdings General Unsecured Claims and Old Holdings Equity Interests are Impaired and Holders of such Claims or Interests will not receive or retain any property under the Plan and are deemed to reject the Plan; and

.   In consideration for providing the commitment to backstop the Rights Offering, the Debtors have agreed to sell and the Backstop Parties have agreed to purchase (i) 2,558,182 shares, or approximately 11.75%, of the New Common Stock at the Holdback Subscription Price and (ii) 1,000,000 shares of the New Preferred Stock at the New Preferred Stock Subscription Price. In addition, the Debtors have agreed to issue warrants to the Backstop Parties to purchase 1,693,827 shares, or approximately 7%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan).

In order for the Plan to be confirmed by the Bankruptcy Court pursuant to section 1129(b) of the Bankruptcy Code, at least one class of Impaired Claims must accept the Plan, determined without including votes to accept the Plan cast by "insiders," as that term is defined in section 101(31) of the Bankruptcy Code. A class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected such plan. The Backstop Parties (which hold a substantial majority in dollar amount of Senior Subordinated Note Claims) support the Plan and have agreed to vote in favor of the Plan.

Even if the requisite classes accept the Plan, the Plan will be confirmed by the Bankruptcy Court only if all other requirements to confirmation are satisfied. See section 13.01 "Certain Risk Factors—Certain Bankruptcy Law Considerations—Risk of Non-Confirmation or Modification of the Plan."

1.04    **Separate Sub-Plan for Each Debtor**

Under the Plan, there is a separate Sub-Plan for each Debtor. Generally, Holders of a General Unsecured Claim or Equity Interest against a Debtor only have a right to be paid from the assets of the specific Debtor against which they hold a Claim or in which they have an interest from such assets that remain following the payment of that Debtor's secured creditors. The only asset of Holdings is its Equity Interest in CSA. Because CSA's value is insufficient to pay its creditors in full, the Equity Interest in CSA is worthless. Therefore, no asset exists at Holdings to distribute to Holders of Holdings General Unsecured Claims and Holders of Old Holdings Equity Interests. Therefore, these Entities will receive no distribution under the Plan.

1.05    **Summary of the Rights Offering and Holdback**

Based on discussions with their key constituents, the Debtors determined that their ability to consummate a consensual restructuring and emerge from chapter 11 as quickly as possible would require a significant new money investment. The Debtors further determined, with the input of their key constituents, that a new money investment would be accomplished most effectively through a rights offering backstopped by one or more parties to ensure that the Debtors would receive the full amount of their new money investment. Pursuant to the Original Plan, the Debtors had negotiated for a new money investment that would allow the Debtors to pay the Holders of the Prepetition Credit Facility Claims in full. As discussed herein, after the filing of the Original Plan, the Debtors were approached by a group of Second Backstop Parties regarding an alternate transaction, and the Debtors ultimately negotiated an alternative new money investment by a combined backstop party group that will allow the Debtors to unimpair the Holders of Prepetition Credit Facility Claims, Subsidiary Debtor General Unsecured Claims and Senior Note Claims (with the Supporting Senior Noteholders agreeing to forgo cash payment on their Supporting Senior Note Claims, and instead receiving a distribution of New Common Stock on account of their Supporting Senior Note Claims), while providing a portion of the equity in Reorganized Holdings to Holders of Allowed Senior Subordinated Note Claims. In that regard, the Debtors intend to conduct the Rights Offering to raise $355 million in new capital, which, when combined with the New Secured Debt Facility, will be used to pay the Holders of Prepetition Credit Facility Claims, Subsidiary Debtor General Unsecured Claims and Senior Note Claims in full, in Cash, on the Effective Date.

Participation in the Rights Offering will be available to any Holder of Allowed Senior Subordinated Note Claims that, in accordance with the Rights Offering Procedures, timely returned an Investor Certificate certifying that such Holder is an Accredited Investor, a QIB or a Non-U.S. Person (or a qualified transferee of such Holder in accordance with the Rights Offering Procedures). Each Holder of an Allowed Senior Subordinated Note Claim that (i) timely returned the Investor Certificate in accordance with the instructions on the Investor Certificate certifying that it is not an Accredited Investor, a QIB or a Non-U.S. Person and (ii) continues to hold such Allowed Senior Subordinated Note Claim on the Effective Date, will

receive a distribution of a number of shares of New Common Stock determined after the deadline for receipt of all Investor Certificates in a manner previously agreed upon by the Debtors and the Backstop Parties with a value equal to the value of the Senior Subordinated Noteholder Rights such Holder would have received if it was an Accredited Investor, a QIB or a Non-U.S. Person and which number of shares will be filed as a Plan Supplement Investor Certificates were distributed to the Holders of Allowed Senior Subordinated Note Claims on February 12, 2010. If a Holder of an Allowed Senior Subordinated Note Claim was determined to be an Eligible Noteholder, such Holder has been sent additional materials with instructions on how to participate in the Rights Offering.

In connection with the Rights Offering, the Debtors will distribute to Eligible Noteholders rights to purchase shares of New Common Stock in return for Cash. Eligible Noteholders will acquire their share of rights to subscribe for up to, in the aggregate, 8,623,491 shares, or approximately 39.6%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants).

Each Senior Subordinated Noteholder Right represents the right to purchase, and can only be exercised to purchase, New Common Stock. The subscription price for each share of New Common Stock purchased pursuant to the Rights Offering is $21.54. In addition, each Eligible Noteholder that has exercised the full amount of its Senior Subordinated Noteholder Rights will have the right to subscribe for additional shares of New Common Stock not subscribed for in the Rights Offering. The price per share to purchase such additional shares is $21.54.

The Rights Offering will commence on the Subscription Commencement Date and terminate on the Subscription Deadline. The procedures for properly exercising the Rights are set forth in the Rights Offering Procedures. The Senior Subordinated Noteholder Rights offered pursuant to the Rights Offering will only be transferable together with their underlying Claims in accordance with the Rights Offering Procedures. Once an Eligible Noteholder or its transferee has properly exercised its rights pursuant to the Rights Offering Procedures, such exercise will not be permitted to be revoked until the date that is 270 days following the deadline to exercise such rights, if the Effective Date has not occurred on or before such date.

In the event the shares offered pursuant to the Rights Offering are not fully subscribed for during the Subscription Period, the Backstop Parties have agreed to purchase the unsubscribed shares (including any shares not purchased due to rounding) pursuant to the Equity Commitment Agreement. The Backstop Parties have agreed to purchase such shares at a price per share of $21.54. The Equity Commitment Agreement and the Rights Offering Procedures (and related documentation) have been filed concurrently with this Disclosure Statement. The commitment of the Backstop Parties to purchase the unsubscribed shares offered pursuant to the Rights Offering, as provided in the Equity Commitment Agreement, will help to ensure that the Debtors receive the full amount of the $355 million in Cash in connection with the Rights Offering. In consideration for providing the commitment to backstop the Rights Offering, the Backstop Parties will receive a commitment premium equal to $12,425,000, which represents 3.5% of the Rights Offering Amount. In addition, the Backstop Parties have agreed to purchase,

and the Debtors have agreed to sell, (i) 2,558,182 shares, or approximately 11.75%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants) at the Holdback Subscription Price and (ii) 1,000,000 shares of the New Preferred Stock at the New Preferred Stock Subscription Price. In addition, the Debtors have agreed to issue warrants to the Backstop Parties to purchase 1,693,827 shares, or approximately 7%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan), at a strike price of $27.33.

The Rights Offering is further described in the Rights Offering Procedures, which are attached to the Plan as Exhibit B.

1.06    **Summary of Classifications and Treatment of Claims and Equity Interests**

Pursuant to sections 1122 and 1123(a) of the Bankruptcy Code, set forth below is a designation of classes of Claims and Equity Interests. Administrative Expenses and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code (set forth in Articles II and III of the Plan) have not been classified and are excluded from the following classes in accordance with section 1123(a)(l) of the Bankruptcy Code.

| Class | Type of Claim or Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| Not Applicable | Administrative Expenses | On the later of (a) the Effective Date (or as soon thereafter as is practicable), (b) the date on which the Bankruptcy Court enters an order allowing such Administrative Expense, or (c) such other date to which the Reorganized Debtors and the Holder of the Allowed Administrative Expense agree, the Debtors or the Reorganized Debtors, as the case may be, will pay each Allowed Administrative Expense in full, in Cash; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtors or the Reorganized Debtors, as the case may be, will be paid in full or performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business, | 100% |

consistent with past practice.

| | | | |
|---|---|---|---|
| Not Applicable | Priority Tax Claims (approximately $3,000,000 estimated) | At the sole option of the Debtors, each Holder of an Allowed Priority Tax Claim will be entitled to receive from the Reorganized Debtors on account of such Claim: (i) on the Effective Date, or as soon thereafter as is practicable, Cash payments in an amount equal to such Allowed Priority Tax Claim or (ii) such other treatment agreed to by each Holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as the case may be. | 100% |
| Class 1 | Priority Claims (approximately $250,000 estimated) | Unimpaired. On the latest of (a) the Effective Date (or as soon as practicable thereafter), (b) the date on which such Priority Claim becomes an Allowed Priority Claim, or (c) such other date on which the Debtors and the Holder of such Allowed Priority Claim may agree, each Holder of an Allowed Priority Claim will be entitled to receive Cash in an amount sufficient to render such Allowed Priority Claim Unimpaired under section 1124 of the Bankruptcy Code; provided, however, that Allowed Priority Claims representing obligations incurred in the ordinary course will be paid in full or performed by the Debtors or Reorganized Debtors, consistent with past practice. | 100% |
| Class 2 | Miscellaneous Secured Claims (approximately $0 estimated) | Unimpaired. On the Effective Date, at the sole option of the Debtors, (i) the legal, equitable and contractual rights to which the Miscellaneous Secured Claim entitles the Holder of such Claim will remain unaltered, and the Holder of such Claim will retain any Liens and/or security interests securing such Claim, or (ii) the | 100% |

| | | Debtors will provide other treatment that will render such Miscellaneous Secured Claim Unimpaired under section 1124 of the Bankruptcy Code. | |
|---|---|---|---|
| Class 3 | Intercompany Claims (approximately $1,087,000,000 estimated) | Unimpaired. On the Effective Date, at the option of the Debtors or the Reorganized Debtors, either (a) the legal, equitable and contractual rights to which the Intercompany Claim entitles the Holder of such Claim will remain unaltered, in full or in part, and treated in the ordinary course of business, (b) such Intercompany Claim will be cancelled and discharged, in full or in part, in which case such discharged and satisfied portion will be eliminated and the Holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Plan, or (c) such Intercompany Claim will be settled and discharged in exchange for property of the Debtors; provided, however, that any Intercompany Claims against any Debtor held by a non-Debtor Subsidiary will remain unaltered. | 100% |
| Class 4 | Prepetition Credit Facility Claims ($658,416,000 (which includes principal plus accrued pre- and post-petition interest calculated at the applicable non-default rate or rates (including interest on interest) through May 1, 2010) plus any accrued post-petition interest from May 2, 2010 through the Effective Date at the applicable non-default rate or rates (including interest on interest)) | Unimpaired. On the Effective Date, each Holder of an Allowed Prepetition Credit Facility Claim will receive payment in full, in Cash. | 100% |

| Class 5 | Senior Note Claims ($219,250,000)(which includes principal plus accrued pre- and post-petition interest calculated at the applicable non-default rate or rates (including interest on interest) through May 1, 2010), plus any accrued post-petition interest from May 2, 2010 through the Effective Date at the applicable non-default rate or rates (including interest on interest) and any other amounts the Bankruptcy Court may order as necessary to render Class 5 Unimpaired) | Unimpaired. On the Effective Date, each Holder of an Allowed Senior Note Claim will receive payment in full, in Cash; provided, however, that pursuant to Section 1123(a)(4) of the Bankruptcy Code each Supporting Senior Noteholder has agreed to forgo its right to receive payment in full, in Cash, and in lieu thereof, has agreed to accept, in full satisfaction of its Allowed Supporting Senior Note Claim, and in consideration for its Allowed Supporting Senior Note Claim and its commitment under the Equity Commitment Agreement, less favorable treatment consisting of its Pro Rata share of 4,563,095 shares of the New Common Stock. | 100% |
|---|---|---|---|
| Class 6 | Senior Subordinated Note Claims ($330,000,000) | Impaired. On the Effective Date, (i) each Holder of an Allowed Senior Subordinated Note Claim will be entitled to receive its Pro Rata share of, in the aggregate, 1,742,222 shares, or approximately 8%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants), and warrants to acquire an additional 725,926, or approximately 3%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan), (ii) each Eligible Noteholder will be entitled to receive its share of rights to subscribe for up to, in the aggregate, 8,623,491 | 25.8% (assuming full participation of Holders of Allowed Senior Subordinated Note Claims in the Rights Offering); 15.4% (assuming no participation from Holders of Allowed Senior Subordinated Claims in the Rights Offering). |

| | | | |
|---|---|---|---|
| | | shares, or approximately 39.6%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants), with the right to purchase additional shares not subscribed for, and (iii) each Non-Eligible Noteholder shall receive its pro rata share of the Non-Eligible Noteholder Shares. | |
| Class 7 | Subsidiary Debtor General Unsecured Claims (approximately $22,200,000 estimated) | Unimpaired: On the latest of (a) the Effective Date (or as soon as practicable thereafter), (b) the date on which such Subsidiary Debtor General Unsecured Claim becomes an Allowed Subsidiary Debtor General Unsecured Claim, or (c) such other date on which the Debtors and the Holder of such Allowed Subsidiary Debtor General Unsecured Claim may agree, each Holder of an Allowed Subsidiary Debtor General Unsecured Claim will be entitled to receive Cash in an amount sufficient to render such Allowed Subsidiary Debtor General Unsecured Claim Unimpaired under section 1124 of the Bankruptcy Code | 100% |
| Class 8 | Subsidiary Debtor Equity Interests | Unimpaired. On the Effective Date, the legal, equitable and contractual rights to which the Subsidiary Debtor Equity Interest entitles the Holder of such Interest will remain unaltered. | 100% |
| Class 9 | Holdings General Unsecured Claims (approximately $69,113,000 estimated) | Impaired. On the Effective Date, all Holdings General Unsecured Claims will be extinguished and no distributions will be made to Holders of Holdings General Unsecured Claims. | 0% |

| Class 10 | Old Holdings Equity Interests | Impaired. On the Effective Date, all Old Holdings Equity Interests will be cancelled and extinguished and no distributions will be made to Holders of Old Holdings Equity Interests. | 0% |

**For a more detailed description of the treatment of the foregoing classes of Claims and Equity Interests, see section 5.03 "Summary of the Plan—Classification and Treatment of Claims and Equity Interests Under the Plan."**

**IF THE REQUISITE ACCEPTANCES ARE RECEIVED, THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE PLAN IS CONSUMMATED, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE WHO DO NOT OR ARE NOT ENTITLED TO SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TREATMENT AFFORDED SUCH HOLDERS THEREUNDER.**

### 1.07    Conditions of Confirmation and Consummation of Plan

Consummation of the Plan is subject to satisfaction of the following conditions (which, other than those relating to the effectiveness of the Equity Commitment Agreement, the commencement of the Rights Offering and satisfaction of the closing conditions contained in the New Working Capital Facility Documents and the New Secured Debt Facility Documents, may be waived by the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Required Backstop Parties, which will not be unreasonably withheld, and after consultation with the Creditors' Committee):

(a)    Disclosure Statement.  The Disclosure Statement Approval Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Required Backstop Parties and the Creditors' Committee;

(b)    Plan Documents and Agreements.  All documents and agreements contemplated by, related to or necessary to the Plan are satisfactory to the applicable Debtor and shall be in form and substance reasonably satisfactory to the Required Backstop Parties as and to the extent required by the Equity Commitment Agreement and such other party as provided under the Plan;

(c)    The Rights Offering and Equity Commitment Approval Order.  The Rights Offering and Equity Commitment Approval Order shall have become a Final Order in form and substance reasonably satisfactory to the Required Backstop Parties;

(d)    The Equity Commitment Agreement.  The Equity Commitment Agreement shall continue to be in full force and effect and the conditions and the obligations of the parties thereto shall have been satisfied or waived in accordance therewith;

(e)    New Working Capital Credit Facility Documents and New Secured Debt Facility Documents.  The Debtors must have received a firm written commitment for the New

Working Capital Credit Facility and the New Secured Debt Facility in form and substance reasonably satisfactory to the Required Backstop Parties;

(f)     Confirmation Order.  The Confirmation Order shall have become a Final Order in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee; provided, however, that any provision in the Confirmation Order that is inconsistent with the Plan or the Equity Commitment Agreement or any exhibits to either of the foregoing and is in any way materially adverse to the Backstop Parties, the Senior Noteholders, the Senior Subordinated Noteholders, the New Preferred Stock and/or the New Common Stock, shall be subject to the consent of the Required Backstop Parties and shall be in form and substance reasonably satisfactory to the Creditors' Committee;

(g)     Rights Offering.

(i)     The Rights Offering shall have been conducted and consummated in accordance with the Plan, the Equity Commitment Agreement and the Rights Offering Procedures;

(ii)     The Rights Offering Amount shall have been received by the Debtors;

(iii)     The Backstop Parties shall have received the Backstop Warrants, the Holdback Shares and the Rights Offering Shares, if any, in accordance with the terms and conditions of the Equity Commitment Agreement, the Plan and the Rights Offering Procedures;

(iv)     Eligible Noteholders shall have received their respective Rights Offering Shares in accordance with the terms and conditions of the Plan and the Rights Offering Procedures; and

(v)     All fees and expenses due and owing by the Debtors pursuant to the Equity Commitment Agreement and the Rights Offering and Equity Commitment Approval Order shall have been paid, in full, in Cash, without the need for the Backstop Parties to file retention or fee applications with the Bankruptcy Court;

(h)     Authorizations, Consents and Approvals.  All authorizations, consents and regulatory approvals in connection with the consummation of the Plan shall have been obtained and not revoked;

(i)     New Credit Facility Documents.  If applicable, all conditions to the New Working Capital Facility Documents and the New Secured Debt Facility Documents (both of which must comply with the requirements of the Equity Commitment Agreement), other than the occurrence of the Effective Date of the Plan, must have been satisfied or waived (such waiver requiring, respectively, the consent of the requisite lenders thereto) pursuant to the terms thereof;

(j)     Subsidiary Debtor General Unsecured Claims.  Subsidiary Debtor General Unsecured Claims (excluding the Senior Note Claims and the Senior Subordinated Note Claims) shall not exceed $33 million;

(k)     CCAA Plan of Arrangement.   The CCAA Plan shall have become effective in accordance with its terms, the Sanction Order and the CCAA, and the Sanction Order shall have become a Final Order;

(l)     Cooper Tire L/C:  The Cooper Tire L/C, if required to be issued pursuant to the terms of the Cooper Tire Settlement Agreement, shall have been issued in accordance with the terms of Cooper Tire Settlement Agreement; and

(m)     Issuance of New Capital Stock and New Capital Warrants.  The Debtors shall have issued the New Capital Stock and the New Capital Warrants pursuant to the provisions of the Plan.

<h1 style="text-align:center">ARTICLE II.<br>DEFINITIONS</h1>

For purposes of this Disclosure Statement, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined have the meanings ascribed to them in this Article II.  Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, the feminine, and the neuter.  The word "including" is not a limiting term and shall be interpreted to mean "including, but not limited to".  Any term used in this Disclosure Statement that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules whether or not capitalized and whether or not such definition is specified.  For purposes of this Disclosure Statement, any reference to a contract, instrument, release, indenture, order, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions and shall be in form and substance satisfactory to the Debtors.

Accredited Investor:  As defined in Rule 501(a) of Regulation D of the Securities Act.

Administrative Expense:  Collectively, any cost or expense of administration of the Chapter 11 Cases allowed under section 503(b) of the Bankruptcy Code.

Affiliates:  As defined in section 101(2) of the Bankruptcy Code, except that the term Affiliate shall be applicable to any Entity (and not just a Debtor).

Allowed:  With respect to Claims, (a) any Claim against a Debtor, proof of which is timely filed or by order of the Bankruptcy Court or pursuant to the Plan is not or will not be required to be filed, (b) any Claim that has been or is hereafter listed in the Schedules as neither disputed, contingent nor unliquidated, and for which no timely Proof of Claim has been filed, or (c) any Claim allowed pursuant to the Plan or the Confirmation Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim will be allowed only if (i) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (ii) such an objection is so interposed and the Claim shall have been allowed by a Final Order

(but only if such allowance was not solely for the purpose of voting to accept or reject the Plan). Except as otherwise specified in the Plan or a Final Order, the amount of an Allowed Claim shall not include interest on such Claim after the Filing Date.

Backstop Commitment Fees and Expenses Approval Order: The order approving the payment of reasonable and documented fees and expenses incurred by counsel for the Backstop Parties in connection with the negotiation, documentation, and implementation of the Rights Offering and any and all supporting documents and related transactions, entered by the Bankruptcy Court on January 5, 2010 [Docket No. 671].

Backstop Parties: Collectively, those parties set forth in the Equity Commitment Agreement, that are providing the equity commitment thereunder, which as of the date hereof are American High-Income Trust; American Funds Insurance Series, Asset Allocation Fund; American Funds Insurance Series, High-Income Bond Fund; Barclays Bank PLC; Future Fund Board of Guardians; Lerner Enterprises, LLC; Lord Abbett & Co. LLC as investment advisor on behalf of multiple clients; Oak Hill Credit Opportunities Financing, Ltd.; OHA Strategic Credit Master Fund, L.P.; OHA Strategic Credit Master Fund II, L.P.; OHSF II Financing Ltd.; Silver Point Capital, L.P.; TCW Shared Opportunity Fund IV, L.P.; TCW Shared Opportunity Fund IVB, L.P.; TCW Shared Opportunity Fund V, L.P. and TD High Yield Income Fund.

Backstop Shelf Registration Statement: A registration statement on Form S-1 for the delayed or continuous sale of securities pursuant to Rule 415 under the Securities Act covering resales by the Backstop Parties and any of their affiliates and such other holders that are party to the Registration Rights Agreement of (i) all shares of New Common Stock issued in the Rights Offering, (ii) all shares of New Capital Stock and all New Capital Warrants issued pursuant to the Equity Commitment Agreement and (iii) all shares of New Common Stock issued upon conversion of the New Preferred Stock and upon exercise of the New Capital Warrants.

Backstop Warrants: In the aggregate, 70% of the New Capital Warrants, which are to be issued to the Backstop Parties.

Ballot: The ballots distributed together with the Disclosure Statement to Holders of an Impaired Claim or Old Holdings Equity Interest entitled to vote for the purpose of accepting or rejecting the Plan.

Bankruptcy Code: Title 11 of the United States Code, as amended from time to time, as applicable during the Chapter 11 Cases.

Bankruptcy Court: The United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

Bankruptcy Fees: Any fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code.

Bankruptcy Rules: The Federal Rules of Bankruptcy Procedure, as amended from time to time, promulgated under section 2075 of title 28 of the United States Code.

Bar Date: The date designated by the Court as the last day for filing a Proof of Claim against the Debtors.

Business Day: Any day other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

Canadian Court: The Ontario Superior Court of Justice (Commercial List), or any other Canadian court having jurisdiction over the CCAA Proceeding or such other insolvency related proceeding of CSA Canada.

Cash: Legal tender of the United States of America.

Causes of Action: Any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

CCAA: Companies' Creditors Arrangement Act (Canada), R.S.C., 1985, c.C-36, as amended.

CCAA Plan: The plan of compromise or arrangement of CSA Canada prepared and filed on March 12, 2010 in the CCAA Proceeding, together with all exhibits thereto, as the same may be amended from time to time in accordance with the terms therewith in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee.

CCAA Proceeding: The proceeding under Canada's CCAA commenced by CSA Canada on August 4, 2009, in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada.

Certificate of Designations: The Certificate of Designations of the New Preferred Stock, attached to the Plan as Exhibit D and attached to the Equity Commitment Agreement as Exhibit J as the same may be modified with the consent of the Required Backstop Parties and in consultation with the Creditors' Committee; provided, however, that any material modification thereof shall be in form and substance reasonably satisfactory to the Creditors' Committee and filed as a Plan Supplement.

Chapter 11 Cases: The respective cases under chapter 11 of the Bankruptcy Code concerning the Debtors commenced on the Filing Date.

Claim: Any right to (a) payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (b) an equitable remedy for breach of performance of the Debtors if such breach gives rise to a right to payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**Committees:** Collectively (i) the Creditors' Committee, and (ii) any other committee(s) appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

**Confirmation Date:** The date on which the Confirmation Order is entered on the docket maintained by the clerk of the Bankruptcy Court with respect to the Chapter 11 Cases.

**Confirmation Hearing:** The hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code regarding the confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

**Confirmation Order:** The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors Committee.

**Consenting Backstop Parties:** Two-thirds in amount of the Backstop Parties based on Commitment Percentage, whose consent may be granted or withheld in accordance with section 16 of the Equity Commitment Agreement.

**Cooper Tire L/C:** The letter of credit to be issued to Cooper Tire pursuant to the terms of the Cooper Tire Settlement Agreement.

**Cooper Tire Settlement Agreement:** That certain Agreement Concerning Terms and Conditions of a Compromise and Settlement, dated March 17, 2010, by and between Holdings, CSA and CSA Canada, as defendants, Cooper Tire & Rubber Company and Cooper Tyre Rubber & Company UK Limited, as plaintiffs, and the Creditors' Committee, as an interested party, in the adversary proceeding: Cooper Tire & Rubber Company v. Cooper-Standard Holdings, Inc. et. al., Adv. Proc. No. 09-52014 (PJW).

**Creditor:** Any Entity that is the Holder of a Claim against any of the Debtors that arose on or before the Filing Date or a Claim against any of the Debtors' estates of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code.

**Creditors' Committee:** The official committee of unsecured creditors, appointed in these Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on August 14, 2009, as the same may be constituted from time to time.

**CSA:** Cooper-Standard Automotive Inc.

**CSA Canada:** Cooper-Standard Automotive Canada Limited.

**Debtors:** Collectively, Holdings, CSA, Cooper-Standard Automotive FHS Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, Cooper-Standard Automotive OH, LLC, StanTech, Inc., Westborn Service Center, Inc., North American Rubber, Incorporated, Sterling Investments Company, Cooper-Standard Automotive NC L.L.C., CS Automotive LLC, CSA Services Inc., and NISCO Holding Company.

DIP Facility: The Debtors' superpriority senior secured postpetition credit facility, consisting of a $175,000,000 superpriority single draw term loan facility and a $25,000,000 standby uncommitted single draw term loan facility, provided by the DIP Lenders to Holdings and the other borrowers party thereto during these Chapter 11 Cases, pursuant to the DIP Financing Agreement and the DIP Financing Order.

DIP Financing Agent: (a) Deutsche Bank Trust Company Americas, in its capacity as the administrative agent, collateral agent and documentation agent under the DIP Financing Agreement; and (b) Deutsche Bank Securities Inc., in its capacity as the syndication agent, sole lead arranger and sole book runner under the DIP Financing Agreement.

DIP Financing Agreement: The debtor in possession credit agreement, dated as of December 18, 2009, as amended, modified or otherwise supplemented from time to time, by and among Holdings and the other borrowers party thereto, as the borrowers, the DIP Lenders, the other financial institutions party thereto, and the DIP Financing Agent.

DIP Financing Fees and Expenses: Without duplication, all reasonable fees, costs, charges, and expenses required to be paid by the Debtors under the terms of the DIP Financing Agreement, the DIP Original Financing Agreement, and/or any separate engagement letter executed in connection therewith, including but not limited to, the fees and disbursements of professionals, including without limitation (a) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the DIP Financing Agent, (b) each local counsel to the DIP Financing Agent, (c) Capstone Advisory Group LLC, as advisor to the DIP Financing Agent, and (d) Houlihan Lokey Howard & Zukin Capital, Inc., as advisor to the DIP Financing Agent.

DIP Financing Order: The Final Order (I) Authorizing U.S. Debtors (A) to Obtain Replacement Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364, (B) to Use Cash Collateral Pursuant to 11 U.S.C § 363, and (II) Granting Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 [Docket No. 649], entered on December 29, 2009, and as amended, modified or supplemented by the Bankruptcy Court from time to time.

DIP Lender Claims: A Claim against a Debtor arising pursuant to the DIP Financing Agreement, including all "DIP Obligations" as such term is defined in the DIP Financing Order.

DIP Lenders: The lenders under the DIP Financing Agreement and the DIP Original Financing Agreement, as appropriate.

DIP Original Financing Agent: (a) Deutsche Bank Trust Company Americas, in its capacity as the administrative agent, collateral agent and documentation agent under the DIP Original Financing Agreement; (b) Deutsche Bank Securities Inc., in its capacity as the joint lead arranger and book runner under the DIP Original Financing Agreement; (c) Banc of America Securities LLC as co-syndication agent and co-arranger under the DIP Original Financing Agreement; (d) General Electric Capital Corporation as co-syndication agent and joint lead arranger and book runner under the DIP Original Financing Agreement; and (e) UBS Securities LLC as co-syndication agent and co-arranger under the DIP Original Financing Agreement.

**DIP Original Financing Agreement**: The debtor in possession credit agreement, dated as of August 5, 2009, as amended, modified or otherwise supplemented from time to time, by and among Holdings and the other borrowers party thereto, as the borrowers, the lenders and other financial institutions party thereto, and the DIP Original Financing Agent, which was refinanced in full with the DIP Financing Agreement.

**DIP Original Financing Order**: The Corrected Final Order (I) Authorizing U.S. Debtors (A) to Obtain Replacement Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364, (B) to Use Cash Collateral Pursuant to 11 U.S.C § 363, and (II) Granting Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 [Docket No. 179], entered on September 2, 2009, and as amended, modified or supplemented by the Bankruptcy Court from time to time.

**Disclosure Statement**: The disclosure statement relating to the Plan, including the exhibits and schedules thereto, as the same may be amended, modified, or supplemented from time to time (in accordance with the Equity Commitment Agreement), as approved by the Bankruptcy Court pursuant to the Disclosure Statement Approval Order.

**Disclosure Statement Approval Order**: The order approving the Disclosure Statement Motion, entered by the Bankruptcy Court on or about March 26, 2010 [Docket No. ____], in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee.

**Disclosure Statement Motion**: The motion filed by the Debtors on February 1, 2010, pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018 seeking approval of the adequacy of this Disclosure Statement and the solicitation procedures and scheduling the Confirmation Hearing [Docket No. 753], including any amendments and supplements thereto.

**Disputed**: With respect to Claims or Equity Interests, any Claim or Equity Interest that is not Allowed.

**Distribution Record Date**: The date established in the Confirmation Order for determining the identity of Holders of Claims entitled to distributions under the Plan, which shall be no earlier than the date of entry of the Confirmation Order.

**Effective Date**: The first Business Day immediately following the date upon which all conditions to the Effective Date set forth in sections 13.01 and 13.02 of the Plan have been satisfied or waived by the applicable Debtor or Reorganized Debtor, as the case may be, and the Required Backstop Parties and in consultation with the Creditors' Committee (all in accordance with section 13.03 of the Plan); provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect.

**Eligible Noteholder**: A Holder of an Allowed Senior Subordinated Note Claim that either is (i) a Holder of such Claim as of the Rights Offering Record Date or is a transferee of such Claim evidenced by one or more Certification Period Transfer Notices (as defined in the Rights Offering Procedures) that begin with the transfer by the Holder holding such Claim as of

the Rights Offering Record Date and timely certifies in the Investor Certificate that such Holder is a QIB, an Accredited Investor or a Non-U.S. Person, or (ii) any subsequent transferee thereafter evidenced by one or more Post-Certification Period Transfer Notices (as defined in the Rights Offering Procedures) prior to the Subscription Deadline (as defined in the Rights Offering Procedures); provided, however, that a transferor Holder that has delivered a Post-Certification Period Transfer Notice to the Subscription Agent evidencing the transfer of all such Holder's Allowed Senior Subordinated Note Claims shall no longer be deemed to be an Eligible Noteholder.

Entity: Any individual, corporation, limited or general partnership, limited liability company, joint venture, association, joint stock company, estate, entity, trust, trustee, United States Trustee, unincorporated organization, government, Governmental Unit, agency or political subdivision thereof.

Equity Commitment Agreement: The Commitment Agreement, dated March 19, 2010, approved by the Bankruptcy Court by an order (which will become a Final Order) dated March 26, 2010 [Docket No.  ], by and between Holdings and the Backstop Parties.

Equity Interests: Old Holdings Equity Interests and Subsidiary Debtor Equity Interests.

ERISA: As amended, the Employee Retirement Income Security Act of 1974.

Estates: The bankruptcy estates of the Debtors in the Chapter 11 Cases created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Debtors' Chapter 11 Cases.

Fee Auditor: Warren H. Smith & Associates, P.C.

Fee Auditor Order: That certain Order Appointing Fee Auditor And Establishing Related Procedures Concerning The Payment Of Compensation And Reimbursement Of Expenses Of Professionals And Members Of Official Committees And Consideration Of Fee Applications, entered on October 16, 2009 [Docket No. 346].

Filing Date: August 3, 2009, the date on which the Debtors filed with the Bankruptcy Court their petitions commencing the Chapter 11 Cases.

Final Order: An order, ruling or judgment of the Bankruptcy Court, Canadian Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing will then be pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear will have been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, Canadian Court or other court of competent jurisdiction (as applicable) will have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing will have been denied and the time to take any further appeal,

petition for certiorari or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order will not cause such order not to be a Final Order.

General Bar Date: December 4, 2009 at 5:00 p.m. (prevailing Pacific Time).

General Unsecured Claim: Any Claim against Holdings or the Subsidiary Debtors other than an Administrative Expense, Miscellaneous Secured Claim, DIP Lender Claim, DIP Financing Fees and Expenses, Prepetition Credit Facility Administrative Claim, Prepetition Credit Facility Claim, Prepetition Credit Facility Fees and Expenses, Senior Note Claim, Senior Subordinated Note Claim, Intercompany Claim, Priority Claim, or Priority Tax Claim.

Governmental Unit: As defined in section 101(27) of the Bankruptcy Code.

Governmental Unit Bar Date: February 1, 2010 at 5:00 p.m. (prevailing Pacific Time).

Holdback Common Shares: 2,558,182 shares of New Common Stock.

Holdback Preferred Shares: 1,000,000 shares of New Preferred Stock.

Holdback Shares: Collectively, the Holdback Common Shares and the Holdback Preferred Shares.

Holdback Subscription Price: $27.07 per share of the Holdback Common Shares offered to be purchased by the Backstop Parties pursuant to the Rights Offering.

Holder: Any Entity that holds a Claim or Equity Interest.

Holdings: Cooper-Standard Holdings Inc.

Holdings General Unsecured Claims: All General Unsecured Claims against Holdings, including, to the extent the Cooper Tire Settlement Agreement is not approved by the Bankruptcy Court, any and all claims of Cooper Tire & Rubber Company and its Affiliates arising under, relating to or in connection with that certain Stock Purchase Agreement, dated as of September 16, 2004, as amended by the First Amendment to the Stock Purchase Agreement, dated as of December 3, 2004, including with respect to any tax refunds received by the Debtors and/or CSA Canada.

Impaired: Any Claim or Equity Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

Instrument: Any share of stock, security, promissory note or other "Instrument" within the meaning of that term as defined in section 9-102(47) of the Uniform Commercial Code.

Intercompany Claim: Any Claim between and among the Debtors and any Claims of any non-Debtor Subsidiary against a Debtor.

Investor Certificate: The certification form distributed in accordance with the Rights Offering Procedures to each Holder of an Allowed Senior Subordinated Note Claim on which each such Holder must certify (i) whether such Holder is an Accredited Investor, a QIB, a Non-U.S. Person or none of the foregoing and (ii) the aggregate principal amount of Senior Subordinated Notes beneficially owned by such Holder.

KCC: Kurtzman Carson Consultants LLC.

Lien: As defined in section 101(37) of the Bankruptcy Code; except that a Lien that has been avoided in accordance with a provision of the Bankruptcy Code, including sections 544, 545, 546, 547, 548 or 549, shall not constitute a Lien.

Management Incentive Plan: The equity incentive compensation plan to be adopted by Reorganized Holdings, in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee, pursuant to which 10% of the New Capital Stock will be reserved for issuance to the Debtors' management, which shall be filed with the Bankruptcy Court as part of the Plan Supplement. A term sheet setting forth, among other things, the terms and conditions of the Management Incentive Plan is attached to the Plan as Exhibit B.

Miscellaneous Secured Claim: Any Claim, other than a Prepetition Credit Facility Claim, that is a "secured" claim within the meaning of, and to the extent allowable as a secured claim under, section 506 of the Bankruptcy Code.

New Capital Stock: Collectively, the New Common Stock and the New Preferred Stock.

New Capital Warrants: The Backstop Warrants and the Senior Subordinated Noteholders Warrant Distribution to be issued to purchase, in the aggregate, 2,419,753 shares of the New Common Stock pursuant to the terms set forth in the New Capital Warrant Agreement. A term sheet setting forth the terms of the New Capital Warrants is attached to the Equity Commitment Agreement as Exhibit D.

New Capital Warrant Agreement: The warrant agreement governing the New Capital Warrants to be issued by Reorganized Holdings, in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee, and containing the terms set forth in the Warrant Term Sheet attached as Exhibit D to the Equity Commitment Agreement, which shall be filed with the Bankruptcy Court as part of the Plan Supplement.

New Common Stock: The shares of new common stock, par value $0.001 per share, of Reorganized Holdings to be issued by Reorganized Holdings on and after the Effective Date, which shall initially consist of collectively (a) the Senior Subordinated Noteholder Stock Distribution, (b) the Rights Offering Shares, (c) the Holdback Shares, (d) the Non-Eligible Noteholder Shares, (e) the shares issued and issuable in connection with the Management

Incentive Plan, (f) the shares issuable upon conversion of the New Preferred Stock, (g) the shares issuable upon exercise of the New Capital Warrants, and (h) the shares issued to the Supporting Senior Noteholders.

New Common Stock Subscription Price: $21.54 per share of New Common Stock, other than for the Holdback Common Shares, offered pursuant to the Rights Offering.

New Preferred Stock: The shares of 7% Cumulative Participating Convertible Preferred Stock, $100 stated value per share, of Reorganized Holdings and having the terms set forth in the Certificate of Designations, which shall initially consist of collectively (a) 1,000,000 shares and (b) the shares issued and issuable in connection with the Management Incentive Plan.

New Preferred Stock Subscription Price: $100 per share of New Preferred Stock.

New Secured Debt Financing Agreement: The new secured debt agreement in the committed principal amount of up to $450 million to be executed on or prior to (but effective as of) the Effective Date, which will be filed with the Bankruptcy Court as part of the Plan Supplement.

New Secured Debt Facility: The New Secured Debtor Financing Agreement, together with the New Secured Debt Facility Documents, executed in connection with or pursuant to the terms of the New Secured Debt Financing Agreement, and the subject financing thereunder, to be made available on the Effective Date, and which shall be in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee.

New Secured Debt Facility Documents: The loan documents and ancillary agreements and instruments to be executed in connection with or pursuant to the terms of New Secured Debt Financing Agreement.

New Working Capital Credit Agreement: The new senior secured working capital credit agreement in the committed principal amount of up to $150 million, to be executed on or prior to (but effective as of) the Effective Date, which will be filed with the Bankruptcy Court as part of the Plan Supplement.

New Working Capital Facility: The New Working Capital Credit Agreement, together with the New Working Capital Facility Documents, executed in connection with or pursuant to the terms of the New Working Capital Credit Agreement, and the subject financing thereunder, to be made available on the Effective Date, and which shall be in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee.

New Working Capital Facility Documents: The loan documents and ancillary agreements and instruments to be executed in connection with or pursuant to the terms of the New Working Capital Credit Agreement.

Non-Backstop Shelf Registration Statement: A registration statement on Form S-1 for the delayed or continuous sale of securities pursuant to Rule 415 under the Securities Act

covering resales by all Eligible Noteholders (other than the Backstop Parties and any of their affiliates and such holders that are party to the Registration Rights Agreement) of all shares of New Common Stock issued to them in the Rights Offering.

Non-Eligible Noteholder:  A Holder of an Allowed Senior Subordinated Note Claim that (i) is a Holder of such Claim(s) as of the Rights Offering Record Date, (ii) certifies in the Investor Certificate that such Holder is neither a QIB, an Accredited Investor nor a Non-U.S. Person, (iii) continues to hold such Claim(s) until the Effective Date and (iv) delivers the Senior Subordinated Notes underlying such Claim(s) into an election account at the Depository Trust Company in accordance with instructions provided to such Holder.

Non-Eligible Noteholder Shares:  The New Common Stock to be distributed to Non-Eligible Noteholders or, if applicable, any transferee of such Non-Eligible Noteholder in accordance with the Rights Offering Procedures, with the number of shares determined after the deadline for receipt of all Investor Certificates in a manner previously agreed upon by the Debtors and the Required Backstop Parties and which number of shares shall be filed with the Plan Supplement.

Non-U.S. Person:  An Entity that is not a "U.S. person," as that term is defined under Regulation S, promulgated under the Securities Act.

Old Holdings Common Stock:  Holdings' common stock, par value $0.01 per share, issued and outstanding as of the Petition Date.

Old Holdings Equity Interests:  The equity interests in Holdings including (a) those represented by shares of Old Holdings Common Stock and any options, warrants, calls, subscriptions or other similar rights or other agreements, commitments or outstanding securities obligating any Debtor to issue, transfer or sell any shares of Old Holdings Common Stock, and (b) Claims of the type described in, and subject to subordination under section 510(b) of the Bankruptcy Code with respect to Old Holdings Common Stock.

PBGC:  Pension Benefit Guaranty Corporation, a United States Government corporation.

Pension Plans:  Collectively, the Cooper-Standard Automotive Inc. Collectively Bargained Retirement Plan - Gaylord UAW Local 388, the Cooper-Standard Automotive Inc. Hourly Employees' Retirement Plan - Auburn, the Cooper-Standard Automotive Inc. Hourly Employees' Retirement Plan - Bowling Green-Seal, the Cooper-Standard Automotive FHS - NEWLEX Hourly Pension Plan, the Cooper-Standard Automotive Inc. Hourly Employees' Retirement Plan - Bowling Green-Hose and the Cooper-Standard Automotive Inc. Salaried Retirement Plan.

Plan:  The Debtors' Second Amended Joint Chapter 11 Plans, together with all exhibits, appendices and schedules thereto (including the Plan Supplement), as the same may be amended or modified from time to time in accordance with the terms thereof, the Bankruptcy Code and the Bankruptcy Rules.

Plan Supplement: The supplemental appendix to the Plan that will contain forms of the documents relevant to the implementation of the Plan, including, without limitation, the Management Incentive Plan, the commitment letters (or definitive credit agreements executed into escrow) for each of the New Working Capital Credit Agreement and New Secured Debt Financing Agreement, and the list of the initial members of the Board of Directors of Reorganized Holdings, which shall be filed with the Bankruptcy Court no later than five (5) Business Days prior to the Confirmation Hearing; provided, however, that the Reorganized Debtors' Certificate of Incorporation, the Reorganized Holdings By-Laws, the New Capital Warrant Agreement, the number of Non-Eligible Noteholder Shares, the Registration Rights Agreement and the Certificate of Designations shall be filed with the Bankruptcy Court no later than five (5) Business Days prior to the Voting Deadline; provided, further, however, that any such documents that were filed with the Bankruptcy Court as exhibits to the Equity Commitment Agreement will be filed as Plan Supplements only if they have been modified from the version previously filed.

Prepetition Administrative Agent: Deutsche Bank Trust Company Americas, as administrative agent and collateral agent under the Prepetition Credit Facility.

Prepetition Credit Facility: That certain credit agreement, dated as of December 23, 2004, as amended, restated, supplemented or otherwise modified from time to time, among Holdings, CSA, CSA Canada, Cooper-Standard Automotive International Holdings B.V., as borrowers, the Prepetition Credit Facility Lenders, the other financial institutions party thereto, including the Prepetition Credit Facility Parties, and the Prepetition Administrative Agent.

Prepetition Credit Facility Claim: Any Claim against a Debtor arising under the Prepetition Credit Facility, including without limitation, any swap arising under or relating to the Prepetition Credit Facility, held by the Prepetition Credit Facility Parties, and all other Claims against a Debtor arising under the Prepetition Credit Facility, other than the Prepetition Credit Facility Fees and Expenses.

Prepetition Credit Facility Fees and Expenses: All reasonable fees, costs, charges, and expenses required to be paid by the Debtors under the terms of the Prepetition Credit Facility and/or any separate engagement letter with the Debtors, including but not limited to, the fees and disbursements of professionals, including without limitation (a) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the Prepetition Administrative Agent, (b) each local counsel to the Prepetition Administrative Agent,(c) Capstone Advisory Group LLC, as advisor to the Prepetition Administrative Agent, and (d) Houlihan Lokey Howard & Zukin Capital, Inc., as advisor to the Prepetition Administrative Agent.

Prepetition Credit Facility Lenders: Collectively, the Lenders under, and as defined in, the Prepetition Credit Facility.

Prepetition Credit Facility Parties: Collectively, (a) the Prepetition Credit Facility Lenders and (b) the Guaranteed Creditors, Secured Creditors, Syndication Agent, Co-Documentation Agents, and Joint Lead Arrangers and Book Runners in each case, under, and as defined in, the Prepetition Credit Facility.

Prepetition Indentures:  The Senior Note Indenture and the Senior Subordinated Note Indenture.

Priority Claim:  Any Claim that is entitled to priority in payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, DIP Lender Claim, DIP Financing Fees and Expenses, Administrative Expenses or Prepetition Credit Facility Fees and Expenses.

Priority Tax Claim:  Any Claim that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

Pro Rata:  A proportionate share, so that the ratio of the amount of property distributed on account of an Allowed Claim in a class is the same as the ratio such Claim bears to the total amount of all Claims (including Disputed Claims) in such class.

Professional:  (a) Any professional employed in the Chapter 11 Cases pursuant to section 327, 328 or 1103 of the Bankruptcy Code and (b) any other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, professionals employed by the DIP Lenders, DIP Financing Agent, DIP Original Financing Agent or Backstop Parties (including Akin Gump Strauss Hauer & Feld LLP and Davis Polk & Wardwell LLP) shall not be "Professionals" for the purposes of the Plan.

Proof of Claim:  As defined in Bankruptcy Rule 3001.

QIB:  A Qualified Institutional Buyer, as that term is defined under Rule 144A, promulgated under the Securities Act.

Registration Rights Agreement:  The agreement to be entered into on the Effective Date between Reorganized Holdings, the Backstop Parties and certain Eligible Noteholders specified by the Backstop Parties, in the form attached to the Equity Commitment Agreement as Exhibit E, as the same may be modified as provided therein and in consultation with the Creditors' Committee; provided, however, that any material modification thereof shall be in form and substance reasonably satisfactory to the Creditors' Committee and filed as a Plan Supplement.

Reorganized Debtors:  Collectively, the Debtors from and after the Effective Date.

Reorganized Debtors' Certificates of Incorporation:  (i) The second amended and restated certificate of incorporation of Holdings attached to the Plan as Exhibit D and attached to the Equity Commitment Agreement as Exhibit G, as the same may be modified with the consent of the Required Backstop Parties and in consultation with the Creditors' Committee; provided, however, that any material modification thereof shall be in form and substance reasonably satisfactory to the Creditors' Committee and filed as a Plan Supplement, and (ii) the certificates of incorporation and/or articles of organization for the other Reorganized Debtors to be filed with the Bankruptcy Court as part of the Plan Supplement, in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee.

Reorganized Holdings: Holdings from and after the Effective Date.

Reorganized Holdings By-Laws: The by-laws for Reorganized Holdings attached to the Plan as Exhibit E and attached to the Equity Commitment Agreement as Exhibit H, as the same may be modified with the consent of the Required Backstop Parties and in consultation with the Creditors' Committee; provided, however, that any material modification thereof shall be in form and substance reasonably satisfactory to the Creditors' Committee and filed as a Plan Supplement.

Required Backstop Parties: Those Backstop Parties representing two-thirds of the total amount of the Backstop Parties' Commitment Percentage (as defined in the Equity Commitment Agreement).

Rights Offering: The rights offering whereby Eligible Noteholders will be offered the opportunity to subscribe for the Rights Offering Shares in accordance with the Rights Offering Procedures.

Rights Offering Amount: $355 million.

Rights Offering and Equity Commitment Approval Order: The order approving the Rights Offering and the Equity Commitment Agreement, entered by the Bankruptcy Court on March 26, 2010 [Docket No. ].

Rights Offering Procedures: The procedures governing the administration and execution of the Rights Offering, which are attached to the Plan as Exhibit B.

Rights Offering Record Date: February 9, 2010.

Rights Offering Shares: 8,623,491 shares of New Common Stock representing approximately 39.6% of the New Common Stock, subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants.

Sanction Order: The Order of the Canadian Court under the CCAA, in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee, approving the CCAA Plan in the CCAA Proceeding.

Schedules: The schedules of assets and liabilities filed in the Chapter 11 Cases by the Debtors on October 2, 2009, as such schedules may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

Secured Claim: A Claim that (x) is secured by a Lien on property in which a Debtor has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (y) is Allowed by a Final Order or pursuant to the Plan as a Secured Claim.

SEC:  The Securities and Exchange Commission.

Securities Act:  The Securities Act of 1933, as amended.

Securities Exchange Act:  The Securities Exchange Act of 1934, as amended.

Senior Notes:  The 7% Senior Notes due 2012 issued pursuant to the Senior Notes Indenture.

Senior Note Claims:  Any and all Claims against a Debtor arising under or in connection with the Senior Notes or the Senior Note Indenture.

Senior Note Indenture:  That certain indenture, dated December 23, 2004, as amended, modified, or supplemented from time to time, by and between CSA, the certain subsidiary and parent guarantors, and Wilmington Trust Company, pursuant to which, among other things, the Senior Notes were issued.

Senior Note Indenture Trustee:  Wilmington Trust Company as indenture trustee under the Senior Note Indenture, together with its duly appointed successors and assigns, if any.

Senior Noteholders:  The holders of Senior Notes.

Senior Subordinated Notes:  The 8 3/8% Senior Subordinated Notes due 2014 issued pursuant to the Senior Subordinated Note Indenture.

Senior Subordinated Note Claims:  Any and all Claims against a Debtor arising under or in connection with the Senior Subordinated Notes and the Senior Subordinated Note Indenture.

Senior Subordinated Note Indenture:  That certain indenture, dated December 23, 2004, as amended, modified, or supplemented from time to time, by and between CSA, the certain subsidiary and parent guarantors, and the original indenture trustee, Wilmington Trust Company, pursuant to which, among other things, the Senior Subordinated Notes were issued.

Senior Subordinated Note Indenture Trustee:  U.S. Bank National Association, as successor indenture trustee to Wilmington Trust Company under the Senior Subordinated Note Indenture, together with its duly appointed successors and assigns, if any.

Senior Subordinated Noteholder Rights:  The rights issued to Eligible Noteholders to purchase the Rights Offering Shares.

Senior Subordinated Noteholder Oversubscription Right:  The pro rata right of each Eligible Noteholder to subscribe for Rights Offering Shares, to the extent available, in addition to those to be received pursuant to the exercise of the Senior Subordinated Noteholder Rights, provided that such Eligible Noteholder has (i) exercised in full its Senior Subordinated Noteholder Rights, (ii) paid in full for the shares issued in connection with the Senior Subordinated Noteholder Rights (other than with respect to the shares in respect of the Senior Subordinated Noteholder Oversubscription Right) and (iii) specified in the Subscription Form (as

defined in the Rights Offering Procedures) the number of units representing shares of New Common Stock that it wishes to purchase pursuant to its Senior Subordinated Noteholder Oversubscription Right.

Senior Subordinated Noteholders: The holders of Senior Subordinated Notes.

Senior Subordinated Noteholders Stock Distribution: In the aggregate, 1,742,222 shares of the New Common Stock to be issued to Holders of Allowed Senior Subordinated Note Claims in accordance with the Plan.

Senior Subordinated Noteholders Warrant Distribution: In the aggregate, 30% of the New Capital Warrants, to be issued to Holders of Allowed Senior Subordinated Note Claims in accordance with the Plan.

Shelf Registration Statements: Together, the Backstop Shelf Registration Statement and the Non-Backstop Shelf Registration Statement.

Statements: The statements of financial affairs filed in the Chapter 11 Cases by the Debtors on October 2, 2009, as such statements may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

Sub-Plans: The individual chapter 11 plans for each of the Debtors, as the same may be amended from time to time in accordance with the terms of the Plan.

Subscription Agent: KCC

Subscription Commencement Date: The date on which the solicitation of votes to approve the Plan is commenced.

Subscription Deadline: The date that is the later of (i) 5:00 p.m. (New York time) on the date that is twenty (20) Business Days following the Subscription Commencement Date and (ii) the Voting Deadline.

Subscription Form: The forms delivered to Eligible Noteholders pursuant to which such Eligible Noteholders may exercise their Rights.

Subscription Period: The time period during which Eligible Noteholders may subscribe to purchase the Rights Offering Shares offered to Eligible Noteholders, which period shall commence on the Subscription Commencement Date and expire on the Subscription Deadline.

Subsidiaries: All direct and indirect subsidiaries and joint ventures of the Debtors.

Subsidiary Debtors: Cooper-Standard Automotive Inc., Cooper-Standard Automotive FHS Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, Cooper-Standard Automotive OH, LLC, StanTech, Inc., Westborn Service Center, Inc., North

American Rubber, Incorporated, Sterling Investments Company, Cooper-Standard Automotive NC L.L.C., CS Automotive LLC, CSA Services Inc. and NISCO Holding Company.

Subsidiary Debtor Equity Interests: The equity interests in each of the Subsidiary Debtors, including those equity interests rep: ented by shares of common stock of the Subsidiary Debtors and any options, warrants, calls, subscriptions or other similar rights or other agreements, commitments or outstanding securities obligating any Subsidiary Debtor to issue, transfer or sell any shares of common stock of the Subsidiary Debtors.

Subsidiary Debtor General Unsecured Claims: All General Unsecured Claims against the Subsidiary Debtors.

Supporting Senior Note Claims: Senior Note Claims in respect of Senior Notes in an aggregate principal amount of $104,700,000 that the Supporting Senior Noteholders have agreed to exchange for an aggregate of 4,563,095 shares of New Common Stock pursuant to Section 2(h) of the Equity Commitment Agreement and held by the Supporting Senior Noteholders as of the date of the Equity Commitment Agreement (whether or not held by such Holders on the Effective Date).

Supporting Senior Noteholders: Barclays Bank PLC or its affiliates, Capital Research and Management Company or its affiliates, Oak Hill Advisors, L.P. or its affiliates and Silver Point Capital, L.P. or its affiliates and any transferee of any of the foregoing in accordance with Section 6(a)(iii) of the Equity Commitment Agreement.

Tax: All taxes, charges, fees, duties, levies, imposts, rates or other assessments imposed by any federal, state, local or foreign Governmental Unit, including income, gross receipts, excise, property, sales, stamp, use, license, capital stock, transfer, franchise, payroll, withholding, social security, value added and other taxes, and any interest, penalties, fines, losses, damages, costs or additions attributable thereto.

Tax Code: Internal Revenue Code of 1986, as amended.

Unimpaired: Any Claim or Interest that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

United States Trustee: The Office of the United States Trustee for the District of Delaware.

Voting Agent: KCC.

Voting Deadline: The date set by the Bankruptcy Court pursuant to the Disclosure Statement Approval Order by which Ballots for acceptance or rejection of the Plan must be received by the Voting Agent.

# ARTICLE III.
## BACKGROUND

3.01 **Debtors' Business**

(a)     Description of the Debtors' Businesses

Holdings is a Delaware corporation with its primary place of business in Novi, Michigan. Holdings is the ultimate parent company of each of the Debtors. The Debtors and each of their non-Debtor subsidiaries (collectively, the "Company") are leading global manufacturers of fluid handling, vehicle sealing systems, and anti-vibration systems ("AVS") components, systems, subsystems, and modules, primarily for use in passenger vehicles and light trucks for global original equipment manufacturers ("OEMs") and replacement markets. The Company conducts substantially all of its activities through direct and indirect subsidiaries of Holdings, which design and manufacture the Company's products in each major region of the world. The Company operates in sixty-six manufacturing locations and nine design, engineering, and administrative locations around the world, including the United States, Mexico, Canada, Australia, China, Czech Republic, Japan, Germany, Korea, Spain, the United Kingdom, Poland, France, India, Netherlands, Italy, Belgium, and Brazil. For the nine months ended September 30, 2009, the Company generated approximately 46% of net sales in North America, 42% in Europe, 6% in South America, and 6% in Asia/Pacific. Approximately 15% and 9% of the Company's revenues for this period were generated from German and Canadian operations, respectively.

The Company's main customers are OEMs. For the nine months ended September 30, 2009, approximately 35%, 15%, 8%, 7% and 5% of the Company's sales were to Ford Motor Company, General Motors Company ("GM"), Fiat, Volkswagen, and Chrysler Group LLC ("Chrysler"), respectively. The Debtors' other customers include OEMs such as Audi, BMW, Honda, Mercedes Benz, Porsche, PSA Peugeot Citroën, Renault/Nissan, and Toyota, and other Tier I and Tier II automotive suppliers. For the nine months ended September 30, 2009, approximately 82% of the Company's sales consisted of original equipment sold directly to the OEMs for installation on new vehicles. The remaining 18% of the Company's sales were primarily to Tier I and Tier II suppliers. In 2008, the Company's products were found in twenty-two of the twenty-five top-selling models in North America and in nineteen of the twenty top-selling models in Europe.

As of September 30, 2009, the Company employed approximately 18,000 employees worldwide. The Debtors employ approximately 3,300 active employees of which approximately 900 are salaried employees and approximately 2,400 are hourly employees. As of September 30, 2009, unions represented approximately 41% of the Company's employees, with approximately 13% of the Debtors' employees represented by unions. The Company has not experienced any major work stoppages in the past ten years.

The Company operates in two divisions, North America and International (covering Europe, South America and Asia). Through the North American and International divisions, the Company supplies a diverse range of products on a global basis to a broad group of customers. The Company's principal product lines are described more fully below.

<ol type="i">
<li>Vehicle Sealing Systems</li>
</ol>

The Company is a leading global supplier of vehicle sealing products to the automotive industry with approximately 28% of global market share. The Company is known throughout the industry to be a leader in providing innovative design and manufacturing solutions for complex automotive designs. The Company's sealing products include: (i) door seals that fit the door structure and body cabin of the vehicle to seal rain, dust, and noise from the occupants of vehicles; (ii) body seals that provide further noise and aesthetic coverage of weld flanges on the vehicle body; (iii) hood seals that protect engine components against water and dust penetration while also reducing engine and road noise in the vehicle's interior during high-speed travel; (iv) belt line seals that protect against water, dust and noise for driver and passenger door moveable glass; (v) lower door seals that protect in the "rocker" area against water and dust penetration and reduce loud road noise entering the cabin and maintain quietness during high-speed driving; (vi) a glass run channel assembly that enables the movable door glass and door to form one surface, improving glass movement and sealing the vehicle's interior from the exterior environment; (vii) trunk lid and lift gate seals located on the body flanges in the truck or lift gate compartment that offer protection against water and dust penetration; (viii) a roof seal that combines compressibility with superior design for use on soft top weather sealing applications; (ix) sunroof seals that are required to create a narrow sealing space and minimize resistance for the sunroof; and (x) obstacle detection sensors (SafeSeal®) that will reverse windows and doors upon sensing the capacitance of an animate object.

<ol type="i" start="2">
<li>Anti-Vibration Systems</li>
</ol>

The Company is one of the leading suppliers of vehicle anti-vibration (AVS) products in North America. The Company is known in North America for utilizing its advanced development and testing of AVS products and subsystems to provide innovative solutions. The Company's AVS products include components manufactured with various types of rubber: natural rubber, butyl or EPDM in combination with stamped steel, aluminum or cast iron sub-components. Additionally, the Company supplies brackets that are manufactured from stamped steel, aluminum, or cast iron as individual final products. The typical production process for a rubber and metal product involves mixing of rubber compounds, metal preparation (cleaning and primer application), injection molding of the rubber and metals, final assembly, and testing as required based on specific products. A significant aspect of this product line is the research and development capability necessary for product applications. Full vehicle dynamic analysis is often necessary, and is accomplished through the Company's highly specialized laboratory equipment, including vehicle dynamometers, four-post vehicle dynamics simulators, and advanced anechoic and semi-anechoic noise analysis chambers.

The Company's AVS products include: (i) body/cradle mounts that enable isolation of the interior cabin from the vehicle body, reducing noise, vibration, and harshness; (ii) engine mounts that secure and isolate vehicle powertrain noise, vibration, and harshness from the uni-body or frame; (iii) transmission mounts that enable mounting of transmission to vehicle body and reducing vibration and harshness from the powertrain; (iv) torque link that controls the fore and aft movement of transverse mounted engines within their compartment while isolating engine noise and vibration from the body; (v) strut mounts that isolate vibration from the suspension and dampen vibration from the suspension into the interior cabin; (vi) spring seats/

bumpers that work in conjunction with AVS systems to prevent offensive noise generation; (vii) suspension bushing that allows flexibility in suspension components and eliminates noise, vibration and harshness from entering into the interior cabin; (viii) mass damper that is developed to counteract a specific resonance at a specific frequency to eliminate vibration; and (ix) hydromounts/hydrobushings comprising of an engine mount or suspension bushing filled with fluid (hydro mounts provide spring rate and damping performance that varies according to frequency and displacement, while conventional (non-hydro) mounts provide fixed response).

(iii)    The Fluid Handling Products

The Company is one of the leading global integrators of fluid systems and subsystems and components that control, sense, and deliver fluids and vapors in motor vehicles. The Company believes that it is the second largest global provider of fluid handling system products manufactured in its industry. The Company offers an extensive product portfolio and is positioned to serve its diverse customer base around the world. The Company's fluid handling products are principally found in four major vehicle systems: thermal management; fuel and brake; emissions management; and power management. The thermal management products direct, control and transport oil, coolant, water, and other fluids throughout the vehicle. The fuel and brake products direct, control, and transport fuel, brake fluid, and vapors throughout the vehicle. The emissions management products direct, control, and transmit emission vapors and fluids throughout the vehicle. Lastly, the power management products direct, control, and transmit power management fluids throughout the vehicle. The Company provides thermal management solutions that enhance hybrid powertrain cooling systems and offer bio-fuel compatible materials for alternative fuel vehicles. The Company's products support improved fuel economy initiatives with lightweight, high performance plastic and aluminum materials that reduce weight and offer an improved value equation. The Company specializes in complete fuel system integration encompassing products from the fuel rail to the fuel tank lines. The Company's low permeation fuel lines meet and exceed LEV II (low emission vehicle) and PZEV (partial zero emission vehicle) emission standards. The Company supports reduced emissions through the control of flow and temperature of exhaust gas. For the nine months ended September 30, 2009, the Company generated approximately 35% of total revenue before corporate eliminations from the fluid handling products.

(b)    Seasonality

Historically, sales to automotive customers are lowest during the months prior to model changeovers and during assembly plant shutdowns. However, economic conditions and consumer demand may change the traditional seasonality of the industry as lower production may prevail without the impact of seasonality. In previous years, changeover periods have typically resulted in lower sales volumes during July, August, and December. During these periods of lower sales volumes, profit performance is lower, but working capital improves due to continuing collection of accounts receivable.

(c)    Backlog of Orders

The Company's OEM sales are generally based upon purchase orders issued by the OEMs and as such the Company does not have a backlog of orders at any point in time.

Once selected to supply products for a particular platform, the Company typically supplies those products for the platform life, which is normally six to eight years, although there is no guarantee that this will occur. In addition, when the Company is the incumbent supplier to a given platform, the Company believes it has an advantage in winning the redesign or replacement platform.

(d)     Competition

The Company believes that the principal competitive factors in its industry are price, quality, service, performance, design and engineering capabilities, innovation, and timely delivery. The Company believes that its capabilities in these core competencies are integral to its position as a market leader in each of its product lines. In body and chassis products, the Company competes with Toyoda Gosei, Trelleborg, Tokai, Vibracoustic, Paulstra, Hutchinson, Henniges, Meteor, SaarGummi, and Standard Profil, among others. In fluid handling products, the Company competes with TI Automotive, Martinrea, Hutchinson, Conti-Tech, and Pierburg Gustav Wahler, along with numerous smaller companies in this competitive market.

(e)     Patents and Trademarks

The Company holds over 500 patents and patent applications worldwide, covering all major technologies relating to its business. These patents are grouped into two major categories: products, which deal with specific product invention claims for products which can be produced; and processes, which deal with specific manufacturing processes that are used for producing products. Most patents held by the Company (90%+) are in the former (products) category. Additionally, the Company develops significant technologies that it treats as trade secrets and chooses not to disclose to the public through the patent process, but they nonetheless provide significant competitive advantage and contribute to the company's global leadership position its various markets. The company has further technology sharing and licensing agreements with various third parties, including Nishikawa Rubber Company, one of its joint venture partners in vehicle sealing products. The Company has mutual agreements with Nishikawa Rubber Company for sales, marketing, and engineering services on certain body sealing products the Company sells and has maintained a relationship for more than 35 years. Under those agreements, each party pays for services provided by the other and royalties on certain products for which the other party provides design or development services. The Company also owns or has licensed several trademarks that are registered in many countries, enabling it to protect and market its products worldwide. Key trademarks include StanPro® (aftermarket trim seals), SafeSeal™ (obstacle detection sensors), and Stratlink™ (proprietary TPV polymer). During 2006, the Company purchased the right to use its current name from Cooper Tire.

(f)     Research and Development

The Company operates nine design, engineering, and administration facilities throughout the world and employs 496 research and development personnel, some of whom reside at customer facilities. The Company utilizes Design for Six Sigma and other methodologies that emphasize manufacturability and quality. The Company has been pursuing innovations that assist in resource conservation with particular attention to developing materials

39

that are lighter weight and made of materials that can be recycled, and the Company's development teams work closely with its customers to design and deliver thermal management solutions for cooling electric motors and batteries for new hybrids. As mentioned above, the company also devotes considerable research and development resources into noise, vibration, and harshness (NVH), resulting in high value, state-of-the-art solutions for its customers. These activities are applied not only in their AVS product lines, but also in vehicle sealing (noise transmission isolation and abatement via vehicle windows and doors); fuel delivery systems (isolation of fuel injectors on fuel rails); and thermal management (noise and vibration free coolant pumps and valves). The Company spent $74.8 million, $77.2 million, and $81.9 million in 2006, 2007, and 2008, respectively, and $46.6 million as of September 30, 2009, on research and development.

(g)    Joint Ventures and Strategic Alliances

The Company has used joint ventures to supplement its entry into new geographic markets such as China, Korea and India and to acquire new customers. The Company also has a joint venture in North America, which has proven valuable in establishing new relationships with North American Japanese manufacturers. The Company guarantees certain obligations of certain of its joint ventures.

(h)    Corporate History

CSA Acquisition Corp. was formed and capitalized in 2004 as a Delaware corporation owned by affiliates of each of The Cypress Group L.L.C., a New York-based private equity firm, and GS Capital Partners 2000, L.P., a subsidiary of the Goldman Sachs Group (collectively, with their affiliates the "Sponsors") via the sale of 3,180,000 shares of common stock to the Sponsors (with each Sponsor obtaining 49.1% of the outstanding shares of common stock). CSA Acquisition Corp. then entered into a stock purchase agreement with Cooper Tire & Rubber Company ("Cooper Tire") on September 16, 2004. The parties entered into an amendment of the stock purchase agreement on December 3, 2004, which provided for the acquisition by CSA Acquisition Corp. of all of the outstanding shares of capital stock of certain subsidiaries of Cooper Tire comprising Cooper Tire's automotive division for a purchase price of $1.165 billion in cash (the "2004 Acquisition"). In connection with the 2004 Acquisition, CSA Acquisition Corp. changed its name to Cooper-Standard Automotive Holdings Inc. (previously defined as "Holdings"). Also in connection with the 2004 Acquisition, on December 23, 2004, Holdings, CSA, and CSA Canada entered into a credit agreement that consisted of revolving credit facilities in a total principal amount of up to $125.0 million, a term loan facility of $51.3 million, a term loan facility of $115.0 million and a term loan facility of $185.0 million. The term loans were used to fund the 2004 Acquisition.

On February 6, 2006, the Company acquired fluid handling businesses in North America, Europe and China from ITT Industries, Inc. for approximately $202 million. ITT Industries, Inc., based in Auburn Hills, Michigan, was a leading manufacturer of steel and plastic tubing for fuel and brake lines and quick-connects, and operated fifteen facilities in seven countries. The acquisition of the fluid handling businesses was funded pursuant to an amendment to the credit agreement, which established an additional term loan facility, with a notional amount of $215 million. The additional term loan facility was structured in two

tranches, with $190 million borrowed in US dollars and €20.725 million borrowed in Euros, to take into consideration the value of the European assets acquired in the transaction.

On August 31, 2007, the Company completed the acquisition of nine Metzeler Automotive Profile Systems sealing systems operations in Germany, Italy, Poland, Belarus, Belgium (collectively, "MAPS"), and a joint venture interest in China from Automotive Sealing Systems S.A. The MAPS businesses were acquired for approximately $144 million.[1] The acquisition of the MAPS businesses was funded in part by borrowings under the credit agreement. The Company borrowed €44.0 million and combined this borrowing with Euro amounts outstanding under the ITT Industries, Inc. term loan facility to create a new term loan facility. In addition, the Company borrowed $10.0 million under the revolving credit facility and €15.0 million under the dual-currency sub limit of the revolving credit facility, borrowed directly by Cooper-Standard Automotive International Holdings BV, an indirectly owned Dutch subsidiary of Holdings. The Company also received an aggregate of $30.0 million in equity contributions from its Sponsors, affiliates of GS Capital Partners 2000, L.P., which contributed a total of $15.0 million, and affiliates of The Cypress Group L.L.C., which also contributed a total of $15.0 million. The remainder of the funding necessary for the acquisition came from available cash on hand.

### 3.02    **Prepetition Financing**

As of the Filing Date, the Company had approximately $1.170 billion of outstanding indebtedness on a consolidated basis, of which $84.3 million consisted of draws on a senior secured revolving credit facility; $522.8 million consisted of five senior secured term loan facilities; $513.4 million consisted of the Senior Notes and Senior Subordinated Notes; and $49.9 consisted of debt on account of other credit facilities, capital leases for affiliates, swaps, and other miscellaneous obligations.

(a)    The Prepetition Credit Facility

As described above, on December 23, 2004, in connection with the 2004 Acquisition, Holdings, CSA and CSA Canada entered into the Prepetition Credit Facility with various lending institutions, Deutsche Bank Trust Company Americas, as administrative agent, Lehman Commercial Paper Inc., as syndication agent, and Goldman Sachs Credit Partners, L.P., UBS Securities LLC and The Bank of Nova Scotia, as co-documentation agents. The Prepetition Credit Facility consists of (i) a $125 million revolving credit facility (the "Revolving Credit Facility") with available letters of credit of $45.0 million[2] and (ii) term loan facilities consisting of a Term Loan A facility of the Canadian dollar equivalent of $51.3 million with a maturity of 2010 and a Term Loan B facility of $115.0 million with a maturity of December 2011, both of which were funded through CSA Canada, and a Term Loan C facility of $185.0 million with a maturity of December 2011. The term loans were used to fund the 2004 Acquisition. In

---

[1]    Pursuant to subscription agreements entered into as of August 27, 2007, the Company issued a total of 250,000 additional shares of common stock to its Sponsors, which were invested by the Sponsors in connection with the financing of the Company's acquisition of MAPS.

[2]    The Revolving Credit Facility consists of a multi-currency facility revolver to CSA Canada, a dollar facility revolver to CSA, and a dual-borrower, dual currency facility revolver that can be drawn by either CSA or CSA International Holdings BV, a subsidiary of Holdings incorporated under the laws of the Netherlands.

addition, as part of the Prepetition Credit Facility, the Company entered into a Term Loan D of $215 million with a maturity of 2011 (structured into a U.S. tranche of $190 million and a European tranche of €20.7 million) and later a Term Loan E (collectively with Term Loans A, B, C, and D, the "Term Loan Facilities") of €64.7 million (which incorporates the European tranche of Term Loan D) with a maturity of 2011, which were used to fund the acquisition of fluid handling businesses in North America, Europe and China from ITT Industries, Inc. and the MAPS businesses.[3] The Prepetition Credit Facility is unconditionally guaranteed on a senior secured basis by Holdings and substantially all of its domestic subsidiaries, and its Canadian subsidiaries in the case of Term Loans A and B and Canadian dollar borrowings under the Revolving Credit Facility.

As of the Filing Date, the total amount outstanding under the Prepetition Credit Facility including swap obligations was $627 million.

(b)     Senior Notes and Senior Subordinated Notes

In connection with the 2004 Acquisition, CSA also issued $200.0 million 7% Senior Notes due 2012 (the "Senior Notes") and $350.0 million 8 3/8% Senior Subordinated Notes due 2014 (the "Senior Subordinated Notes"). The Senior Notes and Senior Subordinated Notes are guaranteed by Holdings and all U.S. Subsidiaries. As of the Filing Date, the principal outstanding amount of the Senior Notes, including accrued and unpaid interest, was $208.9 million. In addition, as of the Filing Date, the principal outstanding amount of the Senior Subordinated Notes, including accrued and unpaid interest, was $330 million. The indebtedness evidenced by the Senior Notes is unsecured senior indebtedness of CSA. The indebtedness evidenced by the Senior Subordinated Notes is unsecured senior subordinated indebtedness of CSA.

(c)     Old Holdings Common Stock

Holdings has 3,482,612 shares of authorized outstanding common stock. Holdings' principal shareholders are affiliates of the Sponsors. Each of the Sponsors, including their respective affiliates, currently owns approximately 49.3% of the equity of Holdings. The remaining shares are owned by current and former officers and directors.

(d)     Off Balance Sheet Factoring Arrangements

As part of its working capital management, certain of the Debtors' foreign non-debtor subsidiaries sell certain receivables through third party financial institutions without recourse. At September 30, 2009, the Company had $33.4 million of receivables outstanding under receivables transfer agreements entered into by various foreign locations.

3.03     **Events Preceding Commencement of the Chapter 11 Cases**

(a)     Operational Restructuring Efforts

---

[3]     Term Loans C, D and E were funded through CSA.

Since the 2004 Acquisition, the Company has implemented an aggressive restructuring strategy to reduce costs and eliminate non-strategic or duplicative facilities across the Company. Many manufacturing facilities across the United States, Canada, Europe, Asia, and Australia were closed, consolidated, or sold. The Company also reduced its European and U.S. workforce and froze contributions to certain of its global and U.S. pension plans. In October 2008, the Company commenced the initial phase of a global reorganization in North America and Europe, announcing in March 2009 the implementation of a comprehensive plan involving the discontinuation of its global product line operating divisions, formerly called the Body & Chassis Systems division and the Fluid Systems division, and the establishment of a new operating structure organized on the basis of geographic regions. As a result, the Company now operates in two divisions, North America and International. This new operating structure allows the Company to maintain its full portfolio of global products and provide unified customer contact points, while better managing its operating costs and resources. The Company has also implemented temporary layoffs, wage reductions, and modifications to employee benefit programs. Furthermore, salaried headcount has been reduced by over 1,300 workers in the past 12 months.

(b)     The Global Financial Crisis

The unprecedented global economic crisis had a devastating effect on the automotive industry and ultimately the Company's business. Cars and light trucks are a major purchase for consumers and the purchase of these items is highly dependent upon the health of the overall economy. Similarly, the purchase of new commercial vehicles is highly dependent upon macro-economic factors such as gross domestic product growth, disposable income, and interest rates. Due to the global financial crisis, which resulted in the massive deterioration of consumer net worth and a shortage of financing for consumers and businesses, potential purchasers were holding onto their vehicles longer and foregoing the purchase of new vehicles. Consequently, there was a severe global downturn in both the light vehicle and heavy vehicle market.

U.S. automotive sales declined significantly in 2008 and through the first two fiscal quarters of 2009. In 2004, North American vehicle production was at 15.8 million units. In 2007, there were 16.2 million vehicles produced, in 2008, there were 12.6 million vehicles produced and through the first two fiscal quarters of 2009, only 8 million vehicles. The OEMs, including GM, Ford and Chrysler, suffered greatly as a result. Notwithstanding the receipt of billions of dollars of financial aid from the federal government, GM and Chrysler each filed for chapter 11 protection during the second quarter of 2009. The impact of the crisis on the OEMs rippled through the automotive industry with no clear end in sight. In Europe, the market was fragmented with significant overcapacity and estimated production volumes were declining. Since the majority of the Company's customers are OEMs and their suppliers, the Debtors likewise experienced a significant fall off in sales, resulting in a decline in operating income and EBITDA.

Furthermore, the cost of raw materials that the Company uses in manufacturing many of its products increased significantly from 2006 to 2008, with some of these increases continuing in 2009. The principal raw materials the Company purchases include fabricated metal-based components, synthetic rubber, carbon black and natural rubber. The Company also

purchases raw steel and steel related components. The increase in the price of these items materially increased the Company's operating costs and adversely affected its profit margins because it is generally difficult to pass these increased costs on to the Company's customers. While these increases fell off in the second half of 2008, continued volatility in the global market has presented risk in forecasting costs.

(c)     The Company's High Degree of Leverage

As a result of the severe downturn in the automotive industry and the accompanying decrease in production volumes, the Company was over-leveraged, with outstanding indebtedness of approximately $1.170 billion as of the Filing Date. The Company dedicated a substantial portion of its cash flows from operations to the payment of principal and interest on the Company's indebtedness. The Company engaged in discussion regarding possible alternatives to the bankruptcy filing, including refinancing a portion of its indebtedness with its key creditors. However, it was unable to complete those negotiations prior to seeking bankruptcy protection.

(d)     Prepetition Restructuring Efforts

Prior to the filing of the Chapter 11 Cases, the Company undertook a concentrated effort to reduce its leverage to maintain its position as a leading global supplier as the automotive industry undergoes a massive overhaul worldwide. To assist with this effort, the Company hired Lazard Freres & Co. LLC ("Lazard") to advise it on restructuring its debt. The Company first commenced negotiations with its Sponsors in an effort to obtain liquidity and avoid the need for chapter 11 protection. With the realization that a restructuring of the Company's indebtedness was necessary, the Company and its advisors commenced discussions with the Prepetition Credit Facility Lenders, while continuing to pursue alternatives with the Sponsors. In connection with those efforts, the Company also reached out to and commenced discussions with certain Senior Noteholders and the Senior Subordinated Noteholders. While these restructuring efforts were ongoing, the Company was also in discussions with its Prepetition Credit Facility Lenders and other possible financing sources regarding potential postpetition debtor in possession financing.

(e)     Prepetition Defaults and Forbearance Agreements

On June 15, 2009, the Company announced that it would utilize a 30-day grace period in connection with interest payments scheduled for June 15, 2009 on its Senior Notes and Senior Subordinated Notes to allow the Company to continue discussions with its stakeholders to increase liquidity and improve its capital structure. The 30-day grace period expired on July 15, 2009. On July 14, 2009, the Debtors negotiated a limited waiver agreement (the "Waiver") with the Prepetition Credit Facility Lenders and secured forbearance agreements (the "Forbearance Agreements") with the majority of its Senior Noteholders and majority of its Senior Subordinated Noteholders. Pursuant to the Waiver, the Prepetition Credit Facility Lenders agreed to waive certain events of default, including the Debtors' non-payment of the June 15, 2009 interest payments within the applicable 30-day grace period.

Pursuant to its terms, the Waiver would have expired on July 28, 2009 absent notice from the Prepetition Credit Facility Lenders that the Waiver would continue through

August 14, 2009. On July 27, 2009, the Prepetition Credit Facility Lenders amended and restated the Waiver, extending the waiver period until August 14, 2009. Under the Forbearance Agreements, the Senior Noteholders and Senior Subordinated Noteholders agreed that they would not exercise their rights and remedies under the Senior Note Indenture and Senior Subordinated Note Indenture in connection with the nonpayment of the June 15, 2009 interest payments until the earlier of (i) August 14, 2009 or (ii) the expiration of the Waiver.

During this period the Debtors engaged in negotiations with the Prepetition Credit Facility Lenders to arrange for postpetition debtor in possession financing. In connection therewith, the Debtors agreed to enter into a superpriority senior secured postpetition credit facility (the "DIP Facility"). The proposed lenders under the DIP Facility agreed to provide financing up to an aggregate principal amount of $200,000,000, consisting of a $175,000,000 superpriority delayed draw term loan facility and a $25,000,000 standby uncommitted single draw term loan facility.

In addition, during this period, the Debtors engaged in negotiations with the Prepetition Credit Facility Lenders regarding a consensual restructuring of the Company's indebtedness. However, while the Debtors made progress in its negotiations with the Prepetition Credit Facility Lenders, the Debtors were not able to reach agreement on the terms of a plan of reorganization.

(f)     Tax Refund Received by CSA Canada

As discussed above, until the 2004 Acquisition, the Debtors and CSA Canada were owned by Cooper Tire. Under the terms of the purchase agreement, to the extent that Holdings (or any of its affiliates or subsidiaries) were to receive any tax refunds for periods of time prior to the 2004 Acquisition, Cooper Tire would have a claim against Holdings for the amounts refunded, plus interest received (net of taxes), subject to certain offsets. In that regard, on July 27, 2009, CSA Canada received an income tax refund in the approximate amount of CAD $80 million from the Canada Revenue Agency, which is the federal portion of a refund owing as a result of certain transfer pricing issues for the years 2000-2007, and expects to receive an additional CAD $47 million from the Canada Revenue Agency, which is the provincial portion of a refund owing to the same transfer pricing issues (collectively, the "Canadian Tax Refund"). On July 31, 2009, Cooper Tire demanded payment of at least $38 million from Holdings for the period prior to 2004 and threatened litigation. In addition to amounts already received, CSA Canada expects to receive additional income tax refunds for amounts paid to the Ontario provincial government (the "Anticipated Canadian Tax Refund"). Following the filing of the Chapter 11 Cases, Cooper Tire initiated the litigation described below in section 4.06 of the Disclosure Statement, which has been settled pursuant to the Cooper Tire Settlement Agreement.

3.04    **Pending Ordinary Course Litigation**

As a consequence of the Debtors' commencement of the Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States were automatically stayed pursuant to Section 362 of the Bankruptcy Code.

The Debtors are involved in various legal proceedings arising in the ordinary course of business. The Debtors periodically assess their liabilities and contingencies in connection with these proceedings based upon the information available to the Debtors. Based upon their review of these proceedings, the Debtors believe that their ultimate liability in connection with these pending or threatened ordinary course legal proceedings will not have a material effect on their results of operations, cash flows or financial position.

The Debtors anticipate that, to the extent any pending litigation is not resolved prior to the Effective Date or removed by the Debtors to federal court in accordance with their powers under the Bankruptcy Code, such litigation will continue after the Effective Date in the forum(s) in which it was initiated. Any adverse judgment against or liability of the Debtors arising out of these ordinary course legal proceedings would constitute a Claim that will be treated in accordance with the provisions of the Plan and the Bankruptcy Code.

## ARTICLE IV.
## DESCRIPTION OF CHAPTER 11 CASES

Although the Debtors continued to negotiate with their constituents over the restructuring of the Debtors' balance sheets, at the time of the Filing Date, given the near term expiration of the Waiver and Forbearance Agreements, the risk of potential litigation over nonpayment of amounts that may be owed to Cooper Tire, and the benefits to the Debtors of being able to access the post-petition debtor in possession financing, the Debtors determined that it was in the best interests of the Company and its stakeholders to file these Chapter 11 Cases so as to complete negotiations of, and implement, a balance sheet restructuring.

On the Filing Date, the Debtors commenced the Chapter 11 Cases, which were consolidated for procedural purposes only under Case No. 09-12743 (PJW) and are currently pending before the Honorable Peter J. Walsh. Since the Filing Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court. Transactions out of the ordinary course of business have required Bankruptcy Court approval. In addition, the Bankruptcy Court has supervised the Debtors' employment of attorneys and other professionals.

An immediate effect of the filing of the bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against the Debtors, and litigation against the Debtors. This injunction remains in effect, unless modified or lifted by order of the Bankruptcy Court, until a plan of reorganization is confirmed and becomes effective.

4.01 **First Day Motions**

(a) Traditional First Day Motions

On the Filing Date, the Debtors submitted a number of motions and applications requesting so-called "first day orders." On August 5, 2009, the Bankruptcy Court entered the following first day orders, among others:

- an order directing joint administration of the Debtors' chapter 11 cases;

- an interim order authorizing the Debtors to maintain their pre-petition bank accounts, business forms and stationery, and to continue using their centralized cash management system;[4]

- an order authorizing the debtors to continue to honor obligations on account of the debtors' warranties, clearinghouse functions, and participation in purchasing programs;

- an interim order authorizing the Debtors to pay prepetition employee wages, salaries, and other compensation, to contribute to employees benefit programs and continuing them in the ordinary course, to make deductions from employee paychecks for certain employee benefit plans and payroll taxes;[5]

- an interim order prohibiting utilities from altering, refusing, or discontinuing service to or discriminating against the Debtors, determining that the utilities were adequately assured of payment, and establishing procedures for determining requests for additional adequate assurance;[6]

- an interim order confirming the grant of administrative expense status to obligations arising from prepetition delivery of goods received within 20 days of the filing date, authorizing the debtors to pay such obligations in their discretion in the ordinary course of business, and authorizing the debtors to pay additional prepetition obligations to certain essential suppliers;[7]

- an order authorizing the Debtors to pay certain pre-petition tax liabilities;

---

[4] A second interim order authorizing the Debtors to maintain their pre-petition bank accounts, business forms and stationery, and to continue using their centralized cash management system was entered by the Bankruptcy Court on September 1, 2009. A final hearing on the relief sought regarding this motion was scheduled for October 5, 2009. On October 2, 2009, the hearing was continued to October 27, 2009 at 9:30 a.m., and on such date, the Bankruptcy Court entered a final order authorizing the Debtors to maintain their pre-petition bank accounts, business forms and stationery, and to continue using their centralized cash management system.

[5] A final order authorizing the Debtors to pay prepetition employee wages, salaries, and other compensation, to contribute to employees benefit programs and continuing them in the ordinary course, and to make deductions from employee paychecks for certain employee benefit plans and payroll taxes was entered by the Bankruptcy Court on September 1, 2009.

[6] A final order prohibiting utilities from altering, refusing, or discontinuing service to or discriminating against the Debtors, determining that the utilities were adequately assured of payment, and establishing procedures for determining requests for additional adequate assurance was entered by the Bankruptcy Court on September 1, 2009.

[7] A final order confirming the grant of administrative expense status to obligations arising from prepetition delivery of goods received within 20 days of the filing date, authorizing the Debtors to pay such obligations in their discretion in the ordinary course of business, and authorizing the Debtors to pay additional prepetition obligations to certain essential suppliers was entered by the Bankruptcy Court on September 1, 2009.

- an order authorizing (but not directing) the Debtors to pay the prepetition claims of shippers, warehousemen, customs brokers, and tooling vendors; and

- an interim order authorizing the Debtors to obtain postpetition financing and to use cash collateral.[8]

## 4.02 **Retention of Professionals**

In the period leading up to the Filing Date, the Debtors sought the services of seasoned and capable bankruptcy professionals to assist the Debtors in their efforts to deleverage their balance sheet and determine the best course of action with respect to their pending debt payments on the Prepetition Credit Facility, the Senior Notes and the Senior Subordinated Notes. The Debtors determined that retaining Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") as their bankruptcy counsel, Lazard as their investment banker and financial advisor, and Alvarez & Marsal North America, LLC ("A&M") as their restructuring advisor was in their best interests and gave them the best opportunity to lead the Company through a restructuring in or out of chapter 11.

In that regard, on August 13, 2009, the Debtors filed applications to retain and employ Fried Frank, Lazard and A&M, nunc pro tunc to the Filing Date, as their advisors in connection with the Chapter 11 Cases. On September 1, 2009, the Bankruptcy Court entered an order approving Fried Frank as the Debtors' legal counsel in the Chapter 11 Cases. Fried Frank's services in the Chapter 11 Cases include, among other things: (i) providing the Debtors with legal advice with respect to their powers and duties as chapter 11 debtors and debtors in possession; (ii) advising and consulting on the conduct of the Chapter 11 Cases; (iii) taking necessary action to protect and preserve the Debtors' Estates; (iv) preparing, presenting and responding to, on behalf of the Debtors, as debtors in possession, necessary applications, motions, answers, orders, reports and other legal papers in connection with the administration of the Chapter 11 Cases; (v) advising the Debtors in connection with post-petition debtor in possession financing and cash collateral arrangements and documents relating thereto; (vi) negotiating, preparing and reviewing the Debtors' plan of reorganization and related documentation; (vii) assisting and representing the Debtors in matters relating to litigation initiated in the Chapter 11 Cases; and (viii) advising the Debtors in connection with exit financing in connection with their emergence from chapter 11 and documents relating thereto.

On September 1, 2009, the Bankruptcy Court entered an order approving A&M as the Debtors' restructuring advisors. A&M's services in the Chapter 11 Cases include: (i) assisting in the preparation and development of short-term cash flow forecasts and liquidity plans; (ii) assisting the Debtors' management team and counsel regarding the coordination of resources relating to ongoing restructuring efforts; (iii) assisting in the preparation of financial information for distribution to creditors and others; (iv) assisting the Debtors with information and analysis required pursuant to the Debtors' post-petition debtor in possession financing; (v) providing analysis of creditor claims and developing databases, as necessary to track such

---

[8] A final order authorizing the Debtors to obtain postpetition financing and to use cash collateral was entered by the Bankruptcy Court on September 1, 2009.

claims; and (vi) assisting the Debtors' management with preparing and developing the Debtors' statements of financial affairs, schedules of assets and liabilities and financial statements pursuant to Bankruptcy Rule 2015.3.

On September 11, 2009, the Bankruptcy Court approved the Debtors' application to retain and employ Lazard as an investment banker and financial advisor. Lazard was retained with respect to, among other things: (i) evaluating the Debtors' potential debt capacity, (ii) assisting in the determination of the capital structure for the Debtors, (iii) assisting in the determination of a range of values for the Debtors on a going concern basis, (iv) advising the Debtors on tactics and strategies for negotiating with the Debtors' stakeholders, (v) advising and assisting the Debtors in evaluating potential financing transactions, and (vi) assisting the Debtors in preparing documentation, and providing testimony, as necessary, with respect to matter on which Lazard has been engaged to advise the Debtors.

In addition, on August 13, 2009, the Debtors filed an application to retain and employ Richards, Layton & Finger, P.A., nunc pro tunc to the Filing Date, as co-counsel and Delaware counsel. On September 1, 2009, the Bankruptcy Court entered an order approving the Debtors' application.

### 4.03    **Appointment of Creditors' Committee**

On August 14, 2009, the United States Trustee appointed the Creditors' Committee, which consists of six members.[9] The entities that are members of, and the counsel and advisors retained by, the Creditors' Committee are set forth below.

(a)    Members of the Committee

Wilmington Trust Company, as Indenture Trustee
Rodney Square North
1100 N. Market Street
Wilmington, DE 19890
Chair

U.S. Bank National Association, as Indenture Trustee
60 Livingston Avenue
St. Paul, MN 55107-2292

TD High Yield Income Fund
161 Bay Street, 33rd Floor
Toronto, ON M5J 2T2

United Steelworkers
Five Gateway Center, Room 807
Pittsburgh, PA 15222

---

[9]    When the Creditors' Committee was created on August 14, 2009, it consisted of seven members. However, since that date, Pioneer High Yield Fund and EMS Chemie (North America), Inc. have resigned from their positions on the Creditors' Committee.

Pension Benefit Guaranty Corporation
1200 K Street, N.W.
Washington, DC 20005-4026

      (b)      Professionals Retained by the Creditors' Committee

Kramer, Levin, Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention: Kenneth H. Eckstein, Esq., Robert T. Schmidt, Esq., and Stephen D. Zide, Esq.
As Co-Counsel to the Official Committee of Unsecured Creditors

and

Young, Conway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, P.O. Box 391
Wilmington, DE 19899
Attention: M. Blake Cleary, Esq.
As Co-Counsel to the Official Committee of Unsecured Creditors

Bennett Jones LLP
3400 One First Canadian Place
P.O. Box 130
Toronto, Ontario M5X 1A4
As Special Canadian Counsel to the Official Committee of Unsecured Creditors

FTI Consulting Inc.
3 Times Square, 9th Floor
New York, NY 10036
As Financial Advisors to the Official Committee of Unsecured Creditors

### 4.04    **The DIP Financing Facility**

      In order to continue to operate during the Chapter 11 Cases, on the Filing Date, the Debtors sought the Bankruptcy Court's approval to obtain debtor in possession financing offered by the Prepetition Credit Facility Lenders. In that regard, on August 5, 2009, the Bankruptcy Court approved on an interim basis the Debtors' original post-petition debtor in possession financing agreement with the Prepetition Credit Facility Lenders (the "Original DIP Financing Agreement"), which provided the Debtors with the necessary capital to fund their post-petition activities. The DIP Original Financing Agreement provided for an initial DIP Facility in an aggregate principal amount of $175,000,000 and an uncommitted incremental DIP Facility in an aggregate principal amount of $25,000,000. The Initial DIP Facility consisted of a Tranche A Term Loan drawn by CSA, a Tranche B Term Loan drawn by CSA Canada, and a Tranche C Term Loan drawn by Metzeler Automotive Profile Systems GmbH (the "Additional Foreign Borrower"). On September 1, 2009, the Bankruptcy Court approved the Original DIP

Financing Agreement on a final basis and on September 2, 2009, the Bankruptcy Court entered a final order.

Interest under the Original DIP Financing Agreement was incurred at the LIBOR Rate plus 9.50% or the Prime Rate plus 8.50%, to be paid on a quarterly basis. The LIBOR Rate floor was 3.00% and the Prime Rate floor was 4.00%. In addition, in accordance with the Original DIP Financing Agreement, the Debtors paid an upfront fee equal to 3.00% of all commitments under the Original DIP Financing Agreement as of the entry of the interim order approving the Original DIP Financing Agreement to the DIP Financing Agent.

4.05    **The Refinanced DIP Financing Facility**

Subsequent to the entry of the final order approving the Original DIP Financing Agreement, the Debtors determined that they would be able to obtain post-petition financing from the DIP Lenders on more favorable economic terms and without having to pay an additional commitment fee, while preserving the other terms of the Original DIP Financing Agreement. In that regard, on December 9, 2009, the Debtors sought approval of the DIP Financing Agreement, which, similar to the Original DIP Financing Agreement, provided for an initial DIP Facility in an aggregate principal amount of $175,000,000 (the "Initial DIP Facility") and an uncommitted incremental DIP Facility in an aggregate principal amount of $25,000,000 (the "Incremental DIP Facility"). The Initial DIP Facility consists of a Tranche A Term Loan drawn by CSA, a Tranche B Term Loan drawn by CSA Canada, and a Tranche C Term Loan drawn by the Additional Foreign Borrower (collectively, with the loans under the Incremental DIP Facility, the "Refinanced DIP Loans"). On December 29, 2009, the Bankruptcy Court entered the DIP Financing Order approving the DIP Financing Agreement on a final basis. The proceeds of the DIP Facility were used to pay in full the obligations under the Original DIP Financing Agreement, and, after giving effect to such payment in full, have been, and will continue to be, used for working capital requirements and general corporate purposes of each of the borrowers under the DIP Financing Agreement and their respective subsidiaries.

The maturity date of the DIP Financing Agreement is August 4, 2010 with the possibility of one 90-day extension, subject to the prior written consent of the Required Lenders under the DIP Financing Agreement. In the event that the maturity date of the DIP Financing Agreement is so extended, the Debtors would be required to pay an extension fee equal to 1% of the aggregate principal amount of outstanding DIP Loans to the DIP Financing Agent.

The loans under the DIP Financing Agreement bear interest at the LIBOR Rate plus 6% or the Prime Rate plus 5%, to be paid on a quarterly basis. The LIBOR Rate floor is 2% and the Prime Rate floor is 3%. Upon the occurrence and during the continuation of an event of default, interest will accrue at a rate equal to 2% above the rate previously applicable to such obligations, payable on demand. In addition, the Debtors paid an exit fee equal to 1% for the loans under the Original DIP Financing Agreement in connection with entering into the DIP Financing Agreement and paying in full the obligations under the Original DIP Financing Agreement. The Debtors, however, will not be required to pay an exit fee in connection with paying in full their obligations under the DIP Financing Agreement.

The Debtors are required to pay all expenses of the DIP Lenders and the DIP Financing Agent (including fees, expenses, and charges of counsel to the DIP Lenders and the DIP Financing Agent).

### 4.06    The Cooper Tire Adversary Proceeding

Holdings, CSA and CSA Canada (the "Defendants") have been named as defendants in the adversary proceeding initiated by Cooper Tire & Rubber Company and Cooper Tyre Rubber & Company UK Limited (together, "Cooper Tire"): Cooper Tire & Rubber Company v. Cooper-Standard Holdings, Inc. et. al., Adv. Proc. No. 09-52014 (PJW) (the "Cooper Tire Adversary Proceeding") pending in the U.S. Bankruptcy Court for the District of Delaware. On August 5, 2009, Cooper Tire filed a motion to lift the automatic stay seeking to commence proceedings in the CCAA Proceeding of CSA Canada. The Bankruptcy Court denied Cooper Tire's motion to lift the automatic stay on August 18, 2009. On August 19, 2009, Cooper Tire filed the Cooper Tire Adversary Proceeding seeking a declaratory judgment that the Canadian Tax Refund is property of Cooper Tire or, in the alternative, either the imposition of (i) a resulting trust in Cooper Tire's favor over the Canadian Tax Refund or (ii) a constructive trust in Cooper Tire's favor over the Canadian Tax Refund. Cooper Tire's complaint alleges that approximately US $60 million of the Canadian Tax Refund is attributable to tax periods prior to December 23, 2004, and, therefore, is Cooper Tire's property pursuant to a Stock Purchase Agreement, dated as of September 16, 2004, among Cooper Tire, Cooper Tyre & Rubber Company UK and Holdings (the "Stock Purchase Agreement"). In addition, Cooper Tire's complaint alleges that an unspecified portion of the Anticipated Canadian Tax Refund is attributable to the tax periods prior to December 23, 2004 and that some portion of the Anticipated Canadian Tax Refund is also its property.

Cooper Tire filed an amended complaint in the Cooper Tire Adversary Proceeding on October 5, 2009, which added CSA Canada as a defendant in the proceedings. On January 6, 2010, following the completion of discovery, the parties in the Cooper Tire Adversary Proceeding each filed a motion for summary judgment. In a letter to counsel dated January 26, 2010, the Bankruptcy Court notified the parties that it had determined to set the matter for trial.[10]

Thereafter, on March 17, 2010, The Defendants, Cooper Tire and the Creditors' Committee entered into the Cooper Tire Settlement Agreement. A motion seeking approval of the Settlement Agreement will be filed with the Bankruptcy Court in the near term. Pursuant to the terms of the Settlement Agreement, the Defendants, among other things, agreed to (i) pay Cooper Tire $17,639,080.98 in cash and (ii) obtain a release of Cooper Tire's obligations in connection with the Surgoinsville Lease Guarantee (as defined in the Settlement Agreement) or, alternatively, provide a letter of credit in favor of Cooper Tire, in the initial amount of $7 million

---

[10] With respect to the Cooper Tire litigation in the CCAA Proceedings, on September 29, 2009, the Canadian Court issued an order lifting the stay in the CCAA Proceedings so that Cooper Tire could commence proceedings against CSA Canada in the Bankruptcy Court. In addition, the Canadian Court ordered that CSA Canada segregate any forthcoming tax refunds until the Bankruptcy Court made a determination on the merits of Cooper Tire's claims with respect to the tax refunds. On October 16, 2009, CSA Canada filed a motion for leave to appeal the decision of the Canadian Court to segregate the forthcoming tax refunds, and leave to appeal was granted on January 22, 2010.

(but declining by $1 million per year for seven years) to reimburse Cooper Tire for any amounts that it is required to pay its landlord on account of the Surgoinsville Lease Guarantee. In addition, Cooper Tire has agreed to dismiss its complaint in the Bankruptcy Court with prejudice and claim no further entitlement to the tax refunds. The parties have also granted general mutual releases to each other with respect to claims and liabilities under the Stock Purchase Agreement and other claims and liabilities, subject to the following exceptions: (i) CSA will continue to honor its existing contractual obligation to indemnify Cooper Tire against workers compensation liabilities relating to CSA employees who were employed when Cooper Tire was CSA's parent company and (ii) Cooper Tire will continue to indemnify CSA with respect to certain environmental matters covered by the Stock Purchase Agreement.

### 4.07    Schedules of Assets and Liabilities & Statements of Financial Affairs

Pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, unless otherwise ordered by the Bankruptcy Court, the Debtors must each file certain schedules of claims, assets, liabilities, executory contracts and unexpired leases and other information (the "Schedules") and a Statement of Financial Affairs (the "Statements") within fifteen (15) days of the Filing Date. This information is designed to provide creditors and other interested parties with material information to enable each creditor to evaluate its proposed treatment under any plan. Local Rule 1007-1(b) extends the Debtors' deadline to file their schedules and statements beyond the fifteen days previously provided by Bankruptcy Rule 1007 by an additional fifteen (15) days, for a total of thirty days. On September 30, 2009, the Debtors requested, and were granted, an extension of time to file their Schedules and Statements, through and including October 2, 2009. The Debtors filed the Schedules and Statements with the Bankruptcy Court on October 2, 2009.

### 4.08    Bankruptcy Rule 2015.3(a) Reports of Financial Information

Pursuant to Bankruptcy Rule 2015.3(a), the Debtors must periodically file certain financial reports regarding the value, operations, and profitability of each entity that is not a publicly-traded corporation or a debtor in a case under the Bankruptcy Code, and in which the Debtors' estates hold a substantial or controlling interest. Pursuant to Bankruptcy Rule 2015.3(b), the first such report must be filed within five (5) days before the first date set for the meeting of creditors under section 341 of the Bankruptcy Code.

On September 4, 2009, the Debtors filed a motion (the "Rule 2015.3 Motion") for an order granting the Debtors additional time, through and including October 5, 2009, to file all of their respective initial reports of financial information required by Bankruptcy Rule 2015.3 or to seek a modification of the reporting requirements of Bankruptcy Rule 2015.3(a) for cause. An order approving the Rule 2015.3 Motion was entered by the Bankruptcy Court on September 30, 2009. On October 5, 2009, the Debtors filed their initial reports of financial information required by Bankruptcy Rule 2015.3, except reports for those entities subject to the Rule 2015.3 Joint Venture Motion (as discussed below).

On October 2, 2009, the Debtors filed a further motion (the "Rule 2015.3 Joint Venture Motion") for an order (i) authorizing the Debtors to file under seal certain reports of financial information required by Bankruptcy Rule 2015.3(a) relating to certain joint ventures

(the "Sealed Joint Ventures") in which the Debtors own at least a 50% interest and (ii) granting the Debtors additional time, through October 30, 2009, to file the reports of financial information required by Bankruptcy Rule 2015.3(a) relating to such joint ventures. The Bankruptcy Court entered an order approving the Rule 2015.3 Joint Venture Motion on November 23, 2009 and the Debtors subsequently filed Bankruptcy Rule 2015.3 reports for the Sealed Joint Ventures under seal.

4.09    **Bar Dates**

On October 9, 2009, the Debtors filed a motion seeking an order establishing bar dates by which creditors must file Proofs of Claim in the Debtors' Chapter 11 Cases, and approving the forms and manner of notice thereof. The Debtors requested that the Bankruptcy Court set December 4, 2009 at 5:00 p.m. (PST) (the "General Bar Date"), as the bar date for all Creditors holding Claims against the Debtors, and February 1, 2010 at 5:00 p.m. (PST) (the "Governmental Unit Bar Date"), as the bar date for all governmental entities to file Proofs of Claim in the Debtors' cases or be forever barred from asserting such Claims against the Debtors. The Debtors' motion also sought to establish the bar date by which Creditors must file claims arising out of the rejection of executory contracts or unexpired leases as the later of (a) the General Bar Date or (b) thirty (30) days after the entry of an order authorizing the rejection of such executory contract or unexpired lease. On October 27, 2009, the Bankruptcy Court entered an order setting the foregoing bar dates.

4.10    **Exclusivity**

Pursuant to section 1121 of the Bankruptcy Code, a chapter 11 debtor has the exclusive right to (i) file a plan or plans of reorganization until 120 days after the petition date and (ii) solicit acceptances of such plan or plans until 180 days after the petition date. Under section 1121(d) of the Bankruptcy Code, the bankruptcy court may extend the exclusive periods within which to file a plan or plans and solicit acceptances of such plan or plans up to a maximum of 18 months and 20 months, respectively, after the petition date. The Debtors' exclusive periods to file a plan or plans and solicit acceptances of such plan or plans were set to expire on December 1, 2009 and February 1, 2010, respectively. On November 23, 2009, the Bankruptcy Court entered an order approving the Debtors' motion seeking to extend the exclusive periods within which the Debtors may file a plan or plans and solicit acceptances of such plan or plans through March 31, 2010 and June 1, 2010, respectively. On March 18, 2010, the Bankruptcy Court entered an order approving the Debtors' motion seeking to extend the exclusive periods to file a plan or plans and solicit acceptances of such plan or plans through June 29, 2010 and August 30, 2010, respectively.

4.11    **Unexpired Non-Residential Real Property Leases**

Section 365(d)(4) of the Bankruptcy Code provides that if a debtor fails to assume its unexpired non-residential real property leases under which it is a lessee within 120 days after the petition date, such leases are deemed to be rejected. Section 365(d)(4) states that a bankruptcy court may extend the time period within which to assume such leases by an additional 90 days. The time period within which the Debtors were required to assume or reject their unexpired nonresidential real property leases under which they are a lessee was set to expire

on December 1, 2009. On November 23, 2009, the Bankruptcy Court entered an order approving the Debtors' motion seeking to extend this time period to March 1, 2010. Thereafter, on February 12, 2010, the Debtors filed omnibus motions to reject one non-residential real property lease under which they are a lessee and to assume nine non-residential real property leases. The Debtors also obtained Bankruptcy Court approval of stipulations by and between the Debtors and their landlords for the remaining four leases to extend the rejection deadline. On March 1, 2010, the Bankruptcy Court entered orders approving the Debtors' omnibus assumption and rejection motions.

### 4.12   **Removal of Claims and Actions**

Bankruptcy Rule 9027(a) provides that if a claim or cause of action in a civil action is pending when a case under the Bankruptcy Code is commenced, a notice of removal may be filed on, among other things, ninety (90) days after the petition date. The time period within which the Debtors were required to file their notices of removal was set to expire on November 2, 2009. On November 23, 2009, the Bankruptcy Court entered an order approving the Debtors' motion seeking to extend the time period within which the Debtors may file notices of removal with respect to claims and actions pending as of the Filing Date to March 2, 2010. On March 18, 2010, the Bankruptcy Court entered an order approving the Debtors' motion seeking to extend the time period within which to file notices of removal through June 1, 2010.

### 4.13   **Development of the Business Plan**

Since the Filing Date, the capital markets in the United States have continued to thaw and the global automotive industry has shown signs of improvement. Both GM and Chrysler have emerged from chapter 11 through the sale of their assets to new entities and have since undertaken initiatives to improve the quality of their brands, increase sales, and wind-down their unprofitable businesses. The federal government, in addition to the financial aid it had already provided to the OEMs in early 2009, implemented the "Cash-for-Clunkers" program that provided significant rebates to consumers on new automobile purchases for trading in their previously-owned vehicles that qualified as "gas guzzlers." The Cash-for-Clunkers program dramatically improved automotive sales in the fiscal third quarter of 2009. Although the Cash-for-Clunkers program has since expired, the Debtors' business operations in the second half of 2009 have remained strong with the Company earning an operating profit of $24.9 million for the three months ending September 30, 2009 as opposed to an operating loss of $10.1 million for the same period in 2008.

Given the recent improvements in the U.S. economy and the global automotive industry, the Debtors' management has put together a business plan that sets forth management's projections with regard to the Debtors' future performance. The Debtors' management believes that the business plan presents the best alternative to maximize value for the Debtors' go-forward business and provides all constituents with the most realistic look at the future of the Debtors' businesses. After careful consideration, the Debtors' Board of Directors approved the business plan on December 1, 2009. Further, since December 1, 2009, the Debtors' management has continued to review their go-forward business performance. Based on this ongoing review and after careful consideration, in late February 2010, the Debtors' management updated their

business plan with respect to management's projections with regard to the Debtors' future performance for the 2010 fiscal year.

### 4.14 **Negotiations Relating to Development of the Plan**

Prior to commencing these Chapter 11 Cases and since the filing of the Debtors' petitions for relief under the Bankruptcy Code, the Debtors' have sought a consensual restructuring of their balance sheets so as to be able to emerge from chapter 11 with an appropriate capital structure that would enable the Debtors to remain competitive.

Although the value of the Debtors significantly exceeds the amount of the Prepetition Credit Facility Claims under the Prepetition Credit Facility, the Debtors could not reinstate or refinance that debt because the Debtors would be significantly over leveraged. Accordingly, the Debtors' initial efforts focused on negotiating a stand-alone chapter 11 plan with the Creditors' Committee and the Prepetition Credit Facility Lenders that would provide the Prepetition Credit Facility Lenders with a recovery consisting of debt and equity in Reorganized Holdings, with the remaining equity being distributed to the Noteholders. However, as negotiations continued, it became apparent that the Prepetition Credit Facility Lenders, the Creditors' Committee and certain of Senior Noteholders and Senior Subordinated Noteholders held vastly different views of the value of the Reorganized Debtors and that the Prepetition Credit Facility Lenders would not accept equity at a value that would be acceptable to the Noteholders or the Creditors' Committee. The Debtors also recognized the potential obstacles they would face if they could not force the Prepetition Credit Facility Lenders to accept equity in satisfaction of their Prepetition Credit Facility Claims.

(a)     The Original Backstop Commitment

During the course of negotiations, automotive industry forecasts and the capital markets improved. As a result, the Debtors began to explore alternative transactions for restructuring that would pay the Prepetition Credit Facility Claims in Cash. The Debtors then began discussions with the Creditors' Committee and certain Noteholders regarding a potential "new money" plan that would include a backstopped equity rights offering which, when combined with exit financing, would allow the Debtors to pay the Prepetition Credit Facility Lenders in full in Cash while distributing equity in Reorganized Holdings to the Senior Noteholders, the Senior Subordinated Noteholders and those parties that agreed to backstop the rights offering. Thereafter, the First Backstop Parties came forward with a proposal to backstop an equity rights offering in the amount of $245 million. The proceeds of the rights offering would be used in conjunction with exit financing to pay the Prepetition Credit Facility Lenders in full. In addition, the proposal provided that Noteholders would receive a direct distribution of new equity in Reorganized Holdings, and the Senior Subordinated Noteholders would receive warrants to purchase a portion of the new equity.

After extensive negotiations with the Creditors' Committee and the Original Backstop Parties, on February 1, 2010 the Debtors and the First Backstop Parties executed the Original Commitment Agreement and by separate motion the Debtors sought approval of the procedures for conducting the rights offering and authority to enter into the Original Equity Commitment Agreement (the "Original Rights Offering Approval Motion"). The Creditors'

Committee signed a Plan Support Agreement in which the Creditors' Committee agreed to support the Original Commitment Agreement and the Original Plan. The Debtors also filed the Original Plan, the corresponding disclosure statement with respect to the Original Plan, and a motion seeking approval of the Original Disclosure Statement and the solicitation of votes in connection with the Original Plan.

(b)     The Current Backstop Commitment

Shortly after filing the Original Plan, certain of the Debtors' Noteholders (the "Second Backstop Parties") approached the Debtors with an alternative proposal to backstop a rights offering that would provide an improved recovery to the Noteholders than those provided for in the Original Plan. Accordingly, the Debtors adjourned the hearing on the approval of the Original Commitment Agreement to engage in negotiations with the Second Backstop Parties regarding the alternative proposal and reengage with the First Backstop Parties to improve the terms of the Original Commitment Agreement.

When final documentation was substantially complete with the Second Backstop Parties, discussions with the First Backstop Parties resumed in earnest. Consistent with their fiduciary duties to creditors, the Debtors and their professionals concluded that the best possible outcome for the estate would be to broker a joint proposal from the two backstop groups, who collectively hold over half of the principal amount of the Senior Notes and a substantial majority of the principal amount of the Senior Subordinated Notes. Such a joint proposal would yield higher recoveries for creditors, minimize or eliminate potential confirmation issues and place these chapter 11 cases on a clear and expeditious path to exit

After extensive, arms-length negotiations between the Debtors, the Creditors' Committee, the First Backstop Parties and the Second Backstop Parties, all parties agreed upon the terms of a revised restructuring proposal incorporated in the new Equity Commitment Agreement. The Equity Commitment Agreement and the Plan provide for a $355 million backstopped equity rights offering that would pay the Prepetition Facility Claims and the Senior Note Claims in full, in cash (with the Supporting Senior Noteholders agreeing to forgo cash payment on their Supporting Senior Note Claims, and instead receiving a distribution of New Common Stock on account of their Supporting Senior Note Claims), and improve the recovery to the Senior Subordinated Noteholders. Thus, the Debtors have now filed the Plan, which has the support of Holders holding more than half of the outstanding principal amount of Senior Note Claims and Holders holding a substantial majority of the outstanding principal amount of the Senior Subordinated Note Claims.

On March 19, 2010 the Debtors and the Backstop Parties executed the Equity Commitment Agreement and the Debtors filed a supplement (the "Supplement") to the Original Rights Offering Approval Motion, as amended by the Supplement (the "Rights Offering and Equity Commitment Approval Motion") seeking approval of the procedures for conducting the Rights Offering and authority to enter into the Equity Commitment Agreement. With the execution of the Equity Commitment Agreement, the Debtors have now reached a consensual agreement with their key stakeholders and the Creditors' Committee. Accordingly, contemporaneously with the filing of this Disclosure Statement, the Debtors are filing the Plan and seeking approval of the Rights Offering and Equity Commitment Approval Motion, which

has the support of the Creditors' Committee and the Backstop Parties. The Debtors believe that the Plan not only comports with the requirements of the Bankruptcy Code, but is fair and reasonable to all constituents.

## ARTICLE V.
## SUMMARY OF THE PLAN

THE FOLLOWING IS A SUMMARY OF CERTAIN SIGNIFICANT PROVISIONS OF THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS APPENDIX C. TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL BE CONTROLLING.

The Debtors believe that under the Plan, Holders of Claims will obtain a recovery with a value no less than what would otherwise be recovered by such Holders if the assets of the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See section 17.07 "Acceptance and Confirmation of the Plan—Best Interests Test."

### 5.01 **General**

Chapter 11 of the Bankruptcy Code is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and its creditors and stockholders. Upon the filing of a petition for relief under chapter 11 of the Bankruptcy Code, section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's case under chapter 11 of the Bankruptcy Code or that otherwise interfere with the debtor's property or business.

Formulation of a plan is the principal objective of a case under chapter 11 of the Bankruptcy Code. In general, a plan under chapter 11 of the Bankruptcy Code (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan and (iii) contains other provisions necessary to effectuate the plan. Chapter 11 of the Bankruptcy Code does not require each Holder of a claim or interest to vote in favor of the plan of reorganization in order for the Bankruptcy Court to confirm the plan. However, a plan must be accepted by the Holders of at least one impaired class of claims without considering the votes of "insiders" within the meaning of the Bankruptcy Code. Generally, a claim or interest is "impaired" if its legal, equitable or contractual rights are altered. A Holder of an impaired claim or interest that will receive a distribution under the plan is entitled to vote to accept or reject the plan.

Distributions made under the Plan will be made on the Effective Date, as soon thereafter as is practicable, or at such other time or times specified in the Plan.

### 5.02 **Voting on the Plan**

(a)     Holders of Claims Entitled to Vote

As more fully described below, the Plan is divided into thirteen (13) Sub-Plans, one for each Debtor, and designates ten (10) separate classes of Claims and Equity Interests. See section 5.03 "Summary of the Plan—Classification and Treatment of Claims and Equity Interests Under the Plan." Holders of Senior Subordinated Note Claims (Class 6) are Impaired under the Plan and will be entitled to vote to accept or reject the Plan. Holders of Holdings General Unsecured Claims (Class 9) and Old Holdings Equity Interests (Class 10) will not receive any distribution under the Plan and are therefore deemed to reject the Plan and votes of Classes 9 and 10 will therefore not be solicited. The Holders of Priority Claims (Class 1), Miscellaneous Secured Claims (Class 2), Intercompany Claims (Class 3), Senior Note Claims (Class 5), Subsidiary Debtor General Unsecured Claims (Class 7) and Subsidiary Debtor Equity Interests (Class 8) are Unimpaired and are conclusively presumed to accept the Plan.

(b)     Votes Required for Class Acceptance

The Bankruptcy Court will determine whether sufficient acceptances have been received to confirm the Plan. In order for the Plan to be confirmed under section 1129(b) of the Bankruptcy Code, among other requirements, at least one class of Impaired Claims must have accepted the Plan which acceptance will be determined without including any acceptances of the Plan by any "insider," as defined in the Bankruptcy Code. The class of Senior Subordinated Note Claims (Class 6) will have accepted the Plan if the Plan has been accepted by Holders of Senior Subordinated Note Claims (Class 6) that hold at least two-thirds in amount and more than one-half in number of the Allowed Senior Subordinated Note Claims (Class 6) of Holders of Senior Subordinated Note Claims (Class 6) that vote to accept or reject the Plan. Because Holders of Holdings General Unsecured Claims (Class 9) and the Holders of Old Holdings Equity Interests (Class 10) will not receive any distribution under the Plan and, therefore, will be conclusively presumed to reject the Plan as a matter of law, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code. Although the Holders of Old Holdings Equity Interests will not receive a distribution or retain any property under the Plan and are deemed to reject the Plan, such Holders have advised the Debtors that they support the Plan. In addition, the Backstop Parties (which hold a substantial majority in dollar amount of Senior Subordinated Note Claims (Class 6)) support the Plan and have agreed to vote in favor of the Plan.

5.03    **Classification and Treatment of Claims and Equity Interests Under the Plan**

The Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim or interest of a creditor or equity holder in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that all Claims and Equity Interests have been appropriately classified in the Plan.

**Except to the extent that modification of classification in the Plan adversely affects the treatment of a Holder of a Claim or Equity Interest and requires resolicitation, acceptance of the Plan by any Holder of a Claim or Interest pursuant to the solicitation will be deemed to be a consent to the Plan's treatment of such Holder regardless of the class as to which such Holder is ultimately deemed to be a member.**

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtors believe that they have complied with this standard of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such standard, the Bankruptcy Court could deny confirmation if the Holders of Claims or Equity Interests affected do not consent to the treatment afforded them under the Plan.

Only classes that are Impaired under the Plan, but that are not deemed to have rejected the Plan as a matter of law, are entitled to vote to accept or reject the Plan. Generally, a class of claims or interests is considered to be "Unimpaired" under a chapter 11 plan if such plan does not alter the legal, equitable and contractual rights of the holders of such claims or equity interests. Under the Bankruptcy Code, holders of claims and interests in an Unimpaired class are conclusively presumed to have accepted a plan and are not entitled to vote to accept or reject a plan.

As indicated below, two classes of secured Claims (Class 2 – Miscellaneous Secured Claims and Class 4 – Prepetition Credit Facility Claims), four classes of unsecured Claims (Class 1 – Priority Claims, Class 3 – Intercompany Claims, Class 5 – Senior Note Claims, and Class 7 – Subsidiary Debtor General Unsecured Claims), and one class of Equity Interests (Class 8 – Subsidiary Debtor Equity Interests) are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan. One class of unsecured Claims (Class 6 – Senior Subordinated Note Claims) is Impaired and is entitled to vote on the Plan. The remaining classes, one class of unsecured Claims (Class 9 – Holdings General Unsecured Claims) and one class of Equity Interests (Class 10 – Old Holdings Equity Interests) will receive no distribution under the Plan and the Claims and Old Holdings Equity Interests in such classes will be extinguished. As a result, such classes are deemed to have rejected the Plan.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Priority Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 2 | Miscellaneous Secured Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 3 | Intercompany Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 4 | Prepetition Credit Facility Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 5 | Senior Note Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 6 | Senior Subordinated Note Claims | Impaired | entitled to vote |
| 7 | Subsidiary Debtor General Unsecured Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 8 | Subsidiary Debtor Equity Interests | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 9 | Holdings General Unsecured | Impaired | deemed to reject the Plan; not |

| | | | entitled to vote |
|---|---|---|---|
| | Claims | | |
| 10 | Old Holdings Equity Interests | Impaired | deemed to reject the Plan; not entitled to vote |

As noted above, the Plan constitutes a separate Sub-Plan for each of the thirteen Debtors. Except for the Claims and Administrative Expenses addressed in Articles II and III of the Plan, all Claims and Interests against a particular Debtor are placed in classes for each of the Debtors (as designated by subclasses A through M for each of the thirteen Debtors). The Subsidiary Debtors are not Holders of any Intercompany Claims against Holdings, and therefore Holdings does not have Class 3. CS Automotive LLC did not issue or guarantee the Senior Notes or Senior Subordinated Notes, and therefore does not have Classes 5 and 6. Class 8 consists of the Subsidiary Debtor Interests held by the Debtors. Class 10 consists of Old Holdings Equity Interests, which relate only to the Sub-Plan for Holdings. In that regard, the classification and treatment of Claims and Equity Interests under the Plan are as follows (to the extent that the descriptions and explanations contained in this Disclosure Statement vary with the terms and conditions of the Plan, the terms and conditions of the Plan are controlling):

**Cooper-Standard Holdings Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1A | Priority Claims | Unimpaired | Deemed to accept |
| 2A | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 4A | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5A | Senior Note Claims | Unimpaired | Deemed to accept |
| 6A | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 9 | Holdings General Unsecured Claims | Impaired | Deemed to reject |
| 10 | Old Holdings Equity Interests | Impaired | Deemed to reject |

**Cooper-Standard Automotive Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1B | Priority Claims | Unimpaired | Deemed to accept |
| 2B | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3B | Intercompany Claims | Unimpaired | Deemed to accept |
| 4B | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5B | Senior Note Claims | Unimpaired | Deemed to accept |
| 6B | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7B | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8B | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Cooper-Standard Automotive FHS Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1C | Priority Claims | Unimpaired | Deemed to accept |
| 2C | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3C | Intercompany Claims | Unimpaired | Deemed to accept |
| 4C | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5C | Senior Note Claims | Unimpaired | Deemed to accept |
| 6C | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7C | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8C | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Cooper-Standard Fluid Systems Mexico Holding LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1D | Priority Claims | Unimpaired | Deemed to accept |
| 2D | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |

| 3C | Intercompany Claims | Unimpaired | Deemed to accept |
|---|---|---|---|
| 4D | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5D | Senior Note Claims | Unimpaired | Deemed to accept |
| 6D | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7D | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8D | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Cooper-Standard Automotive, OH LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1E | Priority Claims | Unimpaired | Deemed to accept |
| 2E | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3E | Intercompany Claims | Unimpaired | Deemed to accept |
| 4E | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5E | Senior Note Claims | Unimpaired | Deemed to accept |
| 6E | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7E | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8E | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**StanTech, Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1F | Priority Claims | Unimpaired | Deemed to accept |
| 2F | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3F | Intercompany Claims | Unimpaired | Deemed to accept |
| 4F | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5F | Senior Note Claims | Unimpaired | Deemed to accept |
| 6F | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7F | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8F | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Westborn Services Center, Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1G | Priority Claims | Unimpaired | Deemed to accept |
| 2G | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3G | Intercompany Claims | Unimpaired | Deemed to accept |
| 4G | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5G | Senior Note Claims | Unimpaired | Deemed to accept |
| 6G | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7G | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8G | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**North American Rubber Company, Incorporated**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1H | Priority Claims | Unimpaired | Deemed to accept |
| 2H | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3H | Intercompany Claims | Unimpaired | Deemed to accept |
| 4H | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5H | Senior Note Claims | Unimpaired | Deemed to accept |
| 6H | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7H | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8H | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Sterling Investments Company**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1I | Priority Claims | Unimpaired | Deemed to accept |
| 2I | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3I | Intercompany Claims | Unimpaired | Deemed to accept |

| 4I | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
|---|---|---|---|
| 5I | Senior Note Claims | Unimpaired | Deemed to accept |
| 6I | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7I | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8I | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Cooper-Standard Automotive NC LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1J | Priority Claims | Unimpaired | Deemed to accept |
| 2J | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3J | Intercompany Claims | Unimpaired | Deemed to accept |
| 4J | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5J | Senior Note Claims | Unimpaired | Deemed to accept |
| 6J | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7J | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8J | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**CSA Services Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1K | Priority Claims | Unimpaired | Deemed to accept |
| 2K | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3K | Intercompany Claims | Unimpaired | Deemed to accept |
| 4K | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5K | Senior Note Claims | Unimpaired | Deemed to accept |
| 6K | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7K | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8K | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**NISCO Holding Company**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1L | Priority Claims | Unimpaired | Deemed to accept |
| 2L | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3L | Intercompany Claims | Unimpaired | Deemed to accept |
| 4L | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5L | Senior Note Claims | Unimpaired | Deemed to accept |
| 6L | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7L | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8L | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**CS Automotive LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1M | Priority Claims | Unimpaired | Deemed to accept |
| 2M | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3M | Intercompany Claims | Unimpaired | Deemed to accept |
| 4M | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 7M | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8M | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

(a)     Treatment of Administrative Expenses

Administrative Expenses.     Administrative Expenses consist of the actual and necessary expenses incurred during the Chapter 11 Cases. Such expenses include costs incurred in the operation of the Debtors' businesses after the commencement of the Chapter 11 Cases, the actual, reasonable fees and expenses of professionals that they or any Committee appointed in

the Chapter 11 Cases retains, post-petition taxes, if any, and certain other obligations arising after the commencement of the Chapter 11 Cases, including the Bankruptcy Fees.

Treatment of Administrative Expenses. The Debtors or the Reorganized Debtors, as the case may be, will pay each Allowed Administrative Expense against Holdings and the Subsidiary Debtors in full, in Cash, on the later of (a) the Effective Date (or as soon thereafter as is practicable), (b) the date on which the Bankruptcy Court enters an order allowing such Administrative Expense, or (c) such other date to which the Reorganized Debtors and the Holder of the Allowed Administrative Expense agree; provided, however, that Allowed Administrative Expenses representing (a) obligations incurred in the ordinary course of business or assumed by the Debtors or the Reorganized Debtors, as the case may be, will be paid in full or performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and (b) obligations incurred to Professionals for services provided through the Confirmation Date will be paid in accordance with the applicable Bankruptcy Court order approving the fees and expenses of each such Professional; provided, further, however, that Allowed Administrative Expenses incurred by the Debtors or the Reorganized Debtors, as the case may be, after the Confirmation Date, including claims for Professionals' fees and expenses, will not require application to the Bankruptcy Court and will be paid by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business and without further Bankruptcy Court approval; and, provided, further, however, that all reasonable and documented fees and expenses of counsel and other advisors to the Backstop Parties constitute Allowed Administrative Expenses and will be paid by the Debtors in the ordinary course of business during the Chapter 11 Cases without the necessity to file a proof of claim or file any application to or receive any approval from the Bankruptcy Court or the Fee Auditor, in accordance with the terms and subject to the conditions of the Backstop Commitment Fees and Expenses Approval Order and, to the extent approved by the Bankruptcy Court, the order approving the Equity Commitment Agreement. All DIP Obligations (as such term is defined in the DIP Financing Order) payable under the DIP Financing Agreement and with respect to DIP Financing Fees and Expenses, under the DIP Financing Agreement and DIP Original Financing Agreement, and all other DIP Lender Claims are (a) Allowed in full; (b) shall not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity; (c) constitute Allowed Administrative Expenses; and (d) will be paid in full, in Cash, on the Effective Date, without the need for application to or approval from any court. All Prepetition Credit Facility Fees and Expenses are (a) Allowed in full; (b) will not be subject to any avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable, or otherwise), recharacterization, disgorgement, disallowance, impairment, objection, defenses, claims, causes of action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity; (c) constitute Allowed Administrative Expenses; and (d) will be paid in full, in Cash, on the Effective Date, without the need for application to or approval from any court.

Final Application for Compensation and Reimbursement of Professionals' Fees and Expenses. The Plan provides that all applications for final allowance of compensation and reimbursement of Professionals' fees and expenses must be filed no later than 120 days following the Effective Date and will be subject to the authorization and approval of the Court.

Any objections to such applications must be filed no later than twenty (20) days following the date on which a final fee application is filed with the Court.

Post-Effective Date Fees and Expenses of the Fee Auditor. Following the Effective Date, the Reorganized Debtors will pay in cash, within thirty (30) days of receipt by the Reorganized Debtors of an invoice from the Fee Auditor, all reasonable and documented fees and expenses of the Fee Auditor that are incurred after the Effective Date, without the need for any further authorization from the Bankruptcy Court. In the event that the Reorganized Debtors object to payment of such invoice from the Fee Auditor for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court will retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by the Reorganized Debtors.

Full Settlement. As more specifically set forth in, and without in any way limiting, section 12.01 of the Plan, the distributions provided for in and when paid pursuant to section 2.01 of the Plan are in full settlement and release of all Administrative Expenses.

    (b)    Treatment of Priority Tax Claims

Priority Tax Claims. A "Priority Tax Claim" is any Claim against the Debtors of the type specified in section 507(a)(8) of the Bankruptcy Code. These Claims consist of certain unsecured Claims of Governmental Units for taxes. The Debtors estimate that Priority Tax Claims are, in the aggregate, approximately $3,000,000.

Treatment. With respect to each Allowed Priority Tax Claim against Holdings and the Subsidiary Debtors, at the sole option of the Debtors, each Holder of an Allowed Priority Tax Claim will be entitled to receive from the Reorganized Debtors on account of such Claim:

    (i)    On the Effective Date, or as soon thereafter as is practicable, Cash payments in an amount equal to such Allowed Priority Tax Claim; or

    (ii)    Such other treatment agreed to by each Holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as the case may be.

Full Settlement. As more specifically set forth in, and without in any way limiting, section 12.01 of the Plan, the distributions provided for in and when paid pursuant to the section 3.01 of the Plan are in full settlement, release and discharge of all Priority Tax Claims.

    (c)    Class 1 – Priority Claims

Class 1 (Subclasses 1A through 1M) consists of all Allowed Claims arising on or prior to the Filing Date that are entitled to priority status in accordance with section 507(a) of the Bankruptcy Code, other than Administrative Expenses and Priority Tax Claims. Priority Claims include Claims for wages, salaries and contributions to employee benefit plans to the extent that such Claims are entitled to priority under section 507(a) of the Bankruptcy Code. The Debtors estimate that Priority Claims are, in the aggregate, approximately $250,000.

Treatment of Priority Claims. On the latest of (a) the Effective Date (or as soon as practicable thereafter), (b) the date on which such Priority Claim becomes an Allowed Priority Claim, or (c) such other date on which the Debtors and the Holder of such Allowed Priority Claim may agree, each Holder of an Allowed Priority Claim will be entitled to receive Cash in an amount sufficient to render such Allowed Priority Claim Unimpaired under section 1124 of the Bankruptcy Code; provided, however, that Allowed Priority Claims representing obligations incurred in the ordinary course will be paid in full or performed by the Debtors or Reorganized Debtors, consistent with past practice.

Full Settlement. As more specifically set forth in, and without in any way limiting section 12.01 of the Plan, the distributions provided in section 6.01 of the Plan to Holders of Priority Claims (when distributed to Holders of Priority Claims in accordance with the Plan) are in full settlement and release of each Holder's Priority Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Priority Claim was based. Subclasses 1A through 1M are Unimpaired.

(d)     Class 2 – Miscellaneous Secured Claims

Class 2 (Subclasses 2A through 2M) consists of all Miscellaneous Secured Claims. The Debtors estimate that Miscellaneous Secured Claims are, in the aggregate, $0. Miscellaneous Secured Claims are Allowed in the amount of approximately $0. On the Effective Date, at the sole option of the Debtors, (i) the legal, equitable and contractual rights to which the Miscellaneous Secured Claim entitles the Holder of such Claim will remain unaltered, and the Holder of such Claim will retain any Liens and/or security interests securing such Claim, or (ii) the Debtors will provide other treatment that will render such Miscellaneous Secured Claim Unimpaired under section 1124 of the Bankruptcy Code. Subclasses 2A through 2M are Unimpaired.

(e)     Class 3 – Intercompany Claims

Class 3 (Subclasses 3B through 3M) consists of all Intercompany Claims. The Debtors estimate that Intercompany Claims are, in the aggregate, approximately $1,087,000,000. On the Effective Date, at the option of the Debtors or the Reorganized Debtors, either (a) the legal, equitable and contractual rights to which the Intercompany Claim entitles the Holder of such Claim will remain unaltered, in full or in part, and treated in the ordinary course of business, (b) such Intercompany Claim will be cancelled and discharged, in full or in part, in which case such discharged and satisfied portion will be eliminated and the Holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Plan, or (c) such Intercompany Claim will be settled and discharged in exchange for property of the Debtors; provided, however, that any Intercompany Claims against any Debtor held by a non-Debtor Subsidiary will remain unaltered. Subclasses 3B through 3M are Unimpaired.

(f)     Class 4 – Prepetition Credit Facility Claims