Class 4 (Subclasses 4A through 4M) consists of all Prepetition Credit Facility Claims. The Prepetition Credit Facility Claims are Allowed in an amount of no less than $658,416,000 (which includes principal plus accrued pre- and post-petition interest calculated at the applicable non-default rate or rates (including interest on interest) through May 1, 2010) plus any accrued post-petition interest from May 2, 2010 through the Effective Date at the applicable non-default rate or rates (including interest on interest). Such Claims will not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, claims, causes of action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity.

Treatment of Prepetition Credit Facility Claims. On the Effective Date, in full satisfaction, release, and discharge of, and in exchange for, all Allowed Prepetition Credit Facility Claims, each Holder of an Allowed Prepetition Credit Facility Claim will receive payment in full, in Cash.

Full Settlement. As more specifically set forth in, and without in any way limiting section 12.01 of the Plan, the distributions provided in section 6.04 of the Plan to the Holders of Prepetition Credit Facility Claims (when distributed to the Prepetition Administrative Agent in accordance with the Plan) are in full settlement and release of each Holder's Prepetition Credit Facility Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Prepetition Credit Facility Claim was based. Subclasses 4A through 4M are Unimpaired.

(g)　　Class 5 – Senior Note Claims

Class 5 (Subclasses 5A through 5L) consists of all Senior Note Claims. The Senior Note Claims are Allowed in the amount of no less than $219,250,000 (which includes principal plus accrued pre- and post-petition interest calculated at the applicable non-default rate or rates (including interest on interest) through May 1, 2010), plus any accrued post-petition interest from May 2, 2010 through the Effective Date at the applicable non-default rate or rates (including interest on interest) and any other amounts the Bankruptcy Court may order as necessary to render Class 5 Unimpaired, without avoidance, setoff, subordination, any defenses, counterclaims, or any other reduction of any kind.

Treatment of Senior Note Claims. On the Effective Date, in full satisfaction, release, and discharge of, and in exchange for, all Allowed Senior Note Claims, each Holder of an Allowed Senior Note Claim will receive payment in full, in Cash. However, pursuant to the terms and conditions of the Equity Commitment Agreement, each Supporting Senior Noteholder has agreed to accept worse treatment under the Plan than other Holders of Allowed Senior Note Claims in accordance with Section 1123(a)(4) of the Bankruptcy Code such that instead of receiving payment in full, in Cash, in exchange for its Allowed Senior Note Claims, each Supporting Senior Noteholder has agreed to accept, in full satisfaction of its Allowed Supporting Senior Note Claim and its commitments under the Equity Commitment Agreement, its Pro Rata share of 4,563,095 shares of the New Common Stock.

Full Settlement. As more specifically set forth in, and without in any way limiting section 12.01 of the Plan, the benefits provided in section 6.05 of the Plan to the Holders of Senior Note Claims (when distributed to the Senior Note Indenture Trustee in accordance with the Plan) are in full settlement and release of each Holder's Senior Note Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Senior Note Claim was based. Subclasses 5A through 5L are Unimpaired.

Senior Note Indenture Trustee Fees and Expenses. On the date that distributions are first made pursuant to section 10.01 of the Plan, the Debtors or the Reorganized Debtors, as the case may be, will pay the reasonable and documented fees and expenses of the Senior Note Indenture Trustee, through and including the Effective Date, in Cash, including the reasonable and documented fees and expenses of its professionals. The Senior Note Indenture Trustee will also be entitled to payment of its fees and expenses after the Effective Date in connection with the implementation of the Plan.

(h)    Class 6 – Senior Subordinated Note Claims

Class 6 (Subclasses 6A through 6L) consists of all Senior Subordinated Note Claims. The Senior Subordinated Note Claims are Allowed in the amount of no less than $330,000,000, without avoidance, setoff, subordination, any defenses, counterclaims, or any other reduction of any kind.

Treatment of Senior Subordinated Note Claims. On the Effective Date, in full satisfaction, release, and discharge of, and in exchange for, all Allowed Senior Subordinated Note Claims, (i) each Holder of an Allowed Senior Subordinated Note Claim will be entitled to receive its Pro Rata share of (y) the Senior Subordinated Noteholder Stock Distribution and (z) the Senior Subordinated Noteholder Warrant Distribution, (ii) each Eligible Noteholder will be entitled to receive its pro rata share of the Senior Subordinated Noteholder Rights and Senior Subordinated Noteholder Oversubscription Rights (as applicable), and (iii) each Non-Eligible Noteholder will receive its pro rata share of the Non-Eligible Noteholder Shares.

Full Settlement. As more specifically set forth in, and without in any way limiting section 12.01 of the Plan, the benefits provided in section 6.06 of the Plan to the Holders of Senior Subordinated Note Claims (when distributed to the Senior Subordinated Note Indenture Trustee in accordance with the Plan) are in full settlement and release of each Holder's Senior Subordinated Note Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Senior Subordinated Note Claim was based. Subclasses 6A through 6L are Impaired.

Senior Subordinated Note Indenture Trustee Fees and Expenses. On the date that distributions are first made pursuant to section 10.01 of the Plan, the Debtors or the Reorganized Debtors, as the case may be, will pay the reasonable and documented fees and expenses of the Senior Subordinated Note Indenture Trustee, through and including the Effective Date, in Cash, including the reasonable and documented fees and expenses of its professionals. The Senior

Subordinated Note Indenture Trustee will also be entitled to payment of its fees after the Effective Date in connection with the implementation of the Plan.

        (i)      Class 7 – Subsidiary Debtor General Unsecured Claims

Class 7 (Subclasses 7B through 7M) consists of all Subsidiary Debtor General Unsecured Claims. The Debtors estimate that Subsidiary Debtor Unsecured Claims are, in the aggregate, approximately $22,200,000.

Treatment of Subsidiary Debtor General Unsecured Claims. On the latest of (a) the Effective Date (or as soon as practicable thereafter), (b) the date on which such Subsidiary Debtor General Unsecured Claim becomes an Allowed Subsidiary Debtor General Unsecured Claim, or (c) such other date on which the Debtors and the Holder of such Allowed Subsidiary Debtor General Unsecured Claim may agree, each Holder of an Allowed Subsidiary Debtor General Unsecured Claim will be entitled to receive Cash in an amount sufficient to render such Allowed Subsidiary Debtor General Unsecured Claim Unimpaired under section 1124 of the Bankruptcy Code.

Full Settlement. As more specifically set forth in, and without in any way limiting section 12.01 of the Plan, the distributions provided in section 6.07 of the Plan to the Holders of Subsidiary Debtor General Unsecured Claims (when distributed to the Holders of Subsidiary Debtor General Unsecured Claims in accordance with the Plan) are in full settlement and release of all Holders' General Unsecured Claims against any and all of the Subsidiary Debtors and all other Claims against any and all of the Subsidiary Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such General Unsecured Claim or other Claim was based. Subclasses 7B through 7M are Unimpaired.

        (j)      Class 8 – Subsidiary Debtor Equity Interests

Class 8 (Subclasses 8B through 8M) consists of Subsidiary Debtor Equity Interests, which consist of the Equity Interests in each of the Subsidiary Debtors held by the other Subsidiary Debtors. On the Effective Date, the legal, equitable and contractual rights to which the Subsidiary Debtor Equity Interest entitles the Holder of such Interest will remain unaltered. Subclasses 8B through 8M are Unimpaired.

        (k)      Class 9 – Holdings General Unsecured Claims

Class 9 consists of all Holdings General Unsecured Claims. The Debtors estimate that Holdings General Unsecured Claims are, in the aggregate, $69,113,000. On the Effective Date, all Holdings General Unsecured Claims will be extinguished and no distributions will be made to Holders of Holdings General Unsecured Claims. The Holders of Holdings General Unsecured Claims are not entitled to receive any distribution or retain any property under the Plan, and any such Claims will be cancelled, released and extinguished on the Effective Date. Class 9 is Impaired.

        (l)      Class 10 – Old Holdings Equity Interests

Class 10 consists of Old Holdings Equity Interests, which are currently held by the Sponsors. On the Effective Date, all Old Holdings Equity Interests will be cancelled and extinguished and no distributions will be made to Holders of Old Holdings Equity Interests. The Holders of Old Holdings Equity Interests are not entitled to receive any distribution or retain any property under the Plan. Although the Holders of Old Holdings Equity Interests will not receive a distribution or retain any property under the Plan and are deemed to reject the Plan, such Holders have advised the Debtors that they support the Plan. Class 10 is Impaired.

## ARTICLE VI.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Subject to the approval of the Bankruptcy Court, the Bankruptcy Code empowers a debtor in possession to assume or reject executory contracts and unexpired leases. Generally, an "executory contract" is a contract under which material performance is due from both parties. If an executory contract or unexpired lease is rejected by a debtor in possession, the other parties to the agreement may file a claim for damages incurred by reason of the rejection, which claim is treated as a pre-petition claim. If an executory contract or unexpired lease is assumed by a debtor in possession, the debtor in possession has the obligation to perform its obligations thereunder in accordance with the terms of such agreement and failure to perform such obligations would result in a claim for damages that may be entitled to administrative expense status.

6.01    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

The Debtors will have until the Confirmation Date to file a motion or motions to assume or reject executory contracts and unexpired leases that have not been previously assumed or rejected. In that regard, Section 8.01 of the Plan provides that each executory contract or unexpired lease that (i) has not been expressly assumed or rejected with approval by order of the Bankruptcy Court on or prior to the Confirmation Date, (ii) is not the subject of a motion to reject pending as of the Confirmation Date, or (iii) that is not specifically designated as a contract or lease to be rejected on Schedule 8.01 of the Plan, will be assumed by the Debtors as of the Confirmation Date. The Debtors will file Schedule 8.01 as part of the Plan Supplement, which must be in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee, and will serve Schedule 8.01 on the counterparties to such contracts or leases.

Section 8.01 of the Plan further provides that each executory contract and unexpired lease that is assumed or that is assumed and assigned will include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (b) in respect of agreements relating to premises, all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless (i) any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Plan, or (ii) the non-Debtor party to such executory contract or unexpired lease has agreed otherwise.

6.02    **Cure of Defaults**

Section 8.02 of the Plan provides that, except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to section 8.01 of the Plan, the Debtors will, in consultation with the Required Backstop Parties and the Creditors' Committee, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days after the Confirmation Date, file a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts and unexpired leases to be assumed. The parties to such executory contracts and unexpired leases to be assumed by the Debtors will have thirty (30) days to object to the cure amounts listed by the Debtors. A party to an executory contract or unexpired lease to be assumed by the Debtors that does not file an objection with the Bankruptcy Court on or before the deadline set by section 8.02 of the Plan for objections to the cure amount will have waived its right to dispute such amount. If there are any objections filed, the Bankruptcy Court will hold a hearing. In the event the Bankruptcy Court determines that the cure amount is greater than the cure amount listed by the Debtors, the Reorganized Debtors may elect to reject the executory contract or unexpired lease and not pay such greater cure amount. All cure amounts to be paid pursuant to section 8.02 of the Plan will be paid by the Reorganized Debtors.

6.03    **Bar Date for Rejection Damages**

Section 8.03 of the Plan provides that with respect to any executory contract or unexpired lease rejected by the Debtors, the rejection will be deemed to constitute a breach of such contract or lease immediately prior to the Filing Date and may result in a pre-Filing Date Claim against the rejecting Debtor for damages. A Claim for damages against any such Debtor arising from the rejection by such Debtor of any executory contract or unexpired lease pursuant to a Final Order will be forever barred and will not be enforceable against any such Debtor or the Reorganized Debtors or any of their Affiliates or Subsidiaries or their respective property or interest in property and no holder of any such Claim will participate in any distribution under the Plan unless a Proof of Claim is filed with the Bankruptcy Court. Unless otherwise provided by an order of the Bankruptcy Court entered prior to the Confirmation Date, a Proof of Claim with respect to any Claim against the Debtors arising from the rejection of any executory contract or unexpired lease pursuant to an order of the Bankruptcy Court (including the Confirmation Order) must be filed with the Bankruptcy Court by the later of (a) the General Bar Date or (b) thirty (30) days from the date of entry of such order of the Bankruptcy Court approving such rejection. Any Entity that fails to file a Proof of Claim with respect to its Claim arising from such a rejection within the period set forth above will be forever barred from asserting a Claim against the Debtors or the Reorganized Debtors or any of their Affiliates or Subsidiaries or their respective property or interests in property. All Allowed Claims arising from the rejection of executory contracts or unexpired leases will be classified as General Unsecured Claims against the applicable Debtor.

6.04    **Employee Benefit Plans and Agreements**

The Debtors have been operating in the ordinary course of business since the Filing Date. In that regard, the Debtors have continued paying all post-petition employee

salaries, incentive payments and benefits. Subject to the occurrence of the Effective Date and Section 8.04 of the Plan, the Reorganized Debtors will honor, in the ordinary course of business, all employee compensation and employee benefit plans and agreements of the Debtors including, without limitation, incentive agreements with the Debtors' management, the existing annual incentive plan, the existing long term incentive plan, the existing Deferred Compensation Plan and Pre-2005 Executive Deferred Compensation Plan, the existing Change of Control Severance Pay Plan, the existing salaried employee retirement and savings plans and Nonqualified Supplementary Benefit Plan (SERP), and the existing employment agreements and any and all other employee benefit plans and agreements entered into before, on or after the Filing Date and not since terminated. In addition, the Reorganized Debtors will undertake and commit to take the actions relating to such existing employment agreements and plans as set forth on Exhibit B of the Plan and to pay an emergence component award to eligible executives of the Debtors in accordance with Exhibit B and to adopt the Management Incentive Plan with the terms set forth on Exhibit B. Notwithstanding the foregoing, the change of control provisions (including without limitation any right of such participant to terminate employment for "good reason" and any Company funding obligation) will not be triggered under such employment agreement, the Company's Change of Control Severance Pay Plan, Nonqualified Supplementary Benefit Plan (SERP), Deferred Compensation Plan and Pre-2005 Executive Deferred Compensation Plan, in each case as a result of (x) the Company's emergence from Chapter 11 as contemplated by the Plan, (y) the execution and delivery of the Equity Commitment Agreement or (z) the consummation of the transactions provided in the Equity Commitment Agreement and/or the Plan (or otherwise contemplated by the Equity Commitment Agreement and/or the Plan to occur prior to or on or about the Effective Date); provided that the waiver set forth in this sentence shall not apply if a Backstop Party (A) enters into any written shareholder or voting agreement (other than the Equity Commitment Agreement, the Ancillary Agreements (as defined in the Equity Commitment Agreement) or the Plan), (B) purchases or acquires pre-petition claims with respect to the Senior Subordinated Notes (including the purchase or acquisition of any such pre-petition claim held by any other Backstop Party or its affiliates, but excluding any purchase or acquisition by a Backstop Party or its affiliates in its broker/dealer, market making, flow trading or other non-proprietary trading activities), or (C) assigns the Equity Commitment Agreement or its obligations hereunder pursuant to Section 12 of the Equity Commitment Agreement, in the case of each of clauses (A), (B) and (C), only if such action would result in such Backstop Party having beneficial ownership of greater than or equal to 50% of the total voting power of the Company's voting power upon emergence; provided further, that this waiver shall not apply with respect to any rights under Section 7 of the Change of Control Severance Pay Plan in the event that an excise tax is imposed by the IRS pursuant to Section 4999 of the Code by reason of a payment (which is made following an event that the Company reasonably and in good faith determines would have constituted a "change of control" for purposes of such participant's entitlement to payments under such plan, had such participant not executed such waiver) that the IRS asserts is "contingent on a change of control" of the Company within the meaning of Section 280G of the Code, despite the reasonable best efforts of the Company to withstand such assertion, where appropriate. For purposes of clarification, (i) neither (a) the agreements and arrangements involving Backstop Parties that are contemplated by the Equity Commitment Agreement or the Plan to occur or exist prior to, on or about the Effective Date nor (b) any agreements or arrangements by Backstop Parties at any time prior to, on or after the Effective Date to dispose of any or all of their securities of the Company shall be taken into account in

determining whether such Backstop Parties constitute a "group" for purposes of the change of control provisions in the employment agreements and the plans referred to herein  and (ii) the acquisition by any person of any equity interest in the Company at any time following the issuance of Backstop Purchaser Shares (as defined in the Equity Commitment Agreement), Rights Offering Shares and Warrants (including the Backstop Purchaser Warrants (as defined in the Equity Commitment Agreement) pursuant to the Plan (other than any acquisition from any Backstop Party that is agreed to between such Backstop Party and its transferee or assignee and consummated on or about the Effective Date) shall not be deemed a transaction provided for in the Equity Commitment Agreement or the Plan.

The Reorganized Debtors will also pay all retiree benefits, if any, of the Debtors (within the meaning of section 1114 of the Bankruptcy Code).  The Reorganized Debtors will pay such retiree benefits at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors are obligated to provide such benefits.

## ARTICLE VII.
## IMPLEMENTATION OF THE PLAN

7.01    **No Substantive Consolidation**

The Chapter 11 Cases have been consolidated for procedural purposes only. Accordingly, the Plan constitutes a separate Sub-Plan for each of the thirteen Debtors.  Except for the Claims and Administrative Expenses addressed in Articles II and III of the Plan, all Claims and Interests against a particular Debtor are placed into Classes 1 through 10 and subclasses A through M for each of the thirteen Debtors, as applicable.

Except as specifically set forth herein, nothing in the Plan or this Disclosure Statement constitutes an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.    Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as a separate Claim against each Debtor's Estate; provided, however, that no Holder will be entitled to receive more than payment in full of its Allowed Claim (plus postpetition interest, if and to the extent provided in the Plan), and such Claims will be administered and treated in the manner provided in the Plan.  In the event that any Sub-Plan cannot be confirmed, the Sub-Plans of the other Debtors may be confirmed and those Debtors will be permitted to emerge from chapter 11 protection, and the Debtors reserve the right (subject to the consent of the Required Backstop Parties, which must not be unreasonably withheld and in consultation with the Creditors' Committee) to sever the Chapter 11 Case of any such Debtor from the remaining Chapter 11 Cases covered by the Plan and convert the Chapter 11 Case of such Debtor to a case under Chapter 7 of the Bankruptcy Code without otherwise impacting the Plan, this Disclosure Statement Approval Order, the application of the Plan to the remaining Debtors and any order related to the Plan, in respect of the remaining Debtors.  For the avoidance of doubt, nothing set forth in section 9.01 of the Plan will in any way affect the treatment of or distribution to holders of DIP Lenders Claims, DIP Financing Fees and Expenses, Prepetition Credit Facility Claims, Prepetition Credit Facility Fees and Expenses set forth elsewhere in the Plan, or any Transaction Expenses as that term is defined in the Equity Commitment Agreement.

7.02    **Vesting of Property**

Under Section 9.02 of the Plan, on the Effective Date, title to all property of the Debtors' Estates will pass to and vest in the applicable Reorganized Debtor, free and clear of all Claims, interests, Liens, security interests, charges and other encumbrances (except as otherwise provided in the Plan). Confirmation of the Plan (subject to the occurrence of the Effective Date) will be binding, and the Debtors' debts will, without in any way limiting section 12.01 of the Plan, be discharged as provided in section 1141 of the Bankruptcy Code. In addition, from and after the Effective Date, the Reorganized Debtors may operate their business(es) and may use, acquire and dispose of property without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject to the terms and conditions of the Plan.

7.03    **Preservation of Causes of Action**

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, including Article 12 of the Plan, the Reorganized Debtors will retain all Causes of Action, including Causes of Action that may exist under sections 542, 544 through 550 and 558 of the Bankruptcy Code or under similar state laws, provided however, that all Claims and Causes of Action against the DIP Financing Agent, the DIP Original Financing Agent, the DIP Lenders, the Prepetition Administrative Agent, or the Prepetition Credit Facility Parties with respect to, in connection with, related to or arising from the Prepetition Credit Facility, the DIP Facility or the facility relating to that certain DIP Original Financing Agreement have been and are irrevocably released and waived and are therefore not retained by any party. The Reorganized Debtors, as representatives of the Estates, will retain the exclusive right to enforce, bring, release, settle or compromise, in their sole discretion, any and all such Causes of Action, including such Causes of Action listed as assets in the Debtors' Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules").

On October 2, 2009, the Debtors filed their Schedules. As stated in the Schedules, in the 90 days prior to the Filing Date, the Debtors made payments to third parties. In addition, as stated in the Schedules, in the one year period prior to the Filing Date, the Debtors made payments to Insiders (as that term is defined in the Bankruptcy Code).

The mere fact that payments were made to a creditor during the ninety days prior to the Filing Date or to an Insider during the one year period prior to the Filing Date does not by itself mean that these payments are subject to avoidance. Many of these payments were made in the ordinary course or resulted in new value being given to the Debtors; as such, the payments may not be avoidable as preferential transfers as they are subject to valid defenses under section 547(c) of the Bankruptcy Code. In addition, many of the payments made to creditors were made on account of executory contracts and unexpired leases that were assumed since the Filing Date, and as such, the Debtors cannot seek to avoid these payments. Further, as part of the DIP Financing Order, the Bankruptcy Court ordered that certain payments made to the Debtors' Prepetition Credit Facility Lenders are not subject to avoidance. Additionally, and as set forth in the Schedules, many of the payments were made to taxing authorities, governmental entities, and other entities entitled to priority under the Bankruptcy Code, and these claims are not subject to avoidance. Also, on the first day of the Debtors' Chapter 11 Cases, the Debtors were granted

authority to honor pre-petition payment obligations to numerous entities, including essential and foreign suppliers, as the Bankruptcy Court determined that making such payments was necessary for the continuation of the Debtors' business operations; the Debtors cannot now seek to avoid payments made to these creditors. Moreover, other payments were made to entities necessary to the day-to-day operations of the Debtors' business, such as utilities and insurance carriers.

### 7.04    **Implementation**

Pursuant to the Rights Offering and Equity Commitment Approval Order, the Debtors were authorized to enter into the Equity Commitment Agreement and conduct the Rights Offering. In that regard, pursuant to the Confirmation Order and upon confirmation of the Plan, the Debtors or the Reorganized Debtors, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. The Reorganized Debtors will be authorized to execute, deliver, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. On or before the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may file with the Court the agreements and documents as may be necessary or appropriate to effectuate or further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as the case may be, will be authorized to execute the agreements and documents and take such other actions as are necessary to effectuate the transactions provided for in the Plan, without the need for any required approvals, authorizations or consents.

### 7.05    **Rights Offering and Holdback**

As noted above, the Debtors seek to raise $355 million in new capital through the implementation of the Rights Offering and execution of the Equity Commitment Agreement, which, when combined with borrowings under the New Secured Debt Facility, will be used to pay the Holders of Prepetition Credit Facility Claims and Senior Note Claims in full on the Effective Date.

Participation in the Rights Offering will be available to any Holder of Allowed Senior Subordinated Note Claims that, in accordance with the Rights Offering Procedures, timely returned an Investor Certificate certifying that such Holder is an Accredited Investor, a QIB or a Non-U.S. Person (or a qualified transferee of such Holder in accordance with the Rights Offering Procedures). Each Holder of an Allowed Senior Subordinated Note Claim that (i) timely returned the Investor Certificate in accordance with the instructions on the Investor Certificate certifying that it is not an Accredited Investor, a QIB or a Non-U.S. Person and (ii) continues to hold such Allowed Senior Subordinated Note Claim on the Effective Date, will receive a distribution of a number of shares of New Common Stock determined after the deadline for receipt of all Investor Certificates in a manner previously agreed upon by the Debtors and the Backstop Parties with a value equal to the value of the Senior Subordinated Noteholder Rights such Holder would have received if it was an Accredited Investor, a QIB or a Non-U.S. Person and which number of shares will be filed as a Plan Supplement Investor Certificates were distributed to the Holders of Allowed Senior Subordinated Note Claims on February 12, 2010. If a Holder of an Allowed Senior Subordinated Note Claim was determined

to be an Eligible Noteholder, such Holder has been sent additional materials with instructions on how to participate in the Rights Offering.

In connection with the Rights Offering, the Debtors will distribute to Eligible Noteholders rights to purchase shares of New Common Stock in return for Cash. Eligible Noteholders will acquire their share of rights to subscribe for up to, in the aggregate, 8,623,491 shares, or approximately 39.6%, of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants).

Each Senior Subordinated Noteholder Right represents the right to purchase, and can only be exercised to purchase, New Common Stock. The subscription price for each share of New Common Stock purchased pursuant to the Rights Offering is $21.54. In addition, each Eligible Noteholder that has exercised the full amount of its Senior Subordinated Noteholder Rights will have the right to subscribe for additional shares of New Common Stock not subscribed for in the Rights Offering. The price per share to purchase such additional shares is $21.54.

The Rights Offering will commence on the Subscription Commencement Date and terminate on the Subscription Deadline. The procedures for properly exercising the Rights are set forth in the Rights Offering Procedures. The Senior Subordinated Noteholder Rights offered pursuant to the Rights Offering will only be transferable together with their underlying Claims in accordance with the Rights Offering Procedures. Once an Eligible Noteholder or its transferee has properly exercised its rights pursuant to the Rights Offering Procedures, such exercise will not be permitted to be revoked until the date that is 270 days following the deadline to exercise such rights, if the Effective Date has not occurred on or before such date.

In the event the shares offered pursuant to the Rights Offering are not fully subscribed for during the Subscription Period, the Backstop Parties have agreed to purchase the unsubscribed shares (including any shares not purchased due to rounding) pursuant to the Equity Commitment Agreement. The Backstop Parties have agreed to purchase such shares at a price per share of $21.54. The Equity Commitment Agreement and the Rights Offering Procedures (and related documentation) have been filed concurrently with this Disclosure Statement. The commitment of the Backstop Parties to purchase the unsubscribed shares offered pursuant to the Rights Offering, as provided in the Equity Commitment Agreement, will help to ensure that the Debtors will receive the full amount of the $355 million in Cash in connection with the Rights Offering. In consideration for providing the commitment to backstop the Rights Offering, the Backstop Parties will receive a commitment premium equal to $12,425,000, which represents 3.5% of the Rights Offering Amount. In addition, the Backstop Parties have agreed to purchase, and the Debtors have agreed to sell, (i) 2,558,182 shares, or approximately 11.75% of the New Common Stock to be issued on the Effective Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan and shares issuable upon exercise of the New Capital Warrants) at the Holdback Subscription Price and (ii) 1,000,000 shares of the New Preferred Stock at the New Preferred Stock Subscription Price. In addition, the Debtors have agreed to issue warrants to the Backstop Parties to purchase 1,693,827 shares, or approximately 7%, of the New Common Stock to be issued on the Effective

Date (assuming conversion of the New Preferred Stock and subject to dilution from shares issued pursuant to the Management Incentive Plan), at a strike price of $27.33.

### 7.06    **New Credit Facilities**

The Debtors believe that incurring new, affordable debt financing upon their emergence from chapter 11 is necessary to fund the Plan and provide the Reorganized Debtors with the necessary liquidity post-emergence to fund their business operations and remain competitive as a global automotive supplier.  In that regard, on the Effective Date, the Reorganized Debtors will enter into the New Working Capital Facility and the New Secured Debt Facility and to grant the liens contemplated thereby.

### 7.07    **Corporate Action**

On the Effective Date, and as provided in the Plan, the adoption of the Reorganized Debtors' Certificates of Incorporation, the Reorganized Holdings By-Laws, the Certificate of Designations, the selection of directors and officers of the Reorganized Debtors, and all actions of the Debtors and the Reorganized Debtors contemplated by the Plan will be deemed, without further action of any kind or nature, to be authorized and approved in all respects (subject to the provisions of the Plan and the Confirmation Order).  All matters provided for in the Plan involving the corporate structure of the Debtors and the Reorganized Debtors and any corporate action required by the Debtors and the Reorganized Debtors in connection with the Plan, will be deemed to have timely occurred in accordance with applicable state law and will be in effect, without any requirement of further action by the security holders or directors or officers of the Debtors and the Reorganized Debtors.

### 7.08    **Issuance of New Common Stock**

The issuance and distribution of the New Common Stock by Reorganized Holdings to Holders of Allowed Senior Subordinated Note Claims (including pursuant to the Rights Offering), to the Backstop Parties, to Holders of Allowed Supporting Senior Note Claims and pursuant to the Management Incentive Plan will be authorized under the Plan and will be directed, without the need for any further corporate action, under applicable law, regulation, order, rule or otherwise.  The New Common Stock being distributed to Holders in exchange for their Allowed Senior Subordinated Note Claims and Allowed Supporting Senior Note Claims will be contributed by Reorganized Holdings to CSA and CSA will distribute the New Common Stock to the Holders of Allowed Senior Subordinated Note Claims and Allowed Supporting Senior Note Claims in exchange for their Claims and in satisfaction of any properly exercised Senior Subordinated Noteholder Rights or Senior Subordinated Noteholder Oversubscription Rights.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the New Common Stock issued pursuant to the Plan and its transfer will be exempt from registration under the Securities Act, as amended, all rules and regulations promulgated thereunder, and any and all applicable state and local laws, rules, and regulations.  However, shares of New Common Stock issued to the Eligible Noteholders pursuant to the Rights Offering and to the Backstop Parties pursuant to the Equity Commitment Agreement will be issued pursuant to an exemption from registration under the Securities Act and equivalent exemptions under state securities laws.  The Non-Eligible Noteholder Shares, and

all shares of New Common Stock being issued pursuant to the Rights Offering and the Equity Commitment Agreement, will be issued at one time on the Effective Date.

In addition to the foregoing, for a period of nine months following the Effective Date, the Company will not, without the prior written consent of the Backstop Parties, (i) register the New Common Stock under the Securities Act or (ii) cause the New Common Stock to be listed for trading on a securities exchange, in each case except in connection with an underwritten initial public offering of the New Common Stock or as required by applicable law; provided, however, that the Company will use its reasonable best efforts to promptly register the New Common Stock under the Securities Exchange Act following the six month anniversary of the Effective Date if (i) the Non-Backstop Shelf Registration Statement has not been declared effective by the Securities and Exchange Commission and (ii) the Company, in an exercise of its sound business judgment, determines that such action would be prudent for the Company and would likely result in a material benefit to the holders of New Common Stock whose shares would be registered under the Non-Backstop Shelf Registration Statement.

7.09    **Issuance of New Preferred Stock**

As of the Effective Date, Reorganized Holdings will be authorized to issue pursuant to the Reorganized Debtors' Certificate of Incorporation up to 10,000,000 shares of preferred stock, par value $.001 per share. Pursuant to the Plan, Reorganized Holdings will issue 1,000,000 shares of the New Preferred Stock and preferred shares issued and issuable in connection with the Management Incentive Plan. The terms of the New Preferred Stock are set forth in the Certificate of Designations, which is attached as Exhibit J to the Equity Commitment Agreement. The following summary of the terms of the New Preferred Stock does not purport to be complete and is qualified in its entirety by reference to the Certificate of Designations.

The New Preferred Stock will rank senior to the New Common Stock and to all other classes or series of capital stock of Reorganized Holdings (together, "Junior Securities"), except for any such other class or series, the terms of which expressly provide that it ranks on a parity with the New Preferred Stock as to preferred dividend rights, rights of redemption and rights on liquidation, dissolution or winding-up of Reorganized Holdings.

Holders of the New Preferred Stock will be entitled to receive cumulative preferred dividends payable, at the option of Reorganized Holdings, either in cash or in additional shares of New Preferred Stock ("Additional Shares") on each share of New Preferred Stock at the rate of 7% per annum (paid in quarterly arrears) and dividends to the same extent and on the same basis as declared by the Board of Directors with respect to shares of New Common Stock (other than dividends payable in New Common Stock) in an amount equal to the product of (i) the number of shares of New Common Stock issuable upon conversion of a share of New Preferred Stock and (ii) the dividend payable on a share of the New Common Stock. No dividends or other distributions may be made or set aside for payment on any Junior Securities (unless payable in shares of Junior Securities), and no Junior Securities may be acquired (except as specified in the Certificate of Designations), by Reorganized Holdings, unless the full cumulative preferred dividends have been paid (in cash or Additional Shares) on all outstanding shares of New Preferred Stock for all past dividend periods and, in case of a cash dividend on any Junior Securities, all Additional Shares (which the holders have the option to submit for redemption and which are tendered for redemption) have been redeemed, and the dividends

payable to holders of New Preferred Stock with respect to dividends or distributions on the New Common Stock have been paid.

The New Preferred Stock is convertible into New Common Stock at the option of its holders at any time at the conversion price set forth in the Certificate of Designations which is initially $23.30574 per share (as adjusted in certain customary circumstances as specified in the Certificate of Designations, including stock splits and reclassifications, stock dividends and distributions, tender or exchange offers, rights plans and certain issuances of common stock or derivatives). The New Preferred Stock is also convertible into New Common Stock at the option of Reorganized Holdings from and after the third anniversary of the Effective Date, provided that (i) the closing sale price (as defined in the Certificate of Designations) of the New Common Stock exceeded 155% of the applicable conversion price for each of 30 consecutive trading days within 45 days prior to the date Reorganized Holdings notifies the holders of New Preferred Stock of the exercise of its conversion right, (ii) the shares of New Common Stock have been listed on the New York Stock Exchange, the NASDAQ Global Select Market or the NASDAQ Global Market and registered pursuant to Section 12 of the Exchange Act, and (iii) the conditions set forth below in connection with a resale registration statement in the event of a redemption by Reorganized Holdings have been satisfied. Reorganized Holdings may also cause the conversion of all of the shares of New Preferred Stock into shares of New Common Stock immediately prior to the consummation of an initial underwritten public offering of shares of New Common Stock pursuant to a registration statement under the Securities Act, if the holders of two-thirds of the outstanding shares of New Preferred Stock approve such conversion and the shares of New Common Stock have been listed on the New York Stock Exchange, the NASDAQ Global Select Market or the NASDAQ Global Market and registered pursuant to Section 12 of the Exchange Act.

At any time on or within 30 days after receipt of a notice from Reorganized Holdings that a change of control (as defined in the Certificate of Designations) or a cash transaction (as defined in the Certificate of Designations) has occurred, each holder of New Preferred Stock may require Reorganized Holdings to redeem all or a portion of such holder's shares of New Preferred Stock at a cash price per share equal to the greater of (1) the sum of $100 (which amount will be appropriately adjusted in the event of any stock split, stock combination or other similar recapitalization of the New Preferred Stock) (the "Stated Value") and all accrued and unpaid dividends to the redemption date and (2) the conversion value (as defined in the Certificate of Designations) as of the second trading day prior to the redemption date; *provided* that, in case of a cash transaction prior to the fifth anniversary of the Effective Date, each holder of shares of New Preferred Stock exercising its redemption rights will instead receive a cash price per share equal to the greater of (x) the product of the Multiplier and the sum of the Stated Value and all accrued and unpaid dividends to the date of the consummation of the cash transaction, and (y) the conversion value as of such date. "Multiplier" means 1.175 if the cash transaction occurs prior to the first anniversary of the Effective Date, 1.125 if the cash transaction occurs on or after the first anniversary and prior to the fifth anniversary of the Effective Date and 1.0 thereafter. In the event of a cash transaction, Reorganized Holdings may cause all of the shares of New Preferred Stock to be converted in the cash transaction into a cash amount also equal to the greater of (x) the product of the Multiplier and the sum of the Stated Value and all accrued and unpaid dividends to the date of the consummation of the cash transaction and (y) the conversion value as of such date.

In addition, from and after the sixth anniversary of the Effective Date, Reorganized Holdings may redeem shares of New Preferred Stock at any time in whole or in part at a cash price per share equal to the greater of (1) the sum of the Stated Value and all accrued and unpaid dividends, which sum will, in the case of a redemption prior to the seventh anniversary of the Effective Date, be multiplied by 1.125, and (2) 75% of the conversion value as of the second trading day prior to the redemption date; provided that if the amount in clause (2) is greater than the amount in clause (1), Reorganized Holdings may redeem such shares by paying an amount in cash equal to the amount in clause (1) and issuing such number of shares of New Common Stock valued at the closing sale price of the Common Stock on the second trading day prior to the redemption date equal to the excess of the amount in clause (2) over the amount in clause (1). Prior to exercising such redemption right, a resale registration statement covering the shares of New Common Stock issuable upon conversion of New Preferred Stock has to be filed by Reorganized Holdings, declared effective by the Securities and Exchange Commission and it has to be effective and available for resales for at least 60 days after the relevant redemption date. Such resale registration statement will not be required if (A) each holder of New Preferred Stock is not an affiliate of Reorganized Holdings, (B) the shares of New Common Stock deliverable upon conversion will not be subject to any transfer or resale restrictions under applicable United States securities laws, (C) Reorganized Holdings has agreed to deliver upon conversion shares of New Common Stock without any legend through the facilities of The Depositary Trust Company, New York, or any successor depositary, and (D) upon conversion, the holders of New Preferred Stock would be permitted to freely resell their shares of New Common Stock in the relevant market. Reorganized Holdings may not redeem any shares of New Preferred Stock as described above and may not set aside any cash amount for such redemption, unless full cumulative preferred dividends and full participating dividends, each as described above, have been paid on all outstanding shares of New Preferred Stock for all past dividend periods.

In the event of any liquidation, dissolution or winding-up of Reorganized Holdings, the holders of New Preferred Stock are entitled to priority in payments from Reorganized Holdings in the amount per share of New Preferred Stock equal to the greater of (i) the sum of the Stated Value and all accrued and unpaid cumulative preferred dividends (whether or not earned or declared) to the date of final distribution to the holders of New Preferred Stock and (ii) the amount such share of New Preferred Stock would be entitled to receive pursuant to the liquidation, dissolution or winding up of Reorganized Holdings if such share had been converted into shares of Common Stock.

As provided in the Certificate of Designations, certain actions of Reorganized Holdings require the affirmative approval of the holders of two-thirds of the outstanding shares of New Preferred Stock, voting as a class, in which event each share of New Preferred will have one vote. Except as required by law, in all other situations the holders of shares of New Preferred Stock will vote together with the holders of shares of New Common Stock on all matters upon which holders of shares of New Common Stock have the right to vote and the holders of shares of New Preferred Stock will be entitled to one vote for each share of New Common Stock issuable upon conversion of a share of New Preferred Stock.

If Reorganized Holdings is not subject to the reporting requirements of Sections 13 or 15(d) of the Exchange Act, Reorganized Holdings has to provide the holders of New Preferred Stock with all quarterly and annual financial information and all current reports that

would be required to be contained on Forms 10-Q, 10-K and 8-K, respectively, if Reorganized Holdings were required to file such reports with the Commission. For so long as any of the shares of the New Preferred Stock constitute "restricted securities" under Rule 144, Reorganized Holdings has to provide to the holders and prospective investors the information reasonably necessary to comply with Rules 144 and 144A with respect to re-sales of the shares under the Securities Act, to the extent required to enable the shares to be sold without registration under the Securities Act within the limitation of the exemptions provided by Rules 144 and 144A.

For more information on the issuance and terms of the New Preferred Stock, please see the Certificate of Designations attached to the Equity Commitment Agreement as Exhibit J.

### 7.10    Issuance of New Capital Warrants

On the Effective Date, Reorganized Holdings will issue the New Capital Warrants pursuant to the terms of the New Capital Warrant Agreement, which will be filed with the Bankruptcy Court as part of the Plan Supplement. The issuance of the New Capital Warrants, and the New Common Stock underlying the New Capital Warrants, by Reorganized Holdings and their distribution to the Backstop Parties and to Holders of Allowed Senior Subordinated Claims are authorized and directed, without the need for any further corporate action, under applicable law, regulation, order, rule or otherwise. The New Capital Warrants being distributed to Holders in exchange for their Allowed Senior Subordinated Note Claims will be contributed by Reorganized Holdings to CSA and CSA will distribute the New Capital Warrants to Holders of Allowed Senior Subordinated Note Claims in exchange for their Claims. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the Senior Subordinated Noteholders Warrant Distribution issued pursuant to the Plan and the underlying New Common Stock and their transfer will be exempt from registration under the Securities Act, as amended, all rules and regulations promulgated thereunder, and any and all applicable state and local laws, rules, and regulations. The Backstop Warrants, the New Common Stock underlying the Backstop Warrants and their transfer in each instance will be issued pursuant to an exemption from registration under the Securities Act and equivalent exemptions under state securities laws.

### 7.11    Registration Rights Agreement; Shelf Registrations

On the Effective Date, Reorganized Holdings, the Backstop Parties and certain Eligible Noteholders specified by the Backstop Parties will execute the Registration Rights Agreement in respect of the New Common Stock (including New Common Stock issuable upon conversion of New Preferred Stock and upon exercise of New Capital Warrants), the New Preferred Stock and the New Capital Warrants held or beneficially owned by the parties thereto.

Reorganized Holdings will use its commercially reasonable efforts, at its own cost and expense, to file the Shelf Registration Statements with the SEC within sixty (60) days following the Effective Date, and to cause the Shelf Registration Statements to be declared effective by the SEC as soon as practicable thereafter but in no event later than ninety (90) days following the Effective Date. Reorganized Holdings will use its commercially reasonable efforts to continuously maintain the effectiveness of the Shelf Registration Statements until the earliest to occur of (i) the date on which all securities registered under the applicable Shelf Registration

Statement have been sold in a transaction registered under the Securities Act or pursuant to Rule 144 under the Securities Act and (ii) the first anniversary of the original date of effectiveness of the applicable Shelf Registration Statement; provided that Reorganized Holdings will use its commercially reasonable efforts to continuously maintain the effectiveness of the Backstop Shelf Registration Statement with respect to New Capital Warrants issued to the Backstop Parties and the New Common Stock issuable upon the exercise of such New Capital Warrants until the date on which all New Capital Warrants have been exercised for New Common Stock or the New Capital Warrants have expired.

The plan of distribution of each Shelf Registration Statement will at a minimum allow the shares of New Capital Stock registered thereunder to be sold on any national securities exchange on which the New Capital Stock is then listed, in the over-the-counter market, in other brokerage transactions or transactions with a market maker and in privately negotiated transactions.  For the avoidance of doubt, Reorganized Holdings will not be required to allow the Shelf Registration Statements to be utilized for offerings of New Capital Stock or Warrants involving an underwriter, except that the Backstop Shelf Registration Statement shall at the request of a Backstop Party cover market making transactions by the Backstop Party in its capacity as a broker dealer.  Reorganized Holdings will take all action reasonably necessary or advisable to allow all Holders of (x) shares of New Capital Stock issued in the Rights Offering, (y) shares of New Capital Stock and New Capital Warrants issued pursuant to the Equity Commitment Agreement and (z) shares of New Common Stock issued upon conversion of the New Preferred Stock and upon exercise of the New Capital Warrants, or their transferees, to include such securities in the applicable Shelf Registration Statement.  The provisions of the Registration Rights Agreement regarding the following matters will apply mutatis mutandis to the Shelf Registration Statements: company undertakings to notify selling holders of the effectiveness of the registration statement, to maintain the effectiveness of the registration statement, to furnish to selling holders copies of the registration statement and the related prospectus, to qualify and maintain the qualification of the shares registered under the registration statement in accordance with state securities laws, to amend or supplement the registration statement and the related prospectus as required to comply with law (including with respect to material misstatements and omissions), and to prevent or obtain the withdrawal of any stop order with respect to the registration statement; provisions regarding suspension periods , holdback agreements (except that such holdback agreements will only be applicable during the period that Reorganized Holdings is obligated to keep the applicable Shelf Registration Statement effective for sales under such Shelf Registration Statement), free writing prospectuses, indemnification and contribution and information required from selling shareholders; provided, however, Reorganized Holdings will be obligated to register such securities in the Shelf Registration Statements only to the extent permitted by applicable securities laws.  Notwithstanding the foregoing, in the event that the Shelf Registration Statements have been filed and thereafter Reorganized Holdings determines reasonably and in good faith that the filing of the Backstop Shelf Registration Statement, or a request to declare the Backstop Shelf Registration Statement effective, is preventing or materially delaying, or would prevent or materially delay, the ability to cause the Non-Backstop Shelf Registration Statement to be declared effective, Reorganized Holdings will promptly withdraw the Backstop Shelf Registration Statement and not refile the Backstop Shelf Registration Statement unless and until (I) (x) the Non-Backstop Shelf Registration Statement has been declared effective and (y) Reorganized Holdings determines reasonably and in good faith that the filing of the Backstop

Shelf Registration Statement, or a request to declare the Backstop Shelf Registration Statement effective, would not cause the effectiveness of the Non-Backstop Shelf Registration Statement to be withdrawn or prevent or materially delay the ability to cause any post-effective amendment thereto be declared effective or (II) until the shares of New Common Stock registered under the Non-Backstop Shelf Registration Statement can be sold pursuant to Rule 144(b)(1)(i) under the Securities Act. Thereafter, Reorganized Holdings will use commercially reasonable efforts to file the Backstop Shelf Registration Statement and have it declared effective as soon as practicable and maintain the effectiveness of the Shelf Registration Statements as required above.

### 7.12   **Cancellation of Existing Securities and Agreements**

On the Effective Date, the Prepetition Credit Facility, the Senior Notes, the Senior Subordinated Notes, and the Old Holdings Equity Interests, as well as any and all securities or agreements relating to the DIP Financing Agreement, the Prepetition Credit Facility and/or the Senior Note Indenture and Senior Subordinated Note Indenture will be automatically cancelled, terminated and of no further force or effect; without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the parties, as applicable, under the agreements, indentures, and certificates of designation governing such Claims or interests will be discharged; provided, however, that the Prepetition Credit Facility, the Senior Note Indenture and the Senior Subordinated Note Indenture will continue in effect for the limited purpose of (i) allowing the Prepetition Administrative Agent, the Senior Note Indenture Trustee and the Senior Subordinated Note Indenture Trustee, respectively, to make any distributions on account of the Prepetition Credit Facility Claims, the Senior Notes or the Senior Subordinated Notes pursuant to sections 10.03 and 10.04 of the Plan, to perform such other necessary administrative or other functions with respect thereto, and for the Senior Note Indenture Trustee and the Senior Subordinated Note Indenture Trustee to have the benefit of all the rights and protections and other provisions of the Senior Note Indenture or the Senior Subordinated Note Indenture, respectively, vis-à-vis the Senior Noteholders and the Senior Subordinated Noteholders, respectively, including their lien rights, if any, with respect to any distribution to their respective Noteholders under the Plan (for the avoidance of doubt, neither the Rights Offering Shares, the Holdback Shares , nor the Non-Eligible Noteholder Shares are distributions to Noteholders for these purposes), and (ii) permitting the Senior Note Indenture Trustee or the Senior Subordinated Note Indenture Trustee, respectively, to assert any right to indemnification, contribution, or other claim it may have under the Senior Note Indenture or the Senior Subordinated Note Indenture, respectively, subject to any and all defenses any party may have under the Plan or applicable law to any such asserted rights or claims. All subordination provisions in the Senior Subordinated Note Indenture will be compromised and settled by the Plan and neither the Senior Note Indenture Trustee nor the Senior Noteholders will have any claim to any Class 6 distribution under the Plan by reason of any such subordination provisions.

### 7.13   **Reorganized Debtors' Certificates of Incorporation; Certificate of Designations**

On or prior to the Effective Date, Holdings will file, with the Secretary of State of Delaware, the second amended and restated certificate of incorporation of Reorganized Holdings and the Certificate of Designations. On the Effective Date, or as soon thereafter as practicable,

each of the other Reorganized Debtors will file, with the applicable Secretary of State of the State where the applicable Reorganized Debtor is organized, their respective Reorganized Debtors' Certificates of Incorporation.

### 7.14    **Directors of the Reorganized Debtors**

The new Board of Directors of Reorganized Holdings on and after the Effective Date will consist of (i) the chief executive officer of Reorganized Holdings, (ii) two (2) independent members from the current Board of Directors of Holdings selected by the Debtors, (iii) one (1) independent member nominated by Capital Research and Management Company, Lord, Abbett & Co. LLC, TCW Asset Management Company and TD Asset Management Inc. in consultation with (but without the need for the approval of) the chief executive officer of Reorganized Holdings and an independent search firm as agreed upon by such parties and the Debtors (it being understood that Korn/Ferry International ("Korn Ferry") has been agreed upon), (iv) one (1) independent member nominated by Barclays Capital, Inc. in consultation with (but without the need for the approval of) the chief executive officer of Reorganized Holdings and an independent search firm as agreed upon by such parties and the Debtors (it being understood that Korn Ferry has been agreed upon), (v) one (1) member nominated by Oak Hill Advisors, L.P., and (vi) one (1) member nominated by Silver Point Capital, L.P., with the consent of Barclays Capital, Inc. if such member is not independent. With respect to the independent members nominated pursuant to (ii), (iii) and (iv) of this paragraph, such nominations will be made in consultation with the Creditors' Committee, which consultation will be solely for the Creditors' Committee to determine whether such nominee has a prior relationship with a Backstop Party that would reasonably be expected to influence the exercise of business judgment of the nominee. In addition, Oak Hill Advisors, L.P. and Silver Point Capital, L.P. will each have the right to appoint one (1) observer to the board. Such members of the Board of Directors will take office immediately following the issuance of the shares of New Capital Stock pursuant to Sections 9.08(a) and 9.09 of the Plan and will hold office until the annual meeting of stockholders in 2011. If the member nominated by Oak Hill Advisors L.P. is designated as a member of the initial compensation (or equivalent) committee, either the member nominated by Silver Point Capital, L.P. or the member nominated by Barclays Capital, Inc. will also be designated as a member of such committee. If either of the members nominated by Silver Point Capital, L.P. or Barclays Capital, Inc. is designated as a member of the initial compensation (or equivalent) committee, the member nominated by Oak Hill Advisors L.P. will also be designated as a member of such committee. The list of names of all members of the new Board of Directors of Reorganized Holdings that are known as of the date that is five (5) Business Days prior to the Confirmation Hearing will be filed with the Bankruptcy Court as part of the Plan Supplement. The Board of Directors for each of the remaining Reorganized Debtors on and after the Effective Date will be filed with the Bankruptcy Court as part of the Plan Supplement. The classification and composition of the Board of Directors of each of the Reorganized Debtors will be consistent with the respective Reorganized Debtors' Certificate of Incorporation. Each such director or officer will serve from and after the Effective Date pursuant to the terms of the respective Reorganized Debtors' Certificate of Incorporation and the Reorganized Holdings By-laws and the applicable corporation or limited liability company law, as applicable, of the state in which the Reorganized Debtor is organized.

7.15    **Management Agreements**

Under Section 9.14 of the Plan, on the Effective Date, the Reorganized Debtors will honor, in the ordinary course of business, all employee compensation and employee benefit plans and agreements of the Debtors including, without limitation, incentive agreements with the Debtors' management, the existing annual incentive plan, the existing long term incentive plan, the existing Deferred Compensation Plan and Pre-2005 Executive Deferred Compensation Plan, the existing Change of Control Severance Pay Plan, the existing salaried employee retirement and savings plans and Nonqualified Supplementary Benefit Plan (SERP), and the existing employment agreements and any and all other employee benefit plans and agreements entered into before, on or after the Filing Date and not since terminated. In addition, the Reorganized Debtors will undertake and commit to take the actions relating to such existing employment agreements and plans as set forth on Exhibit B of the Plan and to pay an emergence component award to eligible executives of the Debtors in accordance with Exhibit B and to adopt the Management Incentive Plan with the terms set forth on Exhibit B. Notwithstanding the foregoing, the change of control provisions (including without limitation any right of such participant to terminate employment for "good reason" and any Company funding obligation) will not be triggered under such employment agreement, the Company's Change of Control Severance Pay Plan, Nonqualified Supplementary Benefit Plan (SERP), Deferred Compensation Plan and Pre-2005 Executive Deferred Compensation Plan, in each case as a result of (x) the Company's emergence from Chapter 11 as contemplated by the Plan, (y) the execution and delivery of the Equity Commitment Agreement or (z) the consummation of the transactions provided in the Equity Commitment Agreement and/or the Plan (or otherwise contemplated by the Equity Commitment Agreement and/or the Plan to occur prior to or on or about the Effective Date); provided that the waiver set forth in this sentence shall not apply if a Backstop Party (A) enters into any written shareholder or voting agreement (other than the Equity Commitment Agreement, the Ancillary Agreements (as defined in the Equity Commitment Agreement) or the Plan), (B) purchases or acquires pre-petition claims with respect to the Senior Subordinated Notes (including the purchase or acquisition of any such pre-petition claim held by any other Backstop Party or its affiliates, but excluding any purchase or acquisition by a Backstop Party or its affiliates in its broker/dealer, market making, flow trading or other non-proprietary trading activities), or (C) assigns the Equity Commitment Agreement or its obligations hereunder pursuant to Section 12 of the Equity Commitment Agreement, in the case of each of clauses (A), (B) and (C), only if such action would result in such Backstop Party having beneficial ownership of greater than or equal to 50% of the total voting power of the Company's voting power upon emergence; provided further, that this waiver shall not apply with respect to any rights under Section 7 of the Change of Control Severance Pay Plan in the event that an excise tax is imposed by the IRS pursuant to Section 4999 of the Code by reason of a payment (which is made following an event that the Company reasonably and in good faith determines would have constituted a "change of control" for purposes of such participant's entitlement to payments under such plan, had such participant not executed such waiver) that the IRS asserts is "contingent on a change of control" of the Company within the meaning of Section 280G of the Code, despite the reasonable best efforts of the Company to withstand such assertion, where appropriate. For purposes of clarification, (i) neither (a) the agreements and arrangements involving Backstop Parties that are contemplated by the Equity Commitment Agreement or the Plan to occur or exist prior to, on or about the Effective Date nor (b) any agreements or arrangements by Backstop Parties at any time prior to, on or after the Effective Date to dispose

85

of any or all of their securities of the Company shall be taken into account in determining whether such Backstop Parties constitute a "group" for purposes of the change of control provisions in the employment agreements and the plans referred to herein and (ii) the acquisition by any person of any equity interest in the Company at any time following the issuance of Backstop Purchaser Shares (as defined in the Equity Commitment Agreement), Rights Offering Shares and Warrants (including the Backstop Purchaser Warrants (as defined in the Equity Commitment Agreement) pursuant to the Plan (other than any acquisition from any Backstop Party that is agreed to between such Backstop Party and its transferee or assignee and consummated on or about the Effective Date) shall not be deemed a transaction provided for in the Equity Commitment Agreement or the Plan.

### 7.16    **Pension Plans**

CSA is the contributing sponsor for the Pension Plans. The Pension Plans are covered by Title IV of ERISA. The PBGC guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.

Upon confirmation of the Plan, the Reorganized Debtors will assume and maintain the Pension Plans, and contribute to the Pension Plans the amount necessary to satisfy the minimum funding standards under sections 302 and 303 of ERISA, 29 U.S.C. §§ 1082 and 1083, and sections 412 and 430 of the Tax Code, 26 U.S.C. §§ 412 and 430. The Pension Plans may be terminated after the Effective Date only if the statutory requirements of either ERISA section 4041, 29 U.S.C. § 1341 or ERISA section 4042, 29 U.S.C. § 1342, are met. If the Pension Plans terminate, the Reorganized Debtors will be jointly and severally liable for the unpaid minimum funding contributions, statutory premiums, and unfunded benefit liabilities of the Pension Plans. See ERISA sections 4062(a), 4007; 29 U.S.C. §§ 1362(a), 1307.

In addition, nothing in the Plan will be construed as discharging, releasing, or relieving the Debtors, or their successors, including the Reorganized Debtors, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans or the PBGC. The PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order.

### 7.17    **Termination of DIP Financing Agreement**

Upon payment of all DIP Obligations (as such term is defined in the DIP Financing Order) incurred under or pursuant to the DIP Financing Agreement, in full, in Cash, on the Effective Date, as provided in section 2.01 of the Plan, (i) the DIP Financing Agreement will be terminated and any and all securities or agreements relating to the DIP Financing Agreement will be automatically cancelled, terminated and of no further force or effect, without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the parties, as applicable, under the agreements, and (ii) all Liens and security interests granted to secure such Obligations will be released and will be of no further force and effect.

7.18    **Director Nomination Agreements**

Under Nomination Agreements to be executed on the Effective Date by Reorganized Holdings and the Backstop Parties and their respective affiliates (the "Stockholders"), the Stockholders will have the right to designate certain persons for nomination to the Board of Directors, so long as the Stockholders or their affiliates beneficially own at least 7.5% of the New Common Stock on an as converted basis assuming the conversion of all New Preferred Stock. The Nomination Agreements will be in effect until the earlier of (i) termination of the Nomination Agreement at the election of the Stockholder by written notice to the Company, and (ii) immediately prior to the annual meeting of stockholders of Reorganized Holdings held during the 2013 calendar year, unless terminated earlier as a result of the Stockholders' holdings of New Common Stock. Forms of the Nomination Agreements are attached to the Equity Commitment Agreement as Exhibit F.

## ARTICLE VIII.
## DISTRIBUTIONS UNDER THE PLAN

8.01    **Timing of Distributions Under the Plan**

Except as otherwise provided in the Plan, without in any way limiting Article 11 of the Plan, and subject to section 13.02 of the Plan, payments and distributions in respect of Allowed Claims will be made by the Reorganized Debtors (or their designee) on or as promptly as practicable after the Effective Date but no later than 30 days thereafter.

8.02    **Distributions on Account of the Prepetition Credit Facility Claim**

All distributions on account of the Prepetition Credit Facility Claim will be made to the Prepetition Administrative Agent, which will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to Holders of Prepetition Credit Facility Claims. The Reorganized Debtors will pay the Prepetition Administrative Agent its reasonable fees and expenses for making distributions under the Plan to Holders of the Prepetition Credit Facility Claims.

8.03    **Distributions on Account of the Senior Notes**

All distributions on account of the Senior Notes will be made to the Senior Note Indenture Trustee, which will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to Holders of Senior Note Claims; provided, however, that the shares of New Common Stock being distributed to Holders of Allowed Supporting Senior Note Claims pursuant to section 6.05(a) of the Plan and the Equity Commitment Agreement will be distributed through the Subscription Agent or its designee, as the case may be. The Reorganized Debtors will pay the Senior Note Indenture Trustee, in Cash, its reasonable and documented fees and expenses (including reasonable and documented professional fees) for making distributions under the Plan to Holders of the Senior Note Claims. To the extent the Senior Note Indenture Trustee provides services related to distributions pursuant to the Plan, such Senior Note Indenture Trustee will receive from the Reorganized Debtors, without further court approval and upon presenting to the Reorganized Debtors adequate documentation, reasonable compensation, in Cash, for such services and reimbursement of reasonable expenses

(including reasonable and documented professional fees) incurred in connection with such services. These payments will be made in the ordinary course by the Reorganized Debtors on terms agreed to between the Senior Note Indenture Trustee and the Reorganized Debtors. Any payments to be made to the Senior Note Indenture Trustee on account of fees and expenses incurred pursuant to Section 10.03(a) of the Plan or any other section of the Plan will be subject to the requirement that such fees and expenses be reasonable and documented, as determined by the Debtors and the Backstop Parties.

In connection with distributions on account of the Senior Notes Claims, the Senior Note Indenture Trustee will not be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions. In addition, any and all distributions on account of Senior Note Claims made by the Senior Note Indenture Trustee will be subject to the right of the Senior Note Indenture Trustee to exercise its rights and remedies under the Senior Note Indenture for any unpaid fees and expenses incurred prior to the Effective Date, any fees and expenses of the Senior Note Indenture Trustee incurred in making distributions pursuant to the Plan, and any fees and expenses of the Senior Note Indenture Trustee incurred in responding to any objection to the payment of the fees and expenses of the Senior Note Indenture Trustee pursuant to section 6.05 of the Plan, including reasonable and documented professional fees for any such activity.

The Senior Note Indenture Trustee's exercise of any rights and remedies it may have under the Senior Note Indenture against a distribution to recover repayment of any unpaid fees and expenses will not subject the Senior Note Indenture Trustee to the jurisdiction of the Bankruptcy Court with respect to either the exercise of such rights and remedies or the fees and costs recovered thereby.

The foregoing is in addition to any rights or remedies of the Senior Note Indenture Trustee under the Senior Note Indenture.

### 8.04    **Distributions on Account of the Senior Subordinated Notes**

All distributions on account of the Senior Subordinated Notes will be made to the Senior Subordinated Note Indenture Trustee, which will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to Holders of Senior Subordinated Note Claims; provided, however, that the Rights Offering Shares, the Holdback Shares, the New Capital and the Non-Eligible Noteholder Shares shall be distributed through the Subscription Agent or its designee, as the case may be. The Reorganized Debtors will pay the Senior Subordinated Note Indenture Trustee its reasonable and documented fees and expenses (including reasonable and documented professional fees) for making distributions under the Plan to Holders of the Senior Subordinated Note Claims. To the extent the Senior Subordinated Note Indenture Trustee provides services related to distributions pursuant to the Plan, such Senior Subordinated Note Indenture Trustee will receive from the Reorganized Debtors, without further court approval and upon presenting to the Reorganized Debtors adequate documentation, reasonable compensation, in Cash, for such services and reimbursement of reasonable expenses (including reasonable and documented professional fees) incurred in connection with such services. These payments will be made in the ordinary course by the Reorganized Debtors on terms agreed to between the Senior Subordinated Note Indenture Trustee and the Reorganized

Debtors. Any payments to be made to the Senior Subordinated Note Indenture Trustee on account of fees and expenses incurred pursuant to Section 10.04(a) of the Plan or any other section of the Plan will be subject to the requirement that such fees and expenses be reasonable and documented, as determined by the Debtors and the Backstop Parties.

In connection with distributions on account of the Senior Subordinated Notes Claims, the Senior Subordinated Note Indenture Trustee will not be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions. In addition, any and all distributions, except for the Rights Offering Shares, Holdback Shares, the New Capital Warrants and Non-Eligible Noteholder Shares, on account of Senior Subordinated Note Claims will be subject to the right of the Senior Subordinated Note Indenture Trustee to exercise its rights and remedies under the Senior Subordinated Note Indenture for any unpaid fees and expenses incurred prior to the Effective Date, any fees and expenses of the Senior Subordinated Note Indenture Trustee incurred in making distributions pursuant to the Plan, and any fees and expenses of the Senior Subordinated Note Indenture Trustee incurred in responding to any objection to the payment of the fees and expenses of the Senior Subordinated Note Indenture Trustee pursuant to section 6.05 of the Plan, including reasonable and documented professional fees for any such activity.

The Senior Subordinated Note Indenture Trustee's exercise of any rights and remedies it may have under the Senior Subordinated Note Indenture against a distribution to recover repayment of any unpaid fees and expenses will not subject the Senior Subordinated Note Indenture Trustee to the jurisdiction of the Bankruptcy Court with respect to either the exercise of such rights and remedies or the fees and costs recovered thereby.

The foregoing will be in addition to any rights or remedies of the Senior Subordinated Note Indenture Trustee under the Senior Subordinated Note Indenture.

8.05    **Allocation of Consideration**

The aggregate consideration to be distributed to the Holders of Allowed Claims in each Class under the Plan will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any, to the extent that interest is payable under the Plan.

8.06    **Cash Payments**

Cash payments made pursuant to the Plan will be in U.S. dollars. Cash payments to foreign Creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks issued by the Reorganized Debtors will be null and void if not cashed within 120 days of the date of the issuance thereof. Requests for reissuance of any check must be made directly to the Debtors or Reorganized Debtors, as the case may be, as set forth in section 10.16 of the Plan.

8.07    **Payment of Statutory Fees**

All Bankruptcy Fees as determined by the Bankruptcy Court at the Confirmation Hearing will be paid by the Debtors on or before the Effective Date, or by the Reorganized Debtors as soon as practicable thereafter. All Bankruptcy Fees will be paid until the Bankruptcy Court enters a final decree closing the Chapter 11 Cases.

8.08    **No Interest**

Except with respect to Holders of Unimpaired Claims entitled to interest under applicable non-bankruptcy law or as otherwise expressly provided in the Plan, no Holder of an Allowed Claim will receive interest on the distribution to which such Holder is entitled hereunder, regardless of whether such distribution is made on the Effective Date or thereafter. Without limiting the generality of the foregoing, interest will be not be paid upon any Disputed Claim in respect of the period from the Filing Date to the date a final distribution is made thereon if, and after, such Disputed Claim becomes an Allowed Claim.

8.09    **Setoffs**

The Reorganized Debtors may (but will not be required to), pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, exercise (i) the setoff rights, of the Debtors or the Reorganized Debtors, as the case may be, against any Allowed Claims and the distributions to be made pursuant to the Plan on account of such Allowed Claims, and (ii) Claims of any nature whatsoever that the Debtors or the Reorganized Debtors or their successors may hold (and could have asserted) against the Holder of such Claim; provided, however, that neither the failure to effect a setoff (or to utilize any other rights pursuant to section 553 of the Bankruptcy Code) nor the allowance of any Claim hereunder will constitute a waiver or release of any such Claims or rights against such Holder, unless an order allowing such Claim otherwise so provides.

8.10    **Special Provision Regarding Unimpaired Claims**

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement entered into and enforceable pursuant to the terms of the Plan, nothing herein affects the Debtors' or Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims or to request disallowance or subordination of any such Claim. In addition, notwithstanding anything to the contrary, Unimpaired Claims are subject to all applicable provisions of the Bankruptcy Code, including section 502(b) of the Bankruptcy Code.

8.11    **Fractional Securities**

Notwithstanding any other provision of the Plan, only whole numbers of shares of New Common Stock and New Preferred Stock and New Capital Warrants will be issued or transferred (if allowed), as the case may be, pursuant to the Plan. The Reorganized Debtors will not distribute any fractional shares of New Common Stock and New Preferred Stock or New Capital Warrants. For purposes of distribution, fractional shares of New Common Stock and

New Preferred Stock and New Capital Warrants will be rounded down to the nearest share of New Common Stock, New Preferred Stock or New Capital Warrant, as applicable.

### 8.12    Compliance with Tax Requirements

In connection with the Plan and all instruments issued in connection with and distributed under the Plan, any party issuing any instrument or making any distribution under the Plan must comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan must be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution under the Plan has the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on such Holder by any governmental unit, including income, withholding and other Tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or distributing party for payment of any such Tax obligations.

### 8.13    Persons Deemed Holders of Registered Securities; the Distribution Record Date

As of the close of business on the Distribution Record Date, there will be no further changes in the record Holders of any Claims or Equity Interests. The Debtors, the Reorganized Debtors, or their designees will have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Distribution Record Date, and will be entitled to recognize and deal for the purposes under the Plan (except as to voting to accept or reject the Plan) with only those Holders of record as of the close of business on the Distribution Record Date. In the event of any dispute regarding the identity of any party entitled to any payment or distribution in respect of any Claim under the Plan, no payments or distributions will be made in respect of such Claim until the Bankruptcy Court resolves that dispute pursuant to a Final Order.

### 8.14    Surrender of Existing Securities

As a condition to receiving any distribution under the Plan, and except as otherwise provided in section 10.16 of the Plan, each Holder of an Instrument evidencing a Claim must surrender such Instrument to the Reorganized Debtors or their designee (with the exception of the distribution of the Rights Offering Shares, the Holdback Shares, the New Capital Warrants and the Non-Eligible Noteholder Shares); provided, however, with respect to the Senior Notes and the Senior Subordinated Notes, the requirements of section 10.14 will be deemed satisfied in full if the Senior Note Indenture Trustee and the Senior Subordinated Note Indenture Trustee coordinate with the Depository Trust Company (or such other securities depository or custodian thereof) to surrender and cancel their respective original global notes as soon as practicable after the Effective Date, and no further surrender or cancellation thereof will be required, or in the event the Depository Trust Company (or such other securities depository or custodian thereof) does not surrender such original global notes as soon as practicable after the Effective Date, the Debtors will waive such requirement and no further surrender or cancellation

thereof will be required. Any Holder of a Claim that fails to (a) surrender such Instrument or (b) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Reorganized Debtors or their designee before the later to occur of (i) the second anniversary of the Effective Date and (ii) six (6) months following the date such Holder's Claim becomes an Allowed Claim, will be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan. Upon compliance with section 10.15 of the Plan, the Holder of a Claim evidenced by any such lost, stolen, mutilated or destroyed Instrument will, for all purposes under the Plan, be deemed to have surrendered such Instrument.

### 8.15    Undeliverable or Unclaimed Distributions

Any Entity that is entitled to receive a Cash distribution under the Plan but that fails to cash a check within 120 days of its issuance will be entitled to receive a reissued check from the Reorganized Debtors for the amount of the original check, without any interest, if such Entity requests in writing the Reorganized Debtors or their designee to reissue such check and provides the Reorganized Debtors or their designee, as the case may be, with such documentation as the Reorganized Debtors or their designee request to verify in their reasonable discretion that such Entity is entitled to such check, prior to the second anniversary of the Effective Date. If an Entity fails to cash a check within 120 days of its issuance and fails to request reissuance of such check prior to the later to occur of (i) the second anniversary of the Effective Date and (ii) six (6) months following the date such Holder's Claim becomes an Allowed Claim, such Entity will not be entitled to receive any distribution under the Plan. If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or their designee as undeliverable, while the Reorganized Debtors will make reasonable efforts to obtain the then-current address of such Holder, no further distributions will be made to such Holder unless and until the Reorganized Debtors or their designee obtain or are notified in writing of such Holder's then-current address. Undeliverable distributions will remain in the possession of the Reorganized Debtors, or their designee pursuant to section 9.02 of the Plan until such time as a distribution becomes deliverable.

All claims for undeliverable distributions must be made on or before the later to occur of (i) the second anniversary of the Effective Date and (ii) six (6) months following the date the Claim underlying such distribution becomes an Allowed Claim. After such date, all unclaimed property will revert to the Reorganized Debtors and the Claim of any Holder or successor to such Holder with respect to such property will be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

### 8.16    Distributions on Account of General Unsecured Claims

The Reorganized Debtors will make or otherwise arrange and be responsible for the making of all distributions to Holders of General Unsecured Claims under the Plan.

### 8.17    Exemption From Certain Transfer Taxes

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from a Debtor to a Reorganized Debtor or any other person or Entity pursuant to the Plan, including the granting or

recording of any Lien or mortgage on any property under the New Working Capital Facility Documents or the New Secured Debt Facility Documents will not be subject to any stamp tax or other similar tax, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE IX.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### 9.01    Objections to Claims; Disputed Claims

As soon as practicable following the filing of a Proof of Claim in these Chapter 11 Cases, but in no event later than 180 days after the Effective Date (unless extended by an order of the Bankruptcy Court), the Debtors or Reorganized Debtors, as the case may be, will file objections to such Proofs of Claim with the Bankruptcy Court and serve such objections on the holders of each of the Claims to which objections are made; provided, however, that the Debtor and Reorganized Debtors will not object to Claims that are Allowed Claims pursuant to the Plan. Nothing contained in the Plan, however, will limit the Debtors' or Reorganized Debtors' right to object to Proofs of Claim, if any, that are not Allowed under the Plan or that are filed or amended more than 180 days after the Effective Date. The Debtors and Reorganized Debtors will be authorized to, and will, resolve all Disputed Claims by withdrawing or settling any objection thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction over the validity, nature, and/or amount thereof.

### 9.02    Estimation of Claims

Any Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as the case may be, may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism. Unless otherwise ordered by the Bankruptcy Court, all objections to, and request for estimation of, Claims will be filed and served on the applicable claimant on or before the date that is 180 days after the Effective Date or 180 days after such Claim is filed, whichever is later. On and after the Effective Date, except to the extent that the Reorganized Debtors consent, or with respect to the fee Claims of Professionals, only the Reorganized Debtors will have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to, and requests for estimation of, Claims.

9.03    **Payments and Distributions with Respect to Disputed Claims**

No payments of distributions will be made in respect of a Disputed Claim until such Disputed Claim becomes an Allowed Claim; provided, however, that where the Debtors, in good faith, reasonably dispute the allowance of no more than 25% of any Claim, the Reorganized Debtors shall make a distribution on or as promptly as practicable after the Effective Date in accordance with Section 10.01 of the Plan on account of the portion of such Claim that is not a Disputed Claim.

9.04    **Timing of Payments and Distributions with Respect to Disputed Claims**

Subject to the provisions of the Plan, payments and distributions with respect to each Disputed Claim that ultimately becomes an Allowed Claim that would have otherwise been made had such Claim been an Allowed Claim on the Effective Date will be made within 60 days after the date that such Disputed Claim becomes an Allowed Claim.   Holders of Disputed Claims, regardless of whether such Disputed Claims become Allowed Claims, will be bound, obligated and governed in all respects by the provisions of the Plan.

9.05    **Prosecution of Objections**

After the Confirmation Date, the Reorganized Debtors will have the authority to file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

## ARTICLE X.
## DISCHARGE, INJUNCTIONS, RELEASES AND SETTLEMENT OF CLAIMS

**As discussed below, the Plan provides for various releases that are to become effective as of the Confirmation Date but subject to the occurrence of the Effective Date. As noted above, the releases being provided under the Plan are a critical part of the compromise and settlement between the Creditors' Committee, the Senior Noteholders, the Senior Subordinated Noteholders, the Holders of Equity Interests and the Debtors that is embodied in the Plan.  The releases are being provided in consideration of, among other things, the services provided to the Debtors by their present and former shareholders, directors, officers, employees, affiliates, agents, advisors, financial advisors, accountants, investment bankers, attorneys, and representatives, as well as the efforts expended by the Creditors' Committee, the present and former holders of the Senior Notes, the present and former holders of the Senior Subordinated Notes, the Senior Note Indenture Trustee, the Senior Subordinated Note Indenture Trustee, and the respective present and former members of the foregoing (except that with respect to the Creditors' Committee only the present members thereof), and each of their present and former affiliates, officers, directors, shareholders, attorneys, accountants, financial advisors, investment bankers, advisory affiliates, employees, agents, successors and assigns, which resulted in a consensual Plan that (a) maximizes the value of the Debtors' businesses and (b) provides for an expedient emergence from chapter 11.  Additionally, as set forth below, the releases**

do not apply to any Entity who has been or is hereafter found to have acted wrongfully with certain misconduct or who has selected to "opt-out" of such releases.

10.01    <u>Discharge of all Claims and Old Equity Interests and Releases</u>

(a)    Except as otherwise expressly provided in the Plan, the confirmation of the Plan (subject to the occurrence of the Effective Date) will discharge the Debtors and the Reorganized Debtors from any Claim that arose before the Confirmation Date and any Claim of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a Proof of Claim is filed or is deemed filed, whether or not such Claim is Allowed and whether or not the Holder of such Claim has voted on the Plan. Confirmation of the Plan will not discharge any DIP Lender Claims or other DIP Obligations (as that term is defined in the DIP Financing Order and the DIP Original Financing Order) under the DIP Financing Agreement unless and until all such DIP Lender Claims and DIP Obligations (as that term is defined in the DIP Financing Order) are paid in full, in cash and all Letters of Credit issued under the Prepetition Credit Facility and that were subsequently issued on or after the Filing Date as permitted under the DIP Financing Agreement have been terminated or cash collateralized or supported by a backstop letter of credit or similarly defeased or rolled into the New Working Capital Facility.

(b)    Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by the Plan, the distributions and rights that are provided in the Plan will be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of all Claims and Causes of Action against, liabilities of, liens on, obligations of and Old Holdings Equity Interests in Holdings or Reorganized Holdings or the direct or indirect assets and properties of the Debtors or the Reorganized Debtors, whether known or unknown, regardless of whether a Proof of Claim or interest was filed, whether or not Allowed and whether or not the Holder of the Claim or Old Holdings Equity Interest has voted on the Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Old Holdings Equity Interest, in each case regardless of whether a Proof of Claim or interest was filed, whether or not Allowed and whether or not the Holder of the Claim or Old Holdings Equity Interest has voted on the Plan; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, nothing in the Plan or this Disclosure Statement is intended to release any insurer from having to provide coverage under any policy to which the Debtors, the Reorganized Debtors, and/or their current or former officers, directors, employees, representatives, or agents are parties or beneficiaries.

(c)    In addition, but in no way limiting the generality of the foregoing, any Holder of a Senior Subordinated Note Claim that votes to accept the Plan, and, to the fullest extent permissible under applicable law, any Holder of a Claim that does not vote to accept the Plan, will be agreeing to the release provisions of the Plan and will be presumed conclusively to have unconditionally and forever released the Debtors, the Reorganized Debtors, the Subsidiaries, the present and former Prepetition Credit Facility Parties, the present and former Prepetition Administrative Agent, the present and former DIP

Lenders, the present and former DIP Financing Agent, the present and former DIP Original Financing Agent, the Backstop Parties, the Creditors' Committee, the Senior Note Indenture Trustee, the Senior Subordinated Note Indenture Trustee, the Senior Noteholders, the Senior Subordinated Noteholders, and the present and former members of any of the foregoing (together with the advisory affiliates and advised affiliates of such members) (and each solely in their capacity as such), their respective successors, assigns, and each of their respective affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities), as well as the Debtors' officers, directors, and employees who hold such positions on the Confirmation Date and any Entity claimed to be liable derivatively through any of the foregoing, from any Cause of Action based on the same subject matter as the Claim on which the distribution is received; provided, however, that the foregoing releases will not apply to any person or Entity who, in connection with any act or omission by such person or Entity in connection with or relating to the Debtors or their businesses, has been or is hereafter found by any Final Order or any court or tribunal to have acted with gross negligence or willful misconduct; provided, further, however, that the foregoing releases will not apply to any Holder of a Senior Subordinated Note Claim if such Holder "opts-out" of the releases provided in section 12.01(c) of the Plan by a written election pursuant to such Holder's Ballot.

   (d) Additionally, except as otherwise specifically provided by the Plan or the Confirmation Order, the confirmation of the Plan (subject to the occurrence of the Effective Date) will act as a discharge and release of all Causes of Action (including Causes of Action of a trustee and debtor in possession under the Bankruptcy Code) of the Debtors and Reorganized Debtors, whether known or unknown, against (in each case, only in the specified capacity): (i) their present and former directors, shareholders, officers and employees, agents, attorneys, advisors, accountants, financial advisors and investment bankers; (ii) the present and former Prepetition Administrative Agent and the present and former Prepetition Credit Facility Parties, each in such capacity, and their respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (iii) the present and former Holders of the Senior Notes, each in such capacity, and their respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors investment bankers, successors and assigns (including any professionals retained by such persons or entities); (iv) the Senior Note Indenture Trustee, in such capacity, and its present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (v) the present and former Holders of the Senior Subordinated Notes, each in such capacity, and their respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (vi) the Senior Subordinated Indenture Trustee, in such capacity, and its present and former affiliates, officers, directors,

shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors investment bankers, successors and assigns (including any professionals retained by such persons or entities); (vii) the Creditors' Committee and its respective present and former members and the present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities) of each of the Creditors' Committee and their respective present and former members; (viii) each of the Backstop Parties, each in such capacity, and each of the respective Backstop Parties' present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (ix) the present and former DIP Financing Agent, the present and former DIP Original Financing Agent, and the present and former DIP Lenders, each in such capacity, and each of their respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons and entities), and (x) any Entity claimed to be liable derivatively through any of the foregoing. Notwithstanding the generality of the foregoing, nothing in the Plan will release any claims of any Debtors or Reorganized Debtors, as the case may be, against any Subsidiaries that are not Debtors or Reorganized Debtors, as the case may be; provided, however, that the foregoing releases will not apply to any person or Entity who, in connection with any act or omission by such person or Entity in connection with or relating to the Debtors or their businesses, has been or is hereafter found by any court or tribunal by Final Order to have acted with gross negligence or willful misconduct.

10.02 **Exculpation**

The Debtors, the Reorganized Debtors, the present and former Prepetition Credit Facility Parties, the present and former Prepetition Administrative Agent, the present and former DIP Lenders, the present and former DIP Financing Agent, the present and former DIP Original Financing Agent, the Senior Note Indenture Trustee, the Senior Subordinated Note Indenture Trustee, the Senior Noteholders, the Senior Subordinated Noteholders, the Creditors' Committee, each of the Backstop Parties and each of the respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns of the foregoing (including any professionals retained by such persons or entities), will have no liability for any act or omission in connection with, or arising out of, the pursuit of approval of the Rights Offering, this Disclosure Statement, the Plan or the CCAA Plan, or the solicitation of votes for or confirmation of the Plan or the CCAA Plan, or the consummation of the Plan and implementation of the CCAA Plan, or the transactions contemplated and effectuated by the Plan or the CCAA Plan or the administration of the Plan or the CCAA Plan or the property to be distributed under the Plan or the CCAA Plan, or any other act or omission during the administration of the Debtors' Estates or in contemplation of the Chapter 11 Cases or the CCAA Proceeding except for gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court, and in all respects, will be entitled

to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

10.03  **Injunction**

Sections 12.01, 12.02 and 12.03 of the Plan will also act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim, Interest or Cause of Action satisfied, released or discharged under the Plan. Notwithstanding any other provision of the Plan or the Confirmation Order, Confirmation of the Plan will not enjoin or extinguish any Creditor's rights of setoff or recoupment, if any, to the extent that such Creditor has a valid Claim and a valid right of recoupment or setoff under applicable state or federal law (including, without limitation, the Bankruptcy Code). Without limiting the applicability of the foregoing, (a) mutuality will be required for any setoff and (b) no creditor may setoff (i) any prepetition Claim against any postpetition obligation owed to any of the Debtors or (ii) any postpetition claim against any prepetition obligation owed to any of the Debtors. Nothing herein or in the Plan will constitute any admission by any of the Debtors that any Creditor has a valid right of setoff or right of recoupment under applicable state or federal law (including the Bankruptcy Code); and, **provided, further,** that any and all defenses of the Debtors and/or Reorganized Debtors with respect to any such asserted right of setoff or right of recoupment and to challenge the assertion of any such right of setoff or recoupment are hereby preserved in their entirety.

10.04  **Guarantees and Claims of Subordination**

(a)    Guarantees. The classification and the manner of satisfying all Claims under the Plan take into consideration (i) the possible existence of any alleged guarantees by the Debtors of obligations of any Entity or Entities and (ii) that the Debtors may be joint obligors with another Entity or Entities with respect to the same obligation. The Holders of Claims will be entitled to only one distribution with respect to any given obligation of the Debtors under the Plan.

(b)    Claims of Subordination. Except as specifically provided in the Plan, to the fullest extent permitted by applicable law, all Claims and Old Holdings Equity Interests, and all rights and claims between or among Holders of Claims or Old Holdings Equity Interests relating in any manner whatsoever to Claims or Old Holdings Equity Interests, based on any contractual, equitable or legal subordination rights, will be terminated on the Effective Date and discharged in the manner provided in the Plan, and all such Claims, Old Holdings Equity Interests and rights so based and all such contractual, equitable and legal subordination rights to which any Entity may be entitled will be irrevocably waived upon the Effective Date. To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under the Plan will not be subject to levy, garnishment, attachment or like legal process by any Holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination rights, so that, notwithstanding any such contractual, equitable or legal subordination rights, each Holder of a Claim or Equity Interest will have and receive the benefit of the rights and distributions set forth in the Plan.

10.05  **Survival of Indemnification Obligations**

Notwithstanding anything to the contrary contained in the Plan, subject to the occurrence of the Effective Date, the Reorganized Debtors will honor the Debtors' obligations to indemnify their directors, officers, agents, employees and representatives serving in such capacity on the Filing Date pursuant to their respective certificates of incorporation, by-laws, contractual obligations or any applicable laws in respect of all past, present and future actions, suits and proceedings against any of such directors, officers, agents, employees and representatives based upon any act or omission that occurred while such director, officer, agent, employee or representative was employed by or provided services to the Debtors, and that was related to service with, for, or on behalf of the Debtors.

## ARTICLE XI.
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

11.01  **Conditions to Entry of the Confirmation Order**

The Plan contains several conditions to confirmation.  Specifically, the following conditions must occur and be satisfied or waived in accordance with section 13.03 of the Plan by the applicable Debtor on or prior to the Confirmation Date:

(a)  <u>Disclosure Statement</u>.  The Disclosure Statement Approval Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Required Backstop Parties and the Creditors' Committee;

(b)  <u>Plan Documents and Agreements</u>.  All documents and agreements contemplated by, related to or necessary to the Plan shall be satisfactory to the applicable Debtor and shall be in form and substance reasonably satisfactory to the Required Backstop Parties as and to the extent required by the Equity Commitment Agreement and such other party as provided under the Plan;

(c)  <u>The Rights Offering and Equity Commitment Approval Order</u>.  The Rights Offering and Equity Commitment Approval Order shall have become a Final Order in form and substance reasonably satisfactory to the Required Backstop Parties;

(d)  <u>The Equity Commitment Agreement</u>.  The Equity Commitment Agreement shall continue to be in full force and effect and the conditions and the obligations of the parties thereto shall have been satisfied or waived in accordance therewith; and

(e)  <u>New Working Capital Credit Facility Documents and New Secured Debt Facility Documents</u>.  The Debtors must have received a firm written commitment for the New Working Capital Credit Facility and the New Secured Debt Facility in form and substance reasonably satisfactory to the Required Backstop Parties.

11.02  **Conditions to Effective Date**

The Plan contains several conditions to the occurrence of the Effective Date.  Specifically, the following conditions must occur and be satisfied or waived in accordance with

section 13.03 of the Plan by the applicable Debtor, or as applicable, the Required Backstop Parties, on or before the Effective Date for the Plan to be effective on the Effective Date:

(a)    Entry of Confirmation Order.  The Confirmation Order shall have become a Final Order in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee; provided, however, that any provision in the Confirmation Order that is inconsistent with the Plan or the Equity Commitment Agreement or any exhibits to either of the foregoing and is in any way materially adverse to the Backstop Parties, the Senior Noteholders, the Senior Subordinated Noteholders, the New Preferred Stock and/or the New Common Stock, shall be subject to the consent of the Required Backstop Parties and shall be in form and substance reasonably satisfactory to the Creditors' Committee;

(b)    The Equity Commitment Agreement.  The Equity Commitment Agreement shall continue to be in full force and effect, and the conditions to the obligations of the parties thereto shall have been satisfied or waived in accordance therewith;

(c)    Rights Offering.

(i)    The Rights Offering shall have been conducted and consummated in accordance with the Plan, the Equity Commitment Agreement and the Rights Offering Procedures;

(ii)    The Rights Offering Amount shall have been received by the Debtors;

(iii)    The Backstop Parties shall have received the Backstop Warrants, the Holdback Shares and the Rights Offering Shares, if any, in accordance with the terms and conditions of the Equity Commitment Agreement, the Plan and the Rights Offering Procedures;

(iv)    Eligible Noteholders shall have received their respective Rights Offering Shares in accordance with the terms and conditions of the Plan and the Rights Offering Procedures; and

(v)    All fees and expenses due and owing by the Debtors pursuant to the Equity Commitment Agreement and the Rights Offering and Equity Commitment Approval Order shall have been paid, in full and in Cash, without the need for the Backstop Parties to file retention or fee applications with the Bankruptcy Court.

(d)    Authorizations, Consents and Approvals.  All authorizations, consents and regulatory approvals in connection with the consummation of the Plan shall have been obtained and not revoked;

(e)    New Credit Facility Documents.  All conditions to the New Working Capital Facility Documents and the New Secured Debt Facility Documents, (both of which must comply with the requirements of the Equity Commitment Agreement), other than the occurrence of the Effective Date of the Plan, must have been satisfied or waived (such waiver requiring, respectively, the consent of the requisite lenders thereto) pursuant to the terms thereof;

(f)    Subsidiary Debtor General Unsecured Claims. Subsidiary Debtor General Unsecured Claims (excluding the Senior Note Claims and the Senior Subordinated Note Claims) shall not exceed $33 million;

(g)    CCAA Plan of Arrangement. The CCAA Plan shall have become effective in accordance with its terms, the Sanction Order and the CCAA, and the Sanction Order shall have become a Final Order;

(h)    Cooper Tire L/C: The Cooper Tire L/C, if required to be issued pursuant to the terms of the Cooper Tire Settlement Agreement, shall have been issued in accordance with the terms of Cooper Tire Settlement Agreement; and

(i)    Issuance of New Capital Stock and New Capital Warrants. The Debtors shall have issued the New Capital Stock and the New Capital Warrants pursuant to the provisions of the Plan.

### 11.03    **Waiver of Conditions**

Notwithstanding anything to the contrary that may be set forth in the lead in to Section 13.01 of the Plan, the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Consenting Backstop Parties, which will not be unreasonably withheld, and after consultation with the Creditors' Committee, may waive one or more of the conditions precedent to the confirmation or effectiveness of the Plan set forth in sections 13.01 and 13.02 of the Plan, other than the conditions contained in section 13.01(d) and (e) and section 13.02(b), (c) and (d), without any other notice to parties in interest or the Bankruptcy Court and without a hearing; provided, however, that the conditions set forth in sections 13.01(a) and (b) of the Plan and 13.02(a), (c)(i), (c)(ii) and (c)(iv) of the Plan may only be waived by the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Creditors' Committee and the Consenting Backstop Parties, which consent shall not be unreasonably withheld.

### 11.04    **Effect of Failure of Conditions**

If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 180 days after the date the Bankruptcy Court enters the Confirmation Order, or by such later date as is proposed by the Debtors (with the consent of the Consenting Backstop Parties, which shall not be unreasonably withheld) and approved, after notice and a hearing, by the Bankruptcy Court, then upon motion by the Debtors (after consultation with the Consenting Backstop Parties and the Creditors' Committee) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to section 13.04 of the Plan, the Plan will be null and void in all respects, and nothing contained herein or in the Plan will (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors or (b) prejudice in any manner the rights of the Holder of any Claim or Equity Interest in the Debtors.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS OF THE PLAN

12.01 **Retention of Jurisdiction**

The business and assets of the Debtors will remain subject to the jurisdiction of the Bankruptcy Court until the Effective Date. From and after the Effective Date, the Bankruptcy Court will retain and have exclusive jurisdiction of all matters arising out of, and related to the Chapter 11 Cases or the Plan pursuant to, and for purposes of, subsection 105(a) and section 1142 of the Bankruptcy Code and for, among other things, to:

(a) Determine any and all disputes relating to Administrative Expenses, Claims and Equity Interests, including the allowance and amount thereof, and any right to setoff;

(b) Determine any and all disputes among creditors with respect to their Claims;

(c) Determine any and all objections to cure amounts required pursuant to section 8.02 of the Plan;

(d) Consider and allow any and all applications for compensation for professional services rendered and disbursements incurred up to and including the Confirmation Date in connection therewith;

(e) Determine any and all applications, motions, adversary proceedings and contested or litigated matters pending on the Effective Date and arising in or related to the Chapter 11 Cases or the Plan;

(f) Remedy any defect or omission or reconcile any inconsistency in the Plan or the Confirmation Order;

(g) Enforce the provisions of the Plan relating to the distributions to be made hereunder;

(h) Issue such orders, consistent with section 1142 of the Bankruptcy Code, as may be necessary to effectuate the consummation and full and complete implementation of the Plan;

(i) Enforce and interpret any provisions of the Plan;

(j) Determine such other matters as may be set forth in the Confirmation Order or that may arise in connection with the implementation of the Plan;

(k) Determine the amounts allowable as Administrative Expenses pursuant to section 503(b) of the Bankruptcy Code;

(l) Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Rights Offering and any agreements or

documents necessary to effectuate the terms and conditions of the Plan, or any orders entered by the Bankruptcy Court during the pendency of the Chapter 11 Cases;

(m)    Hear and determine any issue for which the Plan or any document related to or ancillary thereto requires a Final Order of the Bankruptcy Court;

(n)    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    Hear and determine any issue related to the composition of the new Board of Directors of each of the Reorganized Debtors;

(p)    Hear any other matter not inconsistent with the Bankruptcy Code; and

(q)    Enter a final decree closing the Chapter 11 Cases.

### 12.02  **Binding Effect**

The provisions of the Plan will be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, any Holder of a Claim or Equity Interest, their respective predecessors, successors, assigns, agents, officers and directors and any other Entity affected by the Plan.  Except as expressly set forth therein, nothing in the Plan is intended to affect or will affect any rights or interests of the DIP Lenders, the DIP Financing Agent, the DIP Original Financing Agent, the Prepetition Credit Facility Parties, or the Prepetition Administrative Agent under the DIP Financing Agreement, the DIP Original Financing Agreement, the DIP Financing Order, or the DIP Original Financing Order, including, without limitation, any waivers, releases, or stipulations contained therein.

### 12.03  **Authorization of Corporate Action**

The entry of the Confirmation Order will constitute a direction and authorization to and of the Debtors or the Reorganized Debtors, as the case may be, to take or cause to be taken any corporate action necessary or appropriate to consummate the provisions of the Plan prior to and through the Effective Date (including the filing of the Reorganized Debtors' Certificates of Incorporation), and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Bankruptcy Court.  Any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, including the approval of the Reorganized Debtors' Certificates of Incorporation by the requisite number of stockholders of each Reorganized Debtor, will, as of the Effective Date, be deemed to have occurred and will be effective as provided in the Plan and will be authorized and approved in all respects without any requirement of further action under applicable law, regulation, order, or rule, including any action by the security holders or directors of the Debtors or the Reorganized Debtors.

### 12.04  **Modification of the Plan**

The Plan may be altered, amended or modified by the Debtors, before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code; provided, however, that no such alterations, amendments or modifications will be made without the consent of the

Consenting Backstop Parties and the Creditors' Committee, which shall not be unreasonably withheld. A Holder of an Allowed Claim that has accepted the Plan will be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder.

### 12.05  **Withdrawal of the Plan**

The Debtors reserve the right at any time prior to the entry of the Confirmation Order, with the consent of the Consenting Backstop Parties and the Creditors' Committee, which must not be unreasonably withheld, to revoke or withdraw the Plan. If the Debtors revoke or withdraw the Plan then the Plan will be deemed null and void. In such event, nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other person, or an admission against interests of the Debtors, nor will it prejudice in any manner the rights of the Debtors or any person in any further proceeding involving the Debtors.

### 12.06  **Non-Voting Stock**

In accordance with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors' Certificates of Incorporation will contain a provision prohibiting the issuance of nonvoting equity securities by each of the Reorganized Debtors, subject to further amendment of such Reorganized Debtor's Certificates of Incorporation as permitted by applicable law.

### 12.07  **Dissolution of the Committee**

On the Effective Date, all Committees will cease to exist and their members and employees or agents (including attorneys, investment bankers, financial advisors, accountants and other professionals) will be released from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases and no subsequent fees will accrue to any Committee, other than in connection with any application for final allowance of compensation and reimbursement of expenses in accordance with section 2.01 of the Plan; provided, however, that following the Effective Date, the Creditors' Committee will continue to have standing and a right to be heard with respect to: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date; and (iii) responding to creditor inquiries for forty-five (45) days following the Effective Date. All reasonable and documented fees and expenses incurred by counsel retained by the Creditors' Committee in connection therewith (other than with regard to any appeal of the Confirmation Order that the Committee is prosecuting or supporting) shall be paid by the Reorganized Debtors without the requirement of any further order of the Bankruptcy Court.

### 12.08  **Record Date for Voting Purposes**

For purposes of determining the Holders of Claims and interests who are entitled to vote on the Plan, the record date will be the date that the Court enters the Order approving the Disclosure Statement or such other date as determined by the Court in such Order.

### 12.09 **Section 1125(e) of the Bankruptcy Code**

The Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon confirmation of the Plan will be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

The Debtors, each of the members of the Creditors' Committee, and each of the Backstop Parties (and each of their respective Affiliates, agents, directors, officers, principals, members, employees, representatives, advisors, attorneys and other professionals) have, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the New Capital Stock under the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 12.10 **Post-Confirmation Obligations**

The Reorganized Debtors will pay fees assessed against each of the Debtors' Estates until entry of an order closing the respective Chapter 11 Cases.

### 12.11 **Severability of Plan Provisions**

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of Debtors, which request will be made in accordance with section 14.04 of the Plan, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Subject to section 14.04 of the Plan and Bankruptcy Rule 3019, notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 12.12 **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, personal representative, successor or assign of such entity.

# ARTICLE XIII.
# CERTAIN RISK FACTORS

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AND THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT AND INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

13.01  **Certain Bankruptcy Law Considerations.**

(a)  The Debtors' Liquidity Position Imposes Significant Challenges to Its Ability to Continue Operations During the Chapter 11 Cases

As global economic conditions have deteriorated, the Debtors have experienced significant pressure on their business, including the Debtors' liquidity position. The Chapter 11 Cases may increase this pressure. Because of the public disclosure of the Debtors' liquidity constraints, the Debtors' ability to maintain normal credit terms with suppliers has become impaired. The terms of the trade credit received from suppliers have been shortened from historical levels. If liquidity problems persist, suppliers could refuse to provide key products and services in the future. The financial condition and results of operations of the Debtors, in particular with regard to the Debtors' potential failure to meet debt obligations, may lead some customers to become reluctant to enter into long-term agreements with the Debtors. In addition to the cash requirements necessary to fund continuing operations, it is anticipated that the Debtors will incur significant professional fees and other restructuring costs in connection with the Chapter 11 Cases and the restructuring of the Debtors' business operations.

The Debtors are currently conducting operations using borrowings from the DIP Facility. There can be no assurance that the amounts of cash from operations and amounts made available under the DIP Facility will be sufficient to fund the Debtors' operations. In the event that cash flows and available borrowings under the DIP Facility are not sufficient to meet the Debtors' liquidity requirements, the Debtors' operations would be adversely affected and the Debtors may not be able to continue as a going concern.

(b)  During the Pendency of the Chapter 11 Cases, the Financial Results of the Debtors May Be Unstable and May Not Reflect Historical Trends

During the pendency of the Chapter 11 Cases, the Debtors' financial results may fluctuate as they reflect asset impairments, asset dispositions, restructuring activities, contract terminations and rejections, and claims assessments. As a result, the historical financial performance of the Debtors may not be indicative of the financial performance following the commencement of the Chapter 11 Cases. Further, the Debtors may sell or otherwise dispose of assets or businesses and liquidate or settle liabilities, with court approval, for amounts other than those reflected in the Debtors' historical financial statements. Any such sale or disposition and any comprehensive restructuring plan could materially change the amounts and classifications reported in the Debtors' historical consolidated financial statements, which do not give effect to

any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of a comprehensive restructuring plan.

(c)     Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(d)     Risk of Non-Confirmation or Modification of the Plan

Although the Debtors believe that the Plan satisfies all requirements necessary for its confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan or any Sub-Plan will not be required for such confirmation or that such modifications would not necessitate the resolicitation of votes.

There can be no assurance that the requisite acceptances of the Plan or any Sub-Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan or any Sub-Plan. The Bankruptcy Court could decline to confirm the Plan or any Sub-Plan if it found that any of the statutory requirements for its confirmation had not been met, including the requirement that the terms of the Plan or any Sub-Plan are fair and equitable to a non-accepting class of Claims or Equity Interests. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things, a finding by the Bankruptcy Court that (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (ii) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and (iii) the value of distributions to a non-accepting Holder of Claims and Equity Interests within a particular class under the plan will not be less than the value of distributions such Holder would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, will not be followed by the need for further financial reorganization and that non-accepting Holders of Claims will receive distributions no less than would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such case under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether a restructuring of the Debtors could be implemented and what distributions Holders of Claims or Equity Interests ultimately would receive with respect to their Claims or Equity Interests. If an alternative reorganization could not be agreed to in the very near term, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that Holders of Claims and

Equity Interests would receive substantially less favorable treatment than they would receive under the Plan.

Holders of Claims or Equity Interests may assert, among other things, that the valuation analysis set forth herein is incorrect or that the Plan is not "fair and equitable" and provides a greater than permitted recovery to certain classes of Claims. Although the Debtors stand by Lazard's valuation analysis, there can be no assurance that any such assertions by Holders of Claims or Equity Interests will not delay the Debtors' emergence from chapter 11 of the Bankruptcy Code or prevent confirmation of the Plan.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms of the Plan as necessary for its confirmation. Such modification could result in a less favorable treatment of any non-accepting class or classes, as well as of any classes junior to such non-accepting classes, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property of a lesser value than currently provided in the Plan to the class affected by the modification or no distribution of property whatsoever to such class under the Plan.

     (e)    The Debtors May Object to the Amount or Classification of a Claim or Equity Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim except any such Claims or Equity Interests that are deemed Allowed under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection. Any Holder of a Claim or Equity Interest that is subject to any objection may not receive its specified share of the estimated distributions described in this Disclosure Statement. In addition, the estimated recoveries included in the Disclosure Statement are based on an estimate of Allowed Claims. Because distributions under the Plan are linked to the amount and value of the Allowed Claims, any material increase in the amount of Allowed Claims over the amounts estimated by the Debtors would materially reduce the recovery to Holders of Allowed Claims under the Plan. The Debtors can make no assurances as to the final Allowed amount of Allowed Claims under the Plan.

     (f)    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur as soon as one (1) Business Day after the date upon which the Confirmation Order becomes a Final Order, there can be no assurance as to such timing. Moreover, if the conditions precedent to the Effective Date have not occurred and have not been waived as provided under the Plan, the Plan would be deemed null and void and the Debtors may propose and solicit votes on an alternative plan of reorganization that may not be as favorable to parties-in-interest as the Plan. In addition, a party-in-interest may appeal the entry of the Confirmation Order, which could prevent the Confirmation Order from becoming a Final Order for an extended period of time.

     (g)    Effect of the Chapter 11 Cases on the Debtors' Businesses

During the Chapter 11 Cases, the Debtors' operations, including the Debtors' ability to execute their business plan, are subject to the risks and uncertainties associated with a chapter 11 bankruptcy. Risks and uncertainties associated with such a proceeding include the following:

- Actions and decisions of the Debtors' creditors and other third parties with interests in the Chapter 11 Cases, which may be inconsistent with the Debtors' plans;

- The Debtors' ability to obtain bankruptcy court approval of this Disclosure Statement, the Plan, or other motions in the proceedings made from time to time;

- The Debtors' ability to develop, prosecute, confirm, and consummate the Plan or other chapter 11 plan of reorganization with respect to the proceedings;

- The Debtors' ability to obtain and maintain commercially reasonable terms with vendors and service providers;

- The Debtors' ability to maintain contracts that are critical to their operations;

- The Debtors' ability to retain management and other key individuals;

- The Debtors' ability to retain the tax refunds relating to the pre-acquisition period; and

- Risks associated with third parties seeking and obtaining court approval to terminate or shorten the Debtors' exclusivity period to propose and confirm a chapter 11 plan of reorganization, to appoint a trustee under Chapter 11, or to convert the Chapter 11 Cases into liquidations under Chapter 7 of the Bankruptcy Code.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' sales and relationships with the Debtors' customers, suppliers, joint venture partners and employees, which in turn could adversely affect the Debtors' operations and financial condition, particularly if the proceedings are protracted. Also, transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, in order to successfully emerge from chapter 11, senior management will be required to spend significant amounts of time assisting with the confirmation of the Plan, instead of concentrating exclusively on business operations. Further, the Debtors have made, and will continue to make, judgments as to whether the Debtors should limit investment in, exit, or dispose of certain businesses. These judgments may result in the sale or divestiture of assets or businesses, but there can be no assurance that the Debtors will be able to complete any sale or divestiture on acceptable terms or at all. Any decision by management to

further limit investment in, exit, or dispose of businesses may result in the recording of additional charges.

Because of the risks and uncertainties associated with the Chapter 11 Cases, the ultimate impact that events that occur during these proceedings will have on the Debtors' business, financial condition and results of operations cannot be accurately predicted or quantified. There can be no assurance as to what values, if any, will be ascribed in the proceedings to the Debtors' various pre-petition liabilities, common stock, and other securities.

The Debtors believe that confirmation and consummation of the Plan in an expeditious manner will result in the Chapter 11 Cases having a minimal adverse long-term impact on relationships with customers, suppliers, joint venture partners and employees of the Debtors or the Reorganized Debtors. If confirmation and consummation of the Plan do not occur expeditiously, continuing the Chapter 11 Cases will result in the loss of business opportunities for the Debtors, which would cause irreparable harm to the Debtors and the Reorganized Debtors. In addition, prolonged Chapter 11 Cases may make it more difficult for the Debtors to retain and attract management and other key personnel and would require senior management to spend an excessive amount of time and effort dealing with the Debtors' financial problems instead of focusing on the operation of their businesses. Moreover, an increased duration of the Chapter 11 Cases will result in increased costs for professional fees and similar expenses.

(h)    A Long Period of Operating in Chapter 11 May Harm the Debtors' Business

A long period of operating under chapter 11 could adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. A prolonged period of operating under chapter 11 will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers, suppliers and joint venture partners will lose confidence in the Debtors' ability to successfully reorganize the Debtors' businesses and seek to establish alternative commercial relationships. Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. A prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing. If the Debtors require additional financing during the Chapter 11 Cases and they are unable to obtain the financing on favorable terms or at all, the Debtors' chances of successfully reorganizing their businesses may be seriously jeopardized.

(i)     Conversion of the Chapter 11 Cases to Chapter 7

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors, the Chapter 11 Cases can be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in no distributions being made to creditors and smaller distributions being made to Holders of Prepetition Credit Facility Claims because of (i) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the Debtors' business as going concerns; (ii) additional administrative expenses involved in the appointment of a trustee; and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations.

(j)     The DIP Financing Agreement Imposes Significant Operating and Financial Restrictions on the Debtors, Compliance or Non-Compliance with Which Could Have a Material Adverse Effect on the Debtors' Liquidity and Operations

Restrictions imposed by the terms of the DIP Financing Agreement could adversely affect the Debtors by limiting their ability to plan for or react to market conditions or to meet its capital needs and could result in an event of default under the DIP Financing Agreement. These restrictions might limit the Debtors' ability, subject to certain exceptions, to, among other things:

- Incur additional indebtedness and issue stock;

- Make prepayments on or purchase indebtedness in whole or in part;

- Pay dividends and other distributions with respect to the Debtors' capital stock or repurchase the Debtors' capital stock or make other restricted payments;

- Make investments;

- Enter into transactions with affiliates on other than arm's-length terms;

- Create or incur liens to secure debt;

- Consolidate or merge with another entity, or allow one of the Debtors' subsidiaries to do so;

- Lease, transfer or sell assets and use proceeds of permitted asset leases, transfers or sales;

- Incur dividend or other payment restrictions affecting subsidiaries;

- Make capital expenditures beyond specified limits;

111

. Engage in specified business activities; and

. Acquire facilities or other businesses.

In addition, the DIP Financing Agreement contains financial covenants that require the Debtors to maintain maximum levels of consolidated earnings before interest, taxes, depreciation, amortization and certain adjustments and minimum levels of consolidated liquidity. These limitations could have a material adverse effect on the Debtors' liquidity and operations. If the Debtors fail to comply with the restrictions under the DIP Financing Agreement and are unable to obtain a waiver or amendment or a default exists and is continuing under the DIP Financing Agreement, the DIP Lenders could declare outstanding borrowings and other obligations under the DIP Financing Agreement immediately due and payable. The Debtors' ability to comply with these restrictions may be affected by events beyond the Debtors' control, and any material deviations from the Debtors' forecasts could require us to seek waivers or amendments of covenants or alternative sources of financing or to reduce expenditures. There can be no assurances that such waivers, amendments or alternative financing could be obtained, or if obtained, would be on acceptable terms to the Debtors. If the Debtors are unable to comply with the terms of the DIP Financing Agreement, or if the Debtors fail to generate sufficient cash flow from operations, or, if it became necessary, to obtain such waivers, amendments or alternative financing, it could adversely impact the timing of, and the Debtors' ultimate ability to successfully implement, the Plan or other chapter 11 plan of reorganization.

(k)     An Involuntary Insolvency Proceeding Could be Commenced Against the Company's Foreign Subsidiaries and/or Affiliates

There can be no assurance that creditors of non-debtor Subsidiaries of the Company will not attempt to commence insolvency proceedings. If an involuntary proceeding is commenced in a foreign jurisdiction in which an Affiliate or Subsidiary of the Debtors operates, an administrator or foreign trustee would be appointed to take control of the non-Debtor foreign operating companies, supplanting the role of the Debtors' current management and supervisory boards that currently oversee the operations and restructuring efforts of the foreign non-Debtor Affiliates. In addition, an involuntary foreign insolvency proceeding of the foreign non-Debtor Affiliates would result in a substantial loss of cumulative value of the Debtors' non-Debtor Affiliates and consequently of the value of the collateral securing the Prepetition Credit Facility Claims and the value of the Senior Subordinated Noteholder Rights and the New Common Stock that the Holders of the Senior Subordinated Note Claims and Supporting Senior Note Claims would receive pursuant to the Plan.

(l)     The Canadian Court in the CCAA Proceeding May Not Extend the Stay Under the CCAA Proceeding and CSA Canada May Be Subject to Involuntary Liquidation

There can be no assurance that the Canadian Court in the CCAA Proceeding will extend the stay applicable to CSA Canada in connection with the CCAA Proceeding. The creditors of CSA Canada may seek to lift the stay in the CCAA Proceeding and file an application for a bankruptcy order under the Bankruptcy and Insolvency Act (Canada) for the liquidation of CSA Canada or seek the appointment of a Receiver or Receiver-Manager over CSA Canada.

(m)    The Canadian Court May Not Sanction the CCAA Plan or the CCAA Plan May Not Be Implemented

There can be no assurance that the Canadian Court in the CCAA Proceeding will sanction the CCAA Plan, or that the condition precedent to the implementation may be satisfied or waived.  If the CCAA Plan is not sanctioned by the Canadian Court, or implemented in accordance with its terms, it is unclear whether a restructuring of CSA Canada could be implemented and what impact the non-sanctioning or non-implementation would have on the Chapter 11 Cases.

### 13.02    Risks Related to the Debtors' Business

(a)    The Automotive Industry

The Debtors' principal operations are directly related to domestic and foreign automotive production.  Industry sales and production are cyclical in nature, difficult to predict and can be affected by numerous factors, including, but not limited to, the strength of the economy generally, consumer spending or, in specific regions such as North America or Europe, by prevailing interest rates and by other factors which may have an effect on the level of the Debtors' sales.  The Projections set forth in this Disclosure Statement assume certain automotive sales and production levels and economic conditions that ultimately may not occur.  Any decline in demand for new automobiles, particularly in the United States, could have a material adverse impact on the Debtors, or the Reorganized Debtors', as the case may be, performance and financial condition and could adversely impact their results of operations.

In that regard, the recent global financial crisis and the dislocation in the global credit markets has had a major impact on the global economy and has resulted in a global economic recession.  Business activity and production across the world have undergone a major negative readjustment due to the shortage of affordable financing, which has led to drastically higher unemployment numbers and weaker consumer spending.  The high unemployment rate among consumers has been exacerbated by the lingering housing crisis and the significant decline in the value of residential and commercial real estate.

Due to the global economic recession, sale and production levels in the automotive industry declined substantially in the second half of 2008 and through the first half of 2009.  These levels are not expected to recover to pre-recession levels in the near future.  In that regard, the reduction of automotive sales and production combined with the overall reduction of business activity throughout the world has had an adverse impact on the Company's revenues, profitability, cash flow and operations.  There is no guarantee that the condition of the global economy and automotive industry will not deteriorate even further, and any such continued deterioration will also have an adverse impact on the Debtors' business or financial condition.

(b)    Dependence on Major Customers

The loss of any major customers could affect the financial health of the Debtors.  In the nine months ended September 30, 2009, the Debtors' most significant customers were Ford and GM, which accounted for approximately 43% of its net sales on a worldwide basis.  In addition, the Debtors' five largest customers (Ford, GM, Volkswagen, Fiat, and Chrysler) and

their subsidiaries accounted for approximately 65% of the Debtors' global sales for the nine months ended September 30, 2009.  The Debtors have been a supplier to these companies for many years, and continually engage in efforts to improve and expand relations with each of these customers.  However, the Debtors' management cannot guarantee that the Debtors will maintain or improve these relationships or that the Debtors will continue to supply their customers at current levels.  The loss of a significant portion of sales to the Debtors' largest customers could have a material adverse effect on the Debtors and their financial performance.  In addition, certain of the Debtors' customers are currently facing significant financial challenges.  GM and Chrysler have recently emerged from chapter 11 bankruptcy protection and bankruptcy filings or restructuring initiatives by other customers could result in adverse changes in customers' production levels, pricing, and payment terms, could impair their viability as customers of the Debtors, and could limit the Debtors' ability to collect receivables, which could harm the Debtors' business or results of operations.  Absent the foregoing risks, which are outside of the Debtors' control, the Debtors believe that relationships with their customers will be maintained if the Chapter 11 Cases proceed as proposed in the Plan and discussed herein.  However, if there is a protracted chapter 11 process, the Debtors believe their relationships with their customers likely would be adversely impacted and the Debtors' operations likely would be materially affected.  Weakened operating results could adversely affect the Debtors' ability to complete solicitation of acceptances of the Plan or, if such solicitation is successfully completed, to obtain confirmation of the Plan.

       (c)     A Prolonged Contraction in Automotive Sales and Production Volumes and the Financial Conditions of OEMs Could Adversely Affect the Viability of the Debtors' Supply Base

       The Debtors' suppliers are subject to many of the same consequences that would impact the Debtors as a result of a prolonged contraction in automotive sales and production volumes.  In addition, many of the Debtors' suppliers also directly supply to Ford, GM and Chrysler, and the financial condition of these OEMs could impact the collectability of their accounts receivable. Depending on each supplier's financial condition and access to capital, its viability could be threatened by such conditions or events which could impact its ability to meet its contractual commitments to the Debtors and consequently impact their ability to meet their own commitments to their customers.  There is no assurance that the Debtors would be able to establish alternative sources of supply in time to meet such commitments and avoid potential penalties and damages that could result from such failure.

       (d)     The Debtors Could Be Adversely Affected If They Are Unable to Continue to Compete Successfully in the Automotive Parts Industry

       The automotive parts industry is highly competitive.  The Debtors face numerous competitors in each of the product lines the Debtors serve.  In general, there are three or more significant competitors for most of the products offered by the Company and numerous smaller competitors.  The Debtors also face increased competition for certain of their products from suppliers producing in lower-cost countries such as Korea and China, especially for certain lower-technology noise, vibration and harshness control products that have physical characteristics that make long-distance shipping more feasible and economical.  The Debtors

may not be able to continue to compete favorably and increased competition in the Debtors' markets may have a material adverse effect on the Debtors' businesses.

(e)     Disruption in the Financial Markets Are Adversely Impacting the Availability and Cost of Credit Which Could Continue to Negatively Affect the Debtors' Businesses

Disruptions in the financial markets, including the bankruptcy, insolvency or restructuring of certain financial institutions, and the general lack of liquidity continue to adversely impact the availability and cost of incremental credit for many companies, including us, and may adversely affect the availability of credit already arranged including, in our case, credit already arranged under our DIP Financing Agreement.   These disruptions are also adversely affecting the U.S. and world economy, further negatively impacting consumer spending patterns in the automotive industry. In addition, as our customers and suppliers respond to rapidly changing consumer preferences, they may require access to additional capital. If required capital is not obtained or its cost is prohibitively high, their business would be negatively impacted which could result in further restructuring or even reorganization under bankruptcy laws. Any such negative impact, in turn, could negatively affect our business, either through loss of sales to any of our customers so affected or through inability to meet our commitments (or inability to meet them without excess expense) because of our suppliers' inability to perform.

(f)     The Reorganized Debtors May Incur Financial Liability with Respect to their Customer Programs and Warranties

The Debtors may be exposed to product liability and warranty claims in the event that their products actually or allegedly fail to perform as expected or the use of their products results, or is alleged to result, in bodily injury and/or property damage. Accordingly, the Debtors could experience material warranty or product liability losses in the future and incur significant costs to defend these claims.

In addition, if any of the Debtors products are, or are alleged to be, defective, the Debtors may be required to participate in a recall of that product if the defect or the alleged defect relates to automotive safety.   The Debtors' costs associated with providing product warranties could be material.   Product liability, warranty, and recall costs may have a material adverse effect on the Debtors' business, results of operations, and financial condition.

(g)     Key Personnel

The Debtors' ability to operate their businesses and implement their strategies depends, in part, on the efforts of their key employees. The severe down turn in the auto industry may add additional pressure to the Debtors' ability to retain key employees.   In addition, the Debtors' future success will depend on, among other factors, the Debtors' ability to attract and retain other qualified personnel.   The loss of the services of any of the Debtors' key employees or the failure to attract or retain other qualified personnel could have a material adverse effect on their businesses or business prospects.

(h)     Litigation

The Debtors are periodically involved in claims, litigation and various legal matters that arise in the ordinary course of business. Each of these matters is subject to various uncertainties, and some of these matters may be resolved unfavorably with respect to the Debtors. A reserve estimate is established for each matter and updated as additional information becomes available. The Debtors do not believe that the ultimate resolution of any of these matters will have a material adverse effect on their financial condition, results of operations, or cash flows.

(i)     Increasing Costs for or Reduced Availability of Manufactured Components and Raw Materials May Adversely Affect the Debtors' Profitability

The principal raw materials that the Debtors purchase include fabricated metal-based components, synthetic rubber, carbon black, and natural rubber. Raw materials comprise the largest component of the Debtors' costs, representing approximately 55.6% of the Debtors' total costs during the nine months ended September 30, 2009. A significant increase in the price of these items could materially increase the Debtors' operating costs and materially and adversely affect the Debtors' profit margins because it is generally difficult to pass through these increased costs to their customers. For example, the Debtors have experienced significant price increases in their raw steel and steel-related components purchases as a result of increased global demand. While these increases fell off in the second half of 2008, continued volatility in the global market presents risk in forecasting cost.

Because the Debtors purchase various types of raw materials and manufactured components, they may be materially and adversely affected by the failure of their suppliers of those materials to perform as expected. This non-performance may consist of delivery delays or failures caused by production issues or delivery of non-conforming products. The risk of non-performance may also result from the insolvency or bankruptcy of one or more of their suppliers. The Debtors' suppliers' ability to supply products to the Debtors is also subject to a number of risks, including availability of raw materials, such as steel and natural rubber, destruction of their facilities, or work stoppages. In addition, the Debtors' failure to promptly pay, or order sufficient quantities of inventory from their suppliers may increase the cost of products they purchase or may lead to suppliers refusing to sell products to them at all. The Debtors' efforts to protect against and to minimize these risks may not always be effective.

The Debtors consider the production capacities and financial condition of suppliers in their selection process, and expect that they will meet the Debtors' delivery requirements. However, there can be no assurance that strong demand, capacity limitations, shortages of raw materials or other problems will not result in any shortages or delays in the supply of components to the Debtors.

(j)     The Debtors Are Subject to Other Risks Associated with Their Non-U.S. Operations

The Debtors have significant manufacturing operations outside the United States, including joint ventures and other alliances. The Debtors' operations are located in 18 countries and they export to several other countries. As of September 30, 2009, approximately 74% of the

Debtors' net sales originated outside the United States. Risks are inherent in international operations, including:

.     exchange controls and currency restrictions;

.     currency fluctuations and devaluations;

.     changes in local economic conditions;

.     changes in laws and regulations, including the imposition of embargos;

.     exposure to possible expropriation or other government actions; and

.     unsettled political conditions and possible terrorist attacks against American interests.

These and other factors may have a material adverse effect on the Debtors' international operations or on the Debtors' businesses, results of operations, and financial condition. For example, the Debtors are faced with potential difficulties in staffing and managing local operations and they have to design local solutions to manage credit risks of local customers and distributors. Also, the cost and complexity of streamlining operations in certain European countries is greater than would be the case in the United States, due primarily to labor laws in those countries that can make reducing employment levels more time-consuming and expensive than in the United States. The Debtors' flexibility in their foreign operations can also be somewhat limited by agreements they have entered into with their foreign joint venture partners.

The Debtors' overall success as a global business depends, in part, upon their ability to succeed in differing economic, social, and political conditions. The Debtors may not continue to succeed in developing and implementing policies and strategies that are effective in each location where they do business, and failure to do so could harm their businesses, results of operations, and financial condition.

The Debtors' sales outside the United States expose them to currency risks. During times of a strengthening U.S. dollar, at a constant level of business, the Debtors' reported international sales and earnings will be reduced because the local currency will translate into fewer U.S. dollars. In addition to currency translation risks, the Debtors incur a currency transaction risk whenever one of their operating subsidiaries enters into either a purchase or a sales transaction using a different currency from the currency in which it receives revenues. Given the volatility of exchange rates, the Debtors may not be able to manage their currency transaction and/or translation risks effectively, or volatility in currency exchange rates may have a material adverse effect on the Debtors' financial condition or results of operations.

(k)     The Debtors' Import and Export Compliance

The Debtors operate a globally integrated business that requires the cross border movement of both finished goods and parts thereof. The cross border movement of goods is subject to a broad range of laws and regulations related to the customs process, some of which

117

are specific to the integrated structure of the automotive industry. In addition, the government of each respective jurisdiction where the Debtors do business can impose controls and prohibitions on the goods themselves, as well as their destination. Governments also impose restrictions and prohibitions on specific countries and individuals that their nationals can do business with and the restrictions imposed in one jurisdiction may conflict with those imposed in another jurisdiction where the Debtors do business. Failure to comply with these laws and regulations can lead to significant liability including, but not limited to, substantial fines and criminal charges. As the Debtors operate a globally integrated automotive parts business it is difficult to assess each subsidiary's import/export compliance and correspondingly difficult to precisely assess the potential for liability. The Debtors may have undiscovered liability related to the cross border movement of goods, which, if discovered by the Debtors or the relevant government authority, may materially affect the Debtors' financial condition, as well as disrupt the Debtors' business procedures.

> (l)     The Debtors' Lean Manufacturing and Other Cost Savings Plans May Not Be Effective

The Debtors' operations strategy includes cutting costs by reducing product errors, inventory levels, operator motion, overproduction, and waiting while fostering the increased flow of material, information, and communication. The cost savings that the Debtors anticipate from these initiatives may not be achieved on schedule or at the level anticipated by management. If the Debtors are unable to realize these anticipated savings, their operating results and financial condition may be adversely affected. Moreover, the implementation of cost saving plans and facilities integration may disrupt the Debtors' operations and performance.

> (m)     Work Stoppages or Similar Difficulties Could Disrupt the Debtors' Operations

As of September 30, 2009, approximately 41% of the Debtors' employees were represented by unions, and approximately 13% of their employees were union represented employees located in the United States. It is possible that the Debtors' workforce will become more unionized in the future. A work stoppage at one or more of the Debtors' plants may have a material adverse effect on the Debtors' businesses. Unionization activities could also increase the Debtors' costs, which could have an adverse effect on their profitability. The Debtors may be subject to work stoppages and may be affected by other labor disputes. Additionally, a work stoppage at one or more of the Debtors' customers or their customers' suppliers could adversely affect the Debtors' operations if an alternative source of supply were not readily available. Stoppages by employees of the Debtors' customers also could result in reduced demand for their products and have a material adverse effect on their businesses.

> (n)     The Debtors' Intellectual Property Portfolio May Be Subject to Legal Challenges

The Debtors have developed and actively pursue developing proprietary technology in the automotive industry and rely on intellectual property laws and a number of patents in many jurisdictions to protect such technology. However, the Debtors may be unable to prevent third parties from using the Debtors' intellectual property without authorization. If the

Debtors had to litigate to protect these rights, any proceedings could be costly, and they may not prevail. The Debtors also face increasing exposure to the claims of others for infringement of intellectual property rights. The Debtors may have material intellectual property claims asserted against them in the future and could incur significant costs or losses related to such claims.

(o)    The Debtors' Success Depends in Part on Their Development of Improved Products, and the Debtors' Efforts May Fail to Meet the Needs of Customers on a Timely or Cost-Effective Basis

The Debtors' continued success depends on their ability to maintain advanced technological capabilities, machinery, and knowledge necessary to adapt to changing market demands as well as to develop and commercialize innovative products. The Debtors may not be able to develop new products as successfully as in the past or be able to keep pace with technological developments by their competitors and the industry generally. In addition, the Debtors may develop specific technologies and capabilities in anticipation of customers' demands for new innovations and technologies. If such demand does not materialize, the Debtors may be unable to recover the costs incurred in such programs. If the Debtors are unable to recover these costs or if any such programs do not progress as expected, their business, financial condition, or results of operations could be materially adversely affected.

(p)    The Debtors Are Subject to a Broad Range of Environmental, Health, and Safety Laws and Regulations, Which Could Adversely Affect Their Businesses and Results of Operations

The Debtors are subject to a broad range of federal, state, and local environmental and occupational safety and health laws and regulations in the United States and other countries, including those governing emissions to air, discharges to water, noise and odor emissions; the generation, handling, storage, transportation, treatment, and disposal of waste materials; the cleanup of contaminated properties; and human health and safety. The Debtors may incur substantial costs associated with hazardous substance contamination or exposure, including cleanup costs, fines, and civil or criminal sanctions, third party property or natural resource damage, or personal injury claims, or costs to upgrade or replace existing equipment, as a result of violations of or liabilities under environmental laws or the failure to maintain or comply with environmental permits required at the Debtors' locations. In addition, many of the Debtors' current and former facilities are located on properties with long histories of industrial or commercial operations and some of these properties have been subject to certain environmental investigations and remediation activities. The Debtors maintain environmental reserves for certain of these sites, which the Debtors believe are adequate. Because some environmental laws (such as the Comprehensive Environmental Response, Compensation and Liability Act) can impose liability retroactively and regardless of fault, on potentially responsible parties for the entire cost of cleanup at currently or formerly owned and operated facilities, as well as sites at which such parties disposed or arranged for disposal of hazardous waste, the Debtors could become liable for investigating or remediating contamination at its current or former properties or other properties (including offsite waste disposal locations). The Debtors may not always be in complete compliance with all applicable requirements of environmental law or regulation, and they may receive notices of violation or become subject to enforcement actions or incur material costs or liabilities in connection with such requirements. In addition, new environmental

requirements or changes to interpretations of existing requirements, or in their enforcement, could have a material adverse effect on the Debtors' businesses, results of operations, and financial condition. For example, while the Debtors are not large emitters of greenhouse gases, laws, regulations and certain regional initiatives under consideration by the U.S. Congress, the U.S. Environmental Protection Agency, and various states, and in effect in certain foreign jurisdictions, could result in increased operating costs to control and monitor such emissions. The Debtors have made and will continue to make expenditures to comply with environmental requirements. While the Debtors' costs to defend and settle claims arising under environmental laws in the past have not been material, such costs may be material in the future.

### 13.03  **Factors Affecting the Value of the Securities**

(a)     The Projections set forth in this Disclosure Statement May Not be Achieved

The Projections cover the operations of the Reorganized Debtors through the period ending December 31, 2013. The Projections are based on numerous assumptions that are an integral part thereof, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary product development and capital expenditures, the ability to establish strength in new markets and to maintain, improve and strengthen existing markets, consumer purchasing trends and preferences, the ability to increase gross margins and control future operating expenses and other matters, many of which are beyond the control of the Reorganized Debtors, including regulatory actions, and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the operations of the Reorganized Debtors. These variations may be material and adverse. Because the actual results achieved throughout the periods covered by the Projections will vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

(b)     The New Working Capital Credit Facility and the New Secured Debt Facility May Impose Restrictions on the Reorganized Debtors' Businesses

The New Working Capital Agreement and the New Secured Debt Financing Agreement may contain covenants imposing significant restrictions on the Reorganized Debtors' businesses. These restrictions may affect the Reorganized Debtors' ability to operate their businesses and may limit their ability to take advantage of potential business opportunities as they arise. The Reorganized Debtors' ability to comply with these agreements may be affected by events beyond their control, including prevailing economic, financial and industry conditions, all of which are subject to the risks described in this section. The breach of any of these covenants or restrictions could result in a default under the New Working Capital Credit Agreement and/or the New Secured Debt Agreement. An event of default under the New Working Capital Credit Agreement and/or the New Secured Debt Financing Agreement may permit some of the Reorganized Debtors' lenders to declare all amounts borrowed from them to be immediately due and payable. In such case, the Reorganized Debtors may be unable to pay

such amounts. In addition, due to various business, financial, economic or other factors, the Reorganized Debtors may be unable to make payments required under the New Working Capital Agreement and/or the New Secured Debt Financing Agreement as they become due, including repaying the principal amount thereof.

(c)     Post-Emergence Leverage

The Debtors will be materially leveraged upon emergence from chapter 11. The Debtors' high degree of leverage could have important consequences, including:

.     It may limit the Debtors' ability to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions, and general corporate or other purposes on favorable terms or at all;

.     A substantial portion of the Debtors' cash flows from operations must be dedicated to the payment of principal and interest on the Debtors' indebtedness and thus will not be available for other purposes, including the Debtors' operations, capital expenditures, and future business opportunities;

.     It may place the Debtors at a competitive disadvantage compared to those of their competitors that are less highly leveraged;

.     It may restrict the Debtors' ability to make strategic acquisitions or cause them to make non-strategic divestitures; and

.     The Debtors' may be more vulnerable than a less highly-leveraged company to a downturn in general economic conditions or in the Debtors' businesses, or the Debtors may be unable to carry out the desired amount of capital spending to support the Debtors' growth.

(d)     Absence of Market for Shares of the New Common Stock, New Preferred Stock and New Capital Warrants

Shares of the New Capital Stock and the New Capital Warrants are newly issued securities for which there is no established trading market and there can be no assurance that a trading market for these securities will develop. In addition, there is no public market for shares of the New Capital Stock and the New Capital Warrants and such a public market may not develop following the issuance of these securities. Accordingly, no assurance can be given as to the ability of Holders of shares of the New Capital Stock and the New Capital Warrants to sell such securities or the price that Holders may obtain for such securities.

(e)     The Backstop Parties May Acquire a Significant Degree of Influence over the Matters Presented to Shareholders

The Backstop Parties may acquire a significant degree of influence over the matters that are presented to shareholders of Reorganized Holdings pursuant to Holdings'

Reorganized Debtor Certificate of Incorporation and the Reorganized Holdings By-laws. In accordance with the Plan, the Backstop Parties may acquire, upon conversion of the New Preferred Stock and the exercise of the Backstop Warrants, approximately 90%, of the shares of New Common Stock if the Backstop Purchasers were to purchase all of the $355 million of New Capital Stock for which it has provided a backstop commitment or is entitled to under the Equity Commitment Agreement.

(f)     Holders of Shares of New Capital Stock and Backstop Warrants Will Be Restricted in Their Ability to Transfer or Resell such Shares

The New Capital Stock issued pursuant to the Rights Offering and the Backstop Warrants will be exempt from registration under the Securities Act and applicable state securities laws. The New Capital Stock and Backstop Warrants will not be registered under the Securities Act and, therefore, until Reorganized Holdings fulfills its obligations to register the New Capital Stock and Backstop Warrants under the Plan or the Registration Rights Agreement, holders of shares of New Capital Stock issued pursuant to the Rights Offering and Backstop Warrants may only offer or sell the shares pursuant to an exemption from, or in transactions not subject to, the registration requirements of the Securities Act and applicable state securities laws or pursuant to an effective registration statement. In addition, the Debtors cannot assure that Reorganized Holdings will be able to register the New Capital Stock and the Backstop Warrants in the manner and at the times contemplated by the Plan and the Registration Rights Agreement.

(g)     Reorganized Holdings' Ability to Pay Any Dividends on the New Common Stock and the New Preferred Stock will be Limited

Reorganized Holdings cannot assure the Holders of the New Common Stock and New Preferred Stock that it will be able to pay dividends. Reorganized Holdings' ability to pay any cash or non-cash dividends on its stock is subject to the availability of adequate cash (or other consideration) to pay dividends, applicable provisions of state law and the terms of the New Working Capital Facility and the New Secured Debt Financing Facility and any other financing instruments or arrangements that it or its Affiliates or Subsidiaries may enter into in the future. Furthermore, even if Reorganized Holdings has such cash or non-cash property available and provisions and terms of its financing agreements would not be violated by the payment of dividends, the payment of any dividend is subject to the discretion of the board of directors of Reorganized Holdings.

**ALTHOUGH THE DEBTORS' MANAGEMENT HAS USED ITS REASONABLE BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, SOME OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND IS BASED UPON AN ANALYSIS OF DATA AVAILABLE AT THE TIME OF THE PREPARATION OF THE PLAN AND THIS DISCLOSURE STATEMENT. WHILE THE DEBTORS' MANAGEMENT BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS, THE DEBTORS' MANAGEMENT IS UNABLE TO REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN AND ATTACHED HERETO IS WITHOUT INACCURACIES.**

THESE RISK FACTORS CONTAIN CERTAIN FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING, AMONG OTHERS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.    ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

## ARTICLE XIV.
## APPLICATION OF SECURITIES ACT

14.01    **Issuance and Resale of New Securities Under the Plan**

(a)    Section 1145 of the Bankruptcy Code

Section 1145 of the Bankruptcy Code generally exempts the issuance of a security from registration under the Securities Act (and any equivalent state securities or "blue sky" laws) if the following conditions are satisfied: (i) the security is issued by a debtor (or its successor) under a chapter 11 plan, (ii) the recipient of the security holds a claim against, an interest in, or a claim for an administrative expense against, the debtor and (iii) the security is issued entirely in exchange for such claim or interest, or is issued "principally" in exchange for such claim or interest and "partly" for cash or property.

Section 1145 is not available to any entity that is defined as an underwriter as defined in section 1145(b) of the Bankruptcy Code.  Section 1145(b) of the Bankruptcy Code defines "underwriter" as an entity who: (A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest; (B) offers to sell securities offered or sold under a plan for the Holder of such securities; (C) offers to buy securities offered or sold under a plan from the Holder of such securities, if such offer to buy is (i) with a view to distribution of such securities, and (ii) under an agreement made in connection with the plan, with the consummation of a plan, or with the offer or sale of securities under a plan; or (D) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities.  Issuer for these purposes is defined as any person who, directly or indirectly, controls, is controlled by, or is under direct or indirect common control with, the issuer.  "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

Securities exempt from registration under section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(l) of the Securities Act, which provides that the registration provisions of the Securities Act do not apply to transactions by persons other than issuers, underwriters or dealers  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  **However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration in any given instance and as to any applicable requirements or conditions to such availability.**

Securities distributed under the Plan to affiliates of the Company, meaning persons in a "control" relationship with the Company as defined above, would not be eligible for the exemption of section 1145.  However, affiliates who receive securities under the Plan that would otherwise qualify for the exemption of section 1145 might still be able to sell those securities without registration pursuant to Rule 144 of the Securities Act.  Rule 144 allows a holder of securities that is an affiliate of the issuer that is in compliance with the reporting requirements of Rule 144 of such securities to sell, without registration, within any three-month period a number of such securities that does not exceed the greater of one percent (1%) of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four (4) calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer.

There can be no assurance that an active market for any of the securities to be distributed under the Plan will develop and no assurance can be given as to the prices at which they might be traded.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.**

**MOREOVER, SUCH SECURITIES, OR THE DOCUMENTS THAT ESTABLISH THE TERMS AND PROVISIONS THEREOF, MAY CONTAIN TERMS AND LEGENDS THAT RESTRICT OR INDICATE THE EXISTENCE OF RESTRICTIONS ON THE TRANSFERABILITY OF SUCH SECURITIES.**

**THE DEBTORS RECOMMEND THAT RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT WITH LEGAL COUNSEL CONCERNING THE LIMITATIONS ON THEIR ABILITY TO DISPOSE OF SUCH SECURITIES.**

14.02  **New Common Stock, New Preferred Stock, New Capital Warrants**

The Plan provides that (i) all Old Holdings Equity Interests will be cancelled as of the Effective Date and (ii) Holders of Allowed Senior Subordinated Note Claims and Supporting Senior Note Claims will receive distributions of New Common Stock and Holders of Allowed Senior Subordinated Note Claims will receive the Senior Subordinated Noteholder Warrant Distribution.

The Debtors believe that (i) the New Common Stock being distributed pursuant to the Senior Subordinated Noteholder Stock Distribution and the Non-Eligible Noteholder Shares and (ii) the New Capital Warrants being distributed pursuant to the Senior Subordinated Noteholder Warrant Distribution, are exempt from the registration requirements of the Securities Act and equivalent state securities or "blue sky" laws pursuant to the exemption, and subject to exceptions and limitations, contained in section 1145 of the Bankruptcy Code, as described in section 14.01 of Article XIV "Application of Securities Act."

14.03  **Rights Offering: Rights Offering Shares, Holdback Shares and Backstop Warrants**

The Rights Offering is described in section 9.05 of the Plan and above in section 7.05 of this Disclosure Statement. Pursuant to the Rights Offering, the Debtors will issue Senior Subordinated Noteholder Rights to purchase the Rights Offering Shares to Eligible Noteholders of Allowed Senior Subordinated Note Claims. The Backstop Parties, pursuant to the Equity Commitment Agreement, have agreed to purchase all Rights Offering Shares that are not subscribed for in the Rights Offering. The Backstop Parties will also receive the Holdback Shares and the Backstop Warrants as consideration for their commitment under the Equity Commitment Agreement. The Debtors believe that the Rights Offering Shares, the Holdback Shares and the Backstop Warrants are exempt from registration under the Securities Act, pursuant to an exemption from the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

## ARTICLE XV.
## FINANCIAL PROJECTIONS, VALUATION AND ASSUMPTIONS USED

The projected financial and valuation information set forth below and on the attached Appendix A (the "Projections") should be read in conjunction with the assumptions, qualifications, limitations and explanations set forth herein and the other information set forth herein.[11]

---

[11]  Further information regarding the Debtors' historical financial information, as well as business, is set forth in Holdings' Form 10-K for the fiscal year ended December 31, 2008, Holdings' Form 10-Q for the quarterly period ended September 30, 2009, Holdings' Form 10-Q for the quarterly period ended June 30, 2009, and Holdings' Form 10-Q for the quarterly period ended March 31, 2009 which are attached to this Disclosure Statement as Appendices D, E, F, and G, respectively.

15.01  **Valuation of the Debtors**

THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO THE REORGANIZED DEBTORS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.

    (a)      Overview

       The Debtors have been advised by Lazard, their financial advisor, with respect to the potential consolidated Enterprise Value (as hereinafter defined), expressed as a range of values, of the Reorganized Debtors on a going-concern basis. Lazard undertook this valuation analysis for the purpose of determining value available for Distribution to Holders of Allowed Claims pursuant to the Plan and to analyze the potential relative recoveries to such Holders thereunder. The estimated total value available for Distribution (the "Distributable Value") to Holders of Allowed Claims is based upon the estimated value of the Reorganized Debtors' operations on a going concern basis (the "Enterprise Value," as identified above).

       Based solely on information provided by the Debtors and publicly available information, Lazard has concluded solely for purposes of the Plan that the estimated Distributable Value of the Reorganized Debtors ranges from  $975 million to $1,075 million, with a mid-point estimate of approximately $1,025 million as of an assumed Effective Date of May 1, 2010. Based on an assumed net debt balance of approximately $430 million on the Effective Date, an estimated value of $128 million for the New Preferred Stock, an estimated value of $21 million for the New Capital Warrants and the assumed mid-point Enterprise Value estimate of approximately $1,025 million, Lazard's estimated Distributable Value implies an estimated mid-point value for the New Common Stock of approximately $446 million. Assuming 17,486,990 shares of New Common Stock are distributed to the Holders of Allowed Claims, participants in the Rights Offering and the Backstop Parties pursuant to the Plan, the estimated mid-point value of New Common Stock is equal to $25.52 per share. These values do not give effect to the potentially dilutive impact of (a) any additional shares issued pursuant to the plan as compensation to Senior Subordinated Noteholders who are not Qualified Institutional Investors or Accredited Investors, and thus unable to participate in the Rights Offering or (b) any shares granted, or issued upon exercise of any options that may be granted, under a long-term incentive plan which the Board of Directors of the Reorganized Debtors may authorize for management of the Reorganized Debtors. Lazard's estimates of Enterprise Value and Distributable Value do not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

       THE ESTIMATED DISTRIBUTABLE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF MAY 1, 2010, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION PROVIDED BY THE REORGANIZED DEBTORS AND PUBLICLY AVAILABLE INFORMATION AS OF FEBRUARY 26, 2010. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S

CONCLUSIONS, NEITHER LAZARD NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM SUCH ESTIMATES.

With respect to the Projections (as defined below) prepared by the management of the Debtors and included in this Disclosure Statement, Lazard assumed that such Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's Distributable Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including EBITDA growth and improvements in EBITDA margins, earnings and cash flow. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value.

In estimating the Enterprise Value and Distributable Value of the Reorganized Debtors, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Projections as described in this Disclosure Statement, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Reorganized Debtors' business and its prospects; (c) met with members of senior management to discuss the Debtors' operations and future prospects; (d) reviewed extensive publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Debtors; (e) considered certain economic and industry information relevant to the operating business; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. For all purposes of its valuation analysis, Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.

In addition, Lazard did not independently verify management's Projections, or any other information, in connection with its valuation analysis, and no independent valuations or appraisals of the Reorganized Debtors were sought or obtained in connection herewith.

Lazard's analysis addresses the estimated going-concern Enterprise Value of the Debtors and does not value other contingent assets such as any potential value related to certain potential tax attributes, including NOLs. It does not address other aspects of the proposed reorganization, the Plan or any other transactions, and it does not address the Debtors' underlying business decision to effect the reorganization set forth in the Plan. Lazard's valuation analysis does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to nor did Lazard express any view as to what the value of the Debtors' securities will be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Such estimates reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating

business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, Lazard, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by pre-petition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors which generally influence the prices of securities.

(b)     Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values and Distributable Values for the Reorganized Debtors. Lazard performed certain procedures, including each of the financial analyses described below, and reviewed with the management of the Debtors the assumptions on which such analyses were based. Lazard's valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusion as to Enterprise Value.

Under the valuation methodologies summarized below, Lazard derived a range of Enterprise Values for the Reorganized Debtor's consolidated global operations and its unconsolidated joint venture interests (the "Minority JV's") to arrive at a consolidated Enterprise Value range.

(i)     Comparable Company Analysis

Comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, observed enterprise values and equity values for selected public companies are commonly expressed as multiples of various measures of earnings, most commonly earnings before interest, taxes, depreciation and amortization ("EBITDA"), earnings before interest and taxes ("EBIT") and net income. In addition, each company's operational performance, operating margins, profitability, leverage and business trends are examined. Based on these analyses, financial multiples and ratios are calculated to measure each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics: similar lines of businesses, customers, business risks, growth prospects, maturity of businesses, location, market presence and scale of operations. The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value,

which, when coupled with other approaches, presents a foundation for estimating Enterprise Value.

Lazard selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Debtors in one or more of the factors described above: American Axle & Manufacturing Holdings, Inc., ArvinMeritor, Inc., Autoliv, Inc., BorgWarner Inc., Continental AG, Dana Holding Corp., Exide Technologies, Federal-Mogul Corp, Magna International Inc., Martinrea International Inc., Tenneco Inc., TRW Automotive Holdings Corp. and Valeo.

Using publicly available information, Lazard calculated multiples of enterprise value to EBITDA for the latest twelve months ended ("LTM") December 31, 2009; and each of the calendar years ended 2010 through 2012 for the Peer Group by dividing the enterprise values of each comparable company as of February 26, 2010, by their reported LTM and projected 2010-2012 EBITDA, as estimated by equity research analysts and reported by Institutional Brokers' Estimate System (IBES). Given the significant disruptions in the automotive sector that began in 2008 and continued in 2009, including the bankruptcies of General Motors Corporation and Chrysler Corporation, Lazard's valuation analysis was more heavily focused on 2010 - 2012 multiples.

In determining the applicable enterprise value multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue and EBITDA results, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, and similarity in business lines.

Having calculated these statistics, Lazard then applied the range of multiples to the Debtors' Adjusted EBITDA to determine a range of Enterprise Values. To calculate Adjusted EBITDA, Lazard adjusted the Debtors' EBITDA to exclude assumed non-recurring expenses/charges, restructuring fees and expenses, losses from discontinued or inactive operations, plant closure costs, and dividend income from the Minority JVs. Although Lazard adjusted EBITDA for these factors, it also took into consideration the fact that the Debtors have historically taken significant restructuring charges in many years and also project future restructuring charges in each year of the forecast. Lazard valued the Debtors' interests in the Minority JVs separately.

(ii)    Precedent Transactions Analysis

Precedent transactions analysis estimates the value of a company by examining public merger and acquisition transactions. An analysis of a company's transaction value as a multiple of various operating statistics provides industry-wide valuation multiples for companies in similar lines of business to the Debtors. Transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors. Lazard considered prices paid as a multiple of revenue, EBIT, and EBITDA, which were then applied to the Debtors' key operating statistics to estimate the Enterprise Value or value to a potential strategic buyer.