Unlike the comparable public company analysis, the valuation analysis in this methodology reflects a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. Other factors that may affect the values derived in a precedent transaction analysis include the following: (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in a case of a competitive bidding contest); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable public company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each company. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Because the precedent transaction analysis explains other aspects of value besides the inherent value of a company, there are limitations as to its use in the valuation of the Debtors.

In estimating a range of Enterprise Values for the Reorganized Debtors under this methodology, Lazard used publicly available information to calculate multiples of total transaction value ("Transaction Value") to the LTM EBITDA of selected acquired companies at the time of the announcement of the relevant transaction and applied these multiples to the Debtors' LTM December 31, 2009 Adjusted EBITDA.

Lazard evaluated various merger and acquisition transactions that have occurred in the automotive supply industry over the past eight years and involved target companies which produced products that were similar to those of the Debtors, namely sealing, fluid handling, or noise vibration and harshness ("NVH") products. Over that time period, there were a limited number of precedent transactions and of those that are relevant, in some cases limited financial information was disclosed. The analysis was further limited by the fact that the most recent precedent transaction was in June 2007, prior to the industry disruptions that began in 2008.

(iii)    Discounted Cash Flow Analysis

The Discounted Cash Flow ("DCF") analysis is a forward-looking enterprise valuation methodology that relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business, based on its capital structure. Using a DCF analysis, the Enterprise Value of the Reorganized Debtors is estimated by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on

projections provided by management of the Debtors (the "Projections") plus an estimate for the value of the firm beyond the period of 2010 to 2013 (the "Projection Period") known as the terminal value. The terminal value is derived by one of two (2) approaches: 1) applying a multiple to the Debtors' projected EBITDA in the final year of the Projection Period, discounted back to the Assumed Effective Date by the Discount Rate; and 2) dividing the projected unlevered free cash flow in the year following the final projected year by the Discount Rate minus a range of perpetual growth rates, discounted back to the Assumed Effective Date by the Discount Rate.

To estimate the Discount Rate for each the U.S. and Non-U.S. operations of the Reorganized Debtors, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term debt-to-total capitalization based on the adjusted average (defined as the average adjusted to exclude the highest and lowest data points) of its Peer Group. Lazard calculated the cost of equity based on the Capital Asset Pricing Model, which assumes that the required equity return is a function of, among other things, the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard estimated what would be the Reorganized Debtors' blended cost of debt based on current capital markets conditions and the financing costs for comparable companies with leverage similar to the Reorganized Debtors' target capital structure. In determining the terminal multiple, Lazard used a range based upon historical LTM EBITDA multiples that the Peer Group traded at over the past five years.

Although relatively formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect assumptions regarding cost of capital and terminal multiples. Lazard calculated its DCF valuation on a range of Discount Rates of 12.9% to 15.5%, Perpetual Growth Rates of 3.3% to 4.3% and terminal value EBITDA multiples of 4.5x to 5.5x.

In applying the above methodology, Lazard utilized management's detailed Projections for the period beginning April 1, 2010 and ending December 31, 2013 to derive unlevered, after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF analysis, the Reorganized Debtors are assumed to be full taxpayers at the applicable regional level corporate income tax rates. These cash flows, along with the terminal value, are discounted back to the assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values.

(iv)    Minority JV's

Lazard applied the DCF and multiple methods to estimate a range of values for the Debtors' unconsolidated joint venture interests in Nishikawa Standard Company and Shanghai SAIC-Metzler Sealing Systems Co. Ltd. Lazard also utilized the dividend discount methodology based upon management's Projections for the dividends that would be received on the Debtors' interests. Lazard estimated the value of the Debtors' unconsolidated joint venture

interest in Guyoung Technology Co. Ltd. based upon the market price of its publicly traded stock.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE FOR SUMMARY DESCRIPTION.  IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS.  THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

### 15.02  **Financial Projections**

The Projections attached hereto as Appendix A reflect numerous assumptions, including various assumptions with respect to the anticipated future performance of the Reorganized Debtors after the restructuring contemplated under the Plan is consummated, industry performance, general business and economic conditions and other matters, some of which are beyond the control of the Reorganized Debtors.  In addition, unanticipated events and circumstances may affect the actual financial results of the Reorganized Debtors in the future. THEREFORE, WHILE THE PROJECTIONS ARE NECESSARILY PRESENTED WITH NUMERICAL SPECIFICITY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE FISCAL YEARS ENDING DECEMBER 31, 2010-2013 MAY VARY FROM THE PROJECTED RESULTS. THESE VARIATIONS MAY BE MATERIAL.  ACCORDINGLY, NO REPRESENTATION CAN BE MADE OR IS MADE WITH RESPECT TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY OF THE REORGANIZED DEBTORS TO ACHIEVE THE PROJECTED RESULTS.  See Article XIII herein, entitled "Certain Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors and their non-Debtor Subsidiaries and of the various risks associated with the securities of the Reorganized Debtors to be issued pursuant to the Plan.

The Debtors do not, as a matter of course, make public projections of their anticipated financial position or results of operations.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections in the event that actual industry performance or the general economic or business climate differs from that upon which the Projections have been based.  Further, the Debtors do not anticipate that they will include such information in documents required to be filed with the SEC, or otherwise make such information public.

The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view toward compliance with published guidelines regarding projections or forecasts.  The Projections have

not been audited, reviewed or compiled by the Debtors' independent public accountants. Although presented with numerical specificity, the Projections are based upon a variety of assumptions, some of which have not been achieved to date and may not be realized in the future, and are subject to significant business, litigation, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. Consequently, the Projections should not be regarded as a representation or warranty, by the Debtors or any other person, that the Projections will be realized.

Neither the Debtors' independent public accountants, nor any other independent accountants or financial advisors, have compiled, examined or performed any procedures with respect to the projected consolidated financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the projected financial information.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: The projected financial statements in Appendix A (the "Projected Financial Statements") contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995. "Forward-looking statements" in these Projected Financial Statements include the intent, belief or current expectations of the Debtors and members of their Management teams with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. While management believes that its expectations are based on reasonable assumptions within the bounds of its knowledge of its business and operations, prospective investors are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from these contemplated by such forward-looking statements. Important factors currently known to management that could cause actual results to differ materially from those contemplated by the forward-looking statements in these Projected Financial Statements include, but are not limited to, further adverse developments with respect to the Debtors' liquidity position or operations of the various businesses of the Reorganized Debtors, adverse developments in the bank financing or public or private markets for debt or equity securities, or adverse developments in the timing or results of the Debtors' current strategic business plan (including the timeline to emerge from chapter 11) and the possible negative effects that could result from potential economic and political factors around the world in the various foreign markets in which the Reorganized Debtors operate.

## ARTICLE XVI.
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtors and to U.S. Holders (as defined below) of Allowed Senior Subordinated Note Claims. The discussion does not address the United States federal income tax consequences to Holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan or Holders whose Claims are

extinguished without a distribution in exchange therefor. The discussion is for general purposes only, and is based upon the Tax Code, the United States Treasury regulations (including temporary and proposed regulations) promulgated thereunder (the "U.S. Regulations"), judicial authorities and current administrative rulings and practice, all as of the date hereof and all of which are subject to change, possibly retroactively. This summary does not discuss all aspects of United States federal income taxation which may be important to particular Holders in light of their individual investment circumstances, including, but not limited to, banks, financial institutions, broker-dealers, traders, insurance companies, real estate investment trusts, regulated investment companies, tax-exempt organizations, Holders reporting gain on the installment method, U.S. Holders whose functional currency is not the United States dollar, U.S. Holders who hold Senior Subordinated Note Claims, New Common Stock, Senior Subordinated Noteholder Rights or New Capital Warrants as part of a hedging transaction, straddle, conversion transaction, constructive sale, wash sale or other integrated transaction, Holders who acquire New Common Stock or New Capital Warrants other than pursuant to the Plan or Holders other than U.S. Holders. In addition, this summary does not address any tax consequences other than United States federal income tax consequences.

The tax consequences of certain aspects of the Plan are uncertain because of the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. No ruling has been requested from the Internal Revenue Service ("IRS") with respect to any of the matters discussed herein, and no opinion of counsel has been sought or obtained with respect thereto.

As used herein, a "U.S. Holder" means a beneficial owner of a Senior Subordinated Note Claim, New Common Stock, Senior Subordinated Noteholder Rights or New Capital Warrants that is, for United States federal income tax purposes,

- a citizen or resident of the United States;

- a corporation organized in or under the laws of the United States or any political subdivision thereof;

- an estate the income of which is subject to United States federal income taxation regardless of its source; or

- a trust if, (i) the trust is subject to the supervision of a court within the United States and the control of one or more "United States persons" as described in section 7701(a)(30) of the Tax Code or (ii) the trust has a valid election in effect under applicable U.S. Regulations to be treated as a "United States person."

If a partnership (or other entity classified as a partnership for United States federal income tax purposes) is the beneficial owner of a Senior Subordinated Note Claim, the United States federal income tax treatment of a partner in the partnership will generally depend on the status of the partner, the activities of the partnership and certain determinations made at the partner level. If you are a partnership that is a beneficial owner of a Senior Subordinated Note

Claim, New Common Stock, Senior Subordinated Noteholder Rights or New Capital Warrant or a partner in such a partnership, you should consult your own tax advisor regarding the United States federal income tax consequences of the implementation of the Plan.

PURSUANT TO UNITED STATES TREASURY DEPARTMENT CIRCULAR 230, WE ARE INFORMING YOU THAT (A) THIS DISCUSSION IS NOT INTENDED AND WAS NOT WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE UNITED STATES FEDERAL TAX LAWS THAT MAY BE IMPOSED ON THE TAXPAYER, (B) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE PLAN, AND (C) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN TO THEM.  THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF APPROVAL AND IMPLEMENTATION OF THE PLAN AS TO ANY HOLDER OF CLAIMS, NOR ARE THE DEBTORS OR THEIR COUNSEL RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

16.01    **United States Federal Income Tax Consequences to the Debtors**

(a)    Cancellation of Indebtedness and Reduction of Tax Attributes

The Debtors generally will realize cancellation of indebtedness ("COI") income on the discharge of existing indebtedness cancelled or exchanged for property of the Debtors (including New Common Stock, Senior Subordinated Noteholder Rights and New Capital Warrants) or Cash to the extent the fair market value of any such property and Cash is less than the principal amount, plus any accrued but unpaid interest, of the indebtedness discharged thereby.  Certain statutory or judicial exceptions can apply to limit the amount of COI realized by a debtor (such as where the payment of the discharged debt would have given rise to a tax deduction or where the discharge of indebtedness is treated as an adjustment to the purchase price of certain previously-acquired assets).

Under section 108 of the Tax Code, COI income realized by a debtor will not be recognized if the COI income occurs in a case brought under the Bankruptcy Code, provided the debtor is under the jurisdiction of the court in such case and the cancellation of indebtedness is granted by the court or is pursuant to a plan approved by the court (the "Bankruptcy Exception"). Accordingly, because the cancellation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the Bankruptcy Court in such case and the cancellation of the Debtors' indebtedness will be pursuant to the Plan, the

135

Debtors will not be required to recognize any COI income realized as a result of the implementation of the Plan.

Under section 108(b) of the Tax Code, a taxpayer that does not recognize COI income under the Bankruptcy Exception will be required to reduce certain tax attributes, including its net operating losses and loss carryforwards ("NOLs") (and certain other losses, credits and carryforwards, if any) and its tax basis in its assets (but not below the total amount of liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of COI income excluded from income under the Bankruptcy Exception. Where a taxpayer is a member of a group filing a consolidated United States federal income tax return, applicable U.S. Regulations require, in certain circumstances, that the attribute reduction of the consolidated subsidiaries of the debtor and other members of the group also be reduced as a result of the COI of a member. The United States federal income tax return that included the Debtors for the taxable year that ended December 31, 2008 reflects an NOL carryforward to future periods of $127 million. The Debtors expect to have recognized additional losses for the 2009 taxable year.

As a result of the application of section 108(b) of the Tax Code, the Debtors expect that the Debtors' consolidated NOLs will be eliminated or significantly reduced by reason of consummation of the Plan and that the tax basis particular Debtors have in their assets may be reduced. In addition, as discussed below, even if NOLs of the Debtors were to remain following attribute reduction, section 382 of the Tax Code should apply to limit the ability of the Debtors to utilize any such remaining NOLs in future years.

Under Section 108(i) of the Tax Code, the Debtors can, in certain circumstances, elect to defer than exclude COI income from taxable income. Deferred COI income under this rule would be included in the Debtors' taxable income ratably over the five taxable-year period starting in 2014. This election is irrevocable. Under this deferral regime, the Debtors would not be required to reduce any of their tax attributes but would have taxable COI income in future years. The Debtors do not expect to make this election.

(b)    Section 382 Limitations on NOLs

Under section 382 of the Tax Code, if a corporation with NOLs or certain other tax attributes (a "Loss Corporation") undergoes an "Ownership Change," the use of such NOLs (and certain other tax attributes) will generally be subject to an annual limitation as described below. In general, an "Ownership Change" occurs if the percentage of the value of the Loss Corporation's stock owned by one or more direct or indirect "five percent shareholders" has increased by more than 50 percentage points over the lowest percentage of that value owned by such five percent shareholder or shareholders at any time during the applicable "testing period" (generally, the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation). The Plan should trigger an Ownership Change of the Debtors on the Effective Date under the Tax Code.

When a Loss Corporation undergoes an Ownership Change, an annual limitation (the "Annual Section 382 Limitation") generally limits the ability of the Loss Corporation to utilize historic NOLs, capital loss carryforwards and, if the Loss Corporation has a net unrealized

built-in loss on the date of the Ownership Change, certain subsequently recognized "built-in" losses and deductions (i.e., losses and deductions that have economically accrued but are unrecognized as of the date of the Ownership Change). As a general rule, the Annual Section 382 Limitation equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the Ownership Change and the applicable "long-term tax-exempt rate" in effect for the month in which the Ownership Change occurs (e.g., 4.14% for Ownership Changes occurring in the month of February, 2010). Subject to certain limitations, any unused portion of the Annual Section 382 Limitation may be available in subsequent years. A Loss Corporation must meet certain continuity of business enterprise requirements for at least two years following an Ownership Change in order to preserve the Annual Section 382 Limitation.

A special rule under section 382 of the Tax Code applicable to a Loss Corporation under the jurisdiction of a Bankruptcy Court will apply in calculating the Annual Section 382 Limitation. Under this special rule, the limitation will be calculated by reference to the lesser of the value of the corporation's newly issued stock (with certain adjustments) immediately after the Ownership Change (as opposed to immediately before the Ownership Change, as discussed above) or the value of the corporation's assets (determined without regard to liabilities) immediately before the Ownership Change. Although such calculation may substantially increase the Annual Section 382 Limitation, the Debtors' use of any NOLs, built-in losses and deductions remaining after the implementation of the Plan may still be substantially limited after an Ownership Change.

As stated above, the Debtors should undergo an Ownership Change as a result of the implementation of the Plan. The Debtors have not yet determined whether the Debtors will have a net unrealized built-in loss on the Effective Date. If an Ownership Change occurs, the ability of the Debtors to utilize any NOLs that may remain after the implementation of the Plan will be, and their ability to utilize certain subsequently recognized built-in losses and deductions (if any) may be, subject to an Annual Section 382 Limitation, as described above.

(c)    Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. The Debtors have not determined whether the receipt of the New Common Stock, Senior Subordinated Noteholder Rights and New Capital Warrants by Holders of Senior Subordinated Note Claims pursuant to the Plan may qualify for this exception. Even if the Debtors qualify for this exception, the Debtors are likely to elect not to have the exception apply and instead remain subject to the annual limitation described above.

(d)    Alternative Minimum Tax

In general, a United States federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular United States federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are

modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available loss carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available loss carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an Ownership Change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the Ownership Change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular United States federal income tax liability in future taxable years when the corporation is no longer subject to the AMT and otherwise becomes subject to regular tax.

### 16.02   United States Federal Income Tax Consequences of the Plan to U.S. Holders of Senior Subordinated Note Claims

Pursuant to the Plan, Holders of Allowed Senior Subordinated Note Claims will receive New Common Stock and New Capital Warrants and, in the case of Holders of Allowed Senior Subordinated Note Claims that are Eligible Noteholders, Senior Subordinated Noteholder Rights in satisfaction and discharge of their Claims. Solely for purposes of this Section 16.02, the term "Eligible Noteholder" refers only to an Eligible Noteholder that is also a U.S. Holder.

(a)     Tax Treatment of the Exchange of Allowed Senior Subordinated Note Claims

The United States federal income tax consequences to a U.S. Holder of exchanging an Allowed Senior Subordinated Note Claim for New Common Stock and New Capital Warrants and, if applicable, Senior Subordinated Noteholder Rights are uncertain and complex and depend upon, among other things, whether the exchange constitutes a taxable exchange or, alternatively, a tax-deferred transaction for United States federal income tax purposes, and, in the case of an Eligible Noteholder, whether the Senior Subordinated Noteholder Rights are treated as separate from the New Common Stock issued in the exchange or, alternatively, are disregarded. In order for the exchange of a Senior Subordinated Note Claim to be treated as a tax-deferred transaction, the Senior Subordinated Note Claim being exchanged would generally be required to be a "security" for purposes of the reorganization provisions of the Tax Code. The determination of whether a debt instrument constitutes a security depends upon an evaluation of the nature of the debt instrument based on all the facts and circumstances. The term of the debt instrument is particularly important in this regard and ordinarily debt instruments with short term original maturities are not considered securities, while debt instruments with long term original maturities are likely to be considered securities. The dividing line between short term and long term will vary depending on the particular facts and circumstances and there are numerous other factors that may be considered in determining whether a debt instrument constitutes a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the similarity of the debt instrument to a cash payment, and the purpose of the borrowing. Generally, however,

an original maturity on a corporate debt instrument of less than five years is an indication that the instrument is not a security whereas an original maturity on a corporate debt instrument of more than ten years is an indication that the instrument is a security. Under the foregoing principles, the Senior Subordinated Notes, which had an original maturity of approximately 10 years, are likely to be treated as securities for United States federal income tax purposes. Amounts received by a U.S. Holder on account of accrued interest in respect of a Claim, to the extent attributable to the current U.S. Holder's holding period, are not securities. U.S. Holders of Senior Subordinated Note Claims are urged to consult their tax advisors regarding the United States federal income tax status of the exchange of their Claims for New Common Stock and New Capital Warrants and, if applicable, Senior Subordinated Noteholder Rights as either a taxable or a tax-deferred exchange and the United States federal income tax consequences of implementation of the Plan to them based on their particular circumstances and should not rely solely on the general discussion herein.

The Plan provides that Holdings will issue New Common Stock and New Capital Warrants to CSA and CSA will then transfer the New Common Stock and New Capital Warrants to the Holders of Allowed Senior Subordinated Note Claims in satisfaction of their Claims and, in the case of Eligible Noteholders that exercise the Senior Subordinated Noteholder Rights, in satisfaction of their Senior Subordinated Noteholder Rights. If this characterization of the transaction were respected for United States federal income tax purposes, an exchange of an Allowed Senior Subordinated Note Claim for New Common Stock and New Capital Warrants and, in the case of an Eligible Noteholder, Senior Subordinated Noteholder Rights would constitute a fully taxable transaction under section 1001 of the Tax Code. Nonetheless, under IRS Revenue Ruling 59-222, it is possible that the transaction could be characterized as if Holders of the Senior Subordinated Note Claims had exchanged their Claims for stock of CSA and then exchanged that stock for New Common Stock and New Capital Warrants of Holdings in a transaction or series of transactions qualifying for tax deferred treatment for United States federal income tax purposes. However, the applicability of this authority to an exchange of an Allowed Senior Subordinated Note Claim pursuant to the Plan is uncertain as the exchange described in the Revenue Ruling differs in significant respects from the exchange described herein.

(i)    Consequences if the Exchange of Allowed Senior Subordinated Note Claims Constitutes a Fully Taxable Transaction

If the Exchange of an Allowed Senior Subordinated Note Claim for New Common Stock and New Capital Warrants and, in the case of an Eligible Noteholder, Senior Subordinated Noteholder Rights pursuant to the Plan constitutes a fully taxable transaction, an exchanging U.S. Holder would recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the New Common Stock and the New Capital Warrants and, in the case of an Eligible Noteholder, possibly the Senior Subordinated Noteholder Rights received in exchange for the Claim (other than New Common Stock and New Capital Warrants and, in the case of an Eligible Noteholder, Senior Subordinated Noteholder Rights received on account of accrued interest), and (ii) the U.S. Holder's adjusted tax basis in the Claim (excluding any tax basis attributable to accrued interest) exchanged therefor. A U.S. Holder's tax basis in the New Common Stock and the New Capital Warrants and, in the case of an Eligible Noteholder, possibly the Senior Subordinated Noteholder Rights received would equal the

amount taken into account by such U.S. Holder in respect of such New Common Stock and New Capital Warrants and, in the case of an Eligible Noteholder, Senior Subordinated Noteholder Rights in determining its amount realized on the exchange. A U.S. Holder's holding period for the New Common Stock and the New Capital Warrants and, in the case of an Eligible Noteholder, Senior Subordinated Noteholder Rights received generally would begin on the day after the exchange. See "Tax Treatment of the Senior Subordinated Noteholder Rights" below, for certain additional disclosure regarding the Senior Subordinated Noteholder Rights.

(ii)    Consequences if the Exchange of Allowed Senior Subordinated Note Claims Constitutes a Tax-Deferred Transaction

If the exchange of an Allowed Senior Subordinated Note Claim for New Common Stock and New Capital Warrants and, in the case of an Eligible Noteholder, Senior Subordinated Noteholder Rights were to constitute a tax-deferred transaction, an exchanging U.S. Holder would not recognize any loss on the exchange; however, an exchanging U.S. Holder would be required to recognize gain on the exchange in connection with the receipt of the New Capital Warrants and possibly in connection with the receipt of the Senior Subordinated Noteholder Rights as discussed below (in addition to income or loss, if any, recognized with respect to accrued interest on the Claim exchanged, as discussed below under "Allocation of Consideration Received and Treatment of Amounts Received on Account of Accrued Interest"). The amount of gain required to be recognized (in addition to gain, if any, attributable to accrued interest) by a U.S. Holder that exchanges an Allowed Senior Subordinated Note Claim (treating each Senior Subordinated Note as a separate Claim for this purpose) will be limited to the lesser of (i) the fair market value as of the Effective Date of the New Capital Warrants received with respect to the Claim exchanged therefor and (ii) the amount of gain, if any, realized by the U.S. Holder (determined in the manner discussed above under "Consequences if the Exchange of Allowed Senior Subordinated Note Claims Constitutes a Fully Taxable Transaction") with respect to the Claim exchanged therefor.

The United States federal income tax status of the Senior Subordinated Noteholder Rights to be received by an Eligible Noteholder is uncertain. It is likely that the Senior Subordinated Noteholder Rights would not be treated as property requiring the recognition of gain in a tax-deferred transaction either because (i) the Eligible Noteholder would be treated as receiving rights to acquire stock of CSA in a tax-deferred transaction and, if such Eligible Noteholder exercised those rights, having exchanged those rights for stock of CSA and then having exchanged the stock of CSA for New Common Stock of Holdings in a tax-deferred transaction or because (ii) the Senior Subordinated Noteholder Rights are only exercisable prior to the Effective Date of the Plan and thus an Eligible Noteholder holding an Allowed Senior Subordinated Note Claim that exercises its Senior Subordinated Noteholder Rights would be treated for United States federal income tax purposes as receiving additional New Common Stock with a value equal to the value of such Senior Subordinated Noteholder Rights. If the Senior Subordinated Noteholder Rights are treated as property permitted to be received without the recognition of gain in a tax-deferred transaction, then the tax consequences described above will apply to Eligible Noteholders receiving Senior Subordinated Noteholder Rights in a tax-deferred transaction.

Notwithstanding the foregoing, it is possible that the Senior Subordinated Noteholder Rights will be treated as additional consideration that is not permitted to be received without recognition of gain in a tax-deferred transaction. In such a case, an Eligible Noteholder that exchanges an Allowed Senior Subordinated Note Claim (treating each Senior Subordinated Note Claim as a separate Claim for this purpose) will be required to recognize gain (in addition to gain, if any, attributable to accrued interest) in an amount equal to the lesser of (i) the fair market value as of the Effective Date of the New Capital Warrants and the Senior Subordinated Noteholder Rights and (ii) the amount of gain, if any, realized by the Eligible Noteholder (determined in the manner discussed above under "Consequences if the Exchange of Allowed Senior Subordinated Note Claims Constitutes a Fully Taxable Transaction") with respect to the Claim exchanged therefor.

A U.S. Holder's aggregate initial tax basis in the New Common Stock (and in the case of an Eligible Noteholder, if the Senior Subordinated Noteholder Rights are treated as property permitted to be received without recognition of gain in a tax-deferred transaction, possibly also the Senior Subordinated Noteholder Rights), other than New Common Stock, if any, received on account of accrued interest, would equal such U.S. Holder's adjusted tax basis in the Claim exchanged therefor (excluding any tax basis attributable to accrued interest in respect of such Claim), increased by the amount of any gain recognized as a result of the exchange of such Claim (other than gain, if any, attributable to accrued interest) and reduced by the fair market value as of the Effective Date of the New Capital Warrants and, if the Senior Subordinated Noteholder Rights are treated as property not permitted to be received without recognition of gain in a tax-deferred transaction, further reduced by the fair market value on the Effective Date of the Senior Subordinated Noteholder Rights received by the Eligible Noteholder with respect to the Claim. A U.S. Holder's holding period for the New Common Stock (and in the case of an Eligible Noteholder, if the Senior Subordinated Noteholder Rights are treated as property permitted to be received without recognition of gain in a tax-deferred transaction, possibly also the Senior Subordinated Noteholder Rights), other than New Common Stock, if any, received on account of accrued interest, would include the period during which the U.S. Holder held the Claim exchanged therefor. If the Senior Subordinated Noteholder Rights are treated as property not permitted to be received without recognition of gain in a tax-deferred transaction, an Eligible Noteholder's tax basis in a Senior Subordinated Noteholder Right would equal the fair market value of the Senior Subordinated Noteholder Right as of the Effective Date and an Eligible Noteholder's holding period for a Senior Subordinated Noteholder Right generally would begin on the day after the exchange. A U.S. Holder's tax basis in a New Capital Warrant would equal the fair market value of the New Capital Warrant as of the Effective Date and a U.S. Holder's holding period for a New Capital Warrant generally would begin on the day after the exchange.

U.S. Holders of Senior Subordinated Note Claims are urged to consult their tax advisors with respect to the possibility that the exchange may be treated as a tax-deferred transaction, the treatment of any Senior Subordinated Noteholder Rights received in a tax-deferred transaction, and reporting requirements applicable to persons receiving stock, securities and other property in an exchange in connection with a tax-deferred transaction.

(b)     Character of Gain or Loss and Tax Treatment of Market Discount

141

Subject to the market discount rules described below, any gain or loss recognized by an exchanging U.S. Holder would be capital gain or loss if the Senior Subordinated Note Claim exchanged is held as a capital asset, and would be long term capital gain or loss if, as of the Effective Date, the Claim exchanged has been held by such U.S. Holder for more than one year. Long-term capital gains recognized by non-corporate U.S. Holders prior to January 1, 2011 are taxed at a maximum rate of 15%. Net capital gains on the disposition of capital assets held for one year or less are subject to United States federal income tax at ordinary income tax rates. For a corporate U.S. Holder, all capital gains are currently taxed at the same rate as ordinary income. The deductibility of capital losses is subject to limitations.

Under the "market discount" rules of the Tax Code, if a U.S. Holder acquired its Senior Subordinated Note Claim from a prior holder at a market discount (within the meaning of section 1278 of the Tax Code), any gain recognized by a U.S. Holder as a result of exchanging its Claim for New Common Stock and New Capital Warrants and, in the case of an Eligible Noteholder, Senior Subordinated Noteholder Rights would be treated as ordinary income (rather than capital gain) to the extent of any market discount on the Claim exchanged that has accrued during the period that the U.S. Holder held such Claim and that has not previously been included in income by the U.S. Holder. If the exchange constitutes a fully taxable transaction, the New Common Stock and New Capital Warrants and, in the case of an Eligible Noteholder, the Senior Subordinated Noteholder Rights received would not be treated as having been acquired with market discount. If the exchange constitutes a tax-deferred transaction, any accrued market discount on the U.S. Holder's Claim not previously treated as ordinary income by the U.S. Holder (including, as a result of the exchange, as discussed above) should carry over to the New Common Stock and, in the case of an Eligible Noteholder, possibly the Senior Subordinated Noteholder Rights received in the exchange. In such a case, any gain recognized by the U.S. Holder upon a subsequent disposition should be treated as ordinary income (rather than capital gain) to the extent of the amount of accrued and unrecognized market discount carried over to the New Common Stock and, in the case of an Eligible Noteholder, the Senior Subordinated Noteholder Rights.

(c)     Allocation of Consideration Received and Treatment of Amounts Received on Account of Accrued Interest

Under the Plan, consideration distributed to Holders of Allowed Claims will be treated first as satisfying an amount equal to the stated principal amount of the Allowed Claim and then, to the extent of any excess, as satisfying accrued but unpaid interest in respect of such Allowed Claim, if any. However, there can be no assurance that the IRS will respect such an allocation and the IRS may take the position that the consideration received by Holders of Allowed Claims should be allocated in some other manner. U.S. Holders of Senior Subordinated Note Claims should consult their own tax advisors regarding the proper allocation of the consideration received under the Plan.

A U.S. Holder of an Allowed Senior Subordinated Note Claim that receives consideration on account of accrued interest that has not previously been included in its gross income will be required to recognize ordinary income equal to the fair market value of the consideration received under the Plan with respect to such Claim. Conversely, such U.S. Holder generally would recognize a deductible loss to the extent that any accrued interest previously

142

included in gross income is not paid in full.  A U.S. Holder's aggregate tax basis in any consideration received on account of accrued interest will be the fair market value of such consideration on the Effective Date and a U.S. Holder's holding period for any consideration received on account of accrued interest generally will begin on the day after the Effective Date of the Plan.

      (d)    Tax Treatment of the New Common Stock

      Distributions on shares of the New Common Stock will constitute dividends and be included in a U.S. Holder's gross income (as ordinary income) when paid to the extent of the current or accumulated earnings and profits of Holdings as determined under United States federal income tax principles.  Distributions on shares of New Common Stock received by a U.S. Holder that exceed the current and accumulated earnings and profits of Holdings will be treated first as a non-taxable return of capital reducing (but not below zero) the U.S. Holder's adjusted tax basis in the shares of New Common Stock.  Any such distributions in excess of a U.S. Holder's adjusted tax basis in the shares of New Common Stock will generally be treated as capital gain.  Subject to certain exceptions, dividends received by non-corporate U.S. Holders currently are taxed at a maximum rate of 15% (effective for tax years through 2010), provided that certain holding period requirements are met.  Dividends paid to corporate U.S. Holders will generally qualify for the dividends-received deduction, provided that certain holding period requirements are met.

      Certain events, such as adjustment of the exercise price of the New Capital Warrants could, in some circumstances, be deemed to result in the payment of a taxable distribution to the Holders of the New Capital Warrants if such event has the effect of increasing the proportionate interest of Holders of New Capital Warrants in the earnings and profits or assets of Holdings.  A failure to fully adjust the exercise price of the New Capital Warrants or a failure to fully adjust the conversion price of the New Preferred Stock to be issued to the Backstop Parties to reflect a stock dividend or other event increasing the proportionate interest of Holders of the New Common Stock in the earnings and profits or assets of Holdings could, in some circumstances, be deemed to result in the payment of a taxable distribution to the Holders of the New Common Stock.  However, adjustments to the exercise price of the New Capital Warrants or the conversion price of the New Preferred Stock made pursuant to a bona fide reasonable adjustment formula that has the effect of preventing the dilution of the New Capital Warrants or the New Preferred Stock will not be deemed a taxable distribution.  If a taxable deemed distribution occurs, such deemed distribution would be taxable as a dividend, return of capital or capital gain in accordance with the rules discussed above, and U.S. Holders may recognize income as a result even though they receive no cash or property.

      Upon the sale or other taxable disposition of New Common Stock, in general, a U.S. Holder will recognize taxable gain or loss measured by the difference, if any, between (i) the amount realized on the sale, exchange or other taxable disposition, and (ii) the U.S. Holder adjusted tax basis in the New Common Stock disposed of.  A U.S. Holder's adjusted tax basis in the New Common Stock generally will equal the U.S. Holder's initial tax basis, subject to certain adjustments, as discussed above.  Except as discussed above with respect to market discount, a U.S. Holder's gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if, at the time of the sale or other disposition, the U.S. Holder's holding

period for the New Common Stock is more than one year. Subject to limited exceptions, capital losses cannot be used to offset ordinary income. Long-term capital gain recognized by a non-corporate U.S. Holder currently is subject to a preferential rate of United States federal income taxation.

      (e)     Tax Treatment of the Senior Subordinated Noteholder Rights

The characterization of the Senior Subordinated Noteholder Rights for United States federal income tax purposes is uncertain.

An Eligible Noteholder that receives a Senior Subordinated Noteholder Right (however characterized) pursuant to the Plan generally will not recognize gain or loss upon the exercise of such Senior Subordinated Noteholder Right. However, because the Senior Subordinated Noteholder Rights are exercisable prior to the Effective Date of the Plan, an Eligible Noteholder that exercises its Senior Subordinated Noteholder Rights may be treated for United States federal income tax purposes as receiving additional New Common Stock with a value equal to the value of such Senior Subordinated Noteholder Rights or, alternatively, as receiving Senior Subordinated Noteholder Rights. If the Senior Subordinated Noteholder Rights are disregarded and the Eligible Noteholder is treated as receiving additional New Common Stock, such Eligible Noteholder's aggregate initial tax basis in the New Common Stock received upon exercise of the Senior Subordinated Noteholder Rights will be equal to the sum of (i) the portion of such Eligible Noteholder's aggregate tax basis in the New Common Stock received which is allocated to the additional New Common Stock, based on the relative fair market values of the New Common Stock and the additional New Common Stock treated as received by such Holder on the Effective Date, and (ii) the amount paid to exercise the Senior Subordinated Noteholder Rights. In such a case, the Eligible Noteholder could have a split holding period (part new and part carryover) if the receipt of the additional New Common Stock was part of a tax-deferred transaction, as discussed above, for United States federal income tax purposes.

If, alternatively, an Eligible Noteholder is treated as receiving Senior Subordinated Noteholder Rights pursuant to the Plan, the amount of such Eligible Noteholder's initial tax basis in the New Common Stock received upon exercise of the Senior Subordinated Noteholder Rights will depend on whether the Senior Subordinated Noteholder Rights are treated as property requiring the recognition of gain in a tax-deferred transaction. If the Senior Subordinated Noteholder Rights are treated as property requiring the recognition of gain in a tax-deferred transaction, the amount of such Eligible Noteholder's initial tax basis in the New Common Stock received upon exercise of the Senior Subordinated Noteholder Rights will be equal to the sum of (i) the fair market value of the Senior Subordinated Noteholder Right as of the Effective Date and (ii) the amount paid to exercise the Senior Subordinated Noteholder Rights. If, on the other hand, the Senior Subordinated Noteholder Rights are treated as property permitted to be received without recognition of gain in a tax deferred transaction, the amount of such Eligible Noteholder's initial tax basis in the New Common Stock received upon exercise of the Senior Subordinated Noteholder Rights will be equal to the sum of (i) the portion of such Eligible Noteholder's aggregate tax basis in the New Common Stock and Senior Subordinated Noteholder Rights received which is allocated to the Senior Subordinated Noteholder Rights, based on the relative fair market values of the New Common Stock and the Senior Subordinated Noteholder Rights received by such Holder on the Effective Date, and (ii) the amount paid to

144

exercise the Senior Subordinated Noteholder Rights. In each case in which an Eligible Noteholder is treated as receiving Senior Subordinated Noteholder Rights, the Eligible Noteholder's holding period in the New Common Stock received upon exercise of the Senior Subordinated Noteholder Rights generally would commence on the day following the Effective Date.

It is uncertain whether an Eligible Noteholder that does not exercise a Senior Subordinated Noteholder Right should be treated as not having received anything of additional value in respect of its Allowed Senior Subordinated Note Claim, or should instead be treated as receiving a right that lapsed. In the latter event, the Eligible Noteholder may recognize a loss equal to its tax basis in the Senior Subordinated Noteholder Right, if any. In general, such a loss would be a capital loss, and would be a short term or long term capital loss depending on its holding period for the Senior Subordinated Noteholder Right, which holding period may include the Eligible Noteholder's holding period for its Allowed Senior Subordinated Note Claim exchanged therefor if the exchange constitutes a tax-deferred transaction, as discussed above under "Consequences if the Exchange of Allowed Senior Subordinated Note Claims Constitutes a Tax-Deferred Transaction."

      (f)     Tax Treatment of the New Capital Warrants

A U.S. Holder holding a New Capital Warrant generally will not recognize gain or loss for United States federal income tax purposes upon the exercise of such New Capital Warrant and will have a tax basis in the New Common Stock received equal to its tax basis in the New Capital Warrant exercised, increased by the amount paid to exercise the New Capital Warrant. A U.S. Holder's holding period for the New Common Stock received on exercise of a New Capital Warrant generally would commence the day following the exercise.

A U.S. Holder that allows the New Capital Warrant to lapse would generally recognize a loss for United States federal income tax purposes equal to its tax basis in the New Capital Warrant. In general, such a loss would be a capital loss, and would be a short term or long term capital gain or loss depending on its holding period for the New Capital Warrant.

### 16.03  **Information Reporting and Backup Withholding**

In general, information reporting requirements will apply and backup withholding may apply to payments to non-corporate U.S. Holders pursuant to the Plan, and dividends or disposition proceeds in respect of the New Common Stock. In general, "backup withholding" may apply to such payments if the U.S. Holder fails to provide an accurate taxpayer identification number or is notified by the IRS that it has failed to report all interest and dividends required to be shown on its United States federal income tax returns.

Any amounts withheld under the backup withholding rules from payment to a beneficial owner would be allowed as a credit against such beneficial owner's United States federal income tax liability or refunded to such beneficial owner provided the required information is timely furnished to the IRS.

**In addition, U.S. Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the**

taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns. The foregoing summary has been provided for informational purposes only. All Holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the United States federal, state, local and foreign tax and other tax consequences applicable under the Plan.

**ARTICLE XVII.**
**ACCEPTANCE AND CONFIRMATION OF THE PLAN**

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

### 17.01  Solicitation of Acceptance

The Debtors will solicit in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, the acceptance of the Plan from all record Holders of Claims entitled to vote whether to accept or reject the Plan. The solicitation of acceptances from Holders of Claims in Unimpaired classes is not required under the Bankruptcy Code. In addition, the solicitation of acceptances of the Plan from the Holders of General Unsecured Claims against Holdings and Old Equity Interests is not required because, under the Bankruptcy Code, such Holders are deemed to have rejected the Plan. The following class is Impaired and is entitled to vote on the Plan:

> Class 6 – Senior Subordinated Note Claims.

The record date for determining whether Holders of Claims are entitled to accept or reject the Plan is March 26, 2010 with respect to Holders of Senior Subordinated Note Claims.

The Debtors believe that this classification of Claims and Equity Interests complies with section 1122 of the Bankruptcy Code and is in the best interests of the Debtors, their estates and Holders of Claims and Equity Interests.

### 17.02  Confirmation Hearing

On March 26, 2010, the Debtors filed the Disclosure Statement and their Plan and sought an order that scheduled the hearing to consider confirmation of the Plan. The Bankruptcy Court has scheduled the confirmation hearing for May 12, 2010 at 9:30 a.m.

The Plan provides that the Effective Date of the Plan will be the first Business Day immediately following the date upon which all conditions to the Effective Date set forth in section 13.02 of the Plan have been satisfied or waived by the Debtors or the Reorganized Debtors, as the case may be; provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect.

146

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Notice of the Confirmation Hearing will be provided to all Holders of Claims and Equity Interests or their representatives and other parties in interest (the "Confirmation Notice"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except that an announcement of the adjourned date must be made at the Confirmation Hearing or any adjournment thereof. Objections to confirmation of the Plan must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection and the nature and amount of the Claim or Equity Interest held by the objector. Objections must be filed with the Bankruptcy Court, together with proof of service, and served upon the parties so designated in the Confirmation Notice on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to confirmation of the Plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and the local rules of the Bankruptcy Court.

### 17.03  **Requirements for Confirmation of the Plan**

As discussed below, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. In order for the Plan to be confirmed pursuant to section 1129(b) of the Bankruptcy Code, the Plan must satisfy all of the provisions of section 1129(a) of the Bankruptcy Code, except for section 1129(a)(8) therein. Specifically, the Bankruptcy Court must determine, among other things, that (i) the Plan was accepted by the requisite votes of Holders of Claims entitled to vote on the Plan and each Sub-Plan (see this Article XVII "Acceptance and Confirmation of the Plan"), (ii) the Plan and each Sub-Plan are in the "best interests" of all Holders of Claims and Equity Interests (that is, that each Holder of a Claim or Equity Interest who does not vote to accept the Plan will receive at least as much pursuant to the Plan as he, she or it would receive in a liquidation under chapter 7 of the Bankruptcy Code) (see section 17.07 "Acceptance and Confirmation of the Plan—Best Interests Test" and the Liquidation Analysis attached hereto as Appendix B) and (iii) the Plan and each Sub-Plan are feasible (that is, there is a reasonable probability that the Reorganized Debtors will be able to perform their obligations under the Plan and each Sub-Plan and continue to operate their business without further financial reorganization or liquidation) (see section 17.08 "Acceptance and Confirmation of the Plan—Feasibility").

The Debtors believe that, upon acceptance of the Plan by Class 6 Senior Subordinated Note Claims, the Plan and each Sub-Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code, and the Plan and each Sub-Plan are being proposed and will be submitted to the Bankruptcy Court in good faith.

### 17.04  **Confirmation of the Plan under Section 1129(b)**

Generally, a class of claims or interests is considered to be "unimpaired" under a plan of reorganization if the plan does not alter the legal, equitable and contractual rights of the Holders of such claims or interests. Classes of claims or interests that are not impaired under a

plan of reorganization are conclusively presumed to have accepted the plan of reorganization and are not entitled to vote. Classes of claims or interests that are impaired under a plan of reorganization that receive no distribution or retain no property in respect of such claims or interests are deemed to have rejected the plan of reorganization and are also not entitled to vote.

Acceptances of the Plan are being or will be solicited only from those Holders of Claims in an Impaired class and who are entitled to receive a distribution under the Plan. Under the Plan, Classes 1 (Priority Claims), 2 (Miscellaneous Secured Claims), 3 (Intercompany Claims), 4 (Prepetition Credit Facility Claims), 5 (Senior Note Claims), 7 (Subsidiary Debtor General Unsecured Claims) and 8 (Subsidiary Debtor Equity Interests) are Unimpaired. Class 6 (Senior Subordinated Note Claims) is Impaired, is entitled to a distribution under the Plan and, therefore, is entitled to vote on the Plan. Classes 9 (Holdings General Unsecured Claims) and 10 (Old Holdings Equity Interests) are Impaired, not entitled to receive a distribution under the Plan and, therefore, deemed to reject the Plan as a matter of law. As a result, the Debtors must request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code. See section 5.03 "Summary of the Plan—Classification and Treatment of Claims and Equity Interests Under the Plan." Acceptance of the Plan is being solicited from Holders of Claims in Class 6. See section 1.01 "Introduction and Summary — The Solicitation."

The Debtors will request confirmation of the Plan pursuant to the provisions of section 1129(b) of the Bankruptcy Code. Under these provisions, the Bankruptcy Court will confirm the Plan despite the lack of acceptance by an Impaired class or classes if the Bankruptcy Court finds that (a) the Plan does not discriminate unfairly with respect to each non-accepting Impaired class, (b) the Plan is "fair and equitable" with respect to each non-accepting Impaired class, (c) at least one Impaired class has accepted the Plan (without counting acceptances by Insiders) and (d) the Plan satisfies the other requirements set forth in section 1129(a) of the Bankruptcy Code except for section 1129(a)(8) thereof. In that regard, since at least one Impaired class must accept the Plan in order for the Plan to be confirmed, Class 6 Senior Subordinated Note Claims must vote in favor of the plan as the only the class voting on the Plan. The Backstop Parties (which hold a substantial majority in dollar amount of Senior Subordinated Note Claims) support the Plan and have agreed to vote in favor of the Plan.

17.05 **No Unfair Discrimination**

A plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting class if the value of the cash and/or securities to be distributed to the nonaccepting class is equal or otherwise fair when compared to the value of distributions to other classes whose legal rights are the same as those of the nonaccepting class. The Debtors believe that the Plan and each Sub-Plan would not discriminate unfairly against any nonaccepting class of Claims or Equity Interests.

17.06 **Fair and Equitable Test**

The "fair and equitable" test of section 1129(b) of the Bankruptcy Code requires absolute priority in the payment of claims and interests with respect to any nonaccepting class or classes. The "fair and equitable" test established by the Bankruptcy Code is different for secured claims, unsecured claims and equity interests and includes the following treatment:

(a)   Secured Claims

A plan is fair and equitable with respect to a nonaccepting class of secured claims if (1) the Holder of each claim in such class will retain its lien or liens and receive deferred cash payments totaling the allowed amount of its claim, of a value, as of the effective date of the plan, equal to the value of such Holder's interest in the collateral, (2) the Holder of each claim in such class will receive the proceeds from the sale of such collateral or (3) the Holder of each claim in such class will realize the indubitable equivalent of its allowed secured claim.

(b)   Unsecured Claims

A plan is fair and equitable with respect to a nonaccepting class of unsecured claims if (1) the Holder of each claim in such class will receive or retain under the plan property of a value, as of the effective date of the plan, equal to the allowed amount of its claim or (2) Holders of claims or interests that are junior to the claims of such creditors will not receive or retain any property under the plan on account of such junior claim or interest.

(c)   Equity Interests

A plan is fair and equitable with respect to a nonaccepting class of equity interests if the plan provides that (1) each member of such class receives or retains on account of its interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such interest or (2) Holders of interests that are junior to the interests of such class will not receive or retain any property under the plan on account of such junior interests.

17.07   **Best Interests Test**

Whether or not the Plan is accepted by each class of Claims and Equity Interests, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each class of Claims or Equity Interests Impaired by the Plan—that is, with respect to each Impaired class, (a) each Holder of a Claim or Equity Interest has accepted the Plan or (b) that Holders of Impaired Claims and Equity Interests will receive at least as much pursuant to the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

To determine the value that Holders of Impaired Claims and Equity Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets in the context of a liquidation case under chapter 7 of the Bankruptcy Code. The Cash amount which would be available for satisfaction of Administrative Expenses, Priority Claims, unsecured Claims and Equity Interests in the Debtors would consist of the proceeds resulting from the disposition of the assets of the Debtors, augmented by the Cash held by the Debtors at the time of the commencement of the case under chapter 7 of the Bankruptcy Code. Any such Cash amount then would be reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation and any additional Administrative Expenses and Priority Claims that may result from the termination of the Debtors' businesses and the use of chapter 7 of the

Bankruptcy Code for the purposes of liquidation. Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) is compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, as well as those which might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in cases under chapter 7 of the Bankruptcy Code, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other such appointed committee. In addition, as described above, Claims may arise by reason of the breach or rejection of obligations incurred and executory contracts entered into by the Debtors during the pendency of Chapter 11 Cases by reason of the rejection of executory contracts or leases which otherwise would have been assumed in a reorganization under chapter 11 of the Bankruptcy Code.

To determine whether the Plan is in the best interests of each Impaired class, the present value of the distributions from the proceeds of the liquidation of the Debtors' assets and properties, after subtracting the amounts attributable to the foregoing Claims, costs and expenses, are then compared with the value of the property offered to such classes of Claims and Equity Interests under the Plan.

In applying the "best interests test," it is possible that Claims and Equity Interests in cases under chapter 7 of the Bankruptcy Code may not be classified according to the seniority of such Claims and Equity Interests as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all pre-petition unsecured Claims which have the same rights upon liquidation would be treated as one class for purposes of determining the potential distribution of the liquidation proceeds resulting from such cases under chapter 7 of the Bankruptcy Code. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each Creditor. Creditors who claim to be beneficiaries of any contractual subordination provisions might seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. Section 510 of the Bankruptcy Code specifies that such contractual subordination provisions are enforceable in a case under chapter 7 of the Bankruptcy Code. The rule of absolute priority of distributions applicable in cases under chapter 7 of the Bankruptcy Code provides that no junior creditor may receive any distribution or retain any property until all senior creditors are paid in full with interest. Consequently, the Debtors believe that if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Holders of Claims in all Classes would receive distributions of a value significantly less than the value of the distributions provided to the Creditors in such classes under the Plan, and that Holders of Claims in Class 9 and Holders of Old Holdings Equity Interests in Class 10 would receive no distributions under chapter 7 of the Bankruptcy Code. See the Liquidation Analysis attached hereto as Appendix B.

The Debtors have considered the effects that a liquidation under chapter 7 of the Bankruptcy Code would have on the ultimate proceeds available for distribution to creditors in a case under chapter 11 of the Bankruptcy Code, including (i) the increased costs and expenses of

liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in cases under chapter 7 of the Bankruptcy Code in the context of the expeditious liquidation required under chapter 7 of the Bankruptcy Code and the "forced sale" atmosphere that would prevail and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in a case under chapter 11 of the Bankruptcy Code. Therefore, the Debtors have determined that confirmation of the Plan will provide each Holder of a Claim in all classes with a recovery that is not less (and is expected to be substantially more) than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code. For Classes 9 and 10, confirmation of the Plan and liquidation under chapter 7 of the Bankruptcy Code yields the same result, i.e., no distribution, and therefore, the Debtors believe the best interests test is satisfied with respect to these classes as well.

### 17.08    Feasibility

Even if the Plan is accepted by each class of Claims and even if the Bankruptcy Court determines that the Plan satisfies the "best interests" test, section 1129(a)(11) of the Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is the so-called "feasibility" test. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of such analysis, the Debtors' management has prepared the projections of the balance sheet, cash flow and net income of the Reorganized Debtors (assuming the transactions contemplated by the Plan are consummated) for the fiscal years 2010 through 2013 and set forth in Appendix A to this Disclosure Statement. The significant assumptions on which the Projections are based are set forth in Appendix A. Based on the Projections, the Debtors' management believes that the Reorganized Debtors will be able to make all payments required to be made pursuant to the Plan.

**The Debtors' management has prepared the Projections to comply with the requirements of the Bankruptcy Code. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Debtors' management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the respective expected future financial performance of the Reorganized Debtors. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and Holders of Claims entitled to vote are cautioned not to place undue reliance on the Projections. In particular, this information should not be relied upon to determine how to proceed in connection with the Solicitation. Accordingly, and except as otherwise indicated, the Debtors do not intend, and disclaim any obligation, to (a) furnish updated projections to Holders of Claims prior to the Effective Date or to Holders of New Capital Stock or New Capital Warrants or any other party after the Effective Date or (b) otherwise make such updated information publicly available. Neither the Debtors' independent auditors, nor any other independent**

accountants or financial advisors, have compiled or examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, have not expressed an opinion or any other form of assurance with respect thereto.

The Projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by management, may not be realized and are beyond the Debtors' control. No representations or warranties can be made as to the accuracy of the Projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring subsequent to the date on which the Projections were prepared may be different from those assumed or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a material and possibly adverse manner. The Projections, therefore, may not be relied upon as a representation or warranty or other assurance by the Debtors that the results of the Projections will be achieved.

The Projections are based on the assumption that the Effective Date would occur on or about May 1, 2010. A significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including an increased risk of the Debtors' inability to meet sales and profitability forecasts.

## ARTICLE XVIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
## OF THE PLAN

If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives to the Plan include (a) continuation of the pending Chapter 11 Cases; (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code; and (c) an alternative plan of reorganization.

### 18.01   Continuation of the Chapter 11 Cases

If the Plan is not confirmed, and the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases and the Debtors may have difficulty sustaining the high costs and the erosion of market confidence that may be caused if the Debtors remain as chapter 11 debtors in possession.

### 18.02   Liquidation Under Chapter 7 of the Bankruptcy Code

If no chapter 11 plan for the Debtors is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to Holders of Claims and Equity Interests in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a liquidation under chapter 7 of the Bankruptcy Code would have on the recovery of Holders of Claims and Equity Interests is set forth under section 17.07

"Acceptance and Confirmation of the Plan—Best Interests Test." For the reasons discussed thereunder, the Debtors believe that confirmation of the Plan will provide each Holder of a Claim and Equity Interest entitled to receive a distribution under the Plan with a recovery that is not less (and is expected to be substantially more) than such Holder would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### 18.03  **Alternative Plan**

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization of the Debtors has expired, any other party in interest in the Chapter 11 Cases) could file a different plan or plans. Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of their assets. In addition, until the Plan is consummated, subject to certain conditions, the Debtors may determine to withdraw the Plan and propose and solicit different reorganization plans. With respect to an alternative plan, the Debtors have explored various other alternatives in connection with the formulation and development of the Plan. In a liquidation under chapter 11 of the Bankruptcy Code, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7 of the Bankruptcy Code, probably resulting in somewhat greater (but indeterminate) recoveries than would be obtained in a liquidation under chapter 7 of the Bankruptcy Code. Further, if a trustee were not appointed because such appointment is not required in a case under chapter 11 of the Bankruptcy Code, the expenses for professional fees would most likely be lower than those incurred in a case under chapter 7 of the Bankruptcy Code. Although preferable to liquidation under chapter 7 of the Bankruptcy Code, the Debtors believe that any alternative liquidation under chapter 11 of the Bankruptcy Code is a much less attractive alternative to Holders of Claims and Equity Interests than the Plan because of the greater recovery provided for by the Plan.

### ARTICLE XIX.
### THE BANKRUPTCY PLAN—VOTING INSTRUCTIONS AND PROCEDURES

### 19.01  **General**

The Debtors are soliciting the acceptance of the Plan from Holders of Class 6 Senior Subordinated Note Claims. The Holders of Class 1 Priority Claims, Class 2 Miscellaneous Secured Claims, Class 3 Intercompany Claims, Class 4 Prepetition Credit Facility Claims, Class 5 Senior Note Claims, Class 7 Subsidiary Debtor General Unsecured Claims, and Class 8 Subsidiary Debtor Equity Interests are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan. All Holders of Class 9 Holdings General Unsecured Claims and Class 10 Old Holdings Equity Interests are Impaired, not entitled to receive or retain any property under the Plan, and thus deemed to have rejected the Plan.

A Ballot to be used to accept or reject the Plan has been enclosed with all copies of this Disclosure Statement mailed to Holders of Class 6 Senior Subordinated Note Claims.

The Plan provides that Priority Claims, Intercompany Claims, Miscellaneous Secured Claims, Prepetition Credit Facility Claims, Senior Note Claims, Subsidiary Debtor General Unsecured Claims against, and Subsidiary Debtor Equity Interests will be Unimpaired

under the Plan. The Plan also provides that Holders of Holdings General Unsecured Claims and Old Holdings Equity Interests are not entitled to receive or retain any property under the Plan and therefore are deemed to have rejected the Plan. Accordingly, this Disclosure Statement (and the appendices hereto), together with the accompanying Ballot and the related materials delivered together herewith, are only being furnished to Holders of Class 6 Senior Subordinated Note Claims and may not be relied upon or used for any purpose by such Holders other than to determine whether or not to vote to accept or reject the Plan.

19.02  **Voting Deadline**

**IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 6 EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PLAN.** All known Holders of Claims entitled to vote on the Plan have been sent a Ballot together with this Disclosure Statement. Such Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement.

The Debtors have engaged Kurtzman Carson Consultants LLC ("KCC") as the Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO COUNT, YOUR VOTE MUST BE RECEIVED AT THE FOLLOWING ADDRESS BEFORE THE VOTING DEADLINE OF 7:00 P.M., PREVAILING EASTERN TIME, ON MAY 5, 2010:**

If you are sending by mail, courier or hand delivery, to:

Cooper-Standard Ballot Processing
c/o Kurtzman Carson Consultants
1230 Avenue of the Americas, 7th Floor
New York, NY 10020

**IF YOU HAVE BEEN INSTRUCTED TO RETURN YOUR BALLOT TO YOUR BANK, BROKER, OR OTHER NOMINEE, OR TO THEIR AGENT, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN IT TO THE VOTING AGENT AT THIS ADDRESS BEFORE THE VOTING DEADLINE.**

**IF A BALLOT IS DAMAGED OR LOST, OR FOR ADDITIONAL COPIES OF THIS DISCLOSURE STATEMENT, YOU MAY CONTACT THE DEBTORS' VOTING AGENT. ANY BALLOT WHICH IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE A VOTE TO ACCEPT THE PLAN. IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT THE ADDRESS SPECIFIED ABOVE.**

19.03  **Holders of Claims Entitled to Vote**

The Claims in the following Class are Impaired under the Plan and entitled to receive a distribution; consequently, each Holder of such Claim, as of the Record Date established by the Debtors for purposes of this solicitation, may vote to accept or reject the Plan:

Class 6    —    Senior Subordinated Note Claims
(Holders of the Senior Subordinated Note Claims)

19.04    **Vote Required for Acceptance by a Class**

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class which cast ballots for acceptance or rejection of the plan. Thus, acceptance by a class of claims occurs only if Holders of at least two-thirds in dollar amount and a majority in number of the claims in such class that actually vote cast their Ballots in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

19.05    **Voting Procedures**

The Debtors are providing copies of this Disclosure Statement, Ballots, and where appropriate, Master Ballots, to all registered Holders (as of the Record Date) of Senior Subordinated Note Claims in Class 6. For further information regarding voting procedures, please consult the Disclosure Statement Approval Order.

Registered Holders of Senior Subordinated Note Claims in Class 6 may include brokers, banks, and other nominees. If such registered Holders do not hold Claims for their own accounts, they or their agents (collectively with such registered Holder, "Nominees") should provide copies of this Disclosure Statement and appropriate Ballots to their customers and to beneficial owners. Any beneficial owner who has not received a Ballot should contact his, her, or its Nominee, or the Voting Agent.

(a)    Holders of Class 6 Senior Subordinated Note Claims

Beneficial Owners. Any beneficial owner, as of the Distribution Record Date, of Class 6 Senior Subordinated Note Claims in his, her, or its own name can vote by completing and signing the enclosed Ballot and returning it directly to the Voting Agent (using the enclosed pre-addressed postage-paid envelope) so as to be received by the Voting Agent before the Voting Deadline. If no envelope was enclosed, contact the Voting Agent for instructions. In addition, if any beneficial owner, as of the Distribution Record Date, of Class 6 Senior Subordinated Note Claims votes to accept the Plan, such beneficial owner may elect in writing to opt-out of the releases provided in Section 12.01(c) of the Plan, pursuant to such beneficial owner's Ballot. For a detailed description of the discharge, injunctions, releases and settlement of claims provided in the Plan, please see Article X "Discharge, Injunctions, Releases and Settlement of Claims."

Any beneficial owner holding, as of the Distribution Record Date, Senior Subordinated Note Claims in "street name" through a Nominee can vote by completing and signing the Ballot (unless the Ballot has already been signed, or "prevalidated," by the Nominee), and returning it to the Nominee in sufficient time for the Nominee to then forward the vote so as to be received by the Voting Agent before the Voting Deadline of 7:00 p.m.

(prevailing Eastern Time) on May 5, 2010.  Any Ballot submitted to a Nominee will not be counted until such Nominee properly completes and timely delivers a corresponding Master Ballot to the Voting Agent.  **If your Ballot has already been signed (or "prevalidated") by your Nominee, you must complete the Ballot and return it directly to the Voting Agent so that it is received by the Voting Agent before the Voting Deadline.**

A Nominee that is the registered Holder for a beneficial owner, as of the Distribution Record Date, of Senior Subordinated Note Claims, can obtain the votes of the beneficial owners of such securities, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

The Nominee may "prevalidate" a Ballot by (i) signing the Ballot, (ii) indicating on the Ballot the name of the registered Holder, the amount of securities held by the Nominee for the beneficial owner, and the principal amount and the appropriate account numbers for the accounts in which such securities are held by the Nominee, and (iii) forwarding such Ballot, together with the Disclosure Statement, return envelope, and other materials requested to be forwarded, to the beneficial owner for voting.  The beneficial owner must then indicate his, her or its vote on the Plan, review the certifications contained in the Ballot, and return the Ballot directly to the Voting Agent in the pre-addressed, postage-paid envelope so that it is received by the Voting Agent before the Voting Deadline.  A list of the beneficial owners to whom "prevalidated" Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Voting Deadline.

**OR**

If the Nominee elects not to "prevalidate" Ballots, the Nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Ballots, together with the Disclosure Statement, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such beneficial owner must then indicate his, her or its vote on the Plan, review the certifications contained in the Ballot, execute the Ballot, and return the Ballot to the Nominee.  After collecting the Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Ballots, execute the Master Ballot, and deliver the Master Ballot to the Voting Agent so that it is received by the Voting Agent before the Voting Deadline.  All Ballots returned by beneficial owners should be retained by Nominees for inspection for at least one year from the Voting Deadline.  Please note:  The Nominee should advise the beneficial owners to return their Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Voting Agent so that the Master Ballot is received by the Voting Agent before the Voting Deadline.

(b)     Other

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such persons should indicate such capacity when signing, and unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of their authority to so act.

For purposes of voting to accept or reject the Plan, the beneficial owners of such securities will be deemed to be the "Holder" of such claims represented by such securities.

All Claims, as the case may be, in a Class that are voted by a beneficial owner must be voted either to accept or to reject the Plan and may not be split by the beneficial owner within such Class.  Unless otherwise ordered by the Bankruptcy Court, Ballots or Master Ballots which are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will be deemed to be a vote to accept the Plan.  The Debtors, in their discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots or Master Ballots.

Except as provided below, unless the Ballot or Master Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot or Master Ballot, the Debtors may, in their sole discretion, reject such Ballot or Master Ballot as invalid, and therefore, decline to utilize it in connection with seeking confirmation of the Plan by the Bankruptcy Court.

In the event of a dispute with respect to a Claim, any vote to accept or reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

The Debtors at this time are not requesting the delivery of, and neither the Debtors nor the Voting Agent will accept, certificates representing any notes or equity securities. Prior to the Effective Date, the Debtors will furnish all such Holders with appropriate letters of transmittal to be used to remit such securities in exchange for the distribution under the Plan. Information regarding such remittance procedure (together with all appropriate materials) will be distributed by the Debtors after confirmation of the Plan.

## ARTICLE XX.
## CONCLUSION AND RECOMMENDATION

BASED ON ALL OF THE FACTS AND CIRCUMSTANCES, THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS, AND THEIR ESTATES.  IN ADDITION, THE BACKSTOP PARTIES SUPORT THE PLAN AND HAVE AGREED, SUBJECT TO APPROVAL OF THIS DISCLOSURE STATEMENT, TO VOTE IN FAVOR OF THE PLAN.  THE PLAN PROVIDES FOR AN EQUITABLE AND EARLY DISTRIBUTION TO HOLDERS OF CLAIMS AND PRESERVES THE GOING CONCERN VALUE OF THE DEBTORS.  THE DEBTORS BELIEVE THAT ALTERNATIVES TO CONFIRMATION OF THE PLAN COULD RESULT IN SIGNIFICANT DELAYS, LITIGATION AND COSTS.  FOR THESE REASONS, THE DEBTORS AND THE CREDITORS' COMMITTEE URGE YOU TO RETURN YOUR BALLOT AND VOTE TO ACCEPT THE PLAN.

Dated:   Novi, Michigan
       March 26, 2010

Respectfully submitted,
Cooper-Standard Holdings Inc. (for itself and
on behalf of each of the other Debtors)


By: /s/ Allen J. Campbell
Allen J. Campbell
Vice President and Chief Financial Officer


_____
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Chun I. Jang, Esq.
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:  (302) 651-7700
Fax:  (302) 651-7701

- and –

Gary L. Kaplan, Esq.
Richard J. Slivinski, Esq.
Peter B. Siroka, Esq.
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
One New York Plaza
New York, New York 10004
Tel:  (212) 859-8000
Fax:  (212) 859-4000

*Counsel for Debtors and Debtors in Possession*