Table of Contents

### CONSOLIDATING STATEMENT OF CASH FLOWS
### For the Year Ended December 31, 2007
### (in millions)

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Totals |
|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by operating activities | $— | $(56.4) | $ 28.2 | $ 213.6 | $ — | $ 185.4 |
| **INVESTING ACTIVITIES** | | | | | | |
| Property, plant, and equipment | — | (12.6) | (18.6) | (76.1) | — | (107.3) |
| Acquisition of businesses, net of cash acquired | — | — | (10.0) | (148.7) | — | (158.7) |
| Gross proceeds from sale-leaseback transaction | — | — | — | 4.8 | — | 4.8 |
| Other | — | 0.1 | — | 1.1 | — | 1.2 |
| Net cash used in investing activities | — | (12.5) | (28.6) | (218.9) | — | (260.0) |
| **FINANCING ACTIVITIES** | | | | | | |
| Proceeds from issuance of long-term debt | — | 60.0 | — | — | — | 60.0 |
| Increase/(decrease) in short term debt | — | 1.4 | — | 4.8 | — | 6.2 |
| Principal payments on long-term debt | — | (2.7) | — | (34.9) | — | (37.6) |
| Debt issuance costs | — | (2.9) | — | (0.2) | — | (3.1) |
| Equity Contributions | — | 30.0 | — | — | — | 30.0 |
| Other | — | (0.5) | — | — | — | (0.5) |
| Net cash provided by (used in) financing activities | — | 85.3 | — | (30.3) | — | 55.0 |
| Effects of exchange rate changes on cash | — | 4.3 | — | (0.1) | — | 4.2 |
| Changes in cash and cash equivalents | — | 20.7 | (0.4) | (35.7) | — | (15.4) |
| Cash and cash equivalents at beginning of period | — | 21.9 | 0.4 | 34.0 | — | 56.3 |
| Cash and cash equivalents at end of period | $— | $ 42.6 | $ (0.0) | $ (1.7) | $ — | 40.9 |
| **Depreciation and amortization** | $— | $ 40.8 | $ 30.8 | $ 64.4 | $ — | $ 136.0 |

Table of Contents

**CONSOLIDATING STATEMENT OF CASH FLOWS**
**For the Year Ended December 31, 2008**
**(in millions)**

| | Parent | Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated Totals |
|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | |
| Net cash provided by operating activities | $ 0.5 | $(24.0) | $ 12.2 | $ 147.8 | $ — | $ 136.5 |
| **INVESTING ACTIVITIES** | | | | | | |
| Property, plant, and equipment | — | (9.1) | (12.5) | (70.6) | — | (92.2) |
| Gross proceeds from sale-leaseback transaction | — | — | — | 8.6 | — | 8.6 |
| Other | — | 4.1 | 0.3 | 5.3 | — | 9.7 |
| Net cash used in investing activities | — | (5.0) | (12.2) | (56.7) | — | (73.9) |
| **FINANCING ACTIVITIES** | | | | | | |
| Increase/(decrease) in short term debt | — | 35.8 | — | 1.2 | — | 37.0 |
| Principal payments on long-term debt | — | (2.9) | — | (13.6) | — | (16.5) |
| Repurchase of bonds | — | (5.3) | — | — | — | (5.3) |
| Other | (0.5) | (0.5) | — | (0.1) | — | (1.1) |
| Net cash provided by (used in) financing activities | (0.5) | 27.1 | — | (12.5) | — | 14.1 |
| Effects of exchange rate changes on cash | — | (0.7) | — | (5.4) | — | (6.1) |
| Changes in cash and cash equivalents | — | (2.6) | — | 73.2 | — | 70.6 |
| Cash and cash equivalents at beginning of period | — | 42.6 | — | (1.7) | — | 40.9 |
| Cash and cash equivalents at end of period | $ — | $ 40.0 | $ — | $ 71.5 | $ — | $ 111.5 |
| | | | | | | |
| **Depreciation and amortization** | $ — | $ 37.7 | $ 24.8 | $ 77.6 | $ — | $ 140.1 |

99

Table of Contents

**23. Accounts Receivable Factoring**

As a part of its working capital management, the Company sells certain receivables through third party financial institutions without recourse. The amount sold varies each month based on the amount of underlying receivables and cash flow needs of the Company.

At December 31, 2008, the Company had $43,544 of receivables outstanding under receivable transfer agreements entered into by various locations. The Company incurred a loss on the sale of receivables for the year ended December 31, 2008 of $2,219; this amount is recorded in other income (expense) in the Consolidated Statements of Operations. The Company continues to service the receivables for one of the locations. These are permitted transactions under the Company's credit agreement. The Company is also pursuing similar arrangements in various locations.

Table of Contents

### Schedule II
### Valuation and Qualifying Accounts
### (dollars in millions)

| Description | Balance at beginning of period | Acquisition (b) | Charged to Expenses | Charged (credited) to other accounts (a) | Deductions | Balance at end of period |
|---|---|---|---|---|---|---|
| Allowance for doubtful accounts deducted from accounts receivable | | | | | | |
| Year ended December 31, 2006 | $ 5.4 | 5.8 | 5.5 | 0.7 | (7.3) | $ 10.1 |
| Year ended December 31, 2007 | $ 10.1 | 0.9 | 0.1 | 0.8 | (1.7) | $ 10.2 |
| Year ended December 31, 2008 | $ 10.2 | — | (1.4) | (2.1) | (2.7) | $ 4.0 |
| Inventory reserve account deducted from inventories | | | | | | |
| Year ended December 31, 2006 | $ 6.3 | 2.0 | 3.8 | 0.6 | (1.7) | $ 11.0 |
| Year ended December 31, 2007 | $ 11.0 | 2.1 | 4.0 | 1.0 | (3.3) | $ 14.8 |
| Year ended December 31, 2008 | $ 14.8 | — | 0.9 | (1.1) | (3.8) | $ 10.8 |

(a)   Primarily foreign currency translation.
(b)   2006 relates to FHS acquisition.
       2007 relates to MAPS acquisition.

| Description | Balance at beginning of period | Additions Charged to Income | Charged to Equity | Deductions (a) | Balance at end of period |
|---|---|---|---|---|---|
| Tax valuation allowance | | | | | |
| Year ended December 31, 2006 | $ 71.0 | 12.8 | — | (3.0) | 80.8 |
| Year ended December 31, 2007 | $ 80.8 | 56.4 | (3.3) | (5.1) | 128.8 |
| Year ended December 31, 2008 | $ 128.8 | 45.2 | 21.4 | (20.2) | 175.2 |

(a)   Net reduction in tax valuation allowance is a result of the reversal of valuation allowances set up through purchase accounting and reversed through goodwill as a result of utilization of tax loss carryforwards and other cumulative book/tax difference.

**Item 9.      Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.

Table of Contents

**Item 9A(T).    Controls and Procedures.**

The Company has evaluated, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this Report. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. However, based on that evaluation, the Company's Chief Executive Officer along with the Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this Report.

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the evaluation under the framework in Internal Control – Integrated Framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2008.

This annual report does not include an attestation report of the Company's independent registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's independent registered public accounting firm pursuant to temporary rules of the SEC that permit the Company to provide only management's report in this annual report.

There was no change in the Company's internal control over financial reporting that occurred during the fourth quarter ended December 31, 2008, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**Item 9B.    Other Information.**

None.

Table of Contents

PART III

Item 10.    Directors, and Executive Officers and Corporate Governance

The following table sets forth information about our current directors, executive officers and other named officers.

| Name | Age | Position |
|------|-----|----------|
| James S. McElya | 61 | Chairman, Director, and Chief Executive Officer |
| Edward A. Hasler | 59 | Vice Chairman, Director, and President, North America |
| Allen J. Campbell | 51 | Chief Financial Officer |
| Keith D. Stephenson | 48 | President, International |
| Gerald J. Cardinale | 41 | Director |
| Gary L. Convis | 66 | Director |
| Jack Daly | 42 | Director |
| S.A. (Tony) Johnson | 68 | Director |
| Leo F. Mullin | 66 | Director |
| James A. Stern | 58 | Director |
| Stephen A. Van Oss | 54 | Director |
| Kenneth L. Way | 69 | Director |

**James S. McElya** is our Chairman of the Board of Directors and Chief Executive Officer, a position he has held since March 2009 and previously held from September 2006 to July 2008. He served as executive Chairman from July 2008 to March 2009. Mr. McElya served as President and Chief Executive Officer from the date of the 2004 Acquisition to September 2006. He has been a director of the Company since the 2004 Acquisition. He was President, Cooper-Standard Automotive and a corporate Vice President of Cooper Tire & Rubber Company from June 2000 until the 2004 Acquisition. Mr. McElya has over 33 years of automotive experience. He was previously President of Siebe Automotive Worldwide, a division of Invensys, PLC and spent 22 years with Handy & Harman in various executive management positions, including President, Handy & Harman Automotive, and Corporate Vice President of the parent company. Mr. McElya is the current Chairman of the Board of Directors of the Motor & Equipment Manufacturers Association and is a past Chairman and current member of the Board of Directors of the Original Equipment Supplier Association. He is a member of the Board of Directors of the National Alliance for Accessible Golf.

**Edward A. Hasler** is our Vice Chairman and President, North America, a position he has held since March 2009. He has been a director of the Company since March 2009. Mr. Hasler served as President and Chief Executive Officer from July 2008 to March 2009. He served as President and Chief Operating Officer from September 2006 to July 2008. Mr. Hasler was President, Global Sealing Systems from the date of the 2004 Acquisition to September 2006. He was the President of the Global Sealing Systems Division and a corporate Vice President of Cooper Tire & Rubber Company from 2003 until the 2004 Acquisition. Mr. Hasler was employed from 2000 to 2001 in Germany as Managing Director, Europe for GDX Corporation. Prior to joining GDX, Mr. Hasler had been with Cooper Tire for nearly 15 years. At Cooper Tire, Mr. Hasler held several senior posts including Vice President, Operations; and Vice President, Controller. He has both an MBA and a BS in Business Administration.

**Allen J. Campbell** is our Chief Financial Officer, a position he has held since the 2004 Acquisition. He was Vice President, Asian Operations of the Cooper-Standard Automotive division of Cooper Tire & Rubber Company from 2003 until the 2004 Acquisition and served as Vice President, Finance of the division from 1999 to 2003. Prior to joining Cooper Tire, Mr. Campbell was with The Dow Chemical Company for 18 years and held executive finance positions for both U.S. and Canadian operations. Mr. Campbell is a certified public accountant and received his MBA in Finance from Xavier University.

**Keith D. Stephenson** is our President, International, a position he has held since March 2009. He served as President, Global Body & Chassis Systems from June 2007 to March 2009. Mr. Stephenson was Chief

103

Table of Contents

Development Officer at Boler Company from January 2004 until October 2006. From 1985 to January 2004, he held various senior positions at Hendrickson, a division of Boler Company, including President of International Operations, Senior Vice President of Global Business Operations and President of the Truck Systems Group.

**Gerald J. Cardinale** has been a director of the Company since the 2004 Acquisition in December 2004. Mr. Cardinale is a Managing Director in the Principal Investment Area at Goldman Sachs & Co. He joined Goldman Sachs in 1992 and became a Managing Director in 2002. He serves on the Boards of Directors of Alliance Films Holdings, Inc., Sensus Metering Systems Inc., Clearwire Holdings, Inc., Cequel Communications, LLC, CSI Entertainment, CW Media Holdings, Inc., Griffon Corporation, Guthy-Renker Holdings, LLC, Legends Hospitality Holding Company, LLC and Yankees Entertainment & Sports Networks, LLC. Mr. Cardinale received an Honors B.A. from Harvard University and an M.Phil in Politics from Oxford University where he was a Rhodes Scholar.

**Gary L. Convis** has been a director of the Company since July 2007. Mr. Convis is Vice Chairman of Dana Holding Company, a position he has held since January 2009. He served as Dana's Chief Executive Officer from April 2008 to January 2009. Mr. Convis retired in July 2007 as Chairman of Toyota Motor Manufacturing, Kentucky (TMMK), a position he held since 2006. Mr. Convis had previously served as President of TMMK since 2001. He also was a Managing Officer of Toyota Motor Corporation and Executive Vice President of Toyota Engineering and Manufacturing North America (TEMA), from 2003 until his retirement in 2007. Prior to serving in these roles, Mr. Convis spent 16 years at New United Motor Manufacturing, Inc., a joint venture between General Motors Corporation and Toyota. Mr. Convis also spent more than 20 years in various roles with General Motors and Ford Motor Company. Mr. Convis serves on the Boards of Directors of Dana Holding Corporation, Compass Automotive Group, Inc., and Achates Power LLC.

**Jack Daly** has been a director of the Company since the 2004 Acquisition in December 2004. Mr. Daly is a Managing Director in the Principal Investment Area of Goldman Sachs, where he has worked since 2000. From 1998 to 2000, he was a member of the Investment Banking Division of Goldman Sachs. From 1991 to 1997, Mr. Daly was a Senior Instructor of Mechanical & Aerospace Engineering at Case Western Reserve University. Mr. Daly currently serves as a director of Clearwire Holdings, Inc., Hawker Beechcraft Corporation, Euramax Corporation and McJunkin Redman Corporation. He earned a B.S. and M.S. in Engineering from Case Western Reserve University and an M.B.A. from the Wharton School of Business.

**S.A. (Tony) Johnson** has been a director of the Company since the 2004 Acquisition in December 2004. He served as the Lead Director for our Board of Directors from September 2006 to August 2008 and as our Non-Executive Chairman from the date of the 2004 Acquisition in December 2004 to September 2006. Mr. Johnson is a legendary industrial management company, a position he has held since 2004. Mr. Johnson served as the Chairman of Hidden Creek Industries from May 2001 to May 2004 and was its Chief Executive Officer and President from 1989 to May 2001. Prior to forming Hidden Creek, Mr. Johnson served from 1986 to 1989 as President and Chief Operating Officer of Pentair, Inc. Mr. Johnson currently serves as director of Commercial Vehicles Group Inc. He served as a director of Dura Automotive Systems, Inc. from 1990 to 2004, serving as its Chairman from 1990 to 2003; and also served as Chairman and a director of Automotive Industries Holding, Inc. from May 1990 until its sale to Lear Corporation in August 1995.

**Leo F. Mullin** has been a director of the Company since May 2005. Since September 2004, he has been a Senior Advisor on a part-time basis to Goldman Sachs Capital Partners. Mr. Mullin served as President and Chief Executive Officer of Delta Air Lines from 1997 to 1999, as Chairman and Chief Executive Officer from 1999 to December 31, 2003 and as Chairman until his retirement on April 30, 2004. Previously, he served as Vice Chairman of Unicom Corporation and its principal subsidiary, Commonwealth Edison Company, from 1995 to 1997. He was an executive at First Chicago Corporation from 1981 to 1995, serving as that company's President and Chief Operating Officer from 1993 to 1995. Mr. Mullin is a director of Johnson & Johnson Corporation, Ace Limited and the privately held companies, Euramax Corporation, Educational Management Corporation and Hawker Beechcraft Corporation.

104

Table of Contents

**James A. Stern** has been a director of the Company since May 2007. Mr. Stern is the Chairman of The Cypress Group L.L.C., a position he has held since 1994. Mr. Stern headed Lehman Brothers' Merchant Banking Group before leaving that firm to found Cypress. During his 20-year tenure with Lehman, he held senior management positions where he was responsible for the high yield and primary capital markets groups. He also served as co-head of investment banking and was a member of Lehman's operating committee. Mr. Stern received his degree in Civil Engineering from Tufts University and a MBA from Harvard. Mr. Stern currently serves on the Boards of Directors of Lear Corporation and Affinia Group Inc., and is the Chairman of the Board of Trustees of Tufts University.

**Stephen A. Van Oss** has been a director of the Company since August 2008. Mr. Van Oss also serves as chairman of the Audit Committee of our Board of Directors. Mr. Van Oss is Senior Vice President and Chief Financial and Administrative officer for WESCO Distribution, Inc., a position he has held since July 2004. From 2000 to 2004, Mr. Van Oss served as Vice President and Chief Financial Officer of WESCO. He served as WESCO's Director, Information Technology from 1997 to 2007 and as its Director, Acquisition Management in 1997. From 1995 to 1996, Mr. Van Oss served as Chief Operating Officer and Chief Financial Officer of Paper Back Recycling of America, Inc. He also held various management positions with Reliance Electric Corporation. Mr. Van Oss is a director of WESCO Distribution, Inc. and is a trustee of Robert Morris University.

**Kenneth L. Way** has been a director of the Company since the 2004 Acquisition in December 2004. Mr. Way also serves as chairman of the Compensation Committee of our Board of Directors. Mr. Way is the former Chairman and CEO of Lear Corporation. Mr. Way had been affiliated with Lear Corporation and its predecessor companies for 37 years in various engineering, manufacturing and general management capacities. Mr. Way is also a director of WESCO International, Inc., Comerica, Inc. and CMS Energy Corporation.

## Committees of the Board of Directors

Our Board of Directors currently has an executive committee, an audit committee, and a compensation committee.

### Executive Committee

Our executive committee currently consists of Messrs. McElya, Daly and Stern. Mr. McElya serves as the chairman of the Executive Committee. The Executive Committee has the authority to discharge all functions of the Board of Directors in the management of our business during the interim between meetings of the Board of Directors.

### Audit Committee

Our audit committee currently consists of Messrs. Van Oss, Way, and Daly. Mr. Van Oss serves as the chairman of the audit committee. The Board of Directors has determined that the Company has at least two "audit committee financial experts" (as defined in Item 401(d)(5) of Regulation S-K), Messrs. Van Oss and Way, serving on the Audit Committee. Messrs. Van Oss and Way are "independent" as defined in the listing standards of the NASDAQ Stock Market. The audit committee is responsible for (i) reviewing and discussing with management and our independent auditors our annual audited financial statements and quarterly financial statements and any audit issues and management's response; (ii) reviewing and discussing with management and our independent auditors our financial reporting and accounting standards and principles and significant changes in such standards and principles or their application; (iii) reviewing and discussing with management and our independent auditors our internal system of financial controls and disclosure controls and our risk assessment and management policies and activities; (iv) reviewing and evaluating the independence, qualifications, and performance of our independent auditors; (v) reviewing our legal compliance and ethics programs and investigating matters relating to management's integrity, including adherence to standards of business conduct established in our policies; and (vi) taking such actions as may be required or permitted under applicable law to be taken by an audit committee on behalf of us and our Board of Directors.

Table of Contents

**Compensation Committee**

Our compensation committee currently consists of Messrs. Way, Daly and Stern. Mr. Way serves as the chairman of the compensation committee. The compensation committee is responsible for (i) the review and approval of corporate goals, objectives and other criteria relevant to the compensation of the Chief Executive Officer and other executive officers; (ii) the evaluation of the performance of the Chief Executive Officer and other executive officers and the determination and approval of their compensation; (iii) the review and approval of executive compensation programs; (iv) the review of director compensation and director and officer indemnification and insurance matters; (v) the review and approval of contracts and transactions with executive officers; (vi) the review and approval of equity-based compensation plans and awards made pursuant to such plans; (vii) the approval, review and oversight of employee benefit plans of the Company, including the delegation of responsibility for such programs to the executive officers of the Company; and (viii) taking such actions as may be required or permitted under applicable law to be taken by a compensation committee on behalf of us and our Board of Directors.

**Other Matters Concerning Directors**

Securities and Exchange Commission regulations require the Company to describe certain legal proceedings, including bankruptcy and insolvency filings involving directors of the Company or companies of which a director was an executive officer. Mr. Mullin served as the Chief Executive Officer of Delta Air Lines, Inc. from 1997 through December 2003 and as its Chairman of the Board from 1999 through April 2004. Delta Air Lines filed for protection under Chapter 11 of the United States Bankruptcy Code in September 2005.

**Code of Business Conduct and Ethics**

We have adopted a Code of Business Conduct and Ethics Policy that applies to all directors, officers, and employees of the Company and its subsidiaries, including our chief executive officer, our chief financial officer and our controller. The Code of Business Conduct and Ethics Policy is available on our website at www.cooperstandard.com. We will also post on our website any amendment to, or waiver from, a provision of our policies that applies to our chief executive officer, chief financial officer, or controller, and that relates to any of the following elements of these policies: honest and ethical conduct; disclosure in reports or documents filed by the Company with the SEC and in other public communications; compliance with applicable laws, rules and regulations; prompt internal reporting of code violations; and accountability for adherence to the policies.

106

Table of Contents

Item 11.    Executive Compensation

## COMPENSATION DISCUSSION AND ANALYSIS

**Executive Summary**

This Compensation Discussion and Analysis describes the key principles and material elements of the Company's compensation policies for the "Named Executive Officers" of the Company identified in the "Executive Compensation" section which begins on page 117. Much of what is discussed below, however, applies generally to the Company's executives and is not limited to the Named Executive Officers.

The Compensation Committee, with the assistance of independent executive compensation consultants, regularly reviews the various elements of the Company's executive compensation program. In reviewing elements of compensation, the Company places considerable emphasis on performance-based compensation to ensure executives are compensated for annual and long-term Company results. Performance-based components of compensation normally include annual bonuses tied to annual adjusted EBITDA results, long-term incentive plan awards pertaining to three year performance periods, a stock incentive plan and a management stock purchase plan.

In the latter part of 2008 and continuing into 2009, the Company implemented a number of cost-reduction measures in response to the general economic downturn and, in particular, the substantial decline in worldwide automotive production and sales levels. These measures included reductions in base pay, bonus opportunities and benefits applicable to salaried employees of the Company, including the Named Executive Officers, which are described under "Compensation Determinations".

The Compensation Committee intends to review the special measures described above as economic and industry conditions develop through 2009. The Committee has engaged Hewitt Associates to assist the Company in reviewing its entire executive compensation program in 2009 to ensure that it is appropriate in light of the Company's compensation philosophy and objectives, as well as the economic and industry environment.

**Compensation Philosophy and Objectives**

The objective of our current compensation program is to link executive compensation to Company performance in a manner that accomplishes the following:

- enables us to attract and retain a highly qualified executive leadership team;
- aligns the interests of executives with those of stockholders; and
- motivates our leadership team to implement the Company's long-term growth strategy while delivering consistently strong financial results.

The program rewards sustained enterprise value growth through incentives that are based on the achievement of performance objectives over varying time periods. As detailed below, the Company's incentive programs emphasize specific Company or group-wide objectives over subjective, individual goals. Discretionary features of these programs allow for the recognition of achievements which the objective performance criteria do not fully measure but which further the Company's key strategies. Base salary is designed, in general, to be near the median of the range applicable to companies deemed comparable to the Company and performance-based compensation is designed to provide opportunities above median levels in the industries in which the Company competes for executives.

**Processes Relating to Executive Compensation**

In May 2006, our Board of Directors established the Compensation Committee (the "Committee") to assist in discharging the Board's responsibilities relating to the compensation of the Company's directors and executive officers and the oversight of compensation plans, policies and benefit programs. The Company's human resources executives and professionals support the Committee in its work. In evaluating and determining the salary and incentive compensation of our senior leadership team, the Committee receives information from our Global Vice President,

Table of Contents

Human Resources and recommendations from the CEO. The Committee as a whole, following discussions with the CEO, meets privately and determines the salary and incentive compensation of the CEO. Executives whose compensation is under consideration are not present during the Committee's review meetings. The considerations, criteria and procedures applicable to these determinations are discussed under "Executive Compensation Components" beginning on page 109.

*Total Compensation Review*

In evaluating the compensation of the Company's executives for 2008, the Committee engaged Towers Perrin to assess the market competitiveness of the Company's executive compensation program with particular focus on total direct compensation, which is comprised of base salary, annual incentive award opportunities, long-term incentive award opportunities, executive perquisites other than core health and welfare benefits, and executive severance and change-in-control benefits. Towers Perrin compared the Company's programs in these areas with those of two comparator groups: a group of eleven automotive suppliers selected on the basis of annual sales (ranging from $907 million to $12.4 billion, with a median of $5.0 billion) and a group of 50 companies from various industrial segments also selected on the basis of annual sales (ranging from $290 million to $10.7 billion, with a median of $2.7 billion), as follows:

*Automotive Supplier Revenue-Based Comparator Group*

| | | |
|---|---|---|
| • American Axle & Mfg | • Eaton Corp | • Navistar International |
| • ArvinMeritor | • Fleetwood Enterprises | • PPG Industries Inc |
| • CLARCOR Inc. | • Hayes-Lemmerz | • Timken Co |
| • Cooper Tire & Rubber | • Ingersoll-Rand Co Ltd | |

*Broad Industrial Comparator Group*

| | | |
|---|---|---|
| • Air Products and Chemicals Inc | • GATX Corp | • OMNOVA Solutions Inc |
| • American Axle & Mfg. | • Harley-Davidson Inc. | • Owens-Illinois Inc. |
| • Arctic Cat Inc. | • Harman International Industries | • Parker-Hannifin Corp |
| • ArvinMeritor Inc | • Harsco Corp | • Plum Creek Timber Co Inc |
| • Ball Corp | • Hayes Lemmerz | • Rockwell Automation Inc. |
| • Black & Decker Corp | • HNI Corp | • Smurfit-Stone Container |
| • Brady Corp | • IDEX Corporation | • Sonoco Products Co |
| • Cameron International Corp | • ITT Corp | • Steelcase Inc. |
| • Chesapeake Corp | • Kaman Corp | • Sybron |
| • CLARCOR Inc | • Lafarge North America | • Terex Corp |
| • Constar International Inc | • Louisiana-Pacific Corp | • Thomas & Betts Corp |
| • Cooper Tire & Rubber Co | • MeadWestvaco Corp | • Timken Co (The) |
| • Donaldson Co Inc. | • Milacron Inc. | • Toro Co (The) |
| • Dresser-Rand Group Inc | • Mine Safety Appliances Co | • Trinity Industries Inc |
| • Fleetwood Enterprises Inc. | • Monaco Coach Corp | • USG Corp |
| • Flowserve Corp | • MSC Industrial Direct Co | • Valmont Industries Inc |
| • Fortune Brands Inc. | • Navistar International Corp | |

Table of Contents

*Compensation Determinations*

The Committee reviewed the report of Towers Perrin with the CEO and other members of executive management. The Committee considered the Towers Perrin report in determining the total compensation of senior management, but did not target any percentile level among the comparator groups used in the report in determining the appropriate level of each element of compensation for the executive leadership team. The Committee also took into account distinctions between the Company's equity-based incentive compensation programs and those offered by many of the companies in the comparator groups arising out of the fact that the Company's stock is not publicly traded as is the case with many of the comparator group companies. In this connection, the Committee reviewed the impact of the Company's management stock purchase program which allows for the deferral and allocation of base and incentive compensation into stock units eligible for Company matching (described under "Executive Compensation Components – Management Stock Purchase Plan"). Taking into account the above, the survey data generally reaffirmed that compensation of the executive leadership team as then approved by the Committee was in accordance with the Company's overall compensation strategy.

In the fourth quarter of 2008 and the first quarter of 2009, the Company, with the approval of the Committee, implemented special cost-reduction measures affecting executive compensation. These included a 10% reduction in the base pay of salaried employees in the United States and Canada, including the Named Executive Officers, commencing in January 2009 and remaining in effect through June 2009, subject to extension; the suspension of the Company's annual bonus plan programs in the United States and Canada, including the accrual of annual bonuses payable to the Named Executive Officers, for the first half of 2009; the freezing of benefit accruals under some defined benefit retirement plans in effect in the United States and Canada, including the qualified plan applicable to the Named Executive Officers; and the suspension of Company matching contributions for 2009 under some of the Company's qualified defined contribution plans, including the qualified plan applicable to the Named Executive Officers.

These actions did not reflect a change in the Company's compensation philosophy, but were taken as special measures in response to the general economic downturn and, more specifically, the substantial decline in worldwide automotive production and sales levels. It is difficult to predict how long, and to what extent, the economic and industry conditions that led to these special actions will persist. The Committee will continue to monitor these special measures in light of developing circumstances.

In 2009, the Committee has retained Hewitt Associates to work with management and the Committee and to conduct an executive compensation program audit. The audit will include the design of existing executive compensation programs as well as the value delivered for each executive position. It will result in an assessment of the level of alignment of the Company's executive compensation program and plans with its strategic goals and compensation philosophy, the competitiveness of the program as compared to the external marketplace, and the technical compliance aspects of the program.

**Executive Compensation Components**

The elements of compensation available to the Company's executives are:

*Base Salary*

Our executives are paid a base salary that is determined prior to or at the beginning of each fiscal year or upon changes in roles or positions within the Company. The Committee determines the salary of the CEO and, upon the recommendation of the CEO, the salaries of other members of the executive leadership team. The salaries of other executives are determined by the executives to whom they report, upon consultation with the CEO. Our policy is to pay salaries that are competitive in the markets in which we compete for executives and that take into account the responsibilities and contributions of each executive. The base salary provides executives with a regular stream of income.

Table of Contents

*Bonus*

Prior to or early in the fiscal year, the Committee normally establishes performance targets on which the annual incentive bonuses payable to senior executives with respect to that year will be based. The targets are generally set in terms of the adjusted EBITDA of the Company as a whole or, in the case of executives with responsibility for a Company division, the adjusted EBITDA of that division. Adjusted EBITDA is calculated in a manner similar to that applied with respect to the Company's performance-based covenants under its Senior Credit Facilities and Indentures. "Adjusted EBITDA" (referred to as "Consolidated EBITDA" in the Senior Credit Facilities) is consolidated net income plus the sum of i) consolidated interest expense; ii) consolidated income tax expense; iii) any non-cash charges, losses or expenses; iv) most non-recurring fees, cash charges and other cash expenses; v) non-specified restructuring charges limited to 7.5% of consolidated EBITDA; vi) non-recurring fees, expenses or charges related to professional or financial advisory, financing, underwriting and other similar services related to equity offerings, investments, acquisitions, divestitures or recapitalizations; vii) extraordinary charges or losses; ix) losses related to discontinued operations; x) losses in respect of business or asset dispositions outside the ordinary course; and xi) non-recurring restructuring charges related to the integration of businesses acquired in certain acquisition transactions, subject to certain restrictions. Additional adjustments are sometimes made for extraordinary events upon approval of the Compensation Committee. Adjusted EBITDA is deemed by the Company to be an appropriate objective measurement of the financial performance of the Company or division for that year. For each executive, a bonus amount payable upon achievement of the established performance target is established by the Committee (or, in the case of executives other than the executive leadership team, by the individual to whom such executive reports). In the first quarter following the end of the fiscal year to which the bonus applies, the Committee determines whether, and to what extent, the applicable performance targets were achieved based on the Company's financial results for the fiscal year. The Committee may take into account special circumstances and adjust applicable performance targets and bonuses. The annual incentive bonus is designed to focus the executive leadership team on the achievement of strong financial performance over a one-year period.

Based on the business plan of the Company approved by the Board of Directors for 2008, the Committee established specific Adjusted EBITDA performance levels for 2008 corresponding to "target", "threshold" and "superior performance" bonus payment amounts also established by the Committee. All the Named Executive Officers' bonuses except for Mr. Stephenson's were based on the performance of the Company as a whole. For all Named Executive Officers except Mr. Stephenson , the Compensation Committee established the following Adjusted EBITDA levels for bonus payments: $282,700,000 for a pay-out of 50% of the respective executives' target bonus; $315,000,000 for a pay-out of 100% of the respective executives' target bonus; and $347,300,000 for a pay-out of 200% of the respective executives' target bonus. Mr. Stephenson's bonus was based on the performance of the Body & Chassis division. The Compensation Committee established the following Body & Chassis division Adjusted EBITDA levels for bonus payments to Mr. Stephenson: $184,000,000 for a pay-out of 50% of his target bonus; $210,000,000 for a pay-out of 100% of his target bonus; and $236,000,000 for a pay-out of 200% of his target bonus. The superior performance EBITDA level for the Company as a whole and for the Body & Chassis division was deemed to represent a goal unlikely of achievement based on the assumptions underlying the business plan, except upon performance substantially exceeding expectations. Incentive bonus awards are determined on a linear basis for Adjusted EBITDA attainment falling (1) between the "threshold" and "target" levels, or (2) between the "target" and "superior performance" levels. The threshold Adjusted EBITDA levels for 2008 were not attained by the Company or by the Body & Chassis division and therefore none of the Named Executive Officers received an annual bonus for 2008.

110

Table of Contents

*Long Term Incentive Compensation*

The Company has a Long Term Incentive Plan ("LTIP") which provides for the granting by the Committee of performance-based awards to executive officers covering performance periods of one year or longer. Awards are normally granted in the first quarter of each year; however, interim grants may be made in the case of new hires or promotions. At the time awards are granted, the Committee establishes performance targets and a payment scale which determines payout amounts at different levels of performance. After the end of the performance period, the Committee determines whether, and to what extent, performance targets have been achieved and the amount of any awards that have been earned. Award amounts are subject to discretionary adjustment by the Committee (they may be adjusted downward up to 80% or upward up to 150%). If a participant engages in "inimical conduct," meaning an action or omission contrary to the best interest of the Company, before payment of an award is made, the payment is subject to forfeit. LTIP awards are designed to focus the executive leadership team on strong, sustained cash generation and have therefore been based on the achievement of operating cash flow objectives for the Company as a whole, generally over three-year performance periods.

In general, performance periods are three years in duration. At the time LTIP awards are granted, the Committee establishes a target award amount for each executive which represents the amount the executive will receive at the conclusion of the applicable performance period if performance targets are exactly met during the period. Target award amounts are based on the level of responsibility of the executive and other performance-based factors.

Since the 2004 Acquisition, LTIP awards have been based on the achievement of operating cash generation goals. Based on the business plan of the Company, the Committee establishes specific operating cash flow targets for the Company as a whole on an annual basis. The "target" performance level represents what the Committee deems to be good operating cash flow performance for the year which is reasonably capable of achievement at a high level of performance on the part of the executive leadership team and the employees of the Company, based on the assumptions and business conditions on which the business plan of the Company is based. LTIP awards for the three-year performance period ending December 31, 2008 were based on the achievement of operating cash flow targets for the years ending December 2006, 2007 and 2008. The target operating cash flow for 2006 was established at $119,500,000, for 2007 at $108,200,000 and for 2008 at $179,000,000.

At the end of each LTIP performance period, the Committee determines the extent to which the Company's mean average operating cash flow performance during the performance period met the mean average of the annual operating cash flow targets established by the Committee during the period. Subject to the right of the Committee to make adjustments under the plan, LTIP award payouts are determined in accordance with the following:

| Achievement Level (Average) | Payout % of Target Opportunity |
|---|---|
| Less than 90% of mean target | 0% |
| At 90% of mean target | 50% |
| Each 1% over 90% | +5% |
| At target | 100% |
| Each 1% above target | +10% |

*Stock Incentive Plan*

Effective as of the closing of the 2004 Acquisition, the Company established the 2004 Cooper-Standard Holdings Inc. Stock Incentive Plan, which permits the granting of non-qualified and incentive stock options and other stock-based awards to employees and directors. As of December 31, 2008, the Company had 423,615 shares of common stock reserved for issuance under the plan, including outstanding options granted to certain executives to purchase 190,615 shares of common stock at a price of $100 per share from the date of the 2004 Acquisition through 2007 and additional outstanding options granted to certain

111

Table of Contents

executives to purchase 22,000 shares of common stock at a price of $120 per share in 2008 ("2008 Options"). In each case, the exercise price was determined by the Company to be fair market value on the date of grant. Options are exercisable for ten years, subject to earlier expiration for reasons such as termination of employment. Shares of Company common stock acquired upon exercise of options under the plan are subject to restrictions on transfer.

Most of the option grants to executives were made upon the closing of the 2004 Acquisition or in the first year thereafter. One-half of the options granted to executives in this initial period vest on a time basis at a rate of 20% per year over five years; the remaining one-half vest over five years on a performance basis at a rate of between 0% and 20% per year, depending on the extent to which established performance targets are reached, with 85% attainment of performance targets being the threshold for any vesting. Performance-based options granted during this period are subject to certain acceleration provisions and, regardless of the achievement of performance targets in any year, may vest in full in the event of a transaction in which the Company's Sponsors realize an internal rate of return of at least 20% on their investment in the Company, or may vest in full 8 years following the date of grant if the Compensation Committee determines that certain accounting treatment would be required in the absence of such vesting. The same principles apply in the case of options granted after this initial period but before 2008, except that only the last three years of the five-year period are taken into account, and vesting occurs in increments of 33% rather than 20%. With respect to the 2008 Options, two-thirds of the options vest on a time basis at a rate of 50% per year over two years and the remainder vest based on the performance of the Company in 2008. All of the performance-based options vest based on the achievement by the Company of annual Adjusted EBITDA targets. The 2006 annual Adjusted EBITDA target was $257,200,000, the 2007 annual Adjusted EBITDA target was $307,000,000 and the 2008 annual Adjusted EBITDA target was $323,000,000. The Company did not achieve 85% of the 2008 target and therefore no portion of the 2008 tranche of performance-based options vested as of March 31, 2009.

Although the Committee or the Board is authorized to grant options at any time, the Committee or the Board have not granted options on an annual or other regular or prescribed basis. The Committee considers Stock Incentive Plan options to be a key element of executive compensation that directly aligns the interests of the executive leadership team with those of stockholders and emphasizes sustained growth of enterprise value as a performance objective.

*Management Stock Purchase Plan*

The Company maintains a nonqualified Deferred Compensation Plan which allows eligible executives and directors to defer base pay, bonus payments and long-term incentive pay and have it allocated on a pre-tax basis to various investment alternatives and ultimately distributed to the executive at a designated time in the future. In December 2006, a new plan feature referred to as the "Management Stock Purchase Plan" was established which provides participants the opportunity to "purchase" Company stock units with income deferred under the deferred compensation plan at a price based on the fair value of Company common stock determined on a semi-annual basis by the Committee. Purchased stock units are matched by the Company at year-end on a one-for-one basis, subject to an annual aggregate cap for all executives of $1,500,000 worth of matching units or 15,000 matching units, whichever is less. The Committee can increase the cap in any year. If the matching units are over-subscribed in a given year, participants receive a pro rata number of matching units based on the amount of stock units the participant purchased that year through deferrals. Matching units vest ratably over a three-year period, and may vest earlier upon a participant's death, disability, retirement or termination by the company without cause or by the participant for good reason. Matching units also become 100% vested upon the occurrence of a change in control of the Company for participants who are employed with the Company immediately prior to such change in control. Stock units are distributed to participants in the form of actual shares of the Company's common stock, subject to restrictions on transfer, at a time in the future designated by the participant (though at its sole discretion, the Company may pay purchased units out in cash). A variety of other deemed fixed income and equity investment options are also available under the plan (which mirror the investment options available under the Company's qualified 401(k) plans), though deferrals allocated to such options are not matched.

112

Table of Contents

The timing and form of future payments are specified in the elections submitted by participants with respect to deferrals made for any plan year. Executives may elect to receive payment beginning either at separation from service or at an otherwise specified date (generally at least three years after the year in which the deferrals are made). The form of payment for a given year's deferral account can be any of the following: (i) single lump sum; (ii) annual installments for five years; (iii) annual installments for ten years; (iv) a specified percentage of the account paid as a lump sum, and the remainder paid in either five annual installments or ten annual installments. In December 2008, the Company permitted participants in the plan to elect to receive, in 2009, a full or partial distribution of 2008 plan year income they had originally elected to defer to a later date subject to the condition that any participant making such an election forfeited any right to a matching contribution by the Company with respect to the amount subject to such election.

The Committee considers the Management Stock Purchase Plan as an important component of its incentive-based compensation program which, like the Stock Incentive Plan, aligns the interests of management with those of stockholders and emphasizes the sustained growth of enterprise value. The Management Stock Purchase Plan is available to a broader group of executives than those who currently hold options under the Stock Incentive Plan.

### Retirement Plan Benefits

The Named Executive Officers participate in our qualified defined benefit retirement plan, our qualified defined contribution investment savings plan and our nonqualified supplementary benefit plan. Benefits under these plans provide executives with an income source during their retirement years, and reward executives for long service to the Company. We believe that our retirement plans are generally competitive in the industries in which we compete for executives and assist the Company in attracting and retaining a high caliber executive leadership team.

This section summarizes the terms of the retirement benefits in effect as of the disclosure date, December 31, 2008. However, in response to the continued economic downturn affecting our industry, the Company decided in December 2008 to implement a number of cost-reduction measures that became effective in 2009. These measures included a freeze in future accruals under the Company's qualified defined benefit retirement plan effective February 1, 2009 and a suspension of fixed matching contributions under the Company's qualified defined contribution investment savings plan. The Company's nonqualified supplementary benefit plan continues to accrue benefits but does not "make up" for benefit accruals that are lost due to the changes in the qualified plans described above. The Company intends to conduct an overall retirement program design review during the 2009 calendar year.

### Defined Benefit Retirement Plans

The Cooper-Standard Automotive Inc. Salaried Retirement Plan ("CSA Retirement Plan") is a defined benefit plan that covers all non-union employees of the Company in the United States, including the Named Executive Officers. The CSA Retirement Plan is funded by Company contributions only. There are two types of benefits under the plan, a cash balance benefit and a final average pay benefit. There are two separate "grandfathered" final average pay formulas in the plan, but only one of those formulas applies for purposes of the Named Executive Officers whose benefits are governed by final average pay provisions, so that formula is described herein. The final average pay benefit was closed effective January 1, 2002 with respect to any participant who was not at least 40 years of age and had at least 15 years of earned service as of that date.

The cash balance portion of the CSA Retirement Plan states benefits in the form of a hypothetical account established for each participant which is increased by two components, a pay credit equal to a stated percentage of his or her compensation (as defined more specifically below under "Determination of Benefits under Plans") each year, and an earnings credit equal to the interest rate paid on 30-year Treasury bonds times the hypothetical account balance. The final average pay benefit provides benefits stated as an annuity equal to 1.5% times average compensation (the highest five of the last ten years, as further described below in "Determination of Benefits under Plans") times years of service. This final average pay benefit is payable on an unreduced basis at age 62 or upon attainment of age 55 with 30 years of service.

**Table of Contents**

The Company maintains the Cooper-Standard Automotive Inc. Nonqualified Supplementary Benefit Plan (the "Supplementary Benefit Plan") for the benefit of certain employees (those who are members of a select group of highly-compensated executive employees, including the Named Executive Officers). The Supplementary Benefit Plan provides for an additional pension benefit that is designed to compensate for any reduced benefits under the CSA Retirement Plan due to limits imposed by the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"). The Supplementary Benefit Plan is also designed to provide Mr. McElya a final average pay benefit as if he were eligible for the benefits described under "Final Average Pay Design" below. For cash balance participants, the Supplementary Benefit Plan also provides for an enhanced pay credit as further described under the heading "Determination of Benefits Under Plans" below.

*Defined Contribution Retirement Plans*

The Cooper-Standard Automotive Inc. Investment Savings Plan (the "CSA Savings Plan") is a tax-qualified 401(k) retirement savings plan pursuant to which all U.S. non-union employees, including the Named Executive Officers, may contribute the lesser of up to 50% of "Compensation" (which includes the same compensation as that described below under "Cash Balance Design", except that retention bonuses are excluded) or the limit prescribed by the Internal Revenue Code (though the Company imposes lower deferral percentage limits on highly-compensated employees). The Company matches 40% of employee contributions up to 5% of Compensation, with a maximum matching contribution of 2% of Compensation. The Company may make discretionary matching contributions depending upon annual financial performance. Company matching contributions are 100% vested after the employee has 3 years of service. Employee contributions are always 100% vested.

The Supplementary Benefit Plan also provides for an additional nonqualified employer matching contribution which (1) makes up for any Company contributions to the CSA Savings Plan that were not permitted to be made due to limitations under the Internal Revenue Code and (2) provides a nonqualified employer matching contribution which, when combined with the qualified savings plan match, provides for a total employer matching contribution of 6% of Compensation (without regard to qualified plan limits prescribed by the Internal Revenue Code).

*Determination of Benefits under Plans*

Benefits under the CSA Retirement Plan and the nonqualified defined benefit portion of the Supplementary Benefit Plan are governed by either a cash balance design or a final average pay design.

*Cash Balance Design*

Annual pay credits are added to a participant's cash balance account at the end of each year, based on the participant's compensation for the year and the sum of the participant's age and service as of the beginning of that year. Compensation used as the basis for pay credits ("Compensation") includes all compensation reported as wages for federal income tax purposes excluding employer contributions to a plan of deferred compensation, income attributable to stock options (including income attributable to any disqualifying dispositions thereof), director fees, sales awards, relocation bonuses, signing bonuses, lump-sum severance payments, suggestion system awards, tuition reimbursement, payment upon the exercise of stock appreciation rights or in lieu of the exercise of stock options, imputed income (such as, but not limited to, group term life insurance that is reported as taxable income), benefits accruing or payable under nonqualified retirement plans, expatriate income, and other amounts that are either excludable or deductible from income in whole or in part for federal income tax purposes, or that represent payments pursuant to a program of benefits or deferred compensation, whether or not qualified under the Internal Revenue Code. Annual pay credits are provided as follows:

| Sum of Age and Years of Service | CSA Retirement Plan Applicable Percentage* | Supplementary Benefit Plan Applicable Percentage** |
|---|---|---|
| Up to 35 | 3.0% | 6.0% |
| 36 – 50 | 4.0% | 8.0% |
| 51 – 65 | 5.5% | 11.0% |

114

Table of Contents

| Sum of Age and Years of Service | CSA Retirement Plan Applicable Percentage* | Supplementary Benefit Plan Applicable Percentage** |
|---|---|---|
| 66 – 80 | 7.5% | 15.0% |
| over 80 | 10.0% | 20.0% |

\*    The CSA Retirement Plan provides a pay credit equal to the executive's Compensation, subject to qualified plan limitations under the Internal Revenue Code, times the percentage listed under the "CSA Retirement Plan Applicable Percentage" heading above.

\*\*    The Supplementary Benefit Plan provides a pay credit equal to the difference between (1) the executive's Compensation, without regard to qualified plan limitations, times the percentage listed under the "Supplementary Benefit Plan Applicable Percentage" heading above, and (2) the pay credit provided under the CSA Retirement Plan.

Annual interest credits are also added to a participant's cash balance account each year. This credit is calculated by multiplying the cash balance account as of the end of the prior year by an interest rate that is equal to the annual yield statistic for 30-year U.S. Treasury securities for the month of October of the prior year.

Benefits fully vest upon 3 years of service, with no benefits vested for less than 3 years of service. Service is measured based on an elapsed time basis from date of hire.

Normal retirement age is age 65 with 5 years of service. The normal retirement benefit is defined as a monthly life annuity amount that is actuarially equivalent to the cash balance account projected to normal retirement age with interest credits. For participants whose prior final average pay accrued benefits were frozen and converted to an opening account balance at January 1, 2002 when the cash balance design was implemented, an additional amount is added to the normal retirement benefit based on the difference between (i) the frozen age 65 accrued benefit at January 1, 2002 and (ii) a hypothetical age 65 life annuity amount that is actuarially equivalent to the January 1, 2002 opening cash balance account projected to normal retirement age with interest credits only.

Benefits are payable at termination either in the form of a lump sum or an annuity (the default form and time under the nonqualified plan is a lump sum at separation from service). The lump sum is equal to the cash balance account value at the time of distribution (plus an additional amount, if applicable, associated with the procedure described above for those who had an opening account balance established as of January 1, 2002). The immediate annuity payable is the actuarial equivalent of the normal retirement annuity benefit as described above, except in the event of early retirement, as described below.

Eligibility for early retirement is satisfied with attainment of either (i) age 62 with 10 years of service, or (ii) age 55 with 15 years of service. To the extent these age and service conditions are satisfied, the annuity form of benefit available is based on reducing the normal retirement benefit by 0.6% per month up to 36 months, and 0.4% for each additional month up to 84 months, by which age at retirement precedes age 65.

The normal form of annuity is a single life annuity for non-married participants and a reduced joint life annuity with a 50% survivor benefit for married participants. Other optional forms are available on a reduced basis as well.

*Final Average Pay Design*

The following highlights the basic operation of the final average pay design features of the CSA Retirement Plan and the Supplementary Benefit Plan.

The annual retirement benefit, payable as a life annuity at age 65, is equal to 1.5% multiplied by final average pay multiplied by years of service, where final average pay is determined by taking the average of the highest five calendar years of compensation within the last ten calendar years, excluding the year in which termination occurs. Compensation is determined on the same basis as that applicable to the Cash

115

Table of Contents

Balance Design, except lump sum severance and signing bonuses are not excluded. Benefits associated with pay in excess of qualified plan limitations are provided by the Supplementary Benefit Plan, and benefits associated with pay up to qualified plan limits are provided by the CSA Retirement Plan.

Benefits fully vest upon 3 years of service, with no benefits vested for less than 3 years of service. Service is measured based on an elapsed time basis from date of hire.

Benefits are payable as an annuity at retirement. The normal form of annuity is a single life annuity for non-married participants or a reduced joint life annuity with a 50% survivor benefit for married participants. Other optional forms are available on a reduced basis as well.

Eligibility for early retirement is satisfied with attainment of either (i) age 62 with 10 years of service, or (ii) age 55 with 15 years of service. The annuity form of benefit available is based on reducing the normal retirement benefit by 0.4% per month by which age at retirement precedes age 62. In addition, there is no reduction in any event if a participant has attained age 55 with 30 years of service.

### Termination and Change in Control Benefits

Our Named Executive Officers receive certain benefits under their employment agreements with the Company upon certain termination of employment events, including following a change in control of the Company. These benefits, described in detail under "Terms Applicable to Payments Upon Termination of Employment" below, are intended to ensure that the executive leadership team is able to objectively evaluate potential change in control transactions by addressing the potential personal impact of such transactions on our executives.

### Health Benefits

The Company provides its executives with health and welfare benefits under its Health & Well-Being Benefit Plan that is made available generally to its salaried employees. The Health & Well-Being Benefit Plan is a flexible plan which permits participants to choose among various co-pay options and available benefits, including medical, prescription drug, dental, long-term disability and life insurance and other benefits, depending on the needs of the participant and his or her dependents. These benefits help the Company remain competitive in attracting and retaining a high caliber management team.

### Perquisites

The Company provides each of its senior executives with a vehicle for business and personal use through the Company's vehicle lease program or through a vehicle allowance. The Company also reimburses senior executives the cost of tax preparation and financial planning services up to a maximum of $3,000 per year. The Committee regards the level of such perquisites to be modest and of benefit to the Company in attracting and retaining a high caliber management team.

### Effect of Accounting and Tax Treatment on Compensation Decisions

In the review and establishment of the Company's compensation programs, we consider the anticipated accounting and tax implications to itself and its executives. Section 162(m) of the Internal Revenue Code limits the deductibility of compensation paid to executives in excess of $1,000,000 in a year, other than performance-based compensation meeting certain requirements. The Compensation Committee considers the anticipated tax treatment to the Company of compensation paid to executives; however, there may be instances where the Committee may conclude that it is appropriate to exceed the limitation on deductibility under Section 162(m) to ensure that executive officers are compensated in a manner that is consistent with the Company's overall compensation philosophy and objectives and which the Committee believes to be in the best interests of the Company.

116

Table of Contents

## EXECUTIVE COMPENSATION

Set forth below is information regarding compensation for services to the Company in all capacities of the following executive officers of the Company (the "Named Executive Officers") during the year ended December 31, 2008: (i) our Chief Executive Officer; (ii) our Chief Financial Officer; and (iii) the three most highly compensated executive officers other than the Chief Executive Officer and Chief Financial Officer who were serving as executive officers at December 31, 2008.

### SUMMARY COMPENSATION TABLE

| Name and Principal Position (a) | Year (b) | Salary (c) | Bonus [4] (d) | Stock Awards [5] (e) | Option Awards [6] (f) | Non-Equity Incentive Plan Compensation [7] (g) | Change in Pension Value and Nonqualified Deferred Compensation Earnings [8] (h) | All Other Compensation (i) | Total (j) |
|---|---|---|---|---|---|---|---|---|---|
| James S. McElya, Chairman and Chief Executive Officer | 2008 | $950,000[1] | $ 0 | $ 0 | $ 0 | 534,098 | 586,959 | 183,673[9] | $2,254,730[22] |
| | 2007 | $850,000 | $ 37,500 | $ 284,093 | $ 0 | 1,456,393 | 588,022 | 127,282[10] | $3,343,290[23] |
| | 2006 | $800,000 | $ 50,000 | $ 0 | $ 0 | 867,630 | 461,321 | 103,674[11] | $2,282,625[24] |
| Edward Hasler, Vice Chairman and President, North America | 2008 | $660,578[2],[3] | $ 0 | $ 0 | $ 0 | 504,788 | 466,978 | 95,216[12] | $1,727,560[22] |
| | 2007 | $500,000 | $ 37,500 | $ 416,274 | $ 243,146 | 837,652 | 240,575 | 63,944[13] | $2,339,091[23] |
| | 2006 | $412,404 | $ 50,000 | $ 0 | $ 0 | 474,594 | 258,420 | 40,567[14] | $1,235,985[24] |
| Allen J. Campbell, Vice President and Chief Financial Officer | 2008 | $440,000 | $ 0 | $ 0 | $ 0 | 309,386 | 66,629 | 71,176[15] | $ 887,191[22] |
| | 2007 | $400,000 | $ 37,500 | $ 224,267 | $ 100,578 | 561,597 | 72,013 | 68,825[16] | $1,464,780[23] |
| | 2006 | $347,000 | $ 50,000 | $ 0 | $ 0 | 282,735 | 57,019 | 49,588[17] | $ 786,342[24] |
| Larry J. Beard [25], Vice President Strategic Planning and Business Development | 2008 | $370,443[3] | $ 0 | $ 0 | $ 0 | 309,386 | 122,610 | 73,428[18] | $ 875,867[22] |
| | 2007 | $365,000 | $ 37,500 | $ 210,293 | $ 0 | 533,433 | 125,665 | 51,185[19] | $1,323,076[23] |
| | 2006 | $350,000 | $ 50,000 | $ 0 | $ 0 | 257,251 | 54,834 | 36,096[20] | $ 748,181[24] |
| Keith D. Stephenson, President, International | 2008 | $385,000 | $ 0 | $ 0 | $ 529,562 | $ 0 | 35,392 | 37,663[21] | $ 987,617[22] |

(1)    Mr. McElya served as Chief Executive Officer and Chairman of the Board until June 30, 2008 and continued to serve as Chairman of the Board after that date.

Table of Contents

(2)     Mr. Hasler served as President and Chief Operating Officer until June 1, 2008 at an annualized salary of $600,000; he was promoted to President and Chief Executive Officer as of July 1, 2008 at which time his annualized salary was increased to $750,000. On March 26, 2009, he was named Vice Chairman and President, North America.

(3)     During portions of November and December of 2008, the Company implemented temporary work-time/vacation programs as a cost-savings measure. The impact of programs is reflected in the base salary figures shown in column (c).

(4)     The amount shown in column (d) represents for each Named Executive Officer a special, discretionary bonus awarded by the Board of Directors of the Company in the years indicated. Incentive cash compensation earned during the fiscal year based on pre-established criteria approved by the Compensation Committee under the Company's annual incentive bonus program and Long Term Incentive Plan is reported in column (g).

(5)     The amount shown in column (e) represents the compensation cost associated with Company matching units under the Management Stock Purchase Plan as determined in accordance with FAS 123(R). See Note 17 of the Company's financial statements for 2008 for the assumptions made in determining FAS 123(R) values. There can be no assurance that the FAS 123(R) value will ever be realized. Description of the Management Stock Purchase Plan is found under Executive Compensation Components.

(6)     The amount shown in column (f) represents the compensation costs of stock option awards granted in 2008 for financial reporting purposes under FAS 123(R). See Note 17 of the Company's financial statements for 2008 for the assumptions made in determining FAS 123(R) values. There can be no assurance that the FAS123(R) value will ever be realized.

(7)     The amount shown in column (g) represents: for 2008, the sum of: (i) zero bonus payments for 2008 under the Company's annual incentive bonus program for all Named Executive Officers, and (ii) payments under the Company's Long Term Incentive Plan for the 3-year performance period ending December 31, 2008 of, for Mr. McElya, $534,098; for Mr. Hasler, $504,788; for Mr. Campbell, $309,386; and for Mr. Beard, $309,386; and for 2007, the sum of: (i) bonus payments for 2007 under the Company's annual incentive bonus program of, for Mr. McElya, $1,052,300; for Mr. Hasler, $495,200; for Mr. Campbell, $321,880; and for Mr. Beard, $293,716; and (ii) payments under the Company's Long Term Incentive Plan for the 3-year performance period ending December 31, 2007 of, for Mr. McElya, $404,093; for Mr. Hasler, $342,452; for Mr. Campbell, $239,717; and for Mr. Beard, $239,717; and for 2006, the sum of: (i) bonus payments for 2006 under the Company's annual incentive bonus program of, for Mr. McElya, $756,522; for Mr. Hasler, $405,151; for Mr. Campbell, $213,292; and for Mr. Beard, $187,808; and (ii) payments under the Company's Long Term Incentive Plan for the 2-year performance period ending December 31, 2006 of, for Mr. McElya, $111,108; for Mr. Hasler, $69,443; for Mr. Campbell, $69,443; and for Mr. Beard, $69,443.

(8)     The amount shown in column (h) represents for each Named Executive Officer the sum of the aggregate annualized change in the actuarial present value of accumulated benefits under all defined benefit and actuarial pension plans (qualified and non-qualified, including supplemental plans) from the plan measurement date used for financial statement reporting purposes with respect to the prior completed fiscal year to the plan measurement date used for financial statement reporting purposes with respect to the covered fiscal year.

(9)     The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Investment Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $144,245); the cost of Company-paid personal travel; the cost of Company-paid tax preparation and financial planning services; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(10)    The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Investment Savings Plan and nonqualified defined contribution portion of the

Table of Contents

Supplementary Benefit Plan (totaling $105,250); the cost of Company-paid personal travel; the cost of Company-paid tax preparation and financial planning services; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(11)  The amount shown in column (i) represents matching company contributions under the qualified 401(k) CSA Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $79,171); the cost of a Company-provided apartment; the cost of Company-paid personal travel; the cost of Company-paid tax preparation and financial planning services; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(12)  The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Investment Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $89,584); the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(13)  The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Investment Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $60,726); and life insurance premiums paid by the Company.

(14)  The amount shown in column (i) represents matching company contributions under the qualified 401(k) CSA Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $37,821); and life insurance premiums paid by the Company.

(15)  The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Investment Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $60,040); the cost of Company-paid tax preparation and financial planning services; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(16)  The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Investment Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $43,153); the cost of a Company-provided apartment; the cost of Company-paid tax preparation and financial planning services; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(17)  The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $32,419); the cost of a Company-provided apartment; the cost of Company-paid tax preparation and financial planning services; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(18)  The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Investment Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $54,233); a special one-time Company contribution under the Executive Deferred Compensation Plan; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(19)  The amount shown in column (i) represents matching Company contributions under the qualified 401(k) CSA Investment Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $39,568); the cost of Company-paid tax preparation and financial planning services; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(20)  The amount shown in column (i) represents matching company contributions under the qualified 401(k) CSA Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $30,111); the cost of Company-paid tax preparation and financial planning services; the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

119

Table of Contents

(21)   The amount shown in column (i) represents matching company contributions under the qualified 401(k) CSA Savings Plan and nonqualified defined contribution portion of the Supplementary Benefit Plan (totaling $33,608); the cost of a Company-provided vehicle; and life insurance premiums paid by the Company.

(22)   The percentages of total compensation in 2008 that were attributable to base salary and total bonus (the amounts identified in columns (d) and (g)) were as follows: Mr. McElya, base salary 42.1%, bonus 23.7%; for Mr. Hasler, base salary 38.2%, bonus 29.2%; for Mr. Campbell, base salary 49.6%, bonus 34.9%; for Mr. Beard, base salary 42.3%, bonus 35.3%; for Mr. Stephenson, base salary 39.0%, bonus 0.0%.

(23)   The percentages of total compensation in 2007 that were attributable to base salary and total bonus (the amounts identified in columns (d) and (g)) were as follows: Mr. McElya, base salary 25.4%, bonus 44.7%; for Mr. Hasler, base salary 21.4%, bonus 37.4%; for Mr. Campbell, base salary 27.3%, bonus 40.9%; for Mr. Beard, base salary 27.6%, bonus 43.2%.

(24)   The percentages of total compensation in 2006 that were attributable to base salary and total bonus (the amounts identified in columns (d) and (g)) were as follows: Mr. McElya, base salary 35.0%, bonus 40.2%; for Mr. Hasler, base salary 33.4%, bonus 42.4%; for Mr. Campbell, base salary 44.1%, bonus 42.3%; for Mr. Beard, base salary 46.8%, bonus 41.1%.

(25)   Mr. Beard retired effective March 31, 2009.

Non-Equity Incentive Plan Compensation – Annual Incentive Bonus

For 2008, the Committee established an annual incentive bonus target amount for each member of the executive leadership team based on a percentage of base salary. With respect to the Named Executive Officers, the percentage was 100% for Mr. McElya, 80% for the period from January 1, 2008 through June 30, 2008 and 100% for the period from July 1, 2008 through December 31, 2008 for Mr. Hasler, and 65% for Messrs. Campbell, Beard, and Stephenson. The annual incentive bonus target amounts are based on the levels of responsibility of the executives and other performance-based factors. Incentive bonus amounts actually paid for 2008 performance are set forth in footnote (7) under column (g) of the above Summary Compensation Table.

Table of Contents

## 2008 GRANTS OF PLAN-BASED AWARDS

The following table sets forth information regarding plan-based awards made to the Named Executive Officers during 2008 that provide for possible future payouts.

| Name (a) | Grant Date (b) | Estimated Future Payouts Under Non-Equity Incentive Plan Awards [1] | | | All Other Stock Awards: Number of Shares of Stock or Units (#) [3] (i) | All Other Option Awards; Number of Securities Underlying Options [4] (j) | Exercise or Base Price of Option Awards ($/sh) (k) | Grant Date Fair value of Stock and Option Awards ($/sh) [5] (l) |
|---|---|---|---|---|---|---|---|---|
| | | Threshold (c) | Target (d) | Maximum [2] (e) | | | | |
| James S. McElya | 1/1/2008 | $175,000 | $350,000 | Not applicable | — | — | — | — |
| Edward A. Hasler | 1/1/2008 | $175,000 | $350,000 | Not applicable | — | — | — | — |
| Allen J. Campbell | 1/1/2008 | $100,000 | $200,000 | Not applicable | — | — | — | — |
| Larry J. Beard | 1/1/2008 | $100,000 | $200,000 | Not applicable | — | — | — | — |
| Keith D. Stephenson | 1/1/2008 | $100,000 | $200,000 | Not applicable | — | — | — | — |
| | 3/20/2008 | | | | — | 12,500 | $ 120 | $ 529,562 |

(1)    The non-equity incentive plan awards represent 2008 awards granted by the Compensation Committee to the Named Executive Officers under the Company's Long Term Incentive Plan based on the achievement of operating cash flow objectives in the performance period beginning January 1, 2008 and ending December 31, 2010 ("2008 LTIP Awards"). 2008 LTIP Awards are payable in the first quarter of 2011, depending on the level of achievement of established targets and the approval of the Compensation Committee. The determination of award amounts under the Long Term Incentive Plan is described under "Long-Term Incentive Compensation" under the Executive Compensation Components section. The amounts set forth in footnote (7) under column (g) of the Summary Compensation Table do not pertain to the 2008 LTIP Awards; they reflect payments under a 2006 LTIP award granted by the Compensation Committee under the Long Term Incentive Plan based on the performance period beginning January 1, 2006 and ending December 31, 2008.

(2)    The 2008 LTIP does not provide for a maximum payout; the amount of the payout increases by 10% for each 1% increase in the actual level of achievement above the target level.

(3)    Represents matching stock units awarded under the Management Stock Purchase Plan on December 31, 2008. See Management Stock Purchase Plan under the Executive Compensation Components section for more information about the determination of awards under this plan. None of the NEOs received matching stock units in 2008.

(4)    The amounts shown in column (j) represent stock option awards granted March 20, 2008 under the 2004 Cooper-Standard Holdings Inc. Stock Incentive Plan.

(5)    See Note 17 of the Company's financial statements for 2008 for the assumptions made in determining FAS 123(R) values.

121

Table of Contents

**OUTSTANDING EQUITY AWARDS AT 2008 FISCAL YEAR-END**

The following table sets forth information concerning outstanding stock option awards and stock units under the Management Stock Purchase Plan held by the Named Executive Officers at December 31, 2008, including the number of shares underlying both exercisable and unexercisable portions of each stock option as well as the exercise price and expiration date of each outstanding option.

| | Option Awards[1] | | | | Stock Awards | |
| Name (a) | Number of Securities Underlying Unexercised Options (#) Exercisable [2] (b) | Equity Incentive Plan Awards Number of Securities Underlying Unexercised Unearned Options (#) [3] (d) | Option Exercise Price (e) | Option Expiration Date [4] (f) | Number of Shares or Units of Stock that have not vested (#) (g) | Market Value of Shares or Units of Stock that have not vested [10] (h) |
|---|---|---|---|---|---|---|
| James S. McElya | 29,956 | 14,767 | $ 100 | 12/23/2014 | 1,578[6] | $ 78,900 |
| Edward A. Hasler | 16,476 | 8,125 | $ 100 | 12/23/2014 | 2,313[6] | $ 115,650 |
| | 2,906 | 2,493 | $ 100 | 3/15/2017 | | |
| Allen J. Campbell | 14,979 | 7,383 | $ 100 | 12/23/2014 | 1,246[7] | $ 62,300 |
| | 1,203 | 1,033 | $ 100 | 3/15/2017 | | |
| Larry J. Beard | 16,477 | 8,121 | $ 100 | 12/23/2014 | 1,168[8] | $ 58,400 |
| Keith D. Stephenson | 4,167 | 8,333 | $ 120 | 3/20/2018 | 943[9] | $ 47,150 |

(1)  All of the amounts presented in this portion of the table relate to options to purchase shares of the Company's Common Stock granted to the Named Executive Officers under the Company's Stock Incentive Plan. Options listed above with an Option Expiration Date of December 23, 2014 were granted on December 23, 2004, those with an Option Expiration Date of March 15, 2017 were granted on March 15, 2007, and those with an Option Expiration Date of March 20, 2018 were granted on March 20, 2008.

(2)  Represents time-based options and performance-based options which have vested and were exercisable as of December 31, 2008 with respect to the following number of shares of the Company's common stock: for Mr. McElya, 17,890 shares time-based and 12,066 shares performance-based; for Mr. Hasler, 11,640 shares time-based and 7,743 shares performance-based; for Mr. Campbell, 9,690 shares time-based and 6,492 shares performance-based; for Mr. Beard, 9,840 shares time-based and 6,637 shares performance-based; for Mr. Stephenson, 4,167 shares time-based and 0 shares performance-based.

(3)  Represents outstanding time-based options and performance-based options which have not been earned or vested and were unexercisable as of December 31, 2008 with respect to the following number of shares of the Company's common stock: for Mr. McElya, 4,472 shares time-based and 10,295 shares performance-based; for Mr. Hasler, 3,360 shares time-based and 7,257 shares performance-based; for Mr. Campbell, 2,609 shares time-based and 5,807 shares performance-based; for Mr. Beard, 2,459 shares time-based and 5,662 shares performance-based; for Mr. Stephenson, 4,166 shares time-based and 4,167 shares performance-based.

122

**Table of Contents**

(4)     Options expire on the earliest to occur of: (i) the tenth anniversary of the date of grant; (ii) the first anniversary of the date of the optionee's termination of employment due to death, disability, retirement at normal retirement age or the sale by the Company (not constituting a change of control) of the business in which the optionee was employed; (iii) 90 days following the date of the optionee's termination of employment without cause (or for reasons other than those described in (ii)); or (iv) on the date of the optionee's termination of Employment for cause.

(5)     Represents 1,578 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that had not yet become vested as of December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(6)     Represents 2,313 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that had not yet become vested as of December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(7)     Represents 1,246 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that had not yet become vested as of December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(8)     Represents 1,168 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that had not yet become vested as of December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(9)     Represents 943 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that had not yet become vested as of December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(10)     The values in column (h) equal the total number of matching stock units listed in column (g) for each Named Executive Officer multiplied by the value of Company common stock as of December 31, 2008, which was $50.

123

Table of Contents

## 2008 OPTION EXERCISES AND STOCK VESTED

The following table sets forth certain information regarding stock-based awards that vested during 2008 for our Named Executive Officers. No stock options were exercised by our Named Executive Officers in 2008.

| | Option Awards | | Stock Awards | |
| | Number of Shares Acquired on Exercise (#) (b) | Value Realized on Exercise ($) (c) | Number of Shares Acquired on Vesting (#) (d) | Value Realized on Vesting ($) [6] (e) |
| Name (a) | | | | |
|---|---|---|---|---|
| James S. McElya | — | — | 789[1] | $ 39,450 |
| Edward A. Hasler | — | — | 1,156[2] | $ 57,800 |
| Allen J. Campbell | — | — | 623[3] | $ 31,150 |
| Larry J. Beard | — | — | 584[4] | $ 29,200 |
| Keith D. Stephenson | — | — | 471[5] | $ 23,550 |

(1)   Represents 789 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that became vested on December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(2)   Represents 1,156 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that became vested on December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(3)   Represents 623 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that became vested on December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(4)   Represents 584 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that became vested on December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(5)   Represents 471 stock units which is the portion of the units granted on December 31, 2007 through the Company match under the Management Stock Purchase Plan that became vested on December 31, 2008. These matching units vest ratably over a three year period. Description of Management Stock Purchase Plan is found in Executive Compensation Components.

(6)   The values in column (e) equal the total number of matching stock units listed in column (d) for each Named Executive Officer multiplied by the value of Company common stock as of December 31, 2008, which was $50.

Table of Contents

## 2008 PENSION BENEFITS

The following table sets forth the actuarial present value of each Named Executive Officer's accumulated benefit under the CSA Retirement Plan and the non-qualified defined benefit portion of the Supplementary Benefit Plan as described in "Retirement Plan Benefits" under the Executive Compensation Components section, assuming benefits are paid at normal retirement age or the earliest retirement age at which participants receive unreduced benefits, based on current levels of compensation. The table also shows the number of years of credited service under each plan, computed as of the same pension plan measurement date used in the Company's audited financial statements for the year ended December 31, 2008.

| Name (a) | Plan Name (b) | Number of Years Credited Service (#) (c) | Present Value of Accumulated Benefit [1] ($) (d) | Payments During Last Fiscal Year ($) (e) |
|---|---|---|---|---|
| James S. McElya | CSA Retirement Plan [2] Supplementary | 8.92 | $ 102,910 | $ 0 |
| | Benefit Plan [3] | 12.92[4] | $ 2,414,503 | $ 0 |
| Edward A. Hasler | CSA Retirement Plan [5] Supplementary | 22.00 | $ 626,769 | $ 0 |
| | Benefit Plan [5] | 22.00 | $ 1,141,169 | $ 0 |
| Allen J. Campbell | CSA Retirement Plan [2] Supplementary | 10.25 | $ 112,871 | $ 0 |
| | Benefit Plan [6] | 10.25 | $ 238,296 | $ 0 |
| Larry J. Beard | CSA Retirement Plan [2] Supplementary | 8.92 | $ 99,281 | $ 0 |
| | Benefit Plan [6] | 8.92 | $ 307,891 | $ 0 |
| Keith D. Stephenson | CSA Retirement Plan [2][7] Supplementary | 1.50 | $ 14,065 | $ 0 |
| | Benefit Plan [6][7] | 1.50 | $ 28,818 | $ 0 |

(1)    Present values determined using a December 31, 2008 measurement date and reflect benefits accrued based on service and pay earned through such date. Figures are determined based on post-commencement valuation mortality (UP 1994 table) and commencement of benefits at age 65, except for Mr. McElya and Mr. Hasler, who were assumed to retire at age 62 because they are eligible for unreduced benefits at that age as discussed in footnotes (3) and (5) below. The assumed discount rate as of the measurement date is 6.35%.

(2)    Messrs. McElya, Campbell, Beard, and Stephenson are covered under the cash balance design for purposes of the qualified CSA Retirement Plan.

(3)    Mr. McElya receives two types of defined benefits under the Supplementary Benefit Plan. He receives a non-qualified cash balance benefit determined under usual terms. In addition, he receives a benefit determined under the final average pay design, offset by the annuity-equivalent of his qualified and nonqualified cash balance benefits. Because the final average pay design includes an unreduced feature upon attainment of age 62 and 10 years of service, which the executive would be eligible for, he was assumed to retire at age 62.

(4)    Mr. McElya is granted four years of additional service in the Supplementary Benefit Plan to compensate for lost (non-vested) benefits accrued with his previous employer prior to joining the Company in January 2000.

Table of Contents

(5)   Mr. Hasler is covered under the final average pay design for both the qualified CSA Retirement Plan and the non-qualified Supplementary Benefit Plan. Because the final average pay design includes an unreduced feature upon attainment of age 62 and 10 years of service, which the executive would be eligible for, he was assumed to retire at age 62.

(6)   Messrs. Campbell, Beard, and Stephenson are covered under the cash balance design for purposes of the non-qualified Supplementary Benefit Plan.

(7)   Mr. Stephenson has not met the 3-year vesting requirement.

## 2008 NONQUALIFIED DEFERRED COMPENSATION

The following table sets forth annual executive and company contributions under non-qualified deferred compensation provisions of the Executive Deferred Compensation Plan and the non-qualified defined contribution portion of the Supplementary Benefit Plan, as well each Named Executive Officer's withdrawals, earnings and fiscal-year end balances in those plans.

| Name (a) | Executive Contribution in Last FY [1] (b) | Registrant Contributions in Last FY [2] (c) | Aggregate Earnings in Last FY (d) | Aggregate Withdrawals/ Distributions (e) | Aggregate Balance at Last FYI (f) |
|---|---|---|---|---|---|
| James S. McElya | $ 0 | $ 139,645 | $(946,084) | $ 0 | $1,825,603 |
| Edward A. Hasler | $ 0 | $ 85,294 | $(479,688) | $ 0 | $ 571,475 |
| Allen J. Campbell | $ 0 | $ 55,440 | $(298,255) | $ 0 | $ 321,998 |
| Larry J. Beard | $ 92,611 | $ 57,587 | $(360,495) | $ 0 | $ 692,596 |
| Keith D. Stephenson | $ 0 | $ 29,008 | $(197,334) | $ 0 | $ 170,970 |

(1)   Amounts represent deferrals under the Executive Deferred Compensation Plan related to base salary for 2008 for Mr. Beard.

(2)   Amounts are included in column (i) of the Summary Compensation Table and represent nonqualified Company matching contributions under the Supplementary Benefit Plan as well as a special one-time employer cash contribution under the Executive Deferred Compensation Plan for Mr. Beard of $7,955. The Company match under the Executive Deferred Compensation Plan is made in stock units under the Management Stock Purchase Plan feature, which is more fully described in the Executive Compensation Components section.

Table of Contents

POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE IN CONTROL

The Named Executive Officers have entered into employment agreements with the Company which provide for certain benefits upon termination of employment, including termination following a change in control as defined in the Cooper-Standard Automotive Inc. Change of Control Severance Pay Plan (the "Change in Control Plan"). The table below shows estimates of the value of compensation that would be payable to each Named Executive Officer upon termination of employment with the Company under certain circumstances. As indicated in the table, compensation upon termination of employment varies depending on the circumstances of the termination and whether or not it occurred following a change in control. Amounts presented in the table are calculated as if the employment of the executive terminated effective December 31, 2008. Payments due to any one of the Named Executive Officers upon actual termination of employment can only be determined at the time of termination. There can be no assurance that an actual termination or change in control would produce the same or similar results as those described below if it were to occur on any other date and if the actual circumstances at the time of termination.

Amounts accrued under the normal terms of our pension and deferred compensation plans are not included in this table. Information concerning pension benefits and deferred compensation disclosures is presented under "Pension Benefits", beginning on page 125, and "Nonqualified Deferred Compensation", beginning on page 126, respectively. Similarly, information concerning vested equity awards is not included in the table, and is presented under "Outstanding Equity Awards at Fiscal Year End", beginning on page 122.

<u>Table of Contents</u>

| Name | Severance Payment [1] | Pension Enhancement [2] | Health/Life [3] | Outplacement Services [4] | Accelerated Vesting of Equity Awards [5] | Gross Up [6] | Totals |
|---|---|---|---|---|---|---|---|
| **James S. McElya** | | | | | | | |
| • Termination Without Cause or Resignation for Good Reason, After Change in Control | $7,003,256 | $ 2,038,314 | $ 290,000 | $ 50,000 | — | $3,421,227 | $12,802,797 |
| • Termination Without Cause or Resignation for Good Reason, with no Change in Control | $6,053,256 | $ 2,081,252 | $ 290,000 | $ 50,000 | — | N/A | $8,474,508 |
| • Termination for Cause or Resignation Without Good Reason | — | — | — | — | — | N/A | |
| • Termination due to Death | $7,350,107 | $ 2,491,909 | $ 153,269 | — | — | N/A | $9,995,285 |
| • Termination due to Disability | $7,350,107 | $ 2,491,909 | $ 290,000 | — | — | N/A | $10,132,016 |
| **Edward A. Hasler** | | | | | | | |
| • Termination Without Cause or Resignation for Good Reason, | $3,703,256 | $ 1,476,092 | $ 491,748 | $ 50,000 | — | $2,413,181 | $8,134,277 |
| • Termination Without Cause or Resignation for Good Reason, with no Change in Control | $2,300,000 | $ 1,476,092 | $ 41,686 | — | — | N/A | $3,817,778 |
| • Termination for Cause or Resignation Without Good Reason | — | — | — | — | — | N/A | |
| • Termination due to Death | $ 653,256 | — | — | — | — | N/A | $653,256 |
| • Termination due to Disability | $ 653,256 | — | — | — | — | N/A | $653,256 |
| **Allen J. Campbell** | | | | | | | |
| • Termination Without Cause or Resignation for Good Reason, After Change in Control | $2,213,289 | $ 104,966 | $ 447,420 | $ 50,000 | — | $1,064,187 | $3,879,862 |
| • Termination Without Cause or Resignation for Good Reason, with no Change in Control | $1,400,000 | $ 104,966 | $ 30,135 | — | — | N/A | $1,535,101 |
| • Termination for Cause or Resignation Without Good Reason | — | — | — | — | — | N/A | |
| • Termination due to Death | $ 373,289 | — | — | — | — | N/A | $373,289 |
| • Termination due to Disability | $ 373,289 | — | — | — | — | N/A | $373,289 |
| **Larry J. Beard** | | | | | | | |
| • Termination Without Cause or Resignation for Good Reason, After Change in Control | $1,972,789 | $ 147,359 | $ 295,967 | $ 50,000 | — | $ 857,059 | $3,323,174 |
| • Termination Without Cause or Resignation for Good Reason, with no Change in Control | $1,224,500 | $ 147,359 | $ 34,278 | — | — | N/A | $1,406,137 |
| • Termination for Cause or Resignation Without Good Reason | — | — | — | — | — | N/A | |
| • Termination due to Death | $ 373,289 | — | — | — | — | N/A | $373,289 |
| • Termination due to Disability | $ 373,289 | — | — | — | — | N/A | $373,289 |
| **Keith D. Stephenson** | | | | | | | |
| • Termination Without Cause or Resignation for Good Reason, After Change in Control | $1,494,248 | $ 14,399 | $ 429,561 | $ 50,000 | — | $ 800,674 | $2,788,882 |
| • Termination Without Cause or Resignation for Good Reason, with no Change in Control | $1,031,781 | $ 14,399 | $ 19,880 | — | — | N/A | $1,066,060 |
| • Termination for Cause or Resignation Without Good Reason | — | — | — | — | — | N/A | |
| • Termination due to Death | $ 77,467 | — | — | — | — | N/A | $77,467 |
| • Termination due to Disability | $ 77,467 | — | — | — | — | N/A | $77,467 |

128

Table of Contents

(1)    Cash severance is generally paid in a lump sum at termination. Cash severance amounts estimated above are based on providing executives with prorated outstanding incentive awards and a multiple of the sum of (i) their annual base rate of salary at date of termination plus (ii) their target annual bonus for the year prior to termination, with such multiple equal to three (3) for Mr. McElya and two (2) for Messrs. Hasler, Campbell, Beard, and Stephenson. If the termination occurs following a change of control, each Named Executive officer's cash severance is increased by one additional year's base salary. Further description of the terms applicable to cash severance payments is included under "Terms Applicable to Payments Upon Termination of Employment" beginning on page 130.

(2)    The pension enhancement provides for payment of the present value of the additional accrued benefit that would otherwise be due from the Company's qualified and non-qualified pension plans had the executive continued in active service for a specified number of years beyond termination, with such number of years equal to three (3) for Mr. McElya and two (2) for Messrs. Hasler, Campbell, Beard, and Stephenson. Pension-eligible earnings to be used for these calculations depend on the circumstances of the termination, described under "Terms Applicable to Payments Upon Termination of Employment" beginning on page 130.

(3)    Health and life insurance benefits are continued for the Named Executive Officers and their covered dependents after termination of employment under certain circumstances. In such cases, the commitment is generally to provide for coverage for these benefits in a manner such that (i) benefits provided are substantially similar to those at termination and (ii) recipients of such benefits will not pay higher share of cost for such benefits than had been required prior to termination of employment based on elections in place at that time. Further description of the terms applicable to health and life insurance benefits is included under "Terms Applicable to Payments Upon Termination of Employment," beginning on page 130.

(4)    Under Mr. McElya's employment agreement, payment of the cost of outplacement services is provided in an amount up to 15% of his annual base salary at the time of termination, and for purposes of the computations above, actual reimbursement was assumed not to exceed $50,000. In addition, outplacement services were assumed not to be utilized in the death and disability scenarios for Mr. McElya. Upon termination without cause (or resignation for good reason) after a change of control, all Named Executive officers are entitled to payment of the cost of outplacement services in an amount equal to the lesser of 15% of annual base salary at the time of termination, or $50,000.

(5)    Represents effect of accelerated vesting related to time-based and performance-based stock options. In the event of a change in control, outstanding and unvested time-based stock options become fully vested and exercisable, and 20% to 100% of outstanding and unvested performance-based options for the tranche applicable to the year in which the change in control occurs (and the tranche(s) applicable to future years) shall vest to the extent that cumulative consolidated EBITDA performance from the 2004 calendar year through the most recent fiscal year-end meets or exceeds 85% of cumulative performance targets for the same period (where vesting occurs on a straight-line basis between 20% and 100% depending on achievement of the performance targets between 85% and 100%).

(6)    Upon a change of control of the Company each executive may be subject to certain excise taxes pursuant to Section 280G of the Internal Revenue Code. Pursuant to the executive's employment agreement and/or the Severance Plan, the Company has agreed to reimburse the executive for all excise taxes that are imposed on the executive pursuant to Section 280G and any income and excise taxes that are payable by the executive as a result of this reimbursement. These amounts assume that no amounts will be discounted as attributable to reasonable compensation and no value will be attributed to the non-competition covenants included in the agreement. Amounts will be discounted to the extent the Company can demonstrate by clear and convincing evidence that the non-competition covenants included in the agreement substantially constrains the executive's ability to perform services and there is a reasonable likelihood that the non-competition covenants will be enforced against the individual.

129

Table of Contents

**Terms Applicable to Payments Upon Termination of Employment**

The Company has in effect employment agreements with each of the Named Executive Officers which provide severance pay and benefits in the event of the executive's termination of employment for specified reasons prior to a change of control of the Company, and a Change of Control Severance Pay Plan that provides severance pay and benefits if the executive is terminated following a change of control.

*Mr. McElya's Employment Agreement*

On March 26, 2009, Mr. McElya's existing employment agreement with the Company was amended and restated, primarily to document that Mr. McElya was again serving as the Company's Chief Executive Officer in addition to serving as the Company's Chairman. The material provisions of Mr. McElya's previous employment agreement, entered into in December 2007, remained unchanged. Mr. McElya's employment agreement provides him with special retirement termination benefits in the event that he terminates employment as Chief Executive Officer with at least 90 days prior written notice and agrees to continue providing services to the Company as non-executive Chairman of the Board for a period to be mutually agreed (a "qualified retirement"). The special retirement benefits correspond to the amounts and benefits that would otherwise be payable to Mr. McElya in connection with an involuntary termination of his employment without "cause", or in connection with a voluntary termination of his employment for "good reason", as such terms are defined in the employment agreement. Mr. McElya's employment agreement also provides that, following a qualified retirement as described above, Mr. McElya's stock options with Cooper-Standard Holdings Inc. ("Holdings") will continue to vest as if he remained employed for so long as Mr. McElya continues to serve as non-executive Chairman, and his vested options upon termination as Chairman will remain exercisable until two years following the date of his termination as Chairman (or until the normal option term expiration date, if sooner).

In December 2007, Mr. McElya also entered into a put option agreement with Holdings and certain stockholders of Holdings related to the 20,000 shares of Holdings' common stock that Mr. McElya purchased on December 23, 2004 (the "Purchased Shares"). Under the terms of the put option agreement, in the event of Mr. McElya's qualified retirement as described above, or termination of employment due to death or disability, in each case, prior to the occurrence of a qualified initial public offering of Holdings' common stock, Mr. McElya will have the right to require Holdings to purchase his Purchased Shares for fair market value. Mr. McElya's put right under the put option agreement is generally exercisable within 180 days following the date of his termination as non-executive Chairman of the Company or termination due to death or disability.

The current term of Mr. McElya's employment agreement ends December 31, 2009 but will be automatically extended for one year periods thereafter unless either the Company or Mr. McElya provides a notice of termination by September 30 of a given year. The agreement provides Mr. McElya with an annual base salary (currently $950,000), which is to be reviewed by the Board each year. The Board may increase, but not decrease, the base salary. The agreement also provides Mr. McElya with an annual bonus opportunity based on a percentage of his base salary (currently 100%) as well as participation in the Company's benefit plans and long-term incentive plans and programs. Effective January 2009, Mr. McElya and the other members of the Company's senior leadership team, consented to a 10% reduction in base salary for a six month period, subject to extension, and waived eligibility under the annual bonus plan for a bonus with respect to the first half of 2009. In addition, Mr. McElya consented to the freezing of certain retirement and savings plan benefits.

If Mr. McElya terminates employment for "Good Reason", or the Company terminates Mr. McElya's employment without "Cause", as those terms are defined in the agreement and described below, and in each case prior to a change of control of the Company, then the Company will pay or provide to Mr. McElya: (i) his accrued but unpaid salary, annual and long-term incentive compensation amounts; (ii) a pro rata payment of any target annual and long-term incentive compensation amounts for which the performance periods have not ended; (iii) the greater of a lump sum payment equal to three times his current

130

Table of Contents

annual base salary plus his annual target bonus amount (for the year preceding the year of his termination) or a sum equal to the biweekly payments that Mr. McElya would have received if he were paid at the rate of his average compensation for the remainder of the term; (iv) a lump sum payment equal to the value of three additional years of service credit under the Company's qualified and non-qualified defined benefit pension plans, assuming his compensation under such plans for the three year period was the highest compensation paid to him during any of the five calendar years preceding the year in which his termination of employment occurs (not impacted by the Company's freezing of accruals under the qualified defined benefit retirement plan); (v) three years of continued coverage under the life, accident and health plans sponsored by the Company and in which Mr. McElya was covered immediately prior to his termination; (vi) medical and life insurance coverage for Mr. McElya and his spouse for their lifetimes, and for his dependent children until they cease to qualify as dependents; and (vii) outplacement services for up to two calendar years following the year of termination, not to exceed a cost equal to 15% of his annual base pay. The lump sum amounts described in clauses (iii) and (iv) of the preceding sentence are payable six months following the date of Mr. McElya's termination of employment. If, during the first 36 months of life, medical and accident benefit continuation, the Company is unable to provide what are otherwise intended to be non-taxable benefits to Mr. McElya and his covered family members on a tax-free basis, then the Company will make an additional payment to Mr. McElya to reimburse him for the taxes due on such benefits.

Termination for "Cause" under Mr. McElya's employment agreement means termination for any of the following reasons: (i) any act or omission constituting a material breach by him of any of his significant obligations under the agreement or his continued failure or refusal to adequately perform the duties reasonably required of him which is materially injurious to the Company and his failure to correct such breach, failure or refusal within thirty (30) days of notice to him thereof by the Company's board of directors; (ii) the conviction for a felony or the conviction for or finding by civil verdict of the commission by him of a dishonest act or common law fraud against the Company; or (iii) any other willful act or omission which is materially injurious to the financial condition or business reputation of, or is otherwise materially injurious to, the Company and his failure to correct such act or omission after notification by the Board of any such act or omission.

Termination by Mr. McElya for "Good Reason" under his employment agreement means termination following the occurrence of any of the following, without Mr. McElya's express, prior written consent: (i) a material breach by the Company of its obligations under the agreement relating to Mr. McElya's duties, compensation and benefits, including but not limited to, the assignment to him of any duties materially inconsistent with his status as Chief Executive Officer of the Company, or his removal from such position, or a substantial adverse alteration in the nature of his responsibilities except, in each case, in connection with a promotion, and the failure of the Company to remedy such breach within thirty (30) days after receipt of written notice of such breach from Mr. McElya; (ii) the relocation of Mr. McElya's work location 150 miles or more from its current location, except for relocation to the Company's headquarters and required travel on the Company's business to an extent reasonably required to perform his duties; (iii) except as required by law, the failure by the Company to provide Mr. McElya with benefit plans that provide health, life, disability, retirement and fringe benefits that are substantially comparable in the aggregate to the level of such benefits provided him by Cooper Tire immediately prior to the 2004 Acquisition other than in connection with a reduction in such level of benefits that applies to other senior executives of the Company; (iv) the failure of the Company to obtain a satisfactory agreement from any successor to assume and agree to perform the Company's obligations under the employment agreement and provide Mr. McElya with the same or a comparable position, duties, benefits, and base salary and incentive compensation as provided in the employment agreement; or (v) the failure of the board of directors to elect Mr. McElya to his existing position or an equivalent position.

If Mr. McElya terminates employment as a result of death or disability, then the Company will pay or provide to Mr. McElya or Mr. McElya's beneficiaries, estate or family, as applicable, the amounts and considerations Mr. McElya would have been entitled to as if Mr. McElya's employment had been terminated by Mr. McElya for Good Reason or by the Company without Cause immediately prior to the expiration of the current term of employment.

131

Table of Contents

If Mr. McElya is terminated by the Company for Cause, Mr. McElya will be entitled to base pay and vested benefits under any plan in accordance with that plan and a pro rata portion of any incentive compensation for the year in which the termination occurs up to the date of termination.

Had Mr. McElya voluntarily elected to retire on or before December 31, 2007, Mr. McElya would have been entitled to such amounts as if he had been terminated by the Company for Cause. If Mr. McElya voluntarily elects to retire after January 1, 2008 and agrees to act as the Company's non-executive Chairman of the Board for a mutually agreed upon term, then Mr. McElya will be entitled to the amounts and considerations Mr. McElya would have been entitled to if Mr. McElya's employment had been terminated by Mr. McElya for Good Reason or by the Company without Cause immediately prior to the expiration of the current term of employment.

If the Company elects not to extend Mr. McElya's employment agreement for any year after expiration of the initial term, then Mr. McElya will be treated as if he terminated employment for good reason or the Company terminated without cause and entitled to the severance pay and other benefits described above, except that such pay and benefits will not be paid until his actual termination of employment which shall be deemed effective December 31 of the year in which the Company gave notice.

The agreement also provides that if any payment or the amount of benefits due under the agreement or otherwise would be considered an excess parachute payment that subjects Mr. McElya to excise tax under Internal Revenue Code Section 4999, then the Company will make an additional "gross-up" payment to Mr. McElya to reimburse him for such taxes (and any taxes due on the gross-up payment).

In exchange for the benefits provided under the agreement, Mr. McElya agrees not to compete with the Company for a two-year period after his termination of employment, not to solicit or interfere with any Company employee or customer, and not to disclose confidential and proprietary Company information. Mr. McElya is also required to execute a release of all claims against the Company as a condition to receiving the severance payment and benefits, if applicable.

*Employment Agreements of Other Named Executive Officers*

The Company has in effect employment agreements with the other Named Executive Officers, which are substantially similar to Mr. McElya's employment agreement except as described below. Each agreement has an initial term ending December 31, 2009 and continues for one year periods thereafter, unless the Company or Named Executive Officer provides a notice of termination at least 60 days prior to the end of any term. Under the agreements, each Named Executive Officer is paid an annual base salary, currently as follows: $750,000 for Mr. Hasler; $440,000 for Mr. Campbell; and $385,000 for Mr. Stephenson. Mr. Beard's employment with the Company terminated on March 31, 2009. The agreements provide that the Compensation Committee may increase the base salary from time to time, based upon the recommendation of the Chief Executive Officer. The agreements also provide that the Named Executive Officers are entitled to participate in such annual and long-term incentive compensation programs and benefit plans and programs as are generally provided to senior executives. In January of 2009, the Named Executive Officers consented to a 10% reduction in their base salaries for a six month period, subject to extension, and waived their eligibility under the annual bonus plan to bonuses with respect to the first half of 2009. In addition, the Named Executive Officers consented to the freezing of certain retirement and savings plan benefits.

If a Named Executive Officer terminates employment for "Good Reason" or the Company terminates the employment of the Named Executive Officer without "Cause", as those terms are defined in the agreement and described below, and in each case prior to a change of control of the Company, then the Company will pay or provide to the Named Executive Officer: (i) his accrued but unpaid salary, annual and long-term incentive compensation amounts; (ii) a pro rata payment of any annual incentive compensation amounts for which the performance period has not ended; (iii) a lump sum payment equal to two times the executive's current annual base salary plus his annual target bonus amount (for the year preceding the year of his termination); (iv) a lump sum payment equal to the value of two additional years of service credit under the Company's qualified and nonqualified defined benefit pension plans, assuming the executive's compensation under such plans for such period was the same as the compensation paid to him during the

132

Table of Contents

year preceding his termination of employment (though additional years of service credit are not provided in relation to the qualified plan for this purpose beyond January 31, 2009 when the company froze the qualified plan); and (v) two years of continued coverage under the life and health plans sponsored by the Company at the same cost to the executive as is being charged to active employees.

Termination for "Cause" under the employment agreements of these executives means termination for any of the following reasons: (i) the executive's willful failure to perform duties or directives which is not cured following written notice; (ii) the executive's commission of a felony or crime involving moral turpitude; (iii) the executive's willful malfeasance or misconduct which is demonstrably injurious to the Company; or (iv) material breach by the executive of the non-competition, non-solicitation or confidentiality provisions of the agreement.

Termination by any of these executives for "Good Reason" shall mean termination following any of the following: (i) a substantial diminution in the executive's position or duties, adverse change in reporting lines, or assignment of duties materially inconsistent with the executive's position; (ii) any reduction in the executive's base salary or annual bonus opportunity; (iii) any reduction in the executive's long-term cash incentive compensation opportunities, other than reductions generally affecting other senior executives participating in the applicable long-term incentive compensation programs or arrangements; (iv) the failure of the Company to pay the executive any compensation or benefits when due; (v) relocation of the executive's principal place of work in excess of 50 miles from the executive's current principal place of work; or (vi) any material breach by the Company of the terms of the Agreement; in each case if the Company fails to cure such event within 10 calendar days after receipt from the executive of written notice of the event which constitutes Good Reason.

If the Named Executive Officer's employment terminates due to disability or death, then the Company shall make a pro rata payment of the target amounts payable under any annual and long-term incentive compensation awards then in effect. In the event of any other termination of employment, no amounts are payable under the agreement.

If the Company elects not to extend the Named Executive Officer's employment agreement for any year after expiration of the initial term, then the Named Executive Officer will be treated as if he were terminated by the Company without Cause and entitled to the severance pay and other benefits described above, except that such pay and benefits will not be paid until his actual termination of employment and if his actual termination occurs between ages 64 and 65, his severance multiplier (if higher than one) is reduced to one, and if after age 65, the executive will not be entitled to any severance payment or other benefits under the agreement.

In exchange for the benefits provided under the agreement, the Named Executive Officers agree not to compete with the Company or solicit or interfere with any Company employee or customer for a two-year period after his termination of employment, and not to disclose confidential and proprietary Company information. Each Named Executive Officer is also required to execute a release of all claims against the Company as a condition to receiving the severance payment and benefits, if applicable.

*Change of Control Severance Plan*

If the Named Executive Officers are terminated following a change of control of the Company, then in lieu of the severance payments and benefits described above, the executives are entitled to the severance pay and benefits provided under the Company's Change of Control Severance Pay Plan. Under the plan, if within two years following a "Change of Control" of the Company as defined in the plan and described below, a Named Executive Officer is terminated by the Company (or its successor in the change of control transaction) without "Cause" as defined in the plan and described below, or terminates his employment for certain reasons, then the Company (or its successor) will pay or provide to the Named Executive Officer: (i) an amount equal to one year of his annual base salary; (ii) a pro rata payment of any annual and long-term incentive compensation amounts for which the performance periods have not ended; (iii) a lump sum payment equal to three (for Mr. McElya) and two (for all other Named Executive Officers) times his current annual base salary plus his annual target bonus amount (for the year preceding the year of the change of

133

Table of Contents

control); (iv) a lump sum payment equal to the value of three (for Mr. McElya) and two (for all other Named Executive Officers) additional years of service credit under the Company's qualified and nonqualified defined benefit pension plans, assuming the executive's compensation under such plans for respective period was the highest compensation paid to the executive during any of the five years preceding the year in which his termination of employment occurs (though additional years of service credit are not provided in relation to the qualified plan for this purpose beyond January 31, 2009 when the Company froze the qualified plan); (v) three years (for Mr. McElya) and two years (for all other Named Executive Officers) of continued coverage under the life and health plans sponsored by the Company and in which the executive was covered immediately prior to his termination; (vi) medical and life insurance coverage for the Named Executive Officer and his spouse for their lifetimes, and for his dependent children until they cease to qualify as dependents, at the same cost as was being charged to the Named Executive Officer immediately prior to the change of control; and (vii) outplacement services for up to two calendar years following the year of termination, not to exceed a cost equal to the lesser of 15% of the Executive's annual base pay or $50,000. If, during the first 36 months (for Mr. McElya) or 24 months (for all other Named Executive Officers) of life and medical benefit continuation, the Company is unable to provide what are otherwise intended to be non-taxable benefits to the Named Executive Officer and his covered family members on a tax-free basis, then the Company will make an additional payment to the Named Executive Officer to reimburse him for the taxes due on such benefits. In addition, under the Supplementary Benefit Plan (as described in the Executive Compensation Components section), participants receive a lump sum payout of the present value of their accrued benefits under this plan within 60 days after a termination of employment as described in this paragraph.

A "Change of Control" under the plan means the occurrence of any of the following events: (i) the sale or disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company to any "person" or "group" (as such terms are defined in Sections 13(d)(3) and 14(d)(2) of the Securities Exchange Act of 1934 (the "Exchange Act")) other than certain permitted entities affiliated with the Company or its Sponsors or (ii) any person or group, other than such permitted entities, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of greater than or equal to 50% of the total voting power of the voting stock of the Company, including by way of merger, consolidation or otherwise, except where one or more of the Sponsors and/or their respective affiliates, immediately following such merger, consolidation or other transaction, continue to have the ability to designate or elect a majority of the board of directors of the Company (or the board of directors of the resulting entity or its parent company). A transaction or series of transactions that would otherwise not constitute a Change of Control is treated as a Change of Control for purposes of the Named Executive Officer's entitlements under the plan if clause (i), above, is satisfied in respect of the business or division in which such executive is principally engaged.

Termination for "Cause" under the plan has the same meaning as termination for Cause under Mr. McElya's employment agreement, described above. The circumstances that constitute reasons under the plan for which a Named Executive Officer may terminate his employment and be entitled to severance benefits as if he was terminated without Cause are as follows: (i) for Messrs. McElya, Hasler, Campbell, Beard and Stephenson, a significant adverse change in the nature or scope of the authorities, powers, functions, responsibilities or duties attached to the position held by the executive immediately prior to the Change in Control, (ii) a reduction in the executive's base salary or opportunities for incentive compensation under applicable Company plans and programs, (iii) the termination or denial of the executive's rights to employee benefits or a reduction in the scope or aggregate value thereof, (iv) any material breach of its obligations under the plan by the Company or any successor or (v) a requirement by the Company that the executive move his principal work location more than 50 miles; in each case other than (v) unless remedied by the Company within ten calendar days following notice from the executive of such circumstances. Under the plan, Mr. McElya may voluntarily terminate his employment for any reason or without reason during the thirty-day period immediately following the date that is six months after a Change of Control has occurred (other than a Change of Control related to an initial public offering) and receive the severance benefits applicable to termination without Cause.

134

Table of Contents

The plan also provides that if any payment or the amount of benefits due under the plan or otherwise would be considered an excess parachute payment that subjects the Named Executive Officer to excise tax under Internal Revenue Code Section 4999, then the Company will make an additional "gross-up" payment to the Named Executive Officer to reimburse him for such taxes (and any taxes due on the gross-up payment).

Finally, the plan provides that if the payment of any money or other benefit due under the plan could cause the application of an accelerated or additional tax to a Named Executive Officer under Internal Revenue Code Section 409A, such payment or benefit will be deferred or otherwise restructured to avoid such acceleration or additional tax.

If a Named Executive Officer's employment is terminated for any other reason, then no amounts are payable under the plan.

In exchange for the benefits provided under the plan, each Named Executive Officer agrees not to compete with the Company and not to solicit or interfere with any Company employee or customer for a two-year period (for all Named Executive Officers) after his termination of employment, and agrees not to disclose confidential and proprietary Company information. Each Named Executive Officer is also required to execute a release of all claims against the Company as a condition to receiving the severance payment and benefits.

135

Table of Contents

## DIRECTOR COMPENSATION

The following table sets forth information regarding the compensation received by each of the Company's non-employee directors during the year ended December 31, 2008.

| Name (a) | Fees Earned or Paid in Cash (b) | Stock Awards (c) | Option Awards (d) | All Other Compensation (g) | Total (h) |
|---|---|---|---|---|---|
| S.A. Johnson | $ 124,000[1] | — | — | $ 25,144[8] | $149,144 |
| Gerald J. Cardinale | — [2] | — | — | — | — |
| Gary L. Convis | $ 74,000[3] | — | $ 84,974[7] | — | $158,974 |
| Jack Daly | — [2] | — | — | — | — |
| Leo F. Mullin | — [2] | — | — | — | — |
| James A. Stern | — [2] | — | — | — | — |
| Stephen A. Van Oss | $ 38,000[4] | — | $ 84,974[7] | — | $122,974 |
| Kenneth L. Way | $ 84,000[5] | $ 38,675[6] | $ 42,487[7] | — | $165,162 |
| Michael F. Finley [2] | — [2] | — | — | — | — |

(1) Represents $115,000 for Mr. Johnson's annual outside director fee and service during the year as Lead Director, and $9,000 for attendance at meetings of the Board of Directors in 2008.

(2) As officers or nominees of the Company's Sponsors, Messrs. Cardinale, Daly, Finley, Mullin and Stern were not entitled to compensation for serving as a director or member of any committee of the Board of Directors. Mr. Finley resigned from the Board of Directors effective April 30, 2008.

(3) Represents $65,000 for Mr. Convis' annual outside director fee and $9,000 for attendance at meetings of the Board of Directors in 2008.

(4) Represents $32,500 for Mr. Van Oss' partial year outside director fee, $2,500 for his service as Chairman of the Audit Committee for a portion of 2008 and $3,000 for attendance at meetings of the Board of Directors in 2008.

(5) Represents $65,000 for Mr. Way's annual outside director fee, $10,000 for his service as Chairman of the Audit Committee for a portion of 2008 and Chairman of the Compensation Committee for the remainder of 2008, and $9,000 for attendance at meetings of the Board of Directors in 2008.

(6) The amount shown in column (c) represents the compensation costs associated with Company matching stock units allocated under the Management Stock Purchase Plan as determined in accordance with FAS 123(R). See Note 17 of the Company's financial statements for 2007 for the assumptions made in determining the FAS 123(R) values. There can be no assurance that the FAS 123(R) value will ever be realized. The Management Stock Purchase Plan allows non-executive directors to defer fees under the plan and allocate them to Company stock units that are eligible for matching grants on the same basis as that applicable to executives.

(7) The amount shown in column (d) represents the compensation costs of stock option awards granted in 2008 for financial reporting purposes under FAS 123(R). See Note 17 of the Company's financial statements for 2008 for the assumptions made in determining FAS 123(R) values. There can be no assurance that the FAS123(R) value will ever be realized.

(8) Represents reimbursement of health care benefit premiums.

### Summary of Director Compensation

None of our directors who are officers or nominees of our Sponsors receive any compensation for serving as a director or as a member or chair of a committee of the Board of Directors. Members of the Board of Directors who are not employees of the Company or officers, nominees or employees of our Sponsors are compensated with an outside director fee in the amount of $65,000 per year and, if they serve as chair of a committee of the Board of Directors, an additional fee of $10,000 per year. Our directors who are not employees of the Company or officers, nominees or employees of our Sponsors also receive $1,500 per meeting of the Board of Directors that such members attend, and are eligible to receive grants of non-qualified and incentive stock options and other stock-based awards under the Company's Stock Incentive Plan.

Table of Contents

## COMPENSATION COMMITTEE REPORT

The Compensation Committee of the Board of Directors of the Company has reviewed and discussed the above Compensation Discussion & Analysis with management and, based on such review and discussion, has recommended to the board of directors that the Compensation Discussion & Analysis be included in this annual report.

Kenneth L. Way, Chairman
Jack Daly
James A. Stern

137

Table of Contents

## Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The following table and accompanying footnotes show information regarding the beneficial ownership of the issued and outstanding common stock of Cooper-Standard Holdings Inc. as of March 24, 2009 by (i) each person known by us to beneficially own more than 5% of the issued and outstanding common stock of Cooper-Standard Holdings Inc., (ii) each of our directors, (iii) each named executive officer and (iv) all directors and executive officers as a group.

| Name and beneficial owner | Number | Percent |
|---|---|---|
| The Cypress Group L.L.C.[1] | 1,715,000 | 49.3% |
| The Goldman Sachs Group, Inc.[2] | 1,715,000 | 49.3 |
| James S. McElya | 20,000 | * |
| S.A. (Tony) Johnson | 5,000 | * |
| Kenneth L. Way | 2,500 | * |
| James A. Stern[3] | — | — |
| Gerald J. Cardinale[4] | 1,715,000 | 49.3 |
| Jack Daly | 1,715,000 | 49.3 |
| Leo F. Mullin | 1,000 | * |
| Larry J. Beard | 5,000 | * |
| Allen J. Campbell | 3,150 | * |
| Edward A. Hasler | 2,700 | * |
| All directors and executive officers as a group (11 persons)[5] | 39,350 | 1.1% |

———————————————

\*      less than 1%.

(1)    Includes 1,624,386 shares of common stock owned by Cypress Merchant Banking Partners II L.P., 71,337 shares of common stock owned by Cypress Merchant Banking II C.V., 15,847 shares of common stock owned by 55th Street Partners II L.P. (collectively, the "Cypress Funds") and 3,430 shares owned by Cypress Side-by-Side L.L.C. Cypress Associates II L.L.C. is the managing general partner of Cypress Merchant Banking II C.V. and the general partner of Cypress Merchant Banking Partners II L.P. and 55th Street Partners II L.P., and has voting and investment power over the shares held or controlled by each of these funds. Certain executives of The Cypress Group L.L.C., including Messrs. Jeffrey Hughes and James Stern, may be deemed to share beneficial ownership of the shares shown as beneficially owned by the Cypress Funds. Each of such individuals disclaims beneficial ownership of such shares. Cypress Side-By-Side L.L.C. is a sole member-L.L.C. of which Mr. James A. Stern is the sole member. The business address of these entities is c/o The Cypress Group L.L.C., 65 East 55th Street, New York, New York 10022.

(2)    The number of shares indicated as owned by The Goldman Sachs Group, Inc. ("GS Group") reflects the number of shares of common stock that corresponds to the number of common shares held by investment partnerships (the "GS Funds"), of which affiliates of GS Group are the general partner or managing general partner. GS Group and certain affiliates, including Goldman, Sachs & Co., may be deemed to directly or indirectly own in the aggregate 1,715,000 shares of common stock which are deemed to be beneficially owned directly or indirectly by the GS Funds. Goldman, Sachs & Co. is the investment manager for certain of the GS Funds. Goldman, Sachs & Co. is a direct and indirect, wholly owned subsidiary of GS Group. GS Group, Goldman, Sachs & Co. and the GS Funds share voting power and investment power with certain of their respective affiliates. Shares deemed to be beneficially owned by the GS Funds consist of: (a) GS Capital Partners 2000, L.P. – 970,536 shares, (b) GS Capital Partners 2000 Offshore, L.P. – 352,656 shares, (c) GS Capital Partners 2000 GmbH & Co. Beteiligungs KG – 40,565 shares, (d) GS Capital Partners 2000 Employee Fund, L.P. – 308,368 shares and (e) Goldman Sachs Direct Investment Fund 2000, L.P. – 42,875 shares. GS Group, Goldman, Sachs & Co. and their affiliates each disclaims beneficial ownership of the shares of common stock owned directly

138

Table of Contents

or indirectly by the GS Funds, except to the extent of their pecuniary interest therein, if any. The business address of these entities is c/o GS Capital Partners 2000, 85 Broad St., New York, New York 10004.

(3)   Mr. Stern is Chairman of The Cypress Group L.L.C. Mr. Stern may be deemed to share beneficial ownership of the shares shown as beneficially owned by the Cypress Funds, but disclaims beneficial ownership of such shares. Cypress Side-By-Side L.L.C. is a sole member-L.L.C. of which Mr. James A. Stern is the sole member.

(4)   Mr. Cardinale is a Managing Director in Goldman, Sachs & Co.'s Principal Investment Area. Mr. Cardinale disclaims beneficial ownership of any shares held or controlled by these entities or their affiliates, except to the extent of his pecuniary interest therein, if any.

(5)   Does not include the 1,715,000 shares shown on the table with respect to Mr. Cardinale, which represent the same 1,715,000 shares shown with respect to The Goldman Sachs Group, Inc., or the 1,715,000 shares shown on the table with respect to Mr. Stern, which represent the same 1,715,000 shares shown with respect to the Cypress Group L.L.C.

**Item 13.     Certain Relationships and Related Transactions and Director Independence**

Messrs. Johnson, Cardinale, Convis, Daly, Mullin, Stern, Van Oss and Way are "independent" directors as defined in the listing standards of the Nasdaq Stock Market. Mr. McElya, our Chairman, is not an "independent" director within such definition.

**Item 14.     Principal Accountant Fees and Services (dollar amounts in thousands)**

|  | Fiscal Year Ended December 31, | |
|---|---|---|
|  | 2007 | 2008 |
| Audit fees (1) | $    3,487 | $    3,188 |
| Audit-related fees (2) | 861 | 245 |
| Tax fees (3) | 1,034 | 993 |

(1)   Audit fees include services rendered in connection with the audit of our annual financial statements, the reviews of the financial statements included in our quarterly reports on Form 10-Q, international statutory audits, and assistance with filing of our registration statements.

(2)   Audit related fees include services related to the audits of our employee benefit plans and consultation concerning financial accounting and reporting standards, as well as services related to transaction advisory.

(3)   Tax fees include services related to tax compliance, tax advice, and tax planning.

The Audit Committee has considered whether the provision of services described under the heading "Tax Fees" is compatible with maintaining Ernst & Young LLP's independence. In light of the nature of work performed and amount of the fees paid to Ernst & Young LLP for those services, the Audit Committee concluded that the provision of such services is compatible with maintaining Ernst & Young LLP's independence.

The Audit Committee has also adopted procedures for pre-approving all audit and non-audit services provided by Ernst & Young LLP. All of the audit, audit-related, tax, and all other services performed by Ernst & Young LLP were pre-approved by the Audit Committee pursuant to its pre-approval policies and procedures as described above.

Table of Contents

PART IV

**Item 15.        Exhibits and Financial Statement Schedules**

(a)     Documents Filed as Part of this Report on Form 10-K:

|  | 10-K Report page(s) |
|---|---|
| (1) Financial Statements: | |
| Report of Ernst & Young LLP, independent registered public accountants | 52 |
| Consolidated statements of operations for the years ended December 31, 2008, 2007 and 2006 | 53 |
| Consolidated balance sheets as of December 31, 2008 and December 31, 2007 | 54 |
| Consolidated statements of changes in stockholders' equity for the years ended December 31, 2008, 2007 and 2006 | 55 |
| Consolidated statements of cash flows for the years ended December 31, 2008, 2007 and 2006 | 56 |
| Notes to Consolidated financial statements | 57 |
| | |
| 2. Financial Statement Schedules: | |
| Schedule II – Valuation and Qualifying Accounts | 101 |

All other financial statement schedules are not required under the related instructions or are inapplicable and therefore have been omitted.

3. The Exhibits listed on the "Index to Exhibits" are filed herewith or are incorporated by reference as indicated below.

140

Table of Contents

### Index to Exhibits

| Exhibit No. | Description of Exhibit |
|---|---|
| 3.3** | Certificate of Incorporation of Cooper-Standard Holdings Inc. (incorporated by reference to Exhibit 3.3 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 3.4*** | Certificate of Amendment of Certificate of Incorporation of Cooper-Standard Holdings Inc. dated November 12, 2007. |
| 3.5** | Bylaws of Cooper-Standard Holdings Inc. (incorporated by reference to Exhibit 3.4 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 4.1** | Indenture, 7% Senior Notes due 2012, dated as of December 23, 2004, among Cooper-Standard Automotive Inc., the Guarantors named therein and Wilmington Trust Company, as Trustee (incorporated by reference to Exhibit 4.1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 4.2** | Indenture, 8 3/8% Senior Subordinated Notes due 2014, dated as of December 23, 2004, among Cooper-Standard Automotive Inc., the Guarantors named therein and Wilmington Trust Company, as Trustee (incorporated by reference to Exhibit 4.2 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 4.3*** | Supplemental Indenture No. 1, Senior Notes due 2012, dated as of July 11, 2006, between Cooper-Standard Automotive FHS Inc., as Guaranteeing Subsidiary, and Wilmington Trust Company, as Trustee. |
| 4.4*** | Supplemental Indenture No. 1, Senior Subordinated Notes due 2014, dated as of July 11, 2006, between Cooper-Standard Automotive FHS Inc., as Guaranteeing Subsidiary, and Wilmington Trust Company, as Trustee. |
| 4.5** | Registration Rights Agreement, 7% Senior Notes due 2012, dated as of December 23, 2004, among Cooper-Standard Automotive Inc., the Guarantors named therein, Deutsche Bank Securities Inc., Lehman Brothers Inc., Goldman, Sachs & Co., UBS Securities LLC, BNP Paribas Securities Corp. and Scotia Capital (USA) Inc. (incorporated by reference to Exhibit 4.3 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 4.6** | Registration Rights Agreement, 8 3/8% Senior Subordinated Notes due 2014, dated as of December 23, 2004, among Cooper-Standard Automotive Inc., the Guarantors named therein, Deutsche Bank Securities Inc., Lehman Brothers Inc., Goldman, Sachs & Co., UBS Securities LLC, BNP Paribas Securities Corp. and Scotia Capital (USA) Inc. (incorporated by reference to Exhibit 4.4 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 4.7** | Form of 7% Senior Notes due 2012, exchange note Global Note (incorporated by reference to Exhibit 4.5 to Amendment 1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated April 15, 2005). |
| 4.8** | Form of 8 3/8% Senior Subordinated Notes due 2014, exchange note Global Note (incorporated by reference to Exhibit 4.6 to Amendment 1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated April 15, 2005). |
| 4.9** | 7% Senior Notes due 2012, Rule 144A Global Note (incorporated by reference to Exhibit 4.7 to Amendment 1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated April 15, 2005). |
| 4.10** | 7% Senior Notes due 2012, Regulation S Global Note (incorporated by reference to Exhibit 4.8 to Amendment 1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated April 15, 2005). |

| Exhibit No. | Description of Exhibit |
|---|---|
| 4.11** | 8 ³/8% Senior Subordinated Notes due 2014, Rule 144A Global Note (incorporated by reference to Exhibit 4.9 to Amendment 1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated April 15, 2005). |
| 4.12** | 8 ³/8% Senior Subordinated Notes due 2014, Regulation S Global Note (incorporated by reference to Exhibit 4.10 to Amendment 1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated April 15, 2005). |
| 10.1** | Credit Agreement, dated as of December 23, 2004, among Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., Cooper-Standard Automotive Canada Limited, various lending institutions, Deutsche Bank Trust Company Americas, as Administrative Agent, Lehman Commercial Paper Inc., as Syndication Agent, and Goldman Sachs Credit Partners L.P., UBS Securities LLC, and The Bank of Nova Scotia, as Co-Documentation Agents (incorporated by reference to Exhibit 10.1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.2** | U.S. Security Agreement, dated as of December 23, 2004, among Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., certain subsidiaries of Cooper-Standard Holdings Inc. and Deutsche Bank Trust Company Americas, as Collateral Agent (incorporated by reference to Exhibit 10.2 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.3** | U.S. Pledge Agreement, dated as of December 23, 2004, among Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., certain subsidiaries of Cooper-Standard Holdings Inc. and Deutsche Bank Trust Company Americas, as Collateral Agent (incorporated by reference to Exhibit 10.3 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.4** | U.S. Subsidiaries Guaranty, dated as of December 23, 2004, by certain subsidiaries of Cooper-Standard Holdings Inc. in favor of Deutsche Bank Trust Company Americas, as Administrative Agent (incorporated by reference to Exhibit 10.4 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.5** | Intercompany Subordination Agreement, dated as of December 23, 2004, among Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., certain subsidiaries of Cooper-Standard Holdings Inc. and Deutsche Bank Trust Company Americas, as Collateral Agent (incorporated by reference to Exhibit 10.5 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.6 | First Amendment and Consent to Credit Agreement, dated as of February 1, 2006, among Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., Cooper-Standard Automotive Canada Limited, various lending institutions, Deutsche Bank Trust Company Americas, as Administrative Agent (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K dated February 10, 2005). |
| 10.7 | Second Amendment to Credit Agreement, dated as of July 26, 2007, among Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., Cooper-Standard Automotive Canada Limited, Steffens Beheer BV, various Lender parties, and Deutsche Bank Trust Company Americas (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated August 1, 2007). |

Table of Contents

| Exhibit No. | Description of Exhibit |
|---|---|
| 10.8 | Third Amendment to Credit Agreement, dated as of December 18, 2008, among Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., Cooper-Standard Automotive Canada Limited, Cooper-Standard Automotive International Holdings B.V. (f/k/a Steffens Beheer BV), various Lender parties, and Deutsche Bank Trust Company Americas as administrative agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated December 18, 2008). |
| 10.9** | Stock Purchase Agreement, dated as of September 16, 2004, among Cooper Tire & Rubber Company, Cooper Tyre & Rubber UK Limited and Cooper-Standard Holdings Inc. (incorporated by reference to Exhibit 2.1 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.10** | Amendment Number 1 to the Stock Purchase Agreement, dated as of December 3, 2004, among Cooper Tire & Rubber Company, Cooper Tyre & Rubber UK Limited and Cooper-Standard Holdings Inc. (incorporated by reference to Exhibit 2.2 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.11 | Stock and Asset Purchase Agreement, dated as of December 4, 2005, between ITT Industries, Inc. and Cooper-Standard Automotive Inc. (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated December 8, 2005). |
| 10.12 | First Amendment to the Stock and Asset Purchase Agreement dated February 6, 2006 between Cooper-Standard Automotive Inc. and ITT Industries, Inc. (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated February 10, 2006). |
| 10.13 | Sale and Purchase Agreement, dated and notarized on June 9 and June 10, 2007, by and between Automotive Sealing Systems S.A., Cooper-Standard Automotive Inc. and CSA Germany GmbH & Co. KG (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated June 14, 2007). |
| 10.14** | Stockholders Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and the Stockholders named therein (incorporated by reference to Exhibit 10.7 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.15** | Registration Rights Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and the Stockholders named therein (incorporated by reference to Exhibit 10.8 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.16** | Subscription Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and Cypress Merchant Banking Partners II L.P., Cypress Merchant Banking II C.V., 55th Street Partners II L.P. and Cypress Side-by-Side LLC (incorporated by reference to Exhibit 10.9 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.17** | Subscription Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and GS Capital Partners 2000, L.P., GS Partners 2000 Offshore, L.P., GS Capital Partners 2000 GmbH & Co. KG, GS Capital Partners 2000 Employee Fund, L.P. and Goldman Sachs Direct Investment Fund 2000, L.P. (incorporated by reference to Exhibit 10.10 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| *10.18**** | Fourth Amended and Restated Employment Agreement, dated July 1, 2008, by and among Cooper-Standard Automotive Inc. and James S. McElya. |

143

Table of Contents

| Exhibit No. | Description of Exhibit |
|---|---|
| *10.19*** | Executive Put Option Agreement, dated December 19, 2007, by and among Cooper-Standard Holdings Inc., Cypress Merchant Banking Partners II L.P., Cypress Merchant Banking II C.V., 55th Street Partners II L.P., Cypress Side-by-Side LLC, GS Capital Partners 2000, L.P., GS Capital Partners 2000 Offshore, L.P., GS Capital Partners 2000 GmbH & Co. Beteiligungs KG, GS Capital Partners 2000, L.P. and James S. McElya. |
| *10.20** | Subscription Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and James S. McElya (incorporated by reference to Exhibit 10.20 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| *10.21**** | Employment Agreement, dated as of July 1, 2008, by and among Cooper-Standard Automotive Inc. and Edward A. Hasler. |
| *10.22** | Subscription Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and Edward A. Hasler (incorporated by reference to Exhibit 10.17 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| *10.23**** | Employment Agreement, dated as of January 1, 2009, by and among Cooper-Standard Automotive Inc. and Allen J. Campbell. |
| *10.24** | Subscription Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and Allen J. Campbell (incorporated by reference to Exhibit 10.13 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| *10.25**** | Employment Agreement, dated as of January 1, 2009, by and among Cooper-Standard Automotive Inc. and Keith D. Stephenson. |
| *10.26** | Subscription Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and S.A. Johnson (incorporated by reference to Exhibit 10.19 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| *10.27** | Subscription Agreement, dated as of December 23, 2004, by and among Cooper-Standard Holdings Inc. and Kenneth L. Way (incorporated by reference to Exhibit 10.24 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| *10.29 | Subscription Agreement, dated as of October 27, 2005, by and among Cooper-Standard Holdings Inc. and Leo F. Mullin (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K dated November 2, 2005). |
| *10.30**** | Cooper-Standard Automotive Inc. Change of Control Severance Pay Plan, as Amended and Restated Effective July 1, 2008. |
| *10.31*** | 2004 Cooper-Standard Holdings Inc. Stock Incentive Plan, as Amended and Restated Effective November 1, 2007. |
| *10.32**** | Form of Nonqualified Stock Option Agreement. |
| *10.33**** | Cooper-Standard Automotive Inc. Deferred Compensation Plan, Effective January 1, 2005 with Amendments through December 31, 2008. |
| *10.34 | Cooper-Standard Automotive Inc. Pre-2005 Executive Deferred Compensation Plan, as Amended and Restated Effective January 1, 2005 (incorporated by reference to Exhibit 10.34 to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, dated April 2, 2007). |
| *10.35**** | Cooper-Standard Automotive Inc. Nonqualified Supplementary Benefit Plan, Amended and Restated as of January 1, 2009. |
| *10.36 | Cooper-Standard Automotive Inc. Long-Term Incentive Plan (incorporated by reference to Exhibit 10.36 to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, dated April 2, 2007). |

144

**Table of Contents**

| Exhibit No. | Description of Exhibit |
|---|---|
| 10.37** | Letter Agreement, dated as of December 23, 2004, between Cooper-Standard Holdings Inc. and Cypress Advisors Inc. (incorporated by reference to Exhibit 10.27 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.38** | Letter Agreement, dated as of December 23, 2004, between Cooper-Standard Holdings Inc. and Goldman Sachs & Co. (incorporated by reference to Exhibit 10.28 to the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc., the Company and other Registrant Guarantors dated March 31, 2005). |
| 10.39*** | Limited Liability Company Agreement of Nishikawa Standard Company LLC, dated as of January 1, 2008. |
| 21.1**** | List of Subsidiaries |
| 24.1**** | Powers of Attorney |
| 31.1**** | Certification of Principal Executive Officer Pursuant to 15 U.S.C. 78m(a) or 78o(d) (Section 302 of the Sarbanes-Oxley Act of 2002). |
| 31.2**** | Certification of Principal Financial Officer Pursuant to 15 U.S.C. 78m(a) or 78o(d) (Section 302 of the Sarbanes-Oxley Act of 2002). |
| 32.1**** | Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350 (Section 906 of the Sarbanes-Oxley Act of 2002). |
| 32.2**** | Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350 (Section 906 of the Sarbanes-Oxley Act of 2002). |

| | |
|---|---|
| * | Management contracts and compensatory plans or arrangements |
| ** | Refers to the applicable exhibit filed with the Registration Statement on Form S-4 of Cooper-Standard Automotive Inc. (File Nos. 333-123708) |
| *** | Incorporated by reference to the applicable exhibit filed with the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007 |
| **** | Filed herewith |

145

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**COOPER-STANDARD HOLDINGS INC.**

Date: March 31, 2009

/s/ James S. McElya
James S. McElya
Chairman and Chief Executive Officer and Director

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on March 31, 2009, by the following persons on behalf of the registrant in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ James S. McElya<br>James S. McElya | Chairman and Chief Executive Officer and Director |
| /s/ Allen J. Campbell<br>Allen J. Campbell | Chief Financial Officer (Principal Financial Officer) |
| /s/ Helen T. Yantz<br>Helen T. Yantz | Controller (Principal Accounting Officer) |
| /s/ Edward A. Hasler<br>Edward A. Hasler | Vice Chairman and President, North America, and Director |
| /s/ Gerald J. Cardinale<br>Gerald J. Cardinale | Director |
| /s/ Gary L. Convis<br>Gary L. Convis | Director |
| /s/ Jack Daly<br>Jack Daly | Director |
| /s/ S. A. (Tony) Johnson<br>S. A. (Tony) Johnson | Director |
| /s/ Leo F. Mullin<br>Leo F. Mullin | Director |
| /s/ James A. Stern<br>James A. Stern | Director |
| /s/ Stephen A. Van Oss<br>Stephen A. Van Oss | Director |
| /s/ Kenneth L. Way<br>Kenneth L. Way | Director |

146

Table of Contents

SUPPLEMENTAL INFORMATION TO BE FURNISHED WITH REPORTS FILED PURSUANT TO SECTION 15(d) OF THE ACT BY REGISTRANTS WHICH HAVE NOT REGISTERED SECURITIES PURSUANT TO SECTION 12 OF THE ACT.

No annual report to security holders or proxy material has been sent to the registrant's security holders.

147

Exhibit 10.18

### FOURTH AMENDED AND RESTATED EMPLOYMENT AGREEMENT

THIS FOURTH AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "**Agreement**") is made and entered into as of the 1ˢᵗ day of July, 2008 (the "**Effective Date**") between COOPER-STANDARD AUTOMOTIVE INC., an Ohio corporation with its principal offices located at 39550 Orchard Hill Place Drive, Novi, Michigan 48375 (the "**Company**"), and James S. McElya, residing at 5421 Burnt Hickory Drive, Valrico, Florida 33594 (the "**Executive**"). The Company's parent corporation, Cooper-Standard Holdings Inc., f/k/a CSA Acquisition Corp. ("CSA"), is a party to this Agreement solely for purposes of Section 9(c).

### WITNESSETH:

WHEREAS, the Company has employed the Executive, and Executive has accepted such employment under the terms of the Third Amended and Restated Employment Agreement, which the parties wish to further amend, by entering into this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and intending to be legally bound hereby, the Company and the Executive hereby agree as follows:

1. Certain Defined Terms. In addition to terms defined elsewhere herein, the following terms have the following meanings when used in this Agreement with initial capital letters:

(a) "Affiliate" with respect to an entity, any entity directly or indirectly controlling, controlled by, or under common control with, such first entity.

(b) "Average Compensation" means the Executive's average annual compensation, including Base Pay and any annual and long-term incentive compensation earned, during the five (5) calendar years prior to the year in which a Termination occurs.

(c) "Base Pay" means the Executive's rate of annual base salary, as in effect from time to time.

(d) "Board" means the Board of Directors of the Company.

(e) "Cause" means termination of the Executive's employment with the Company by the Board because of any of the following:

(i) any act or omission constituting a material breach by the Executive of any of his significant obligations or agreements under this Agreement or the continued failure or refusal of the Executive to adequately perform the duties reasonably required hereunder which is materially injurious to the financial condition or business reputation of, or is otherwise materially injurious to, the Company or any Affiliate thereof, after notification by the Board of such breach, failure or refusal and failure of the Executive to correct such breach, failure or refusal within thirty (30) days of such notification (other than by reason of the incapacity of the Executive due to physical or mental illness); or

(ii) the commission by and conviction of the Executive of a felony, or the perpetration by and criminal conviction of or civil verdict finding the Executive committed a dishonest act or common law fraud against the Company or any Affiliate thereof (for the avoidance of doubt, conviction and civil verdict, in each case, shall mean when no further appeals may be taken by the Executive from such conviction or civil verdict and such conviction or civil verdict becomes final and binding upon the Executive with no further right of appeal); or

(iii) any other willful act or omission which is materially injurious to the financial condition or business reputation of, or is otherwise materially injurious to, the Company or any Affiliate thereof, and failure of the Executive to correct such act or omission after notification by the Board of any such act or omission.

Any notification to be given by the Board in accordance with Section 1(e)(i) or 1(e)(iii) shall specifically identify the breach, failure, refusal, act or omission to which the notification relates and shall describe the injury to the Company or any of its Affiliates, and such notification must be given within twelve (12) months of the Board becoming aware, or within twelve (12) months of when the Board should have reasonably become aware of the breach, failure, refusal, act, or omission identified in the notification. Notwithstanding Section 24, failure to notify the Executive within any such twelve (12) month period shall be deemed to be a waiver by the Board of any such breach, failure, refusal, act or omission by the Executive and any such breach, failure, refusal, act or omission by the Executive shall not then be determined to be a breach of this Agreement.

For the avoidance of doubt and for the purpose of determining Cause, the exercise of business judgment by the Executive shall not be determined to be Cause, even if such business judgment materially injures the financial condition or business reputation of, or is otherwise materially injurious to the Company or any Affiliate thereof, unless such business judgment by the Executive was not made in good faith, or constitutes willful or wanton misconduct, or was an intentional violation of state or federal law.

(f) "Code" means the Internal Revenue Code of 1986, as amended. Any reference to a specific provision of the Code shall include any successor provision thereto.

(g) "Committee" means the Compensation Committee of the Board.

(h) "Company" means the Company as hereinbefore defined.

(i) "Disability" or "Disabled" means when, the Executive becomes physically or mentally incapacitated and is therefore unable for a period of six (6) consecutive months or for an aggregate of nine (9) months in any twenty-four (24) consecutive month period to perform the Executive's duties. Any question as to the existence of the Disability of the Executive as to which the Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to the Executive and the Company. If the Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and the Executive shall be final and conclusive for all purposes of the Agreement.

2

(j) "Good Reason" means the occurrence of any of the following, without Executive's express, prior written consent:

(i) a material breach by the Company of Section 2(a) or 2(b) or Section 4 of this Agreement, including but not limited to, the assignment to the Executive of any duties materially inconsistent with his status as Chairman or, effective March 26, 2009, Chief Executive Officer of the Company, or his removal from such position, or a substantial adverse alteration in the nature of his responsibilities from those described herein, except, in each case, in connection with a promotion of the Executive, and the failure of the Company to remedy such breach within thirty (30) days after receipt of written notice of such breach from the Executive;

(ii) the relocation of the office of the Company where the Executive is employed to a location that is 150 miles away from the current location, except for relocation to the Company's headquarters and required travel on the Company's business to an extent reasonably required to perform his duties hereunder;

(iii) except as required by law, the failure by the Company to provide to Executive Plans (as defined in Section 4(c)) that provide health, life, disability, retirement and fringe benefits that are substantially comparable in the aggregate to the level of such benefits provided to Executive by Cooper immediately prior to the Effective Date, other than due to a reduction in such level of benefits to the extent such reduction applies to other senior executives of the Company;

(iv) the failure of the Company to obtain a satisfactory agreement from any successor to assume and agree to perform this Agreement, as contemplated in Section 21 hereof or the purchaser of such business shall fail to agree to assume this Agreement or to provide Executive with the same or a comparable position, duties, benefits, and base salary and incentive compensation as provided in Section 4 of this Agreement; or

(v) the failure of the Board to elect Executive to his existing position or an equivalent position.

(k) "Nonqualified Supplementary Benefit Plan" means any plan which provides for the payment of pension benefits which would be payable under the terms of a Retirement Plan which is a tax-qualified defined benefit plan, but for governmental-imposed limitations on the amount that is permitted to be paid from such Retirement Plan.

(l) "Retirement Plans" means any tax qualified defined benefit plan or scheme sponsored by the Company or any of its Affiliates and the Nonqualified Supplementary Benefit Plan or any successor plans thereto which provide comparable benefits.

(m) "Termination" means the Executive's "separation from service" with the Company and its affiliates within the meaning of Code Section 409A.

3

(n) "Termination Date" means the date on which the Executive's employment with the Company is terminated by the Company or the Executive for any reason or for no reason, pursuant to a Termination. If the Executive's employment is terminated by the Company, such date shall be specified in a written notice of termination (which date shall be no earlier than the date of furnishing such notice), or if no such date is specified therein, the date of receipt by the Executive of such written notice of termination, otherwise the Executive shall specify such date in a written notice of his resignation.

2. Employment and Duties.

(a) Position from July 1, 2008 through March 25, 2009. The Company hereby employs the Executive and the Executive agrees upon the terms and conditions herein set forth to serve, as of the Effective Date, as executive Chairman of the Company, and, in such capacity, shall focus on the alignment of the Company's investments and initiatives with its long-term strategy, interfacing with the Board and fostering relationships with the Company's customers and financial stakeholders, and shall perform such other duties, commensurate with the Executive's title and position of executive Chairman of the Company, as may be assigned to the Executive from time to time by the Board and which are consistent with the Chairman continuing as an employee.

(b) Position as of March 26, 2009. The Executive agrees upon the terms and conditions herein set forth to serve, as of March 26, 2009 through the remainder of the Term, as Chairman and Chief Executive Officer of the Company, and, in such capacity, shall perform such duties as may be delineated in the Bylaws of the Company and such other duties, commensurate with the Executive's title and position of Chairman and Chief Executive Officer of the Company, as may be assigned to the Executive from time to time by the Board.

(c) Exclusive Services. Throughout the Term (as defined in Section 3), Executive shall, except as may from time to time be otherwise agreed in writing by the Company and during reasonable vacations and unless prevented by ill health, devote his full-time and undivided attention during normal business hours to the business and affairs of the Company consistent with his senior executive position, shall in all respects conform to and comply with the lawful and reasonable directions and instructions given to him by the Board, and shall use his best efforts to promote and serve the interests of the Company.

(d) Restrictions on Other Employment. Throughout the Term and provided that such activities do not contravene the provisions of Section 2(c) hereof or Section 15 hereof:

(i) Executive may engage in charitable and community affairs;

(ii) Executive may perform inconsequential services without specific compensation therefor in connection with the management of personal investments; and,

(iii) Executive may, directly or indirectly, render services to any other person or organization (including service as a member of the Board of Directors of any other unaffiliated company), for which he receives compensation, that is not in competition with the Company, subject in each case to the approval of the Board. Executive may retain all fees he receives for such services, and the Company shall not

4

reduce his compensation by the amount of such fees. For purposes of this Section 2(d)(iii) competition shall have the same meaning as intended for the purposes of Section 15.

3. Term of Employment. Subject to the provisions of Section 5 through Section 10 hereof, the Company shall retain the Executive and the Executive shall serve in the employ of the Company for a period (the "**Term**") which commenced on December 23, 2004 and will continue in effect through December 31, 2009; provided, however, that commencing on January 1, 2010, and on January 1 of each year thereafter, the Term shall automatically be extended for one additional year unless, no later than September 30 of the preceding year, the Company shall have given written notice to the Executive that it does not wish to extend this Agreement.

4. Compensation and Other Benefits. Subject to the provisions of this Agreement, the Company shall pay and provide the following compensation and other benefits to the Executive during the Term as compensation for services rendered hereunder:

(a) Base Pay. As of and following the Effective Date, the Company shall continue to pay to the Executive his current Base Pay at the rate of $950,000.00 per annum, payable biweekly. The Base Pay will be reviewed not less than annually by the Board or by the Compensation Committee and may be increased, but not decreased.

(b) Annual Bonus Opportunity. With respect to each full fiscal year during the Term, Executive shall be eligible to earn an annual bonus award of one hundred percent (100%) of Executive's Base Pay or such higher percentage of Executive's Base Pay as may be determined by the Board or the Compensation Committee, based upon and subject to the achievement of annual performance targets established by the Board or Compensation Committee prior to the beginning of or within the first three months of each fiscal year during the Term.

(c) Employee Benefit Plans. At all times during the Term, the Executive shall be provided the opportunity to participate in such Retirement Plans, and such employee pension benefit plans, whether or not qualified, and employee welfare benefit plans, programs and arrangements (collectively, the "**Plans**") as are generally made available to executives of the Company. Unless otherwise required by law, the Company will provide to Executive Plans that provide health, life, disability, retirement and fringe benefits that are substantially comparable in the aggregate to the level of such benefits provided to Executive by Cooper immediately prior to the Effective Date; provided, however, that the Company may reduce such level of benefits to the extent such reduction applies to other senior executives of the Company.

(d) Long-Term Incentive Compensation. The Executive shall be eligible to participate in such long-term incentive plans and programs as the Company generally provides to its senior executives.

(e) Change of Control Severance Pay Plan. The Executive shall participate in the Company's Change of Control Severance Pay Plan, substantially in the form of Annex B. If the Executive is employed on the date of a Change of Control (as defined in the Change of

5

Control Severance Pay Plan), the Change of Control Severance Pay Plan shall apply for purposes of determining the Executive's severance benefits; provided that the Company has not terminated the Change of Control Severance Pay Plan prior to the Change of Control. For the avoidance of doubt, any amounts and benefits that would be payable under the Company's Change of Control Severance Pay Plan shall be reduced and offset pursuant to Section 3 of Exhibit B thereof by any amounts and benefits payable to the Executive pursuant to this Agreement in connection with a Termination hereunder, including, without limitation, payments pursuant to Sections 5, 7, 8, 9 or 10 of this Agreement. Additionally, following any Termination hereunder (including, without limitation, due to a Qualified Retirement) the Executive shall cease to be covered as a participant under the Company's Change of Control Severance Pay Plan.

5. <u>Termination Without Cause or for Good Reason</u>.

(a) If the Executive's employment is terminated by the Company without Cause or if the Executive terminates his employment hereunder for Good Reason, and conditioned upon the Executive's delivering to the Company the Release provided for in Section 16 with all periods for revocation expired, the Company shall pay or provide to the Executive, subject to Section 19:

(i) a single lump sum cash payment within 30 days following the Termination Date equal to the Executive's then current Base Pay that has accrued but not been paid through his Termination Date, any annual and/or long-term bonus earned but unpaid as of the date of termination for any previously completed fiscal year or performance period, and a pro rata incentive compensation payment accrued through his Termination Date. For this purpose, the Executive's pro rata incentive compensation will be determined by multiplying the target amount payable under all outstanding incentive awards multiplied (for each award) by a fraction, the numerator of which is the number of days that have elapsed in the period to which such award relates through the Termination, and the denominator of which is the total number of days in the period;

(ii) a single lump sum cash payment six months following the Termination Date equal to the greater of:

(A) the Executive's Severance Pay, which shall equal the sum of the biweekly payments that the Executive would receive if he were paid at the rate of his Average Compensation for the remainder of the Term; or

(B) three (3) times the sum of (x) Executive's Base Pay plus (y) target annual incentive compensation for the year prior to the year in which such Termination occurs; plus

(iii) a single lump sum cash payment six months following the Termination Date equal to the actuarial equivalent of the excess of (1) the retirement pension (determined as a straight line annuity commencing at age sixty-five (65) or the first of the month following the Executive's termination of employment, whichever is later) which he would have accrued under the terms of the Retirement Plans (without

6

regard to any amendment to such Retirement Plans or other pension benefit program described herein), determined as if the Executive were fully vested thereunder and had accumulated (after the Termination Date) thirty-six (36) additional months (or, if greater, the number of months remaining in the Term) of service credit thereunder at his highest annual pensionable compensation (as determined pursuant to the terms of the Retirement Plans) during any calendar year for the five (5) years immediately preceding the year in which the Termination Date occurs, over (2) the retirement pension (determined as a straight life annuity commencing at age sixty-five (65) or the first of the month following the Executive's termination of employment, whichever is later) which Executive had then accrued pursuant to the provisions of the Retirement Plans. For purposes of this subsection, "actuarial equivalent" shall be determined using all of the same mortality, interest rate and other methods and assumptions as are used from time to time to determine "actuarial equivalence" for lump sum benefits under the Retirement Plan.

(iv) for thirty-six (36) months following his Termination Date, the Company shall arrange to provide Executive with life, accident and health insurance benefits substantially similar to those to which Executive and Executive's eligible dependents were entitled immediately prior to his Termination. Any benefit elections pertaining to Executive during the thirty-six (36) month period shall be consistent with the elections in effect for Executive immediately prior to his Termination. If and to the extent that any benefit described in this subsection 5(a)(iv) is not or cannot be paid or provided under any policy, plan, program or arrangement of the Company, then the Company will itself pay or provide for the payment to Executive and Executive's covered dependents, of such benefits along with, in the case of any benefits described in this subsection 5(a) (iv) that is subject to tax because it is not or cannot be paid or provided under any such policy, plan, program or arrangement of the Company or any affiliated employer, an additional amount (the "Tax Payment") such that after payment by Executive or Executive's dependents or beneficiaries, as the case may be, of all taxes so imposed, the recipient retains an amount equal to such taxes; provided, however, that such benefit must have been non-taxable to Executive during his employment or (ii) such benefit must have been taxable to Executive during his active employment but Executive must have been reimbursed for all taxes so imposed. The Tax Payment shall be paid in the first calendar quarter following the calendar year to which it pertains. Notwithstanding the foregoing, or any other provision of the Company's health insurance plan, for purposes of determining the period of continuation coverage to which Executive or any of his dependents is entitled pursuant to Section 4980B of the Code under the Company's medical, dental and other group health plans, or successor plans, Executive's "qualifying event" will be the termination of the 36-month period described herein. Benefits otherwise receivable by Executive or his eligible dependents pursuant to this subsection 5(a)(iv) shall be reduced to the extent comparable benefits are actually received by Executive and his eligible dependents during the remainder of such period following Executive's Termination, and any such benefits actually received by Executive and his eligible dependents shall be reported to the Company;

(v) following the end of the period specified in subsection 5(a)(iv), the Company shall arrange to provide medical and life insurance coverages to Executive and his spouse for their lifetimes, and Executive's dependent children until they cease to be

7

eligible as "dependents" under the terms of the Company's plans as in effect at the time of Executive's termination (e.g., as a result of reaching age 19) substantially equivalent (taking into account Medicare benefits to which they may become entitled) to those provided to Executive, his spouse and dependents under the Company's employee plans based on Executive's elections in effect immediately preceding his Termination, and at a cost to Executive, his spouse and dependent children not greater that the costs pertaining to them as in effect immediately prior to Executive's Termination. Benefits otherwise receivable by Executive or his dependents pursuant to this subsection 5(a)(v) shall be reduced to the extent comparable benefits are actually received by Executive or his dependents, and any such benefits actually received by Executive and his dependents shall be reported to the Company; and

(vi) outplacement services by a firm selected by the Executive, at the expense of the Company in an amount up to 15% of the Executive's Base Pay, so long as the services are completed prior to the end of the second calendar year following the year in which the Executive's Termination occurs.

(b) Any payments of compensation, pension, severance or other benefits paid from the Trust shall, to the extent thereof, discharge the Company's obligation to pay such amounts hereunder. If the Trust does not pay such amounts and/or to the extent there are not sufficient assets in the Trust to satisfy such obligations, the remaining balance owing to the Executive will be payable by the Company.

6. Termination for Cause. If, prior to the expiration of the Term, the Executive's employment is terminated by the Company for Cause, the Executive shall not be eligible to receive Base Pay under Section 4(a) or to participate in any Plans under Section 4(c) with respect to periods after the Termination Date, except as otherwise provided by applicable law, and except for the right to receive vested benefits under any Plan in accordance with the terms of such Plan. However, the Executive shall be eligible to receive a pro rata portion of any incentive compensation for the Company's fiscal year during which the Termination Date occurs, but not for any later years. As of the date of this Agreement, the Company acknowledges and agrees that the Executive's performance in his prior role as the Company's Chief Executive Officer has been excellent, and that there are no grounds for the Company to terminate the Executive's employment for "Cause."

7. Termination by Death. If the Executive dies prior to the expiration of the Term, this Agreement shall terminate and Executive's beneficiary, estate or family, as applicable, shall be entitled to receive the amounts and considerations provided for in Section 5, at the times provided in Section 5, as if Executive's employment had been terminated by the Company without Cause or by Executive's resignation for Good Reason immediately prior to the expiration of the Term.

8. Termination by Disability. If, prior to the expiration of the Term, the Executive becomes Disabled, the Company or the Executive shall be entitled to terminate his employment, and following such a Termination Executive shall be entitled to receive the amounts and considerations provided for in Section 5, at the times provided in Section 5, as if Executive's employment had been terminated by the Company without Cause or by Executive's resignation for Good Reason immediately prior to the expiration of the Term.

8

9. <u>Termination by Retirement</u>. The Executive shall provide the Company with at least ninety (90) days written notice of his voluntary retirement, which notice shall set forth his effective Termination Date.

(a) If, prior to the expiration of the Term, the Executive voluntarily elects to retire and he agrees to continue his service as the Company's non-executive Chairman of the Board for a period to be mutually agreed with the Company (such a retirement, a "**Qualified Retirement**"), then the Executive shall be entitled to receive as a special retirement termination benefit the amounts and considerations provided for in Section 5, at the times provided in Section 5, as if Executive's employment had been terminated by the Company without Cause or by the Executive's resignation for Good Reason immediately prior to the expiration of the Term; provided that the Termination Date with respect to the Executive's Qualified Retirement shall not be deemed to occur until the date of the Executive's "Termination" as defined herein.

(b) The Company and the Executive agree to negotiate in good faith regarding appropriate compensation for the Executive's continued service as the Company's non-executive Chairman of the Board following his Qualified Retirement from the Company if he voluntarily terminates his employment with the Company. The Company and the Executive anticipate that the level of services that the Executive would perform for the Company in a non-executive Chairman of the Board role would permanently decrease to no more than 20% of the average level of services that the Executive performed for the Company during the period from December 23, 2004 to the date of his retirement.

(c) Following a Qualified Retirement, for purposes of any CSA stock options then held by the Executive, the Executive shall continue to vest in such stock options pursuant to the vesting schedule set forth in the applicable stock option agreements as if the Executive remained an employee of the Company for so long as the Executive continues to serve as non-executive Chairman of the Board. Following the Executive's termination as non-executive Chairman, any then vested CSA stock options shall remain exercisable until the earlier of (i) two years following the date of his termination as non-executive Chairman or (ii) the normal option term expiration date.

10. <u>Expiration of Employment Term</u>. If the Company elects not to extend the Term pursuant to Section 3, unless Executive's employment is earlier terminated pursuant to Sections 5, 6, 7, 8 or 9, Executive's termination of employment hereunder shall be deemed to occur on the close of business on December 31 of the year in which the Company has timely given the notice provided for in Section 3. Upon such deemed termination of Executive's employment hereunder, Executive shall be entitled to receive the amounts and considerations provided for in Section 5 as if Executive's employment had been terminated by the Company without Cause (other than by reason of Executive's death or Disability) or by Executive's resignation for Good Reason immediately prior to the expiration of the Term; provided that the amounts and considerations provided for in Section 5 shall not be paid or begin to be paid until the Executive's actual separation from the Company and its affiliates (within the meaning of Code Section 409A). Following such termination of Executive's employment

9

hereunder as a result of the Company's election not to extend the Term, except as set forth in this Section 10, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

11. Cooper Trust.

(a) The parties acknowledge, that pursuant to the prior Employment Agreement between the Executive and Cooper Tire & Rubber Company dated as of June 6, 2000, as amended (the "Prior Agreement"), upon the earlier to occur of (i) a Change in Control (as defined in the Prior Agreement) or (ii) a declaration by the Board of Directors of Cooper that a Change in Control (as defined in the Prior Agreement) was imminent, Cooper was to transfer certain sums to cover payments to be made to the Executive relating to the Prior Agreement into a trust (the "Trust").

(b) Any payments of compensation, pension, severance or other benefits from the Trust shall, to the extent thereof, discharge the Company's obligation to pay compensation, pension, severance and other benefits hereunder, it being the intent of the Company that assets in such Trust be held as security for the Company's obligation to pay compensation, pension, severance and other benefits under this Agreement.

12. Certain Additional Payments by the Company.

(a) Anything in this Agreement to the contrary notwithstanding, in the event that following the Effective Date the Executive's employment with the Company is terminated by the Company or the Executive, and it shall be determined (as hereafter provided) that any payment (other than the Gross-Up payments provided for in this Section 12) or distribution by the Company or any of its Affiliates to or for the benefit of the Executive, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise pursuant to or by reason of any other agreement, policy, plan, program or arrangement, including without limitation any stock option, performance share, performance unit, stock appreciation right or similar right, or the lapse or termination of any restriction on or the vesting or exercisability of any of the foregoing (a "Payment"), would be subject to the excise tax imposed by Section 4999 of the Code by reason of being considered "contingent on a change in ownership or control" of the Company, within the meaning of Section 280G of the Code or to any similar tax imposed by state or local law, or any interest or penalties with respect to such tax (such tax or taxes, together with any such interest and penalties, being hereafter collectively referred to as the "Excise Tax"), then the Executive shall be entitled to receive an additional payment or payments (collectively, a "Gross-Up Payment"); provided, however, that no Gross-Up Payment shall be made with respect to the Excise Tax, if any, attributable to (i) any incentive stock option ("ISO"), as defined by Section 422 of the Code granted prior to the execution of this Agreement where the addition of a Gross-Up Payment would cause the ISO to lose such status, or (ii) any stock appreciation or similar right, whether or not limited, granted in tandem with any ISO described in clause (i). The Gross-Up Payment shall be in an amount such that, after payment by the Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including any Excise Tax imposed upon the Gross-Up Payment, the Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payment.

10

(b) Subject to the provisions of Section 12(f), all determinations required to be made under this Section 12, including whether an Excise Tax is payable by the Executive and the amount of such Excise Tax and whether a Gross-Up Payment is required to be paid by the Company to the Executive and the amount of such Gross-Up Payment, if any, shall be made by a nationally recognized accounting firm (the "**Accounting Firm**") selected by the Executive in his sole discretion. The Executive shall direct the Accounting Firm to submit its determination and detailed supporting calculations to both the Company and the Executive within 30 calendar days after the Termination Date, if applicable, and any such other time or times as may be requested by the Company or the Executive. If the Accounting Firm determines that any Excise Tax is payable by the Executive, the Company shall pay the required Gross-Up Payment to (or for the benefit of) the Executive on the date the Executive (or the Company, as the case may be) is required to remit such taxes to the taxing authorities. If the Accounting Firm determines that no Excise Tax is payable by the Executive, it shall, at the same time as it makes such determination, furnish the Company and the Executive an opinion that the Executive has substantial authority not to report any Excise Tax on his federal, state or local income or other tax return. As a result of the uncertainty in the application of Section 4999 of the Code (or any successor provision thereto) and the possibility of similar uncertainty regarding applicable state or local tax law at the time of any determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made (an "**Underpayment**"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts or fails to pursue its remedies pursuant to Section 12(f) and the Executive thereafter is required to make a payment of any Excise Tax, the Executive shall direct the Accounting Firm to determine the amount of the Underpayment that has occurred and to submit its determination and detailed supporting calculations to both the Company and the Executive as promptly as possible. Any such Underpayment shall be promptly paid by the Company to, or for the benefit of, the Executive on the date the Executive is required to remit such taxes to the taxing authorities, or if the Underpayment has not been determined at such time, within five (5) business days after receipt of such determination and calculations, but in no event later than the end of the calendar year after the calendar year the Executive remits the related taxes to the taxing authorities.

(c) The Company and the Executive shall each provide the Accounting Firm access to and copies of any books, records and documents in the possession of the Company or the Executive, as the case may be, reasonably requested by the Accounting Firm, and otherwise cooperate with the Accounting Firm in connection with the preparation and issuance of the determinations and calculations contemplated by Section 12(b). Any determination by the Accounting Firm as to the amount of the Gross-Up Payment shall be binding upon the Company and the Executive.

(d) The federal, state and local income or other tax returns filed by the Executive shall be prepared and filed on a consistent basis with the determination of the Accounting Firm with respect to the Excise Tax payable by the Executive. The Executive shall make proper payment of the amount of any Excise Tax and Gross-Up Payment, and at the request of the Company, provide to the Company true and correct copies (with any amendments) of his federal income tax return as filed with the Internal Revenue Service and corresponding state and local tax returns, if relevant, as filed with the applicable taxing authority, and such other documents reasonably requested by the Company, evidencing such payment. If prior to the

11

filing of the Executive's federal income tax return, or corresponding state or local tax return, if relevant, the Accounting Firm determines that the amount of the Gross-Up Payment should be reduced, the Executive shall within five (5) business days pay to the Company the amount of such reduction.

(e) The fees and expenses of the Accounting Firm for its services in connection with the determinations and calculations contemplated by Section 12(b) shall be borne by the Company. If such fees and expenses are initially paid by the Executive, the Company shall reimburse the Executive the full amount of such fees and expenses within five (5) business days after receipt from the Executive of a statement therefor and reasonable evidence of his payment thereof.

(f) The Executive shall notify the Company in writing of any claim by the Internal Revenue Service or any other taxing authority that, if successful, would require the payment by the Company of a Gross-Up Payment. Such notification shall be given as promptly as practicable but no later than ten (10) business days after the Executive actually receives notice of such claim and the Executive shall further apprise the Company of the nature of such claim and the date on which such claim is requested to be paid (in each case, to the extent known by the Executive). The Executive shall not pay such claim prior to the earlier of (i) the expiration of the 30-calendar-day period following the date on which he gives such notice to the Company and (ii) the date that any payment of amount with respect to such claim is due. If the Company notifies the Executive in writing prior to the expiration of such period that it desires to contest such claim, the Executive shall:

(i) provide the Company with any written records or documents in his possession relating to such claim reasonably requested by the Company;

(ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including without limitation accepting legal representation with respect to such claim by an attorney competent in respect of the subject matter and reasonably selected by the Company;

(iii) cooperate with the Company in good faith in order to effectively contest such claim; and

(iv) permit the Company to participate in any proceedings relating to such claim; provided, however, that the Company shall bear and pay directly all costs and expenses (including interest and penalties) incurred in connection with such contest and shall indemnify and hold harmless the Executive, on an after-tax basis, for and against any Excise Tax or income tax, including interest and penalties with respect thereto, imposed as a result of such representation and payment of costs and expenses. Without limiting the foregoing provisions of this Section 12(f), the Company shall control all proceedings taken in connection with the contest of any claim contemplated by this Section 12(f) and, at its sole option, may pursue or forego any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim (provided, however, that the Executive may participate therein at his own cost and expense) and may, at its option, either direct the Executive to pay the tax claimed and

12

sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that if the Company directs the Executive to pay the tax claimed and sue for a refund, the Company shall, to the extent permitted by applicable law and to the extent such payment would not cause the Executive to pay an additional tax under Code Section 409A, advance the amount of such payment to the Executive on an interest-free basis and shall indemnify and hold the Executive harmless, on an after-tax basis, from any Excise Tax or income or other tax, including interest or penalties with respect thereto, imposed with respect to such advance; and provided further, however, that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Executive with respect to which the contested amount is claimed to be due is limited solely to such contested amount. Furthermore, the Company's control of any such contested claim shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and the Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(g) If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 12(f), the Executive receives any refund with respect to such claim, the Executive shall (subject to the Company's complying with the requirements of Section 12(f)) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after any taxes applicable thereto). If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 12(f), a determination is made that the Executive shall not be entitled to any refund with respect to such claim and the Company does not notify the Executive in writing of its intent to contest such denial or refund prior to the expiration of thirty (30) calendar days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of any such advance shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid by the Company to the Executive pursuant to this Section 12.

13. <u>Mitigation</u>. Nothing in this Agreement shall be construed to require Executive to mitigate his damages upon termination of employment without Cause or for Good Reason. The Company hereby acknowledges that it will be difficult and may be impossible for the Executive to find reasonably comparable employment following the Termination Date and that the non-competition covenant contained in Section 15 will further limit the employment opportunities for the Executive. In addition, the Company acknowledges that its severance pay plans applicable in general to its salaried employees do not provide for mitigation, offset or reduction of any severance payment received thereunder. Accordingly, the payment of the severance compensation by the Company to the Executive in accordance with the terms of this Agreement is hereby acknowledged by the Company to be reasonable, and the Executive will not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, nor will any profits, income, earnings or other benefits from any source whatsoever create any mitigation, offset, reduction or any other obligation on the part of the Executive hereunder or otherwise.

13

14. <u>Legal Fees and Expenses</u>. It is the intent of the Company that the Executive not be required to incur legal fees and the related expenses associated with the interpretation, enforcement or defense of Executive's rights under this Agreement by litigation or otherwise because the cost and expense thereof would substantially detract from the benefits intended to be extended to the Executive hereunder. Accordingly, if it should appear to the Executive that the Company has failed to comply with any of its obligations under this Agreement or in the event that the Company or any other person takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, the Executive the benefits provided or intended to be provided to the Executive hereunder, the Company irrevocably authorizes the Executive from time to time to retain counsel of Executive's choice, at the expense of the Company as hereafter provided, to advise and represent the Executive in connection with any such interpretation, enforcement or defense. Notwithstanding any existing or prior attorney-client relationship between the Company and such counsel, the Company irrevocably consents to the Executive's entering into an attorney-client relationship with such counsel, and in that connection the Company and the Executive agree that a confidential relationship shall exist between the Executive and such counsel. Without respect to whether the Executive prevails, in whole or in part, in connection with any of the foregoing, the Company will pay and be solely financially responsible for any and all attorneys' and related fees and expenses incurred by the Executive in connection with any of the foregoing; provided that, in regard to such matters, the Executive has not acted in bad faith or with no colorable claim of success.

15. <u>Secrecy and Noncompetition</u>.

(a) <u>No Competing Employment</u>. For so long as the Executive is employed by the Company and continuing for two (2) years after the termination of such employment for any reason (the "**Non-Compete Period**"), Executive shall not, unless he receives the prior written consent of the Board, directly or indirectly, whether as owner, consultant, employee, partner, venturer, agent, through stock ownership (except ownership of less than one percent (1.0%) of the number of shares outstanding of any securities which are publicly traded), investment of capital, lending of money or property, rendering of services, or otherwise, compete with any of the businesses engaged in by the Company or any of its Affiliates at the time of the termination of the Executive's employment hereunder (such businesses are herein after referred to as the "**Business**"), or assist, become interested in or be connected with any corporation, firm, partnership, joint venture, sole proprietorship or other entity which so competes with the Business. The restrictions imposed by this subsection shall not apply to any geographic area in which neither the Company nor any of its Affiliates is engaged in the Business.

(b) <u>No Interference</u>. During the Non-Compete Period, the Executive shall not, whether for his own account or for the account of any other individual, partnership, firm, corporation or other business organization or entity (other than the Company), intentionally solicit, endeavor to entice away from the Company or any of its Affiliates or otherwise interfere with the relationship of the Company or any of its Affiliates with, any person who is employed by or associated with the Company or any of its Affiliates (including, but not limited to, any independent sales representatives or organizations) or any person or entity who is, or was within the then most recent 12-month period, a customer or client of the Company or any of its Affiliates.

14