pre-tax losses in the U.S. and certain foreign jurisdictions to the extent not offset by other categories of income, tax credits, income tax incentives, withholding taxes, and other permanent items. Further, the Company's current and future provision for income taxes will be significantly impacted by the recognition of valuation allowances in certain countries, particularly the United States. The Company intends to maintain these allowances until it is more likely than not that the deferred tax assets will be realized. Accordingly, income taxes are impacted by the U.S. valuation allowance and the mix of earnings among jurisdictions.

*Nine Months Ended September 30, 2009 Compared with Nine Months Ended September 30, 2008*

*Sales:* Consolidated sales decreased $753.7 million, or 35.5%, in the nine months ended September 30, 2009. This decrease resulted primarily from lower sales volume in both North America and Europe and unfavorable foreign exchange ($150.8 million).

*Gross Profit:* Gross profit decreased $124.4 million to $175.2 million (approximately 12.8% of sales) in the nine months ended September 30, 2009 as compared to $299.6 million (approximately 14.1% of sales) in the nine months ended September 30, 2008. This decrease resulted primarily from lower sales volume in both North America and Europe and unfavorable foreign exchange, partially offset by the favorable impact of management actions and various cost saving initiatives.

*Selling, Administration, and Engineering:* Selling, administration, and engineering expenses decreased $41.5 million to $146.2 million in the nine months ended September 30, 2009 compared to $187.8 million in the nine months ended September 30, 2008, primarily due to the favorable impact of various cost saving initiatives and management actions.

*Impairment Charges:* In the second quarter of 2009 we recorded a goodwill impairment charge of $157.2 million, impairment charges of $202.5 million related to certain intangible assets and impairment charges of $3.0 million related to certain fixed assets within the North America and International segments. During the second quarter of 2009, several events occurred that indicated potential impairment of the Company's goodwill. Such events included: (a) the chapter 11 bankruptcy of both Chrysler LLC and General Motors and unplanned plant shut-downs; (b) continued product volume risk and negative product mix changes; (c) the Company's commencement of negotiations with its sponsors, senior secured lenders, and bondholders to recapitalize its long term debt and equity; (d) the Company's recognition as the second quarter progressed that there was an increasing likelihood that it would breach its financial covenants under its Pre-Petition Credit Agreement; (e) the Company's decision to defer its June 15, 2009 interest payment on its Notes pending the outcome of its quarterly financial results; (f) an analysis of whether the Company would meet its financial covenants for the past quarter; and (g) negotiations with its various constituencies. As a result of the combination of the above factors, the Company significantly reduced its second quarter projections.

*Restructuring:* The increase in restructuring expense of $15.8 million in the nine months ended September 30, 2009 resulted primarily from the final phase of the reorganization of the Company's operating structure, which was initiated during the fourth quarter of 2008.

*Interest Expense, Net:* The decrease in interest expense of $17.6 million in the nine months ended September 30, 2009 resulted primarily from decreased interest rates, decreased term loan balances and the cessation of recording interest expense on the debt that is in default.

*Other Income (Expense):* Other income increased $11.1 million in the nine months ended September 30, 2009 due primarily to an increase in gain on debt repurchase of $7.4 million and an increase in foreign currency gains of $7.0 million, partially offset by losses on sale of receivables of $0.8 million and losses on interest rate swaps of $2.4 million.

44

*Provision for Income Tax Expense (Benefit):* For the nine months ended September 30, 2009, the Company recorded income tax benefit of ($31.3) million on losses before income taxes of ($425.3) million. This compares to an income tax expense of $12.7 million on earnings before income taxes of $7.0 million for the same period of 2008. Income tax expense for the nine month period ended September 30, 2009 differs from statutory rates due to income taxes on foreign earnings, the inability to record a tax benefit for pre-tax losses in the U.S. and certain foreign jurisdictions to the extent not offset by other categories of income, tax credits, income tax incentives, withholding taxes, and other permanent items. Additionally, a discrete income tax benefit was recorded in the three months ended June 30, 2009 related to the settlement of a bi-lateral advanced pricing agreement. See Note 9, Income Taxes of the Condensed Consolidated Financial statements for additional details on the settlement. Further, the Company's current and future provision for income taxes will be significantly impacted by the recognition of valuation allowances in certain countries, particularly the United States. The Company intends to maintain these allowances until it is more likely than not that the deferred tax assets will be realized. Accordingly, income taxes are impacted by the U.S. valuation allowance and the mix of earnings among jurisdictions.

### Segment Results of Operations
### (Dollar amounts in thousands)

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2008 | 2009 | 2008 | 2009 |
|---|---|---|---|---|
| **Sales** | | | | |
| North America | $ 266,571 | $ 251,700 | $ 991,216 | $ 632,234 |
| International | 333,085 | 266,142 | 1,130,100 | 735,422 |
| | $ 599,656 | $ 517,842 | $ 2,121,316 | $ 1,367,656 |
| **Segment profit (loss)** | | | | |
| North America | $ (20,361) | $ 20,036 | $ (1,614) | $ (259,702) |
| International | (13,442) | (5,597) | 8,656 | (165,592) |
| | $ (33,803) | $ 14,439 | $ 7,042 | $ (425,294) |

In 2008 and through March 31, 2009, the Company reported its operating results in three business segments: Body & Chassis Systems, Fluid Systems, and Asia Pacific. The Body & Chassis segment consisted mainly of body sealing products and components that protect vehicle interiors from weather, dust, and noise intrusion as well as systems and components that control and isolate noise vibration in a vehicle to improve ride and handling. The Fluid segment consisted primarily of subsystems and components that direct, control, measure, and transport fluids and vapors throughout a vehicle. The Asia Pacific segment consisted of both Body & Chassis and Fluid operations in that region with the exception of the Company's interest in a joint venture in China which was acquired as part of the MAPS acquisition, and the MAP India joint venture. These joint ventures were included in the Body & Chassis segment which was in line with the internal management structure.

On March 26, 2009, the Company announced the implementation of a plan involving the discontinuation of its global Body & Chassis and Fluid Systems operating divisions and the establishment of a new operating structure organized on the basis of geographic regions. Under the plan, the Company's operating structure as well as reporting segments, has changed, and the Company revised its segment disclosures beginning with the second quarter of 2009 from the three reportable segments to two reportable segments, North America and International (comprising all of the Company's operations outside of North America). Prior periods have been revised to conform to the current period presentation.

45

*Three Months Ended September 30, 2009 Compared with Three Months Ended September 30, 2008*

*North America:* Sales decreased $14.9 million, or 5.6%, primarily due to lower sales volume and unfavorable foreign exchange ($7.0 million). Segment profit increased by $40.4 million, primarily due to the favorable impact of management actions and various cost saving initiatives.

*International:* Sales decreased $66.9 million, or 20.1%, primarily due to lower sales volume in Europe and unfavorable foreign exchange ($20.9 million). Segment loss improved by $7.8 million, primarily in Europe due to the favorable impact of management actions and various cost saving initiatives, partially offset by lower sales volume in Europe and unfavorable foreign exchange.

*Nine Months Ended September 30, 2009 Compared with Nine Months Ended September 30, 2008*

*North America:* Sales decreased $359.0 million, or 36.2%, primarily due to lower sales volume and unfavorable foreign exchange ($30.2 million). Segment loss increased by $258.1 million, primarily due to the impairment of goodwill, intangibles and fixed assets of $242.2 million, lower sales volumes and unfavorable foreign exchange partially offset by the favorable impact of management actions and various cost saving initiatives.

*International:* Sales decreased $394.7 million, or 34.9%, primarily due to lower sales volume in Europe and unfavorable foreign exchange ($120.6 million). Segment profit decreased by $174.2 million, primarily due to the impairment of goodwill, intangibles and fixed assets of $120.5 million, lower sales volume in Europe and unfavorable foreign exchange, partially offset by the favorable impact of management actions and various cost saving initiatives.

### Restructuring

We continually evaluate alternatives in an effort to align our business with the changing needs of our customers and lower the operating cost of our Company. This may include the realignment of our existing manufacturing capacity, facility closures, or similar actions. See the Notes to Condensed Consolidated Financial Statements for discussion of restructuring activities during the nine months ended September 30, 2009.

### Liquidity and Capital Resources

*Operating Activities:* Cash provided by operations in the nine months ended September 30, 2009 was $30.2 million, which included $28.8 million of cash used for changes in operating assets and liabilities. Cash provided by operations in the nine months ended September 30, 2008 was $83.5 million, which included $22.7 million of cash used for changes in operating assets and liabilities. The $53.2 million change in cash from activities was due primarily to an increase in consolidated net loss.

*Investing Activities:* Cash used in investing activities in the nine months ended September 30, 2009 was $25.2 million, which primarily consisted of capital spending as compared to cash used in investing activities of $49.0 million in the nine months ended September 30, 2008, which primarily consisted of $66.8 million of capital spending partially offset by gross proceeds of $8.6 million from a sale-leaseback transaction. We anticipate that we will spend approximately $55 to $60 million on capital expenditures in the year ending December 31, 2009.

46

*Financing Activities*: Cash provided by financing activities in the nine months ended September 30, 2009 was $118.9 million, which consisted primarily of $108.0 million of debtor-in-possession financing, net of debt issuance cost and increased short term debt partially offset by normal debt payments and repurchase of bonds, as compared to cash used in financing activities of $38.4 million in the nine months ended September 30, 2008, which consisted primarily of normal debt payments, repurchase of bonds and decreased short-term debt.

*Pre-Petition Credit Agreement and Notes*: For a discussion of the Company's Pre-Petition Credit Agreement and Notes, see Note 7, Debt.

*DIP Financing:* The DIP Facility under the DIP Credit Agreement entered into by the Company as of August 5, 2009 in connection with the Chapter 11 Cases and the Canadian Proceedings provides for superpriority senior secured term loans to the DIP Borrowers (and the Additional Foreign Borrower ) to be designated in an aggregate principal amount of up to $175 million. The U.S. Borrower has drawn $75 million of the DIP Facility and the Canadian Debtor drew $50 million if the DIP Facility as of September 30, 2009. An additional $50 million has been funded into escrow as of September 30, 2009, and is expected to be released to the Additional Foreign Borrower when local-law credit documentation is finalized. The DIP Credit Agreement also provides for an additional uncommitted $25 million incremental facility, for a total DIP Facility of up to $200 million (if the incremental facility is requested and committed to by the requisite lenders).

As a result of the Chapter 11 Cases and the Canadian Proceedings and the circumstances leading to the Chapter 11 Cases and the Canadian Proceedings, described elsewhere in this report, the Company faces uncertainty regarding the adequacy of its liquidity and capital resources and has limited access to financing. During the pendency of the Chapter 11 Cases and the Canadian Proceedings, the Company expects that its primary sources of liquidity will be cash flows from operations and borrowings under its DIP Credit Agreement as it may be able to obtain. In addition to the cash requirements necessary to fund ongoing operations, the Company has incurred significant professional fees and other costs in connection with the Chapter 11 Cases and the Canadian Proceedings and expects that it will continue to incur significant professional fees and costs. There can be no assurances that the amounts of cash available from operations, together with the DIP Credit Agreement, will be sufficient to fund the Company's operations, including operations during the period until such time as the Company is able to propose a chapter 11 plan of reorganization that will receive the requisite acceptance by creditors and be confirmed by the Bankruptcy Court. The Company's long-term liquidity requirements and the adequacy of its capital resources are difficult to predict at this time and ultimately cannot be determined until a chapter 11 plan of reorganization has been developed and is confirmed by the Bankruptcy Court.

### Critical Accounting Policies and Estimates

*Goodwill.* Goodwill is not amortized but is tested annually for impairment. The Company evaluates each reporting unit's fair value versus its carrying value annually or more frequently if events or changes in circumstances indicate that the carrying value may exceed the fair value of the reporting unit. Estimated fair values are based on the cash flows projected in the reporting units' strategic plans and long-range planning forecasts discounted at a risk-adjusted rate of return. If the carrying value exceeds the fair value, an impairment loss is measured and recognized.

During the second quarter of 2009, several events occurred that indicated potential impairment of the Company's goodwill. Such events included: (a) the chapter 11 bankruptcy of both Chrysler LLC and General Motors and unplanned plant shut-downs; (b) continued product volume risk and negative product mix changes; (c) the Company's commencement of negotiations with its sponsors, senior secured lenders, and bondholders to recapitalize its long term debt and equity; (d) the Company's recognition as the second quarter progressed that there was an increasing likelihood that it would breach its financial covenants under its Pre-Petition

47

Credit Agreement; and (e) the Company's decision to defer its June 15, 2009 interest payment on its Notes pending the outcome of its quarterly financial results, an analysis of whether the Company would meet its financial covenants for the past quarter and negotiations with its various constituencies. As a result of the combination of the above factors, the Company significantly reduced its second quarter projections.

Other significant assumptions used in the discounted cash flow model include discount rate, terminal value growth rate, future capital expenditures, and changes in future working capital requirements. These assumptions were not modified significantly as part of the interim goodwill impairment assessment. The significant decrease in the financial projections resulted in an enterprise value significantly lower than the amount computed in connection with the prior year annual impairment assessment. This significant decrease in enterprise value results in the carrying value of assets at all of our reporting units being greater than the related reporting units' fair value. As a result, the Company recorded goodwill impairment charges of $93,580 in its North America reporting unit, $39,604 in its Europe reporting unit, $22,628 in its South America reporting unit and $1,421 in its Asia Pacific reporting unit during the second quarter of 2009.

While we believe our estimates of fair value are reasonable based upon current information and assumptions about future results, changes in our businesses, the markets for our products, the economic environment and numerous other factors could significantly alter our fair value estimates and result in future impairment of recorded goodwill in the North American reporting unit. An adjustment to the financial projections or other assumptions used to value the North American reporting unit would have had a direct impact on the amount of goodwill impairment recognized during the second quarter and the amount of goodwill remaining on the September 30, 2009 balance sheet.

### Recent Accounting Pronouncements

See Note 1 of the Notes to Condensed Consolidated Financial Statements included elsewhere in this Form 10-Q.

### Forward-Looking Statements

This report includes what the Company believes are "forward-looking statements" as that term is defined under the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements concerning our plans, objectives, goals, strategies, future events, future revenue or performance, capital expenditures, financing needs, plans or intentions relating to acquisitions, business trends, and other information that is not historical information. When used in this report, the words "estimates," "expects," "anticipates," "projects," "plans," "intends," "believes," "forecasts," or future or conditional verbs, such as "will," "should," "could, " or "may," and variations of such words or similar expressions are intended to identify forward-looking statements. All forward-looking statements, including, without limitation, management's examination of historical operating trends and data are based upon our current expectations and various assumptions. Our expectations, beliefs, and projections are expressed in good faith and we believe there is a reasonable basis for them. However, we cannot assure you that these expectations, beliefs, and projections will be achieved.

Such risks, uncertainties, and other important factors include, among others: the impact of our Chapter 11 Cases and Canadian Proceedings; limitations on flexibility in operating our business contained in our debt agreements; our dependence on the automotive industry; availability and cost of raw materials; our dependence on certain major customers; competition in our industry; sovereign and other risks related to our conducting operations outside the United States; the uncertainty of our ability to achieve expected cost reduction savings; our exposure to product liability and warranty claims; labor conditions; our vulnerability to rising interest rates; our ability to meet our customers' needs for new and improved products in a timely manner; our ability to attract and retain key personnel; the possibility that our owners' interests will conflict with yours; our recent status as a stand-alone company; our legal

rights to our intellectual property portfolio; our underfunded pension plans; environmental and other regulation; and the possibility that our acquisition strategy will not be successful. See Item 1A. Risk Factors, in our Form 10-K for our fiscal year ended December 31, 2008 and Item 1A. Risk Factors in Part II of this form 10-Q for additional information regarding these and other risks and uncertainties. There may be other factors that may cause our actual results to differ materially from the forward-looking statements.

All forward-looking statements attributable to us or persons acting on our behalf apply only as of the date of this report and are expressly qualified in their entirety by the cautionary statements included in this report. We undertake no obligation to update or revise forward-looking statements to reflect events or circumstances that arise after the date made or to reflect the occurrence of unanticipated events.

**Item 3.        Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to fluctuations in interest rates, currency exchange rates and commodity prices. We actively monitor our exposure to risk from changes in interest rates, foreign currency exchange rates and commodity prices through the use of derivative financial instruments in accordance with management's guidelines. We do not enter into derivative instruments for trading purposes.

*Interest Rate Risk-* We are subject to interest rate risk in connection with certain variable rate debt. As of September 30, 2009, we had $130.6 million of variable rate debt. A 1% increase in the average interest rate would increase future interest expense by approximately $1.3 million per year.

*Foreign Currency Exchange Risk-* We use forward foreign exchange contracts to hedge the U.S. dollar to reduce the effect of fluctuations in foreign exchange rates on a portion of the forecasted material purchases of our European facilities. As of September 30, 2009, the fair market value of these contracts was approximately $(0.1) million. A 10% strengthening of the U.S. dollar relative to the Euro would result in an increase of $0.2 million in the fair market value of these contracts. A 10% weakening of the U.S. dollar relative to the Euro would result in a decrease of $0.1 million in the fair market value of these contracts.

For additional discussion of the Company's derivative instruments see Note 15, Financial Instruments.

In addition, the counterparties to certain of our derivatives contracts have exercised their option of early termination.

**Item 4.        Controls and Procedures.**

The Company has evaluated, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this Report. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. However, based on that evaluation, the Company's Chief Executive Officer along with the Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this Report.

There have been no changes in the Company's internal control over financial reporting during the quarter ended September 30, 2009 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

49

## PART II — OTHER INFORMATION

**Item 1.      Legal Proceedings.**

The Company is periodically involved in claims, litigation and various legal matters that arise in the ordinary course of business. In addition, the Company conducts and monitors environmental investigations and remedial actions at certain locations. Each of these matters is subject to various uncertainties, and some of these matters may be resolved unfavorably with respect to the Company. A reserve estimate is established for each matter and updated as additional information becomes available. We do not believe that the ultimate resolution of any of these matters will have a material adverse effect on our financial condition, results of operations, or cash flows.

On August 3, 2009, the Debtors filed the Chapter 11 Cases and on August 4, 2009 the Canadian Debtor commenced the Canadian Proceedings. For a further discussion of these matters, see Note 2, Reorganization Under Chapter 11 of the Bankruptcy Code, to the condensed consolidated financial statements, which is incorporated herein by reference. At this time, it is not possible to predict the outcome of the Chapter 11 Cases or the Canadian Proceedings or their effect on our business.

In general, all pending litigation involving the Debtors and the Canadian Debtor was stayed upon the filing of the Chapter 11 Cases and the Canadian Proceeding, respectively.

On August 19, 2009, Cooper Tire and Rubber Company ("CTR") initiated an adversary proceeding in the Chapter 11 Cases, Case No. 09-52014 (PJW), by filing a complaint against the Company and Cooper-Standard Automotive Inc. seeking a declaratory judgment that CTR is entitled to a portion of the $80,000 Canadian dollars tax refund received by the Canadian Debtor from the Canadian government on July 27, 2009 and a portion of all future refunds received by the Canadian Debtor, in each case relating to the pre-acquisition period. CTR is also seeking imposition of a resulting trust or, in the alternative, a constructive trust in favor of CTR and turnover of the portion of the Canadian income tax refunds attributable to the years 2000-2004. On September 29, 2009, the Canadian Court issued an order lifting the stay in the Canadian Proceedings to allow CTR to commence proceedings against the Canadian Debtor in the Chapter 11 Cases and ordering all income tax refunds received by the Canadian Debtor after September 29, 2009 be segregated immediately upon receipt and not disbursed, encumbered or otherwise dealt with in any way until further order of the Canadian Court. On October 5, 2009, CTR filed an amended complaint in the adversary proceeding against the Company, Cooper-Standard Automotive Inc. and the Canadian Debtor. It is the Company's belief that CTR's right to tax refunds for pre-acquisition periods is that of a general unsecured creditor and is subject to the general rules and processes of the Chapter 11 Cases.

**Item 1A.      Risk Factors.**

In addition to other information set forth in this report, you should carefully consider the factors discussed in Part I, Item 1A. Risk Factors in our Annual Report on Form 10-K for the year ended December 31, 2008 which could materially impact our business, financial condition or future results. Risks disclosed in our Annual Report on Form 10-K are not the only risks facing the Company. Additional risks and uncertainties not currently known to us or that we currently deem immaterial may materially adversely impact our business, financial condition or operating results.

The information presented below updates, and should be read in conjunction with, the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2008.

*Risks Related to our Bankruptcy Filings*

*The Debtors filed for protection under Chapter 11 of the Bankruptcy Code on August 3, 2009 and the Canadian Debtor commenced bankruptcy proceedings on August 4, 2009.*

During the Chapter 11 Cases and the Canadian Proceedings, our operations, including our ability to execute our business plan, are subject to the risks and uncertainties associated with our bankruptcy. Risks and uncertainties associated with these proceedings include the following:

- Actions and decisions of our creditors and other third parties with interests in the proceedings, which may be inconsistent with our plans;

- Our ability to obtain court approval with respect to motions in the proceedings made from time to time;

- Our ability to develop, prosecute, confirm, and consummate a chapter 11 plan of reorganization with respect to the proceedings;

- Our ability to obtain and maintain commercially reasonable terms with vendors and service providers;

- Our ability to maintain contracts that are critical to our operations;

- Our ability to retain management and other key individuals;

- Our ability to retain the tax refunds relating to the pre-acquisition period; and

- Risks associated with third parties' seeking and obtaining court approval to terminate or shorten the exclusivity period for us to propose and confirm a chapter 11 plan of reorganization, to appoint a trustee under Chapter 11, or to convert the Chapter 11 Cases into liquidations under Chapter 7 of the Bankruptcy Code.

These risks and uncertainties could affect our business and operations in various ways. For example, negative events or publicity associated with the proceedings could adversely affect our sales and relationships with our customers, as well as with vendors and employees, which in turn could adversely affect our operations and financial condition, particularly if the proceedings are protracted. Also, transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court and the Canadian Court, which may limit our ability to respond timely to certain events or take advantage of certain opportunities. In addition, in order to successfully emerge from the proceedings, senior management will be required to spend significant amounts of time developing a comprehensive chapter 11 plan of reorganization, instead of concentrating exclusively on business operations. Further, the Company has made, and will continue to make, judgments as to whether the Company should limit investment in, exit, or dispose of certain businesses. These proceedings and the development of a chapter 11 plan of reorganization may result in the sale or divestiture of assets or businesses, but there can be no assurance that the Company will be able to complete any sale or divestiture on acceptable terms or at all. Any decision by management to further limit investment in, exit, or dispose of businesses may result in the recording of additional charges.

Because of the risks and uncertainties associated with the proceedings, the ultimate impact that events that occur during these proceedings will have on the Company's business, financial condition and results of operations cannot be accurately predicted or quantified. There can be no assurance as to what values, if any, will be ascribed in the proceedings to the Company's various pre-petition liabilities, common stock, and other securities.

51

*The Company's liquidity position imposes significant challenges to its ability to continue operations.*

As global economic conditions have deteriorated, we have experienced significant pressure on our business, including our liquidity position. The Chapter 11 Cases and the Canadian Proceedings may increase this pressure. Because of the public disclosure of our liquidity constraints, our ability to maintain normal credit terms with suppliers has become impaired. The terms of the trade credit received from suppliers has been reduced. If liquidity problems persist, suppliers could refuse to provide key products and services in the future. The financial condition and results of operations of the Company, in particular with regard to our potential failure to meet debt obligations, may lead some customers to become reluctant to enter into long-term agreements with the Company. In addition to the cash requirements necessary to fund continuing operations, it is anticipated that the Company will incur significant professional fees and other restructuring costs in connection with the Chapter 11 Cases and the Canadian Proceedings and the restructuring of the Company's business operations.

The Company is currently conducting operations using borrowings from the DIP Credit Agreement. There can be no assurance that the amounts of cash from operations and amounts made available under the DIP Credit Agreement will be sufficient to fund the Company's operations. In the event that cash flows and available borrowings under the DIP Credit Agreement are not sufficient to meet the Company's liquidity requirements, the Company's operations would be adversely affected and the Company may not be able to continue as a going concern. For additional information on the DIP Credit Agreement, see Note 7, Debt, DIP Credit Agreement, to the notes to the condensed consolidated financial statements, and also see Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations—Debtor-in-Possession Financing.

*During the pendency of the Chapter 11 Cases and the Canadian Proceedings, the financial results of the Company may be unstable and may not reflect historical trends.*

During the pendency of the Chapter 11 Cases and the Canadian Proceedings, the Company's financial results may fluctuate as they reflect asset impairments, asset dispositions, restructuring activities, contract terminations and rejections, and claims assessments. As a result, the historical financial performance of the Company may not be indicative of the financial performance following the commencement of the Chapter 11 Cases and the Canadian Proceedings. Further, the Company may sell or otherwise dispose of assets or businesses and liquidate or settle liabilities, with court approval, for amounts other than those reflected in the Company's historical financial statements. Any such sale or disposition and any comprehensive restructuring plan could materially change the amounts and classifications reported in the Company's historical consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of a comprehensive restructuring plan.

*The Company may not be able to obtain confirmation of a Chapter 11 plan of reorganization submitted for Bankruptcy Court approval.*

In order to successfully emerge from Chapter 11 as a viable entity, the Company believes that it must develop, and obtain requisite court and creditor approval of a feasible Chapter 11 plan of reorganization. This process requires the Company and the other Debtors to meet certain statutory requirements with respect to adequacy of disclosure with respect to the plan of reorganization, soliciting and obtaining creditor acceptances of the plan, and fulfilling other statutory conditions for confirmation. The Company and the other Debtors may not receive the requisite acceptances to confirm the plan. Even if the requisite acceptances of the plan of reorganization are received, the Bankruptcy Court may not confirm the plan. A dissenting holder of a claim against the Debtors may challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the plan of reorganization if

it found that any of the statutory requirements for confirmation had not been met, including that the terms of the plan are fair and equitable to non-accepting classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (i) the plan of reorganization "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (ii) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and (iii) the value of distributions to non-accepting holders of claims within a particular class under the plan will not be less than the value of distributions such holders would receive if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may determine that the chapter 11 plan of reorganization does not satisfy one or more of these requirements, in which case it would not be confirmable by the Bankruptcy Court. If the plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors would be able to reorganize its businesses and what, if any, distributions holders of claims against it would ultimately receive with respect to their claims. If an alternative reorganization could not be agreed upon, it is possible that the Debtors would have to liquidate its assets, in which case it is likely that holders of claims would receive substantially less favorable treatment than they would receive if the Debtors were to emerge as a viable, reorganized entity.

*A Chapter 11 plan of reorganization may result in the holders of the Company's Notes receiving no distribution on account of their interests and cancellation of their Notes.*

Under the priority scheme established by the Bankruptcy Code, generally, post-petition liabilities and secured claims must be satisfied before pre-petition unsecured creditors and interest holders can receive any distribution or retain any property under a chapter 11 plan of reorganization. The ultimate recovery, if any, to the holders of the Notes and other interest holders will not be determined until confirmation of a chapter 11 plan or plans of reorganization. No assurance can be given as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A chapter 11 plan of reorganization could result in holders of the Company's Notes receiving no distribution on account of their claims and cancellation of their existing Notes. If certain requirements of the Bankruptcy Code are met, a chapter 11 plan of reorganization can be confirmed notwithstanding its rejection by such holders and notwithstanding the fact that such holders do not receive or retain any property on account of their interests under the plan. Accordingly, the Company urges that the appropriate caution be exercised with respect to existing and future investments in the Company's securities as the value and prospects are highly speculative.

*The Canadian Court may not extend the stay under the Canadian Proceedings and our Canadian subsidiary may be subject to involuntary liquidation.*

There can be no assurance that the Canadian Court will extend the stay applicable to the Canadian Debtor, Cooper-Standard Automotive Canada Limited, in connection with the Canadian Proceedings filed under Canada's Companies' Creditors Arrangement Act. The creditors of the Canadian Debtor or others may cause the stay to be lifted in which case the Canadian Debtor could be petitioned into bankruptcy under the Bankruptcy and Insolvency Act (Canada) and liquidated on an involuntary basis.

*A long period of operating under Chapter 11 may harm our business.*

A long period of operating under Chapter 11 could adversely affect the Company's business and operations. So long as the Chapter 11 cases continue, the Company's senior management will be required to spend a significant amount of time and effort dealing with the Bankruptcy reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Chapter 11 will also make it more difficult to attract and retain management and other key personnel necessary to the success

53

and growth of the Company's business. In addition, the longer the Chapter 11 cases continue, the more likely it is that the Company's customers and suppliers will lose confidence in the Company's ability to successfully reorganize the Company's businesses and seek to establish alternative commercial relationships. Furthermore, so long as the Chapter 11 cases continue, the Company will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. A prolonged continuation of the Chapter 11 cases may also require the Company to seek additional financing. If the Company requires additional financing during the Chapter 11 cases and it is unable to obtain the financing on favorable terms or at all, the Company's chances of successfully reorganizing its businesses may be seriously jeopardized.

*Our DIP Credit Agreement will impose significant operating and financial restrictions on us, compliance or non-compliance with which could have a material adverse effect on our liquidity and operations.*

Restrictions imposed by the terms of the Company's DIP Credit Agreement could adversely affect the Company by limiting its ability to plan for or react to market conditions or to meet its capital needs and could result in an event of default under the DIP Credit Agreement. These restrictions might limit our ability, subject to certain exceptions, to, among other things:

- incur additional indebtedness and issue stock;

- make prepayments on or purchase indebtedness in whole or in part;

- pay dividends and other distributions with respect to our capital stock or repurchase our capital stock or make other restricted payments;

- make investments;

- enter into transactions with affiliates on other than arm's-length terms;

- create or incur liens to secure debt;

- consolidate or merge with another entity, or allow one of our subsidiaries to do so;

- lease, transfer or sell assets and use proceeds of permitted asset leases, transfers or sales;

- incur dividend or other payment restrictions affecting subsidiaries;

- make capital expenditures beyond specified limits;

- engage in specified business activities; and

- acquire facilities or other businesses.

These limitations could have a material adverse effect on our liquidity and operations. If we fail to comply with the restrictions under the DIP Credit Agreement and are unable to obtain a waiver or amendment or a default exists and is continuing under the DIP Credit Agreement, the lenders could declare outstanding borrowings and other obligations under the DIP Credit Agreement immediately due and payable. The Company's ability to comply with these restrictions may be affected by events beyond the Company's control, and any material deviations from the Company's forecasts could require us to seek waivers or amendments of covenants or alternative sources of financing or to reduce expenditures. There can be no assurances that such waivers, amendments or alternative financing could be obtained, or if obtained, would be on acceptable terms to the Company. If the Company is unable to comply with the terms of the DIP Credit Agreement, or if the Company fails to generate sufficient cash flow from operations, or, if it became necessary, to obtain such waivers, amendments or alternative financing, it could adversely impact the timing of, and the Company's ultimate ability to successfully implement, a chapter 11 plan of reorganization.

**Item 6.      Exhibits**

The exhibits listed on the "Index to Exhibits" of this report are incorporated by reference herein.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**COOPER-STANDARD HOLDINGS INC.**

| November 13, 2009 | /s/  JAMES S. MCELYA |
|---|---|
| Date | James S. McElya |
| | Chairman, Chief Executive Officer and Director |
| | (Principal Executive Officer) |

| November 13, 2009 | /s/  ALLEN J. CAMPBELL |
|---|---|
| Date | Allen J. Campbell |
| | Chief Financial Officer |
| | (Principal Financial Officer) |

| November 13, 2009 | /s/  HELEN T. YANTZ |
|---|---|
| Date | Helen T. Yantz |
| | Controller |
| | (Principal Accounting Officer) |

56

## INDEX TO EXHIBITS

| Exhibit No. | Description of Exhibit |
|---|---|
| 10.1* | Debtor-In-Possession Credit Agreement, dated as of August 5, 2009, among Cooper-Standard Holdings Inc., a Delaware corporation, Cooper-Standard Automotive Inc., an Ohio corporation, Cooper-Standard Automotive Canada Limited, a corporation organized under the laws of Ontario, various Lenders party thereto and Deutsche Bank Trust Company Americas, as Administrative Agent. |
| 10.2* | First Amendment to Debtor-in-Possession Credit Agreement, dated as of August 31, 2009, among Cooper-Standard Holdings Inc., a Delaware corporation, Cooper-Standard Automotive Inc., an Ohio corporation, Cooper-Standard Automotive Canada Limited, a corporation organized under the laws of Ontario, various Lenders party thereto and Deutsche Bank Trust Company Americas, as Administrative Agent. |
| 10.3* | Second Amendment to Debtor-in-Possession Credit Agreement and Limited Waiver, dated as of September 11, 2009, among Cooper-Standard Holdings Inc., a Delaware corporation, Cooper-Standard Automotive Inc., an Ohio corporation, Cooper-Standard Automotive Canada Limited, a corporation organized under the laws of Ontario, Cooper-Standard Automotive Brasil Sealing LTDA and Cooper-Standard Automotive Brasil Fluid Systems LTDA, each organized under the laws of Brazil, various Lenders party thereto and Deutsche Bank trust Company Americas, as Administrative Agent. |
| 31.1* | Certification of James S. McElya, Chief Executive Officer, pursuant to Rule 13a-14(a)/15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification of Allen J. Campbell, Chief Financial Officer, pursuant to Rule 13a-14(a)/15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1* | Certification of James S. McElya, Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Certification of Allen J. Campbell, Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

* Filed herewith

Exhibit 10.1

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

COOPER-STANDARD HOLDINGS INC.,

COOPER-STANDARD AUTOMOTIVE INC.,

COOPER-STANDARD AUTOMOTIVE CANADA LIMITED,

VARIOUS LENDING INSTITUTIONS,

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent
and
Collateral Agent,

BANC OF AMERICA SECURITIES LLC,
GENERAL ELECTRIC CAPITAL CORPORATION
and
UBS SECURITIES LLC,
as Co-Syndication Agents,

and

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Documentation Agent

Dated as of August 5, 2009

---

DEUTSCHE BANK SECURITIES INC.,
and
GENERAL ELECTRIC CAPITAL CORPORATION,
as Joint Lead Arrangers and Book Runners

BANC OF AMERICA SECURITIES LLC
and
UBS SECURITIES LLC
as Co-Arrangers

## TABLE OF CONTENTS

|  | Page |
|---|---|
| SECTION 1. Definitions | 2 |
| | |
| SECTION 2. Amount and Terms of Credit | 40 |
| | |
| 2.01 Commitments | 40 |
| 2.02 Minimum Borrowing Amounts, etc. | 43 |
| 2.03 Notice of Borrowing | 44 |
| 2.04 Disbursement of Funds | 44 |
| 2.05 Notes | 45 |
| 2.06 Conversions and Continuations | 47 |
| 2.07 Pro Rata Borrowings | 47 |
| 2.08 Interest | 47 |
| 2.09 Interest Periods | 49 |
| 2.10 Increased Costs; Illegality; etc. | 49 |
| 2.11 Compensation | 51 |
| 2.12 Change of Lending Office | 52 |
| 2.13 Replacement of Lenders | 53 |
| 2.14 [Intentionally Omitted] | 53 |
| 2.15 Incremental Term Loan Commitments | 53 |
| | |
| SECTION 3. [Intentionally Omitted] | 56 |
| | |
| SECTION 4. Fees; Commitments | 56 |
| | |
| 4.01 Fees | 56 |
| 4.02 Voluntary Termination of Commitments | 57 |
| 4.03 Mandatory Reduction of Commitments | 57 |
| | |
| SECTION 5. Prepayments; Repayments; Taxes | 58 |
| | |
| 5.01 Voluntary Prepayments | 58 |
| 5.02 Mandatory Repayments | 58 |
| 5.03 Method and Place of Payment | 60 |
| 5.04 Net Payments | 61 |
| | |
| SECTION 6. Conditions Precedent to Credit Events on the Initial Borrowing Date and the Final Borrowing Date | 63 |
| | |
| 6.01 Effective Date; Delivery of Notes | 63 |
| 6.02 Officer's Certificate | 63 |
| 6.03 Opinions of Counsel | 64 |
| 6.04 Company Documents; Proceedings; Capital Structure | 64 |
| 6.05 Adverse Change, etc. | 64 |
| 6.06 Litigation | 64 |
| 6.07 Approvals | 65 |

i

6.08 [Intentionally Omitted] .......... 65
6.09 [Intentionally Omitted] .......... 65
6.10 [Intentionally Omitted] .......... 65
6.11 Outstanding Indebtedness and Preferred Stock .......... 65
6.12 Consent Letter .......... 65
6.13 Subsidiaries Guaranties; Intercompany Subordination Agreement .......... 65
6.14 Pledge Agreements .......... 66
6.15 Security Agreements .......... 67
6.16 Mortgages; Title Insurance; etc. .......... 70
6.17 Shareholders' Agreements; Management Agreements; Collective Bargaining Agreements; Financial Advisors Engagement
     Agreements, Existing Indebtedness Agreements; and Tax Allocation Agreements .......... 70
6.18 Insurance Certificates .......... 71
6.19 Payment of Fees .......... 71
6.20 Patriot Act .......... 71
6.21 Interim Order/Bankruptcy Matters .......... 72
6.22 Financial Statements, 13-Week Budgets and Reports .......... 73
6.23 Amendment of the Prepetition Facility and Prepetition Security Documents .......... 73
6.24 Lien Searches .......... 73
6.25 Final Order .......... 73
6.26 Other Conditions .......... 74

SECTION 7. Conditions Precedent to All Credit Events .......... 45

7.01 No Default; Representations and Warranties .......... 75
7.02 Notice of Borrowing; etc. .......... 75
7.03 Incremental Term Loans .......... 75
7.04 [Intentionally Omitted] .......... 75
7.05 [Intentionally Omitted] .......... 75
7.06 Commitments .......... 75
7.07 Interim Order, Initial Order and Final Order .......... 75
7.08 Payment .......... 75

SECTION 8. Representations and Warranties .......... 76

8.01 Company Status .......... 76
8.02 Authorization; Enforceability .......... 76
8.03 Governmental Approvals; No Conflicts .......... 76
8.04 Financial Condition; No Material Adverse Change .......... 77
8.05 Properties .......... 77
8.06 Litigation and Environmental Matters .......... 78
8.07 Compliance with Laws and Agreements .......... 78
8.08 Investment Company Status .......... 78
8.09 Taxes .......... 78
8.10 ERISA; Canadian Welfare and Pension Plans .......... 79
8.11 Disclosure .......... 80
8.12 Subsidiaries and Joint Ventures .......... 80
8.13 Insurance .......... 80
8.14 Labor Matters .......... 80
8.15 [Intentionally Omitted] .......... 81

ii

8.16 Senior Indebtedness; Designated Senior Indebtedness ............... 81
8.17 Collateral Matters ............... 81
8.18 Scheduled Existing Indebtedness ............... 82
8.19 Cases ............... 82
8.20 Orders ............... 82
8.21 Material Contracts ............... 82
8.22 Forward Looking Projections ............... 82

SECTION 9. Affirmative Covenants ............... 82

9.01 Financial Statements and Other Information ............... 82
9.02 Notices of Material Events ............... 83
9.03 Information Regarding Collateral ............... 84
9.04 Existence; Conduct of Business ............... 85
9.05 Payment of Taxes ............... 85
9.06 Maintenance of Properties ............... 85
9.07 Insurance ............... 85
9.08 Casualty and Condemnation ............... 86
9.09 Books and Records; Inspection and Audit Rights ............... 86
9.10 Compliance with Laws ............... 87
9.11 Use of Proceeds ............... 87
9.12 Additional Subsidiaries ............... 87
9.13 Further Assurances ............... 87
9.14 End of Fiscal Years; Fiscal Quarters ............... 88
9.15 [Intentionally Omitted] ............... 89
9.16 [Intentionally Omitted] ............... 89
9.17 Financial Statements and Additional Bankruptcy-related Reporting ............... 89
9.18 Financial Advisors ............... 90
9.19 Ratings ............... 90
9.20 Environmental Assessment ............... 90
9.21 Post-Closing Actions ............... 91
9.22 Lender Conference Calls ............... 91

SECTION 10. Negative Covenants ............... 91

10.01 Indebtedness; Certain Equity Securities ............... 91
10.02 Liens ............... 94
10.03 Fundamental Changes ............... 96
10.04 Investments, Loans, Advances, Guarantees and Acquisitions ............... 97
10.05 Asset Sales ............... 100
10.06 Sale and Leaseback Transactions ............... 102
10.07 Post Petition Swap Agreements ............... 102
10.08 Restricted Payments; Certain Payments of Indebtedness ............... 103
10.09 Transactions with Affiliates ............... 104
10.10 Restrictive Agreements ............... 104
10.11 Amendment of Material Documents ............... 105
10.12 New Subsidiaries ............... 105
10.13 13-Week Budget ............... 105
10.14 Maximum Capital Expenditures ............... 105
10.15 Limitation on Issuance of Equity Interests ............... 106

iii

10.16 Minimum EBITDA                                                                106
10.17 Minimum Liquidity                                                             106
10.18 Chapter 11 Claims                                                             106
10.19 No Right of Subrogation                                                       107
10.20 Modification of Engagement Letters                                            107
10.21 Hazardous Materials                                                           107

SECTION 11. Events of Default and Remedies                                         107

SECTION 12. The Agents                                                             113

12.01  Appointment                                                                 113
12.02 Nature of Duties                                                             113
12.03 Certain Rights of the Agents                                                 114
12.04 Reliance by Agents                                                           114
12.05 Notice of Default, etc.                                                      114
12.06 Nonreliance on Agents and Other Lenders                                      115
12.07 Indemnification                                                              115
12.08 Agents in their Individual Capacities                                        116
12.09 Holders                                                                      116
12.10 Resignation of the Agents                                                    116
12.11 Collateral Matters                                                           117
12.12 Delivery of Information                                                       118
12.13 Special Appointment of Collateral Agent (German Security Documents)          118
12.14 Special Appointment of Collateral Agent (French Security Documents)          119
12.15 Special Appointment of Collateral Agent (Dutch Security Documents)           120

SECTION 13. Miscellaneous                                                          121

13.01  Payment of Expenses, etc.                                                   121
13.02 Right of Setoff                                                              124
13.03 Notices                                                                      125
13.04 Benefit of Agreement                                                         125
13.05 No Waiver; Remedies Cumulative                                               127
13.06 Payments Pro Rata                                                            127
13.07 Calculations; Computations                                                   128
13.08 Governing Law; Submission to Jurisdiction; Venue                             129
13.09 Counterparts                                                                 131
13.10 Effectiveness                                                                131
13.11 Headings Descriptive                                                         131
13.12 Amendment or Waiver; etc.                                                    131
13.13 Survival                                                                     133
13.14 Domicile of Loans and Commitments                                            133
13.15 Confidentiality                                                              133
13.16 Waiver of Jury Trial                                                         134
13.17 Register                                                                     134
13.18 English Language                                                             135
13.19 Special Provisions Regarding Pledges of Equity Interests in Persons Not Organized in Qualified Jurisdictions    135
13.20 Powers of Attorney; etc.                                                     136

13.21 Waiver of Sovereign Immunity ........................................................... 136
13.22 Determinations of Satisfaction by the Lenders ..................................... 136
13.23 Judgment Currency ............................................................................ 136
13.24 Limitation on Additional Amounts, etc. ............................................... 137
13.25 USA PATRIOT Act ............................................................................ 137
13.26 Abstract Acknowledgment of Indebtedness and Joint Creditorship; Release of German Pledge Agreement ......... 137

SECTION 14. Holdings Guaranty ................................................................... 140

14.01  The Guaranty .................................................................................. 140

14.02  Bankruptcy ..................................................................................... 140
14.03  Nature of Liability ............................................................................ 140
14.04  Independent Obligation ..................................................................... 141
14.05  Authorization .................................................................................. 141
14.06  Reliance .......................................................................................... 142
14.07  Subordination .................................................................................. 142
14.08  Waiver ............................................................................................ 142
14.09  Payments ........................................................................................ 144
14.10  Maximum Liability ............................................................................ 144

SECTION 15. U.S. Borrower's Guaranty ........................................................ 145

15.01  The U.S. Borrower's Guaranty .......................................................... 145
15.02  Bankruptcy ..................................................................................... 145
15.03  Nature of Liability ............................................................................ 145
15.04  Independent Obligation ..................................................................... 146
15.05  Authorization .................................................................................. 146
15.06  Reliance .......................................................................................... 147
15.07  Subordination .................................................................................. 147
15.08  Waiver ............................................................................................ 147
15.09  Payments ........................................................................................ 149
15.10  Maximum Liability ............................................................................ 149

v

| SCHEDULE 1 | List of Lenders and Commitments |
| SCHEDULE 1-A | List of Permitted Joint Ventures |
| SCHEDULE 2.12(a) | Lender Addresses |
| SCHEDULE 6.05 | Existing Material Adverse Effects |
| SCHEDULE 6.06 | Litigation |
| SCHEDULE 6.14 | Certificate Collateral |
| SCHEDULE 6.14(h) | Local Law Pledge Agreements |
| SCHEDULE 8.03 | Conflicts with Material Agreements |
| SCHEDULE 8.05(c) | Real Properties |
| SCHEDULE 8.12 | Subsidiaries |
| SCHEDULE 8.13 | Insurance |
| SCHEDULE 8.18 | Scheduled Existing Indebtedness |
| SCHEDULE 9.21 | Post-Closing Matters |
| SCHEDULE 10.02(a) | Existing Liens |
| SCHEDULE 10.04(c) | Existing Investments |
| SCHEDULE 10.05(b) | Sales, Transfers and Other Dispositions of Assets |
| SCHEDULE 10.09 | Existing Transactions with Affiliates |
| SCHEDULE 10.10 | Existing Restrictions |

| EXHIBIT A-1 | - | Form of Notice of Borrowing |
| EXHIBIT A-2 | - | Form of Notice of Conversion/Continuation |
| EXHIBIT B-1 | - | Form of Tranche A Term Note |
| EXHIBIT B-2 | - | Form of Tranche B Term Note |
| EXHIBIT B-3 | - | Form of Tranche C Term Note |
| EXHIBIT B-4 | - | Form of Incremental Term Note |
| EXHIBIT C | - | [Intentionally Omitted] |
| EXHIBIT D | - | Form of Section 5.04(b)(ii) Certificate |
| EXHIBIT E-1 | - | [Intentionally Omitted] |
| EXHIBIT E-2 | - | [Intentionally Omitted] |
| EXHIBIT F | - | Form of Officers' Certificate |
| EXHIBIT G-1 | - | [Intentionally Omitted] |
| EXHIBIT G-2 | - | [Intentionally Omitted] |
| EXHIBIT H-1 | - | [Intentionally Omitted] |
| EXHIBIT H-2 | - | [Intentionally Omitted] |
| EXHIBIT H-3 | - | [Intentionally Omitted] |
| EXHIBIT H-4 | - | [Intentionally Omitted] |
| EXHIBIT H-5 | - | [Intentionally Omitted] |
| EXHIBIT I-1 | - | [Intentionally Omitted] |
| EXHIBIT I-2 | - | [Intentionally Omitted] |
| EXHIBIT I-3 | - | [Intentionally Omitted] |
| EXHIBIT I-4 | - | [Intentionally Omitted] |
| EXHIBIT I-5 | - | [Intentionally Omitted] |
| EXHIBIT J | - | [Intentionally Omitted] |
| EXHIBIT K | - | Form of Assignment and Assumption Agreement |
| EXHIBIT L | - | Form of Intercompany Note |
| EXHIBIT M | - | Form of Consent Letter |
| EXHIBIT N | - | [Intentionally Omitted] |
| EXHIBIT O | - | Form of Incremental Term Loan Commitment Agreement |
| EXHIBIT P | - | [Intentionally Omitted] |
| EXHIBIT Q | - | Form of Additional Foreign Borrower Designation Agreement |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of August 5, 2009, among COOPER-STANDARD HOLDINGS INC., a Delaware corporation ("Holdings"), COOPER-STANDARD AUTOMOTIVE INC., an Ohio corporation (the "U.S. Borrower"), COOPER-STANDARD AUTOMOTIVE CANADA LIMITED, a corporation organized under the laws of Ontario (the "Canadian Borrower" or the "Canadian Debtor"), an additional borrower that is a Foreign Subsidiary of the U.S. Borrower if it and the Administrative Agent as directed by the Required Lenders execute and deliver an Additional Foreign Borrower Designation Agreement designating such Foreign Subsidiary as the Additional Foreign Borrower hereunder, the Lenders from time to time party hereto, DEUTSCHE BANK TRUST COMPANY AMERICAS, as the administrative agent (in such capacity, the "Administrative Agent") and as the collateral agent (in such capacity, the "Collateral Agent"), BANC OF AMERICA SECURITIES LLC, GENERAL ELECTRIC CAPITAL CORPORATION and UBS SECURITIES LLC, as co-syndication agents (in such capacity, each a "Co-Syndication Agent" and, collectively, the "Co-Syndication Agents"), DEUTSCHE BANK TRUST COMPANY AMERICAS, as documentation agent (in such capacity, the "Documentation Agent"), DEUTSCHE BANK SECURITIES INC. and GENERAL ELECTRIC CAPITAL CORPORATION, as joint lead arrangers and book runners (in such capacity, each a "Joint Lead Arranger" and, collectively, the "Joint Lead Arrangers") and BANC OF AMERICA SECURITIES LLC and UBS SECURITIES LLC, as co-arranger (in such capacity, each a "Co-Arranger" and, collectively, the "Co-Arrangers").

PRELIMINARY STATEMENTS:

On August 3, 2009 (the "Petition Date"), Holdings, the U.S. Borrower, U.S. Finco and each U.S. Subsidiary of the U.S. Borrower (collectively, the "U.S. Debtors") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating their respective cases under Chapter 11 of the Bankruptcy Code (the cases of Holdings, the U.S. Borrower and the U.S. Subsidiaries of the U.S. Borrower, each a "U.S. Case" and collectively, the "U.S. Cases") and continue in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code. On August 4, 2009, the Canadian Borrower commenced proceedings (the "Canadian Case"; together with the U.S. Cases, the "Cases") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA").

The Borrowers (as defined below) have requested that the Lenders provide them with (i) a delayed draw term loan facility in an aggregate principal amount not to exceed U.S.$175,000,000 (the "Initial Facility") and (ii) the ability to incur a single draw incremental term loan facility, which is uncommitted on the date hereof, in an aggregate principal amount not to exceed U.S.$25,000,000 (the "Incremental Facility"; together with the Initial Facility, the "DIP Facility"). The Lenders are willing to make loans to the Borrowers on the terms and subject to the conditions set forth herein.

On or about the Petition Date: (1) the Bankruptcy Court will enter the Interim Order (as defined below) approving on an interim basis the DIP Facility (and the Bankruptcy Court subsequently shall enter the Final Order), and providing *inter alia*, that (i) in the U.S. Cases the obligations under the DIP Facility shall constitute allowed senior administrative expense claims against the U.S. Debtors with priority over any and all administrative expenses, adequate protection claims, dimunition claims and all other claims against the U.S. Debtors, now existing or hereafter arising, of any kind whatsoever, and (ii) the obligations of the U.S. Debtors under

the DIP Facility shall be secured by fully perfected security interests in and Liens upon all pre-and post-petition assets of the U.S. Debtors and certain other non-Debtor Subsidiaries of Holdings, whether existing on the Interim Order Entry Date or thereafter acquired, including any cash and any investments of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Interim Order Entry Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interest in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all of the foregoing and, in the U.S. Cases, subject only to and effective upon entry of the Final Order (and the limitations set forth therein), the Avoidance Actions and (2) the Canadian Court will grant the Initial Order (as defined below), approving the DIP Facility to the Canadian Borrower and providing, *inter alia*, that the obligations of the Canadian Debtor shall be secured by a first-ranking court ordered DIP Lenders' Charge over all the property, assets and undertaking of the Canadian Debtor ranking subordinate only to the Administration Charge (as defined below). The respective priorities of the DIP Facility and other parties claiming Liens on all or any part of the Collateral shall be as set forth in the Interim Order and the Initial Order.

All of the claims and the Liens granted in the Orders and in the Security Documents to the Collateral Agent and the Lenders in respect of the DIP Facility shall be subject only to the Carve-Out (in the case of the claims against and Liens on Collateral of the U.S. Debtors) and the Administration Charge (in the case of the claims against and Liens on Collateral of the Canadian Debtor).

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. <u>Definitions</u>. As used herein, the following terms shall have the meanings herein specified unless the context otherwise requires. Defined terms in this Agreement shall include in the singular number the plural and in the plural the singular:

"<u>13-Week Budget</u>" shall have the meaning provided in Section 9.17(c).

"<u>A&M</u>" shall have the meaning provided in Section 9.18(b).

"<u>A&M Engagement Letter</u>" shall have the meaning provided in Section 6.17.

"<u>Additional Collateral</u>" shall mean all property (whether real or personal) in which security interests are granted (or have been purported to be granted) (and continue to be in effect at the time of determination) pursuant to Sections 9.12 and 9.13.

"<u>Additional Foreign Borrower</u>" shall mean the Foreign Subsidiary of Holdings designated as a Borrower in the Additional Foreign Borrower Designation Agreement.

"<u>Additional Foreign Borrower Credit Parties</u>" shall mean the Additional Foreign Borrower and the Subsidiary Guarantors designated as such in the Additional Foreign Borrower Designation Agreement.

2

"<u>Additional Foreign Borrower Designation Agreement</u>" shall mean the Additional Foreign Borrower Designation Agreement executed by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent at the direction of the Required Lenders substantially in the form of <u>Exhibit Q</u> (appropriately completed), designating (a) the Additional Foreign Borrower, (b) the amount of the Total Tranche C Term Loan Commitment, which shall not be greater than U.S.$50,000,000, and the portion thereof, if any, that shall reduce the Total Tranche A Term Loan Commitment pursuant to Section 4.03(c) and the portion thereof, if any, that shall reduce the Total Tranche B Term Loan Commitment pursuant to Section 4.03(c) (it being understood that the amount of the Total Tranche C Term Loan Commitment shall reduce the aggregate of the Total Tranche A Term Loan Commitment and the Total Tranche B Term Loan Commitment on a dollar-for-dollar basis and the Total Tranche A Term Loan Commitment shall not be so reduced to an amount less than U.S.$100,000,000), (c) the amount of each Lender's Tranche C Term Loan Commitment (which amount shall equal such Lender's pro rata portion (determined as the percentage that the aggregate of such Lender's Tranche A Term Loan Commitment and Tranche B Term Loan Commitment bears to the aggregate Total Tranche A Term Loan Commitment and Total Tranche B Term Loan Commitment immediately prior to the effectiveness of such Additional Foreign Borrower Designation Agreement) of the Total Tranche C Term Loan Commitment), (d) the collateral that will secure the Obligations of the Additional Foreign Borrower and the related Security Documents that will grant a Lien on such collateral and (e) the Foreign Subsidiaries of Holdings that will guarantee and secure the Obligations of the Additional Foreign Borrower and thereby become Additional Foreign Borrower Credit Parties and Subsidiary Guarantors and containing such other provisions, including without limitation implementing amendments to this Agreement and the other Credit Documents as may be contained therein; <u>provided</u> that no such Foreign Subsidiary shall be required to make such a guarantee if doing so would (1) violate applicable law (including corporate benefit, financial assistance, fraudulent preference, thin capitalization rules, and similar laws or regulations), result in a breach or default under an existing contract identified on a schedule attached to the Additional Foreign Borrower Designation Agreement or would reasonably be expected to result in a material incremental tax liability or personal liability of any director or officer of such Foreign Subsidiary or (2) result in costs (administrative or otherwise) that in the determination of the Administrative Agent are materially disproportionate to the benefit obtained thereby, all of which including (a) through (e) above and the foregoing provisos shall be satisfactory in form and substance to the Required Lenders in their sole discretion. For the avoidance of doubt, if the Additional Foreign Borrower is organized under the laws of Germany, the Subsidiaries of such Additional Foreign Borrower that will be required to guarantee and secure the Obligations of the Additional Foreign Borrower shall only be Subsidiaries organized under the laws of Germany.

"<u>Additional Foreign Borrower Incremental Term Loans</u>" shall mean Incremental Term Loans incurred by the Foreign Borrower.

"<u>Additional Security Documents</u>" shall have the meaning provided in Section 9.13.

"<u>Administration Charge</u>" shall mean a charge granted over all of the assets, property and undertaking of the Canadian Borrower by the Canadian Court pursuant to the Initial Order in an aggregate amount not in excess of Cdn.$450,000 ranking in priority over all other encumbrances and other charges granted by the Canadian Court.

3

"Administrative Agent" shall mean Deutsche Bank Trust Company Americas and shall include any successor to the Administrative Agent appointed pursuant to Section 12.10.

"Affiliate" means, with respect to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Neither any Agent nor any Lender shall be deemed to be an Affiliate of Holdings or any of its Subsidiaries solely by virtue of being a party to this Agreement.

"Agent" shall mean the Administrative Agent, the Collateral Agent, the Co-Syndication Agents, the Joint Lead Arrangers, the Co-Arrangers and the Documentation Agent and shall include any successor to any such Person appointed pursuant to Section 12.10.

"Agreement" shall mean this Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended, renewed, refinanced or replaced from time to time.

"Applicable Increased Term Loan Rate" shall mean, at any time, with respect to any newly-created Tranche of Incremental Term Loans, the rate per annum (expressed as a percentage) determined by the Administrative Agent (and notified to the Lenders) as the rate per annum required to equalize the interest rates applicable to each then existing Tranche of Term Loans and such Tranche of Incremental Term Loans. Each determination of the "Applicable Increased Term Loan Rate" shall be made by the Administrative Agent taking into account the relevant factors outlined in subclause (II) of the proviso to clause (vi) of Section 2.15(a) and shall be conclusive and binding on all Lenders absent manifest error.

"Applicable Margin" shall mean initially a percentage per annum equal to (i) in the case of Tranche A Term Loans, Tranche B Term Loans and Tranche C Term Loans maintained as (A) Base Rate Loans, 8.50% and (B) Eurodollar Loans, 9.50% (or, on and after the date of the most recent incurrence of any Tranche of Incremental Term Loans bearing interest at the Applicable Increased Term Loan Rate, the Applicable Increased Term Loan Rate for such Tranche of Incremental Term Loans); and (ii) in the case of any Type of Incremental Term Loan of a given Tranche, that percentage per annum set forth in, or calculated in accordance with, Section 2.15 and the relevant Incremental Term Loan Commitment Agreement (or in the case of Incremental Term Loans of a given Tranche, on and after the date of the most recent incurrence of any Tranche of Incremental Term Loans bearing interest at the Applicable Increased Term Loan Rate, the Applicable Increased Term Loan Rate for such Tranche of Incremental Term Loans).

"Asset Sale" shall mean any sale, transfer or other disposition by Holdings or any of its Subsidiaries to any Person (other than the U.S. Borrower or any Wholly-Owned Subsidiary of the U.S. Borrower to the extent that the aggregate fair market values of the assets subject to such sales, transfers or other dispositions not in the ordinary course of business do not exceed the limitations set forth in Section 10.04(e) (determined for this purpose as though the fair market value of an asset sold from one Person to another were an intercompany loan made by such Person to such other Person) of any asset or property (including, without limitation, any capital stock or other securities of, or other Equity Interests in, another Person) of Holdings or such Subsidiary other than the dispositions described in clauses (a) through (g) inclusive, clause (j) and clause (l) of Section 10.05).

"Assignment and Assumption Agreement" shall mean the Assignment and Assumption Agreement substantially in the form of Exhibit K (appropriately completed).

4

"<u>Authorized Officer</u>" shall mean, with respect to (i) delivering Notices of Borrowing, Notices of Conversion/Continuation and similar notices, any person or persons that has or have been authorized by the board of directors of the relevant Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards on file with the Administrative Agent; (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, principal accounting officer, any treasurer, any controller or (except in the case of financial matters) the general counsel of Holdings or the U.S. Borrower; and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of Holdings or the U.S. Borrower.

"<u>Auto Supplier Support Program</u>" shall mean the Auto Supplier Support Program established by the United States Department of the Treasury pursuant to the authority granted to it by and under the Emergency Economic Stabilization Act of 2008 (Pub. L. 110-343, enacted October 1, 2008), as in effect on the Effective Date and including any modifications thereto, so long as such modifications are not adverse to the interests of the U.S. Borrower, any of its Subsidiaries or the Lenders in any material respect.

"<u>Auto Supplier Support Program Credit Agreement</u>" shall mean each of (i) the Credit Agreement, dated as of April 3, 2009, by and between GM Supplier Receivables, LLC, a Delaware limited liability company, and the United States Department of the Treasury, (ii) the Credit Agreement, dated as of April 7, 2009, by and between Chrysler Receivables SPV LLC, a Delaware limited liability company, and the United States Department of the Treasury and (iii) any other credit agreement or other agreement pursuant to which the United States Department of the Treasury (or other United States governmental agency designated by it pursuant to the Auto Supplier Support Program) shall provide extensions of credit to a Program SPV pursuant to the Auto Supplier Support Program substantially in the form of the Credit Agreement described in preceding clauses (i) and (ii), in each case as in effect on the Effective Date (or, in the case of an agreement referred to in clause (iii), the date of execution and delivery thereof) and including any amendment, modification or waiver of the terms thereof, so long as the same is not adverse to the interests of the U.S. Borrower, any of its Subsidiaries or the Lenders in any material respect.

"<u>Auto Supplier Support Transactions</u>" shall mean each Permitted Credit Protection Transaction and each Permitted Quick Pay Sale.

"<u>Avoidance Actions</u>" shall mean the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise.

"<u>Bankruptcy Code</u>" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto.

"<u>Bankruptcy Court</u>" shall have the meaning provided in the Preliminary Statements.

"<u>Base Rate</u>" at any time shall mean the highest of (i) the rate which is 1/2 of 1% in excess of the Federal Funds Rate at such time, (ii) the Prime Lending Rate at such time and (iii) 4.00% per annum.

5

"<u>Base Rate Loan</u>" shall mean each Loan which is designated or deemed designated as a Base Rate Loan by the respective Borrower at the time of the incurrence thereof or conversion thereto.

"<u>Borrowing</u>" shall mean the borrowing of one Type of Loan pursuant to a single Tranche by the Borrower under such Tranche from all the Lenders having Commitments with respect to such Tranche on a given date (or resulting from a continuation or conversion on such date), having in the case of Eurodollar Loans the same Interest Period; <u>provided</u> (x) that Base Rate Loans incurred pursuant to Section 2.10(b) shall be considered part of the related Borrowing of Eurodollar Loans and (y) any Incremental Term Loans incurred pursuant to Section 2.01(d) shall be considered part of the related Borrowing of the then outstanding Tranche of Term Loans (if any) to which such Incremental Term Loans are added pursuant to, and in accordance with the requirements of, Section 2.15(c).

"<u>Borrowers</u>" shall mean the U.S. Borrower, the Canadian Borrower and the Additional Foreign Borrower.

"<u>Brazilian Collateral Agent</u>" shall mean the "collateral agent" as set forth in the Brazilian Security Agreements.

"<u>Brazilian Credit Party</u>" shall mean each Brazilian Subsidiary.

"<u>Brazilian Pledge Agreement</u>" shall have the meaning provided in Section 6.14(c).

"<u>Brazilian Security Agreement</u>" shall have the meaning provided in Section 6.15(c).

"<u>Brazilian Subsidiary</u>" shall mean each Subsidiary of Holdings incorporated or organized in the Federative Republic of Brazil or any province or territory thereof.

"<u>Business Day</u>" shall mean (i) any day except Saturday, Sunday and any day which shall be in New York City a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on or with respect to, Eurodollar Loans, any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in U.S. dollar deposits in the London interbank market and which shall not be a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close in London or New York City.

"<u>Canadian Borrower</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Canadian Borrower Incremental Term Loans</u>" shall mean Incremental Term Loans incurred by the Canadian Borrower.

"<u>Canadian Case</u>" shall have the meaning provided in the Preliminary Statements.

"<u>Canadian Court</u>" shall have the meaning provided in the Preliminary Statements.

"<u>Canadian Credit Party</u>" shall mean the Canadian Borrower and each Canadian Subsidiary Guarantor.

6

"Canadian Debtor" shall have the meaning provided in the first paragraph of this Agreement.

"Canadian Dollar Equivalent" shall mean, at any time for the determination thereof, the amount of Canadian Dollars which could be purchased with the amount of U.S. Dollars involved in such computation at the spot rate of exchange therefor as quoted by the Administrative Agent as of 11:00 A.M. (New York time) on the date two Business Days prior to the date of any determination thereof for purchase on such date (or, in the case of any determination pursuant to Section 13.23, on the date of determination).

"Canadian Dollars" and "Cdn.$" shall mean freely transferable lawful money of Canada.

"Canadian Pension Plan" shall mean any "registered pension plan" that is subject to the funding requirements of the *Pension Benefits Act* (Ontario) or applicable pension benefits legislation in any other Canadian jurisdiction and is applicable to employees of any Subsidiary of Holdings resident in Canada or any province or territory thereof.

"Canadian Pledge Agreement" shall have the meaning provided in Section 6.14(b).

"Canadian Security Agreement" shall have the meaning provided in Section 6.15(b).

"Canadian Subsidiaries Guaranty" shall have the meaning provided in Section 6.13(b).

"Canadian Subsidiary" shall mean (i) each Subsidiary of Holdings incorporated or organized in Canada or any province or territory thereof and (ii) U.S. Finco.

"Canadian Subsidiary Guarantor" shall mean (i) each Wholly-Owned Subsidiary of Holdings that is a Canadian Subsidiary as of the Initial Borrowing Date (other than the Canadian Borrower) and (ii) each other Wholly-Owned Subsidiary of Holdings that is a Canadian Subsidiary and is created, established or acquired after the Initial Borrowing Date which executes and delivers a Canadian Subsidiaries Guaranty, unless and until such time as the respective Canadian Subsidiary is released from all of its obligations under its Canadian Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Canadian Welfare Plan" shall mean any medical, health, hospitalization, insurance, retirement or other employee benefit or welfare plan or arrangement (but excluding any Canadian Pension Plan) applicable to employees of a Subsidiary of the U.S. Borrower resident in Canada or any province or territory thereof.

"Capital Expenditures" means, for any period, (a) the additions to property, plant and equipment and other capital expenditures of the U.S. Borrower and its Subsidiaries that are (or would be) set forth in a consolidated statement of cash flows of the U.S. Borrower for such period prepared in accordance with U.S. GAAP and (b) Capital Lease Obligations incurred by the U.S. Borrower and its Subsidiaries during such period, provided that Capital Expenditures shall not include (i) the purchase price of equipment to the extent the consideration therefor consists of used or surplus equipment traded in at the time of such purchase, (ii) interest capitalized during such period, (iii) expenditures that are accounted for as capital expenditures of the U.S. Borrower and its Subsidiaries and that actually are paid for by a third party (excluding Holdings or any Subsidiary thereof) and for which neither

7

Holdings nor any Subsidiary thereof has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period) and (iv) the book value of any asset owned by the U.S. Borrower or any of its Subsidiaries prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of the U.S. Borrower or such Subsidiary reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period, provided that (A) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (B) such book value shall have been included in Capital Expenditures when such asset was originally acquired if such asset was originally acquired on or after January 1, 2009.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under U.S. GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with U.S. GAAP.

"Carve-Out" shall have the meaning provided in the Orders.

"Cases" shall have the meaning provided in the Preliminary Statements.

"CCAA" shall have the meaning provided in the Preliminary Statements.

"CCAA Plan" shall have the meaning provided in Section 11(x).

"Change in Control" means occupation of a majority of the seats (other than vacant seats) on the board of directors of Holdings by Persons who were neither (i) nominated by the board of directors of Holdings, (ii) appointed by directors so nominated or (iii) nominated or appointed by the Permitted Holders (other than in connection with a transaction which results in Permitted Holders ceasing to own Equity Interests in Holdings).

"Co-Arranger" shall have the meaning provided in the first paragraph of this Agreement and shall include any successor to a Co-Arranger appointed pursuant to Section 12.10.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean all property (whether real or personal, movable or immovable) with respect to which any security interests have been granted (or purported to be granted) pursuant to the Orders or any Security Document (including any Additional Security Document), including, without limitation, all Pledge Agreement Collateral, all Mortgaged Properties and all cash and Permitted Investments delivered as collateral pursuant to Sections 5.02 or 11 or any Credit Document and all Additional Collateral, if any.

8

"Collateral Agent" shall mean DBTCA, acting as collateral agent for the Secured Creditors.

"Collective Bargaining Agreements" shall have the meaning provided in Section 6.17.

"Commitment" shall mean any of the commitments of any Lender, i.e., whether a Tranche A Term Loan Commitment, Tranche B Term Loan Commitment, Tranche C Term Loan Commitment or Incremental Term Loan Commitment.

"Company" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period plus (in the case of charges, losses and expenses) or minus (in the case of income and gains), without duplication and to the extent deducted in determining such Consolidated Net Income for such period, the sum of (i) consolidated interest expense of the U.S. Borrower and its Subsidiaries for such period (including, to the extent not otherwise included in consolidated interest expense for such period, commissions, discounts, yield and other fees and charges incurred during such period in connection with Permitted Securitizations and Auto Supplier Support Transactions that are payable to any person other than a U.S. Credit Party, and any other amounts for such period comparable to or in the nature of interest under any Permitted Securitization and any Auto Supplier Support Transaction, including losses on the sale of assets relating to any receivables securitization transaction accounted for as a "true sale"), (ii) consolidated income tax expense of the U.S. Borrower and its Subsidiaries for such period (including any income tax expense of Holdings for such period to the extent the U.S. Borrower has made payment to or for the account of Holdings in respect thereof), (iii) all amounts attributable to depreciation and amortization expense of the U.S. Borrower and its Subsidiaries for such period and (iv) any non-cash charges, losses or expenses of the U.S. Borrower and its Subsidiaries for such period (including any unrealized foreign exchange losses, but excluding any non-cash charge, loss or expense in respect of an item that was included in Consolidated Net Income in a prior period) and any non-cash charge, loss or expense that relates to the write-down or write-off of inventory or assets, (v) any expenses incurred in such period by the U.S. Borrower or any of its Subsidiaries related to the early termination of any Swap Agreements as a result of any Default or Event of Default under any Indebtedness existing prior to the Effective Date (including, without limitation, as a result of the Cases) to the extent not paid in cash, (vi) any cash Restructuring Charges in an amount not to exceed U.S.$15,000,000 for the period from the Effective Date through December 31, 2009 and U.S.$15,000,000 for each subsequent Fiscal Year, (vii) any professional fees and other costs and expenses incurred in such period connection with the Cases, (viii) any non-cash income or non-cash gains (including any unrealized foreign exchange gains) and (ix) any realized foreign exchange gains or losses related to conversion of Loans made hereunder into local currencies.

"Consolidated Liquidity" shall mean, on any date, (a) the fair market value on such date of unrestricted cash and cash equivalents held in securities accounts of the U.S. Borrower and its Subsidiaries, (b) the amount of unrestricted available funds held on such date in bank deposit accounts of the U.S. Borrower and its Subsidiaries and (c) the proportionate amount of cash owned by any Existing Joint Venture (determined on the basis of the proportionate ownership interest of the U.S. Borrower and its Subsidiaries in such Existing Joint Venture), to the extent that such amount is immediately and unconditionally available to the U.S. Borrower and its Subsidiaries on such date, in each case subject to no Liens other than (i) Liens in favor of the Secured Creditors pursuant to the Security Documents, (ii) Liens in favor of the Secured Creditors (as such term is defined in the Prepetition Facility) pursuant to the Prepetition Security Documents and (iii) Liens permitted by Section 10.02(a)(xvii).

9

"Consolidated Net Income" shall mean, for any period, the net income or loss of the U.S. Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with U.S. GAAP (adjusted to reflect any charge, tax or expense incurred or accrued by Holdings during such period as though such charge, tax or expense had been incurred by the U.S. Borrower, to the extent that the U.S. Borrower has made or is permitted under the Credit Documents to make any payment to or for the account of Holdings in respect thereof), provided that (a) there shall be excluded from Consolidated Net Income (i) the income of any Subsidiary of the U.S. Borrower to the extent that the declaration or payment of dividends or other distributions by such Subsidiary of that income is not at the time permitted by a Requirement of Law (other than as a result of the Cases) or any agreement or instrument applicable to such Subsidiary, except to the extent of the amount of cash dividends or other cash distributions actually paid to the U.S. Borrower or any of its Subsidiaries during such period (unless the income of the Subsidiary receiving such dividend or distribution would be excluded from Consolidated Net Income pursuant to this proviso) and (ii) the income or loss of any Person accrued prior to the date it becomes a Subsidiary of the U.S. Borrower or is merged into or consolidated with the U.S. Borrower or any of its Subsidiaries or the date that such Person's assets are acquired by the U.S. Borrower or any of its Subsidiaries and (b) there shall be included in Consolidated Net Income the income of any Permitted Joint Venture to the extent of the amount of cash dividends or other cash distributions actually paid by such Permitted Joint Venture to the U.S. Borrower or any of its Subsidiaries during such period (unless the income of the Subsidiary receiving such dividend or distribution would be excluded from Consolidated Net Income pursuant to clause (a) above).

"Consummation Date" shall mean the first date on which both (i) a Plan of Reorganization or a plan of liquidation under Chapter 11 of the Bankruptcy Code that is confirmed pursuant to an order of the Bankruptcy Court and (ii) a CCAA Plan that is approved by the requisite creditors of the Canadian Borrower and the Canadian Court, in the case of any U.S. Debtor or the Canadian Debtor, as the case may be, shall have become effective in accordance with its terms.

"Control" means the possession, directly or indirectly, of the power to (i) direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise or (ii) vote 10% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of a Person. "Controlling" and "Controlled" have meanings correlative thereto.

"Co-Syndication Agent" shall have the meaning provided in the first paragraph of this Agreement and shall include any successor to each of the Co-Syndication Agents appointed pursuant to Section 12.10.

"Credit Agreement Party" shall mean Holdings and each Borrower.

"Credit Documents" shall mean this Agreement, the Notes, each Subsidiaries Guaranty, the Intercompany Subordination Agreement, each Security Document, each Incremental Term Loan Commitment Agreement, the Additional Foreign Borrower Designation Agreement, any German Abstract Acknowledgment and any other guarantees or security documents executed and delivered for the benefit of the Lenders in accordance with the requirements of this Agreement and any other guaranties, pledge agreements or security documents executed and delivered in accordance with the requirements of Sections 9.12 and 9.13.

10

"Credit Event" shall mean the making of a Loan.

"Credit Party" shall mean each U.S. Credit Party, each Canadian Credit Party, each Mexican Credit Party, each Brazilian Credit Party, each Dutch Credit Party and, following the execution and delivery of an Additional Foreign Borrower Designation Agreement, each Additional Foreign Borrower Credit Party.

"DBSI" shall mean Deutsche Bank Securities Inc., in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"DBTCA" shall mean Deutsche Bank Trust Company Americas, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"Debtors" shall mean, collectively, the U.S. Debtors and the Canadian Debtor.

"Debtor Relief Laws" shall mean the Bankruptcy Code (other than under the U.S. Case), the Companies' Creditors Arrangement Act of Canada (other than under the Canadian Case), the Bankruptcy and Insolvency Act of Canada, the Dutch Bankruptcy Act (*Faillissementswet*), the German Insolvency Law, the Spanish Insolvency Code, the Mexican Bankruptcy Law (*Ley de Concursos Mercantiles*) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, compromise, *faillissement (voorlopige)*, *surseance van betaling*, *onderbewindstelling*, *ontbinding*, *concurso mercantil* or similar debtor relief laws (including corporate laws) of the United States, Canada, The Netherlands, Germany, Spain, Brazil, the Czech Republic, Japan, the Republic of Korea, the United Kingdom, India, Poland, Mexico, Australia, Barbados, China, Belgium, Italy or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (including administration, administrative receivership, voluntary arrangement and schemes of arrangement).

"Default" shall mean any event, act or condition, which with notice or lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"DIP Facility" shall have the meaning provided in the Preliminary Statements.

"DIP Lenders' Charge" shall have the meaning provided in the Initial Order.

"Directors' Charge" shall mean a directors' and officers' charge granted over the property, assets and undertaking of the Canadian Borrower by the Canadian Court pursuant to the Initial Order in an aggregate amount not in excess of the amount set forth in the Initial Order.

"Disclosure Statement" shall have the meaning provided in Section 11(x).

11

"Documentation Agent" shall have the meaning provided in the first paragraph of this Agreement and shall include any successor to the Documentation Agent appointed pursuant to Section 12.10.

"Domestic Subsidiary" shall mean, as to any Person, any Subsidiary of such Person incorporated or organized in the United States or any State or territory thereof or the District of Columbia (other than U.S. Finco).

"Dutch BV" shall mean Cooper-Standard Automotive Holdings BV, a company incorporated under the laws of The Netherlands.

"Dutch Credit Party" shall mean each Dutch Subsidiary.

"Dutch Security Agreements" shall have the meaning provided in Section 6.15(e).

"Dutch Subsidiary" shall mean each Subsidiary of Holdings incorporated or organized in The Netherlands or any province or territory thereof.

"Escrow Agreement" shall have the meaning provided in Section 2.01(e).

"Escrowed Amount" shall have the meaning provided in Section 2.01(e).

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Effective Date" shall have the meaning provided in Section 13.10.

"Eligible Transferee" shall mean and include a commercial bank, a mutual fund, an insurance company, a financial institution, a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act), any fund that regularly invests in bank loans or any other "accredited investor" (as defined in Regulation D), but in any event excluding any individual and Holdings and its Subsidiaries and Affiliates. For the avoidance of doubt, neither Holdings, nor any of its Subsidiaries, nor any of their respective Affiliates (including any Permitted Holder that owns 5% or more of the Equity Interests of Holdings) shall be an Eligible Transferee.

"Environmental Laws" shall mean all applicable federal, provincial, state, local and foreign laws (including common law), treaties, regulations, rules, directives, orders, injunctions, decrees, notices or legally binding agreements, in each case issued, promulgated or entered into by any Governmental Authority relating to protection of the environment, natural resources, human health and safety (as relating to Hazardous Materials, the environment or occupational health and safety), or the presence of, Release of, or exposure to, Hazardous Materials.

"Environmental Liability" shall mean liabilities, obligations, damages, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and medical monitoring, investigation or remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or noncompliance with any Environmental Law, (b) the presence, generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

12

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the U.S. Borrower or Subsidiaries of the U.S. Borrower, is treated as a single employer under Section 414(b) or (c) of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than reportable events with respect to which the 30-day notice period has been waived), (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by Holdings, the U.S. Borrower or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, (e) the receipt by Holdings, the U.S. Borrower or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the incurrence by Holdings, the U.S. Borrower or any of their respective ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan or (g) the receipt by Holdings, the U.S. Borrower or any of their respective ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from Holdings, the U.S. Borrower or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar Loans" shall mean each Loan designated as such by the respective Borrower or Borrowers at the time of the incurrence thereof.

"Eurodollar Rate" shall mean, for any Interest Period, the higher of (a) (i) the rate (rounded upwards to the nearest 1/16 of 1%) appearing on the page identified as 'Reuters Libor 01' of the Reuters Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interests rates applicable to U.S. dollar deposits in the London interbank market) for U.S. Dollar deposits of amounts in immediately available funds comparable to the principal amount of the applicable Eurodollar Loan for which the Eurodollar Rate is being determined with maturities comparable to the Interest Period for which such Eurodollar Rate will apply, as of approximately 10:00 A.M. (New York time) on the Interest Determination Date divided by (ii) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves) applicable to any

13

member bank of the Federal Reserve System in respect of Eurocurrency liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D) and (b) 3.0% per annum. The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive and binding on the Borrowers absent manifest error.

"Event of Default" shall have the meaning provided in Section 11.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder.

"Existing Indebtedness Agreements" shall have the meaning provided in Section 6.17.

"Existing Joint Ventures" means joint ventures in respect of which each Borrower or any of their respective Subsidiaries holds any Equity Interests on the Initial Borrowing Date, as set forth on Schedule 8.12.

"Exit Fee" shall have the meaning provided in Section 4.01(c).

"Federal Funds Rate" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent.

"Fees" shall mean all amounts payable pursuant to, or referred to in, Section 4.01.

"FEMA" shall mean the Federal Emergency Management Agency.

"Final Order" shall have the meaning provided in Section 6.25.

"Final Borrowing Date" shall mean the date of the Borrowing of Term Loans under Section 2.01 on the Final Order Entry Date.

"Final Order Entry Date" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Advisors Engagement Agreements" shall have the meaning provided in Section 6.17.

"First Day Orders" means all orders entered by the Bankruptcy Court on the Petition Date or within five Business Days of the Petition Date or based on motions filed on the Petition Date or within five Business Days of the Petition Date, in form and substance satisfactory to the Required Lenders.

14

"Fiscal Quarter" shall mean, for any Fiscal Year, each of (i) the three month period commencing on January 1 of such Fiscal Year and ending on March 31 of such Fiscal Year, (ii) the three month period commencing on April 1 of such Fiscal Year and ending on June 30 of such Fiscal Year, (iii) the three month period commencing on July 1 of such Fiscal Year and ending on September 30 of such Fiscal Year and (iv) the three month period commencing on October 1 of such Fiscal Year and ending on December 31 of such Fiscal Year, as the case may be. For purposes of this Agreement, a reference to the 1st Fiscal Quarter of any Fiscal Year shall be a reference to the period referred to in clause (i) above; a reference to the 2nd Fiscal Quarter of any Fiscal Year shall be a reference to the period referred to in clause (ii) above; a reference to the 3rd Fiscal Quarter of any Fiscal Year shall be a reference to the period referred to in clause (iii) above; and a reference to the 4th Fiscal Quarter of any Fiscal Year shall be a reference to the period referred to in clause (iv) above.

"Fiscal Year" shall mean the fiscal year of the U.S. Borrower and its Subsidiaries ending on December 31 of each calendar year. For purposes of this Agreement, any particular Fiscal Year shall be designated by reference to the calendar year in which the majority of such Fiscal Year falls.

"Foreign Pension Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States of America by Holdings or any one or more of its Subsidiaries primarily for the benefit of employees of Holdings or any of its Subsidiaries residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code, but excluding any Canadian Pension Plan.

"Foreign Pledge Agreements" shall mean and include the Canadian Pledge Agreement, the Brazilian Pledge Agreement, the German Pledge Agreements, the Mexican Amendment to the Equity Interest Pledge Agreement, the Mexican Floating Lien Pledge Agreement and the Local Law Pledge Agreements.

"Foreign Security Document" shall mean each Security Document other than a U.S. Security Document.

"Foreign Subsidiary" shall mean, as to any Person, any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"German Abstract Acknowledgement" means each of (i) that certain German law Abstract Acknowledgment of Indebtedness *(Abstraktes Schuldanerkenntnis)* delivered pursuant to Section 6.14(d) between the Canadian Borrower and the Collateral Agent, (ii) if applicable, that certain German law Abstract Acknowledgment of Indebtedness *(Abstraktes Schuldanerkenntnis)* dated on or about the date of Additional Foreign Borrower Designation Agreement between the Additional Foreign Borrower and the Collateral Agent and (iii) if applicable, any other German law Abstract Acknowledgment of Indebtedness *(Abstraktes Schuldanerkenntnis)* between any Subsidiary of Holdings organized under the laws of Germany and the Collateral Agent.

"German Pledge Agreements" shall have the meaning provided in Section 6.14(d).

15

"German Pledge Intercreditor Agreement" shall mean that certain German Pledge Intercreditor Agreement delivered pursuant to Section 6.14(d) between Holdings, the Borrowers, the Collateral Agent and the "Collateral Agent" (as defined in the Prepetition Facility).

"Global Subsidiaries Guarantor" shall mean each U.S. Subsidiary Guarantor, Mexican Subsidiary, Brazilian Subsidiary and Dutch Subsidiary which executes and delivers a Global Subsidiaries Guaranty, unless and until such time as the respective Subsidiary is released from all of its obligations under its Global Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Global Subsidiaries Guaranty" shall have the meaning provided in Section 6.13(a) and shall include any counterpart thereof and any other substantially identical guaranty executed and delivered by any Domestic Subsidiary, Mexican Subsidiary, Brazilian Subsidiary and Dutch Subsidiary of the U.S. Borrower pursuant to Sections 9.12 or 9.13.

"Governmental Authority" shall mean the government of the United States of America, Canada, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof (including pursuant to any synthetic lease financing), (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party or applicant in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (b) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guarantee (without giving effect to any rights of indemnification, contribution or subrogation), unless such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be such guaranteeing Person's maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guaranteed Creditors" shall mean and include each of the Agents, the Collateral Agent, the Lenders and each Person (other than any Credit Party or any of its Subsidiaries) party to any Post Petition Swap Agreement or Post Petition Cash Management Arrangement to the extent that such Person constitutes a Secured Creditor under any of the Security Documents.

16

"<u>Guarantors</u>" shall mean and include Holdings, the U.S. Borrower and each Subsidiary Guarantor.

"<u>Guaranty</u>" and "<u>Guaranties</u>" shall mean and include the Holdings Guaranty, the U.S. Borrower's Guaranty and each Subsidiaries Guaranty.

"<u>Hazardous Materials</u>" shall mean (i) all petroleum products or byproducts and all other petroleum hydrocarbons, coal ash, radon gas, asbestos or asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (ii) all chemicals, materials, substances or wastes that are prohibited, limited or regulated by or pursuant to any Environmental Law.

"<u>Holdings</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Holdings Guaranteed Obligations</u>" shall mean (i) the principal and interest on each Note issued to each Lender, and all Loans made, under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities (including, without limitation, indemnities, fees and interest thereon) of the Borrowers (or any of them) to each Lender, each Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document and the due performance and compliance by each Borrower with all the terms, conditions and agreements contained in this Agreement and each other Credit Document to which it is a party and (ii) all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities of the U.S. Borrower or any of its Subsidiaries owing under any Post Petition Swap Agreement or Post Petition Cash Management Arrangements entered into by the U.S. Borrower or any of its Subsidiaries with any Guaranteed Creditor so long as such Guaranteed Creditor participates in such Post Petition Swap Agreement, and their subsequent assigns, if any, whether now in existence or hereafter arising, and the due performance and compliance with all terms, conditions and agreements contained therein.

"<u>Holdings Guaranteed Party</u>" shall mean each Borrower and each Subsidiary of Holdings party to any Post Petition Swap Agreement or any Post Petition Cash Management Arrangements with any Secured Creditor.

"<u>Holdings Guaranty</u>" shall mean the guaranty of Holdings pursuant to Section 14.

"<u>Immaterial Subsidiary</u>" means, as of the date of determination, each of Holdings' Subsidiaries that as of such time is not a Credit Party and has consolidated assets with a book value of US$1,000,000 or less and which has consolidated revenues of US$1,000,000 for the most recently ended period of four consecutive fiscal quarters.

"<u>Incremental Facility</u>" shall have the meaning provided in the Preliminary Statements.

"<u>Incremental Term Loan</u>" shall have the meaning provided in Section 2.01(d).

"<u>Incremental Term Loan Borrower</u>" shall mean (x) the U.S. Borrower, with respect to U.S. Borrower Incremental Term Loans, (y) the Canadian Borrower, with respect to Canadian Borrower Incremental Term Loans and (z) the Additional Foreign Borrower, with respect to Additional Foreign Borrower Incremental Term Loans.

17

"Incremental Term Loan Borrowing Date" shall mean the date on which Incremental Term Loans are incurred pursuant to Section 2.01 (d), which date shall be the date of the effectiveness of the respective Incremental Term Loan Commitment Agreement pursuant to which such Incremental Term Loans are to be made.

"Incremental Term Loan Commitment" shall mean, for each Lender, the commitment to make Incremental Term Loans provided by such Lender pursuant to Section 2.15 on the Incremental Term Loan Borrowing Date, in such amount as agreed to by such Lender in the respective Incremental Term Loan Commitment Agreement delivered pursuant to Section 2.15, as the same may be terminated pursuant to Sections 4.03 and/or 11.

"Incremental Term Loan Commitment Agreement" shall mean the Incremental Term Loan Commitment Agreement in the form of Exhibit O (appropriately completed) executed in accordance with Section 2.15.

"Incremental Term Loan Commitment Requirements" shall mean, with respect to any provision of the Incremental Term Loan Commitment on the Incremental Term Loan Borrowing Date, the satisfaction of each of the following conditions: (v) no Default or Event of Default then exists or would result therefrom; (w) the delivery by the relevant Credit Parties of such technical amendments, modifications and/or supplements to the respective Security Documents as are reasonably requested by the Administrative Agent to ensure that the additional Obligations to be incurred pursuant to the Incremental Term Loan Commitments are secured by, and entitled to the benefits of, the relevant Security Documents; (x) the delivery by the U.S. Borrower to the Administrative Agent of an officer's certificate executed by an Authorized Officer of the U.S. Borrower certifying as to compliance with preceding clause (v); (y) the satisfaction of all other conditions precedent that may be set forth in the respective Incremental Term Loan Commitment Agreement and (z) the completion by the Credit Parties of such other actions as the Administrative Agent may reasonably request in connection with the provision of the Incremental Term Loan Commitment (including, without limitation, delivery of officers' certificates, resolutions, evidence of good standing and reasonably satisfactory opinions of counsel).

"Incremental Term Loan Lender" shall have the meaning provided in Section 2.15(b).

"Incremental Term Loan Maturity Date" shall mean the final maturity date set forth for Incremental Term Loans in the Incremental Term Loan Commitment Agreement relating thereto.

"Incremental Term Loan Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Incremental Term Note" shall have the meaning provided in Section 2.05(a).

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such

18

Person in respect of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (f) all obligations of others secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Guarantees by such Person of the obligations of others (to the extent such obligations would constitute "Indebtedness" pursuant to the other clauses of this definition), (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party or applicant in respect of letters of credit and letters of guaranty, (j) the amount of any Permitted Securitizations of such Person and (h) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Initial Borrowing Date" shall mean the date of the Borrowing of Term Loans under Sections 2.01(a) and (b) on or after the Interim Order Entry Date.

"Initial Equity Investors" shall mean Cypress Merchant Banking Partners II L.P., Cypress Merchant Banking II C.V., 55th Street Partners II L.P., Cypress Side-by-Side LLC, GS Capital Partners 2000, L.P., GS Capital Partners 2000 Offshore, L.P., GS Capital Partners 2000 GmbH & Co. KG, GS Capital Partners 2000 Employee Fund, L.P. and Goldman Sachs Direct Investment Fund 2000, L.P.

"Initial Facility" shall have the meaning provided in the Preliminary Statements.

"Initial Order" shall mean the initial order granted by the Canadian Court on August 4, 2009 upon an application made by the Canadian Borrower pursuant to the CCAA, in form and substance satisfactory to the sole discretion of the Required Lenders, as such order may be amended, restated, supplemented or modified from time to time with the consent of the Required Lenders in their sole discretion and in form and substance satisfactory to the sole discretion of the Required Lenders.

"Intercompany Debt" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by Holdings or any Subsidiary of Holdings to Holdings or any other Subsidiary of Holdings.

"Intercompany Note" shall mean a promissory note evidencing intercompany loans made pursuant to Section 10.04(e), in each case duly executed and delivered substantially in the form of Exhibit L, with blanks completed in conformity herewith (or such other form as may be approved by the Administrative Agent or the Required Lenders).

"Intercompany Scheduled Existing Indebtedness" shall have the meaning provided in Section 8.18.

"Intercompany Subordination Agreement" shall have the meaning provided in Section 6.26(b).

19

"Interest Determination Date" shall mean, with respect to any Eurodollar Loan, the second Business Day prior to the commencement of any Interest Period relating to such Eurodollar Loan.

"Interest Period" shall mean, with respect to any Eurodollar Loan, the interest period applicable thereto, as determined pursuant to Section 2.09.

"Interim Order" shall mean the interim order, in form and substance acceptable to the Required Lenders in their sole discretion, (I) authorizing Debtors (A) to obtain post-petition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3)(I) and 364(e) and (B) to utilize cash collateral pursuant to 11 U.S.C. § 363, (II) granting adequate protection to prepetition secured parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (III) scheduling a final hearing pursuant to Bankruptcy Rules 4001(b) and (c) entered by the Bankruptcy Court on or about the date hereof).

"Interim Order Entry Date" shall mean later of the date of the Bankruptcy Court's entry of the Interim Order and the Canadian Court's entry of the Initial Order.

"Investment" shall have the meaning provided in the preamble to Section 10.04.

"Joint Lead Arrangers" shall mean DBSI and General Electric Capital Corporation, each in their capacities as Joint Lead Arrangers and Book Runners.

"Judgment Currency" shall have the meaning provided in Section 13.23(a).

"Judgment Currency Conversion Date" shall have the meaning provided in Section 13.23(a).

"Lazard" shall have the meaning provided in Section 9.18.

"Lazard Engagement Letter" shall have the meaning provided in Section 6.17.

"Leasehold" of any Person shall mean all of the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lender" shall mean and include each financial institution with a Commitment listed on Schedule 1 (as amended from time to time), as well as any Person that becomes a "Lender" hereunder pursuant to Sections 2.13, 2.15 and/or 13.04(b). Unless the context otherwise requires, each reference in this Agreement to a Lender includes each lending office (including any Affiliate of the respective Lender) of the respective Lender designated from time to time pursuant to Section 2.12. For the avoidance of doubt, neither Holdings, nor any of its Subsidiaries, nor any of their respective Affiliates (including any Permitted Holder that owns 5% or more of the Equity Interests of Holdings) shall become a Lender.

"Lender Advisors" shall mean Capstone Advisory Group LLC and Houlihan Lokey Howard & Zukin Capital, Inc. as financial advisors to the Lenders, and other consultants for the Lenders.

20

"Lender Default" shall mean, as to any Lender, (i) the wrongful refusal (which has not been retracted) of such Lender to make available its portion of any Borrowing, (ii) such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, (iii) such Lender having notified the Administrative Agent and/or any Credit Agreement Party (x) that it does not intend to comply with its obligations under Sections 2.01 in circumstances where such non-compliance would constitute a breach of such Lender's obligations thereunder or (y) of the events described in preceding clause (ii), (iv) any Affiliate of such Lender that has Control of such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, (v) any previously cured "Lender Default" of such Lender under this Agreement, unless such Lender Default has ceased to exist for a period of at least 90 consecutive days, or (vi) any default by such Lender with respect to its obligations under any other credit facility to which it is a party and which the Administrative Agent believes in good faith has occurred and is continuing.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien (statutory or other), security trust, deemed trust, charge, preference, priority or other security agreement of any kind or nature whatsoever (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC, PPSA or any similar recording or notice statute, and any lease having substantially the same economic effect as the foregoing).

"Loan" shall mean each Tranche A Term Loan, each Tranche B Term Loan, each Tranche C Term Loan and each Incremental Term Loan.

"Local Law Pledge Agreement" shall have the meaning provided in Section 6.14(f).

"Majority Lenders" of any Tranche shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if all outstanding Obligations of the other Tranches under this Agreement were repaid in full and all Commitments with respect thereto were terminated.

"Management Agreements" shall have the meaning provided in Section 6.17.

"Margin Regulations" shall mean, collectively, Regulation T, Regulation U and Regulation X.

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean any event, development or circumstance that has had, or could reasonably be expected to have, a material adverse effect on (i) the business, assets, liabilities, condition (financial or otherwise) or results of operations or prospects of Holdings, the Borrowers and their respective Subsidiaries, taken as a whole, (ii) the ability of any Credit Party to perform any of its material obligations under any Credit Document or (iii) the validity or enforceability of any of the Credit Documents or the rights and remedies of the Agents and the Lenders hereunder or thereunder.

"Material Contract" shall mean any contract the loss of which, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

21

"Material Indebtedness" shall mean Indebtedness (other than the Loans), or obligations in respect of one or more Post Petition Swap Agreements (if any), of any one or more of Holdings, the Borrowers and the Subsidiaries of the U.S. Borrower in an aggregate principal amount exceeding U.S.$10,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the U.S. Borrower or any Subsidiary of the U.S. Borrower in respect of any Post Petition Swap Agreements (if any) at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the U.S. Borrower or such Subsidiary would be required to pay if such Post Petition Swap Agreement were terminated at such time.

"Material Subsidiary" means, as of the date of determination, each of Holdings' Subsidiaries that as of such time is not an Immaterial Subsidiary.

"Maturity Date" shall mean the date that is the earliest of (a) the date that is 364 days after the Interim Order Entry Date, (b) the Consummation Date, (c) the date that is 30 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date and (d) the date of the acceleration of the Loans under Section 11; provided that, so long as no Default or Event of Default shall have occurred and be continuing as of the then-current Maturity Date or would result therefrom, the Maturity Date may be extended by 90 days at the option of the Borrowers and with the prior consent of the Required Lenders, so long as the Borrowers shall pay a fee on the date of such extension to the Administrative Agent for the account of the Lenders equal to 1.00% of the sum of the then outstanding Loans plus the unused Commitments in effect immediately prior to giving effect to such extension.

"Mediofactor Facility" shall mean, collectively, (1) the factoring agreement dated July 6, 2005 by and between Metzeler Automotive Profile Systems Italy SPA and Intesa Mediofactoring in regards to the accounts receivable of debtor Pinifarina SPA C.F., and (2) the factoring agreement dated July 6, 2005 by and between Metzeler Automotive Profile Systems Italy SPA and Intesa Mediofactoring in regards to the accounts receivable of debtors Case New Holland Italia SPA, Fornitek - SRL, Industria Manifatturiera Articoli Tecnici, Italcab SRL, Plastal SPA, Rieter Automotive Fimit SPA, SV Gomma SRL, Siac SPA and Siccom Societa a Responsabilita' Limitata.

"Mexican Amendment to the Equity Interest Pledge Agreement" shall mean the Amendment to the Equity Interests Pledge Agreement delivered pursuant to Section 6.15(d), among Cooper-Standard Automotive Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, CSA Services Inc., Cooper-Standard Automotive de México, S.A. de C.V., Cooper-Standard Automotive FHS Inc. and Cooper-Standard Automotive Fluid Systems de México, S. de R.L. de C.V., as pledgors, DBTCA, as collateral agent for the Prepetition Lenders, as pledgee and the Collateral Agent, as pledgee, pursuant to which, among other things, the parties thereto shall amend the Mexican Equity Interest Pledge Agreement, to incorporate the Collateral Agent as pledgee and the Holdings Guaranteed Obligations as part of the obligations guaranteed by the first priority Lien and security interest granted by the pledgors, over their respective Mexican Pledged Equity Interests, in favor of DBTCA, as collateral agent for the Prepetition Lenders and the Collateral Agent, acting in the name and for the benefit of the Secured Creditors, as pledgees, in form and substance satisfactory to the Required Lenders.

"Mexican Collateral" shall mean the Mexican Real Estate Properties, the Mexican Pledged Equity Interests, and all other Mexican Property that, in accordance with the Mexican Security Agreements, from time to time is subject to any Lien in favor of the Mexican Collateral Agent or the Collateral Agent, as the case may be.

22

"Mexican Equity Interests Pledge Agreement" shall mean the Amended and Restated Pledge Agreement dated February 15, 2005 (as amended and restated on February 15, 2008), among Cooper-Standard Automotive Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, CSA Services Inc., Cooper-Standard Automotive de México, S.A. de C.V., Cooper-Standard Automotive FHS Inc., and Cooper-Standard Automotive Fluid Systems de México, S. de R.L. de C.V., as pledgors, Deutsche Bank Trust Company Americas, as collateral agent for the Prepetition Lenders, as pledgee, pursuant to which the pledgors created a first priority pledge and security interest over the Mexican Pledged Equity Interests in favor of DBTCA as collateral agent for the Prepetition Lenders, as pledgee, to guaranty the payment obligations derived from the Prepetition Facility.

"Mexican Credit Party" shall mean each Mexican Subsidiary.

"Mexican Floating Lien Pledge Agreement" shall mean each Mexican Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*) delivered pursuant to Section 6.15(d)(iii), among each respective Mexican Credit Party, as pledgors and the Collateral Agent, as pledgee, acting in the name and for the benefit of the Collateral Agent, pursuant to which each respective Mexican Credit Party created a first priority pledge and security interest over their respective Mexican Property, in form and substance satisfactory to the Required Lenders.

"Mexican Pledged Equity Interests" shall mean Equity Interests representing the capital stock of the Mexican Credit Parties pledged pursuant to the Mexican Security Agreements.

"Mexican Property" shall mean with respect to any Mexican Subsidiary, any property, rights or revenues, or interest therein (other than the Mexican Real Estate Properties), owned by such Mexican Subsidiary.

"Mexican Real Estate Properties" shall mean with respect to any Mexican Credit Party, any real estate property located in Mexico owned by such Mexican Credit Party.

"Mexican Security Agreements" shall mean and include the Mexican Floating Lien Pledge Agreement, the Mexican Security Trust Agreement and the Mexican Equity Interests Pledge Agreement (as amended by the Mexican Amendment to the Equity Interests Pledge Agreement), and each pledge or other security agreement entered into pursuant to the terms of this Agreement and governed by the laws of Mexico.

"Mexican Security Trust Agreement" shall mean the Irrevocable Transfer of Title and Security Trust Agreement (*Contrato de Fideicomiso Irrevocable Translativo de Dominio y de Garantía*) delivered pursuant to Section 6.15(d)(ii), among each of the Mexican Credit Parties that own Mexican Real Estate Property, as settlors, the Collateral Agent, as first place beneficiary, and the Mexican Security Trustee, in such capacity, pursuant to which each of the applicable Mexican Credit Parties shall create a first priority Lien and security interest over the Mexican Real Estate Properties, in form and substance satisfactory to the Required Lenders.

"Mexican Security Trustee" shall mean a Mexican financial institution acting as security trustee for purposes of the Mexican Security Trust Agreement.

"Mexican Subsidiary" shall mean each Subsidiary of Holdings incorporated or organized in Mexico.

23

"Minimum Borrowing Amount" shall mean U.S.$5,000,000.

"Monitor" means the monitor appointed pursuant to the Initial Order, being RSM Richter Inc.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgage" shall mean each mortgage, debenture (together with a debenture delivery agreement), deed of trust or deed to secure debt required to be delivered with respect to any Real Property pursuant to the terms of this Agreement, together with any assignment of leases and rents to be executed in connection therewith (as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof).

"Mortgage Policy" shall mean each mortgage title insurance policy (and all endorsements thereto) for each Mortgaged Property required to be delivered pursuant to this Agreement.

"Mortgaged Property" shall mean each Real Property owned by Holdings or any of its Subsidiaries and required to be mortgaged pursuant to this Agreement.

"Multiemployer Plan" shall mean a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is established or maintained in the United States of America.

"Net Proceeds" shall mean, with respect to any event, (a) the cash proceeds received in respect of such event including, without limitation (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty event, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event and (ii) the amount of all taxes paid (or reasonably estimated to be payable) that are directly attributable to such event (as determined reasonably and in good faith by an Authorized Officer) or would result therefrom.

"Non-Defaulting Lender" shall mean each Lender other than a Defaulting Lender.

"Non-U.S. Borrower" means any Borrower that is not a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code).

"Note" shall mean each Tranche A Term Note, each Tranche B Term Note, each Tranche C Term Note and each Incremental Term Note.

"Notice of Borrowing" shall have the meaning provided in Section 2.03(a).

"Notice of Notice of Conversion/Continuation" shall have the meaning provided in Section 2.06.

"Notice Office" shall mean the office of the Administrative Agent located at 60 Wall Street, MS NYC60-4305, New York, NY 10005-2858, or such other office as the Administrative Agent may designate in writing to Holdings and the Lenders from time to time.

24

"Obligation Currency" shall have the meaning provided in Section 13.23(a).

"Obligations" shall mean all (a) advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party and its Subsidiaries arising under any Credit Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding and (b) obligations of any Borrower or any Credit Party arising under any Post Petition Swap Agreement or any Post Petition Cash Management Arrangement. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and of their Subsidiaries to the extent they have obligations under the Credit Documents) include (i) the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party or Subsidiary under any Credit Document and (ii) the obligation of any Credit Party or Subsidiary to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Credit Party or such Subsidiary to the extent originally payable by that Credit Party or Subsidiary.

"Operating Forecast" shall have the meaning provided in Section 9.17(a) and be in form and substance reasonably satisfactory to the Required Lenders.

"Orders" shall mean, collectively, the Interim Order, the Initial Order, the Final Order and any Other CCAA Order.

"Other Auto Supplier Support Program Requirements" shall mean, as to any sale of Receivables and Related Assets by the U.S. Borrower or any of its Subsidiaries to a Program SPV pursuant to an Auto Supplier Support Transaction, (i) the applicable Program SPV shall be party to an Auto Supplier Support Program Credit Agreement (which shall be in full force and effect), (ii) no "Default" or "Event of Default" under, and as defined, in the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party shall have occurred and be continuing, (iii) the Receivables and Related Assets so sold shall constitute "Eligible Receivables" (as defined in the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party), (iv) the sale of such Receivables and Related Assets shall be made in accordance with the relevant Supplier Purchase Agreement (as defined in the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party) and (v) the U.S. Borrower or its relevant Subsidiary shall not be an "Ineligible Supplier" (as defined in the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party).

"Other CCAA Order" shall mean each order, that is in form and substance acceptable to the Required Lenders in their sole discretion, issued by the Canadian Court in the Canadian Case other than the Initial Order that could not reasonably be expected to have an adverse effect on the Lenders, as each such Order may be amended restated, supplemented or modified from time to time with the consent of the Required Lenders in their sole discretion.

"Payment Office" shall mean the office of the Administrative Agent located at 60 Wall Street, MS NYC60-4305, New York, NY 10005-2858, or such other office as the Administrative Agent may designate in writing to Holdings and the Lenders from time to time.

25

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 5002 of ERISA, or any successor thereto.

"Permitted Credit Protection Transaction" shall mean any transaction or series of transactions entered into by the U.S. Borrower or any of its Subsidiaries in connection with the Auto Supplier Support Program pursuant to which it sells Receivables payable by any Qualifying OEM and all Related Assets to a Program SPV established by such Qualifying OEM in exchange for a "payment right" from such Program SPV in an amount equal to the face amount of the Receivables so sold less any discount; provided that (1) the discount shall not exceed 2.0% of the face amount of the Receivables so sold, (2) no other commissions, fees or charges shall be payable by the U.S. Borrower or any of its Subsidiaries in connection with any such transaction, (3) such "payment right" shall be due and payable by the SPV Subsidiary to the U.S. Borrower or its applicable Subsidiary on the same date the payment on the related Receivable so sold is due from the Qualifying OEM (or, if earlier, two business days prior to the maturity date of the Auto Supplier Support Program Credit Agreement to which such Program SPV is a party) and (4) at the time of such sale, the Other Auto Supplier Support Program Requirements are satisfied.

"Permitted Encumbrances" shall mean:

(a) Liens imposed by law for taxes, rates, assessments or other governmental charges or levies the payment of which is not yet due, or for which installments have been paid based on reasonable estimates pending final assessments, or if due, the validity of which is being contested in accordance with Section 9.05 and for which reserves have been taken in accordance with and to the extent required by U.S. GAAP;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers' and other like Liens imposed by law (including Liens of customs and revenue authorities to secure customs duties in connection with the importation of goods), arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in accordance with Section 9.05;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e) judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Section 11;

(f) easements, zoning restrictions, rights-of-way, licenses, permits, reservations, covenants, servitudes, and rights in the nature of easements (including, without limiting the generality of the foregoing, licenses, easements, rights-of-way and rights in the nature of easements for sidewalks, public ways, sewers, drains, gas, steam and water mains or electric light and power, or telephone and telegraph conduits, poles, wires and cables) and land use and building restrictions, by-laws, regulations and ordinances of federal, provincial, regional, state, municipal and other Governmental Authorities, minor defects or irregularities of title and other similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the U.S. Borrower or any Subsidiary of the U.S. Borrower;

26

(g) landlords' and lessors' and other like Liens in respect of rent not in default or being reasonably contested and the rights of any tenant, occupant or licensee under any lease, occupancy agreement or license which do not materially impair the use of the real property subject thereto for the purpose for which it is used by that Person;

(h) reservations, limitations, provisos and conditions expressed in any original grant from the Crown or other grant of real or immovable property, or interests therein; and

(i) the right reserved to or vested in any Governmental Authority by the terms of any lease, license, franchise, grant or permit acquired by that Person or by any statutory provision to terminate any such lease, license, franchise, grant or permit, or to require annual or other payments as a condition to the continuance thereof.

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Holder" shall mean (i) any Initial Equity Investor and any Affiliate of any Initial Equity Investor that is neither an operating company nor a company controlled by an operating company and (ii) any general partner of any of the foregoing.

"Permitted Investments" shall mean:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b) investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c) investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than U.S.$500,000,000;

(d) repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e) money market funds that comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above.

27

"Permitted Joint Venture" shall mean any joint venture listed on Schedule 1-A (a) in which the U.S. Borrower or any Subsidiary of the U.S. Borrower, together with any other Subsidiary of the U.S. Borrower, holds Equity Interests that represents 50% or less of the ordinary voting power and aggregate equity value represented by the issued and outstanding Equity Interests in such joint venture and (b) that is engaged in a business permitted under Section 10.03(b), including the Existing Joint Ventures.

"Permitted Liens" shall have the meaning provided in Section 10.02.

"Permitted Quick Pay Sale" shall mean any transaction or series of transactions entered into by the U.S. Borrower or any of its Subsidiaries in connection with the Auto Supplier Support Program pursuant to which it sells Receivables payable by any Qualifying OEM and all Related Assets to a Program SPV established by such Qualifying OEM in exchange for cash consideration (payable not later than four business days following such sale) in an amount equal to the face amount of the Receivables so sold less any discount; provided that (i) the discount shall not exceed 3% of the face amount of the Receivables so sold, (ii) no other commissions, fees or charges shall be payable by the U.S. Borrower or any of its Subsidiaries in connection with any such transaction, (iii) the sum of the face amount of the Receivables offered for sale but for which payment has not yet been received (and intended to qualify as "Permitted Quick Pay Sales" pursuant to this definition) shall not exceed U.S.$50,000,000 in the aggregate outstanding at any given time and (iv) at the time of such sale, the Other Auto Supplier Support Program Requirements are satisfied.

"Permitted Securitization" shall mean any transaction or series of transactions that may be entered into by any Foreign Subsidiary (other than the Canadian Credit Parties) of the U.S. Borrower pursuant to which it may sell, convey, contribute to capital or otherwise transfer (which sale, conveyance, contribution to capital or transfer may include or be supported by the grant of a security interest) Receivables or interests therein and all collateral securing such Receivables, all contracts and contract rights, purchase orders, security interests, financing statements or other documentation in respect of such Receivables, any guarantees, indemnities, warranties or other obligations in respect of such Receivables, any other assets that are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving receivables similar to such Receivables and any collections or proceeds of any of the foregoing (collectively, the "Related Assets") (i) to a trust, partnership, corporation or other Person (other than the U.S. Borrower or any Subsidiary of the U.S. Borrower, other than a SPE Subsidiary), which transfer is funded in whole or in part, directly or indirectly, by the incurrence or issuance by the transferee or any successor transferee of Indebtedness, fractional undivided interests or other securities that are to receive payments from, or that represent interests in, the cash flow derived from such Receivables and Related Assets or interests in such Receivables and Related Assets, or (ii) directly to one or more investors or other purchasers (other than the U.S. Borrower or any Subsidiary of the U.S. Borrower), it being understood that a Permitted Securitization may involve (A) one or more sequential transfers or pledges of the same Receivables and Related Assets, or interests therein (such as a sale, conveyance or other transfer to an SPE Subsidiary followed by a pledge of the transferred Receivables and Related Assets to secure Indebtedness incurred by the SPE Subsidiary), and all such transfers, pledges and Indebtedness incurrences shall be part of and constitute a single Permitted Securitization, and (B) periodic transfers or pledges of Receivables and/or revolving transactions in which new Receivables and Related Assets, or interests therein, are transferred or pledged upon collection of previously transferred or pledged Receivables and Related Assets, or interests therein, provided that (x) any such transactions shall provide for recourse to such Foreign Subsidiary of the U.S. Borrower (other than any SPE Subsidiary) or the U.S. Borrower (as applicable) only in respect of the cash flows in respect of such Receivables and Related

28

Assets and to the extent of other customary securitization undertakings in the jurisdiction relevant to such transactions and (y) the aggregate amount of all such transactions constituting "Permitted Securitizations" shall not exceed U.S.$75,000,000 at any time outstanding. The "amount" or "principal amount" of any Permitted Securitization shall be deemed at any time to be (1) the aggregate principal, or stated amount, of the Indebtedness, fractional undivided interests (which stated amount may be described as a "net investment" or similar term reflecting the amount invested in such undivided interest) or other securities incurred or issued pursuant to such Permitted Securitization, in each case outstanding at such time, or (2) in the case of any Permitted Securitization in respect of which no such Indebtedness, fractional undivided interests or securities are incurred or issued, the cash purchase price paid by the buyer in connection with its purchase of Receivables less the amount of collections received by the U.S. Borrower or any Subsidiary of the U.S. Borrower in respect of such Receivables and paid to such buyer, excluding any amounts applied to purchase fees or discount or in the nature of interest. Each Lender authorizes each of the Administrative Agent and Collateral Agent to enter into an intercreditor agreement in respect of each Permitted Securitization from time to time in effect and to take all actions it deems appropriate or necessary in connection with any such intercreditor agreement. Notwithstanding the foregoing, in no event shall any Auto Supplier Support Transaction constitute (or qualify as) a "Permitted Securitization".

"Person" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" shall have the meaning specified in the Preliminary Statements.

"Plan" shall mean any employee pension benefit plan established or maintained in the United States of America subject to the provisions of Title IV or Section 302 of ERISA or Section 412 of the Code, and in respect of which Holdings or a Subsidiary of Holdings or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization" shall have the meaning provided in Section 11(x).

"Plan Termination Event" shall have the meaning provided in Section 11(l).

"Pledge Agreement Collateral" shall mean all U.S. Pledge Agreement Collateral and all other Equity Interests or other property similar to that pledged (or purported to have been pledged) pursuant to the U.S. Pledge Agreement which is pledged (or purported to be pledged) pursuant to one or more Canadian Pledge Agreements, Local Law Pledge Agreements, other Foreign Security Documents or Additional Security Documents.

"Pledge Agreements" shall mean the U.S. Pledge Agreement and each Foreign Pledge Agreement.

29

"Post Petition Cash Management Arrangements" shall mean any agreement or arrangement entered into after the Petition Date with Bank of America, N.A. (or its Affiliates) or other Secured Creditors providing for treasury, depository and/or cash management services (including corporate credit card services) or any automated clearing house transfer services (including customary overdraft lines), to the extent the payment obligations of the U.S. Borrower and its Subsidiaries under all such agreements or arrangements do not exceed (i) in the case of such agreements or arrangements entered into with Bank of American, N.A. (or its Affiliates), U.S.$5,500,000 in the aggregate at any time outstanding or (ii) in the case of all other agreements or arrangements entered into with other Secured Creditors, U.S.$2,500,000 in the aggregate at any time outstanding.

"Post Petition Swap Agreement" shall mean any Swap Agreement entered into after the Petition Date with a Lender.

"PPSA" shall mean the Personal Property Security Act (Ontario) and the regulations thereunder and any other personal property security legislation and applicable regulations of any other province or territory of Canada where a Canadian Credit Party has, from time to time, tangible personal property, in each case, as may be amended from time to time and includes any successor legislation.

"Preferred Equity" as applied to the Equity Interests of any Person, shall mean Equity Interests of such Person (other than common stock of such Person) of any class or classes (however designed) that ranks prior, as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of such Person, to Equity Interests of any other class of such Person.

"Prepetition Agent" shall mean Deutsche Bank Trust Company Americas, as administrative agent and collateral agent under the Prepetition Facility.

"Prepetition Facility" shall mean that certain Credit Agreement, dated as of December 23, 2004 (as amended, restated, supplemented or otherwise modified from time to time, including by that certain First Amendment and Consent to Credit Agreement, dated February 1, 2006, that certain Second Amendment to Credit Agreement, dated July 26, 2007, that certain Third Amendment and Waiver to Credit Agreement, dated December 18, 2008, that certain Fourth Amendment to Credit Agreement, dated May 15, 2009 and that certain Fifth Amendment to the Credit Agreement, dated July 14, 2009), among Holdings, Cooper-Standard Automotive Inc., Cooper-Standard Automotive Canada Limited, Cooper-Standard Automotive International Holdings B.V. (f/k/a Steffens Beheer BV), the "Lenders" (as defined therein) from time to time party thereto, the Prepetition Agent, as administrative agent for the "Lenders" and the other agents party thereto.

"Prepetition Facility Amendment" shall mean that certain Fifth Amendment and Consent to Credit Agreement dated as of July 14, 2009, between Holdings, Cooper-Standard Automotive Inc., Cooper-Standard Automotive Canada Limited, Cooper-Standard Automotive International Holdings B.V. (f/k/a Steffens Beheer BV), the lenders party thereto and the Prepetition Agent.

"Prepetition Lenders" shall mean the "Lenders" (as defined therein) under the Prepetition Facility.

"Prepetition Loan Documents" shall mean the Prepetition Facility and the "Credit Documents" as defined in the Prepetition Facility.

30

"Prepetition Obligations" shall mean the "Obligations" as defined in the Prepetition Facility.

"Prepetition Security Documents" shall mean the "Security Documents" as defined in the Prepetition Facility.

"Prime Lending Rate" shall mean the rate which DBTCA (or another bank of recognized standing reasonably selected by the Administrative Agent) announces from time to time as its prime lending rate to commercial borrowers in the United States (in the case of Base Rate Loans to the U.S. Borrower) or Canada (in the case of Base Rate Loans to the Canadian Borrower), as the case may be, the Prime Lending Rate to change when and as such prime lending rate changes. The Prime Lending Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. DBTCA may make commercial loans or other loans at rates of interest at, above or below the Prime Lending Rate.

"Priority Payables" means, with respect to any Person, any amount payable by such Person solely to the extent that it is secured by a Lien which ranks or is capable of ranking prior to or pari passu with the Liens created by the Security Documents, including amounts which are owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, tax payable pursuant to Part IX of the Excise Tax Act (Canada) (net of GST input credits), income tax, workers compensation, government royalties, pension fund obligations, Canada Pension Plan obligations and overdue taxes.

"Program SPV" shall mean (i) GM Supplier Receivables, LLC, a Delaware limited liability company, (ii) Chrysler Receivables SPV LLC, a Delaware limited liability company and (iii) any other special purpose, bankruptcy remote, vehicle established by a Qualifying OEM in connection with an Auto Supplier Support Program.

"Qualified Preferred Stock" shall mean Preferred Equity of Holdings that (a) is issued at an aggregate purchase price no less than its aggregate liquidation preference, (b) does not require any payment of dividends (other than in additional shares of such preferred stock) prior to the date that is one year after the Maturity Date, (c) is not mandatorily redeemable pursuant to a sinking fund obligation or otherwise prior to the date that is one year after the Maturity Date, (d) contains no maintenance covenants, other covenants materially adverse to the Lenders or remedies (other than voting rights and increases in pay-in-kind dividends) and (e) is convertible only into common equity of Holdings or securities that would constitute Qualified Preferred Stock.

"Qualifying OEM" shall mean any original equipment manufacturer taking part in the Auto Supplier Support Program, including, without limitation, General Motors Corporation, a Delaware corporation, and Chrysler, LLC, a Delaware limited liability company.

"Quarterly Payment Date" shall mean the last Business Day of each March, June, September and December.

"Real Property" of any Person shall mean all of the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

31

"Receivables" shall mean accounts receivable (including all rights to payment created by or arising from the sales of goods, leases of goods or the rendition of services, no matter how evidenced (including in the form of chattel paper) and whether or not earned by performance).

"Recovery Event" shall mean the receipt by Holdings or any of its Subsidiaries of any insurance or condemnation proceeds payable (i) by reason of theft, physical destruction or damage or any other similar event with respect to any properties or assets of Holdings or any of its Subsidiaries, (ii) by reason of any condemnation, taking, seizing or similar event with respect to any properties or assets of Holdings or any of its Subsidiaries and (iii) under any policy of insurance required to be maintained under Section 9.07.

"Register" shall have the meaning provided in Section 13.17.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from to time in effect and any successor to all or any portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or any portion thereof.

"Reinvestment Deferred Amount" shall mean, with respect to any Reinvestment Event, the aggregate Net Proceeds received by Holdings or any of its Subsidiaries in connection therewith that are not applied to prepay the Loans pursuant to Section 5.02(c) or (e) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event" shall mean any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice" shall mean a written notice executed by an Authorized Officer stating that no Event of Default has occurred and is continuing and that the U.S. Borrower (directly or indirectly through a Wholly-Owned Subsidiary) intends and expects to use all or a specified portion of the Net Proceeds of an Asset Sale or Recovery Event in the business of the U.S. Borrower and its Subsidiaries (it being understood that any portion of such Net Proceeds not used as aforesaid shall be subject to the mandatory prepayment requirements of Sections 5.02(c) and (e)).

"Reinvestment Prepayment Amount" shall mean, with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the business of the U.S. Borrower and its Subsidiaries.

"Reinvestment Prepayment Date" shall mean, with respect to any Reinvestment Event, the earlier of (a) the date occurring 180 days after such Reinvestment Event and (b) the date on which the U.S. Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the business of the U.S. Borrower and its Subsidiaries with all or any portion of the relevant Reinvestment Deferred Amount.

"Related Assets" shall have the meaning provided in the definition of Permitted Securitization.

"Release" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Remaining Present Value" shall mean, as of any date with respect to any lease, the present value as of such date of the scheduled future lease payments with respect to such lease, determined with a discount rate equal to a market rate of interest for such lease reasonably determined at the time such lease was entered into.

"Replaced Lender" shall have the meaning provided in Section 2.13.

"Replacement Lender" shall have the meaning provided in Section 2.13.

"Required Appraisal" shall have the meaning provided in Section 9.13(d).

"Required Lenders" shall mean Non-Defaulting Lenders, the sum of whose outstanding principal of Loans (or, if prior to the occurrence of the Credit Events on the Initial Borrowing Date, whose Tranche A Term Loan Commitments and Tranche B Term Loan Commitments) as of any date of determination represent greater than 50% of the sum of all outstanding principal of Loans (or if prior to the occurrence of the Credit Events on the Initial Borrowing Date, the sum of all Tranche A Term Loan Commitments and Tranche B Term Loan Commitments) of Non-Defaulting Lenders at such time.

"Requirement of Law" shall mean, with respect to any Person, (i) the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person and (ii) any statute, law, treaty, rule, regulation, order, decree, writ, injunction or determination of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted" shall mean, when referring to cash or Permitted Investments of the U.S. Borrower or any of its Subsidiaries, that such cash or Permitted Investments (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the U.S. Borrower or of any such Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder), (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors or (iii) are not otherwise generally available for use by the U.S. Borrower or such Subsidiary.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, any Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings, any Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in Holdings, any Borrower or any Subsidiary.

33

"Restructuring Charges" shall mean charges in respect of restructurings, plant closings, headcount reductions or other similar actions, including severance charges in respect of employee terminations.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw Hill, Inc.

"Sale and Leaseback Transaction" shall have the meaning provided in Section 10.06.

"Scheduled Existing Indebtedness" shall mean Third Party Scheduled Existing Indebtedness and Intercompany Scheduled Existing Indebtedness.

"Scheduled Repayment" shall mean any Tranche A Term Loan Scheduled Repayment, Tranche B Term Loan Scheduled Repayment, Tranche C Term Loan Scheduled Repayment and/or Incremental Term Loan Scheduled Repayment, as applicable.

"SEC" shall mean the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Section 5.04(b)(ii) Certificate" shall have the meaning provided in Section 5.04(b)(ii).

"Secured Creditor" shall mean each applicable "Secured Creditor", as defined in any applicable Security Document.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Agreements" shall mean the U.S. Security Agreement, the Canadian Security Agreement, the Brazilian Security Agreement, the Dutch Security Agreements and the Mexican Security Trust Agreement.

"Security Document" shall mean and include each of the Security Agreements, the Pledge Agreements, each Mortgage and, after the execution and delivery thereof, each Additional Security Document and all other mortgages, pledge agreements, security agreements and other security documents entered into from time to time pursuant to Sections 9.12 and/or 9.13 and/or as required by the Additional Foreign Borrower Designation Agreement, in each case as the same may be modified, supplemented or amended from time to time in accordance with the terms hereof and thereof.

"Shareholders' Agreements" shall have the meaning provided in Section 6.17.

"SPE Subsidiary" shall mean any Wholly-Owned Subsidiary formed solely for the purpose of, and that engages only in, one or more Permitted Securitizations.

"Sponsor" shall mean, collectively, The Cypress Group L.L.C. and GS Capital Partners 2000, L.P.

34

"Subsidiaries Guaranty" shall mean and include the Global Subsidiaries Guaranty, the Canadian Subsidiaries Guaranty and any other guaranty executed and delivered by any Subsidiary of the U.S. Borrower pursuant to Sections 9.12 and/or 9.13 and/or as required by the Additional Foreign Borrower Designation Agreement.

"Subsidiary" of any Person shall mean and include (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through one or more Subsidiaries of such Person and (ii) any partnership, association, limited liability company, joint venture or other entity (other than a corporation) in which such Person directly or indirectly through one or more Subsidiaries of such Person, has more than a 50% Equity Interest at the time.

"Subsidiary Guarantor" shall mean each Subsidiary of Holdings that executes and delivers any Subsidiaries Guaranty, unless and until such time as the respective Subsidiary is released from all of its obligations under any relevant Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Supermajority Lenders" of any Tranche shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if (x) all outstanding Obligations of the other Tranches under this Agreement were repaid in full and all Commitments with respect thereto were terminated and (y) the percentage "50%" contained therein were changed to "66-2/3%."

"Superpriority Claim" shall mean a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the U.S. Borrower or any of its Subsidiaries shall be a Swap Agreement.

"Tax Allocation Agreements" shall have the meaning provided in Section 6.17.

"Tax Distribution" shall mean, in the event that Holdings and the U.S. Borrower become pass-through or disregarded entities for U.S. federal income tax purposes, a distribution to Holdings to the extent the proceeds of such distribution are distributed to the holders of Equity Interests of Holdings in any taxable year to enable such holders to pay their Tax liability on their respective shares of cumulative taxable income attributable to Holdings for such year.

"Taxes" shall have the meaning provided in Section 5.04(a).

"Term Loans" shall mean and include Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans and each Incremental Term Loan.

35

"Third Party Scheduled Existing Indebtedness" shall have the meaning provided in Section 8.18.

"Total Commitment" shall mean, at any time, the sum of the Total Tranche A Term Loan Commitment, the Total Tranche B Term Loan Commitment, the Total Tranche C Term Loan Commitment and the Total Incremental Term Loan Commitment.

"Total Incremental Term Loan Commitment" shall mean, at any time, the sum of the Incremental Term Loan Commitments of each of the Lenders with such a Commitment at such time.

"Total Tranche A Term Loan Commitment" shall mean, at any time, the sum of the Tranche A Term Loan Commitments of each of the Lenders with such a Commitment at such time. The initial amount of the Total Tranche A Term Loan Commitment shall be U.S.$125,000,000.

"Total Tranche B Term Loan Commitment" shall mean, at any time, the sum of the Tranche B Term Loan Commitments of each of the Lenders with such a Commitment at such time. The initial amount of the Total Tranche B Term Loan Commitment shall be U.S.$50,000,000.

"Total Tranche C Term Loan Commitment" shall mean, at any time, the sum of the Tranche C Term Loan Commitments of each of the Lenders with such a Commitment at such time.

"Tranche" shall mean the respective facilities and commitments utilized in making Loans hereunder (i.e., whether Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans or Incremental Term Loans made pursuant to one or more tranches designated pursuant to the respective Incremental Term Loan Commitment Agreements in accordance with the relevant requirements specified in Section 2.15); provided that in the circumstances contemplated by Section 2.15(c), Incremental Term Loans may be made part of a then existing Tranche of Term Loans.

"Tranche A Term Loan" shall have the meaning provided in Section 2.01(a).

"Tranche A Term Loan Commitment" shall mean, with respect to each Lender, the amount set forth opposite such Lender's name in Schedule 1 directly below the column entitled "Tranche A Term Loan Commitment", as the same may be (i) reduced pursuant to Section 4.03(c) or (ii) terminated pursuant to Section 4.03 and/or 11.

"Tranche A Term Loan Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Tranche A Term Note" shall have the meaning provided in Section 2.05(a).

"Tranche A TL Lender" shall mean any Lender with a Tranche A Term Loan Commitment or outstanding Tranche A Term Loans.

"Tranche B Term Loan" shall mean have the meaning provided in Section 2.01(b).

"Tranche B Term Loan Commitment" shall mean, with respect to each Lender, the amount set forth opposite such Lender's name in Schedule 1 directly below the column entitled "Tranche B Term Loan Commitment", as the same may be (i) reduced pursuant to Section 4.03(c) or (ii) terminated pursuant to Sections 4.03 and/or 11.

36

"Tranche B Term Loan Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Tranche B Term Note" shall have the meaning provided in Section 2.05(a).

"Tranche B TL Lender" shall mean any Lender with a Tranche B Term Loan Commitment or outstanding Tranche B Term Loans.

"Tranche C Term Loan" shall mean have the meaning provided in Section 2.01(c).

"Tranche C Term Loan Commitment" shall mean, with respect to each Lender, (i) prior to the delivery of an executed Additional Foreign Borrower Designation Agreement, zero and (ii) after the execution and delivery an Additional Foreign Borrower Designation Agreement, the amount set forth opposite such Lender's name in Schedule 1 to the Additional Foreign Borrower Designation Agreement directly below the column entitled "Tranche C Term Loan Commitment" (which amount shall equal such Lender's pro rata portion (determined as the percentage that the aggregate of such Lender's Tranche A Term Loan Commitment and Tranche B Term Loan Commitment bears to the aggregate Total Tranche A Term Loan Commitment and Total Tranche B Term Loan Commitment immediately prior to the effectiveness of such Additional Foreign Borrower Designation Agreement) of the Total Tranche C Term Loan Commitment as set forth on said Schedule I), in each case as the same may be terminated pursuant to Sections 4.03 and/or 11.

"Tranche C Term Loan Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Tranche C Term Note" shall have the meaning provided in Section 2.05(a).

"Tranche C TL Lender" shall mean any Lender with a Tranche C Term Loan Commitment or outstanding Tranche C Term Loans.

"Transaction" shall mean, collectively, (i) the entering into of the Credit Documents and the incurrence of Loans, (ii) the commencement of the Cases, (iii) the entering into of the Prepetition Facility Amendment, (iv) all intercompany loans, equity contributions, repayments of intercompany loans, dividends, distributions and other intercompany Investments related to the foregoing and (v) the payment of all fees and expenses in connection with the foregoing.

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a Eurodollar Loan.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the relevant jurisdiction.

"Unrestricted" shall mean, when referring to cash or Permitted Investments of the U.S. Borrower or any of its Subsidiaries, that such cash or Permitted Investments are not Restricted.

"Unscheduled Third Party Indebtedness" shall have the meaning provided in Section 6.11.

"U.S." or "United States" shall mean the United States of America.

37

"U.S. Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"U.S. Borrower Guaranteed Obligations" shall mean (i) the principal and interest on each Tranche B Term Note, each Tranche C Term Note, each Incremental Term Note issued by the Canadian Borrower to each Lender, each Incremental Term Note issued by the Additional Foreign Borrower to each Lender, each Tranche B Term Loan, each Tranche C Term Loan, each Incremental Term Loan made to the Canadian Borrower and each Incremental Term Loan made to the Additional Foreign Borrower, under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities (including, without limitation, indemnities, fees and interest thereon) of the Canadian Borrower and the Additional Foreign Borrower to each Lender, each Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement or any other Credit Document and the due performance and compliance by the Canadian Borrower and the Additional Foreign Borrower with all the terms, conditions and agreements contained in the Credit Documents to which it is a party and (ii) all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities of each Subsidiary of the U.S. Borrower owing under each Post Petition Swap Agreement or Post Petition Cash Management Arrangement entered into by each Subsidiary of the U.S. Borrower with any Guaranteed Creditor so long as such Guaranteed Creditor participates in such Post Petition Swap Agreement or Post Petition Cash Management Arrangement, and their subsequent assigns, if any, whether now in existence or hereafter arising, and the due performance and compliance with all terms, conditions and agreements contained therein.

"U.S. Borrower Guaranteed Party" shall mean (i) the Canadian Borrower, (ii) the Additional Foreign Borrower and (iii) each Subsidiary of the U.S. Borrower party to any Post Petition Swap Agreement or any Post Petition Cash Management Arrangement with any Secured Creditor.

"U.S. Borrower's Guaranty" shall mean the guaranty of the U.S. Borrower pursuant to Section 15.

"U.S. Borrower Incremental Term Loans" shall mean Incremental Term Loans incurred by the U.S. Borrower.

"U.S. Cases" shall have the meaning provided in the Preliminary Statements.

"U.S. Credit Party" shall mean Holdings, the U.S. Borrower and each U.S. Subsidiary Guarantor.

"U.S. Debtors" shall have the meaning provided in the Preliminary Statements.

"U.S. Dollar Equivalent" of an amount denominated in a currency other than U.S. Dollars shall mean, at any time for the determination thereof, the amount of U.S. Dollars which could be purchased with the amount of such currency involved in such computation at the spot exchange rate therefor as quoted by the Administrative Agent as of 11:00 A.M. (New York time) on the date two Business Days prior to the date of any determination thereof for purchase on such date (or, in the case of any determination pursuant to Section 13.23, at the date of determination). Notwithstanding anything to the contrary contained in this definition, at any time that a Default or an Event of Default then exists, the Administrative Agent may revalue the U.S. Dollar Equivalent of any amounts outstanding under the Credit Documents in a currency other than U.S. Dollars in its sole discretion.

38

"U.S. Dollars", "Dollars" and the sign "U.S. $" shall each mean freely transferable lawful money of the United States of America.

"U.S. Finco" shall mean CS Automotive LLC, a limited liability company organized under the laws of the State of Delaware.

"U.S. GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time; provided that determinations made pursuant to this Agreement in accordance with U.S. GAAP are subject (to the extent provided therein) to Section 13.07(a).

"U.S. Pledge Agreement" shall have the meaning provided in Section 6.14(a).

"U.S. Pledge Agreement Collateral" shall mean all of the "Collateral" as defined in the U.S. Pledge Agreement.

"U.S. Security Agreement" shall have the meaning provided in Section 6.15(a).

"U.S. Security Documents" shall mean and include the U.S. Security Agreement, the U.S. Pledge Agreement, each Mortgage covering a Mortgaged Property located in the United States or any State or territory thereof and each other Security Document covering assets of a U.S. Credit Party situated in the United States or any State or territory thereof.

"U.S. Subsidiary Guarantor" shall mean (i) each Wholly-Owned Domestic Subsidiary of Holdings as of the Initial Borrowing Date (other than the U.S. Borrower) and (ii) each other Wholly-Owned Domestic Subsidiary of Holdings created, established or acquired after the Initial Borrowing Date which executes and delivers a Global Subsidiaries Guaranty, unless and until such time as the respective Domestic Subsidiary is released from all of its obligations under its Global Subsidiaries Guaranty in accordance with the terms and provisions thereof.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing (i) the then outstanding principal amount of such Indebtedness into (ii) the product obtained by multiplying (x) the amount of each then remaining installment or other required scheduled payments of principal, including payment at final maturity, in respect thereof, by (y) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person that is a Domestic Subsidiary of such Person.

"Wholly-Owned Foreign Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock (other than director's qualifying shares and/or other nominal amounts of shares required by applicable law to be held by Persons other than such Person) is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% Equity Interest at such time.

39

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in ERISA.

"Written" (whether lower or upper case) or "in writing" shall mean any form of written communication or a communication by means of telex, facsimile device, telegraph or cable.

SECTION 2. Amount and Terms of Credit.

2.01 Commitments.

(a) Tranche A Term Loans. Subject to and upon the terms and conditions set forth herein, each Lender with a Tranche A Term Loan Commitment severally agrees to make a term loan (each, a "Tranche A Term Loan" and, collectively, the "Tranche A Term Loans") to the U.S. Borrower, which Tranche A Term Loans:

(i) shall be incurred by the U.S. Borrower pursuant to a single drawing on the Initial Borrowing Date in an aggregate principal amount equal to the lesser of U.S.$35,000,000 and such other amount as may be approved in the Interim Order and a single drawing on the Final Borrowing Date in an aggregate principal amount not exceeding the amount of the Total Tranche A Term Loan Commitment on such date (determined after giving effect to any reduction thereof on such date pursuant to Section 4.03(c) but before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) minus the aggregate principal amount of Tranche A Term Loans borrowed on the Initial Borrowing Date, in each case for the purposes described in Section 9.11(a); provided that, if on or prior to the Final Borrowing Date (x) an Additional Foreign Borrower Designation Agreement is not executed and delivered by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent as directed by the Required Lenders or (y) all conditions set forth therein shall not have been satisfied as determined by the Required Lenders in their sole discretion, in no event shall the aggregate principal amount of Tranche A Term Loans made on the Final Borrowing Date plus the aggregate principal amount of Tranche B Term Loans made on the Final Borrowing Date exceed U.S.$75,000,000, unless otherwise agreed by the Required Lenders;

(ii) shall be denominated in U.S. Dollars;

(iii) except as hereafter provided, shall, at the option of the U.S. Borrower, be incurred and maintained as Base Rate Loans or Eurodollar Loans, provided that, except as otherwise specifically provided in Section 2.10(b), all Tranche A Term Loans made as part of the same Borrowing shall at all times consist of Tranche A Term Loans of the same Type; and

40

(iv) shall be made by each Lender in an aggregate principal amount not in excess of (x) in the case of the Borrowing on the Initial Borrowing Date, the Tranche A Term Loan Commitment of such Lender on the Initial Borrowing Date (determined before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) and (y) in the case of the Borrowing on the Final Borrowing Date, the Tranche A Term Loan Commitment of such Lender on the Final Borrowing Date (determined after giving effect to any reduction thereof on such date pursuant to Section 4.03(c) but before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)).

Once repaid, Tranche A Term Loans incurred hereunder may not be reborrowed.

(b) <u>Tranche B Term Loans</u>. Subject to and upon the terms and conditions set forth herein, each Lender with a Tranche B Term Loan Commitment severally agrees to make a term loan (each, a "<u>Tranche B Term Loan</u>" and, collectively, the "<u>Tranche B Term Loans</u>") to the Canadian Borrower, which Tranche B Term Loans:

(i) shall be incurred by the Canadian Borrower pursuant to a single drawing on the Initial Borrowing Date in an aggregate principal amount equal to the lesser of U.S.$15,000,000 and such other amount as may be approved in the Initial Order and a single drawing on the Final Borrowing Date in an aggregate principal amount not exceeding the lesser of (A) an amount approved by the Canadian Court pursuant to an amendment, restatement, supplement or modification to the Initial Order (or, if applicable, an Other CCAA Order) for a Borrowing by the Canadian Borrower on the Final Borrowing Date and (B) the amount of the Total Tranche B Term Loan Commitment on such date (determined after giving effect to any reduction thereof on such date pursuant to Section 4.03(c) but before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) minus the aggregate principal amount of Tranche B Term Loans borrowed on the Initial Borrowing Date, in each case for the purposes described in Section 9.11(a); <u>provided</u> that, if on or prior to the Final Borrowing Date (x) an Additional Foreign Borrower Designation Agreement is not executed and delivered by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent as directed by the Required Lenders or (y) all conditions set forth therein shall not have been satisfied as determined by the Required Lenders in their sole discretion, in no event shall the aggregate principal amount of Tranche A Term Loans made on the Final Borrowing Date plus the aggregate principal amount of Tranche B Term Loans made on the Final Borrowing Date exceed U.S.$75,000,000, unless otherwise agreed by the Required Lenders;

(ii) shall be denominated in U.S. Dollars;

(iii) except as hereafter provided, shall, at the option of the Canadian Borrower, be incurred and maintained as Base Rate Loans or Eurodollar Loans, <u>provided</u> that, except as otherwise specifically provided in Section 2.10(b), all Tranche B Term Loans made as part of the same Borrowing shall at all times consist of Tranche B Term Loans of the same Type; and

(iv) shall be made by each Lender in an aggregate principal amount not in excess of (x) in the case of the Borrowing on the Initial Borrowing Date, the Tranche B Term Loan Commitment of such Lender on the Initial Borrowing Date (determined before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) and (y) in the case of the Borrowing on the Final Borrowing Date, the Tranche B Term Loan Commitment of such Lender on the Final Borrowing Date (determined after giving effect to any reduction thereof on such date pursuant to Section 4.03(c) but before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)).

41

Once repaid, Tranche B Term Loans incurred hereunder may not be reborrowed.

(c) <u>Tranche C Term Loans</u>. Subject to and upon the terms and conditions set forth herein, if on or prior to the Final Borrowing Date an Additional Foreign Borrower Designation Agreement is executed and delivered by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent as directed by the Required Lenders and all conditions set forth therein shall have been satisfied as determined by the Required Lenders in their sole discretion, each Lender with a Tranche C Term Loan Commitment severally agrees to make a term loan (each, a "<u>Tranche C Term Loan</u>" and, collectively, the "<u>Tranche C Term Loans</u>") to the Additional Foreign Borrower, which Tranche C Term Loans:

(i) shall be incurred by the Additional Foreign Borrower pursuant to a single drawing on the Final Borrowing Date in an aggregate principal amount equal to the amount of the Total Tranche C Term Loan Commitment on such date (determined before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)) for the purposes described in Section 9.11(a);

(ii) shall be denominated in U.S. Dollars;

(iii) except as hereafter provided, shall, at the option of the Additional Foreign Borrower, be incurred and maintained as Base Rate Loans or Eurodollar Loans, <u>provided</u> that, except as otherwise specifically provided in Section 2.10(b), all Tranche C Term Loans made as part of the same Borrowing shall at all times consist of Tranche C Term Loans of the same Type; and

(iv) shall be made by each Lender in an aggregate principal amount not in excess of, the Tranche C Term Loan Commitment of such Lender on the Final Borrowing Date (determined before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)).

Once repaid, Tranche C Term Loans incurred hereunder may not be reborrowed.

(d) <u>Incremental Term Loans</u>. Subject to and upon the terms and conditions set forth herein, (i) each Lender with an Incremental Term Loan Commitment for a given Tranche of Incremental Term Loans severally agrees, to make a term loan (each, an "<u>Incremental Term Loan</u>" and, collectively, the "<u>Incremental Term Loans</u>") to the Incremental Term Loan Borrower for such Tranche, which Incremental Term Loans:

(i) shall be incurred pursuant to a single drawing for such Tranche on the applicable Incremental Term Loan Borrowing Date for the purposes described in Section 9.11(a);

(ii) shall be denominated in U.S. Dollars;

(iii) shall, except as hereinafter provided, at the option of the Incremental Term Loan Borrower for such Tranche, be incurred and maintained as one Borrowing of Base Rate Loans or Eurodollar Loans, <u>provided</u> that except as otherwise specifically provided in Section 2.10 (b), all such Incremental Term Loans of a given Tranche made as part of the same Borrowing shall at all times consist of Incremental Term Loans of the same Type; and

42

(iv) shall not exceed for any such Incremental Term Loan Lender at any time of any incurrence thereof, the Incremental Term Loan Commitment of such Incremental Term Loan Lender for such Tranche on the respective Incremental Term Loan Borrowing Date (before giving effect to the reduction thereof on such date pursuant to Section 4.03(b)).

Once repaid, Incremental Term Loans may not be reborrowed.

(e) <u>Escrow Arrangement</u>. If on or prior to the Final Borrowing Date, (x) an Additional Foreign Borrower Designation Agreement is not executed and delivered by the U.S. Borrower, the Additional Foreign Borrower and the Administrative Agent as directed by the Required Lenders or (y) all conditions set forth therein shall not have been satisfied as determined by the Required Lenders in their sole discretion, an amount equal to U.S.$50,000,000 (the "<u>Escrowed Amount</u>") shall be funded on the Final Borrowing Date into an interest-bearing escrow account pursuant to an escrow agreement executed by the U.S. Borrower, the Administrative Agent and an escrow agent (which escrow agreement and escrow agent shall be satisfactory to the Required Lenders; such approval not to be unreasonably withheld or delayed) (the "<u>Escrow Agreement</u>") and (i) until the release of the Escrowed Amount from escrow, the U.S. Borrower or, if specified by the U.S. Borrower and the Canadian Borrower on or prior to the Final Borrowing Date and approved by the Canadian Court pursuant to an amendment, restatement, supplement or modification to the Initial Order (or, if applicable, an Other CCAA Order), the Canadian Borrower, shall pay an amount equal to the interest that would be payable on the Escrowed Amount if it were a Eurodollar Loan hereunder (which amount may be reimbursed by the Additional Foreign Borrower to the U.S. Borrower or Canadian Borrower, as applicable, upon their request) and (ii) the Escrowed Amount shall be released from escrow in accordance with the terms and conditions of the Escrow Agreement (A) to the Additional Foreign Borrower as a Tranche C Term Loan, upon satisfaction of the conditions therefor specified in the Additional Foreign Borrower Designation Agreement, (B) if agreed to by the Required Lenders, to the U.S. Borrower as a Tranche A Term Loan or, if specified by the U.S. Borrower and the Canadian Borrower on or prior to the date of such release and approved by the Canadian Court pursuant to an amendment, restatement, supplement or modification to the Initial Order (or, if applicable, an Other CCAA Order), to the Canadian Borrower as a Tranche B Term Loan or (C) to the Administrative Agent for repayment to the Lenders at any time if so requested by the U.S. Borrower, or automatically on the 120th day following the Final Borrowing Date if either of the foregoing releases specified in clauses (A) and (B) have not occurred by such date, it being understood for the avoidance of doubt that the U.S. Borrower shall pay to the Administrative Agent for the account of each Lender a fee on such repaid amounts equal to 1.00% multiplied by such repaid amounts, which fee shall constitute an Exit Fee for purposes of Section 4.01(c) and for all other purposes of the Credit Documents.

2.02 <u>Minimum Borrowing Amounts, etc.</u> The aggregate principal amount of each Borrowing of Loans shall not be less than the Minimum Borrowing Amount applicable to Borrowings of the respective Type and Tranche of Loans to be made or maintained pursuant to the respective Borrowing. More than one Borrowing may be incurred on any day, but at no time shall there be outstanding more than ten (10) Borrowings of Eurodollar Loans.

43

2.03 <u>Notice of Borrowing</u>. (a) Whenever a Borrower desires to make a Borrowing of Loans hereunder, an Authorized Officer of such Borrower shall give the Administrative Agent at its Notice Office at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) of each Base Rate Loan and at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of each Eurodollar Loan, <u>provided</u> that any such notice shall be deemed to have been given on a certain day only if given before 12:00 Noon (New York time) on such day. Each such written notice or written confirmation of telephonic notice (each, a "<u>Notice of Borrowing</u>"), except as otherwise expressly provided in Section 2.10, shall be irrevocable and shall be given by or on behalf of the respective Borrower in the form of <u>Exhibit A-1</u>, appropriately completed to specify: (i) the aggregate principal amount of the Loans to be made pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), (iii) whether the respective Borrowing shall consist of Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans or Incremental Term Loans, (iv) in the case of Incremental Term Loans, the Borrower thereof, and (v) whether the Loans being made pursuant to such Borrowing are to be initially maintained as Base Rate Loans or Eurodollar Loans and, if Eurodollar Loans, the Interest Period to be initially applicable thereto, which shall be three months. The Administrative Agent shall promptly give each Lender which is required to make Loans of the Tranche specified in the respective Notice of Borrowing notice of such proposed Borrowing, of such Lender's proportionate share thereof (determined in accordance with Section 2.07) and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

(b) Without in any way limiting the obligation of each Borrower to confirm in writing any telephonic notice permitted to be given hereunder, the Administrative Agent may, prior to receipt of written confirmation, act without liability upon the basis of any such telephonic notice reasonably believed by the Administrative Agent in good faith to be from an Authorized Officer of such Borrower. In each such case, the Administrative Agent's record of the terms of such telephonic notice shall be conclusive evidence of the contents of such notice, absent manifest error.

2.04 <u>Disbursement of Funds</u>. Not later than 12:00 Noon (New York time) on the date specified in each Notice of Borrowing, each Lender with a Commitment under the respective Tranche will make available its <u>pro rata</u> portion (determined in accordance with Section 2.07) of each such Borrowing requested to be made on such date. All such amounts shall be made available in U.S. Dollars and in immediately available funds at the Payment Office of the Administrative Agent, and the Administrative Agent will make available to the respective Borrower at the Payment Office or such other location as may be reasonably satisfactory to the Administrative Agent and specified in the relevant Notice of Borrowing the aggregate of the amounts so made available by the Lenders prior to 1:00 P.M. (New York time) on such day to the extent of funds actually received by the Administrative Agent prior to such time on such day. Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may, in reliance upon such assumption, make available to the relevant Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the relevant Borrower to pay immediately such corresponding amount to the Administrative Agent and such Borrower shall immediately pay such corresponding amount to the Administrative Agent. The Administrative Agent shall also be entitled to recover on demand from such Lender or the relevant Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the

44

respective Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate and (ii) if recovered from the respective Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.08. Nothing in this Section 2.04 shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the relevant Borrower may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

2.05 <u>Notes</u>. (a) Subject to the provisions of Section 2.05(g), the Borrowers' obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced (i) if Tranche A Term Loans, by a promissory note duly executed and delivered by the U.S. Borrower substantially in the form of <u>Exhibit B-1</u> with blanks appropriately completed in conformity herewith (each, a "<u>Tranche A Term Note</u>" and, collectively, the "<u>Tranche A Term Notes</u>"), (ii) if Tranche B Term Loans, by a promissory note duly executed and delivered by the Canadian Borrower substantially in the form of <u>Exhibit B-2</u> with blanks appropriately completed in conformity herewith (each, a "<u>Tranche B Term Note</u>" and, collectively, the "<u>Tranche B Term Notes</u>"), (iii) if Tranche C Term Loans, by a promissory note duly executed and delivered by the Additional Foreign Borrower substantially in the form of <u>Exhibit B-3</u> with blanks appropriately completed in conformity herewith (each, a "<u>Tranche C Term Note</u>" and, collectively, the "<u>Tranche C Term Notes</u>") and (iv) if Incremental Term Loans, by a promissory note duly executed and delivered by the Incremental Term Loan Borrower for such Tranche substantially in the form of <u>Exhibit B-4</u>, with blanks appropriately completed in conformity herewith (each, an "<u>Incremental Term Note</u>" and, collectively, the "<u>Incremental Term Notes</u>").

(b) The Tranche A Term Note issued to each Lender with a Tranche A Term Loan Commitment or outstanding Tranche A Term Loans shall (i) be executed by the U.S. Borrower, (ii) be payable to such Lender (or an affiliate designated by such Lender) or its registered assigns and be dated the Initial Borrowing Date (or, in the case of any Tranche A Term Note issued after the Initial Borrowing Date, the date of issuance thereof), (iii) be in a stated principal amount (expressed in U.S. Dollars) equal to the Tranche A Term Loan Commitment of such Lender on the Initial Borrowing Date before giving effect to any reductions thereto on such date (or, in the case of any Tranche A Term Note issued after the Initial Borrowing Date, in a stated principal amount (expressed in U.S. Dollars) equal to the sum of the outstanding principal amount of the Tranche A Term Loan of such Lender and the Tranche A Term Loan Commitment of such Lender on the date of the issuance thereof) and be payable in the outstanding principal amount of Tranche A Term Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary repayment as provided in Section 5.01 and mandatory repayment as provided in Section 5.02 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(c) The Tranche B Term Note issued to each Lender with a Tranche B Term Loan Commitment or outstanding Tranche B Term Loans shall (i) be executed by the Canadian Borrower, (ii) be payable to such Lender (or an affiliate designated by such Lender) or its registered assigns and be dated the Initial Borrowing Date (or, in the case of any Tranche B Term Note issued after the Initial Borrowing Date, the date of issuance thereof), (iii) be in a stated principal amount (expressed in U.S. Dollars) equal to the Tranche B Term Loan Commitment of such Lender on the Initial Borrowing Date before giving effect to any reductions thereto on such date (or, in the case of any Tranche B Term Note issued after the Initial Borrowing Date, in a stated principal amount (expressed in U.S.

45

Dollars) equal to the sum of the outstanding principal amount of the Tranche B Term Loan of such Lender and the Tranche B Term Loan Commitment of such Lender on the date of the issuance thereof) and be payable in the outstanding principal amount of Tranche B Term Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary repayment as provided in Section 5.01 and mandatory repayment as provided in Section 5.02 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(d) The Tranche C Term Note issued to each Lender with a Tranche C Term Loan Commitment or outstanding Tranche C Term Loans shall (i) be executed by the Additional Foreign Borrower, (ii) be payable to such Lender (or an affiliate designated by such Lender) or its registered assigns and be dated the Final Borrowing Date (or, in the case of any Tranche C Term Note issued after the Final Borrowing Date, the date of issuance thereof), (iii) be in a stated principal amount (expressed in U.S. Dollars) equal to the Tranche C Term Loan Commitment of such Lender on the Final Borrowing Date before giving effect to any reductions thereto on such date and be payable in the outstanding principal amount of Tranche C Term Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of the Base Rate Loans and Eurodollar Loans, as the case may be, evidenced thereby, (vi) be subject to voluntary repayment as provided in Section 5.01 and mandatory repayment as provided in Section 5.02 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(e) The Incremental Term Note issued to each Lender with an Incremental Term Loan Commitment or outstanding Incremental Term Loans under a given Tranche shall (i) be executed by the Incremental Term Loan Borrower for such Tranche, (ii) be payable to such Lender (or an affiliate designated by such Lender) or its registered assigns and be dated the date of issuance thereof, (iii) be in a stated principal amount (expressed in U.S. Dollars) equal to the Incremental Term Loan Commitment of such Lender on the Incremental Term Loan Borrowing Date (prior to the incurrence of any Incremental Term Loans pursuant thereto on such date) (or, if issued thereafter, be in a stated principal amount (expressed in U.S. Dollars) equal to the outstanding principal amount of the Incremental Term Loans of such Lender on the date of issuance thereof) and be payable (in U.S. Dollars) in the principal amount of the Incremental Term Loans evidenced thereby from time to time, (iv) mature on the Incremental Term Loan Maturity Date, (v) bear interest as provided in the appropriate clause of Section 2.08 in respect of Base Rate Loans or Eurodollar Loans, as applicable, evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 5.01 and mandatory repayment as provided in Section 5.02 and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(f) Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and will prior to any transfer of any of its Notes endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in any such notation or endorsement shall not affect each Borrower's obligations in respect of any Loans.

(g) Notwithstanding anything to the contrary contained above or elsewhere in this Agreement, Notes shall only be delivered to Lenders that at any time specifically request the delivery of such Notes. No failure of any Lender to request or obtain a Note evidencing its Loans to each Borrower shall affect or in any manner impair the obligations of the respective Borrower to pay the

46

Loans (and all related Obligations) which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents. Any Lender that does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (f). At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the relevant Borrower shall promptly execute and deliver to the respective Lender the requested Note or Notes in the appropriate amount or amounts to evidence such Loans.

2.06 Conversions and Continuations. Each Borrower shall have the option to convert, on any Business Day occurring after the Initial Borrowing Date, all or a portion equal to at least the applicable Minimum Borrowing Amount (and, if greater, in an integral multiple of U.S.$500,000) of the outstanding principal amount of Loans made pursuant to one or more Borrowings of one or more Types under a single Tranche into a Borrowing or Borrowings of another Type under such Tranche, provided that (i) except as otherwise provided in Section 2.10(b) or unless the respective Borrower pays all amounts owing pursuant to Section 2.11 concurrently with any such conversion, Eurodollar Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Eurodollar Loans being converted, (ii) no such partial conversion of Eurodollar Loans shall reduce the outstanding principal amount of such Eurodollar Loans made pursuant to a single Borrowing to less than the applicable Minimum Borrowing Amount applicable thereto, and (iii) Base Rate Loans may not be converted into Eurodollar Loans if an Event of Default is in existence on the date of conversion and the Administrative Agent (on behalf of the Required Lenders) has given notice to the U.S. Borrower that no such conversion shall be permitted while such Event of Default is continuing. Each such conversion shall be effected by a Borrower by giving the Administrative Agent at its Notice Office prior to 12:00 Noon (New York time) at least three Business Days' prior notice (each, a "Notice of Conversion/Continuation") in the form of Exhibit A-2, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were made and, if to be converted into Eurodollar Loans, the Interest Period to be initially applicable thereto, which shall be three months. The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07 Pro Rata Borrowings. All Borrowings of Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans and Incremental Term Loans under this Agreement shall be incurred from the Lenders pro rata on the basis of such Lenders' Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, Tranche C Term Loan Commitments and Incremental Term Loan Commitments, as the case may be. The funding of the Escrowed Amount pursuant to Section 2.01(e) shall be funded by the Lenders pro rata on the basis of such Lenders' aggregate Tranche A Term Loan Commitments and Tranche B Term Loan Commitments. It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08 Interest. (a) The U.S. Borrower hereby agrees to pay (in the case of Tranche A Term Loans and U.S. Borrower Incremental Term Loans, in each case maintained as Base Rate Loans), the Canadian Borrower hereby agrees to pay (in the case of Tranche B Term Loans and Canadian Borrower Incremental Term Loans, in each case maintained as Base Rate Loans) and the Additional Foreign Borrower hereby agrees to pay (in the case of Tranche C Term Loans and Additional Foreign Borrower Incremental Term Loans, in each case maintained as Base Rate Loans), interest in respect of the unpaid principal amount of each Base Rate Loan made to it from the date the proceeds thereof are made available to it until the earlier of (i) the maturity (whether by acceleration or otherwise) of such Base Rate Loan and (ii) the conversion of such Base Rate Loan to a Eurodollar Loan pursuant to Section 2.06, at a rate per annum which shall be equal to the sum of the Base Rate in effect from time to time during the period such Base Rate Loan is outstanding plus the relevant Applicable Margin as in effect from time to time.

47

(b) The U.S. Borrower hereby agrees to pay (in the case of Tranche A Term Loans and U.S. Borrower Incremental Term Loans maintained as Eurodollar Loans), the Canadian Borrower hereby agrees to pay (in the case of Tranche B Term Loans and Canadian Borrower Incremental Term Loans, in each case maintained as Eurodollar Loans) and the Additional Foreign Borrower hereby agrees to pay (in the case of Tranche C Term Loans and Additional Foreign Borrower Incremental Term Loans, in each case maintained as Eurodollar Loans), interest in respect of the unpaid principal amount of each Eurodollar Loan made to it from the date the proceeds thereof are made available to it until the earlier of (i) the maturity (whether by acceleration or otherwise) of such Eurodollar Loan and (ii) the conversion of such Eurodollar Loan to a Base Rate Loan pursuant to Section 2.06, 2.09 or 2.10, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the Eurodollar Rate for such Interest Period plus the relevant Applicable Margin as in effect from time to time.

(c) [Intentionally Omitted].

(d) To the fullest extent permitted by applicable law, overdue principal and, to the extent permitted by law, overdue interest in respect of each Loan and any other overdue amount payable hereunder shall, in each case, bear interest at a rate per annum (1) in the case of overdue principal of, and interest or other overdue amounts owing with respect to, Eurodollar Loans, equal to 2.00% per annum in excess of the Applicable Margin for Eurodollar Loans as in effect from time to time plus the Eurodollar Rate for such successive periods not exceeding one month as the Administrative Agent may determine from time to time in respect of amounts comparable to the amount not paid, and (2) in all other cases, equal to the greater of (x) 2.00% per annum in excess of the rate otherwise applicable to Base Rate Loans from time to time and (y) the rate which is 2.00% in excess of the rate then borne by such Loans, in each case with such interest to be payable on demand.

(e) Accrued (and theretofore unpaid) interest shall be calculated daily and payable (i) in respect of each Base Rate Loan, quarterly in arrears on each Quarterly Payment Date, (ii) in respect of each Eurodollar Loan, on (x) the date of any conversion into a Base Rate Loan pursuant to Section 2.06, 2.09 or 2.10(b), as applicable (on the amount converted) ,and (y) the last day of each Interest Period applicable thereto and (iii) in respect of each Loan, on (x) the date of any prepayment or repayment thereof (on the amount prepaid or repaid), (y) at maturity (whether by acceleration or otherwise) and (z) after such maturity, on demand.

(f) All computations of interest hereunder shall be made in accordance with Section 13.07(b) and (c).

(g) Upon each Interest Determination Date, the Administrative Agent shall determine the relevant Eurodollar Rate for the respective Interest Period or Interest Periods and shall promptly notify the respective Borrower and the respective Lenders thereof. Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

48

2.09 Interest Periods. At the time a Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or the continuation as or conversion into, any Eurodollar Loans (in the case of the initial Interest Period applicable thereto) or on the third Business Day prior to the expiration of an Interest Period applicable to such Eurodollar Loans (in the case of any subsequent Interest Period), the interest period (each, an "Interest Period") shall be a three-month period; provided that:

(i) all Eurodollar Loans comprising the same Borrowing shall at all times have the same Interest Period;

(ii) the initial Interest Period for any Eurodollar Loan shall commence on the date of Borrowing of such Eurodollar Loan (or the date of any conversion thereto from a Borrowing of Base Rate Loans) and each Interest Period occurring thereafter in respect of such Eurodollar Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(iii) if any Interest Period relating to a Eurodollar Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iv) if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, however, that if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(v) no Interest Period in respect of any Borrowing under a given Tranche of Loans shall be selected which extends beyond the respective Maturity Date for such Tranche of Loans;

(vi) no Interest Period may be elected at any time an Event of Default is then in existence if the Administrative Agent (on the behalf of the Required Lenders) has given notice to the U.S. Borrower that no Interest Period may be elected while such Event of Default is continuing; and

(vii) no Interest Period in respect of any Borrowing of any Tranche of Term Loans shall be elected which extends beyond any date upon which a Scheduled Repayment for the respective Tranche of Term Loans will be required to be made under Section 5.02(b), if, after giving effect to the election of such Interest Period, the aggregate principal amount under such Tranche of Term Loans which have Interest Periods which will expire after such date will be in excess of the aggregate principal amount under such Tranche of Term Loans then outstanding less the aggregate amount of such required Scheduled Repayment.

2.10 Increased Costs; Illegality; etc. (a) In the event that any Lender shall have determined in good faith (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clauses (i) and (iv) below, may be made only by the Administrative Agent):

(i) on any Interest Determination Date that, by reason of any changes arising after the Effective Date affecting the applicable interbank market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of the Eurodollar Rate; or

49

(ii) at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Eurodollar Loans because of (x) any change since the Effective Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, for example, but not limited to (A) a change in the basis of taxation of payments to a Lender of the principal of or interest on the Loans or any other amounts payable hereunder (except for changes in the rate of tax on, or determined by reference to, the net income or net profits of such Lender imposed by the jurisdiction in which its principal office or applicable lending office is located), or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate and/or (y) other circumstances affecting such Lender, the applicable interbank market or the position of such Lender in such market (whether or not such Lender was a Lender at the time of such occurrence); or

(iii) at any time after the Effective Date, that the making or continuance of any Eurodollar Loan has been made unlawful by any law or governmental rule, regulation or order (or would conflict with any governmental rule, regulation, guideline, request or order not having the force of law but with which such Lender customarily complies even though the failure to comply therewith would not be unlawful), or impracticable as a result of a contingency occurring after the Effective Date which materially and adversely affects the applicable interbank market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (by telephone confirmed in writing) to the affected Borrower, and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (w) in the case of clause (i) above, in the event Eurodollar Loans are so affected, Eurodollar Loans shall no longer be available until such time as the Administrative Agent notifies Holdings, any affected Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by each Borrower with respect to Eurodollar Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by such Borrower, (x) in the case of clause (ii) above, the respective Borrower or Borrowers agrees, subject to the provisions of Section 13.24 (to the extent applicable), to pay to such Lender, upon written demand therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (with the written notice as to the additional amounts owed to such Lender, submitted to the respective Borrower or Borrowers by such Lender in accordance with the foregoing to be, absent manifest error, final and conclusive and binding on all the parties hereto, although the failure to give any such notice shall not release or diminish any of the respective Borrower's or Borrowers' obligations to pay additional amounts pursuant to this Section 2.10(a) upon the subsequent receipt of such notice), and (y) in the case of clause (iii) above, the respective Borrower or Borrowers shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law.

(b) At any time that any Eurodollar Loan is affected by the circumstances described in Section 2.10(a)(ii) or (iii), the affected Borrower may (and in the case of a Eurodollar Loan affected by the circumstances described in Section 2.10(a)(iii) shall) either (x) if the affected Eurodollar Loan is then being made initially (or pursuant to a conversion), cancel the respective Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that such Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected Eurodollar Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, in the case of a Eurodollar Loan, require the affected Lender to convert such Eurodollar Loan into a Base Rate Loan (which conversion, in the case of the circumstance described in Section 2.10(a)(iii), shall occur no later than the last day of the Interest Period then applicable to such Eurodollar Loan or such earlier day as shall be required by applicable law); provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

(c) If any Lender shall have determined after the Effective Date that the adoption or effectiveness after the Effective Date of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change after the Effective Date in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on such Lender's or such other corporation's capital or assets as a consequence of such Lender's Commitment or Commitments hereunder or its obligations hereunder to each Borrower to a level below that which such Lender or such other corporation could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration such Lender's or such other corporation's policies with respect to capital adequacy), then from time to time, upon written demand by such Lender (with a copy to the Administrative Agent), accompanied by the notice referred to in the next succeeding sentence of this clause (c), such Borrower agrees, subject to the provisions of Section 13.24 (to the extent applicable), to pay to such Lender such additional amount or amounts as will compensate such Lender or such other corporation for such reduction in the rate of return to such Lender or such other corporation. Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the relevant Borrower (a copy of which shall be sent by such Lender to the Administrative Agent), which notice shall set forth such Lender's basis for asserting its rights under this Section 2.10(c) and the calculation, in reasonable detail, of such additional amounts claimed hereunder, although (subject to the provisions of Section 13.24 (to the extent applicable)) the failure to give any such notice shall not release or diminish such Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon the subsequent receipt of such notice. A Lender's good faith determination of compensation owing under this Section 2.10(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto.

2.11 Compensation. Each Borrower severally agrees, subject to the provisions of Section 13.24 (to the extent applicable), to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Loans but excluding

51

any loss of anticipated profit) which such Lender may sustain: (i) if for any reason (other than a default by such Lender or any Agent) a Borrowing of, or a conversion from or into, Eurodollar Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by such Borrower or deemed withdrawn pursuant to Section 2.10(a)); (ii) if any repayment (including any repayment made pursuant to Sections 5.01 or 5.02 or as a result of an acceleration of the Loans pursuant to Section 11 or as a result of the replacement of a Lender pursuant to Sections 2.13 or 5.01) or conversion or realignment of any of its Eurodollar Loans occurs on a date which is not the last day of an Interest Period applicable thereto; (iii) if any prepayment of any Eurodollar Loans is not made on any date specified in a notice of prepayment given by the respective Borrower or Borrowers; or (iv) as a consequence of (x) any other default by such Borrower to repay its Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to Section 2.10 (b). Each Lender's calculation of the amount of compensation owing pursuant to this Section 2.11 shall be made in good faith. A Lender's basis for requesting compensation pursuant to this Section 2.11 and a Lender's calculation of the amount thereof, shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.12 Change of Lending Office. (a) Each Lender may at any time or from time to time designate, by written notice to the Administrative Agent to the extent not already reflected on Schedule 2.12(a), one or more lending offices (which, for this purpose, may include Affiliates of the respective Lender) for the various Loans made by such Lender; provided that, for designations made after the Effective Date, to the extent such designation shall result in increased costs under Sections 2.10 or 5.04 in excess of those which would be charged in the absence of the designation of a different lending office (including a different Affiliate of the respective Lender), then the Borrowers shall not be obligated to pay such excess increased costs (although if such designation results in increased costs, the Borrowers shall be obligated to pay the costs which would have applied in the absence of such designation and any subsequent increased costs of the type described above resulting from changes after the date of the respective designation). Except as provided in the immediately preceding sentence, each lending office and Affiliate of any Lender designated as provided above shall, for all purposes of this Agreement, be treated in the same manner as the respective Lender (and shall be entitled to all indemnities and similar provisions in respect of its acting as such hereunder).

(b) Each Lender agrees that upon the occurrence of any event giving rise to the operation of Sections 2.10(a)(ii) or (iii), Section 2.10(c) or Section 5.04 with respect to such Lender, it will, if requested by the applicable Borrower by notice to such Lender, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of each Borrower or the rights of any Lender provided in Sections 2.10 and 5.04.

2.13 _Replacement of Lenders_. (x) If any Lender becomes a Defaulting Lender or (y) upon the occurrence of any event giving rise to the operation of Sections 2.10(a)(ii) or (iii), Section 2.10(c) or Section 5.04 with respect to any Lender which results in such Lender charging to each Borrower increased costs materially in excess of the average costs being charged by the other Lenders in respect of such contingency, the U.S. Borrower shall have the right, in accordance with the requirements of Section 13.04(b), to replace such Lender (the "_Replaced Lender_") with one or more Eligible Transferees (collectively, the "_Replacement Lender_"), none of whom shall constitute a Defaulting Lender at the time of such replacement and each of whom shall be reasonably acceptable to the Administrative Agent; _provided_ that:

(i) at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire all of the Commitments and all then outstanding Loans of the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum (in the relevant currency or currencies) of (A) an amount equal to the principal of, and all accrued interest on, all then outstanding Loans of the respective Replaced Lender and (B) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to Section 4.01; and

(ii) all obligations of the Borrowers owing to the Replaced Lender (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid but including all amounts, if any, owing under Section 2.11 shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (i) and (ii) above, the recordation of the assignment on the Register by the Administrative Agent pursuant to Section 13.17 and, if so requested by the Replacement Lender (when applicable), delivery to the Replacement Lender of the appropriate Note or Notes executed by the respective Borrower, the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 5.04, 13.01 and 13.06), which shall survive as to such Replaced Lender. In connection with any replacement of Lenders pursuant to, and as contemplated by, this Section 2.13, each Borrower hereby irrevocably authorizes Holdings to take all necessary action, in the name of such Borrower as described above in this Section 2.13 in order to effect the replacement of the respective Replacement Lender or Lenders in accordance with the preceding provisions of this Section 2.13.

2.14 [Intentionally Omitted].

2.15 _Incremental Term Loan Commitments_. (a) So long as no Default or Event of Default is then in existence, each Borrower shall have the right, in consultation and coordination with the Administrative Agent as to all of the matters set forth below in this Section 2.15, and with the consent of the Required Lenders, to request at one time after the Initial Borrowing Date, that one or more Lenders (and/or one or more other Persons which are Eligible Transferees and which will become Lenders) provide Incremental Term Loan Commitments to such Borrower and, subject to the terms and conditions contained in this Agreement and in the Incremental Term Loan Commitment Agreement, make Incremental Term Loans pursuant thereto; it being understood and agreed, however, that (i) no Lender shall be obligated to provide an Incremental Term Loan Commitment as a result of any such request by such Borrower, and until such time, if any, as such Lender has agreed in its sole discretion to provide an Incremental Term Loan Commitment and executed and delivered to the Administrative Agent an Incremental Term Loan Commitment Agreement as provided in clause (b) of this Section 2.15, such Lender shall not be obligated to fund any Incremental Term Loans, (ii) each Tranche of Incremental Term Loan Commitments shall be made available to a single Borrower and shall be denominated in U.S. Dollars,

53

(iii) the amount of Incremental Term Loan Commitments made available pursuant to a given Incremental Term Loan Commitment Agreement shall be in a minimum aggregate amount for all Lenders which provide an Incremental Term Loan Commitment thereunder (including Eligible Transferees who will become Lenders) of U.S.$10,000,000, (iv) the aggregate amount of all Incremental Term Loan Commitments provided pursuant to this Section 2.15 on and after the Effective Date shall not exceed U.S.$25,000,000, (v) each Incremental Term Loan Commitment Agreement shall specifically designate, with the approval of the Administrative Agent, the Tranche of the Incremental Term Loan Commitments being provided thereunder (which Tranche shall be a new Tranche (i.e., not the same as any existing Tranche of Incremental Term Loans, Incremental Term Loan Commitments or other Term Loans), unless the requirements of Section 2.15(c) are satisfied, (vi) if to be incurred as a new Tranche of Incremental Term Loans, such Incremental Term Loans shall have the same terms as each other Tranche of Term Loans as in effect immediately prior to the effectiveness of the applicable Incremental Term Loan Agreement, except as to purpose and mandatory repayment application provisions (which are governed by Section 5.02); provided, however, that (I) the maturity and amortization of such Tranche of Incremental Term Loans may differ, so long as such Tranche of Incremental Term Loans shall have (a) an Incremental Term Loan Maturity Date of no earlier than the Maturity Date and (b) a Weighted Average Life to Maturity of no less than the Weighted Average Life to Maturity as then in effect for the Tranche A Term Loans and (II) the "interest rate" for such Tranche of Incremental Term Loans as of the Incremental Term Loan Borrowing Date therefor (which, for such purposes only, shall be determined by the Administrative Agent and deemed to include all upfront or similar fees or original issue discount (amortized over the life of such Incremental Term Loans) payable to all Lenders providing such Incremental Term Loans, but exclusive of any arrangement, structuring or other fees payable in connection therewith that are not shared with all Lenders providing such Tranche of Incremental Term Loans) may exceed the "interest rate" then applicable to the Tranche A Term Loans, Tranche B Term Loans and the Tranche C Term Loans, in the case of a new Tranche of Incremental Term Loans (as such "interest rate" shall have been determined by the Administrative Agent on the same basis provided in the immediately preceding parenthetical) if the Applicable Margin for the Tranche A Term Loans, Tranche B Term Loans and the Tranche C Term Loans is increased to the Applicable Increased Term Loan Rate for such Tranche of Incremental Term Loans, (vii) all Incremental Term Loans (and all interest, fees and other amounts payable thereon) incurred by a given Incremental Term Loan Borrower shall be Obligations of such Incremental Term Loan Borrower under this Agreement and the other applicable Credit Documents and shall be secured by the relevant Security Agreements, and guaranteed under each relevant Guaranty, on a pari passu basis with all other Loans secured by each such Security Agreement and guaranteed under each such Guaranty and (viii) each Lender (including any Eligible Transferee who will become a Lender) agreeing to provide an Incremental Term Loan Commitment pursuant to an Incremental Term Loan Commitment Agreement shall, subject to the satisfaction of the relevant conditions set forth in this Agreement, make Incremental Term Loans under the Tranche specified in such Incremental Term Loan Commitment Agreement as provided in Section 2.01(d) and such Loans shall thereafter be deemed to be Incremental Term Loans under such Tranche for all purposes of this Agreement and the other applicable Credit Documents.

(b) At the time of the provision of Incremental Term Loan Commitments pursuant to this Section 2.15, the respective Incremental Term Loan Borrower, the Administrative Agent and each such Lender or other Eligible Transferee which agrees to provide an Incremental Term Loan Commitment (each, an "Incremental Term Loan Lender") shall execute and deliver to the Administrative Agent an Incremental Term Loan Commitment Agreement substantially in the form of Exhibit O (appropriately completed), with the effectiveness of the Incremental Term Loan Commitment provided therein to occur on the date on which (w) a

54

fully executed copy of the respective Incremental Term Loan Commitment Agreement shall have been delivered to the Administrative Agent, (x) all fees required to be paid in connection therewith at the time of such effectiveness shall have been paid (including, without limitation, any agreed upon up-front or arrangement fees owing to the Administrative Agent), (y) all Incremental Term Loan Commitment Requirements are satisfied, and (z) all other conditions set forth in this Section 2.15 shall have been satisfied. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Incremental Term Loan Commitment Agreement, and at such time, (i) Schedule 1 shall be deemed modified to reflect the revised Incremental Term Loan Commitments of the affected Lenders and (ii) to the extent requested by any Incremental Term Loan Lender, Incremental Term Notes will be issued at the respective Incremental Term Loan Borrower's expense, to such Incremental Term Loan Lender, to be in conformity with the requirements of Section 2.05 (with appropriate modification) to the extent needed to reflect the new Incremental Term Loans made by such Incremental Term Loan Lender.

(c) Notwithstanding anything to the contrary contained above in this Section 2.15, the Incremental Term Loan Commitments provided by an Incremental Term Loan Lender or Incremental Term Loan Lenders, as the case may be, pursuant to each Incremental Term Loan Commitment Agreement shall constitute a new Tranche, which shall be separate and distinct from the existing Tranches pursuant to this Agreement (with a designation which may be made in letters (i.e., A, B, C, etc.), numbers (1, 2, 3, etc.) or a combination thereof (i.e., A-1, A-2, B-1, B-2, C-1, C-2, etc.), provided that, with the consent of the Administrative Agent, the parties to a given Incremental Term Loan Commitment Agreement may specify therein that the respective Incremental Term Loans made pursuant thereto shall constitute part of, and be added to, an existing Tranche of Term Loans, in any case so long as the following requirements are satisfied:

(i) the Incremental Term Loans to be made pursuant to such Incremental Term Loan Commitment Agreement shall have the same Borrower, the same Maturity Date, the same Applicable Margins and the same currency denomination as the Tranche of Term Loans to which the new Incremental Term Loans are being added;

(ii) the new Incremental Term Loans shall have the same Scheduled Repayment dates as then remain with respect to the Tranche to which such new Incremental Term Loans are being added with the amount of each Scheduled Repayment applicable to such new Incremental Term Loans to be the same on a proportionate basis as is theretofore applicable to the Tranche to which such new Incremental Term Loans are being added, thereby increasing the amount of each then remaining Scheduled Repayment of the respective Tranche proportionately; and

(iii) on the date of the making of such new Incremental Term Loans, and notwithstanding anything to the contrary set forth in Section 2.09, such new Incremental Term Loans shall be added to (and form part of) each Borrowing of outstanding Term Loans of the respective Tranche on a pro rata basis (based on the relative sizes of the various outstanding Borrowings), so that each Lender under the respective holding Tranche of Term Loans participates in each outstanding Borrowing of Term Loans of the respective Tranche (after giving effect to the incurrence of such new Incremental Term Loans pursuant to Section 2.01(d)) on a pro rata basis.

55

To the extent the provisions of preceding clause (iii) require that Lenders making new Incremental Term Loans add such Incremental Term Loans to the then outstanding Borrowings of Eurodollar Loans of such Tranche, it is acknowledged that the effect thereof may result in such new Incremental Term Loans having short Interest Periods (i.e., an Interest Period that began during an Interest Period, then applicable to outstanding Eurodollar Loans of such Tranche and which will end on the last day of such Interest Period). In connection therewith, it is hereby agreed that, to the extent the Incremental Term Loans are to be so added to the then outstanding Borrowings of Term Loans of such Tranche which are maintained as Eurodollar Loans, the Lenders that have made such Incremental Term Loans shall be entitled to receive from the U.S. Borrower such amounts, as reasonably determined by the respective Lenders, to compensate them for funding the new Incremental Term Loans of the respective Tranche during an existing Interest Period (rather than at the beginning of the respective Interest Period based upon rates then applicable thereto). All determinations by any Lender pursuant to the immediately preceding sentence shall, absent manifest error, be final and conclusive and binding on all parties hereto.

SECTION 3. [Intentionally Omitted].

SECTION 4. Fees; Commitments.

4.01 Fees. Each Borrower agrees to pay to the Administrative Agent and the Lenders, as applicable, the following fees:

(a) an agency fee, payable to the Administrative Agent for its own account in such amounts and at such times as have been agreed to in writing by the Borrowers and the Administrative Agent;

(b) an upfront fee, payable to the Administrative Agent for the account of each Lender on the Interim Order Entry Date in an amount equal to 3.00% multiplied by the aggregate amount of the Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, Tranche C Term Loan Commitments and, if applicable, Incremental Term Loan Commitments, in each case of such Lender as of the Interim Order Entry Date; and

(c) an exit fee, payable to the Administrative Agent for the account of each Lender on the date of termination of the undrawn Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, Tranche C Term Loan Commitments and, if applicable, Incremental Term Loan Commitments, in each case of such Lender (other than pursuant to Section 4.03(b) by reason of a Borrowing) or upon each repayment or prepayment of the Loans, in an amount equal to 1.00% multiplied by (i) the amount of such Commitments so terminated and (ii) the amount of principal of such Loans repaid or prepaid (such fee, together with the fee payable pursuant to Section 2.01(e)(C), an "Exit Fee");

(d) an extension fee, payable by the Borrowers to the Administrative Agent for the account of each Lender on the date of the extension of the Maturity Date as described in the definition of "Maturity Date", in an amount equal to 1.00% multiplied by the sum of the aggregate outstanding principal amount of the Loans of such Lender plus the aggregate amount of the Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, Tranche C Term Loan Commitments and, if applicable, Incremental Term Loan Commitments, in each case of such Lender immediately after to giving effect to such extension; and

(e) such other fees, to each Agent, for its own account, as have been agreed to in writing by the Borrowers and such Agent.

56

All computations of Fees shall be made in accordance with Section 13.07(b) and (c) and all fees shall be payable in U.S. Dollars and shall be non-refundable under all circumstances.

4.02 <u>Voluntary Termination of Commitments</u>. Upon at least three (3) Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrowers shall have the right, at any time or from time to time, without premium or penalty (other than Exit Fees on the amount of the Total Commitment), to terminate the Total Commitment in whole but not in part.

4.03 <u>Mandatory Reduction of Commitments</u>.

(a) The Total Commitment (other than the Total Incremental Term Loan Commitment under a given Tranche) and the Tranche A Term Loan Commitment and Tranche B Term Loan Commitments shall terminate at 5:00 P.M. (New York time) on (i) August 14, 2009 unless the Initial Borrowing Date has occurred on or before such time or (ii) the Final Borrowing Date.

(b) In addition, upon each Borrowing of Loans of any Tranche under Section 2.01 hereof, the aggregate Commitments of such Tranche shall be reduced by the principal amount of Loans of such Tranche included in such Borrowing.

(c) Upon the execution and delivery of the Additional Foreign Borrower Designation Agreement, (i) the Total Tranche A Term Loan Commitment shall be reduced on a dollar-for-dollar basis by the amount of the Total Tranche C Term Loan Commitment specified therein to reduce the Total Tranche A Term Loan Commitment and (ii) the Total Tranche B Term Loan Commitment shall be reduced on a dollar-for-dollar basis by the amount of the Total Tranche C Term Loan Commitment specified therein to reduce the Total Tranche B Term Loan Commitment.

(d) Each reduction to the Total Tranche A Term Loan Commitment, the Total Tranche B Term Loan Commitment, the Total Tranche C Term Loan Commitment and the Total Incremental Term Loan Commitment under a given Tranche pursuant to this Section 4.03 as provided above shall be applied proportionately to reduce the Tranche A Term Loan Commitment, the Tranche B Term Loan Commitment, the Tranche C Term Loan Commitment and the Incremental Term Loan Commitment under such Tranche, as the case may be, of each Lender with such a Commitment.

(e) Each termination or reduction of the Total Tranche A Term Loan Commitment, the Total Tranche B Term Loan Commitment, the Total Tranche C Term Loan Commitment and the Total Incremental Term Loan Commitment under a given Tranche and the Total Commitment shall be permanent.

57

SECTION 5. Prepayments; Repayments; Taxes.

5.01 Voluntary Prepayments. Each Borrower shall have the right to prepay the Loans made to such Borrower, with the payment of Exit Fees but without premium or penalty except as otherwise provided in this Agreement, in whole but not in part, at any time and from time to time on the following terms and conditions:

(i) an Authorized Officer of such Borrower shall give the Administrative Agent at its Notice Office written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay the Loans, whether such Loans are Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans, U.S. Borrower Incremental Term Loans, Canadian Borrower Incremental Term Loans or Additional Foreign Borrower Incremental Term Loans, the amount of the Loans to be prepaid and the Types of Loans to be repaid, which notice shall be given by an Authorized Officer of such Borrower (x) prior to 1:00 P.M. (New York time) at least one Business Day prior to the date of such prepayment in the case of Loans maintained as Base Rate Loans and (y) prior to 10:00 A.M. (New York time) at least three Business Days prior to the date of such prepayment in the case of Eurodollar Loans, and such written notice shall be promptly transmitted by the Administrative Agent to each of the Lenders;

(ii) at the time of any prepayment of Eurodollar Loans pursuant to this Section 5.01 on any date other than the last day of the Interest Period applicable thereto, such Borrower shall pay the amounts required pursuant to Section 2.11; and

(iii) each prepayment in respect of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans made pursuant to such Borrowing.

5.02 Mandatory Repayments. (a) [Intentionally Omitted].

(b) (i) In addition to any other mandatory repayments pursuant to this Section 5.02, on each date set forth below, the U.S. Borrower shall be required to repay that principal amount of Tranche A Term Loans, to the extent then outstanding, (A) in an amount equal to 0.25% of the original principal amount of the Tranche A Term Loans on the last day of each Fiscal Quarter (each such repayment, as the same may be reduced as provided in Section 5.02(g) and as the same may be increased as provided in clause (ii) of Section 2.15(c), a "Tranche A Term Loan Scheduled Repayment") and (B) in an amount equal to the balance of the outstanding Tranche A Term Loans payable on the Maturity Date.

(ii) In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, on each date set forth below, the Canadian Borrower shall be required to repay that principal amount of Tranche B Term Loans, to the extent then outstanding, (A) in an amount equal to 0.25% of the original principal amount of the Tranche B Term Loans on the last day of each Fiscal Quarter (each such repayment, as the same may be reduced as provided in Section 5.02(g) and as the same may be increased as provided in clause (ii) of Section 2.15(c), a "Tranche B Term Loan Scheduled Repayment") and (B) in an amount equal to the balance of the outstanding Tranche B Term Loans payable on the Maturity Date.

(iii) In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, on each date set forth below, the Additional Foreign Borrower shall be required to repay that principal amount of Tranche C Term Loans, to the extent then outstanding, (A) in an amount equal to 0.25% of the original principal amount of the Tranche C Term Loans on the last day of each Fiscal Quarter (each such repayment, as the same may be reduced as provided in Section 5.02(g) and as the same may be increased as provided in clause (ii) of Section 2.15 (c), a "Tranche C Term Loan Scheduled Repayment") and (B) in an amount equal to the balance of the outstanding Tranche C Term Loans payable on the Maturity Date.

(iv) In addition to any other mandatory repayments or commitment reductions pursuant to this Section 5.02, each Incremental Term Loan Borrower shall be required to make, with respect to each Tranche of Incremental Term Loans of such Incremental Term Loan Borrower, to the extent then outstanding, scheduled amortization payments of such Tranche of Incremental Term Loans on the dates and in the principal amounts set forth in the respective Incremental Term Loan Commitment Agreement (each such repayment, as the same may be reduced as provided in Sections 4.02, 5.01 and 5.02(g), an "Incremental Term Loan Scheduled Repayment"); provided that, if any Incremental Term Loans are incurred which will be added to (and form part of) an existing Tranche of Incremental Term Loans as contemplated by Section 2.15(c), the amount of the then remaining Incremental Term Loan Scheduled Repayments of the respective Tranche shall be proportionally increased (with the aggregate amount of increases to the then remaining Incremental Term Loan Scheduled Repayments to equal the aggregate principal amount of such new Incremental Term Loans then being incurred) in accordance with the requirements of clause (ii) of Section 2.15(c).

(c) In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Effective Date upon which Holdings or any of its Subsidiaries receives Net Proceeds from any Asset Sale, unless a Reinvestment Notice shall have been timely delivered in respect thereof, an amount equal to 100% of the Net Proceeds from such Asset Sale shall be applied as a mandatory prepayment in accordance with the requirements of Sections 5.02(g) and (h); provided that, notwithstanding the foregoing, (i) the aggregate Net Proceeds of Asset Sales that may be excluded from the foregoing prepayment requirement under this Section 5.02(c) pursuant to Reinvestment Notices, together with the aggregate Net Proceeds of Recovery Events that may be excluded from the prepayment requirement under Section 5.02(e) pursuant to Reinvestment Notices, shall not exceed U.S.$25,000,000 and (ii) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Loans as set forth in Sections 5.02(g) and (h).

(d) In addition to any other mandatory repayments pursuant to this Section 5.02, on each date on or after the Effective Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any incurrence of Indebtedness (other than Indebtedness permitted pursuant to Section 10.01(a)) or from any issuance of Equity Interests, an amount equal to 100% of the Net Proceeds from such incurrence or issuance shall be applied as a mandatory prepayment in accordance with the requirements of Sections 5.02(g) and (h).

(e) In addition to any other mandatory repayments pursuant to this Section 5.02, within five Business Days following each date on or after the Effective Date upon which Holdings or any of its Subsidiaries receives any proceeds from any Recovery Event, unless a Reinvestment Notice shall have been timely delivered in respect thereof, an amount equal to 100% of the Net Proceeds of such Recovery Event shall be applied as a mandatory prepayment in accordance with the requirements of Sections 5.02(g) and (h); provided that, notwithstanding the foregoing, (i) the aggregate Net Proceeds of Recovery Events that may be excluded from the foregoing prepayment requirement under this Section 5.02(e) pursuant to Reinvestment Notices, together with the aggregate Net Proceeds of Asset Sales that may be excluded from the prepayment requirement under Section 5.02(c) pursuant to Reinvestment Notices, shall not exceed U.S.$25,000,000 and (ii) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Loans as set forth in Sections 5.02(g) and (h).

(f) [Intentionally Omitted].

(g) (I) Each amount required to be applied pursuant to Sections 5.02(c), (d) and (e) in accordance with this Section 5.02(g) shall be applied to repay the outstanding principal amount of Term Loans.

(II) Each amount required to be applied to repay outstanding Term Loans pursuant to this Section 5.02(g) shall be applied pro rata to each Tranche of Term Loans (based upon the then outstanding principal amounts of the respective Tranches of Term Loans).

(III) All repayments of outstanding Term Loans required by Sections 5.02(c), (d) and (e) shall be applied to reduce the then remaining Scheduled Repayments of the respective Tranche of Term Loans on a pro rata basis (based upon the then remaining principal amounts of the Scheduled Repayments of such Tranche of Term Loans after giving effect to all prior reductions thereto).

(h) With respect to each repayment of Loans required by this Section 5.02, the respective Borrower may (subject to the requirements of preceding clause (g)) designate the Types of Loans of the respective Tranche which are to be repaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings of the respective Tranche pursuant to which made, provided that: (i) in the case of repayments of Eurodollar Loans, repayments of such Loans pursuant to this Section 5.02 on any day other than the last day of an Interest Period applicable thereto shall be accompanied by payment by the respective Borrower of all amounts owing in connection therewith pursuant to Section 2.11; (ii) if any repayment of Eurodollar Loans made pursuant to a single Borrowing shall reduce the outstanding Eurodollar Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable to the respective Eurodollar Loans, such Borrowing shall be converted at the end of the then current Interest Period into a Borrowing of Base Rate Loans; and (iii) each repayment of any Tranche of Loans made pursuant to a Borrowing shall be applied pro rata among such Tranche of Loans. In the absence of a designation by the respective Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

(i) Notwithstanding anything to the contrary contained elsewhere in this Agreement, all then outstanding Loans shall be repaid in full on the respective Maturity Date for such Loans.

5.03 Method and Place of Payment. Except as otherwise specifically provided herein, all payments under this Agreement or any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 12:00 Noon (New York time) on the date when due and shall be made in U.S. Dollars in immediately available funds at the Payment Office of the Administrative Agent in respect of any obligation of the Borrowers under this Agreement. The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 12:00 Noon (New York time) like funds relating to the payment of principal, interest or Fees ratably to the Lenders entitled thereto. Any payments under this Agreement which are made later than 1:00 P.M. (New York time) shall be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

60