5.04 <u>Net Payments</u>. (a) All payments made by any Credit Party under any Credit Document (including, in the case of Holdings or the U.S. Borrower, in its capacity as a guarantor pursuant to Section 14 or 15, as the case may be) or under any Note will be made without setoff, counterclaim or other defense. Except as provided in Section 5.04(b), all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding (i) any tax imposed on or measured by the net income, capital, or net profits of a Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein and (ii) any U.S. withholding tax that is imposed on amounts payable to such Lender with respect to any such payments of the U.S. Borrower at the time such Lender becomes party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the U.S. Borrower with respect to such withholding taxes pursuant to this paragraph 5.04 (a)) and all interest, penalties or similar liabilities with respect thereto (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "<u>Taxes</u>"). If any Taxes are so levied or imposed, the respective Borrower (or other Credit Party making the payment) shall, subject to the limitations with respect to the application of this Section 5.04 set forth in the first sentence of Section 2.12(a) and in the penultimate sentence of Section 13.04(b), pay the full amount of such Taxes to the appropriate Governmental Authority, and shall pay such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note. The respective Borrower (or Credit Party) will furnish to the Administrative Agent within 45 days after the date of the payment of any Taxes due pursuant to applicable law certified copies of tax receipts or, to the extent such tax receipts are not customarily provided by the relevant Governmental Authority, other evidence of payment of such Tax reasonably acceptable to the Lender, evidencing such payment by such Borrower (or the respective other Credit Party). The Credit Agreement Parties jointly and severally agree (and each Subsidiary Guarantor pursuant to its respective Subsidiary Guaranty, and the incorporation by reference therein of the provisions of this Section 5.04, shall agree) to indemnify and hold harmless each Lender, and reimburse such Lender upon its written request, for the amount of any Taxes levied or imposed on and paid by such Lender.

(b) Each Lender that is a Lender to the U.S. Borrower and that is not a United States person (as such term is defined in Section 7701(a) (30) of the Code) agrees to deliver to the U.S. Borrower and the Administrative Agent on or prior to the Effective Date, or in the case of a Lender that is a Lender to the U.S. Borrower and that is an assignee or transferee of an interest under this Agreement pursuant to Sections 2.13 or 13.04 (unless the respective Lender was already a Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or successor forms) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments to be made under this Agreement and under any Note, or (ii) if the Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI or Form W-8BEN (with respect to a complete exemption under an income tax treaty) pursuant to clause (i) above, (x) a certificate substantially in the form of <u>Exhibit D</u> appropriately completed (any such certificate, a "<u>Section 5.04(b)(ii) Certificate</u>") and (y) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (with respect to the portfolio interest exemption) (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from United States

withholding tax with respect to payments of interest to be made under this Agreement and under any Note. In addition, each Lender that is a Lender to the U.S. Borrower agrees that from time to time after the Effective Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, it will deliver to the U.S. Borrower and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to the benefits of any income tax treaty), or Form W-8BEN (with respect to the portfolio interest exemption) and a Section 5.04(b)(ii) Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement and any Note, or it shall immediately notify the U.S. Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Lender shall not be required to deliver any such Form or Certificate pursuant to this Section 5.04(b); provided, however, in the event that the Lender cannot deliver any Form or Certificate which certifies to such Lender's complete exemption from United States withholding tax as of such date, the U.S. Borrower shall not be obligated pursuant to Section 5.04(a) to gross-up payments to be made to such Lender in respect of United States withholding taxes except to the extent that the Lender's inability to provide the Form or Certificate is directly as a result of changes, after the date the Lender became a party to this Agreement, in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such United States withholding taxes. Notwithstanding anything to the contrary contained in Section 5.04(a), but subject to Section 13.04(b) and the immediately succeeding sentence, (x) the U.S. Borrower shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or similar taxes imposed by the United States (or any political subdivision or taxing authority thereof or therein) from interest, fees or other amounts payable by the U.S. Borrower hereunder for the account of any Lender that is a Lender to the U.S. Borrower and which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. Federal income tax purposes to the extent that such Lender has not provided to the U.S. Borrower U.S. Internal Revenue Service Forms that establish a complete exemption from such deduction or withholding and (y) the U.S. Borrower shall not be obligated pursuant to Section 5.04(a) hereof to gross-up payments to be made to a Lender in respect of income or similar taxes imposed by the United States (including, without limitation, United States withholding taxes) if (I) such Lender has not provided to the U.S. Borrower the Internal Revenue Service Forms required to be provided to the U.S. Borrower pursuant to this Section 5.04(b) or (II) in the case of a payment, other than interest, to a Lender described in clause (ii) above, to the extent that such forms do not establish a complete exemption from withholding of such taxes. Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this Section 5.04 and except as set forth in Section 13.04(b), the Borrower agrees to pay additional amounts and to indemnify each Lender in the manner set forth in Section 5.04(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any amounts deducted or withheld by it as described in the immediately preceding sentence (x) from amounts payable to or for the account of such Lender under Section 2.01(e), but only if and to the extent the amounts deducted or withheld exceed the amounts that would have been deducted or withheld if the amounts payable to such Lender under Section 2.01(e) were instead payable to or for the account of such Lender with respect to interest payments on a Tranche A Term Loan or a Tranche B Term Loan, as applicable, or (y) as a result of any changes after the Effective Date (or, if later, after the date such Lender became party to this Agreement) in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of income or similar taxes.

(c) If any Borrower pays any additional amount under this Section 5.04 to a Lender and such Lender determines in its sole good faith discretion that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), such Lender shall pay to such Borrower an amount that the Lender shall, in its sole good faith discretion, determine is equal to the net benefit, after tax, which was obtained by the Lender in such year as a consequence of such Tax Benefit; provided, however, that (i) any Lender may determine, in its sole good faith discretion consistent with the policies of such Lender, whether to seek a Tax Benefit; (ii) any Taxes that are imposed on a Lender as a result of a disallowance or reduction (including through the expiration of any tax credit carryover or carryback of such Lender that otherwise would not have expired) of any Tax Benefit with respect to which such Lender has made a payment to such Borrower pursuant to this Section 5.04(c) shall be treated as a Tax for which such Borrower is obligated to indemnify such Lender pursuant to this Section 5.04 without any exclusions or defenses; (iii) nothing in this Section 5.04 (c) shall require the Lender to disclose any confidential information to such Borrower (including, without limitation, its tax returns); and (iv) no Lender shall be required to pay any amounts pursuant to this Section 5.04(c) at any time which a Default or Event of Default exists.

(d) Each Lender agrees to use reasonable efforts (consistent with legal and regulatory restrictions and subject to overall policy considerations of such Lender) to file any certificate or document or to furnish to the Non-U.S. Borrower any information, in each case, as reasonably requested by the Non-U.S. Borrower that may be necessary to establish any available exemption from, or reduction in the amount of, any Taxes; provided, however, that nothing in this Section 5.04(c) shall require a Lender to disclose any confidential information (including, without limitation, its tax returns or its calculations).

SECTION 6. Conditions Precedent to Credit Events on the Initial Borrowing Date and the Final Borrowing Date.

Initial Borrowing Date

A. All obligations of each Lender to make each Loan hereunder on the Initial Borrowing Date is subject to the satisfaction of the Required Lenders in their sole discretion of the following applicable conditions precedent (subject to Section 9.21), and such other conditions as set forth herein, in each case on or prior to 5:00 p.m. (New York time) on August 14, 2009 and, if such conditions are not satisfied by such time, all obligations of each Lender under the DIP Facility (including the Total Commitment) shall terminate at such time unless extended prior to such time by the Required Lenders in their sole discretion:

6.01 Effective Date; Delivery of Notes. On or prior to the Initial Borrowing Date, (i) the Effective Date shall have occurred and (ii) there shall have been delivered to the Administrative Agent for the account of each Lender which has requested the same the appropriate Tranche A Term Note and Tranche B Term Note, in each case executed by the relevant Borrower and in the amount, maturity and as otherwise provided herein.

6.02 Officer's Certificate. On the Initial Borrowing Date, the Administrative Agent shall have received a certificate from the U.S. Borrower, dated such date and signed by the chairman, a vice-chairman, the president or any vice-president of the U.S. Borrower, and attested to by the

secretary, any assistant secretary or other senior officer of such the U.S. Borrower, certifying that all of the applicable conditions set forth in Sections 6.05 and 6.07 and Section 7.01 (other than such conditions that are expressly subject to the satisfaction of the Agents and/or the Required Lenders), have been satisfied on such date.

6.03 Opinions of Counsel. On the Initial Borrowing Date, the Administrative Agent shall have received (i) from Davies Ward Phillips & Vineberg LLP, special Canadian counsel to the Canadian Credit Parties, an opinion addressed to each Agent, the Collateral Agent and each of the Lenders and dated the Initial Borrowing Date in form and substance satisfactory to the Required Lenders and (ii) from foreign counsel to the Credit Parties and/or the Agents in The Netherlands, Germany, France, Brazil and Mexico, in each case reasonably satisfactory to the Agents, opinions which shall (x) be addressed to each Agent, the Collateral Agent and each of the Lenders and be dated the Initial Borrowing Date, (y) cover various matters regarding the execution, delivery and performance of the Global Subsidiaries Guaranty, the Local Law Pledge Agreements, the Brazilian Security Agreements, the Mexican Security Agreements and the Dutch Security Agreements and the perfection and, to the extent required by the Administrative Agent, priority of security interests granted by Credit Parties in respect of entities organized in such jurisdiction, and/or such other matters incident to the transactions contemplated herein as the Agents may reasonably request and (z) be in form, scope and substance reasonably satisfactory to the Agents.

6.04 Company Documents; Proceedings; Capital Structure. (a) On the Initial Borrowing Date, the Administrative Agent shall have received from each Credit Party a certificate, dated the Initial Borrowing Date, signed by the chairman, a vice-chairman, the president or any vice-president of such Credit Party, and attested to by the secretary, any assistant secretary or other senior officer of such Credit Party, in the form of Exhibit F (or, in respect of each Credit Party other than the U.S. Borrower, with such modification thereto as may be acceptable to the Administrative Agent in its sole discretion) with appropriate insertions, together with copies of the certificate of incorporation, by-laws or equivalent organizational documents of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and all of the foregoing (including each such certificate of incorporation, by-laws or other organizational document) shall be reasonably satisfactory to the Agents.

(b) On the Initial Borrowing Date, all Company and legal proceedings and all instruments and agreements in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be satisfactory in form and substance in the sole discretion of Required Lenders, and the Administrative Agent shall have received all information and copies of all certificates, documents and papers, including good standing certificates, bring-down certificates and any other records of Company proceedings and governmental approvals, if any, which the Required Lenders may have reasonably requested in connection therewith, such documents and papers, where appropriate, to be certified by proper Company or governmental authorities.

6.05 Adverse Change, etc. Except as set forth on Schedule 6.05 hereto, since July 14, 2009, no Material Adverse Effect (other than by virtue of the commencement of the Cases) shall have occurred.

6.06 Litigation. Except as set forth on Schedule 6.06, on the Initial Borrowing Date, there shall be no actions, suits, proceedings or investigations pending or threatened (a) with respect to the Transaction or any documentation executed in connection therewith (including any Credit Document) or the transactions contemplated hereby and thereby or (b) which any Agent or the Required Lenders shall determine has had, or could reasonably be expected to have, a Material Adverse Effect.

6.07 <u>Approvals</u>. On or prior to the Initial Borrowing Date, (i) all necessary governmental (domestic and foreign), regulatory and third party approvals and/or consents required in connection with any Existing Indebtedness, the transactions contemplated by the Credit Documents and otherwise referred to herein or therein shall have been obtained and remain in full force and effect and evidence thereof shall have been provided to the Administrative Agent, and (ii) all applicable waiting periods shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the making of the Loans and the transactions contemplated by the Credit Documents or otherwise referred to herein or therein. Additionally, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the consummation of the Transaction or the making of the Loans or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein.

6.08 [Intentionally Omitted].

6.09 [Intentionally Omitted].

6.10 [Intentionally Omitted].

6.11 <u>Outstanding Indebtedness and Preferred Stock</u>. On the Initial Borrowing Date and after giving effect to the consummation of the Transaction, Holdings and its Subsidiaries shall have no outstanding Preferred Equity or Indebtedness, except for (i) Indebtedness pursuant to or in respect of the Credit Documents, (ii) Intercompany Scheduled Existing Indebtedness, and (iii) such other existing indebtedness of Holdings and its Subsidiaries, if any, as shall be permitted by the Agents and Required Lenders to remain outstanding (all of which shall be listed as Third Party Scheduled Existing Indebtedness on Part A of Schedule 8.18; <u>provided</u> that such Indebtedness not in excess of U.S.$10,000,000 in the aggregate ("<u>Unscheduled Third Party Indebtedness</u>") shall not be required to be listed as Third Party Scheduled Existing Indebtedness on Part A of Schedule 8.18).

6.12 <u>Consent Letter</u>. On the Initial Borrowing Date, the Administrative Agent shall have received a letter from Corporation Service Company, presently located at 80 State Street, Albany, New York, 12207, substantially in the form of <u>Exhibit M</u> (appropriately completed), indicating its consent to its appointment by the Canadian Borrower as its agent to receive service of process as specified in Section 13.08.

6.13 <u>Subsidiaries Guaranties; Intercompany Subordination Agreement</u>. (a) On the Initial Borrowing Date, each Global Subsidiaries Guarantor shall have duly authorized, executed and delivered the Global Subsidiaries Guaranty in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "<u>Global Subsidiaries Guaranty</u>"), guaranteeing all of the obligations of each of the Borrowers as more fully provided therein, and the Global Subsidiaries Guaranty shall be in full force and effect.

(b) On the Initial Borrowing Date, each Canadian Subsidiary Guarantor shall have duly authorized, executed and delivered the Canadian Subsidiaries Guaranty in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "<u>Canadian Subsidiaries Guaranty</u>"), guaranteeing all of the obligations of the Canadian Borrower as more fully provided therein, and the Canadian Subsidiaries Guaranty shall be in full force and effect.

6.14 Pledge Agreements. (a) On the Initial Borrowing Date, each U.S. Credit Party shall have duly authorized, executed and delivered the U.S. Pledge Agreement in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "U.S. Pledge Agreement") and shall (except to the extent delivered to and in the possession of the Prepetition Agent) have delivered to the Collateral Agent, as Pledgee thereunder, all of the certificated U.S. Pledge Agreement Collateral, if any, referred to therein and then owned by such U.S. Credit Party (other than the certificated U.S. Pledge Agreement Collateral set forth on Part A of Schedule 6.14 which shall be delivered on such date as indicated on Part A of Schedule 6.14), (x) endorsed in blank in the case of promissory notes constituting U.S. Pledge Agreement Collateral and (y) together with executed and undated transfer powers in the case of certificated Equity Interests constituting U.S. Pledge Agreement Collateral, and the U.S. Pledge Agreement shall be in full force and effect.

(b) On the Initial Borrowing Date, each Canadian Credit Party shall have duly authorized, executed and delivered the Canadian Pledge Agreement in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Canadian Pledge Agreement") and (ii) shall (except to the extent delivered to and in the possession of the Prepetition Agent) have delivered to the Collateral Agent, as Pledgee thereunder, all of the certificated Collateral, if any, referred to therein and then owned by such Canadian Credit Party (other than the certificated Collateral set forth on Part B of Schedule 6.14 which shall be delivered on such date as indicated on Part B of Schedule 6.14), (x) endorsed in blank in the case of promissory notes constituting Collateral therein and (y) together with executed and undated transfer powers in the case of certificated Equity Interests constituting Collateral therein, and the Canadian Pledge Agreement shall be in full force and effect.

(c) On the Initial Borrowing Date, each Brazilian Credit Party shall have duly authorized, executed and delivered the Brazilian Pledge Agreements in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Brazilian Pledge Agreements") together with evidence of the filing for registration of the Brazilian Pledge Agreements with the competent registries in Brazil or other actions as may be necessary or, in the reasonable opinion of the Brazilian Collateral Agent, advisable to perfect the security interests purported to be created by the Brazilian Pledge Agreements and intended to be created by the Brazilian Pledge Agreements, and the Brazilian Pledge Agreements shall be in full force and effect.

(d) On the Initial Borrowing Date, the Canadian Borrower shall have duly authorized, executed and delivered the German Law Pledge Agreement (as defined in Section 13.26) and the Abstract Acknowledgement of Indebtedness (as defined in Section 13.26) and Holdings and the Borrowers shall have duly authorized, executed and delivered the German Pledge Intercreditor Agreement, in each case in form and substance satisfactory to the Required Lenders (collectively, as each is amended, modified, restated and/or supplemented from time to time, the "German Pledge Agreements") together with evidence of the filing for registration of the German Pledge Agreements with the competent registries in Germany or other actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests purported to be created by the German Pledge Agreements and intended to be created by the German Pledge Agreements, and the German Pledge Agreements shall be in full force and effect.

(e) [Intentionally Omitted].

(f) On the Initial Borrowing Date, with respect to any Credit Party which is pledging promissory notes or Equity Interests in one or more Persons organized under the laws of a different jurisdiction from the jurisdiction of organization of the respective Credit Party, if the Agents determine (based on advice of local counsel) that it would be in the interests of the Lenders that the respective Credit Party authorize, execute and deliver one or more additional pledge agreements governed by the laws of the jurisdiction or jurisdictions in which the Person or Persons whose promissory notes or Equity Interests are being pledged is (or are) organized, then the respective Credit Party shall (i) so authorize, execute and deliver one or more such additional pledge agreements (each, as amended, modified, restated and/or supplemented from time to time, a "Local Law Pledge Agreement" and, collectively, the "Local Law Pledge Agreements") and (ii) take such actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable under local law (as advised by local counsel) to create, maintain, effect, perfect, preserve, maintain and protect the security interests granted (or purported to be granted) by each such Local Law Pledge Agreement. Each Local Law Pledge Agreement shall (i) be prepared by local counsel reasonably satisfactory to the Agents, (ii) be in form and substance reasonably satisfactory to the Agents and (iii) be in full force and effect on the Initial Borrowing Date, it being understood and agreed, however, in the case of any Local Law Pledge Agreement entered into by Holdings or any of its Domestic Subsidiaries, the respective Credit Party shall not be required to pledge more than 65% of the total combined voting power of all classes of Equity Interests entitled to vote of any Foreign Subsidiary that is a corporation (or treated as such for U.S. federal tax purposes), other than any such Foreign Subsidiary organized under the laws of Mexico, Brazil or The Netherlands, in support of its obligations (x) as a Borrower under the Credit Agreement (in the case of the U.S. Borrower) or (y) under its Guaranty in respect of the Obligations of the U.S. Borrower (in the case of the other U.S. Credit Parties) (although 100% of the non-voting Equity Interests, if any, of each such Foreign Subsidiary shall be required to be pledged in support of such obligations). Schedule 6.14(h) sets forth a list of all Local Law Pledge Agreements to be executed and delivered on the Initial Borrowing Date.

6.15 Security Agreements. (a) On the Initial Borrowing Date, each U.S. Credit Party shall have duly authorized, executed and delivered the Security Agreement in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "U.S. Security Agreement") covering all of such U.S. Credit Party's present and future Collateral referred to therein, together with:

(i) proper financing statements (Form UCC-1 or the equivalent) fully executed (where required) for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests purported to be created by the U.S. Security Agreement;

(ii) evidence of the completion of all other recordings and filings of, or with respect to, the U.S. Security Agreement or other actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests intended to be created by the U.S. Security Agreement; and

and the U.S. Security Agreement and such other documents shall be in full force and effect.

(b) On the Initial Borrowing Date, each Canadian Credit Party shall have duly authorized, executed and delivered a Canadian Security Agreement in form and substance satisfactory to the Required Lenders (as amended, amended and restated, modified and/or supplemented from time to time, the "Canadian Security Agreement") covering all of such Canadian Credit Party's present and future Collateral referred to therein, together with:

(i) proper financing statements (PPSA Form 1-C or such other financing statements or similar notices as shall be required by local law), registered under the PPSA in Ontario and each other jurisdiction as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests purported to be created by the Canadian Security Agreement;

(ii) PPSA inquiry response certificates certified by the Ontario Registrar of Personal Property or any other equivalent certificate or search report in any other province or territory, listing all effective financing statements that name Holdings or any of its Subsidiaries, or a division or other operating unit of any such Person, as debtor and that are filed in the jurisdictions referred to in said clause (i), together with evidence of the discharge (by a PPSA Form 2-C or such other termination statements as shall be required by local law) of all Liens other than Permitted Liens and acknowledgments and confirmations from secured creditors of such Canadian Credit Party as reasonably requested by the Collateral Agent; and

(iii) evidence of the completion of all other recordings and filings of, or with respect to, the Canadian Security Agreement as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests intended to be created by the Canadian Security Agreement;

and the Canadian Security Agreement shall be in full force and effect.

(c) On the Initial Borrowing Date, each Brazilian Credit Party and the Brazilian Collateral Agent shall have duly authorized, executed and delivered the Brazilian Security Agreements in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Brazilian Security Agreements") covering all of such Brazilian Credit Party's present and future Collateral referred to therein, together with evidence of the filing for registration of the Brazilian Security Agreements with the competent registries in Brazil or other actions as may be necessary or, in the reasonable opinion of the Brazilian Collateral Agent, advisable to perfect the security interests purported to be created by the Brazilian Security Agreements and intended to be created by the Brazilian Security Agreements;

and the Brazilian Security Agreements and such other documents shall be in full force and effect.

68

(d) On the Initial Borrowing Date, each Mexican Credit Party and the other parties thereto, as applicable shall have duly authorized, executed and delivered the Mexican Security Agreements covering all present and future Mexican Collateral referred to therein, in the following terms:

(i) *Mexican Amendment to the Equity Interests Pledge Agreement*. No later than on the Initial Borrowing Date, certain pledgors shall:

(y) execute and deliver the Mexican Amendment to the Equity Interests Pledge Agreement, in order to incorporate the Holdings Guaranteed Obligations as obligations covered by the first-priority pledge (*prenda en primer lugar*) created on all of the Mexican Pledged Equity Interests of the Mexican Credit Parties held or beneficially owned by certain pledgors thereunder in favor of the Collateral Agent, in form and substance satisfactory to the Required Lenders;

(z) deliver evidence of the completion of all other recordings (including the registry of a notation regarding the Mexican Amendment to the Equity Interests Pledge Agreement in the stock registry books of the Mexican Credit Parties) or other actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interest over the Mexican Pledged Equity Interests intended to be created by the Mexican Amendment to the Equity Interest Pledge Agreement;

(ii) *Mexican Security Trust Agreement*. No later than on the Initial Borrowing Date, each of the Mexican Credit Parties that own a Mexican Real Estate Property, shall:

(y) execute and deliver the Mexican Security Trust Agreement, by which a perfected first-priority Lien in favor of the Collateral Agent is created over their Mexican Real Estate Properties, in form and substance satisfactory to the Required Lenders; and

(z) deliver documents evidencing that registration filings of the Mexican Security Trust Agreement with the "Public Registry of Property" of the jurisdiction in which each Mexican Real Estate Property is located are in the process of being made by a notary public.

(iii) *Mexican Floating Lien Pledge Agreement*. No later than on the Initial Borrowing Date, each of the Mexican Credit Parties shall:

(y) execute and deliver a Mexican Floating Lien Pledge Agreements, by which a perfected first-priority Lien in favor of the Mexican Collateral Agent is created over their Mexican Property owned by each of the Mexican Credit Parties, respectively, in form and substance satisfactory to the Required Lenders; and

(z) deliver documents evidencing that registration filings of each Mexican Floating Lien Pledge Agreement with the applicable "Public Registry of Commerce" are in the process of being made by a notary public.

(iv) *Mexican Counsel Opinion*. No later than on the Initial Borrowing Date, certain Mexican counsel shall deliver to the Collateral Agent an opinion of such Mexican counsel under the Mexican Security Agreements, reasonably satisfactory to the Collateral Agent, with respect to the security interests created pursuant to the Mexican Security Agreements, in form and substance satisfactory to the Required Lenders.

(e) On the Initial Borrowing Date, each Dutch Credit Party and the Collateral Agent shall have duly authorized, executed and delivered the Dutch Security Agreements in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "Dutch Security Agreements") covering all of such Dutch Credit Party's present and future Collateral referred to therein, together with evidence of the filing for registration of the Dutch Security Agreements with the competent registries in The Netherlands or other actions as may be necessary or, in the reasonable opinion of the Collateral Agent, advisable to perfect the security interests purported to be created by the Dutch Security Agreements and intended to be created by the Dutch Security Agreements.

6.16 Mortgages; Title Insurance; etc. On the Initial Borrowing Date, the Collateral Agent shall have received:

(a) fully executed counterparts of Mortgages in form and substance reasonably satisfactory to the Collateral Agent (with such changes thereto as shall be advisable under the law of the jurisdiction in which such Mortgage is being recorded), which Mortgages shall cover such of the Real Property owned by Holdings or any of its Subsidiaries (after giving effect to the Transaction) as are designated on Part A of Schedule 8.05(c) as a Mortgaged Property, together with evidence that counterparts of the Mortgages have been delivered to the title insurance company insuring the lien of such Mortgage for recording in all places to the extent necessary, unless otherwise agreed by the Required Lenders, or, in the reasonable opinion of the Collateral Agent, advisable to effectively create a valid and enforceable first priority mortgage lien on each Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, subject to Permitted Encumbrances of the type described in clauses (a), (b) and (f) of the definition thereof and other matters of title shown on the title report prepared by, or provided to, the applicable title company and reasonably acceptable to the Administrative Agent; and

(b) UCC-1 Fixture Filings (or the equivalent under applicable laws) covering each Mortgaged Property.

6.17 Shareholders' Agreements; Management Agreements; Collective Bargaining Agreements; Financial Advisors Engagement Agreements, Existing Indebtedness Agreements; and Tax Allocation Agreements. On or prior to the Initial Borrowing Date, there shall have been made available to the Administrative Agent by the U.S Borrower true and correct copies of the following documents, certified as such by the U.S. Borrower, to the extent not previously delivered under the Prepetition Facility to the Prepetition Agent:

(i) all written agreements (including, without limitation, shareholders' agreements, subscription agreements and registration rights agreements) entered into by Holdings or any of its Subsidiaries governing the terms and relative rights of its capital stock or other Equity Interests and any agreements entered into by shareholders relating to any such entity with respect to its capital stock or other Equity Interests (collectively, the "Shareholders' Agreements");

(ii) all written agreements (excluding employment agreements) entered into by Holdings or any of its Subsidiaries with respect to the management of Holdings or any of its Subsidiaries after giving effect to the Transaction (including consulting agreements and other management advisory agreements) (collectively, the "Management Agreements");

(iii) the collective bargaining agreements (A) between Cooper-Standard Automotive Group (Bowling Green, Ohio) and the United Steelworkers of America, AFL-CIO (Local No. 1152 of Bowling Green, Ohio), dated as of February 12, 2001, (B) between Cooper-Standard Automotive (Gaylord, Michigan) and the United Autoworkers (Local No. 388 of Gaylord, Michigan), dated as of March 18, 2008, (C) between Cooper-Standard Automotive (Auburn, Indiana) and the United Steelworkers of America, AFL-CIO-CLC (Local No. 634 of Auburn, Indiana), dated as of November 8, 1999 and (D) between Cooper-Standard Automotive Group (Bowling Green, Ohio) and United Steelworkers of America, AFL-CIO-CLC (Local No. 1042 of Bowling Green, Ohio), dated as of July 23, 1999 (collectively, the "Collective Bargaining Agreements");

(iv) the engagement letters (A) between Holdings and A&M, dated as of May 19, 2009 (together with all side letters in connection therewith, the "A&M Engagement Letter") and (B) between Holdings, its controlled Subsidiaries and Lazard, dated as of June 1, 2009 (together with all side letters in connection therewith, the "Lazard Engagement Letter"; together with the A&M Engagement Letter, "Financial Advisors Engagement Agreements") and all fees payable in connection with the Financial Advisors Engagement Agreements;

(v) all agreements evidencing or relating to any Scheduled Existing Indebtedness of Holdings or any of its Subsidiaries (collectively, the "Existing Indebtedness Agreements"); and

(vi) any tax sharing or tax allocation agreements entered into by Holdings or any of its Subsidiaries (collectively, the "Tax Allocation Agreements");

all of which Shareholders' Agreements, Management Agreements, Collective Bargaining Agreements, Financial Advisors Engagement Agreements (including the fees payable in connection therewith), Existing Indebtedness Agreements and Tax Allocation Agreements shall be in form and substance satisfactory to the Agents and shall be in full force and effect on the Initial Borrowing Date.

6.18 Insurance Certificates. On or before the Initial Borrowing Date, the Administrative Agent shall have received evidence of insurance complying with the requirements of Section 9.07 for the business and properties of Holdings and its Subsidiaries, in scope, form and substance reasonably satisfactory to the Agents and naming the Collateral Agent as an additional insured and/or loss payee, and stating that such insurance shall not be canceled without at least 30 days' (or 10 days', in the case of any cancellation arising from any non-payment of insurance premium) prior written notice by the insurer to the Collateral Agent.

6.19 Payment of Fees. On the Initial Borrowing Date, all costs, fees and expenses, and all other compensation due to the Agents and the Lenders (including, without limitation, legal fees and expenses) shall have been paid to the extent then due.

6.20 Patriot Act. The Administrative Agent shall have received all documentation and other information mutually agreed to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "PATRIOT Act"), including the information described in Section 13.25.

6.21 Interim Order/Bankruptcy Matters.

(i) (a) The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory in the sole discretion of the Required Lenders, on such prior notice as may be satisfactory to the Required Lenders in their sole discretion, the Interim Order no later than five (5) Business Days after the date of commencement of the Cases, approving and authorizing the DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance satisfactory to the Required Lenders and their counsel in their sole discretion and (b) the Canadian Court shall have entered, upon application in form and substance satisfactory in the sole discretion of the Required Lenders, on such prior notice as may be satisfactory to the Required Lenders in their sole discretion, the Initial Order as to the transactions contemplated hereby, which Initial Order shall be in form and substance satisfactory to the sole discretion of the Required Lenders and their counsel in their sole discretion.

(ii) The Interim Order, the Initial Order and the Credit Documents shall be in full force and effect and shall not (in whole in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge anywhere in the world.

(iii) The Credit Parties shall be in compliance in all respects with the Interim Order and the Initial Order.

(iv) (w) The U.S. Cases shall have been commenced in the Bankruptcy Court for the District of Delaware, (x) the Canadian Case shall have been commenced in the Canadian Court, (y) a First Day Order approving the cash management system of the Debtors, in form, scope and substance acceptable to the Required Lenders, shall have been entered by the Bankruptcy Court, be in full force and effect, and shall not, in whole or in part, have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or being challenged in whole or in part in any jurisdiction in any part of the world and the Debtors shall be in compliance with such First Day Order (except for such modifications as may be acceptable to the Administrative Agent and the Required Lenders); and (z) the amount of claims incurred prior to the Petition Date that are permitted to be paid under each First Day Order shall be acceptable to the Required Lenders in their sole discretion; provided that consent by the Required Lenders to the entry of any First Day Order shall authorize the Debtors making payments as specified in such First Day Orders.

(v) The Administrative Agent shall have received on or prior to the Effective Date each engagement letter (or amended engagement letter) for each of the Credit Parties' professionals that have been or that will be retained under section 327(a), 327(e), 328 or 363 of the Bankruptcy Code, other than the Financial Advisors Engagement Agreements, and each has been executed in form and substance acceptable to the Required Lenders, and each has been dated the Effective Date unless otherwise indicated or agreed to by the Required Lenders, and all fees in connection therewith shall be acceptable to the Required Lenders, in form and substance satisfactory to the Required Lenders.

(vi) This Agreement shall have been approved by the Canadian Court pursuant to an amendment, restatement, supplement or modification to the Initial Order or, if applicable, an Other CCAA Order.

6.22 <u>Financial Statements, 13-Week Budgets and Reports</u>. The Lenders shall have received the 13-Week Budget, which 13-Week Budget shall be in form and substance satisfactory to the Required Lenders in their sole discretion, including a forecast of sources and uses of cash as described in Section 9.17(c) by the Debtors and the non-Debtor Guarantors on a weekly basis for the succeeding 13 calendar weeks.

6.23 <u>Amendment of the Prepetition Facility and Prepetition Security Documents</u>. The Prepetition Facility Amendment, executed by the requisite Prepetition Lenders, Holdings, the U.S. Borrower, the Canadian Borrower and the Prepetition Administrative Agent, and amendments to the Prepetition Security Documents shall have been delivered to the Administrative Agent.

6.24 <u>Lien Searches</u>. The Administrative Agent shall have received the results of a recent lien search (if applicable) in each of the jurisdictions where any Credit Party is organized and, in the case of the Canadian Borrower, has tangible personal or real property, and such search shall reveal no liens on any of the assets of the Credit Parties except for liens permitted by Section 10.02 or discharged on or prior to the Effective Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

The occurrence of the Initial Borrowing Date and the acceptance of the benefits or proceeds of each Credit Event shall constitute a representation and warranty by each Credit Agreement Party to each Agent and each of the Lenders that all the conditions specified in Section 6 (A) on the Initial Borrowing Date and applicable to such Credit Event (other than such conditions that are expressly subject to the satisfaction of the Agents and/or the Required Lenders, and subject to Section 9.21) exist as of that time. All of the Notes, certificates, legal opinions and other documents and papers referred to in Sections 6 (A), unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Lenders (as evidenced by their execution and delivery of this Agreement).

Final Borrowing Date.

B. The obligation of each Lender to make each Loan hereunder, in each case on the Final Borrowing Date, is subject, at the time of the making of such Loans:

6.25 <u>Final Order</u>.

(i) Not later than 30 days following the Interim Order Entry Date, a final order shall have been entered by the Bankruptcy Court (the "<u>Final Order</u>") in form and substance satisfactory to the Required Lenders in their sole discretion on a motion by the U.S. Debtors that is in form and substance satisfactory to the Required Lenders, which Final Order shall have been entered on such prior notice to such parties as may be satisfactory to the Required Lenders in their sole discretion, approving and authorizing on a final basis the matters provided for herein.

(ii) The Final Order, the Interim Order, the Initial Order and the Credit Documents shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge anywhere in the world.

(iii) No order shall have been entered by the Canadian Court in the Canadian Case that has an adverse impact on the Credit Documents, the Initial Order or the priority of the DIP Lenders' Charge or the transactions contemplated thereby.

(iv) The Credit Parties shall be in compliance with the Final Order.

(v) The Lenders shall have received the required periodic updates of the 13-Week Budget and weekly variance reports, each in form and substance satisfactory to the Required Lenders, and Credit Parties shall be in compliance with the updated 13-Week Budget.

6.26 <u>Other Conditions</u>. (a) The Lenders shall have received the periodic updates of the 13-Week Budget and weekly variance reports, as required hereunder, each in form and substance satisfactory to the Required Lenders, and Credit Parties shall be in compliance with the updated 13-Week Budget.

(b) Each Credit Party and each other Subsidiary of Holdings which is an obligee or obligor with respect to any Intercompany Debt shall have duly authorized, executed and delivered the Intercompany Subordination Agreement in form and substance satisfactory to the Required Lenders (as amended, modified, restated and/or supplemented from time to time, the "<u>Intercompany Subordination Agreement</u>"), and the Intercompany Subordination Agreement shall be in full force and effect.

(c) Sections 10.14, 10.16 and 10.17 shall have been amended to address the period ending on the Maturity Date (without giving effect to any extension thereof) in a manner satisfactory to the U.S. Borrower and the Administrative Agent.

The occurrence of the Final Borrowing Date and the acceptance of the benefits or proceeds of each Credit Event shall constitute a representation and warranty by each Credit Agreement Party to each Agent and each of the Lenders that all the conditions specified in Section 6 (B) on the Finial Borrowing Date and applicable to such Credit Event (other than such conditions that are expressly subject to the satisfaction of the Agents and/or the Required Lenders, and subject to Section 9.21) exist as of that time. All of the Notes, certificates, legal opinions and other documents and papers referred to in Sections 6 (B), unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Lenders (as evidenced by their execution and delivery of this Agreement).

SECTION 7. <u>Conditions Precedent to All Credit Events</u>. The obligation of each Lender to make Loans (including Loans made on the Initial Borrowing Date, the Final Borrowing Date and on each Incremental Term Loan Borrowing Date), is subject, at the time of each such Credit Event (except as hereinafter indicated), to the satisfaction of the following conditions:

7.01 <u>No Default; Representations and Warranties</u>. At the time of each such Credit Event and immediately after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein or in any other Credit Document shall be true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) only as of such specified date).

7.02 <u>Notice of Borrowing; etc</u>. Prior to the making of each Loan, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.03(a).

7.03 <u>Incremental Term Loans</u>. Prior to the incurrence of any Incremental Term Loans on the Incremental Term Loan Borrowing Date, Holdings shall have satisfied (or caused to be satisfied) all of the applicable conditions set forth in Section 2.15.

7.04 [Intentionally Omitted].

7.05 [Intentionally Omitted].

7.06 <u>Commitments</u>. As a result of any Borrowing, usage of the Commitments shall not exceed (i) the aggregate amount authorized by the Interim Order, the Initial Order or the Final Order, as the case may be and (ii) if so reflected in the 13-Week Budget, the maximum amount of borrowings contemplated to be outstanding as reflected in the 13-Week Budget and as otherwise agreed by the parties.

7.07 <u>Interim Order, Initial Order and Final Order</u>. The Interim Order, the Initial Order and the Final Order, as the case may be, and all Credit Documents shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge in any jurisdiction worldwide.

7.08 <u>Payment</u>. All costs, fees, expenses (including, without limitation, legal fees) and other compensation contemplated by the Credit Documents (and any such amounts owing pursuant to the Prepetition Facility) to be payable to the Agents or Lenders shall have been paid to the extent due.

The occurrence of the Initial Borrowing Date and the Final Borrowing Date and the acceptance of the benefits or proceeds of each Credit Event shall constitute a representation and warranty by each Credit Agreement Party to each Agent and each of the Lenders that all the conditions specified in Section 7 exist as of that time. All of the Notes, certificates, legal opinions and other documents and papers referred to in Section 7, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Lenders (as evidenced by their execution and delivery of this Agreement).

SECTION 8. Representations and Warranties. In order to induce the Lenders to enter into this Agreement, to make the Loans as provided for herein, each Credit Agreement Party makes the following representations, warranties and agreements with the Lenders, in each case after giving effect to the Transaction, all of which shall survive the execution and delivery of this Agreement, the making of the Loans (with the occurrence of the Initial Borrowing Date and each Credit Event on or after the Initial Borrowing Date being deemed to constitute a representation and warranty that the matters specified in this Section 8 are true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) on and as of the Initial Borrowing Date and on and as of the date of each such Credit Event, unless stated to relate to a specific earlier date in which case such representations and warranties shall be true and correct in all material respects (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) as of such earlier date):

8.01 Company Status. Each Credit Agreement Party and each of its Subsidiaries (i) is a duly organized and validly existing Company in good standing (or its equivalent) under the laws of the jurisdiction of its organization, (ii) subject, in the case of the U.S. Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order, has all requisite Company power and authority to own its assets, to carry on its business as now conducted and as proposed to be conducted and, subject, in the case of the Canadian Borrower, to the entry by the Canadian Court of the Initial Order, to execute, deliver and perform its obligations under each Credit Document to which it is a party and (iii) subject, in the case of the Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

8.02 Authorization; Enforceability. Subject, in the case of the Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and the entry by the Canadian Court of the Initial Order, as applicable, each component of the Transaction to be entered into by each Credit Agreement Party and its Subsidiaries has been duly authorized by all necessary Company action and, if required, stockholder action. Subject, in the case of the Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order, this Agreement has been duly executed and delivered by each Credit Agreement Party and constitutes, and each other Credit Document to which any Credit Party is to be a party, when executed and delivered by such Credit Party, will constitute, a legal, valid and binding obligation of such Credit Agreement Party or such Credit Party, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

8.03 Governmental Approvals; No Conflicts. The Transaction (a) subject, in the case of the Debtors, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and the entry by the Canadian Court of the Initial Order, as applicable, does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Credit Documents, (b) subject, in the case of the Canadian Borrower, to the entry by the Canadian Court of the Initial Order, will not violate any Requirement of Law applicable to any Credit Agreement Party or any of its Subsidiaries, as applicable, (c) subject, in the

case of the Canadian Borrower, to the entry by the Canadian Court of the Initial Order, other than as set forth on Schedule 8.03 or as a result of the commencement of the U.S. Cases, will not violate or result in a default under any indenture or other material agreement or instrument binding upon any Credit Agreement Party or any of its Subsidiaries or any of their respective assets, or give rise to a right thereunder to require any payment to be made by any Credit Agreement Party or any of its Subsidiaries or give rise to a right of, or result in, termination, cancellation or acceleration of any material obligation thereunder, and (d) will not result in the creation or imposition of any Lien on any asset of any Credit Agreement Party or any of its Subsidiaries, except Liens created under the Credit Documents or pursuant to the Orders.

8.04 Financial Condition; No Material Adverse Change. (a) The U.S. Borrower has heretofore furnished to the Agents and to the Lenders (i) its consolidated balance sheet as of December 31, 2008, (ii) its consolidated statements of income, stockholders' equity and cash flows for the Fiscal Years ended December 31, 2007, and December 31, 2008, in the case of clauses (i) and (ii), reported on by Ernst & Young LLP, independent public accountants, and (iii) its consolidated balance sheet and combined statements of income, stockholders' equity and cash flows as of and for the three months ended March 31, 2009 (and the comparable period for the prior Fiscal Year), as reviewed by Ernst & Young, LLP, independent public accountants, in accordance with Statement on Auditing Standards No. 100. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the U.S. Borrower and its Subsidiaries as of such dates and for such periods in accordance with U.S. GAAP consistently applied, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b) Except as disclosed in the financial statements referred to in clause (a) above or the notes thereto, after giving effect to the Transaction, none of Holdings, the U.S. Borrower or any of their respective Subsidiaries has, as of the Initial Borrowing Date, any material direct or contingent liabilities, unusual long term commitments or material unrealized losses.

(c) There has not been any event, development or circumstance that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect since July 14, 2009; provided that the filing of the Cases shall not in and of itself be deemed a Material Adverse Effect for purposes of this Section 8.04(c).

(d) The Credit Parties have disclosed to the Agents and the Lenders all material assumptions with respect to the 13-Week Budget.

8.05 Properties. (a) Each Credit Agreement Party and each of its Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business (including each Mortgaged Property), except for Permitted Encumbrances with respect to each Mortgaged Property and with respect to each Real Property which is not a Mortgaged Property, Permitted Liens and minor defects in title that do not interfere with its ability to conduct its business as currently conducted and as proposed to be conducted or to utilize such properties for their intended purposes.

(b) Each Credit Agreement Party and each of its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and, to the knowledge of each Credit Agreement Party or any of its respective Subsidiaries, the use thereof by each Credit Agreement Party and each of its Subsidiaries does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c) Schedule 8.05(c) sets forth the address of each Real Property that is owned or leased by Holdings or any of its Subsidiaries as of the Initial Borrowing Date.

(d) As of the Initial Borrowing Date, neither Credit Agreement Party nor any of its Subsidiaries has received notice of, or has knowledge of, any pending or contemplated condemnation proceeding affecting any Mortgaged Property or any sale or disposition thereof in lieu of condemnation. Neither any Mortgaged Property nor any interest therein is subject to any right of first refusal, option or other contractual right to purchase such Mortgaged Property or interest therein, except as permitted by Sections 10.02 and 10.05.

8.06 Litigation and Environmental Matters. (a) Except for the commencement of the Cases and as set forth on Schedule 6.06, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Credit Agreement Party or any of its Subsidiaries, threatened against or affecting any Credit Agreement Party or any of its Subsidiaries (x) that could reasonably be expected, individually or in the aggregate, to (i) result in a Material Adverse Effect or (ii) adversely affect in any material respect the ability of the Credit Parties to consummate the Transaction or (y) with respect to any Credit Document.

(b) Except as set forth on Schedule 6.05, and with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither any Credit Agreement Party nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

8.07 Compliance with Laws and Agreements. Each Credit Agreement Party and each of its Subsidiaries is in compliance with all material Requirements of Law applicable to it or its property and all material indentures, agreements and other instruments binding upon it or its property. No Default or Event of Default has occurred and is continuing.

8.08 Investment Company Status. Neither any Credit Agreement Party nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

8.09 Taxes. Each Credit Agreement Party and each of its Subsidiaries has timely filed or caused to be filed all federal, state and provincial income tax returns and all other material tax returns and reports, domestic and foreign, required to be filed by it and has paid or caused to be paid all material taxes required to have been paid by it, except any taxes that are being contested in good faith by appropriate proceedings and for which such Credit Agreement Party or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with U.S. GAAP.

8.10 <u>ERISA; Canadian Welfare and Pension Plans</u>. (a) No ERISA Event (other than the filing of the Cases) has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. The present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount that, when combined with the amount of the total unfunded liability (whether on a going concern or wind-up basis of each Canadian Pension Plan) using the actuarial methods and assumptions employed in the most recent actuarial reports prepared in respect of each such Canadian Pension Plan that had a deficiency on that basis, could reasonably be expected to result in a Material Adverse Effect.

(b) Except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.10(b) could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (x) each Canadian Welfare Plan has been maintained and is in compliance with the terms thereof and all applicable Requirements of Law including, without limitation, all requirements relating to employee participation, funding, investment of funds, benefits and transactions with the Credit Parties and persons related to them and (y) with respect to Canadian Pension Plans: (i) no steps have been taken to terminate any Canadian Pension Plan (wholly or in part) which could result in any Credit Party being required to make any additional contribution to the Canadian Pension Plan; (ii) no contribution failure has occurred with respect to any Canadian Pension Plan sufficient to give rise to a Lien under any applicable pension benefits laws of any jurisdiction; (iii) no condition exists and no event or transaction has occurred with respect to any Canadian Pension Plan which is reasonably likely to result in any Credit Party incurring any material liability, fine or penalty; (iv) no Credit Party has a material contingent liability with respect to any post-retirement benefit under a Canadian Welfare Plan; (v) each Canadian Pension Plan is in compliance in all material respects with all applicable pension benefits laws and laws in respect to Taxes; (vi) all contributions (including, employee contributions made by authorized payroll deductions or other withholdings) required to be made in respect of each Canadian Pension Plan as determined in the most recently completed and filed actuarial valuation report have been made in accordance with all Requirements of Law and the terms of each Canadian Pension Plan; (vii) all required special payments, if any, have been made in accordance with Requirements of Law and the most recent actuarial report filed therefor; and (viii) no event has occurred and no conditions exist with respect to any Canadian Pension Plan that has resulted or could reasonably be expected to result in any Canadian Pension Plan (A) having its registration revoked or refused or (B) being subject to an involuntary winding-up (either in whole or in part) by any relevant pension benefits regulatory authority and no Taxes or penalties under any applicable pension benefits laws or laws in respect to Taxes are owing or eligible.

(c) Except to the extent that a breach of any of the representations, warranties or agreements in this Section 8.10(c) could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (w) each Foreign Pension Plan has been maintained and administered in a timely manner in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing (including, without limitation, maintaining registered status) with applicable regulatory or other Governmental Authorities, (x) all contributions required to be made with respect to a Foreign Pension Plan have been timely made, (y) none of the Credit Parties nor any of their respective Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan, and

79

(z) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Credit Party's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

8.11 Disclosure. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Credit Party to any Agent or any Lender in connection with the negotiation of this Agreement or any other Credit Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided that, with respect to projected financial information, each Credit Agreement Party represents only that such information was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Initial Borrowing Date, as of the Initial Borrowing Date.

8.12 Subsidiaries and Joint Ventures. (a) Holdings does not have any Subsidiaries other than the U.S. Borrower and the Subsidiaries of the U.S. Borrower listed on Schedule 8.12. Schedule 8.12 sets forth the name of, and the ownership interest of Holdings in, (a) each Subsidiary, including the U.S. Borrower (and identifies each Subsidiary that is a Credit Party), and (b) each joint venture in which Holdings, the U.S. Borrower or any of their respective Subsidiaries holds an Equity Interest, in each case as of the Initial Borrowing Date.

(b) As of the Initial Borrowing Date (and after giving effect to the Transaction), there does not exist any Subsidiary of Holdings that (x) is organized under the laws of the United States, or a State thereof, other than the U.S. Credit Parties and (y) that is organized under the laws of Canada, or a province or territory thereof, other than the Canadian Credit Parties.

(c) (i) Holdings shall at all times own directly 100% of the capital stock or other Equity Interests of the U.S. Borrower and (ii) the U.S. Borrower shall at all times own directly 100% of the capital stock or other Equity Interests of the Canadian Borrower.

8.13 Insurance. Schedule 8.13 sets forth a description of all insurance maintained by or on behalf of each Credit Agreement Party and each of its Subsidiaries as of the Initial Borrowing Date. As of the Initial Borrowing Date, all premiums due and payable in respect of such insurance have been paid. Each Credit Agreement Party reasonably believes that the insurance maintained by or on behalf of each Credit Agreement Party and each of its Subsidiaries is adequate.

8.14 Labor Matters. As of the Initial Borrowing Date, there are no strikes, lockouts or slowdowns against any Credit Agreement Party or any of its Subsidiaries pending or, to the knowledge of any Credit Agreement Party, threatened. The hours worked by and payments made to employees of the Credit Agreement Parties and their respective Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, provincial, local or foreign law dealing with such matters. All payments due from any Credit Agreement Party or any of its Subsidiaries, or for which any claim may be made against any Credit Agreement Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Credit Agreement Party or such Subsidiary. The consummation of the Transaction will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Credit Agreement Party or any of its Subsidiaries is bound.

8.15 [Intentionally Omitted].

8.16 Senior Indebtedness; Designated Senior Indebtedness. The subordination provisions contained in the indenture and the documents governing the U.S. Borrower's 8.375% Senior Subordinated Notes due 2014 (and any notes issued in exchange therefor pursuant to such indenture) are enforceable against the U.S. Borrower and the U.S. Subsidiary Guarantors party thereto and the holders thereof, and all Obligations of the U.S. Borrower and all Guaranteed Obligations (as defined in the Global Subsidiaries Guaranty) of the U.S. Subsidiary Guarantors are within the definitions of "Senior Indebtedness" and "Designated Senior Indebtedness" included in such subordination provisions.

8.17 Collateral Matters. (a) The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Secured Creditors legal, valid, enforceable and fully perfected security interests in and Liens on the Collateral of the U.S. Debtors.

(b) Each Mortgage (other than a Mortgage granted by a Debtor, as to which clause (a) or (c) of this Section 8.17 is applicable), upon execution and delivery by the parties thereto, will create in favor of the Collateral Agent, for the benefit of the Secured Creditors, a legal, valid and enforceable Lien on all the applicable mortgagor's right, title and interest in and to the Mortgaged Properties subject thereto and the proceeds thereof, and when the Mortgages have been filed in the jurisdictions specified in Schedule 8.05(c), the Mortgages will constitute a fully perfected Lien on all right, title and interest of the mortgagors in the Mortgaged Properties and the proceeds thereof, prior and superior in right to any other Person (but subject to Liens or other encumbrances for which exceptions are taken in the policies of title insurance delivered in respect of the Mortgaged Properties and subject to Permitted Liens).

(c) Upon the issuance of the Initial Order, the DIP Lenders' Charge is effective to create in favor of the Secured Creditors' legal, valid, enforceable and fully perfected security interests in and Liens on the Collateral of the Canadian Borrower.

(d) Each Security Document, other than the U.S. Security Agreement, the U.S. Pledge Agreement, the Mortgages, the Canadian Security Agreement and the Canadian Pledge Agreement, when executed and delivered, will be effective under applicable law to create in favor of the Collateral Agent, for the benefit of the Secured Creditors, a valid and enforceable security interest or hypothec, as the case may be, in the Collateral subject thereto (and defined therein), and will, upon the taking of any required action under applicable law to perfect each Lien, constitute a fully perfected Lien on and security interest or hypothec, as the case may be in all right, title and interest of the Credit Parties in the Collateral subject thereto, prior and superior to the rights of any other Person except for Permitted Liens and Permitted Encumbrances.

(e) All "Collateral" under as and defined in the Prepetition Facility required to be delivered under the Prepetition Loan Documents has been delivered to the Prepetition Agent as "Pledgee" thereunder,

81

8.18 <u>Scheduled Existing Indebtedness</u>. Schedule 8.18 sets forth a true and complete list of all Indebtedness of Holdings and its Subsidiaries as of the Initial Borrowing Date which is to remain outstanding after giving effect to the Transaction and the incurrence of Loans on such date (exclusive of Indebtedness pursuant to this Agreement and the other Credit Documents and Unscheduled Third Party Indebtedness), in each case showing the aggregate principal amount thereof (and the aggregate amount of any undrawn commitments with respect thereto) and the name of the respective borrower and any other entity which directly or indirectly guarantees such debt. Part A of Schedule 8.18 lists all Indebtedness as described in the immediately preceding sentence which is owed to Persons other than Holdings or any of its Subsidiaries (after giving effect to the Transaction) (with all such Indebtedness being herein called "<u>Third Party Scheduled Existing Indebtedness</u>") and Part B of Schedule 8.18 lists all Indebtedness as described in the immediately preceding sentence which is owed to Holdings and its Subsidiaries (after giving effect to the Transaction) (with all of such Indebtedness being herein called "<u>Intercompany Scheduled Existing Indebtedness</u>").

8.19 <u>Cases</u>. The U.S. Cases were commenced on the Petition Date and the Canadian Case was commenced on August 4, 2009, in each case, in accordance with applicable law and proper notice thereof and of the hearing for the approval of the Final Order has been given as identified in the Certificate of Service filed with the Bankruptcy Court.

8.20 <u>Orders</u>. The Interim Order or, after it has been entered, Final Order (as applicable), the Initial Order and the transactions contemplated by this Agreement and the other Loan Documents are in full force and effect, and have not, in whole or in part, been reversed, modified, amended, stayed (for more than five (5) days), vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction in any part of the world and the Debtors are in compliance with the Interim Order, the Initial Order, the Final Order and each Other CCAA Order, as applicable.

8.21 <u>Material Contracts</u>. No default has occurred and is continuing under any Material Contract that is not otherwise stayed by the Interim Order, the Final Order or the Initial Order, as applicable.

8.22 <u>Forward Looking Projections</u>. All forward looking projections included in each 13-Week Budget have been completed in good faith and based on assumptions which were reasonable when made.

SECTION 9. <u>Affirmative Covenants</u>. Each Credit Agreement Party hereby covenants and agrees that as of the Effective Date and thereafter for so long as this Agreement is in effect and until the Total Commitment has been terminated, and the Loans and Notes, together with interest, Fees and all other Obligations (other than any indemnities described in Section 13.13 which are not then due and payable) incurred hereunder, are paid in full:

9.01 <u>Financial Statements and Other Information</u>. The U.S. Borrower will furnish to the Administrative Agent (for distribution to each Lender):

(a) within 90 days (or such shorter period as the SEC shall specify for the filing of annual reports on Form 10-K) after the end of each Fiscal Year, its audited consolidated balance sheet and consolidated statements of income, stockholders' equity and cash flows as of the end of and for such Fiscal Year, and the related notes thereto, setting forth in each case in comparative form the figures for the previous Fiscal Year, all reported on by independent public accountants of recognized national standing (without any exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the U.S. Borrower and its Subsidiaries on a consolidated basis in accordance with U.S. GAAP consistently applied;

(b) within 45 days (or such shorter period as the SEC shall specify for the filing of quarterly reports on Form 10-Q) after the end of each of the first three Fiscal Quarters of each Fiscal Year, its consolidated balance sheet and consolidated statements of income, stockholders' equity and cash flows as of the end of and for such Fiscal Quarter and the then-elapsed portion of the Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by an Authorized Officer as presenting fairly in all material respects the financial condition and results of operations of the U.S. Borrower and its Subsidiaries on a consolidated basis in accordance with U.S. GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c) concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of an Authorized Officer (i) certifying as to whether a Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations (A) demonstrating compliance with Sections 10.14, 10.16 and 10.17 and (B) detailed information regarding the utilization of the baskets described in Sections 10.01 (a) (vi), 10.01 (a)(vii), 10.01 (a)(xv), 10.01 (a)(xviii), 10.01(a)(xix), 10.01 (a)(xx), 10.02(a)(xiii), 10.04(e), 10.04(j), 10.04(q), 10.04(r), 10.05(b), 10.05(i), 10.05(j), 10.05(k), 10.06, 10.08(a), 10.09 and 10.14(a) of this Agreement, in each case as of the last day of the Fiscal Quarter or Fiscal Year, as the case may be, then last ended;

(d) concurrently with any delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default or Event of Default and, if such knowledge has been obtained, describing such Default or Event of Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(e) promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Credit Agreement Party or any of its Subsidiaries with the SEC or with any national securities exchange, as applicable;

(f) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Credit Agreement Party or any of its Subsidiaries or any Plan, or compliance with the terms of any Credit Document, as the Administrative Agent or any Lender may reasonably request;

9.02 Notices of Material Events. The Credit Agreement Parties will furnish to the Administrative Agent (for distribution to each Lender), prompt written notice of the following:

(a) the occurrence of any Default or Event of Default;

(b) the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Credit Agreement Party or any of its Affiliates that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

83

(c) the occurrence of any ERISA Event or Plan Termination Event or any fact or circumstance that gives rise to a reasonable expectation that any ERISA Event or Plan Termination Event will occur that, in either case, alone or together with any other ERISA Events or Plan Termination Events that have occurred, could reasonably be expected to result in liability of the Credit Agreement Parties and their respective Subsidiaries in an aggregate amount exceeding U.S.$5,000,000;

(d) the filing of any annual actuarial valuation report (and any subsequent report containing material changes) in respect of a Canadian Pension Plan with any Governmental Authority, together with a copy of such report forthwith after such filing; and

(e) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 9.02 shall be accompanied by a statement of a Authorized Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

9.03 Information Regarding Collateral. (a) The U.S. Borrower will furnish to the Collateral Agent prompt written notice of any change (i) in any Credit Party's corporate name, (ii) in the jurisdiction of incorporation or organization of any Credit Party, (iii) in any U.S. Credit Party's organizational identification number or (iv) in the case of any Canadian Credit Party, in the chief executive office or principal place of business of such Person, or in any jurisdiction (country, state or province) where such Canadian Credit Party stores or maintains tangible personal property or acquires Real Property (owned or leased). For greater certainty, no Canadian Credit Party may change its jurisdiction of incorporation and become an unlimited liability company in such jurisdiction. Each Credit Agreement Party agrees not to effect or permit any change referred to in the preceding sentence unless any new documentation is executed by any Credit Party (including, without limitation, a movable hypothec under any applicable laws of Canada or province or territory thereof) and all filings have been made under the UCC, the PPSA, The Register of Personal and Movable Real Rights or otherwise that are required, in each case, in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral. The U.S. Borrower also agrees promptly to notify the Collateral Agent if any material portion of the Collateral is damaged, destroyed or otherwise the subject of a Recovery Event.

(b) At the time of delivery of the annual financial statements pursuant to Section 9.01(a), the U.S. Borrower shall deliver to the Collateral Agent a certificate of an Authorized Officer certifying that there have been no changes to Annexes A through H of the U.S. Security Agreement, Annexes A through H of the Canadian Security Agreement, Annexes A through G of the U.S. Pledge Agreement, Annexes A through G of the Canadian Pledge Agreement and the annexes or schedules to each other Security Document, in each case since the Initial Borrowing Date or, if later, since the date of the most recent certificate delivered pursuant to this Section 9.03(b), or if there have been any such changes, a list in reasonable detail of such changes (but, in each case, only to the extent that such changes are required to be reported to the Collateral Agent pursuant to the terms of such Security Documents) and whether the relevant Credit Parties have otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes, provided that the U.S. Borrower shall also deliver the certificate required by this

84

Section 9.03(b) with respect to Annexes A, C, D and F of the U.S. Security Agreement on a quarterly basis at the time of delivery of financial statements pursuant to Sections 9.01(b); provided further that each Credit Agreement Party will, and will cause each of its Subsidiaries to, at the expense of such Borrower to (a) notify the Collateral Agent of any acquisition of assets (i) not previously listed on Annexes A through H of the U.S. Security Agreement, Annexes A through H of the Canadian Security Agreement, Annexes A through G of the U.S. Pledge Agreement, Annexes A through G of the Canadian Pledge Agreement and the annexes or schedules to each other Security Document and (ii) not previously subject to a pledge under the Security Documents, and (b) at the request of the Collateral Agent, take such further steps (or authorize the Collateral Agent to take such further steps) relating to such acquired assets as the Collateral Agent may reasonably require to satisfy perfection and priority of the Liens created or intended to be created by the Security Documents with respect to such acquired assets.

9.04 <u>Existence; Conduct of Business</u>. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, permits, approvals, authorizations, licenses, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, <u>provided</u> that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 10.03, and <u>provided further</u>, that the foregoing shall not prohibit any Credit Agreement Party or any of its Subsidiaries from causing or permitting the expiration, cancellation, abandonment, impairment or invalidation of any rights, qualifications, permits, approvals, authorizations, licenses, franchises, patents, copyrights, domain names, trademarks or tradenames, or from failing to maintain or renew, abandoning, impairing or permitting to expire or be cancelled any applications or registrations for any of such item, if, in such Credit Agreement Party's or such Subsidiary's, as applicable, reasonable business judgment, such item is no longer material to the conduct of its business.

9.05 <u>Payment of Taxes</u>. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, pay its liabilities for taxes (other than the tax liabilities arising prior to the Petition Date), before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and such Credit Agreement Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with U.S. GAAP, (b) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

9.06 <u>Maintenance of Properties</u>. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

9.07 <u>Insurance</u>. (a) Each Credit Agreement Party will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies, (a) insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required to be maintained pursuant to the Security Documents. The U.S. Borrower will furnish to the Administrative Agent, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

(b) Each Credit Agreement Party will, and will cause each of its Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by such Credit Agreement Parties and/or such Subsidiaries) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee and/or additional insured), (ii) shall state that such insurance policies shall not be canceled without at least 30 days' (or 10 days', in the case of any cancellation arising from any non-payment of insurance premium) prior written notice thereof by the respective insurer to the Collateral Agent, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors, and (iv) shall be deposited with the Collateral Agent.

(c) If any Credit Agreement Party or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 9.07, or if any Credit Agreement Party or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Credit Agreement Parties jointly and severally agree to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

9.08 Casualty and Condemnation. The U.S. Borrower (a) will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation under similar proceeding and (b) will ensure that the net proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Security Documents.

9.09 Books and Records; Inspection and Audit Rights. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, keep proper books of record and account in accordance with U.S. GAAP, consistently applied, and in accordance with the internal controls of Holdings and each of its Subsidiaries. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties during normal business hours, to examine and make extracts from its books and records, including Phase I or Phase II environment assessment reports, and to discuss its affairs, finances and condition with its officers, employees and independent accountants, all at such reasonable times and as often as reasonably requested (subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract), provided that an officer of the Borrowers may attend any such discussions with such employees or accountants. Without limiting the foregoing, if an Event of Default is continuing or if the Administrative Agent at any time has a reasonable basis to believe that there exist violations of Environmental Laws by any Credit Agreement Party or that there exist any Environmental Liability, in each case, that would have, in the aggregate, a Material Adverse Effect, then each Credit Agreement Party will, and will cause each of its Subsidiaries to, promptly upon receipt of request from the Administrative Agent, allow a reputable environmental consulting firm reasonably acceptable to the Administrative Agent, and its representatives, access to such real property for the purpose of conducting such environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case as the Administrative Agent may from time to time reasonably request. Such audits, assessments and reports, shall be in form and substance reasonably acceptable to the Required Lenders.

9.10 <u>Compliance with Laws</u>. Each Credit Agreement Party will, and will cause each of its Subsidiaries to, comply with all Requirements of Law, including Environmental Laws, applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

9.11 <u>Use of Proceeds</u>. (a) Each Credit Agreement Party will, and will cause each of its Subsidiaries to, use the proceeds of the Loans solely (x) for working capital requirements and general corporate purposes (including to pay administration costs of any U.S. Cases and the Canadian Cases and claims or amounts approved by the Bankruptcy Court or the Canadian Court) of the Credit Parties and their Subsidiaries and (y) to pay fees and expenses incurred in connection with the Transaction.

(b) No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of the Margin Regulations.

9.12 <u>Additional Subsidiaries</u>. If any additional SPE Subsidiary of Holdings is formed or acquired after the Initial Borrowing Date, the U.S. Borrower will, promptly after such Subsidiary is formed or acquired, notify the Collateral Agent and the Lenders (through the Administrative Agent) thereof and, upon the consummation of the Permitted Securitization to which such SPE Subsidiary relates, cause the Equity Interests of such new Subsidiary to be pledged pursuant to, and to the extent required by, the relevant Security Document and the certificates, if any, representing such Equity Interests, together with appropriate transfer powers duly executed in blank, to be delivered to the Collateral Agent.

9.13 <u>Further Assurances</u>. (a) Each Credit Agreement Party will, and will cause each other Credit Party to, grant to the Collateral Agent security interests and mortgages in such assets and Real Property of such Credit Agreement Party and such Credit Party which are of the type required to be pledged, assigned or hypothecated pursuant to the original Security Documents and as are not covered by such original Security Documents, in each case to the extent requested from time to time by the Administrative Agent or the Required Lenders (collectively, the "<u>Additional Security Documents</u>"). All such security interests and mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Collateral Agent and shall constitute valid and enforceable perfected security interests, hypothecations and mortgages superior to and prior to the rights of all third Persons and enforceable as against third parties and subject to no other Liens except for Permitted Liens or, in the case of Real Property, the Permitted Encumbrances described in clauses (a), (b) and (f) of the definition thereof and other matters of title shown on the title report prepared by the applicable title company and acceptable to the Administrative Agent. The Additional Security Documents or instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full. Notwithstanding the foregoing, (i) this Section 9.13(a) shall not apply to (and Holdings and its Subsidiaries shall not be required to grant a mortgage in) any Real Property the fair market value of which (as determined in good faith by senior management of Holdings) is less than U.S.$5,000,000 and (ii) the foregoing requirements shall not require the creation or perfection of pledges of or security interests in particular assets of the Credit Parties if and for so long as, the Administrative Agent, in consultation with Holdings, reasonably determines that the cost of creating or perfecting such pledges or security interests in such assets (taking into account any adverse tax consequences to Holdings and its Affiliates (including the imposition of withholding or other material taxes on Lenders)) shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

87

(b) Each Credit Agreement Party will, and will cause each of its Subsidiaries to, at the expense of such Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, real property surveys, reports and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents as the Collateral Agent may reasonably require (including any of the foregoing required for each Credit Agreement Party to comply with Section 6.16 of the Credit Agreement). Furthermore, each Credit Agreement Party shall cause to be delivered to the Collateral Agent such opinions of counsel, title insurance and other related documents as may be reasonably requested by the Collateral Agent to assure itself that this Section 9.13 has been complied with. Each Credit Agreement Party also agrees to provide to the Collateral Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(c) Each Credit Agreement Party agrees that each action required above by this Section 9.13 shall be completed as soon as possible, but in no event later than 30 days after such action is either requested to be taken by the Administrative Agent, the Collateral Agent or the Required Lenders or required to be taken by the Credit Agreement Parties and their respective Subsidiaries pursuant to the terms of this Section 9.13 (or such later date as shall be determined by the Administrative Agent in its sole discretion in any given case); provided that in no event will any Borrower or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts, to obtain consents from third parties with respect to its compliance with this Section 9.13.

(d) In the event that the Administrative Agent or the Required Lenders at any time after the Initial Borrowing Date determine in their sole discretion (whether as a result of a position taken by an applicable bank regulatory agency or official, or otherwise) that real estate appraisals satisfying the requirements set forth in 12 C.F.R., Part 34-Subpart C, or any successor or similar statute, rule, regulation, guideline or order in any jurisdiction (any such appraisal a "Required Appraisal") are or were required to be obtained, in connection with any Mortgaged Property or Mortgaged Properties, then, within 90 days after receiving written notice thereof from the Administrative Agent, the relevant Credit Agreement Party shall cause such Required Appraisal to be delivered, at the expense of such Credit Agreement Party, to the Administrative Agent, which Required Appraisal, and the respective appraiser, shall be satisfactory to the Administrative Agent.

9.14 End of Fiscal Years; Fiscal Quarters. If Holdings and the U.S. Borrower change their and their Subsidiaries' Fiscal Year or Fiscal Quarter end dates, Holdings and the U.S. Borrower shall give immediate written notice of such change to the Administrative Agent and, in such an event, the Credit Agreement Parties and the Administrative Agent shall, and are hereby authorized by the Lenders to, make any modifications or adjustments to this Agreement (including the financial covenants contained in Sections 10.14, 10.16 and 10.17) that are necessary to reflect any such change; it being understood that each of the Credit Agreement Parties and the Administrative Agent agree to negotiate in good faith to implement such necessary modifications or adjustments.

88

9.15 [Intentionally Omitted].

9.16 [Intentionally Omitted].

9.17 Financial Statements and Additional Bankruptcy-related Reporting. The U.S. Borrower shall furnish to the Administrative Agent (with sufficient copies for each of the Lenders, which the Administrative Agent shall provide to the Lenders) each of the following:

(a) *Operating Forecast.* (A) Within 30 days of the Interim Order Entry Date, a projected operating budget on a monthly basis through the end of the current fiscal year of Holdings, in form and substance acceptable to the Required Lenders (the "Operating Forecast"), to include income statements by country, cash flow statement on a consolidated basis, and a balance sheet on a consolidated basis; (B) within 120 days of the Interim Order Entry Date, an Operating Forecast, in the format set forth in 9.17(a)(A), through the end of the subsequent fiscal year of Holdings, on a monthly basis, in form and substance acceptable to the Required Lenders; and (C) updated Operating Forecasts as become available from time to time.

(b) *Operating Reports.* As it becomes available and within ten (10) days of the Interim Order Date, a copy of the most recent operating report known as of the date hereof as "Corporate Monthly Operations Report", including statistics for each operating plant of Holdings and its Subsidiaries and reported on a monthly basis, in form and substance acceptable to the Required Lenders.

(c) *13-Week Budgets.* Commencing on the Effective Date, and every fourth week thereafter, a 13-week rolling cash flow forecast detailing cash receipts and cash disbursements on a weekly basis broken down for (i) the U.S. Credit Parties and (ii) the Canadian Credit Parties for the next 13 weeks; and commencing with the first 13-Week Budget due after September 1, 2009 (excluding U.S. Finco), broken down by (A) the U.S. Credit Parties, (B) the Canadian Credit Parties (excluding U.S. Finco), and (C) all other Subsidiaries, and by week and aggregated by country, including anticipated uses of the DIP Facility (a "13-Week Budget"), in each case in form substantially similar to the 13-Week Budget delivered pursuant to Section 6.22 and substance satisfactory to the Required Lenders in their sole discretion.

(d) *Weekly DIP Budget Performance Report.* Commencing on the first Thursday after the Effective Date, and every Thursday thereafter (or if Thursday is not a business day, on the next succeeding business day), a comparison of the actual cash flows for the most recently completed week (ending on the previous Sunday) to the most recent 13-Week Budget for such week for each line item in the applicable 13-Week Budget, including an explanation for all material variances from the applicable 13-Week Budget, and any other information requested by the Administrative Agent to determine compliance with the financial covenants contained in Sections 10.17 and 10.18, the form of which shall be satisfactory to the Administrative Agent in its sole discretion, in each case certified by the Chief Financial Officer of the U.S. Borrower.

(e) *Monthly Reports.* Monthly reports with respect to asset sales and facility closures.

(f) *Sales Flash Reports.* By Thursday of each week, a "flash" sales report which includes actual and forecasted sales for the current and subsequent month.

(g) *Interim Order, Initial Order, Final Order and Other Canadian Court Orders.* As soon as practicable in advance of filing with the Bankruptcy Court or the Canadian Court the Interim Order, the Initial Order, the Final Order and copies of any other proposed orders of the Canadian Court in the Canadian Case, as applicable, all other proposed orders and pleadings related to the DIP Facility (which must be, in each case, in form and substance satisfactory to the sole discretion of Required Lenders), any pleading relating to a Chapter 11 plan or a CCAA plan of compromise or arrangement, and/or any disclosure statement or other summary documents related to or copies of such Chapter 11 plan or CCAA plan.

(h) *Additional Requirements.* Additional reporting requirements reasonably requested by the Administrative Agent, including, without limitation, with respect to litigation, contingent liabilities, and ERISA, Canadian Pension Plans and environmental events.

(i) *Environmental.* (i) Any unpermitted Releases, (ii) receipt of any notice of violation of or potential liability or similar notice under, or the existence of any condition that could reasonably be expected to result in violations of or liabilities under, any Environmental Law or (iii) the commencement of, or any material and adverse change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or liability under any Environmental Law, that, for each of clauses (i), (ii) and (iii) above, in the aggregate for each such clause, could reasonably be expected to in an result in an Material Adverse Effect.

(j) *Access to Information.* Information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with senior management and other company advisors and the Required Lenders and Lender Advisors, and the Lender Advisors shall be provided with access to all information any of them shall reasonably request.

9.18 Financial Advisors. Upon terms and conditions satisfactory to the Required Lenders, the U.S. Borrower will (a) continue to retain Lazard Frères & Co. LLC ("Lazard") and/or other financial consultants and advisors acceptable to the Required Lenders; provided that in the event that Lazard's engagement has been terminated, the U.S. Borrower shall use commercially reasonable efforts to have approved by the Bankruptcy Court within 30 days a replacement advisor satisfactory to the Required Lenders and (b) continue to retain Alvarez & Marsal ("A&M") as restructuring advisors and/or other financial consultants and advisors acceptable to the Required Lenders; provided that in the event that A&M's engagement has been terminated, the U.S. Borrower shall use commercially reasonable efforts to have approved by the Bankruptcy Court within 30 days a replacement restructuring advisor satisfactory to the Required Lenders.

9.19 Ratings. The Credit Agreement Parties will, and will cause each of its Subsidiaries to, use commercially reasonable efforts to have the Loans rated by Moody's and S&P within 90 days after the Initial Borrowing Date.

9.20 Environmental Assessment. Within 30 days of the Interim Order Entry Date, the Credit Agreement Parties shall engage a reputable international third-party consultant, reasonably acceptable to Administrative Agent, to review the environmental, health and safety management systems and compliance programs of Holdings and its Subsidiaries, conduct an assessment of the compliance with environmental laws and cleanup liabilities of Holdings and its Subsidiaries in all applicable jurisdictions, and provide recommendations on any improvements and corrections as may be necessary or appropriate to maintain compliance with good management practices and environmental laws. Within 90 days of the Interim Order, the Credit Agreement Parties shall provide written satisfactory confirmation to the Administrative Agent describing any findings from such assessment and that such findings have been properly resolved.

9.21 <u>Post-Closing Actions</u>. Notwithstanding anything to the contrary contained in this Agreement or the other Credit Documents, each Credit Agreement Party shall, and shall cause each of its Subsidiaries to, consummate each of the actions set forth in Schedule 9.21, within the applicable specified time periods set forth therein. All conditions precedent and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above, rather than as elsewhere provided in the Credit Documents), <u>provided</u> that (x) to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Initial Borrowing Date, the respective representation and warranty shall be required to be true and correct in all material respects at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 9.21 and (y) all representations and warranties relating to the Security Documents shall be required to be true immediately after the actions required to be taken by Section 9.21 have been taken (or were required to be taken). The occurrence of each Credit Event shall constitute a representation, warranty and covenant by the Credit Agreement Parties to each of the Lenders that the actions required pursuant to this Section 9.21 will be, or have been, taken within the relevant time periods referred to in this Section 9.21 and that, at such time, all representations and warranties contained in this Agreement and the other Credit Documents shall then be true and correct in all material respects without any modification pursuant to this Section 9.21, and the parties hereto acknowledge and agree that the failure to take any of the actions required above, within the relevant time periods required above, shall give rise to an immediate Event of Default pursuant to this Agreement.

9.22 <u>Lender Conference Calls</u>. On a regular basis (but in any event no less frequently than quarterly if and to the extent requested by the Administrative Agent) at such times as the Borrowers and the Administrative Agent shall agree, host a conference call with the Administrative Agent and the Lenders to discuss the performance of the business, strategic alternatives and other issues as the Administrative Agent may reasonably request.

SECTION 10. <u>Negative Covenants</u>. Each Credit Agreement Party hereby covenants and agrees that as of the Effective Date and thereafter for so long as this Agreement is in effect and until the Total Commitment has terminated, no Notes are outstanding and the Loans, together with interest, Fees and all other Obligations (other than any indemnities described in Section 13.13 which are not then due and payable) incurred hereunder, are paid in full:

10.01 <u>Indebtedness; Certain Equity Securities</u>. (a) No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), create, incur, assume or permit to exist any Indebtedness, except:

(i) Indebtedness created under the Credit Documents;

(ii) [Intentionally Omitted];

(iii) [Intentionally Omitted];

(iv) Third Party Scheduled Existing Indebtedness existing on the Effective Date and set forth in Part C of Schedule 8.18 (for purposes of this clause (iv), treating unutilized amounts of overdraft facilities and lines of credit specifically identified on said Part C as outstanding Indebtedness of a like principal amount, even though same remain undrawn on such date) and extensions, renewals and replacements of any such Indebtedness, provided that such extending, renewal or replacement Indebtedness (A) shall not add guarantors, obligors or security from that which applied to the Indebtedness being extended, renewed or replaced, (B) shall not be in a principal amount that exceeds the principal amount of the Indebtedness being extended, renewed or replaced (plus accrued interest and premium thereon), (C) shall not have an earlier maturity date or a decreased Weighted Average Life to Maturity than the Indebtedness being extended, renewed or replaced and (D) shall be subordinated to the Obligations on the same terms (or, from the perspective of the Lenders, better terms), if any, as the Indebtedness being extended, renewed or replaced;

(v) intercompany Indebtedness by and among the Borrowers and their Subsidiaries permitted pursuant to subclauses (v), (w), (x) and (y) of Section 10.04(e);

(vi) Guarantees (v) by any U.S. Credit Party (other than Holdings) of Indebtedness incurred after the date hereof of any other U.S. Credit Party, (w) by any Canadian Credit Party of Indebtedness incurred after the date hereof of any other Credit Party (other than an Additional Foreign Borrower Credit Party), (x)(I) by any U.S. Credit Party (other than Holdings) of Indebtedness incurred after the date hereof of any Foreign Subsidiary of the U.S. Borrower and (II) by any Canadian Credit Party of Indebtedness incurred after the date hereof of any Foreign Subsidiary of the U.S. Borrower that is not a Canadian Credit Party, (y) by any Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party or an Additional Foreign Borrower Credit Party) of Indebtedness incurred after the date hereof of the U.S. Borrower or any Subsidiary of the U.S. Borrower and (z) the U.S. Credit Parties (other than Holdings) and the Canadian Credit Parties of Indebtedness incurred after the date hereof of any Foreign Subsidiary of the U.S. Borrower which is not organized under the laws of a European country, provided that, in each case, (1) the Indebtedness so Guaranteed is permitted by this Section 10.01 (other than Section 10.01(a)(iv)), (2) Guarantees permitted under this clause (vi) shall be subordinated to the Obligations of the U.S. Borrower or the applicable Subsidiary, as the case may be, on the same terms as the Indebtedness so Guaranteed is subordinated to the Obligations, (3) the aggregate outstanding principal amount of all Indebtedness of Subsidiaries guaranteed pursuant to subclause (x) of this clause (vi), when added to the aggregate principal amount of all intercompany loans made pursuant to (and in reliance on) Section 10.04(e)(x) and the aggregate amount of cash equity contributions made pursuant to (and in reliance on) Section 10.04(d)(x), shall not exceed U.S.$60,000,000 at any time and shall not exceed U.S.$50,000,000 at the end of any calendar month (provided that if the Mediofactor Facility shall be cancelled and not replaced in whole or in part the two immediately preceding dollar limits shall each be increased by U.S.$20,000,000) (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (4) the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to subclause (z) of this clause (vi), when added to the aggregate principal amount of all intercompany loans made pursuant to (and in reliance on) Section 10.04(e)(z)(ii) and the aggregate amount of cash equity contributions made pursuant to (and in reliance on) Section 10.04(d)(z), shall not exceed U.S.$10,000,000 at any time (in each

case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)) and (5) no Guarantees may be made or incurred pursuant to subclause (x) of this clause (vi) at any time any Default or any Event of Default is in existence (or would be in existence after giving effect thereto);

(vii) Indebtedness of the U.S. Borrower or any of its Subsidiaries incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed by the U.S. Borrower or any of its Subsidiaries in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (plus accrued interest and premium in respect thereof), provided that (A) such Indebtedness is incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement and (B) the aggregate principal amount of Indebtedness permitted by this clause (vii) shall not exceed, together with the Remaining Present Value of all leases permitted under Section 10.06, U.S.$15,000,000 at any time outstanding;

(viii) Indebtedness by and among Dutch BV and one or more Foreign Subsidiaries of the U.S. Borrower organized under the laws of a European country pursuant to a manual cash pooling arrangement; provided that (a) the Additional Foreign Borrower may borrow but shall not lend pursuant to such manual cash pooling arrangement, (b) Dutch BV shall act as an intermediary for such Foreign Subsidiaries participating in the pool, (c) the pool shall have at all times an aggregate cash position of at least U.S.$0 and (d) at any time, the positive excess of (1) the aggregate amount owing in respect of the pool by Dutch BV to Credit Parties participating in the pool over (2) the aggregate amount owing in respect of the pool to Dutch BV by Credit Parties participating in the pool shall not exceed the applicable amount specified in clause (II) of the proviso in Section 10.04(e);

(ix) Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(x) (A) Indebtedness of the U.S. Borrower or any of its Subsidiaries in respect of performance bonds, bid bonds, appeal bonds, surety bonds, completion guarantees and similar obligations, in each case provided in the ordinary course of business and (B) any refinancings, renewals and replacements of any such Indebtedness pursuant to the preceding clause (A) that do not increase the outstanding principal amount thereof (plus accrued interest and premium in respect thereof);

(xi) Indebtedness of any Credit Party pursuant to Swap Agreements or Post Petition Swap Agreements permitted by Section 10.07;

(xii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five Business Days of its incurrence;

93

(xiii) reimbursement obligations in respect of letters of credit issued for the account of the U.S. Borrower or any of its Subsidiaries, in an aggregate amount not in excess of U.S.\$35,000,000 at any time outstanding;

(xiv) Permitted Securitizations;

(xv) Indebtedness of any Foreign Subsidiary (other than a Canadian Credit Party) incurred to finance working capital needs of such Foreign Subsidiary, provided that the aggregate principal amount of Indebtedness permitted by this clause (xv), shall not exceed U.S.\$20,000,000 at any time outstanding;

(xvi) [Intentionally Omitted];

(xvii) Indebtedness arising from agreements of the U.S. Borrower or a Subsidiary of the U.S. Borrower providing for indemnification in connection with the disposition of any business, any assets or any Subsidiary of the U.S. Borrower, other than Guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition; and

(xviii) other Indebtedness of the U.S. Borrower or any Credit Party (other than Holdings), provided that the aggregate principal amount of Indebtedness permitted by this clause (xviii) shall not exceed U.S.\$10,000,000 at any time outstanding.

(b) The U.S. Borrower will not, and will not permit any of its Subsidiaries to, issue any Preferred Equity.

(c) Holdings will not issue any Preferred Equity other than Qualified Preferred Stock.

10.02 Liens. (a) No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to) create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except (Liens described below are herein referred to as "Permitted Liens")

(i) (A) Liens created under the Credit Documents, the DIP Lenders' Charge, the Administration Charge, the Directors' Charge (to the extent subordinated in full to the DIP Lenders' Charge), and any other Liens created under the Interim Order, the Initial Order, the Final Order or any Other CCAA Order (in each case to the extent subordinated in full to the DIP Lenders' Charge) and (B) Liens granted in favor of the Canadian Borrower in respect of any intercompany loans made by the Canadian Borrower, to the extent (i) such loans are otherwise permitted hereunder and (ii) such liens are required in connection with the administration of the Canadian Case;

(ii) Permitted Encumbrances;

(iii) any Lien on any property or asset of the U.S. Borrower or any of its Subsidiaries existing on the Initial Borrowing Date and either (x) set forth in Schedule 10.02(a) or (y) securing obligations in an aggregate amount less than U.S.$2,500,000, provided that (A) such Lien shall not apply to any other property or asset of the U.S. Borrower or any of its Subsidiaries and (B) such Lien shall secure only those obligations which it secures on the Initial Borrowing Date and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof (plus accrued interest and premium in respect thereof);

(iv) Liens created under the Prepetition Loan Documents (except to the extent such Liens are released by the Orders or the DIP Loan Documents or by the transactions contemplated hereby or thereby);

(v) Liens on fixed or capital assets acquired, constructed or improved by the U.S. Borrower or any of its Subsidiaries, provided that (A) such Liens secure Indebtedness permitted by clause (vii) of Section 10.01(a), (B) such Liens and the Indebtedness secured thereby are incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (D) such Liens shall not apply to any other property or assets of the U.S. Borrower or any of its Subsidiaries;

(vi) Liens of a collecting bank arising in the ordinary course of business under Section 5-208 of the UCC covering only the items being collected upon;

(vii) Liens that are statutory, common law or contractual rights of set-off relating to deposit accounts in favor of banks and other depositary institutions arising in the ordinary course of business;

(viii) Liens arising out of sale and leaseback transactions permitted by Section 10.06;

(ix) Liens granted by a Subsidiary of the U.S. Borrower that is not a Credit Party in favor of the U.S. Borrower or another Credit Party in respect of Indebtedness owed by such Subsidiary;

(x) Liens representing any interest or title of a licensor, lessor or sub-licensor under any lease or license entered into by the U.S. Borrower or any of its Subsidiaries in the ordinary course of business;

(xi) sales or other transfers of Receivables pursuant to, and Liens existing or deemed to exist in connection with, Permitted Securitizations permitted by Section 10.01(a)(xiv);

(xii) Liens on property of a Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party or an Additional Foreign Borrower Credit Party) or any of its Foreign Subsidiaries (other than a Canadian Credit Party or an Additional Foreign Borrower Credit Party) securing Indebtedness permitted by Section 10.01(a)(xv);

95

(xiii) Liens with respect to property or assets of the U.S. Borrower or any of its Subsidiaries not constituting Collateral with an aggregate fair value (valued at the time of creation thereof) of not more than U.S.$5,000,000 at any time;

(xiv) Liens (a) securing obligations in respect of trade-related letters of credit or trade-related bankers acceptances issued in the ordinary course of business of the U.S. Borrower and its Subsidiaries, in each case covering the goods (or the documents of title in respect of such goods) financed by such letters of credit or trade-related bankers acceptances and the proceeds and products thereof and (b) on up to U.S.$35,000,000 of cash (which may be proceeds of the Loans) to secure obligations in respect of letters of credit issued by one or more Lenders for the account of the U.S. Borrower or any of its Subsidiaries;

(xv) Liens on securities held by the U.S. Borrower or any of its Subsidiaries representing an interest in a joint venture to which the U.S. Borrower or such Subsidiary is a party (provided that such joint venture is not a Subsidiary of the U.S. Borrower) to the extent that (A) such Liens constitute purchase options, calls or similar rights of a counterparty to such joint venture and (B) such Liens are granted pursuant to the terms of the partnership agreement, joint venture agreement or other similar document or documents pursuant to which such joint venture was created or otherwise governing the rights and obligations of the parties to such joint venture;

(xvi) sales of Receivables and Related Assets pursuant to, and Liens existing or deemed to exist in connection with, Auto Supplier Support Transactions; and

(xvii) undetermined or inchoate Liens and charges arising or potentially arising under statutory provisions which have not at the time been filed or registered in accordance with applicable law or of which written notice has not been given in accordance with applicable law, or which if filed or registered, relates to obligations not yet due or delinquent.

10.03 Fundamental Changes. (a) No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, or liquidate or dissolve, except that (i) any Domestic Subsidiary of the U.S. Borrower may be merged, consolidated or liquidated with or into the U.S. Borrower (so long as the surviving Person of such merger, consolidation or liquidation is a corporation, limited liability company or limited partnership organized or existing under the laws of the United States of America, any State thereof or the District of Columbia and, if such surviving Person is not the U.S. Borrower, such Person expressly assumes, in writing, all the obligations of the U.S. Borrower under the Credit Documents pursuant to an assumption agreement in form and substance reasonably satisfactory to the Administrative Agent) or any U.S. Subsidiary Guarantor (so long as the surviving Person of such merger, consolidation or liquidation is a Wholly-Owned Domestic Subsidiary of the U.S. Borrower, is a corporation, limited liability company or limited partnership and is or becomes a U.S. Subsidiary Guarantor concurrently with such merger, consolidation or liquidation), (ii) any Canadian Subsidiary of the U.S. Borrower (other than the Canadian Borrower and any unlimited liability company) may be merged, consolidated, amalgamated or liquidated with or into the Canadian Borrower (so long as the Canadian Borrower is the surviving corporation of such merger, consolidation, amalgamation or liquidation and is not an unlimited liability company) or any Canadian Subsidiary Guarantor (so long as the surviving Person of such merger, consolidation, amalgamation or liquidation is a Wholly-Owned Subsidiary of the

96

U.S. Borrower organized or existing under the laws of Canada or any province thereof, is not an unlimited liability company and is or becomes a Canadian Subsidiary Guarantor concurrently with such merger, consolidation or liquidation), (iii) any Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party or an Additional Foreign Borrower Credit Party) may be merged, consolidated or liquidated with or into any Credit Party (so long as such Credit Party is the surviving corporation of such merger, consolidation or liquidation), (iv) any Foreign Subsidiary of the U.S. Borrower that is not a Credit Party may be merged, consolidated or liquidated with or into any other Foreign Subsidiary of the U.S. Borrower that is not a Credit Party and (v) any asset sale permitted by Section 10.05(k) may be effected through the merger of a Subsidiary with a third party; provided that any such merger, consolidation, amalgamation or liquidation shall only be permitted pursuant to this clause (a), so long as (I) no Default and no Event of Default then exists or would exist immediately after giving effect thereto, (II) except in the case of sub-clause (v) above, any security interests granted to the Collateral Agent for the benefit of the Secured Creditors in the assets (and Equity Interests) of any such Person subject to any such transaction shall remain in full force and effect and perfected and enforceable (to at least the same extent as in effect immediately prior to such merger, consolidation, amalgamation or liquidation) and (III) the surviving Person from the merger (the "Surviving Entity") assumes all obligations under the Credit Documents of the Person or Persons being merged into the Surviving Entity.

(b) No Credit Agreement Party will, nor will permit any of its Subsidiaries to, engage to any material extent in any business other than (i) businesses of the type conducted by the U.S. Borrower and its Subsidiaries on the Initial Borrowing Date and businesses reasonably related or incidental thereto and (ii) in the case of SPE Subsidiaries of the U.S. Borrower, Permitted Securitizations.

(c) Notwithstanding anything to the contrary contained in Section 10.03(b), (i) Holdings will not engage in any business or activity other than the ownership of all the outstanding Equity Interests of the U.S. Borrower and activities incidental thereto and (ii) Holdings will not own or acquire any assets (other than Equity Interests of the U.S. Borrower and the cash proceeds of any Restricted Payments permitted by Section 10.08) or incur any liabilities (other than liabilities under the Credit Documents, Third-Party Scheduled Existing Indebtedness in the form of guaranties identified on Part C of Schedule 8.18 and liabilities reasonably incurred in connection with its maintenance of its existence).

(d) Notwithstanding anything to the contrary contained in Section 10.03(b), (i) U.S. Finco will not engage in any business or activity other than the holding of an intercompany loan to CSA Holding (Deutschland) GmbH and activities incidental thereto and (ii) U.S. Finco will not own or acquire any assets (other than the intercompany obligation owing to it by CSA Holding (Deutschland) GmbH described in preceding clause (i) and cash proceeds from any payments made in respect thereof) or incur any liabilities (other than liabilities under the Credit Documents to which it is a party and liabilities reasonably incurred in connection with its maintenance of its existence)

10.04 Investments, Loans, Advances, Guarantees and Acquisitions. No Credit Agreement Party will, nor will permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), purchase, hold or acquire any Equity Interests in or evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (each of the foregoing, an "Investment"), except:

(a) [Intentionally Omitted];

97

(b) Permitted Investments;

(c) Investments existing on the Effective Date and set forth on Schedule 10.04(c);

(d) (v) any U.S. Credit Party may make cash common equity contributions to any of its direct Wholly-Owned Subsidiaries that is a U.S. Credit Party, (w) any Canadian Credit Party may make cash common equity contributions to any of its direct Wholly-Owned Subsidiaries that is a Canadian Credit Party, (x)(I) any U.S. Credit Party may make cash common equity contributions to any of its direct Foreign Subsidiaries and (II) any Canadian Credit Party may make cash common equity contributions to any of its direct Foreign Subsidiaries that is not a Canadian Credit Party, (y) any Foreign Subsidiary (other than a Canadian Credit Party) may make cash common equity contributions to any of its direct Foreign Subsidiaries and (z) the U.S. Credit Parties (other than Holdings) and the Canadian Credit Parties may make cash common equity contributions to any Foreign Subsidiary of the U.S. Borrower which is not organized under the laws of a European country; provided that (I) the aggregate amount of the cash common equity contributions made pursuant to subclause (x) of this clause (d), when added to the aggregate outstanding principal amount of all intercompany loans made pursuant to (and in reliance on) subclause (x) of clause (e) below and the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to Section 10.01(a)(vi)(x), shall not exceed U.S.$60,000,000 at any time and shall not exceed U.S.$50,000,000 at the end of any calendar month (provided that if the Mediofactor Facility shall be cancelled and not replaced in whole or in part the two immediately preceding dollar limits shall each be increased by U.S.$20,000,000) (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (II) the aggregate amount of the cash common equity contributions made pursuant to subclause (z) of this clause (d), when added to the aggregate outstanding principal amount of all intercompany loans made pursuant to (and in reliance on) subclause (z)(ii) of clause (e) below and the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to Section 10.01(a)(vi)(z), shall not exceed U.S.$10,000,000 at any time (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (III) no contributions may be made after the Effective Date pursuant to subclause (x) of this clause (d) at any time any Default or any Event of Default is in existence (or would be in existence after giving effect thereto), (IV) any Equity Interests held by a Credit Party shall be pledged to the Collateral Agent for the benefit of the Secured Creditors as, and to the extent required by, the relevant Pledge Agreement and (V) any cash common equity contribution made by a Canadian Credit Party is subject to approval of the Canadian Court;

(e) (v) U.S. Credit Parties (other than Holdings) may make intercompany loans to each other, (w) Canadian Credit Parties may make intercompany loans to any other Credit Party (other than Dutch BV), (x)(I) U.S. Credit Parties (other than Holdings) may make intercompany loans to any Foreign Subsidiary of the U.S. Borrower and (II) Canadian Credit Parties and the Additional Foreign

Borrower Credit Parties (other than Dutch BV) may make intercompany loans to any Foreign Subsidiary of the U.S. Borrower that is not a Canadian Credit Party, (y) any Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party and Dutch BV) may make intercompany loans to any Credit Party and any Foreign Subsidiary of the U.S. Borrower that is not a Credit Party may make intercompany loans to any other Foreign Subsidiary of the U.S. Borrower that is not a Credit Party and (z) (i) Dutch BV may make intercompany loans to any U.S Credit Party, any Canadian Credit Party, any Additional Foreign Borrower Credit Party and any Foreign Subsidiary of the U.S. Borrower permitted pursuant to Section 10.01(a)(viii) and (ii) the U.S. Credit Parties (other than Holdings) and the Canadian Credit Parties may make intercompany loans to any Foreign Subsidiary of the U.S. Borrower which is not organized under the laws of a European country; provided that (I) any such intercompany loan made by a Credit Party pursuant to this clause (e) shall be evidenced by an Intercompany Note pledged in favor of the Collateral Agent for the benefit of the relevant Secured Creditors pursuant to the relevant Pledge Agreement, (II) the aggregate outstanding principal amount of all such intercompany loans made pursuant to this clause (e) above, when added to the aggregate amount of cash equity contributions made pursuant to (and in reliance on) Section 10.04(d)(x) above and the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to Section 10.01(a)(vi)(x), shall not exceed U.S.$60,000,000 at any time and shall not exceed U.S.$50,000,000 at the end of any calendar month (provided that if the Mediofactor Facility shall be cancelled and not replaced in whole or in part the two immediately preceding dollar limits shall each be increased by U.S.$20,000,000) (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (III) the aggregate outstanding principal amount of all such intercompany loans made pursuant to subclause (z)(ii) of this clause (e) above, when added to the aggregate amount of cash equity contributions made pursuant to (and in reliance on) Section 10.04(d)(z) above and the aggregate outstanding principal amount of all Indebtedness of Subsidiaries Guaranteed pursuant to Section 10.01(a)(vi)(z), shall not exceed U.S.$10,000,000 at any time (in each case, determined without regard to write-downs or write-offs thereof and, in the case of equity contributions, net of any returns of capital in the form of dividends or distributions actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such Investment at the time such Investment was made)), (IV) no intercompany loans may be made pursuant to subclause (x) of this clause (e) at any time any Default or any Event of Default is in existence (or would be in existence after giving effect thereto), (V) each intercompany loan made pursuant to this clause (e) shall be subject to subordination as, and to the extent required by, the Intercompany Subordination Agreement, (VI) any intercompany loans made pursuant to this clause (e) shall cease to be permitted hereunder if the obligor or obligee thereunder ceases to constitute a Credit Party or a Subsidiary of the U.S. Borrower, as applicable, as contemplated above and (VII) any intercompany loan made by a Canadian Credit Party is subject to approval of the Canadian Court;

(f) Guarantees constituting Indebtedness expressly permitted by Section 10.01(a);

(g) receivables or other trade payables owing to the U.S. Borrower or any of its Subsidiaries if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms, provided that such trade terms may include such concessionary trade terms as the U.S. Borrower or any such Subsidiary deems reasonable under the circumstances;

99

(h) Investments consisting of Equity Interests, obligations, securities or other property received in settlement of delinquent accounts of and disputes with customers and suppliers in the ordinary course of business and owing to the U.S. Borrower or any of its Subsidiaries or in satisfaction of judgments;

(i) Investments by the U.S. Borrower or any of its Subsidiaries in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(j) loans or advances by the U.S. Borrower or any of its Subsidiaries to employees made in the ordinary course of business (including travel, entertainment and relocation expenses) of the U.S. Borrower or any of its Subsidiaries not exceeding U.S.$1,000,000 in the aggregate at any time outstanding (determined without regard to any write-downs or write-offs of such loans or advances);

(k) Investments in the form of Swap Agreements permitted by Section 10.07;

(l) [Intentionally Omitted];

(m) Investments received in connection with the dispositions of assets permitted by Section 10.05;

(n) Investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances";

(o) Investments and Guarantees arising or made under Permitted Securitizations permitted by Section 10.01(a)(xiv);

(p) [Intentionally Omitted];

(q) other Investments by the U.S. Borrower or any of its Subsidiaries in an aggregate amount, as valued at cost at the time each such Investment is made (including all commitments for future investments), not exceeding U.S.$10,000,000 in the aggregate for all such Investments made from and after the Initial Borrowing Date plus an amount equal to any returns of capital actually received in cash in respect of any such Investments (which amount shall not exceed the amount of such investment valued at cost at the time such investment was made);

(r) [Intentionally Omitted];

(s) [Intentionally Omitted]; and

(t) any Investment which may be deemed to exist as a result of the consummation of any Auto Supplier Support Transaction.

10.05 Asset Sales. No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the U.S. Borrower permit any of its Subsidiaries to issue any additional Equity Interest in such Subsidiary (other than to the U.S. Borrower or any of its Subsidiaries in compliance with Section 10.04), except (and subject to the Initial Order):

(a) sales, transfers and dispositions of (i) inventory in the ordinary course of business and (ii) surplus, obsolete or worn out equipment or property in the ordinary course of business;

(b) sales, transfers and dispositions of assets (v) among the U.S. Credit Parties (other than Holdings), (w) by any Canadian Credit Party to any other Credit Party (other than Holdings), (x) by any Credit Party to any Foreign Subsidiary of the U.S. Borrower, (y) by any Subsidiary of the U.S. Borrower to any Credit Party (other than Holdings) and (z) by any Foreign Subsidiary of the U.S. Borrower that is not a Credit Party to (1) any Credit Party (other than Holdings) or (2) any other Foreign Subsidiary of the U.S. Borrower; provided that (I) no Default and no Event of Default then exists or would exist immediately after giving effect to the respective transfer, (II) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the relevant Security Documents in the assets so transferred shall remain in full force and effect and perfected and enforceable (to at least the same extent as in effect immediately prior to such transfer) and (III) the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon subclause (x) of this clause (b) either (X) does not exceed U.S.$500,000 in any Fiscal Year or (Y) if such assets consist of surplus, obsolete or worn out equipment listed on Schedule 10.05(b), does not exceed U.S.$2,500,000;

(c) sales, transfers and dispositions of accounts receivable in connection with the compromise, settlement or collection thereof;

(d) sales, transfers and dispositions of property to the extent such property constitutes an investment permitted by clause (b), (h), (m) or (n) of Section 10.04;

(e) sale and leaseback transactions permitted by Section 10.06;

(f) dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the U.S. Borrower or any of its Subsidiaries;

(g) sales, transfers and other dispositions of Receivables and Related Assets (as defined in the definition of "Permitted Securitization") pursuant to Permitted Securitizations permitted by Section 10.01(a)(xiv);

(h) licensing and cross-licensing arrangements entered into in the ordinary course of business involving any technology or other intellectual property of the U.S. Borrower or any of its Subsidiaries;

(i) sales, transfers and other dispositions of assets listed on Part A or B of Schedule 10.05(b); provided that any Equity Interests received by the U.S. Borrower or any of its Subsidiaries in exchange for the assets listed on Part A of such Schedule 10.05(b) are pledged to the Collateral Agent to secure the Obligations to the extent such pledge would not (1) violate applicable law (including corporate benefit, financial assistance, fraudulent preference, thin capitalization rules, and similar laws or regulations), result in a breach or default under an existing contract identified on Part C of Schedule 10.05(b) or would reasonably be expected to result in a material incremental tax liability or personal liability of any director or officer of the pledgor of such Equity Interests or (2) result in costs (administrative or otherwise) that in the determination of the Administrative Agent are materially disproportionate to the benefit obtained thereby, all of which shall be satisfactory in form and substance to the Required Lenders in their sole discretion;

(j) sales, transfers and other dispositions of assets for proceeds not constituting cash or Permitted Investments, <u>provided</u> that the aggregate fair market value of all assets, sold, transferred or otherwise disposed of in reliance upon this paragraph (j) shall not exceed U.S.$2,000,000 during the term of this Agreement;

(k) sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary of the U.S. Borrower unless all Equity Interests in such Subsidiary are sold) that are not permitted by any other clause of this Section 10.05, <u>provided</u> that the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon this clause (k) shall not exceed U.S.$10,000,000 during any Fiscal Year; and

(l) sales of Receivables and Related Assets pursuant to Auto Supplier Support Transactions,

<u>provided</u> that (i) all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clauses (b) and (f) above) shall be made for fair value, (ii) all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b), (f), (h) (to the extent relating to cross-licensing), (i), (j) and (l) (to the extent relating to Permitted Credit Protection Transactions) above) shall be made for at least 75% cash consideration (which cash consideration (1) for purposes of clause (a)(i) above, shall be deemed to include accounts receivable and (2) for purposes of clause (a)(ii) above, shall be deemed to include additions to property, plant and equipment received in connection with a trade in of surplus, obsolete or worn out equipment) and <u>provided</u> further, that for purposes of the preceding proviso, the assumption by the transferee of liabilities associated with the assets subject to any sale, transfer or other disposition (other than any liabilities that are subordinated to the Obligations or have stated maturity that is outside the Maturity Date) shall not be deemed to be consideration paid in respect of such assets.

10.06 <u>Sale and Leaseback Transactions</u>. No Credit Agreement Party will, nor will permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "<u>Sale and Leaseback Transaction</u>"), <u>provided</u> that (and subject to the Initial Order), a Sale and Leaseback Transaction shall be permitted so long as at the time the lease in connection therewith is entered into, and after giving effect to the entering into of such lease, the Remaining Present Value of such lease (together with Indebtedness outstanding pursuant to clause (vii) of Section 10.01(a) and the Remaining Present Value of outstanding leases previously entered into under this Section 10.06) does not exceed U.S.$10,000,000.

10.07 <u>Post Petition Swap Agreements</u>. No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), enter into any Post Petition Swap Agreement, except (a) Post Petition Swap Agreements entered into to hedge or mitigate risks to which the U.S. Borrower or any of its Subsidiaries has

102

actual exposure (other than those in respect of Equity Interests of the U.S. Borrower or any of its Subsidiaries) and (b) Post Petition Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of U.S. Borrower or any of its Subsidiaries.

10.08 Restricted Payments; Certain Payments of Indebtedness.

(a) No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) each of Holdings and the U.S. Borrower may declare and pay dividends with respect to its common stock payable solely in additional shares of its common stock, and Holdings may declare and pay dividends with respect to its preferred stock payable solely in additional shares of such preferred stock or in shares of its common stock, (ii) Subsidiaries of the U.S. Borrower may declare and pay dividends ratably with respect to their capital stock, membership or partnership interests or other similar Equity Interests, (iii) the U.S. Borrower may make Restricted Payments to Holdings to permit Holdings to make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of Holdings and its Subsidiaries that have been approved by the board of directors of Holdings in an amount during any Fiscal Year equal to the sum of (A) U.S.$1,000,000 and (B) amounts received by Holdings as a result of the sale of Equity Interests in Holdings to employees, officer, directors or consultants of Holdings, the U.S. Borrower or any Subsidiary of the U.S. Borrower since the beginning of the relevant Fiscal Year, which amounts, if not used in any Fiscal Year, may be carried forward to any subsequent Fiscal Year, (iv) the U.S. Borrower may pay dividends to Holdings, at such times and in such amounts (A) not exceeding U.S.$2,500,000 during any Fiscal Year, as shall be necessary to permit Holdings to discharge its corporate overhead (including franchise taxes and directors fees) and other permitted liabilities and to make payments permitted by Section 10.09 and (B) as shall be necessary to pay any taxes that are due and payable by Holdings as part of a consolidated, combined, unitary or similar group that includes the U.S. Borrower or any of its Subsidiaries, to the extent that such taxes relate to the operations of the U.S. Borrower and its Subsidiaries and so long as any refunds received by Holdings attributable to the U.S. Borrower or any of its Subsidiaries shall be promptly returned by Holdings to the U.S. Borrower and (v) without duplication as to amounts distributable with respect to taxes under clause (iv) above, in the event that Holdings and the U.S. Borrower become pass-through or disregarded entities for U.S. federal income tax purposes, the U.S. Borrower may make Tax Distributions to Holdings to the extent that the aggregate amount of Tax Distributions made pursuant to this clause (v) in respect of any taxable year does not exceed the aggregate amount of U.S. federal, state and local income taxes that would have otherwise been payable by the U.S. Borrower for such taxable year had it remained a corporation for U.S. federal income tax purposes for such taxable year, in each case as may be approved by the Bankruptcy Court and the Canadian Court.

(b) No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Scheduled Existing Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness, except, in each case as may be approved by the Bankruptcy Court and the Canadian Court.

10.09 <u>Transactions with Affiliates</u>. No Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (subject to the Initial Order) (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Credit Agreement Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among (x) the U.S. Borrower and the other Credit Parties not involving any other Affiliate, (y) the Canadian Borrower and the other Canadian Credit Parties not involving any other Affiliate or (z) the Credit Parties not involving any other Affiliate, so long as the aggregate transaction value (as determined in good faith by the U.S. Borrower) for all such transactions described in this clause (z) does not exceed U.S.$1,000,000, (c) any investment or Guarantee permitted by Sections 10.04(d), 10.04(e), 10.04(f), 10.04(j) or 10.04(o), (d) any Indebtedness permitted under Section 10.01(a)(v), Section 10.01(a)(vi) or Section 10.01(a)(viii), (e) any Restricted Payment permitted by Section 10.08, (f) any contribution to the capital of Holdings by any Permitted Holder or any purchase of Equity Interests of Holdings by any Permitted Holder, (g) the payment of reasonable fees to directors of Holdings or any of its Subsidiaries who are not employees of Holdings or any of its Subsidiaries, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers, employees and consultants of Holdings or any of its Subsidiaries in the ordinary course of business, (h) any transactions permitted by Section 10.05(g), and (i) transactions in existence on the Effective Date or pursuant to agreements in existence on the Effective Date and, in each case, set forth on Schedule 10.09 or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect.

10.10 <u>Restrictive Agreements</u>. No Credit Agreement Party will, nor will permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Credit Agreement Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets or (b) the ability of any Subsidiary of the U.S. Borrower to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the U.S. Borrower or any other Subsidiary of the U.S. Borrower or to Guarantee Indebtedness of the U.S. Borrower or any other Subsidiary of the U.S. Borrower, <u>provided</u> that (i) the foregoing shall not apply to restrictions and conditions imposed by (A) applicable laws (B) any Credit Document, and (C) any instrument or agreement governing any Indebtedness incurred by a Foreign Subsidiary of the U.S. Borrower (other than a Canadian Credit Party) pursuant to Section 10.01(a)(xv), but only to the extent such restrictions or conditions are imposed only on such Foreign Subsidiary and its Foreign Subsidiaries, (ii) the foregoing shall not apply to restrictions and conditions existing on the Effective Date and identified on Schedule 10.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements and other documents (including organizational documents) governing any Permitted Joint Venture, (iv) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary of the U.S. Borrower or the sale of assets pending such sale, <u>provided</u> such restrictions and conditions apply only to the Subsidiary or assets that are to be sold and such sale is permitted

hereunder, (v) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to Permitted Securitizations or Auto Supplier Support Transactions permitted by this Agreement if such restrictions or conditions apply only to the Receivables and the Related Assets that are the subject of the Permitted Securitization or Auto Supplier Support Transaction, as the case may be, and neither clause (a) nor clause (b) of the foregoing shall apply to restrictions or conditions imposed on any SPE Subsidiary in connection with any Permitted Securitization, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement (other than in respect of an Auto Supplier Support Transaction) if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (vii) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof.

10.11 Amendment of Material Documents. No Credit Agreement Party will, nor will it permit any of its respective Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), amend, modify or waive any of its rights under (a) any Existing Indebtedness Agreement, (b) any Tax Allocation Agreement, (c) any Management Agreement, or (d) its certificate of incorporation, by-laws or other organizational documents, in each case to the extent such amendment, modification or waiver would be materially adverse to the Lenders; provided that in no event shall any amendment or modification to the foregoing (i) increase the applicable interest rate, (ii) shorten the maturity date from that theretofore in effect, (iii) modify or change any subordination provisions contained therein or (iv) make any covenant more restrictive in any material respect than previously existed thereunder.

10.12 New Subsidiaries. No Credit Agreement Party will, nor will it permit any of its respective Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to), form or acquire any new Subsidiary, other than an SPE Subsidiary.

10.13 13-Week Budget. Each of the Credit Parties will, and will cause each of its Subsidiaries to, comply with the most recently delivered 13-Week Budget. Operating cash disbursements shall be tested every four weeks on a combined basis, for the U.S. Credit Parties and the Canadian Credit Parties, as compared to the most recent 13-Week Budget with a permitted variance for the four-week period of 15%. For purposes of the covenant described in the preceding sentence, the disbursement of funds collected on behalf of one Subsidiary on behalf of another Subsidiary, shall be excluded from operating cash disbursements.

10.14 Maximum Capital Expenditures. The U.S. Borrower will not, nor will it permit any of its Subsidiaries to, incur or make any Capital Expenditures for the three month period ending on the last day of September 2009, the six month period ending on the last day of December 2009 or the nine month period ending on the last day of March 2010, respectively, set forth below in excess of the maximum amount set forth below opposite such period:

| PERIOD | CAPITAL EXPENDITURES | |
| --- | --- | --- |
| Three month period ending September 30, 2009 | U.S.$ | 30,000,000 |
| Six month period ending December 31, 2009 | U.S.$ | 52,500,000 |
| Nine month period ending March 30, 2010 | U.S.$ | 77,500,000 |

10.15 Limitation on Issuance of Equity Interests. Neither the U.S. Borrower nor the Canadian Borrower will issue any capital stock or other Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock or other Equity Interests, except (i) for transfers and replacements of then outstanding shares of capital stock or other Equity Interests and (ii) for stock splits, stock dividends and additional issuances which do not decrease the percentage ownership of Holdings (in the case of the U.S. Borrower) or the U.S. Borrower (in the case of the Canadian Borrower) in any class of the capital stock or other Equity Interests of such Borrower.

10.16 Minimum EBITDA. The U.S. Borrower will not permit Consolidated EBITDA for the three month period ending on the last day of September 2009, the six month period ending on the last day of December 2009 or the nine month period ending on the last day of March 2010, respectively, to be less than the minimum amount set forth below opposite such period:

| PERIOD | MINIMUM CONSOLIDATED EBITDA | |
| --- | --- | --- |
| Three month period ending September 30, 2009 | U.S.$ | 35,000,000 |
| Six month period ending December 31, 2009 | U.S.$ | 77,500,000 |
| Nine month period ending March 30, 2010 | U.S.$ | 102,500,000 |

10.17 Minimum Liquidity. Holdings shall maintain Consolidated Liquidity, (i) in the case of the calendar months August 2009 and September 2009, as determined at all times, commencing on the Final Borrowing Date, for and reported on a monthly basis for the preceding monthly period, of at least U.S.$100,000,000 and (ii) in the case of any calendar month after September 2009, as determined as of the last day of such calendar month and reported on a monthly basis for the preceding calendar month, of at least U.S.$100,000,000.

10.18 Chapter 11 Claims. Unless the Required Lenders consent (which consent may be given or withheld in their sole discretion) and except as expressly provided in the Orders, the Debtors shall not, and shall not permit any of their Subsidiaries to, agree to, incur, create, assume, suffer to exist or permit or apply to the Bankruptcy Court or the Canadian Court for authority to do so (including any extension, grant or application in respect of the Prepetition Obligations) (a) any administrative expense, unsecured claim, or other Superpriority Claim or Lien (including any administrative expense, unsecured claim, or other super-priority claim or lien in respect of the Prepetition Obligations) which is *pari passu* with or senior to the claims of the Secured Creditors against the Credit Parties hereunder, or apply to the Bankruptcy Court or the Canadian Court for authority to do so, except for the Carve-Out and the Administration Charge or (b) the extension of any existing adequate protection or the grant of further adequate protection.

10.19 <u>No Right of Subrogation</u>. No Credit Party will, nor will it permit any of its Subsidiaries to, assert any right of subrogation or contribution against any other Credit Party or any of their Subsidiaries as long as any Obligation or any Commitment remains outstanding.

10.20 <u>Modification of Engagement Letters</u>. No Credit Party will, nor will it permit any of its Subsidiaries to, (i) materially modify any terms (including any economic terms) of the A&M Engagement Letter or the Lazard Engagement Letter or (ii) enter into any other engagement letter with any other financial, restructuring or similar advisor in connection with the Transaction without the terms and conditions of such engagement letter being satisfactory to the Required Lenders in their sole discretion.

10.21 <u>Hazardous Materials</u>. No Credit Party shall cause or suffer to exist any Release of any Hazardous Materials at, to or from any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party that would violate any Environmental Laws, form the basis for any Environmental Liability or otherwise adversely affect the value or marketability of any real property (whether or not owned by any Credit Party), other than such violations, Environmental Liability and effects that would not, in the aggregate, have a Material Adverse Effect.

SECTION 11. <u>Events of Default and Remedies</u>. If any of the following specified events (any such event, an "<u>Event of Default</u>") shall occur:

(a) any Borrower shall fail to pay any principal of any Loan or Note, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) any Borrower shall fail to pay any interest on any Loan or Note or any Fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Agreement or any other Credit Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c) any representation or warranty made or deemed made by or on behalf of any Credit Agreement Party or any of its Subsidiaries in or in connection with any Credit Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Credit Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty), in either case when made or deemed made, except to the extent such representation or warranty relates expressly to an earlier date (in which case such representation or warranty shall prove to have been incorrect in any material respect (without giving effect to any materiality or Material Adverse Effect qualifier in any representation or warranty) as of such earlier date);

(d) any Credit Agreement Party shall fail to observe or perform any covenant, condition or agreement contained in Sections 9.02(a), 9.03(a), 9.04 (with respect to the existence of any Credit Agreement Party) or 9.11 or in Section 10;

(e) any Credit Agreement Party or any other Credit Party shall fail to observe or perform any covenant, condition or agreement contained in any Credit Document (other than those specified in clause (a), (b) or (d) of this Section 11), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to Holdings or the U.S. Borrower (which notice will be given at the request of any Lender);

(f) any Credit Agreement Party or any of its Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness (which, in the case of any Debtor, was incurred after the Petition Date or where payment thereof by a Debtor or enforcement, acceleration or termination thereof by the holder(s) of such Material Indebtedness was not otherwise subject to a stay of proceedings in any of the Cases), when and as the same shall become due and payable (after giving effect to any applicable grace period with respect thereto, provided that, during the applicable grace period, no additional consideration is paid or additional rights are granted in respect of such Material Indebtedness);

(g) any event or condition occurs that results in any Material Indebtedness (which, in the case of any Debtor, was incurred after the Petition Date or where payment thereof by a Debtor or enforcement, acceleration or termination thereof by the holder(s) of such Material Indebtedness was not otherwise subject to a stay of proceedings in either of the Cases) becoming due or, in the case of a Permitted Securitization (other than the Mediofactor Facility), terminating (except voluntary terminations) prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of such Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due or, in the case of a Permitted Securitization (other than the Mediofactor Facility), to be terminated, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets (to the extent not prohibited under this Agreement) securing such Indebtedness;

(h) (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking liquidation, reorganization or other relief in respect of any Credit Party or any of its Subsidiaries (other than an Immaterial Subsidiary) or its debts, or of a substantial part of its assets, under any Federal, state or foreign Debtor Relief Law now or hereafter in effect (including the Bankruptcy Code) or (ii) a proceeding shall be commenced or a petition filed seeking the appointment of a receiver, interim receiver, receiver and manager, trustee, sequestrator, conservator, liquidator, provisional liquidator, rehabilitator, examiner with expanded powers under the Bankruptcy Code, responsible officer, or any similar party or officer under any Debtor Relief Law (other than the appointment of the Monitor with respect to the Canadian Case) for any Credit Party, any of their Subsidiaries (other than Immaterial Subsidiaries), or a substantial part of any such entity's assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) any Credit Party or any of their respective Immaterial Subsidiaries shall (i) other than the Cases, voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign Debtor Relief Law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding

108

or petition described in clause (h) of this Section 11, (iii) apply for or consent to the appointment of a receiver, interim receiver, receiver and manager, trustee, sequestrator, conservator, liquidator, provisional liquidator, rehabilitator, examiner with expanded powers under the Bankruptcy Code, responsible officer, or any similar party or officer under any Debtor Relief Law (other than the appointment of the Monitor with respect to the Canadian Case), (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any formal action for the purpose of effecting any of the foregoing;

(j) any Credit Party or any of its Subsidiaries (other than a Debtor) shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k) one or more judgments for the payment of money in an aggregate amount in excess of U.S.$10,000,000 shall be rendered against any Credit Agreement Party or any of its Subsidiaries (but in the case of the Debtors, only as to post-Petition Date activities or where enforcement thereof was not subject to a stay of proceedings in any of the Cases) or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Credit Agreement Party or any of its Subsidiaries to enforce any such judgment;

(l) (x) an ERISA Event (other than the filing of the Cases) shall have occurred and/or (y) a Credit Party or a Governmental Authority shall have taken steps to terminate a Canadian Pension Plan and/or a Foreign Pension Plan ("Plan Termination Events") or any fact or circumstance gives rise to a reasonable expectation that any Plan Termination Event could occur that, when taken together with all other ERISA Events and/or Plan Termination Events that have occurred, could reasonably be expected to result in liability of, and/or required contribution by, Holdings and its Subsidiaries in an aggregate amount exceeding U.S.$10,000,000 for all periods;

(m) The failure to make payment of any Priority Payables in excess of an amount equal to Cdn.$100,000 as and when due;

(n) any Lien purported to be created under any Security Document or the DIP Lenders' Charge shall cease to be, or shall be asserted by any Credit Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Document or the DIP Lenders' Charge, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Credit Documents or (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments (if any) delivered to it under the Security Documents or to file all continuation statements;

(o) any Credit Document shall not be, or for any reason be asserted by any Credit Party not to be, a legal, valid and binding obligation of any party thereto;

(p) any Guaranty shall cease to be in full force and effect (other than in accordance with the terms thereof) or shall be asserted by any Credit Party not to be in effect or not to be legal, valid and binding obligations;

(q) a Change in Control shall occur;

(r) The Final Order Entry Date shall not have occurred by the date that is 30 days after the Interim Order Entry Date;

(s) Any proceeding before a court, tribunal, or Governmental Authority or agency in any jurisdiction seeking to (i) amend in a manner adverse to the DIP Lenders, vacate, reverse, nullify, or otherwise challenge any provision of the Interim Order, the Initial Order, or any Other CCAA Order (whether in whole or in part), or any of the transactions required to effectuate the DIP Facility (or any document related to such transactions), (ii) amend in a manner adverse to the DIP Lenders, release, subordinate, nullify, or otherwise challenge any material lien, charge or similar security securing the DIP Facility (iii) prohibit the Administrative Agent, the Prepetition Administrative Agent, the Lenders, or the Prepetition Lenders from acting in accordance with this Agreement or the Interim Order or the Initial Order, (iv) apply or require the Administrative Agent or Prepetition Administrative Agent to apply the proceeds of any material collateral securing the Obligations or the Prepetition Obligations except in the manner and in the order set forth in this Agreement and the Interim Order or the Initial Order, (v) foreclose or otherwise act against any material collateral securing the Obligations wherever located in the world or (vi) reduce the percentage ownership of any Credit Party or Material Subsidiary of Holdings in any entity, and in each case such pleading, complaint, summons, opening or other filing or similar document or act is not denied or otherwise adjudicated in favor of the applicable Credit Party or other Subsidiary of Holdings to the satisfaction of the Required Lenders in their sole discretion shall be (A) commenced by any Credit Party or any of their Subsidiaries; or (B) commenced by any other party and not dismissed, stayed, withdrawn, enjoined, held in abeyance via abstention or otherwise resolved to the satisfaction of the Required Lenders in their sole discretion within (i) in the case of any proceeding before the Bankruptcy Court or Canadian Court, ten (10) days after such proceeding is commenced or (ii) in the case of any proceeding before any Government Authority (other than the Bankruptcy Court or the Canadian Court), thirty (30) days after such proceeding is commenced;

(t) The Bankruptcy Court or the Canadian Court, as applicable, shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code and under the Initial Order to any party in interest, including without limitation any holder or holders of any security interest:

(i) to permit foreclosure, the granting of a deed in lieu of foreclosure, or any similar action or other act of enforcement on any assets of the U.S. Debtors or the Canadian Debtor, as applicable, having an aggregate book value in excess of U.S.$500,000; or

(ii) to permit any other action or actions that would, either singly or in the aggregate, have a Material Adverse Effect on the U.S. Debtors or the Canadian Debtor, as applicable, or their estates or the value of the Collateral in the aggregate or the interests of any Lenders in the Collateral in the aggregate;

(u) the Interim Order, the Initial Order, or the Credit Documents (in whole or in part) shall cease to be in full force and in effect, shall have been reversed, modified, amended, stayed for more than ten days, vacated, appealed or subject to a stay pending appeal;

110

(v) Any of the Credit Parties or any of their Affiliates shall fail to comply with the Interim Order, the Final Order, the Initial Order or, to the extent non-compliance would be adverse to the Lenders, any Other CCAA Order in any respect;

(w) There shall be filed a motion, pleading or proceeding by any of the Credit Parties or their Affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to any motion, pleading or proceeding brought by another party which results in such an impairment;

(x) A motion seeking approval of a disclosure statement (the "Disclosure Statement") for a Chapter 11 plan of reorganization for each of the U.S. Debtors that proposes to pay all Obligations in full in cash on the effective date of such plan, (the "Plan of Reorganization") shall not have been filed with the Bankruptcy Court before the 70th day before the Maturity Date or a motion seeking approval for the circulation to the requisite creditors of the Canadian Debtor of a plan of compromise or arrangement of the Canadian Debtor that proposes to pay all Obligations in full in cash on the effective date of such plan, (the "CCAA Plan"), shall not have been filed with the Canadian Court before the 60th day before the Maturity Date;

(y) An order approving the Disclosure Statement and permitting solicitation of the Plan of Reorganization shall not have been entered by the Bankruptcy Court before the 45th day before the Maturity Date;

(z) The Plan of Reorganization shall not have been confirmed by the Bankruptcy Court before the 10th day before the Maturity Date or the CCAA Plan shall not have been approved by the requisite creditors of the Canadian Debtor before the 15th day before the Maturity Date and by the Canadian Court before the 5th day before the Maturity Date;

(aa) The Plan of Reorganization and a CCAA Plan shall not have been consummated and become effective and fully implemented before the Maturity Date;

(bb) (i) Any of the Cases shall be dismissed or converted to a Chapter 7 Case or a Chapter 11 plan of liquidation shall have been filed for any of the U.S. Cases or the Canadian Case shall be terminated or proceedings thereunder shall be stayed, or the Canadian Case shall be converted into proceeding under the Bankruptcy & Insolvency Act (Canada); (ii) a trustee, receiver, interim receiver or receiver and manager shall be appointed in any of the Cases or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)); or (iii) the Bankruptcy Court shall abstain from asserting jurisdiction over any of the U.S. Debtors or the Canadian Court shall abstain from asserting jurisdiction over the Canadian Debtor;

111

(cc) An application shall be made by any U.S. Debtor, any Guarantor or any Subsidiary of Holdings seeking an order by the Bankruptcy Court, or an order shall be entered by the Bankruptcy Court, approving a Disclosure Statement in any of the U.S. Cases with respect to a plan not that does not propose to pay all Obligations in full in cash on the effective date of such plan or an application shall have been made by the Canadian Debtor or any other Person seeking an order of the Canadian Court, or an order of the Canadian Court shall be entered, approving a CCAA plan of compromise or arrangement in respect of the Canadian Cases with respect to a plan that does not propose to pay all Obligations in full in cash on the effective date of such plan;

(dd) Any of the U.S. Debtors shall cease to have the exclusive right pursuant to Section 1121 of the Bankruptcy Code to file a plan of reorganization;

(ee) The occurrence of a "default" or "event of default" under any other agreement where a creditor is granted status as an "unaffected creditor" in the Canadian Case; or

(ff) Any order shall be issued by the Canadian Court in the Canadian Case that is adverse to the Lenders in any material respect.

(A) During the continuance of any Event of Default pursuant to this Section 11, the Administrative Agent (i) may, and at the request of the Required Lenders shall, by advance written notice to the Borrowers that is also filed with the Bankruptcy Court and with the Canadian Court and the Monitor in accordance with the Initial Order declare that all or any portion of the Commitments be terminated, whereupon the obligation of each Lender to make any Term Loan shall immediately terminate and (ii) may, and at the request of the Required Lenders shall, by advance written notice to the Borrowers that is also filed with the Bankruptcy Court and with the Canadian Court and the Monitor in accordance with the Initial Order, declare the Loans, all interest thereon and all other amounts and Obligations payable under this Agreement to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts and Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers. In addition, subject solely to any requirement of the giving of notice, if any, by the terms of the Interim Order or the Final Order or the Initial Order, as the case may be, the automatic stay provided in section 362 of the Bankruptcy Code and under the Initial Order in respect of the DIP Lenders' Charge and the Credit Documents as the case may be, shall be deemed automatically vacated without further action or order of the Bankruptcy Court or the Canadian Court, as the case may be, the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents, including, without limitation, all rights and remedies with respect to the Collateral and the Guarantors. In addition to the remedies set forth above, the Administrative Agent may, and at the request of the Required Lenders shall, direct the Administrative Agent to exercise any remedies provided for by the Security Documents in accordance with the terms thereof or any other remedies provided by applicable law or in equity.

(B) At any time after termination of the Commitments or acceleration of the maturity of the Loans, (a) if the Borrowers shall pay all arrears of interest and all payments on account of principal of the Loans and other Obligations that shall have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein) and all Events of Default and Defaults (other than non-payment of principal of and accrued interest on the Loans due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to Section 13.12, then upon the written consent of the Required Lenders and written notice to the Borrowers, the termination of the Commitments or the acceleration and their

112

consequences may be rescinded and annulled and (b) in the case of such remedies exercised under Section 11(A)(i), upon the written consent of the Required Lenders and written notice to the Borrowers, the termination of the Commitments or the acceleration and their consequences applicable to the Lenders may be rescinded and annulled; provided, however, that such action shall not affect any subsequent Event of Default or Default or impair any right or remedy consequent thereon. The provisions of the preceding sentence are intended merely to bind the Lenders to a decision that may be made at the election of the Required Lenders, and such provisions are not intended to benefit the Borrowers and do not give the Borrowers the right to require the Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

SECTION 12. The Agents.

12.01 Appointment. (a) Each Lender hereby irrevocably designates and appoints DBTCA as Administrative Agent for such Lender (as used hereinafter for purposes of this Section 12, the term "Administrative Agent" shall mean DBTCA in its capacities as Administrative Agent and as Collateral Agent hereunder and pursuant to the Security Documents and the term "Agent" shall include the term "Administrative Agent" as so defined), (b) Banc of America Securities LLC, General Electric Capital Corporation and UBS Securities LLC as Co-Syndication Agents for such Lender, (c) Banc of America Securities LLC and UBS Securities LLC as Co-Arrangers for such Lender, and (d) DBTCA as Documentation Agent for such Lender, each to act as specified herein and in the other Credit Documents, and each such Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent, each Co-Syndication Agent, each Co-Arranger and the Documentation Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder or thereunder as are specifically delegated to or required of the Administrative Agent, such Co-Syndication Agent, each Co-Arranger or the Documentation Agent, as the case may be, by the terms hereof or thereof, together with such other powers as are reasonably incidental thereto. Each of the Agents may perform any of their respective duties under this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein by or through its respective officers, directors, agents, employees or affiliates (it being understood and agreed, for avoidance of doubt and without limiting the generality of the foregoing, that the Administrative Agent and/or Collateral Agent may perform any of its duties under the Security Documents by or through one or more of its affiliates).

(b) The provisions of this Section 12 are solely for the benefit of the Administrative Agent, the Co-Syndication Agents, the Co-Arrangers, the Documentation Agent and the Lenders, and neither Holdings nor any of its Subsidiaries shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, each of the Administrative Agent, the Co-Syndication Agents, the Co-Arrangers and the Documentation Agent shall act solely as agent for the Lenders, and none of the Administrative Agent, the Co-Syndication Agents, the Co-Arrangers or the Documentation Agent assumes (and shall not be deemed to have assumed) any obligation or relationship of agency or trust with or for Holdings or any of its Subsidiaries.

12.02 Nature of Duties. (a) No Agent shall have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents. Neither any Agent nor any of its officers, directors, agents, employees, representatives or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in

113

connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The duties of the Agents shall be mechanical and administrative in nature; no Agent shall have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

(b) Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, each of the Joint Lead Arrangers, Co-Syndication Agents and Co-Arrangers is named as such for recognition purposes only, and in their respective capacities as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Joint Lead Arrangers, Co-Syndication Agents and Co-Arrangers shall be entitled to all indemnification and reimbursement rights in favor of "Agents" as, and to the extent, provided for under Sections 12.07 and 13.01. Without limitation of the foregoing, none of the Joint Lead Arrangers, Co-Syndication Agents and Co-Arrangers shall, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship in respect of any Lender or any other Person.

12.03 Certain Rights of the Agents. The Agents shall have the right to request instructions from the Required Lenders at any time. If any Agent shall request instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders; and such Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against any Agent or any of its employees, directors, officers, agents, representatives or affiliates as a result of such Agent or such other person acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

12.04 Reliance by Agents. Each Agent shall be entitled to rely, and shall be fully protected (and shall have no liability to any Person) in relying, upon any note, writing, resolution, notice, statement, certificate, telex, facsimile, teletype or telecopier message, cablegram, radiogram, order, telephone message or other document or conversation that such Agent believed, in the absence of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision), to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by such Agent (which may be counsel for the Credit Parties) and, with respect to other matters, upon advice of independent public accountants or other experts, consultants or specialists selected by it.

12.05 Notice of Default, etc. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has actually received written notice from a Lender or a Credit Agreement Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give prompt notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be

114

reasonably directed by the Required Lenders; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders (as determined by the Administrative Agent in its sole discretion).

12.06 Nonreliance on Agents and Other Lenders. Independently and without reliance upon any Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings and its Subsidiaries and, except as expressly provided in this Agreement, no Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. No Agent or their respective affiliates nor any of their respective officers, directors, agents or employees shall be responsible to any Lender or the holder of any Note for, or be required or have any duty to ascertain, inquire or verify the accuracy of, (i) any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith, (ii) the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any other Credit Document, (iii) the financial condition of Holdings and any of its Subsidiaries, (iv) the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, (v) the satisfaction of any of the conditions precedent set forth in Sections 6 or 7, or (vi) the existence or possible existence of any Default or Event of Default.

12.07 Indemnification. (a) To the extent any Agent (or any affiliate thereof) is not reimbursed and indemnified by the Credit Agreement Parties, the Lenders will reimburse and indemnify such Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders), for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Agent (or any affiliate thereof) in performing its respective duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document, provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, claims, judgments, suits, costs, expenses or disbursements resulting from such Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(b) Any Agent shall be fully justified in failing or refusing to take any action hereunder and under any other Credit Document (except actions expressly required to be taken by it hereunder or under the Credit Documents) unless it shall first be indemnified to its satisfaction by the Lenders pro rata against any and all liability, cost and expense that it may incur by reason of taking or continuing to take any such action.

(c) The agreements in this Section 12.07 shall survive the payment of all Obligations.

115

12.08 Agents in their Individual Capacities. With respect to its obligation to make Loans under this Agreement, each Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender", "Required Lenders", "Supermajority Lenders", "Majority Lenders", "holders of Notes" or any similar terms shall, unless the context clearly indicates otherwise, include each Agent in its individual capacity. Each Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to, any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.09 Holders. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person or entity who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

12.10 Resignation of the Agents. (a) The Administrative Agent may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents (including, without limitation, its functions and duties as Collateral Agent) at any time by giving 15 Business Days' prior written notice to the Lenders. Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b) Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder and/or under the other Credit Documents who shall be a commercial bank or trust company acceptable to Holdings, which acceptance shall not be unreasonably withheld or delayed (provided that Holdings' approval shall not be required if an Event of Default then exists).

(c) If a successor Administrative Agent shall not have been so appointed within such 15 Business Day period, the Administrative Agent, with the consent of Holdings (which consent shall not be unreasonably withheld or delayed, provided that Holdings' consent shall not be required if an Event of Default then exists), shall then appoint a successor Administrative Agent who shall serve as Administrative Agent hereunder and/or under the other Credit Documents until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d) If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 20th Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

116

(e) Each Co-Syndication Agent may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents at any time by giving five Business Days' prior written notice to the Lenders. Such resignation shall take effect at the end of such five Business Day period.

(f) Each Co-Arranger may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents at any time by giving five Business Days' prior written notice to the Lenders. Such resignation shall take effect at the end of such five Business Day period.

(g) The Documentation Agent may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents at any time by giving five Business Days' prior written notice to the Lenders. Such resignation shall take effect at the end of such five Business Day period.

(h) Upon a resignation of any Agent pursuant to this Section 12.10, such Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 12 shall continue in effect for the benefit of such Agent for all of its actions and inactions while serving as such Agent.

12.11 Collateral Matters. (a) Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Creditors. Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b) The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than the Credit Parties) upon the sale or other disposition thereof in compliance with Sections 10.05 or 10.06, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 13.12) or (iv) as otherwise may be expressly provided in the relevant Security Documents. The Lenders hereby authorize (i) the Collateral Agent to release (or subordinate) any Lien granted to or held by the Collateral Agent upon any Collateral consisting of Receivables or Related Assets sold pursuant to any Auto Supplier Support Transaction and (ii) the Administrative Agent and the Collateral Agent to consent to any Auto Supplier Support Transaction and enter into any related documentation required in connection with the Credit Parties' participation in the Auto Supplier Support Program. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release (or subordinate) particular types or items of Collateral pursuant to this Section 12.11.

(c) The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Agreement Party or any of its Subsidiaries or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 12.11 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(d) The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to appoint a collateral agent, security trustee, trustee or Person serving in a similar capacity, including an Affiliate of the Collateral Agent, in such foreign jurisdiction and authorize such collateral agent, security trustee, trustee or Person serving in a similar capacity to enter into any Foreign Security Documents governed by the laws of such jurisdiction for the benefit of the Lenders and the other Secured Creditors. Each such collateral agent, security trustee, trustee or Person serving in a similar capacity shall be entitled to all of the benefits afforded the Collateral Agent hereunder (including, but not limited to the benefits under Section 12.07 and Section 13.01) and the powers of the Collateral Agent under the Section 12, as if such collateral agent, security trustee, trustee or Person serving in a similar capacity were the Collateral Agent hereunder.

(e) The Lenders hereby authorize the Collateral Agent and each such collateral agent, security trustee, trustee or Person serving in a similar capacity referred to in the Section 12.11(d) to enter into any intercreditor arrangements to reflect the relative Lien priority of, or right to receive proceeds from Collateral securing, the DIP Facility relative to the Prepetition Facility and such other matters as may be incidental thereto.

12.12 Delivery of Information. The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Agreement Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

12.13 Special Appointment of Collateral Agent (German Security Documents). (a) Without prejudice to the generality of Section 12.11:

(i) Each Lender hereby appoints, on the terms hereof, and each Hedging Creditor (as defined in the U.S. Security Agreement) by their acceptance of the benefits of the German Security (as defined below) and by notice in writing to the Collateral Agent to that effect hereby appoints, on the terms hereof, the Collateral Agent as trustee (*Treuhaender*), agent and administrator for the purpose of holding on trust (*Treuhand*) accepting, administering and enforcing the German Security for and on behalf of the Lenders and the other Secured Creditors.

118

(ii) The Collateral Agent accepts its appointment as a trustee (*Treuhaender*), agent and administrator of the German Security on the terms and subject to the conditions set out in this Agreement.

(iii) The Secured Creditors agree that, in relation to the German Security, no Secured Creditor shall exercise any independent power to enforce any German Security or take any other action in relation to the enforcement of the German Security, or make or receive any declarations in relation thereto; and

(b) The Collateral Agent shall:

(i) hold and administer any German Security which is security assigned or otherwise transferred (*Sicherungsübereignung/Sicherungsabtretung*) under German law under a non-accessory security right (*nicht akzessorische Sicherheit*) to it as a trustee (*Treuhaender*) for the benefit of the Secured Creditors; and

(ii) administer any German Security which is pledged under German law (*Verpfaendung*) or otherwise transferred in accordance with German law to any of the Secured Creditors under an accessory security right (*akzessorische Sicherheit*),

where "German Security" means the assets the subject of a security document which is governed by German Law. Each Secured Creditor hereby authorizes the Collateral Agent to accept, as its representative (*Stellvertreter*), any German Security created in favor of such Secured Creditor.

(c) Furthermore, each Secured Creditor hereby authorizes (*bevollmaechtigt*) the Collateral Agent (with the right of sub-delegation) to enter into any documents evidencing German Security and to make and accept all declarations and take all actions as it considers necessary or useful in connection with any German Security on behalf of such Secured Creditor. The Collateral Agent shall further be entitled to rescind, amend and/or execute new and different documents securing the German Security. The Collateral Agent is released from the restrictions arising under Clause 181 of the German Civil Code (*Buergerliches Gesetzbuch*) (restrictions on self-dealing).

12.14 Special Appointment of Collateral Agent (French Security Documents). (a) Each of Secured Creditors (as such defined below) as "*mandants*" under French law:

(i) hereby irrevocably appoints the Collateral Agent to act as its agent ("*mandataire*" under French law) under and in connection with the French Security Documents (as such term is defined below); and

(ii) irrevocably authorizes the Collateral Agent to execute for and on its behalf the French Security Documents (as such term is defined below) and to perform the duties and to exercise the rights, powers and discretions that are specifically delegated to it under or in connection with the French Security Documents (as such term is defined below), together with any other rights, powers and discretions which are incidental thereto and to give a good discharge for any moneys payable under the French Security Documents (as such term is defined below).

119

For purposes of this Section 12.14, "Security Documents" means those Security Documents stated to be governed by the laws of France and reference to "Secured Creditors" shall be construed as a reference to such Secured Creditors as defined in the French Security Documents.

(b) The Collateral Agent will act solely for itself and as agent for the other Secured Creditors in carrying out its functions as agent under the French Security Documents.

(c) The relationship between the Secured Creditors (other than the Collateral Agent) on the one hand and the Collateral Agent on the other is that of principal ("*mandant*" under French law) and agent ("*mandataire*" under French law) only. The Collateral Agent shall not have, nor be deemed to have, assumed any obligations to, or trust or fiduciary relationship with, any party to this Agreement other than those for which specific provision is made by the French Security Documents and, to the extent permissible under French law, the other provisions of this Agreement, which shall be deemed to be incorporated in this Section 12.14, where reference is made to any French Security Documents.

(d) Notwithstanding Section 13.08 (*Governing Law; Submission to Jurisdiction; Venue*) of this Agreement, the provision of this Section 12.14 and the other provisions of this Agreement which are deemed to be incorporated in this Section 12.14 as stated in paragraph (c) above, shall be governed by, and construed in accordance with, French law and any dispute arising out of this Section 12.14 shall be submitted to the Commercial Court of Paris (*Tribunal de Commerce de Paris*).

(e) The Secured Creditors, the Collateral Agent and the other parties hereto which are also party to any French Security Document irrevocably acknowledge that the existence and extent of the Collateral Agent's authority resulting from this Section 12.14 and the effects of the Collateral Agent's exercise of this authority shall be governed by French law.

12.15 Special Appointment of Collateral Agent (Dutch Security Documents).

(a) Each Credit Agreement Party irrevocably and unconditionally undertakes (and to the extent necessary undertakes in advance (*bij voorbaat*)) to pay to the Collateral Agent amounts equal to any amounts owing from time to time by that Credit Agreement Party to any Secured Creditor under any Credit Document as and when those amounts are due.

(b) Each Credit Agreement Party, the Collateral Agent and the other Secured Creditors acknowledge that the obligations of each Credit Agreement Party under Section 12.15(a) are several and are separate and independent (*eigen zelfstandige verplichtingen*) from, and shall not in any way limit or affect, the corresponding obligations of that Credit Agreement Party to any Secured Creditor under any Credit Document (its "Corresponding Debt") nor shall the amounts for which each Credit Agreement Party is liable under Section 12.15(a) (its "Parallel Debt") be limited or affected in any way by its Corresponding Debt provided that:

(i) the Parallel Debt of each Credit Agreement Party shall be decreased to the extent that its Corresponding Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and

120

(ii) the Corresponding Debt of each Credit Agreement Party shall be decreased to the extent that its Parallel Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and

(iii) the amount of the Parallel Debt of each Credit Agreement Party shall at all times be equal to the amount of its Corresponding Debt.

(c) For the purpose of this Section 12.15, the Collateral Agent acts in its own name and on behalf of itself and not as agent, representative or trustee of any other Secured Creditor, and its claims in respect of each Parallel Debt shall not be held on trust.

(d) The security granted under the Security Documents to the Collateral Agent to secure each Parallel Debt is granted to the Collateral Agent in its capacity as sole creditor of each Parallel Debt.

(e) All monies received or recovered by the Collateral Agent pursuant to this Section 12.15, and all amounts received or recovered by the Collateral Agent from or by the enforcement of any security granted to secure each Parallel Debt, shall be applied in accordance with Section 7.14 of the U.S. Security Agreement.

(f) Without limiting or affecting the Collateral Agent's rights against the Credit Agreement Parties (whether under this Section 12.15 or under any other provision of the Credit Documents), each Credit Agreement Party acknowledges that:

(i) nothing in this Section 12.15 shall impose any obligation on the Collateral Agent to advance any sum to any Credit Agreement Party or otherwise under any Credit Document, except in its capacity as Lender; and

(ii) for the purpose of any vote taken under any Credit Document, the Collateral Agent shall not be regarded as having any participation or commitment other than those which it has in its capacity as a Lender.

(g) For the avoidance of doubt (i) the Parallel Debt of each Credit Agreement Party will become due and payable (*opeisbaar*) at the same time its Corresponding Debt becomes due and payable and (ii) without prejudice to Section 12.15, a Credit Agreement Party may not repay or prepay its Parallel Debt unless directed to do so by the Collateral Agent or the Collateral is enforced by the Collateral Agent.

SECTION 13. Miscellaneous.

13.01 Payment of Expenses, etc. (a) The Credit Agreement Parties jointly and severally agree, whether or not the transactions herein contemplated are consummated, to:

(i) pay all documented (pursuant to summary form invoices which may be redacted for privileged information) fees, out-of-pocket audit, legal, appraisal, valuation, filing, document duplication and reproduction and investigation expenses and for all other documented costs and expenses of every type and nature of each Agent (including internal costs of such Agent incurred on a *per diem* basis, the fees and disbursements of Milbank, Tweed, Hadley & McCloy LLP and local and foreign counsel and

consultants, the fees, expenses and disbursements of the Lender Advisors, auditors, accountants, appraisers, printers, insurance and environmental advisors, and other consultants and agents) in connection with (A) the negotiation, preparation, execution and delivery of this Agreement, other Credit Documents, the documents and instruments referred to herein and therein or any proposal letter or commitment letter issued in connection therewith; (B) the Administrative Agent's periodic audits of the Borrowers or any of their Subsidiaries, as the case may be; (C) the funding of all loans; (D) the creation, perfection or protection of the Liens under any applicable Credit Document (including any reasonable fees, disbursements and expenses for local counsel in various jurisdictions), (E) the ongoing administration of this Agreement, including consultation with attorneys in connection therewith and with respect to each Agent's and each Lender's rights and responsibilities hereunder and under the other Credit Documents; (F) any amendment, waiver, consent, assignment, restatement or supplement relating to this Agreement, other Credit Documents and the documents and instruments referred to herein and therein; and (G) syndication efforts with respect to this Agreement;

(ii) pay all out-of-pocket costs and expenses of each Agent, the Collateral Agent and each of the Lenders (including, without limitation, the fees and disbursements of counsel (including costs of in-house counsel and costs of settlement) and consultants for each Agent, the Collateral Agent and each of the Lenders) in connection with (A) the enforcement of this Agreement, other Credit Documents and the documents and instruments referred to herein or therein or the enforcement of Obligations or any security therefore; (B) the exercise or enforcement of any right or remedy available by reason of a Default or Event of Default; (C) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceeding; (D) the commencement, defense or intervention in any court proceeding or filing a petition, complaint, answer, motion or other pleading relating in any way to the Obligations, any Credit Party, any of the U.S. Borrower's Subsidiaries, this Agreement or any other Credit Document and the documents and instruments referred to therein or the Cases; (E) the response to, and preparation for, any subpoena or request for document production with which any Agent or Lender is served or deposition or other proceedings in which such Agent or Lender is called to testify, in each case, relating in any way to the Obligations, any Credit Party, any of the Borrowers' Subsidiaries, this Agreement or any other Credit Documents and the documents and instruments referred to herein or therein; (F) the protection of the rights of each Agent, the Collateral Agent and each of the Lenders under this Agreement, other Credit Documents and the documents and instruments referred to herein or therein; or (G) taking any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) described in clauses (A) through (F) above (including the Cases).

(iii) pay all documented (pursuant to summary form invoices which may be redacted for privileged information) fees, out-of-pocket costs and expenses of each Agent, the Collateral Agent (including, without limitation, the fees and disbursements of Milbank, Tweed, Hadley & McCloy LLP and local and foreign counsel and consultants), the Lenders, and the Prepetition Lenders in connection with (A) the Prepetition Facility and other Prepetition Loan Documents and the documents and instruments referred to therein; (B) any amendment, waiver, consent, assignment, restatement or supplement relating to the Prepetition Facility, other Prepetition Documents and the documents and instruments referred to therein; (C) the creation, perfection or protection of the Liens under any applicable Prepetition Loan Document (including any reasonable fees, disbursements and expenses for local counsel in various jurisdictions); (D) the commencement, defense or intervention in any court proceeding or filing a petition, complaint, answer, motion or other pleading relating in any way to the Prepetition Loan Documents; and (E) the response to, and preparation for, any subpoena or request for document production with which any Agent is served or deposition or other proceedings in which such Agent is called to testify, in each case, relating in any way to the Prepetition Loan Documents;

(iv) pay all documented (pursuant to summary form invoices which may be redacted for privileged information) fees and expenses of the Lender Advisors;

(b) The Credit Agreement Parties jointly and severally agree, whether or not the transactions herein contemplated are consummated, to pay and hold each of the Agents, the Collateral Agent and each of the Lenders harmless from and against any and all present and future stamp, documentary, transfer, sales and use, goods and services, harmonized sales, value added, excise and other similar taxes with respect to the foregoing matters, the performance of any obligation under this Agreement or any other Credit Document or any payment thereunder, and save each of the Agents, the Collateral Agent and each of the Lenders harmless from and against any and all liabilities (including, without limitation, penalties and interest) with respect to or resulting from any delay or omission to pay such taxes; and

(c) The Credit Agreement Parties jointly and severally agree, whether or not the transactions herein contemplated are consummated, to indemnify each Agent, the Collateral Agent, each Lender and each of its respective affiliates and its and their respective officers, directors, employees, representatives, trustees, advisors and agents from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not any Agent, the Collateral Agent, or any Lender is a party thereto and whether or not any such investigation, litigation or other proceeding is brought by or on behalf of any Agent, the Collateral Agent, any Lender, any Credit Party or any third Person or otherwise) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the Transaction or the consummation of any other transactions contemplated by any Document or the exercise or enforcement of any of their rights or remedies provided herein or in any other Credit Documents, or (b) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased or operated by any Credit Agreement Party or any of its Subsidiaries, the Release, generation, storage, transportation, handling or disposal of Hazardous Materials at any location, whether or not owned, leased or operated by any Credit Agreement Party or any of its Subsidiaries, the non-compliance of any Real Property with foreign, federal, state and local laws, regulations, and ordinances (including applicable permits thereunder) applicable to any Real Property, or any Environmental Liability in connection with or relating to any Credit Agreement Party, any of its Subsidiaries or any of their operations or activities or any Real Property at any time owned, leased or operated by any Credit Agreement Party or any of its Subsidiaries, in each case, including, without limitation, the fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding (but excluding any such liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including attorneys' and consultants' fees and disbursements) to the extent incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)). To the extent that the undertaking to indemnify, pay or hold harmless any Agent, the Collateral Agent, any Lender or any other indemnified person set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Credit Agreement Parties hereby agree to make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

13.02 <u>Right of Setoff</u>. (a) In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, each Agent, each Lender and the Collateral Agent is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Agreement Party or any of its Subsidiaries or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by such Agent, such Lender or the Collateral Agent (including, without limitation, by branches and agencies of such Agent, such Lender or the Collateral Agent wherever located) to or for the credit or the account of any Credit Agreement Party or any of its Subsidiaries against and on account of the Obligations and liabilities of such Credit Agreement Party or such Subsidiary, as the case may be, to such Agent, such Lender or the Collateral Agent under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 13.06(b) and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not such Agent, such Lender or the Collateral Agent shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured. Each Borrower agrees that any Lender purchasing participations as required by Section 13.06(b), may, to the fullest extent permitted by law, exercise all rights (including without limitation the right of setoff) with respect to such participations as fully as if such Lender is a direct creditor of such Borrower with respect to such participations in the amount thereof.

(b) **NOTWITHSTANDING THE FOREGOING SUBSECTION (a), AT ANY TIME THAT THE LOANS OR ANY OTHER OBLIGATION SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO LENDER OR THE ADMINISTRATIVE AGENT SHALL EXERCISE A RIGHT OF SETOFF, LIEN OR COUNTERCLAIM OR TAKE ANY COURT OR ADMINISTRATIVE ACTION OR INSTITUTE ANY PROCEEDING TO ENFORCE ANY PROVISION OF THIS AGREEMENT OR ANY NOTE UNLESS IT IS TAKEN WITH THE CONSENT OF THE REQUIRED LENDERS OR APPROVED IN WRITING BY THE ADMINISTRATIVE AGENT, IF SUCH SETOFF OR ACTION OR PROCEEDING WOULD OR MIGHT (PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d AND 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR SECTION 2924 OF THE CALIFORNIA CIVIL CODE, IF APPLICABLE, OR OTHERWISE) AFFECT OR IMPAIR THE VALIDITY, PRIORITY OR ENFORCEABILITY OF THE LIENS GRANTED TO THE COLLATERAL AGENT PURSUANT TO THE SECURITY DOCUMENTS OR THE ENFORCEABILITY OF THE NOTES AND OTHER OBLIGATIONS HEREUNDER, AND ANY ATTEMPTED EXERCISE BY ANY LENDER OR THE ADMINISTRATIVE AGENT OF ANY SUCH RIGHT WITHOUT OBTAINING SUCH CONSENT OF THE REQUIRED LENDERS OR THE ADMINISTRATIVE AGENT SHALL BE NULL AND VOID. THIS SUBSECTION (b) SHALL BE SOLELY FOR THE BENEFIT OF EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREUNDER.**

13.03 Notices. (a) Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telecopier or facsimile communication) and mailed, telecopied or delivered: if to any Credit Agreement Party, at the address specified opposite its signature below; if to any Lender, at its address specified on Schedule 2.12(a); and if to the Administrative Agent, at its Notice Office; or, as to any Credit Agreement Party or any of the Agents, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to Holdings and the Administrative Agent. All such notices and communications shall be mailed, telecopied or faxed, or sent by overnight courier, and shall be effective when deposited in the mails, delivered overnight courier, or sent by facsimile, or telecopier, as the case may be, except that notices and communications to the Administrative Agent and/or any Credit Agreement Party shall not be effective until received by the Administrative Agent or the applicable Credit Agreement Party, as the case may be.

(b) Without in any way limiting the obligation of Holdings and its Subsidiaries to confirm in writing any telephonic notice permitted to be given hereunder, any Agent may prior to receipt of written confirmation act without liability upon the basis of such telephonic notice, believed by such Agent in good faith to be from an Authorized Officer. In each such case, each Credit Agreement Party hereby waives the right to dispute such Agent's record of the terms of such telephonic notice.

13.04 Benefit of Agreement. (a) This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, no Credit Agreement Party may assign or transfer any of its rights, obligations or interest hereunder or under any other Credit Document without the prior written consent of each of the Lenders and, provided further, that, although any Lender may (without the consent of any Credit Party) transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments or Loans hereunder except as provided in Section 13.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and, provided further, that no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment or of a mandatory repayment of Loans shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof and that any amendment or modification to the financial definitions in this Agreement or to Section 13.07 shall not constitute a reduction in any rate of interest or Fees for purposes of this clause (i), notwithstanding the fact that such amendment or modification actually results in such a reduction), (ii) consent to the assignment or transfer by any Credit Agreement Party of any of its rights and obligations under this Agreement, or (iii) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) supporting the Obligations in which such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrowers hereunder shall be determined as if such Lender had not sold such participation.

125

(b) Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may:

(x) assign all or a portion of its Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to (i) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company, (ii) one or more Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(ii)), or (iii) in the case of any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is managed by the same investment advisor of a Lender or by an Affiliate of such investment advisor; or

(y) assign all, or if less than all, a portion equal to at least U.S.$1,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to one or more Eligible Transferees (treating (I) any fund that invests in loans and (II) any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor, as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement;

provided that (i) each assignment of Tranche A Term Loans, Tranche B Term Loans, Tranche C Term Loans, Tranche A Term Loan Commitments, Tranche B Term Loan Commitments, or Tranche C Term Loan Commitments (and the Obligations associated with all such Loans and Commitments) may only be made as part of an assignment by such assigning Lender of a pro rata portion of (x) all such Loans and Commitments then held by it and (y) all of its rights and obligations under Section 2.01(e), (ii) at the time of such assignment Schedule 1 shall be deemed modified to reflect the Commitments and/or outstanding Loans, as the case may be, of such new Lender and of the existing Lenders, (iii) new Notes will be issued, at the respective Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, as the case may be, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Loans, as the case may be, of the affected Tranche, (iv) except in the case of assignments by the Agents in connection with their syndication of this Agreement, the consent of the Administrative Agent and, so long as no Default or Event of Default then exists and is continuing, the U.S. Borrower shall be required in connection with any such assignment pursuant to clause (y) of this Section 13.04(b) (which consent shall not be unreasonably withheld or delayed), (v) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of U.S.$3,500 (other than with respect to such assignments from an assigning Lender to its Affiliate) and (vi) such transfer or assignment will not be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.17. To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and/or outstanding Term Loans, as the case may be. At the time of each assignment pursuant to this

126

Section 13.04(b) to a Person which is not already a Lender hereunder and which is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for Federal income tax purposes, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the U.S. Borrower and the Administrative Agent the appropriate Internal Revenue Service Forms (and, if applicable, a Section 5.04(b)(ii) Certificate) described in Section 5.04(b)(ii) to the extent such forms would provide a complete exemption from or reduction in United States withholding tax. At the time of each assignment pursuant to this Section 13.04(b) to a Person which is not already a Lender hereunder, for the purpose of perfecting and enforcing certain security interests purported and intended to be created by the Brazilian Security Documents, the respective assignee Lender shall provide to the Administrative Agent an executed power of attorney in favor of the Brazilian Collateral Agent. To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 2.13 or this Section 13.04(b) would, at the time of such assignment, result in increased costs under Sections 2.10, 2.11 or 5.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c) Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank or other foreign Governmental Authority in support of borrowings made by such Lender from such Federal Reserve Bank or other foreign Governmental Authority and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or any Credit Agreement Party), any Lender which is a fund may pledge all or any portion of its Loans or Notes to its trustee or to a collateral agent or to another creditor providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of, or any other representative of a holder of, such obligations, or such other creditor, as the case may be. No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

13.05 <u>No Waiver; Remedies Cumulative</u>. No failure or delay on the part of any Agent, the Collateral Agent, or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between any Credit Party and any Agent, the Collateral Agent, or any Lender shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any Agent, the Collateral Agent or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

13.06 <u>Payments Pro Rata</u>. (a) Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of any Credit Party in respect of any Obligations of such Credit Party, it shall, except as otherwise provided in this Agreement, distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its <u>pro rata</u> share of any such payment) <u>pro rata</u> based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b) Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise) which is applicable to the payment of the principal of, or interest on, the Loans of any Tranche or other Fees, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the principal of, or interest on, the Loans of such Tranche or other Fees then owed and due to such Lender bears to the total of such Obligations then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all of the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c) Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 13.06(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

13.07 Calculations; Computations. (a) The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with U.S. GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto), provided that (i) if the U.S. Borrower notifies the Administrative Agent that the U.S. Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in U.S. GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the U.S. Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in U.S. GAAP or in the application thereof, then such provision shall be interpreted on the basis of U.S. GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith and (iii) for purposes of determining compliance with any incurrence or expenditure tests set forth in Sections 9 and/or 10, any amounts so incurred or expended (to the extent incurred or expended in a currency other than U.S. Dollars) shall be converted into U.S. Dollars on the basis of the exchange rates (as shown on Reuters ECB page 37 or, if same does not provide such exchange rates, on such other basis as is reasonably satisfactory to the Administrative Agent) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate U.S. Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the aggregate amount outstanding at any time and it is expressed in terms of U.S. Dollars, all outstanding amounts originally incurred or spent in currencies other than U.S. Dollars shall be converted into U.S. Dollars on the basis of the exchange rates (as shown on Reuters ECB page 37 or, if same does not provide such exchange rates, on such other basis as is reasonably satisfactory to the Administrative Agent) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time).

(b) All computations of interest (other than interest based on the Base Rate at times when the Base Rate is based on the Prime Lending Rate), and other Fees hereunder shall be made on the basis of a year of 360 days for the actual number of days occurring in the period for which such interest or Fees are payable. All computations of interest based on the Prime Lending Rate and clause (x) of the definition of Base Rate shall be based on a year of 365 days.

(c) For purposes of the *Interest Act* (Canada), (i) whenever any interest or fee under this Agreement is calculated using a rate based on a year of 360 days or 365 days, as the case may be, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate based on a year of 360 days or 365 days, as the case may be, (y) multiplied by the actual number of days in the calendar year in which such annual rate is to be ascertained, and (z) divided by 360 or 365, as the case may be; (ii) the principle of deemed reinvestment or interest does not apply to any interest calculation under this Agreement; and (iii) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

(d) If any provision of this Agreement or of any of the other Credit Documents would obligate any Credit Party to make any payment of interest with respect to the Obligations or other amount payable to any Lender in an amount or calculated at a rate which would result in a receipt by that Lender of "interest" with respect to the Obligations at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)) then, notwithstanding such provision, such amount or rates shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not so result in a receipt by that Lender of interest with respect to the Obligations at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (i) first, by reducing the amount or rates of interest required to be paid to the affected Lender under Section 2.08; and (ii) thereafter, by reducing any charges, fees, commissions, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute "interest" with respect to the Obligations for purposes of Section 347 of the Criminal Code (Canada). Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received an amount in excess of the maximum permitted by that section of the Criminal Code (Canada), then the Canadian Borrower shall be entitled, by notice in writing to the affected Lender, to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to Canadian Borrower. Any amount or rate of interest on the Obligations referred to in this Section 13.07(d) shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that the applicable Loan or Loans remain outstanding on the assumption that any charges, fees, commissions, expenses, premiums and other amounts that fall within the meaning of "interest" (as defined in the Criminal Code (Canada)) shall, if they relate to a specific period of time, be pro-rated over that period of time and otherwise be pro-rated over the period from the Initial Borrowing Date to the applicable Maturity Date and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent shall be conclusive for the purposes of such determination.

13.08 <u>Governing Law; Submission to Jurisdiction; Venue.</u> (a) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE SECURITY DOCUMENTS AND EXCEPT TO THE EXTENT NEW YORK LAW IS SUPERSEDED BY THE BANKRUPTCY CODE, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

(b) (i) Prior to the closing or dismissal of the U.S. Cases, the U.S. Credit Parties shall submit to the exclusive jurisdiction of the Bankruptcy Court over any legal action or proceeding with respect to this Agreement or any other Credit Document. Following the closing or dismissal of a U.S. Case of any U.S. Credit Party, such U.S. Credit Party shall submit to the exclusive jurisdiction of the courts of the State of New York or of the United States for the Southern District of New York, in each case located within the City of New York.

129

(ii) Prior to the termination or dismissal of the Canadian Case, the Canadian Borrower shall submit to the non-exclusive jurisdiction of the Canadian Court over any legal action or proceeding with respect to this Agreement or any other Credit Document. Following the termination or dismissal of the Canadian Case, the Canadian Borrower shall submit to the non-exclusive jurisdiction of the courts of the State of New York or of the United States for the Southern District of New York, in each case located within the City of New York.

(iii) If (A) a Credit Agreement Party is neither the U.S. Credit Parties nor the Canadian Borrower or (B) the Bankruptcy Court, in case of the U.S. Credit Parties, or the Canadian Court, in case of the Canadian Borrower, does not have or does not exercise jurisdiction over such Credit Agreement Party, as the case may be, then a legal action or proceeding may be brought in the courts of the State of New York or of the United States for the Southern District of New York, in each case located within the City of New York.

(iv) By execution and delivery of this Agreement, each Credit Agreement Party hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

(c) The Canadian Borrower hereby irrevocably designates, appoints and empowers Corporation Service Company, with offices on the date hereof at 80 State Street, Albany, NY 12207, as its designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents which may be served in any such action or proceeding. If for any reason such designee, appointee and agent shall cease to be available to act as such, the Canadian Borrower agrees to designate a new designee, appointee and agent in New York City on the terms and for the purposes of this provision reasonably satisfactory to the Administrative Agent under this Agreement.

(d) Each Credit Agreement Party hereby further irrevocably waives any claim that any such courts lack jurisdiction over such Credit Agreement Party, and agrees not to plead or claim, in any legal action or proceeding with respect to this Agreement or any other Credit Document brought in any of the aforesaid courts, that any such court lacks jurisdiction over such Credit Agreement Party. Each Credit Agreement Party further irrevocably consents to the service of process in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Credit Agreement Party, as the case may be, at its address for notices pursuant to Section 13.03, such service to become effective 30 days after such mailing. Each Credit Agreement Party hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other Credit Document that service of process was in any way invalid or ineffective.

(e) Nothing herein shall affect the right of any Agent, the Collateral Agent, any Lender or the holder of any Note to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against any Credit Agreement Party in any other jurisdiction.

(f) SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND THE CANADIAN COURT AS PROVIDED IN CLAUSES (b)(i) AND (ii) ABOVE, EACH CREDIT AGREEMENT PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (b) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(g) EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT.

13.09 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with each Credit Agreement Party and the Administrative Agent.

13.10 <u>Effectiveness</u>. This Agreement shall become effective on the date (the "<u>Effective Date</u>") on which each Credit Agreement Party, each Agent, the Collateral Agent and each of the Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same (including by way of facsimile transmission) to the Administrative Agent at the Notice Office or at the office of the Administrative Agents' counsel or, in the case of the Lenders, shall have given to the Administrative Agent or the Administrative Agents' counsel telephonic (confirmed in writing), written or telex notice (actually received) at such applicable office that the same has been signed and mailed to it. The Administrative Agent will give Holdings and each Lender prompt written notice of the occurrence of the Effective Date.

13.11 <u>Headings Descriptive</u>. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.12 <u>Amendment or Waiver; etc.</u> (a) Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the U.S. Borrower may be released from, any Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), <u>provided</u> that no such change, waiver, discharge or termination shall, without the consent of each Lender (other than a Defaulting Lender) (with Obligations being directly affected thereby in the case of the following clause (i)), (i) extend the final scheduled maturity of any Loan or Note (other than by amending clause (c) of the definition of "Maturity Date") or extend the duration of any Interest Period beyond six months, or reduce the rate or extend the time of payment of interest (other than as a result of any waiver of the applicability of any post-default increase in interest rates) or Fees thereon, or reduce the principal amount thereof (except to the extent paid in cash), (ii) release all or substantially all of the Collateral (except as

131

expressly provided in the Credit Documents) under any Security Document or alter the relative priority of the Liens, (iii) amend, modify or waive any provision of this Section 13.12 (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Tranche A Term Loans, Tranche B Term Loans and Tranche C Term Loans on the Effective Date), (iv) reduce the percentage specified in the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Term Loans are included on the Effective Date), (v) consent to the assignment or transfer by any Credit Agreement Party of any of its rights and obligations under this Agreement, or (vi) release the Holdings Guaranty, the U.S. Borrower's Guaranty or any Subsidiaries Guaranty; provided further, that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase in the Commitment of such Lender), (2) without the consent of each Agent affected thereby, amend, modify or waive any provision of Section 12 as same applies to such Agent or any other provision as same relates to the rights or obligations of such Agent, (3) without the consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (4) except in cases where additional extensions of term loans are being afforded substantially the same treatment afforded to the Term Loans pursuant to this Agreement as originally in effect, without the consent of the Majority Lenders of each Tranche which is being allocated a lesser prepayment, repayment or commitment reduction as a result of the actions described below, alter the required application of any prepayments or repayments (or commitment reduction), as between the various Tranches, pursuant to Sections 5.01 or 5.02 (excluding Section 5.02 (b)) (although the Required Lenders may waive, in whole or in part, any such prepayment, repayment or commitment reduction, so long as the application, as amongst the various Tranches, of any such prepayment, repayment or commitment reduction which is still required to be made is not altered), (5) without the consent of the Majority Lenders of the respective Tranche affected thereby, amend the definition of Majority Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Majority Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Effective Date), or (6) without the consent of the Supermajority Lenders of the respective Tranche, reduce the amount of or extend the date of, any Tranche A Term Loan Scheduled Repayment, Tranche B Term Loan Scheduled Repayment, Tranche C Term Loan Scheduled Repayment or Incremental Term Loan Scheduled Repayment (except that, if additional Loans are made pursuant to a given Tranche, the Scheduled Repayments of such Tranche may be increased on a proportionate basis without the consent otherwise required by this clause (6)), or amend the definition of Supermajority Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Supermajority Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Effective Date). Notwithstanding anything to the contrary contained above in this Section 13.12(a), the Administrative Agent and/or the Collateral Agent shall be permitted to enter into such amendments and/or modifications (i) as specified in Section 6.26(c) and (ii) to the Foreign Security Documents which may be required in the discretion of the Administrative Agent and/or the Collateral Agent which are of a technical nature and/or are, in the judgment of the Collateral Agent, required by applicable law, in the interests of the Secured Creditors or necessary or, in the reasonable opinion of the Collateral Agent, advisable to preserve, maintain, perfect and/or protect the security interests purported to the granted by the respective Foreign Security Documents.