(b) Notwithstanding anything to the contrary contained in clause (a) above of this Section 13.12, the respective Borrower, the Administrative Agent and each Incremental Term Loan Lender may, in accordance with the provisions of Section 2.15, enter into an Incremental Term Loan Commitment Agreement, <u>provided</u> that after the execution and delivery by the respective Borrower, the Administrative Agent and each such Incremental Term Loan Lender of such Incremental Term Loan Commitment Agreement, such Incremental Term Loan Commitment Agreement may thereafter only be modified in accordance with the requirements of clause (a) above of this Section 13.12.

13.13 <u>Survival</u>. All indemnities set forth herein including, without limitation, in Sections 2.10, 2.11, 5.04, 12.07, 13.01 and 13.17, shall survive the execution and delivery of this Agreement and the making and repayment of the Loans and the other Obligations.

13.14 <u>Domicile of Loans and Commitments</u>. Each Lender may transfer and carry its Loans and/or Commitments at, to or for the account of any branch office, subsidiary or affiliate of such Lender. Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.14 would, at the time of such transfer, result in increased costs under Sections 2.10, 2.11 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

13.15 <u>Confidentiality</u>. (a) Subject to the provisions of clause (b) of this Section 13.15, each of the Lenders agrees that it will use its reasonable efforts not to disclose without the prior consent of any Credit Agreement Party (other than to its affiliates and its and their respective directors, employees, auditors, counsel or other professional advisors, to affiliates or to another Lender if the Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information) any information with respect to Holdings or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement; <u>provided</u> that any Lender may disclose any such information (a) as has become generally available to the public other than by virtue of a breach of this Section 13.15(a) by the respective Lender, (b) as may be required or appropriate (x) in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors or (y) in connection with any request or requirement of any such regulatory body, (c) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (d) to comply with any law, order, regulation or ruling applicable to such Lender, (e) to the Administrative Agent, the Collateral Agent or any other Agent, (f) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 13.15 and (g) to any creditor or any prospective transferee or participant in connection with any contemplated transfer or participation of any of the Obligations or any interest therein by such Lender; <u>provided</u> that such creditor or prospective transferee or participant agrees to be bound by the confidentiality provisions contained in this Section 13.15 to the same extent as such Lender.

133

(b) Each Credit Agreement Party hereby acknowledges and agrees that each Lender may share with any of its affiliates or its investment advisors, and such affiliates and investment advisors may share with such Lender, any information related to Holdings or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of such entities), <u>provided</u> that such Persons shall be subject to the provisions of this Section 13.15 to the same extent as such Lender and shall only use such information in connection with matters relating to this Agreement.

13.16 <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.17 <u>Register</u>. Each of the Borrowers hereby designates the Administrative Agent, and the Administrative Agent agrees, to serve as such Borrower's agent, solely for purposes of this Section 13.17, to maintain a register at one of its offices in New York, New York (the "<u>Register</u>") on which it will record the Commitments from time to time of each of the Lenders, the Loans made by each of the Lenders and each repayment in respect of the principal amount of the Loans of each Lender. Failure to make any such recordation, or any error in such recordation shall not affect each Borrower's obligations in respect of such Loans. With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and/or Loans. Prior to such recordation, all amounts owing to the transferor with respect to such Commitments and/or Loans shall remain owing to the transferor. The registration of an assignment or transfer of all or part of any Commitments and/or Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04(b). Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and the registration of assignment or transfer of all or part of a Commitment and/or Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender any Note evidencing such Commitment and/or Loan and such Note shall be marked "cancelled", and one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or, if requested thereby, the new Lender. The registration of any provision of Incremental Term Loan Commitments pursuant to Section 2.15 shall be recorded by the Administrative Agent on the Register only upon the acceptance of the Administrative Agent of a properly executed and delivered Incremental Term Loan Commitment Agreement. Coincident with the delivery of such Incremental Term Loan Commitment Agreement for acceptance and registration of the provision of an Incremental Term Loan Commitment, or as soon thereafter as practicable, to the extent requested by such Incremental Term Loan Lenders and Incremental Term Notes shall be issued, at the respective Borrower's expense, to such Incremental Term Loan Lenders, to be in conformity with Section 2.05 (with appropriate modification) to the extent needed to reflect the Incremental Term Loan Commitments and outstanding Incremental Term Loans made by such Incremental Term Loan Lender. Each Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature that may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 13.17 in respect of the Loans and Commitments made to such Borrower.

134

13.18 <u>English Language</u>. This Agreement and all other Credit Documents shall be in the English language, except as required by applicable local law (in which event certified English translations thereof shall, upon the request of the Administrative Agent, be provided by Holdings to the Administrative Agent). All documents, certificates, reports or notices to be delivered or communications to be given or made by any party hereto pursuant to the terms of this Agreement or any other Credit Document shall be in the English language or, if originally written in another language, shall, upon request of the Administrative Agent, be accompanied by an accurate English translation upon which the other parties hereto shall have the right to rely for all purposes of this Agreement and the other Credit Documents.

13.19 <u>Special Provisions Regarding Pledges of Equity Interests in Persons Not Organized in Qualified Jurisdictions</u>. The parties hereto acknowledge and agree that the provisions of the various Security Documents executed and delivered by the Credit Parties require that, among other things, all Equity Interests in, various Persons owned by the respective Credit Party be pledged, and delivered for pledge, pursuant to the Security Documents. The parties hereto further acknowledge and agree that each Credit Party shall be required to take all actions under the laws of the jurisdiction in which such Credit Party is organized to create and perfect all security interests granted pursuant to the various Security Documents and to take all actions under the laws of the United States, Canada, Germany, France, Brazil, Mexico and The Netherlands to perfect the security interests in the Equity Interests of any Person organized under the laws of said jurisdictions (to the extent said Equity Interests are owned by any Credit Party). Except as provided in the immediately preceding sentence, to the extent any Security Document requires or provides for the pledge of Equity Interests in any Person organized under the laws of a jurisdiction other than those specified in the immediately preceding sentence, it is acknowledged that, as of the Initial Borrowing Date, no actions have been required to be taken to perfect, under local law of the jurisdiction of the Person who issued the respective promissory notes or whose Equity Interests are pledged, under the Security Documents. The Credit Agreement Parties hereby agree that, following any reasonable request by the Administrative Agent or Required Lenders to do so, each Credit Agreement Party shall, and shall cause its Subsidiaries to, take such actions (including, without limitation, the execution of Additional Security Documents, the making of any filings and the delivery of appropriate legal opinions) under the local law of any jurisdiction with respect to which such actions have not already been taken as are determined by the Administrative Agent or Required Lenders to be necessary or, in the reasonable opinion of the Administrative Agent, advisable in order to fully perfect, preserve or protect the security interests granted pursuant to the various Security Documents under the laws of such jurisdictions. If requested to do so pursuant to this Section 13.19, all such actions shall be taken in accordance with the provisions of this Section 13.19 and Sections 9.12 and 9.13 and within the time periods set forth therein. All conditions and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing and so that same are not violated by reason of the failure to take actions under local law (but only with respect to Equity Interests in Persons organized under laws of jurisdictions other than the United States, Canada, Germany, France, Brazil, Mexico or The Netherlands) not required to be taken in accordance with the provisions of this Section 13.19, <u>provided</u> that to the extent any representation or warranty would not be true because the foregoing actions were not taken, the respective representation of warranties shall be required to be true and correct in all material respects at such time as the respective action is required to be taken in accordance with the foregoing provisions of this Section 13.19 or pursuant to Sections 9.12 and 9.13.

135

13.20 <u>Powers of Attorney; etc.</u> Each of Holdings and the U.S. Borrower is hereby authorized by, and on behalf of, the Canadian Borrower to give Notices of Borrowing, Notices of Conversion/Continuation and other notices and directions in connection with the extensions of credit and repayments thereof to be made pursuant to this Agreement to the Canadian Borrower (including without limitation notices as to the application of proceeds of such extensions of credit). The Canadian Borrower hereby grants to each of Holdings and the U.S. Borrower an irrevocable power-of attorney, in the Canadian Borrower's name, to take the actions contemplated above in this Section 13.20 and in the last sentence of Section 2.13 hereof. Furthermore, the Canadian Borrower agrees that the Agents and the Lenders may at any time rely upon any notices, instructions or other information furnished by Holdings or the U.S. Borrower.

13.21 <u>Waiver of Sovereign Immunity.</u> Each of the Credit Agreement Parties, in respect of itself, its Subsidiaries, its process agents, and its properties and revenues, hereby irrevocably agrees that, to the extent that such Credit Agreement Party, its Subsidiaries or any of its properties has or may hereafter acquire any right of immunity, whether characterized as sovereign immunity or otherwise, from any legal proceedings, whether in the United States, Canada or elsewhere, to enforce or collect upon the Loans or any Credit Document or any other liability or obligation of such Credit Agreement Party or any of its Subsidiaries related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, such Credit Agreement Party, for itself and on behalf of its Subsidiaries, hereby expressly waives, to the fullest extent permissible under applicable law, any such immunity, and agrees not to assert any such right or claim in any such proceeding, whether in the United States, Canada or elsewhere. Without limiting the generality of the foregoing, each Credit Agreement Party further agrees that the waivers set forth in this Section 13.21 shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for purposes of such Act.

13.22 <u>Determinations of Satisfaction by the Lenders.</u> Where a document or matter is required by this Agreement to be satisfactory to the Lenders (or a subset thereof) (whether reasonably, or in its or their sole discretion, or otherwise), such document or matter shall be deemed to be so satisfactory in the absence of notice from any Lender to the U.S. Borrower and the Administrative Agent that such document or matter is not satisfactory.

13.23 <u>Judgment Currency.</u>

(a) The Credit Parties' obligations hereunder and under the other Credit Documents to make payments in U.S. Dollars (the "Obligation Currency") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by the Administrative Agent, the Collateral Agent or the respective Lender of the full amount of the Obligation Currency expressed to be payable to the Administrative Agent, the Collateral Agent or such Lender under this Agreement or the other Credit Documents. If for the purpose of obtaining or enforcing judgment against any Credit Party in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "Judgment Currency") an amount due in the Obligation Currency, the conversion shall be made, at the Canadian Dollar Equivalent or the U.S. Dollar Equivalent thereof, as the case may be, and, in the case of other currencies, the rate of exchange (as quoted by the Administrative Agent or if the Administrative Agent does not quote a rate of exchange on such currency, by a known dealer in such currency designated by the Administrative Agent) determined, in each case, as of the day on which the judgment is given (such day being hereinafter referred to as the "Judgment Currency Conversion Date").

136

(b) If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due by any Borrower, such Borrower covenants and agrees to pay, or cause to be paid, such additional amounts, if any (but in any event not a lesser amount), as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate or exchange prevailing on the Judgment Currency Conversion Date.

(c) For purposes of determining the U.S. Dollar Equivalent or the Canadian Dollar Equivalent or any other rate of exchange for this Section, such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency. If the amount of the Judgment Currency so purchased exceeds the sum originally due to the Lenders in the Judgment Currency, the Lenders shall, except during the occurrence and continuation of an Event of Default under paragraph (a), (b), (h), (i) or (j) of Section 11 (in which case such excess shall be applied by such Lender to any outstanding Obligations owed to such Lender by any Credit Party), remit such excess to the relevant Borrower.

13.24 <u>Limitation on Additional Amounts, etc</u>. Notwithstanding anything to the contrary contained in Section 2.10 or 2.11 of this Agreement, unless a Lender gives notice to the respective Borrower that it is obligated to pay an amount under such Section within six months after the date the Lender incurs the respective increased costs, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital, then such Lender shall only be entitled to be compensated for such amount by the respective Borrower pursuant to said Section 2.10 or 2.11, as the case may be, to the extent of the costs, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital that are incurred or suffered on or after the date which occurs six months prior to such Lender giving notice to the respective Borrower that it is obligated to pay the respective amounts pursuant to said Section 2.10 or 2.11, as the case may be (<u>provided further</u> that, if any Requirement of Law giving rise, directly or indirectly, to such obligation to pay under Section 2.10 or 2.11, as the case may be, is retroactive, then the six month period referred to above shall be extended to include the period of retroactive effect thereof). This Section 13.24 shall have no applicability to any Section of this Agreement other than said Sections 2.10 or 2.11.

13.25 <u>USA PATRIOT Act</u>. Each Lender subject to the Act hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Patriot Act</u>"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of each of the Borrowers and other information that will allow such Lender to identify each of the Borrowers in accordance with the Patriot Act.

13.26 <u>Abstract Acknowledgment of Indebtedness and Joint Creditorship; Release of German Pledge Agreement</u>.

(a) In connection with the Local Law Pledge Agreement pursuant to which the Canadian Borrower has pledged all of its Equity Interests in its wholly-owned Subsidiary CSA Holding (Deutschland) GmbH to the Collateral Agent (the "German Law Pledge Agreement"), the Canadian Borrower has granted an abstract acknowledgement of indebtedness (*abstraktes Schuldanerkenntnis*) to the Collateral Agent in a separate agreement governed by German law to pay to the Collateral Agent amounts equal to, and in the currency of, any amounts owed by the Canadian Borrower to a Secured Creditor (as defined in the Canadian Pledge Agreement) under any Credit Document, Post Petition Swap Agreement or Post Petition Cash Management Arrangement as and when such amounts falls due for payment under the relevant Credit Document, Post Petition Swap Agreement or Post Petition Cash Management Arrangement or would have fallen due but for any discharge resulting from failure of another Secured Creditor to take appropriate steps, in insolvency proceedings affecting the Canadian Borrower or any other Credit Party, to preserve its entitlement to be paid that amount (the "Abstract Acknowledgement of Indebtedness"). For purposes of the Abstract Acknowledgement of Indebtedness only, the Collateral Agent shall be the joint creditor (together with the relevant Secured Creditor) of all obligations of the Canadian Borrower towards each of the Secured Creditors under the Credit Documents, the Post Petition Swap Agreements and the Post Petition Cash Management Arrangements.

(b) Any amount due and payable by the Canadian Borrower to the Collateral Agent under the Abstract Acknowledgement of Indebtedness shall be decreased to the extent that the other Secured Creditors have received (and are able to retain) payment in full of the corresponding amount under the other provisions of the Credit Documents, the Post Petition Swap Agreements or the Post Petition Cash Management Arrangements and any amount due and payable by the Canadian Borrower to the other Secured Creditors under those provisions shall be decreased to the extent that the Collateral Agent has received (and is able to retain) payment in full in cash of the corresponding amount under the Abstract Acknowledgement of Indebtedness, provided that the Canadian Borrower may not consider its obligations towards a Secured Creditor to be so discharged by virtue of any set-off, counterclaim or similar defence that it may invoke vis-à-vis the Collateral Agent. For purposes of the Abstract Acknowledgement of Indebtedness and German Law Pledge Agreement only, for the avoidance of doubt and notwithstanding any provision in the Abstract Acknowledgement of Indebtedness, irrevocable and unconditional payment in full in cash of all of the Credit Document Obligations (as defined in the Canadian Pledge Agreement) shall satisfy in full all obligations owed by the Canadian Borrower under the Abstract Acknowledgement of Indebtedness.

(c) Subject to paragraph (b) above, the rights of the Secured Creditors (other than the Collateral Agent) to receive payment of amounts payable by the Canadian Borrower under the Credit Documents, the Post Petition Swap Agreements and the Post Petition Cash Management Arrangements are several and are separate and independent from, and without prejudice to, the rights of the Collateral Agent to receive payment under the Abstract Acknowledgement of Indebtedness.

(d) On the German Pledge Termination Date (as defined below), the German Law Pledge Agreement shall terminate and the security interests granted thereby shall be released automatically (provided that all indemnities set forth therein shall survive any such termination) and the Collateral Agent, at the request and expense of the Canadian Borrower, will execute and deliver to the Canadian Borrower a proper instrument or instruments (including local law termination statements) acknowledging the satisfaction and termination of the German Law Pledge Agreement (including, without limitation, local law termination statements and instruments of satisfaction, discharge and/or reconveyance), and will assign, transfer and deliver to the Canadian Borrower (without recourse and without any representation or warranty) such of the Equity Interests in CSA Holding (Deutschland) GmbH as may be in

138

the possession of the Collateral Agent or any of its sub-agents thereunder and as has not theretofore been sold or otherwise applied or released pursuant to the German Law Pledge Agreement, together with any moneys at the time held by the Collateral Agent or any of its sub-agents hereunder. As used in this Agreement, "German Pledge Termination Date" shall mean the date upon which the Commitments under the Credit Agreement have been terminated, no or Note is outstanding (and all Loans have been paid in full), and all other Credit Document Obligations (as defined in the Canadian Pledge Agreement) (other than indemnities described in the German Law Pledge Agreement and described in Section 13.01 hereof, and any other indemnities set forth in any other Security Documents, in each case which are not then due and payable) then due and payable have been paid in full.

(e) In the event that any Equity Interests in CSA Holding (Deutschland) GmbH are sold or otherwise disposed of (to a Person other than a Credit Party) at any time prior to the time at which all Credit Document Obligations (as defined in the Canadian Pledge Agreement) have been paid in full and all Commitments, in connection with a sale or disposition permitted by Section 10.05 hereof or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by Section 13.12 hereof), the proceeds of such sale or disposition (or from such release) are applied in accordance with the terms of the Credit Agreement to the extent required to be so applied, such Equity Interests shall be automatically released from the security interest granted under the German Law Pledge Agreement and the Collateral Agent, at the request and expense of the Canadian Borrower, will execute and deliver such documentation (including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to the Canadian Borrower (without recourse and without any representation or warranty) such Equity Interests as are then being (or has been) so sold or released and as may be in the possession of the Collateral Agent (or, in the case of Equity Interests held by any sub-agent designated pursuant to the German Law Pledge Agreement, such sub-agent) and has not theretofore been released pursuant to this Agreement.

(f) At any time that the Canadian Borrower desires that the Collateral Agent execute and deliver any release documentation as provided in the foregoing in this Section 13.26, the Canadian Borrower shall deliver to the Collateral Agent (and the relevant sub-agent, if any, designated pursuant to the German Law Pledge Agreement) a certificate signed by an authorized officer of the Canadian Borrower stating that the release of the respective Collateral is permitted pursuant to this Section 13.26. The Collateral Agent shall have no liability whatsoever to any other Secured Creditor (as defined in the Canadian Pledge Agreement) as the result of any release of Collateral by it in accordance with (or which the Collateral Agent believes to be in accordance with) this Section 13.26.

(g) If at any time all of the Equity Interests of the Canadian Borrower owned by the U.S. Borrower or any of its Subsidiaries are sold (to a Person other than a Credit Party) in a transaction permitted pursuant to the Credit Agreement (and which does not violate the terms of any other Secured Debt Agreement (as defined in the Canadian Pledge Agreement) then in effect), then, at the request and expense of the U.S. Borrower, the Canadian Borrower shall be released as a pledgor under the German Law Pledge Agreement pursuant to this Section 13.26 automatically without any further action hereunder (it being understood that the sale of all of the Equity Interests in any Person that owns, directly or indirectly, all of the Equity Interests in the Canadian Borrower shall be deemed to be a sale of all of the Equity Interests in the Canadian Borrower for purposes of this Section), and the Collateral Agent is authorized and directed to execute and deliver such instruments of release as are reasonably satisfactory to it. At any time that the U.S. Borrower desires that the Canadian Borrower be released from the German Law Pledge Agreement as provided in this

139

Section 13.26, the U.S. Borrower shall deliver to the Collateral Agent a certificate signed by a principal executive officer of the U.S. Borrower stating that the release of the Canadian Borrower is permitted pursuant to this Section 13.26. The Collateral Agent shall have no liability whatsoever to any other Secured Creditor as a result of the release of the Canadian Borrower by it in accordance with, or which it believes to be in accordance with, this Section 13.26.

SECTION 14. Holdings Guaranty.

14.01 The Guaranty. In order to induce the each of the Agents, the Collateral Agent and the Lenders to enter into this Agreement and to extend credit hereunder, and to induce the other Guaranteed Creditors to enter into Post Petition Swap Agreements, and in recognition of the direct benefits to be received by Holdings from the proceeds of the Loans and the entering into of such Post Petition Swap Agreements, Holdings hereby agrees with the primary, absolute and unconditional, as follows: Holdings hereby unconditionally and irrevocably guarantees, as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Holdings Guaranteed Obligations to the Guaranteed Creditors. If any or all of the Holdings Guaranteed Obligations to the Guaranteed Creditors becomes due and payable hereunder, Holdings unconditionally and irrevocably promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, together with any and all expenses which may be incurred by the Guaranteed Creditors in collecting any of the Holdings Guaranteed Obligations. This Holdings Guaranty is a guaranty of payment and not of collection. This Holdings Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. If claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Holdings Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrowers and any other Holdings Guaranteed Party), then and in such event Holdings agrees that any such judgment, decree, order, settlement or compromise shall be binding upon Holdings, notwithstanding any revocation of this Holdings Guaranty or any other instrument evidencing any liability of each Borrower or any other Holdings Guaranteed Party, and Holdings shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

14.02 Bankruptcy. Additionally, Holdings unconditionally and irrevocably guarantees the payment of any and all of the Holdings Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by each Borrower or any other Holdings Guaranteed Party upon the occurrence of any of the events specified in clause (h), (i) or (j) of Section 11, and irrevocably and unconditionally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand.

14.03 Nature of Liability. The liability of Holdings hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Holdings Guaranteed Obligations whether executed by Holdings, any other guarantor or by any other party, and the liability of Holdings hereunder is not affected or impaired by (a) any direction as to application of payment by each Borrower, any other Holdings Guaranteed Party or any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Holdings Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase,

140

decrease or change in personnel by each Borrower or any other Holdings Guaranteed Party, or (e) any payment made to the Guaranteed Creditors on the Holdings Guaranteed Obligations which any such Guaranteed Creditor repays to each Borrower or any other Holdings Guaranteed Party pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and Holdings waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction of the type described in Section 14.05, or (g) the lack of validity or enforceability of any Credit Document or any other instrument relating thereto.

14.04 <u>Independent Obligation</u>. No invalidity, irregularity or unenforceability of all or any part of the Holdings Guaranteed Obligations or of any security therefor shall affect, impair or be a defense to this Holdings Guaranty, and this Holdings Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the Holdings Guaranteed Obligations. The obligations of Holdings hereunder are independent of the obligations of each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party and a separate action or actions may be brought and prosecuted against Holdings whether or not action is brought against each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party and whether or not each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party be joined in any such action or actions. Holdings waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by a Borrower or any other Holdings Guaranteed Party or other circumstance that operates to toll any statute of limitations as to such Borrower or such other Holdings Guaranteed Party shall operate to toll the statute of limitations as to Holdings.

14.05 <u>Authorization</u>. Holdings authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a) change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Holdings Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Holdings Guaranty made shall apply to the Holdings Guaranteed Obligations as so changed, extended, renewed, increased or altered;

(b) take and hold security for the payment of the Holdings Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Holdings Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c) exercise or refrain from exercising any rights against each Borrower, any other Holdings Guaranteed Party or others or otherwise act or refrain from acting;

141

(d) release or substitute any one or more endorsers, guarantors, each Borrower, any other Holdings Guaranteed Party or other obligors;

(e) settle or compromise any of the Holdings Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of each Borrower or any other Holdings Guaranteed Party to their respective creditors other than the Guaranteed Creditors;

(f) apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of each Borrower or any other Holdings Guaranteed Party to the Guaranteed Creditors regardless of what liability or liabilities of such Borrower or such other Holdings Guaranteed Party remain unpaid;

(g) consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any Post Petition Swap Agreement or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document, any Post Petition Swap Agreement or any of such other instruments or agreements; and/or

(h) take any other action that would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of Holdings from its liabilities under this Holdings Guaranty.

14.06 Reliance. It is not necessary for the Guaranteed Creditors to inquire into the capacity or powers of each Borrower or any other Holdings Guaranteed Party or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Holdings Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

14.07 Subordination. Any of the indebtedness of each Borrower or any other Holdings Guaranteed Party now or hereafter owing to Holdings is hereby subordinated to the Holdings Guaranteed Obligations of such Borrower or such other Holdings Guaranteed Party owing to the Guaranteed Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of such Borrower or such other Holdings Guaranteed Party to Holdings shall be collected, enforced and received by Holdings for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the Holdings Guaranteed Obligations of such Borrower or such Holdings Guaranteed Party to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of Holdings under the other provisions of this Holdings Guaranty. Prior to the transfer by Holdings of any note or negotiable instrument evidencing any of the indebtedness of each Borrower or any other Holdings Guaranteed Party to Holdings, Holdings shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.

14.08 Waiver. (a) Holdings waives any right (except as shall be required by applicable statute and cannot be waived) to require any Guaranteed Creditor to (i) proceed against each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party, (ii) proceed against or exhaust any security held from each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever. Holdings waives any

142

defense based on or arising out of any defense of each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party, other than payment in full in cash of the Holdings Guaranteed Obligations, based on or arising out of the disability of each Borrower, any other Holdings Guaranteed Party, any other guarantor or any other party, or the unenforceability of the Holdings Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of each Borrower or any other Holdings Guaranteed Party other than payment in full in cash of the Holdings Guaranteed Obligations. The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against each Borrower, any other Holdings Guaranteed Party or any other party, or any security, without affecting or impairing in any way the liability of Holdings hereunder except to the extent the Holdings Guaranteed Obligations have been paid in full in cash. Holdings waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Holdings against each Borrower, any other Holdings Guaranteed Party or any other party or any security.

(b) Holdings waives all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Holdings Guaranty, and notices of the existence, creation or incurring of new or additional Holdings Guaranteed Obligations. Holdings assumes all responsibility for being and keeping itself informed of each Borrower's and each other Holdings Guaranteed Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Holdings Guaranteed Obligations and the nature, scope and extent of the risks which Holdings assumes and incurs hereunder, and agrees that the Guaranteed Creditors shall have no duty to advise Holdings of information known to them regarding such circumstances or risks.

(c) Until such time as the Holdings Guaranteed Obligations have been paid in full in cash, Holdings hereby waives all rights of subrogation which it may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code, or otherwise) to the claims of the Guaranteed Creditors against each Borrower, any other Holdings Guaranteed Party or any other guarantor of the Holdings Guaranteed Obligations and all contractual, statutory or common law rights of reimbursement, contribution or indemnity from each Borrower, any other Holdings Guaranteed Party or any other guarantor which it may at any time otherwise have as a result of this Holdings Guaranty.

(d) Holdings hereby acknowledges and affirms that it understands that to the extent the Holdings Guaranteed Obligations are secured by Real Property located in California, Holdings shall be liable for the full amount of the liability hereunder notwithstanding the foreclosure on such Real Property by trustee sale or any other reason impairing Holdings' or any Guaranteed Creditor's right to proceed against each Borrower, any other Holdings Guaranteed Party or any other guarantor of the Holdings Guaranteed Obligations. In accordance with Section 2856 of the California Code of Civil Procedure, Holdings hereby waives until such time as the Holdings Guaranteed Obligations have been paid in full in cash:

(i) all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to Holdings by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Code of Civil Procedure;

143

(ii) all rights and defenses that Holdings may have because the Holdings Guaranteed Obligations are secured by Real Property located in California, meaning, among other things, that: (A) the Guaranteed Creditors may collect from Holdings without first foreclosing on any real or personal property collateral pledged by each Borrower or any other Credit Party, and (B) if the Guaranteed Creditors foreclose on any Real Property collateral pledged by each Borrower or any other Credit Party, (1) the amount of the Holdings Guaranteed Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) the Guaranteed Creditors may collect from Holdings even if the Guaranteed Creditors, by foreclosing on the Real Property collateral, have destroyed any right Holdings may have to collect from each Borrower or any other Holdings Guaranteed Party, it being understood that this is an unconditional and irrevocable waiver of any rights and defenses Holdings may have because the Holdings Guaranteed Obligations are secured by Real Property (including, without limitation, any rights or defenses based upon Sections 580a, 580d or 726 of the California Code of Civil Procedure); and

(iii) all rights and defenses arising out of an election of remedies by the Guaranteed Creditors, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the Holdings Guaranteed Obligations, has destroyed Holdings' rights of subrogation and reimbursement against each Borrower or any other Holdings Guaranteed Party by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

(e) Holdings warrants and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law of public policy, such waivers shall be effective only to the maximum extent permitted by law.

14.09 Payments. All payments made by Holdings pursuant to this Section 14 shall be made in U.S. Dollars. All payments made by Holdings pursuant to this Section 14 will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Sections 5.03 and 5.04.

14.10 Maximum Liability. It is the desire and intent of Holdings and the Guaranteed Creditors that this Holdings Guaranty shall be enforced against Holdings to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If, however, and to the extent that, the obligations of Holdings under this Holdings Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of Holdings' obligations under this Holdings Guaranty shall be deemed to be reduced and Holdings shall pay the maximum amount of the Holdings Guaranteed Obligations which would be permissible under applicable law.

144

SECTION 15. U.S. Borrower's Guaranty.

15.01 The U.S. Borrower's Guaranty. In order to induce the each of the Agents, the Collateral Agent, and the Lenders to enter into this Agreement and to extend credit hereunder, and to induce the other Guaranteed Creditors to enter into Post Petition Swap Agreements, and in recognition of the direct benefits to be received by the U.S. Borrower from the proceeds of the Loans and the entering into of such Post Petition Swap Agreements, the U.S. Borrower hereby agrees with the Guaranteed Creditors as follows: the U.S. Borrower hereby unconditionally and irrevocably guarantees, as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the U.S. Borrower Guaranteed Obligations to the Guaranteed Creditors. If any or all of the U.S. Borrower Guaranteed Obligations to the Guaranteed Creditors becomes due and payable hereunder, the U.S. Borrower unconditionally and irrevocably promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, together with any and all expenses which may be incurred by the Guaranteed Creditors in collecting any of the U.S. Borrower Guaranteed Obligations. This U.S. Borrower's Guaranty is a guaranty of payment and not of collection. This U.S. Borrower's Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. If claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the U.S. Borrower Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Canadian Borrower or any other U.S. Borrower Guaranteed Party), then and in such event the U.S. Borrower agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the U.S. Borrower, notwithstanding any revocation of this U.S. Borrower's Guaranty or any other instrument evidencing any liability of the Canadian Borrower or any U.S. Borrower Guaranteed Party, and the U.S. Borrower shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

15.02 Bankruptcy. Additionally, the U.S. Borrower unconditionally and irrevocably, guarantees the payment of any and all of the U.S. Borrower Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by the Canadian Borrower or any other U.S. Borrower Guaranteed Party upon the occurrence of any of the events specified in clause (h), (i) or (j) of Section 11, and irrevocably and unconditionally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand.

15.03 Nature of Liability. The liability of the U.S. Borrower hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the U.S. Borrower Guaranteed Obligations whether executed by the U.S. Borrower, any other guarantor or any other party, and the liability of the U.S. Borrower Guarantors hereunder is not affected or impaired by (a) any direction as to application of payment by the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the U.S. Borrower Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Canadian Borrower or any other U.S. Borrower Guaranteed Party or (e) any payment made to the Guaranteed Creditors on the U.S. Borrower Guaranteed Obligations which any such Guaranteed Creditor repays to the Canadian Borrower or any other U.S. Borrower Guaranteed Party pursuant to court order in any

145

bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and the U.S. Borrower waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction of the type described in Section 15.05, or (g) the lack of validity or enforceability of any Credit Document or any other instrument relating thereto.

15.04 <u>Independent Obligation</u>. No invalidity, irregularity or unenforceability of all or any part of the U.S. Borrower Guaranteed Obligations or of any security therefor shall affect, impair or be a defense to this U.S. Borrower's Guaranty, and this U.S. Borrower's Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the U.S. Borrower Guaranteed Obligations. The obligations of the U.S. Borrower hereunder are independent of the obligations of the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party, and a separate action or actions may be brought and prosecuted against the U.S. Borrower whether or not action is brought against the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party and whether or not the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party be joined in any such action or actions. The U.S. Borrower waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Canadian Borrower or any other U.S. Borrower Guaranteed Party or other circumstance that operates to toll any statute of limitations as to the Canadian Borrower or such other U.S. Borrower Guaranteed Party shall operate to toll the statute of limitations as to the U.S. Borrower.

15.05 <u>Authorization</u>. The U.S. Borrower authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a) change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the U.S. Borrower Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this U.S. Borrower's Guaranty made shall apply to the U.S. Borrower Guaranteed Obligations as so changed, extended, renewed, increased or altered;

(b) take and hold security for the payment of the U.S. Borrower Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the U.S. Borrower Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c) exercise or refrain from exercising any rights against the Canadian Borrower, any other U.S. Borrower Guaranteed Party or others or otherwise act or refrain from acting;

(d) release or substitute any one or more endorsers, guarantors, the Canadian Borrower, any other U.S. Borrower Guaranteed Party or other obligors;

146

(e) settle or compromise any of the U.S. Borrower Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Canadian Borrower or any other U.S. Borrower Guaranteed Party to their respective creditors other than the Guaranteed Creditors;

(f) apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Canadian Borrower or any other U.S. Borrower Guaranteed Party to the Guaranteed Creditors regardless of what liability or liabilities of the Canadian Borrower or such other U.S. Borrower Guaranteed Party remain unpaid;

(g) consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any Post Petition Swap Agreement or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document or any Post Petition Swap Agreement or any of such other instruments or agreements; and/or

(h) take any other action that would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of the U.S. Borrower from its liabilities under this U.S. Borrower's Guaranty.

15.06 Reliance. It is not necessary for the Guaranteed Creditors to inquire into the capacity or powers of the Canadian Borrower or any other U.S. Borrower Guaranteed Party or the officers, directors, partners or agents acting or purporting to act on its or their behalf, and any U.S. Borrower Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

15.07 Subordination. Any of the indebtedness of the Canadian Borrower or any other U.S. Borrower Guaranteed Party now or hereafter owing to the U.S. Borrower is hereby subordinated to the U.S. Borrower Guaranteed Obligations of the Canadian Borrower or such other U.S. Borrower Guaranteed Party owing to the Guaranteed Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of the Canadian Borrower or such other U.S. Borrower Guaranteed Party to the U.S. Borrower shall be collected, enforced and received by the U.S. Borrower for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the U.S. Borrower Guaranteed Obligations of the Canadian Borrower or such other U.S. Borrower Guaranteed Party to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of the U.S. Borrower under the other provisions of this U.S. Borrower's Guaranty. Prior to the transfer by the U.S. Borrower of any note or negotiable instrument evidencing any of the indebtedness of the Canadian Borrower or any other U.S. Borrower Guaranteed Party to the U.S. Borrower, the U.S. Borrower shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.

15.08 Waiver. (a) The U.S. Borrower waives any right (except as shall be required by applicable statute and cannot be waived) to require any Guaranteed Creditor to (i) proceed against the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Canadian Borrower, any other U.S. Borrower Guaranteed Party, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever. The U.S. Borrower waives any defense based on or arising out of any defense of the Canadian Borrower, any

147

other U.S. Borrower Guaranteed Party, any other guarantor or any other party, other than payment in full in cash of the U.S. Borrower Guaranteed Obligations, based on or arising out of the disability of the Canadian Borrower, any other Guaranteed Party, any other guarantor or any other party, or the unenforceability of the U.S. Borrower Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Canadian Borrower or any other U.S. Borrower Guaranteed Party other than payment in full in cash of the U.S. Borrower Guaranteed Obligations. The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other party, or any security, without affecting or impairing in any way the liability of the U.S. Borrower hereunder except to the extent the U.S. Borrower Guaranteed Obligations have been paid in full in cash. The U.S. Borrower waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the U.S. Borrower against the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other party or any security.

(b) The U.S. Borrower waives all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this U.S. Borrower's Guaranty, and notices of the existence, creation or incurring of new or additional U.S. Borrower Guaranteed Obligations. The U.S. Borrower assumes all responsibility for being and keeping itself informed of the Canadian Borrower's and each other U.S. Borrower Guaranteed Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the U.S. Borrower Guaranteed Obligations and the nature, scope and extent of the risks which the U.S. Borrower assumes and incurs hereunder, and agrees that the Guaranteed Creditors shall have no duty to advise the U.S. Borrower of information known to them regarding such circumstances or risks.

(c) Until such time as the U.S. Borrower Guaranteed Obligations have been paid in full in cash, the U.S. Borrower hereby waives all rights of subrogation which it may at any time otherwise have as a result of this U.S. Borrower's Guaranty (whether contractual, under Section 509 of the Bankruptcy Code, or otherwise) to the claims of the Guaranteed Creditors against the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other guarantor of the U.S. Borrower Guaranteed Obligations and all contractual, statutory or common law rights of reimbursement, contribution or indemnity from the Canadian Borrower, any other U.S. Borrower Guaranteed Party or any other guarantor which it may at any time otherwise have as a result of this U.S. Borrower's Guaranty.

(d) The U.S. Borrower hereby acknowledges and affirms that it understands that to the extent the U.S. Borrower Guaranteed Obligations are secured by Real Property located in California, the U.S. Borrower shall be liable for the full amount of the liability hereunder notwithstanding the foreclosure on such Real Property by trustee sale or any other reason impairing the U.S. Borrower's or any Guaranteed Creditor's right to proceed against any U.S. Borrower Guaranteed Party or any other guarantor of the U.S. Borrower Guaranteed Obligations. In accordance with Section 2856 of the California Code of Civil Procedure, the U.S. Borrower hereby waives until such time as the U.S. Borrower Guaranteed Obligations have been paid in full in cash:

(i) all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the U.S. Borrower by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Code of Civil Procedure;

148

(ii) all rights and defenses that the U.S. Borrower may have because the U.S. Borrower Guaranteed Obligations are secured by Real Property located in California, meaning, among other things, that: (A) the Guaranteed Creditors may collect from the U.S. Borrower without first foreclosing on any real or personal property collateral pledged by any Credit Party, and (B) if the Guaranteed Creditors foreclose on any Real Property collateral pledged by any Credit Party, (1) the amount of the U.S. Borrower Guaranteed Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) the Guaranteed Creditors may collect from the U.S. Borrower even if the Guaranteed Creditors, by foreclosing on the Real Property collateral, have destroyed any right the U.S. Borrower may have to collect from any U.S. Borrower Guaranteed Party, it being understood that this is an unconditional and irrevocable waiver of any rights and defenses the U.S. Borrower may have because the U.S. Borrower Guaranteed Obligations are secured by Real Property (including, without limitation, any rights or defenses based upon Sections 580a, 580d or 726 of the California Code of Civil Procedure); and

(iii) all rights and defenses arising out of an election of remedies by the Guaranteed Creditors, even though that election of remedies, such as a non-judicial foreclosure with respect to security for the U.S. Borrower Guaranteed Obligations, has destroyed the U.S. Borrower's rights of subrogation and reimbursement against any U.S. Borrower Guaranteed Party by the operation of Section 680d of the California Code of Civil Procedure or otherwise.

(c) The U.S. Borrower warrants and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law of public policy, such waivers shall be effective only to the maximum extent permitted by law.

15.09 Payments. All payments made by the U.S. Borrower pursuant to this Section 15 shall be made in U.S. Dollars. All payments made by the U.S. Borrower pursuant to this Section 15 will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Sections 5.03 and 5.04.

15.10 Maximum Liability. It is the desire and intent of the U.S Borrower and the Guaranteed Creditors that this U.S. Borrower's Guaranty shall be enforced against the U.S Borrower to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If, however, and to the extent that, the obligations of the U.S Borrower under this U.S. Borrower's Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of the U.S Borrower's obligations under this U.S. Borrower's Guaranty shall be deemed to be reduced and the U.S. Borrower shall pay the maximum amount of the U.S Borrower Guaranteed Obligations which would be permissible under applicable law.

* * * *

149

Exhibit 10.2

FIRST AMENDMENT TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT

FIRST AMENDMENT TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of August 31, 2009 (this "First Amendment"), among COOPER-STANDARD HOLDINGS INC., a Delaware corporation ("Holdings"), COOPER-STANDARD AUTOMOTIVE INC., an Ohio corporation (the "U.S. Borrower"), COOPER-STANDARD AUTOMOTIVE CANADA LIMITED, a corporation organized under the laws of Ontario (the "Canadian Borrower" and together with the U.S. Borrower, the "Borrowers" and each a "Borrower"), various LENDERS party to the DIP Credit Agreement referred to below, and DEUTSCHE BANK TRUST COMPANY AMERICAS ("DBTCA"), as Administrative Agent (in such capacity, the "Administrative Agent"). All capitalized terms used herein and not otherwise defined herein shall have the respective meaning provided to such terms in the DIP Credit Agreement.

W I T N E S S E T H :

WHEREAS, Holdings, the U.S. Borrower and the Canadian Borrower (collectively, the "DIP Credit Agreement Parties"), various Lenders, the Administrative Agent and certain other Agents have entered into a Debtor-In-Possession Credit Agreement, dated as of August 5, 2009 (as amended, modified and/or supplemented to, but not including, the date hereof, the "DIP Credit Agreement");

WHEREAS, Holdings, the U.S. Borrower, U.S. Finco and each U.S. Subsidiary of the U.S. Borrower (collectively, the "U.S. Debtors") have filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating their respective cases under Chapter 11 of the Bankruptcy Code (the cases of Holdings, the U.S. Borrower and the U.S. Subsidiaries of the U.S. Borrower, each a "U.S. Case" and collectively, the "U.S. Cases") and shall continue in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Canadian Borrower has commenced proceedings (the "Canadian Case"; together with the U.S. Cases, the "Cases") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA");

WHEREAS, none of Foreign Subsidiaries of the U.S. Borrower (other than the Canadian Debtor) is or shall be debtors-in-possession in the Cases;

WHEREAS, the DIP Credit Agreement Parties have requested that the Lenders agree to amend the DIP Credit Agreement as provided herein;

- 1 -

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein and for other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the DIP Credit Agreement Parties, and the Lenders hereby agree as follows:

ARTICLE 1

Amendments

Section 1.01 The definition of "Global Subsidiary Guarantor" appearing in Section 1 of the DIP Credit Agreement is hereby amended to read in its entirety as follows:

"Global Subsidiaries Guarantor" shall mean each U.S. Subsidiary Guarantor, Wholly-Owned Mexican Subsidiary, Brazilian Subsidiary and Dutch Subsidiary which executes and delivers a Global Subsidiaries Guaranty, unless and until such time as the respective Subsidiary is released from all of its obligations under its Global Subsidiaries Guaranty in accordance with the terms and provisions thereof.

Section 1.02 The definition of "Global Subsidiary Guaranty" appearing in Section 1 of the DIP Credit Agreement is hereby amended to read in its entirety as follows:

"Global Subsidiaries Guaranty" shall have the meaning provided in Section 6.13(a) and shall include any counterpart thereof and any other substantially identical guaranty executed and delivered by any Domestic Subsidiary, Wholly-Owned Mexican Subsidiary, Brazilian Subsidiary and Dutch Subsidiary of the U.S. Borrower pursuant to Sections 9.12 or 9.13.

Section 1.03 Section 1 of the DIP Credit Agreement is hereby further amended by adding the following terms in proper alphabetic order:

"Wholly-Owned Mexican Subsidiary" shall mean each Wholly-Owned Subsidiary of Holdings incorporated or organized in Mexico.

Section 1.04 Section 6.26(b) of the DIP Credit Agreement is hereby amended by inserting the phrase "Wholly-Owned" following the word "other" in the first line thereof.

Section 1.05 Section 10.04(c) of the DIP Credit Agreement is hereby amended by inserting the phrase "other Investments, in each case as" following the word "and" in the first line thereof.

Section 1.06 Section 10.05(i) of the DIP Credit Agreement is hereby amended by deleting the phrases "Part A or B", "Part A of" and "Part C of" appearing therein.

Section 1.07 Section 10.14 of the DIP Credit Agreement is hereby amended to read in its entirety as follows:

"10.14. Maximum Capital Expenditures. The U.S. Borrower will not, nor will it permit any of its Subsidiaries to, incur or make any Capital Expenditures for the three month period ending on the last day of September 2009, the six month period ending on the last day of December 2009, the nine month period ending on the last day of March 2010 or the twelve month period ending on the last day of June 2010, respectively, set forth below in excess of the maximum amount set forth below opposite such period:

| PERIOD | CAPITAL EXPENDITURES |
|---|---|
| Three month period ending September 30, 2009 | U.S.$ 30,000,000 |
| Six month period ending December 31, 2009 | U.S.$ 52,500,000 |
| Nine month period ending March 30, 2010 | U.S.$ 77,500,000 |
| Twelve month period ending June 30, 2010 | As agreed to by the Administrative Agent with the approval of the Required Lenders " |

- 2 -

Section 1.08 Section 10.16 of the Credit Agreement is hereby amended to read in its entirety as follows:

"10.16. <u>Minimum EBITDA</u>. The U.S. Borrower will not permit Consolidated EBITDA for the three month period ending on the last day of September 2009, the six month period ending on the last day of December 2009, the nine month period ending on the last day of March 2010, or the twelve month period ending on the last day of June 2010, respectively, to be less than the minimum amount set forth below opposite such period:

| PERIOD | MINIMUM CONSOLIDATED EBITDA | |
|---|---|---|
| Three month period ending September 30, 2009 | U.S.$ | 32,500,000 |
| Six month period ending December 31, 2009 | U.S.$ | 72,500,000 |
| Nine month period ending March 30, 2010 | U.S.$ | 100,000,000 |
| Twelve month period ending June 30, 2010 | U.S.$ | 127,500,000 |

"

Section 1.09 Section 11(i) of the DIP Credit Agreement is hereby amended by deleting the phrase "any Credit Party or any of their respective Immaterial Subsidiaries" therein, and replacing it with the phrase "any Credit Party or any of their respective Subsidiaries (other than an Immaterial Subsidiary)".

Section 1.10 Section 11(s) of the DIP Credit Agreement is hereby amended to read in its entirety as follows:

"With respect to any proceeding before a court, tribunal, or Governmental Authority or agency in any jurisdiction seeking to (i) amend in a manner adverse to the DIP Lenders, vacate, reverse, nullify, or otherwise challenge any provision of the Interim Order, the Initial Order, or any Other CCAA Order (whether in whole or in part), or any of the transactions required to

- 3 -

effectuate the DIP Facility (or any document related to such transactions), (ii) amend in a manner adverse to the DIP Lenders, release, subordinate, nullify, or otherwise challenge any material lien, charge or similar security securing the DIP Facility, (iii) prohibit the Administrative Agent, the Prepetition Administrative Agent, the Lenders, or the Prepetition Lenders from acting in accordance with this Agreement or the Interim Order or the Initial Order, (iv) apply or require the Administrative Agent or Prepetition Administrative Agent to apply the proceeds of any material collateral securing the Obligations or the Prepetition Obligations except in the manner and in the order set forth in this Agreement and the Interim Order or the Initial Order, (v) foreclose or otherwise act against any material collateral securing the Obligations wherever located in the world or (vi) reduce the percentage ownership of any Credit Party or Material Subsidiary of Holdings in any entity, and in each case (A) the Debtors fail to promptly oppose the relief sought in such proceeding or (B) such court, tribunal, or Governmental Authority or agency enters or issues an order, opinion, decision, decree or takes any similar act which has the effect of granting such relief;"

Section 1.11 Part B, first table, second to last row, of Schedule 8.18 is amended by deleting the amount "$180,345,141" in the 'Balance Outstanding' column, and replacing it with the amount "$148,840,000".

Section 1.12 Section 5 of Schedule 9.21 to the DIP Credit Agreement is hereby amended to read in its entirety as follows:

5. Brazil Pledge Agreements and Brazilian Security Agreements –
Sections 6.14(c) and 6.15(c):

| | | | |
|---|---|---|---|
| (1) | Execution and delivery of the Brazilian Pledge Agreements and the Brazilian Security Agreements. | (1) | No later than September 4, 2009 |
| (2) | Translation and evidence of filing and registration of the Brazilian Pledge Agreements and the Brazilian Security Agreements. | (2) | No later than September 21, 2009 |
| (3) | Execution of Brazilian mortgages. | (3) | No later than September 30, 2009 |
| (4) | Registration of Brazilian mortgages. | (4) | No later than October 31, 2009 |

Section 1.13 Section 8 of Schedule 9.21 is amended by deleting the phrase "10 days" therein, and replacing it with the phrase "20 days".

Section 1.14 Part A, item #3 of Schedule 10.04(c) is amended by deleting the percentage "65%", and replacing it with the percentage "47.5%".

- 4 -

ARTICLE 2

Miscellaneous

Section 2.01. <u>Conditions to Effectiveness</u>. This First Amendment shall become effective on the date (the "<u>First Amendment Effective Date</u>") on which the Administrative Agent shall have received this First Amendment, executed and delivered by a duly authorized officer of each of Holdings, each Borrower and the Required Lenders.

Section 2.02. <u>Continuing Effect; No Other Waivers or Amendments</u>. This First Amendment shall not constitute an amendment or waiver of or consent to any provision of the DIP Credit Agreement and the other Credit Documents except as expressly stated herein and shall not be construed as an amendment, waiver or consent to any action on the part of Holdings, any Borrower or any other Subsidiary of Holdings that would require an amendment, waiver or consent of the Administrative Agent or the Lenders except as expressly stated herein. Except as expressly waived hereby, the provisions of the DIP Credit Agreement and the other Credit Documents are and shall remain in full force and effect in accordance with their terms.

Section 2.03. <u>Counterparts</u>. This First Amendment may be executed in any number of separate counterparts by the parties hereto (including by telecopy or via electronic mail), each of which counterparts when so executed shall be an original, but all the counterparts shall together constitute one and the same instrument.

Section 2.04. <u>Payment of Fees and Expenses</u>. The Borrowers agree to pay or reimburse the Administrative Agent for all of its reasonable out-of-pocket costs and reasonable expenses incurred in connection with this First Amendment, any other documents prepared in connection herewith and the transactions contemplated hereby, including, without limitation, the reasonable fees, charges and disbursements of counsel to the Administrative Agent.

Section 2.05. <u>References to the Credit Agreement</u>. From and after the First Amendment Effective Date, all references in the DIP Credit Agreement and each of the other Credit Documents to the DIP Credit Agreement shall be deemed to be references to the DIP Credit Agreement as modified hereby.

Section 2.06. <u>GOVERNING LAW</u>. THIS FIRST AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS FIRST AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (EXCEPT ANY CHOICE OF LAW PRINCIPAL THAT WOULD REQUIRE THE APPLICATION OF A LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK).

\* \* \*

- 5 -

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be executed and delivered by their respective duly authorized officers as of the date first above written.

COOPER-STANDARD HOLDINGS, INC.

By:_____
     Name:
     Title:

COOPER-STANDARD AUTOMOTIVE INC.

By:_____
     Name:
     Title:

COOPER-STANDARD AUTOMOTIVE CANADA LIMITED

By:_____
     Name:
     Title:

DEUTSCHE BANK TRUST COMPANY AMERICAS, as
Administrative Agent and as a Lender

By:_____
      Name:
      Title:

By:_____
      Name:
      Title:

**Exhibit 10.3**

SECOND AMENDMENT TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT AND
LIMITED WAIVER

SECOND AMENDMENT TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT AND LIMITED WAIVER, dated as of September 11, 2009 (this "Second Amendment"), among COOPER-STANDARD HOLDINGS INC., a Delaware corporation ("Holdings"), COOPER-STANDARD AUTOMOTIVE INC., an Ohio corporation (the "U.S. Borrower"), COOPER-STANDARD AUTOMOTIVE CANADA LIMITED, a corporation organized under the laws of Ontario (the "Canadian Borrower" and together with the U.S. Borrower, the "Borrowers" and each a "Borrower"), COOPER-STANDARD AUTOMOTIVE BRASIL SEALING LTDA. ("Cooper Brazil Sealing"), COOPER-STANDARD AUTOMOTIVE BRASIL FLUID SYSTEMS LTDA. ("Cooper Brazil Fluid"; together with Cooper Brazil Sealing, the "Brazilian Credit Parties" and each a "Brazilian Credit Party"), various LENDERS party to the DIP Credit Agreement referred to below (the "Lenders"), DEUTSCHE BANK TRUST COMPANY AMERICAS ("DBTCA"), as Administrative Agent (in such capacity, the "Administrative Agent") and DEUTSCHE BANK S.A. – BANCO ALEMÃO as Brazilian Collateral Agent (in such capacity, the "Brazilian Collateral Agent"). All capitalized terms used herein and not otherwise defined herein shall have the respective meaning provided to such terms in the DIP Credit Agreement.

W I T N E S S E T H :

WHEREAS, Holdings, the U.S. Borrower and the Canadian Borrower (collectively, the "DIP Credit Agreement Parties"), various Lenders, the Administrative Agent and certain other Agents have entered into a Debtor-In-Possession Credit Agreement, dated as of August 5, 2009 (as amended, modified and/or supplemented to, but not including, the date hereof, the "DIP Credit Agreement");

WHEREAS, Cooper Brazil Sealing and the Brazilian Collateral Agent have entered into a Receivables Pledge Agreement, dated as of September 2, 2009, (the "Sealing Receivables Pledge Agreement");

WHEREAS, Cooper Brazil Fluid and the Brazilian Collateral Agent have entered into a Receivables Pledge Agreement, dated as of September 2, 2009, (the "Fluid Receivables Pledge Agreement"; together with the Sealing Receivables Pledge Agreement, the "Brazilian Receivables Pledge Agreements");

WHEREAS, Holdings, the U.S. Borrower, U.S. Finco and each U.S. Subsidiary of the U.S. Borrower (collectively, the "U.S. Debtors") have filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating their respective cases under Chapter 11 of the Bankruptcy Code (the cases of Holdings, the U.S. Borrower and the U.S. Subsidiaries of the U.S. Borrower, each a "U.S. Case" and collectively, the "U.S. Cases") and shall continue in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

- 1 -

WHEREAS, the Canadian Borrower has commenced proceedings (the "Canadian Case"; together with the U.S. Cases, the "Cases") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA");

WHEREAS, none of Foreign Subsidiaries of the U.S. Borrower (other than the Canadian Debtor) is or shall be debtors-in-possession in the Cases;

WHEREAS, the DIP Credit Agreement Parties have requested that the Lenders agree to amend the DIP Credit Agreement as provided herein;

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein and for other valuable consideration, the receipt and adequacy of which are hereby acknowledged, (i) the DIP Credit Agreement Parties and the Lenders hereby agree (with respect to Article 1) as follows and (ii) the Brazilian Credit Parties, the Brazilian Collateral Agent and the Lenders hereby agree (with respect to Article 2) as follows:

ARTICLE 1

Amendments

Section 1.01. Section 10.01(a) of the DIP Credit Agreement is hereby amended by (i) replacing the period at the end of clause (xviii) thereof with a semi-colon and (ii) inserting a provisional clause at the end of Section 10.01(a) applicable to clauses (i) through (xviii) thereof reading as follows:

"provided that, notwithstanding the foregoing clauses (i) through (xviii), no Credit Agreement Party will permit the Brazilian Credit Parties to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to permit any of the Brazilian Credit Parties to) create, incur, assume or permit to exist any Indebtedness (which, for the purposes of this proviso, shall include trade accounts payable and accrued obligations incurred in the ordinary course of business) in excess of an aggregate principal amount of U.S.$25,000,000 at any time outstanding (exclusive, in any case, of Indebtedness of the type specified in Section 10.01(a)(v))."

Section 1.02. Section 10.02(a) of the DIP Credit Agreement is hereby amended by (i) replacing the phrase "Section 5-208" in clause (vi) therein with the phrase "Section 4-208", (ii) replacing the period at the end of clause (xvii) thereof with a semi-colon and (iii) inserting a provisional clause at the end of Section 10.02(a) applicable to clauses (i) through (xvii) thereof reading as follows:

"provided that, notwithstanding the foregoing clauses (i) through (xvii), no Credit Agreement Party will, nor will it permit any of its Subsidiaries to (nor will it apply to the Bankruptcy Court or the Canadian Court for authority to) create, incur, assume or permit to exist any Lien on any accounts receivables owned at any time by any Brazilian Credit Party, or assign or sell any income or revenues or rights in respect of any thereof, except Liens (i) created under the Brazilian Pledge Agreements and the Brazilian Security Agreements or (ii) of the type specified in Section 10.02(a)(ii) or (vii))."

- 2 -

## ARTICLE 2

### Waivers

Section 2.01. <u>Limited Waiver</u>. Subject to the terms and conditions set forth herein, the Brazilian Collateral Agent is hereby authorized to waive, and hereby waives, solely during the period commencing on the date hereof and ending on the Limited Waiver Termination Date (as defined below) (the "<u>Limited Waiver Period</u>"), (i) the requirement, as set forth in Section 4.1(c) of the Sealing Receivables Pledge Agreement, of Cooper Brazil Sealing to notify, within 10 days from the execution thereof, all of the account debtors of the applicable Receivables (as defined in the Sealing Receivables Pledge Agreement) of the pledge created thereby and (ii) the requirement, as set forth in Section 4.1(c) of the Fluid Receivables Pledge Agreement, of Cooper Brazil Fluid to notify, within 10 days from the execution thereof, all of the account debtors of the applicable Receivables (as defined in the Fluid Receivables Pledge Agreement) of the pledge created thereby.

Section 2.02. <u>Waiver Termination Events</u>. The limited waivers set forth in <u>Section 2.01</u> shall immediately terminate and be of no further force and effect, automatically and without the taking of any action or the giving of any notice by any Person, upon the earlier to occur of (a) or (b) (the "<u>Limited Waiver Termination Date</u>"):

(a) January 10, 2010;

(b) the occurrence of an Event of Default.

## ARTICLE 3
### Miscellaneous

Section 3.01. <u>Conditions to Effectiveness</u>. This Second Amendment shall become effective on the date (the "<u>Second Amendment Effective Date</u>") on which the Administrative Agent shall have received this Second Amendment, executed and delivered by a duly authorized officer of each of Holdings, each Borrower, each Brazilian Credit Party, the Brazilian Collateral Agent and the Required Lenders.

Section 3.02. <u>Continuing Effect; No Other Waivers or Amendments</u>. This Second Amendment shall not constitute an amendment or waiver of or consent to any provision of the DIP Credit Agreement and the other Credit Documents except as expressly stated herein and shall not be construed as an amendment, waiver or consent to any action on the part of Holdings, any Borrower or any other Subsidiary of Holdings that would require an amendment, waiver or consent of the Administrative Agent or the Lenders except as expressly stated herein. Except as expressly waived hereby, the provisions of the DIP Credit Agreement and the other Credit Documents are and shall remain in full force and effect in accordance with their terms.

Section 3.03. <u>Counterparts</u>. This Second Amendment may be executed in any number of separate counterparts by the parties hereto (including by telecopy or via electronic mail), each of which counterparts when so executed shall be an original, but all the counterparts shall together constitute one and the same instrument.

- 3 -

Section 3.04. <u>Payment of Fees and Expenses</u>. The Borrowers agree to pay or reimburse the Administrative Agent for all of its reasonable out-of-pocket costs and reasonable expenses incurred in connection with this Second Amendment, any other documents prepared in connection herewith and the transactions contemplated hereby, including, without limitation, the reasonable fees, charges and disbursements of counsel to the Administrative Agent.

Section 3.05. <u>References to the DIP Credit Agreement and the Brazilian Receivables Agreements</u>. From and after the Second Amendment Effective Date, (i) all references in the DIP Credit Agreement and each of the other Credit Documents to the DIP Credit Agreement shall be deemed to be references to the DIP Credit Agreement as modified hereby and (ii) all references in the Brazilian Receivables Pledge Agreements to the Brazilian Receivables Pledge Agreement (or in the DIP Credit Agreement and each of the other Credit Documents to the Brazilian Pledge Agreements) shall be deemed to be references to the Brazilian Receivables Pledge Agreements as modified hereby.

Section 3.06. <u>GOVERNING LAW</u>. THIS SECOND AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS SECOND AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (EXCEPT (I) ANY CHOICE OF LAW PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF A LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK AND (II) ARTICLE 2, WHICH SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE FEDERATIVE REPUBLIC OF BRAZIL).

\* \* \*

- 4 -

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to be executed and delivered by their respective duly authorized officers as of the date first above written.

COOPER-STANDARD HOLDINGS, INC.

By:_____
      Name:
      Title:

COOPER-STANDARD AUTOMOTIVE INC.

By:_____
      Name:
      Title:

COOPER-STANDARD AUTOMOTIVE CANADA LIMITED

By:_____
      Name:
      Title:

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent and as a Lender

By:_____
     Name:
     Title:

By:_____
     Name:
     Title:

[

AND BEING THUS AGREED AND CONTRACTED, the parties execute the present Second Amendment in five (5) copies of equal text and form, in the presence of the undersigned witnesses.

COOPER-STANDARD AUTOMOTIVE BRASIL SEALING LTDA.

_____
By:
Title:

_____
By:
Title:

COOPER-STANDARD AUTOMOTIVE BRASIL FLUID SYSTEMS LTDA.

_____
By:
Title:

_____
By:
Title:

DEUTSCHE BANK S.A. – BANCO ALEMÃO

_____
By:
Title:

_____
By:
Title:

Witnesses:

1._____     2._____
Name:                                                       Name:
ID Card:                                                   ID Card:

[

SIGNATURE PAGE TO THE SECOND AMENDMENT,
DATED AS OF THE DATE FIRST WRITTEN ABOVE, TO
THE DEBTOR-IN-POSSESSION CREDIT AGREEMENT,
DATED AS OF AUGUST 5, 2009, AMONG COOPER-
STANDARD HOLDINGS INC., COOPER-STANDARD
AUTOMOTIVE INC., COOPER-STANDARD
AUTOMOTIVE CANADA LIMITED, THE LENDERS
FROM TIME TO TIME PARTY THERETO AND
DEUTSCHE BANK TRUST COMPANY AMERICAS AS
ADMINISTRATIVE AGENT

NAME OF INSTITUTION

_____ , as a Lender

By: _____
     Name:
     Title:

[

EXHIBIT 31.1

CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER, PURSUANT TO 15 U.S.C. 78m(a) or 78o(d)
(SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002)

I, James S. McElya, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Cooper-Standard Holdings Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 13, 2009                                    By:  /s/ James S. McElya
                                                                James S. McElya
                                                                Chief Executive Officer

EXHIBIT 31.2

CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER, PURSUANT TO 15 U.S.C. 78m(a) or 78o(d)
(SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002)

I, Allen J. Campbell, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Cooper-Standard Holdings Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 13, 2009

By:  /s/ Allen J. Campbell
     Allen J. Campbell
     Chief Financial Officer

**EXHIBIT 32.1**

CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350 AS
(SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002)

In connection with the Quarterly Report of Cooper-Standard Holdings Inc. (the "Company") on Form 10-Q for the period ended September 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, James S. McElya, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 13, 2009

By:  /s/ James S. McElya
          James S. McElya
          Chief Executive Officer

**EXHIBIT 32.2**

CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350
(SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002)

In connection with the Quarterly Report of Cooper-Standard Holdings Inc. (the "Company") on Form 10-Q for the period ended September 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Allen J. Campbell, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 13, 2009

By: /s/ Allen J. Campbell
     Allen J. Campbell
     Chief Financial Officer