# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COOPER-STANDARD HOLDINGS INC., *et al.*,[1] | ) Case No. 09-12743 (PJW) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |

---

## DEBTORS' ~~FIRST~~ SECOND AMENDED JOINT CHAPTER 11 PLAN

---

Dated:  Novi, Michigan
       March ~~19,~~ 26, 2010

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:  Mark D. Collins, Esq.
       Michael J. Merchant, Esq.
       Chun I. Jang, Esq.
       Drew G. Sloan, Esq.
Tel:  (302) 651-7700
Fax:  (302) 651-7701

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
Attn:  Gary L. Kaplan, Esq.
       Richard J. Slivinski, Esq.
       Peter B. Siroka, Esq.
Tel:  (212) 859-8000
Fax:  (212) 859-4000

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Cooper-Standard Holdings Inc. (5088); Cooper-Standard Automotive Inc. (9970); Cooper-Standard Automotive FHS Inc. (2953); Cooper-Standard Automotive Fluid Systems Mexico Holding LLC (0442); Cooper-Standard Automotive, OH LLC (2845); StanTech, Inc. (4014); Westborn Service Center, Inc. (7448); North American Rubber, Incorporated (9926); Sterling Investments Company (1393); Cooper-Standard Automotive NC LLC (2839); CS Automotive LLC (4267); CSA Services Inc. (9510); and NISCO Holding Company (1697). The corporate address of the Debtors is 39550 Orchard Hill Place Drive, Novi, Michigan 48375.

# TABLE OF CONTENTS

## DEBTORS' ~~FIRST~~<ins>SECOND</ins> AMENDED CHAPTER 11 PLAN

### ARTICLE ONE
### DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

### ARTICLE TWO
### PROVISIONS FOR TREATMENT OF ADMINISTRATIVE EXPENSES

2.01.   Administrative Expenses. ....................................................................17

### ARTICLE THREE
### PROVISIONS FOR TREATMENT OF PRIORITY TAX CLAIMS

3.01.   Priority Tax Claims..............................................................................19

### ARTICLE FOUR
### CLASSIFICATION OF CLAIMS AND INTERESTS

4.01.   Designation of Classes.........................................................................19
4.02.   Classification........................................................................................20

### ARTICLE FIVE
### IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND NOT IMPAIRED BY THIS PLAN

5.01.   Classes of Claims and Interests Impaired by this Plan and Entitled to Vote....................23
5.02.   Class of Claims and Interests Impaired by this Plan and Deemed to Reject this Plan ....................................................................................23
5.03.   Classes of Claims Not Impaired by this Plan and Conclusively Presumed to Accept this Plan ....................................................................................23

### ARTICLE SIX
### PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

6.01.   Priority Claims (Subclasses 1A through 1M). ....................................24
6.02.   Miscellaneous Secured Claims (Subclasses 2A through 2M) ..........24
6.03.   Intercompany Claims (Subclasses 3B through 3M) .........................24
6.04.   Prepetition Credit Facility Claims (Subclasses 4A through 4M).....................24
6.05.   Senior Note Claims (Subclasses 5A through 5L). .............................25
6.06.   Senior Subordinated Note Claims (Subclasses 6A through 6L).......................26
6.07.   Subsidiary Debtor General Unsecured Claims (Subclasses 7B through 7M)....................26
6.08.   Subsidiary Debtor Equity Interests (Subclasses 8B through 8M) ....................27
6.09.   Holdings General Unsecured Claims (Class 9) .................................27

6.10.    Old Holdings Equity Interests (Class 10) ...........................................................27

**ARTICLE SEVEN**
**ACCEPTANCE OR REJECTION OF THIS PLAN; EFFECT OF REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS**

7.01.    Acceptance by an Impaired Class of Creditors...................................................27
7.02.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.................27

**ARTICLE EIGHT**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

8.01.    Assumption and Rejection of Executory Contracts and Unexpired Leases. .....................28
8.02.    Cure of Defaults....................................................................................................29
8.03.    Bar Date for Rejection Damages .........................................................................29
8.04.    Employee Benefit Plans and Agreements.............................................................3029

**ARTICLE NINE**
**IMPLEMENTATION**

9.01.    No Substantive Consolidation..............................................................................31
9.02.    Vesting of Property ..............................................................................................31
9.03.    Preservation of Causes of Action.........................................................................32
9.04.    Implementation ....................................................................................................32
9.05.    Rights Offering. ...................................................................................................32
9.06.    New Credit Facilities ...........................................................................................33
9.07.    Corporate Action..................................................................................................33
9.08.    Issuance of New Common Stock..........................................................................34
9.09.    Issuance of New Preferred Stock..........................................................................34
9.10.    Issuance of New Capital Warrants .......................................................................35
9.11.    Registration Rights Agreement............................................................................35
9.12.    Cancellation of Existing Securities and Agreements...........................................3637
9.13.    Reorganized Debtors' Certificates of Incorporation; Certificate of
        Designations.........................................................................................................37
9.14.    Directors of the Reorganized Debtors...................................................................37
9.15.    Management Agreements .....................................................................................38
9.16.    Pension Plans .......................................................................................................39
9.17.    Termination of DIP Financing Agreement ...........................................................40
9.18.    Compromise of Controversies .............................................................................40
9.19.    Transactions on Business Days.............................................................................40

**ARTICLE TEN**
**PROVISIONS COVERING DISTRIBUTIONS**

10.01. Timing of Distributions Under this Plan..............................................................40
10.02. Distributions on Account of the Prepetition Credit Facility Claim ......................4041
10.03. Distributions on Account of the Senior Notes. ...................................................41
10.04. Distributions on Account of the Senior Subordinated Notes...............................42

10.05. Allocation of Consideration .................................................................................43
10.06. Cash Payments .......................................................................................................43
10.07. Payment of Statutory Fees ...................................................................................43
10.08. No Interest ..............................................................................................................43
10.09. Setoffs .....................................................................................................................43
10.10. Special Provision Regarding Unimpaired Claims ...............................................44
10.11. Fractional Securities ..............................................................................................44
10.12. Compliance with Tax Requirements .....................................................................44
10.13. Persons Deemed Holders of Registered Securities; the Distribution Record
       Date ........................................................................................................................44
10.14. Surrender of Existing Securities ........................................................................4445
10.15. Undeliverable or Unclaimed Distributions. .........................................................45
10.16. Distributions on Account of General Unsecured Claims .....................................46
10.17. Exemption From Certain Transfer Taxes .............................................................46

## ARTICLE ELEVEN
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

11.01. Objections to Claims; Disputed Claims ................................................................46
11.02. Estimation of Claims ..............................................................................................46
11.03. Payments and Distributions with Respect to Disputed Claims ............................47
11.04. Timing of Payments and Distributions with Respect to Disputed Claims ...........47
11.05. Prosecution of Objections .....................................................................................47

## ARTICLE TWELVE
## DISCHARGE, INJUNCTIONS, RELEASES AND SETTLEMENTS OF CLAIMS

12.01. **Discharge of All Claims and Interests and Releases.** ......................................47
12.02. **Exculpation** ..........................................................................................................50
12.03. **Injunction.** ............................................................................................................50
12.04. **Guarantees and Claims of Subordination** .........................................................51
12.05. Survival of Indemnification Obligations ..............................................................51

## ARTICLE THIRTEEN
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

13.01. Conditions to Entry of the Confirmation Order ....................................................51
13.02. Conditions to Effective Date ..................................................................................52
13.03. Waiver of Conditions ..............................................................................................53
13.04. Effect of Failure of Conditions .............................................................................54

## ARTICLE FOURTEEN
## MISCELLANEOUS PROVISIONS

14.01. Court to Retain Jurisdiction ..................................................................................54
14.02. Binding Effect of this Plan .....................................................................................55
14.03. Authorization of Corporate Action ........................................................................56
14.04. Modification of this Plan ........................................................................................56

14.05. Withdrawal of this Plan ...................................................................................56

14.06. Captions ................................................................................................................56

14.07. Nonvoting Stock ...................................................................................................56

14.08. Dissolution of the Committee ..........................................................................5657

14.09. Record Date for Voting Purposes .....................................................................57

14.10. Method of Notice ................................................................................................57

14.11. Section 1125(e) of the Bankruptcy Code. .......................................................59

14.12. Post-Confirmation Obligations .......................................................................5960

14.13. Severability of Plan Provisions .........................................................................60

14.14. Successors and Assigns.......................................................................................60

## DEBTORS' ~~FIRST~~SECOND AMENDED CHAPTER 11 PLAN

Cooper-Standard Holdings Inc., Cooper-Standard Automotive Inc., Cooper-Standard Automotive FHS Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, Cooper-Standard Automotive, OH LLC, StanTech, Inc., Westborn Service Center, Inc., North American Rubber, Incorporated, Sterling Investments Company, Cooper-Standard Automotive NC LLC, CS Automotive LLC, CSA Services Inc. and NISCO Holding Company, the above-captioned debtors and debtors in possession, hereby propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code (as defined below). The Debtors have not been substantively consolidated, and the Plan is comprised of thirteen (13) Sub-Plans, one for each Debtor.

### ARTICLE ONE
### DEFINITIONS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME AND GOVERNING LAW

A.     SCOPE OF DEFINITIONS; RULES OF CONSTRUCTION

Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, the feminine, and the neuter. The word "including" is not a limiting term and shall be interpreted to mean "including, but not limited to". Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Unless the context requires otherwise, the following words and phrases shall have the meaning set forth below:

B.     DEFINITIONS

Accredited Investor:  As defined in Rule 501(a) of Regulation D of the Securities Act.

Administrative Expense:  Collectively, any cost or expense of administration of the Chapter 11 Cases allowed under section 503(b) of the Bankruptcy Code.

Affiliates:  As defined in section 101(2) of the Bankruptcy Code, except that the term Affiliate shall be applicable to any Entity (and not just a Debtor).

Allowed:  With respect to Claims, (a) any Claim against a Debtor, proof of which is timely filed or by order of the Bankruptcy Court or pursuant to the Plan is not or will not be required to be filed, (b) any Claim that has been or is hereafter listed in the Schedules as neither disputed, contingent nor unliquidated, and for which no timely Proof of Claim has been filed, or (c) any Claim allowed pursuant to this Plan or the Confirmation Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim will be allowed only if (i) no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (ii) such an objection is so interposed and the Claim shall have been

allowed by a Final Order (but only if such allowance was not solely for the purpose of voting to accept or reject this plan). Except as otherwise specified in this Plan or a Final Order, the amount of an Allowed Claim shall not include interest on such Claim after the Filing Date.

Backstop Commitment Fees and Expenses Approval Order: The order approving the payment of reasonable and documented fees and expenses incurred by counsel for the Backstop Parties in connection with the negotiation, documentation, and implementation of the Rights Offering and any and all supporting documents and related transactions, entered by the Bankruptcy Court on January 5, 2010 [Docket No. 671].

Backstop Parties: Collectively, those parties set forth in the Equity Commitment Agreement, that are providing the equity commitment thereunder.

Backstop Shelf Registration Statement: A registration statement on Form S-1 for the delayed or continuous sale of securities pursuant to Rule 415 under the Securities Act covering resales by the Backstop Parties and any of their affiliates and such other holders that are party to the Registration Rights Agreement of (i) all shares of New Common Stock issued in the Rights Offering, (ii) all shares of New Capital Stock and all New Capital Warrants issued pursuant to the Equity Commitment Agreement and (iii) all shares of New Common Stock issued upon conversion of the New Preferred Stock and upon exercise of the New Capital Warrants.

Backstop Warrants: In the aggregate, 70% of the New Capital Warrants, which are to be issued to the Backstop Parties.

Ballot: The ballots distributed together with the Disclosure Statement to Holders of an Impaired Claim or Old Holdings Equity Interest entitled to vote for the purpose of accepting or rejecting this Plan.

Bankruptcy Code: Title 11 of the United States Code, as amended from time to time, as applicable during the Chapter 11 Cases.

Bankruptcy Court: The United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

Bankruptcy Fees: Any fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code.

Bankruptcy Rules: The Federal Rules of Bankruptcy Procedure, as amended from time to time, promulgated under section 2075 of title 28 of the United States Code.

Bar Date: The date designated by the Court as the last day for filing a Proof of Claim against the Debtors.

Business Day: Any day other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

Canadian Court: The Ontario Superior Court of Justice (Commercial List), or any other Canadian court having jurisdiction over the CCAA Proceeding or such other insolvency related proceeding of CSA Canada.

Cash: Legal tender of the United States of America.

Causes of Action: Any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

CCAA: Companies' Creditors Arrangement Act (Canada), R.S.C., 1985, c.C-36, as amended.

CCAA Plan: The plan of compromise or arrangement of CSA Canada prepared and filed on March 12, 2010 in the CCAA Proceeding, together with all exhibits thereto, as the same may be amended from time to time in accordance with the terms therewith in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee.

CCAA Proceeding: The proceeding under Canada's CCAA commenced by CSA Canada on August 4, 2009, in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada.

Certificate of Designations: The Certificate of Designations of the New Preferred Stock, attached hereto as Exhibit A and attached to the Equity Commitment Agreement as Exhibit J as the same may be modified with the consent of the Required Backstop Parties and in consultation with the Creditors' Committee; provided, however, that any material modification thereof shall be in form and substance reasonably satisfactory to the Creditors' Committee and filed as a Plan Supplement.

Chapter 11 Cases: The respective cases under chapter 11 of the Bankruptcy Code concerning the Debtors commenced on the Filing Date.

Claim: Any right to (a) payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (b) an equitable remedy for breach of performance of the Debtors if such breach gives rise to a right to payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

Committees: Collectively (i) the Creditors' Committee, and (ii) any other committee(s) appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

Confirmation Date:  The date on which the Confirmation Order is entered on the docket maintained by the clerk of the Bankruptcy Court with respect to the Chapter 11 Cases.

Confirmation Hearing:  The hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code regarding the confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

Confirmation Order:  The order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee.  ·

Consenting Backstop Parties:  Two-thirds in amount of the Backstop Parties based on Commitment Percentage, whose consent may be granted or withheld in accordance with section 16 of the Equity Commitment Agreement.

Cooper Tire L/C:  The letter of credit to be issued to Cooper Tire pursuant to the terms of the Cooper Tire Settlement Agreement.

Cooper Tire Settlement Agreement:  That certain Agreement Concerning Terms and Conditions of a Compromise and Settlement, dated March 17, 2010, by and between Holdings, CSA and CSA Canada, as defendants, Cooper Tire & Rubber Company and Cooper Tyre Rubber & Company UK Limited, as plaintiffs, and the Creditors' Committee, as an interested party, in the adversary proceeding: Cooper Tire & Rubber Company v. Cooper-Standard Holdings, Inc. et. al., Adv. Proc. No. 09-52014 (PJW).

Creditor:  Any Entity that is the Holder of a Claim against any of the Debtors that arose on or before the Filing Date or a Claim against any of the Debtors' estates of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code.

Creditors' Committee:  The official committee of unsecured creditors, appointed in these Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on August 14, 2009, as the same may be constituted from time to time.

CSA:  Cooper-Standard Automotive Inc.

CSA Canada:  Cooper-Standard Automotive Canada Limited.

Debtors:  Collectively, Holdings, CSA, Cooper-Standard Automotive FHS Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, Cooper-Standard Automotive OH, LLC, StanTech, Inc., Westborn Service Center, Inc., North American Rubber, Incorporated, Sterling Investments Company, Cooper-Standard Automotive NC L.L.C., CS Automotive LLC, CSA Services Inc., and NISCO Holding Company.

DIP Facility:  The Debtors' superpriority senior secured postpetition credit facility, consisting of a $175,000,000 superpriority single draw term loan facility and a $25,000,000 standby uncommitted single draw term loan facility, provided by the DIP

Lenders to Holdings and the other borrowers party thereto during these Chapter 11 Cases, pursuant to the DIP Financing Agreement and the DIP Financing Order.

DIP Financing Agent: (a) Deutsche Bank Trust Company Americas, in its capacity as the administrative agent, collateral agent and documentation agent under the DIP Financing Agreement; and (b) Deutsche Bank Securities Inc., in its capacity as the syndication agent, sole lead arranger and sole book runner under the DIP Financing Agreement.

DIP Financing Agreement: The debtor in possession credit agreement, dated as of December 18, 2009, as amended, modified or otherwise supplemented from time to time, by and among Holdings and the other borrowers party thereto, as the borrowers, the DIP Lenders, the other financial institutions party thereto, and the DIP Financing Agent.

DIP Financing Fees and Expenses: Without duplication, all reasonable fees, costs, charges, and expenses required to be paid by the Debtors under the terms of the DIP Financing Agreement, the DIP Original Financing Agreement, and/or any separate engagement letter executed in connection therewith, including but not limited to, the fees and disbursements of professionals, including without limitation (a) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the DIP Financing Agent, (b) each local counsel to the DIP Financing Agent, (c) Capstone Advisory Group LLC, as advisor to the DIP Financing Agent, and (d) Houlihan Lokey Howard & Zukin Capital, Inc., as advisor to the DIP Financing Agent.

DIP Financing Order: The Final Order (I) Authorizing U.S. Debtors (A) to Obtain Replacement Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364, (B) to Use Cash Collateral Pursuant to 11 U.S.C § 363, and (II) Granting Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 [Docket No. 649], entered on December 29, 2009, and as amended, modified or supplemented by the Bankruptcy Court from time to time.

DIP Lender Claims: A Claim against a Debtor arising pursuant to the DIP Financing Agreement, including all "DIP Obligations" as such term is defined in the DIP Financing Order.

DIP Lenders: The lenders under the DIP Financing Agreement and the DIP Original Financing Agreement, as appropriate.

DIP Original Financing Agent: (a) Deutsche Bank Trust Company Americas, in its capacity as the administrative agent, collateral agent and documentation agent under the DIP Original Financing Agreement; (b) Deutsche Bank Securities Inc., in its capacity as the joint lead arranger and book runner under the DIP Original Financing Agreement; (c) Banc of America Securities LLC as co-syndication agent and co-arranger under the DIP Original Financing Agreement; (d) General Electric Capital Corporation as co-syndication agent and joint lead arranger and book runner under the DIP Original Financing Agreement; and (e) UBS Securities LLC as co-syndication agent and co-arranger under the DIP Original Financing Agreement.

DIP Original Financing Agreement: The debtor in possession credit agreement, dated as of August 5, 2009, as amended, modified or otherwise supplemented from

time to time, by and among Holdings and the other borrowers party thereto, as the borrowers, the lenders and other financial institutions party thereto, and the DIP Original Financing Agent, which was refinanced in full with the DIP Financing Agreement.

DIP Original Financing Order: The Corrected Final Order (I) Authorizing U.S. Debtors (A) to Obtain Replacement Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364, (B) to Use Cash Collateral Pursuant to 11 U.S.C § 363, and (II) Granting Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 [Docket No. 179], entered on September 2, 2009, and as amended, modified or supplemented by the Bankruptcy Court from time to time.

Disclosure Statement: The disclosure statement relating to this Plan, including the exhibits and schedules thereto, as the same may be amended, modified, or supplemented from time to time (in accordance with the Equity Commitment Agreement), as approved by the Bankruptcy Court pursuant to the Disclosure Statement Approval Order.

Disclosure Statement Approval Order: The order approving the Disclosure Statement Motion, entered by the Bankruptcy Court on [~~~~~~~~~,or about March 26, 2010] [Docket No. ___], in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee.

Disclosure Statement Motion: The motion filed by the Debtors on February 1, 2010, pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018 seeking approval of the adequacy of the Disclosure Statement and the solicitation procedures and scheduling the Confirmation Hearing [Docket No. 753], including any amendments and supplements thereto.

Disputed: With respect to Claims or Equity Interests, any Claim or Equity Interest that is not Allowed.

Distribution Record Date: The date established in the Confirmation Order for determining the identity of Holders of Claims entitled to distributions under this Plan, which shall be no earlier than the date of entry of the Confirmation Order.

Effective Date: The first Business Day immediately following the date upon which all conditions to the Effective Date set forth in sections 13.01 and 13.02 of this Plan have been satisfied or waived by the applicable Debtor or Reorganized Debtor, as the case may be, and the Required Backstop Parties and in consultation with the Creditors' Committee (all in accordance with section 13.03 of this Plan); provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first Business Day after such stay is no longer in effect.

Eligible Noteholder: A Holder of an Allowed Senior Subordinated Note Claim that either is (i) a Holder of such Claim as of the Rights Offering Record Date or is a transferee of such Claim evidenced by one or more Certification Period Transfer Notices (as defined in the Rights Offering Procedures) that begin with the transfer by the Holder holding such Claim as of the Rights Offering Record Date and timely certifies in the Investor Certificate that such Holder is a QIB, an Accredited Investor or a Non-U.S. Person, or (ii) any subsequent

transferee thereafter evidenced by one or more Post-Certification Period Transfer Notices (as defined in the Rights Offering Procedures) prior to the Subscription Deadline (as defined in the Rights Offering Procedures); provided, however, that a transferor Holder that has delivered a Post-Certification Period Transfer Notice to the Subscription Agent evidencing the transfer of all such Holder's Allowed Senior Subordinated Note Claims shall no longer be deemed to be an Eligible Noteholder.

Entity: Any individual, corporation, limited or general partnership, limited liability company, joint venture, association, joint stock company, estate, entity, trust, trustee, United States Trustee, unincorporated organization, government, Governmental Unit, agency or political subdivision thereof.

Equity Commitment Agreement: The Commitment Agreement, dated March 19, 2010, approved by the Bankruptcy Court by an order (which will become a Final Order) dated March [--];26, 2010 [Docket No. ], by and between Holdings and the Backstop Parties.

Equity Interests: Old Holdings Equity Interests and Subsidiary Debtor Equity Interests.

ERISA: As amended, the Employee Retirement Income Security Act of 1974.

Estates: The bankruptcy estates of the Debtors in the Chapter 11 Cases created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Debtors' Chapter 11 Cases.

Fee Auditor: Warren H. Smith & Associates, P.C.

Fee Auditor Order: That certain Order Appointing Fee Auditor And Establishing Related Procedures Concerning The Payment Of Compensation And Reimbursement Of Expenses Of Professionals And Members Of Official Committees And Consideration Of Fee Applications, entered on October 16, 2009 [Docket No. 346].

Filing Date: August 3, 2009, the date on which the Debtors filed with the Bankruptcy Court their petitions commencing the Chapter 11 Cases.

Final Order: An order, ruling or judgment of the Bankruptcy Court, Canadian Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for *certiorari*, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending, or as to which any right to appeal, petition for *certiorari*, reargue, or rehear will have been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of *certiorari*, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, Canadian Court or other court of competent jurisdiction (as applicable) will have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing will have been denied and the time to take

any further appeal, petition for *certiorari* or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order will not cause such order not to be a Final Order.

General Bar Date: December 4, 2009 at 5:00 p.m. (prevailing Pacific Time).

General Unsecured Claim: Any Claim against Holdings or the Subsidiary Debtors other than an Administrative Expense, Miscellaneous Secured Claim, DIP Lender Claim, DIP Financing Fees and Expenses, Prepetition Credit Facility Administrative Claim, Prepetition Credit Facility Claim, Prepetition Credit Facility Fees and Expenses, Senior Note Claim, Senior Subordinated Note Claim, Intercompany Claim, Priority Claim, or Priority Tax Claim.

Governmental Unit: As defined in section 101(27) of the Bankruptcy Code.

Governmental Unit Bar Date: February 1, 2010 at 5:00 p.m. (prevailing Pacific Time).

Holdback Common Shares: 2,558,182 shares of New Common Stock.

Holdback Preferred Shares: 1,000,000 shares of New Preferred Stock.

Holdback Shares: Collectively, the Holdback Common Shares and the Holdback Preferred Shares.

Holder: Any Entity that holds a Claim or Equity Interest.

Holdings: Cooper-Standard Holdings Inc.

Holdings General Unsecured Claims: All General Unsecured Claims against Holdings, including, to the extent the Cooper Tire Settlement Agreement is not approved by the Bankruptcy Court, any and all claims of Cooper Tire & Rubber Company and its Affiliates arising under, relating to or in connection with that certain Stock Purchase Agreement dated as of September 16, 2004, as amended by the First Amendment to the Stock Purchase Agreement, dated as of December 3, 2004, including with respect to any tax refunds received by the Debtors and/or CSA Canada.

Impaired: Any Claim or Equity Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

Instrument: Any share of stock, security, promissory note or other "Instrument" within the meaning of that term as defined in section 9-102(47) of the Uniform Commercial Code.

Intercompany Claim: Any Claim between and among the Debtors and any Claims of any non-Debtor Subsidiary against a Debtor.

Investor Certificate: The certification form distributed in accordance with the Rights Offering Procedures to each Holder of an Allowed Senior Subordinated Note Claim on which each such Holder must certify (i) whether such Holder is an Accredited Investor, a QIB, a Non-U.S. Person or none of the foregoing and (ii) the aggregate principal amount of Senior Subordinated Notes beneficially owned by such Holder.

KCC: Kurtzman Carson Consultants LLC.

Lien: As defined in section 101(37) of the Bankruptcy Code; except that a Lien that has been avoided in accordance with a provision of the Bankruptcy Code, including sections 544, 545, 546, 547, 548 or 549, shall not constitute a Lien.

Management Incentive Plan: The equity incentive compensation plan to be adopted by Reorganized Holdings, in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee, pursuant to which 10% of the New Capital Stock will be reserved for issuance to the Debtors' management, which shall be filed with the Bankruptcy Court as part of the Plan Supplement. A term sheet setting forth, among other things, the terms and conditions of the Management Incentive Plan is attached hereto as Exhibit B.

Miscellaneous Secured Claim: Any Claim, other than a Prepetition Credit Facility Claim, that is a "secured" claim within the meaning of, and to the extent allowable as a secured claim under, section 506 of the Bankruptcy Code.

New Capital Stock: Collectively, the New Common Stock and the New Preferred Stock.

New Capital Warrants: The Backstop Warrants and the Senior Subordinated Noteholders Warrant Distribution to be issued to purchase, in the aggregate, 2,419,753 shares of the New Common Stock pursuant to the terms set forth in the New Capital Warrant Agreement. A term sheet setting forth the terms of the New Capital Warrants is attached to the Equity Commitment Agreement as Exhibit D.

New Capital Warrant Agreement: The warrant agreement governing the New Capital Warrants to be issued by Reorganized Holdings, in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee, and containing the terms set forth in the Warrant Term Sheet attached as Exhibit D to the Equity Commitment Agreement and attached as Exhibit C to this Plan, which shall be filed with the Bankruptcy Court as part of the Plan Supplement.

New Common Stock: The shares of new common stock, par value $0.001 per share, of Reorganized Holdings.

New Preferred Stock: The shares of 7% Cumulative Participating Convertible Preferred Stock, $100 stated value per share and having the terms set forth in the Certificate of Designations, of Reorganized Holdings.

New Secured Debt Financing Agreement: The new secured debt agreement in the committed principal amount of up to $450 million to be executed on or prior to (but effective as of) the Effective Date, which will be filed with the Bankruptcy Court as part of the Plan Supplement.

New Secured Debt Facility: The New Secured Debtor Financing Agreement, together with the New Secured Debt Facility Documents, executed in connection with or pursuant to the terms of the New Secured Debt Financing Agreement, and the subject financing thereunder, to be made available on the Effective Date, and which shall be in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee.

New Secured Debt Facility Documents: The loan documents and ancillary agreements and instruments to be executed in connection with or pursuant to the terms of New Secured Debt Financing Agreement.

New Working Capital Credit Agreement: The new senior secured working capital credit agreement in the committed principal amount of up to $150 million, to be executed on or prior to (but effective as of) the Effective Date, which will be filed with the Bankruptcy Court as part of the Plan Supplement.

New Working Capital Facility: The New Working Capital Credit Agreement, together with the New Working Capital Facility Documents, executed in connection with or pursuant to the terms of the New Working Capital Credit Agreement, and the subject financing thereunder, to be made available on the Effective Date, and which shall be in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee.

New Working Capital Facility Documents: The loan documents and ancillary agreements and instruments to be executed in connection with or pursuant to the terms of the New Working Capital Credit Agreement.

Non-Backstop Shelf Registration Statement: A registration statement on Form S-1 for the delayed or continuous sale of securities pursuant to Rule 415 under the Securities Act covering resales by all Eligible Noteholders (other than the Backstop Parties and any of their affiliates and such holders that are party to the Registration Rights Agreement) of all shares of New Common Stock issued to them in the Rights Offering.

Non-Eligible Noteholder: A Holder of an Allowed Senior Subordinated Note Claim that (i) is a Holder of such Claim(s) as of the Rights Offering Record Date, (ii) certifies in the Investor Certificate that such Holder is neither a QIB, an Accredited Investor nor a Non-U.S. Person, (iii) continues to hold such Claim(s) until the Effective Date and (iv) delivers the Senior Subordinated Notes underlying such Claim(s) into an election account at the Depository Trust Company in accordance with instructions provided to such Holder.

Non-Eligible Noteholder Shares: The New Common Stock to be distributed to Non-Eligible Noteholders or, if applicable, any transferee of such Non-Eligible Noteholder in accordance with the Rights Offering Procedures, with the number of shares determined after the deadline for receipt of all Investor Certificates in a manner previously agreed upon by the Debtors and the Required Backstop Parties and which number of shares shall be filed with the Plan Supplement.

Non-U.S. Person: An Entity that is not a "U.S. person," as that term is defined under Regulation S, promulgated under the Securities Act.

Old Holdings Common Stock: Holdings' common stock, par value $0.01 per share, issued and outstanding as of the Petition Date.

Old Holdings Equity Interests: The equity interests in Holdings including (a) those represented by shares of Old Holdings Common Stock and any options, warrants, calls, subscriptions or other similar rights or other agreements, commitments or outstanding securities obligating any Debtor to issue, transfer or sell any shares of Old Holdings Common Stock, and (b) Claims of the type described in, and subject to subordination under section 510(b) of the Bankruptcy Code with respect to Old Holdings Common Stock.

PBGC: Pension Benefit Guaranty Corporation, a United States Government corporation.

Pension Plans: Collectively, the Cooper-Standard Automotive Inc. Collectively Bargained Retirement Plan - Gaylord UAW Local 388, the Cooper-Standard Automotive Inc. Hourly Employees' Retirement Plan - Auburn, the Cooper-Standard Automotive Inc. Hourly Employees' Retirement Plan - Bowling Green-Seal, the Cooper-Standard Automotive FHS - NEWLEX Hourly Pension Plan, the Cooper-Standard Automotive Inc. Hourly Employees' Retirement Plan - Bowling Green-Hose and the Cooper-Standard Automotive Inc. Salaried Retirement Plan.

Plan: The Debtors' ~~First~~Second Amended Joint Chapter 11 Plans, together with all exhibits, appendices and schedules thereto (including the Plan Supplement), as the same may be amended or modified from time to time in accordance with the terms thereof, the Bankruptcy Code and the Bankruptcy Rules.

Plan Supplement: The supplemental appendix to this Plan that will contain forms of the documents relevant to the implementation of this Plan, including, without limitation, the Management Incentive Plan, the commitment letters (or definitive credit agreements executed into escrow) for each of the New Working Capital Credit Agreement and New Secured Debt Financing Agreement, and the list of the initial members of the Board of Directors of Reorganized Holdings, which shall be filed with the Bankruptcy Court no later than five (5) Business Days prior to the Confirmation Hearing; provided, however, that the Reorganized Debtors' Certificate of Incorporation, the Reorganized Holdings By-Laws, the New Capital Warrant Agreement, the number of Non-Eligible Noteholder Shares, the Registration Rights Agreement and the Certificate of Designations shall be filed with the Bankruptcy Court no later than five (5) Business Days prior to the Voting Deadline; provided, further, however, that any

such documents that were filed with the Bankruptcy Court as exhibits to the Equity Commitment Agreement will be filed as Plan Supplements only if they have been modified from the version previously filed.

Prepetition Administrative Agent: Deutsche Bank Trust Company Americas, as administrative agent and collateral agent under the Prepetition Credit Facility.

Prepetition Credit Facility: That certain credit agreement, dated as of December 23, 2004, as amended, restated, supplemented or otherwise modified from time to time, among Holdings, CSA, CSA Canada, Cooper-Standard Automotive International Holdings B.V., as borrowers, the Prepetition Credit Facility Lenders, the other financial institutions party thereto, including the Prepetition Credit Facility Parties, and the Prepetition Administrative Agent.

Prepetition Credit Facility Claim: Any Claim against a Debtor arising under the Prepetition Credit Facility, including without limitation, any swap arising under or relating to the Prepetition Credit Facility, held by the Prepetition Credit Facility Parties, and all other Claims against a Debtor arising under the Prepetition Credit Facility, other than the Prepetition Credit Facility Fees and Expenses.

Prepetition Credit Facility Fees and Expenses: All reasonable fees, costs, charges, and expenses required to be paid by the Debtors under the terms of the Prepetition Credit Facility and/or any separate engagement letter with the Debtors, including but not limited to, the fees and disbursements of professionals, including without limitation (a) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the Prepetition Administrative Agent, (b) each local counsel to the Prepetition Administrative Agent,(c) Capstone Advisory Group LLC, as advisor to the Prepetition Administrative Agent, and (d) Houlihan Lokey Howard & Zukin Capital, Inc., as advisor to the Prepetition Administrative Agent.

Prepetition Credit Facility Lenders: Collectively, the Lenders under, and as defined in, the Prepetition Credit Facility.

Prepetition Credit Facility Parties: Collectively, (a) the Prepetition Credit Facility Lenders and (b) the Guaranteed Creditors, Secured Creditors, Syndication Agent, Co-Documentation Agents, and Joint Lead Arrangers and Book Runners in each case, under, and as defined in, the Prepetition Credit Facility.

Prepetition Indentures: The Senior Note Indenture and the Senior Subordinated Note Indenture.

Priority Claim: Any Claim that is entitled to priority in payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, DIP Lender Claim, DIP Financing Fees and Expenses, Administrative Expenses or Prepetition Credit Facility Fees and Expenses.

Priority Tax Claim: Any Claim that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

Pro Rata: A proportionate share, so that the ratio of the amount of property distributed on account of an Allowed Claim in a class is the same as the ratio such Claim bears to the total amount of all Claims (including Disputed Claims) in such class.

Professional: (a) Any professional employed in the Chapter 11 Cases pursuant to section 327, 328 or 1103 of the Bankruptcy Code and (b) any other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, professionals employed by the DIP Lenders, DIP Financing Agent, DIP Original Financing Agent or Backstop Parties (including Akin Gump Strauss Hauer & Feld LLP and Davis Polk & Wardwell LLP) shall not be "Professionals" for the purposes of this Plan.

Proof of Claim: As defined in Bankruptcy Rule 3001.

QIB: A Qualified Institutional Buyer, as that term is defined under Rule 144A, promulgated under the Securities Act.

Registration Rights Agreement: The agreement to be entered into on the Effective Date between Reorganized Holdings, the Backstop Parties and certain Eligible Noteholders specified by the Backstop Parties, in the form attached to the Equity Commitment Agreement as Exhibit E, as the same may be modified as provided therein and in consultation with the Creditors' Committee; provided, however, that any material modification thereof shall be in form and substance reasonably satisfactory to the Creditors' Committee and filed as a Plan Supplement.

Reorganized Debtors: Collectively, the Debtors from and after the Effective Date.

Reorganized Debtors' Certificates of Incorporation: (i) The second amended and restated certificate of incorporation of Holdings attached hereto as Exhibit D and attached to the Equity Commitment Agreement as Exhibit G, as the same may be modified with the consent of the Required Backstop Parties and in consultation with the Creditors' Committee; provided, however, that any material modification thereof shall be in form and substance reasonably satisfactory to the Creditors' Committee and filed as a Plan Supplement, and (ii) the certificates of incorporation and/or articles of organization for the other Reorganized Debtors to be filed with the Bankruptcy Court as part of the Plan Supplement, in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee.

Reorganized Holdings: Holdings from and after the Effective Date.

Reorganized Holdings By-Laws: The by-laws for Reorganized Holdings attached hereto as Exhibit E and attached to the Equity Commitment Agreement as Exhibit H, as the same may be modified with the consent of the Required Backstop Parties and in consultation with the Creditors' Committee; provided, however, that any material modification thereof shall be in form and substance reasonably satisfactory to the Creditors' Committee and filed as a Plan Supplement.

Required Backstop Parties: Those Backstop Parties representing two-thirds of the total amount of the Backstop Parties' Commitment Percentage (as defined in the Equity Commitment Agreement).

Rights Offering: The rights offering whereby Eligible Noteholders will be offered the opportunity to subscribe for the Rights Offering Shares in accordance with the Rights Offering Procedures.

Rights Offering Amount: $355 million.

Rights Offering and Equity Commitment Approval Order: The order approving the Rights Offering and the Equity Commitment Agreement, entered by the Bankruptcy Court on March [ ],26, 2010 [Docket No. ].

Rights Offering Procedures: The procedures governing the administration and execution of the Rights Offering, which are attached hereto as Exhibit F.

Rights Offering Record Date: February 9, 2010.

Rights Offering Shares: In the aggregate, 8,623,491 shares of New Common Stock issuable upon the exercise of the Senior Subordinated Noteholder Rights.

Sanction Order: The Order of the Canadian Court under the CCAA, in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee, approving the CCAA Plan in the CCAA Proceeding.

Schedules: The schedules of assets and liabilities filed in the Chapter 11 Cases by the Debtors on October 2, 2009, as such schedules may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

Secured Claim: A Claim that (x) is secured by a Lien on property in which a Debtor has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (y) is Allowed by a Final Order or pursuant to this Plan as a Secured Claim.

SEC: The Securities and Exchange Commission.

Securities Act: The Securities Act of 1933, as amended.

Securities Exchange Act: The Securities Exchange Act of 1934, as amended.

Senior Notes: The 7% Senior Notes due 2012 issued pursuant to the Senior Notes Indenture.

Senior Note Claims: Any and all Claims against a Debtor arising under or in connection with the Senior Notes or the Senior Note Indenture.

Senior Note Indenture: That certain indenture, dated December 23, 2004, as amended, modified, or supplemented from time to time, by and between CSA, the certain subsidiary and parent guarantors, and Wilmington Trust Company, pursuant to which, among other things, the Senior Notes were issued.

Senior Note Indenture Trustee: Wilmington Trust Company as indenture trustee under the Senior Note Indenture, together with its duly appointed successors and assigns, if any.

Senior Noteholders: The holders of Senior Notes.

Senior Subordinated Notes: The 8 3/8% Senior Subordinated Notes due 2014 issued pursuant to the Senior Subordinated Note Indenture.

Senior Subordinated Note Claims: Any and all Claims against a Debtor arising under or in connection with the Senior Subordinated Notes and the Senior Subordinated Note Indenture.

Senior Subordinated Note Indenture: That certain indenture, dated December 23, 2004, as amended, modified, or supplemented from time to time, by and between CSA, the certain subsidiary and parent guarantors, and the original indenture trustee, Wilmington Trust Company, pursuant to which, among other things, the Senior Subordinated Notes were issued.

Senior Subordinated Note Indenture Trustee: U.S. Bank National Association, as successor indenture trustee to Wilmington Trust Company under the Senior Subordinated Note Indenture, together with its duly appointed successors and assigns, if any.

Senior Subordinated Noteholder Rights: The rights issued to Eligible Noteholders to purchase the Rights Offering Shares.

Senior Subordinated Noteholder Oversubscription Right. The pro rata right of each Eligible Noteholder to subscribe for Rights Offering Shares, to the extent available, in addition to those to be received pursuant to the exercise of the Senior Subordinated Noteholder Rights, provided that such Eligible Noteholder has (i) exercised in full its Senior Subordinated Noteholder Rights, (ii) paid in full for the shares issued in connection with the Senior Subordinated Noteholder Rights (other than with respect to the shares in respect of the Senior Subordinated Noteholder Oversubscription Right) and (iii) specified in the Subscription Form (as defined in the Rights Offering Procedures) the number of units representing shares of New Common Stock that it wishes to purchase pursuant to its Senior Subordinated Noteholder Oversubscription Right.

Senior Subordinated Noteholders: The holders of Senior Subordinated Notes.

Senior Subordinated Noteholders Stock Distribution:  In the aggregate, 1,742,222 shares of the New Common Stock to be issued to Holders of Allowed Senior Subordinated Note Claims in accordance with this Plan.

Senior Subordinated Noteholders Warrant Distribution:  In the aggregate, 30% of the New Capital Warrants, to be issued to Holders of Allowed Senior Subordinated Note Claims in accordance with this Plan.

Shelf Registration Statements:  Together, the Backstop Shelf Registration Statement and the Non-Backstop Shelf Registration Statement.

Statements:  The statements of financial affairs filed in the Chapter 11 Cases by the Debtors on October 2, 2009, as such statements may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

Sub-Plans:  The individual chapter 11 plans for each of the Debtors, as the same may be amended from time to time in accordance with the terms of the Plan.

Subscription Agent:  KCC

Subsidiaries:  All direct and indirect subsidiaries and joint ventures of the Debtors.

Subsidiary Debtors:  Cooper-Standard Automotive Inc., Cooper-Standard Automotive FHS Inc., Cooper-Standard Automotive Fluid Systems Mexico Holding LLC, Cooper-Standard Automotive OH, LLC, StanTech, Inc., Westborn Service Center, Inc., North American Rubber, Incorporated, Sterling Investments Company, Cooper-Standard Automotive NC L.L.C., CS Automotive LLC, CSA Services Inc. and NISCO Holding Company.

Subsidiary Debtor Equity Interests:  The equity interests in each of the Subsidiary Debtors, including those equity interests represented by shares of common stock of the Subsidiary Debtors and any options, warrants, calls, subscriptions or other similar rights or other agreements, commitments or outstanding securities obligating any Subsidiary Debtor to issue, transfer or sell any shares of common stock of the Subsidiary Debtors.

Subsidiary Debtor General Unsecured Claims:  All General Unsecured Claims against the Subsidiary Debtors.

Supporting Senior Note Claims:  Senior Note Claims in respect of Senior Notes in an aggregate principal amount of $104,700,000 that the Supporting Senior Noteholders have agreed to exchange for an aggregate of 4,563,095 shares of New Common Stock pursuant to Section 2(h) of the Equity Commitment Agreement and held by the Supporting Senior Noteholders as of the date of the Equity Commitment Agreement (whether or not held by such Holders on the Effective Date).

Supporting Senior Noteholders:  Shall have the meaning set forth in the Equity Commitment Agreement.

**Tax**: All taxes, charges, fees, duties, levies, imposts, rates or other assessments imposed by any federal, state, local or foreign Governmental Unit, including income, gross receipts, excise, property, sales, stamp, use, license, capital stock, transfer, franchise, payroll, withholding, social security, value added and other taxes, and any interest, penalties, fines, losses, damages, costs or additions attributable thereto.

**Tax Code**: Internal Revenue Code of 1986, as amended.

**Unimpaired**: Any Claim or Interest that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

**United States Trustee**: The Office of the United States Trustee for the District of Delaware.

**Voting Agent**: KCC.

**Voting Deadline**: The date set by the Bankruptcy Court pursuant to the Disclosure Statement Approval Order by which Ballots for acceptance or rejection of this Plan must be received by the Voting Agent.

## C.    RULES OF INTERPRETATION

For purposes of this Plan: (a) any reference in this Plan to a contract, instrument, release, indenture, order, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions and shall be in form and substance satisfactory to the Debtors; (b) any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in this Plan to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to this Plan; (d) the words "herein" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; and (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply. All exhibits and schedules to this Plan (including the Plan Supplement) are incorporated into this Plan and shall be deemed to be included in, and made a part of, this Plan, as if fully set forth herein.

## D.    COMPUTATION OF TIME

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE TWO**
**PROVISIONS FOR TREATMENT OF ADMINISTRATIVE EXPENSES**

2.01.    **Administrative Expenses**.

(a)     The Debtors or the Reorganized Debtors, as the case may be, will pay each Allowed Administrative Expense against Holdings and the Subsidiary Debtors in full, in Cash, on the later of (a) the Effective Date (or as soon thereafter as is practicable), (b) the date on which the Bankruptcy Court enters an order allowing such Administrative Expense, or (c) such other date to which the Reorganized Debtors and the Holder of the Allowed Administrative Expense agree; provided, however, that Allowed Administrative Expenses representing (a) obligations incurred in the ordinary course of business or assumed by the Debtors or the Reorganized Debtors, as the case may be, will be paid in full or performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and (b) obligations incurred to Professionals for services provided through the Confirmation Date will be paid in accordance with the applicable Bankruptcy Court order approving the fees and expenses of each such Professional; provided, further, however, that Allowed Administrative Expenses incurred by the Debtors or the Reorganized Debtors, as the case may be, after the Confirmation Date, including claims for Professionals' fees and expenses, will not require application to the Bankruptcy Court and shall be paid by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business and without further Bankruptcy Court approval; and, provided, further, however, that all reasonable and documented fees and expenses of counsel and other advisors to the Backstop Parties shall constitute Allowed Administrative Expenses and shall be paid by the Debtors in the ordinary course of business during the Chapter 11 Cases without the necessity to file a proof of claim or file any application to or receive any approval from the Bankruptcy Court, in accordance with the terms and subject to the conditions of the Backstop Commitment Fees and Expenses Approval Order and, to the extent approved by the Bankruptcy Court, the order approving the Equity Commitment Agreement. All DIP Obligations (as such term is defined in the DIP Financing Order) payable under the DIP Financing Agreement and with respect to DIP Financing Fees and Expenses, under the DIP Financing Agreement and DIP Original Financing Agreement, and all other DIP Lender Claims are (a) Allowed in full; (b) shall not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity; (c) shall constitute Allowed Administrative Expenses; and (d) shall be paid in full, in Cash, on the Effective Date, without the need for application to or approval from any court. All Prepetition Credit Facility Fees and Expenses are (a) Allowed in full; (b) shall not be subject to any avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable, or otherwise), recharacterization, disgorgement, disallowance, impairment, objection, defenses, claims, causes of action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity; (c) shall constitute Allowed Administrative Expenses; and (d) shall be paid in full, in Cash, on the Effective Date, without the need for application to or approval from any court.

(b)     Final Application for Compensation and Reimbursement of Professionals' Fees and Expenses. All applications for final allowance of compensation and reimbursement of Professionals' fees and expenses must be filed no later than 120 days following the Effective Date and will be subject to the authorization and approval of the Court. Any objections to such applications shall be filed no later than twenty (20) days following the date on which a final fee application is filed with the Court.

(c)    Post-Effective Date Fees and Expenses of the Fee Auditor. Following the Effective Date, the Reorganized Debtors shall pay in cash, within thirty (30) days of receipt by the Reorganized Debtors of an invoice from the Fee Auditor, all reasonable and documented fees and expenses of the Fee Auditor that are incurred after the Effective Date, without the need for any further authorization from the Bankruptcy Court. In the event that the Reorganized Debtors object to payment of such invoice from the Fee Auditor for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by the Reorganized Debtors.

(d)    Full Settlement. As more specifically set forth in, and without in any way limiting, section 12.01 of this Plan, the distributions provided for in and when paid pursuant to this section 2.01 are in full settlement and release of all Administrative Expenses.

## ARTICLE THREE
## PROVISIONS FOR TREATMENT OF PRIORITY TAX CLAIMS

3.01.    Priority Tax Claims.

(a)    Treatment. With respect to each Allowed Priority Tax Claim against Holdings and the Subsidiary Debtors, at the sole option of the Debtors, each Holder of an Allowed Priority Tax Claim shall be entitled to receive from the Reorganized Debtors on account of such Claim:

(i)    On the Effective Date, or as soon thereafter as is practicable, Cash payments in an amount equal to such Allowed Priority Tax Claim; or

(ii)    Such other treatment agreed to by each Holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as the case may be.

(b)    Full Settlement. As more specifically set forth in, and without in any way limiting, section 12.01 of this Plan, the distributions provided for in and when paid pursuant to this section 3.01 are in full settlement, release and discharge of all Priority Tax Claims.

## ARTICLE FOUR
## CLASSIFICATION OF CLAIMS AND INTERESTS

4.01.    Designation of Classes. Pursuant to sections 1122 and 1123(a) of the Bankruptcy Code, set forth below is a designation of classes of Claims and Equity Interests. Administrative Expenses and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code (set forth in Articles Two and Three, above) have not been classified and are excluded from the following classes in accordance with section 1123(a)(l) of the Bankruptcy Code.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Priority Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 2 | Miscellaneous Secured Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 3 | Intercompany Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 4 | Prepetition Credit Facility Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 5 | Senior Note Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 6 | Senior Subordinated Note Claims | Impaired | entitled to vote |
| 7 | Subsidiary Debtor General Unsecured Claims | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 8 | Subsidiary Debtor Equity Interests | Unimpaired | deemed to accept the Plan; not entitled to vote |
| 9 | Holdings General Unsecured Claims | Impaired | deemed to reject the Plan; not entitled to vote |
| 10 | Old Holdings Equity Interests | Impaired | deemed to reject the Plan; not entitled to vote |

4.02.    Classification.  This Plan constitutes a separate Sub-Plan for each of the thirteen Debtors.  Except for the Claims and Administrative Expenses addressed in Articles II and III above, all Claims and Interests against a particular Debtor are placed in classes for each of the Debtors (as designated by subclasses A through M for each of the thirteen Debtors).  The Subsidiary Debtors are not Holders of any Intercompany Claims against Holdings, and therefore Holdings does not have Class 3.  CS Automotive LLC did not issue or guarantee the Senior Notes or Senior Subordinated Notes, and therefore does not have Classes 5 and 6.  Class 8 consists of the Subsidiary Debtor Interests held by the Debtors.  Class 10 consists of Old Holdings Equity Interests, which relate only to the Sub-Plan for Holdings.  In that regard, the classification and treatment of Claims and Equity Interests under this Plan are as follows:

| Cooper-Standard Holdings Inc. | | | |
|-------|-------|--------|---------------|
| Class | Claim | Status | Voting Rights |
| 1A | Priority Claims | Unimpaired | Deemed to accept |
| 2A | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 4A | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5A | Senior Note Claims | Unimpaired | Deemed to accept |

| 6A | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 9 | Holdings General Unsecured Claims | Impaired | Deemed to reject |
| 10 | Old Holdings Equity Interests | Impaired | Deemed to reject |

**Cooper-Standard Automotive Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1B | Priority Claims | Unimpaired | Deemed to accept |
| 2B | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3B | Intercompany Claims | Unimpaired | Deemed to accept |
| 4B | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5B | Senior Note Claims | Unimpaired | Deemed to accept |
| 6B | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7B | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8B | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Cooper-Standard Automotive FHS Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1C | Priority Claims | Unimpaired | Deemed to accept |
| 2C | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3C | Intercompany Claims | Unimpaired | Deemed to accept |
| 4C | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5C | Senior Note Claims | Unimpaired | Deemed to accept |
| 6C | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7C | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8C | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Cooper-Standard Fluid Systems Mexico Holding LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1D | Priority Claims | Unimpaired | Deemed to accept |
| 2D | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3C | Intercompany Claims | Unimpaired | Deemed to accept |
| 4D | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5D | Senior Note Claims | Unimpaired | Deemed to accept |
| 6D | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7D | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8D | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Cooper-Standard Automotive, OH LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1E | Priority Claims | Unimpaired | Deemed to accept |
| 2E | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3E | Intercompany Claims | Unimpaired | Deemed to accept |
| 4E | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5E | Senior Note Claims | Unimpaired | Deemed to accept |
| 6E | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7E | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8E | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**StanTech, Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1F | Priority Claims | Unimpaired | Deemed to accept |
| 2F | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3F | Intercompany Claims | Unimpaired | Deemed to accept |
| 4F | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5F | Senior Note Claims | Unimpaired | Deemed to accept |
| 6F | Senior Subordinated Note Claims | Impaired | Entitled to vote |

| 7F | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8F | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Westborn Services Center, Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1G | Priority Claims | Unimpaired | Deemed to accept |
| 2G | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3G | Intercompany Claims | Unimpaired | Deemed to accept |
| 4G | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5G | Senior Note Claims | Unimpaired | Deemed to accept |
| 6G | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7G | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8G | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**North American Rubber Company, Incorporated**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1H | Priority Claims | Unimpaired | Deemed to accept |
| 2H | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3H | Intercompany Claims | Unimpaired | Deemed to accept |
| 4H | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5H | Senior Note Claims | Unimpaired | Deemed to accept |
| 6H | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7H | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8H | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Sterling Investments Company**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1I | Priority Claims | Unimpaired | Deemed to accept |
| 2I | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3I | Intercompany Claims | Unimpaired | Deemed to accept |
| 4I | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5I | Senior Note Claims | Unimpaired | Deemed to accept |
| 6I | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7I | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8I | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**Cooper-Standard Automotive NC LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1J | Priority Claims | Unimpaired | Deemed to accept |
| 2J | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3J | Intercompany Claims | Unimpaired | Deemed to accept |
| 4J | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5J | Senior Note Claims | Unimpaired | Deemed to accept |
| 6J | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7J | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8J | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**CSA Services Inc.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1K | Priority Claims | Unimpaired | Deemed to accept |
| 2K | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3K | Intercompany Claims | Unimpaired | Deemed to accept |
| 4K | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5K | Senior Note Claims | Unimpaired | Deemed to accept |
| 6K | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7K | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |

| 8K | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |
|---|---|---|---|

**NISCO Holding Company**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1L | Priority Claims | Unimpaired | Deemed to accept |
| 2L | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3L | Intercompany Claims | Unimpaired | Deemed to accept |
| 4L | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 5L | Senior Note Claims | Unimpaired | Deemed to accept |
| 6L | Senior Subordinated Note Claims | Impaired | Entitled to vote |
| 7L | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8L | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

**CS Automotive LLC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1M | Priority Claims | Unimpaired | Deemed to accept |
| 2M | Miscellaneous Secured Claims | Unimpaired | Deemed to accept |
| 3M | Intercompany Claims | Unimpaired | Deemed to accept |
| 4M | Prepetition Credit Facility Claims | Unimpaired | Deemed to accept |
| 7M | Subsidiary Debtor General Unsecured Claims | Unimpaired | Deemed to accept |
| 8M | Subsidiary Debtor Equity Interests | Unimpaired | Deemed to accept |

## ARTICLE FIVE
## IDENTIFICATION OF CLASSES OF CLAIMS AND
## INTERESTS IMPAIRED AND NOT IMPAIRED BY THIS PLAN

5.01.    Class of Claims and Interests Impaired by this Plan and Entitled to Vote. Senior Subordinated Note Claims (Class 6) are Impaired by this Plan and the Holders of Allowed Claims in that class are entitled to vote to accept or reject this Plan.

5.02.    Class of Claims and Interests Impaired by this Plan and Deemed to Reject this Plan. Holdings General Unsecured Claims (Class 9) and Old Holdings Equity Interests (Class 10) are Impaired and such Holders do not receive or retain any property under this Plan. Under section 1126(g) of the Bankruptcy Code, the Holders of Allowed Claims or Equity Interests in such classes are deemed to reject this Plan and the votes of such Holders will not be solicited. Although the Holders of Old Holdings Equity Interests will not receive a distribution or retain any property under this Plan and are deemed to reject this Plan, such Holders have advised the Debtors that they support this Plan.

5.03.    Classes of Claims Not Impaired by this Plan and Conclusively Presumed to Accept this Plan. Priority Claims (Class 1), Miscellaneous Secured Claims (Class 2), Intercompany Claims (Class 3), Prepetition Credit Facility Claims (Class 4), Senior Note Claims (Class 5), Subsidiary Debtor General Unsecured Claims (Class 7) and the Subsidiary Debtor Equity Interests (Class 8) are not Impaired by this Plan. Under section 1126(f) of the Bankruptcy Code, the Holders of such Allowed Claims or Equity Interests in such classes are conclusively presumed to accept this Plan, and the votes of such Holders will not be solicited.

## ARTICLE SIX
## PROVISIONS FOR TREATMENT OF
## CLAIMS AND INTERESTS

6.01.    Priority Claims (Subclasses 1A through 1M).

(a)    Treatment of Priority Claims.  On the latest of (a) the Effective Date (or as soon as practicable thereafter), (b) the date on which such Priority Claim becomes an Allowed Priority Claim, or (c) such other date on which the Debtors and the Holder of such Allowed Priority Claim may agree, each Holder of an Allowed Priority Claim shall be entitled to receive Cash in an amount sufficient to render such Allowed Priority Claim Unimpaired under section 1124 of the Bankruptcy Code; provided, however, that Allowed Priority Claims representing obligations incurred in the ordinary course will be paid in full or performed by the Debtors or Reorganized Debtors, consistent with past practice.

(b)    Full Settlement.  As more specifically set forth in, and without in any way limiting section 12.01 of this Plan, the distributions provided in this section 6.01 to Holders of Priority Claims (when distributed to Holders of Priority Claims in accordance with the Plan)] are in full settlement and release of each Holder's Priority Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Priority Claim was based.  Subclasses 1A through 1M are Unimpaired.

6.02.    Miscellaneous Secured Claims (Subclasses 2A through 2M).  On the Effective Date, at the sole option of the Debtors, (i) the legal, equitable and contractual rights to which the Miscellaneous Secured Claim entitles the Holder of such Claim will remain unaltered, and the Holder of such Claim shall retain any Liens and/or security interests securing such Claim, or (ii) the Debtors will provide other treatment that will render such Miscellaneous Secured Claim Unimpaired under section 1124 of the Bankruptcy Code.  Subclasses 2A through 2M are Unimpaired.

6.03.    Intercompany Claims (Subclasses 3B through 3M).  On the Effective Date, at the option of the Debtors or the Reorganized Debtors, either (a) the legal, equitable and contractual rights to which the Intercompany Claim entitles the Holder of such Claim will remain unaltered, in full or in part, and treated in the ordinary course of business, (b) such Intercompany Claim shall be cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan, or (c) such Intercompany Claim shall be settled and discharged in exchange for property of the Debtors; provided, however, that any Intercompany Claims against any Debtor held by a non-Debtor Subsidiary shall remain unaltered.  Subclasses 3B through 3M are Unimpaired.

6.04.    Prepetition Credit Facility Claims (Subclasses 4A through 4M).

(a)    Treatment of Prepetition Credit Facility Claims.  All Prepetition Credit Facility Claims are Allowed in full and shall be paid, in full, in Cash, on the Effective Date and shall not be subject to avoidance, setoff, off-set, recoupment, subordination (whether

24

contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, claims, causes of action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity. For avoidance of doubt, the Prepetition Credit Facility Claims are Allowed in an amount of no less than $658,416,000 (which includes principal plus accrued pre- and post-petition interest calculated at the applicable non-default rate or rates (including interest on interest) through May 1, 2010) plus any accrued post-petition interest from May 2, 2010 through the Effective Date at the applicable non-default rate or rates (including interest on interest). On the Effective Date, in full satisfaction, release and discharge of, and in exchange for, all Allowed Prepetition Credit Facility Claims, each Holder of an Allowed Prepetition Credit Facility Claim will receive payment in full, in Cash.

(b)     Full Settlement. As more specifically set forth in, and without in any way limiting section 12.01 of this Plan, the distributions provided in this section 6.04 to the Holders of Prepetition Credit Facility Claims (when distributed to the Prepetition Administrative Agent in accordance with this Plan) are in full settlement and release of each Holder's Prepetition Credit Facility Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Prepetition Credit Facility Claim was based. Subclasses 4A through 4M are Unimpaired.

6.05.     Senior Note Claims (Subclasses 5A through 5L).

(a)     Treatment of Senior Note Claims. The Senior Note Claims are Allowed in an amount of no less than $219,250,000 (which includes principal plus accrued pre- and post-petition interest calculated at the applicable non-default rate or rates (including interest on interest) through May 1, 2010), plus any accrued post-petition interest from May 2, 2010 through the Effective Date at the applicable non-default rate or rates (including interest on interest) and any other amounts the Bankruptcy Court may order as necessary to render Class 5 Unimpaired, without avoidance, setoff, subordination, any defenses, counterclaims, or any other reduction of any kind. On the Effective Date, in full satisfaction, release, and discharge of, and in exchange for, all Allowed Senior Note Claims, each Holder of an Allowed Senior Note Claim will receive payment in full, in Cash; provided, however, that pursuant to Section 1123(a)(4) of the Bankruptcy Code each Supporting Senior Noteholder has agreed to forgo its right to receive payment in full, in Cash, and in lieu thereof, has agreed to accept, in full satisfaction of its Allowed Supporting Senior Note Claim, and in consideration for its Allowed Supporting Senior Note Claim and its commitment under the Equity Commitment Agreement, less favorable treatment consisting of its Pro Rata share of 4,563,095 shares of the New Common Stock.

(b)     Full Settlement. As more specifically set forth in, and without in any way limiting section 12.01 of this Plan, the benefits provided in this section 6.05 to the Holders of Senior Note Claims (when distributed to the Senior Note Indenture Trustee in accordance with this Plan) are in full settlement and release of each Holder's Senior Note Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Senior Note Claim was based. Subclasses 5A through 5L are Unimpaired.

(c)     Senior Note Indenture Trustee Fees and Expenses.  On the date that distributions are first made pursuant to section 10.01 of this Plan, the Debtors or the Reorganized Debtors, as the case may be, shall pay the reasonable and documented fees and expenses of the Senior Note Indenture Trustee, through and including the Effective Date, in Cash, including the reasonable and documented fees and expenses of its professionals.  The Senior Note Indenture Trustee shall also be entitled to payment of its fees and expenses after the Effective Date in connection with the implementation of the Plan.

6.06.     Senior Subordinated Note Claims (Subclasses 6A through 6L).

(a)     Treatment of Senior Subordinated Note Claims.  The Senior Subordinated Note Claims are Allowed in the amount of no less than $330,000,000, without avoidance, setoff, subordination, any defenses, counterclaims, or any other reduction of any kind. On the Effective Date, in full satisfaction, release, and discharge of, and in exchange for, all Allowed Senior Subordinated Note Claims, (i) each Holder of an Allowed Senior Subordinated Note Claim shall be entitled to receive its Pro Rata share of the (y) Senior Subordinated Noteholder Stock Distribution and (z) Senior Subordinated Noteholder Warrant Distribution, (ii) each Eligible Noteholder shall be entitled to receive its pro rata share of the Senior Subordinated Noteholder Rights and Senior Subordinated Noteholder Oversubscription Rights (as applicable), and (iii) each Non-Eligible Noteholder shall receive its pro rata share of the Non-Eligible Noteholder Shares.

(b)     Full Settlement.  As more specifically set forth in, and without in any way limiting section 12.01 of this Plan, the benefits provided in this section 6.06 to the Holders of Senior Subordinated Note Claims (when distributed to the Senior Subordinated Note Indenture Trustee in accordance with this Plan) are in full settlement and release of each Holder's Senior Subordinated Note Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Senior Subordinated Note Claim was based. Subclasses 6A through 6L are Impaired.

(c)     Senior Subordinated Note Indenture Trustee Fees and Expenses. On the date that distributions are first made pursuant to section 10.01 of this Plan, the Debtors or the Reorganized Debtors, as the case may be, shall pay the reasonable and documented fees and expenses of the Senior Subordinated Note Indenture Trustee, through and including the Effective Date, in Cash, including the reasonable and documented fees and expenses of its professionals. The Senior Subordinated Note Indenture Trustee shall also be entitled to payment of its fees after the Effective Date in connection with the implementation of the Plan.

6.07.     Subsidiary Debtor General Unsecured Claims (Subclasses 7B through 7M).

(a)     Treatment of Subsidiary Debtor General Unsecured Claims.  On the latest of (a) the Effective Date (or as soon as practicable thereafter), (b) the date on which such Subsidiary Debtor General Unsecured Claim becomes an Allowed Subsidiary Debtor General Unsecured Claim, or (c) such other date on which the Debtors and the Holder of such Allowed Subsidiary Debtor General Unsecured Claim may agree, each Holder of an Allowed

Subsidiary Debtor General Unsecured Claim shall be entitled to receive Cash in an amount sufficient to render such Allowed Subsidiary Debtor General Unsecured Claim Unimpaired under section 1124 of the Bankruptcy Code.

(b)     Full Settlement. As more specifically set forth in, and without in any way limiting section 12.01 of this Plan, the distributions provided in this section 6.07 to the Holders of Subsidiary Debtor General Unsecured Claims (when distributed to the Holders of Subsidiary Debtor General Unsecured Claims in accordance with this Plan) are in full settlement and release of all Holders' General Unsecured Claims against any and all of the Subsidiary Debtors and all other Claims against any and all of the Subsidiary Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such General Unsecured Claim or other Claim was based. Subclasses 7B through 7M are Unimpaired.

6.08.     Subsidiary Debtor Equity Interests (Subclasses 8B through 8M). On the Effective Date, the legal, equitable and contractual rights to which the Subsidiary Debtor Equity Interest entitles the Holder of such Interest will remain unaltered. Subclasses 8B through 8M are Unimpaired.

6.09.     Holdings General Unsecured Claims (Class 9). On the Effective Date, all Holdings General Unsecured Claims will be extinguished and no distributions will be made to Holders of Holdings General Unsecured Claims. The Holders of Holdings General Unsecured Claims are not entitled to receive any distribution or retain any property under this Plan, and any such Claims will be cancelled, released and extinguished on the Effective Date. Class 9 is Impaired.

6.10.     Old Holdings Equity Interests (Class 10). On the Effective Date, all Old Holdings Equity Interests will be cancelled and extinguished and no distributions will be made to Holders of Old Holdings Equity Interests. The Holders of Old Holdings Equity Interests are not entitled to receive any distribution or retain any property under this Plan. Class 10 is Impaired.

**ARTICLE SEVEN**
**ACCEPTANCE OR REJECTION OF THIS PLAN;**
**EFFECT OF REJECTION BY ONE OR MORE IMPAIRED**
**CLASSES OF CLAIMS OR INTERESTS**

7.01.     Acceptance by an Impaired Class of Creditors. Consistent with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired class of Claims will have accepted this Plan if this Plan is accepted by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

7.02.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code. With respect to Classes 9 and 10, the Debtors intend to request that the Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code.

## ARTICLE EIGHT
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.01.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

(a)    Each executory contract or unexpired lease that (i) has not been expressly assumed or rejected with approval by order of the Bankruptcy Court on or prior to the Confirmation Date, (ii) is not the subject of a motion to reject pending as of the Confirmation Date, or (iii) that is not specifically designated as a contract or lease to be rejected on Schedule 8.01 of this Plan, which Schedule shall be filed as part of the Plan Supplement, shall be in form and substance reasonably satisfactory to the Required Backstop Parties and in consultation with the Creditors' Committee and served on the counterparties to such contracts or leases, will, as of the Confirmation Date, and subject to this section 8.01, be deemed to have been assumed by the Debtors.

(b)    Notwithstanding anything otherwise to the contrary, the Debtors reserve the right, with the prior consent of the Required Backstop Parties, which shall not be unreasonably withheld, on or prior to the Confirmation Date, to amend Schedule 8.01 to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, assumed or rejected. The Debtors shall provide notice of any amendments to Schedule 8.01 to the parties to the executory contracts and unexpired leases affected thereby and the Creditors' Committee. The listing of a document on Schedule 8.01 shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

(c)    Approval of Assumptions and Rejections by Confirmation Order. Entry of the Confirmation Order by the Court shall constitute approval of the rejections, assumptions and, to the extent applicable, assumptions and assignments, contemplated by this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to section 8.01(a) of this Plan (except for those that are assumed and assigned) shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, or any order of the Court authorizing or providing for its assumption or applicable federal law. Except as otherwise provided in the Confirmation Order, the only adequate assurance of future performance shall be the promise of the applicable Reorganized Debtor to perform all obligations under any executory contract or unexpired lease under this Plan. The Debtors reserve the right (upon consultation with the Required Backstop Parties and the Creditors' Committee) to file a motion on or before the Confirmation Date to assume or reject any executory contract and unexpired lease.

(d)    Scope of Assumed Agreements. Each executory contract and unexpired lease that is assumed or that is assumed and assigned shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (b) in respect of agreements relating to premises, all executory contracts or unexpired leases appurtenant to the premises, including all easements,

licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless (i) any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan, or (ii) the non-Debtor party to such executory contract or unexpired lease has agreed otherwise.

8.02.    Cure of Defaults. Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to section 8.01 of this Plan, the Debtors shall, in consultation with the Required Backstop Parties and the Creditors' Committee, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days after the Confirmation Date, file a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts and unexpired leases to be assumed. The parties to such executory contracts and unexpired leases to be assumed by the Debtors shall have thirty (30) days to object to the cure amounts listed by the Debtors. A party to an executory contract or unexpired lease to be assumed by the Debtors that does not file an objection with the Bankruptcy Court on or before the deadline set by this section 8.02 for objections to the cure amount shall be deemed to have waived its right to dispute such amount. If there are any objections filed, the Bankruptcy Court shall hold a hearing. In the event the Bankruptcy Court determines that the cure amount is greater than the cure amount listed by the Debtors, the Reorganized Debtors may elect to reject the executory contract or unexpired lease and not pay such greater cure amount. All cure amounts to be paid pursuant to this section 8.02 will be paid by the Reorganized Debtors.

8.03.    Bar Date for Rejection Damages. With respect to any executory contract or unexpired lease rejected by the Debtors, the rejection will be deemed to constitute a breach of such contract or lease immediately prior to the Filing Date and may result in a pre-Filing Date Claim against the rejecting Debtor for damages. A Claim for damages against any such Debtor arising from the rejection by such Debtor of any executory contract or unexpired lease pursuant to a Final Order will be forever barred and will not be enforceable against any such Debtor or the Reorganized Debtors or any of their Affiliates or Subsidiaries or their respective property or interest in property and no holder of any such Claim will participate in any distribution under this Plan unless a Proof of Claim is filed with the Bankruptcy Court. Unless otherwise provided by an order of the Bankruptcy Court entered prior to the Confirmation Date, a Proof of Claim with respect to any Claim against the Debtors arising from the rejection of any executory contract or unexpired lease pursuant to an order of the Bankruptcy Court (including the Confirmation Order) must be filed with the Bankruptcy Court by the later of (a) the General Bar Date, or (b) thirty (30) days from the date of entry of such order of the Bankruptcy Court approving such rejection. Any Entity that fails to file a Proof of Claim with respect to its Claim arising from such a rejection within the period set forth above will be forever barred from asserting a Claim against the Debtors or the Reorganized Debtors or any of their Affiliates or Subsidiaries or their respective property or interests in property. All Allowed Claims arising from the rejection of executory contracts or unexpired leases will be classified as General Unsecured Claims against the applicable Debtor.

8.04.    Employee Benefit Plans and Agreements.

(a)     Employee Benefit Plans and Agreements.  On or after the Effective Date, the Reorganized Debtors shall honor, in the ordinary course of business, all employee compensation and employee benefit plans and agreements of the Debtors including, without limitation, incentive agreements with the Debtors' management, the existing annual incentive plan, the existing long term incentive plan, the existing Deferred Compensation Plan and Pre-2005 Executive Deferred Compensation Plan, the existing Change of Control Severance Pay Plan, the existing salaried employee retirement and savings plans and Nonqualified Supplementary Benefit Plan (SERP), and the existing employment agreements and any and all other employee benefit plans and agreements entered into before, on or after the Filing Date and not since terminated.  In addition, the Reorganized Debtors shall undertake and commit to take the actions relating to such existing employment agreements and plans as set forth on Exhibit B hereof and to pay an emergence component award to eligible executives of the Debtors in accordance with Exhibit B hereof and to adopt the Management Incentive Plan with the terms set forth on Exhibit B hereof.  Notwithstanding the foregoing, the change of control provisions (including without limitation any right of such participant to terminate employment for "good reason" and any Company funding obligation) shall not be triggered under such employment agreement, the Company's Change of Control Severance Pay Plan, Nonqualified Supplementary Benefit Plan (SERP), Deferred Compensation Plan and Pre-2005 Executive Deferred Compensation Plan, in each case as a result of (x) the Company's emergence from Chapter 11 as contemplated by this Plan, (y) the execution and delivery of the Equity Commitment Agreement or (z) the consummation of the transactions provided in the Equity Commitment Agreement and/or this Plan (or otherwise contemplated by the Equity Commitment Agreement and/or this Plan to occur prior to or on or about the Effective Date); provided that the waiver set forth in this sentence shall not apply if a Backstop Party (A) enters into any written shareholder or voting agreement (other than the Equity Commitment Agreement, the Ancillary Agreements (as defined in the Equity Commitment Agreement) or this Plan), (B) purchases or acquires pre-petition claims with respect to the Senior Subordinated Notes (including the purchase or acquisition of any such pre-petition claim held by any other Backstop Party or its affiliates, but excluding any purchase or acquisition by a Backstop Party or its affiliates in its broker/dealer, market making, flow trading or other non-proprietary trading activities), or (C) assigns the Equity Commitment Agreement or its obligations hereunder pursuant to Section 12 of the Equity Commitment Agreement, in the case of each of clauses (A), (B) and (C), only if such action would result in such Backstop Party having beneficial ownership of greater than or equal to 50% of the total voting power of the Company's voting power upon emergence; provided further, that this waiver shall not apply with respect to any rights under Section 7 of the Change of Control Severance Pay Plan in the event that an excise tax is imposed by the IRS pursuant to Section 4999 of the Code by reason of a payment (which is made following an event that the Company reasonably and in good faith determines would have constituted a "change of control" for purposes of such participant's entitlement to payments under such plan, had such participant not executed such waiver) that the IRS asserts is "contingent on a change of control" of the Company within the meaning of Section 280G of the Code, despite the reasonable best efforts of the Company to withstand such assertion, where appropriate.  For purposes of clarification, (i) neither (a) the agreements and arrangements involving Backstop Parties that are contemplated by the Equity Commitment Agreement or this Plan to occur or exist prior to, on or about the Effective Date nor (b) any agreements or arrangements by Backstop Parties at any time prior to, on or after the Effective Date to dispose of any or all of their securities of the Company shall be taken into

account in determining whether such Backstop Parties constitute a "group" for purposes of the change of control provisions in the employment agreements and the plans referred to herein and (ii) the acquisition by any person of any equity interest in the Company at any time following the issuance of Backstop Purchaser Shares (as defined in the Equity Commitment Agreement), Rights Offering Shares and Warrants (including the Backstop Purchaser Warrants (as defined in the Equity Commitment Agreement) pursuant to this Plan (other than any acquisition from any Backstop Party that is agreed to between such Backstop Party and its transferee or assignee and consummated on or about the Effective Date) shall not be deemed a transaction provided for in the Equity Commitment Agreement or this Plan.

(b)     Retiree Benefits.  On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors are obligated to provide such benefits.

## ARTICLE NINE
## IMPLEMENTATION

9.01.     No Substantive Consolidation.  The Chapter 11 Cases have been consolidated for procedural purposes only.  On the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated.  Except as specifically set forth herein, nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor. Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as a separate Claim against each Debtor's Estate; provided, however, that no Holder shall be entitled to receive more than payment in full of its Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.  In the event that any Sub-Plan cannot be confirmed, the Sub-Plans of the other Debtors may be confirmed and those Debtors will be permitted to emerge from chapter 11 protection, and the Debtors reserve the right (subject to the consent of the Required Backstop Parties, which shall not be unreasonably withheld and in consultation with the Creditors' Committee) to sever the Chapter 11 Case of any such Debtor from the remaining Chapter 11 Cases covered by the Plan and convert the Chapter 11 Case of such Debtor to a case under Chapter 7 of the Bankruptcy Code without otherwise impacting this Plan, the Disclosure Statement Approval Order, the application of the Plan to the remaining Debtors and any order related to the Plan, in respect of the remaining Debtors.  For the avoidance of doubt, nothing set forth in this paragraph shall in any way affect the treatment of or distributions to holders of DIP Lender Claims, DIP Financing Fees and Expenses, Prepetition Credit Facility Claims, Prepetition Credit Facility Fees and Expenses set forth elsewhere in this Plan, or any Transaction Expenses as that term is defined in the Equity Commitment Agreement.

9.02.     Vesting of Property.  On the Effective Date, title to all property of the Debtors' Estates will pass to and vest in the applicable Reorganized Debtor, free and clear of all Claims, interests, Liens, security interests, charges and other encumbrances (except as otherwise

provided in this Plan). Confirmation of this Plan (subject to the occurrence of the Effective Date) will be binding, and the Debtors' debts will, without in any way limiting section 12.01 of this Plan, be discharged as provided in section 1141 of the Bankruptcy Code. From and after the Effective Date, the Reorganized Debtors may operate their business(es) and may use, acquire and dispose of property without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject to the terms and conditions of the Plan.

9.03.    Preservation of Causes of Action.

(a)    In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan, including Article 12 of this Plan, the Reorganized Debtors shall retain all Causes of Action, including Causes of Action that may exist under sections 542, 544 through 550 and 558 of the Bankruptcy Code or under similar state laws provided, however; that all Claims and Causes of Action against the DIP Financing Agent, the DIP Original Financing Agent, the DIP Lenders, the Prepetition Administrative Agent, or the Prepetition Credit Facility Parties with respect to, in connection with, related to or arising from the Prepetition Credit Facility, the DIP Facility or the facility relating to that certain DIP Original Financing Agreement have been and hereby are irrevocably released and waived and are therefore not retained by any party.

(b)    The Reorganized Debtors, as representatives of the Estates, will retain the exclusive right to enforce, bring, release, settle or compromise, in their sole discretion, any and all Causes of Action of the Debtors not released pursuant to the terms of this Plan.

9.04.    Implementation. Pursuant to the Rights Offering and Equity Commitment Approval Order, the Debtors were authorized to enter into the Equity Commitment Agreement and conduct the Rights Offering. In that regard, pursuant to the Confirmation Order and upon confirmation of this Plan, the Debtors or the Reorganized Debtors, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of this Plan. The Reorganized Debtors shall be authorized to execute, deliver, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. On or before the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, may file with the Court the agreements and documents as may be necessary or appropriate to effectuate or further evidence the terms and conditions of this Plan. The Debtors or the Reorganized Debtors, as the case may be, are hereby authorized to execute the agreements and documents and take such other actions as are necessary to effectuate the transactions provided for in this Plan, without the need for any required approvals, authorizations or consents.

9.05.    Rights Offering and Holdback.

(a)    The Rights Offering shall be conducted, and the Rights Offering Shares and the Holdback Shares shall be issued to Eligible Noteholders and the Backstop Parties, as applicable, pursuant to the Rights Offering Procedures and the Equity Commitment Agreement, as applicable, and the Non-Eligible Noteholder Shares shall be issued to the Non-Eligible Noteholders. Notwithstanding anything contained in this Plan or the Rights Offering

Procedures to the contrary, the Debtors, with the consent of the Required Backstop Parties, which shall not be unreasonably withheld, and in consultation with the Creditors' Committee, may modify the Rights Offering Procedures or adopt such additional detailed procedures consistent with the Rights Offering Procedures to more efficiently administer the exercise of the Senior Subordinated Noteholder Rights and the Senior Subordinated Noteholder Oversubscription Rights.

        (b)     <u>Transfer Restriction and Revocation</u>. The Senior Subordinated Noteholder Rights and the Senior Subordinated Noteholder Oversubscription Rights shall not be assignable or detachable, and shall not be transferable other than in connection with the transfer of the corresponding Claims, as evidenced by a Post-Certification Period Transfer Notice (as defined in the Rights Offering Procedures). In addition, once an Eligible Noteholder has properly exercised its Senior Subordinated Noteholder Rights or Senior Subordinated Noteholder Oversubscription Rights, as the case may be, such exercise cannot be revoked, rescinded or annulled for any reason unless the Effective Date has not occurred on or before the 270 days following the Subscription Deadline, at which time an Eligible Noteholder may revoke the exercise of all, but not less than all, of the Senior Subordinated Noteholder Rights and Senior Subordinated Noteholder Oversubscription Rights it has exercised by delivery of a revocation notice pursuant to the Rights Offering Procedures.

        (c)     <u>Issuance of the Rights Offering Shares and Holdback Shares</u>. On the Effective Date, Reorganized Holdings shall issue the Holdback Shares and the Rights Offering Shares as applicable, to (a) the Backstop Parties pursuant to the Equity Commitment Agreement and (b) those Eligible Noteholders (including the Backstop Parties), that, in accordance with this Plan and the Rights Offering Procedures, validly exercised their respective Senior Subordinated Noteholder Rights and, if applicable, Senior Subordinated Noteholder Oversubscription Rights.

        9.06.     <u>New Credit Facilities</u>. On the Effective Date, the Reorganized Debtors will be authorized under this Plan to enter into the New Working Capital Facility and the New Secured Debt Facility and to grant the liens contemplated thereby.

        9.07.     <u>Corporate Action</u>. On the Effective Date, and as provided in this Plan, the adoption of the Reorganized Debtors' Certificates of Incorporation, the Reorganized Holdings By-Laws, the Certificate of Designations, the selection of directors and officers of the Reorganized Debtors, and all actions of the Debtors and the Reorganized Debtors contemplated by this Plan will be deemed, without further action of any kind or nature, to be authorized and approved in all respects (subject to the provisions of this Plan and the Confirmation Order). All matters provided for in this Plan involving the corporate structure of the Debtors and the Reorganized Debtors and any corporate action required by the Debtors and the Reorganized Debtors in connection with this Plan will be deemed to have timely occurred in accordance with applicable state law and will be in effect, without any requirement of further action by the security holders or directors or officers of the Debtors and the Reorganized Debtors.

9.08.    <u>Issuance of New Common Stock</u>.

(a)    The issuance and distribution of the New Common Stock by Reorganized Holdings to Holders of Allowed Senior Subordinated Note Claims (including pursuant to the Rights Offering), to the Backstop Parties, to Holders of Allowed Supporting Senior Note Claims and pursuant to the Management Incentive Plan are hereby authorized and directed, without the need for any further corporate action, under applicable law, regulation, order, rule or otherwise. The New Common Stock being distributed to Holders in exchange for their Allowed Senior Subordinated Note Claims and Allowed Supporting Senior Note Claims shall be contributed by Reorganized Holdings to CSA and CSA shall distribute the New Common Stock to Holders of Allowed Senior Subordinated Note Claims and Allowed Supporting Senior Note Claims and in satisfaction of any properly exercised Senior Subordinated Noteholder Rights or Senior Subordinated Noteholder Oversubscription Rights. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the New Common Stock issued pursuant to this Plan and its transfer will be exempt from registration under the Securities Act, as amended, all rules and regulations promulgated thereunder, and any and all applicable state and local laws, rules, and regulations; provided, however, that shares of New Common Stock issued to the Eligible Noteholders pursuant to the Rights Offering and to the Backstop Parties pursuant to the Equity Commitment Agreement shall be issued pursuant to an exemption from registration under the Securities Act and equivalent exemptions under state securities laws. The Non-Eligible Noteholder Shares and all shares of New Common Stock being issued pursuant to the Rights Offering and the Equity Commitment Agreement shall be issued at one time on the Effective Date.

(b)    For a period of nine months following the Effective Date, the Company shall not, without the prior written consent of the Backstop Parties, (i) register the New Common Stock under the Securities Exchange Act or (ii) cause the New Common Stock to be listed for trading on a securities exchange, in each case except in connection with an underwritten initial public offering of the New Common Stock or as required by applicable law; provided, however, that the Company ~~may~~shall use its reasonable best efforts to promptly register the New Common Stock under the Securities Exchange Act ~~if~~following the six month anniversary of the Effective Date if (i) the Non-Backstop Shelf Registration Statement has not been declared effective by the Securities and Exchange Commission ~~by the six month anniversary of the Effective Date~~and (ii) the Company, in an exercise of its sound business judgment, determines that such action would be prudent for the Company and would likely result in a material benefit to the holders of New Common Stock whose shares would be registered under the Non-Backstop Shelf Registration Statement.

9.09.    <u>Issuance of New Preferred Stock</u>. Except as otherwise provided in this Plan, the issuance and distribution of the New Preferred Stock by Reorganized Holdings to the Backstop Parties and pursuant to the Management Incentive Plan are hereby authorized and directed, without the need for any further corporate action, under applicable law, regulation, order, rule or otherwise. Shares of New Preferred Stock being issued to the Backstop Parties pursuant to the Equity Commitment Agreement shall be issued pursuant to an exemption from registration under the Securities Act and equivalent exemptions under state securities laws. All shares of New Preferred Stock being issued pursuant to the Equity Commitment Agreement shall be issued at one time on the Effective Date. Information regarding the issuance and terms of the

New Preferred Stock is set forth in the Certificate of Designations, which is attached to the Equity Commitment Agreement as Exhibit J.

9.10.    Issuance of New Capital Warrants.  On the Effective Date, Reorganized Holdings shall issue the New Capital Warrants pursuant to the terms of the New Capital Warrant Agreement, which will be filed with the Bankruptcy Court as part of the Plan Supplement.  The issuance of the New Capital Warrants, and the New Common Stock underlying the New Capital Warrants, by Reorganized Holdings and their distribution to the Backstop Parties and to Holders of Allowed Senior Subordinated Claims are hereby authorized and directed, without the need for any further corporate action, under applicable law, regulation, order, rule or otherwise.  The New Capital Warrants being distributed to Holders in exchange for their Allowed Senior Subordinated Note Claims shall be contributed by Reorganized Holdings to CSA and CSA shall distribute the New Capital Warrants to Holders of Allowed Senior Subordinated Note Claims in exchange for their Claims.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the Senior Subordinated Noteholders Warrant Distribution issued pursuant to this Plan and the underlying New Common Stock and their transfer will be exempt from registration under the Securities Act, as amended, all rules and regulations promulgated thereunder, and any and all applicable state and local laws, rules, and regulations.  The Backstop Warrants, the New Common Stock underlying the Backstop Warrants and their transfer in each instance shall be issued pursuant to an exemption from registration under the Securities Act and equivalent exemptions under state securities laws.

9.11.    Registration Rights Agreement; Shelf Registrations.

(a)    Registration Rights Agreement.  On the Effective Date, Reorganized Holdings, the Backstop Parties and certain Eligible Noteholders specified by the Backstop Parties will execute the Registration Rights Agreement in respect of the New Common Stock (including New Common Stock issuable upon conversion of New Preferred Stock and upon exercise of New Capital Warrants), the New Preferred Stock and the New Capital Warrants held or beneficially owned by the parties thereto.

(b)    Shelf Registrations.  Reorganized Holdings shall use its commercially reasonable efforts, at its own cost and expense, to file the Shelf Registration Statements with the SEC within sixty (60) days following the Effective Date, and to cause the Shelf Registration Statements to be declared effective by the SEC as soon as practicable thereafter but in no event later than ninety (90) days following the Effective Date.  Reorganized Holdings shall use its commercially reasonable efforts to continuously maintain the effectiveness of the Shelf Registration Statements until the earliest to occur of (i) the date on which all securities registered under the applicable Shelf Registration Statement have been sold in a transaction registered under the Securities Act or pursuant to Rule 144 under the Securities Act and (ii) the first anniversary of the original date of effectiveness of the applicable Shelf Registration Statement; provided that Reorganized Holdings shall use its commercially reasonable efforts to continuously maintain the effectiveness of the Backstop Shelf Registration Statement with respect to New Capital Warrants issued to the Backstop Parties and the New Common Stock issuable upon the exercise of such New Capital Warrants until the date on which all New Capital Warrants have been exercised for New Common Stock or the New Capital Warrants have expired.  The plan of distribution of each Shelf Registration Statement shall at a

minimum allow the shares of New Capital Stock registered thereunder to be sold on any national securities exchange on which the New Capital Stock is then listed, in the over-the-counter market, in other brokerage transactions or transactions with a market maker and in privately negotiated transactions. For the avoidance of doubt, Reorganized Holdings shall not be required to allow the Shelf Registration Statements to be utilized for offerings of New Capital Stock or Warrants involving an underwriter, except that the Backstop Shelf Registration Statement shall at the request of a Backstop Party cover market making transactions by the Backstop Party in its capacity as a broker dealer. Reorganized Holdings shall take all action reasonably necessary or advisable to allow all Holders of (x) shares of New Capital Stock issued in the Rights Offering, (y) shares of New Capital Stock and New Capital Warrants issued pursuant to the Equity Commitment Agreement and (z) shares of New Common Stock issued upon conversion of the New Preferred Stock and upon exercise of the New Capital Warrants, or their transferees, to include such securities in the applicable Shelf Registration Statement. The provisions of the Registration Rights Agreement regarding the following matters shall apply mutatis mutandis to the Shelf Registration Statements: company undertakings to notify selling holders of the effectiveness of the registration statement, to maintain the effectiveness of the registration statement, to furnish to selling holders copies of the registration statement and the related prospectus, to qualify and maintain the qualification of the shares registered under the registration statement in accordance with state securities laws, to amend or supplement the registration statement and the related prospectus as required to comply with law (including with respect to material misstatements and omissions), and to prevent or obtain the withdrawal of any stop order with respect to the registration statement; provisions regarding suspension periods , holdback agreements (except that such holdback agreements shall only be applicable during the period that Reorganized Holdings is obligated to keep the applicable Shelf Registration Statement effective for sales under such Shelf Registration Statement), free writing prospectuses, indemnification and contribution and information required from selling shareholders; provided, however, Reorganized Holdings shall be obligated to register such securities in the Shelf Registration Statements only to the extent permitted by applicable securities laws. Notwithstanding the foregoing, in the event that the Shelf Registration Statements have been filed and thereafter Reorganized Holdings determines reasonably and in good faith that the filing of the Backstop Shelf Registration Statement, or a request to declare the Backstop Shelf Registration Statement effective, is preventing or materially delaying, or would prevent or materially delay, the ability to cause the Non-Backstop Shelf Registration Statement to be declared effective, Reorganized Holdings shall promptly withdraw the Backstop Shelf Registration Statement and not refile the Backstop Shelf Registration Statement unless and until (I) (x) the Non-Backstop Shelf Registration Statement has been declared effective and (y) Reorganized Holdings determines reasonably and in good faith that the filing of the Backstop Shelf Registration Statement, or a request to declare the Backstop Shelf Registration Statement effective, would not cause the effectiveness of the Non-Backstop Shelf Registration Statement to be withdrawn or prevent or materially delay the ability to cause any post-effective amendment thereto be declared effective or (II) until the shares of New Common Stock registered under the Non-Backstop Shelf Registration Statement can be sold pursuant to Rule 144(b)(1)(i) under the Securities Act. Thereafter, Reorganized Holdings shall use commercially reasonable efforts to file the Backstop Shelf Registration Statement and have it declared effective as soon as practicable and maintain the effectiveness of the Shelf Registration Statements as required above.

9.12. <u>Cancellation of Existing Securities and Agreements</u>. On the Effective Date, the Prepetition Credit Facility, the Senior Notes, the Senior Subordinated Notes, and the Old Holdings Equity Interests, as well as any and all securities or agreements relating to the DIP Financing Agreement, Prepetition Credit Facility and/or the Senior Note Indenture and Senior Subordinated Note Indenture shall be deemed automatically cancelled, terminated and of no further force or effect, without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the parties, as applicable, under the agreements, indentures, and certificates of designation governing such Claims or interests shall be discharged; <u>provided</u>, <u>however</u>, that the Prepetition Credit Facility, the Senior Note Indenture and the Senior Subordinated Note Indenture shall continue in effect for the limited purpose of (i) allowing the Prepetition Administrative Agent, the Senior Note Indenture Trustee and the Senior Subordinated Note Indenture Trustee, respectively, to make any distributions on account of the Prepetition Credit Facility Claims, the Senior Notes or the Senior Subordinated Notes pursuant to sections 10.03 and 10.04 of this Plan, to perform such other necessary administrative or other functions with respect thereto, and for the Senior Note Indenture Trustee and Senior Subordinated Note Indenture Trustee, to have the benefit of all the rights and protections and other provisions of the Senior Note Indenture or the Senior Subordinated Note Indenture, respectively, vis-à-vis the Senior Noteholders and the Senior Subordinated Noteholders, respectively, including their lien rights, if any, with respect to any distribution to their respective Noteholders under the Plan (for the avoidance of doubt, neither the Rights Offering Shares, the Holdback Shares nor the Non-Eligible Noteholder Shares are distributions to Noteholders for these purposes), and (ii) permitting the Senior Note Indenture Trustee or the Senior Subordinated Note Indenture Trustee, respectively, to assert any right to indemnification, contribution, or other claim it may have under the Senior Note Indenture or the Senior Subordinated Note Indenture, respectively, subject to any and all defenses any party may have under the Plan or applicable law to any such asserted rights or claims. All subordination provisions in the Senior Subordinated Note Indenture are compromised and settled by the Plan and neither the Senior Note Indenture Trustee nor the Senior Noteholders shall have any claim to any Class 6 distribution under the Plan by reason of any such subordination provisions.

9.13. <u>Reorganized Debtors' Certificates of Incorporation; Certificate of Designations</u>. On or prior to the Effective Date, Holdings shall file, with the Secretary of State of Delaware, the second amended and restated certificate of incorporation of Reorganized Holdings and the Certificate of Designations. On the Effective Date, or as soon thereafter as practicable, each of the other Reorganized Debtors shall file, with the applicable Secretary of State of the State where the applicable Reorganized Debtor is organized, their respective Reorganized Debtors' Certificates of Incorporation.

9.14. <u>Directors of the Reorganized Debtors</u>. The new Board of Directors of Reorganized Holdings on and after the Effective Date shall consist of (i) the chief executive officer of Reorganized Holdings, (ii) two (2) independent members from the current Board of Directors of Holdings selected by the Debtors, (iii) one (1) independent member nominated by Capital Research and Management Company, Lord, Abbett & Co. LLC, TCW Asset Management Company and TD Asset Management Inc. in consultation with (but without the need for the approval of) the chief executive officer of Reorganized Holdings and an independent search firm as agreed upon by such parties and the Debtors (it being understood that Korn/Ferry International ("Korn Ferry") has been agreed upon), (iv) one (1) independent member nominated

by Barclays Capital, Inc. in consultation with (but without the need for the approval of) the chief executive officer of Reorganized Holdings and an independent search firm as agreed upon by such parties and the Debtors (it being understood that Korn Ferry has been agreed upon), (v) one (1) member nominated by Oak Hill Advisors, L.P., and (vi) one (1) member nominated by Silver Point Capital, L.P., with the consent of Barclays Capital, Inc. if such member is not independent. With respect to the independent members nominated pursuant to (ii), (iii) and (iv) of this paragraph, such nominations shall be made in consultation with the Creditors' Committee, which consultation will be solely for the Creditors' Committee to determine whether such nominee has a prior relationship with a Backstop Party that would reasonably be expected to influence the exercise of business judgment of the nominee. In addition, Oak Hill Advisors, L.P. and Silver Point Capital, L.P. shall each have the right to appoint one (1) observer to the board. Such members of the Board of Directors shall take office immediately following the issuance of the shares of New Capital Stock pursuant to Sections 9.08(a) and 9.09 of the Plan and shall hold office until the annual meeting of stockholders in 2011. If the member nominated by Oak Hill Advisors L.P. is designated as a member of the initial compensation (or equivalent) committee, either the member nominated by Silver Point Capital, L.P. or the member nominated by Barclays Capital, Inc. will also be designated as a member of such committee. If either of the members nominated by Silver Point Capital, L.P. or Barclays Capital, Inc. is designated as a member of the initial compensation (or equivalent) committee, the member nominated by Oak Hill Advisors L.P. will also be designated as a member of such committee. The list of names of all members of the new Board of Directors of Reorganized Holdings that are known as of the date that is five (5) Business Days prior to the Confirmation Hearing will be filed with the Bankruptcy Court as part of the Plan Supplement. The Board of Directors for each of the remaining Reorganized Debtors on and after the Effective Date will be filed with the Bankruptcy Court as part of the Plan Supplement. The classification and composition of the Board of Directors of each of the Reorganized Debtors shall be consistent with the respective Reorganized Debtors' Certificate of Incorporation. Each such director or officer shall serve from and after the Effective Date pursuant to the terms of the respective Reorganized Debtors' Certificate of Incorporation and the Reorganized Holdings By-laws and the applicable corporation or limited liability company law, as applicable, of the state in which the Reorganized Debtor is organized.

9.15. <u>Management Agreements</u>. On the Effective Date, the Reorganized Debtors shall honor, in the ordinary course of business, all employee compensation and employee benefit plans and agreements of the Debtors including, without limitation, incentive agreements with the Debtors' management, the existing annual incentive plan, the existing long term incentive plan, the existing Deferred Compensation Plan and Pre-2005 Executive Deferred Compensation Plan, the existing Change of Control Severance Pay Plan, the existing salaried employee retirement and savings plans and Nonqualified Supplementary Benefit Plan (SERP), and the existing employment agreements and any and all other employee benefit plans and agreements entered into before, on or after the Filing Date and not since terminated. In addition, the Reorganized Debtors shall undertake and commit to take the actions relating to such existing employment agreements and plans as set forth on Exhibit B hereof and to pay an emergence component award to eligible executives of the Debtors in accordance with Exhibit B hereof and to adopt the Management Incentive Plan with the terms set forth on Exhibit B hereof. Notwithstanding the foregoing, the change of control provisions (including without limitation any right of such participant to terminate employment for "good reason" and any Company funding obligation) shall not be triggered under such employment agreement, the Company's

38

Change of Control Severance Pay Plan, Nonqualified Supplementary Benefit Plan (SERP), Deferred Compensation Plan and Pre-2005 Executive Deferred Compensation Plan, in each case as a result of (x) the Company's emergence from Chapter 11 as contemplated by this Plan, (y) the execution and delivery of the Equity Commitment Agreement or (z) the consummation of the transactions provided in the Equity Commitment Agreement and/or this Plan (or otherwise contemplated by the Equity Commitment Agreement and/or this Plan to occur prior to or on or about the Effective Date); provided that the waiver set forth in this sentence shall not apply if a Backstop Party (A) enters into any written shareholder or voting agreement (other than the Equity Commitment Agreement, the Ancillary Agreements (as defined in the Equity Commitment Agreement) or this Plan), (B) purchases or acquires pre-petition claims with respect to the Senior Subordinated Notes (including the purchase or acquisition of any such pre-petition claim held by any other Backstop Party or its affiliates, but excluding any purchase or acquisition by a Backstop Party or its affiliates in its broker/dealer, market making, flow trading or other non-proprietary trading activities), or (C) assigns the Equity Commitment Agreement or its obligations hereunder pursuant to Section 12 of the Equity Commitment Agreement, in the case of each of clauses (A), (B) and (C), only if such action would result in such Backstop Party having beneficial ownership of greater than or equal to 50% of the total voting power of the Company's voting power upon emergence; provided further, that this waiver shall not apply with respect to any rights under Section 7 of the Change of Control Severance Pay Plan in the event that an excise tax is imposed by the IRS pursuant to Section 4999 of the Code by reason of a payment (which is made following an event that the Company reasonably and in good faith determines would have constituted a "change of control" for purposes of such participant's entitlement to payments under such plan, had such participant not executed such waiver) that the IRS asserts is "contingent on a change of control" of the Company within the meaning of Section 280G of the Code, despite the reasonable best efforts of the Company to withstand such assertion, where appropriate. For purposes of clarification, (i) neither (a) the agreements and arrangements involving Backstop Parties that are contemplated by the Equity Commitment Agreement or this Plan to occur or exist prior to, on or about the Effective Date nor (b) any agreements or arrangements by Backstop Parties at any time prior to, on or after the Effective Date to dispose of any or all of their securities of the Company shall be taken into account in determining whether such Backstop Parties constitute a "group" for purposes of the change of control provisions in the employment agreements and the plans referred to herein and (ii) the acquisition by any person of any equity interest in the Company at any time following the issuance of Backstop Purchaser Shares (as defined in the Equity Commitment Agreement), Rights Offering Shares and Warrants (including the Backstop Purchaser Warrants (as defined in the Equity Commitment Agreement) pursuant to this Plan (other than any acquisition from any Backstop Party that is agreed to between such Backstop Party and its transferee or assignee and consummated on or about the Effective Date) shall not be deemed a transaction provided for in the Equity Commitment Agreement or this Plan.

9.16.    Pension Plans. CSA is the contributing sponsor for the Pension Plans. The Pension Plans are covered by Title IV of ERISA. The PBGC guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.

(a)    Upon confirmation of this Plan, the Reorganized Debtors will assume and maintain the Pension Plans, and contribute to the Pension Plans the amount necessary to satisfy the minimum funding standards under sections 302 and 303 of ERISA, 29

U.S.C. §§ 1082 and 1083, and sections 412 and 430 of the Tax Code, 26 U.S.C. §§ 412 and 430. The Pension Plans may be terminated after the Effective Date only if the statutory requirements of either ERISA section 4041, 29 U.S.C. § 1341 or ERISA section 4042, 29 U.S.C. § 1342, are met. If the Pension Plans terminate, the Reorganized Debtors will be jointly and severally liable for the unpaid minimum funding contributions, statutory premiums, and unfunded benefit liabilities of the Pension Plans. See ERISA sections 4062(a), 4007; 29 U.S.C. §§ 1362(a), 1307.

(b)     Nothing in this Plan will be construed as discharging, releasing, or relieving the Debtors, or their successors, including the Reorganized Debtors, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans or the PBGC. The PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability as a result of any provision of this Plan or the Confirmation Order.

9.17.     Termination of DIP Financing Agreement. Upon payment of all DIP Obligations (as such term is defined in the DIP Financing Order) incurred under or pursuant to the DIP Financing Agreement, in full, in Cash, on the Effective Date, as provided in section 2.01 of this Plan, (i) the DIP Financing Agreement shall be terminated and any and all securities or agreements relating to the DIP Financing Agreement shall be deemed automatically cancelled, terminated and of no further force or effect, without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the parties, as applicable, under the agreements, and (ii) all Liens and security interests granted to secure such Obligations will be released and will be of no further force and effect.

9.18.     Compromise of Controversies. Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, unless otherwise provided in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, disputes regarding the value of the Reorganized Debtors, disputes regarding the value of the New Common Stock, and any and all claims of subordination between the Senior Noteholders and the Senior Subordinated Noteholders. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

9.19.     Transactions on Business Days. If the Effective Date or any other date on which a transaction may occur under this Plan will occur on a day that is not a Business Day, the transactions contemplated by this Plan to occur on such day will instead occur on the next succeeding Business Day.

### ARTICLE TEN
### PROVISIONS COVERING DISTRIBUTIONS

10.01.     Timing of Distributions Under this Plan. Except as otherwise provided in this Plan, without in any way limiting Article 11 of this Plan, and subject to section 13.02 of this

Plan, payments and distributions in respect of Allowed Claims will be made by the Reorganized Debtors (or their designee) on or as promptly as practicable after the Effective Date but no later than 30 days thereafter.

10.02.    <u>Distributions on Account of the Prepetition Credit Facility Claim</u>.  All distributions on account of the Prepetition Credit Facility Claim will be made to the Prepetition Administrative Agent, which will serve as the Reorganized Debtors' designee for purposes of making distributions under this Plan to Holders of Prepetition Credit Facility Claims.  The Reorganized Debtors will pay the Prepetition Administrative Agent its reasonable fees and expenses for making distributions under this Plan to Holders of the Prepetition Credit Facility Claims.

10.03.    <u>Distributions on Account of the Senior Notes</u>.

(a)    All distributions on account of the Senior Notes will be made to the Senior Note Indenture Trustee, which will serve as the Reorganized Debtors' designee for purposes of making distributions under this Plan to Holders of Senior Note Claims; <u>provided, however,</u> that the shares of New Common Stock being distributed to Holders of Allowed Supporting Senior Note Claims pursuant to section 6.05(a) of this Plan and the Equity Commitment Agreement will be distributed through the Subscription Agent or its designee, as the case may be.  The Reorganized Debtors will pay the Senior Note Indenture Trustee, in Cash, its reasonable and documented fees and expenses (including reasonable and documented professional fees) for making distributions under this Plan to Holders of the Senior Note Claims. To the extent the Senior Note Indenture Trustee provides services related to distributions pursuant to this Plan, such Senior Note Indenture Trustee will receive from the Reorganized Debtors, without further court approval and upon presenting to the Reorganized Debtors adequate documentation, reasonable compensation, in Cash, for such services and reimbursement of reasonable expenses (including reasonable and documented professional fees) incurred in connection with such services.  These payments will be made in the ordinary course by the Reorganized Debtors on terms agreed to between the Senior Note Indenture Trustee and the Reorganized Debtors.  Any payments to be made to the Senior Note Indenture Trustee on account of fees and expenses incurred pursuant to this Section 10.03(a) or any other section of the Plan shall be subject to the requirement that such fees and expenses be reasonable and documented, as determined by the Debtors and the Backstop Parties.

(b)    The Senior Note Indenture Trustee shall not be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions.

(c)    Any and all distributions on account of Senior Note Claims made by the Senior Note Indenture Trustee shall be subject to the right of the Senior Note Indenture Trustee to exercise its rights and remedies under the Senior Note Indenture for any unpaid reasonable and documented fees and expenses incurred prior to the Effective Date, any reasonable and documented fees and expenses of the Senior Note Indenture Trustee incurred in making distributions pursuant to this Plan, and any reasonable and documented fees and expenses of the Senior Note Indenture Trustee incurred in responding to any objection to the payment of the reasonable and documented fees and expenses of the Senior Note Indenture

Trustee pursuant to section 6.05 of this Plan, including reasonable and documented professional fees for any such activity.

(d) The Senior Note Indenture Trustee's exercise of any rights and remedies it may have under the Senior Note Indenture against a distribution to recover repayment of any reasonable and documented unpaid fees and expenses shall not subject the Senior Note Indenture Trustee to the jurisdiction of the Bankruptcy Court with respect to either the exercise of such rights and remedies or the fees and costs recovered thereby.

(e) The foregoing shall be in addition to any rights or remedies of the Senior Note Indenture Trustee under the Senior Note Indenture.

10.04. <u>Distributions on Account of the Senior Subordinated Notes</u>.

(a) All distributions on account of the Senior Subordinated Notes will be made to the Senior Subordinated Note Indenture Trustee, which will serve as the Reorganized Debtors' designee for purposes of making distributions under this Plan to Holders of Senior Subordinated Note Claims, <u>provided</u>, <u>however</u>, that the Rights Offering Shares, the Holdback Shares, the New Capital Warrants and the Non-Eligible Noteholder Shares shall be distributed through the Subscription Agent or its designee, as the case may be. The Reorganized Debtors will pay the Senior Subordinated Note Indenture Trustee its reasonable and documented fees and expenses (including reasonable and documented professional fees) for making distributions under this Plan to Holders of the Senior Subordinated Note Claims. To the extent the Senior Subordinated Note Indenture Trustee provides services related to distributions pursuant to this Plan, such Senior Subordinated Note Indenture Trustee will receive from the Reorganized Debtors, without further court approval and upon presenting to the Reorganized Debtors adequate documentation, reasonable compensation, in Cash, for such services and reimbursement of reasonable expenses (including reasonable and documented professional fees) incurred in connection with such services. These payments will be made in the ordinary course by the Reorganized Debtors on terms agreed to between the Senior Subordinated Note Indenture Trustee and the Reorganized Debtors. Any payments to be made to the Senior Subordinated Note Indenture Trustee on account of fees and expenses incurred pursuant to this Section 10.04(a) or any other section of the Plan shall be subject to the requirement that such fees and expenses be reasonable and documented, as determined by the Debtors and the Backstop Parties.

(b) The Senior Subordinated Note Indenture Trustee shall not be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions.

(c) Any and all distributions, except for the Rights Offering Shares, the Holdback Shares, the New Capital Warrants and Non-Eligible Noteholder Shares, on account of Senior Subordinated Note Claims shall be subject to the right of the Senior Subordinated Note Indenture Trustee to exercise its rights and remedies under the Senior Subordinated Note Indenture for any reasonable and documented unpaid fees and expenses incurred prior to the Effective Date, any reasonable and documented fees and expenses of the Senior Subordinated Note Indenture Trustee incurred in making distributions pursuant to this Plan, and any reasonable and documented fees and expenses of the Senior Subordinated Note Indenture Trustee incurred

in responding to any objection to the payment of the reasonable and documented fees and expenses of the Senior Subordinated Note Indenture Trustee pursuant to section 6.05 of this Plan, including reasonable and documented professional fees for any such activity.

(d)     The Senior Subordinated Note Indenture Trustee's exercise of any rights and remedies it may have under the Senior Subordinated Note Indenture against a distribution to recover repayment of any reasonable and documented unpaid fees and expenses shall not subject the Senior Subordinated Note Indenture Trustee to the jurisdiction of the Bankruptcy Court with respect to either the exercise of such rights and remedies or the fees and costs recovered thereby.

(e)     The foregoing shall be in addition to any rights or remedies of the Senior Subordinated Note Indenture Trustee under the Senior Subordinated Note Indenture

10.05.     Allocation of Consideration. The aggregate consideration to be distributed to the Holders of Allowed Claims in each Class under this Plan will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any, to the extent that interest is payable under this Plan.

10.06.     Cash Payments. Cash payments made pursuant to this Plan will be in U.S. dollars. Cash payments to foreign Creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to this Plan in the form of checks issued by the Reorganized Debtors will be null and void if not cashed within 120 days of the date of the issuance thereof. Requests for reissuance of any check must be made directly to the Debtors or Reorganized Debtors, as the case may be, as set forth in section 10.15 of this Plan.

10.07.     Payment of Statutory Fees. All Bankruptcy Fees as determined by the Bankruptcy Court at the Confirmation Hearing will be paid by the Debtors on or before the Effective Date, or by the Reorganized Debtors as soon as practicable thereafter. All Bankruptcy Fees will be paid until the Bankruptcy Court enters a final decree closing the Chapter 11 Cases.

10.08.     No Interest. Except with respect to Holders of Unimpaired Claims entitled to interest under applicable non-bankruptcy law or as otherwise expressly provided in this Plan, no Holder of an Allowed Claim will receive interest on the distribution to which such Holder is entitled hereunder, regardless of whether such distribution is made on the Effective Date or thereafter. Without limiting the generality of the foregoing, interest shall be not be paid upon any Disputed Claim in respect of the period from the Filing Date to the date a final distribution is made thereon if, and after, such Disputed Claim becomes an Allowed Claim.

10.09.     Setoffs. The Reorganized Debtors may (but will not be required to), pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, exercise (i) the setoff rights, of the Debtors or the Reorganized Debtors, as the case may be, against any Allowed Claims and the distributions to be made pursuant to this Plan on account of such Allowed Claims, and (ii) Claims of any nature whatsoever that the Debtors or the Reorganized Debtors or their successors may hold (and could have asserted) against the Holder of such Claim;

provided, however, that neither the failure to effect a setoff (or to utilize any other rights pursuant to section 553 of the Bankruptcy Code) nor the allowance of any Claim hereunder will constitute a waiver or release of any such Claims or rights against such Holder, unless an order allowing such Claim otherwise so provides.

10.10.    Special Provision Regarding Unimpaired Claims.  Except as otherwise provided in this Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement entered into and enforceable pursuant to the terms of this Plan, nothing herein shall affect the Debtors' or Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims or to request disallowance or subordination of any such Claim.  In addition, notwithstanding anything to the contrary, Unimpaired Claims are subject to all applicable provisions of the Bankruptcy Code, including section 502(b) of the Bankruptcy Code.

10.11.    Fractional Securities.  Notwithstanding any other provision of the Plan, only whole numbers of shares of New Common Stock and New Preferred Stock and New Capital Warrants will be issued or transferred (if allowed), as the case may be, pursuant to the Plan.  The Reorganized Debtors will not distribute any fractional shares of New Common Stock and New Preferred Stock or New Capital Warrants.  For purposes of distribution, fractional shares of New Common Stock and New Preferred Stock and New Capital Warrants will be rounded down to the nearest share of New Common Stock, New Preferred Stock or New Capital Warrant, as applicable.

10.12.    Compliance with Tax Requirements.  In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on such Holder by any governmental unit, including income, withholding and other Tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or distributing party for payment of any such Tax obligations.

10.13.    Persons Deemed Holders of Registered Securities; the Distribution Record Date.  As of the close of business on the Distribution Record Date, there will be no further changes in the record Holders of any Claims or Interests.  The Debtors, the Reorganized Debtors, or their designees will have no obligation to recognize any transfer of any such Claims or Equity Interests occurring after the close of business on the Distribution Record Date, and will be entitled to recognize and deal for the purposes under this Plan (except as to voting to accept or reject this Plan) with only those Holders of record as of the close of business on the Distribution Record Date.  In the event of any dispute regarding the identity of any party entitled to any payment or distribution in respect of the Claims, no payments or distributions will be made in respect of such Claim until the Bankruptcy Court resolves that dispute pursuant to a Final Order.

10.14.    Surrender of Existing Securities.  As a condition to receiving any distribution under this Plan, and except as otherwise provided in section 10.16 of this Plan, each Holder of an Instrument evidencing a Claim must surrender such Instrument to the Reorganized Debtors or their designee (with the exception of the distribution of the Rights Offering Shares, the Holdback Shares, the New Capital Warrants and the Non-Eligible Noteholder Shares); provided, however, with respect to the Senior Notes and the Senior Subordinated Notes, the requirements of this section 10.14 shall be deemed satisfied in full if the Senior Note Indenture Trustee and the Senior Subordinated Note Indenture Trustee coordinate with the Depository Trust Company (or such other securities depository or custodian thereof) to surrender and cancel their respective original global notes as soon as practicable after the Effective Date, and no further surrender or cancellation thereof shall be required, or in the event the Depository Trust Company (or such other securities depository or custodian thereof) does not surrender such original global notes as soon as practicable after the Effective, the Debtors shall waive such requirement and no further surrender or cancellation thereof shall be required.  Any other Holder of a Claim that fails to (a) surrender such Instrument or (b) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Reorganized Debtors or their designee before the later to occur of (i) the second anniversary of the Effective Date and (ii) six (6) months following the date such Holder's Claim becomes an Allowed Claim, shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under this Plan. Upon compliance with this section 10.14, the Holder of a Claim evidenced by any such lost, stolen, mutilated or destroyed Instrument will, for all purposes under this Plan, be deemed to have surrendered such Instrument.

10.15.    Undeliverable or Unclaimed Distributions.

(a)        Any Entity that is entitled to receive a Cash distribution under this Plan but that fails to cash a check within 120 days of its issuance shall be entitled to receive a reissued check from the Reorganized Debtors for the amount of the original check, without any interest, if such Entity requests in writing the Reorganized Debtors or their designee to reissue such check and provides the Reorganized Debtors or their designee, as the case may be, with such documentation as the Reorganized Debtors or their designee request to verify in their reasonable discretion that such Entity is entitled to such check, prior to the second anniversary of the Effective Date.  If an Entity fails to cash a check within 120 days of its issuance and fails to request reissuance of such check prior to the later to occur of (i) the second anniversary of the Effective Date and (ii) six (6) months following the date such Holder's Claim becomes an Allowed Claim, such Entity shall not be entitled to receive any distribution under this Plan.  If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or their designee as undeliverable, while the Reorganized Debtors will make reasonable efforts to obtain the then-current address of such Holder, no further distributions will be made to such Holder unless and until the Reorganized Debtors or their designee obtain or are notified in writing of such Holder's then-current address.  Undeliverable distributions will remain in the possession of the Reorganized Debtors, or their designee pursuant to section 9.02 of this Plan until such time as a distribution becomes deliverable.

(b)        All claims for undeliverable distributions must be made on or before the later to occur of (i) the second anniversary of the Effective Date and (ii) six (6) months following the date the Claim underlying such distribution becomes an Allowed Claim.

After such date, all unclaimed property shall revert to the Reorganized Debtors and the Claim of any Holder or successor to such Holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

10.16. Distributions on Account of General Unsecured Claims. The Reorganized Debtors will make or otherwise arrange and be responsible for the making of all distributions to Holders of General Unsecured Claims under this Plan.

10.17. Exemption From Certain Transfer Taxes. Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from a Debtor to a Reorganized Debtor or any other person or Entity pursuant to this Plan, including the granting or recording of any Lien or mortgage on any property under the New Working Capital Facility Documents or the New Secured Debt Facility Documents will not be subject to any stamp tax or other similar tax, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE ELEVEN
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

11.01. Objections to Claims; Disputed Claims. As soon as practicable following the filing of a Proof of Claim in these Chapter 11 Cases, but in no event later than 180 days after the Effective Date (unless extended by an order of the Bankruptcy Court), the Debtors or Reorganized Debtors, as the case may be, will file objections to such Proofs of Claim with the Bankruptcy Court and serve such objections on the holders of each of the Claims to which objections are made; provided, however, that the Debtor and Reorganized Debtors will not object to Claims that are Allowed Claims pursuant to this Plan. Nothing contained in this Plan, however, will limit the Debtors' or Reorganized Debtors' right to object to Proofs of Claim, if any, that are not Allowed under this Plan or that are filed or amended more than 180 days after the Effective Date. The Debtors and Reorganized Debtors will be authorized to, and will, resolve all Disputed Claims by withdrawing or settling any objection thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction over the validity, nature, and/or amount thereof.

11.02. Estimation of Claims. Any Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as the case may be, may elect to pursue any supplemental proceedings

to object to any ultimate payment of such Claim.  All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.  Unless otherwise ordered by the Bankruptcy Court, all objections to, and request for estimation of, Claims will be filed and served on the applicable claimant on or before the date that is 180 days after the Effective Date or 180 days after such Claim is filed, whichever is later.  On and after the Effective Date, except to the extent that the Reorganized Debtors consent, or with respect to the fee Claims of Professionals, only the Reorganized Debtors will have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to, and requests for estimation of, Claims.

        11.03.     <u>Payments and Distributions with Respect to Disputed Claims</u>.  No payments of distributions will be made in respect of a Disputed Claim until such Disputed Claim becomes an Allowed Claim, <u>provided, however,</u> that where the Debtors, in good faith, reasonably dispute the allowance of no more than 25% of any Claim, the Reorganized Debtors shall make a distribution on or as promptly as practicable after the Effective Date in accordance with Section 10.01 of this Plan on account of the portion of such Claim that is not a Disputed Claim.

        11.04.     <u>Timing of Payments and Distributions with Respect to Disputed Claims</u>. Subject to the provisions of this Plan, payments and distributions with respect to each Disputed Claim that ultimately becomes an Allowed Claim, that would have otherwise been made had such Claim been an Allowed Claim on the Effective Date will be made within 60 days after the date that such Disputed Claim becomes an Allowed Claim.  Holders of Disputed Claims, regardless of whether such Disputed Claims becomes Allowed Claims, will be bound, obligated and governed in all respects by the provisions of this Plan.

        11.05.     <u>Prosecution of Objections</u>.  After the Confirmation Date, the Reorganized Debtors shall have the authority to file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**ARTICLE TWELVE**
**DISCHARGE, INJUNCTIONS, RELEASES AND SETTLEMENTS OF CLAIMS**

        12.01.     **Discharge of All Claims and Interests and Releases.**

        (a)      **Except as otherwise expressly provided in this Plan, the confirmation of this Plan (subject to the occurrence of the Effective Date) will discharge the Debtors and the Reorganized Debtors from any Claim that arose before the Confirmation Date and any Claim of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a Proof of Claim is filed or is deemed filed, whether or not such Claim is Allowed and whether or not the Holder of such Claim has voted on this Plan.  Confirmation of this Plan will not discharge any DIP Lender Claims or other DIP Obligations (as that term is defined in the DIP Financing Order and the DIP Original Financing Order) under the DIP Financing Agreement unless and until all such DIP Lender Claims and DIP Obligations (as that term is defined in the DIP Financing Order)**

47

are paid in full, in cash and all Letters of Credit issued under the Prepetition Credit Facility and that were subsequently issued on or after the Filing Date as permitted under the DIP Financing Agreement have been terminated or cash collateralized or supported by a backstop letter of credit or similarly defeased or rolled into the New Working Capital Facility.

(b)     Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by this Plan, the distributions and rights that are provided in this Plan will be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of all Claims and Causes of Action against, liabilities of, liens on, obligations of and Old Holdings Equity Interests in Holdings or Reorganized Holdings or the direct or indirect assets and properties of the Debtors or the Reorganized Debtors, whether known or unknown, regardless of whether a Proof of Claim or interest was filed, whether or not Allowed and whether or not the Holder of the Claim or Old Holdings Equity Interest has voted on this Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Old Holdings Equity Interest, in each case regardless of whether a Proof of Claim or interest was filed, whether or not Allowed and whether or not the Holder of the Claim or Old Holdings Equity Interest has voted on this Plan; provided, however, that notwithstanding the foregoing, nothing in this Plan or the Disclosure Statement is intended to release any insurer from having to provide coverage under any policy to which the Debtors, the Reorganized Debtors, and/or their current or former officers, directors, employees, representatives, or agents are parties or beneficiaries.

(c)     In addition, but in no way limiting the generality of the foregoing, any Holder of a Senior Subordinated Note Claim that votes to accept this Plan, and, to the fullest extent permissible under applicable law, any Holder of a Claim that does not vote to accept the Plan, will be agreeing to the release provisions of this Plan and will be presumed conclusively to have unconditionally and forever released the Debtors, the Reorganized Debtors, the Subsidiaries, the present and former Prepetition Credit Facility Parties, the present and former Prepetition Administrative Agent, the present and former DIP Lenders, the present and former DIP Financing Agent, the present and former DIP Original Financing Agent, the Backstop Parties, the Creditors' Committee, the Senior Note Indenture Trustee, the Senior Subordinated Note Indenture Trustee, the Senior Noteholders, the Senior Subordinated Noteholders, and the present and former members of any of the foregoing (together with the advisory affiliates and advised affiliates of such members) (and each solely in their capacity as such), their respective successors, assigns, and each of their respective affiliates officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities), as well as the Debtors' officers, directors, and employees who hold such positions on the Confirmation Date and any Entity claimed to be liable derivatively through any of the foregoing, from any Cause of Action based on the same subject matter as the Claim on which the distribution is received; provided, however, that the foregoing releases shall not apply to any person or Entity who, in connection with any act or omission

by such person or Entity in connection with or relating to the Debtors or their businesses, has been or is hereafter found by any Final Order or any court or tribunal to have acted with gross negligence or willful misconduct; provided, further, however, that the foregoing releases shall not apply to any Holder of a Senior Subordinated Note Claim if such Holder does not vote to accept the Plan and "opts-out" of the releases provided in this section 12.01(c) herein by a written election pursuant to such Holder's Ballot.

(d) Additionally, except as otherwise specifically provided by this Plan or the Confirmation Order, the confirmation of this Plan (subject to the occurrence of the Effective Date) shall act as a discharge and release of all Causes of Action (including Causes of Action of a trustee and debtor in possession under the Bankruptcy Code) of the Debtors and Reorganized Debtors, whether known or unknown, against (in each case, only in the specified capacity): (i) their present and former directors, shareholders, officers and employees, agents, attorneys, advisors, accountants, financial advisors, and investment bankers; (ii) the present and former Prepetition Administrative Agent and the present and former Prepetition Credit Facility Parties, each in such capacity, and their respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (iii) the present and former Holders of the Senior Notes, each in such capacity, and their respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (iv) the Senior Note Indenture Trustee, in such capacity, and its present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (v) the present and former Holders of the Senior Subordinated Notes, each in such capacity, and their respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (vi) the Senior Subordinated Indenture Trustee, in such capacity, and its present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (vii) the Creditors' Committee and its respective present and former members and the present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities) of each of the Creditors' Committee and their respective present and former members; (viii) each of the Backstop Parties, each in such capacity, and each of the respective Backstop Parties' present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (ix) the present and former DIP Financing Agent, the present and former DIP Original Financing Agent, and the present and former DIP Lenders, each in such capacity, and each of their

respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons and entities); and (x) any Entity claimed to be liable derivatively through any of the foregoing. Notwithstanding the generality of the foregoing, nothing in this Plan shall release any claims of any Debtors or Reorganized Debtors, as the case may be, against any Subsidiaries that are not Debtors or Reorganized Debtors, as the case may be; provided, however, that the foregoing releases shall not apply to any person or Entity who, in connection with any act or omission by such person or Entity in connection with or relating to the Debtors or their businesses, has been or is hereafter found by any court or tribunal by Final Order to have acted with gross negligence or willful misconduct.

12.02. **Exculpation.** The Debtors, the Reorganized Debtors, the present and former Prepetition Credit Facility Parties, the present and former Prepetition Administrative Agent, the present and former DIP Lenders, the present and former DIP Financing Agent, the present and former DIP Original Financing Agent, the Senior Note Indenture Trustee, the Senior Subordinated Note Indenture Trustee, the Senior Noteholders, the Senior Subordinated Noteholders, the Creditors' Committee, each of the Backstop Parties and each of the respective present and former affiliates, officers, directors, shareholders, advisory affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns of the foregoing (including any professionals retained by such persons or entities), will have no liability for any act or omission in connection with, or arising out of, the pursuit of approval of the Rights Offering, the Disclosure Statement, this Plan or the CCAA Plan, or the solicitation of votes for or confirmation of this Plan or the CCAA Plan, or the consummation of this Plan and implementation of the CCAA Plan, or the transactions contemplated and effectuated by this Plan or the CCAA Plan or the administration of this Plan or the CCAA Plan or the property to be distributed under this Plan or the CCAA Plan, or any other act or omission during the administration of the Debtors' Estates or in contemplation of the Chapter 11 Cases or the CCAA Proceeding except for gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court, and in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

12.03. **Injunction.** Sections 12.01 and 12.02 of this Plan and this section 12.03 will also act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim, Interest or Cause of Action satisfied, released or discharged under this Plan. Notwithstanding any other provision of this Plan or the Confirmation Order, Confirmation of this Plan shall not enjoin or extinguish any Creditor's rights of setoff or recoupment, if any, to the extent that such Creditor has a valid Claim and a valid right of recoupment or setoff under applicable state or federal law (including, without limitation, the Bankruptcy Code). Without limiting the applicability of the foregoing, (a) mutuality shall be required for any setoff and (b) no creditor may setoff (i) any prepetition Claim against any postpetition obligation owed to any of the Debtors or (ii) any postpetition claim against any prepetition obligation owed to any of the Debtors. Nothing herein shall constitute any admission by any of the Debtors that any Creditor has a valid right of setoff or right of recoupment under applicable state

or federal law (including the Bankruptcy Code); and, **provided, further,** that any and all defenses of the Debtors and/or Reorganized Debtors with respect to any such asserted right of setoff or right of recoupment and to challenge the assertion of any such right of setoff or recoupment are hereby preserved in their entirety.

### 12.04. <u>Guarantees and Claims of Subordination</u>

(a) <u>Guarantees</u>. The classification and the manner of satisfying all Claims under this Plan take into consideration (i) the possible existence of any alleged guarantees by the Debtors of obligations of any Entity or Entities, and (ii) that the Debtors may be joint obligors with another Entity or Entities with respect to the same obligation. The Holders of Claims will be entitled to only one distribution with respect to any given obligation of the Debtors under the Plan.

(b) <u>Claims of Subordination</u>. Except as specifically provided herein, to the fullest extent permitted by applicable law, all Claims and Old Holdings Equity Interests, and all rights and claims between or among Holders of Claims or Old Holdings Equity Interests relating in any manner whatsoever to Claims or Old Holdings Equity Interests, based on any contractual, equitable or legal subordination rights, will be terminated on the Effective Date and discharged in the manner provided in this Plan, and all such Claims, Old Holdings Equity Interests and rights so based and all such contractual, equitable and legal subordination rights to which any Entity may be entitled will be irrevocably waived upon the Effective Date. To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under this Plan will not be subject to levy, garnishment, attachment or like legal process by any Holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination rights, so that, notwithstanding any such contractual, equitable or legal subordination rights, each Holder of a Claim or Equity Interest will have and receive the benefit of the rights and distributions set forth in this Plan.

### 12.05. <u>Survival of Indemnification Obligations</u>. Notwithstanding anything to the contrary contained in this Plan, subject to the occurrence of the Effective Date, the Reorganized Debtors shall honor the Debtors' obligations to indemnify their directors, officers, agents, employees and representatives serving in such capacity on the Filing Date pursuant to their respective certificates of incorporation, by-laws, contractual obligations or any applicable laws in respect of all past, present and future actions, suits and proceedings against any of such directors, officers, agents, employees and representatives based upon any act or omission that occurred while such director, officer, agent, employee or representative was employed by or provided services to the Debtors, and that was related to service with, for, or on behalf of the Debtors.

### ARTICLE THIRTEEN
### CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

13.01. <u>Conditions to Entry of the Confirmation Order</u>. The following conditions must occur and be satisfied or waived in accordance with section 13.03 of this Plan by the applicable Debtor on or prior to the Confirmation Date:

(a)    Disclosure Statement. The Disclosure Statement Approval Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Required Backstop Parties and the Creditors' Committee;

(b)    Plan Documents and Agreements. All documents and agreements contemplated by, related to or necessary to this Plan shall be satisfactory to the applicable Debtor and shall be in form and substance reasonably satisfactory to the Required Backstop Parties as and to the extent required by the Equity Commitment Agreement and such other party as provided under the Plan;

(c)    The Rights Offering and Equity Commitment Approval Order. The Rights Offering and Equity Commitment Approval Order shall have become a Final Order in form and substance reasonably satisfactory to the Required Backstop Parties;

(d)    The Equity Commitment Agreement. The Equity Commitment Agreement shall continue to be in full force and effect and the conditions and the obligations of the parties thereto shall have been satisfied or waived in accordance therewith; and

(e)    New Working Capital Credit Facility Documents and New Secured Debt Facility Documents. The Debtors must have received a firm written commitment for the New Working Capital Credit Facility and the New Secured Debt Facility in form and substance reasonably satisfactory to the Required Backstop Parties.

13.02.    Conditions to Effective Date. The following conditions must occur and be satisfied or waived in accordance with section 13.03 of this Plan by the applicable Debtor, or as applicable, the Required Backstop Parties, on or before the Effective Date for this Plan to be effective on the Effective Date:

(a)    Confirmation Order. The Confirmation Order shall have become a Final Order in form and substance reasonably satisfactory to the Required Backstop Parties and the Creditors' Committee; provided, however, that any provision in the Confirmation Order that is inconsistent with this Plan or the Equity Commitment Agreement or any exhibits to either of the foregoing and is in any way materially adverse to the Backstop Parties, the Senior Noteholders, the Senior Subordinated Noteholders, the New Preferred Stock and/or the New Common Stock, shall be subject to the consent of the Required Backstop Parties and shall be in form and substance reasonably satisfactory to the Creditors' Committee.

(b)    The Equity Commitment Agreement. The Equity Commitment Agreement shall continue to be in full force and effect, and the conditions to the obligations of the parties thereto shall have been satisfied or waived in accordance therewith;

(c)    Rights Offering.

(i)    The Rights Offering shall have been conducted and consummated in accordance with this Plan, the Equity Commitment Agreement and the Rights Offering Procedures;

(ii)     The Rights Offering Amount shall have been received by the Debtors;

(iii)     The Backstop Parties shall have received the Backstop Warrants, the Holdback Shares and the Rights Offering Shares, if any, in accordance with the terms and conditions of the Equity Commitment Agreement, the Plan and the Rights Offering Procedures;

(iv)     Eligible Noteholders shall have received their respective Rights Offering Shares in accordance with the terms and conditions of the Plan and the Rights Offering Procedures; and

(v)     All fees and expenses due and owing by the Debtors pursuant to the Equity Commitment Agreement and the Rights Offering and Equity Commitment Approval Order shall have been paid, in full and in Cash, without the need for the Backstop Parties to file retention or fee applications with the Bankruptcy Court.

(d)     Authorizations, Consents and Approvals. All authorizations, consents and regulatory approvals in connection with the consummation of this Plan shall have been obtained and not revoked;

(e)     New Credit Facility Documents. All conditions to the New Working Capital Facility Documents and the New Secured Debt Facility Documents (both of which must comply with the requirements of the Equity Commitment Agreement), other than the occurrence of the Effective Date of this Plan, must have been satisfied or waived (such waiver requiring, respectively, the consent of the requisite lenders thereto) pursuant to the terms thereof;

(f)     Subsidiary Debtor General Unsecured Claims. Subsidiary Debtor General Unsecured Claims (excluding the Senior Note Claims and the Senior Subordinated Note Claims) shall not exceed $33 million;

(g)     CCAA Plan of Arrangement. The CCAA Plan shall have become effective in accordance with its terms, the Sanction Order and the CCAA, and the Sanction Order shall have become a Final Order;

(h)     Cooper Tire L/C: The Cooper Tire L/C, if required to be issued pursuant to the terms of the Cooper Tire Settlement Agreement, shall have been issued in accordance with the terms of Cooper Tire Settlement Agreement; and

(i)     Issuance of New Capital Stock and New Capital Warrants. The Debtors shall have issued the New Capital Stock and the New Capital Warrants pursuant to the provisions of this Plan.

13.03.     Waiver of Conditions. Notwithstanding anything to the contrary that may be set forth in the lead in to Section 13.01 of this Plan, the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Consenting Backstop Parties, which shall not be unreasonably withheld, and after consultation with the Creditors' Committee, may waive one or more of the conditions precedent to the confirmation or effectiveness of this Plan set forth in

sections 13.01 and 13.02 of this Plan, other than the conditions contained in section 13.01(d) and (e) and section 13.02(b), (c) and (d), without any other notice to parties in interest or the Bankruptcy Court and without a hearing; provided, however, that the conditions set forth in sections 13.01(a) and (b) and 13.02(a), (c)(i), (c)(ii) and (c)(iv) may only be waived by the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Creditors' Committee and the Consenting Backstop Parties, which consent shall not be unreasonably withheld.

13.04.    Effect of Failure of Conditions.  If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 180 days after the date the Bankruptcy Court enters the Confirmation Order, or by such later date as is proposed by the Debtors (with the consent of the Consenting Backstop Parties, which shall not be unreasonably withheld), and approved, after notice and a hearing, by the Bankruptcy Court, then upon motion by the Debtors (after consultation with the Consenting Backstop Parties and the Creditors' Committee) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this section 13.04, this Plan will be null and void in all respects, and nothing contained in this Plan will (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors or (b) prejudice in any manner the rights of the Holder of any Claim or Equity Interest in the Debtors.

## ARTICLE FOURTEEN
## MISCELLANEOUS PROVISIONS

14.01.    Court to Retain Jurisdiction.  The business and assets of the Debtors shall remain subject to the jurisdiction of the Bankruptcy Court until the Effective Date.  From and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction of all matters arising out of, and related to the Chapter 11 Cases or this Plan pursuant to, and for purposes of, subsection 105(a) and section 1142 of the Bankruptcy Code and for, among other things, to:

(a)    Determine any and all disputes relating to Administrative Expenses, Claims and Equity Interests, including the allowance and amount thereof, and any right to setoff;

(b)    Determine any and all disputes among creditors with respect to their Claims;

(c)    Determine any and all objections to cure amounts required pursuant to section 8.02 of this Plan;

(d)     Consider and allow any and all applications for compensation for professional services rendered and disbursements incurred up to and including the Confirmation Date in connection therewith;

(e)     Determine any and all applications, motions, adversary proceedings and contested or litigated matters pending on the Effective Date and arising in or related to the Chapter 11 Cases or this Plan;

(f)     Remedy any defect or omission or reconcile any inconsistency in this Plan or the Confirmation Order;

(g)     Enforce the provisions of this Plan relating to the distributions to be made hereunder;

(h)     Issue such orders, consistent with section 1142 of the Bankruptcy Code, as may be necessary to effectuate the consummation and full and complete implementation of this Plan;

(i)     Enforce and interpret any provisions of this Plan;

(j)     Determine such other matters as may be set forth in the Confirmation Order or that may arise in connection with the implementation of this Plan;

(k)     Determine the amounts allowable as Administrative Expenses pursuant to section 503(b) of the Bankruptcy Code;

(l)     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Rights Offering and any agreements or documents necessary to effectuate the terms and conditions of this Plan, or any orders entered by the Bankruptcy Court during the pendency of the Chapter 11 Cases;

(m)     Hear and determine any issue for which this Plan or any document related to or ancillary thereto requires a Final Order of the Bankruptcy Court;

(n)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     Hear and determine any issue related to the composition of the new Board of Directors of each of the Reorganized Debtors;

(p)     Hear any other matter not inconsistent with the Bankruptcy Code; and

(q)     Enter a final decree closing the Chapter 11 Cases.

14.02.     Binding Effect of this Plan.  The provisions of this Plan will be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, any Holder of a Claim or Equity Interest, their respective predecessors, successors, assigns, agents, officers and directors

and any other Entity affected by this Plan. Except as expressly set forth therein, nothing in this Plan is intended to affect or will affect any rights or interests of the DIP Lenders, the DIP Financing Agent, the DIP Original Financing Agent, the Prepetition Credit Facility Parties, or the Prepetition Administrative Agent under the DIP Financing Agreement, the DIP Original Financing Agreement, the DIP Financing Order, or the DIP Original Financing Order, including, without limitation, any waivers, releases, or stipulations contained therein.

14.03.    Authorization of Corporate Action. The entry of the Confirmation Order shall constitute a direction and authorization to and of the Debtors or the Reorganized Debtors, as the case may be, to take or cause to be taken any corporate action necessary or appropriate to consummate the provisions of this Plan prior to and through the Effective Date (including the filing of the Reorganized Debtors' Certificates of Incorporation), and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court. Any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, including the approval of the Reorganized Debtors' Certificates of Incorporation by the requisite number of stockholders of each Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred and shall be effective as provided in this Plan and shall be authorized and approved in all respects without any requirement of further action under applicable law, regulation, order, or rule, including any action by the security holders or directors of the Debtors or the Reorganized Debtors.

14.04.    Modification of this Plan. This Plan may be altered, amended or modified by the Debtors, before or after the Confirmation Date, as provided in section 1127 of the Bankruptcy Code; provided, however, that no such alterations, amendments or modifications shall be made without the consent of the Consenting Backstop Parties and the Creditors' Committee, which shall not be unreasonably withheld. A Holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder.

14.05.    Withdrawal of this Plan. The Debtors reserve the right at any time prior to the entry of the Confirmation Order, with the consent of the Consenting Backstop Parties and the Creditors' Committee, which shall not be unreasonably withheld, to revoke or withdraw this Plan. If the Debtors revoke or withdraw this Plan then this Plan will be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other person, or an admission against interests of the Debtors, nor shall it prejudice in any manner the rights of the Debtors or any person in any further proceeding involving the Debtors.

14.06.    Captions. Article and Section captions used in this Plan are for convenience only and will not affect the construction of this Plan.

14.07.    Nonvoting Stock. In accordance with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors' Certificates of Incorporation will contain a provision prohibiting the issuance of nonvoting equity securities by each of the Reorganized Debtors, subject to further amendment of such Reorganized Debtor's Certificate of Incorporation as permitted by applicable law.

14.08.    Dissolution of the Committee.  On the Effective Date, all Committees shall cease to exist and their members and employees or agents (including attorneys, investment bankers, financial advisors, accountants and other professionals) shall be released from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases and no subsequent fees will accrue to any Committee, other than in connection with any application for final allowance of compensation and reimbursement of expenses in accordance with section 2.01 of this Plan; provided, however, that following the Effective Date, the Creditors' Committee shall continue to have standing and a right to be heard with respect to: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date; and (iii) responding to creditor inquiries for forty-five (45) days following the Effective Date.  All reasonable and documented fees and expenses incurred by counsel retained by the Creditors' Committee in connection therewith (other than with regard to any appeal of the Confirmation Order that the Committee is prosecuting or supporting) shall be paid by the Reorganized Debtors without the requirement of any further order of the Bankruptcy Court.

14.09.    Record Date for Voting Purposes.  For purposes of determining the Holders of Claims and interests who are entitled to vote on this Plan, the record date shall be the date that the Court enters the Order approving the Disclosure Statement or such other date as determined by the Court in such Order.

14.10.    Method of Notice.  All notices required to be given under this Plan, if any, will be in writing and will be sent by first class mail, postage prepaid, or by a nationally recognized overnight courier:

If to the Debtors to:

Cooper-Standard Automotive Inc.
39550 Orchard Hill Place Drive
Novi, Michigan 48375
Attn.:  Timothy Hefferon (Vice President, General Counsel)

with copies to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York  10004-1980
Attn.:  Gary L. Kaplan, Esq.
         Richard J. Slivinski, Esq.
         Peter B. Siroka, Esq.

and

Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19899
Attn.: Mark D. Collins, Esq.
       Michael J. Merchant, Esq.
       Chun I. Jang, Esq.
       Drew G. Sloan, Esq.

If to the Creditors Committee to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn.: Robert T. Schmidt, Esq.
       Kenneth H. Eckstein, Esq.
       Stephen D. Zide, Esq.

       and

Young Conaway Stargatt & Taylor, LLP
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801
Attn.: M. Blake Cleary, Esq.


If to the DIP Lenders, the DIP Financing Agent, the DIP Original Financing
Agent, the Prepetition Lenders or the Prepetition Agent to:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005
Attn.: Abhilash M. Raval, Esq.
       Brian Kinney, Esq.

       and

Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attn.: Robert J. Dehney, Esq.

If to the Backstop Parties to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn.: Timothy Graulich, Esq.
        Brian M. Resnick, Esq.

     and

Bayard, P.A.
222 Delaware Avenue
Suite 900
Wilmington, Delaware 19899
Attn.: Charlene D. Davis, Esq.

     and

Akin, Gump, Strauss, Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn.: Daniel H. Golden, Esq.
        Arik Preis, Esq.

     and

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899
Attn: Curtis A. Hehn, Esq.

Any of the above may, from time to time, changes its address for future notices and other communications hereunder by filing a notice of the change of address with the Court. Any and all notices given under this Plan will be effective when received.

    14.11.    Section 1125(e) of the Bankruptcy Code.

    (a)    The Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon confirmation of this Plan will be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

    (b)    The Debtors, each of the members of any Committee, and each of the Backstop Parties (and each of their respective Affiliates, agents, directors, officers, principals, members, employees, representatives, advisors, attorneys and other professionals) have, and upon confirmation of this Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the New Capital Stock under this Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or

regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

14.12. <u>Post-Confirmation Obligations</u>. The Reorganized Debtors will pay fees assessed against each of the Debtors' Estates until entry of an order closing the respective Chapter 11 Cases.

14.13. <u>Severability of Plan Provisions</u>. If, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of Debtors, which request shall be made in accordance with section 14.04 of this Plan, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Subject to section 14.04 of this Plan and Bankruptcy Rule 3019, notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.14. <u>Successors and Assigns</u>. The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor or assign of such entity.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated: Novi, Michigan
March ~~19,~~26, 2010

Respectfully submitted,

Cooper-Standard Holdings Inc. (for itself
and on behalf of each of the other Debtors)

J. Campbell

By: _____ /s/ Allen

Allen J. Campbell

Vice President and Chief Financial Officer

RICHARDS, LAYTON & FINGER, P.A.

_____

Mark D. Collins (Bar No. 2981)
Michael J. Merchant (Bar No. 3854)
Chun I. Jang (Bar No. 4790)
Drew G. Sloan (Bar No. 5069)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
Gary L. Kaplan, Esq.
Richard J. Slivinski, Esq.
Peter B. Siroka, Esq.
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000

*Counsel for Debtors and
Debtors in Possession*

## Schedule 8.1

## Rejected Executory Contracts or Unexpired Leases

Exhibit A

Form of Certificate of Designations

# Exhibit B

Term Sheet regarding Management Compensation

Exhibit C

Warrant Term Sheet

Exhibit D

Form of Second Amended and Restated Certificate of Incorporation

Exhibit E

Form of Amended and Restated By-Laws

# Exhibit F

## Rights Offering Procedures~~Schedule 8.1~~

~~Rejected Executory Contracts or Unexpired Leases~~